**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

                              **CASE NO. 17-CV-00070**

vs.

WALMART STORES EAST, LP,

        Defendant.

---

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56**

---

Respectfully submitted by,

MWH Law Group LLP

By: /s/ Warren E. Buliox

Emery K. Harlan
State Bar No. 1000240
Warren E. Buliox
State Bar No. 1056215
735 N. Water Street, Suite 610
Milwaukee, WI 53202
(414) 436-0353 Phone
(414) 436-0354 Facsimile
emery.harlan@mwhlawgroup.com
warren.buliox@mwhlawgroup.com

**COUNSEL FOR DEFENDANT WALMART STORES EAST, LP**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BRIEF SUMMARY OF FACTS ........................................................................................3

THE STANDARD FOR SUMMARY JUDGMENT ......................................................4

ARGUMENT ........................................................................................................................5

   A. WALMART IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THE EEOC CANNOT MEET ITS BURDEN OF SHOWING THAT MS. SPAETH IS A QUALIFIED INDIVIDUAL WITH A DISABILITY UNDER THE ADA ..............................................................................................5

      1. Attendance Was an Essential Function of Ms. Spaeth's Job .........................................7

      2. Ms. Spaeth's Alleged Inability to Report and Stay at Work on a Consistent Basis Because of Her Medical Condition Meant that She Could Not Perform an Essential Element of Her Job and Rendered Her Unqualified for Her Position at Walmart ........9

      3. Plaintiff's Proposed Accommodation Would Not Have Changed Ms. Spaeth's Ability to Come to Work on a Consistent and Reliable Basis and Therefore Would Not Have Enabled Her to Perform Her Job..................................................................................13

      4. The EEOC's Proposed Accommodation Would Have Required Someone Else to Perform the Essential Functions of Ms. Spaeth's Position During Critical Times of the Work Day and is Not Reasonable As a Matter of Law..............................................15

      5. Plaintiff's Proposed Accommodation of Permanently Restructuring Ms. Spaeth's Work Schedule Would Have Created an Undue Burden by Requiring Walmart to Permanently Schedule Ms. Spaeth Outside of Business Need and Accordingly Is Not a Reasonable Accommodation as a Matter of Law ........................................................18

   B. EVEN IF THE COURT WERE TO FIND A TRIABLE ISSUE ON THE QUALIFIED INDIVIDUAL WITH A DISABILITY ISSUE, DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S REASONABLE ACCOMMODATION, TERMS AND CONDITIONS, TERMINATION AND FAILURE TO REHIRE CLAIMS ..............................................................................................................20

      1. There is Nothing Connecting Ms. Spaeth's Down Syndrome to Her Ability to Come to Work or a Need for a Reasonable Accommodation As It Relates to Her Work Schedule ..................................................................................................................20

      2. Plaintiff's Terms and Conditions and Termination Claims Are Wholly Without Merit and Walmart is Entitled to Summary Judgment on the Same ....................................23

      3. Plaintiff's Failure to Rehire Claim Also Fails Because the ADA is Not a Second Chance Statute and Because the Claim Otherwise Lacks Merit.............................................27

i

C. Even Assuming That This Court Were to Deny Walmart's Motion for Summary Judgment, Walmart is Entitled to Judgment on Any Punitive Damages Claim Advanced by the EEOC. .................................................................................................29

**CONCLUSION** .................................................................................................30

Case 1:17-cv-00070-WCG   Filed 05/17/19   Page 3 of 34   Document 93

# INTRODUCTION

[T]he critical question is whether an "essential function" of [the employee's] regular full-time position with [the employer] was regular attendance, and if so, did he fulfill that "essential function." Also, the fact that [the employer] had infinite patience [with regard to Nicosia's poor attendance] does not necessarily mean that every company must put up with employees who do not come to work. . . .The issue before us is, when is enough, enough? [Citation omitted.]

At the outset, let us be clear that our court, and every circuit that has addressed this issue, has held that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs.

*EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 948 (7th Cir. 2001).

With this and similar case law, courts throughout the Seventh Circuit (and in other circuits) portended the basis on which Plaintiff Equal Employment Opportunity Commission ("EEOC") litigates this case. The EEOC, bringing this action on behalf of former associate (employee) Marlo Spaeth, alleges that Ms. Spaeth has Down Syndrome and needed a modified work schedule in order to perform her job, and that Walmart failed to reasonably accommodate her with a modified schedule, subjected her to unfair discipline, terminated her employment because of her medical condition and then declined to rehire or reinstate her after her discharge, all in violation of the Americans with Disabilities Act ("ADA"), as amended. Yet, Ms. Spaeth was not able to come to work, or stay at work, on a regular, reliable basis, even if the modified work schedule the EEOC proposes as an accommodation was hypothetically put into place. Accordingly, and as a matter of law, she was not a qualified individual with a disability, Walmart was not obligated to accommodate her and any claims of disability discrimination the EEOC advances in this case fail.

This is not the only problem with the EEOC's case. For instance, the agency offers nothing more than theoretical constructs and supposition in support of its claim that Ms. Spaeth needed a modified work schedule *because of* her Down Syndrome. It argues that Ms. Spaeth, whose work

1

schedule changed in November 2014, needed the accommodation of being returned to her previous work schedule because people with Down Syndrome cannot adjust to change. There is no admissible medical evidence in the record to support that this was the case with Ms. Spaeth in particular, and the expert the EEOC proofers on this issue relies only on non-peer reviewed material and on generalizations.[1]

At any rate, the modified work schedule the EEOC proposes would not have changed anything, as it is undisputed that Ms. Spaeth failed to come or stay at work on a consistent, predictable basis even if the modified schedule would have been applied during the period in question. The accommodation the EEOC proposes would not have been effective, and is of no moment.

Regardless, accommodating Ms. Spaeth in such a matter would have created an undue burden for Walmart as it would have, for example, required Walmart to engage and pay for an Associate during times when the Associate was not needed (as determined by business need) and as it would have resulted in lapses in Walmart's ability to meet customer and operating demand. Moreover, during the times in which no one was working in Ms. Spaeth's area because she was not at work, Walmart had to engage Ms. Spaeth's co-workers from other areas in the store to pick up the load and perform Ms. Spaeth's essential job functions for her, which as a matter of law is not a reasonable accommodation.

As for the EEOC's terms and conditions, termination and failure to rehire claims, there is no evidence in the record of a single similarly situated associate who was treated less favorably

---

[1] Walmart anticipates that the EEOC will oppose this motion. If, in its opposition, the EEOC cites to and relies on the opinion of its expert, Walmart anticipates opposing that opinion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The EEOC's expert's opinion lacks scientific methodology, is based on incomplete or inaccurate facts, and relies on non-peer reviewed material. It is speculative and unreliable. The agency's expert is also not qualified to assess and speak to Ms. Spaeth's ability to adapt to change at work in 2014 and 2015.

than Ms. Spaeth and, given Ms. Spaeth's undisputed attendance record at Walmart, there is nothing from which a reasonable jury can conclude that it was Ms. Spaeth's medical condition, as opposed to her excessive absenteeism, that led to the decision to terminate Ms. Spaeth and then not reinstate her after her discharge. Whatever rhetorical appeals to sympathy the EEOC may implore does not change the undisputed fact that Ms. Spaeth had *17 attendance occurrences* (during a time when Walmart policy only allowed for 7 attendance occurrences) before she was discharged for excessive absenteeism. Walmart's actions toward Ms. Spaeth were legitimate and non-discriminatory. Enough was enough.

