# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

                                Case No. 17-CV-00070

v.

WAL-MART STORES EAST, LP,

        Defendants.

## PLAINTIFF EEOC'S RESPONSE IN OPPOSITION TO DEFENDANT'S PROPOSED FINDINGS OF FACTS

Pursuant to Federal Rule of Civil Procedure 56(c) and the Court's Local Rule 56(b)(2) and in support of Plaintiff Equal Employment Opportunity Commission ("Plaintiff" or "EEOC")'s contemporaneously filed Memorandum in Opposition to Defendant Wal-Mart Stores East, LP ("Defendant" or "Walmart")'s Motion for Summary Judgment, Plaintiff respectfully submits EEOC's Response in Opposition to Defendant's Proposed Findings of Facts.

EEOC respectfully submits that there are genuine disputes regarding many of the "Facts" proposed by the Defendant. These disputed facts must be reviewed and determined by the fact finder at trial, and collectively entitle EEOC to a denial of Defendant's motion for judgment as a matter of law. EEOC responds to each "fact" in

Defendant's Proposed Facts as set forth below. [1]

## DEFENDANT'S PROPOSED MATERIAL FACTS

### A. PROCEDURAL HISTORY

1. Marlo Spaeth ("Ms. Spaeth") is a former Associate of Walmart who worked for the company as a Sales Associate at its Manitowoc, Wisconsin store (Store #1449) (hereinafter the "Manitowoc Store") from August 2, 1999 to July 10, 2015. (Declaration of Lee Spude at ¶ 3, 4.) Walmart refers to its employees as "Associates." (*Id*. at ¶ 4.)

**EEOC's Response: Not Disputed.**

2. Walmart terminated Ms. Spaeth's employment for excessive absenteeism on July 10, 2015. (*Id*. at ¶ 55; Dkt. # 1 at ¶ 20.)

**EEOC's Response: Disputed. Walmart terminated Marlo Spaeth because of her disability and her need for an accommodation. (Vance Decl., ¶ 30, Ex. 29 Charge of Discrimination at EEOC00107.) Marlo's guardian and sister, Amy Jo Stevenson reported to the Department of Justice in October 2015, "while under Julie's direct supervision for the better part of her final year, she was targeted and removed from Walmart employment." Stevenson also reported, "For the last year, Marlo was being scheduled random days from 1 pm to 5:30 pm. It was a known challenge for Marlo to make this change, as working until 5:30 was too late for her well-being. Marlo had asked both**

[1] The EEOC refers to contemporaneously filed Plaintiff EEOC'S Statement of Additional Facts that Require Denial of Summary Judgment as "EEOC SAF." The EEOC refers to its responses to Defendant's Proposed Findings of Facts as "EEOC Resp. Def. PFOF."

2

**her supervisor Julie and the HR manager Karen to be switched back to the Noon to 4pm shift. I, as Marlo's guardian, had also asked Karen to have her shift switched back to accommodate Marlo's known disabilities. Both Julie and Karen have confirmed receiving these requests." (Vance Decl. ¶ 31, Ex. 30 DOJ Complaint Narrative at EEOC0099.)**

3. On January 28, 2016, Ms. Spaeth filed a Charge of Discrimination (the "Charge") (EEOC Charge No. 443-2016-00202C) against Walmart with the EEOC alleging that Walmart disciplined her, failed to accommodate her disability, discharged her, and did not rehire her, all in violation of the Americans with Disabilities Act ("ADA"). (Declaration of Warren Buliox at ¶ 2, Ex. A.) On April 27, 2016, Amy Jo Stevenson filed an Amended Charge of Discrimination with the EEOC on behalf of Ms. Spaeth making the same allegations. (*Id.* at ¶ 3, Ex. B.)

**EEOC's Response: Not disputed.**

4. Ms. Stevenson became Ms. Spaeth's legal guardian on January 24, 2018. (*Id.* at ¶ 4, Ex. C.) Up until the time of Ms. Spaeth's termination, Ms. Spaeth's mother was her legal guardian. (Stevenson Dep. at p. 66.)[2]

**EEOC's Response: Not disputed as to the date that Amy Jo Stevenson transitioned from her court-appointed role as permanent alternate standby guardian to guardian, replacing Sandra Barnes. (Vance Decl., ¶ 32, Ex. 31 Guardianship at D001994.) However, EEOC disputes that Amy Jo**

---

[2] Transcript excerpts of all referenced deposition testimony are attached to the simultaneously filed Declaration of Warren Buliox.

**Stevenson was not a "legal guardian" of Marlo Spaeth before January 24, 2018. Since December 23, 1996, Amy Jo Stevenson has been the court-appointed permanent alternate standby guardian of Marlo Spaeth and Sandra Barnes was the permanent guardian. (*Id.,* pp. D001974-1975.) On January 24, 2018, Amy Jo Stevenson transitioned from her role as permanent alternate standby guardian of Marlo Spaeth to replace Sandra Barnes as Ms. Spaeth's primary legal guardian. (*Id.,* at D001994.) At that time, Nathan Spaeth replaced Ms. Stevenson as standby guardian. (*Id*.)**

5. On August 31, 2016, the EEOC issued a Determination on Ms. Stevenson's Charge of Discrimination and, on January 18, 2017, this lawsuit was filed by the EEOC. (Buliox Decl. at ¶ 5, Ex. D; Dkt. # 1.)

**EEOC's Response: Not disputed.**

B. WALMART'S BUSINESS OPERATIONS AND POLICIES

6. Throughout her employment at Walmart, Ms. Spaeth worked at Walmart Store #1449 in Manitowoc, Wisconsin. (Spude Decl. at ¶¶ 3, 4.) Walmart Store #1449 (also referred to herein as the "Manitowoc Store") is a retail establishment selling consumer goods to the general public. (Spude Decl. at ¶ 6.)

**EEOC's Response: Not disputed.**

4

7. At all times during Ms. Spaeth's employment, Walmart had in place policies designed to foster an environment of equal employment opportunities and to prevent unlawful discrimination on the basis of protected characteristics. (*Id.* at ¶ 7.)

**EEOC's Response: Disputed. Because Walmart failed to follow its policy on reasonable accommodations, that policy was not "in place." (EEOC SAF ¶¶ 62-73.)**

8. For example, Walmart's Discrimination & Harassment Prevention Policy (Updated: September 19, 2011) provided:

> At Walmart, we believe in respecting the dignity of every individual. Respectful and professional conduct furthers our mission, promotes productivity, minimizes disputes and enhances our reputation in the communities where we work. All associates, customers, members, or other individuals with whom we have contact in the course of our business should be treated fairly and respectfully without regard to their personal appearance, beliefs, culture, affiliations, or any other characteristics, as long as their conduct does not interfere with the legitimate interests of Walmart or other individuals.
>
> We are also committed to providing an environment that is free of discrimination or harassment based on an *individual's status*.
>
> *Individual's status* means an individual's ... disability ... or any other legally protected status.
>
> We will take any reported violation of this policy seriously, and we will promptly and thoroughly investigate any report of a possible violation in accordance with the procedures set forth in the management guidelines.

(*Id.* at ¶ 8, Ex. A.) (Emphasis in original.) This specific policy was in effect at the Manitowoc Store from September 19, 2011 through Ms. Spaeth's last day at work with Walmart in 2015. (*Id.*)

EEOC's Response: Not disputed that the policy described contains the language cited above. Disputed that the policy was actually "in effect" or followed by Walmart's management, human resources, and ethics employees with regard to Marlo Spaeth. For example, Walmart did not take Amy Jo Stevenson's complaint about discrimination "seriously" in violation of this policy and others. Stevenson informed Walmart that Spaeth's termination was the direct result of Walmart's failure to accommodate Spaeth in violation of the ADA, a point which Stevenson made, explicitly, to Walmart at the July 16, 2015 post-termination meeting. (EEOC's SAF ¶¶ 51, 56, 57, 60, 61). This is demonstrated by manager Robin Castro's July 16th email to Market Human Resources Manager Lee Spude in which Castro summarizes the meeting with Stevenson and Spaeth: "Marlo's sister, Amy Jo and her mom, Sandra [, came in today] to ask us to give Marlo her job back. Amy Jo and Sandra feel that [Marlo] was picked on by ASM Julie and according to the ADA Act we should have changed Marlo's schedule when Marlo asked…She stated that if we don't give Marlo her job back they would take further action." (EEOC's SAF ¶ 40). Walmart did not genuinely consider giving Spaeth back her job, though, and indeed, contrary to its own policies and to the law, refused

6

**to communicate further with Spaeth's family about Spaeth's employment and her need for accommodation. (*See id.*, ¶¶ 63,72, 73). In response to Castro's email confirming that Marlo, herself, had asked for a scheduling accommodation before her termination, Walmart's Market Human Resources Manager completely ignored the details about the failure to accommodate Marlo's disability in violation of the ADA and tells Castro: "1. Call the legal hotline and put them on notice of the 'theat' [sic]. 2. Do not have any further discussion with Marlo's relatives." (EEOC's SAF ¶ 73). Instead of making any attempt to remedy the discrimination, Walmart went immediately into defense mode.**

9. Walmart's Accommodation in Employment - (Medical-Related) Policy - Wisconsin (Updated: March 5, 2014) and its Accommodation in Employment (Medical-Related) Management Guidelines - Walmart (Updated: March 5, 2014) provide, in part, that:

> At Walmart, every associate and job applicant has full access to equal employment opportunities. We will provide associates who have a *disability* with *reasonable accommodations* to enable them to perform the essential functions of their jobs, seek new jobs within Walmart and enjoy the benefits of employment. Walmart will also provide *reasonable accommodations* during the hiring process to job applicants with a *disability*. (emphasis in original)
> Reasonable accommodations do not include:
>
> - Reassignment to a job that is not vacant;
> - Creating a new job;

7

- Eliminating essential functions of a job or transferring an essential function to another associate;
- Providing assistive devices needed outside of the workplace (such as eyeglasses or hearing aids) or
- Providing an accommodation that is excessively costly, disruptive or would alter the nature or operation of the business, which would be deemed as an undue hardship.

(*Id.* at ¶ 9, Ex. B.) These specific policies were in effect at the Manitowoc Store from March 5, 2014 through Ms. Spaeth's last day at work with Walmart in 2015. (*Id*. at ¶ 9.)

**EEOC's Response: EEOC's objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC does not dispute the content of the written policy. EEOC disputes that these policies "were in effect at the Manitowoc Store" when Walmart failed to enter into the interactive process with Marlo Spaeth or any of her family members and failed to accommodate Spaeth. (EEOC's SAF ¶¶ 63,72, 73). Further, EEOC disputes the modified schedule would cause any hardship, let alone a costly, undue hardship. Ms. Stern's email of December 2014 indicated that if Spaeth "is not going to work the entire shifts then there are other associates in the store that would be more than happy to have those hours." (EEOC's SAF ¶ 89).**

10. In addition, Walmart provides trainings/instruction to Associates on the Americans with Disabilities Act and disability rights, including but not limited to accommodations and accessibility. (Becker Decl. at ¶ 14.) Over the course of their careers

8

at Walmart, Walmart has also provided trainings to Manitowoc Store Manager Kent Abitz, Market Human Resources Manager Lee Spude, Manitowoc Store Assistant Manager Julia Stern, Manitowoc Store Co-Manager (in 2015) Robin Castro, Manitowoc Store Co-Manager Bonnie Popp and Manitowoc Store Personnel Coordinator Karen Becker on the Americans with Disabilities Act and disability rights, including but not limited to accommodations and accessibility. (Becker Decl. at ¶ 14.)

**EEOC's Response: Not disputed.**

11. Through Walmart's intranet (the "WIRE"), Associates have access to non-management policies and managers have access to management related policies and guidelines. (Spude Decl. at ¶ 10.) All employees are expected to be familiar with and follow the policies that apply to them. (*Id.*)

**EEOC's Response: Not disputed that Associates have access to policies and guideless through the "WIRE." However, EEOC disputes that Walmart expects employees to follow the policies that apply to them as evidenced by repeated testimony from managers that they do not take part in requests for reasonable accommodations, but rather refer employees to the Personnel Coordinator or some other person. (Vance Decl., ¶ 6, Ex. 5 Castro Deposition 152: 5 – 152:17; *Id.*, ¶ 11, Ex. 10 Stern Deposition 62:19 – 63:11.)**

12. During Ms. Spaeth's employment, Walmart also had in place an "Open Door Communications Policy." (*Id.* at ¶ 11, Ex. C.) This specific policy was updated August 10, 2012 and remained in effect through Ms. Spaeth's last day of employment in 2015. (*Id.*)

9

Walmart's "Open Door Policy" encourages employees to use the open door process to discuss all matters, including ideas, suggestions, and concerns, with immediate or next level management without fear of retaliation. (*Id.*)

> **EEOC's Response: Disputed. While Walmart had a written "Open Door Policy," this policy was not in effect because Walmart cut-off communication with the family of Marlo Spaeth after they brought a request for rehire and a complaint that Spaeth should have been accommodated to Walmart managers. (EEOC SAF ¶ 73). Walmart's Market Human Resources Manager directed Walmart's Assistant Manager to cease communication with Amy Jo Stevenson, closing the door to any further discussions regarding an accommodation for Spaeth and reinstatement or rehire for Spaeth. (Vance Decl., ¶ 6, Ex. 5 Castro Deposition 144:10-145:19; *Id.,* ¶ 14, Ex. 13 30(b)(6) Deposition Vol. II. 163:24-165:21).**

13. Walmart also has an entire department, the Accommodation Service Center, dedicated exclusively to servicing ADA/disability accommodation issues. (Spude Decl. at ¶ 12.)

> **EEOC's Response: Not disputed that Walmart has an Accommodation Service Center. However, Walmart never provided Spaeth or any member of Spaeth's family an accommodations packet so that she could engage in the interactive process with the Accommodations Service Center. (EEOC SAF ¶ 32, 44, 70.)**

10

## C. WALMART'S ATTENDANCE POLICIES

14. Walmart's Field Attendance and Punctuality Policy, updated April 29, 2013

and in force through the last day of Ms. Spaeth's employment in 2015, provides, in part:

> "One of Walmart's basic beliefs is service to our customers. **In order to provide extraordinary customer service, we must have appropriate staffing in all areas at all times.** To accomplish this, you as a Walmart hourly store associate should be both punctual and present for all scheduled shifts. We understand that you may have to miss work on occasion. **However, <u>regular and punctual attendance is a required and essential function of each associate's job</u>. If you have excessive absences or incomplete shifts (arriving late or leaving early), you will be subject to disciplinary action up to and including termination.**
>
> * * * * *
>
> An unauthorized absence means any time you are away from scheduled work (full day absence or incomplete shift) that is not approved by your supervisor or manager, even if you use an income replacement benefit (such as illness protection, personal or vacation time) to offset lost work time .... **Unauthorized absences and incomplete shifts are monitored and may result in disciplinary action ...."**

(*Id*. at ¶ 13, Ex. D.)  (Emphasis added.)

