# EXHIBIT 2

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF WISCONSIN
 2                    GREEN BAY DIVISION

 3
    = = = = = = = = = = = = = = = = = = = = = = = = =
 4
    EQUAL EMPLOYMENT OPPORTUNITY
 5  COMMISSION,

 6         Plaintiff,

 7     v.                Civil Action No. 2:17-cv-70

 8  WAL-MART STORES EAST, LP,

 9         Defendant.

10  = = = = = = = = = = = = = = = = = = = = = = = = =

11
                 Deposition of KENT ABITZ
12
              *Contains Confidential Portions*
13
                 Friday, February 22, 2019
14
                         1:37 p.m.
15
                            at
16
      U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
17                 310 W. Wisconsin Avenue
                         Suite 500
18                  Milwaukee, Wisconsin

19

20

21

22

23

24

25  Reporter:  Christal A. Hansen, CSR-IA/IL, RPR
```

**Page 42**

1 in domestics and housewares, 8 to 15. If you
2 included apparel, like now we include apparel
3 and homelines, but not -- I don't think back
4 then there would be that many.
5 　　Q.　And do you have a memory of how many
6 domestics and housewares employees were
7 full-time when you first started at the
8 Manitowoc store?
9 　　A.　No.
10 　　Q.　Those departments are open 24 hours
11 seven days per week, correct?
12 　　A.　Yes.
13 　　Q.　And staffed 24 hours a day seven days
14 per week, correct?
15 　　A.　The department specifically?
16 　　Q.　Right.
17 　　A.　No.
18 　　Q.　What happens? Why aren't they -- what
19 do you mean that they're not staffed 24 hours a
20 day seven days a week?
21 　　A.　Once we get to 10:00 p.m., the third
22 shift would come in and take over the
23 responsibility of staffing our store. There
24 wouldn't be a specific associate assigned to
25 domestics and housewares the entire evening

**Page 43**

1 unless there was really heavy freight there.
2 　　Q.　And when you say "the entire evening,"
3 at what time does that change to the situation
4 where there's a domestic and housewares employee
5 staffed there?
6 　　A.　I'm not sure of the exact time. Either
7 6:00 a.m. or 7:00 a.m.
8 　　Q.　And do you recall how many department
9 managers worked in domestics and housewares
10 department when you first began the job as store
11 manager in Manitowoc?
12 　　A.　I know for sure one. I'm not sure if
13 there was two because the structure changes back
14 then, but for certain there was one.
15 　　Q.　And are department managers typically
16 full-time?
17 　　A.　Yes.
18 　　Q.　Hourly, paid by the hour, correct?
19 　　A.　Yes.
20 　　Q.　Prior to the date that Marlo Spaeth was
21 terminated, did you have a role in setting
22 schedules?
23 　　A.　No.
24 　　Q.　So, to your knowledge, in June -- in
25 2015 before July 10th, who -- in 2015 who would

**Page 44**

1 have been the people printing or setting --
2 excuse me -- Marlo Spaeth's schedule?
3 　　A.　I can give you an idea of who would do
4 it. I don't know who did it. It would be the
5 housewares/homelines, if you will, assistant
6 manager.
7 　　Q.　And am I right that that was
8 Julia Stern in 2015?
9 　　A.　Yes.
10 　　Q.　As the store manager you have
11 familiarity with performance appraisals,
12 correct?
13 　　A.　Yes.
14 　　Q.　And you can identify performance
15 evaluations by looking at them; is that correct,
16 from Walmart?
17 　　A.　Yes.
18 　　　　　(Exhibit Nos. 92 - 94 marked for
19 　　　identification by the reporter.)
20 　　Q.　So, directing your attention to what's
21 been marked as Exhibit 92 that's in front of you
22 dated October 27th, 1999, do you recognize what
23 this document is?
24 　　A.　A performance appraisal.
25 　　Q.　And can you tell me who the employee is

**Page 45**

1 being appraised?
2 　　A.　Marlo Spaeth.
3 　　Q.　And I'm right that Brett Wiley's
4 signature appears on this document; is that
5 correct?
6 　　A.　Yes.
7 　　　　　MR. BULIOX: I'm going to object
8 to the extent it calls for speculation.
9 　　Q.　To your knowledge, who's Brett Wiley?
10 　　A.　Brett Wiley was the, I believe, the
11 store manager before Jason.
12 　　Q.　And I guess I said signature. I should
13 say his name is printed in Print Supervisor's
14 Name, do you see that, Brett Wiley?
15 　　A.　Yes.
16 　　Q.　And I'll direct your attention to
17 Exhibit 93.
18 　　　　Do you recognize what that document
19 is?
