# EXHIBIT 7

## Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF WISCONSIN
 3   --------------------------------------------------------
 4   EQUAL EMPLOYMENT OPPORTUNITY
     COMMISSION,
 5
 6                       Plaintiff,
 7                                    Case No. 1:17-CV-00070
          -vs-
 8
 9   WAL-MART STORES EAST, L.P.,
10
                         Defendant.
11
     --------------------------------------------------------
12
13              Video Examination of DAVID SMITH, M.D.,
14   taken at the instance of the Defendant, under and
15   pursuant to the Federal Rules of Civil Procedure, before
16   KARA D. SHAWHAN, a Certified Realtime Reporter,
17   Registered Merit Reporter and Notary Public in and for
18   the State of Wisconsin, at CityCenter, 735 North Water
19   Street, Milwaukee, Wisconsin, on October 5, 2018,
20   commencing at 8:37 a.m. and concluding at 12:19 p.m.
21
22
23
24
25
```

## Page 2

```
 1                    A P P E A R A N C E S
 2   U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by
     MS. CARRIE VANCE,
 3   MS. LESLIE CARTER,
     310 West Wisconsin Avenue,
 4   Milwaukee, Wisconsin 53203,
     (414)297-1130,
 5   carrie.vance@eeoc.gov,
     leslie.carter@eeoc.gov,
 6   appeared on behalf of the Plaintiff.
 7   MWH LAW GROUP, LLC, by
     MR. EMERY HARLAN,
 8   735 North Water Street,
     Milwaukee, Wisconsin 53202,
 9   (414)436-0353,
     emery.harlan@mwhlawgroup.com,
10   appeared on behalf of the Defendant.
11
                       A L S O   P R E S E N T
12
     Mr. Doug vanderHoof, Videographer.
13
14                          * * * * *
                            I N D E X
15
16   Examination:                                        Page
17   By Mr. Harlan......................................   5
18
     Exhibits Identified:                                Page
19
     Exhibit 54 -   CV..................................   9
20   Exhibit 54A -  Copy of the Notes That Dr. Smith
                    Prepared and Brought to the
21                  Deposition.........................   8
     Exhibit 55 -   Everything That Dr. Smith Has
22                  Prepared and Filed in Connection
                    With the Case......................  69
23   Exhibit 56 -   Set of Documents From the EEOC That
                    Purports to Represent Dr. Smith's
24                  File...............................  83
25
```

## Page 3

```
 1                          * * * * *
 2   Disposition Of Original Exhibit/s:
 3   Attached To Original Transcript
 4
 5                          * * * * *
```

## Page 4

```
 1       TRANSCRIPT OF PROCEEDINGS
 2       (Exhibit Nos. 54 and 55 were marked.)
 3       THE VIDEOGRAPHER: We are now on the
 4   record. My name is Doug vanderHoof. I'm a
 5   videographer retained by Lexitas Reporting. This
 6   is the video deposition for the U.S. District
 7   Court, Eastern District of Wisconsin. Today's date
 8   is October 5, 2018, and the time on screen is 8:38
 9   in the morning.
10       This deposition is being held at
11   CityCenter, 735 North Water Street in Milwaukee, in
12   the matter of the Equal Employment Opportunity
13   Commission versus Wal-Mart Stores East, L.P. The
14   deponent is David Smith M.D.
15       Could I ask counsel to please identify
16   themselves and say who they represent?
17       MR. HARLAN: Emery Harlan of MWH Law
18   Group on behalf of Defendant Wal-Mart.
19       MS. VANCE: Attorney Carrie Vance on
20   behalf of Plaintiff United States Equal Employment
21   Opportunity Commission.
22       THE VIDEOGRAPHER: Thank you. And the
23   court reporter is Kara Shawhan. Could I ask you to
24   please swear the witness.
25       DAVID SMITH, M.D., called as a witness
```

Page 37

1 the lawsuit was inappropriate. Fair?
2 A. I was suspicious.
3 Q. All right. And also at that time based on your
4 experience working with other Down syndrome
5 patients, you had formed an opinion that employers
6 often mishandle situations -- work transition
7 situations with Down syndrome individuals.
