# **EXHIBIT 10**

Page 1

```
            IN THE UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF WISCONSIN

                     GREEN BAY DIVISION

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                  )
                             )
               Plaintiff,    )
                             )
     vs.                     )  Civil Action No: 2:17-cv-70
                             )
WAL-MART STORES EAST, LP,    )
                             )
               Defendant.    )
_____)


                       Deposition of

                      JULIA A. STERN

                 Tuesday, September 4, 2018

                          9:07 a.m.

                            at

         U.S. Equal Employment Opportunity Commission

                  310 West Wisconsin Avenue

                     Milwaukee, Wisconsin









               Reported by Faye M. Talatzko, RPR
```

**Page 50**

1  A  No.
2  Q  Do you know -- Do you have any knowledge of who may
3     have prompted Bonnie Popp to fill out a scheduling
4     availability form for Marlo Spaeth on February 16,
5     2015?
6  A  No.
7  Q  Did you terminate Marlo Spaeth?
8  A  Yes.
9  Q  And when was that?
10 A  On July 10th, I believe. 2015.
11 Q  I'm sorry?
12 A  2015.
13 Q  July 10, 2015. Why did you terminate Marlo Spaeth?
14 A  Because of her attendance.
15 Q  What was wrong with the attendance of Marlo Spaeth?
16 A  She was not working her entire shifts or at all.
17 Q  When you say "or at all," what do you mean?
18 A  She had a couple of days where she did not come into
19     work at all, nor did she call in.
20 Q  And prior to termination, how many coachings did
21     Marlo Spaeth receive?
22 A  Two.
23 Q  And are both of those coachings represented in
24     Exhibit 20?
25 A  Yes.

**Page 51**

1  Q  Is it your testimony that an employee -- Let me
2     rephrase.
3            Is it your testimony that Marlo Spaeth
4     could have been terminated at the time of her second
5     coaching, March 18, 2015?
6  A  She would not have been terminated because she
7     received the coaching.
8  Q  Did she need two coachings plus additional violations
9     of the attendance policy in order to be eligible for
10    termination?
11 A  Yes.
12 Q  And so at the time of March 18, 2015, there was
13    not -- there had not been enough discipline of Marlo
14    Spaeth at that point to make her eligible for
15    termination; is that correct?
16           Do you understand the question?
17 A  That's why she had the second coaching.
18 Q  On March -- That's why she had the second coaching on
19    March 18, 2015; is that correct?
20 A  Yes.
21 Q  And when you terminated Marlo Spaeth, did you have a
22    meeting with her?
23 A  Yes.
24 Q  Where were you?
25 A  In the invoice office -- or, in the management

**Page 52**

1     office.
2  Q  And this was July 10, 2015?
3  A  Yes.
4  Q  And who are all the people who were in the management
5     office during this meeting on July 10, 2015?
6  A  Marlo, myself, and Robin Castro.
7  Q  And what is the title of Robin Castro's position?
8  A  She was a shift manager. Co-manager.
9  Q  I'm sorry. Shift manager?
10 A  They interchange. The company goes back and forth
11    between shift manager and co-manager, so it is the
12    same position.
13 Q  At the time was her title co-manager?
14 A  I -- Yes, I guess.
15 Q  And in effect, Robin Castro was above you but below
16    the store manager; is that correct? In the chain of
17    command.
18 A  Yes.
19 Q  Did Marlo Spaeth have any advance notice that you
20    would want to meet with her before the actual meeting
21    on July 10, 2015?
22 A  No.
23 Q  Is it also true that nobody in the -- none of the
24    family members of Marlo Spaeth had any advance notice
25    of the July 10th, 2015 meeting?

**Page 53**

1  A  True.
2  Q  Did the meeting occur during Marlo's scheduled shift?
3  A  Yes.
4  Q  And how did Marlo first become aware that you wanted
5     to meet with her?
6  A  I called her into the office.
7  Q  On a telephone?
8  A  No.
9  Q  Did you go out --
10 A  Went out and got her, and brought her back to the
11    office.
12 Q  Okay. And tell me everything you remember about what
13    was said at that meeting.
14 A  We told her that we were terminating her employment
15    because of the excessive absence occurrences.
16 Q  When you say "we," did you say that or did Robin
17    Castro say that?
18 A  Both Robin and I were talking.
19 Q  Did you have any papers that you showed Marlo Spaeth?
20 A  We would have had her attendance tracking.
21 Q  Any other papers?
22 A  No. Just her attendance tracking.
23 Q  Is there anything else you recall about the meeting?
24 A  And that she was upset. She cried.
25 Q  What else do you remember?

**Page 54**

1  A   It took a while for her to leave. You know, she just
2      sat in the chair and cried.
3  Q   What did she say?
4  A   I don't recall.
5  Q   Did she understand the word "terminated," in your
6      opinion?
7  A   Well, yeah, we told her that she wasn't going to be
8      working with us anymore, that we were ending her
9      employment. She understood that.
10 Q   Is Marlo Spaeth disabled?
11         MR. BULIOX: Objection as to the
12     definition of "disabled."
13         But subject to that, go ahead and answer.
14         You know, actually the objection goes a
15     little bit further, to the extent that Ms. Stern is
16     not a medical professional.
17         Subject to those objections, answer, if
18     you can.
19 BY MS. VANCE:
20 Q   Let me rephrase. Does Marlo Spaeth have a
21     disability?
22         MR. BULIOX: Same objection.
23 A   I know she had Down Syndrome, just from working with
24     her.
25 BY MS. VANCE:

