# **EXHIBIT 11**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF WISCONSIN
 3  ------------------------------------------------------
 4  EQUAL EMPLOYMENT OPPORTUNITY
    COMMISSION,
 5
                  Plaintiff,
 6
      -vs-                        Case No. 1:17-CV-00070
 7
    WAL-MART STORES EAST, L.P.,
 8
                  Defendant.
 9
    ------------------------------------------------------
10
11         Video Examination of AMY STEVENSON, taken
12  at the instance of the Defendant, under and pursuant to
13  the Federal Rules of Civil Procedure, before KARA D.
14  SHAHWAN, a Certified Realtime Reporter, Registered Merit
15  Reporter and Notary Public in and for the State of
16  Wisconsin, at Holiday Inn, 4601 Calumet Avenue,
17  Manitowoc, Wisconsin, on September 21, 2018, commencing
18  at 7:59 a.m. and concluding at 4:12 p.m.
19
20
21
22
23
24
25
```

Page 3

```
 1  Exhibit 36 - CCAP Entry For Worthless Check Charge
                 in Calumet County.................... 115
 2  Exhibit 37 - Notes of EEOC Interview of Marlo
                 Spaeth........................... 154
 3  Exhibit 38 - EEOC Interview of Amy Stevenson....... 163
    Exhibit 39 - Coaching For Improvement Policy At
 4               Wal-Mart........................... 206
    Exhibit 40 - Wal-Mart's Discrimination &
 5               Harassment Prevention Policy....... 207
    Exhibit 41 - Wal-Mart's Open Door Communication
 6               Policy............................. 210
    Exhibit 42 - Wal-Mart's Harassment Policy.......... 210
 7  Exhibit 43 - Wal-Mart's Field Attendance and
                 Punctuality Policy................. 211
 8  Exhibit 44 - Printout From the Company's
                 Attendance and Tracking System For
 9               Marlo For the Dates Indicated...... 213
    Exhibit 45 - Complaint With DOJ.................... 223
10  Exhibit 46 - Notes of a Phone Conversation Between
                 Ms. Stevenson and Someone At the EEOC
11               on Or About May 9, 2016 ........... 250
    Exhibit 47 - Medical Records...................... 255
12
13              * * * * *
14  Disposition Of Original Exhibit/s:
15  Attached To Original Transcript
16
17              * * * * *
18
19
20
21
22
23
24
25
```

Page 2

```
 1              A P P E A R A N C E S
 2  U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by
    MS. CARRIE VANCE,
 3  MS. LESLIE N. CARTER,
    310 West Wisconsin Avenue, Suite 500,
 4  Milwaukee, Wisconsin 53203,
    (414)297-1130,
 5  carrie.vance@eeoc.gov,
    appeared on behalf of the Plaintiff.
 6
    MWH LAW GROUP, LLC, by
 7  MR. EMERY HARLAN,
    735 North Water Street,
 8  Milwaukee, Wisconsin 53202,
    (414)436-0353,
 9  emery.harlan@mwhlawgroup.com,
    appeared on behalf of the Defendant.
10
            A L S O   P R E S E N T
11
    Ms. Marlo Spaeth;
12  Ms. Barbara Barnes;
    Mr. Doug vanderHoof, Videographer.
13
14              * * * * *
                I N D E X
15
16  Examination:                              Page
17  By Mr. Harlan.....................................   5
    By Ms. Vance..................................... 277
18  By Mr. Harlan................................... 282
19
    Exhibits Identified:                      Page
20
    Exhibit 31 - Copy of Documents Ms. Stevenson
21               Provided to EEOC and Were Produced to
                 Mr. Harlan......................... 15
22  Exhibit 32 - Press Release......................... 75
    Exhibit 33 - Letters of Guardianship of the Estate
23               Due to Incompetency................ 103
    Exhibit 34 - Bankruptcy Petition.................. 108
24  Exhibit 35 - CCAP Entry Regarding Worthless Check
                 Charge in Brown County............. 113
25
```

Page 4

```
 1      TRANSCRIPT OF PROCEEDINGS
 2      THE VIDEOGRAPHER: We're now on the
 3  record for a matter in the U.S. District Court,
 4  Eastern District of Wisconsin, Green Bay Division,
 5  Case No. 1:17-cv-00070, EEOC versus Wal-Mart Stores
 6  East, L.P.
 7      It's the 21st of September, 2018.  It's
 8  now 7:59 Central Time.  This is the video-recorded
 9  deposition of Amy Stevenson.  We're in the
10  Manitowoc Holiday Inn.  My name is Doug vanderHoof,
11  legal video specialist, representing -- excuse me
12  -- Lexitas.
13      For the record, would counsel please
14  introduce themselves and state who they represent.
15      MR. HARLAN: Emery Harlan on behalf of
16  Defendant Wal-Mart.
17      MS. VANCE: Attorney Carrie Vance with
18  the United States Equal Employment Opportunity
19  Commission.
20      MS. CARTER: And Attorney Leslie Carter
21  with the Equal Employment Opportunity Commission.
22      THE VIDEOGRAPHER: Thank you.  Would you
23  swear the witness, please.
24      AMY STEVENSON, called as a witness
25  herein, having been first duly sworn on oath, was
```

Case 1:17-cv-00070-WCG   Filed 06/17/19   Page 2 of 23   Document 106-11

1 A. That was a quote from the manager that was sitting
2 right here, those two lines.
3 Q. And when you say "right here," for the record,
4 you're referring to --
5 A. Right to my right.
6 Q. Okay.
7 A. Those two lines together were stated.
8 Q. Oh. So this is all one quote.
9 A. Well, it's -- The first part -- The first line is
10 more of a quote. The second line is more of a
11 paraphrase.
12 Q. Were these words said around the same time?
13 A. Yes. By the same person.
14 Q. Okay. So the same person said, "Marlo didn't like
15 me at first," and then also said words to the
16 effect "when I taught her new things."
17 A. Correct.
18 Q. And why were those things important from your
19 perspective to write on 746?
20 A. Same reason. My notes. Just to have them for
21 reference.
22 Q. And what did you understand those words to mean?
23 A. I think it was -- It was confirmation to me that at
24 least this one individual seated to my right
25 understood that -- or witnessed -- maybe didn't

1 understand, but witnessed the difficulty in change
2 in Marlo's routine. She noted to me that Marlo
3 didn't like her because she was teaching her new
4 things.
5 Q. Did she say Marlo told her that's why she didn't
6 like her at first?
7 A. She did not say that, that I recall.
8 Q. Got it. Then on Pages 747, 748, they look like two
9 pages regarding the Americans with Disabilities
10 Act, and it looks like it bears the date of
11 9-18-2018. Do you recall where these pages came
12 from?
13 A. This is a printout from this week replicating the
14 printout that I took to that meeting with managers
15 at Wal-Mart. The original could not be located
16 likely due to the fact that there was a fire at my
17 business, and that's where I kept most of my
18 paperwork. So this is a replica of that. The
19 answer is, this is a replica of what I took to that
20 meeting when I spoke to Karen and the group of
21 managers for reference purposes.
22 Q. Okay. So your recollection is you took some
23 information about the Americans with Disabilities
24 Act that is either identical to what's on Pages 747
25 and 748 or substantially the same.

1 A. I would believe it to be identical, yes.
2 Q. Okay. And did you do anything with the Americans
3 with Disabilities Act material that you took to
4 that meeting with management?
5 A. Did I do anything with it? I held it up and showed
6 it to everybody.
7 Q. Did you disseminate a copy of it to the folks who
8 were there?
9 A. That sounds like something I would have done, but I
10 don't recall.
11 Q. Okay. But you do recall holding it up at some
12 point during the meeting.
13 A. Absolutely.
14 Q. Okay. And the person who was to your right at that
15 meeting, do you recall that person's name?
16 A. No.
17 Q. A woman?
18 A. Woman.
19 Q. Okay. And it wasn't Julia, and it wasn't Karen?
20 A. Julia was not in the meeting; and no, it wasn't
21 Karen.
22 Q. Okay. Got it. All right. Moving on. Page 749.
23 Oh. Before we go to 749, so if I understood your
24 testimony, you created a folder of notes -- Well,
25 strike that. Exhibit 31 was in a folder of

1 documents that you kept and maintained over time.
2 Correct?
3 A. "Maintained" is a strong word. When I had the
4 fire, paperwork was all thrown together and ended
5 up at a central location, so things may have been
6 subsequently located and put in the file before
7 Wednesday, but my answer to your question is not
8 necessarily in a timely basis.
9 Q. Okay. So the notes and other material that's part
10 of Exhibit 31, they were not put into a folder
11 after they were created.
12 A. They may have been.
13 Q. They may have been.
14 A. Um-hum.
15 Q. Why would some of the things be here and certain
16 other things not be here if it was all in the same
17 location?
18 MS. VANCE: Objection, assumes facts not
19 in evidence.
20 BY MR. HARLAN:
21 Q. If you know. Well, is it true that as you created
22 documents -- As documents came into existence that
23 related to your sister's case, you kept them in a
24 central place, in a folder?
25 A. The central place was not a stable place. It was

1 Q. Okay. So there's no other document --
2 A. No.
3 Q. -- anywhere? Okay. All right. And so in that
4 call, she mentioned that 20 days would be
5 approximate date when -- or time frame to get the
6 answer to the question that was on the table at the
7 meeting.
8 A. That was my understanding, yeah. That's what she
9 told me.
10 Q. Okay. And then you have on these notes "Fired
11 7-10."
12 A. Correct.
13 Q. Was that something mentioned by somebody during
14 that call?
15 A. No.
16 Q. Okay. That's just a fact as you understood it.
17 A. Correct.
18 Q. Okay. And then you had "Met 7-16." Was that
19 something mentioned during the phone call on
20 August 3 with Robin?
21 A. I don't believe so.
22 Q. Okay. Again, that's a fact based on what you
23 understood the situation to be.
24 A. Correct.
25 Q. And what was the purpose of writing those two facts

1 underneath the -- your notes about the call with
2 Robin on August 3?
3 A. The purpose was to do the math, which is the next
4 line, showing that 20 days was August 5.
5 Q. Okay. All right. Then we see an entry here of
6 "8-14, not in," so I'm assuming that means you
7 tried to call Robin on that day and did not get to
8 her.
9 A. Correct.
10 Q. Did you leave a message?
11 A. There was no message system.
12 Q. Okay. You just called and got no answer?
13 A. She doesn't have a phone number -- She doesn't have
14 a desk or a phone number. Yeah. Yeah. She doesn't have
15 a phone number. I have to call and ask for her,
16 and they say, "She's not in." That's the end of
17 the phone call.
18 Q. And the person that you would have spoken to, did
19 you say, "Hey, could you let her know that
20 Ms. Stevenson called"?
21 A. I may or may not have.
22 Q. Okay. But you're not sure.
23 A. Correct.
24 Q. All right. And if you didn't tell someone to let
25 Robin know that you had called, can you think of

1 any way she would have known that you had called on
2 that day?
3 A. I don't know how they communicate there.
4 Q. Right. And I'm just asking are you aware how she
5 could possibly have known you would have called on
6 8-14 if -- and we don't know -- you didn't tell the
7 person who picked up the phone --
8 A. How could she possibly have known?
9    MS. VANCE: Objection, asked and
10 answered.
11    BY MR. HARLAN:
12 Q. Yeah. Go ahead. Yeah. How would she have known
13 that you called her on August 14 if you did not
14 tell the person who picked up the phone "Hey, let
15 Robin know that Ms. Stevenson tried to reach her
16 today"? How would she have known that you called
17 looking for her?
