UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    Plaintiff,

  v.         Case No. 17-C-70

WAL-MART STORES EAST LP,

    Defendant.

## DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

   Plaintiff Equal Employment Opportunity Commission brought this action against Defendant Walmart Stores East LP on behalf of Marlo Spaeth, who was terminated from her position as a Sales Associate at its Manitowoc store. Spaeth was born with Down Syndrome, "a genetic disorder which varies in severity but causes lifelong intellectual disability and developmental delays." *Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 700 (7th Cir. 2014) (internal quotation marks and citation omitted). The EEOC alleges that Walmart's decision to terminate Spaeth's employment constitutes unlawful discrimination under Title I of the Americans with Disabilities Act of 1990 (ADA) and Title I of the Civil Rights Act of 1991. Presently before the court is Walmart's motion for summary judgment. For the following reasons, Walmart's motion will be denied.

### BACKGROUND

   Marlo Spaeth was born with Down Syndrome. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 1, Dkt. No. 104. The EEOC claims that, because of her Down Syndrome, Spaeth is limited in the major life activity of learning, has difficulty adapting to changes in her routine, and is unable

to drive. *Id.* ¶ 2. Spaeth is a former Associate of Walmart who worked for the company as a Sales Associate at its Manitowoc, Wisconsin store from August 2, 1999 to July 10, 2015. Def.'s Proposed Findings of Fact (DPFOF) ¶ 1, Dkt. No. 99. During her employment interview with Walmart in 1999, Spaeth was accompanied by her mother but answered questions on her own. *Id.* ¶ 21. She was ultimately hired as a part-time employee. *Id.* ¶ 34. Karen Becker, Walmart's Personnel Coordinator, completed the initial Scheduling Availability form with Spaeth's mother, Sandra Barnes. Barnes informed Becker that Spaeth could not work weekends and that her availability would have to follow the bus schedule. *Id.* ¶ 22. In 2006, Spaeth's signed Scheduling Availability Form indicated that she was available to work from 12:30 p.m. to 4:00 p.m. on Mondays, Tuesdays, Wednesdays, and Fridays and requested a minimum of 14 hours per week. PPFOF ¶ 16; Dkt. No. 106-17 at 2. During her employment history, Spaeth received 16 annual performance evaluations with ratings of "Solid Performer" or "Meets Expectations" and pay raises. PPFOF ¶ 4. Spaeth's pay raises brought her starting wage of $5.50 per hour in 1999 up to $12.50 per hour in 2014. *Id.* ¶ 5.

Spaeth initially worked as an Apparel/Homes Sales Associate and then as a Fabrics, Crafts, and Home Furnishing Sales Associate. DPFOF ¶ 24. In 2014, Spaeth began working as a Sales Associate in Walmart's Housewares and Domestic departments. *Id.* ¶ 23. She was responsible for folding towels, tidying the aisles, and helping customers locate items. These were the essential duties of Spaeth's job. *Id.* Spaeth and others who held this position were responsible for performing each of these job responsibilities. *Id.* ¶ 27. Attendance and punctuality were also essential functions of Spaeth's job at Walmart. *Id.* ¶ 28. It is only the attendance function of her job that Walmart contends Spaeth was unable to meet after she was assigned a new shift schedule in November 2014. *Id.* ¶ 29.

Walmart's Field Attendance and Punctuality Policy, updated on April 29, 2013, and in force through the last day of Spaeth's employment, provides in part:

> One of Walmart's basic beliefs is service to our customers. In order to provide extraordinary customer service, we must have appropriate staffing in all areas at all times. To accomplish this, you as a Walmart hourly store associate should be both punctual and present for all scheduled shifts. We understand that you may have to miss work on occasion. However, regular and punctual attendance is a required and essential function of each associate's job. If you have excessive absences or incomplete shifts (arriving late or leaving early), you will be subject to disciplinary action up to and including termination.
>
> . . .
>
> An unauthorized absence means any time you are away from scheduled work (full day absence or incomplete shift) that is not approved by your supervisor or manager, even if you use an income replacement benefit (such as illness protection, personal or vacation time) to offset lost work time . . . . Unauthorized absences and incomplete shifts are monitored and may result in disciplinary action . . . .

*Id.* ¶ 14.

Walmart uses a point system to enforce its attendance policy. Under its point system, multiple instances of unexcused absences or incomplete shifts equate to an occurrence subject to discipline as defined by the policy. One to three consecutive unexcused absences for the same reason resulted in one occurrence; three incomplete shifts, caused by being tardy or leaving early in a rolling six-month period, resulted in one occurrence; three occurrences in a rolling six-month period resulted in a personal discussion; and four or more occurrences in a rolling six-month period resulted in "Coaching for Improvement." *Id.* ¶ 15. Four absence occurrences within a six-month period also results in a first written warning; five absence occurrences within a six-month period results in a second written warning; six absence occurrences within a six-month period results in a third written warning; and seven absence occurrences within a six-month period results in termination. *Id.* ¶ 18. Walmart's policy also provides for escalation of disciplinary steps so

that continued violations of the attendance policy could lead directly from a second coaching to termination. *Id.* ¶ 19.

