Page 26

1 additional information in the case, then I may or may
2 not formulate additional opinions. But as of today
3 what you have is current.
4 Q Other than Wal-Mart's attorneys, did you consult with
5 anyone else about this case?
6 A No.
7 Q At any point in your work in this case, have you
8 reviewed any of the performance evaluations of Marlo
9 Spaeth?
10 A I don't recall.
11 Q And that sounds like you may have, but you can't
12 certainly say that you did, right?
13 A I reviewed a tremendous amount of documents in the
14 case, so I can't tell you that I -- that I did or did
15 not. I don't recall.
16 Q If Marlo Spaeth had a long history of positive
17 performance evaluations, that is something you do not
18 have knowledge of; is that correct?
19     MR. BULIOX: I'm sorry, can you repeat the
20 question?
21     (Previous question read by the reporter.)
22     MR. BULIOX: Okay. I would just object to
23 form and to the extent it's been asked and answered
24 already, but subject to that you can go ahead and
25 answer it if you can.

Page 27

1     THE WITNESS: I understand from the
2 material that I reviewed that she was -- she had a
3 long history of pretty good performance. I don't
4 recall a lot of details of it, but I do recall that
5 she had a history of positive performance.
6 BY MS. VANCE:
7 Q Have you been retained directly by Wal-Mart in this
8 case or by Wal-Mart's law firm or by another entity?
9 A I was retained -- the way that I got into this case
10 was through Thomson, T-H-O-M-S-O-N, Reuters,
11 R-E-U-T-E-R-S. They have a professional referral
12 service, so they are people that kind of got ahold of
13 me on this case.
14 Q And Thomson Reuters is a service that maintains lists
15 of area expert witnesses; is that correct?
16 A That's my understanding.
17 Q And how long do you believe you have been listed as
18 an expert available for hire through the service,
19 Thomson Reuters?
20 A This was the first time that I received a case from
21 them, so a year or two.
22 Q Are there any other similar services that list you as
23 an available expert witness?
24 A Not to my knowledge.
25 Q And I'm sorry, you said a year or two, maybe 2017

Page 28

1 that you first appeared on the Thomson Reuters list?
2 A Yes, maybe mid to late 2017.
3 Q Thank you. What did you understand your engagement
4 to be?
5 A Boy, that's a hard question. I understood that my
6 engagement in this case was to provide objective
7 information to the counsel for Wal-Mart specifically
8 regarding Ms. Spaeth's current cognitive functioning
9 as well as her level of cognitive functioning when
10 she was released from Wal-Mart.
11 Q And when you were corresponding with Thomson Reuters,
12 did you have knowledge that Marlo Spaeth is a woman
13 who has Down syndrome at that time?
14     MR. BULIOX: Objection as to form. Are you
15 saying when he was contracting with Thompson Reuters
16 in the very beginning two years ago, or are you
17 saying in connection with this case?
18 BY MS. VANCE:
19 Q In connection with this case.
20 A I believe so. I believe they contacted me and
21 asked -- I believe they asked me what my experience
22 was with Down syndrome.
23 Q What is your experience with Down syndrome?
24 A Well, I have evaluated individuals with Down syndrome
25 and provided clinical treatment services to

Page 29

1 individuals with Down syndrome.
2 Q I'll focus on your statement that you have evaluated
3 individuals with Down syndrome. In what capacity
4 have you evaluated individuals with Down syndrome?
5 A Primarily in a clinical capacity. For many years I
6 worked for Michael Reese Hospital in Chicago in what
7 was then called the Dysfunctioning Child Center --
8 not a very good name. They changed it to the
9 Developmental Institute later, thank goodness.
10     However, I worked at the Developmental --
11 or the Dysfunctioning Child Center doing evaluations
12 of multihandicapped children and adults in
13 conjunction with the genetics department at the
14 hospital. So I would evaluate children and young
15 adults with multiple handicaps including frequently
16 Down syndrome.
17     And then my job as part of the
18 multidisciplinary team was to represent the hospital
19 and our -- our evaluation results primarily in school
20 hearings related to either Section 504 of the
21 Rehabilitation Act or the special education laws for
22 both the state of Illinois and the federal
23 government.
24 Q Did you render professional opinions in the school
25 hearings?

