UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---------------------------------------------------------------

EQUAL EMPLOYMENT OPPORTUNITY          )
COMMISSION,                           )
                                      )
                    Plaintiff,        )   Case No. CV 17-70
                                      )   Green Bay, Wisconsin
        vs.                           )
                                      )   June 18. 2021
WAL-MART STORES EAST LP,              )   1:31 p.m.
                                      )
                    Defendant.        )

---------------------------------------------------------------

**TRANSCRIPT OF FINAL PRETRIAL CONFERENCE**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              **Justin Mulaire**
                                United States Equal Employment
                                Opportunity Commission
                                230 S Dearborn St - Ste 2920
                                Chicago, IL 60604
                                312-872-9666
                                Email: justin.mulaire@eeoc.gov

                                **Carrie Noelle Vance**
                                **Leslie N Carter**
                                United States Equal Employment
                                Opportunity Commission
                                Milwaukee District Office
                                310 W Wisconsin Ave - Ste 500
                                Milwaukee, WI 53203-2292
                                414-297-4188
                                Fax: 414-297-3186
                                Email: carrie.vance@eeoc.gov
                                Email: leslie.carter@eeoc.gov

U.S. Official Transcriber:      JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:              WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

```
APPEARANCES CONT'D:

For the Defendant:              Emery K Harlan
                                Warren E Buliox
                                MWH Law Group LLP
                                735 N Water St - Ste 610
                                Milwaukee, WI 53202
                                414-436-0353
                                Fax: 414-436-0354
                                emery.harlan@mwhlawgroup.com
                                warren.buliox@mwhlawgroup.com

                                George Burnett
                                Law Firm of Conway Olejniczak &
                                Jerry SC
                                231 S Adams St
                                PO Box 23200
                                Green Bay, WI 54305
                                920-437-0476
                                Fax: 920-437-2868
                                rgb@lcojlaw.com
```

1              TRANSCRIPT OF PROCEEDINGS

2          Transcribed From Audio Recording

3                    *     *     *

4          THE COURT:  Be seated.

5          THE CLERK:  The Court calls Case No. 17-CV-70, *Equal*

6   *Employment Opportunity Commission vs. Wal-Mart Stores East, LP*

7   for a final pretrial conference.  May I have the appearances,

8   please?

9          MS. VANCE:  Good afternoon.  Attorney Carrie Vance for

10  the Equal Employment Opportunity Commission.

11         MS. CARTER:  Attorney Leslie Carter for the Equal

12  Employment Opportunity Commission.

13         MR. MULAIRE:  And Justin Mulaire, also for the EEOC.

14         THE COURT:  Okay.  Good afternoon.

15         MR. HARLAN:  Good afternoon, Your Honor.  Emery Harlan

16  on behalf of Walmart.

17         MR. BULIOX:  Government noon as well, Your Honor.

18  Warren Buliox on behalf of Walmart.

19         MR BURNETT:  And George Burnett, Your Honor, on behalf

20  of Walmart.

21         THE COURT:  All right.  Well, good afternoon, all.

22         Well, number 1, if you wish you may remove your masks.

23  You don't have to, but you may.  You know each other.  You

24  probably came up here in the same car.

25              (General laughter.)

1        THE COURT:  And you're probably all vaccinated.

2        UNIDENTIFIED SPEAKER:  Yes.

3        THE COURT:  I think we're looking for July 7th for

4   the -- or July 4th for the general lifting of the mandate

5   overall.  And it would be nice to get rid of some of our

6   plexiglass, too.  It does have a certain glare to it.  But

7   anyhow, that's yet to come.

8        You're scheduled for trial beginning --

9        THE CLERK:  July 12th.

10       THE COURT:  -- July 12th.  And we're planning on going

11  to trial.  There's not a criminal case that will bump you that I

12  know of.  So if everybody is in reasonably decent health we'll

13  go forward.

14       I plan on probably, for a trial this length, probably

15  an eight-person jury.  Means we have eight.  If we lose a couple

16  we're still good.  But that's typically the way I would work

17  that.

18       I think it probably makes sense to address your

19  motions in limine and then do housekeeping matters.  Any problem

20  with going forward in that fashion?

21       MR. HARLAN:  No, Your Honor.

22       MS. VANCE:  No, Your Honor.

23       THE COURT:  Okay.  So first, starting with Plaintiff

24  EEOC's motion:

25       **"Walmart should be barred from arguing that other**

1  **employees with developmental disabilities worked in the store**

2  **and were not discriminated against."**

3        I'm going to deny that motion.  I understand that

4  that's not a dispositive.  That's not, you know, conclusive.

5  It's obviously possible not to discriminate against members of a

6  class and still discriminate against the particular plaintiff

7  involved.

8        But if the argument in the claim is essentially that

9  Walmart discriminated against persons with disabilities, and in

10  particular a person with Down syndrome, and there's other people

11  with similar disabilities working for Walmart, I think it's

12  relevant.  It's not, as I said, not conclusive, and certainly

13  EEOC is free to argue and cross-examine concerning any

14  witnesses.  But I'm not going to deny Walmart from showing that

15  kind of -- or presenting that kind of evidence.

16      **"Walmart witnesses should be barred from offering**

17  **speculation and lay opinion testimony regarding the needs of**

18  **Marlo Spaeth, an individual with Down syndrome."**

19        I'm going to deny that.  They can't speculate.

20  Obviously speculation is not evidence and witnesses aren't

21  allowed to speculate.  But I imagine -- or assume let me say --

22  assume that witnesses that interacted with Ms. Spaeth in the

23  course of her employment would have testimony to offer

24  concerning her request for help, or her response when she was

25  given directions in response to customers asking questions, that

1   sort of thing would be admissible. Her reaction to supervisors.

2   Much of that would be factual testimony. But then there's also

3   room for lay testimony in this area. I think that's where

4   there's, you know, some discretion.

5        But I think lay people are in a position to give

6   opinions on with respect to other individuals with whom they

7   interact, not so much what they understood, maybe what was

8   indicated or what was said to them.

9        I think some of this is impossible to rule ahead of

10   time. And so let me preface all of these with the

11   acknowledgement that a motion in limine gets you a ruling in

12   limine. It's not a final ruling. And circumstances can change,

13   too.

14        So if, in fact, it appears that some of what I ruled

15   inadmissible now, if there's a door opened or now the context --

16   feel free to bring that to my attention outside the presence of

17   the jury. We'll address it at that point and then go from

18   there.

19        And likewise, anything that I've denied -- in other

20   words, barring testimony, if something comes up where it's being

21   explored in ways that you feel are unfair or prejudicial, I

22   recognize that these are fluid situations. So number 3:

23        **"Holding that the EEOC does not need to enter evidence**

24   **relating to jurisdictional prerequisites where Walmart has**

25   **admitted such prerequisites were satisfied."**

6

1      That's, of course, granted.  Walmart does not dispute

2   that.  I don't think we want to talk about the number of

3   employees, or interstate commerce, or all of that if we don't

4   have to.

5      **"4.  Allowing EEOC to introduce certain deposition**

6   **testimony in its case-in-chief."**

7      You know, we have a local rule that I've never

8   understood that says you're limited to what, five pages?  That

9   doesn't make sense to me.  So don't -- but you have to tell each

10  other.  You have to reveal the excerpts that you wish to

11  present.  And then I deal with the objections to those excerpts.

12     I can't rule in the abstract that deposition testimony

13  is going to be permitted unless I know specifically what

14  testimony is being offered and then what the objections are.  So

15  I'll deny that.

16     But I think you ought to present each other with those

17  deposition excerpts that you intend to introduce.  And then the

18  other side then, if you reach agreement, wonderful, I don't need

19  to hear anything about it.  And if you want to bore a jury with

20  an hour of it, that's fine.  If it gets carried away I may

21  interrupt.  But, I mean, really, I think the rule of five pages

22  is unreasonable given the nature of cases.

23     On the other hand, there's a natural inclination, I

24  think most experienced attorneys know that they want to limit

25  that as much as they can because they don't want to bore the

1  jury.

2          And so I'll leave that to you.  But if there are

3  disputes, if there are objections to the testimony, if you would

4  present those at least a week ahead of time or a week and a half

5  ahead of time before trial, then I'll be in a position to give

6  you rulings.  If this is a videotape deposition you'll need

7  editing and I'd suggest you move quickly then.  If it's just

8  transcript I can give you that much more easily and quickly.

9          So that's -- you know, that's a denial of the motion

10  just to introduce without it being identified and the other side

11  being given an opportunity to object.

12          MS. VANCE:  Your Honor, may I address that quickly?

13          THE COURT:  Sure.

14          MS. VANCE:  We did file with our pretrial report our

15  deposition designations that we are referring to in motion in

16  limine 4.

17          THE COURT:  Okay.  Then Walmart, if you have any

18  objections, notify -- first of all, you know, see if you can

19  work them out.  If not, let me know what they are and we can

20  either get something in writing or get you on the phone or

21  something next week or the week after to let you know where

22  those are, rulings on those.  Okay.

23          **"Excluding evidence of and argument about past**

24  **financial difficulties, related --"**

25          This is the bad checks issue.  That's very remote.

1    And I have a pretty good understanding of how bad check cases

2    work.  A check goes in that's insufficient funds, the store

3    gives a notice.  If it's not cured in a certain time, it goes to

4    the DA, they issue it as a criminal.  They eventually drop them

5    if there's restitution or allow an ordinance violation.

6         I think that this is so remote and the circumstances

7    are such that I don't think this -- I think the possibility of

8    unfair prejudice outweighs any probative value it has.  So I'm

9    going to exclude the evidence of her bad checks.  It's not

10   even -- to me these cases aren't even clear there's a crime,

11   especially when it ends up as an ordinance violation and just a

12   restitution or small fine.  And then it's so long ago.

13        Again, that's a motion in limine.  I'm not exactly

14   clear on how Ms. Stevenson's testimony will impact here.  I know

15   Walmart views her as a key witness testifying to certain

16   responses made by Walmart employees that they deny having made.

