

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
**Chicago District Office**

Justin Mulaire
Direct dial: 312-872-9666
justin.mulaire@eeoc.gov

JCK Federal Building
230 S. Dearborn, Suite 2920
Chicago, IL 60604
Website: www.eeoc.gov

July 8, 2021

<u>Via ECF</u>
Honorable William C. Griesbach
Eastern District of Wisconsin - Green Bay
Jefferson Court Building
125 S. Jefferson Street – Room 102
Green Bay, WI 54301-4541

      **RE:**   *EEOC v. Wal-Mart Stores East, LP*
              Case No. 1:17-cv-00070

Dear Judge Griesbach:

      This letter provides additional points and authority on several issues addressed during yesterday's hearing.

      **1.**       **<u>Admissibility of Walmart's Position Statement</u>**

      A position statement submitted by an employer during an EEOC investigation is admissible, for example to illustrate shifting or inconsistent explanations of an employment decision. <u>See</u> <u>Donley v. Stryker Sales Corporation</u>, 906 F.3d 635, 638 (7th Cir. 2018) ("[A]n employer's shifting factual accounts and explanations for an adverse employment decision can often support a reasonable inference that the facts are in dispute and that an employer's stated reason was not the real reason for its decision."); <u>see also</u> <u>Thomas v. Big Lots Stores</u>, 2016 WL 1746366, *2 (N.D. Ind. May 3, 2016) ("[Position] statements may be admissible as an admission of a party opponent or a prior inconsistent statement, and a jury can determine the weight to be given them.") (collecting cases).

      That an employer's prior explanation of a matter that was untruthful may also be evidence of reckless disregard, supporting a claim for punitive damages. <u>See</u> <u>Bruso v. United Airlines</u>, 239 F.3d 848, 858 (7th Cir. 2001) ("A plaintiff may also establish ... reckless disregard ... by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions.").

      Walmart contends that a position statement is covered by Title VII's prohibition on disclosing conciliation efforts, contained in 42 U.S.C. § 2000e-5(b). This court previously analyzed and rejected this proposition in <u>Brooks v. Grandma's House Day Care Centers, Inc.</u>, 227 F.Supp.2d 1041, 1042-45 (E.D. Wis. 2002). As the statute and <u>Brooks</u> make clear, "conciliation" occurs only after the Commission investigates a charge and makes a determination

on it. A position statement submitted prior to that determination is part of the investigation, not conciliation.

## 2. Attendance Records of Other Hourly Employees Are Admissible

The attendance records of Karen Becker and Deborah Moss (Plaintiff's Trial Exhibit Nos. 25, 27) show that Walmart does not, in reality, treat frequent early departures as rendering employees *unqualified* to work at a Walmart store.

Walmart contends that because Becker and Moss had different job titles and duties, the jury can infer nothing from Walmart's treatment of their early departures. In Coleman v. Donahoe, the Seventh Circuit rejected such an inflexible approach. See 667 F.3d 835, 848-49 (2012). "The question is not whether the employer classified the comparators in the same way, but whether the employer subjected them to different employment policies. Comparators need only be similar enough to enable a meaningful comparison." Id. (internal quotation marks and citation omitted). Moreover, the employees need not have the same immediate supervisors; the fact that they ultimately report up to the same higher-level decisionmakers can suffice. See Perez v. Thorntons, 731 F.3d 699, 707-08 (7th Cir. 2013); Coleman, 667 F.3d at 848.

Becker, Moss, and Spaeth were similar enough to enable a meaningful comparison for the limited purpose of assessing whether Walmart truly considered employees with such attendance records unqualified to even be in the workplace. They were all hourly employees. All worked at the same Manitowoc Walmart store, ultimately reporting to the same store manager. The Walmart attendance policy, on its face, applied to all store employees. See Trial Exh. 1054. Indeed, Walmart itself contends in this case that "regular attendance is an essential function of *every* job." See Defendant's Motion in Limine No. 4 (ECF No. 185) at 11 (emphasis added). Having staked out that broad position, Walmart cannot now complain that evidence contradicting it is inadmissible.

During the periods covered by the exhibits, Becker left early on over 100 occasions, and Moss on over 200 occasions. As with Spaeth, most of these early departures were manager-approved. The function of this evidence is not to compare the precise levels of discipline meted out to each employee for attendance issues. Rather, the fact that Walmart continued to employ these individuals at all — and indeed for an extended period of time — belies the company's stark claim that such employees are not even qualified for their jobs.

Becker and Moss's records concern periods leading up to 2008 — a time around the middle rather than the end of Spaeth's employment — and Walmart argues that it began to take a stricter approach later in that period. But a tightening of attendance practices is not conclusive evidence that the company fundamentally changed the qualifications needed to work in its stores. Even if it were, it is the sort of competing factual consideration that is more properly weighed by the jury. To the extent Walmart can identify some risk that the jury will consider these records for some other, improper purpose, the appropriate solution would be a limiting instruction, not complete exclusion of the evidence.

Walmart asserts that Spaeth not simply that its actions were motivated by her attendance, but that she was *unqualified* because of her attendance. The plain implication of that defense is that,

2

despite making use of her labor for 16 years and rating her performance satisfactory, Walmart did so not because she was actually qualified but rather as some kind of act of charity for an employee with a disability.  Records of other, non-disabled employees with similar attendance patterns and who the company similarly employed for a long period of time undermine that defense and should be considered by the jury.

### 3. Evidence of a Tortfeasor's Wealth is Relevant to Punitive Damages

The longstanding rule has been that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded...." See City of Newport v. Fact Concerts, 453 U.S. 247, 270 (1981).  Although Walmart suggests that the Seventh Circuit altered this rule for corporations in Zazu Designs v. L'Oreal, 979 F.2d 499 (7th Cir. 1992), a careful analysis of that decision reveals that Zazu's discussion of punitive damages was *dictum*.  See Donald v. Wexford Health Sources, 266 F.Supp.3d 1097 (C.D. Ill. 2017) (also surveying other cases that interpret Zazu).  As the Donald court concluded, a corporate defendant's financial resources are relevant to the question of punitive damages.

Accordingly, Walmart's objection to the relevance of the sheet of financial data set forth in Trial Exhibit No. 41 should be overruled.

Sincerely,

s/Justin Mulaire
U.S. Equal Employment Opportunity Commission
230 S. Dearborn St., Ste. 2920
Chicago, IL  60604
312-872-9666
justin.mulaire@eeoc.gov