For these and for all the reasons stated herein, the EEOC claims under the ADA fail as a matter of law and Walmart is entitled to judgment as a matter of law.

## BRIEF SUMMARY OF FACTS[2]

Marlo Spaeth worked as a Sales Associate for Walmart at its Manitowoc, Wisconsin store (the "Manitowoc Store") from 1999 to July 10, 2015, when she was discharged for excessive absenteeism. (DPFOF at ¶¶ 1-2.) For a large portion of her employment, Ms. Spaeth was scheduled to work from 12:00 pm to 4:00 pm, a few days a week. (*Id*. at ¶ 34.) In November 2014, Walmart had its Manitowoc Store switch to automated computer-based scheduling. (*Id*. at ¶¶ 42-48.) This automated scheduling system was based on analytics of customer traffic, and was designed to ensure Associates (employees) were in place in the proper areas and the proper time to adequately meet customer demand and operating demand. (*Id*.)

On November 24, 2014, Ms. Spaeth's schedule changed to 1:00 pm to 5:30 pm as a result of this automated scheduling system. (*Id*. at ¶ 50.) Both before and after this schedule change, Ms.

---

[2] **Walmart adopts in full and incorporates by reference its contemporaneously filed Defendant's Proposed Findings of Facts ("DPFOF") as to which there is no genuine issue and entitle Defendant to judgment as a matter of law.**

3

Spaeth struggled with attendance. (*Id*. at ¶¶ 35-36, 55-61, 63-73, 77-80.)  For instance, between January 9, 2012 and November 21, 2014, Ms. Spaeth had **over 100 occasions** where she left work early (defined by Walmart policy as leaving work 10 minutes or more prior to the end of a schedule shift) and several absences. (*Id*. at ¶ 35.)  Ms. Spaeth's leave earlies were largely, but not entirely, approved or otherwise not counted against her. (*Id*.)

After her schedule change, this pattern continued for the remainder of 2014 and into 2015. In 2014, Julie Stern, an Assistant Manager at the Manitowoc Store, became Ms. Spaeth's supervisor. (*Id*. at ¶ 32.)  While Ms. Stern excused several of Ms. Spaeth's attendance infractions initially, she eventually held Ms. Spaeth accountable for her attendance violations and issued Ms. Spaeth two (2) written reprimands. (*Id*. at ¶ 57, 65, 73.)  Ms. Spaeth's attendance did not improve and, eventually, she was discharged for excessive absenteeism. (*Id*. at ¶¶ 67-80.)  At the time of her discharge, Ms. Spaeth amassed four **(4) no-call/no shows** and **39 incomplete shifts/leave earlies** over the course of a six (6) month period, which Walmart calculated amounted to **17 attendance occurrences** under its attendance policy. (*Id*.) Walmart policy called for termination after 7 occurrences.  (*Id*. at ¶¶ 18 and 81.)  Enough was enough.

## THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment may appropriately be entered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The United States Supreme Court has ruled that a moving party is entitled to judgment as a matter of law when the non-moving party fails to establish the "existence of an element essential to [its] case, and on which [it] will bear the burden of proof at

4

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Summary judgment is thus "designed to head off a trial if the opposing party 'does not have a reasonable prospect of prevailing before a reasonable jury -- that is, a jury that will base its decision on facts and the law, rather than on sympathy or antipathy or private notions of justice.'" *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir. 1991) (*quoting Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

A motion for summary judgment cannot be defeated by the nonmoving party through mere conclusory allegations. A nonmoving party must show that there is more than "'some metaphysical doubt as to the material facts'" in order to avoid summary dismissal. *Johnson v. Univ. of Wisconsin-Eau Claire, et. al.*, 70 F.3d 469, 477 (7th Cir. 1995) (*quoting Matsushitu Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "[T]he mere existence of *some* alleged factual dispute . . . will not defeat . . . summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

## ARGUMENT

### A. WALMART IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THE EEOC CANNOT MEET ITS BURDEN OF SHOWING THAT MS. SPAETH IS A QUALIFIED INDIVIDUAL WITH A DISABILITY UNDER THE ADA.

The Americans with Disabilities Act ("ADA" or the "Act") only affords protection to a "qualified individual" which the Act defines as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 USC § 12112(a); 42 USC § 12111(8); *Basith v. Cook Cty*, 241 F.3d 919, 927 (7th Cir. 2001). The EEOC bears the burden of establishing that Ms. Spaeth is a qualified individual with a disability. *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d

5

558, 563-564 (7th Cir. 2000). This requires evidence that: (i) Ms. Spaeth possess the requisite knowledge, skill, experience, etc. for the job at issue and (ii) Ms. Spaeth "can perform the essential functions of the position held or desired, with or without reasonable accommodations." *Budde v. Kane County Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996).

As is pertinent to Plaintiff's claims in this action, the term "reasonable accommodation" means:

> modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, *that enable an individual with a disability who is qualified to perform the essential functions of that position*.

29 C.F.R. § 1630.2(o)(1)(i-iii) (1997) (italics added). It is axiomatic that employers are not required to provide accommodations to employees who are not qualified, that is, unable to perform the essential functions of the job with or without reasonable accommodations. Accordingly, the ADA does not require employers to keep employees who cannot perform the essential functions of their positions with or without reasonable accommodations. It is also well established that in complying with its duty to provide reasonable accommodation to qualified individuals with a disability, an employer does not have to eliminate an essential function, i.e., a fundamental duty, of the position. This is precisely because a person with a disability who is unable to perform the essential functions, with or without reasonable accommodations, is *not* a "qualified" individual with a disability within the meaning of the ADA. With or without reasonable accommodations, Ms. Spaeth was unable to perform a critically essential function of her job – regular attendance – and was therefore not a qualified individual with a disability for purposes of the ADA.

6

1.  Attendance Was an Essential Function of Ms. Spaeth's Job.

The Seventh Circuit has counseled that in determining the essential functions of a position, courts "look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013) (citation omitted); *see also Basith*, 241 F.3d at 927. Courts generally "do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *DePaoli v. Abbot Laboratories*, 140 F.3d 668, 674 (7th Cir. 1998).

As it relates to attendance, the Seventh Circuit has held that "[c]ommon sense dictates that regular attendance is usually an essential function in most every employment setting," and that this is especially true when the "work must be done on the employer's premises." *Javanovic v. In-Sink-Erator*, 201 F.3d 894, 899-900 (7th Cir. 2000); *also see Yellow Freight*, 253 F.3d at 948 ("in most cases, attendance at the job site is a basic requirement of most jobs"); *Adams v. Forest Pres. Dist.*, 2006 U.S. Dist. LEXIS 41758 at *17-18 (N.D. Ill. 2006) (noting that "[t]he Seventh Circuit has held that, subject to a few exceptions such as that of a substitute school teacher, regular attendance is a basic and essential function of every job.") (citations omitted).