**EEOC's Response: Not disputed.**

15. The attendance policy further provides for a point system where instances of

unexcused absences tally as occurrences subject to discipline as defined by the policy:

| Event | Result |
|---|---|
| One to three consecutive unexcused absences (for same reason) | One Occurrence |
| Three Incomplete Shifts (tardy or leave early in a rolling six-month period) | One Occurrence |

11

| Three Occurrences (in a rolling six-month period) | Personal Discussion |
|---|---|
| Four or More Occurrences (in a rolling six-month period) | Coaching for Improvement (advancement to next coaching level if active coaching exists) |

(*Id.* at ¶ 14; Ex. D.)

**EEOC'S Response: Not disputed.**

16. Walmart's Attendance and Punctuality Management Guidelines, updated April 29, 2013 and in effect on Ms. Spaeth's last day of employment in 2015, instruct Walmart management to monitor associate attendance and hold Associates accountable for attendance policy violations. (*Id.* at ¶ 15, Ex. E.) This policy further provides for a personal discussion with the Associate to ensure that the Associate is aware of the Associate's attendance record, the attendance policy, and to provide opportunity to improve prior to being advanced to Coaching for Improvement. (*Id.*)

**EEOC's Response: Not disputed.**

17. The Coaching for Improvement policy, updated April 19, 2012 and effective on Ms. Spaeth's last date of employment in 2015, is based on levels of discipline designed to provide instruction and assistance to an Associate to foster improvement prior to reaching the level of termination. (*Id.* at ¶ 16, Ex. F.) In part, the policy provides:

> "Coaching for improvement is a tool we use to provide instruction and assistance to you. If your job performance fails to meet the reasonable expectations and standards for all associates in the same or similar position or if your conduct violates a company policy or interferes or creates a risk of interfering with the safe, orderly and efficient operation of our business. This approach provides you with an opportunity to identify, acknowledge and change unacceptable job

12

performance or conduct and enables us to retain those associates who demonstrate the interest, ability and desire to be successful."

(*Id.*)

**EEOC's Response: Not disputed as to the content of the Coaching for Improvement policy. However, disputed that Walmart's purpose for coaching Spaeth was, "to provide instruction and assistance to an Associate to foster improvement prior to reaching the level of termination" when, unlike past practice, Walmart did nothing to notify or involve Spaeth's family regarding the desire for improved attendance. In the past, Walmart's Personnel Coordinator communicated with Spaeth's family to ensure understanding of supervisor requests. (*See* Vance Decl., ¶ 4, Ex. 3 Becker Deposition 126:4 – 134:6; 179:10 – 180:23; 194:6-195:7 (Becker testified any time Spaeth would not understand something or have a problem she would communicate with Marlo's family except that during Spaeth's last eight months, Becker never communicated about schedule problems or discipline for attendance.)**

18. The Attendance and Punctuality Management Guidelines define the levels of Coaching for Improvement based on the number of absence occurrences:

| Absence occurrences within a six-month period | Action |
|---|---|
| 4 | First Written |
| 5 | Second Written |

13

| 6 | Third Written |
|---|---|
| 7 | Termination |

(*Id.* at ¶ 17; Ex. F.)

**EEOC's Response: Not disputed.**

19. Walmart policy also provides for escalation of disciplinary steps so that continued violations of the attendance policy could lead directly from a second coaching to termination. (Stern Dep. at pp. 34-35, 51; Spude 30(b)(6) Dep. at pp. 128-130; Spude Decl. at Ex. F.)

**EEOC's Response: Not disputed.**

**D.** <u>MARLO SPAETH'S GENERAL EMPLOYMENT HISTORY WITH WALMART</u>

20. Ms. Spaeth was hired by Walmart on or about August 2, 1999 as a Sales Associate at the Manitowoc Store (Spude Decl. at ¶ 5.)

**EEOC's Response: Not disputed.**

21. During the interview process, Ms. Spaeth answered questions on her own. (Becker p. 111.)

**EEOC's Response: Not disputed. However, Ms. Spaeth was not on her own, and unlike typical practice, she was accompanied by her mother during the interview. (Vance Decl., ¶ 4, Ex. 3 Becker Deposition, 66:16-67:2, 101:10-20).**

22. Ms. Becker filled out Ms. Spaeth's initial Scheduling Availability form with Ms. Spaeth's mother, Sandra Barnes, and Ms. Spaeth's Down Syndrome was not mentioned nor was any request for accommodation made for Ms. Spaeth. (Becker Decl. at ¶ 5; Becker Dep. at pp. 66-67.) Ms. Barnes informed Ms. Becker that Ms. Spaeth could not work weekends and would have to follow the bus schedule. (Becker Dep. at pp. 117-118.)

**EEOC's Response:**

**EEOC objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC does not dispute that Ms. Becker filled out the Initial Scheduling Availability form with Ms. Spaeth and her mother. That Ms. Spaeth had to follow the bus schedule and could not work weekends are also not disputed. However, EEOC disputes that no request for accommodation on the basis of Ms. Spaeth's Down syndrome was made. In fact, Ms. Stevenson testified that Ms. Spaeth must use the bus system because she is unable to drive due to Down Syndrome. (Vance Decl., ¶ 12, Ex. 11 Stevenson Deposition 186:25 - 188:1.) Further, despite the fact that Walmart's availability forms state, "You must be available for a minimum of 16 hours per week." Ms. Spaeth's availability forms were consistently approved by managers. (EEOC SAF ¶ 17.) The practices of allowing Ms. Spaeth to work within her 14 hours of availability which never included weekend shifts were accommodations made by Walmart for Ms. Spaeth's disability for 15 years.**

15

23. In 2014 and up to the time of her discharge, Ms. Spaeth worked as a Sales Associate in Walmart's Housewares and Domestic departments at the Manitowoc store where she was responsible for folding towels, tidying the aisles and helping customers locate items. (Stern Dep. at p. 17; Spude Decl. at ¶ 18; Buliox Decl. at ¶ 6, Ex. E at EEOC Response to Interrogatory No. 4.) These duties were essential duties of Ms. Spaeth's job at Walmart. (*Id.*)

**EEOC's Response: Not disputed.**

24. Ms. Spaeth formally worked as an Apparel/Homes Sales Associate and a Fabrics, Crafts & Home Furnishings Sales associate in 2014 and up to the time of her discharge from Walmart. (Spude Decl. at ¶ 19.)

**EEOC's Response: Not disputed.**

25. The Apparel/Home Sales Associate Job Description (published on January 30, 2012) and signed by Ms. Spaeth includes the following as Essential Functions of the position:

- Maintains merchandise presentation by stocking and rotating merchandise; removing damaged or out-of-date goods; setting up, cleaning, and organizing product displays; signing and pricing merchandise appropriately; and securing fragile and high-shrink merchandise.
- Maintains area of responsibility in accordance with company policies and procedures by properly handling claims and returns; zoning the area; arranging and organizing merchandise and supplies; identifying shrink and damages; and ensuring a safe work environment.
- Maintains the fitting room in accordance with company policies and procedures by folding and hanging clothing; ensuring pricing labels/tickets are attached; returning merchandise to appropriate departments; processing defective merchandise; answering phone for the entire facility; and monitoring the area of shrink, security risks, and safety.

16

- Organizes and maintains the Apparel Department by following rack rules; creating an appealing presentation for the customer; following fashion merchandising guidelines, and processing and displaying clothing.
- Provides customer service by acknowledging the customer; identifying customer needs; assisting with purchasing decisions; locating merchandise; resolving customer issues and concerns; promoting products and services; maintaining a safe shopping environment; and appropriately representing and supporting the company's mission.
- Receives and stocks merchandise and supplies from distribution centers and suppliers throughout the facility and organizes and maintains facility by following company procedures; utilizing equipment appropriately; merchandising; and completing and retaining required paperwork, logs, and other documentation.
- Complies with company policies, procedures, and standards of ethics and integrity by implementing related action plans; using the Open Door Policy; and applying these in executing business processes and practices.
- Completes work assignments and priorities by using policies, data, and resources; collaborating with managers, co-workers, customers, and other business partners; identifying priorities, deadlines, and expectations; carrying out tasks; communicating progress and information; determining and recommending ways to address improvement opportunities; and adapting to and learning from change, difficulties, and feedback.

(Spude Decl. at ¶ 20, Ex. G.)

**EEOC's Response: Not disputed.**

26. The Fabrics, Crafts & Home Furnishings Sales Job Description (revised on February 2, 2009) and signed by Ms. Spaeth includes the following as Essential Functions of the position:

- Provides Customer service by acknowledging the Customer, identifying Customer needs, assisting with purchasing decisions, locating merchandise, resolving Customer issues and concerns, and promoting products and services, while maintaining a safe shopping environment.
- Maintains merchandise presentation by stocking and rotating merchandise, removing damages or out-of-date goods, setting up, cleaning, and organizing product displays, signing and pricing

17

merchandise appropriately, and securing fragile and high-shrink merchandise.

- Maintains area of responsibility in accordance with Company policies and procedures by properly handling claims and returns, zoning the area, arranging and organizing merchandise/supplies, identifying shrink and damages, and ensuring a safe work environment.
- Receives and stocks merchandise supplies from distribution centers and suppliers and organizes and maintains facility by following company procedures, utilizing equipment appropriately, merchandising, and completing and retaining required paperwork, logs, and other documentation.
- Provides fabrics/crafts products to Customers by assisting with fabric, accessory, pattern, or tool selection, measuring and cutting materials, processing markdowns, creating price tickets, and verifying the amount of fabric received.

(Spude Decl. at ¶ 21, Ex. H.)

**EEOC's Response: Not disputed.**

27. Walmart considers the job responsibilities listed in the previous two paragraphs to be essential functions of Ms. Spaeth's job at Walmart during 2014 and up to the time of her discharge from Walmart. (Spude Decl. at ¶ 22.) Ms. Spaeth, and others who held the positions Ms. Spaeth last held with Walmart, were responsible for performing each of these job responsibilities. (*Id.*)

**EEOC's Response: EEOC's objects to the multiple facts presented in this one proposed finding of fact as it puts the overall number of statements of fact proposed by Defendant over the 150 limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC does not dispute that the job responsibilities listed in paragraphs 25 and 26 are categorized by Walmart as "Essential Functions."**

28. Attendance and punctuality were essential functions of Ms. Spaeth's job at Walmart. (30(b)(6) Dep. at pp. 44-46; Spude Decl. at ¶ 28.)

18

**EEOC's Response:** Not disputed that attendance and punctuality were essential functions of Spaeth's job. But disputed that working after 4 pm or during "peak times" is an essential function of Ms. Spaeth's job, since Spaeth works at a twenty-four hour Walmart that is staffed around the clock. (EEOC's SAF ¶ 50). And disputed that early departures are attendance violations of the attendance policy at Walmart. As Spaeth and Ms. Moss testified, they left early with manager approval because there was not much work. (EEOC SAF ¶¶ 68, 21.)

29. Ms. Spaeth was able to meet the essential job functions of her position with the exception of adhering to the shift schedule she was assigned. (30(b)(6) Dep. at p. 46.)

**EEOC's Response:** Disputed. Ms. Spaeth has 16 annual performance evaluations documenting her successful performance of the essential functions of her job. Additionally, in 9 out of the 10 years in which those performance evaluations tracked attendant, Ms. Spaeth had zero days absent and zero days tardy. (EEOC SAF ¶¶ 4, 5, 6, 7, 8, 9, 10, 11, 12.)

30. Ms. Spaeth has Down Syndrome according to the EEOC. (Dkt. 1 at ¶ 12.) During Ms. Spaeth's employment, Walmart was unaware of any other medical condition of Ms. Spaeth. (Spude Decl. at ¶ 24; Stern Decl. at ¶ 5; Popp Decl. at ¶ 4; Becker Decl. at ¶ 4.)

**EEOC's Response:** Not disputed. Additionally, this fact is not material.

31. There is no documentation in Walmart's employment file for Ms. Spaeth that indicated that Ms. Spaeth had a legal guardian and there is no indication in these files that anyone (other than Ms. Spaeth) needed to be consulted relative to employment matters concerning Ms. Spaeth. (Stern Dep. at p. 32; Stern Decl. at ¶. 6; Becker Dep. at p. 197; Popp Decl. at ¶ 5; Becker Decl. at ¶ 6.)

**EEOC's Response: Disputed. Walmart was aware that Ms. Spaeth was accompanied by her mother at her interview for employment and that Sandra Barnes completed Marlo's Scheduling availability form for her. (Vance Decl., ¶ 4, Ex. 3 Becker Deposition, 66:16-67:2, 101:10-20). Karen Becker was also in frequent contact with Spaeth's mother, Sandra Barnes, regarding Marlo's employment at Walmart. (*Id.,* ¶ 12, Ex. 11 Stevenson Deposition, 177:15-178:5).**

32. Julia Stern was an Assistant Manager at the Manitowoc Store for some time and directly supervised Ms. Spaeth during portions of 2014 and throughout 2015 up to the time of Ms. Spaeth's discharge from Walmart. (Stern Dep. at pp. 11, 17; Stern Decl. at ¶¶ 2, 4.)

**EEOC's Response: Not disputed.**

33. Neither Ms. Stern, Bonnie Popp (a Co-Manager at the Manitowoc Store at the time Ms. Spaeth's employment with Walmart ended), Robin Castro (another Co-Manager at the Manitowoc Store at the time Ms. Spaeth's employment with Walmart ended), nor Karen Becker (a Personnel Coordinator at the time Ms. Spaeth's employment

with Walmart ended) were aware that Ms. Spaeth had a legal guardian who needed to be contacted for employment related matters. (Stern Dep. at pp. 11, 26-27, 32; Popp Dep. at pp. 17, 49-50; Becker Dep. at pp. 29, 101, 197; Becker Decl. at ¶ 7; Castro Dep. at pp. 24-25, 33-34; Castro Decl. at ¶ 4.)

**EEOC's Response: EEOC's objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 limitation in Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC disputes that Karen Becker was unaware that Ms. Spaeth had a legal guardian who needed to be contacted for employment related matters. To the contrary, Ms. Becker testified to a long history of communication with Ms. Spaeth's guardian for multiple employment related matters. (Vance Decl., ¶ 4, Ex. 3 Becker Deposition pp. 126:4 – 134:6.). Additionally, Ms. Spaeth's sister, Ms. Stevenson testified,**

**177:15  Q   But you didn't go in.  You had a phone call with**

**177:16        Karen.**

**177:17  A   Right.  Karen has always been the go-to person, and**

**177:18        Karen has always been the person who called and**

**177:19        said "Marlo's smock is dirty" or "Marlo came in and**

**177:20        had a hole in her pants today."  It's always been**

**177:21        Karen.  Karen has always been the one who made the**

**177:22        accommodations throughout her employment.**

**177:23  Q   Well, what other -- What reasonable accommodations**

21

177:24       did the company give or Karen give Marlo prior to

177:25       this schedule incident coming up?