20 　　A.　Performance appraisal.
21 　　Q.　And who is the associate being
22 appraised?
23 　　A.　Marlo Spaeth.
24 　　Q.　And do you agree with me that
25 Brett Wiley's printed name is also on this

## Page 62

1  agree with me she typed June 3, 2015?
2     A.   Where?
3     Q.   I'm sorry. That next to Marlo's name,
4  Marlo Spaeth's name, the date is June 3, 2015?
5     A.   Yes.
6            MS. VANCE: Actually, I need a
7  break. Can I call a break, a bathroom break for
8  10 minutes.
9            MR. BULIOX: Sure.
10           (Recess.)
11           MS. VANCE: We are back on the
12 record after a little break.
13           EXAMINATION
14 BY MS. VANCE: (Continued.)
15    Q.   Mr. Abitz, is there anything about your
16 prior testimony that you wanted to add to or
17 clarify after this break?
18    A.   No.
19    Q.   I would like to show you what was
20 marked at a previous deposition as Castro
21 Deposition 86.
22       Now, do you recognize this document?
23    A.   It's an Accommodation in Employment
24 Management Guidelines.
25    Q.   And if you wanted to find this in the

## Page 63

1  computer, how would you find it?
2     A.   I would look on the WIRE.
3     Q.   Right. And am I correct that
4  management guidelines are geared towards
5  salaried members of management at the store
6  level?
7     A.   I would say yes.
8     Q.   And do these Accommodations in
9  Employment (Medical-Related) Management
10 Guidelines - Walmart come from Walmart
11 headquarters to the best of your knowledge?
12    A.   To the best of my knowledge, yes.
13    Q.   And I'll ask you to -- well, let me
14 also ask you, have you consulted this management
15 guidelines before in your job as a store
16 manager?
17    A.   I'm sure I have. I certainly don't
18 recall when, but any time that there would be a
19 request for accommodation or if I thought there
20 was a request for accommodation, I would
21 certainly pull the policy up and try to identify
22 if it's something that we could do or who I
23 would, you know, team up with or partner with.
24    Q.   All right. And then, I'll ask you to
25 read through this to see if you agree with me.

## Page 64

1        According to this document, a request
2  for a job adjustment can sometimes be handled at
3  the store level without escalating beyond the
4  store level; is that correct?
5     A.   Yes.
6     Q.   And this document gives managers
7  guidelines about which job adjustments can be
8  made at the store level, correct?
9     A.   Yes.
10    Q.   I mean, you know, is it this policy
11 that -- these management guidelines that you
12 would consult if you were trying to figure out,
13 okay, does this reason -- you know request for
14 reasonable accommodation fall within my
15 authority as store manager? Is this the
16 guidelines you would consult?
17    A.   Yes. It's been updated many times, but
18 yes. Even if -- if I might add, even if there
19 was a job aid, I would partner, certainly, with
20 my HR representative, which would be Karen.
21       And then, if we may disagree, we
22 certainly would partner with Lee Spude. Or, if
23 we still weren't clear, we would send something
24 to the -- I think it's some kind of packet to
25 the Accommodation Service Center.

## Page 65

1        So, if I'm going to approve a job aid,
2  which is basically what this is asking to do,
3  it's giving me permission that I can make those
4  decisions. If it's something I wasn't
5  comfortable with, I would certainly partner
6  with, you know, the resources that I have.
7     Q.   And the resources that you have are
8  Karen Becker as your personnel coordinator in
9  your store, correct?
10    A.   Yes.
11    Q.   And Lee Spude as your market human
12 resources manager at the market level in
13 Green Bay, right?
14    A.   Yes.
15    Q.   I want to turn your attention to the
16 second page of Exhibit 86. And we see at the
17 top that there's a list. One of the lists says
18 Scheduling. And if you'll read with me --
19       "Scheduling: Minor changes to
20 availability and scheduling preferences does not
21 include approval of set schedules, guaranteed
22 hours or creating special schedules."
23       Did I read that right?
24    A.   Yes.
25    Q.   Is it your understanding that these

Page 66