8 Correct?
9 A. No. When there's a problem -- When there's a
10 problem, that's one of the suspicions that I have.
11 I think there's a lot of great employers out there
12 who do a very good job handling situations like
13 this or are sensitive to it and do a very good job.
14 Q. So when you --
15 A. But in this case from the -- from the reading that
16 I had, I was very suspicious.
17 Q. So help me then understand your analogy of the
18 water flowing downhill. So did that relate to
19 employers that you have personal knowledge of given
20 your work with certain Down syndrome patients?
21 What did that analogy apply to?
22 A. That applied to when there's a problem.
23 Q. Okay.
24 A. When there's a problem.
25 Q. So prior to -- Well, at the time that you reached

Page 38

1 out to the EEOC to help them in their lawsuit
2 against Wal-Mart, you had already experienced many
3 times in situations where there was a problem with
4 your patients that the employer had done something
5 inappropriate.
6 A. No. I wouldn't say that. I would say that there
7 was a problem with transitions, whether it's an
8 employer, a sheltered workshop, a school, or it
9 could be a home, that there is a problem, and some
10 of those have been employers.
11 Q. Okay. Let me ask you --
12 A. I like employers.
13 Q. Okay. And along those lines, at the time that you
14 had reached out to the EEOC about this matter, had
15 you ever volunteered your services for any
16 employer?
17 A. No.
18 Q. Had you ever worked with any employer in terms of
19 helping them handle a particular situation with a
20 Down syndrome patient of yours.
21 A. I may have given some advice in terms of how to
22 work it better, but none of them were at this
23 point, where there was a legal concern. So for
24 example, somebody might be moving from one part of
25 a workshop to another part, and how do you help

Page 39

1 them make that transition without it being
2 difficult? And there are ways to do that. Instead
3 of just "You're going over here," prepare them so
4 they can make the transition well.
5 Q. So yeah. I wasn't limiting my question to
6 situations where there was a lawsuit involved. I
7 was asking was there ever any situations prior to
8 this matter where you had worked in a proactive way
9 with an employer to address a workplace situation
10 with a Down syndrome patient of yours?
11 A. In a proactive way? No. Because it's usually
12 after they've come to me and there's been a
13 problem.
14 Q. So even after a patient has arrived at the clinic
15 and made you aware of a problem in the patient's
16 workplace, even in those situations, prior to
17 working with the EEOC in this lawsuit, had you ever
18 on behalf of the patient reached out to an employer
19 to try to give the employer help in navigating the
20 situation?
21 A. I give information to the family or the person who
22 brought them in, if they're at a group home or
23 such, and then they have -- they have normally just
24 gone -- you know, followed my suggestions. And I'm
25 not a -- You know, I usually have somebody else

Page 40

1 work with them directly on it, but I give the -- I
2 give the advice about how to make a transition
3 work.
4 Q. So if I understand your testimony then, on the
5 situations where you have had advice to offer an
6 employer, you've never given that advice to the
7 employer. You've given it to your patient or some
8 other third party with the possibility that they
9 may convey it to the employer.
10 A. Well, they have -- They've come to me for the
11 problem, and yes, from what I can gather, they've
12 always gotten back in touch with the employer. The
13 employer is often a sheltered workshop. So they're
14 usually sensitive to these sorts of things.
15 Q. But to be clear --
16 A. I haven't worked directly with them.
17 Q. And nor have you contacted any employer to help
18 them try to deal with a workplace issue.
19 A. I haven't had to.
20 Q. And you haven't. Correct?
21 A. I have not.
22 Q. And notwithstanding the fact that you don't have a
23 great current relationship with your ex-wife, it
24 sounds like, you have a good relationship with your
25 son. Right?

Page 137

1 Q. Did you ask her, for instance, whether -- after
2 your schedule changed whether you at least worked
3 the amount of hours or the hours that you had
4 previously been assigned?
5 A. No.
6 Q. And you're saying that information has no relevance
7 in terms of whether her reason for not being able
8 to work the new schedule is due to the fact that
9 her routine was interrupted?