**Page 55**

1  Q   And had you known that she had Down's Syndrome the
2      entire time that you had worked with her?
3  A   Yes.
4  Q   Did you give Marlo Spaeth any paperwork as part of
5      this termination meeting?
6  A   Yeah, they get like -- For insurance and stuff, they
7      get a copy of all the phone numbers they can call if
8      they have any...
9  Q   Any what?
10 A   Any insurance or, you know, 401s or any of that kind
11     of stuff, profit sharing. There's different numbers
12     on that piece of paper they can call.
13 Q   Do you remember giving Marlo Spaeth that paperwork?
14 A   I don't remember. I'm sure we did, because we do for
15     everyone.
16 Q   Do you have any knowledge of whether or not Marlo
17     Spaeth called Wal-Mart after July 10, 2015, to ask
18     about her schedule for work?
19 A   No.
20 Q   Do you have any knowledge of whether or not Marlo
21     Spaeth returned to Wal-Mart to work after July 10,
22     2015?
23 A   No.
24 Q   After the July 10, 2015 meeting, did you have any
25     contact with any family member of Marlo Spaeth?

**Page 56**

1  A   Her sister called that night.
2  Q   And would that be her sister Amy Stevenson? Does
3      that sound correct?
4  A   Yes.
5  Q   And when you say "that night," around what time do
6      you think it was?
7  A   I don't know. I don't know. I don't remember
8      what -- I don't remember what time it was. It was
9      after Marlo left.
10 Q   "After Marlo left." And was it still your shift? Do
11     you think you were still clocked in?
12 A   Yes.
13 Q   And did you answer the phone?
14 A   Yes.
15 Q   Okay. What did Ms. Stevenson say to you in this
16     phone call?
17 A   She called twice. The first time she called and
18     asked if she could speak to someone about getting
19     Marlo's job back.
20         And I told her I would give her the store
21     manager -- give him her phone number, and he would
22     contact her.
23 Q   And did you? Or did you have -- I'm sorry. When you
24     said I would give her the phone number, did you in
25     fact give Ms. Stevenson the phone number of the store

**Page 57**

1      manager?
2  A   No. I told her I would give the store manager her
3      phone number.
4  Q   I see.
5  A   And he would contact her when he was in.
6  Q   And did you do that?
7  A   He wasn't in. I gave him -- I sent him the email,
8      giving him the phone number.
9  Q   So you sent an email to -- Now, at that time was it
10     Jason or Kent?
11 A   That was Kent.
12 Q   That was to Kent. You sent Kent an email with Amy
13     Stevenson's phone number on it; is that correct?
14 A   Yes.
15 Q   Do you think it was that day? That very day,
16     July 10, 2015?
17 A   I believe so.
18 Q   Was there anything else spoken in that first
19     conversation with Amy Jo Stevenson?
20 A   Not that I recall. She just wanted to talk to
21     someone.
22 Q   Did Amy Stevenson have any way of knowing that you
23     personally had been in the meeting where Marlo was
24     terminated?
25         MR. BULIOX: Objection. Calls for

**Page 62**

1  A  No.
2  Q  Have you ever had a computer-based learning module
3     that trained you on assisting employees who request a
4     reasonable accommodation, and finding the proper
5     paperwork at Wal-Mart?
6        MR. BULIOX:  I'll object.  Same objection
7     as before.
8  A  As far as I recall, no.  I -- I've had many, many,
9     many CBLs over the years, but not specifically on
10    filling out paperwork.
11 BY MS. VANCE:
12 Q  Has an employee ever talked to you as a member of
13    salaried management about needing a reasonable
14    accommodation from Wal-Mart?
15 A  No.
16       MR. BULIOX:  Same objection.  I'm going
17    to make a standing objection.
18 BY MS. VANCE:
19 Q  If an employee tomorrow at work or the next time you
20    are at work came to you and said, "I need to request
21    a reasonable accommodation, what should I do," what
22    would be your answer?
23 A  I would refer them to the store manager.
24 Q  And have you ever seen any of the paperwork that an
25    employee would need to fill out to request a

**Page 63**

1     reasonable accommodation?
2  A  No.
3  Q  And so it sounds like you've never participated in
4     the process where an employee under your management
5     purview has received a reasonable accommodation from
6     Wal-Mart.
7  A  I don't make the decision on that.  That has to be
8     the store manager or someone from the market.  It is
9     higher up than me, so I just refer them to the store
10    manager, and then they decide -- or if he has to go
11    higher, depending on what the accommodation is.
12 Q  If somebody who is under your management purview
13    has a reasonable accommodation in place, how are
14    you -- or, are you made aware of the accommodation
15    somehow?
16 A  Yes.
17 Q  How?
18 A  Yes.  Either Kent would tell us or Karen would have
19    that.  She would let us know, because they would have
20    to put it in their file.  And she would let us know,
21    you know, that this person needs to sit down every so
22    often or whatever.
23 Q  And is that information conveyed to you in writing or
24    in a spoken conversation?
25 A  In a spoken conversation.

**Page 64**

1  Q  In Exhibit 24, halfway down that first paragraph I'm
2     reading.  "Marlo was aware that she was to work her
3     full shifts which are always 1 to 5:30, and Karen
4     would print out her schedules for her."
5        Is that "Karen" referring to Karen
6     Becker?  Is that right?
7  A  Yes.
8  Q  The last sentence of paragraph 1 says, on June 29th
9     and 30th she was in -- I'm sorry.
10       "Robin and I both sat down with Marlo and
11    explained that due to the excessive occurrences
12    between both absences and incomplete shifts we were
13    ending her employment with us and proceeded with the
14    Gain."
15       What is the Gain referred to there?
16 A  That's what it is called on the computer, to
17    terminate an associate.  You pull it up and then it
18    has all their information and everything that you
19    have to fill out.
20 Q  Did Gain stand for something?  Is it an acronym?
21 A  Not that I know of.
22 Q  Do you have any idea why it is called Gain?
23 A  I don't know.
24 Q  Is there something special that you as an assistant
25    manager do in order to access Gain?