18 A. I don't know how they communicate. They may have
19 told her that I called.
20 Q. Okay. Do you recall who you spoke to on the 14th?
21 A. No. A name? No.
22 Q. Okay. Do you recall what you said to the person on
23 the 14th?
24 A. My practice would be to say who I am and who I want
25 to talk to.

1 Q. Okay.
2 A. I don't --
3 Q. And consistent with your practice in terms of who
4 you are, what would your practice have been in
5 terms of identifying who you are? What would you
6 -- What words would you have used?
7 A. This is "Amy Jo Stevenson, Marlo Spaeth's sister."
8 Q. Okay.
9    MS. VANCE: Can I ask for a break in the
10 next few minutes or now? It's 9:00.
11    MR. HARLAN: Yeah. Of course.
12    MS. VANCE: Okay. Let's go off the
13 record.
14    THE VIDEOGRAPHER: Okay. We're going off
15 the record. It is 9:02.
16    (A break was taken.)
17    THE VIDEOGRAPHER: Okay. We're back on
18 the record at 9:15.
19    BY MR. HARLAN:
20 Q. Okay. So we were looking at Exhibit 31, Page 750.
21 Then just going down the rest of the entries there,
22 on 8-14 and 8-18 it says, "Not in." I'm assuming
23 that you called and weren't able to get to Robin on
24 that day?
25 A. Correct.

1 Q. On those days? I'm sorry. And again, you would
2 have just -- You wouldn't have left a message. You
3 would have called and asked for her, and she wasn't
4 available.
5 A. I don't believe I left a message.
6 Q. Okay. All right. And then on 8-21, what's your
7 recollection of what happened on that day?
8 A. I -- Based on my notes, it would appear that I did
9 reach her, and her response to my question is --
10 was that she will "check on it and call me." She
11 "has my number."
12 Q. And is that all you recall from that conversation
13 on that date?
14 A. My request and her answer. I believe so.
15 Q. And what was your request during that call?
16 A. As I mentioned before, we had the meeting where we
17 -- I spoke about the ADA and asked for the
18 reasonable accommodation and asked if Marlo, since
19 she was rehireable, if she could have her job back,
20 and her response was she "will check on it and
21 call." She "has my number."
22 Q. So did you leave that conversation with the
23 impression that Robin wasn't the person that could
24 make the decision on whether Ms. Spaeth would be
25 rehired?

1 A. I already had that impression.
2 Q. Okay. And for the record, Ms. Spaeth and
3 Ms. Barnes have departed. Correct?
4 A. Correct.
5 Q. And where did they go? Do you know?
6 A. Right now?
7 Q. Yeah. Where did they leave the deposition and head
8 to?
9 A. For breakfast.
10 Q. Okay. And are they having breakfast in the hotel
11 or somewhere else?
12 A. Across the parking lot at Perkins.
13 Q. Okay. And are they waiting here for you to take
14 them home, or how are they going to get from this
15 location to wherever they're going?
16 A. That is not the plan. They'll ride the transit.
17 Q. Okay. So Ms. Barnes also gets around via bus.
18 A. Correct.
19 Q. She doesn't drive.
20 A. No.
21 Q. Okay. Then it looks like you made another call on
22 August 31?
23 A. Yes.
24 Q. Just like the prior calls where Ms. -- where Robin
25 wasn't available, you asked for her and didn't get

1 through?
2 A. Correct.
3 Q. Okay. You didn't leave a message?
4 A. I don't recall.
5 Q. Okay. Am I reading the next entry as 9 --
6 September 8?
7 A. I believe so.
8 Q. Okay. What happened on that day?
9 A. It would appear that I reached her. She still had
10 not gotten confirmation. When she does, she will
11 call Marlo, and she was waiting on Kent.
12 Q. Okay. Do you recall anything else being said on
13 September 8 during the call you had with Robin on
14 that day by you or Robin?
15 A. I believe the term "regional office" was used.
16 Q. Anything else you recall?
17 A. No.
18 Q. Okay. Then we have an entry on 9 -- September 21.
19 What do you recall being said on that date?
20 A. It would appear that I reached her again, and she
21 told me they have come to a conclusion and that she
22 would have to speak with Marlo. She couldn't say
23 anything to me.
24 Q. What did you say in response to that?
25 A. "Okay. I'll call Marlo."

1 Q. Okay. Did you ask why they couldn't speak to you?
2 A. I don't think so.
3 Q. And am I correct that at this particular time you
4 were not Marlo's legal guardian?
5 A. Correct. Her mother was still alive. I was her
6 acting guardian, not her legal guardian.
7 Q. Okay. And when you say you were her "acting
8 guardian," was that a position or office that you
9 held --
10 A. No.
11 Q. -- by virtue of some court decree or order?
12 A. No.
13 Q. Okay. That's more of a practical designation?
14 A. Practical.
15 Q. All right. Then the next few pages -- Well, strike
16 that. Any other communications with Wal-Mart
17 between August 3 and September 21 that you can
18 recall other than what's referenced on Page 750?
19 A. No.
20 Q. No e-mail communications?
21 A. No.
22 Q. Okay. No in-person visits with anyone between
23 those two dates?
24 A. No.
25 Q. Okay. All right. Then 751 through 756 looks like

Page 145

1  Q.  Okay.
2  A.  Within one year of her employment ending.
3  Q.  So the first time that you learned from Marlo that
4  she was being asked to work a shift that was 1 to 5
5  was after her employment ended at Wal-Mart?
6  A.  Within one year before her employment --
7  Q.  Oh.  Prior --
8  A.  Correct.
9  Q.  One year prior to her leaving her employ of
10  Wal-Mart.
11  A.  Correct.
12  Q.  Okay.  When was the first occasion -- So the first
13  occasion was one year prior to her leaving, and
14  tell me about that occasion.
15  A.  Within one year.
16  Q.  Within one year.  So tell me about that first
17  instance when you recall Marlo communicating this
18  to you.  Were you at her house?  Was she at your
19  house?  Over the phone?  E-mail?  What was it?
20  A.  I don't recall the first one.  I just recall
21  several.  I see us in the car maybe when I picked
22  her up from work one time.  I see us in Mom's car.
23  Q.  I'm not following when you say "I see us."
24  A.  I was told so many times.  I don't recall the
25  first time, was your question to recall the first

Page 146

1  time, and I don't know when the first time was.
2  Q.  And you can't recall what the circumstance was,
3  whether you were picking her up from work, a social
4  event, telephone call.
5  A.  It could have been any of those --
6  Q.  Okay.
7  A.  -- or all of those.
8  Q.  Okay.  So if I understand your testimony, you know
9  that you heard about it more than once from Marlo
10  that she was being asked to work this 1-to-5 shift.
11  You believe the first time was within a year before
12  she left Wal-Mart.
13  A.  I believe all of the times were within one year.
14  Q.  Okay.  So all the times that you had communications
15  with Marlo about the fact that she was being asked
16  to work a 1-to-5 shift was within a one-year period
17  before she left Wal-Mart.
18  A.  Correct.
19  Q.  And so you can't tell me the first time you recall
20  this being said.  You can't relate where you were,
21  who was present, what exactly she said.
22  A.  The first time I was told may have been from my
23  mother.
24  Q.  But you don't know for sure.
25  A.  I don't.

Page 147

1  Q.  All right.  Can you recall how many times you heard
2  it from Marlo or your mother that she was being
3  asked to work a 1-to-5 shift?
4  A.  Less than 100.
5  Q.  And more than?
6  A.  A couple dozen.
7  Q.  Now, can you tell me about any of -- So you're
8  saying it's between 24 and 100 times within a
9  one-year period of her -- before she left Wal-Mart
10  that you heard from Marlo or her mother that she
11  was being asked to move to a 1-to-5 work schedule.
12  Can you tell me about what Marlo or your mother
13  said on any one occasion?  Since you can't identify
14  any specific one, can you tell me what you recall
15  your mother saying or Marlo saying about the shift
16  change on any occasion?
17  A.  I don't think she was asked.
18  Q.  So the answer is "yes," you can recall something?
19  I don't want you to guess.  I want you to tell me
20  what specifically you can recall on any occasion
21  where that subject came up.
22  A.  I was speaking to what you said, that I don't think
23  they asked her.  They just handed her a printout.
24  Q.  Okay.  I appreciate that clarification.  But I need
25  to know whether you can recall what was said by

Page 148

1  your mother or Marlo on any instance or any
2  occasion.
3  A.  Marlo repeatedly cited that she would miss the bus.
4  She would miss dinner.  And conversations with my
5  mom included the need to contact Karen.
6  Q.  Anything else?
7  A.  Not at this time.
8  Q.  Okay.  And did you take any notes of those
9  conversations?
10  A.  No.
11  Q.  Any of them?
12  A.  Not written, no.
13  Q.  Okay.  When you say "not written," what other kind
14  of note is there if it's not in writing?  I'm not
15  trying to be funny.  I just don't know what else --
16  A.  A mental note.
17  Q.  Okay.  So you --
18  A.  But those aren't any good.
19  Q.  No.  They're good if you can recall them.  That's
20  what -- It looks like you made a mental note
21  because you're telling me about it.
22  A.  All I recall is notes.  I can't specifically give
23  you quote/unquotes, but mental notes I can give
24  you.
25  Q.  And you've given it to me.  Right?  There's no

Case 1:17-cv-00070-WCG   Filed 06/17/19   Page 6 of 23   Document 106-11

Page 149

1  other mental note that you have that you haven't
2  shared in this deposition right now. Correct?
3  A.  Right.
4  Q.  All right. So just to go back so I make sure I'm
5  clear. Okay. So if I understand your testimony
6  then, the sum total of what you can recall Marlo or
7  your mother conveying on the subject of her being
8  directed to work a 1-to-5 shift instead of her
9  normal 12-to-4 shift was over the course of a year,
10  between 20 and 100 times -- 24 and 100 times during
11  a one-year period prior to her leaving, you heard
12  Marlo say in response to being directed to work the
13  1-to-5 shift that she would miss the bus, miss
14  dinner. And what you heard from your mother was
15  "We need to contact Karen."
16  A.  Those are summations of what I said, but yes. I
17  just -- All I can remember are the mental notes of
18  my conversation with my mother, and the result of
19  that was that we needed to call Karen.
20  Q.  Okay.
21  A.  Karen was always the go-to person to --
22  Q.  Did Marlo say it was Karen who was directing her to
23  work the 1-to-5 shift?
24  A.  Marlo knew Karen as the person who handed her her
25  schedule weekly.

Page 150

1  Q.  Did Marlo say it was Karen that was directing her
2  to work the 1-to-5 shift?
3  A.  I don't know that she said those words.
4  Q.  Do you have any personal knowledge of Karen being
5  the person who set the schedule?
6  A.  Personal knowledge?
7  Q.  You said Karen handed her the schedule.
8  A.  Right. So to Marlo, that's who wrote the schedule,
9  I would think.
10  Q.  Right. I'm not asking what Marlo thought. I'm
11  asking what you know. Do you know whether Karen
12  made out the schedule?
13  A.  I do not.
14  Q.  Okay. All right.
15     THE VIDEOGRAPHER: Excuse me, Counsel.
16  In a few minutes we need to change the tape.
17     MR. HARLAN: Okay.
18     MS. VANCE: We'll go to lunch.
19     MR. HARLAN: Yeah. Let me know when we
20  get another minute or so from the tape, and we'll
21  break, and we'll break for lunch.