Walmart's Attendance and Punctuality Management Guidelines, updated on April 29, 2013, and in effect on Spaeth's last day of employment in 2015, instruct Walmart management to monitor associate attendance and hold Associates accountable for attendance policy violations. *Id.* ¶ 16. The policy instructs managers to have a personal discussion with the Associate to ensure the Associate is aware of her attendance record and the attendance policy and to provide an opportunity to improve prior to being advanced to Coaching for Improvement. *Id.*

The Coaching for Improvement Policy, updated on April 19, 2012, and effective on Spaeth's last day of employment in 2015, is based on levels of discipline designed to provide instruction and assistance to an Associate to foster improvement prior to reaching the level of termination. *Id.* ¶ 17. The policy provides, in part:

> Coaching for improvement is a tool we use to provide instruction and assistance to you if your job performance fails to meet the reasonable expectations and standards for all associates in the same or similar position or if your conduct violates a company policy or interferes or creates a risk of interfering with the safe, orderly and efficient operation of our business. This approach provides you with an opportunity to identify, acknowledge and change unacceptable job performance or conduct and enables us to retain those associates who demonstrate the interest, ability and desire to be successful.

Spude Decl., Ex. F, Dkt. No. 102-6 at 2. The Attendance and Punctuality Management Guidelines define the levels of Coaching for Improvement based on the number of absence occurrences.

The events that culminated in the termination of Spaeth's employment at Walmart began in November of 2014. For most of her employment, Spaeth was scheduled to work from 12:00 p.m. to 4:00 p.m. *Id.* ¶ 34. On many occasions over the course of her employment, Spaeth did not work a full shift. For instance, between January 9, 2012, and November 21, 2014, Spaeth left work early at least 10 minutes or more prior to the end of her shift on 114 occasions and was

absent on 7 occasions. Throughout Spaeth's employment, Walmart's tracking of attendance included a frequent practice of manager-authorized early departures. PPFOF ¶ 18. Spaeth's early departures were largely, but not entirely, approved or otherwise not counted against her. DPFOF ¶ 35. From March 2006 through November 2014, Spaeth clocked out before the end of her shift with manager approval on 122 occasions, with most of her early departures coded as authorized incomplete shifts. PPFOF ¶ 20. On February 3, 2012, Spaeth received a verbal coaching for her attendance issues, and Spaeth's performance reviews over the years noted concerns with her performance. DPFOF ¶¶ 36–37. In 2014, Julia Stern, who was an Assistant Manager at the Manitowoc Store, began to directly supervise Spaeth. *Id.* ¶ 32.

Also in 2014, the Manitowoc Store changed its scheduling process for hourly Associates because it found that its current scheduling process was not meeting the needs of business. *Id.* ¶ 42. More specifically, in November 2014, the Manitowoc store began scheduling Associates based on customer traffic in an effort to improve efficiency by scheduling Associates during times of the day when business was at its peak. Under the new Customer Service Scheduling system, Associate shifts were automatically generated by a computer program and included a 1:00 p.m. to 5:30 p.m. shift instead of a 12:00 p.m. to 4:00 p.m. shift. The busiest time of the day at the Manitowoc Store, according to its analytics of customer traffic, was 4:00 p.m. to 5:30 p.m. *Id.* ¶ 44.

In November 2014, Spaeth's work shift was changed from 12:00 p.m. to 4:00 p.m. to 1:00 p.m. to 5:30 p.m. in accordance with Walmart's customer focus/traffic scheduling system. *Id.* ¶ 50. At that time, schedules were printed by Karen Becker and hung on the bulletin board in the hallway. Schedules could also be printed by Associates. *Id.* ¶ 51. Historically, Spaeth's schedule was written down for her every week, and Becker verbally reminded Spaeth of her work schedule.

*Id.*  Spaeth would read the schedule given to her by Becker to know when she was scheduled to work.  She also checked her schedule every day while working at Walmart.  *Id.* ¶ 52.