Page 42

1　　　individuals that were seeking either accommodations
2　　　or -- for employers that were concerned that
3　　　individuals may need accommodations, so I perform
4　　　evaluations and consultation.
5　Q　And what companies have you performed consultations
6　　　like that for?
7　A　They're generally private employers, although I
8　　　did -- if I recall correctly, there was a
9　　　municipality in Walworth County that I did some
10　　consultation and evaluation on.
11　Q　On approximately how many cases would you estimate
12　　you've served in that capacity?
13　A　I don't recall exactly, but it's probably five or
14　　fewer.
15　Q　Five or fewer. And to be clear, in none of those
16　　situations did the worker in question have Down
17　　syndrome, correct?
18　A　We're talking about consultation to employers,
19　　correct?
20　Q　Correct.
21　A　Under ADA?
22　Q　The five or fewer that you've testified about.
23　A　Yes, I don't believe any of those individuals had
24　　Down syndrome.
25　Q　Do you have any professional or clinical experience

Page 43

1　　　working with people who have disabilities to set
2　　　up -- I'm sorry. I think your prior testimony you
3　　　answered that. I'll withdraw the question.
4　　　　　Do you have any professional training in
5　　　the medical treatment of Alzheimer's?
6　A　No.
7　Q　Do you have any professional or clinical experience
8　　　in the medical treatment of Alzheimer's?
9　A　I've worked with a number of individuals as part of
10　　evaluation and consultation who have had Alzheimer's
11　　or other forms of dementia. I've been involved in
12　　cases, so I'm not sure if that's the kind of
13　　experience you're looking for or not.
14　Q　No, I'd be looking for the medical management of a
15　　patient with Alzheimer's.
16　A　Because I'm not a physician, I don't prescribe
17　　medication, so if we are isolating everything medical
18　　management, the answer is going to be no.
19　Q　Is it also true you do not have any professional
20　　training in the medical treatment of any form of
21　　dementia?
22　A　Correct.
23　Q　Do you have any clinical experience in the treatment
24　　of any form of dementia?
25　A　Yes.

Page 44

1　Q　And what is that?
2　A　I've been involved in consultation and often
3　　　following evaluations with individuals who have
4　　　dementia as part of a treatment team or a
5　　　consultation team. I've provided input into
6　　　treatment programming.
7　Q　And for -- as a psychologist presumably, correct?
8　A　Yes.
9　Q　And how many situations would you estimate you've
10　　been involved in as a psychologist in treatment for a
11　　patient with any form of dementia?
12　A　As a treatment provider or as providing consultation
13　　and input? Those are two separate questions.
14　Q　Right, thank you. So let's separate. Have you ever
15　　been the treatment provider for a patient who has any
16　　form of dementia?
17　A　I generally don't treat adults so -- I'm a child
18　　psychologist by training. So it would be very
19　　unlikely that I would have -- and I don't recall a
20　　specific case where I would have been involved in
21　　treatment programming, providing direct treatment
22　　services for a person with dementia.
23　Q　And then the other capacity you indicated where you
24　　do have some clinical experience is in the
25　　consultation?

Page 45

1　A　Yes.
2　Q　How many instances would you estimate you have been
3　　　involved clinically as a consultant in the treatment
4　　　of any form of dementia?
5　A　That's very difficult to say because I don't keep
6　　　track of specific types of cases. But there have
7　　　been many different cases in which I have provided
8　　　consultation and been involved as part of the
9　　　treatment team for individuals who have had dementia.
10　Q　If you've been involved in the treatment team for a
11　　client or a patient with dementia -- you said many
12　　times. Would you say over ten times that --
13　A　Yes.
14　Q　-- you've served in that capacity? Have you served
15　　in that capacity over 20 times?
16　A　Yes.
17　Q　Have you served in that capacity over 50 times?
18　A　I believe so.
19　Q　And is there a typical course of treatment that you
20　　recommend for a client with dementia?
21　A　Not necessarily. Each client is an individual in and
22　　of themselves, but typically a treatment program
23　　would include medical evaluation and treatment. It
24　　would include psychological evaluation and treatment.
25　　It would include social work case management