17   You know, if that happens and we see some of this, we can take

18   another look at it, but my inclination is this is just too

19   remote.  She's not a party -- well, she is a party, but it's

20   really the EEOC and the plaintiff is Ms. Spaeth, at least a

21   party in interest more than her representative.  So I'm going to

22   exclude that.

23        MS. VANCE:  Thank you, Your Honor.

24        THE COURT:  And partly based on the remoteness, but I

25   think especially the unfair prejudice I think outweighs the

9

1 probative value here.  That's subject to re-evaluation as the

2 case goes.  Okay.

3 　　　　　**"Excluding testimony and argument as to whether one**

4 **witness believes another."**

5 　　　　　That's -- there's no opposition because that's an

6 obvious rule of evidence.  We don't allow witnesses to assess

7 credibility of other witnesses.  That's the jury's function.

8 　　　　　**"7.  Excluding evidence relating to any previously**

9 **undisclosed witness or documents."**

10 　　　　　It's kind of in the rules already, subject to the

11 exceptions of late notice or rebuttal.  And so, subject to those

12 exceptions.  If you have a witness you're going to call who

13 hasn't been disclosed, or a document, show it to the other side.

14 If there's a dispute, bring it to my attention, we'll rule on it

15 as it goes.

16 　　　　　Obviously the key is, was there cause for the late

17 notice?  Is there prejudice?  Things like that.  So those will

18 govern that.  So I'm not going to enter a blanket exclusion

19 other than to note that the rules, you know, clearly prohibit

20 sandbagging and surprises and bushwhacking, that sort of thing.

21 So, number 8:

22 　　　　　**"Barring Walmart from making disparaging remarks about**

23 **the EEOC or its position as a federal agency."**

24 　　　　　Let's see, Walmart versus the government.  Both have

25 people in the world that don't like them.  And both have people

1    in the world that think they're the greatest thing since sliced

2    bread.  I think -- I have difficulty trying to edit your closing

3    arguments.  I expect civility.  And again there's -- one of the

4    times -- I had a closing argument once where I just laid there

5    and I felt bad because I let the defense attorney just go on

6    something terrible.  And it was beyond -- I should have

7    intervened, but I didn't.  And the jury was out and they came

8    back with a question before they came back with their verdict.

9    They wanted to know if they could award costs and attorneys'

10   fees to the other side.

11          And I say that because, again, you know, the penalty

12   for being uncivil or rude, jurors see that.  And I think this is

13   one of those things where a argument over the claim or the

14   argument, a criticism of someone's argument can so easily be

15   interpreted as a cast of aspersions upon your honor and

16   integrity.  Avoid the honor and integrity part.  Do battle with

17   each other's arguments and I think we'll be fine.

18          I'm not going to enter a ruling on that one.  I'm

19   going to deny the motion with the understanding that if you

20   believe that the arguments are improper, let me know.  I

21   recognize the need to ensure civility and I'll certainly enforce

22   those rules.  Let's see.

23          **"9.  Restricting evidence relating to the issues of**

24   **equitable relief such as back pay, reinstatement or front pay in**

25   **lieu of reinstatement, lost benefits, tax offset, mitigation and**

11

1  **injunctive relief to be addressed to the Court alone or by**

2  **post-trial briefing."**

3          Yeah, I think that makes some sense.  I mean, I always

4  thought of back pay as part of damages, and I think a lot of

5  attorneys just try cases with that in mind.  But after looking

6  at the citation and following up on some of the research that

7  was provided, it's clear to me that back pay is separate from

8  the damages here.  And it's part of equitable relief.  It's

9  clearly to be determined by the Court.

10          Now, you know, if there's no liability and no damages

11  awarded, then we're not going to get into back pay anyhow so

12  that makes it go away.  This is partly what Walmart would like

13  to do is bifurcate damages entirely.  We'll get to that.

14          But I think this part of damages are bifurcated by

15  virtue of the fact that this is equitable relief, injunctive

16  back pay that's considered equitable relief under the caselaw.

17  And so it's something that the Court decides.

18          And Walmart has suggested it could be done by

19  affidavit.  I think that's probably reasonable.  But if Walmart

20  believes that affidavit doesn't do it, they can have a trial to

21  the Court or a hearing on equitable relief.  In other words, if

22  Walmart takes a pay scale and multiplies it out, the hours, and

23  Walmart -- I mean EEOC does that, the plaintiff does that and

24  comes up with a calculation of back pay and Walmart disagrees,

25  I'll certainly hear evidence on that.

12

1    But it is a matter of equitable relief under the

2    caselaw as I see it now.  And the case that you cited where

3    Judge Sykes affirmed the trial court's handling of that issue I

4    thought was pretty right on point.  And when looking closely at

5    the statute, I see where you're coming from.  So I'm going to

6    grant that.  Yup.  Go ahead, Mr. --

7         MR. HARLAN:  Your Honor, I just want to clarify one

8    thing.  So does that mean that we can't put in evidence

9    regarding lack of Ms. Spaeth's seeking new employment?  So that

10   issue it seems to me would be relevant to the question of

11   whether, you know, in terms of whether she has sought new

12   employment in terms of what her real motivation was for not

13   following the attendance policy.

14        THE COURT:  No, I think -- to the extent -- well, one

15   is mitigation can be addressed.  If there's a failure to

16   mitigate damages that can be addressed in the hearing before the

17   Court on back pay.  But if your argument, if I understand it

18   correctly, Mr. Harlan, is that it also goes to the liability.

19        MR. HARLAN:  Yes.

20        THE COURT:  You feel free to introduce that evidence

21   as part of liability.  I don't think there's any -- here again,

22   there's some of a shifting.  My hunch is if we get past -- if

23   the jury finds liability, my sense is that back pay, the amount

24   of back pay is not going to be the big issue here.  But it might

25   be.  I'm certainly willing to concede that.

1      But if the lack of any effort to seek other
2  alternative employment is part of your argument that she wasn't
3  a qualified person with a disability or wasn't interested,
4  didn't desire to work, something like that, that would be
5  admissible it seems to me.
6          MR. HARLAN:  Thank you.
7          THE COURT:  Yeah.  Okay.  And then:
8          **"Allowing the EEOC to use leading questions during**
9  **direct examination of witnesses with intellectual disabilities**
10 **and ensuring cross-examinations --"**
11      That's a wait and see.  It seems to me that if we can
12 do with the proper open-ended questions, fine.  If it becomes
13 clear that that's not possible, that in order for the witness to
14 testify, to respond, you have to do the other.  And I note I
15 think EEOC wanted to do perhaps a voir dire.  You wanted a
16 determination of competency.
17         MR. HARLAN:  That was us.
18         THE COURT:  Okay, Walmart wanted to do a voir dire
19 perhaps of Ms. Spaeth --
20         MR. HARLAN:  Yes.
21         THE COURT:  -- to see if she understands the
22 difference between -- to see where that goes.
23      And I think we can do that outside the presence of the
24 jury before she testifies.  And I've done, you know, cases with
25 very young children testifying and we've done that sort of

1    thing.  So if -- you know, it doesn't -- it does seem to me that

2    the question is -- and this is something you might want to look

3    at, and I'll look at it more closely.

4         Even a witness who, for example, the oath, they don't

5    understand the oath, they don't understand the difference

6    between truth and falsehood, I don't know if it -- is there an

7    argument to be made that nevertheless that their presence is

8    evidence or their responses are evidence even if it's not

9    typically under oath?

10        I don't know if there's an argument like that or

11   however you want to look at it.  But I have no idea how

12   functional Ms. Spaeth is at this point.  I know there's an

13   argument of whether she suffers from dementia, whether it's

14   depression.  It sounds like she has had some declines.  It's

15   been what now, five, six years since she was employed at

16   Walmart.  Two since the case was started.  COVID obviously

17   delayed things quite a bit, as well as some of the complexity.

18   But, yup, anything on that?

19        MS. VANCE:  Yes, Your Honor, if I may.

20        We are -- the EEOC is not asking for an in-camera

21   review.  And competency has not been any issue in this case.

22        Walmart deposed Ms. Spaeth under oath for about 10

23   hours and then asked for a second day of deposition and put her

24   under oath for a second day.  There was no question at the time

25   that that was sworn testimony, that she was under oath.  And

1   then Walmart in its own pretrial report mentioned it.

2   Competency of Ms. Spaeth is not an issue for them.

3           And so, you know, bringing it back to our motion --

4   well --

5           THE COURT:  We're not going to -- we're not going to

6   have like a psychological evaluation of her or anything like

7   that, but my understanding is that she needs to take an oath.

8           MS. VANCE:  Right.  Yes, Your Honor, as she has.

9           THE COURT:  Testimony has to be given under oath.  And

10  is it your position that whether she understands the oath,

11  whether she understands the difference between telling the truth

12  or telling a lie it doesn't make any difference?  She still

13  testifies even if she doesn't understand the meaning of the

14  oath?  Because that's what I view as the competence issue that

15  the Court would decide.

16          And again, I'd go back to a child, a very young child

17  who doesn't understand the difference between the truth and a

18  lie in, you know, a sexual assault cases in state court is what

19  I'm thinking.  It would not be uncommon to begin the

20  presentation of that witness by making a record that they

21  understand the difference between the truth and the lie.  And as

22  long as they understand the difference, I think they can

23  testify.

24          Now, the oath, you know, plays a different role there.

25  But that's the key thing.  The witness needs to understand the

1   difference between telling the truth and telling of a lie.  And

2   as long as this witness understands that, it seems to me clearly

3   they're competent to testify.  That's not a long voir dire.

4   It's usually a couple of questions.  And it can be outside the

5   presence of the jury if you think it would be prejudicial, or it

6   could be in the presence of the jury.  Typically in the cases in

7   which I've seen that done with young child witnesses, it's done

8   in the presence of the jury so the jury understands this person

9   knows the difference and that they can put some confidence in

10  that testimony.  They can trust -- consider it trustworthy at

11  least to the extent that the witness understands the difference

12  between a lie and telling the truth and a lie.  But we can look

13  at that more closely.