This Court has addressed the issue of attendance as an essential job function as well. In *Guzman v. Brown Cty.*, 2016 U.S. Dist. LEXIS 188515 at *18-19 (E.D. Wis. 2016) (Chief Judge William C. Griesbach), the plaintiff in that case offered several arguments in support of the proposition that attendance was not an essential function of his job, including but not limited to an argument that it could not have been an essential function because it was not listed in his job description. In rejecting each of plaintiff's arguments, the Court noted, among other items, Seventh Circuit precedent that "employer[s] are generally permitted to treat regular attendance as an

7

essential job requirement" and that, while the attendance was not listed as an essential function of the plaintiff's job, most of the duties of the job required attendance at work. *Id*. at 19. The Court also specifically noted that "[t]he ADA provides that consideration shall be given to the employer's judgment as to what functions of a job are essential.'" *Id. at \*19; citing Taylor-Novotny v. Health All. Med. Plans, Inc*., 772 F.3d 478, 490 (7th Cir. 2014).

Here, there can be no genuine dispute that attendance was an essential function of Ms. Spaeth's job. While her job description does not expressly reference attendance, Walmart's Field Attendance and Punctuality Policy does, specifically providing that "regular and punctual attendance is a required and essential function of each associate's job." (DPFOF at ¶ 14.)

Moreover, Ms. Spaeth last worked for Walmart as an Apparel/Homes Sales Associate at the Manitowoc store where she was responsible for maintaining the presentation of merchandise in the store, arranging and organizing merchandise in the store, handling in-store merchandise returns, and providing customer service by acknowledging the customer and assisting with the shopping experience, among other duties. (DPFOF at ¶¶ 24-25.)[3] According to the EEOC in its discovery responses, "[s]he was responsible for folding towels, tidying the aisles and helping customers locate items." (*Id*. at ¶ 23.) As she could not do any of this if she was not in the store, her physical attendance at work was a critical, essential component of her job. On this point, this Court's analysis in *Guzman* is particularly instructive:

> Guzman argues that she was a qualified individual because "[a]ttendance was not an essential function of Plaintiff's job." Pl.'s Br. in Opp. 19, ECF No. 33. Guzman's argument is meritless. The Telecommunication Operator position involves being at a station answering emergency calls and dispatching critical services to the Brown County community. Without her attendance, the calls do not get answered, the emergency services do not get dispatched, and the job does not get done. Guzman's

---

[3] *See* the delineated "Essential Functions" in the Job Description for an "Apparel/Home Sales Associate." (DPFOF at ¶ 25.)

> attendance is absolutely required at work, or else someone else has to perform her
> job for her.

*Guzman*, 2016 U.S. Dist. LEXIS 188515 at *18. The same applies in this case and Walmart respectfully submits that the Court should find that attendance was an essential function of Ms. Spaeth's job.

Of note, Walmart has policies and procedures in place that govern how attendance issues are addressed. (DPFOF at ¶¶ 14-19.) These policies and procedures provide detail guidance and instruction for managers for tracking, logging and holding associates accountable for attendance issues, and set clear expectations for associates as it relates to unacceptable attendance. (*Id*.) Walmart expects its managers to follow these policies and hold its associates accountable. (*Id*.) Ms. Spaeth's last manager, Manitowoc Store Julie Stern, did this when she disciplined Ms. Spaeth for not meeting Walmart's attendance expectations. (*Id*. at ¶¶ 65 and 73.) While the EEOC disputes whether Ms. Spaeth should have been held accountable for her attendance issues, there can be no genuine dispute that Walmart (and Ms. Stern) expected regular and predictable attendance from Ms. Spaeth and that the written discipline Ms. Spaeth received cited her attendance as a concern for Walmart. (*Id*.) Under these additional circumstances, attendance should be considered an essential function of Ms. Spaeth's job.

2. Ms. Spaeth's Alleged Inability to Report and Stay at Work on a Consistent Basis Because of Her Medical Condition Meant that She Could Not Perform an Essential Element of Her Job and Rendered Her Unqualified for Her Position at Walmart.

The EEOC alleges in its Complaint that Ms. Spaeth, because of her disability, was unable to maintain the work schedule assigned to her by Walmart's automated scheduling system. (Dkt. # 1 at ¶15-16, 19.) Assuming for the sake of argument that that is true and taking into consideration undisputed facts concerning Ms. Spaeth's actual attendance, Ms. Spaeth cannot be considered qualified for her position at Walmart as a matter of law.

9

As the Seventh Circuit has explained, employers are "generally permitted to treat regular attendance as an essential job requirement" and a "plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). The ADA does not excuse employees from not working. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017). If a person is unable to work and do his/her job, that person is not qualified for the job. *See Id.* This commonsense notion that a person who cannot come to work because of a disability is not a "qualified individual" for ADA purposes is not unique to this Circuit. *See e.g. Nesser v. TWA*, 160 F.3d 442, 445 (8th Cir. 1998) (holding that the plaintiff "did not establish that he could perform the essential functions of his job without accommodation because he was unable to attend work on a regular basis); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) ("Because [the plaintiff] could not attend work, he [was] not a 'qualified individual with a disability' under the ADA.")

Here, Walmart's automated scheduling system scheduled Ms. Spaeth to work from 1:00 pm to 5:30 pm, starting in November 2014. (DPFOF at ¶ 50.) According to the EEOC, she could not work this schedule because of her disability. (Dkt. # 1 at ¶ 19.) As the EEOC contends that she (allegedly) could have worked from noon to 4:00 pm during this time, this meant at the very least that Ms. Spaeth was unavailable for work every day from 4:00 pm to 5:30 pm on a permanent basis because of her disability.

While the EEOC argues that Ms. Spaeth could have worked her old schedule (from noon to 4:00 pm) during the material time, the record does not support this. Between November 2014 (when Walmart's automated scheduling system went into place for Ms. Spaeth) and July 2015 (when Ms. Spaeth was discharged for excessive absenteeism), Ms. Spaeth was a no-call/no-show

10

on four (4) separate occasions and left work earlier than 4:00 pm on numerous occasions. (DPFOF at ¶¶ 55-80.) Her departures before 4:00 pm included:

- November 25, 2014 – In: 11:47am – **Out: 3:39pm**
- December 8, 2014 – In: 12:53pm – **Out: 3:39pm**
- December 10, 2014 – In: 12:50pm – **Out: 3:21pm**
- December 11, 2014 – In: 12:46pm – **Out: 3:20pm**
- December 12, 2014 – In: 12:45pm – **Out: 3:20pm**
- December 15, 2014 – In: 12:46pm – **Out: 3:19pm**
- December 18, 2014 – In: 12:47pm – **Out: 3:19pm**
- December 19, 2014 – In: 12:47pm – **Out: 3:18pm**
- February 13, 2015 – In: 11:48am – **Out: 3:48pm**

(*See Id*. at ¶¶ 56, 60 and 64.)