178:1 A   She worked four days a week noon to 4, not

178:2       Thursdays.

178:3 Q   Was that an accommodation, from your standpoint?

178:4 A   Yes.  I believe Karen understood the need for

178:5       routine.  I believe Julia did not.

(*Id.,* ¶ 12, Ex. 11 Stevenson Deposition pp. 177:15-178:5.)

### E.  MARLO SPAETH'S GENERAL ATTENDANCE AND PERFORMANCE AT WALMART

34. Ms. Spaeth was hired by Walmart as a part-time employee and she worked on a part-time basis throughout her employment with Walmart. (Spude Decl. at ¶ 25.) For most of her employment, she was scheduled to work from 12:00 pm to 4:00 pm. (*Id.* at ¶ 25.)

**EEOC's Response: Not disputed.**

35. On multiple occasions over the course of her employment, Ms. Spaeth did not work a full shift. For example, between January 9, 2012 through November 21, 2014, Ms. Spaeth left work early (defined by Walmart policy as leaving work 10 minutes or more prior to the end of a scheduled shift) on 114 occasions and was absent on 7 occasions. (Spude Decl. at ¶ 26, Ex. I.) Ms. Spaeth's leave earlies were largely, but not entirely, approved or otherwise not counted against her.  (*Id*. at ¶ 27; Ex. I)

**EEOC's Response: Not disputed. Spaeth testified that she left early because her managers instructed her to when there was no work. (EEOC SAF ¶ 19.) Walmart's practice of manager approval for early departures was not specific to Ms. Spaeth. (EEOC'S SAF ¶¶ 21-22).**

36. On February 3, 2012, Ms. Spaeth received a documented verbal coaching for her attendance issues. (Spude Decl. at ¶ 28, Ex. J.)

**EEOC's Response: Not disputed. However, this fact about absences in 2012 is not material. Ms. Spaeth's attendance records indicate that she was absent for three shifts in January 2012 in which she was scheduled and did not work. (Vance Decl., ¶ 20, Ex. 19 Spaeth Attendance Reports at D000424.)**

37. According to Ms. Spaeth's performance reviews, there were concerns with her performance over the years, such as:

- Ms. Spaeth's October 1999 Performance Appraisal identified multiple Areas for Improvement: greet customers first; take broken merchandise to the service desk or claims; use safe work practices; and always make sure all displays are secure.

- In June 2001, Ms. Spaeth was instructed that she needed to work at trying to find the correct location for out of place items.

- In June 2003, management noted that Ms. Spaeth needed to improve in returning damaged merchandise.

23

- In June 2004, it was noted that management would like to see zoning by Ms. Spaeth in other areas of her department.

- In her June 2005 review, Ms. Spaeth was reminded to say hello and practice the 10-foot rule.

- Ms. Spaeth's manager identified several Areas for Improvement in Ms. Spaeth's June 2006 review: continue to learn and zone other areas; look for new challenges; and, remember safety - look for new areas along the way.

- **In her June 2007 review, Ms. Spaeth's manager noted that she needs to improve her performance by continuing to work until the end of her shift.**

- **In her June 2008 review, Ms. Spaeth was criticized for not adhering to correct break timeframes.**

- Ms. Spaeth's April 2009 review identified her as requiring improvement in completing the task of folding <u>all</u> towels every day and staying busy until the conclusion of her shift.

- In her August 2, 2009 to August 2, 2010 review, her manager noted that Ms. Spaeth needed to go to the service desk to collect returned merchandise and improve her assistance in housewares.

- In her June 1, 2010 to June 1, 2011 review, her manager rated her as Development Needed in the categories of Influence and Communicate:

24

Share Information and Adaptability: Adapt. Ms. Spaeth's manager noted that she needed to improve her performance by increasing the number of aisles that she completes before the end of her shift.

- In her August 2, 2011 to August 2, 2012 review, Ms. Spaeth's manager identified as an area of improvement for Ms. Spaeth that she needs to restock the returns for both domestics and housewares before she concludes her shift for the day.

- On or about June 3, 2015, Ms. Spaeth was evaluated by Ms. Stern. In this evaluation, Ms. Spaeth was rated as "Development Needed" in the areas of Judgment, Execution and Results, and Adaptability. Supporting comments included a need for Ms. Spaeth to focus on zoning both the domestics and housewares departments as per her job function **and to also be aware of taking timely breaks and correctly clocking in and out for scheduled shifts.**

(Spude Decl. at ¶¶ 29 - 42, Exs. K - W.)

**EEOC's Response: EEOC's objects to the multiple facts presented in this one proposed finding of fact, as it puts the number of statements of fact proposed by Defendant over the 150 limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC does not dispute the contents of the performance evaluations of Marlo Spaeth, except that EEOC adds that 16 out of Spaeth's 17 annual performance reviews rated her at "Solid Performer" or "Meets Expectations" overall. (EEOC's SAF ¶ 4).**

25

38. Relative to Ms. Spaeth's general level of functioning while at work, while Ms. Becker did assist Ms. Spaeth with her initial login and password information as she had done with other Associates, Ms. Spaeth was able to complete computer-based training modules at Walmart unassisted. (Becker Dep. at pp. 114-115; Moss Dep. at p. 73.)

**EEOC's Response: Not disputed.**

39. Ms. Spaeth was also able to learn new tasks throughout her employment at Walmart. (Becker Dep. at p. 134; Moss Dep. at pp. 95-96.)

**EEOC's Response: EEOC does not dispute that this testimony shows Ms. Spaeth's ability to learn new tasks. However, the surrounding testimony also demonstrates that Ms. Spaeth learned new tasks by having them shown to her and "through the repetition of it" (Vance Decl., ¶ 7, Ex. 6 Moss Deposition 95:7 – 95:13.) Additionally, Becker testified that Walmart did not even attempt to teach Ms. Spaeth to work the registers because "she was probably not capable of it." (Vance Decl., ¶ 4, Ex. 3 Becker Deposition 134:20 – 134:24.)**

40. Ms. Castro had experience with teaching Ms. Spaeth new work duties and instructed Ms. Stern to use repetition when teaching Ms. Spaeth how to do returns. (Castro Dep. at pp. 155, 31-33.)

**EEOC's Response: Not disputed.**

41. During her employment at Walmart, Ms. Spaeth learned a new task of how to go to the service desk and place items in the return cart in the correct location. (Castro Dep. at pp. 156-157.)  In addition, Ms. Castro assigned Ms. Spaeth the job duty of dusting

off the coffee pots with a Swiffer and Ms. Spaeth learned how to complete this task and incorporated the same into her routine. (Castro Dep. at p. 156.)

**EEOC's Response: Not disputed.** *See* **EEOC's Resp. to Def. PFOF ¶ 39.**

F. WALMART'S CUSTOMER FIRST SCHEDULING SYSTEM

42. In 2014, the Manitowoc Store changed its scheduling process for hourly Associates in that Walmart had found that its current scheduling process was not meeting the needs of the business. (Spude Decl. at ¶ 43.)

**EEOC's Response: Disputed. Walmart's Personnel Coordinator testified that the scheduling system used by Walmart, which based employee schedules on customer traffic, was in place for at least the entire 20 years of her employment as Personnel Coordinator. (Vance Decl., ¶ 4. Ex. 3 Becker Deposition 62:15 – 64:5; 23:14-23:15.) Walmart has offered no evidence of any change in customer traffic from 1999 to 2014.**

43. Specifically, in approximately November 2014, the Manitowoc Store began scheduling Associates based on customer traffic in customer-driven time periods. (Stern Dep. at 80; Popp Dep. at p. 67; Castro Dep. at p. 49.) This system was to be more effective and schedule Associates during times of the most business to have associates available to serve customers. (Popp Dep. at p. 69.)

**EEOC's Response: Disputed.** *See* **EEOC Resp. Def. PFOF 42.**

44. Under this new scheduling system, shifts were automatically generated by a computer program and included a 1:00 pm to 5:30 pm shift. (Stern Dep. at pp. 80.) Based on customer traffic, a 12:00 pm to 4:00 pm shift was no longer an option. (Stern Dep. at

27

pp. 81.) The busiest time of the day at the Manitowoc Store was 4:00 pm to 5:30 pm. (Popp

Dep. at p. 93; Spaeth Dep. at p. 78.)

> **EEOC's Response: Not disputed that the busiest time of the day at the Manitowoc Store was 4 pm to 5:30 pm. Disputed that the scheduling system was "new" and that a 12 pm to 4 pm shift was "no longer an option," since scheduling accommodations are listed as an example of a reasonable accommodation in Walmart's antidiscrimination policy. (*See* EEOC's SAF ¶¶ 24, 68). Walmart's Personnel Coordinator also testified that the scheduling system used by Walmart, which based employee schedules on customer traffic, was in place for at least the entire 20 years of her employment as Personnel Coordinator. (Vance Decl., 4. Ex. 3 Becker Deposition 62:15 – 64:5; 23:14 - 23:15.) Further, the 12:00 p.m. to 4:00 p.m. shift remained an option; the process for manually keying in a specific schedule for an individual remained the same as it had been for years, Spaeth's managers simply ceased the practice of keying in Spaeth's schedule in November 2014. (EEOC SAF ¶¶ 23, 24.)**

45. The new automated scheduling system (which is referred to as Customer Service Scheduling or CSS) uses analytics on customer traffic and demand to most efficiently schedule Associates to meet specific customer demand and operating demand. (Spude Decl. at ¶ 44; Spude 30(b)(6) Dep. at p. 44.)

> **EEOC's Response: Disputed that the scheduling system was "new." Walmart's Personnel Coordinator testified that the scheduling system used by Walmart, which based employee schedules according to customer traffic, was in place for**

**at least the entire 20 years of her employment as Personnel Coordinator. (Vance Decl., ¶ 4. Ex. 3 Becker Deposition 62:15 – 64:5; 23:14 - 23:15.)**

46. The system enables Walmart to run its stores effectively and efficiently, eliminating expenditures on superfluous wages and ensuring that Associates are in place in the appropriate area to assist customers during critical times in the day where customer traffic is at its highest. (Spude 30(b)(6) Dep. at pp. 44, 121; Spude Decl. at ¶ 45.)

**EEOC's Response: Not disputed. Walmart's Personnel Coordinator testified that the scheduling system used by Walmart, which based employee schedules on customer traffic, was in place for at least the entire 20 years of her employment as Personnel Coordinator. (Vance Decl., ¶ 4, Ex. 3 Becker Deposition 62:15 – 64:5; 23:14 - 23:15.)**

47. Having Associates in place during critical times and providing customer service to customers in timely and expedient manners (and avoiding lapses in customer service) is a key to Walmart's business. (Spude Decl. at ¶ 46.)

**EEOC's Response: Not disputed that it is important for Walmart to have some Associates in place "during critical times." Disputed that Walmart must have *all* Associates in place at critical times, since the Manitowoc store is staffed twenty-four hours a day, which necessitates also having Associates in place during non-critical times. (EEOC's SAF ¶ 50.)**

48. Not following analytics and disregarding shifts generated by Walmart's Customer Scheduling System (CSS) would place Walmart in predicaments where customer

29

demand is not met and/or where wages or employee resources are expended unnecessarily. (Spude 30(b)(6) Dep. at pp. 44, 121; Spude Decl. at ¶ 47.)

> **EEOC's Response:** EEOC disputes that there is any factual basis that accommodating Ms. Spaeth would have placed Walmart in predicaments where customer demand is not met and/or where wages or employee resources are expended unnecessarily. Ms. Spaeth earned $12.50 per hour (EEOC's SAF ¶ 5.) Therefore, any employee earning less than $12.50/hr could have worked part of the shift generated for Ms. Spaeth by CSS at a savings to Walmart.

49. The implementation of CSS was not motivated by or connected to anyone's protected class status. (Spude Decl. at ¶ 48.)

> **EEOC's Response: Not disputed.**

## G. MARLO SPAETH'S CONTINUED ATTENDANCE ISSUES AND THE DECISION TO TERMINATE HER EMPLOYMENT

50. In November of 2014, Ms. Spaeth's work shift was changed from 12:00 pm to 4:00 pm to 1:00 pm to 5:30 pm in accordance with Walmart's customer focus/traffic scheduling system. (Stern Dep. at pp. 80.) The first shift with her revised hours was November 24, 2014. (Spude Decl. at ¶ 49.)

> **EEOC's Response: Not disputed.**

51. At the time of Ms. Spaeth's shift change, generated schedules were printed by Karen Becker and hung on the bulletin board in the hallway and could also be printed by Associates. (Stern Dep. at pp. 93, 106.) Historically, Ms. Spaeth's schedule was written

30

down for her every week and this practice continued after the scheduling system change in November 2014. (Becker Dep. at p. 181; Spaeth Dep. at p. 204). Ms. Becker also verbally reminded Ms. Spaeth of her work schedule. (Becker Dep. at p. 181.)

> **EEOC's Response: EEOC's objects to the multiple facts presented in this one proposed finding of fact, as it puts the number of statements of fact proposed by Defendant over the 150 facts limitation of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC does not dispute Paragraph 51.**

52. Ms. Spaeth would read the schedule given to her by Ms. Becker to know when she was scheduled to work and to make sure she was working her scheduled shift. (Spaeth Dep. at pp. 207-208.) Ms. Spaeth also checked her schedule every day while working at Walmart. (Spaeth Dep. at p. 243.)

> **EEOC's Response: Not disputed.**

53. In addition, every week when Ms. Becker gave Ms. Spaeth her schedule, Ms. Spaeth shared it with her sisters Barbara Barnes and Amy Jo Stevenson. (Spaeth Dep. at pp. 17, 65; Stevenson Dep. at p. 7.) Ms. Spaeth told Ms. Stevenson that Walmart wanted her to work until 5:30 pm and Ms. Barnes knew that Ms. Spaeth's schedule had changed and she was getting home from work later and after 6:00 pm. (Spaeth Dep. at p. 77; Barnes Dep. at pp. 51-52.)