```
 1  management guidelines give you the authority to
 2  approve requests for minor changes to
 3  availability and scheduling preferences within
 4  the store?
 5      A.  Define "minor," I guess, would be --
 6      Q.  Well, that's what I want to ask you.
 7          But, first I'm trying to establish
 8  that we agree this management guideline says,
 9  Hey, the store manager in the store, you know,
10  acting on his or her own --
11      A.  Absolutely.
12      Q.  -- authority can --
13      A.  You could make changes, yes.
14      Q.  -- can approve minor changes to
15  availability and scheduling preferences?
16      A.  Yes.
17      Q.  And in your experience as store manager
18  for Walmart, of Sheboygan North or Manitowoc,
19  have you ever approved minor changes to
20  availability or scheduling preferences, you
21  know, using these -- consulting -- or according
22  to these guidelines?
23      A.  I'm sure I have, yes.  I'm not sure the
24  exact detail, but I'm certain if someone would
25  come and say, "I need to have off Tuesdays for a
```

Page 67

```
 1  doctor's appointment," certainly I would
 2  consider that, you know, something that I could
 3  accommodate.
 4      Q.  And with that kind of request, does the
 5  associate fill out a formal request form?  Do
 6  you document that in any way?
 7      A.  Yes, it goes into the personnel file.
 8  If you're going to create a -- at least now -- I
 9  don't remember back in 2013 -- if you were going
10  to create, like, a job aid, let's say an
11  associate had surgery on their foot and they
12  wanted to wear a boot to work -- to work and
13  walk up front and they had to use a cane,
14  certainly that would go into the personnel file
15  and something that I could approve.
16      Q.  And what's the form that would go into
17  the personnel file?
18      A.  I don't know the name of it exactly.
19      Q.  Is it different than the paperwork that
20  is sent to the accommodations service center?
21      A.  I believe so.
22      Q.  You gave the example of please don't
23  schedule me as available on Tuesdays because of
24  doctor's appointments.
25          Can you think -- do you have any
```

Page 68

```
 1  memory of a specific associate who needed a
 2  minor change to availability and scheduling
 3  preference that you approved?
 4      A.  None that I can think of right now.
 5      Q.  You just -- it's not uncommon, you know
 6  you've done it before; is that fair?
 7      A.  I would say I've done it before; I
 8  would say that's fair.
 9      Q.  Okay.  And if Marlo Spaeth asked for
10  changing her 5:30 schedules to end at 4:00,
11  would your judgment call in that situation be,
12  yeah, let's do that, that's a minor change to
13  availability and scheduling preference?
14      A.  That would not.
15      Q.  And in that case, if you were asked to
16  change Marlo Spaeth's -- or to maintain
17  Marlo Spaeth's availability to end at 4:00, if
18  your testimony is, I would not do that in-house
19  on my own authority, what steps would you take?
20      A.  I would partner with Karen.  I would
21  partner with Lee.  And that would, in my
22  opinion, would go to the Accommodation Service
23  Center, help center, in my opinion.
24      Q.  And to be clear, no one at Walmart ever
25  approached Marlo Spaeth or a family member of
```

Page 69

```
 1  hers with the paperwork that goes to the
 2  Accommodation Service Center, correct?
 3              MR. BULIOX:  I'm going to object
 4  to the extent it calls for speculation and
 5  assumes facts not in evidence such as there
 6  being any conversation about accommodation
 7  paperwork in the first place.  So, subject to
 8  that, go ahead and answer.
 9      A.  Yeah, I wouldn't know if anybody had
10  done that.
11      Q.  You know that you did not, correct?
12      A.  Yeah, I did not.
13      Q.  And have you had a situation where an
14  associate who is a subordinate to you as a
15  salaried member of management did do this
16  process of submitting the paperwork to
17  Accommodation Service Center about scheduling
18  availability?
19      A.  A salaried member of management?
20      Q.  Yeah.  So, that would be years, a
21  broader span of years in your career.
22      A.  I don't know that a salaried member of
23  management would take care of that situation.
24      Q.  Oh, are you saying it would be more
25  likely to be only a store manager?
```