10 A. I don't believe so.
11 Q. Okay.
12 A. I don't think it had anything to do with it.
13 Q. Pardon?
14 A. I don't think it would change my opinion.
15 Q. Okay. And why is that something that wouldn't be
16 relevant to the opinions that you've given?
17 A. Well, like I said earlier, there's -- it's not
18 unusual to have some variation. I mean, that's
19 just -- She's thrown off her schedule. So she's --
20 She may do things differently from one day to the
21 next. She's confused. If I understand what you're
22 saying.
23 Q. Okay. And when you say "she's confused," did she
24 tell you anything during the examination of her
25 that indicated that she had this confusion?

Page 138

1 A. She wouldn't do that. I wouldn't expect her to say
2 that.
3 Q. And did Amy Jo tell you that she was confused about
4 the new schedule?
5 A. No. I don't know that Amy Jo would know that.
6 Q. Did you ever -- Are you saying that you can give an
7 opinion to a reasonable degree of medical certainty
8 that she was confused by the new schedule?
9 A. I didn't say she was confused by the new schedule.
10 I said that the change in the schedule would throw
11 her off so that other portions of her life,
12 including her work schedule and all that, could be
13 thrown off. She's under stress. If you've been
14 under stress, it doesn't affect just the thing that
15 stresses you. There are other -- It affects how
16 you go about your day in other areas too. So
17 you're stressed at school. You might -- that will
18 have an impact on your stress at home or how you
19 act at home. That's just how people work.
20 Q. And I guess what I'm looking for then is what did
21 you -- What were you told by Amy Jo or what did you
22 see in the records that you reviewed that leads you
23 to the -- to have the opinion that she was thrown
24 off by the new schedule? I think that was your
25 testimony.

Page 139

1 A. Yeah. Well, this was in reference to a question
2 that you had asked, and I said that, you know, I
3 can see how she might have been thrown off --
4 Q. Right.
5 A. -- from her schedule. It's nothing Amy Jo said.
6 It's what you said.
7 Q. No. I asked you if she wasn't even working until
8 4, would that change your opinion? And your answer
9 was "No. And the reason it doesn't is because she
10 was thrown off by the change of schedule." And so
11 my question is, since that's your opinion, what did
12 you hear from Amy Jo, Marlo, or review in the
13 documents that gives you a basis for that opinion
14 that she was thrown off by the fact that she was
15 asked to work -- instead of working 12 to 4, she
16 was asked to work the same days from 1 to 5:30?
17 A. I'm not sure exactly what you're asking here.
18 Q. Okay. So let me try to break it down. I asked you
19 "Would it change your opinion, sir, if you learned
20 --" Because apparently you don't know this. Right?
21 You don't know that there were days that she didn't
22 even work until 4 after her schedule changed.
23 A. I don't know -- You're telling me that I didn't.
24 When I looked through the record I may have seen
25 that. I don't recall that.

Page 140

1 Q. Okay.
2 A. But that doesn't mean that I didn't know that at
3 one point.
4 Q. Okay.
5 A. Yeah.
6 Q. So --
7 A. But it would not change my opinion.
8 Q. It wouldn't change your opinion.
9 A. No.
10 Q. Okay. And what you said is the reason it wouldn't
11 change your opinion is because you think she was
12 thrown off by the new schedule that required her to
13 work different hours.
14 A. This new schedule and the pressure that she was
15 under to try to get into that new schedule, yes. I
16 mean, like I said, when you're under stress, it
17 impacts all of your life, not just that one
18 single --
19 Q. Okay.
20 A. -- thing.
21 Q. So it's the new schedule and the stress that she
22 experienced trying to adhere to that schedule. And
23 so I'm asking you, what did you hear from Amy Jo,
24 Marlo, or from the documents -- or did you see in
25 the documents that you reviewed prior to giving

Page 141

1  your opinions that gives you a basis to say "That's
2  why she couldn't comply with the schedule"?