**Page 65**

1  A  You have to go onto the computer and access the Gain
2     app, I guess you would call it.  And then you go in
3     and put their name in, and it pulls up all -- you
4     know, their address and everything, and you type in
5     there the reason for the termination.
6  Q  What else?  What other information do you input in
7     the Gain?
8  A  You put if they are eligible for rehire, if you would
9     rehire them.  Just comments.  If they turned in like
10    their vest and their main badge.
11 Q  On July 10, 2015, what did you input into the Gain
12    after your meeting with Marlo Spaeth?
13 A  I don't recall what I put in.  I'm sure I put in
14    because of the occurrences, yeah, that we were
15    terminating her for attendance.
16 Q  Do you recall what you marked as far as eligibility
17    to be rehired for Marlo Spaeth on July 10, 2015?
18 A  I would most likely have put that she is eligible for
19    rehire.
20 Q  Why do you say that that's the most likely thing that
21    you would have done?
22 A  Just because the majority of the terminations I've
23    done, they are eligible for rehire.  Attendance is
24    one thing that is something that a person can fix.
25    You know, it is not something terrible, that they

### Page 74

1　Q　Is there any minimum at Wal-Mart required? Any
2　　　minimum requirement for how many associates ought to
3　　　be in a department at any time?
4　A　No.
5　Q　And in that first half of 2015, was the department
6　　　manager position for domestics a full-time position?
7　A　All department manager positions are full-time.
8　Q　And are they -- Are department managers always
9　　　covering day shift?
10　A　Yes, mostly, unless they choose to come in to work
11　　　with an associate on the weekend or overnight. Or on
12　　　the evening shift.
13　Q　In that first half of 2015, did the domestics
14　　　department have more than one department manager?
15　A　That I don't recall, because it went from -- at one
16　　　point there were three between all of them and then
17　　　it went to two. So...
18　Q　Do you recall whether there were two at the first
19　　　half of 2015?
20　A　There would have been at least one for domestics and
21　　　one for housewares.
22　Q　And can a department manager from housewares cover
23　　　the domestics department if the department manager
24　　　from domestics is not working?
25　A　Yes.

### Page 75

1　Q　And what's the name of the department that Marlo
2　　　Spaeth worked in?
3　A　It was -- Well, she was mostly in domestics and
4　　　housewares.
5　Q　And I think your testimony is that you thought there
6　　　was probably one more associate. Do you know whether
7　　　the other associate would have been full-time or
8　　　part-time?
9　A　Part-time.
10　Q　In 2014 did you have any role in scheduling?
11　A　Yes.
12　Q　Did you have any role in receiving applications for
13　　　employment?
14　A　Yes.
15　Q　And what is your role in the application for
16　　　employment process?
17　A　If we have a position open, then I would review the
18　　　applicants and choose ones that I would like to
19　　　interview.
20　Q　And in that capacity, do you also review candidates
21　　　who are trying to get rehired by Wal-Mart?
22　A　Yes. They would have to fill out an application just
23　　　like anyone else.
24　Q　If you are reviewing applications, do you separate
25　　　rehire applications from first-time employment

### Page 76

1　　　applications in any way when you are reviewing them?
2　A　No. They all pop up in the screen together. The
3　　　rehires fill out an application just like everyone
4　　　else does. The only difference is on theirs it says
5　　　"have you ever worked for Wal-Mart before" and they
6　　　put the dates that they worked there.
7　Q　Is there anything about the system -- Let me back up
8　　　on that. The date range that they worked at Wal-Mart
9　　　is what they would put on the application?
10　A　Yes.
11　Q　Okay. As opposed to the days of the week. They are
12　　　actually telling you the time frame?
13　A　Right. Like I worked there in 2010 to April or June
14　　　or something.
15　Q　Does the system flag somebody who has worked at
16　　　Wal-Mart versus an applicant who has never worked at
17　　　Wal-Mart --
18　A　No, no.
19　Q　-- in any way?
20　　　　　　How long do you think it would take --
21　　　I'm sorry.
22　　　　　　How long do you estimate it would take to
23　　　fill out an application in 2015?
24　A　Maybe a half hour to an hour. It is done on a
25　　　computer so, you know, however proficient you are on

### Page 77

1　　　a computer.
2　Q　Can it be done from any computer with an internet
3　　　connection or does it have to be done at Wal-Mart?
4　A　No, it can be done from anywhere.
5　　　　　　(Exhibit 25 marked for identification.)
6　Q　All right. I am handing you what's been marked as
7　　　Exhibit 25. Ms. Stern, what is this document?
8　A　A series of emails that I sent about Marlo's
9　　　attendance.
10　Q　Now I'll direct your attention to the second page.
11　　　So this email titled "Marlo" you sent on January 13,
12　　　2015, to Robin Castro, Bonnie Popp, and Jason Radue;
13　　　is that correct?
14　A　Yes.
15　Q　Is there anyone else besides those three people who
16　　　are above you in your chain of command --
17　A　No.
18　Q　-- in the store?
19　　　　　　I suppose there's probably a Walton
20　　　higher up your chain of command.
21　　　　　　But in the store it is those three
22　　　people, correct?
23　A　Yes.
24　Q　And then in the email you go on to relay some
25　　　information from the meeting that would have been