22     BY MR. HARLAN:
23  Q.  So I take it based on what Marlo was communicating
24  to you well before she was let go, she clearly
25  understood that she was no longer working the

Page 151

1  12-to-4 schedule. Fair?
2  A.  No.
3  Q.  Okay.
4  A.  To this day she thinks her schedule is noon to 4.
5  Q.  So even though she was telling you that her
6  managers were directing her to work the
7  1-to-5 schedule, she still thought that she was
8  working a 12-to-4 schedule.
9  A.  I don't think she ever said anything about her
10  managers directing her. She just had a piece of
11  paper that Karen gave her.
12  Q.  Okay. So let me ask it this way. What did Marlo,
13  in your discussions with her, communicate to you
14  verbally, nonverbally, that causes you to believe
15  that Marlo believed that she was still working a
16  12-to-4 schedule?
17  A.  That's what she always worked. It's what she
18  always worked, and --
19  Q.  I'm not sure you heard my question.
20  A.  Okay.
21  Q.  So my question was, what was communicated to you
22  from Marlo, okay, after she made it known to you
23  that she was being moved to a 1-to-5 shift, what
24  words or what verbal or nonverbal communications
25  did you receive from Marlo that causes you to

Page 152

1  believe that notwithstanding the fact that she was
2  being told she works 1 to 5 she still believed she
3  was working 12 to 4?
4  A.  I don't think there are any, but I wanted to go
5  back to what you said, that they switched her --
6  You make it sound like they switched her from
7  second shift to third shift, but she would come
8  home with her schedule, and there might be a
9  noon-to-4 day on there, and then there might be a
10  1-to-5 or a 1-to-5:30. So it wasn't as you make it
11  sound, that they were switching her shift. It was
12  -- There were days, and the days became more and
13  more frequent that it was 1 to 5 instead of noon to
14  4.
15  Q.  Okay.
16  A.  To the point where I think at the end it was
17  probably always 1 to 5.
18  Q.  So let's start with what you know as opposed to
19  what somebody else told you. So when you said "She
20  would come home with a piece of paper that set
21  forth what shift she was scheduled to work," did
22  you ever see any of those pieces of paper prior to
23  her being terminated from Wal-Mart?
24  A.  I've seen those, yes.
25  Q.  Okay. How many times did you see pieces of paper

Page 153

1 that set forth the hours that Marlo was supposed to
2 work within the one-year period prior to her
3 leaving Wal-Mart?
4 A. I don't know. Maybe once.
5 Q. Okay. So there may have been one occasion where
6 you saw a schedule that Marlo was supposed to
7 follow relative to the hours that she was going to
8 work during this one-year period prior to her
9 leaving the employ of Wal-Mart. Correct?
10 A. Yeah. I don't -- Yeah. I don't recall specifics
11 on that. It's not something --
12 Q. Well, I'm not following when you say you don't
13 recall specifics. I'm not asking --
14 A. I believe I've seen the paper that she gets her
15 schedule printed out. I don't know how many times
16 or -- I've seen that.
17 Q. And when you have seen the schedule, you've seen
18 Marlo -- you've seen a schedule for Marlo during
19 this one-year period prior to her leaving the
20 employ of Wal-Mart that had on it a shift other
21 than 12 to 4.
22 A. No. I don't know that.
23 Q. So you don't have any --
24 A. All I'm testifying to is that I've seen those
25 pieces of paper that she brings home.

Page 154

1 Q. So you can't testify that you have personal
2 knowledge of having seen a schedule for Marlo that
3 contains a shift for her to work other than 12 to
4 4. Is that your testimony?
5 A. I don't believe so. It wasn't my practice to.
6 Q. Okay. Let's go off then. We'll take a break.
7 A. Okay.
8     THE VIDEOGRAPHER: Okay. We're going off
9 the record at exactly noon. This is the end of the
10 second DVD. It's 1 hour 50 minutes and 35 seconds.
11 We're off the record.
12     (A break was taken.)
13     THE VIDEOGRAPHER: We're back on the
14 record at 12:35. This is the beginning of the
15 third DVD.
16     (Exhibit No. 37 was marked.)
17     BY MR. HARLAN:
18 Q. I'm showing you what's been marked as Deposition
19 Exhibit 37. So at some point you and Marlo were
20 interviewed by the EEOC during the investigation
21 phase of this matter. Is that correct?
22 A. Yes.
23 Q. All right. And so this appears to be notes of the
24 interviewer from her interview of Marlo, and my
25 question is -- Well, first of all, you were present

Page 155

1 for the entirety of that interview. Correct?
2 A. I believe so.
3 Q. Yeah. If you can just look at it and tell me if
4 there are any things in here that you would assert
5 were not part of that interview.
6 A. I can't really read the writing.
7 Q. Okay. Well, let me ask you -- So you're not able
8 to look at this and discern whether these are
9 things were said by the investigator or Marlo or
10 you during the interview?
11 A. It would just take me some time to try and
12 decipher.
13 Q. Okay. Take some time to look at it.
14     (Exhibit No. 38 was marked.)
15     THE WITNESS: So your question was?
16     BY MR. HARLAN:
17 Q. Yeah. Is there anything in here that you would
18 assert was not part of that interview?
19 A. No. Not that I see --
20 Q. Okay.
21 A. -- right now.
22 Q. So there's nothing on here inconsistent with what
23 you recall being said by you and Marlo during the
24 interview.
25 A. No.

Page 156

1 Q. Is that correct?
2 A. Correct.
3 Q. Okay. Are you able to look at this and see which
4 statements on here were your statements as opposed
5 to Marlo's?
6 A. In No. 2 it says something about how long. I think
7 Marlo said "Can't remember," and I said "15 years,
8 I think."
9 Q. Okay.
10 A. I'm the one that mentioned Manager Brett, I think,
11 in No. 3.
12 Q. So you communicated during the interview that
13 "Manager Brett, miss him a lot"?
14 A. Oh, no. That's what that says? No. That's Marlo.
15 Q. Well, that's what I'm thinking it says.
16 A. Yeah. You're right. That's Marlo. I've heard
17 that.
18 Q. How about in -- How about "Used to work 12 to 4"?
19 A. That's her question.
20 Q. Well, in the writing there do you see where it says
21 "Used to work 12 to 4"?
22 A. I do.
23 Q. Did Marlo understand at the point of this interview
24 that her schedule had been changed?
25     MS. VANCE: Objection.

Page 165

1 question calls for a legal conclusion.
2    BY MR. HARLAN:
3 Q.  Well, certainly the court had not appointed you
4 legal guardian.  Correct?
5    MS. VANCE: Objection to
6 mischaracterization of the evidence which showed
7 that Ms. Stevenson was the standby guardian in
8 2016.
9    BY MR. HARLAN:
10 Q.  Had the court appointed you legal guardian for
11 Ms. Spaeth?
12    MS. VANCE: Same objection to the extent
13 the question calls for a legal conclusion.
14    BY MR. HARLAN:
15 Q.  Had the court appointed you legal guardian as of
16 the date of this?
17    MS. VANCE: Same objection.
18    THE WITNESS: I'm not a lawyer, but when
19 my mother passed, I assumed the guardianship
20 duties, and there's now being raised some -- you're
21 raising a question about legal or not and the dates
22 of court paperwork, but the day my mom passed is
23 the day I assumed guardianship duties, and I know
24 that that's what the document said to the court --
25    BY MR. HARLAN:

Page 166

1 Q.  Okay.
2 A.  -- as well to have it switched.
3 Q.  So as of this day, your mother had -- She had
4 already passed by this day?
5 A.  Yes.
6 Q.  Okay.  So the last question on Page 126 -- So first
7 of all, is the writing here an accurate recording
8 of what you all discussed in your interview with
9 Ms. Lawent?  Is there anything inaccurate about it?
10 A.  Not that I see at this time.  I believe it's
11 accurate.
12 Q.  All right.  The last -- The last question on
13 Page 126, "Was guardianship discussed at the
14 meeting with HR?"  "Oh, yeah.  In complaint form
15 from us."  What complaint form are you referring
16 to?  First of all, do you agree that that's what it
17 says, "complaint form"?
18 A.  That's what it looks like.  I have no idea what
19 that means.
20 Q.  Was there a complaint form that was submitted by
21 you or anybody in your family to Wal-Mart?
22 A.  Not that I'm aware of.
23 Q.  Okay.  Then a little bit later on it says "Karen
24 was mum during meeting.  She acknowledged we called
25 prior to discharge about schedule."  Do you see

Page 167

1 that?
2 A.  Yes.
3 Q.  Did I read that accurately?
4 A.  Yes.
5 Q.  And then it also says, "Marlo said something too."
6 Do you know what that's referring to?
7 A.  That Marlo had repeatedly asked for her schedule to
8 be restored.
9 Q.  Had asked someone at Wal-Mart to have her schedule
10 restored?
11 A.  Right.
12 Q.  So the first question relative to that, do you have
13 any personal knowledge of that?  Do you know?
14 A.  Define "personal knowledge."  I had to be there?
15 Q.  What you saw, what you heard.
16 A.  I didn't see it.  I was told by her.
17 Q.  Okay.  You that's the extent of your knowledge, what
18 Marlo told you --
19 A.  Right.
20 Q.  -- she said to somebody at Wal-Mart.
21 A.  Right.
22 Q.  You weren't able to see it or hear it yourself.
23 A.  Well, Karen confirmed it to me over the telephone
24 when I called and asked for the reasonable
25 accommodation to have her schedule restored.  I

Page 168

1 said, "Marlo's been asking."  "Yes, she has."  So
2 that was personal information.
3 Q.  Well, but again, even in that situation, you didn't
4 observe or -- You didn't observe Marlo asking.  You
5 didn't hear Marlo asking.  You heard Karen say --
6 A.  And Marlo, yes.
7 Q.  You heard Karen tell you that Marlo had raised the
8 issue.  Fair?
9 A.  True.
10 Q.  Okay.  So -- And then -- So going back to the lines
11 that say "Karen was mum during meeting.  She
12 acknowledged we called prior to discharge about
13 schedule."  So tell me what that is referring to.
14 A.  In the meeting, Karen was seated at about 2:00 to
15 where I was seated, and I mentioned during that
16 manager -- we'll call it a managers meeting if
17 that's -- or a meeting with the managers.
18 Q.  And this is a meeting shortly after Ms. --
19 A.  Termination.
20 Q.  -- Spaeth's termination?
21 A.  Yes.
22 Q.  Okay.
23 A.  And I brought up the fact that Marlo had repeatedly
24 asked for her schedule to be restored and that, in
25 fact, I called Karen and asked the same, and Karen

1  gave an affirmative nod.
2  Q.  Did she say anything?
3  A.  No.  Not during the entire meeting.
4  Q.  Do you know if the others in the meeting observed
5  her nodding?
6  A.  I couldn't attest to that.
7  Q.  Okay.  All right.  But it says "We called."  Who is
8  the "we"?
9  A.  I'm going to -- I -- I'm going to -- educated --
10  Q.  I don't want you to guess.
11  A.  Okay.  I believe it was my mom and I.
12  Q.  Okay.  Were you present when your mother called
13  Wal-Mart about your sister's schedule?  Did you
14  hear your mother on the phone with somebody at
15  Wal-Mart about your sister's schedule?
16  A.  I don't recall.
17  Q.  Would there be anything that would refresh your
18  recollection?  Do you have any notes that might
19  address this topic?
20  A.  No.
21  Q.  All right.  But you know for sure you called Karen.
22  A.  Yes.
23  Q.  And how many times did you call Karen -- Well,
24  first of all, is Karen the only person you called
25  at Wal-Mart to discuss your sister's schedule, the

1  fact that it was changed from her normal
2  12-to-4 shift to something else?