Spaeth's first shift with her new 1:00 p.m. to 5:30 p.m. hours was on November 24, 2014. Spaeth timely punched in for her shift at 12:55 p.m. but departed early at 4:41 p.m.  *Id.* ¶ 55.  Over the course of the next week, Spaeth left work early on the following days:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| November 25, 2014 | 11:47 a.m. | 3:39 p.m. | Departed 1 hour, 51 minutes early |
| November 26, 2014 | 12:49 p.m. | 4:30 p.m. | Departed 1 hour early |
| December 1, 2014 | 12:47 p.m. | 4:19 p.m. | Departed 1 hour, 11 minutes early |
| December 3, 2014 | 12:45 p.m. | 4:19 p.m. | Departed 1 hour, 11 minutes early |

*Id.* ¶ 56.  Walmart made a management exception for Spaeth and excused these missed hours.  *Id.* ¶ 57.  Management's decision to excuse missed hours was not specific to Spaeth.  The same consideration was given to other Associates to allow time to adjust to the new scheduling system. Pl.'s Resp. to DPFOF ¶ 57.  Spaeth did not show up for her scheduled shift on Black Friday, November 28, 2014, however, which resulted in an unauthorized absence.  DPFOF ¶ 58.

Over the course of the next week and a half, Spaeth departed early and failed to complete her shifts on the following dates:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| December 8, 2014 | 12:53 p.m. | 3:39 p.m. | Departed 1 hour, 51 minutes early |
| December 10, 2014 | 12:50 p.m. | 3:21 p.m. | Departed 2 hours, 9 minutes early |
| December 11, 2014 | 12:46 p.m. | 3:20 p.m. | Departed 2 hours, 10 minutes early |
| December 12, 2014 | 12:45 p.m. | 3:20 p.m. | Departed 2 hours, 10 minutes early |
| December 15, 2014 | 12:46 p.m. | 3:19 p.m. | Departed 2 hours, 11 minutes early |

*Id.* ¶ 60.  On December 17, 2014, Stern sent an email to other managers regarding Spaeth's attendance:

> On 12/17/14 I had a discussion with Marlo about her attendance.  She has been schedule[d] for the past 3 weeks from 1:00pm to 5:30pm, however she has been clocking in around 12:45 and clocking out around 3:00.  I had previously stalked [sic] to her about clocking in and out 15 minutes or more early a couple of weeks ago, as she was accumulating incomplete shifts due to leaving early. . . . I explained

that she needs to work what she is scheduled, and at this point it should be a coaching but that I was giving her a chance to correct it after our discussion today. I told her I expected her to work her entire shift today and going forward, and if she continued not to work them I would then have to coach her as I need to be consistent with all the associates on attendance . . . . Then, after the grocery zone she stopped me on the salesfloor and said that she was going home (this was about 3:00) as she had talked to Karen [Becker] and she was concerned that if she did not eat supper on time that she would get sick, and that she wanted to talk to her sister about her scheduled [sic]. So I let her leave as I was not sure if has [sic] to make any adjustments, but I did tell her that the next two days she is scheduled 1-5:30 and I expect her to work that schedule. . . . So after she left and I got a chance to talk to Karen she told me that Marlo never even came to see her today - so she lied about having talked to Karen as well.

*Id.* ¶ 63. During the discussion, Spaeth also informed Stern that she only works 12:00 p.m. to 4:00 p.m. and that she would get sick if she did not eat supper on time. PPFOF ¶ 31. Over the next two days, Spaeth left work early and did not complete her full shifts:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| December 18, 2014 | 12:47 p.m. | 3:19 p.m. | Departed 2 hours, 11 minutes early |
| December 19, 2014 | 12:47 p.m. | 3:18 p.m. | Departed 2 hours, 12 minutes early |

DPFOF ¶ 64.

On December 22, 2014, Stern issued Spaeth a First Written Coaching. *Id.* ¶ 65. Stern noted that Spaeth had left her shifts early and that when Spaeth does not work her scheduled shifts, other associates have to finish her tasks and there is a possible loss of customer sales. *Id.* Following the December Coaching, Spaeth expressed frustration with her new hours to Amy Jo Stevenson, Spaeth's legal guardian, and conveyed that she felt Stern and Robin Castro were picking on her by assigning her new hours. *Id.* ¶ 54. Spaeth repeatedly stated to Becker that she wanted her hours restored to noon to 4:00 p.m. so that she could make it home for dinner and not miss the bus. She also thought it was too late to work and she would get hot. PPFOF ¶ 29. Spaeth also complained to Becker that Stern was picking on her and did not like her. Becker advised the store manager of the complaint the following morning. *Id.* ¶ 36. The EEOC asserts that Stevenson

also called Becker to request an accommodation of a modified schedule because of Spaeth's inability to adapt to working late due to Down Syndrome. *Id.* ¶ 30. Becker disputes that such a conversation occurred. Def.'s Resp. PPFOF ¶ 30, Dkt. No. 122.

Spaeth left work at 4:34 p.m. on December 22, 2014. DPFOF ¶ 67. She also left early on the following days:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| January 5, 2015 | 12:49 p.m. | 4:03 p.m. | Departed 1 hour, 27 minutes early |
| January 9, 2015 | 12:48 p.m. | 5:13 p.m. | Departed 17 minutes early |

DPFOF ¶ 68. Stern discussed Spaeth's continued early departures with Spaeth on January 13, 2015. *Id.* ¶ 69.