**Page 46**

1  evaluation and services, and it would include family
2  support services.
3  Q  And your role on the team would be with the
4     psychological evaluation and treatment part; is that
5     correct?
6  A  Well, it depends on -- it depends on the setting. So
7     my role in various treatment settings might be
8     limited to the psychological portion, but it might
9     also be related to the overall provision of services
10    and the coordination of services among different
11    professionals. It just depends on the particular
12    setting that I was in at the time.
13 Q  Would the medical evaluation and treatment portion
14    or -- yeah, portion of the teams you're describing be
15    performed by a person with an M.D. degree?
16 A  An M.D. or a D.O., a licensed physician.
17 Q  And to your memory have any of the clients or -- have
18    any of the cases in which you've been on a team for
19    the treatment of a person with some form of dementia
20    focused on a client who had Down syndrome as well as
21    a form of dementia?
22 A  I don't remember a specific case.
23 Q  I'm going to ask you to review Exhibit 126, your
24    curriculum vitae, and tell me if there are any
25    updates.

**Page 47**

1  A  I can answer that now. There are updates. And I
2     brought with me today I think two copies of my
3     current, updated CV that will have the revision date
4     on the bottom of page one of February of 2019.
5  Q  All right. Is that being copied currently?
6  A  Yes.
7  Q  So we will exhibit that later. I believe the -- one
8     of the reasons we're scheduled for today is because
9     another possible date I asked for was a date you were
10    in court testifying. Is -- do you know what case
11    that was on in February?
12 A  I have no idea.
13 Q  But to the best of your knowledge, would that
14    February case that you testified on be in the updated
15    curriculum vitae?
16 A  No, that would be on my Rule 26 list.
17 Q  Okay. Which is Exhibit 125?
18 A  Yes, although note that the Rule 26 list that you
19    have is dated December 14 of 2018 and it's now the
20    end of March, so that's updated on a regular basis.
21 Q  All right. So I guess I would ask for the most
22    recent, because I have reason to believe you were in
23    court in February, because I wanted to depose you a
24    day that you were supposed to be in court.
25 A  I'm sorry, you know how judges are.

**Page 48**

1  Q  Do you know whether -- any case you did in February
2     was civil or criminal?
3  A  Not without looking. I have that information if
4     you'd like me to look. It will just take a sec.
5  Q  Yeah, why don't you let me know if it was civil or
6     criminal, or if you have the name of the case that
7     would be the best.
8  A  I can do both assuming I can get a connection.
9  Q  Oh, you can't get a connection.
10 A  I can't?
11 Q  Not at the EEOC.
12 A  You never know.
13            (Discussion held off the record.)
14            THE WITNESS: You said February -- actually
15    let me just look at my Rule 26 list here.
16            (Exhibit 127 marked for identification.)
17            THE WITNESS: In February, that was
18    February 14 or February 26?
19 BY MS. VANCE:
20 Q  I think 26 was the date I was looking at.
21 A  February 26 I was involved in a Daubert hearing,
22    18CF242 Ozaukee County criminal case. State v.
23    Steiner, S-T-E-I-N-E-R, hyphen VanBuren, capital V
24    A-N, capital B-U-R-E-N.
25 Q  That was a criminal. What about the February 14?

**Page 49**

1  A  State v. Santiago 17CF2577, Milwaukee County
2     criminal.
3  Q  Were you court appointed in either of those cases?
4  A  No, in both of those cases I was retained by the
5     defense.
6  Q  And were those cases involving child testimony of
7     victimization of some sort?
8  A  Those cases were both child forensic interview
9     reviews.
10 Q  And the felony allegations against the criminal
11    defendant were of felony -- I don't want to say
12    assault, because it's going to be broader than
13    that -- felonious conduct against the children you
14    interviewed?
15 A  Yes. Not the children I interviewed, the children
16    who were the alleged victims. I did not interview
17    the children.
18 Q  Thank you. All right. Now, I'd like to direct your
19    attention to an exhibit we just had marked as Exhibit
20    127.
21            When I look at the last sentence going to
22    the second page, I see that when you evaluated Marlo
23    Spaeth on June 1, 2018, you conducted a [redacted]
24    [redacted] that was completed by Amy Jo
25    Stevenson, correct?