14          MS. VANCE:  Yes, Your Honor.  I mean, in general, our

15  position is that this trial can proceed under the rules as it

16  would, and that was part of Motion in Limine 10 pointing out

17  that the rule does allow, even on direct, for leading questions

18  if it's necessary.

19          THE COURT:  Yeah.  And we'll see if that's necessary.

20  Yup.  Okay.  So those are Walmart's motions.  Anything else on

21  that?

22          MS. VANCE:  Yes, Your Honor.  The second part of that

23  EEOC's Motion in Limine 10 was about cross-examination using

24  documents.

25          THE COURT:  Uh-huh.  Again, I don't know -- you know,

1    it seems to me we're going to have to go document by document.

2    If there's a question of documents I'm not going to blankelty

3    prohibit it or allow it.  I just want to -- let's see what

4    happens.

5           MS. VANCE:  So, Your Honor --

6           THE COURT:  I don't see that as prejudicial.  And I

7    don't feel I'm in a position to rule ahead of time on that until

8    I see this witness or see the documents or understand how this

9    is intended to work.

10          MS. VANCE:  Could we propose, Your Honor, that part of

11   presenting the document to the witness would be having the

12   witness read from the document so that we at least establish a

13   foundation of literacy of the words in the document, the

14   content?

15          THE COURT:  Mr. Harlan, what's your view on that, or

16   Mr. Buliox?

17          MR. HARLAN:  Your Honor, I think your approach is the

18   appropriate one which is to see what happens at trial.  I

19   haven't even figured out what documents, if Ms. Spaeth

20   testifies, they're going to show her.  So I think it's premature

21   to try to say for a particular document we may be showing to her

22   just to say can you recognize your signature.  I mean, I just

23   don't know.  I think it's not appropriate at this point to try

24   to figure out what's going to happen.  If she gets on the stand

25   and testifies, then --

1      THE COURT:  A witness who says I don't recognize a

2  document, I mean, obviously the first step in introducing a

3  document through a witness is showing the document to the

4  witness, asking them do you recognize the document, asking them

5  what it is.  If the witness can't even testify to that, the

6  document doesn't come in through that witness.

7      So I think there's automatic safeguards in the

8  requirement that a foundation be laid before a witness is

9  introduced -- or a document is introduced through any witness.

10  So I think that's -- these aren't the kinds of things either

11  that would prejudice a jury.  That's why I don't think it's so

12  important that we nail it down at this point.

13      MR. HARLAN:  To give the EEOC some comfort, based on

14  our deposition, we don't plan on showing her a bunch of policies

15  and records and that sort of thing and asking her to testify

16  about those things.

17      THE COURT:  Okay.

18      MR. HARLAN:  I don't think that's going to be

19  productive.  And frankly, I don't think it's going to make us

20  look good in front of the jury.  So we're not going to be trying

21  to catch her by showing her a bunch of documents and say, hey,

22  you know, do you agree that this was putting you on notice that

23  you were violating an attendance policy.  That's not where we're

24  going.

25      THE COURT:  Okay.  Let's go to Walmart's, then,

1  motions.

2      **"1.  The Court should prohibit evidence pertaining to**

3  **the EEOC's internal determination."**

4      I don't perceive any objection to that other than

5  jurisdictional requirements which are stipulated to.  So that

6  determination is not admissible.  It's not the one that matters

7  in this proceeding.  So I'll grant number 1.

8      MS. VANCE:  Can we have one second, Your Honor?

9      THE COURT:  Uh-huh.  This is document 185, page 2.

10     MS. VANCE:  Thank you.

11     THE COURT:  Yeah.

12     MS. VANCE:  Thank you.

13     THE COURT:  Uh-huh.  Okay.  I don't think -- if I

14  recall correctly that wasn't really objected to.  Number 2 is:

15     **"Evidence about other cases or claims of**

16  **discrimination involving Walmart should also be barred."**

17     That's granted.  Of course, again, subject to the door

18  not being opened or -- you know, and if you feel the door is

19  opened you can again ask that we revisit that.

20     MS. VANCE:  And, Your Honor, may I speak to that?

21     THE COURT:  Yup.

22     MS. VANCE:  And we had asked for the carveout that

23  during what may be post-trial briefing on equitable relief.

24     THE COURT:  Yeah, this is just for trial purposes.

25     MS. VANCE:  Got it.

1    THE COURT:  I do these motions as addressing what's

2    admissible at trial in front of a jury.

3    Okay.  So I recognize that if EEOC prevails they may

4    wish to introduce other evidence for purposes of injunctive

5    relief or other equitable relief.

6    MS. VANCE:  Yes, Your Honor.

7    THE COURT:  **"3.  The Court should preclude testimony**

8    **and argument to the effect that supposed violations of Walmart's**

9    **internal anti-discrimination policies means Walmart**

10   **discriminated in violation of federal law."**

11   Now, as I understand it, the way the motion is phrased

12   is to preclude testimony or argument to the effect that the

13   violation itself means a violation of federal law, violation of

14   a policy.  And I think that's true.  So to that extent I grant

15   it.

16   But I think Walmart acknowledges that the evidence of

17   their failure to follow the policy, their own policies, may be

18   admissible to show intent or to show animus or, you know, on the

19   part of the employee that maybe violated policy, things like

20   that.  And this may be an area where Walmart may want me to give

21   a curative instruction to let the jury know that a violation of

22   internal policies is not a violation of federal law.  And the

23   mere fact that Walmart may not have followed their internal

24   policies, which go beyond federal law, or are not required by

25   federal law, does not mean that the jury should find liability

1    under the ADA.

2            That I think would be probably the best way to handle

3    that.  And then there shouldn't be testimony or argument that

4    this amounts to a violation of policy therefore it's a violation

5    of federal law.  I think the EEOC doesn't disagree with that, as

6    I read their response.

7            **"4.  Testimony or evidence relating to remote in time**

8    **attendance records of non-similarly situated associates should**

9    **be excluded at trial."**

10           And now, this one I -- I'm inclined to grant this with

11   this understanding, if I understand it correctly.  I think that

12   ignoring late or absences or, you know, taking time off, things

13   like that, could very well be relevant in this case.

14           But as I understand it, Ms. Spaeth was a sales

15   associate.  She was in the store part where, as long as the

16   store is open, there's work to be done.  Customers may need

17   help.  There's tasks to be done.  Whereas the other employees

18   were in an area where there was a set task.  Once the task is

19   completed they were told they could leave, by management.  Yes?

20   No?

21           MS. VANCE:  Your Honor, I would speak to that and say

22   no.  Ms. Spaeth's early departures were with the understanding

23   that her tasks were done.  She had finished her returns, she had

24   tidied her zone, and there was no work left so she could clock

25   out early.

1    THE COURT:  Okay.

2    MS. VANCE:  Work is slow or no work left.  I finished

3  my work and so I could clock out early.  Which is parallel to

4  the testimony of the other hourly -- of Debbie Moss, one of the

5  other hourly associates.

6    THE COURT:  Okay.  Mr. Emory or Mr. Buliox?

7    MR. BULIOX:  Yes, Judge, if I can just offer just a

8  little bit of context.  And I think you were kind of spot-on

9  there.  We're talking about apples and oranges.  We're talking

10  about an employee in Ms. Spaeth who worked in the store, in the

11  store part on the one hand, and on the other hand we're talking

12  about employees who were in the back office in, you know,

13  HR-type functions.  One is a training coordinator and the other

14  one is a personnel coordinator.  Completely different

15  supervisors, completely different responsibilities.  Just a

16  completely different, you know, situation all in all.  And on

17  top of that, we're looking at, you know, attendance records that

18  go back to 2008.

19    THE COURT:  Yeah.

20    MR. BULIOX:  Six years, roughly, you know, since the

21  time that Ms. Spaeth was let go and had her attendance issues

22  that led to the end of her employment.

23    You know, EEOC talks about routine and, you know,

24  things like that, but, you know, routine changes over time.  And

25  this is an employment case.  In employment cams we look at

1    similarly situated individuals, and these people could not be

2    any more non-similarly situated.

3              THE COURT:  Okay.  Ms. Vance?

4              MS. VANCE:  Yes, Your Honor, if I may.

5              THE COURT:  Sure.

6              MS. VANCE:  We cited the *Ortiz* case in our response

7    which speaks to this issue where in *Ortiz* the Seventh Circuit

8    looked at the behavior of managers, people with various

9    positions within the same company as Ortiz, to see whether the

10   employer actually did penalize the behavior that it was -- that

11   it argued that Mr. Ortiz was terminated for.

12             So this does go to the issue of whether the violation

13   that Walmart says Ms. Spaeth was terminated for was actually

14   something that Walmart terminated others for.  And these people

15   are not offered as, you know, job-to-job comparators.

16             THE COURT:  It's not a summary judgment case.

17             MS. VANCE:  Right.

18             THE COURT:  That's the key here.  I think comparators

19   come in more on those types of cases.

20             Go ahead, Mr. Buliox.

21             MR. BULIOX:  Yeah, sure.  So I'm going to read you a

22   quick line from the *Ortiz* case.  It says:

23             *"A juror also might infer that because of Ortiz'*

24   *ethnicity one of his managers fired him for using techniques*

25   *that were tolerated when practiced by other brokers."*

1    The key word is "brokers."  Ortiz was a broker, the

2  other people were brokers that they were comparing largely.

3    THE COURT:  Yeah.

4    MR. BULIOX:  In this case we're comparing, again, a

5  sales associate with HR people.

6    THE COURT:  Yeah.  I think, though, those kinds of

7  distinctions can be brought out on cross-examination.  And I

8  think probably that's the way this needs to be handled.  As well

9  as the fact that we're talking different timeframes, we're

10  talking changes.

11    But the argument here for, as I understand it, for a

12  reasonable accommodation, is the question of whether it would be

13  an undue hardship to provide that accommodation.  And I think

14  that it's arguable that these other employees were provided that

15  accommodation.

16    Obviously there are distinctions in the jobs they

17  held.  That can be brought out.  There's a difference in time.