Assuming for the sake of argument only that returning Ms. Spaeth to her old schedule of noon to 4:00 pm would have been a reasonable accommodation (which for the reasons discussed below Walmart disputes), Ms. Spaeth was unable to come to work on a reliable, consistent and non-erratic basis even with her old schedule, and therefore falls outside the definition of a "qualified individual" with a disability. As this Court noted in Guzman,

> The regulations present two prongs to the definition of "qualified individual." First, the disabled individual "satisfies the requisite skill, experience, education and other job-related requirements of the employment position [he] holds or desires." 29 C.F.R. § 1630.2(m). ***Second, he "can perform the essential functions of such position" with or without accommodation***. *Id.*

*Guzman*, 2016 U.S. Dist. LEXIS 188515 at *17-18 (emphasis in bold italics added). The determination of whether an employee is qualified for purposes of the ADA "should be based on the qualified disabled individual's capabilities at the time of the employment decision." *Id.* at *18 (internal quotation and citation omitted). Ms. Spaeth could not come to work on a regular, non-erratic basis *without the EEOC's proposed accommodation* of a noon to 4:00 pm schedule, and she could not come to work on a regular, non-erratic basis *with the EEOC's proposed*

11

*accommodation* of a noon to 4:00 pm schedule. This is a textbook example of someone who, by definition, is not a "qualified individual" with a disability.

Because Ms. Spaeth could not, with or without a reasonable accommodation, perform the essential function of coming to, or staying at, work on a regular, consistent and non-erratic basis during the time of the adverse actions asserted in this case, she was not, by definition, a qualified individual with a disability. Accordingly, she does not fit within the parameters of the protections afforded by the ADA, and each of EEOC's ADA-based claims in this matter fail as a matter of law and should be summarily dismissed. *See Yellow Freight Sys.*, 253 F.3d at 948 ("let us be clear that our court, and every circuit that has addressed this issue, has held that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability.").

Indeed, courts in the Seventh Circuit, including this Court, have routinely granted summary judgment in favor of employers where the employee is unable, with or without a reasonable accommodation, to commit to regular attendance. *See e.g. Id.* (noting that irregular, spotty attendance can render an employee unqualified for a job and affirming summary judgment on behalf of the employer where the employee had a history of poor attendance and was thus not a qualified individual with a disability); *Guzman*, 2016 U.S. Dist. LEXIS 188515 at *18-19 (granting summary judgment for the employer upon finding that the employee's ADA claims failed because she was not a qualified individual with a disability given her inability to come to work).

"[I]t is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation*." Basden*, 714 F.3d at 1037; *citing Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863-64 (7th Cir. 2005). Undisputed facts in this case show that Ms. Spaeth was unable,

with or without a reasonable accommodation, to perform the essential function of coming to work on a regular basis. She was not a qualified individual with a disability, and Walmart is entitled to summary judgment on the EEOC's claims.

3. Plaintiff's Proposed Accommodation Would Not Have Changed Ms. Spaeth's Ability to Come to Work on a Consistent and Reliable Basis and Therefore Would Not Have Enabled Her to Perform Her Job.

A "reasonable accommodation" is a work modification that allows a disabled employee to perform the essential functions of the employment position. 29 C.F.R. § 1630.2(o)(1)(i-iii). The EEOC argues that Ms. Spaeth was entitled to a modified schedule but while the law references modified schedules as a type of potential reasonable accommodation, "the regulations nowhere state that all modified work schedules are *ipso facto* reasonable." *Peirson v. Lucent Techs, Inc.*, 2006 U.S. Dist. LEXIS 73827 at *10-11 (N.D. Ill. 2006).

The Seventh Circuit has held that the accommodation must be both "efficacious" and proportional to costs to be reasonable, and that the employee/plaintiff bears the burden of making such a showing. *Vande Zanda v. Wis. Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995). In other words, in addition to being proportional to costs, the accommodation proposed must be effective in order to be considered a reasonable accommodation under the law. *See Severson*, 872 F.3d at 482 ("effectiveness is a necessary but not sufficient condition for a reasonable accommodation under the ADA"). Indeed, and as the Seventh Circuit has noted, "[t]o 'accommodate' a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all." *Vande Zanda*, 44 F.3d at 542. "***If the proposed accommodation does not make it possible for the employee to perform his job, then the employee is not a 'qualified individual' as that term is defined in the ADA.***" *Severson*, 872 F.3d at 481.

Unrefuted facts in the record demonstrate that the accommodation the EEOC champions (returning Ms. Spaeth to her old schedule) would have been inconsequential to her ability to, on a regular and reliable basis, come to work or stay at work for a full shift to perform her job at Walmart. As noted above, even if Ms. Spaeth's old schedule was applied during the material times, she would have still left work *on multiple occasions* prior to the end of her old schedule (4:00 pm) and still would have had several no-call/no-shows. *See supra*. Changing her schedule back to her previous schedule would not have been effective in quelling these issues.

Notably, finding no support in the record, the EEOC seemingly relies on unsupported conclusory statements, generalizations and speculation to support its position that changing Ms. Spaeth's schedule would have enabled her to perform her job. For instance, the EEOC's expert opines that "[b]y simply allowing Marlo [Spaeth] to maintain her previous schedule, the problem of 'absenteeism' that she developed could have been prevented." (DPFOF at ¶ 120.) From the "Documents Reviewed" section of both reports the EEOC's expert prepared, however, there is no apparent reference to him reviewing Ms. Spaeth's actual attendance record so his proclamation that her old schedule would have remedied her attendance issues is not fact-based, and, if anything, presents as conjecture. (*Id*.) Indeed, there appears to be no analysis behind this conclusion other than *perhaps* the generalization that people with Down Syndrome may find it difficult to adapt to change and that they get into "grooves." (*Id*.) Notwithstanding the fact that the expert's groove theory is based on non-peer reviewed material and should be disregarded, the EEOC's expert did not assess Ms. Spaeth during or around the time of the attendance issues in question in this case (between November 2014 through July 2015), and there are otherwise no medical documents or notes that support the EEOC's expert's conclusions. (*Id*.) Again, his conclusions present as speculation.

14

It is the EEOC's burden to show that the proposed accommodation would have enabled Ms. Spaeth to come to work on a reliable basis and do her job. All that it offers in support of this is generalizations and speculation, but such offerings cannot create a triable issue of fact regarding the effectiveness, or lack thereof, of the accommodation proposed. *See e.g. Pfeifer v. Caterpillar Inc.*, 2000 U.S. Dist. LEXIS 5733, at *13 (N.D. Ill. 2000) (noting that the plaintiff offered no evidence that the accommodation would have been an efficacious remedy and that speculation is not enough to defeat summary judgment).