> **EEOC's Response: EEOC objects to this fact as containing multiple facts. Thus, exceeding Walmart's 150 fact limit of Civil L.R. 56 (b)(1)(c)(ii). EEOC disputes that Ms. Spaeth shared her schedule with her sisters every week. Rather, when asked if Spaeth came home with a work schedule, Ms. Barnes**

31

testified, "I don't know. I don't think I ever saw her with a schedule. If she had a schedule, she didn't show – she didn't – she never showed me what it was. (Vance Decl., ¶ 33, Ex. 32 Barnes Deposition 53:8 – 53:16.) Further, Ms. Stevenson did not testify at all on page 7 of her deposition regarding Ms. Spaeth's schedule. Yet Defendant cites page 7 for the proposition that Spaeth shared her schedule with her sisters every week. On the contrary, Ms. Stevenson testified:

> 152:18  Q   So let's start with what you know as opposed to
>
> 152:19     what somebody else told you.  So when you said "She
>
> 152:20     would come home with a piece of paper that set
>
> 152:21     forth what shift she was scheduled to work," did
>
> 152:22     you ever see any of those pieces of paper prior to
>
> 152:23     her being terminated from Wal-Mart?
>
> 152:24  A   I've seen those, yes.
>
> 152:25  Q   Okay.  How many times did you see pieces of paper
>
> 153:1     that set forth the hours that Marlo was supposed to
>
> 153:2     work within the one-year period prior to her
>
> 153:3     leaving Wal-Mart?
>
> 153:4  A   I don't know.  Maybe once.
>
> (Vance Decl., ¶ 12, Ex. 11 Stevenson Deposition 152:18-153:4)

54. Ms. Spaeth expressed frustration with her new hours to Ms. Stevenson and conveyed that she felt that Julia [Stern] and Robin [Castro] were picking on her by telling

her that she had to work the new hours. (Stevenson Dep. at pp. 138, 141-142.) Ms. Stevenson was informed by Ms. Spaeth of her shift change 24 to 100 times, was aware that Walmart put Ms. Spaeth's hours in writing and gave them to her on a printout, and that Ms. Becker handed Ms. Spaeth's schedule to her weekly. (Stevenson Dep. at pp. 145-147, 149.) Ms. Spaeth communicated her new schedule of 1:00 pm to 5:30 pm to Ms. Stevenson and Ms. Stevenson had no reason to believe that Ms. Spaeth did not understand her new hours. (Stevenson Dep. at p. 269.)

> **EEOC's Response: EEOC objects to this fact as containing multiple facts. Thus, it exceeds Walmart's 150 fact limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to this objection, disputed in part. Stevenson actually testified that she *did* have reason to believe Spaeth did not understand her new schedule. (Vance Decl. ¶ 12. Ex. 11 Stevenson Dep. 150:23-151:2.)**

55. Ms. Spaeth's first shift with her revised hours was **November 24, 2014**. (Spude Decl. at ¶ 49; Ex. I.) While Ms. Spaeth timely punched in for her shift (12:55 pm) that day, she did not complete this shift and departed 49 minutes early at 4:41 pm. (*Id.* at Ex. I.)

> **EEOC's Response: Not disputed.**

56. Over the course of the next week (between November 25, 2014 and December 3, 2014), Ms. Spaeth left work early on the following days:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| **November 25, 2014** | 11:47 am | 3:39 pm | Departed 1 hour 51 minutes early |
| **November 26, 2014** | 12:49 pm | 4:30 pm | Departed 1 hour early |
| **December 1, 2014** | 12:47 pm | 4:19 pm | Departed 1 hour 11 minutes early |
| **December 3, 2014** | 12:45 pm | 4:19 pm | Departed 1 hour 11 minutes early |

(*Id.* at ¶ 50; Ex. I.)

**EEOC's Response: Not disputed.**

57. Although the lost hours on these five days totaled 6 hours and 2 minutes, Walmart made a management exception for Ms. Spaeth and excused these missed hours, meaning the occasions in which Ms. Spaeth left prior to the end of her scheduled shift during this time were not counted against her. (*Id.* at ¶ 51; Ex. I.)

**EEOC's Response: Not disputed. However, this practice was not specific to Ms. Spaeth. Ms. Stern testified that the Market Human Resource Manager, Lee Spude, instructed managers to code early departures during the first few weeks the system was implemented as business needs incomplete shifts which are manager-approved in order to allow all associates to have time to adjust to the**

34

**new scheduling system. (Vance Decl., ¶ 11. Ex. 10 Stern Deposition 128:24 –**

**130:6.)**

58. Ms. Spaeth also did not show for her scheduled shift on Black Friday, November 28, 2014, resulting in an unauthorized absence. (*Id.* at ¶ Ex. I.)

**EEOC's Response:  Not disputed.**

59. Ms. Spaeth's absences between November 24, 2014 through December 3, 2014 covered the week of Thanksgiving and Black Friday. (*Id.*)

**EEOC's Response:  Not disputed.**

60. Over the course of the next approximate week and a half, Ms. Spaeth departed early and failed to complete her shifts on the following dates:

| Date | Punch In | Punch Out | Total Time Missed |
|---|---|---|---|
| **December 8, 2014** | 12:53 pm | 3:39 pm | Departed 1 hour 51 minutes early |
| **December 10, 2014** | 12:50 pm | 3:21 pm | Departed 2 hours 9 minutes early |
| **December 11, 2014** | 12:46 pm | 3:20 pm | Departed 2 hours 10 minutes early |
| **December 12, 2014** | 12:45 pm | 3:20 pm | Departed 2 hours 10 minutes early |
| **December 15, 2014** | 12:46 pm | 3:19 pm | Departed 2 hours 11 minutes early |

(*Id.* at Ex. I.)

**EEOC's Response: Not disputed. EEOC's expert, Dr. David Smith testified that the disruption of Ms. Spaeth's routine resulted in the overall decline in functioning demonstrated by Spaeth's attendance following the schedule change. (EEOC's SAF ¶¶ 83-85.)**

61. This additional time missed by Ms. Spaeth during the holiday season amounted to 10 hours and 31 minutes. (*Id.*)

**EEOC's Response:  Not disputed. EEOC's expert, Dr. David Smith concluded that the disruption of Ms. Spaeth's routine resulted in the rapid decline in functioning demonstrated by Spaeth's attendance following the schedule change. (EEOC's SAF ¶¶ 83-85.)**

62. Ms. Stevenson, Ms. Spaeth's current legal guardian, testified that Ms. Spaeth leaving prior to 4:00 pm does not make sense in the context of Down Syndrome and knows of no reason why Ms. Spaeth would leave as early as 3:00 pm. (Stevenson Dep. at pp. 215-217.)

**EEOC's Response: Not disputed regarding Stevenson's testimony. However, disputed that Ms. Spaeth leaving prior to 4:00 pm does not make sense in the context of Down syndrome. EEOC's expert, Dr. David Smith concluded that the disruption of Ms. Spaeth's routine resulted in the overall decline in functioning demonstrated by Spaeth's attendance following the schedule change. (EEOC's SAF ¶¶ 83-85.)**

36

63. In a December 17, 2014 email from Ms. Stern to other managers at the

Manitowoc Store, Ms. Stern wrote, in part:

> On 12/17/14 I had a discussion with Marlo [Spaeth] about her attendance. She
> has been schedule for the past 3 weeks from 1:00pm to 5:30pm, however she
> has been clocking in around 12:45 and clocking out around 3:00. I had
> previously stalked to her about clocking in and out 15 minutes or more early a
> couple of weeks ago, as she was accumulating incomplete shifts due to leaving
> early. . . . I explained that she needs to work what she is scheduled, and at this
> point it should be a coaching but that I was giving her a chance to correct it after
> our discussion today. I told her I expected her to work her entire shift today and
> going forward, and if she continued to not work them I would then have to coach
> her as I need to be consistent with all the associates on attendance. . . . Then,
> after the grocery zone she stopped me on the salesfloor and said that she was
> going home (this was about 3:00) as she had talked to Karen [Becker] and she
> was concerned that if she did not eat supper on time that she would get sick, and
> that she wanted to talk to her sister about her scheduled. So I let her leave as I
> was not sure if has to make any adjustments, but I did tell her that the next two
> days she is scheduled 1-5:30 and I expect her to work that schedule. . . . So after
> she left and I got a chance to talk to Karen she told me that Marlo never even
> came to see her today – so she lied about having talked to Karen as well.

(Stern Dep. at p. 77; Stern Decl. at ¶ 7, Ex. A.) This email was drafted and sent on

December 17, 2015, and summarizes Ms. Stern's interactions with Ms. Spaeth and Ms.

Becker on that day concerning attendance-related items relating to Ms. Spaeth.   (Stern

Decl. at ¶ 7.)

> **EEOC's Response: Not disputed that Stern's email summarizes Stern's version**
>
> **of her interactions with Marlo Spaeth. However, the email also confirms that**
>
> **Marlo Spaeth requested a scheduling accommodation, which was ignored by**
>
> **Stern and Becker, as well as the other recipients of Stern's email. Moreover,**
>
> **Stern admits, "So I let her leave," giving Spaeth permission to go, and yet still**
>
> **considered the departure as an unauthorized early departure. Also disputed**

**that Spaeth left at "about 3:00," as she left much closer to 3:30 pm. (*See* Def.'s PFOF ¶ 64; EEOC's Resp. Def.'s PFOF ¶ 65.) EEOC's expert, Dr. David Smith concluded that the disruption of Ms. Spaeth's routine resulted in the overall decline in functioning demonstrated by Spaeth's attendance following the schedule change. (EEOC's SAF ¶¶ 83-85.)**

64. Over the course of the following two (2) days, Ms. Spaeth left work early and did not complete her full shifts, departing on those days as follows:

| Date | Punch In | Punch Out | Total Time Missed |
|---|---|---|---|
| **December 18, 2014** | 12:47 pm | 3:19 pm | Departed 2 hours 11 minutes early |
| **December 19, 2014** | 12:47 pm | 3:18 pm | Departed 2 hours 12 minutes early |

(Spude Decl. at Ex. I.)

**EEOC's Response: Not disputed that Spaeth left work early on December 18th and 19th, 2014. EEOC's expert, Dr. David Smith concluded that the disruption of Ms. Spaeth's routine resulted in the rapid decline in functioning demonstrated by Spaeth's attendance following the schedule change. (EEOC's SAF ¶¶ 83-85.)**

65. On December 22, 2014, Ms. Stern issued to Ms. Spaeth a First Written Coaching (Stern Dep. at p. 28; Stern Decl. at ¶ 8, Ex. B; Spude Decl. at ¶ 53, Ex. X.) The

38

"Observations of Associate's Behavior and/or Performance" section of the Coaching provided that:

> On 12/17/2[01]4 a discussion was held with Marlo about her attendance. She has been scheduled to work from 1:00pm to 5:30pm however she has been clocking out around 3:00 pm. It was expressed clearly to her that she is expected to work her scheduled shifts. She was scheduled to work on 12/18 and 12/19 for the shifts of 1:00pm to 5:30pm, yet both days she left around 3:00pm again.

and the "Impact of Associate's Behavior" section of this Coaching provided that:

> When Marlo does not work her scheduled shifts there is a lack of customer service as well as completing her tasks. This results in fellow associates having to finish her tasks, and possible loss of customer sales.

(*Id.*)

**EEOC's Response: Disputed that Spaeth left work "around 3 pm" or had been "clocking out around 3 pm," when the evidence shows Spaeth left much closer to 3:30 pm. (*See* Def.'s PFOF ¶ 64; EEOC's Resp. Def.'s PFOF ¶ 65.) EEOC's expert, Dr. David Smith concluded that, because of Spaeth's Down syndrome, the disruption of Ms. Spaeth's 12 pm to 4 pm routine resulted in the decline in functioning demonstrated by Spaeth's attendance following the schedule change. (EEOC's SAF ¶¶ 83-85.)**

66. In issuing Ms. Spaeth her First Written Coaching, Ms. Stern read the observations, impact, behavior, and next level sections to Ms. Spaeth. (Stern Dep. at p. 34.)

**EEOC's Response: Not disputed that Ms. Stern may have read the document described to Spaeth; but disputed that Spaeth understood what she was read. (*See* EEOC's SAF ¶¶ 38, 51) (Spaeth did not understand the disciplinary actions or termination.)**

39

67. After receiving this First Written Coaching, and on the same day of this Coaching (**December 22, 2014**), Ms. Spaeth left work at 4:34 pm prior to the end of her scheduled shift. (Stern Decl. at ¶ 9; Spude Decl. at Ex. I.)

**EEOC's Response: Disputed that Spaeth understood the Coaching. (*See EEOC's SAF ¶¶ 38, 51) (Spaeth did not understand the disciplinary actions or termination.)**

68. She also left early on the following days over the course of the next few weeks:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| **January 5, 2015** | 12:49 pm | 4:03 pm | Departed 1 hour 27 minutes early |
| **January 9, 2015** | 12:48 pm | 5:13 pm | Departed 17 minutes early |

(Spude Decl. at Ex. I.)

**EEOC's Response: Not disputed.**

69. On January 13, 2015, Ms. Stern discussed with Ms. Spaeth her continued early departures. (Stern Dep. at pp. 77-78; Stern Decl. at ¶ 7, Ex. A.)

**EEOC's Response: Not disputed, but incomplete. Stern also testified that Spaeth asked for her old schedule back every time Stern spoke to Spaeth about her attendance. (Vance Decl., ¶ 11, Ex. 10 Stern Dep. pp. 77:6-79:8.) Therefore,**

**Stern admits to ignoring multiple requests for accommodation from Spaeth, a person with a known disability:**

78:7 Q    And let's see.  In the middle I see that it says,

78:8       "She wanted to know why she can't just work noon to

78:9       4, like she used to."

78:10              Do you see where I'm reading?

78:11 A    Yes.

78:12 Q    What do you recall Marlo saying that prompted you to

78:13      write that?

78:14 A    That she just wished she could work noon to 4, like

78:15      she used to.

78:16 Q    And when did Marlo say that to you?

78:17 A    Whenever I would talk to her about her attendance.

78:18 Q    How often was that in this December 2014 to January

78:19      2015 time frame?

78:20 A    I'm not sure how many times.  I mean we documented

78:21      the coaching and when we talked to her on

78:22      December 17th.

78:23 Q    So is it fair to say that more than three times

78:24      Marlo said something to the effect of wanting to know

78:25      why she just -- or, can't just work noon to 4, like

79:1     she used to?

41

79:2 A    Possibly, yes.

79:3 Q    Do you think it would be more than three times that

79:4    she would have expressed a sentiment like that to

79:5    you?

79:6 A    I don't remember.  I don't know how many times.  I

79:7    know it was whenever I talked to her about

79:8    attendance.

(*Id.,* **Stern Deposition, 78:7-79:8.)**

70. In a January 13, 2015 email from Ms. Stern to other managers at the

Manitowoc Store, Ms. Stern wrote in part:

> On December 22, 2014 I gave Marlo S. a first coaching for attendance. .
> . . At that time I again went over the importance of having her work her
> scheduled shifts several times to ensure she understood. Since then she
> has been leaving early still. So today Robin [Castro] and I talked to her
> again. When I asked her why she was still leaving early she said she was
> afraid she would miss the bus, even though it runs until 8pm. She wanted
> to know why she can't just work noon to 4 like she used to. She does
> understand what shifts she is scheduled and that she is expected to work
> the full shifts. We explained to her that these are the shifts that are
> generated due to customer traffic and that is when we need her here. We
> also explained that if she cannot work these hours we will have to give
> them to someone that can, and that if she continues to not work her
> complete shifts that it will lead to subsequent coachings and potentially
> termination. . . . She did repeat back to us what we talked to her about so
> she does understand. A while later out on the salesfloor she apologized to
> me and said that she was wrong and she knows that she has to wok what
> she is scheduled.