3  A.  Well, I know what I've learned by working with
4  people with Down syndrome.  I know that they have
5  -- This is a story that I've heard before -- or
6  similar story.  And they have trouble changing
7  often -- not always, but often changing schedules
8  or -- Transitions is the term that refers to it in
9  general, but change in routine.  Those can be very
10 difficult for people with Down syndrome.
11     And, you know, can I tell you what's
12 going on in someone's head?  I can't tell you
13 what's going on inside your head.  But I can tell
14 you that -- and neither do you?  But at any rate,
15 you know, she's -- It's difficult.  It's difficult.
16 She's having trouble.  I don't know how else to put
17 it.
18 Q.  So so far, based on what I just heard you say, that
19 -- and tell me if I'm misinterpreting what you're
20 saying.  Marlo Spaeth has Down syndrome.
21 A.  Um-hum.
22 Q.  Okay?  These are the things that you're basing your
23 opinion on that she couldn't adapt to the new
24 schedule.
25 A.  Um-hum.

Page 142

1  Q.  She has Down syndrome.  In your clinical
2  experience, people with Down syndrome have trouble
3  making transitions.
4  A.  Correct.  Not all of them, but the majority.
5  Q.  Yes.  Thank you for clarifying.
6  A.  And the book puts that in there.
7  Q.  Some Down syndrome individuals -- individuals with
8  Down syndrome have difficulty with transitions like
9  being assigned a new work schedule.
10 A.  Correct.
11 Q.  Okay.  And Ms. Spaeth was reported to be having
12 difficulties after her schedule changed.
13 A.  Not only reported, but she lost her job because of
14 it.
15 Q.  So is that the sum total of the things that you
16 relied upon in issuing the opinion that you've
17 issued in this case -- one of the opinions -- in
18 terms of the fact that there was a causal
19 connection between her Down syndrome connection and
20 the difficulties that she faced in adhering to the
21 new schedule?
22 A.  And there was the temporal -- the time -- temporal,
23 the time.  Before that she was doing pretty well.
24 She had a record of doing well at work.  Where she
25 started to have trouble is, according to the work

Page 143

1  records, is after they changed the schedule.
2  Q.  Okay.  And I take it that you would agree that
3  there's a myriad of other factors, right, aside
4  from those that you've mentioned, that could
5  account for someone like Marlo basically not
6  wanting to work the new schedule.  Right?
7  A.  That's --
8     MS. VANCE: Objection, vague.
9     THE WITNESS: Yeah.  I mean --
10    BY MR. HARLAN:
11 Q.  Well, there are other -- Let me -- Hold on.  Don't
12 answer the question.
13 A.  Sure.
14 Q.  Would you agree with me that there are other things
15 besides what you just testified to that could
16 explain why Marlo Spaeth was not following her new
17 schedule?
18 A.  Physicians look at patterns.  They look at the --
19 kind of what's going on, what they're familiar
20 with, what they've seen happen.  And based upon
21 that, I would say that it was the schedule change.
22 I also did not see other medical conditions that
23 seemed to contribute to that.
24 Q.  So part of how you got to the conclusion that it
25 was the schedule change that -- Part of how you got

Page 144

1  to the conclusion that the schedule change
2  -- Strike that.  Part of how you got to the
3  conclusion that Ms. Spaeth's Down syndrome
4  condition combined with the schedule change
5  accounted for her having these difficulties meeting
6  the schedule is the fact that you didn't see other
7  problems -- other indications in her medical
8  history that would explain it, and you didn't see
9  anything in her work record that would explain it.
10 So, for instance, you didn't see that she had a
11 pattern of not adhering to her old work schedule.
12 A.  No.  In fact, the reports are that she was doing
13 well.
14 Q.  Right.  And so part of how you got to your
15 conclusion is because you -- you saw those facts.
16 Right?
17 A.  Um-hum.
18 Q.  Is that "yes"?
19 A.  Yes.  I'm sorry.
20 Q.  Okay.  But aside from that, like one explanation
21 could be that she didn't want to work those hours.
22 Right?  Having nothing to do with the fact that she
23 has Down syndrome, she frankly wanted to be home by
24 6.  Isn't that a possible explanation for why she
25 wasn't working the hours?