**Page 78**

1 three weeks ago. Is that right?
2 A Yes.
3 Q Okay. And you say you did a coaching for attendance.
4 　　Just to make sure all the documents are
5 lining up -- That's Exhibit 20, correct?
6 A Yes.
7 Q And let's see. In the middle I see that it says,
8 "She wanted to know why she can't just work noon to
9 4, like she used to."
10 　　Do you see where I'm reading?
11 A Yes.
12 Q What do you recall Marlo saying that prompted you to
13 write that?
14 A That she just wished she could work noon to 4, like
15 she used to.
16 Q And when did Marlo say that to you?
17 A Whenever I would talk to her about her attendance.
18 Q How often was that in this December 2014 to January
19 2015 time frame?
20 A I'm not sure how many times. I mean we documented
21 the coaching and when we talked to her on
22 December 17th.
23 Q So is it fair to say that more than three times
24 Marlo said something to the effect of wanting to know
25 why she just -- or, can't just work noon to 4, like

**Page 79**

1 she used to?
2 A Possibly, yes.
3 Q Do you think it would be more than three times that
4 she would have expressed a sentiment like that to
5 you?
6 A I don't remember. I don't know how many times. I
7 know it was whenever I talked to her about
8 attendance.
9 Q And it sounds like you had documented a personal
10 discussion. Right?
11 A Um-hum.
12 Q From December 17, 2014, right, on Exhibit 21? Is
13 that right?
14 A Right.
15 Q You think during that personal discussion she asked
16 you a question to the effect of: Why can't I just
17 work noon to 4, like I used to?
18 A She may have.
19 Q It sounds like it was something that she asked
20 you -- Well, I think you said three times. Do you
21 think it probably was more than three times?
22 A I don't know.
23 Q But it sounds like it wasn't less than three times.
24 Maybe it was at least three separate occasions where
25 she asked you this?

**Page 80**

1 A It could have been.
2 Q So now I'm asking you why couldn't Marlo just work
3 noon to 4 like she used to?
4 A Because the system generated the schedule according
5 to the traffic of the customers, and it generated
6 shifts from 1 to 5:30, so that was the shift that was
7 available for her. That was the shift she was
8 available for; that's why she got those shifts.
9 There was no 12-to-4 shift generated anymore.
10 Q When did the system -- When you say "anymore," when
11 did the system switch from having the possibility of
12 having a noon-to-4 shift to not having that shift
13 anymore?
14 A Like right around -- Before like Thanksgiving'ish, I
15 guess.
16 Q Of November of 2014?
17 A Yeah. Because it goes according to the customers
18 coming into the store. So, you know, a bit with the
19 holiday season and getting busier, it generates
20 different shifts. It doesn't always generate the
21 same shift, other than a department manager.
22 Q I don't understand what you mean when you say, "it
23 doesn't always generate the same shift, other than a
24 department manager."
25 A Department managers always work the same shift from

**Page 81**

1 day to day. The rest of the sales force, the
2 associates and the cashiers and everyone else in the
3 store, it goes according to the customer traffic.
4 　　So if it is busy at noon, it will
5 generate shifts at noon; if it is busy at suppertime,
6 it generates them at suppertime. And then it looks
7 at, you know, the coverage with the department
8 managers. It looks at all of the coverage during the
9 day and then it fills in the shifts to cover for the
10 customer flow.
11 Q Does this happen every year for holidays?
12 　　I'm trying to understand why the
13 possibility of a noon-to-4 shift wasn't a possibility
14 anymore.
15 A Well, the company looks at the system all the time
16 and makes updates to it so, you know, it changes all
17 the time. Like now we're on a completely different
18 scheduling system than what we were then. The
19 majority of it is based off of the customer traffic,
20 so it looks at how many customers we have each hour
21 and that's how it generates shifts.
22 Q And it sounds like in November of 2014 the system
23 wasn't going to generate a noon-to-4 shift for
24 Marlo Spaeth anymore --
25 A Right.

**Page 82**

1  Q  -- because of customer traffic. Is that right?
2  A  Correct.
3  Q  What about November 2013, like the holiday, the rush
4     before then?
5  A  I don't know. I wouldn't know.
6  Q  This periodic change or update in the scheduling
7     system, did it happen before 2014 or was 2014 the
8     first time that you saw a change in what shifts you
9     could schedule?
10 A  Like I said, I was on nights for part of 2014. So,
11    you know, the shifts change all the time and then it
12    fills in whoever is available during those hours.
13    That's who gets assigned the shifts.
14 Q  Was that true in 2013, the way it was in 2014?
15 A  I would think so, yes.
16 Q  So you've been at Wal-Mart since 1990. Was the
17    scheduling system this way, where there's periodic
18    changes according to customer flow, ever since 1990?
19 A  Yes, it is always changing.
20 Q  And in your past experience scheduling days as an
21    assistant manager, have you ever seen other seasons
22    or other times when the system would no longer
23    generate a noon-to-4 schedule?
24 A  I can't answer that, because I don't know how many
25    noon-to-4 schedules it would have generated. It

**Page 83**

1     could have four cashiers, too. I don't know.
2        The only schedule I would look at was the
3     area I was over. And it was put in those -- whatever
4     shifts were available, and then assign whoever is
5     available to those shifts.
6  Q  Any reason to believe that November of 2014 would
7     have been the first time since 1990 that the system
8     would not have been able to generate a noon-to-4
9     schedule for Marlo Spaeth?
10 A  If that was the time that the customer traffic
11    dictated someone to be there, it would have generated
12    the shift for that time. It wouldn't just generate a
13    specific shift for Marlo or anyone else.
14 Q  And then do you -- But it sounds like you don't have
15    any specific knowledge of any day-shift employees who
16    worked a noon-to-4 day shift when you were in charge
17    of day shifts, before this 2014 situation.
18 A  No, no.
19 Q  Okay. "No" is the answer?
20 A  No.
21 Q  Okay. Can you predict? Is there like a set time
22    frame when the scheduling system changes what shifts
23    are available?
24 A  No. It changes it all the time.
25 Q  It could change it from week to week?