3  A.  Yes.
4  Q.  Okay.  How many times did you speak to Karen about
5  that subject?
6  A.  I believe once.
7  Q.  And can you tell me when that was?
8  A.  Within a couple months before her firing.
9  Q.  What prompted you to call her?
10  A.  Marlo.
11  Q.  And what about Marlo prompted you to call Karen
12  about --
13  A.  Everything that we talked about.  Her frustration
14  level, her inability to adapt, her frustration, the
15  fact that she had been requesting on her own
16  reasonable accommodation and wasn't getting it.  I
17  talked with my mother, and at that time --
18  Q.  Can I stop you for a second?
19  A.  Sure.
20  Q.  On the subject of Marlo requesting on her own
21  reasonable accommodation, that's a subject that you
22  also have no personal knowledge of.  Correct?
23      MS. VANCE: I'm going to object to the
24  confusing nature of the question.  I think if you
25  say "firsthand observation," it might clear up the

1  confusion here with "personal knowledge" because I
2  think the witness is thinking "If I hear something
3  secondhand, I now have personal knowledge" as
4  opposed to a firsthand observation.
5      MR. HARLAN: Well, I'm going to stick
6  with personal knowledge, but I understand the
7  concern, and I'll try to be clear.
8  BY MR. HARLAN:
9  Q.  So for purposes of the question in this deposition,
10  "personal knowledge" means something you see or
11  observe yourself as opposed to something somebody
12  tells you secondhand.  Okay?  So my question is on
13  the issue of whether Marlo requested reasonable
14  accommodation from Wal-Mart about her change in
15  schedule, do you have personal knowledge of that
16  fact?
17  A.  As you're defining "personal knowledge," no.  I've
18  been told by both parties.
19  Q.  So you weren't present when Marlo --
20  A.  No.  I was not present.
21  Q.  Let me finish the question.  So you weren't present
22  for any conversation or statement by Marlo to
23  someone at Wal-Mart about a request for -- to use
24  your words -- "reasonable accommodation."
25  A.  No.

1  Q.  And you weren't -- You didn't see an e-mail, for
2  instance, from Marlo to someone at Wal-Mart on that
3  subject.
4  A.  No.  We weren't afforded that.
5  Q.  Okay.  And you didn't see a letter sent by Marlo to
6  somebody at Wal-Mart on that subject matter.
7  A.  No.
8  Q.  Okay.  So on the subject of Marlo asking for a
9  reasonable accommodation, what do you understand
10  Marlo to have communicated to someone at Wal-Mart
11  about wanting a reasonable accommodation?
12  A.  From what I was told and later confirmed by Karen
13  is that she asked to have her hours restored to
14  noon to 4 so she could make it home for dinner and
15  not miss the bus, and it was too late to work, and
16  she would get hot, complete with a fanning of her
17  face when she would tell me.
18  Q.  How many times did Marlo indicate that she had
19  communicated this to someone at Wal-Mart?
20      MS. VANCE: Objection, vague.  How many
21  times was it communicated to the witness --
22      MR. HARLAN: To someone at Wal-Mart.
23      MS. VANCE: -- or to anyone?
24      BY MR. HARLAN:
25  Q.  You said that Marlo told you that she had

1  communicated these things to someone at Wal-Mart,
2  and so my question is how many times did Marlo tell
3  you that she had communicated --
4  A.  That would be -- The best I could give you is an
5  educated guess.
6  Q.  Well, so first -- So let me first establish, you
7  can't remember how many times Marlo -- You can't
8  remember what Marlo told you in terms of the number
9  of times that she had spoken with someone at
10  Wal-Mart about wanting her schedule to be restored
11  to 12 to 4 for the reasons that you testified to.
12  A.  The exact number of times?  No.
13  Q.  Okay.  Now give me your best guess as far as you
14  can recall.
15  A.  12.
16  Q.  Okay.  So your understanding is that -- Your best
17  guess is Marlo communicated to you that on 12
18  different occasions, she had asked individuals or
19  an individual at Wal-Mart to restore her schedule
20  to 12 to 4 for the reasons that you testified to.
21  A.  Correct.
22  Q.  Okay.  Do you recall Marlo indicating who she had
23  made this request -- these requests to?
24  A.  Karen.
25  Q.  Did Marlo ever communicate to you in any

1  discussions you had with her about what she had
2  discussed with Wal-Mart or asked Wal-Mart, did she
3  ever indicate that she had communicated to Wal-Mart
4  that the need to go back to 12 to 4 had something
5  to do with her Down syndrome?
6  A.  She wouldn't have used the words "Down syndrome."
7  She would have said "need" because she needs to not
8  miss the bus, and she needs to be home for dinner.
9  Q.  Yeah.  I'm not asking you to guess.  Now I'm asking
10  you a specific question.
11  A.  I didn't guess.
12  Q.  Did Marlo ever tell you that she had informed or
13  asked the people at Wal-Mart -- Well, strike that.
14  Did Marlo ever, in relaying to you that on 12
15  occasions she asked Karen at Wal-Mart to
16  restore her schedule to 12 to 4, did she ever say
17  that she had mentioned her Down syndrome as being a
18  reason for wanting her schedule restored to 12 to
19  4?
20  A.  She did not tell me that she used "Down syndrome."
21  Q.  Okay.  Did you, in your conversations with Karen --
22  I think you testified that you spoke to Karen and
23  asked for Marlo's schedule to be restored to 12 to
24  4.  Did you ever mention to Karen that you wanted
25  that done because of Marlo's Down syndrome?

1  A.  Yeah.  I -- Yes.  It was related to her inability,
2  which they were witnessing.  It was her inability
3  to adapt was because of her down -- well, in large
4  part due to her Down syndrome.
5  Q.  Okay.  So I just want to be clear so there's no
6  confusion.  Your testimony is -- Well, first of
7  all, how many times did you talk to Karen about the
8  subject of restoring Marlo's schedule to 12 to 4?
9  A.  Once over the phone.  None in person.
10  Q.  So you had one conversation with Karen about the
11  subject of restoring Marlo's schedule to 12 to 4;
12  is that correct?
13  A.  I believe so.
14  Q.  Okay.  And was there anybody who witnessed the
15  conversation other than you and Karen?
16  A.  Not on my side.
17  Q.  Did you take any notes of the conversation?
18  A.  Mental.  I left the conversation believing that she
19  was going to handle it.
20  Q.  Did you record it with a tape recorder --
21  A.  No.
22  Q.  -- or in any way?
23  A.  No.
24  Q.  Did you memorialize the conversation somewhere
25  where, after it was over with, you wrote up some

1  notes of what you and Karen had discussed?
2  A.  No.
3  Q.  Okay.  It was an important topic.  Right?
4  A.  I thought it was a topic that was going to be
5  handled right there.  But yes.
6  Q.  Okay.  But at the time you called Karen, you
7  understood that Marlo had been in communication
8  with Karen at least 12 times and made the same
9  request that you were making.
10  A.  Yes.
11  Q.  And it hadn't been dealt with.
12  A.  Correct.
13  Q.  And yet you didn't think it was important to
14  memorialize that discussion about the need to
15  change the schedule back to 12 to 4?
16  MS. VANCE:  Objection, asked and
17  answered.
18  BY MR. HARLAN:
19  Q.  Go ahead.
20  A.  State it again.
21  Q.  So despite the fact that -- At the time you had
22  this one telephone call with Karen, despite the
23  fact that Marlo had already told you that at least
24  12 times she had asked Karen to restore her
25  schedule because of the problems it was causing

Page 177

1 her, despite knowing that, you didn't try to take
2 any notes or memorialize that discussion?
3 A.  I don't believe so.  If I did, that memorialization
4 would have been lost in my fire.
5 Q.  And why would you have confidence when you left
6 that conversation that Karen was going to adjust
7 the schedule if she had ignored Marlo's pleas to
8 restore the schedule to 12 to 4?
9 A.  It was my assumption then and now that they were
10 discriminating against her, and I thought that I
11 could come in and -- I believed I could come in and
12 explain reasonable accommodation, and it would be
13 made right.  It's -- Call me naive, but I never
14 thought I'd be sitting here today.
15 Q.  But you didn't go in.  You had a phone call with
16 Karen.
17 A.  Right.  Karen has always been the go-to person, and
18 Karen has always been the person who called and
19 said "Marlo's smock is dirty" or "Marlo came in and
20 had a hole in her pants today."  It's always been
21 Karen.  Karen has always been the one who made the
22 accommodations throughout her employment.
23 Q.  Well, what other -- What reasonable accommodations
24 did the company give or Karen give Marlo prior to
25 this schedule incident coming up?

Page 178

1 A.  She worked four days a week noon to 4, not
2 Thursdays.
3 Q.  Was that an accommodation, from your standpoint?
4 A.  Yes.  I believe Karen understood the need for
5 routine.  I believe Julia did not.
6 Q.  So it's my understanding that Marlo worked 12 to 4
7 from the inception of her employment.  Correct?
8 A.  Yes.
9 Q.  And that was when, 1999?
10 A.  Yes.
11 Q.  And were you involved in the onboarding of Marlo at
12 Wal-Mart back in 1999?
13 A.  No, I was not.
14 Q.  You weren't even in the area.  Were you?
15 A.  Yes, I was.
16 Q.  Okay.  So what causes you to believe that the
17 decision to allow Marlo to work 12 to 4 and not --
18 and only work four days a week was an accommodation
19 granted because of Marlo's condition?
20 A.  I also believe a job coach went in with my mother
21 and Marlo.  I think the job coach would have been
22 through Holiday House, which we talked about
23 before.  So it was a group understanding that this
24 is how her employment was going to work.  It wasn't
25 going to be five days a week.  It wasn't going to

Page 179

1 be eight hours a day.  It was going to be four
2 hours, and it was going to be four days a week, and
3 it was always Thursdays off.
4 Q.  And I guess I'm asking a slightly different
5 question.
6 A.  Okay.
7 Q.  You're describing what transpired in terms of what
8 her hours were and the fact that she had a job
9 coach.  What I don't understand is what causes you
10 to believe that that was some sort of accommodation
11 made because of Marlo's physical or mental
12 condition.
13 A.  What causes me to believe that?
14 Q.  So first of all, let's just set a baseline.
15 A.  Yeah.
16 Q.  You weren't involved directly in any of these
17 discussions --
18 A.  I wasn't --
19 Q.  -- in terms of what her schedule was going to be or
20 how many days a week or how many hours she was
21 going to work.  Correct?
22 A.  Not at that time.  There was a time years down the
23 road where my mother and I went in and talked to
24 the manager because her schedule had switched, and
25 they put it back.

Page 180

1 Q.  Okay.  So in terms of this 12-to-4 schedule four
2 days a week only four hours a day, you have no
3 personal knowledge as in terms of what Wal-Mart's
4 rationale or thinking was in terms of agreeing to
5 that.
6 A.  Personal?  No.
7 Q.  And nobody at Wal-Mart ever said, "We were doing
8 that as some sort of reasonable accommodation or
9 accommodation on account of Ms. Spaeth's physical
10 or mental condition."  Correct?
11 A.  Not that I recall.
12 Q.  Okay.  All right.  So you had this one conversation
13 with Karen where you're addressing the fact that
14 Marlo's schedule has changed to something other
15 than 12 to 4.  Correct?
16 A.  Correct.
17 Q.  Not witnessed by anybody.  It's just you and Karen
18 on the telephone.