On January 13, 2015, Stern sent an email to other managers, summarizing a meeting she had with Spaeth and Robin Castro:

> On December 22, 2014 I gave Marlo S. a first coaching for attendance. . . . At that time I again went over the importance of having her work her scheduled shifts several times to ensure she understood. Since then she has been leaving early still. So today Robin and I talked to her again. When I asked her why she was still leaving early she said she was afraid she would miss the bus, even though it runs until 8pm. She wanted to know why she can't just work noon to 4 like she used to. She does understand what shifts she is scheduled and that she is expected to work the full shifts. We explained to her that these are the shifts that are generated due to customer traffic and that is when we need her here. We also explained that if she cannot work these hours we will have to give them to someone that can, and that if she continues to not work her complete shifts that it will lead to subsequent coachings and potentially termination. . . . She did repeat back to us what we talked to her about so she does understand. A while later out on the salesfloor she apologized to me and said that she was wrong and she knows that she has to wo[r]k what she is scheduled.

*Id.* ¶ 70. After this conversation, Spaeth left early on the following days:

| Date | Punch In | Punch Out | Total Time Missed |
|------|----------|-----------|-------------------|
| January 13, 2015 | 12:46 p.m. | 5:19 p.m. | Departed 11 minutes early |
| January 19, 2015 | 12:53 p.m. | 5:15 p.m. | Departed 15 minutes early |
| January 23, 2015 | 12:51 p.m. | 4:47 p.m. | Departed 43 minutes early |
| January 30, 2015 | 12:50 p.m. | 5:14 p.m. | Departed 16 minutes early |
| February 3, 2015 | 12:47 p.m. | 5:18 p.m. | Departed 12 minutes early |

| February 13, 2015 | 11:48 a.m. | 3:48 p.m. | Departed 1 hour, 42 minutes early |

*Id.* ¶ 71. Spaeth was also a no call/no show on February 24, 2015, and March 13, 2015. *Id.* ¶ 72.

On February 16, 2015, Walmart had Spaeth sign a customer service scheduling availability form that stated that Spaeth could work from 12:00 p.m. to 6:00 p.m. on Monday, Tuesday, Wednesday, and Friday and that she requested a maximum of 24 hours weekly and a maximum of 5 hours daily. Dkt. No. 106-17 at 4. On March 18, 2015, Stern issued a Second Written Coaching to Spaeth. DPFOF ¶ 73. With Spaeth's First and Second Written Warnings, Spaeth was advised that additional attendance issues could result in further disciplinary action up to and including termination. *Id.* ¶ 77. Following the issuance of the Second Written Coaching, Spaeth continued to have attendance issues and accrued an additional 16 interrupted shifts. *Id.* ¶ 78. Walmart also recorded that Spaeth had two no call/no shows on June 29 and June 30. *Id.* The EEOC disputes that these absences were true no shows because Spaeth stated that she was told by Becker not to come in on those days. Pl.'s Resp. DPFOF ¶ 78. Walmart determined that, between January 13, 2015 and July 8, 2015, Spaeth had accumulated 17 attendance occurrences:

| Dates and Types of Attendance Violations | Occurrences |
|---|---|
| January 13, 2015 - left early<br>January 19, 2015 - left early<br>January 23, 2015 - left early | 1 Occurrence |
| January 30, 2015 - left early<br>February 3, 2015 - left early<br>February 13, 2015 - left early | 1 Occurrence |
| February 24, 2015 - no call/no show | 1 Occurrence |
| March 13, 2015 - no call/no show | 1 Occurrence |
| April 1, 2015 - left early<br>April 3, 2015 - left early<br>April 6, 2015 - left early | 1 Occurrence |
| April 7, 2015 - left early<br>April 8, 2015 - left early<br>April 10, 2015 - left early | 1 Occurrence |
| April 13, 2015 - left early<br>April 14, 2015 - left early<br>April 15, 2015 - left early | 1 Occurrence |

| | |
|---|---|
| April 17, 2015 - left early<br>April 20, 2015 - left early<br>April 22, 2015 - left early | 1 Occurrence |
| April 27, 2015 - left early<br>April 28, 2015 - left early<br>April 29, 2015 - left early | 1 Occurrence |
| May 1, 2015 - left early<br>May 4, 2015 - left early<br>May 5, 2015 - left early | 1 Occurrence |
| May 13, 2015 - left early<br>May 19, 2015 - left early<br>May 20, 2015 - left early | 1 Occurrence |
| May 22, 2015 - left early<br>May 29, 2015 - left early<br>June 1, 2015 - left early | 1 Occurrence |
| June 2, 2015 - left early<br>June 5, 2015 - left early<br>June 12, 2015 - left early | 1 Occurrence |
| June 29, 2015 - no call/no show | 1 Occurrence |
| June 30, 2015 - no call/no show | 1 Occurrence |
| June 24, 2015 - left early<br>June 25, 2015 - left early<br>July 1, 2015 - left early | 1 Occurrence |
| July 3, 2015 - left early<br>July 7, 2015 - left early<br>July 8, 2015 - left early | 1 Occurrence |
| **Total** | **17 Occurrences** |

DPFOF ¶ 80.  On July 10, 2015, Walmart terminated Spaeth for excessive absenteeism. *Id.* ¶ 79.