Page 98

1      that in part because patients with ▮ can have
2      very high scores and perfect scores in some cases on
3      this ▮?
4 A   That's not the reason I put that in there. I put
5      that in there because she had -- when I did this, she
6      had a diagnosis of ▮.
7 Q   From where?
8 A   From her medical records from the APMP, Ms. Kaminsky.
9 Q   That was ▮ was the diagnosis.
10 A   It actually said ▮ in the records that I
11      reviewed. So I'm looking at a person in front of me
12      who has a diagnosis of ▮ although I do -- I
13      will tell you that Dr. Smith disputed that of course,
14      so that was one of the things I was looking at.
15      And as you know, in my report I believe I
16      said that Ms. -- that she had ▮
17      ▮ So I'm
18      seeing signs of ▮ here as well. So what I
19      needed to know then was her performance on the ▮
20      simply a performance of ▮ she's getting a
21      little lower score because of ▮ or are there
22      other factors in play.
23      In this particular case I felt that her
24      scores were lower than I would expect even given the
25      diagnosis of ▮. That's why I put that in

Page 99

1      there.
2 Q   Because as the test manual indicates, people with
3      ▮ can still have perfect scores?
4 A   I'm not sure if the test manual said they can have
5      perfect scores. There's probably some perfect scores
6      in there.
7 Q   50 is a perfect score, right?
8 A   Yeah, 50 is a perfect score. But generally people
9      with ▮ will score a little bit lower on the
10      ▮ than people without ▮.
11 Q   And then I want to direct your attention to the
12      reliance you place on the review of Ms. Kaminsky's
13      medical records. If we look at Bates stamp D002049,
14      on the fourth full paragraph you write, In the
15      current case I have limited information concerning
16      Ms. Spaeth's functioning in July 2012. The
17      information that I have, however, indicates that an
18      unidentified clinician evaluated her and determined
19      that she was experiencing ▮ Details of that
20      evaluation were not available to me.
21 A   Oh, July 2015 is what I should have said. I think I
22      misspoke there.
23 Q   Did you make any inquiry with anyone about how the
24      evaluation of Ms. Spaeth was conducted?
25 A   I reviewed the records and looked at the

Page 100

1      documentation from Dr. Kaminsky.
2 Q   Nurse practitioner Kaminsky?
3 A   I'm sorry, APNP.
4 Q   And I want to say it's Annette. Does that sound
5      right to you?
6 A   It could be.
7 Q   And it sounds to me like you had no conversation with
8      Ms. Kaminsky at any point, correct?
9 A   You are correct.
10 Q   You had no conversation with Ms. Stevenson, the
11      sister of Marlo Spaeth, at any point concerning that
12      evaluation, clinical evaluation, correct?
13 A   The only conversations I had with Amy Jo Stevenson
14      were conducted in June when I met with her. And I'm
15      looking at my notes which are Bates stamped D001110
16      and subsequent.
17 Q   In which exhibit, please?
18 A   128. These are my handwritten notes at the time that
19      I met with Ms. Spaeth. And as you recall, I met with
20      Amy Jo during the beginning of that to get some
21      background information. And I asked about history,
22      and I'm just looking at my notes to see if she
23      mentioned the ▮ diagnosis or the medication
24      that she had taken. And the answer is no, she did
25      not mention her history of taking medication or

Page 101

1      ▮ difficulties or her discussion with Nurse
2      Practitioner Kaminsky about it.
3 Q   All right. And if you found out that Ms. Spaeth was
4      evaluated with a ▮ test but had higher scores than
5      the scores she had with you, would that in any way
6      affect your opinion?
7 A   Well, it might. I would like to -- in that case I
8      would want to see the ▮ scores and see copies of
9      the information that is part of that test record, and
10      I would want to compare them and see -- you know, see
11      what the differences or the similarities were.
12 Q   And if she had a score that was lower, would that
13      affect your opinion?
14 A   It might depend on how much lower it was and what
15      areas it was lower.
16 Q   If the clinical evaluation consisted of a five-minute
17      phone call between Ms. Stevenson and Ms. Kaminsky
18      with reports of ▮, would that affect your
19      opinion in this case?
20      MR. BULIOX: Objection, form, calls for
21      speculation. Subject to that if you can answer, go
22      ahead.
23      THE WITNESS: Well, I'm aware that -- and
24      the answer is I'm not sure. I know that -- because I
25      subsequently was able to see records from Nurse