18  That can be brought out.  But it does seem to me that that's the

19  argument that the plaintiff is entitled to make here, and I

20  think that'll go to the jury.

21    MS. VANCE:  Thank you, Your Honor.

22    THE COURT:  Yeah.  Okay.  So then next comes:

23    **"Bar all testimony, evidence and/or argument relating**

24  **to, concerning or referencing certain statements of**

25  **non-decisionmaker Karen Becker and Walmart not contacting Marlo**

1  **Spaeth's mother or sister to discuss any scheduling change."**

2        Here again this goes to the interactive process, that

3  full question of how you -- how an employer is required to

4  address and accommodate an employee with a disability.  And I

5  think you're going to have to -- that I'm going to deny.

6        Ms. Becker's testimony, that was her job really, to --

7  as I understand it, to work out those kind of accommodations.

8  And she was kind of left out of this process.

9        So my understanding is that, again, would be

10  admissible.  And any -- any effects of it would be -- you know,

11  the fact that she couldn't guarantee that talking would have

12  made a difference, that's all argument, it seems to me, and so

13  that evidence would be admissible.

14        **"Evidence relating to availability forms for Marlo**

15  **Spaeth and testimony or evidence relating to a misstatement in a**

16  **position statement relating to those availability forms should**

17  **be excluded."**

18        Here again, that seems to bear on the manner in which

19  the company dealt with Ms. Spaeth.  I think it's admissible.  I

20  don't see unfair prejudice here.  I think there's argument, but

21  there's explanations both ways.  I think there's a realistic

22  argument that Walmart can make that those who had her sign

23  weren't aware of or weren't sufficiently aware of her

24  disability.  But I think that's admissible.

25        **"7.  The Court should limit the testimony of**

1    **plaintiff's expert, Dr. Smith."**

2            I agree Dr. Smith can't say that in his opinion

3    Walmart violated the ADA.  Walmart -- EEOC I think concedes that

4    much.

5            But I think the other things he's testified to are

6    things I've already covered in the motion, the *Daubert* motion,

7    and I intend to deny it and he can testify to that.

8            MR. HARLAN:  Briefly, Judge, can I just be heard on

9    that issue?

10           THE COURT:  Yes.

11           MR. HARLAN:  So with respect to the earlier motion

12   that we brought, the Court really didn't address the relevance

13   issue.  And we've kind of fine-tuned it in light of, you know,

14   what is clear Seventh Circuit precedent if you look at the

15   *Ekstrand* case which is really right on point here.

16           We're talking about an individual who was clearly

17   disabled.  But what is not clear is whether there is a

18   connection between some limitation associated with her

19   disability and the supposed needs that were expressed to

20   Walmart.

21           And so that *Ekstrand* case is really important because

22   it says that the duty to provide a reasonable accommodation

23   isn't even triggered until there is some showing that the

24   employer knew that what the employee was complaining about was

25   really -- or asking about or asking for an accommodation for, is

1    connected to a limitation related to a disability.

2           So when Dr. Smith, after the fact -- so Dr. Smith is

3    nowhere in the equation while Ms. Spaeth is employed at

4    Walmart -- after the fact, is offering an opinion about this

5    habit or groove that Ms. Spaeth was in.  That's not anything

6    Walmart could possibly be charged with understanding.

7           It's nothing that was even, you know, looking at the

8    testimony in the light most favorable to the EEOC, nobody is

9    saying that they presented any kind of medical information to

10   Walmart to put them on notice that there was some connection

11   between the behaviors that Ms. Spaeth was displaying and the

12   limitations related to her Down syndrome.

13          And so Dr. Smith, now coming in 2021, talking about

14   that issue, doesn't go to the central issue about reasonable

15   accommodation because it's not anything Walmart could have

16   possibly have known.

17          THE COURT:  Ms. Vance, do you want to respond to that?

18          MS. VANCE:  I'll defer to Attorney Mulaire.

19          MR. MULAIRE:  I think I have this one.

20          Your Honor, I guess we respectfully disagree that the

21   law is that demanding for an employee who needs an accommodation

22   of a disability.  I mean, the other cases are clear that there

23   are no magic words for requesting an accommodation.  And it's

24   during the interactive process that an employer would be free

25   to, you know, seek more information about whether or not there

1    genuinely is a connection between the disability and the

2    requested accommodation or the need for an accommodation,

3    whether some other accommodation might be appropriate.

4         So attempting to put the cart before the horse and

5    insist that the employee sort of provide -- especially an

6    employee with an intellectual disability -- provide this sort of

7    detailed medical information, sort of drawing that sort of link

8    is not what the law requires.

9         THE COURT:  I think that's an argument I expect you to

10   make to the jury, Mr. Harlan.  And I -- I think that you have

11   some -- you know, there's merit to it, but I don't think it is

12   so clear that I can exclude this testimony.

13        I think part of this might have come out in the

14   interactive process.  I think it's arguable that it was

15   immediately apparent that the change of schedule upset a routine

16   that she had had for 16 years and that the simple accommodation

17   required would have been to just keep her at the schedule.

18        Now, this -- I mean, does Walmart not have the ability

19   to schedule workers at set times when -- I mean, I think this

20   case is, in many ways, very interesting and very consequential.

21        Walmart, like many employers who hire Down syndrome

22   children, are viewed by many of us, many people, as really doing

23   a gift, providing a gift, almost charity.  Because Down syndrome

24   kids -- I'm the father of a Down syndrome child, I know what

25   this is like.  And you appreciate the fact that they have a job

1  and the structure.  And I don't know if that many employers gets

2  all the work that they would out of someone without that kind of

3  a disability.

4         You know, I think that the difficultly with this case

5  is, you know, EEOC may win the battle and the effect for Down

6  syndrome children may be very bad if employers say we're not

7  going to do this anymore, we're not going to take this risk.

8         Now, on the other hand, you have the sheltered

9  workshops that are providing structure for Down syndrome people,

10  but the Department of Labor is insisting that they be paid

11  minimum wage for those jobs and they can't afford to pay minimum

12  wage in those jobs.

13         So anyone that looks at this, and has thought of it,

14  is wondering, really, is this really benefiting Down syndrome

15  children.

16         Now, those are policy issues that I recognize I don't

17  have -- I mean, I'm to follow the law and I'm doing my best to

18  follow the law.  And I think those are important policy

19  questions for people in a higher pay grade or a different pay

20  grade perhaps than I.

21         Although I recognize that ultimately one of the

22  questions in this case is whether or not Ms. Spaeth was a

23  qualified person with a disability.  I've concluded that's up to

24  the jury, but we'll see what the evidence shows and consider all

25  those things.

1    But I think at this point I think the evidence is such

2    that this goes to the jury.  And Dr. Smith's testimony that this

3    is the kind of an accommodation that would have worked for this

4    disability is something the jury will consider.  And they'll

5    also consider whether Walmart had any reason to suspect that

6    that was the only accommodation required and whether or not it

7    would have been an unreasonable hardship on Walmart, which is

8    difficult to explain given the size of Walmart or everything

9    else.

10    But, on the other hand, you know, like I said, Walmart

11    and those companies that hire Down syndrome children often is,

12    you know, I think a showing of goodwill and effort to build

13    goodwill with communities.  I think that's an important service.

14    Now, whether or not this type of a case would act as a

15    disincentive for that, I think that's a different question

16    entirely.  But I'm satisfied that at this stage this testimony

17    is admissible.

18    MR. HARLAN:  Just one further point, Your Honor, and I

19    understand your ruling.

20    THE COURT:  Uh-huh

21    MR. HARLAN:  But it is important to look at that

22    *Ekstrand* case because it does -- it's going to play itself out

23    with respect to the jury instructions and the jury verdict form.

24    THE COURT:  Yeah, I've looked at it.

25    MR. HARLAN:  Okay.

1        THE COURT:  And I understand what you're saying.

2   Yeah.

3        MR. HARLAN:  I mean, I think the Seventh Circuit law

4   is clear that the focus has to be on what the employer

5   reasonably understood and knew at the time.

6        THE COURT:  And I think that jury instructions is a

7   good place to put that.

8        MR. HARLAN:  Okay.

9        THE COURT:  Because I'm saying that -- my ruling isn't

10  that your argument is unreasonable.

11        MR. HARLAN:  Okay.

12        THE COURT:  It's just that it goes to that -- the jury

13  is going to have to assess that aspect.  And I will properly

14  instruct them on the basis of the caselaw here.

15        MR. HARLAN:  Thank you, sir.

16        THE COURT:  Okay.  We'll have a jury instruction

17  conference once this trial gets underway.  But I hope that you

18  would give me -- especially instructions of this type that are

19  focused on a specific issue and based on a Seventh Circuit

20  precedent -- get me that and the citation and share those jury

21  instructions back and forth and we'll be in a better position to

22  address those when it comes time to finalize those.

23        I don't really get into the instructions until we're

24  closer to the trial, to tell you the truth.

25        MR. HARLAN:  Okay.

1    THE COURT:  Too many cases go away.  If I spent all my

2  time preparing jury instructions of trials that settle I

3  wouldn't have time to get done the other cases I have to do.

4    But I am aware of the importance of instructions in a

5  case like this with significant caselaw.  So please feel free to

6  present those and give them to me before -- at least the week

7  before.  And both sides should.  You know, and the authority

8  you're relying on cited in the instructions is very helpful as

9  well.

10    Ms. Vance?

11    MS. VANCE:  Yes, Your Honor.  In both pretrial reports

12  submitted by both parties there are proposed jury instructions.

13  Are you speaking now to a format different beyond the proposed

14  jury instructions that were filed with pretrial reports that

15  kind of have footnotes --

16    THE COURT:  No.

17    MS. VANCE:  -- with authority?

18    THE COURT:  Those are good.  Those are good.

19    MS. VANCE:  Is that what you're looking for?

20    THE COURT:  Yeah.  Normally I'm seeing pattern

21  instructions.  These are additional instructions.  And if you've

22  already submitted those in the form of your proposed

23  instructions, that's wonderful, that's exactly -- but I haven't

24  gone over those in the kind of detail that I will as we get

25  closer to trial.