Ms. Spaeth's actual attendance record speaks volumes and foreclosures any reasonable suggestion that changing her schedule would have had any impact of her attendance failures overall. As changing Ms. Spaeth's schedule back to her old schedule would not have helped her perform the essential functions of her job, Walmart cannot be found to have denied Ms. Spaeth a reasonable accommodation. *See supra; also see e.g. Valadez v. Steiner Corp.*, 2004 U.S. Dist. LEXIS 14031, at *11 (N.D. Ill. 2004) ("The handicapped parking space is not a reasonable accommodation because Valadez cannot prove that it would have enabled him to perform the essential functions of the job."); *Moore v. Cty. Of Cook*, 1998 U.S. Dist. LEXIS 15733, at *30 (N.D. Ill. 1998) ("For the above stated reasons, the Hospital did not fail to provide Ms. Moore with a reasonable accommodation, because doing so would not have removed a barrier from her performance of her job.").

4. The EEOC's Proposed Accommodation Would Have Required Someone Else to Perform the Essential Functions of Ms. Spaeth's Position During Critical Times of the Work Day and is Not Reasonable As a Matter of Law.

As noted above, the EEOC alleges that Ms. Spaeth, because of her disability, was unable to maintain the work schedule assigned to her by Walmart's automated scheduling system. (Dkt. # 1 at ¶15-16, 19.) That system, which is referred to at Walmart as the Customer Scheduling

15

System or "CSS," went into place at the store Ms. Spaeth worked at in November of 2014. (DPFOF at ¶¶ 42-48.) The system is created and designed to specifically generate shifts that would meet customer demand and operating demand factors for running the store effectively. (*Id*.)

Based on these factors, and beginning in November of 2014, Ms. Spaeth's was scheduled by the system to work from 1:00 pm to 5:30 pm on a few days throughout the week. (*Id*. at ¶ 50.) The EEOC argues that, irrespective of Walmart's automated scheduling system, Walmart should have returned Ms. Spaeth to her previous schedule of noon to 4:00 pm as a "reasonable" accommodation. (Dkt. #1 at ¶16.) Doing so, however, would have required someone else to perform Ms. Spaeth's duties between the hours of 4:00 pm and 5:30 pm on the days she was scheduled to work. (DPFOF at ¶¶ 65, 73 and 141.) This is not, as a matter of law, a reasonable accommodation.

Under the ADA, employers are not required to reallocate essential duties and have other employees perform those duties. *See e.g.*, *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) ("Under the ADA, an employer is not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee."); *Peters v. City of Mauston*, 311 F.3d, 835, 845 (7th Cir. 2002) (holding accommodation not reasonable when it would require another person to perform an essential function of the plaintiff's job); *Sieberns v. Wal-Mart Stores*, 125 F.3d 1019, 1022(7th Cir. 1997) (same); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir.1996) ("reasonable accommodation does not encompass reallocation of essential job functions"); *Stubbs v. Marc Ctr.,* 950 F. Supp. 889, 895 (C.D. Ill. 1997) (plaintiff's "attempted accommodation to temporarily shift his duties to his coworkers and subordinates is unreasonable as a matter of law.").

16

Courts in other federal circuits have similarly held that reallocation of essential job duties is, as a matter of law, not a reasonable accommodation. *See*, *e.g.*, *Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 20 (1st Cir. 1998); *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991); *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998); *Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006); *Milton v. Serviner*, 53 F.3d 1118, 1124 (10th Cir. 1995); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259-60 (11th Cir. 2001); *Turner v. City of Paris, Ky.*, 2012 U.S. Dist. LEXIS 181694 (E.D. Ky. 2012); *Bivins v. Bruno's, Inc.*, 953 F. Supp. 1558, 1562 (M.D. Ga. 1997). Recently, the Seventh Circuit reaffirmed this principle, stating that a plaintiff's proposed accommodation of having another individual assist her in lifting objects weighing over 20 pounds, and thus in excess of her work restriction, was not a reasonable accommodation. *Majors*, 714 F.3d at 534.

If the EEOC's position that Ms. Spaeth could not work the automated work shift assigned to her because of her disability is taken at face value, Ms. Spaeth could not perform any aspect of her job, essential or otherwise, between the hours of 4:00 pm to 5:30 pm (or any other hours outside of noon to 4:00 pm) and Walmart would have had to reallocate those functions to someone else in order to meet customer demand/traffic. (DPFOF at ¶ 141.) Significantly, Walmart did in fact reallocate Ms. Spaeth's duties during times in which she did not work her full shift. (*Id*. at ¶¶ 65, 73.) As noted in Ms. Spaeth's December 2014 written warning for attendance/punctuality issues, Ms. Spaeth repeatedly leaving around 3:00 pm (when she was scheduled to work to 5:30 pm) "result[ed] in fellow associates having to finish her tasks . . . ." (*Id*. at ¶ 65.) Similarly, Ms. Spaeth's March 2015 written warning for attendance/punctuality issues provided that Ms. Spaeth's two (2) no-call, no-shows in an approximate three (3) week timespan and eight (8) leave earlies in an approximate five (5) week period meant that "[h]er

share of the workload must be done by other associates in addition to their own tasks." (*Id.* at ¶ 73.)

Ms. Spaeth's disability allegedly necessitated her absences from work and required her to leave early, which in turn required Walmart to reassign her job duties to someone else. As she was purportedly unable to work at Walmart without an accommodation which would have required a reallocation of her essential job duties, she was not a qualified individual with a disability and the accommodation proposed in this case is not reasonable, as a matter of law. For this additional reason, the EEOC's ADA claims fail and should be dismissed.

5.   Plaintiff's Proposed Accommodation of Permanently Restructuring Ms. Spaeth's Work Schedule Would Have Created an Undue Burden by Requiring Walmart to Permanently Schedule Ms. Spaeth Outside of Business Need and Accordingly Is Not a Reasonable Accommodation as a Matter of Law.

An accommodation is unreasonable if it creates an undue hardship or burden upon an employer. *See* 29 C.F.R. 1630.2. Under the ADA, an undue hardship is defined as "an action requiring significant difficulty or expense." 42 USC 12111(10)(A). The Seventh Circuit has noted that undue hardship equates to undue cost in relation to the benefits of the accommodation and the employer's resources. *Vande Zande*, 44 F.3d at 543.  Employers are not required to allow workers to work under circumstances where their productivity would be "greatly reduced." *Id.* at 545. Further, "a demand for an effective accommodation could prove unreasonable because of its impact, not on business operations, but on fellow employees . . . .") *US Airways, Inc. v. Barnett*, 535 391, 400-401 (2002); *also see Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011) (noting that an accommodation may create a hardship "if it causes more than a de minimis impact on co-workers").

Walmart's automated scheduling system (Customer Service Scheduling or CSS) is not an arbitrary scheduling model. (DPFOF at ¶¶ 43, 45-49.) It uses analytics on customer traffic and

demand to most efficiently schedule associates to meet specific customer demand and operating demand. (Id. at ¶ 45.) It enables Walmart to run its stores effectively and efficiently, eliminating expenditures on superfluous wages and ensuring that associates are in place in the appropriate area to assist customers during critical times in the day where customer traffic is at its highest. (*Id*. at ¶ 46.)