(Stern Dep. at pp. 77-78; Stern Decl. at ¶ 7, Ex. A.) This email was drafted and sent on

January 13, 2015, and summarizes Ms. Stern's interactions with Ms. Spaeth and Ms. Castro

on that day concerning attendance-related items relating to Ms. Spaeth. (Stern Decl. at ¶ 7.)

> **EEOC's Response: Not disputed. Indeed, this email also documents Spaeth's requests for reasonable accommodation, which were ignored, as well as how Walmart could have found another associate to work from 4 pm to 5:30 pm without any hardship.**

71. After the conversation referenced above in the preceding paragraph, Ms. Spaeth left early on the following days:

| Date | Punch In | Punch Out | Total Time Missed |
|---|---|---|---|
| **January 13, 2015** | 12:46 pm | 5:19 pm | Departed 11 minutes early |
| **January 19, 2015** | 12:53 pm | 5:15 pm | Departed 15 minutes early) |
| **January 23, 2015** | 12:51 pm | 4:47 pm | Departed 43 minutes early |
| **January 30, 2015** | 12:50 pm | 5:14 pm | Departed 16 minutes early |
| **February 3, 2015** | 12:47 pm | 5:18 pm | Departed 12 minutes early |
| **February 13, 2015** | 11:48 am | 3:48 pm | Departed 1 hour 42 minutes early |

(Spude Decl. at Ex. I.)

> **EEOC's Response: Not disputed.**

72. In addition to these incomplete shifts, Ms. Spaeth was also a no call/no show on February 24, 2015 and March 13, 2015. (Spude Decl. at ¶ 52; Ex. I.) Both of these absences are considered full day absences. (*Id.* at ¶ 52.)

**EEOC's Response: Not disputed.**

73. On March 18, 2015, Ms. Stern issued to Ms. Spaeth a Second Written Coaching. (Stern Dep. at p. 29; Stern Decl. at ¶ 10, Ex. C; Spude Decl. at ¶ 53, Ex. X.) The "Observations of Associate's Behavior and/or Performance" section of the Coaching provided that:

> Marlo [Spaeth] was scheduled to work from 13:00 to 17:30 on 2/24/2015, and on 3/13/2015. She did not come in to work nor did she call in, so this is considered by policy to be a non call/ no show absence occurrence. She has also left before the end of her scheduled shift on eight days between 1/05/2015 and 02/13/2015.

and the "Impact of Associate Behavior" section of the Coaching provided that:

> When Marlo is not here the zoning standards of the housewares and domestics departments does not reflect a positive presentation, which can lead to an unsatisfactory shopping experience for the customer and may result in potential lost sales. Her share of the workload must be done by other associates in addition to their own tasks.

(*Id.*)

**EEOC's Response: Disputed that Spaeth understood the Coaching. (*See* EEOC's SAF ¶¶ 38, 51) (Spaeth did not understand the disciplinary actions or termination.)**

74. Ms. Stern read all of the information to Ms. Spaeth that Ms. Stern had typed on this Second Writing Coaching. (Stern Dep. at p. 30.)

44

**EEOC's Response: Not disputed that Ms. Stern read the Second Written Coaching to Spaeth. But disputed that Spaeth understood the Coaching. (*See* EEOC's SAF ¶¶ 38, 51) (Spaeth did not understand the disciplinary actions or termination.)**

75. In response, Ms. Spaeth said that she would check her schedule and make sure she would be to work on time. (Stern Dep. at p. 30.)

**EEOC's Response: Not disputed that Ms. Spaeth would have been able to repeat after Stern that she would check her schedule every day. But disputed that Spaeth understood the Coaching. (*See* EEOC's SAF ¶¶ 38, 51) (Spaeth did not understand the disciplinary actions or termination.)**

76. Ms. Spaeth typed the words "I will check my schedule every day" into the Second Written Coaching. (Stern Dep. at p. 33.) Ms. Stevenson testified that Ms. Spaeth has the capacity to understand these words. (Stevenson Dep. at pp. 221-222.)

**EEOC's Response: Not disputed.**

77. With both Ms. Spaeth's First Written Warning and her Second Written Warning, Ms. Spaeth was advised that additional attendance issues could result in further disciplinary action up to and including termination. (Stern Dep. at Ex. 20; Stern Decl. at ¶¶ 8, 10, Exs. B, C.)

**EEOC's Response: Not disputed.**

45

78. Following the issuance of her Second Written Coaching, Ms. Spaeth continued to have attendance issues and accrued an additional 16 interrupted shifts and 2 additional no call/no shows on June 29 and June 30, 2015. (Spude Decl. at ¶ 54; Ex. I.)

**EEOC's Response: Not disputed as to the attendance violations attributed to Spaeth. However, there is a dispute in the record that the June 29 and June 30, 2015 absences were true "no call/no shows." In October 23, 2015, Ms. Stevenson reported to the Civil Rights Division of the Department of Justice, "During our conversation, I learned that Marlo had left work early on some days and did not show for work on two days. Knowing that this was not Marlo's style, I continued to question Julie and later Marlo. I learned that Marlo received her weekly schedule from Karen, who printed it out for her. She was told by Karen not come in on the two days in question." (Vance Decl., ¶ 31, Ex. 30 DOJ Complaint Narrative EEOC00099.)**

79. On July 10, 2015, Walmart terminated Ms. Spaeth for excessive absenteeism. (Stern Dep. at p. 50; Stern Decl. at ¶ 11; Spude Decl. at ¶¶ 5, 55; Dkt #1 at ¶ 20; Popp Decl. at ¶ 6; Becker Decl. at ¶ 8.)

**EEOC's Response: Not disputed that Walmart told Ms. Spaeth it was firing her for absenteeism. Though EEOC disputes that Walmart's intention was to enforce its attendance policy rather than to target Spaeth and discriminate against an employee who required a reasonable accommodation. (*See* Vance Decl., ¶ 31. Ex. 30 DOJ Complaint Narrative EEOC000099.)**

46

80. Between January 13, 2015 and July 8, 2015, Ms. Spaeth accumulated 17 attendance occurrences. (Spude Decl. at ¶ 56; Ex. I.) The date of each occurrence was as follows:

| Dates and Types of Attendance Violations | Occurrences |
|---|---|
| | |
| 7/8/15 – Left Early<br>7/7/15 – Left Early<br>7/3/15 – Left Early | 1 occurrence |
| 7/1/15 – Left Early<br>6/26/15 – Left Early<br>6/24/15 – Left Early | 1 occurrence |
| 6/30/15 – No Call/No Show | 1 occurrence |
| 6/29/15 – No Call/No Show | 1 occurrence |
| 6/12/15 – Left Early<br>6/5/15 – Left Early<br>6/2/15 – Left Early | 1 occurrence |
| 6/1/15 – Left Early<br>5/29/15 – Left Early<br>5/22/15 – Left Early | 1 occurrence |
| 5/20/15 – Left Early<br>5/19/15 – Left Early<br>5/13/15 – Left Early | 1 occurrence |
| 5/5/15 – Left Early<br>5/4/15 – Left Early<br>5/1/15 – Left Early | 1 occurrence |
| 4/29/15– Left Early<br>4/28/15 – Left Early<br>4/27/15 – Left Early | 1 occurrence |
| 4/22/15 – Left Early<br>4/20/15 – Left Early<br>4/17/15 – Left Early | 1 occurrence |
| 4/15/15 – Left Early<br>4/14/15 – Left Early<br>4/13/15 – Left Early | 1 occurrence |
| 4/10/15 – Left Early<br>4/8/15 – Left Early<br>4/7/15 – Left Early | 1 occurrence |
| 4/6/15 – Left Early | 1 occurrence |

| | |
|---|---|
| 4/3/15 – Left Early | |
| 4/1/15 – Left Early | |
| 3/13/15 – No Call/No Show | 1 occurrence |
| 2/24/15 – No Call/No Show | 1 occurrence |
| 2/13/15 – Left Early | 1 occurrence |
| 2/3/15 – Left Early | |
| 1/30/15 – Left Early | |
| 1/23/15 – Left Early | 1 occurrence |
| 1/19/15 – Left Early | |
| 1/13/15 – Left Early | |
| | |
| **TOTAL** | **17 Occurrences** |

(*Id*. at Ex. I.)

**EEOC's Response: Not disputed.**

81. Walmart policy at the time called for termination after seven (7) attendance occurrences. (Spude Decl. at ¶ 56; Ex. F.)

**EEOC's Response: Disputed. While Walmart's written attendance policy may have called for termination after 7 occurrences, the attendance policy which was actually in effect at Walmart was much more lenient. (*See* EEOC's SAF ¶¶ 18-22.)**

H. The Decision to Not Reverse Ms. Spaeth's Termination and Reinstate Her Employment Without Her Reapplying

82. Following Ms. Spaeth's termination, Ms. Stevenson requested a meeting with Walmart to discuss Ms. Spaeth being reinstated into her position with Walmart. (Stern Dep. at p. 56; Stern Decl. at ¶ 12.) Ms. Stevenson represented at around this time that she was Ms. Spaeth's legal guardian. (Stern Decl. at ¶ 12.)

**EEOC's Response: Not disputed. (*See* EEOC's Resp. Def.'s PFOF, ¶ 4.)**

48

83. Walmart agreed to the meeting Ms. Stevenson requested, and on July 16, 2015, that meeting was held. (Castro Dep. at pp. 116-117; Popp Dep. at pp. 81-82; Popp Decl. at ¶ 7; Spude Decl. at ¶ 63; Castro Decl. at ¶ 5.) In attendance were Ms. Castro, Ms. Popp, Ms. Becker, Ms. Stevenson, Sandra Barnes (Ms. Spaeth's mother) and Ms. Spaeth. (Castro Dep. at pp. 116-117; Popp Dep. at pp. 81-82; Popp Decl. at ¶ 7; Castro Decl. at ¶ 5.)

**EEOC's Response: Not disputed.**

84. During the referenced July 16, 2015 meeting, Ms. Stevenson said that Walmart should have changed Ms. Spaeth's hours to what she "wanted" under the ADA. (Castro Dep. at pp. 118-119.) Ms. Stevenson also indicated that she believed Ms. Spaeth was being targeted by Ms. Stern because of her medical condition. (Popp Decl. at ¶ 8.)

**EEOC's Response: Not disputed. (*See* EEOC's SAF ¶¶ 39-43, 45, 46, 62-73.)**

85. During this meeting, Ms. Stevenson demanded that Ms. Spaeth be reemployed and indicated that if Ms. Spaeth was not reemployed and given the schedule she "wanted" she would bring a lawsuit against Walmart under the ADA. (Castro Dep. at p. 119; Becker Dep. at p. 169; Castro Decl. at ¶ 5; Popp Decl. at ¶ 8.)

**EEOC's Response: Not disputed. (*See* EEOC's SAF ¶¶ 39-43, 45, 46, 62-73.)**

86. After a termination, there are generally two ways an Associate can be reemployed at Walmart pursuant to written Walmart policy – rehire or reinstatement. (Spude Decl. at ¶ 57, 58, Ex. Y.)

**EEOC's Response: Not disputed.**

49

87. Under Walmart policy, if Associates want to be rehired after termination, they must ordinarily reapply through a written application process. (Spude Decl. at ¶ 59, Ex. Y.) They must wait 30 days before being able to reapply. (*Id*.)

**EEOC's Response: Not disputed.**

88. If they do not reapply, they can have their employment restored through Walmart's reinstatement process, which requires review and approval by management. (*Id*. at ¶ 60.) Reinstatement is not a right, guarantee or mere formality, and it does not occur unless there is substantial ground for reversing a termination decision, such as but not limited to error or misapplication of policy. (*Id*.)

**EEOC's Response: Not disputed.**

89. Reinstatement does not occur often and, during the period of January 1, 2014 through December 1, 2018, there has not been a single Associate (disabled or not) who has been reinstated at the Manitowoc after being discharged for attendance violations at the Manitowoc Store. (*Id.* at ¶ 61.)

**EEOC's Response: Not disputed; however, at least one associate has been reinstated after being terminated for attendance. (EEOC's SAF ¶ 58.) Moreover, at least eight other associates were rehired after being terminated for attendance violations. (EEOC's SAF ¶ 48.) Yet, Walmart told Spaeth that *she* would not be rehired. (EEOC's SAF ¶ 49.)**

90. Ms. Stevenson, Ms. Spaeth and Ms. Barnes were informed during the July 16, 2015, meeting with members of Walmart management that Ms. Spaeth could reapply for a position at Walmart. (Popp Decl. at ¶ 9; Castro Decl. at ¶ 6.)

50

**EEOC's Response: Disputed.** Ms. Stevenson testified that her take away from the post-termination meeting was that the managers had to check with their superiors and then get back to Ms. Stevenson with an answer regarding whether Marlo could go back to work at Walmart. She testified:

277:13   I want to direct your attention to the managers

277:14       meeting you testified about.  What was the end

277:15       result of that meeting?

277:16  A   That they were going to get back to me.

277:17  Q   About what?

277:18  A   If they could make the -- At that time I knew the

277:19       word "reasonable accommodation" of restoring

277:20       Marlo's work shifts to noon to 4 because, in fact,

277:21       they had created the problem itself of switching

277:22       her to 1 to 5 and 1 to 5:30, and it seemed pretty

277:23       simple to me that they would just switch it back,

277:24       but the end result was that they would get back to

277:25       me.  That was all.  We didn't have to do anything.

278:1       We didn't have to -- That was it.  That was all we

278:2       needed to do.

278:3  Q   Did they give you any information that would

278:4       explain why they couldn't do that right then and

278:5       there?

278:6  A   No.  I was actually surprised they couldn't.  I --

278:7      No.

278:8  Q   Were you -- Did they give you any information that

278:9      there were certain steps they were going --

278:10     somebody in the room was going to take?

278:11  A   I remember Karen having to talk with regional.  I

278:12     remember the word "regional."

278:13  Q   Did you have any homework or takeaway

278:14     responsibilities walking out of that meeting that

278:15     you were going to do?

278:16  A   Not that I recall, no.

**(Vance Dec., ¶ 12, Ex. 11, Stevenson Deposition, 277:13-278:16.)**

91. As of at least the end of 2018, Ms. Spaeth had not reapplied for employment at Walmart since her discharge. (Spude Decl. at ¶ 62.)

**EEOC's Response: Not disputed. Ms. Spaeth was personally informed by Robin Castro in September 2015 that she would not be rehired. (EEOC SAF ¶ 49.) Filling out an application for a position after you were told you will not be rehired violates common sense.**

92. Walmart considered Ms. Stevenson's above-referenced July 16, 2015 demand/request that Ms. Spaeth be reemployed as a request for reinstatement. (*Id*. at ¶¶ 63, 64.)