**Page 84**

1  A  It could.
2  Q  And to your knowledge, how long has scheduling been
3     based in part on an analysis of customer traffic?
4  A  The entire time that I have been there. It has
5     always been computer-based scheduling.
6  Q  And that's since 1990 without interruption; is that
7     correct?
8  A  Yes.
9  Q  I'll direct your attention back to Exhibit 25. And,
10    oh, about six lines down I read, "Karen and I also
11    checked her file and availability. She has nothing
12    on file restricting work hours and is available
13    until 6 p.m."
14       So I'm going to ask, that "Karen" that
15    you are referring to is Karen Becker, correct?
16 A  Yes.
17 Q  And so when you write that, it was that you and Karen
18    went together to check Marlo's file; is that right?
19 A  Yes, she pulled the file, and we looked at it
20    together to see if she had any medical restrictions
21    on time for her to eat.
22 Q  And what did you find?
23 A  There was nothing in there.
24 Q  Okay. And then did you find her scheduling
25    availability form?

**Page 85**

1  A  That's on the computer.
2  Q  So her scheduling availability form --
3  A  I wouldn't have looked at the form in there, because
4     we go off of what's on the computer. So whatever was
5     in there was what -- the shifts that she would be
6     available for. So she was available from noon until
7     6, in the computer system.
8  Q  In the computer. So when you say "I checked in
9     there," you mean in the computer system?
10 A  Yes.
11 Q  Okay. And this document, Exhibit 22, that was
12    physically signed, the actual paper with the
13    signature is in the personnel file, correct?
14 A  Yes.
15 Q  Okay. And so when you were looking with Karen in
16    Marlo's personnel file, are you testifying that you
17    did not see the scheduling availability form that is
18    marked as Exhibit 22?
19 A  I didn't look for those at all. We just looked to
20    see if she had anything in the medical part that said
21    she needed to eat at a certain time.
22 Q  Okay. So this paper -- The piece of paper existed in
23    the file you were looking at, correct?
24 A  Correct.
25 Q  And it is not where you were looking, it sounds like.

**Page 98**

1  someone's schedule when there is a business need.
2  Like you gave the example of Black Friday. What do
3  you do as a manager to change the time somebody is
4  scheduled?
5  A  That's where we talk to each associate to see who
6     could come in during the sale time that we needed,
7     and then we could go in and adjust the shift times
8     for that sale period.
9  Q  And physically what do you do to adjust the time for
10    the period?
11 A  You highlight that shift and then you would hit
12    whichever F key it was to adjust the time frame.
13 Q  So does it take like three keys to change --
14 A  I don't know.
15 Q  -- from 12 to 11?
16 A  Maybe.
17 Q  And then if you wanted to change a 5:30 end time to
18    4, you would have to hit one of the F -- like one of
19    the function keys and then --
20 A  Change the time.
21 Q  -- type in the new time. So maybe four key strokes.
22            And the schedules show up a week at a
23    time, correct?
24 A  Yes.
25 Q  Okay. How long do you think it would have taken you

**Page 99**

1  to change Marlo Spaeth's schedule to shifts that were
2  12:30 to 4, if you wanted to?
3             MR. BULIOX: Objection. It misstates the
4  testimony and mischaracterizes what was just
5  testified to about business needs, as a personal
6  want.
7             Subject to that, go ahead and answer the
8  question.
9  BY MS. VANCE:
10 Q  Let me restate the question. If you were directed by
11    somebody up your chain of command to change Marlo's
12    schedule to make sure that she worked a schedule that
13    reflects only the availability in Exhibit 22, how
14    long would that have taken you in November of 2014?
15 A  That would have only taken a couple of minutes.
16 Q  For the week?
17 A  Yes.
18 Q  And in your experience since you became a member of
19    salaried management, have you ever managed an
20    employee of Wal-Mart who had a reasonable
21    accommodation on their schedule?
22 A  No.
23            MR. BULIOX: Again, my objection to
24    "reasonable accommodation" from earlier stands.
25 BY MS. VANCE:

**Page 100**

1  Q  And I would ask you, do you think you've ever had a
2     computer-based learning course on reasonable
3     accommodations that would have mentioned a modified
4     schedule as a possible accommodation?
5  A  No, I don't think so.
6  Q  And I'm trying to remember your testimony from this
7     morning. I'm just blanking. Do you have a memory of
8     taking a computer-based learning course at Wal-Mart
9     that addressed reasonable accommodations in
10    employment?
11 A  I had taken a lot of CBLs over the years, and I'm
12    sure somewhere along the line there was something
13    about it, but...
14 Q  It sounds like you don't have a specific memory. But
15    you know that you've probably had more than 100 CBLs
16    in the last decade, correct?
17 A  Probably.
18 Q  Can you estimate for me how many computer-based
19    learning courses you take over the year as an
20    assistant manager?
21 A  It varies from year to year. It depends. If we have
22    to update our food licenses, there's more than
23    normal. So it varies every year.
24 Q  Since you have become a member of salaried
25    management, do you think you have taken more than

**Page 101**

1  200 CBLs?
2  A  I couldn't tell you how many. I honestly couldn't.
3  Q  But would you agree with me that it is more than 100?
4  A  Most likely, yes.
5  Q  Have you ever seen the list of your trainings? Is
6     there one maintained in your personnel file?
7  A  There would be on the CBL computer, of what we did on
8     there. Before that we had microfiche, so there's no
9     list of that.
10 Q  When did you switch from microfiche to the computer
11    tracked system?
12 A  Yeah.
13 Q  Do you know when you switched away from microfiche?
14 A  No, it was -- No. It was in the beginning of my
15    salaried career, somewhere around there.
16 Q  Last millennium?
17 A  Yeah.
18 Q  Or, no. It would be maybe after 2000, if it was the
19    beginning of your salaried management career. Like
20    2002. Okay.
21            Do you know whether a list of your CBL
22    trainings is maintained in your paper personnel file?
23 A  That I don't know. My file is at the home office; it
24    is not in the store. So I don't know what they all
25    have in there.