19 A.  Correct.
20 Q.  How long did the conversation go?
21 A.  Five minutes.
22 Q.  Okay.  Tell me everything you recall saying to
23 Karen in that five-minute conversation.
24 A.  Everything I recall I already shared with you, and
25 that was the need for Marlo's schedule to be

1   restored.  She had the inability to work that late,
2   and Karen was going to take care of it.  She was
3   going to talk to the manager and take care of it.
4   So as far as I was concerned, that was -- I was
5   done with it at that point.
6   Q.   And what did Karen say?  Tell me your best
7   recollection of what words Karen uttered in that
8   five-minute conversation.
9   A.   I recall her telling me she was going to talk to
10  the manager.
11  Q.   So anything else you recall Karen saying in that
12  five-minute conversation?
13  A.   No.
14  Q.   And then in terms of what you said, you testified
15  that you needed for Marlo's schedule to be
16  restored, had an inability to work that late.
17  A.   Yes.
18  Q.   So I'm going ask you specifically what words you
19  recall using in that five-minute conversation with
20  Karen.  And that's Karen Becker?  What's Karen's
21  last name?  Do you know?
22  A.   Karen.
23  Q.   Okay.  Is it Becker?  I can't remember.  Yeah.
24  It's Karen Becker.  So in that conversation with
25  Karen Becker, tell me to the best of your

1   recollection what words you recall using.  And if
2   you want to take a break, because this, from my
3   standpoint, is important, I'm very happy to
4   accommodate you to do that.
5   A.   Nope.
6   Q.   Okay.  So tell me to the best of your recollection
7   what words you used on this occasion where you had
8   a five-minute call with Ms. Becker.
9   A.   "It's my understanding that Marlo's been getting
10  schedules that are 1 to 5 instead of noon to 4.
11  It's also my understanding that she's been talking
12  to you about having that switched or restored to
13  noon to 4.  Because of her disability, she has the
14  inability to make this change, especially after all
15  of these years where the routine has been
16  established.  She's afraid she's going to miss the
17  bus.  She's afraid she's going to miss dinner.
18  It's upsetting to her.  She gets too hot.  She says
19  she feels sick, and she can't accommodate it, so we
20  need it switched back for her."  Not for me.  I
21  think you said for me.
22  Q.   Anything else you recall in terms of specific words
23  from Ms. Becker during this five-minute call with
24  her?
25  A.   No.

1   Q.   Did you have a conversation prior to Ms. Spaeth's
2   termination with anyone else where you discussed
3   restoring the schedule?
4   A.   Years prior with a different manager, Mom and I
5   went in.  Marlo was not present.  It was just Mom
6   and I, and he opened up the computer, he changed
7   some things, and her schedule was restored.
8   Q.   And with respect to that manager -- It sounds like
9   it's a male.
10  A.   It was.
11  Q.   Time frame, approximately?
12  A.   Within ten years.  Probably closer to within five.
13  Q.   So between five and ten years prior to Marlo being
14  let go at Wal-Mart?
15  A.   Correct.  And that meeting is what led me to at the
16  time not feeling the need to memorialize my
17  conversation with Karen, because I assumed she
18  could open the computer and make the change, and
19  order would have been restored.
20  Q.   And in this conversation with the male manager five
21  to ten years before Marlo's termination, tell me to
22  the best of your recollection what was said in this
23  meeting.  And this was an in-person meeting.
24  Correct?
25  A.   Yes.

1   Q.   Okay.  Tell me what was said.
2   A.   We talked about --
3   Q.   And I'm --
4   A.   Go ahead.
5   Q.   I'm going to ask you not to generalize, but tell me
6   what words you can recall being said by all
7   parties.
8   A.   Okay.  He told us that her schedule had been opened
9   up because they were -- everybody was looking for
10  hours.  Because I started the conversation with --
11  "Has every" -- Because her hours were cut and
12  changed.  So I said, "Has everybody's hours been
13  cut?"  And he said, "Yeah.  Everybody is looking
14  for hours."  And I at that time spoke "Because you
15  can't cut just Marlo's hours.  You have to cut
16  everybody's hours if you're cutting Marlo's hours."
17  And so he said that the schedule in the computer
18  had been opened up to schedule her for other times,
19  and that's how this was happening that she was
20  getting these schedules that weren't even when the
21  bus -- when the bus ran.
22       So we went over her availability, and
23  noon to 4 was restored, and she didn't work four
24  days a week for a period of time.  She worked
25  anywhere from one to four.

Page 185

1 Q. Okay. And what did your mother say during the
2 meeting?
3 A. I don't recall.
4 Q. Did you take any notes of this meeting?
5 A. No.
6 Q. Record it in any way?
7 A. No.
8 Q. What hours had she been scheduled that needed to be
9 reversed, if you will, in this meeting with the
10 male manager?
11 A. I don't recall. Not noon to 4. I don't know,
12 though.
13 Q. Okay. Did the subject of Marlo's disability come
14 up in that meeting?
15 A. Yes. We were talking that she had to ride -- be
16 able to catch the bus.
17 Q. Okay. And what specifically was said in that
18 meeting about her disability?
19 A. I don't recall other than -- I do recall,
20 noteworthy, that she couldn't drive, but I don't
21 know beyond that what was --
22 Q. So when you say that the subject of her disability
23 came up, did you tell the manager that she had a
24 disability, and therefore, needed the schedule
25 reversed for that meeting?

Page 186

1 A. It was common knowledge.
2 Q. During the meeting did you tell the manager that
3 she had a disability and the schedule needed to be
4 reversed on account of her disability, or did you
5 simply say, "She's got problems being able to get a
6 bus"?
7 A. I don't think either one of those. It was really a
8 simple meeting where we said "This is --
9 Q. Well, you're the person that said that the subject
10 of her disability came up, and I just want to
11 understand how it came up.
12 A. I believe I was referring to her -- She can't
13 drive, which is because of her disability.
14 Q. And did you tell that to the manager? Did you say
15 "Hey, she can't drive; and therefore, she has" --
16 A. Oh, yeah. That's probably what my mother said.
17 Q. Let me finish the question. In that meeting with
18 the male manager did you tell the manager, "Hey,
19 Marlo needs her schedule put back to the way it was
20 because she can't drive on account of her physical
21 or mental condition, and the bus doesn't run during
22 that time." Is that what you're testifying to?
23 A. I don't know if those were the exact words, but
24 yes.
25 Q. Okay. Well, tell me what words you do recall using

Page 187

1 that dealt with the subject of Marlo's disability.
2 A. It centered around her disability and inability to
3 drive and her need to ride the bus.
4 Q. You're characterizing it. So rather than
5 characterizing --
6 A. I cannot swear to you what I said that day. I
7 can't even tell you when it was.
8 Q. I appreciate that. But you testified that the
9 subject of her disability came up in that meeting,
10 and all I'm asking is, can you tell us what words
11 you recall saying or hearing that leads you to
12 believe that the subject matter of her disability
13 was raised in that meeting with the male manager?
14 A. I've already done that to the best I can.
15 Q. Okay. Can you do it again just so I'm clear on the
16 record?
17 A. I don't know how I said it, but we talked about her
18 disability and her inability to drive and her need
19 to take public transportation. I think I said that
20 three or four times now. But I don't remember -- I
21 can't give you a quote.
22 Q. And when you say "her disability," you mentioned
23 her Down syndrome specifically?
24 A. I don't know. The unique thing about Down syndrome
25 is you don't have to be told someone has Down

Page 188

1 syndrome.
2 Q. So at the time that you had the conversation with
3 Ms. -- Well, first of all, with respect to your
4 mother, I think your testimony was you believe that
5 your mother also spoke to Ms. Becker. Correct?
6 A. Yes.
7 Q. And you believe that your mother asked to have
8 Marlo's hours restored to 12 to 4?
9 A. Yes.
10 Q. Okay. But again, this is a conversation you
11 weren't privy to. Correct?
12 A. Correct.
13 Q. So how do you know your mother spoke to Karen
14 Becker?
15 A. My mother used me as her confidante. We guardianed
16 Marlo together. She used me.
17 Q. So your mother relayed to you that she had called
18 Karen about basically getting Marlo's schedule
19 restored.
20 A. Right.
21 Q. Okay. Do you recall when that was?
22 A. Within that year because that's the -- Other than
23 the time we went in and they just switched it back,
24 this -- within the last year is the only time it
25 was an issue.

Page 193

1 A. No.
2 Q. So at the time you spoke to Ms. Becker, it was your
3 understanding that Marlo was working the entire new
4 shift she had been assigned?
5 A. Yes.
6 Q. And when was the first time that you learned that
7 she was not working the entire shift that she had
8 been assigned?
9 A. When I called to speak with her manager, Julia, on
10 the day she was let go.
11 Q. And when did you first learn that she was having to
12 work a 1-to-5 shift?
13 A. When she told me. I don't know a date.
14 Q. Okay. Well, using as a point of reference July of
15 2015 --
16 A. Within that year is when that started, and it
17 started out as a day, and then it got more and
18 more.
19 Q. You said you were familiar with the concept of
20 Marlo being worn down at the end of the shift,
21 needing to catch a bus. You seem to suggest that
22 that had come up in some other context other than
23 Wal-Mart.
24 A. What I was referring to is it is a known feature of
25 Down syndrome, and as her sister, it's a known

Page 194

1 feature of Marlo that when it's noon, she better be
2 sitting and having lunch. And when it's 4:30 or 5,
3 she better be having dinner. Or in her mind, the
4 chaos of that not happening is more than she can
5 process and deal with.
6 Q. And that's something --
7 A. So to not -- And also along with catching the bus.
8 If she didn't catch the 4:15 bus, that's a problem
9 for her.
10 Q. Okay. And how long have you known that Marlo had
11 these sort of tendencies when she was at work, and
12 it was past the time that she needed to catch the
13 bus or have dinner?
14 A. I didn't have that knowledge. I wasn't privileged
15 with that knowledge that she was having trouble at
16 work.
17 Q. No. You've testified to that. I'm asking a
18 different question. This anxiety -- Is that fair,
19 to call it "anxiety"?
20 A. No.
21 Q. Okay. What would you call it?
22 A. The need for structure and routine is I think a
23 fantastic feature of Down syndrome, and she's had
24 it her entire life. She was born with it.
25 Q. Okay. So well before her change in shift, you knew

Page 195

1 that something like a change in a shift would
2 create a problem for Marlo.
3 A. I hadn't thought about it, but had you asked me
4 that question then, I would have said, "Yeah,
5 probably. Yeah."
6 Q. No. I'm -- When you say you hadn't thought about
7 it, I thought your testimony was --
8 A. You said I always knew that a change in a Wal-Mart
9 shift would -- I didn't think about that.
10 Q. Yeah. But before the change in shift, you
11 certainly knew that changes created problems for
12 her. Correct?
13 A. Yes.
14 Q. Is that fair?
15 A. That's -- Yes.
16 Q. And certainly a shift represents a change. Right?
17 A. Absolutely.
18 Q. A significant change. Right?
19 A. Yes.
20 Q. And despite the fact that you were informed by your
21 sister more than a year before her termination that
22 there was a significant change in her daily
23 schedule, you never inquired of your sister or
24 anybody at Wal-Mart how this was affecting her
25 attendance?

Page 196

1 MS. VANCE: I'm going to object to the
2 mischaracterization of prior testimony as being
3 told more than a year before the termination.