Walmart's written attendance policy called for termination after seven attendance occurrences.

*Id.* ¶ 81.

Following Spaeth's termination, Stevenson requested a meeting with Walmart to discuss

reinstating Spaeth into her position.  *Id.* ¶ 82.  After an employee is terminated from Walmart, the

employee can be reemployed through either rehire or reinstatement.  *Id.* ¶ 86.  If an Associate

wishes to be rehired after termination, she must wait thirty days after her termination to reapply

through a written application process.  *Id.* ¶ 87.  Since October 2015, Walmart has rehired at least

eight other employees who had previously been fired for excessive absences.  PPFOF ¶ 48.  If an

Associate does not reapply for a position, she can have her employment restored through Walmart's reinstatement process, which requires review and approval by management. Reinstatement is not a guarantee or mere formality, and it does not occur unless there is substantial ground for reversing a termination decision. DPFOF ¶ 88. During the period of January 1, 2014, and December 1, 2018, there has not been a single Associate reinstated at the Manitowoc store after being discharged for attendance violations. *Id.* ¶ 89.

On July 16, 2015, Castro, Popp Becker, Stevenson, and Barnes attended a meeting regarding Spaeth's reemployment. *Id.* ¶ 83. Stevenson stated that Walmart should have changed Spaeth's hours to what she had wanted under the ADA and believed Stern targeted Spaeth because of Spaeth's mental condition. *Id.* ¶ 84. Stevenson demanded that Spaeth be reemployed and indicated that, if Spaeth was not reemployed and given the schedule she wanted, she would bring a lawsuit against Walmart under the ADA. *Id.* ¶ 85. Walmart considered Stevenson's request that Spaeth be reemployed as a request for reinstatement and asserts that Stevenson, Spaeth, and Barnes were informed that Spaeth could reapply for a position at Walmart. *Id.* ¶¶ 90, 92. Stevenson and Spaeth were also informed that Stevenson's demand would be given to upper management for consideration. *Id.* ¶ 93. Stevenson's takeaway from the meeting was that the managers had to check with their superiors and then would get back to Stevenson with an answer regarding whether Spaeth could return to work at Walmart. Pl.'s Resp. DPFOF ¶ 90.

On July 22, 2015, Castro reported the matter to Walmart's ethics hotline. DPFOF ¶ 93. Upon receiving Castro's report, Walmart conducted an investigation, which consisted of Associate interviews, review of Spaeth's attendance record, review of Spaeth's disciplinary and counseling history, review of Walmart's policies on attendance and punctuality, and a review of whether Stevenson's allegations had any merit. *Id.* ¶ 94. The investigation confirmed Spaeth had

11

accumulated 17 attendance violations prior to her discharge and that she should have been discharged at 7 occurrences.  *Id.* ¶ 96.  Walmart concluded Spaeth's discharge was based on objective and verifiable policy violations and declined to reverse its termination decision and reinstate Spaeth to her former job.  *Id.*  On September 22, 2015, Walmart communicated to Spaeth its decision not to reemploy her as requested.  *Id.* ¶ 97.  This decision did not impact her eligibility for rehire by Walmart.  *Id.* ¶ 100.  As of 2018, Spaeth did not reapply for employment at Walmart since her discharge.  *Id.* ¶ 91.  Walmart was not aware of any reasonable accommodation that had been requested by Spaeth or on Spaeth's behalf.  PPFOF ¶ 33.

On January 28, 2016, Spaeth filed a charge of discrimination against Walmart with the EEOC alleging that Walmart disciplined her, failed to accommodate her disability, discharged her, and did not rehire her, all in violation of the ADA.  DPFOF ¶ 3.  Stevenson filed an Amended Charge of Discrimination with the EEOC on behalf of Spaeth making the same allegations on April 27, 2016.  *Id.*  The EEOC issued a Determination on Stevenson's Charge of Discrimination on August 31, 2016, and filed the lawsuit on January 18, 2017.  *Id.* ¶ 5.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party.  *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)

(citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability" and requires that employers make reasonable accommodations for the known physical or mental impairments of an otherwise qualified individual with a disability. 42 U.S.C. §§ 12112(a); 12112(b)(5)(A). To succeed on an ADA claim, the EEOC must show that (1) Spaeth is disabled, (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *See Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019). Walmart does not dispute that Spaeth is disabled under the ADA. It does dispute, however, that Spaeth is qualified to perform the essential functions of the job, either with or without reasonable accommodations. Walmart also contends that, even if Spaeth is a qualified individual with a disability, there is no evidence that it discriminated against her in failing to accommodate her, unlawfully disciplining her, terminating her employment and in failing to rehire her. Walmart also argues that there is no evidence to support the EEOC's claim for punitive damages.