Page 106

1　　　　it falls within about the first percentile.
2　　　　　　　So there's a huge difference when you -- if
3　　　　she was not experiencing in this case attention
4　　　　problems, you would expect that percentile range to
5　　　　be around 50, and instead it's around one so -- and
6　　　　that's compared to the normative sample, the age
7　　　　group that Dr. Smith references that she would be
8　　　　more of a valid comparison.
9　　　　　　　So what I'm saying with this Appendix C is
10　　　essentially it doesn't matter if you consider that
11　　　she may be aging at a rate significantly faster than
12　　　a person in the normal population, she still is very
13　　　consistent with individuals with ▮▮▮ and is
14　　　not consistent with persons of that older
15　　　chronological age.
16　Q　Are her scores consistent with being a person who has
17　　　Down syndrome who does not have ▮▮▮?
18　A　Her scores are not consistent with being a person
19　　　that does not have ▮▮▮. Regardless of whether
20　　　she has Down syndrome or not, her scores are not
21　　　consistent with a person who doesn't have ▮▮▮.
22　Q　So is -- to your knowledge is there research about
23　　　how a person who has ▮▮▮ but -- I'm sorry, who
24　　　has Down syndrome but does not have ▮▮▮ would
25　　　typically score on the ▮▮▮?

Page 107

1　A　I don't believe there's been any research that has
2　　　looked at that.
3　Q　So what is your basis for saying that she -- I mean
4　　　are you saying that she couldn't have gotten these
5　　　scores on the ▮▮▮ just because she
6　　　has Down syndrome without ▮▮▮?
7　　　　　MR. BULIOX: I'm going to object to form,
8　　　but subject to that, if you understand the question,
9　　　answer.
10　　　　　THE WITNESS: I know many individuals with
11　　　Down syndrome and without ▮▮▮ and it is highly
12　　　unlikely that a person with Down syndrome without
13　　　▮▮▮ would score this low.
14　BY MS. VANCE:
15　Q　Could poor effort be a possible explanation for
16　　　scoring as low as Marlo Spaeth did on the ▮▮▮?
17　A　Although -- it could contribute to it. That is one
18　　　of the things that I considered. It could contribute
19　　　to it, but I don't believe that's the case in this
20　　　particular situation.
21　Q　And could stress have contributed to lower scores on
22　　　the ▮▮ in Marlo Spaeth's case?
23　A　I think it's possible that stress could have
24　　　contributed. Again I don't feel that stress would
25　　　have been sufficient to result in scores of this

Page 108

1　　　magnitude.
2　Q　And for the ▮▮, do depression symptoms affect
3　　　people's performance?
4　A　They could potentially, yes.
5　Q　And you write that Dr. Smith opined that the
6　　　▮▮▮ -- I'm on 2049, last paragraph. Dr. Smith
7　　　opined that the ▮▮▮ that was earlier diagnosed
8　　　for Ms. Spaeth may have been ▮▮▮ that
9　　　results from anxiety and depression. While that is
10　　clearly a possibility, it is not consistent with the
11　　data available to me.
12　　　　　And I wanted to ask you why do you write
13　　that that is clearly a possibility?
14　A　Well, because we know that a person that is
15　　experiencing severe anxiety or depression could also
16　　then have problems with memory and attention and
17　　motivation. Those symptoms can co-occur.
18　Q　And do you think it's possible that the depressive
19　　symptoms for a person with Down syndrome that do
20　　manifest -- well, strike that.
21　　　　　I'll withdraw the question.
22　　　　　Turning to 2050 on the next page, you noted
23　　that Ms. Spaeth's scores on the ▮▮ have not declined
24　　over the six-month period between your administration
25　　of the two tests, right?

Page 109

1　A　I'm looking for what paragraph you're on.
2　Q　The first full paragraph.
3　A　Yes, I see that. Yes.
4　Q　She was -- now, was her score overall higher the
5　　　second time it was given? Looks like there was a
6　　　total score of ▮ in June but then a total score
7　　　of -- total raw score of ▮ in December.
8　A　You're correct.
9　Q　The second time she took it there was some
10　　improvement in her percentile that she ranked in,
11　　correct, in total score?
12　A　The second time --
13　Q　Right.
14　A　-- that she took it? No, her percentile range was
15　　below the first percentile in both -- in both test
16　　administrations unless you're referring to her -- the
17　　comparison with the ▮▮▮ sample.
18　Q　That's the ▮ percentile?
19　A　Yes, it is.
20　Q　So compared to the ▮▮▮ sample, the first time
21　　you administered the test, she scored in what would
22　　have been consistent with the 38th percentile for
23　　people who have ▮▮▮?
24　A　Correct.
25　Q　The second time she beat out 8 percentile of those