1            MS. VANCE:  Yes, Your Honor.

2            THE COURT:  Okay.

3            So, that's Mr. Smith's opinions.  Those are going to

4    be admissible then.

5            "Bar testimony, evidence" --

6            MR. HARLAN:  Your Honor, can I just ask you one other

7    question about that motion?

8            THE COURT:  Yes.  Uh-huh.

9            MR. HARLAN:  We also were asking about whether he

10   ought to be able to give an opinion about testing.  Because

11   there's nothing in his CV that would suggest that he is a expert

12   in the area of psychological tests or test administration.  You

13   know, he's basically a general practitioner, a medical doctor.

14           THE COURT:  Uh-huh.  And I think his -- my inclination

15   is yes, but I'll look more closely at that.  And the reason I'm

16   thinking is that he has a good awareness, vast experience with

17   Down syndrome people, people with Down syndrome.  And so he's

18   going to -- I think his testimony, as I understand it, is that

19   the typical test for intellectual functioning requires -- it's

20   not effective in measuring cognitive ability of people that have

21   that type of disability.

22           And I think that that's probably something that even a

23   layperson, but I think somebody especially with the experience

24   of Dr. Smith with people with Down syndrome, is probably going

25   to be in a -- has the kind of expertise, I would think, that

1    would allow him to give some opinion on that.

2              MR. HARLAN:  Okay.

3              THE COURT:  And I know there's another opinion --

4    there's -- I know the EEOC is challenging Dr. Thompson's

5    opinion.  And I'm going to let both in, just so -- I mean, we're

6    going to let the jury look at these and consider these opinions.

7              I'm not going to give a full decision on it today.

8    And I'm still reading Dr. Thompson's opinion in the briefs.  But

9    my inclination is those are both going in, and I'll give you

10   something in writing on Thompson's opinion before then.  It

11   seems to me he's measuring -- he's testifying as to cognitive

12   ability or cognitive levels.  And even though he doesn't have

13   the kind of specialization in Down syndrome, we're talking about

14   human beings, human beings -- intellectual capacity of human

15   beings.

16             And, yes, Down syndrome is a disability that limits

17   cognitive ability.  And I think his ability to measure those

18   things in people is relevant to this case, and I think it goes

19   to a number of issues, so my inclination is that's going in as

20   well.  But we'll make a record on that at some later point.

21   Okay.

22             **"Bar testimony, evidence or argument relating to or**

23   **concerning referencing alleged retaliation."**

24             That's number 8.  And my understanding is the EEOC

25   does not oppose that.  There's evidence that bears on the rehire

35

1  and that whole question.  But you're not -- there's no claim for

2  retaliation here and so there's not going to be argument or a

3  claim for retaliation.

4          MS. VANCE:  Yes, Your Honor, just to clarify.

5          The evidence overlaps.

6          THE COURT:  Right.

7          MS. VANCE:  But we're not going to present it as

8  evidence of retaliation.  It would be for the rehire and the

9  termination.

10          THE COURT:  Right.  And I think it goes to intent or

11  state of mind with respect to somebody who has this disability,

12  is the argument.

13          MS. VANCE:  Yes, Your Honor.

14          THE COURT:  And I recognize that there's both sides of

15  that.

16          **"9.  All testimony, evidence or argument relating to**

17  **associates other than Ms. Spaeth should be barred."**

18          This has to do with the -- is this the performance

19  evaluations?

20          MS. VANCE:  Yes, Your Honor.

21          THE COURT:  I think I need to see those performance

22  evaluations before I rule one way or the other on that.

23          MS. VANCE:  And would you like to do that now,

24  Your Honor?

25          THE COURT:  Do you have them?

 1          MS. VANCE:  I have not the most legible copies once

 2    they're printed.

 3          THE COURT:  What specifically do you --

 4          I mean, Mr. Harlan, was this directed at internal

 5    evaluations by Walmart as to how this incident was handled?  Or

 6    Mr. Buliox, whoever has got this?

 7          MR. HARLAN:  Please give me one second, Your Honor.

 8    Let me just get to that.

 9          THE COURT:  Yeah.

10          MR. HARLAN:  Yes.  I think this was directed at

11    certain performance evaluations of other individuals in terms of

12    whether they got the constructive feedback on cooperation or

13    other things that we believe that the EEOC will somehow try to

14    offer in evidence in this case.

15          And I can't imagine how Walmart's evaluation of other

16    employees on issues not having to do with EEO issues or

17    diversity, I don't understand how that bears on the question of

18    whether we discriminated against Ms. Spaeth.

19          THE COURT:  I think I'm going to have to see the

20    evidence before I know.  And I assume -- you know, you

21    understand you can't show a document to the jury without -- or

22    even a witness without sharing it to the other side.  And I

23    think maybe the best way to handle this one is to talk to each

24    other, bring this to my attention the morning of trial or some

25    point and we'll look at that at that point.

1          MS. VANCE:  All right.  It is Plaintiff's Exhibit 42.

2          THE COURT:  Okay.

3          MS. VANCE:  And then, Your Honor, we would reserve the

4   right in our equitable relief arguments following jury trial

5   to --

6          THE COURT:  Sure.  Again, this is -- these rulings are

7   only for the trial in front of the jury.  And then:

8          **"Finally, the evidence and testimony relating to Marlo**

9   **Spaeth's remote in time attendance infractions and the practice**

10  **of non-decisionmakers ignoring Marlo Spaeth's attendance**

11  **violations should be excluded from trial."**

12         And I'm going to deny that one.  I think that goes to

13  again the question of whether this was -- this would have been a

14  reasonable accommodation, whether or not it would have been a

15  hardship, that sort of thing.  I think it goes to the jury and

16  the jury has to assess those things.  And they're entitled --

17  the EEOC or plaintiff is entitled to present that evidence and

18  have the jury assess it.

19         So those are my rulings, as I said, the preliminary --

20  or the motions in limine rulings and hopefully that will give

21  you some guidance and we can go from there.

22         I am not going to bifurcate the trial, damages from

23  liability.  I recognize the argument that the concern that the

24  jury would be -- could be prejudiced and award -- that's always

25  a possibility.  It's the same jury that's going to decide it

1    anyhow.  And it seems to me the evidence is going to be

2    intertwined.

3              I understood the practice in the Western District, I

4    guess before Judge Peterson, was that they often bifurcated

5    cases.  But that's not been my practice.  And I find it much

6    easier to do it -- and especially when I see the way the damage

7    statute here works where back pay is treated as an equitable

8    question.  And then the other is --

9              And I think in terms of the fear of prejudice, I think

10   that again is something jury instructions need to handle.  The

11   jury needs to be instructed that they're to decide this case on

12   evidence and law, not on emotion or sympathy or prejudice.

13             And those are the types of things that I think you

14   always worry about in a trial.  But I think that jurors are

15   typically aware of that and they're reminded of that.  And I

16   think that's -- there's no way to avoid it since you have the

17   same jury that's going to decide liability decide damages.  I

18   think it just would prolong the trial or has the danger of

19   prolonging it.

20             MS. VANCE:  Thank you, Your Honor.

21             THE COURT:  Uh-huh.  So, and then, as I've indicated,

22   I am going to deny the motion to exclude Dr. Thompson's

23   testimony, but I want to issue a decision on that in a little

24   more detail.

25             So.  Oh, there's a motion to quash the subpoena that

1　just came in today.  And I don't have a response to it and I'm

2　not sure.  Is Ms. Spaeth receiving Social Security disability?

3　　　　　　　MS. VANCE:  Yes, Your Honor, she has her entire life.

4　　　　　　　THE COURT:  Okay.  Oh, so she's never made more than

5　necessary to qualify for Social Security disability.

6　　　　　　　MS. VANCE:  Exactly, Your Honor.

7　　　　　　　THE COURT:  And as I understand the law in this area,

8　that doesn't preclude a claim for ADA because of the additional

9　requirement of providing a reasonable accommodation.  And so

10　that doesn't preclude it, this claim here.  I don't know --

11　　　　　　　MR. HARLAN:  No.  I mean, we -- Your Honor, I'm sorry

12　to interrupt.

13　　　　　　　THE COURT:  Go ahead, Mr. Harlan.

14　　　　　　　MR. HARLAN:  So just -- and I understand you haven't

15　reviewed the EEOC's motion, and I think we can give you our

16　response to it now and save everybody some time.

17　　　　　　　THE COURT:  Sure.

18　　　　　　　MR. HARLAN:  They have moved to quash our subpoenas

19　for Social Security records, the hospital records, and the

20　EEOC's file relative to the retaliation claim.  I think the

21　first argument is discovery is closed, we're not entitled to it

22　because we didn't ask for it in discovery.

23　　　　　　　Well, we did ask for records in discovery relative to

24　the hospital records and the Social Security records.  There was

25　resistance I think to the medical records, and I think you had

1  to intervene and direct that they would sign an authorization so

2  that we could get the records.

3         So we did diligently pursue both the Social Security

4  records and the medical records during discovery.  We received

5  documents I think through 2018.  And all we simply have asked is

6  that both the Social Security Administration and the hospital

7  produce updated records.  Discovery in this case closed in 2019.

8         THE COURT:  Yeah.

9         MR. HARLAN:  It's 2021.

10        THE COURT:  Right.

11        MR. HARLAN:  So even if we had exercised the utmost

12 diligence, we couldn't have gotten up-to-date records before the

13 close of discovery.

14        Moreover, completely lacking in EEOC's response is any

15 indication of prejudice.  They have not indicated how these

16 records are prejudicial, how they won't have sufficient time to

17 look at them and see if, you know, there's anything there that

18 they need to prepare for.

19        With respect to the hospital records, we actually have

20 the records.  In response to the subpoena they produced the

21 records and we've already given those records to the EEOC.

22        With respect to the EEOC file, that's a little bit of

23 a nuanced law review type of argument.  But the bottom line is

24 that we're the same parties to the charge; right?  So there was

25 a retaliation charge filed against Walmart during the course of

1 this case, and we're simply asking for the records to see if

2 there are any admissions in there that might be helpful to our

3 case.