Having associates in place during critical times and providing customer service to customers in timely and expedient manners (and avoiding lapses in customer service) is a key to Walmart's business. (*Id*. at ¶ 47.) Not following analytics and disregarding shifts generated by Walmart's Customer Scheduling System would place Walmart in predicaments where customer demand is not met and/or where wages or employee resources are expended unnecessarily. (*Id*. at ¶ 48.)

In Ms. Spaeth's circumstance, scheduling her, *on a permanent basis*, from noon to 4:00 pm (which is outside the 1:00 pm to 5:30 pm schedule for her generated by Walmart's automated scheduling system) would have required Walmart, in perpetuity, to expend unnecessary wages or her from noon to 1:00 pm. (*Id*. at ¶ 139.) It would have also meant that there would have been no one in Ms. Spaeth's area to meet customer demand during critical times in the day unless someone else from another area came over to help. (*Id*. at ¶ 141-142.) The quandary with this is that Associates who had to leave their area to work Ms. Spaeth's area would not be available to meet customer demand in their area. (*Id*. at ¶ 143.) As noted above, in both Ms. Spaeth's December 2014 and March 2015 written warnings, it was documented that other associates were in fact required to finish tasks for Ms. Spaeth. (*Id*. at ¶¶ 65 and 73.) It was also noted in her warnings that her not working her scheduled shift resulted in lapses in customer service, and the potential of

unsatisfactory shopping experiences and lost sales. (*Id*.) Unsatisfactory shopping experiences adversely affect Walmart's business. (*Id*. at ¶ 144.)

Walmart is required neither to bear these business costs nor negatively impact its employees through the accommodation suggested in this case. *See supra; also see D'Eredita v. ITT Corp.*, 2015 LEXIS 150522 at *20-21 (W.D.N.Y. 2015) (holding that the law does not require employers to endure superfluous labor expense and activity that reduce employee productivity).

Assessing the proportionality of the benefit of the proposed accommodation for Ms. Spaeth (which as explained above would have been inconsequential given her attendance issues) in relation to the cost of the accommodation compels a finding that the accommodation proposed in this case imposes an undue burden and is not a reasonable accommodation as a matter of law. For this additional reason, Ms. Spaeth is not a qualified individual with a disability.

**B. EVEN IF THE COURT WERE TO FIND A TRIABLE ISSUE ON THE QUALIFIED INDIVIDUAL WITH A DISABILITY ISSUE, DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S REASONABLE ACCOMMODATION, TERMS AND CONDITIONS, TERMINATION AND FAILURE TO REHIRE CLAIMS.**

1. There is Nothing Connecting Ms. Spaeth's Down Syndrome to Her Ability to Come to Work or a Need for a Reasonable Accommodation As It Relates to Her Work Schedule.

This case is about what Ms. Spaeth wants (*see e.g.* DPFOF at ¶¶ 106, 107, 109, 110, 112, 114 and 115), and not about what she needs. Nothing in the record supports a medical necessity for the accommodation proposed and nothing in the record supports a tangible, contemporaneous link between Ms. Spaeth's Down Syndrome and her ability to work the shift she was assigned. When asked in written discovery to explain how Ms. Spaeth was allegedly unable to maintain her new schedule because of her disability, the EEOC made a sweeping generalization about consistent schedules being paramount for individuals with Down Syndrome and noted that it anticipated expert testimony related to Down Syndrome.

It did proffer a medical doctor as an expert of this subject but its expert, like the EEOC, only provided generalizations about people with Down Syndrome and their ability, in general, to adapt to change. (DPFOF at ¶ 120.) He did not examine Ms. Spaeth at or around the time of the adverse actions alleged in this case and could not have made a determination about Ms. Spaeth's particular and actual state of mind and specific ability to adapt to change at or around the time of the adverse actions at issue. (*Id*.) He also performed no psychological tests on Ms. Spaeth, at any time. (*Id*.) When this all is coupled with the fact that there are no contemporaneous medical records to suggest that Ms. Spaeth was unable to adapt to her new work schedule at Walmart (or even unable to adapt to change in general at and around the time of the adverse actions alleged in this case), there is no basis from which a reasonable juror could find a connection between Ms. Spaeth's Down Syndrome and the proposed accommodation.

Again, and as noted above, analysis of a disabled individual's abilities/ qualifications "should be based on the qualified disabled individual's capabilities at the time of the employment decision." *Guzman,* 2016 U.S. Dist. LEXIS 188515 at *18 (internal quotation and citation omitted). As the Seventh Circuit has noted:

> "[s]ome impairments may be disabling for particular individuals but not for others, depending on the stage of the disease or the disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors." 29 C.F.R. 1630.2(j), App. (1995). Thus, while a given disability may limit one employee (and therefore necessitate a reasonable accommodation), it may not limit another. For this reason, the ADA does not require an employer to assume that an employee with a disability suffers from a limitation. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs.

*Taylor-Novotny v. Health All. Med. Plans, Inc.,* 772 F.3d 478, 494 (7th Cir. 2014) (citations omitted). While this dealt with an employer's knowledge of a disability's limiting affects, the Seventh Circuit's point that impairments vary from individual to individual resonates in this case

21

as the EEOC and its expert have offered nothing other than conjecture and generalizations about people with Down Syndrome to support the argument that Ms. Spaeth's condition affected her ability to stay at or come to work as scheduled. This cannot carry the day, as inferences based on mere speculation do not enjoy the benefit of the doubt from the court and are not enough to defeat summary judgment. *See e.g. Herzog v. Graphic Packaging Int'l, Inc.,* 742 F.3d 802, 806 (7th Cir. 2014).

Notably, while the EEOC's expert makes unsupported, conclusory statements about Ms. Spaeth's purported inability to adapt to change, he does note that: (i) there is " a lot of variation" with people with Down Syndrome; (ii) Ms. Spaeth functions [currently] at the "higher end of the spectrum;" and that Ms. Spaeth "has learned new tasks since her termination from Walmart," which suggest that she does have the ability to adapt to change. (DPFOF at ¶ 125.) Significantly, this is supported by Walmart's expert, who opines that Ms. Spaeth demonstrated through standardized testing that she has the ability to adapt to change. (*Id*. at ¶ 127.) Moreover, associates at Walmart testified of several occasions in which Ms. Spaeth was able to adapt to change at work and learn a new work task or work routine. (*Id*. at ¶¶ 39-41, 130-133.) Ms. Spaeth's own sister and legal guardian even acknowledges as much when she noted during her deposition that Ms. Spaeth has the ability to adapt to change and learn new routines (although it takes time). (DPFOF at ¶ 129.)

Without anything beyond supposition connecting Ms. Spaeth's medical condition to her ability to work or the need for the accommodation suggested, the EEOC's ADA claims fall short again, and warrant summary dismissal.

22

2. Plaintiff's Terms and Conditions and Termination Claims Are Wholly Without Merit and Walmart is Entitled to Summary Judgment on the Same.