**EEOC's Response: Disputed. Ms. Stevenson requested reemployment for Marlo Spaeth, whether reinstatement or rehire, whichever option would allow Spaeth to return to work with an accommodation. (*See* EEOC's SAF ¶¶ 60-61.)**

93. Following Ms. Stevenson's July 16, 2015, demand that Ms. Spaeth be reemployed and mention of the ADA, Ms. Stevenson and Ms. Spaeth were informed that Ms. Stevenson's demand would be given to upper management for consideration and, on July 22, 2015, Ms. Castro reported the matter to Walmart's ethics hotline. (Popp Dep. pp. 83-84, 86-87; Becker Dep. p. 174; Castro Decl. at ¶ 7; Abitz Decl. at ¶ 6; Spude Decl. at ¶ 65.)

**EEOC's Response: Not disputed.**

94. Upon receiving Ms. Castro's referenced report to its hotline, Walmart investigated the matter. (Abitz Dep. at pp. 38-39, 77, 83; Abitz Decl. at ¶ 6; Spude Decl. at ¶ 65.) Its investigation consisted of Associate interviews, review of Ms. Spaeth's attendance record, review of Ms. Spaeth's disciplinary history and counselings, review of Walmart's policies on attendance/punctuality and discrimination and a review of whether the allegations raised by Ms. Stevenson during the July 16, 2015 meeting with management had any merit. (Spude Decl. at ¶ 65.)



95. Walmart investigated the matter to determine if Ms. Spaeth was terminated and disciplined based on attendance or based on disability, and to determine whether Ms.

Spaeth should be reinstated under Walmart's reinstatement policy. (Abitz Dep. at p. 77; Abitz Decl. at ¶ 7; Spude Decl. at ¶ 66)

**EEOC's Response: Disputed. (*See* EEOC's Resp. Def.'s PFOF ¶¶ 92, 94.)**

96. After reviewing matters, Walmart concluded that Ms. Spaeth's discharge was based on objective and verifiable policy violations, and it resultantly declined to reverse its termination decision and reinstate Ms. Spaeth into her former job. (Spude Decl. at ¶ 67; Abitz Dep. at p. 85; Abitz Decl. at ¶ 8.) The investigation confirmed for Walmart that Ms. Spaeth had accumulated 17 attendance violations prior to her discharge, and that she should have been discharged at 7 occurrences. (Spude Decl. at ¶ 67; Abitz Decl. at ¶ 9.)

**EEOC's Response: EEOC objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 fact limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC does not dispute that Walmart, incorrectly, reached the conclusions described in Paragraph 96 after investigating Stevenson's discrimination complaint and request for accommodation. However, EEOC disputes that the attendance policy set forth in Walmart's written attendance policy is actually in force at Walmart. (EEOC's SAF ¶¶ 20-22.)**

97. On or about September 22, 2015, Walmart communicated to Ms. Spaeth its decision to not reemploy her as had been requested. (Castro Decl. at ¶ 8; Abitz Dep. at p. 74; Spude Decl. at ¶ 68.)

**EEOC's Response: Not disputed that Ms. Castro called Spaeth on or about September 22, 2015. Disputed as to the wording of Ms. Castro' communication.**

54

**Ms. Castro testified that she told Ms. Spaeth that Walmart would not "rehire" her. (EEOC SAF ¶ 49.) But, what had been requested of Walmart, was that it contact Ms. Stevenson and communicate with her regarding Ms. Spaeth returning to Walmart. (Vance Decl., ¶ 12. Ex. 11 Stevenson Deposition 277:13 – 278:16.) However, Walmart cut off communication with Spaeth's relatives. (EEOC SAF ¶ 73.)**

98. Walmart did not perceive Ms. Stevenson's July 16, 2015, threat of litigation as an accommodation request or an application for reemployment. (Spude Decl. at ¶ 69; 30(b)(6) Dep. at p. 43; Castro Dep. at pp. 123-124.)

**EEOC's Response: Not disputed.**

99. During Ms. Spaeth's employment, Walmart was not aware of any reasonable accommodation that had been requested by Ms. Spaeth or anyone acting on her behalf, and was not aware that Ms. Spaeth might be in need of reasonable accommodation. (Rule 30(b)(6) Dep. at p. 43; Spude Decl. at ¶ 70.)

**EEOC's Response: Disputed. (*See* EEOC's SAF ¶¶ 29, 30, 34, 40, 41, 42, 43.)**

100.     The decision not to reinstate Ms. Spaeth's employment as if she had not been terminated did not impact her eligibility for rehire by Walmart. (Spude Decl. at ¶ 71.)

**EEOC's Response: Not disputed. However, Ms. Spaeth's eligibility for rehire was effectively revoked by Walmart when Ms. Castro informed Spaeth that Walmart would not rehire her. (EEOC SAF ¶ 49.)**

55

101.    Ms. Spaeth is listed as eligible for rehire in Walmart's system and in personnel records.  (Spude Decl. at ¶ 72, Ex. Z.)

**EEOC's Response: This fact is not material given that Ms. Castro told Ms. Spaeth that she would not be rehired by Walmart. (EEOC SAF ¶ 49.)**

I. VARYING EXPLANATIONS GIVEN REGARDING MS. SPAETH INABILITY OR REFUSAL TO WORK FULL SHIFTS

102.    Ms. Stevenson alleged during her deposition that prior to Ms. Spaeth's discharge she called Ms. Becker and advised that Ms. Spaeth was unable to work her new shift because of her Down Syndrome.   (Stevenson Dep. at pp. 167, 169-170.) Ms. Stevenson does not have a record of this, or any documentation to support this.  (*Id*. at p. 169.)

**EEOC's Response: Not disputed.**

103.    Walmart has no record of Ms. Stevenson calling Ms. Becker as Ms. Stevenson alleges in her deposition, and Ms. Becker denied speaking with Ms. Stevenson prior to Ms. Spaeth's discharge. (Becker Dep. at pp. 182-183; Becker Decl. at ¶ 9; Spude Decl. at ¶ 73.)

**EEOC's Response: Not disputed that Walmart denies receiving a call from Ms. Stevenson. Yet Ms. Stevenson did testify that she called Ms. Becker prior to Spaeth's termination to request an accommodation. (*See* EEOC's SAF ¶ 30.) This is a genuine dispute of material fact which precludes summary judgment.**

104.    During the time Ms. Spaeth worked under the supervision of Ms. Stern, Ms. Popp, and Ms. Becker. Ms. Spaeth did not indicate to Ms. Stern or Ms. Popp or

Ms. Becker that her absences and incomplete shifts were related to any medical condition she may have had. (Stern Decl. at ¶ 13; Popp Decl. at ¶ 10; Becker Decl. at ¶ 10.)

**EEOC's Response: Disputed. Spaeth asked for an accommodation of returning to her old schedule. (EEOC's SAF ¶ 34.) There were no magic words or medical documentation required since Spaeth has a known, easily observable, disability. (EEOC's SAF ¶¶ 62-71.)**

105.    Ms. Stern, Ms. Popp, and Ms. Becker did not believe that Ms. Spaeth's absences and incomplete shifts were related to Ms. Spaeth's Down Syndrome, or any other medical condition Ms. Spaeth may have had. (Stern Dep. at p. 84; Stern Decl. at ¶ 14; Popp Decl. at ¶ 11; Becker Decl. at ¶ 11.)

**EEOC's Response: EEOC's objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 fact limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, this "fact" is disputed. Ms. Stern and Ms. Becker believed Marlo's attendance issues could be related to a medical condition, as evidenced by Ms. Stern's testimony that she and Ms. Becker searched Marlo's personnel file for information about medical restrictions. (Vance Decl., ¶ 11, Ex. 10 Stern Deposition, 84:9-84:21.) Moreover, Ms. Stern, Ms. Popp, and Ms. Becker were all aware that Ms. Spaeth had Down syndrome and had asked for a schedule change, yet no one initiated the interactive process.**

106. When Ms. Popp saw Ms. Spaeth at the time clock leaving early and requested an explanation, Ms. Spaeth would respond that she just wanted to leave. (Popp Dep. at p. 64.)

**EEOC's Response: Disputed as incomplete. Ms. Popp's testimony included the statement that Ms. Spaeth said she wanted to leave, to which Popp responded, "Okay," after which Marlo left. (EEOC's SAF, ¶ 76.) Ms. Spaeth also testified that she left early, with manager approval, because there was "not much work." (EEOC's SAF, ¶ 19.)**

107. Ms. Spaeth also told Ms. Castro that she was leaving early because she was too hot or afraid that she would miss the bus. (Castro Dep. at p. 86, 158; Castro Decl. at ¶ 9.)

**EEOC's Response: Not disputed that Ms. Spaeth told Ms. Castro that she was too hot and afraid to miss the bus. However, disputed that these are the only reasons Ms. Spaeth left early. Ms. Spaeth also testified that she left early, with manager approval, because there was "not much work." (EEOC's SAF, ¶ 19.)**

108. A bus Ms. Spaeth used to leave Walmart at the end of her shift ran every one-half hour until 7:45 pm. (Spaeth Dep. at p. 36; Declaration of Tracy Tompkins at ¶ 2, Ex. A.)

**EEOC's Response: Disputed. Barbara Barnes testified that she and Ms. Spaeth catch the bus at the bus stop across the street from their apartment on North Eighth Street. (Vance Decl. ¶ 33, Ex. 32 Barnes Deposition, 8:10-8:19; 39:19-**

58

**40:16). According to the bus schedule at Exhibit A to the Declaration of Tracy Tompkins, ECF No. 98-1, p. 4 of 4, the Route 3 bus that stops at Walmart runs every half an hour until 5:45 pm, but thereafter runs only every hour. Further according to the same bus schedule exhibited by Defendant, that 5:45 pm bus arrives to the Transfer Center at 6:30 pm, where Ms. Spaeth would need to wait an extra half-hour for the last Route 2 bus which leaves at 7 pm to take her to her home near Reed Ave and North Eighth Street. Because the Route 2 bus only runs once per hour after 5:30 p.m., the commute time for Ms. Spaeth is substantially lengthened unless her commute begins within the timeframe when the buses run every half hour rather than the timeframe beginning at 5:30 pm, when the buses runs only once per hour. (ECF No. 98-1, pg. 4.)**

109. Ms. Spaeth informed Training Coordinator Debbie Moss that she was going to clock out early because she was too tired. (Moss Dep. at p. 21, 29-30.)

**EEOC's Response: Not disputed.**

110. Ms. Spaeth left early because she wanted to go home early to have supper. Her sister was unhappy that she was coming home late for supper, and she did not want to work later than 4:00 pm. (Spaeth Dep. at pp. 28, 36-37, 97-98.)

**EEOC's Response: EEOC objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 fact limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC disputes that Ms. Spaeth left early because of unhappiness about a late supper. When asked specifically, "So is the reason that you wanted**

59

to leave work by 4 so that you could be home in time for supper with Barb so that she wouldn't get mad at you?" Ms. Spaeth answered, "No." (Vance Decl., ¶ 9, Ex. 8, Spaeth Deposition 100:17 – 101:14.) Even if Ms. Spaeth and Ms. Barnes were unhappy about a late supper, this fact is not material because Walmart was on notice that Ms. Spaeth would get sick if she missed supper. (*Id.,* ¶ 23, Ex. 22, Stern December 17, 2014 Email.) Ms. Spaeth also cited concerns about missing the bus. It was common knowledge at Walmart that Spaeth is unable to drive due to her disability. (EEOC SAF ¶ 13.) Ms. Spaeth also testified that when there was not much work anymore, her Manager Karen and her Manager Brett told her to go home early. (EEOC SAF ¶ 19.)

111. Barbara Barnes (one of Ms. Spaeth's sisters) questioned Ms. Spaeth about why she was late to return from work and was unhappy with the schedule change because Ms. Barnes was the one making supper. (Barnes Dep. at pp. 24, 55-57; Spaeth Dep. p. 17.) Ms. Barnes did not want supper to be burned on the stove. (Barnes Dep. at pp. 55-57.)

**EEOC's Response: Not disputed. This fact is not material. Moreover, EEOC objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 limit of Civil L.R. 56 (b)(1)(c)(ii).**

112. Ms. Stern and Ms. Becker checked Ms. Spaeth's medical file and confirmed that there was no documented need for Ms. Spaeth to eat at a specific time. (Stern Dep. at pp. 84-85.)

60

**EEOC's Response: Not disputed.**

113.　　Ms. Spaeth was informed by Ms. Stern that she needed to have medical documentation that she would get sick if she did not eat supper on time and she would then be allowed to take her break at that time so that she could eat. (Stern Dep. at pp. 137-139, 156-157.) Ms. Spaeth did not provide any such medical documentation. (Spude Decl. at ¶ 74.)

> **EEOC's Response: EEOC objects to the multiple facts presented in this one proposed finding of fact as it puts the number of statements of fact proposed by Defendant over the 150 limit of Civil L.R. 56 (b)(1)(c)(ii). Subject to the objection, EEOC disputes this proposed fact in part. Not disputed that Ms. Stern testified as described in Proposed Fact No. 113 or that Ms. Spaeth did not provide medical documentation to Ms. Stern. However, EEOC disputes that medical documentation was actually requested or required from Ms. Spaeth. Julia Stern's contemporaneously written email does not include any mention that she asked Marlo Spaeth directly for medical information. (Vance Decl., ¶ 23, Ex. 22, Stern December 17, 2014 Email.) Moreover, Walmart's policy indicates that medical documentation is *not required* where an associate has a known or obvious disability. (EEOC SAF ¶¶ 69, 70.) Julia Stern's search for medical documentation in Ms. Spaeth's file is evidence that she understood that Ms. Spaeth was requesting a disability accommodation. Stern testified that she knew Ms. Spaeth had Down syndrome. (EEOC SAF ¶ 3.) Walmart's policy required Ms. Stern to provide Ms. Spaeth an Accommodation Service Center**

61

packet **"as soon as possible, and in no event more than two days after the request." (Vance Decl., ¶ 17, Ex. 16, Accommodation Management Guidelines at D000985.) No one at Walmart ever gave Marlo Spaeth or her guardian an accommodation request packet. (EEOC SAF ¶¶ 32, 43, 44.) Karen Becker testified that she regretted not giving Spaeth or her guardians an accommodation request packet. (EEOC SAF ¶ 87.)**

114.     No medical professional has attributed Ms. Spaeth feeling "hot" when she worked late to her Down Syndrome and no doctor has ever said that Ms. Spaeth needs to eat at a certain time (Stevenson Dep. at pp. 218-219, 245.)