**Page 118**

1  A  No.
2  Q  And I bet a co-manager could. Is that right?
3  A  Yes.
4  Q  When I look at that code key on the last page, I also
5     see authorized incomplete shift non-FMLA as 58.
6  A  Yeah. I think one is for coming in late and the
7     other one is for leaving early.
8  Q  Okay. And then I see 56 is authorized absence
9     non-FMLA. What is the difference between authorized
10    absence and authorized incomplete shift?
11 A  Because an absence would be their entire shift, and
12    an incomplete would be that they were there part of
13    their shift.
14 Q  And what is a 51? Incomplete shift occur?
15 A  I think that's for more than 50 percent of their
16    shift. So it counts as an entire -- like an absence
17    for the whole day.
18 Q  All right. And those double asterisks, is that if a
19    market human resources manager approves an incomplete
20    shift?
21 A  Yes.
22 Q  So that would have been Lee Spude authorizing an
23    incomplete shift; is that correct?
24 A  Yes.
25 Q  Okay. And then I see 54 is a business need

**Page 119**

1     incomplete shift. What does that mean?
2  A  That's like, say, you have a department manager that
3     gets sick and then someone else comes in to fill in
4     for them.
5          Or a business need is like if someone had
6     to go to the academy. They are going to show up as
7     not being at the store for their shift. So that
8     would be a business need there. They are actually on
9     the clock getting paid for their time, but they are
10    at another store working, or academy school or
11    whatever it is that they are doing.
12 Q  All right. If an associate has completed most of the
13    work in their department and there's not really any
14    customers around, and the manager thinks why don't I
15    just send this person home -- First of all, can a
16    Wal-Mart manager do that?
17 A  Yes.
18 Q  And then how is that decision coded?
19 A  That would be an approved incomplete shift.
20 Q  What would be the code?
21 A  I haven't done these codes in a long time. That
22    would be like a 62 -- or, a 63.
23 Q  All right. But if you sent somebody home early
24    because the shop is -- the store is really slow,
25    that's not called business need, early departure?

**Page 120**

1  A  No, no.
2  Q  Okay. So then let's look on our second page. I'm
3     looking at March -- the top entry, March 12, 2007.
4     It looks like the associate left early, at 3:49, and
5     it was coded as a 63. Is that right?
6  A  Yes.
7  Q  So that would be an example where the associate is
8     not working their complete shift -- or, I guess, in
9     this case Marlo Spaeth didn't work her complete
10    shift, but her manager made sure it was in the system
11    coded as authorized. Correct?
12 A  I am guessing so, yes.
13 Q  And how -- At what point in time do these things get
14    coded?
15 A  Usually, within a couple of days. I mean if the
16    manager is off, it will get coded the next time they
17    work.
18         MR. BULIOX: Just as a standing objection
19    to form and to the extent it calls for speculation,
20    as it concerns actions that weren't taken by
21    Ms. Stern or that Ms. Stern was otherwise involved
22    in.
23         Subject to that, you can go ahead and
24    answer the questions, if you can.
25 BY MS. VANCE:

**Page 121**

1  Q  So as part of your job as the assistant manager, are
2     you entering codes like this pretty much every day
3     for the employees under your management purview?
4  A  Yes. When we are on the system, yes.
5  Q  And what system do you go into to do that?
6  A  This was in the Smart System.
7  Q  And is there any kind of list that the Smart System
8     generates of, hey, these are all the employees who
9     needed codes for their time?
10 A  They would all show up, and you go in and do the ones
11    that were under you.
12 Q  And how often does that happen?
13        MR. BULIOX: Objection as to time.
14 A  It would be on a daily basis. You know, you have so
15    many people under you each day. You know, there's
16    always somebody calling in or coming in late or
17    leaving early. You know, it is a constant thing, so
18    every time that you work you go in and code all your
19    absences.
20 BY MS. VANCE:
21 Q  Okay. I'm turning to our third page. I'm going to
22    count and see if you get the same count. I'm going
23    to count 63s. 11. I count 11 authorized incomplete
24    shifts non-FMLA on page 3. Do you agree with me?
25 A  That's what I count.