4 BY MR. HARLAN:
5 Q. Okay. Well, prior to the termination, having been
6 armed with the information that her schedule had
7 changed and she was now being asked to work a later
8 shift, armed with that information and knowing that
9 it represented a significant change in her daily
10 structured activities, it never occurred to you to
11 maybe check with Marlo to see how she was able to
12 adapt to that change in circumstances?
13 MS. VANCE: Objection, assumes facts not
14 in evidence.
15 THE WITNESS: I don't hear a question
16 there that I can answer.
17 BY MR. HARLAN:
18 Q. Okay. The question is you've testified that Marlo
19 needed structure, and you've known that to be the
20 case basically her whole life. Correct?
21 A. Correct.
22 Q. And you testified that this change from 12 to 4 to
23 1 to 5 or some other shift was a significant change
24 in her daily activity. Correct?
25 A. Correct.

Case 1:17-cv-00070-WCG Filed 06/17/19 Page 15 of 23 Document 106-11

Page 201

1  feel good and would talk to a manager.
2  Q.  But based on what she communicated to you, you
3  understood that she was able to work the entire
4  shift.
5  A.  She didn't communicate otherwise.
6  Q.  Okay.  And you said part of her concern was being
7  able to get home for dinner.
8  A.  Correct.
9  Q.  Would working a shift that was over with at 5:00,
10  given what you know of the then bus schedule, put
11  her in a position where she could get home for
12  dinner at 5:30?
13  A.  I don't know.
14  Q.  Okay.  What time did she have dinner in 2015?
15  A.  When she got home from her 4:00 shift.
16  Q.  And what time would that be?
17  A.  I don't know.
18  Q.  Was the dinner prepared by Barbara?
19  A.  One or the other of them.
20  Q.  Okay.  So she could cook for herself.
21  A.  Um-hum.
22  Q.  And did they always have dinner together?
23  A.  Let me retract that.  She didn't -- She didn't use
24  the oven.  She didn't eat by herself, and she
25  didn't use the oven by herself.  She would eat when

Page 202

1  their family was ready to eat, which was her and
2  Barbara.
3  Q.  Okay.  And do you know what time that is?
4  A.  When she would go home from her 4:00 shift.  I
5  don't know what time -- however long it took for
6  the bus to get home and -- I didn't live there.
7  Q.  Okay.  Were you ever present for any of their
8  dinners?
9  A.  I think I was invited for one over the years.
10  Probably not on a day that Marlo worked, though.
11  Q.  Do you have personal knowledge of whether they ate
12  dinner at the exact same time every day?
13  A.  Personal knowledge?  No.
14  Q.  What about Barbara?  Did she work at Taco Bell?
15  A.  Yes.
16  Q.  Did her shifts fluctuate?
17  A.  No.  She worked mornings --
18  Q.  Okay.
19  A.  Every day.
20  Q.  What was her typical schedule?
21  A.  It was a four-hour shift in the morning.  I know
22  she started pretty early but was done by noon.
23  Q.  Okay.  Was there any connection to -- I think your
24  testimony was Marlo complained about getting sick.
25  Does her getting sick, based on what you know, have

Page 203

1  anything to do with eating?
2  A.  Based on what I know, I would think that was part
3  of it.
4  Q.  Okay.  And do you know if she was telling the
5  people at Wal-Mart that she would get sick because
6  she hadn't eaten supper?
7  A.  I do not have personal knowledge.
8  Q.  Okay.  Did she ever tell you that, that her
9  sickness had something to do with her not eating
10  supper at a particular time?
11  A.  Yes.
12  Q.  Okay.
13  A.  She wasn't -- Yes.
14  Q.  And based on what you know, does she need to eat by
15  a certain time?
16  A.  At the same time.
17  Q.  Okay.
18  A.  So yes.
19  Q.  And why does that cause sickness, if you
20  understand?  Does it have to do with blood sugar,
21  or is it the fact that she needs to eat at the same
22  time?
23  A.  I think it's the routine which is perhaps the
24  number one -- other than physical symptoms -- signs
25  of Down syndrome is the need for routine, which is

Page 204

1  a positive attribute.
2  Q.  Did Barbara take the bus to her job?
3  A.  Yes.  She was often picked up by her father after
4  work.  I shouldn't say often.  Probably once a week
5  he picked her up, and they went to lunch, but yes,
6  she rode the bus.
7  Q.  Was there an issue about being able to take a bus
8  after 5:30?  Did the bus run that she would need to
9  take to get home after 5:30?
10  A.  I honestly don't know how late the bus runs.
11  Q.  Okay.  You told me about Marlo complaining that
12  Julia and Robin picked on her at work.  Did she
13  ever complain of anyone making any sort of
14  derogatory statements about her disability?
15  A.  No.
16  Q.  Or jokes about her disability?
17  A.  No.
18  Q.  And you don't have any knowledge of that occurring.
19  Correct?
20  A.  No.
21  (Exhibit No. 39 was marked.)
22  BY MR. HARLAN:
23  Q.  You testified that you spoke to Karen about moving
24  Marlo back to her 12-to-4 schedule.  Are you aware
25  of anything else besides changing her schedule that

Case 1:17-cv-00070-WCG   Filed 06/17/19   Page 16 of 23   Document 106-11

1 would have allowed her to be able to work the
2 1-to-5 shift?
3     MS. VANCE: Objection. The question is
4 confusing.
5     BY MR. HARLAN:
6 Q.  So it's my understanding that you believe and Marlo
7 believed that working a shift other than 12 to 4
8 was causing her various problems. Correct?
9 A.  And others, yes.
10 Q.  Yeah. And my question is, is there anything other
11 than a change in that shift that would allow her to
12 be able to work 1 to 5?
13 A.  Exclusive of going back in time?  No.
14 Q.  So is it your understanding then that for the rest
15 of her time at Wal-Mart, she would always need to
16 work 12 to 4, otherwise there would be mal-effects?
17 A.  It would have to be tried, I guess.  I can't speak
18 to something that didn't happen.
19 Q.  Have there been other instances in her life that
20 you've observed that she's had to make adjustments
21 and has been able to do that?
22 A.  Not something like that.  Not something where it's
23 been 15 years and the love of her life.  No.  I
24 don't have anything to compare that to.
25 Q.  Well, one adjustment was when she left living at

1 home with her mom to go live with Barbara.  Right?
2 Wouldn't that be a major life adjustment for Marlo?
3 A.  She still did all the same things.  She still
4 brushed her teeth the same, so that's the routine.
5 It was just in a different -- It's like staying in
6 a hotel or going on vacation.  She still brushed
7 her teeth at the same time and ate dinner at the
8 same time.  So I think changing her job schedule is
9 a bigger --
10 Q.  Okay. But -- I'm not quibbling about whether one
11 is bigger than the other, but you would agree that
12 both represented major changes.  Right?
13 A.  I would think so.
14 Q.  And based on your observations, Marlo was able to
15 navigate those changes without any mal-effects.
16 Right?
17 A.  I wasn't local for that at that time.  I wasn't --
18 To the best of my knowledge she did.
19 Q.  Let me show you what's been marked as Deposition
20 Exhibit 39.
21 A.  The text is getting smaller.
22 Q.  Yeah.  I'm not going to ask you a lot of detail.
23 Have you seen this document before?
24 A.  I don't think so.
25 Q.  Okay.  This is a policy -- I'll represent it's a

1 policy that was in place at Wal-Mart while Marlo
2 was there, and my question is, do you have any
3 personal knowledge one way or the other if that's
4 the case?
5 A.  I do not.
6 Q.  Okay.  And you don't know whether Marlo's situation
7 was handled in accordance with this policy one way
8 or the other.  Correct?
9 A.  Correct.
10 Q.  And you don't know whether it's a policy that was
11 reviewed with Marlo during her time at Wal-Mart.
12 Correct?
13 A.  I do not.
14 Q.  Or in 2014 or 2013.  Correct?
15 A.  I do not.  I've heard the word "coaching" in the
16 managers meeting, but I was not privy to this
17 policy.
18     (Exhibit No. 40 was marked.)
19     BY MR. HARLAN:
20 Q.  I'm showing you what's been marked as Deposition
21 Exhibit No. 40.  Really the same question.  Have
22 you seen this policy before?  I'll represent to you
23 it's a Discrimination & Harassment Prevention
24 Policy that was in place during the time Marlo was
25 working at Wal-Mart.

1 A.  I don't believe I've ever seen this.  No.
2 Q.  Okay.  So you have no personal knowledge as to
3 whether it was in place during the time that Marlo
4 was there.
5 A.  Correct.
6 Q.  And no personal knowledge in terms of whether this
7 policy was reviewed with Marlo during her time at
8 Wal-Mart.
9 A.  Correct.
10 Q.  Based on your experience with Marlo, does she have
11 the ability to read and understand things?
12     MS. VANCE: Objection, compound.
13     BY MR. HARLAN:
14 Q.  Does she have the ability to comprehend documents
15 and language in written form?
16     MS. VANCE: Objection, vague.
17     THE WITNESS: You're using two words
18 together, "read" and "comprehend."  She can read.
19     BY MR. HARLAN:
20 Q.  Okay.  And how about comprehend?  Does she have the
21 ability to comprehend things as she reads, based on
22 your experience?
23 A.  Limited.
24 Q.  Okay.  Can you give me an example of things that
25 based on your personal experience she was not able

Page 217

1  -- her normal routine for her to not work until at
2  least 4 on a particular shift?
3  A.  If I'm understanding the question correctly, no.
4  That would be the same as having a day off.  She
5  didn't have any trouble with a day off.
6  Q.  Right.  So working until 4 shouldn't have been a
7  problem because that would have been consistent
8  with her routine.  Correct?
9  A.  On a normal day-to-day basis, right.
10  Q.  And you wouldn't think leaving at 3 would be
11  necessary for her being missing supper or being
12  concerned about missing supper.  Right?  Because
13  she didn't eat until after 4.
14  A.  I wouldn't think those are the reasons, no.
15  Q.  Okay.
16  A.  I couldn't attest what the reason is.
17  Q.  Did you ever send any documents to Wal-Mart asking
18  that her shift be limited to particular hours?
19  A.  No.  We talked in person.
20  Q.  Do you know if your mother or anybody on Marlo's
21  behalf ever wrote something and provided to the
22  company asking that she work only a certain
23  schedule?
24  A.  Not other than what we've talked about already.
25  Q.  Well, I don't think we've talked about anything

Page 218

1  being sent to Wal-Mart unless I missed it.
2  A.  No.  No.
3  Q.  So to your knowledge, nobody -- neither you, your
4  mother or anybody else -- has sent Wal-Mart
5  documentation to be placed in Marlo's file
6  indicating that for purposes of her disability or
7  her mental or physical impairments that she only
8  work certain hours.
9  A.  I don't think so.
10  Q.  You said that you observed Marlo fanning herself
11  when she communicated to you that working the
12  1-to-5 shift made her hot.  Do you recall that?
13  A.  Yes.
14  Q.  Is her being hot a physiological reaction caused by
15  her Down syndrome, to your knowledge?
16  A.  I think the stress is, and then the heat comes from
17  the stress.
18  Q.  Okay.  And has any medical professional given that
19  opinion?
20  A.  Countless.
21  Q.  And who are some of the medical professionals that
22  have diagnosed Marlo's feeling -- her heat
23  sensation feelings as being related to her Down
24  syndrome?
25  A.  I don't know that anybody has mentioned Marlo's

Page 219

1  name, but Down syndrome, in general.
2  Q.  Okay.  But my question was did any of Marlo's
3  doctors or the medical professionals that she's
4  consulted attribute her feelings of being hot to
5  her Down syndrome?