## A. Qualified Individual With A Disability

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that

13

such individual holds or desires." 42 U.S.C. § 12111(8). The court applies a two-step analysis in determining whether a person is a qualified individual. *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 417 (7th Cir. 2016). First, the court determines whether the individual satisfies the "prerequisites of the position, such as possessing the proper educational background, employment experience, skills, or licenses." *Id.* (citation omitted). Second, the court considers "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (quoting *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 285 (7th Cir. 2015)). The EEOC bears the burden of establishing that Spaeth is a qualified individual with a disability. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996).

Walmart maintains that Spaeth is not a qualified individual with a disability within the meaning of the ADA because, with or without reasonable accommodations, Spaeth was unable to perform an essential function of her job, i.e., regular attendance. The Seventh Circuit has recognized that "[a]n employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance. A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948–49 (7th Cir. 2001)); *Jovanovic v. In–Sink–Erator Division of Emerson Elec. Co.*, 201 F.3d 894, 899–900 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job.").

But as the EEOC points out, whether Spaeth can perform the essential function of regularly showing up for work is a disputed fact on this record. For sixteen years, Spaeth was able to perform this essential part of her job satisfactorily enough to receive generally positive performance evaluations and regular wage increases. Indeed, several of her evaluations provided positive comments on her attendance. PPFOF ¶¶ 6, 9–12. It was only after Walmart moved to computer scheduling and changed Spaeth's shift and required her to work until 5:30 p.m. that she experienced significant problems with attendance. The EEOC argues that Walmart's decision to modify Spaeth's schedule and its refusal to change it back when it proved unworkable for her constitutes a failure to reasonably accommodate her disability. Had Walmart allowed such an accommodation, the EEOC contends, Spaeth would not have encountered the absentee problems that Walmart claims justified her termination. To this argument, Walmart offers two responses: (1) the requested accommodation is unreasonable; and (2) even with the requested accommodation, Spaeth was unable to avoid excessive absences. Factual disputes as to each response preclude summary judgment in Walmart's favor as to this issue.

### 1. Reasonable accommodation

Walmart claims that Spaeth's new shift was "dictated by computer analytics on customer traffic which were designed to meet specific customer and operational demand." Def.'s Reply Br., Dkt. No. 123, at 2. The fact that Walmart's computer analytics showed a need for a Sales Associate between 4:00 p.m. and 5:30 p.m., however, does not mean that Spaeth needed to be that Sales Associate. The EEOC notes that the Manitowoc Walmart was open twenty-four hours a day, seven days a week, and presumably had many Sales Associates ready and willing to take on additional hours. At least there has been no showing that it did not. Thus, while Walmart might have preferred to schedule Spaeth only during times of "peak customer traffic," the evidence is

such that a jury might find that it was not essential or even important for all Walmart Sales Associates to work during peak times. The question presented is whether it was reasonable to accommodate Spaeth by allowing her to maintain her previous schedule or at least engage in other efforts to help her adjust to the change.

"A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson v. Hartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). "Under the ADA, a 'reasonable accommodation' may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations for individuals with disabilities.'" *Stern*, 788 F.3d at 288 (quoting 42 U.S.C. § 12111(9)(B)). An employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the employer can demonstrate that the "accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). If the proposed accommodation does not make it possible for the employee to perform her job, the employee is not a "'qualified individual' as that term is defined in the ADA." *Severson*, 872 F.3d at 481.

In this case, notwithstanding the form Walmart apparently had her sign three months after the shift change, Spaeth requested that her work schedule remain unchanged from what it had been for the preceding fifteen years; in other words, that she be given a modified work schedule from the new schedule Walmart implemented. While this may not have been the schedule Walmart wanted Spaeth to work, the evidence is disputed as to whether allowing Spaeth the accommodation would pose an undue hardship on the operation of Walmart's business. That dispute is for a jury to decide.

### 2. Accommodation would make no difference

Walmart contends that the undisputed evidence demonstrates that Spaeth could not commit to regular attendance, even if Spaeth was assigned her old schedule from 12:00 p.m. to 4:00 p.m. From November 2014 to July 2015, Spaeth was a no call/no show on four separate occasions and left work earlier than 4:00 p.m. on 9 occasions. Walmart terminated Spaeth after 17 attendance occurrence violations, when its policy calls for termination after only 7 occurrences. Based on these facts, Walmart, contends that modifying Spaeth's schedule would not have resulted in Spaeth attending work on a regular and reliable basis or staying at work for a full shift to perform her job. There is no evidence, Walmart argues, from which a reasonable jury could conclude that an earlier end time would have allowed Spaeth to "satisfy the essential function of regular attendance." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 490 (7th Cir. 2014).