Page 158

1  A   That's one out of 50 potential questions, and many of
2      the others are a little more difficult for her.
3  Q   The concept of being scheduled, the passive concept
4      of she has been scheduled, can you expect Marlo
5      Spaeth as the person who tested as she did with you
6      June 1 on the [redacted] to comprehend the concept of
7      being scheduled?
8  A   Yes.
9  Q   What about 'she is expected to work her scheduled
10     shift.' Is that within the reading comprehension
11     level she displayed in June of 2018 to you?
12 A   I don't know for sure, but I don't think so.
13 Q   What about the concept of a lack of customer service.
14     Is that within the reading comprehension that Marlo
15     Spaeth displayed to you in June of 2018?
16 A   I didn't test that, but those would be words that I
17     think are probably above her comprehension level in
18     June of 2018.
19 Q   And the -- do you have any knowledge of whether --
20     you testified you don't have any knowledge of whether
21     a person's IQ score on the WAIS IV would decline due
22     to the onset of [redacted]. Do you have any knowledge
23     of whether or not a person's WIAT III scores would
24     change over time given the onset of [redacted]?
25         MR. BULIOX: I'm going to object to the

Page 159

1      extent it mischaracterizes testimony. Subject to
2      that, go ahead and answer.
3         THE WITNESS: I don't know of any research
4      that has specifically addressed that. I think if you
5      think about what you're asking though, you're asking
6      an individual to recognize concepts and to understand
7      discourse. The onset of [redacted] could interfere
8      with those abilities, so it's possible that her
9      performance in 2018 would be worse than her abilities
10     would have been earlier, but I don't have
11     objective -- I don't know of a study that's looked at
12     that specifically.
13 BY MS. VANCE:
14 Q   So if somebody tested with a second grade reading
15     level after they had [redacted] you have no knowledge
16     of whether or not they may have had a higher than
17     second grade reading level prior to [redacted] whether
18     or not we should expect that in the data?
19 A   The test data that I had would not answer that
20     question. You would have to go back and look at
21     other abilities. So for example, in 2015 was she
22     capable of reading a bus schedule, was she capable of
23     making a grocery list and following it, was she
24     capable of following written instructions at a
25     particular level or not. So one would have to go

Page 160

1      back and look for more subjective data.
2  Q   Which we don't have in this case, correct?
3  A   I don't have it.
4  Q   I see the sentence, Continued infractions will result
5      in the next level of coaching up to and including
6      termination.
7         Do you think continued infraction is within
8      the vocabulary that Marlo Spaeth demonstrated to you
9      in June of 2018?
10 A   That term probably is not.
11 Q   I also see 'The expiration date of the coaching may
12     be extended beyond December 23, 2015, date if the
13     associate spent time on LOA.'
14        Would you have read that sentence to Marlo
15     Spaeth in June of 2018 and expected her to comprehend
16     it after you had given her the [redacted] test?
17 A   Not without an explanation.
18 Q   And is that because there are difficult vocabulary
19     words or difficult concepts in that sentence? Why
20     does it require an explanation?
21 A   Well, those are big words, and Marlo is a simple
22     person. So for example, on the back of this exhibit,
23     you'll notice under action plan, 'I will check my
24     schedule every day.' That's much simpler, much more
25     straightforward than the expiration date of the

Page 161

1      coaching. So I would expect her to understand the 'I
2      will check my schedule every day' and perhaps she
3      even said it, I don't know. Without an explanation
4      as opposed to the LOA sentence, that would be a
5      little difficult.
6  Q   What about the vocabulary, 'a no-call/no-show absence
7      occurrence'? Actually let's look at that sentence.
8  A   I'm not sure where --
9  Q   Sorry, I turned the page like you did. Sorry. So
10     let's get this sentence, She did not come to -- I'm
11     sorry -- 'She did not come in to work, nor did she
12     call in, so this is considered by policy to be a
13     no-call/no-show absence occurrence'.
14        MR. BULIOX: I'm sorry, where were you?
15        THE WITNESS: Right there.
16 BY MS. VANCE:
17 Q   Is the word -- would you expect the word 'occurrence'
18     to be within Marlo Spaeth's vocabulary based on your
19     testing?
20 A   No.
21 Q   Would you expect the idea of her actions being
22     considered by policy something within her reading
23     comprehension based on your testing?
24 A   No.
25 Q   And the concept of a no-call/no-show absence, do you