4          The EEOC is citing some statute and rules in their

5 internal guidance that indicates that general members of the

6 public can't get those files.  Well, we're not a general member

7 of the public, we're a party to the charge that was filed.

8 Where the respondent Ms. Spaeth, I think through her sister, was

9 a charging party.  And this went on for a couple of years until

10 there was a decision made that they were not going to amend

11 their complaint and bring a retaliation claim.

12          Again, you know, the EEOC -- you know, this is not

13 like some third party.  They have the records and there is no

14 good reason why they can't disclose the records.  They've had

15 them for the entirety of the time that the charge has been

16 pending.

17          THE COURT:  Mr. Mulaire?

18          MR. MULAIRE:  We can't disclose the records because

19 it's against the law.  So that would be the reason.  But the

20 citations are provided in our motion.

21          But with respect to the charging party or a respondent

22 under the regulations promulgated by the Commission -- which the

23 Supreme Court, we provided the authority in the motion, has

24 recognized the law that governs these sorts of disclosures --

25 even the parties to the charge are the public except under

1    certain circumstances where there either is litigation arising

2    out of the charge or, in a narrow exception, when the charging

3    party is during the window where they can consider litigating

4    the charge.  Outside of those time periods there are

5    confidentiality interests that the regulations serve --

6    regulation is designed -- there's sort of a reliance interest.

7    People submit things to the EEOC knowing that there's this

8    statutory scheme in place and a regulatory scheme such that

9    these things won't all simply be released at the end of the

10   investigation unless they're needed for litigation that arises

11   out of the charge.

12            So the citations are in the brief.  But the rules are

13   clear, this is then the agency's rules which we are obliged to

14   follow.  And they've been the rules for a long time.  When we

15   have to litigate it we do.

16            I can't say, you know, the agency has never lost it in

17   court, but, I mean, in my experience when we've had to litigate

18   it our view is typically sustained.

19            So it's contrary to the regulations which govern here.

20   The EEOC has the statutory authority under Title VII to set

21   procedural rules about disclosures, and these are the rules that

22   apply to everybody and have for a very long time.

23            Oh, and that's with respect to the retaliation

24   investigation file.  With respect to, you know, the other things

25   that they're seeking through trial subpoenas, you know, if they

1    wanted materials after 2018, a lot of time has passed since 2018

2    and so whatever force the argument has that, you know, they have

3    a need for updated records, they could have sought those

4    sometime more than two or three weeks before trial.

5           The prejudice is that we have a little bit of work to

6    do.  We have a trial coming up in a couple of weeks.  And the

7    prospect of hundreds of pages of new records now showing up for

8    us to sort of synthesize and anticipate -- not just what do we

9    think their significance is, but what, you know, ideas might

10   these inspire in our opposing counsel -- that is prejudice

11   because we at this point should be focusing on the evidence that

12   was properly disclosed during discovery, not reams of new

13   evidence.

14          THE COURT:  Well, you have an obligation, every party

15   has, to supplement discovery requests.  And is this more than a

16   supplementation of previously made discovery requests?

17   Especially, Mr. Harlan says they already have the hospital

18   records.  And I don't know if there's anything that's of use to

19   him there, but that's what he's looking for for Social Security

20   too, if there's any update.  And I assume there's not much.

21          But it doesn't sound to me like that's an unusual

22   request given the amount of time that has passed as a result of

23   the delays of the trial.  Because, I mean, we've been -- I think

24   our trial was originally scheduled for last March and, you know,

25   we had a year delay here.  So I would think you should

1    supplement any -- or they should have a right to supplementation

2    of records.

3            MR. MULAIRE:  I mean, typically the supplementation

4    applies to the parties.  I mean, these are records from third

5    parties.  So I guess I would just reiterate that if they wanted

6    additional records from third parties, they should have done

7    that more than, you know, a couple of weeks before trial.  I

8    mean --

9            THE COURT:  And then supplement again in case there's

10   more that happened in the -- just before trial?  I mean, there's

11   an ongoing responsibility.  I expect if there's anything in

12   those records your client let's you know if she returned to the

13   doctor, has some changes in her condition, that should be passed

14   on.  That's part of -- isn't that part of the process?

15           MR. MULAIRE:  Yes.  I mean, with any trial there's

16   always going to be, you know, some point in time between when

17   discovery stops and trial.  So, I mean, I'm not -- I'm trying to

18   advocate the view that, no, no matter how long a period of time

19   no one's entitled to know what goes on in-between.

20           But, you know, discovery ended in 2019, they're saying

21   some of the records they have trailed off in 2018.  There was a

22   lot of time before now to seek supplementation.  If it were the

23   case that, you know, well, they're missing the last six weeks of

24   records, that would be a very different story.

25           Here, I mean, apparently there's already 341 pages

1    that we've gotten.  I don't know how much more is on the way.

2    If they wanted to get several years' worth of materials, it

3    should have happened before now.  It's prejudicial to have to

4    digest all of that during the remaining two or three weeks

5    before trial when --

6              THE COURT:  Well, in terms of Social Security, has

7    there been any change other than just she's receiving payments?

8    I mean, has there been any case, any activity, any hearing, any

9    change in her condition?

10             MS. VANCE:  Not that we know of, Your Honor.  The

11   first time we knew there were Social Security Administration

12   documents in this case at all was Tuesday.

13             THE COURT:  Didn't you know she was receiving Social

14   Security?  So there had to have been an adjudication or --

15             MS. VANCE:  Yes.

16             THE COURT:  Yeah.

17             MS. VANCE:  But there have been no documents in this

18   case until 48 hours ago --

19             THE COURT:  Yeah.

20             MS. VANCE:  -- from the Social Security

21   Administration.

22             THE COURT:  And what are those documents, just payment

23   records or --

24             MS. VANCE:  They're the payment records.

25             THE COURT:  Yeah.  Are the payment records relevant

1    here?

2              MS. VANCE:  I'm not offering them, Your Honor.

3              THE COURT:  Yeah.  Mr. Harlan, what are those --

4              MR. HARLAN:  Yeah, so, Your Honor, we haven't made a

5    final decision in terms of whether the payment records that are

6    part of the Social Security documents are, you know, available

7    for an offset.  We are looking at that issue.

8              But more important are I think filings from

9    Ms. Stevenson that are contained in the records about

10   Ms. Spaeth's condition.  And so I think that is really the great

11   utility of the records for our purposes.

12             So that's why we asked for the records, we received

13   them, we've turned them over to EEOC, I think they have them.

14   And, you know, we're just simply asking for some additional

15   records since the last time we received the production.

16             THE COURT:  You've gotten the hospital records; is

17   that right?

18             MR. HARLAN:  We have the hospital records.  The

19   EEOC --

20             THE COURT:  So the motion to quash is too late, you

21   already have that.

22             MR. HARLAN:  Yes.

23             THE COURT:  And the Social Security -- I assume

24   whatever the hospital would say is what they would -- or

25   Ms. Stevenson would send to Social Security if it's at all

1    relevant.  I mean, what would Social Security have that might

2    bear on this at this point?

3         MR. HARLAN:  Well, what we saw in the original set of

4    documents we received -- and there are not a lot.  They're

5    pretty minimal.  I think as a condition of getting those

6    payments the guardian has to provide certain reports about the

7    condition of Ms. Spaeth and certain activities that she's

8    engaged in during a particular period of time.  And so that

9    might be useful to us, for instance, on the issue of damages.

10        To the extent the testimony is that Ms. Spaeth is

11   completely incapacitated, the termination has caused her not to

12   have any kind of social activity, et cetera, et cetera,

13   et cetera, filings by Ms. Stevenson that contradict that I would

14   think would be extraordinarily relevant and appropriate for the

15   jury to hear.

16        MR. MULAIRE:  So, Your Honor, it sounds like these may

17   be records from prior to the end of discovery -- or prior to

18   discovery ending.  These aren't, you know, supplemental things.

19   I mean, they've come in very recently.  I myself haven't had a

20   chance to see them.  But, I mean, these sound like things that

21   are not just from within the last year or so.

22        So, I mean, to the extent the justification for

23   seeking some of this stuff was how it's supplementing to get

24   more recent documents.  It sounds like they go back further in

25   time than that.  This is something that the defendant could have

1    gotten and explored during discovery but instead we're getting

2    it now.

3              THE COURT:  Mr. Harlan?

4              MR. HARLAN:  You know what, Your Honor, I tell you

5    what, we don't want to waste your time on this.  We can't even

6    get the Social Security records anyway.  So, in fact, we were

7    anticipating that the U.S. Attorney's Office might be here

8    objecting.  They have basically indicated in response to our

9    subpoena that unless you order them to turn over the records,

10   they're not giving us anything beyond what we have already.

11             So I think we'll withdraw the subpoena for the Social

12   Security records.  I think you are inclined to let us continue

13   to have the hospital records that we received and turned over to

14   the EEOC, as long as we can use those we are satisfied.

15             THE COURT:  Yeah.  If there's a complaint of prejudice

16   because records come in, but it seems to me that these are

17   hospital records relating to her condition, that would seem to

18   be admissible.

19             And, you know, if there's something extraordinary

20   different and EEOC feels they need more time, the last thing I

21   want to do is adjourn this case.  I don't think you want me to

22   either.  So I don't see that happening.  But, in any event,

23   we'll just leave that where it lies.

24             MR. HARLAN:  Thank you.

25             THE COURT:  In terms of the retaliation file, I'll

49

1    take a look at these citations.  If you want to send anything,

2    Mr. Harlan, for me to look at in response to this motion, I'll

3    look at that too and we'll issue a decision on that.

4           You know, I wonder, I mean, is there anything there?

5    Are we -- I hate to go through all this if there's nothing there

6    anyhow.  Is there anything that you feel you're withholding or

7    that Mr. Harlan might want, or is that too dangerous a question

8    to answer on the record?  We have all these rights and it turns

9    out there's never anything there.