In the past, courts within the Seventh Circuit evaluated discrimination claims by the so-called "direct" and "indirect" methods of proof. However, in *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit directed courts to discontinue utilization of the "direct" and "indirect" methodology in analyzing discrimination claims. *Id*. at 764. Rather, the sole question is whether a "reasonable fact-finder" could conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action. *Id*. at 765. Overruled by *Ortiz*, as well, is the need to assess whether circumstantial evidence comprises a "convincing mosaic" of discrimination. *Id*. Significantly, however, the Seventh Circuit made it clear that the traditional burden-shifting framework created by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), remains viable and consistent with the "reasonable fact-finder" standard.

To survive summary judgment on its ADA discrimination claims, the EEOC must identify genuine issues of material fact showing that: (i) Ms. Spaeth is disabled; (ii) she was able to perform the essential functions of her job at Walmart with or without reasonable accommodations; and (iii) she suffered an adverse employment action because of her disability. *See Majors v. GE*, 714 F.3d 527, 533 (7th Cir. 2013); *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005) "If an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision." *Nesse, 405 F.3d at 641*. Once the employer articulates a legitimate, non-discriminatory reason for the employment action, the burden shifts back to the plaintiff "to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual." *Id*.

For purposes of summary judgment, Walmart does not dispute that Ms. Spaeth is a disabled individual. However, for the reasons detailed above, she is not a qualified individual with a

23

disability, as a matter of law. She could not perform the essential functions of her job with or without reasonable accommodations. This completely forecloses any ADA disability claim the EEOC advances here.

Even if this was not the case, though, the EEOC's claims still fail. First, and with respect to its terms and conditions claim concerning written warnings Ms. Spaeth received, the Seventh Circuit has been clear that reprimands, without more, are not actionable. An actionable adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007). "Written reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) (upholding summary judgment on discrimination claims based on written disciplines). Ms. Spaeth's written warnings did not significantly change her employment status, and any claim advanced on account of the same fails.

Next, and with respect to both the EEOC's terms and conditions claims and termination claims, there is nothing in the record to suggest that Walmart was motivated by Ms. Spaeth's Down Syndrome, as opposed to her attendance record, in disciplining her and eventually terminating her employment. In other words, there is no indicia of prohibited animus driving the decision(s) at hand and there is no evidence of pretext.

Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Ennin v. CNH Indus. Am. LLC*, 878 F.3d 590, 596 (7th Cir. 2017). Here, Ms. Spaeth was disciplined and discharged for excessive absenteeism. (*See* DPFOF at ¶¶ 2 and 79; *also see* Dkt. # 1 at ¶ 20.) She had four (4) no-call/no-

show attendance violations in a six (6) month period and left work early over 35 times in a six (6) month period. (DPFOF at ¶¶ 67-80.) None of this can be in dispute. In other words, Ms. Spaeth's attendance issues are not made-up and there is nothing in the record which gives rise to a reasonable suspension that Walmart's reasons for disciplining and discharging Ms. Spaeth are pretextual or motivated by her medical condition. *See Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003) (affirming summary judgment where there was no evidence "which would tend to prove the proffered reason was factually baseless, not the actual motivation for the discharge, or insufficient to motivate the discharge").

Of note, the EEOC has not identified a single similarly situated non-disabled employee who was treated more favorably than Ms. Spaeth despite having similar attendance issues. Any suggestion that she was singled out because of her disability is conjecture and insufficient to withstand summary judgment. *See Ennin*, 878 F.3d at 597 (holding that without appropriate comparators or any other indicators of prohibited bias, the plaintiff "is left with mere conjecture and speculation," which is "not enough to survive summary judgment"); *also see Kampmier v. Emeritus Corp.,* 472 F.3d 930, 938 (7th Cir. 2007) (finding that the plaintiff failed to identify an similarly situated employee as required for a prima facie case of disability discrimination and holding that "[b]ecause [the plaintiff] is not disabled and failed to identify a similarly situated individual who [the employer] treated differently, the district court properly granted [the employer's] motion for summary judgment").

Also, the record is devoid of any evidence that, at the time of the employment actions complained of in this case, Ms. Spaeth was meeting Walmart's legitimate employment expectations. As noted, Ms. Spaeth's attendance record (which lays bare several no-call/no-shows incidents and numerous incomplete shifts) is not in dispute. (*See* DPFOF at ¶¶ 67-80.) Also not in

dispute is the fact that Walmart had in place attendance policies that forbade the type of attendance Ms. Spaeth exhibited and that Ms. Spaeth was in fact disciplined for attendance/punctuality issues. (*Id*. at ¶¶ 14-19.) The record, then, does not support a finding that Ms. Spaeth's disability, as opposed to her attendance issues, motivated the employment actions at issue, and the record does not support the EEOC's claims in this case. *See Bell v. Bd. of Edu.*, 662 Fed. Appx. 460, 462 (7th Cir. 2016) ("Because the District concluded that Bell abandoned her job, she was not meeting its legitimate expectations, and because abandonment motivated the firing, it was lawful."); *also see Taylor-Novotny*, 772 F.3d at 481-82 and 490-91 (affirming district court's judgment because the plaintiff "did not establish that she was disabled within the meaning of the ADA and because she was not meeting [the employer's] legitimate expectations for punctuality and accountability").

There is simply nothing in the record to evidence that Ms. Spaeth's medical condition motivated and was the cause of the employment actions at issue. Notably, management was unaware of the *alleged* effects Ms. Spaeth's Down Syndrome had on her ability to complete a full shift (DPFOF at ¶ 134) and therefore could not have had an issue with her (or taken action against her) on account of the same. *See e.g. Taylor-Novotny,* 772 F.3d at 494; *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) (noting that various "provisions of the ADA demonstrate that the employer's knowledge of the disability is a prerequisite to finding liability").

That all said, and to the extent the EEOC argues that Ms. Spaeth was not issued written discipline until after her latest supervisor (Julia Stern) came aboard and that that suggests Ms. Spaeth's disciplines were motivated by her medical condition, such an argument would be unavailing, especially in light of the full record. New management is well within its prerogatives to enforce legitimate, non-discriminatory policies or set job performance expectations not followed or enforced by previous management. *See e.g. Fortier v. Ameritech Mobile Communs.,* 1997 U.S.

Dist. LEXIS 19651 at * 28 (N.D. Ill. 1997) (holding that "[w]hat matters is [the employer's] evaluation of his performance at the time of termination, not in the years prior"); *citing Denisi v. Dominick's Finer Foods*, 99 F.3d 860, 865 (7th Cir. 1996) and *Hong v. Children's Memorial Hosp.* 993 F.2d 1257, 1262 (7th Cir. 1993); *also see Champagne v. Servistar Corp.*, 138 F.3d 7, 14 (1st Cir. 1998) (noting that employers have "substantial leeway" in defining essential functions and may require employees to perform those functions, and finding no threat or interference with ADA rights when new management enforced an essential function of the job not enforced by other managers).

Also, Ms. Stern excused several of Ms. Spaeth's attendance violations with management expectations and under Ms. Stern's watch Walmart did not terminate Ms. Spaeth's employment for attendance violations until she reached 17 attendance occurrences, although Ms. Spaeth could have been discharged after 7 occurrences. (DPFOF at ¶¶ 79-81.) For Walmart, enough was enough. On this record, there is nothing from which a reasonable fact-finder could infer discrimination.