**EEOC's Response: Disputed in part. It is not disputed that Ms. Spaeth did not seek medical care in connection with feeling "hot" when she worked late. However, it is disputed that "no doctor has ever said that Ms. Spaeth needs to eat at a certain time." EEOC's expert, Dr. David Smith, opined about the need for routine with Marlo Spaeth and other individuals with Down syndrome, which would include having meals at the same time every day. (EEOC SAF ¶ 83.) Moreover, Ms. Stevenson testified that Ms. Spaeth was stressed by the schedule change because of Down syndrome and that the sensation of heat comes from the stress. (Vance Decl., ¶ 12, Ex. 11, Stevenson Deposition 218:10 – 218:17.)**

115.     According to Ms. Stevenson, it is possible that Ms. Spaeth understood her new hours and just did not want to work them. (Stevenson Dep. at p. 234.)

**EEOC's Response: Disputed.** Ms. Stevenson explicitly testified that she did *not* believe "it was possible that Ms. Spaeth understood her new hours and just did not want to work them." (Vance Decl., ¶ 12, Ex. 11, Stevenson Deposition, pp. 234:9-234:15.) Ms. Stevenson merely conceded to Walmart's counsel's prodding regarding whether it is "a possible explanation" that Marlo "didn't want to work those hours and refused to do it." (*Id.*) The relevant testimony is provided below with context:

> 233:22 Q  Well, you made reference to seeing an e-mail that
>
> 233:23    evidenced that Ms. Stern had knowledge that Marlo
>
> 233:24    did not understand the coachings. And my question
>
> 233:25    simply is, what in this e-mail is -- are facts that
>
> 234:1    indicate that Ms. Stern knew that Marlo didn't
>
> 234:2    understand what was being communicated to her?
>
> 234:3 A  She's saying right here that she told her that she
>
> 234:4    had to work those hours and then reported that she
>
> 234:5    didn't work those hours. So to say she understood
>
> 234:6    is ludicrous while she's acting -- where action
>
> 234:7    shows that she didn't understand. And she's
>
> 234:8    acknowledging those actions.
>
> 234:9 Q  *Well, isn't one possibility that Marlo understood*

63

*234:10      what she was supposed to do and just didn't do it?*

*234:11  A    Not in Marlo's case.*

**234:12  Q    Well, but that is a possible explanation.  Right?**

**234:13      That she didn't want to work those hours and**

**234:14      refused to do it.**

**234:15  A    That's a possible explanation.**

**(Vance Decl., ¶ 12, Ex. 11, Stevenson Deposition 233:22-234:15) (emphasis added).**

116.      Prior to Ms. Spaeth's termination, Ms. Stevenson had experiences with Ms. Spaeth not being forthcoming with information. (Stevenson Dep. at pp. 237-238.)

**EEOC's Response:**

**Disputed as misconstruing Ms. Stevenson's testimony. Ms. Stevenson did not testify that she had "*experiences* with Ms. Spaeth not being forthcoming with information." Ms. Stevenson testified that she had *one experience* where Marlo was not forthcoming about the fact that she had stopped taking a daily walk because "Marlo is a peacekeeper." However, Ms. Stevenson ended her response with a summation that Marlo is "pretty forthcoming." The relevant deposition testimony is included below:**

**237:9  Q    Prior to Marlo's termination, had you had any**

**237:10      experience with Marlo not being forthcoming with**

**237:11      information?**

64

237:12  A   Yeah -- Yes.

237:13  Q   In what context?

237:14  A   Marlo is a peacekeeper.  That's also a Down

237:15      syndrome trait.

237:16  Q   So in what context did she try to be a peacekeeper

237:17      that resulted, based on your understanding, in her

237:18      not sharing information that you believe she should

237:19      have otherwise shared?

237:20  A   She stopped going for a walk every day and didn't

237:21      tell me that.

237:22  Q   And how did you find out?

237:23  A   Through conversation with her and Barb.

237:24  Q   And when was that, approximately?

237:25  A   A couple years ago.

238:1   Q   Any other situation besides her hiding or

238:2       withholding information about her lack of walking?

238:3   A   Other instances or other --

238:4   Q   Yes.  I'm sorry.

238:5   A   They have an exercise class that they go to, and if

238:6       they skip it, Marlo would not share that with me.

238:7   Q   Have there been instances where there have been

238:8       health issues that cropped up that Marlo withheld

65

**238:9**    from you where she was sick or had experienced some

**238:10**    mal-health issue, and she didn't tell you, and you

**238:11**    found out about it in some other way?

**238:12 A**   Not that I can recall.  She's pretty forthcoming

**238:13**    and thinks I can cure her, so she'll tell me.

**(Vance Decl., ¶ 12, Ex. 11, Stevenson Deposition, 237:9-238:13.)**

117.    Ms. Spaeth acknowledged in her deposition that she was leaving early to take the bus home (Spaeth Dep. at p. 26), that management did not like her punching out early (*Id*. at pp. 30-31, 223), that she was at risk for getting in trouble and for termination for violating Walmart's attendance policy (*Id*. at pp. 63-64, 29-30), that the bus is done at approximately a quarter to 8:00 pm (*Id*. at p. 36), that she knows that she punched out earlier than she was supposed to (*Id*. at p. 49), that she had a meeting at work to talk about leaving work early before she was terminated and that her hours were no longer 12:00 pm to 4:00 pm (*Id*. at pp. 56-58); that she discussed with her mother that she had been talked to by Ms. Stern about leaving work early (*Id*. at pp. 80-82), and that she knew that her termination was because of leaving work early (*Id*. at p. 106).

**EEOC's Response: Disputed. EEOC objects to this proposed "fact," as it contains more than ten different proposed facts, and in combination with Defendant's other proposed facts, is in excess of the Court's mandated limit of 150 proposed facts at summary judgment. Civil L. R. 56 (b)(1)(c)(ii). Subject to and without waiving that objection, these "facts" are disputed by Marlo Spaeth's own testimony as well as the testimony of other witnesses.**

66

For instance, Ms. Spaeth believed that management did not like her punching out early because they were picking on her by making her work late without letting her have her old schedule. (EEOC SAF ¶ 36.) Stern documented Ms. Spaeth's obvious confusion about her schedule and about what was expected of her, "So I let her leave as I was not sure if she has to make any adjustments, but I did tell her that the next two days she is scheduled 1-5:30 and I expect her to work that schedule. She said she only works 12-4" in her email documenting their conversation. (Vance Decl., ¶ 23, Ex. 22 Stern December 17, 2014 email.) Moreover, Ms. Spaeth did not actually understand the discipline or the termination. (EEOC's SAF ¶¶ 19, 38, 76.) As Dr. Smith stated in his initial expert report, "Persons with Down syndrome also tend to be 'people pleasers' and try to avoid social conflict and the anxiety that produces . . .When Ms. Spaeth was approached about her absenteeism, I'm not surprised that she would have simply acknowledged it. I'm also not surprised that she would agree to sign a paper, again to avoid conflict." (Vance Decl., ¶28, Ex. 27, Smith Conclusions 2017.)

J. THE ALLEGED CONNECTION BETWEEN MS. SPAETH'S MEDICAL CONDITION AND HER INABILITY TO WORK THE SHIFT ASSIGNED TO HER.

118. The EEOC alleges in its Complaint that Ms. Spaeth was unable to maintain her new work schedule because of her disability. (Dkt. # 1 at ¶ 19.) When asked

in written discovery to explain how Ms. Spaeth was allegedly unable to maintain her new schedule because of her disability, the EEOC indicated that consistent schedules are paramount for individuals with Down Syndrome and noted that it anticipated expert testimony related to Down Syndrome. (Buliox Decl. at ¶ 6, Ex. E at EEOC Response to Interrogatory No. 14.)

**EEOC's Response: Not disputed.**

119.    The EEOC has identified Dr. David Smith as its expert in this matter. (Buliox Decl. at ¶ 7, Ex. F.) Dr. Smith is not a psychologist, but a medical doctor. (*Id.* at Ex. F.)

**EEOC's Response: Not disputed that Dr. Smith is EEOC's expert and a medical doctor. Marlo Spaeth was born with her disability, Down syndrome. Down syndrome is a *genetic* disorder, not a "psychological" disorder.[3] Dr. Smith's expert report and testimony in this case are based upon his medical training and years of experience as a physician treating individuals with Down syndrome at the Down Syndrome Clinic of Wisconsin, which he founded in 1996. (EEOC SAF ¶¶ 76, 81, 82.)**

---

[3] "Down syndrome, [is] a 'genetic disorder which varies in severity, but causes lifelong intellectual disability and developmental delays.'" *Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 700 (7th Cir. 2014) (citing *Diseases and Conditions: Down syndrome*, Mayo Clinic (Apr. 19, 2014), http://www.mayoclinic.org/diseases-conditions/down-syndrome/basics/definition/con-20020948).

68

120.     Dr. Smith provided two reports and office notes in this matter, true and correct copies of which are being filed with access restricted to the parties. (Buliox Decl. at ¶¶ 8, 9, Exs. G, H.)

**EEOC's Response: Not disputed.**

121.     In his reports, Dr. Smith provides general information about people with Down Syndrome and their general ability to adapt to change. (Buliox Decl. at Ex. G.)

**EEOC's Response: Not disputed.**

122.     Dr. Smith did not examine Ms. Spaeth in 2014 and 2015, and he performed no psychological tests on Ms. Spaeth at any time. (*Id.*) Dr. Smith also did not administer any specific tests, standardized or otherwise, on Ms. Spaeth to assess her *specific* ability to adapt to change. (*Id.*)

> **EEOC's Response: Disputed in part. Not disputed that Dr. Smith did not examine Marlo Spaeth in 2014 and 2015. This is not a material fact, as Marlo Spaeth was born with her disability, Down syndrome. Nor is it disputed that Dr. Smith did not perform any "psychological tests" on Marlo Spaeth, since Down syndrome is a *genetic* disorder, not a "psychological" disorder. Moreover, as Dr. Smith reported, the use of standardized testing for people with Down syndrome is inappropriate in a context such as this because the tests have not been normed for people with Down syndrome. (Vance Decl., ¶ 26, Ex. 25 Smith Updated Conclusions 2019.)**

69

**It is, however, disputed that Dr. Smith did not perform "any specific tests" on Ms. Spaeth to assess her specific ability to adapt to change. Dr. Smith examined Ms. Spaeth and took her history. (EEOC's SAF ¶ 80.) Dr. Smith's expert report and testimony are based upon his medical training and years of experience as a physician treating individuals with Down syndrome at the Down Syndrome Clinic of Wisconsin. (*Id.,* ¶¶ 77, 78, 79, 81.)**

123.     Dr. Smith notes in his report that people with Down Syndrome may find it difficult to adapt to change in that they get into "grooves." (*Id.*) Dr. Smith does not know if the publication (Mental Wellness in Adults with Down Syndrome authored by Dennis McGuire Ph.D.) that he is relying on to support his opinions on the "groove theory" has been peer reviewed. (*Id.*; Smith Dep. at pp. 218-219.)

**EEOC's Response: Disputed in part. Not disputed that Dr. Smith notes in his report that people with Down Syndrome may find it difficult to adapt to change in that they get into "grooves." Disputed that Dr. Smith is "relying on" *Mental Wellness in Adults with Down Syndrome* "to support his opinions on the 'groove theory.'" Dr. Smith has more than enough medical expertise to identify the "groove theory." (EEOC's SAF ¶¶ 77-85.) While Dr. Smith does refer to the description of "the groove" provided in the *Mental Wellness in Adults with Down Syndrome* publication, Dr. Smith's expert report and opinions are based upon his medical training and years of experience as a physician treating individuals with Down syndrome at the Down Syndrome Clinic of Wisconsin, which he founded in 1996. (EEOC SAF ¶¶ 77, 78, 79,**

70

81, 82.)

124.     The publication (Mental Wellness in Adults with Down Syndrome authored by Dennis McGuire Ph.D.)  Dr. Smith references for his groove theory/concept has not been peer reviewed. (Tompkins Decl. at ¶ 3.)

**EEOC's Response: Disputed. Defendant has not defined "peer reviewed," nor why it would be material to this motion for summary judgement. While Dr. Smith does refer to the description of "the groove" provided in the *Mental Wellness in Adults with Down Syndrome* publication, Dr. Smith's expert report and opinions are based upon his medical training and years of experience as a physician treating individuals with Down syndrome at the Down Syndrome Clinic of Wisconsin, which he founded in 1996. (EEOC SAF ¶¶ 77, 78, 79, 81, 82; *See also* EEOC Resp. Def. PFOF ¶¶ 122, 123.)**

125.     According to Dr. Smith, there is "a lot of variation" with people with Down Syndrome, Ms. Spaeth functions [as of the time of his initial report in 2017] at the "higher end of the spectrum," and Ms. Spaeth "has learned new tasks since her termination from Walmart." (Buliox Decl. at Ex. G.)

**EEOC's Response: Not disputed.**

126.     Walmart has identified Dr. David Thompson as its expert in this matter. (Buliox Decl. at ¶ 10, Ex. I.) Dr. Thompson is a licensed psychologist. (*Id*. at Ex. I.)

**EEOC's Response: Not disputed.**

71

127.    Dr. Thompson provided two reports in this matter, true and correct copies of which are being filed with access restricted to the parties. (Buliox Decl. at ¶ 11, Ex. J.)

**EEOC's Response: Not disputed.**

128.    Dr. Thompson performed standardized tests on Ms. Spaeth and, among other conclusions, concluded that as of the time of his test Ms. Spaeth demonstrated an ability to adapt to change. (Buliox Decl. at Ex. J.)

**EEOC's Response: Not disputed that Dr. Thompson concluded that Ms. Spaeth demonstrated an ability to adapt change based on her reactions to minor changes in an artificial testing environment. However, disputed that Dr. Thompson's tests were appropriate to administer to Ms. Spaeth. (*See* Vance Decl., ¶ 26, Ex. 25 Smith Updated Conclusions 2019, p. 4-5.)**

**Ms. Spaeth and other people with Down syndrome cannot adapt to scheduling changes which impact the basic framework of her day without special care being taken to assist her in adjusting, as explained in Dr. Smith's testimony and report. (*Id.; see also* Vance Decl., ¶ 8, Ex. 7 Smith Deposition 38:18 – 39:4; EEOC's SAF ¶¶ 77-85.)**

129.    Ms. Spaeth has adapted to the major life change of going from living with her mother to living with her sister without any mal-affects. (Stevenson Dep. at p. 206.) Further, Ms. Spaeth has the ability to learn new routines but it would take time. (*Id.* at pp. 241-242.)