### Page 126

```
 1      the Smart System and coded the associate left early,
 2      exception as authorized.  Correct?
 3   A  Yes.
 4   Q  And in some cases the manager making that 63
 5      authorization on this page would have been you at
 6      some point, correct?
 7   A  I don't remember when I came to days.  I don't know
 8      what month it was.
 9   Q  Can you remind me for code 60, incomplete shift
10      occur, what -- what that means and how it is
11      different than 51?
12   A  I don't know.
13   Q  Because 51 looks like it stands for incomplete shift
14      occur, correct?
15   A  That's what it looks like.
16   Q  But 60 also is called incomplete shift occur.  They
17      are both 50 and 61.  You wouldn't code that unless
18      there was an unauthorized --
19   A  I think the 51 was coming in late and 60 is leaving
20      early.
21   Q  I see.  Okay.  And for both situations there,
22      unauthorized by management; is that correct?
23   A  Yes.
24   Q  51 and 60?
25   A  Yes.
```

### Page 127

```
 1   Q  And for both the code 51 and the code 60, the
 2      associate is credited with an absence as far as their
 3      attendance record; is that correct?
 4   A  For every three.
 5   Q  For every three?
 6   A  Every three incomplete shifts counts as one absence.
 7   Q  And was there some difference between whether an
 8      associate leaving early was more than 50 percent of
 9      their scheduled time or not?
10   A  More than 50 percent counts as an entire absence.
11   Q  And so how would that -- If it was unauthorized, how
12      would that be coded?
13   A  I don't know.
14   Q  Because I thought you had testified previously that
15      you would use 51 under the absence occurred title if
16      the associate was gone more than 50 percent of their
17      shift, and it would be credited as an absence.  Is
18      that not right?
19   A  I -- I don't know.  It has been a long time since we
20      did these.
21   Q  And you printed this out on March 18, 2015.  You
22      weren't printing out an old document.  You were
23      printing out a current document, correct?
24   A  Yes.
25   Q  Like that was -- This is the system that was in place
```

### Page 128

```
 1      at that time, right?
 2   A  Yes.
 3   Q  And when do you think you stopped using this system?
 4   A  I don't know.  A couple of years ago.
 5   Q  Okay.  In November -- So on this page that covers
 6      November 2014 through February 2015, this is when you
 7      have a memory of being the assistant manager managing
 8      Marlo Spaeth, correct?
 9   A  Yes.
10   Q  And does that mean that these codes all came from
11      you --
12   A  Yes.
13   Q  -- on this page?
14          Okay.  Is it possible that anybody else
15      gave those codes?
16   A  If I was off for some reason.  I would say no,
17      because we aren't off any of those -- during those
18      months.
19   Q  Sorry.  That's funny.  Do you remember what -- So
20      let's take this one at a time.  So business need
21      incomplete shift is the designation for the first
22      11 early departures of Marlo on this page, right?
23   A  Yes.
24   Q  Do you remember what the business need incomplete
25      shift was that prompted you to enter 61?
```

### Page 129

```
 1   A  That was when we were adjusting to the new scheduling
 2      system.
 3   Q  And so what was the business need?
 4   A  So for them -- We put it in as a business need when
 5      we were helping them adjust to the new scheduling
 6      system.
 7   Q  And when you say "them," who do you mean?
 8   A  All of the associates.
 9   Q  "All of the associates."  Okay.  So was there some
10      kind of instruction to you that for a certain period
11      of time you would code early departures as 61,
12      business need incomplete shift?
13   A  I'm sure there was.
14   Q  And where would that have come from?
15   A  Most likely from Lee.
16   Q  From your market human resources manager?
17   A  Yeah.
18   Q  Okay.  Do you remember if there was a time frame
19      given to you in the instruction?
20   A  I don't remember.
21   Q  Let's see.  The last one is December 3rd, 2014?
22   A  Right.
23   Q  Yes.  Let's see.  We see our first scheduling until
24      5:30 on November 24.  So it looks like -- Strike
25      that.
```

Page 130

```
 1      It looks like starting December 8, 2014,
 2    you switched to coding Marlo's early departures,
 3    instead of with the business need designation, with
 4    the incomplete shift occurrence designation of 60.
 5    Is that correct?
 6  A  Yes.
 7  Q  So then let's go back to that piece. Did you have a
 8    conversation with Marlo Spaeth about how you were
 9    coding her early departures in that time frame of
10    early December 2014?
11  A  Not that I recall, until this -- the 17th.
12  Q  So you can't -- I want to see if you remember. If
13    you code her as a 60, your testimony is that the 60s
14    that started in that December 8, 2014 time frame were
15    not counted as absences. It would have been three
16    60s to count as one absence; is that correct?
17  A  Yes.
18  Q  And this chart would not show at any time Marlo
19    Spaeth worked an entire shift; is that correct?
20  A  Right.
21  Q  Did you ever have any conversation with a former
22    manager of Marlo Spaeth about why or when they would
23    choose a designation or how they would choose a
24    designation for Marlo's time when she left early?
25  A  No.
```

Page 131

```
 1  Q  And when you used this document in your meeting with
 2    Marlo on March 18, 2015, did you look through the
 3    history of it?
 4  A  No. I would only have focused on the last part of
 5    it.
 6  Q  Why did you print out a report that went all the way
 7    back to 2006?
 8  A  Because I just printed the whole thing.
 9  Q  Sounds like you didn't put any time frame on the
10    attendance report when you printed it out. Is that
11    right?
12  A  Right. I just printed the entire thing.
13  Q  And it give you the last nine-plus years, it looks
14    like.
15      So if Marlo started in 1999, do you know
16    whether there was any computerized attendance
17    tracking of her work before July 11, 2006?
18  A  I would not know that.
19  Q  Have you ever pulled your own attendance tracking
20    maintenance report?
21  A  I don't clock in and out, so I don't have one.
22  Q  I would like to direct your attention to the
23    February 13, 2015 entry on this report. I think it
24    is actually the last entry on the report. Do you see
25    where I'm pointing?
```