6  A.  We haven't talked about it.
7  Q.  So that would be "No."
8  A.  Correct.
9  Q.  And with respect to the exhibit you have in front
10  of you, Exhibit No. 3, do you have a basis to
11  dispute any of the information in Ms. Stern's
12  e-mail of December 17, 2014?
13  A.  I would dispute as evidence the illegal activity in
14  the first sentence in the second paragraph.
15  Q.  The first sentence of the second paragraph?
16  A.  Yeah.  I think it might be a paragraph.
17  Q.  What's it begin with?
18  A.  "As she is available until 6," and then it states
19  there was no consideration for reasonable
20  accommodations.
21  Q.  Yeah.  I'm not asking you whether you think that
22  Ms. Stern violated the law by what she said in the
23  e-mail.  I'm asking about the facts.  Do you have
24  any --
25  A.  Oh.

Page 220

1  Q.  -- basis to dispute the facts?
2  A.  This is her -- I can't attest to what she wrote.
3  No.  I don't have anything.
4  Q.  Okay.  So you don't know one way or the other
5  whether the statements she listed are true or not.
6  A.  They are between her and someone else.  I've -- No.
7  I don't know.
8  Q.  Thank you.  I'm going to show you what was
9  previously marked as Deposition Exhibit No. 20 at a
10  prior deposition.  These are -- I'll represent to
11  you these are coachings that Marlo was given.  Have
12  you ever seen these before?
13  A.  I don't think so.
14  Q.  Okay.  Same question.  Do you have any basis to
15  dispute the facts that are set forth on these
16  coachings?
17  A.  So what's the question?
18  Q.  Yeah.  So in both of these coachings, there are
19  statements being made about the schedules and Marlo
20  leaving and its impact on the business.  Do you
21  have any basis to dispute those facts as written on
22  both pages of Exhibit 20?
23  A.  Do I have evidence to the contrary?  Is that the
24  question?  No.
25  Q.  Okay.  Do you have any personal knowledge to the

Case 1:17-cv-00070-WCG  Filed 06/17/19  Page 18 of 23  Document 106-11

1  Q.  Got it.  And did you tell DOJ it was a challenge
2  because it was causing her to either miss shifts or
3  leave early?
4  A.  I'd have to keep reading.  I don't know if I did.
5  Q.  Well, I'm asking you based on your recollection,
6  did you communicate to them that one of the ways it
7  was challenging for Marlo is that she didn't feel
8  like she could stay for the entirety of her shift?
9  A.  I think this is my only communication with them,
10  and I'd have to read it in its entirety, like I
11  said, if I can.
12  Q.  Okay.  Yeah.  Go ahead.  Please read it.
13      THE VIDEOGRAPHER: Would this be a good
14  time to change the tape?
15      MR. HARLAN: Yeah.  Why don't we go off.
16  You can keep reading it, and we'll go back on.
17      THE VIDEOGRAPHER: Okay.  This is the end
18  of the third DVD, and it is 1 hour 45 minutes and
19  20 seconds long.  We're off the record.
20      (A break was taken.)
21      THE VIDEOGRAPHER: We're on the record at
22  2:30, and this is the beginning of the fourth DVD
23  of Amy Stevenson's deposition.
24      BY MR. HARLAN:
25  Q.  Okay.  So the question I wanted to know is whether

1  you told the DOJ it was a challenge for Marlo --
2  the change in shift was a challenge for her because
3  she couldn't -- she was either missing shifts or
4  leaving early.  Did you tell the DOJ that?
5  A.  I did not see that in here.
6  Q.  Okay.  And this was a phone call, you believe, or
7  was it something in writing that you submitted?
8  A.  I typed this, I believe.  Submitted.
9  Q.  Like online?
10  A.  I think so.
11  Q.  Okay.  And do you recall hearing from the
12  Department of Justice in response -- any response
13  to what you had submitted?
14  A.  I believe I received the response saying it was
15  going to be handled by the EEOC and, I think that
16  was the first and last of my conversation with
17  them.
18  Q.  Okay.  Moving a little bit further down the page,
19  "Marlo had asked both her supervisor, Julie, and HR
20  manager, Karen, to be switched back to noon to
21  4 p.m." -- "to the noon to 4 p.m. shift."  So
22  again, I believe you've touched on this, but you
23  don't have any personal knowledge that she did
24  that.  Correct?
25  A.  Correct.

1  Q.  "And I, as Marlo's guardian, had also asked Karen
2  to have her schedules switched back to accommodate
3  Marlo's known disabilities."  And I think you've
4  testified you can't say that you specifically said
5  "known disabilities" to Karen when you asked about
6  moving her shift back.  Correct?
7  A.  I think I did.
8      MS. VANCE: Objection.  Misstates prior
9  testimony.
10      BY MR. HARLAN:
11  Q.  Okay.  So your testimony is you have a recollection
12  of saying to Karen when asking to have Marlo's
13  shift moved back to 12 to 4, "You need to do this
14  because of her known disabilities."  Are those the
15  words you used?
16  A.  I believe so.
17  Q.  Um-hum.
18  A.  Because this was written right after that.
19  Q.  And what are the disabilities, plural, that she
20  has?
21  A.  In -- Well, she's Down syndrome, and with that
22  comes disabilities -- learning challenged,
23  inability to adapt.  I could go on and on, but
24  those are the two main that come to mind.
25  Q.  A little bit further down it says, "She was told by

1  Karen not to come in on the two days in question."
2  That's what Marlo told you?
3  A.  Correct.
4  Q.  So that's a fact that you don't have any personal
5  knowledge of.
6  A.  Correct.
7  Q.  And it's nothing Karen ever admitted or anybody at
8  Wal-Mart admitted.  Correct?
9  A.  I don't know that that was specifically discussed.
10  So no.
11  Q.  Okay.  It wasn't something that came up in the
12  manager meeting you had after her termination.
13  Correct?
14  A.  I don't know.
15  Q.  You don't have any recollection of --
16  A.  Correct.
17  Q.  -- telling anybody at the managers meeting that
18  "Hey, I don't know why Marlo is being disciplined
19  for missing -- being a no call, no show for two
20  days when Karen told her not to come in."  You
21  never said that to anybody at the managers meeting.
22  Did you?
23  A.  I don't know.
24  Q.  Why did Marlo -- Did Marlo say why Karen told her
25  not to come in?

Page 233

1 indication to you that Ms. Stern knew that Marlo
2 did not understand the coachings?  If you could
3 direct our attention to that language.
4 A.  I'm starting to read one, two, three, four, five,
5 six, seven lines down.  I need to catch up with
6 myself.  This is -- This outlines a conversation
7 where Julia is doing the talking, and Marlo is not
8 saying anything.  "She did not say one word the
9 entire time."
10 Q.  So in your mind the fact that she didn't say any
11 words --
12 A.  No.  I'm not saying that.  I'm reading out loud.
13 Q.  Oh, I'm sorry.  Go ahead.  I don't want to
14 interrupt you.
15 A.  What I'm saying is this e-mail outlines that she's
16 been talking to Marlo about the need to work those
17 shifts, but in the same e-mail she's acknowledging
18 -- and saying that Marlo understands it, but in the
19 same e-mail is acknowledging that Marlo doesn't
20 understand it and is not working those shifts 1 to
21      5:30.  So what was your question?
22 Q.  Well, you made reference to seeing an e-mail that
23 evidenced that Ms. Stern had knowledge that Marlo
24 did not understand the coachings.  And my question
25 simply is, what in this e-mail is -- are facts that

Page 234

1 indicate that Ms. Stern knew that Marlo didn't
2 understand what was being communicated to her?
3 A.  She's saying right here that she told her that she
4 had to work those hours and then reported that she
5 didn't work those hours.  So to say she understood
6 is ludicrous while she's acting -- where action
7 shows that she didn't understand.  And she's
8 acknowledging those actions.
9 Q.  Well, isn't one possibility that Marlo understood
10 what she was supposed to do and just didn't do it?
11 A.  Not in Marlo's case.
12 Q.  Well, but that is a possible explanation.  Right?
13 That she didn't want to work those hours and
14 refused to do it.
15 A.  That's a possible explanation.
16 Q.  Are you aware of anything in Wal-Mart's policies
17 that obligated them to contact you or anybody else
18 in connection with the decision to coach and
19 discipline Marlo?
20 A.  I'm not privy to their policy.
21 Q.  I think you testified about communicating with
22 Wal-Mart seeking a "reasonable accommodation" for
23 Marlo.  Did you use those specific words when you
24 talked to Ms. Becker?
25 A.  I don't recall.

Page 235

1 Q.  And I assume you have learned as a result of this
2 matter that the term "reasonable accommodation" is
3 a term of art within the Americans With
4 Disabilities Act.  Correct?
5 A.  I learned it the day she got fired, yes.  Well, I
6 think I knew the word, but -- words, but I knew a
7 lot more that day.
8 Q.  And subsequent to her termination, you've learned
9 that those are special words, correct, that have
10 legal meaning?
11 A.  Yeah -- Yes.
12 Q.  So you contacted Karen Becker once.  You believe
13 your mother spoke to her once based on what your
14 mother relayed to you about Marlo's schedule.  Do
15 you have knowledge of anybody else being in
16 communication with Wal-Mart about moving Marlo's
17 schedule back from -- or moving it back to 12 to 4?
18 A.  All of those managers.  Not just Karen.
19 Q.  I'm --
20 A.  Julia.  Robin.
21 Q.  Who spoke to Julia?
22 A.  I --
23 Q.  Oh, I'm sorry.  I may be confusing you because I'm
24 not limited to a time frame.  So prior to the
25 termination, it's my understanding that you had a

Page 236

1 conversation with Karen Becker, one, where you
2 raised the issue of moving the schedule from 1 to 5
3 to 12 to 4, what it had been historically for your
4 sister.  Correct?
5 A.  Yes.
6 Q.  And you understand from talking to your mother that
7 she also spoke to Karen Becker.
8 A.  Yes.
9 Q.  Okay.  And my question is, prior to Marlo's
10 termination, did anybody else to your knowledge
11 speak to anyone at Wal-Mart about that subject?
12 A.  Somebody outside of Wal-Mart?
13 Q.  No.  At -- within Wal-Mart.
14 A.  Yeah.  There's the e-mail that we just looked at is
15 Julia -- I think that's the one where someone in
16 the e-mail acknowledges that Marlo has been asking
17 to have her --
18 Q.  No.  Aside from Marlo.  Like any other family
19 members?
20 A.  No.  That's what I asked you.  No.  Outside of
21 Wal-Mart?  No.
22 Q.  Okay.  So the only conversations besides what Marlo
23 allegedly took up with people at Wal-Mart was you
24 speaking to Karen Becker once, and your mother, to
25 your knowledge, based on what your mother told you,

Page 237

1  speaking to her once.
2  A. Um-hum.
3  Q. Is that "yes"?
4  A. Yes. Sorry. I can't attest to how many times Mom
5  spoke to her because they would talk from time to
6  time.
7  Q. But at least once.
8  A. Yes.
9  Q. Prior to Marlo's termination, had you had any
10  experience with Marlo not being forthcoming with
11  information?
12  A. Yeah -- Yes.
13  Q. In what context?
14  A. Marlo is a peacekeeper. That's also a Down
15  syndrome trait.
16  Q. So in what context did she try to be a peacekeeper
17  that resulted, based on your understanding, in her
18  not sharing information that you believe she should
19  have otherwise shared?
20  A. She stopped going for a walk every day and didn't
21  tell me that.