Prior to its modification of Spaeth's schedule, however, Walmart's enforcement of its attendance policy was more flexible, and it had a practice of regularly excusing employees, including Spaeth, for early departures. Spaeth's early departures were largely approved or otherwise not counted against her. The EEOC contends that Spaeth's attendance problems after the shift change does not show that she was unqualified or that she was unable to complete her shifts but reflects instead that she needed an accommodation. Here, the EEOC again points to Spaeth's long history of solid job performance before the shift change and suggests that her attendance problems thereafter were highly unusual for her. It contends that a jury could conclude, consistent with the opinion of Dr. Smith, the EEOC's expert witness, that "the new schedule and the pressure to adopt to it stressed Spaeth and threw her out of her routine, impacting her functioning in many areas." Pl.'s Mem. In Opp., Dkt. No. 108, at 14. The EEOC argues that

"a reasonable jury could determine that Marlo Spaeth's attendance did not render her unqualified, based upon Walmart's lenient enforcement of its attendance policy and history of approving early departures for Spaeth and other employees." *Id.*

The EEOC also argues that Walmart failed to engage in an interactive process to identify an appropriate accommodation for Spaeth. An employee's request for an accommodation requires that the employer "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (citation omitted). "In a case involving an employee with mental illness, the communication process becomes more difficult. It is crucial that the employer be aware of the difficulties, and help the other party determine what specific accommodations are necessary." *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996) (internal quotation marks and citation omitted). The EEOC maintains that Walmart failed to engage in the interactive process after Spaeth and Stevenson's requests for a schedule change signaled a need for an accommodation.

Walmart notes that the failure to engage in the interactive process required by the ADA is actionable "only if it prevents identification of an appropriate accommodation for a qualified individual." *Basden*, 714 F.3d at 1039 (citing *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). It claims that in this case, the EEOC has not presented evidence permitting a conclusion that Spaeth was a qualified individual for the purposes of the ADA. But, again, Spaeth's lengthy history of performing the job constitutes evidence that she was qualified. Because Walmart failed to engage in the interactive process, the question remains whether that process would have led to a reasonable accommodation that would have allowed Spaeth to continue. Given the nature of her disability, it is at least arguable that instead of documenting her

lapses and warning her of possible consequences, engaging in an interactive process required by the ADA would have resulted in an accommodation that worked. Walmart's Personnel Coordinator suggested as much in expressing regret that she had not contacted Spaeth's mother to speak to her about the change before it was implemented. PPFOF ¶ 87.

This, too, seems to be a question for a jury to decide. If Spaeth's difficulties completing her shift after the change implemented by Walmart were due to the abruptness of the change and Walmart's refusal to accommodate her fears and concerns, a jury may conclude that the requested accommodation would have allowed Spaeth to perform her full duties. Again, the fact that she had been doing so for sixteen years before the change is evidence that she could do so. Likewise, the opinion of the EEOC's expert suggests that the difficulties Spaeth experienced after the shift change adversely impacted her ability to perform even at the level she had been performing prior to the change. There also seems to be some dispute as to whether some of the absences that occurred after the change was excused by other Walmart personnel. *Id.* ¶ 76.

In sum, the record does not support a summary finding that Spaeth is not a qualified individual with a disability as that term is defined in the ADA. Factual disputes exist as to whether the requested accommodation was reasonable and whether with such an accommodation, Spaeth was qualified to perform the essential functions of her job.

**B. Discrimination**

Even if Spaeth is a qualified individual with a disability, Walmart argues that there is no evidence that it discriminated against her on account of such disability. Walmart first argues that Spaeth's employment was terminated for absenteeism and there is no evidence connecting her absenteeism to her disability. Thus, Walmart contends, there is no evidence that Walmart

discriminated against her because she was disabled in the way it treated her. Finally, Walmart argues that there is no evidence to support the EEOC's claim for punitive damages.