### Page 162

1  think that's within the reading comprehension she
2  displayed in your testing?
3  A  Probably not.
4  Q  What about an 'unsatisfactory shopping experience for
5     the customer.' Would you expect Marlo Spaeth to have
6     reading comprehension about an unsatisfactory
7     shopping experience for the customer?
8  A  I think she would have difficulty reading that.
9  Q  What about translating the concept that something
10    that leads to an unsatisfactory shopping experience
11    for the customer may result in potential lost sales.
12    Would you expect her to follow the logic of that
13    phrase?
14 A  Not if you presented it to her just like that. I
15    think you'd need to explain it to her.
16 Q  You wouldn't expect her to be able to read that
17    sentence and comprehend it; is that right?
18 A  Not based on my testing.
19        MR. BULIOX: Again, to be clear, we're
20    talking about Dr. Thompson's testing as it related to
21    his assessments in 2018, we're not talking about 2015
22    or 2014. If we are talking about 2014, 2015, I would
23    object to the form of the question as being vague and
24    ambiguous.
25        MS. VANCE: I think the record's clear.

### Page 163

1  Q  Am I right that you testified that typically you
2     expect an IQ score to remain stable after age 10?
3  A  10 to 12.
4  Q  After age 10 to 12 throughout life, correct?
5  A  Barring some additional insult or disease that
6     affects it.
7  Q  The achievement testing however, does an adult's
8     achievement top out at a certain age and then become
9     stable?
10 A  No. Hopefully we're life-long learners. I'm sure
11    all of us in this room are.
12        MS. VANCE: I have no further questions at
13    this time. It's 5:10.
14        MR. BULIOX: Can we take a short break?
15        MS. VANCE: Yes.
16        (Recess taken from 5:11 to 5:17 p.m.)
17             EXAMINATION
18 BY MR. BULIOX:
19 Q  Dr. Thompson, you talked about Marlo's ability to
20    adapt to change in your final assessment; is that
21    right?
22 A  Yes.
23 Q  And you testified that she showed signs of having
24    flexibility in connection with her routine. Did I
25    hear that right?

### Page 164

1  A  Yes.
2  Q  And that was in your testing, right?
3  A  Yes.
4  Q  And you also testified that at some point in time she
5     developed [redacted] is that correct?
6  A  Yes.
7  Q  And how does that work, does it get worse over time?
8  A  [redacted] typically gets worse over time unless one
9     takes medication to help slow down the progression.
10 Q  So one's ability to function declines over time; is
11    that a fair assessment?
12 A  Yes.
13 Q  And is it fair to say that she would have been higher
14    functioning when it came to her ability to adapt to
15    change back in 2014, 2015?
16 A  I believe so.
17 Q  You indicated I think, and correct me if I'm wrong,
18    earlier in your testimony that you did not speak to
19    Amy Jo or the nurse practitioner to form an opinion
20    regarding the possibility of Ms. Spaeth possibly
21    having [redacted] is that right?
22 A  Correct.
23 Q  Why not?
24 A  Well, I had -- I was testing for that. I knew that
25    there was documentation that she was having [redacted]

### Page 165

1     [redacted], and the documentation included a diagnosis
2     of [redacted] and so I was aware that that was an
3     issue. So I was going to conduct standardized
4     testing to look at that possibility.
5        I could have talked with Amy Jo, but that
6     would have required, first of all, additional time
7     that I didn't have during the assessment. I was
8     limited to two two-hour blocks. It would also -- it
9     would have been Amy's subjective impressions in the
10    middle of litigation, which would have been perhaps
11    suspect because she had potential motivation to push
12    me in one direction. And I didn't need to talk to
13    the -- Ms. Kaminsky, Nurse Kaminsky, because she had
14    already documented things in her record.
15 Q  You did in fact speak to Amy Jo at some point, right?
16 A  Yes, I did.
17 Q  That was during your assessment in June of 2018?
18 A  Yes.
19 Q  At one point in time you were asked about opinion 4A
20    in your report which I believe was Exhibit 130. And
21    if you look at the bottom, if you look at page 10 of
22    18 --
23 A  Yes.
24 Q  -- this is what I'm referring to, so 4A, you see
25    that?