10          MR. MULAIRE:  Yeah.  I mean, you know, we're somewhat

11   constrained.  This isn't just the trial team deciding we don't

12   want to disclose this, this is the Commission's rules which

13   we're obliged to uphold.

14          THE COURT:  Yeah.

15          MR. MULAIRE:  So I feel a little constrained as to how

16   much I can say.  But, no, I don't think our opposing counsel

17   would be super excited if they got this.

18          THE COURT:  Okay.

19          MR. MULAIRE:  But, you know, I can't --

20          THE COURT:  Well, I will look at your motion and then

21   I'll look at anything Mr. Harlan gives me and we'll give you a

22   decision on that as well.

23          Okay.  So, we're set for trial then on July 12th.  And

24   you anticipate we'll get through this in a week?

25          MS. VANCE:  Four days, Your Honor.

1          THE COURT:  Good.  Things go quickly in this court.

2     We pick a jury pretty fast.  I do the voir dire.  And then once

3     I ask questions I usually have counsel approach and we'll --

4     before I release anyone for cause or anything I get your input.

5     If there's anybody I haven't excused that you think should be

6     excused for cause, you can tell me at that point.

7          Any follow-up questions that you want me to ask you

8     can ask then at the side bar.  We'll put all that on the record

9     later as soon as the jury is picked.

10          But my practice, especially in civil cases, is we're

11     usually doing opening statements and even a witness in the

12     morning yet.  So it goes quick.  You'll get my full attention.

13     I get rid of other -- we don't interrupt with a sentencing here

14     or things like that.  So we'll push things off that we can push

15     off.  Whatever we can't push off like initial appearances in

16     criminal cases, things like that, we'll do those over the noon

17     hour.  Or these days we're doing them by Zoom and the magistrate

18     judge that handles this court will do it on the office computer

19     probably.

20          So I think you're going to get our full attention.

21     We'll give you full days.  We'll take our normal recesses,

22     midmorning, midafternoon.  We'll end at about 5:00.  If you have

23     a witness or if we get behind we might have to go later.  If you

24     have a witness you need to finish we could go later.  But

25     typically I'm not -- you know, I don't keep people here after

1    5:00 during trials.  And we start at 8:30 or 9:00, depending on

2    where the jury's coming from.

3            Let's see.  What else?

4            MR. HARLAN:  One issue -- and this is really directed

5    to the EEOC.  We notice in some of the recent filings that there

6    is nothing about the terms and conditions claim, so I'm assuming

7    the EEOC is withdrawing that claim?  It wasn't in the jury

8    instructions, it wasn't on the verdict form.  Because I thought

9    there was a claim about unfair discipline, that that was an

10   independent claim that they were making.

11           MR. MULAIRE:  Yeah, there was some reference to terms

12   and conditions in I think the opening paragraph of our

13   complaint.  But the enumerated claims there and, in any event,

14   the ones that we propose to submit to the jury, are the ones in

15   our proposed verdict form.

16           MR. HARLAN:  Okay.

17           MR. MULAIRE:  Discipline really leads up to the

18   termination so the question really is the termination.  We're

19   not going to try to present a claim about the write-up on

20   December whatever 2014.

21           MR. HARLAN:  So that was expressly in the lawsuit that

22   was filed.

23           THE COURT:  Uh-huh, sure.

24           MR. HARLAN:  And it was in a charge.  And so I don't

25   know if on the record they are withdrawing that specific claim,

1    but I think it would probably be good to have some clarity about

2    it.

3                MR. MULAIRE:  The only three claims that we are

4    pursuing are:  the failure to accommodate, the discharge, and

5    the failure to rehire.

6                MR. HARLAN:  Okay.  And so that other claim is

7    dismissed.

8                THE COURT:  Okay.

9                MR. HARLAN:  Thank you.

10               THE COURT:  Okay.  Anything else that we need to

11   address today?

12               MS. VANCE:  Yes, Your Honor.  We did have a few

13   questions to help us as we prepare, questions of clarification.

14               For opening statements, does this court set any kind

15   of deadlines for the parties to exchange or disclose evidence or

16   demonstrative aids to be used during opening?

17               THE COURT:  Well, you can use demonstrative aids, but

18   show it to the other side first and if there's an objection I

19   need to rule on it.  But I haven't -- I mean, if there's

20   something that you think might be controversial, let them know

21   right away and then send me whatever you have that is in

22   dispute.

23               MS. VANCE:  Yes, Your Honor.

24               THE COURT:  Nothing obviously can be shown to the jury

25   unless it's by agreement of the parties or received into

1    evidence.  Okay?

2            MS. VANCE:  And specifically with respect to showing

3    any deposition excerpts or deposition videos, then that would be

4    precluded at opening; correct?

5            THE COURT:  At opening?  Unless everyone's confident

6    this is going into evidence and -- you know, yeah, I wouldn't go

7    with that sort of thing.  Obviously you can say you'll hear this

8    evidence and see this evidence or whatever, however you do it,

9    and then --

10           MS. VANCE:  Then, Your Honor, for closing statements

11   is plaintiff allowed rebuttal closing?

12           THE COURT:  Plaintiff is granted rebuttal.

13           MS. VANCE:  Thank you.  Then we would ask, can we be

14   permitted to have one attorney do closing but another attorney

15   do the rebuttal closing?

16           THE COURT:  Yes.

17           MS. VANCE:  And during closing may we refer to jury

18   instructions and the verdict sheet?

19           THE COURT:  Yes.  In fact, I often hand out a copy of

20   the verdict to the jurors so they can follow along with your

21   argument.

22           MS. CARTER:  Then for examination of witnesses,

23   Your Honor, we do intend to call some witnesses adversely during

24   our case in chief.  So then how will those examinations proceed?

25   Once they go to cross, are we objecting beyond the scope of

1   direct if the cross-examination of the really Walmart witness,

2   defense witness is --

3           THE COURT:  I typically like to get the witness on and

4   then off and done.  So I would prefer -- unless Walmart wants to

5   separate the cases and present that testimony separately, I

6   would prefer that they go through whatever questions they have

7   of that witness.  So we would not limit the cross to the same

8   topics.  It would be if there's other topics they would go forth

9   and call that witness or examine that witness in whatever way

10  they wish to.  But if they choose to put it on later, they can

11  do that.

12          MR. MULAIRE:  I think the EEOC would also -- our

13  concern is that one or two of the adverse witnesses may really

14  have quite a large role in the defense's case-in-chief, and we

15  would prefer that half their case-in-chief not happen in the

16  middle of our case-in-chief.

17          And so, this isn't going to be a lot of people,

18  there's two -- two in terms of the live witnesses.  So, I mean,

19  I guess --

20          THE COURT:  And you have very brief parts to get in;

21  is that what you're saying?  Or --

22          MR. MULAIRE:  I think compared to what we would

23  anticipate the defendant would do, I think ours is probably

24  shorter.

25          THE COURT:  Are these all local people?

1          MS. CARTER:  Manitowoc local, Your Honor.

2          THE COURT:  Yeah.  Mr. Harlan, what's your view?

3    Mr. Buliox?

4          MR. BURNETT:  This is Mr. Burnett.  I tend to agree

5    with the Court that we put on witnesses once and only once.  And

6    if the opposing party thinks we're beyond where we ought to be,

7    that's an appropriate time for an objection.  But to try to

8    prescript a trial is an impossible job I think.

9          THE COURT:  Yeah.  I think -- let's see where it goes.

10   I mean, if the -- if Walmart begins to take all of your time and

11   shift the focus, we can revisit.  But if -- I don't want to

12   bring a witness back, even if it's only from Manitowoc, if we

13   don't have to.  I think it's a more efficient use of our time to

14   get that witness done and be done with it.  Now, there are

15   exceptions and certainly we can revisit that if it looks like

16   this is interfering in your ability to present your case in any

17   kind of rational and reasonable manner.

18         MS. CARTER:  And just to clarify, Your Honor, if we

19   call a Walmart witness adversely and then Walmart does proceed

20   with their full basically direct examination of that witness, we

21   would then have the opportunity to cross that witness.

22         THE COURT:  You bet.  You bet.  You can cross that

23   witness then too, sure.  I would hope we could finish with that

24   witness completely.

25         MS. CARTER:  Thank you, Your Honor.

1          THE COURT:  Uh-huh.

2          MR. MULAIRE:  I'm sorry, just one other question.  On

3    adverse witnesses different judges prefer different levels of

4    formality and detail in terms of setting up that the person is

5    an adverse witness.  I mean, these are individuals who were in

6    managerial roles at Walmart.  So I think we also wanted to know

7    is that enough, or do we need to have sort of a preliminary

8    examination to establish --

9          THE COURT:  No.  If they're a Walmart employee,

10   unless -- you know, I assume Walmart's not challenging your

11   claim that they're adverse.  If there's a dispute there let me

12   know.  But I can't imagine a -- well, I can imagine actually

13   there's some disgruntled employees, I imagine Walmart has some,

14   but if that's the case let me know.

15         MR. MULAIRE:  Thank you.

16         THE COURT:  Yeah.

17         MS. VANCE:  Your Honor, I wanted to ask next about

18   sequester of witnesses.

19         THE COURT:  If you move to sequester that's automatic,

20   they're sequestered.

21         MR. HARLAN:  Your Honor, can I speak to that?  The

22   only --

23         THE COURT:  Yeah.  Let me finish.  Ms. Vance, did you

24   have something more?

25         MS. VANCE:  Yes, Your Honor.  The legal guardian of

57

1    Marlo Spaeth, her sister, Amy Jo Stephenson, is with her a lot

2    and with her during any situation that would cause stress such

3    as coming to court.  And we would ask permission to stray from a

4    typical sequester to allow, if Marlo is called to testify,

5    Ms. Spaeth is called to testify, that her legal guardian be

6    allowed in the room?

7            THE COURT:  I would consider her a party.  Mr. Harlan,

8    do you oppose that?

9            MR. HARLAN:  Yeah, we wouldn't have any opposition to

10   that.

11           THE COURT:  Yeah.  And what was your question?

12           MR. HARLAN:  So this is -- I understand the Court's

13   preference on sequestering witnesses.  This is a little bit

14   different, though, but I think the record is pretty clear that

15   there's been some diminution in Ms. Spaeth's capacity.