Indeed, at the end of the day, the ADA does not shield employees who have poor and unacceptable attendance issues, *even if those attendance issues are the direct result of a disability*. *See Yellow Freight Sys.*, 253 F.3d at 948. Ms. Spaeth had demonstrative (and undisputable) poor and unreliable attendance, and Walmart was well within its rights under the law to take action against her on account of the same. The EEOC's terms and condition and discharge claims fail.

3. Plaintiff's Failure to Rehire Claim Also Fails Because the ADA is Not a Second Chance Statute and Because the Claim Otherwise Lacks Merit.

Following Ms. Spaeth's termination, Charging Party Amy Jo Stevenson (who presented herself as Ms. Spaeth's sister and legal guardian) called Walmart requesting a meeting with

management to discuss getting Ms. Spaeth's job back.[4] (DPFOF at ¶ 82.) On or about July 16, 2015, that meeting was held. (*Id*. at ¶ 83.) During the meeting, Ms. Stevenson demanded that Ms. Spaeth be given her job back or face an ADA/disability lawsuit – in other words, the termination decision reversed and Ms. Spaeth reemployed. (*Id*. at ¶¶ 84-85.) As detailed in Walmart's Proposed Findings of Fact, Walmart declined to re-employ Ms. Spaeth as had been demanded. (*Id*. at ¶¶ 82-97.) The EEOC contends that this decision to not reinstate Ms. Spaeth violates the ADA in that Walmart decision was allegedly a failure to accommodate and an act of disability discrimination.

The ADA, however, is not a second chance statute. *See Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666-67 (7th Cir. 1995) ("Second chances" are not accommodations envisioned under the ADA, and are not reasonable). Walmart was not obligated to as an accommodation give Ms. Spaeth another shot at employment after she was terminated for excessive absenteeism.

That said, the EEOC's failure to rehire claim is otherwise without merit for many of the reasons its termination and terms and conditions claims cannot survive summary judgment – there are no similarly situated employees, no evidence that Ms. Spaeth was meeting Walmart's legitimate employment expectations, no evidence to support a finding that Ms. Spaeth could perform essential functions of her job (with or without reasonable accommodations) and was a qualified individual with a disability, and no evidence of Walmart having an issue with Ms. Spaeth because of her medical condition (as opposed to her attendance). *See supra*.

On the specific issue of pretext, after a termination, there are generally two ways an Associate can be reemployed at Walmart pursuant to written Walmart policy – rehire or reinstatement. (DPFOF at ¶ 86.) Under Walmart policy, if Associates want to be rehired after termination, they must ordinarily reapply. (*Id*. at ¶ 87.) If they do not reapply, they can have their

---

[4] Upon information and belief, Ms. Stevenson did not become Ms. Spaeth's legal guardian until 2018. (DPFOF at ¶ 4.)

employment restored through Walmart's reinstatement process, which requires review and approval by management. (*Id*. at ¶ 88.) Reinstatement is not a right, guarantee or mere formality, and it does not occur unless there is substantial ground for reversing a termination decision, such as but not limited to error or misapplication of policy. (*Id*.) **It does not occur often and, during the period of January 1, 2014 through December 1, 2018, there has not been a single Associate (disabled or not) who has been reinstated at the Manitowoc Store after being discharged for attendance violations at the Manitowoc store.** (*Id*. at ¶ 89.)

Ms. Spaeth did not reapply for employment with Walmart and, in the weeks following her sister's demand that she be reemployed, Walmart considered the sister's demand as a request for reinstatement. (*Id*. at ¶¶ 91-92.) After reviewing maters, Walmart concluded that Ms. Spaeth's discharge was based on objective and verifiable policy violations, and it resultantly declined to reverse its termination decision and reinstate Ms. Spaeth into her former job. (*Id*. at ¶ 96.) There is no evidence in this record that any of this is untrue or a cover-up for discrimination, and there is nothing from which a reasonable fact-finder could infer disability discrimination. At the end, it was **Ms. Spaeth's 17 substantiated attendance violations,** which were confirmed during an investigation into Ms. Stevenson's demand that Ms. Spaeth be reinstated, that drove the decision to not reinstate Ms. Spaeth as requested. (*Id*.)

C. EVEN ASSUMING THAT THIS COURT WERE TO DENY WALMART'S MOTION FOR SUMMARY JUDGMENT, WALMART IS ENTITLED TO JUDGMENT ON ANY PUNITIVE DAMAGES CLAIM ADVANCED BY THE EEOC.

Summary Judgment should also be granted in Walmart's favor with regard to any claim by Plaintiff for punitive damages. The record here is simply devoid of any facts even suggesting that Walmart acted with "malice" or "reckless indifference" to Ms. Spaeth's federally protected rights. In *Kolstad v. American Dental Association*, 527 U.S. 526, 536 (1999), the Supreme Court

observed that "[i]n the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."

There is simply nothing before the Court to suggest that Walmart acted with "malice" or "reckless indifference" to Ms. Spaeth's rights. It has, for example, policies in place concerning reasonable accommodations for disabled individuals (which associates have access to) and an entire department – the Accommodation Services Center – dedicated exclusively to servicing accommodation issues. (DPFOF at ¶ 13.) It also provides training to associates on ADA and disability rights, including but not limited to accommodations and accessibility. (*Id*. at ¶ 10.)

Further, and with respect to Ms. Spaeth in particular, after Walmart's automated scheduling system was put into place and Ms. Spaeth's schedule changed, Walmart completely excused several of Ms. Spaeth's early departures, meaning she was not assessed attendance occurrences for these policy violations. (*Id*. at ¶ 57.) Further, Ms. Spaeth was allowed to accumulate up to 17 attendance policy violation occurrences before she was ultimately discharged for excessive absenteeism. (*Id*. at ¶¶ 79-81.) Under Walmart policy and practice, she should have been discharged after 7 occurrences. (*Id.* at ¶¶ 18 and 81.) These are not the acts of a malicious employer.

In short, there is not one single fact from which to conclude that Walmart behaved with malice or indifference relative to Ms. Spaeth's rights. Accordingly, and at a minimum, this Court should enter summary judgment in favor of Walmart as to the EEOC's punitive damages claim.

## CONCLUSION

For all the foregoing reasons, Defendant respectfully submits there is no genuine issue as to any material fact and the uncontroverted evidence in the record entitles Defendant to judgment as a matter of law as to all claims in this case. Accordingly, Defendant requests that this Court grant the instant Motion for Summary Judgment as to all of Plaintiff's claims.

30

Dated at Milwaukee, WI this 17th day of May 2019.


*s/ Warren E. Buliox*_____

MWH LAW GROUP LLP
Emery K. Harlan, Esq.
emery.harlan@mwhlawgroup.com
Warren E. Buliox, Esq.
warren.buliox@mwhlawgroup.com
735 N. Water St., Suite 610
Milwaukee, WI 53202
Phone: (414) 436-0353
Fax: (414) 436-0354


**COUNSEL FOR DEFENDANT**