**EEOC's Response: Disputed.** EEOC disputes that it was a "major life change" for Marlo Spaeth to move in with her step-sister, Barbara Barnes, with whom she was raised. Amy Jo Stevenson, Marlo's sister and legal guardian, testified that she believed Marlo adjusted well to the move with Ms. Barnes because although the location changed, her schedule did not change. (Vance Decl. ¶ 12, Ex. 11, Stevenson Dep., 205:19-206:9.) Ms. Stevenson testified that Marlo's job at Walmart was "15 years and the love of [Marlo's] life." *Id.* at 205:23. Ms. Stevenson also testified that the change in Marlo's work schedule at Walmart was a comparatively "bigger" change for Marlo than moving to live with her step-sister, Barbara Barnes:

> 205:19    Have there been other instances in her life that
> 205:20        you've observed that she's had to make adjustments
> 205:21        and has been able to do that?
> 205:22 A:  Not something like that.  Not something where it's
> 205:23        been 15 years and the love of her life.  No.  I
> 205:24        don't have anything to compare that to.
> 205:25 Q:    Well, one adjustment was when she left living at
> 206:1        home with her mom to go live with Barbara.  Right?
> 206:2        Wouldn't that be a major life adjustment for Marlo?
> 206:3 A:    She still did all the same things.  She still
> 206:4        brushed her teeth the same, so that's the routine.
> 206:5        It was just in a different -- It's like staying in
> 206:6        a hotel or going on vacation.  She still brushed
> 206:7        her teeth at the same time and ate dinner at the

206:8      same time.  *So I think changing her job schedule is*

206:9      *a bigger* --


(Vance Decl., ¶ 12, Ex. 11 Stevenson Deposition 205:19 -
206:9.)(emphasis added).


EEOC also disputes that Ms. Stevenson testified that "Ms. Spaeth has
the ability to learn new routines but it would take time." Ms. Stevenson's
actual testimony was as follows:

241:24  Q   So is it fair to say that with respect to her need

241:25       for routine, she has the ability to learn new

242:1       routines.  Correct?

242:2  A   *With a great deal of hardship*.  I would like to

242:3       think that over time, a new routine, but it would

242:4       take time.

(*Id.,* 241:24-242:4) (emphasis added).

Dr. Smith also opined that it is very difficult to change the routine of
individuals with Down syndrome. (EEOC SAF ¶¶ 83, 84.) Dr. Smith also
testified that special steps should be taken to ease any transition, such as
preparing someone in advance for a change. (Vance Decl., ¶ 8, Ex. 7, Smith
Deposition, 38:18 – 39:4.)

74

130. From Walmart's observations, Ms. Spaeth had no difficulty learning new activities and making work adjustments through repetition. (Becker Dep. at p. 134; Moss Dep. at pp. 95-96.)

**EEOC's Response: Disputed. Walmart's witnesses testified that Marlo had some difficulty with change. (*See* EEOC Resp. Def.'s PFOF ¶ 39.)**

131. Ms. Castro had experience with teaching Ms. Spaeth new work duties and instructed Ms. Stern to use repetition when teaching Ms. Spaeth on how to do returns. (Castro Dep. at pp. 155, 31-33.)

**EEOC's Response: Not disputed.**

132. When Ms. Stern first began supervising Ms. Spaeth, Ms. Spaeth was essentially just folding towels so Ms. Stern took her through the housewares department and showed her to zone, which is to straighten items on shelves and put away returns from the service desk. (Stern Dep. at p. 157.) Ms. Spaeth began doing these tasks of zoning and putting away returns on a daily basis. (*Id.*)

**EEOC's Response: Disputed in part. Ms. Spaeth did more than "just folding towels" in her years of working for Walmart before she was supervised by Julia Stern, as evidenced by her performance evaluations (EEOC SAF ¶¶ 4, 6, 7, 8, 9, 10, 11.) EEOC does not dispute that Marlo Spaeth performed the "tasks of zoning and putting away returns on a daily basis" during her employment at Walmart.**

75

133.     During her employment at Walmart, Ms. Spaeth learned a new task of how to go to the service desk and place items in the return cart in the correct location. (Castro Dep. at pp. 156-157.)  In addition, Ms. Castro assigned Ms. Spaeth the job duty of dusting off coffee pots with a Swiffer and Ms. Spaeth learned how to complete this task and incorporated the same into her routine. (Castro Dep. at p. 156.)

**EEOC's Response: Undisputed. However, the examples given here were minor additions to job duties, which did not require Ms. Spaeth to alter her schedule, including meal times and bus schedule. (*See* EEOC's Resp. Def.'s PFOF ¶ 129; EEOC's SAF ¶¶ 77-85.)**

134.     During Ms. Spaeth's employment, neither Ms. Stern (who issued Ms. Spaeth her First and Second Written Coaching's), Kent Abitz (the Store Manager at the Manitowoc Store), Ms. Popp, Ms. Castro, Ms. Becker, nor Lee Spude (Regional Human Resource Manager) were aware of Ms. Spaeth's purported inability to change routines and/or work because of her Down Syndrome. (Stern Dep. at pp. 157, 159; Stern Decl. at ¶ 15; Abitz Decl. at ¶ 10; Popp Dep. at pp. 103-105; Popp Decl. at ¶ 12; Becker at pp. 228-229; Becker Decl. at ¶ 12; Castro Dep. at pp. 155-157; Castro Decl. at ¶ 10; Spude Decl. at ¶ 75.)

**EEOC's Response: Disputed. Walmart knew that Ms. Spaeth has Down syndrome. (EEOC SAF ¶ 3.) And, Walmart knew that Ms. Spaeth had trouble adapting to change. Walmart's witnesses testified that Marlo had some difficulty with change. (*See* EEOC Resp. Def.'s PFOF ¶ 39.) Walmart**

76

**also knew that Ms. Spaeth was having difficulty with the new schedule.**
**(EEOC's SAF ¶¶ 27, 89-90.) Walmart's own policies state that medical**
**information is not necessary where the individual has a known disability.**
**(*Id*. ¶ 69.) It was Walmart's duty to offer an accommodation to Ms. Spaeth.**
**(*Id*. ¶ 86.)**

135.    During Ms. Spaeth's employment, neither Ms. Stern, Mr. Abitz, Ms. Popp, Ms. Castro, Ms. Becker nor Mr. Spude were aware of Ms. Spaeth purportedly not understanding the disciplinary actions given to her. (Stern Dep. at p. 159; Stern Decl. at ¶ 16; Abitz Decl. at ¶ 11; Popp Decl. at ¶ 13; Castro Decl. at ¶ 11; Becker Decl. at ¶ 13; Spude Decl. at ¶ 76.) Ms. Stern, Ms. Popp, Ms. Moss and Ms. Castro testified that they believed Ms. Spaeth understood instruction and/or disciplinary action(s) given to her. (Stern Dep. at pp. 54, 159; Popp Dep. at pp. 83-84; Castro Dep. at pp. 74-75; Moss Dep. at pp. 99.)

**EEOC's Response: Disputed. This fact is also not material because the**
**disciplined occurred as a result of Walmart's failure to accommodate Ms.**
**Spaeth. Moreover, as Dr. Smith wrote, people with Down syndrome are**
**"people pleasers." (*See* EEOC Resp. Def. PFOF ¶ 117.)**

136.    Ms. Stern believed that Ms. Spaeth fully understood her schedule in that she was arriving for work every day at her new time of 1:00 pm instead of 12:00 pm. (Stern Dep. at p. 159.)

**EEOC's Response: Not disputed as to Ms. Stern's understanding.**

137. In a medical record for Ms. Spaeth, it is noted that Ms. Spaeth has Down Syndrome but is "very capable of understanding results" per Ms. Spaeth's mother, Sandra Barnes. (Buliox Decl. at ¶ 12, Ex. K.)

**EEOC's Response: Undisputed that the cited medical record indicates Sandra Barnes told the notetaker that Marlo Spaeth "very capable of understanding results" in reference to whether she should be called about medical test results. Disputed that Ms. Spaeth's purported ability to understand the results of a medical check-up can be extrapolated into an ability to understand "results," generally.**

138. Barbara Barnes, who lives with Ms. Spaeth, testified that Ms. Spaeth reads and understands the newspaper every day. (Barnes Dep. at p. 78; Spaeth Dep. at p. 16.)

**EEOC's Response: Disputed in part. Not disputed that Barbara Barnes testified that Ms. Spaeth reads the newspaper. However, while Ms. Spaeth may flip through a newspaper every morning, it is disputed that Barbara Barnes has knowledge of how much Ms. Spaeth actually comprehends what she sees in the newspaper.** ▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

## K. THE ADDITIONAL EFFECTS OF PERMANENTLY ADJUSTING MARLO SPAETH'S SCHEDULE OUTSIDE OF CUSTOMER DEMAND[4]

139.     Scheduling Ms. Spaeth on a permanent basis from noon to 4:00 pm (which is outside the 1:00 pm to 5:30pm schedule for her generated by Walmart's automated scheduling system) would have required Walmart, in perpetuity, to expend unnecessary wages from noon to 1pm on Ms. Spaeth. (Spude Decl. at ¶ 77.)

**EEOC's Response: Disputed. The Manitowoc Walmart is a 24-hour store. (EEOC SAF ¶ 50.) Therefore, by necessity, Walmart must staff the store from noon to 1 pm. Additionally, had Walmart engaged in the interactive process with Ms. Spaeth, it may have determined that scheduling her to begin her shift at 1:00 p.m. may not have been a problem.**

140.     Between November 2014 and July 2015, noon to 1pm was not a critical and busy (in terms of customer traffic) time of the day for the Manitowoc Store in Walmart's judgment. (Spude Decl. at ¶ 78.)

**EEOC's Response: Undisputed. But, also, immaterial. The Manitowoc Walmart is a 24 hour store. (EEOC SAF ¶ 50.) Therefore, by necessity, Walmart must staff the store from noon to 1 pm. Additionally, had Walmart engaged in the interactive process with Ms. Spaeth, it may have**

---

[4] *Also see* Fact Nos. 42-48, 65 and 73.

**determined that scheduling her to begin her shift at 1:00 p.m. may not have been a problem.**

141.     Scheduling Ms. Spaeth outside of the schedule generated for her by Walmart's automated scheduling system could have also meant that there would have been no one in Ms. Spaeth's area to meet customer demand during critical times in the day unless someone else from another area came over to help. (*Id*. at ¶ 79; Spude 30(b)(6) Dep. at p. 44.)

**EEOC's Response: Disputed. There was no need for any lapses in customer service to occur if Ms. Spaeth's scheduling accommodation request had been granted or if Walmart had engaged in the interactive process to determine whether a different accommodation would suffice. As noted by Walmart Manager Julia Stern in an email regarding Marlo Spaeth, "if [Marlo was] not going to work the entire shifts then there are other associates in the store that would be more than happy to have those hours." (Vance Decl., ¶ 23, Ex. 22 Stern December 17, 2014 email). Therefore, Walmart could have easily prevented or remedied any potential lapses in customer service which resulted from granting Marlo Spaeth's request for a modified schedule as a disability accommodation.**

142.     Between November 2014 and July 2015, 4:00 pm to 5:30 pm was a critical and busy (in terms of customer traffic) time of the day for the Manitowoc Store in Walmart's judgment. (Spude Decl. at ¶ 80.)

80

**EEOC's Response: Undisputed. This fact is not material.**

143.     If someone from a different area needed to leave their area to work Ms. Spaeth's area, that Associate would not be available to meet customer demand in their area. (Spude Decl. at ¶ 81.)

**EEOC's Response: Disputed. Becker testified that Walmart cross-trained sales Associates to cover more than just their area and to move from their departments when customer demand called for it. (Vance Decl., ¶ 4, Ex. 3 Becker Deposition 135:15 – 136:24.)**

144.     Lapses in customer service and/or the ability to meet customer demand can result in unsatisfactory shopping experiences and adversely affect Walmart's business. (Spude Decl. at ¶ 82.)

**EEOC's Response: Undisputed Spude's declaration opines that lapses in customer service and/or the ability to meet customer demand can result in unsatisfactory shopping experiences, generally. Disputed that such happenings would adversely affect Walmart's business, as Walmart made $476,294,000,000 in revenues in 2014. (Vance Decl., ¶ 34, Ex. 33 Stipulation re Finances, p. 3.) Moreover, there was no need for any lapses in customer service to occur if Ms. Spaeth's scheduling accommodation request had been granted. As noted by Walmart Manager Julia Stern in an email regarding Marlo Spaeth, "if [Marlo was] not going to work the entire shifts then there are other associates in the store that would be more than happy**

81

to have those hours." (Vance Decl., ¶ 23, Ex. 22 Stern December 17, 2014 email.). Therefore, Walmart could have easily prevented or remedied any potential lapses in customer service which resulted from granting Marlo Spaeth's request for disability accommodation.**

145.     Ms. Spaeth's specific failures to work her full scheduled shift resulted in the zoning standards of the housewares and domestics departments not reflecting a positive presentation, which had the potential of leading to an unsatisfactory shopping experience for the customer and potential loss of sales. (Stern Dep. at Ex. 20.)

**EEOC's Response: Disputed. Ms. Spaeth requested the accommodation of returning to her former schedule. (EEOC SAF ¶¶ 29, 34.) There was no need for zoning issues or unsatisfactory shopping experiences to occur if Ms. Spaeth's accommodation request had been granted. As noted by Walmart Manager Julia Stern in an email regarding Marlo Spaeth, "if [Marlo was] not going to work the entire shifts then there are other associates in the store that would be more than happy to have those hours." (Vance Decl., ¶ 23, Ex. 22 Stern December 17, 2014 email). Therefore, Walmart could have easily prevented any zoning issues which may have resulted from granting Marlo Spaeth's request for disability accommodation.**

146.     Reduced staffing can result in not meeting the customer or operating demands. (30(b)(6) Dep. p. 44.)

**EEOC's Response: Disputed. Walmart's witness did not mention "reduced**

staffing" in the cited testimony. Moreover, there was no need for "reduced staffing" to occur in Marlo Spaeth's case if Marlo's request to return to her former schedule had been granted. As noted by Walmart Manager Julia Stern in an email regarding Marlo Spaeth's schedule, "if [Marlo was] not going to work the entire shifts then there are other associates in the store that would be more than happy to have those hours." (Vance Decl., ¶ 23, Ex. 22 Stern December 17, 2014 email.). Moreover, Walmart scheduled Ms. Spaeth within her availability without staffing problems for over 15 years. (EEOC SAF ¶ 91.) Therefore, Walmart could have easily prevented or remedied any "reduced staffing" which resulted from granting Marlo Spaeth's request for disability accommodation.

Dated at Milwaukee, Wisconsin this 17th day of June, 2019.

COUNSEL FOR PLAINTIFF

By _s/Carrie Vance_
Carrie Vance
Trial Attorney
EEOC - Milwaukee Area Office
310 W. Wisconsin Ave, Suite 500
Milwaukee, WI 53203
(414) 297-1130
carrie.vance@eeoc.gov

By _s/Leslie Carter_
Leslie N. Carter
Trial Attorney
EEOC – Milwaukee Area Office
310 W. Wisconsin Avenue, Suite 500

Milwaukee, WI 53203-2292
(414) 297-4188
leslie.carter@eeoc.gov