Page 132

```
 1  A  Um-hum.
 2  Q  Am I right that Marlo was scheduled to work from noon
 3    to 4 p.m. on February 13, 2015?
 4  A  Yes.
 5  Q  And it looks like she clocked out 12 minutes early;
 6    is that correct?
 7  A  Yes.
 8  Q  And you marked her as incomplete shift occur, with a
 9    60, right?
10  A  Yes.
11  Q  How was Marlo scheduled 12 noon to 4 on February 13,
12    2015?
13  A  The system probably generated a schedule for her for
14    that shift.
15  Q  To your understanding, why would it have scheduled a
16    12-to-4 shift for her on one day, when on other dates
17    she had 2 p.m. to 5? Is that right? 1 p.m.?
18  A  1 p.m. to 5:30.
19  Q  To 5:30 shift.
20  A  I don't know. I could speculate that it is the day
21    before Valentine's and that maybe it added extra
22    shifts for coverage.
23  Q  And you might have done that, it sounds like, then?
24  A  No.
25  Q  Would that be correct?
```

Page 133

```
 1  A  No.
 2  Q  The computer generated --
 3  A  Yeah. Other than for the Black Friday event or a
 4    specific event, we didn't adjust.
 5  Q  But isn't the day before Valentine's Day a specific
 6    event?
 7  A  No. It is just a holiday. It was not a specific
 8    shopping event.
 9  Q  Okay. So you don't think it means that on
10    February 13, 2015, there was low customer traffic and
11    so it was okay for Marlo to leave at 4; is that
12    right?
13  A  I don't know. I'm guessing that maybe it just added
14    extra shifts in.
15  Q  It was the opposite?
16  A  Yeah.
17  Q  They expected more customer traffic, so they put
18    Marlo in for an extra shift basically; is that right?
19  A  Yes.
20  Q  Do you know whether Marlo was in the system as
21    somebody who could be pulled in to secondary for any
22    other department?
23  A  I don't know that she was secondary. There were only
24    a few that were, and that was usually to help cover
25    mainly the service areas, like the paint desk or the
```

**Page 154**

1  A    No. If she would have changed her availability to
2       12 to 3, she would not have been scheduled anything,
3       because the system had the shift in there for 1 to
4       5:30.
5              So someone else that would have been
6       available from 1 to 5:30 would have been eligible for
7       that shift. Marlo wouldn't have gotten a shift at
8       all.
9  Q    There is no way that Marlo would have been scheduled
10      by the computer if she had an availability less than
11      1 to 5:30; is that right?
12 A    Right.
13 Q    If you had been directed to modify Marlo's schedule
14      as a reasonable accommodation that had been approved
15      by headquarters, and the modified schedule was this
16      hypothetical noon-to-3 time frame, would you have
17      found other associates in the store that would have
18      worked after 3 in Marlo's department?
19 A    Yes.
20             MS. VANCE: I have no further questions
21      for this witness at this time. I tender the witness,
22      as Emery says.
23             MR. BULIOX: I have got to use that
24      sometime.
25             All right. I just have a few questions.

**Page 155**

1              MS. VANCE: Do you want to take a break
2       and organize?
3              MR. BULIOX: Yeah.
4              MS. VANCE: Let's go off the record.
5              (A break was taken from 3:54 to 4:03.)
6              EXAMINATION
7  BY MR. BULIOX:
8  Q    Ms. Stern, I just have a few follow-up questions for
9       you, the first question of which is: You testified
10      earlier about policies and practices with respect to
11      accommodations, correct?
12 A    Yes.
13 Q    Okay. Do you know whether or not Wal-Mart has
14      policies in effect regarding the Americans with
15      Disability Act and accommodations for disabilities?
16 A    Yes.
17 Q    Okay. And when I say Americans with Disability Act,
18      I'm going to refer to that as ADA. Is that fair?
19 A    That's fair.
20 Q    All right. And were those policies in effect during
21      2015?
22 A    Yes.
23 Q    Okay. And do you have access to those policies?
24 A    Yes.
25 Q    And if you had a question about, you know, an issue

**Page 156**

1       about an employee who had a disability or claimed a
2       disability or a question about the ADA or a question
3       about reasonable accommodations or needed information
4       on those things, how would you go about getting that
5       information?
6  A    We can look them up on The Wire. All the associates
7       can look them up.
8  Q    And what's The Wire?
9  A    The Wire is Wal-Mart's web page, if you want to say,
10      like where they have all their information. All the
11      policies and things that are going on, their monthly
12      calendars of events, and all the information is on
13      The Wire.
14 Q    Is it like an internal email -- Not "email."
15      Internet system?
16 A    Yes.
17 Q    So you testified earlier that in response to Marlo
18      Spaeth's saying that she would get sick if she didn't
19      eat at a certain time -- Do you recall testifying
20      about that?
21 A    Yes.
22 Q    Okay. And in response to that, did you propose any
23      other option for Marlo?
24 A    She could take a break at any time to eat when she
25      felt it was necessary.

**Page 157**

1  Q    Could she have taken her break at 4 o'clock p.m.?
2  A    Yes.
3  Q    4:30 p.m.?
4  A    Yes.
5  Q    5:00 p.m.?
6  A    Yes.
7  Q    5:30 p.m.?
8  A    5:30 would have been the end of her shift, but
9       15 minutes prior, yes.
10 Q    5:15. Okay.
11             And from your experience, was Marlo
12      Spaeth able to adapt to change?
13 A    Yes.
14 Q    Okay. Do you have any examples of that?
15 A    When I first started supervising her, she basically
16      would just fold towels. I took her through the
17      housewares department and showed her how to zone,
18      which is straightening everything on the shelves, and
19      putting away returns from the service desk.
20 Q    And was she able to do that?
21 A    She was able to do that. She started doing it on a
22      daily basis.
23 Q    If you could pull up Exhibit No. 30. These are your
24      interview notes from the EEOC interview that you did,
25      that you testified to earlier, correct?