22  Q. And how did you find out?
23  A. Through conversation with her and Barb.
24  Q. And when was that, approximately?
25  A. A couple years ago.

Page 238

1  Q. Any other situation besides her hiding or
2  withholding information about her lack of walking?
3  A. Other instances or other --
4  Q. Yes. I'm sorry.
5  A. They have an exercise class that they go to, and if
6  they skip it, Marlo would not share that with me.
7  Q. Have there been instances where there have been
8  health issues that cropped up that Marlo withheld
9  from you where she was sick or had experienced some
10  mal-health issue, and she didn't tell you, and you
11  found out about it in some other way?
12  A. Not that I can recall. She's pretty forthcoming
13  and thinks I can cure her, so she'll tell me.
14  Q. Who controls Marlo's money?
15  A. Marlo, under my supervision.
16  Q. Okay. And what's that mean?
17  A. She writes her own checks to pay her bills, and I
18  just make sure she has her money in her checking
19  and not too little and not too much, and --
20  Q. And she has a credit card?
21  A. No.
22  Q. A debit card?
23  A. No.
24  Q. And so, for instance, when she takes the bus, does
25  she pay with her own money?

Page 239

1  A. They get a monthly pass, and she pays for that with
2  -- They go to the bus station once a month and buy
3  their monthly pass.
4  Q. They do that on their own?
5  A. Um-hum.
6  Q. Is that a "yes"?
7  A. Yes. Sorry.
8  Q. It's okay. And when you take them grocery
9  shopping, they -- Marlo will select her own food?
10  A. Yes.
11  Q. She can get herself ready in the morning to go to
12  work?
13  A. Yes. I -- Yes.
14  Q. Doesn't need help dressing?
15  A. No.
16  Q. All the activities of daily living she can do on
17  her own?
18  A. Yes.
19  Q. Getting on a bus, she doesn't need somebody out
20  there helping her get on the bus?
21  A. Yes.
22  Q. She knows how to catch the bus and where to get
23  off?
24  A. Yes. It's not common for her to be by herself
25  other than when she was at Wal-Mart.

Page 240

1  Q. And the bus --
2  A. Going to work and coming from work were the only
3  times I can remember she was on the bus by herself.
4  Q. And she's also able to transfer buses during her
5  route to and from work. Correct?
6  A. If it was part of her routine. Dropping her off
7  somewhere in the city and saying "Find your way
8  home," I'm not confident about that. But her
9  routine was solid.
10  Q. And the bus that she would take to work or --
11  Strike that. Well, there was a bus that would drop
12  her off in the parking lot of the Wal-Mart?
13  A. I think right in front of the door.
14  Q. And the same with leaving work?
15  A. Yes.
16  Q. So your testimony was that Marlo -- It's important
17  for her to follow routine. What was her routine on
18  Thursday?
19  A. I imagine everything was the same except going to
20  work. Getting on the bus and going to work and
21  getting on the bus and coming home.
22  Q. Do you know what her Thursday routine was?
23  A. No.
24  Q. How about weekends? What's her weekend routine,
25  since she doesn't work on weekends?

Case 1:17-cv-00070-WCG Filed 06/17/19 Page 21 of 23 Document 106-11

1  A.  I don't live with -- never have -- Well, not in our
2  adult life, I haven't lived with her.  I don't -- I
3  can't attest to what she does all day.
4  Q.  Why would she need a schedule that keeps her from
5  working weekends?
6  A.  The bus doesn't run.
7  Q.  Is there any other reason?
8  A.  Not that I'm aware of.
9  Q.  And when you say, "The bus doesn't run," are you
10  sure?
11  A.  No.
12  Q.  Okay.
13  A.  Pretty sure.
14  Q.  And how about Thursdays?  Why is it important for
15  her not to work on Thursdays?
16  A.  I don't know that that was an important factor.
17  That was just the way it was.
18  Q.  But it was an ask that she not work on Thursdays?
19  A.  I don't know if it was an ask.  I mean, that was
20  more than 15 years ago.  It may have been.  I'm
21  guessing it was more of an ask that she work four,
22  not five days, and Thursday was the odd day out.
23  Nothing happened on Thursday that I can recall.
24  Q.  So is it fair to say that with respect to her need
25  for routine, she has the ability to learn new

1  routines.  Correct?
2  A.  With a great deal of hardship.  I would like to
3  think that over time, a new routine, but it would
4  take time.
5  Q.  And am I correct that throughout her time at
6  Wal-Mart, there have been occasions when she worked
7  -- Before her schedule was more consistently
8  changed from 12 to 4 to 1 to 5, there were
9  occasions when she worked different hours.
10  Correct?
11  A.  I don't know.
12  Q.  Would she have to come in extra on some occasions?
13  A.  I feel like there may have been times she came in
14  early, but I don't know.
15  Q.  Would there be anything about her condition that
16  would preclude her from coming in earlier?
17  A.  As long as she got her lunch, I don't think so.
18  Q.  How about staying late?  You know, it looks like
19  she was -- her normal schedule was to leave work by
20  4, and then when she got her adjusted schedule, it
21  was 5.  Is there any reason that she couldn't work
22  after 5 if she came in later?
23  A.  Any reason?
24  Q.  Yeah.  I mean, let's assume --
25  A.  It caused her stress, which made her sick, which

1  made it problematic.
2  Q.  Are there ways to address that stress and still
3  have a new schedule?  Could she, for instance, take
4  more frequent breaks?  Would that help her adjust
5  to a new schedule?
6  A.  I can't attest to something that didn't happen.  I
7  don't know.
8  Q.  And with respect to the eating -- the need to eat
9  at a particular time, I think you've testified that
10  the challenge is not because she had some issue
11  like diabetes or low blood sugar or anything like
12  that.  It was routine.
13  A.  That would be a correct statement.
14  Q.  Okay.
15  A.  However, I think in anybody you can without eating
16  get experiences of low -- You don't have to be
17  diabetic to have problems with not eating.
18  Q.  Has any doctor observed that she has experienced
19  problems because of her change in routine of eating
20  Subway at Wal-Mart?  That used to be her routine.
21  She'd have -- She'd arrive early, eat a big lunch
22  at Wal-Mart, and it's my understanding looking at
23  her medical records, that routine changed.  So she
24  stopped having a big lunch at Wal-Mart.  Correct?
25  Well, let me ask you a different question.  Were

1  you aware that apparently her normal routine was to
2  come to work early at Wal-Mart, eat a big lunch --
3  A.  I don't know about a big -- I don't know how you're
4  defining "a big lunch," but I believe she went in
5  and had a Subway sub.
6  Q.  All right.  So that was her normal routine.  She'd
7  come in before her shift started, eat --
8  A.  I believe so.
9  Q.  And obviously at some point she stopped doing that.
10  She's no longer eating Subway at Wal-Mart.  And my
11  question is simply, has any medical professional
12  observed that that change has caused some mental or
13  physical issue for her?
14  A.  No.  She still has a sandwich every day for lunch,
15  so there's not any change.
16  Q.  Well, it's been a change in terms of eating Subway.
17  A.  Location of where she ate?  No.
18  Q.  Okay.  And, in fact, the change has been beneficial
19  because it looks like she's in better condition
20  because she's not eating Subway every day.  Right?
21  That's what a doctor reported or a medical
22  professional that she saw?
23  A.  I'm not privy to that.  I know she's in an exercise
24  class every day.  I don't remember anybody ever
25  saying she stopped eating Subway so she's in better

1  this right and be sure it doesn't happen to anybody
2  else and that she's made whole in the matter.  So
3  if that presents itself, I will --
4      BY MR. HARLAN:
5  Q.  You would work with Marlo to see that she's able to
6  get through the examination?
7  A.  I would -- If it presents itself, I'll visit that
8  then.
9  Q.  Okay.  I don't have any other questions.
10     MS. VANCE: Okay.
11     EXAMINATION
12     BY MS. VANCE:
13 Q.  I want to direct your attention to the managers
14 meeting you testified about.  What was the end
15 result of that meeting?
16 A.  That they were going to get back to me.
17 Q.  About what?
18 A.  If they could make the -- At that time I knew the
19 word "reasonable accommodation" of restoring
20 Marlo's work shifts to noon to 4 because, in fact,
21 they had created the problem itself of switching
22 her to 1 to 5 and 1 to 5:30, and it seemed pretty
23 simple to me that they would just switch it back,
24 but the end result was that they would get back to
25 me.  That was all.  We didn't have to do anything.

1  We didn't have to -- That was it.  That was all we
2  needed to do.
3  Q.  Did they give you any information that would
4  explain why they couldn't do that right then and
5  there?
6  A.  No.  I was actually surprised they couldn't.  I --
7  No.
8  Q.  Were you -- Did they give you any information that
9  there were certain steps they were going --
10 somebody in the room was going to take?
11 A.  I remember Karen having to talk with regional.  I
12 remember the word "regional."
13 Q.  Did you have any homework or takeaway
14 responsibilities walking out of that meeting that
15 you were going to do?
16 A.  Not that I recall, no.
17 Q.  Okay.  You testified that Wal-Mart's expert -- and
18 I think Dr. Thompson is his name -- in your opinion
19 did nothing abusive to Marlo during the examination
20 of her.  Correct?
21 A.  Correct.
22 Q.  I want to ask on that topic.  Has Marlo ever had an
23 experience with a psychologist that was similar in
24 any way to her exam with Dr. Thompson?
25 A.  Not to the best of my knowledge.

1  Q.  And when we looked through medical records, is it
2  typical in Marlo's medical history for her to be
3  accompanied at her medical appointments?
4  A.  Yes.
5  Q.  Okay.  And why -- Is there a reason why Marlo's
6  accompanied to medical appointments?
7  A.  As -- In really all things, Marlo can explain
8  herself, speak for herself.  My being there or her
9  mother being there can help to expound upon what
10 she's saying.  If she goes in to the doctor's
11 office and says, "My arm hurts," that might be all
12 you get from her; whereas somebody along with her
13 can explain everything they've heard about her
14 talking about her arm.  So it's really
15 expounding --
16 Q.  Okay.
17 A.  -- on what she can say and remembering and making
18 sure she does what the doctor orders and et cetera.
19 Q.  Have you ever seen a situation where a medical
20 provider asked a question she did not understand?
21 A.  I'm sure I have.  I'm trying to recall one.
22 Q.  Okay.  Did -- And you testified that you observed
23 Wal-Mart's expert, Dr. Thompson, examine Marlo.
24 Correct?
25 A.  Yes.

1  Q.  Did you observe at that time Marlo being asked any
2  question by Dr. Thompson that she did not
3  understand?
4  A.  Many questions that she didn't understand.
5  Q.  Okay.  I want to -- You testified Marlo broke down
6  after the psychological examination from
7  Dr. Thompson.  Can you explain a little more about
8  the details of that, please?
9  A.  Yes.  When she was done in that room, we left
10 quickly, as I recall.  Marlo walked behind Barb and
11 I, not with us, so extra attention was paid to
12 that.  And we left the building, walked to the car,
13 and Marlo was probably five to ten feet behind us
14 the whole time.  I opened her door.  She got in.
15 We got out of the city, we're going down the
16 interstate, and all of a sudden her hands started
17 trembling -- And she hadn't said anything at that
18 point, but her hands started trembling, and then
19 she put her head in her hands and said, "Why me?
20 Why me?"  And she was bawling.  And Barb from the
21 back seat was consoling her.  I was on the
22 interstate unable to pull over, but I put my hand
23 on her, and after a couple minutes of just letting
24 it all out and being encouraged by Barb and I to
25 just let it all out, then the rest of the ride was