### 1. Connection between absenteeism and disability

To be sure, it is often difficult to determine what a person can't do from what they don't want to do. Walmart argues that there is no evidence Spaeth's refusal to work the new shift she was assigned was due to her Down Syndrome, as opposed to simply her desire to avoid working later. "This case is about what Ms. Spaeth wants," Walmart contends, "and not about what she needs." Def.'s Br. In Support, Dkt. No. 93, at 20. "Nothing in the record," it argues, "supports a medical necessity for the accommodation proposed and nothing in the record supports a tangible, contemporaneous link between Ms. Spaeth's Down Syndrome and her ability to work the shift she was assigned." *Id.*

The testimony of Dr. Smith, the EEOC's expert, provides the evidentiary link, however. Dr. Smith, a family practice physician with extensive experience treating people with Down Syndrome, is the program director of the Down Syndrome Clinic of Wisconsin at Children's Hospital, which he founded in 1996. Dr. Smith notes in his report the importance of routine for persons with Down Syndrome so they can manage their days. Because they lack the cognitive ability to adjust well to change, routine protects them from fear and anxiety. The elimination of routine, or what Dr. Smith calls "grooves," is detrimental to a person with Down Syndrome and interferes with the ability of such a person to function effectively. This evidence, along with Spaeth's work history and the testimony of her guardian, is sufficient to raise a jury question as to whether Spaeth's absenteeism after the shift change was a product of her Down Syndrome or simply her desire to get home earlier.

### 2. Terms and conditions of employment

Even if the EEOC can show that Spaeth's absenteeism is causally linked to her Down Syndrome, Walmart argues that there is no evidence that it discriminated against her on account of her disability. She was terminated for absenteeism, Walmart notes, not because she has Down Syndrome. The problem with this argument is that under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796–97 (7th Cir. 2005). For the reasons already set forth, a reasonable jury could find that Spaeth is a qualified individual with a disability who could perform her job with a reasonable accommodation. A reasonable jury could also find that the requested accommodation would not have caused undue hardship to the operation of its business. This amounts to discrimination in violation of the ADA.

The EEOC also argues that a reasonable jury could infer discriminatory intent from Walmart's abrupt departure from its practice of authorizing early departures, the manner in which it had Spaeth sign a new "availability for work" form that corresponded to her new schedule three months after Walmart had made the change, and its refusal to consider Spaeth's request and that of her sister for an accommodation. Based on this evidence, the EEOC contends that Spaeth's attendance violations were a pretext for terminating her, and that the real reason was discrimination against her because of her disability. The EEOC also contends that Walmart's failure to rehire or reinstate Spaeth was discriminatory. These are all issues for a jury to determine. The evidence is not so lacking that summary judgment can be awarded.

### 3. Punitive damages

Even if the EEOC's ADA claims survive, Walmart contends that summary judgment should be granted as to the claim for punitive damages. Punitive damages can be awarded to a plaintiff in an ADA case if it is shown that the defendant "engaged in intentional discrimination 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (quoting 42 U.S.C. § 1981a(b)(1)). Walmart argues that "the record is simply devoid of any facts even suggesting that Walmart acted with 'malice' or 'reckless indifference' to Ms. Spaeth's federally protected rights." Def.'s Br. In Supp. at 29. Walmart notes that it has "policies in place concerning reasonable accommodations for disabled individuals and an entire department—the Accommodations Services Center—dedicated exclusively to servicing accommodation issues." *Id.* at 30.

That fact that Walmart has policies in place concerning reasonable accommodations for people with disabilities, however, does not mean punitive damages are not available, especially when there is evidence that Walmart's employees failed to comply with those policies in responding to Spaeth's obvious difficulties with a change in her hours. To the contrary, the fact that Walmart supervisors undergo training on ADA issues and it has an entire department dedicated to addressing reasonable accommodations can sometimes serve as evidence that its failure to comply with the ADA was malicious or in reckless indifference to the plaintiff's federal rights. A plaintiff may show an employer acted with malice or in reckless indifference to his federally protected rights "by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws but nonetheless ignored them or lied about their discriminatory activities." *Id.* (internal quotation marks omitted). The fact that Walmart supervisors and

managers persisted in their decision to terminate Spaeth's employment and failed to consider an accommodation even when confronted by her sister and even after she requested re-employment could support a jury finding that Walmart's conduct met the standard for awarding punitive damages. Accordingly, summary judgment is denied as to the EEOC's claim for punitive damages as well.

## CONCLUSION

For the reasons set forth above, the court concludes that Walmart is not entitled to summary judgment. At the same time, the court is concerned about how this case and similar cases may impact persons with Down Syndrome in the future. It is not uncommon for employers, especially large, successful companies like Walmart, who can more easily afford to do so, to provide employment opportunities to those with developmental disabilities, even though they may not be the most qualified applicants to perform all of the tasks required. It is the rare person with a cognitive impairment who will be more qualified than a person who is not so impaired, and the ADA does not mandate that employers act as charitable institutions providing employment opportunities for less qualified applicants. Employers often employ persons with developmental disabilities as a goodwill gesture or out of a sense of compassion. The court's concern is that because of cases like this, employers will be less likely to employ such persons in the future. This concern does not change the result under the law, however, and for the reasons set forth, Walmart's motion for summary judgment (Dkt. No. 91) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 29th day of January, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court