Page 166

1 A 4A, yes.
2 Q And you talked about external influences earlier
3   today; is that right?
4 A Yes.
5 Q And you talked about at the onset of the individual
6   portion of the June evaluation Ms. Spaeth
7   spontaneously brought up her separation from
8   employment at Wal-Mart, correct?
9 A Correct.
10 Q Could the external influence have been coaching or
11   direction she received from Amy Jo or somebody else?
12 A Certainly.
13 Q Did her mention of her separation with employment
14   have anything to do with any question you asked her?
15 A No, it did not.
16 Q There was discussion earlier today about Amy Jo and
17   what her motivations were in connection with a report
18   that she gave to Dr. Smith. Do you recall that?
19 A Yes.
20 Q And I think you had mentioned at one point that one
21   of her motivations could have possibly been
22   fabricating a report?
23 A That's one possibility, yes.
24 Q What if there was a period where Amy Jo represented
25   that she was Marlo's guardian and she wasn't her

Page 167

1   guardian, but she represented that she was her
2   guardian as part of her efforts to advance this case
3   or claims against Wal-Mart. Would that be suggestive
4   of any effort to you to fabricate for the sake of
5   advancing the claims or issues against Wal-Mart?
6 A It would certainly make me concerned about that, yes.
7 Q I'm going to show you again Exhibit 20 if you can
8   pull that out.
9     MS. VANCE: It's an exhibit previously
10   marked as Stern dep 20.
11 BY MR. BULIOX:
12 Q Okay, you were asked not too long ago about whether
13   or not Marlo could comprehend from a reading
14   comprehension standpoint several items in this
15   exhibit, correct?
16 A Correct.
17 Q All right. Do you believe based on your assessment
18   of Marlo in 2018 that if this was explained to her,
19   that she would be able to understand the concepts in
20   this document?
21 A If it was explained to her, yes.
22 Q And if you turn to -- I believe it's the second page.
23   So at the bottom it says EEOC00460. Do you see that?
24 A Yes.
25 Q Under action plan it says, quote, I will check my

Page 168

1   schedule every day?
2 A Yes.
3 Q If Marlo is the one that made this comment, what is
4   your takeaway, if any, from that?
5 A I would believe that she understood she needed to
6   check her schedule on a daily basis and then follow
7   the schedule.
8 Q We've spent some time going over Dr. Smith's updated
9   report. What do you think about his report?
10 A I think that his report certainly raises questions
11   about the presence of confirmatory bias.
12 Q And what's confirmatory bias?
13 A Situation where a person goes into a situation with a
14   preconceived notion and then pays attention or gives
15   increased credibility to things that will support
16   their preconceived notion and pays less attention to
17   or discounts the importance of information that might
18   refute their preconceived notion.
19     MR. BULIOX: That's all I have.
20     EXAMINATION
21 BY MS. VANCE:
22 Q I do have some quick follow-up regarding this topic.
23     You've testified about on redirect of Amy
24   Jo Stevenson as an external factor including Marlo
25   Spaeth and noting that Amy Jo, because the case is in

Page 169

1   the middle of litigation, may have bias or motives.
2     I wanted to ask you in your clinical
3   experience have you ever run across special needs
4   trusts?
5     MR. BULIOX: Objection, form, undefined as
6   to what special needs trust is. Subject to that you
7   can answer if you know.
8 BY MS. VANCE:
9 Q Do you know what a special needs trust is?
10 A I believe I know, but I'm not sure. It sounds like
11   a -- more of a legal concept.
12 Q Well, it's a financial concept.
13 A To me it's the same thing.
14 Q Have you ever had clients who -- have you ever been
15   paid out of a special needs trust for treating
16   clients to your knowledge?
17 A For treating clients, I honestly don't know about
18   treating -- certainly for evaluating, but I'm not
19   sure about treating.
20 Q So you received payment from a special needs trust
21   for performing an evaluation of a client?
22 A Yes.
23 Q And are you aware that trusts have trustees?
24 A Yes.
25 Q And is your thinking about Amy Jo Stevenson's motives