16           And so to the extent she has -- to the extent she's

17   going to testify and is going to project herself in such a way

18   to the jury that they may think the way she appears and is able

19   to respond at trial is how she appeared when she worked for

20   Walmart, I would think it would be appropriate to have some of

21   our witnesses observe her in terms of her ability to answer

22   questions, how she is interacting with the lawyers, and then

23   when they are called be able to say, hey, I witnessed her in the

24   courtroom today and that's not how she was when she worked at

25   Walmart.

1    I think it would be unfair to us, given the facts of

2  this particular case, to have her get up on the stand and she

3  can't answer basic questions when that wasn't the way she was

4  back in 2015 when this all happened.

5    THE COURT:  Okay.  It's an interesting argument, but I

6  don't think it changes the sequestration rule.  I think they can

7  describe how she appeared when they worked with her, that's

8  fine, but I don't think we're going to have them listen to her

9  testimony.

10    And from what I can tell it doesn't sound -- I guess

11  it doesn't sound like she's suddenly going to be able to project

12  an entirely more positive -- if anything from what I've heard is

13  she's declined since she was working at Walmart.  So I don't

14  think --

15    MR. HARLAN:  That's the point, Your Honor.  So the

16  concern would be the jury is going to look at her at trial and

17  see how she appears and maybe improperly assume that that's how

18  she was at -- when she was at Walmart and, therefore, think

19  differently about what Walmart should have considered or assumed

20  about her need for an accommodation.  So that's the concern from

21  our standpoint is --

22    THE COURT:  You know, I can see how that would benefit

23  you and how it would benefit EEOC, how it would be a detriment

24  to them to look at her now.  I mean, they may look at her now

25  and conclude she's not a qualified employee with a disability,

1  because she may not be now, but the argument is she was then

2  and, in fact, she may have deteriorated from what I'm hearing.

3  Am I missing something here?  I just don't think --

4         MS. VANCE:  Yes, Your Honor, it is in dispute that

5  there's any deterioration.  The dementia diagnosis our expert

6  believes was a misdiagnosis.  His differential diagnosis was

7  pseudodementia because of depression.

8         THE COURT:  Right.  But doesn't he agree that because

9  of her depression she's declined from her level that she was at

10  the time she worked at Walmart?

11         MS. VANCE:  That is not in his opinions.

12         THE COURT:  Okay.

13         MS. VANCE:  And there's a prescription for depression.

14         THE COURT:  Okay.

15         MR. MULAIRE:  May I add, though, I mean, I would say,

16  as the Court noted a moment ago, their witnesses are free to

17  describe within the bounds of evidence what they witnessed in

18  2015 or 2014.  I think that's the right approach.

19         You know, the reasons that sequestration is normally,

20  you know, granted are precisely that witnesses don't ordinarily

21  come and then sort of comment on the testimony of other people.

22  I mean, not just with respect to credibility but in general,

23  it's the jury's job to, you know, evaluate the witnesses, not

24  other witnesses.

25         THE COURT:  And, of course, to prevent them from

1  conforming their testimony to what they hear and that sort of

2  thing.

3            MR. MULAIRE:  Of course.

4            THE COURT:  So I think the sequestration order limits

5  you to having a representative of your client and whoever you

6  designate as the representative can certainly be in court, but

7  beyond that I think we're limited.  So I will order then --

8  grant the motion to sequester witnesses.  This is Rule 615.

9            MS. VANCE:  Thank you, Your Honor.

10           THE COURT:  And it's pretty much mandatory as I read

11 it.

12           MR. BULIOX:  So, Judge, I have a few quick I guess

13 logistical questions.  One, for opening statements and closing

14 statements, do you place time limits?

15           THE COURT:  No.  Again, that's one of those things

16 that I figure the smart attorneys don't need me to limit them.

17 And I don't know your case well enough, but my experience is

18 I've never had a problem with not limiting.  I think attorneys

19 are smart enough to not waste everyone's time.

20           MR. BULIOX:  Okay.  And in terms of witness

21 examinations, are we going to set up at the podium over there?

22 Is that going to be -- or do you --

23           THE COURT:  The podium -- this is such a small

24 courtroom and if we put that podium in then we're blocking

25 jurors' views.  So you're going to have to question -- you can

1   stand at the table.  You don't have to be right down talking

2   into a microphone.  We pick things up.  I think we'll have a

3   court reporter.  We've done this -- like today we're on

4   recording.  But the reporters enjoy being here for trials

5   because they're in a better position to make sure the record is

6   clear.  But you can question from counsel table.

7              MR. BULIOX:  Thank you.

8              MS. VANCE:  Your Honor, I wanted to ask about

9   publishing exhibits to the jury and whether or not there's a

10  requirement for a sponsoring witness to lay the foundation of

11  every exhibit and in particular exhibits that would be admitted

12  under a Walmart records custodian or exhibits which the parties

13  have stipulated the authenticity of.

14             THE COURT:  Yeah.

15             MS. VANCE:  And I have some specifics.

16             THE COURT:  Well, let me just say this.

17             MS. VANCE:  Okay.

18             THE COURT:  If you stipulate, whatever you stipulate

19  to you can show to the jury.  If there's a dispute as to

20  admissibility, get me to rule on it before you show it to the

21  jury.  I would hope that anything that the only issue is

22  authenticity and you can avoid custodial testimony, I would hope

23  you'll work those things out so that we don't have people coming

24  in and saying, yes, this is an authentic record of regularly

25  kept records at Walmart or something like that.

1      MS. VANCE:  And then the logistics, Your Honor.  If I

2  have an exhibit and I don't have a witness in our witness stand

3  directing the jury's attention, you would just do that from

4  counsel table to the exhibit, to the screen, Your Honor?

5      THE COURT:  Sure.  Uh-huh.

6      MR. MULAIRE:  Could I just clarify on the exhibits, we

7  do plan to talk with opposing counsel and had a very brief

8  discussion the other day about seeing whether we can stipulate

9  to the authenticity of things and whether there are things that

10  we can -- the parties can agree are just admissible.

11      But to the extent there are things where there are no

12  questions of authenticity but we haven't agreed on

13  admissibility, I'm envisioning some things that we don't really

14  need a witness to provide anything further in order to move them

15  into evidence.  I guess we're wondering like do we need to find

16  a witness to mouth some words about something?  Or can we, at

17  the beginning of the court day before the jury comes in, move

18  something into evidence if we think that there's an adequate

19  basis for it but we for whatever reason haven't agreed with

20  opposing counsel about that?

21      THE COURT:  Sure.  I mean, I appreciate -- you know,

22  normally we'll have the attorneys come at 8:30, especially when

23  there's -- and then I like to take up matters then.  Maybe we'll

24  have the jury come at 9:00 or quarter to 9:00 and take up those

25  types of things then.

1          MR. MULAIRE:  Okay, thank you.

2          THE COURT:  Yeah.

3          MS. VANCE:  That was my list, Your Honor.

4          THE COURT:  Good.  Anything further from Walmart?

5          (No response.)

6          THE COURT:  Okay.  Well, like I said, I find this is a

7    very interesting case.  I recognize it's a very important case

8    for both parties and we have a way of resolving it, at least at

9    this level, and then from there we go.

10         (General laughter.)

11         THE COURT:  Of course, you always have that option of

12   settling the case.  If you reach that, let us know.  We don't

13   mind whenever you tell us.  The sooner the better, but that way

14   none of us make mistakes here.

15         MR. MULAIRE:  I apologize, I did think of one other

16   question that we had.  We had a short tour of the court

17   yesterday, and I know that there are two rooms back there that

18   the parties -- that counsel will be able to use.  Is it possible

19   for our witnesses to also wait there rather than just in the

20   hallway?

21         THE COURT:  Yes.  We'll arrange that.  You know, what

22   we've done during COVID times when we've had trials is we've

23   live streamed it to limit the number of people in the courtroom.

24   And we want to make sure we don't live stream it to witnesses.

25         So caution your witnesses that if we are still live

1    streaming, which is kind of different for federal courts, but

2    we're going to have to make sure your witnesses don't see that.

3              One of the first trials we had during COVID, last

4    September we did one, and we actually live streamed it into that

5    large room there for purposes of just making sure public had

6    access.  Public access is -- kind of outweighs our desire not to

7    share photographs of court proceedings.

8              But anyhow, in the next month I'm hoping this mask

9    mandate will be entirely voluntary all the time.  And then I'm

10   thinking if I can get rid of some of this plexiglass, I'd like

11   to do that, too.  I see you took out the dividers, you're

12   welcome to do that.

13             MR. MULAIRE:  We hope that's okay.

14             THE COURT:  Well, that's fine.  Yeah.

15             MS. VANCE:  Your Honor, I think we probably should

16   have that on the record, we have a formal request that our

17   counsel table not be divided, not be set up with the plexiglass.

18             THE COURT:  Fine.  We'll keep those away.

19             MS. VANCE:  Thank you.

20             THE COURT:  That's fine.  Okay.  Anything else?

21             (No response.)

22             THE COURT:  All right.  Well, thank you, all.  We'll

23   get something out on these last two things and get ready to go.

24   And we're already taking a good look at it and will be ready for

25   the 12th.

1          MS. VANCE:  Thank you, Your Honor.

2          THE COURT:  All right.  Court' adjourned then.

3          (Hearing concluded at 3:03 p.m.)

4                          *     *     *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

Reporter and Transcriptionist for the United States District

Court for the Eastern District of Wisconsin, do hereby certify

that the foregoing pages are a true and accurate transcription

of the audio file provided in the aforementioned matter to the

best of my skill and ability.


Signed and Certified June 25, 2021.

/s/John T. Schindhelm

John T. Schindhelm


                    John T. Schindhelm, RPR, RMR, CRR
                    United States Official Reporter
                    517 E Wisconsin Ave., Rm 236,
                        Milwaukee, WI 53202
                    Website: WWW.JOHNSCHINDHELM.COM

