```
1              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF WISCONSIN
2                    GREEN BAY DIVISION
   ------------------------------------------------------------
3  EQUAL EMPLOYMENT OPPORTUNITY    )
   COMMISSION,                     )
4                                  )
                       Plaintiff,  )  Case No. CV 17-70
5                                  )  Green Bay, Wisconsin
       vs.                         )
6                                  )  July 12, 2021
   WAL-MART STORES EAST LP,        )  9:10 a.m.
7                                  )
                       Defendant.  )  DAY 1
8
   ------------------------------------------------------------
9
                    TRANSCRIPT OF JURY TRIAL
10         BEFORE THE HONORABLE WILLIAM C. GRIESBACH
             UNITED STATES SENIOR DISTRICT JUDGE
11
   APPEARANCES:
12
   For the Plaintiff:          Justin Mulaire
13                             United States Equal Employment
                               Opportunity Commission
14                             230 S Dearborn St - Ste 2920
                               Chicago, IL 60604
15                             312-872-9666
                               Email: justin.mulaire@eeoc.gov
16
                               Carrie Noelle Vance
17                             Leslie N Carter
                               United States Equal Employment
18                             Opportunity Commission
                               Milwaukee District Office
19                             310 W Wisconsin Ave - Ste 500
                               Milwaukee, WI 53203-2292
20                             414-297-4188
                               Fax: 414-297-3146
21                             Email: carrie.vance@eeoc.gov
                               Email: leslie.carter@eeoc.gov
22
   U.S. Official Transcriber:  JOHN T. SCHINDHELM, RMR, CRR,
23 Transcript Orders:          WWW.JOHNSCHINDHELM.COM

24 Proceedings recorded by electronic recording,
   transcript produced by computer aided transcription.
25
```

```
 1   APPEARANCES CONT'D:

 2   For the Defendant:              Emery K Harlan
                                     Warren E Buliox
 3                                   MWH Law Group LLP
                                     735 N Water St - Ste 610
 4                                   Milwaukee, WI 53202
                                     414-436-0353
 5                                   Fax: 414-436-0354
                                     emery.harlan@mwhlawgroup.com
 6                                   warren.buliox@mwhlawgroup.com

 7                                   George Burnett
                                     Law Firm of Conway Olejniczak &
 8                                   Jerry SC
                                     231 S Adams St
 9                                   PO Box 23200
                                     Green Bay, WI 54305
10                                   920-437-0476
                                     Fax: 920-437-2868
11                                   rgb@lcojlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2          **(Call to Order of the Court at 9:10 a.m.)**

3          THE COURT:  Please be seated everyone.

4          Good morning.  Let me first say if you're vaccinated

09:10   5    and you're comfortable, you can take your mask off.  Don't feel

6    you have to take them off if you feel more comfortable with them

7    on.

8          As you can see, we are still in the COVID-precaution

9    stage, we have plexiglass all over the place.  I hope you don't

09:11  10   feel claustrophobic.  It's not our intention to make you feel

11   that way and hopefully, as time moves on, we'll be back to a

12   more normal way of conducting trials.

13         In any event, at this point we'll have the clerk call

14   the case and we'll talk about why you're all here.

09:11  15         THE CLERK:  The Court calls Case No. 17-CV-70, *Equal*

16   *Employment Opportunity Commission vs. Wal-Mart Stores East, LP*

17   for a jury trial.  May I have the appearances, please?

18         MS. VANCE:  Good morning.  I'm Attorney Carrie Vance

19   for the United States Equal Employment Opportunity Commission.

09:11  20         MS. CARTER:  Good morning, Leslie Carter for the U.S.

21   Equal Employment Opportunity Commission.

22         MR. MULAIRE:  Justin Mulaire, also for the EEOC.

23         THE COURT:  Good morning.

24         MR. BURNETT:  Good morning, Your Honor, ladies and

09:12  25   gentlemen, I'm George Burnett.  I practice law in Green Bay at

3

1    Conway Olejniczak & Jerry.

2         MR. BULIOX:  Good morning, ladies and gentlemen.  Good

3    morning, Court.  I'm Warren Buliox, I practice law at MWH Law

4    Group.

09:12    5         MR. HARLAN:  Good morning, ladies and gentlemen,

6    Your Honor, Emery Harlan on behalf of Walmart, also from MWH

7    Group.

8         Was that your walk-in music, Your Honor?

9         THE COURT:  You know, we use technology during this

09:12    10   period of COVID.  We actually streamed the trial so that -- one

11   of the requirements of our legal system is that trials are open

12   to the public.  We don't hold secret trials.  But to minimize

13   the number of people in a small courtroom, we stream it.  And

14   part of the problem with streaming and technology is sometimes

09:12    15   you pick up things you don't intend to pick up.  I hope that

16   doesn't happen again, but I can't guarantee it.  You know, if it

17   starts out if you feel an urge -- well, hopefully you won't feel

18   an urge to dance, we'll get it out of here quick and move on.

19         (General laughter.)

09:13    20        THE COURT:  As you heard, the name of this case is

21   EEOC vs. Wal-Mart.  It's a civil suit.  And this case is

22   scheduled for a trial, a jury trial, beginning today.

23         Counsel, are you ready to proceed?

24         MS. VANCE:  Yes, Your Honor.

09:13    25        MR. BURNETT:  We are, Your Honor.

1          THE COURT:  And that's, of course, why you all are

2     here.  We have 14 prospective jurors, potential jurors seated in

3     the jury box.  We also have a number of people in the adjoining

4     room who are listening, and watching, I think, and are able to

09:13   5     hear what we say.

6          Okay.  Maybe not.  Oh, my computer is not on.  So let

7     me fix this.

8          In any event, what we're going to do is, the first

9     step in a trial is to select the jury, and that's what we're

09:14   10    going to do.  Most of you, both here and in the adjoining

11    courtroom, will not -- you know, will be out of here within a

12    couple of hours, and perhaps less, because we need to pick eight

13    to serve as a jury.

14         But the rules of federal procedure govern how we

09:14   15    select a jury and we start out with a larger number, all with a

16    view to making sure we can get a jury that can be fair and

17    impartial to both parties.  And I'll talk about that a little

18    more later.

19         But what I want to do, first of all, is just tell you

09:14   20    a little bit about this case so you have some idea of what it's

21    about before we begin this process.

22         Now, this is a civil case, it's not a criminal case.

23    In a typical civil case the plaintiff who brings the action

24    alleges that the defendant caused harm or injury to the

09:15   25    plaintiff and is liable in money damages.  In this case the

1    plaintiff is the Equal Employment Opportunity Commission, or the

2    EEOC.  The EEOC is an agency of the United States government

3    that is responsible for enforcing the federal laws prohibiting

4    employment discrimination, including the Americans With

09:15    5    Disabilities Act.

6         The EEOC brings this lawsuit on behalf of a person

7    named Marlo Spaeth.  Marlo Spaeth is an individual with Down

8    syndrome.  And the EEOC has brought the action against the

9    defendant, Wal-Mart Stores East, alleging that Walmart violated

09:15    10   the Americans With Disabilities Act when it terminated

11   Ms. Spaeth from her position as a sales associate at the store

12   in Manitowoc, Wisconsin.  So this case involves the Manitowoc

13   Walmart.

14        The EEOC seeks money damages and punitive damages on

09:16    15   behalf of Ms. Spaeth.  And Walmart denies that it violated

16   Ms. Spaeth's rights.

17        So this, in very general terms, is what this case is

18   about.  If you're selected to serve as a juror in this case, you

19   will listen to the evidence and receive my instructions on the

09:16    20   law.  At the end of the trial you will be given a verdict with a

21   series of questions to answer concerning the facts of the case.

22   Your answers to those questions will then determine whether the

23   plaintiff will recover damages from the defendant and, if so,

24   how much.

09:16    25        What we will do now is begin the process that will

1    result in the selection, as I said, of eight of you to serve as

2    the jury in this matter.  The process we use is governed by the

3    Federal Rules of Civil Procedure.  We have to first qualify 14

4    of you by asking you questions to make sure that you have no

09:17    5    financial or personal interest in the outcome of the case so

6    that you can be fair and impartial, and also to make sure that

7    there are no other reasons that would prevent you from serving

8    on the jury.

9            Once we qualify the required number, we then pass the

09:17    10    list with their names on it back and forth between the attorneys

11    and they take strikes to get down to the eight that will serve.

12    So those that are not selected will then be free to leave, and

13    we'll then begin the trial with some preliminary instructions

14    and the opening statements of the attorneys.

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

1          THE COURT:  Go ahead and be seated.

2          The record should reflect we're now outside the

3     presence of the jury; the jury's been selected.  I know,

4     Mr. Emery (sic), you want to put something on the record.

10:24  5     Anyone wish to put anything on the record?

6          MR. HARLAN:  Not at this juncture, Your Honor.

7          THE COURT:  All right.  Very well then.  We'll be in

8     recess.

9          We did have -- the record should reflect we did

10:24 10     discuss in chambers some issues, and I just want to indicate

11     what those rulings were on some of the matters we left open at

12     our Thursday or Friday conference and you submitted over the

13     weekend.

14          So with respect to the admissibility of Walmart's

10:25 15     position statement, I've ruled that that is admissible based

16     primarily on the *Donley vs. Stryker Sales Corporation* case, 906

17     F.3d 635; also the *Thomas vs. Big Lots Stores* at 2016 WL

18     1746366.  This constitutes a statement by a party-opponent.  To

19     the extent that it might be inconsistent with facts stated

10:25 20     later, the courts have said that it's admissible; it's not part

21     of a settlement conference or something like that.  But to the

22     extent it's otherwise relevant then, that statement would be

23     admissible.

24          With respect to attendance records of other hourly

10:26 25     employees, I've ruled, based on my understanding now, that the

1    other employees left early with permission, and that that's not

2    a violation; that Ms. Spaeth left early at times with

3    permission, that's not a violation.

4           And so I don't find that comparable or relevant to --

10:26   5    they held different positions.  The timing of it was much

6    different and the immediate supervisors for each was different.

7    So I've ruled that inadmissible, at least at this point, based

8    on my understanding of the facts of the case which, as I said,

9    is -- there's not a -- these other employees weren't leaving

10:26  10   without permission, and Ms. Spaeth, her violations considered by

11   Walmart were leaving without permission.

12          And then, lastly, with respect to the evidence of

13   Walmart's wealth as relevant to the question of punitive

14   damages, I've concluded that that is admissible.  The *Zazu*

10:27  15   *Designs* case that the Seventh Circuit entered that was cited, a

16   1992 case, suggests that it's not -- it might be prejudicial or

17   under certain circumstances not relevant, but the general rule

18   is that a party's wealth is a relevant consideration for

19   punitive damage purposes, and I'm satisfied that that general

10:27  20   rule applies here.  Again, if it's misused or if there's a

21   prejudicial -- attempt to prejudicially use it, that can be

22   dealt with objections, but in general it would be admissible.

23          So I've made those rulings.  Those are on the record.

24          I know that Walmart, its objection to the

10:27  25   admissibility of its position statement and evidence of its

1   wealth should be noted for the record, that objection was made,

2   as well as EEOC's objection to the ruling on the court's -- on

3   the attendance records of the -- of Ms. Becker and Ms. Moss.

4   Okay?

10:28   5        MR. HARLAN:  Judge, one other issue.  We had also

6   raised I think in the conference Julia Stern's personnel

7   records.  It wasn't clear to me if you had definitively ruled

8   that that's out, and I wanted to make sure that that was the

9   case.  It was a record from much earlier in her career at

10:28   10  Walmart, where she had some coaching about being more

11  considerate to associates.

12       THE COURT:  Oh, this is the immediate supervisor.  The

13  evaluation?  Yes, I ruled that out earlier.

14       MR. HARLAN:  Okay, thank you.

10:28   15       THE COURT:  And that was at the conference we had

16  earlier.  So I didn't go over it again.

17       MR. MULAIRE:  Your Honor, my recollection was that

18  that was one that if something comes up that seems to make it

19  relevant, then it could be revisited later.

10:29   20       THE COURT:  Sure.  And that's true on all this.  When

21  I rule ahead of time, I'm ruling on what I know now and the

22  state of the record now.  If a door gets opened or something

23  looks different, let me know.  You just don't bring it up in

24  front of the jury without addressing it first to the court and

10:29   25  the other counsel.  That's what I'm really ruling on.  Okay?

56

1          Okay, we'll take our break.  I expect that jury to be

2   ready to go in probably 10 minutes or so, so hopefully we can do

3   openings immediately.  Okay?  We're in recess.

4          (Recess taken at 10:29 a.m., until 10:53 a.m.)

10:53   5          (Jury in at 10:53 a.m.)

6          THE COURT:  All right.  Before we begin, ladies and

7   gentlemen, we're going to have to give you another oath.  So

8   please stand and raise your right hand.

9          (Jury sworn.)

10:54   10          THE COURT:  Thank you.  Please be seated.

11          And at this time we're going to hear the opening

12   statements of the attorneys.  As I said in those preliminary

13   instructions, the opening statements are not evidence, but

14   they're important to listen to because it gets you kind of a

10:54   15   blueprint of what the evidence will show.  So we'll listen first

16   to the plaintiff.

17          MS. CARTER:  Thank you, Your Honor.

18               PLAINTIFF OPENING STATEMENT

19          MS. CARTER:  Ladies and gentlemen of the jury, let me

10:55   20   introduce you to Marlo Spaeth.

21          Marlo has Down syndrome.  Down syndrome is a genetic

22   disorder that's associated with growth delays, characteristic

23   facial features, and developmental and intellectual disability.

24          Marlo has a limited ability to understand the world

10:55   25   around her.  She has a limited ability to concentrate and

57

1    communicate with others.  She reads at about a second grade

2    level.  And she has difficulty learning new things.

3            Most importantly, Marlo has significant difficulty

4    adjusting to changes in her routine.  But Marlo does well at her

5    job at Walmart.  And Marlo works noon to 4:00 at the Manitowoc

6    Super Center.  She's a sales associate in Walmart's housewares

7    department.  She's responsible for folding towels, tidying the

8    aisles, and helping customers locate items.

9            Marlo has had a steady routine for the last 15 years

10   based around her job at Walmart, working noon to 4:00, since

11   1999.  And Marlo likes her job at Walmart.  She enjoys helping

12   customers.  And her job is central to her life and to her

13   routine.

14           She's had the same work schedule at Walmart since she

15   started 15 years ago, noon to 4:00.  She wakes up the same time

16   every morning, she catches the same bus to work.  She eats lunch

17   at the same time every work day.  She even eats at the same

18   place, the Subway in the Walmart.  And just before her noon to

19   4:00 shift, just before her noon to 4:00 shift she eats the

20   lunch in Subway.  But after her shift ends, she takes the same

21   bus home from Walmart, the bus that leaves Walmart a little

22   after 4:00.  She gets home a little after 5:00.  She eats dinner

23   the same time every day.

24           Marlo schedules her life around her job at Walmart.

25   It's October 2015, and this schedule has worked for 15 years.

58

1    2014, my mistake.  And this schedule has worked for 15 years.

2         Marlo is a good worker for Walmart.  She's had 15

3    annual performance reviews that rated her as a solid performer

4    and meets expectations.  She's also received annual pay raises

10:58  5    based on her performance.  And 11 of Marlo's performance reviews

6    praise her for having good attendance.

7         And as of June 2014, Marlo's performance review

8    praised her for having zero active absences, that is, until,

9    without asking her, Walmart changed Marlo's schedule.  They

10:58  10   changed Marlo's routine.

11        In November 2014, Walmart's computer scheduling system

12   spat out a new schedule for Marlo.  The noon to 4:00 shift that

13   she's worked for 15 years suddenly becomes a 1:00 to 5:30 p.m.

14   shift.  And for Marlo, this change is a very big deal.  After 15

10:59  15   years of the same routine, Marlo is not able to adjust to the

16   schedule change.  So Marlo asks Walmart, "Why can't I have my

17   old schedule back?"

18        Walmart knows Marlo has Down syndrome, but Walmart

19   doesn't give Marlo her noon to 4:00 schedule back.  And Walmart

10:59  20   doesn't work with Marlo to find a different schedule that will

21   work for both Marlo and Walmart that will help her do her job.

22   Instead, Walmart disciplines Marlo because she can't adjust to

23   the new schedule.  Walmart says Marlo violated Walmart's

24   attendance policy by leaving her shifts before 5:30 p.m., and in

10:59  25   July 2015, Walmart fires Marlo, after 16 years.

59

1      Marlo's younger sister, Amy Jo Stevenson, asked

2  Walmart to give Marlo her job back.  Amy Jo asked Walmart to

3  give Marlo the accommodation of her noon to 4:00 schedule so

4  that she could work the hours that she's used to.  Walmart

11:00   5  denies both requests without explanation to either Marlo or her

6  family.  And so here we are.

7      My name is Leslie Carter.  My co-counsel in this case

8  is Carrie Vance and Justin Mulaire.  You'll see them at the

9  counsel table.  Our paralegal, Lectrice, is with us at the back

11:00   10  table, she'll be helping to show you the evidence in this case.

11      We all work for the Equal Employment Opportunity

12  Commission.  EEOC is the federal agency that was designed to

13  enforce the laws against employment discrimination.  And EEOC

14  filed this case against Walmart on behalf of Marlo Spaeth.

11:01   15      At its heart this case is about keeping promises and

16  doing your part.  One of the laws that we enforce at the EEOC is

17  the Americans With Disabilities Act.  This cases involves claims

18  under the ADA which makes certain promises to people with

19  disabilities.  And under the ADA, both employees and employers

11:01   20  must do their part to keep the promises made in that statute.

21      And one of the ADA's promises is that a person with a

22  disability has the right to a reasonable accommodation that

23  allows them to do their job.  And when I say "accommodation," I

24  just mean it the way the judge said earlier, I'm talking about a

11:01   25  change that allows the person to do their job.

1          Now, this case involves three claims against Walmart

2     under the Americans With Disabilities Act.

3          The first claim:  That Walmart failed to make a

4     reasonable accommodation for Marlo Spaeth.  For Marlo Spaeth's

11:02  5     Down syndrome, specifically.

6          Second:  That Walmart fired Marlo Spaeth due to her

7     Down syndrome or because of her need for a disability

8     accommodation.

9          And third:  That Walmart failed to rehire Marlo Spaeth

11:02  10    because of her Down syndrome and because of her need for a

11    reasonable accommodation.

12          Those are the main issues in this ADA case.

13          You'll hear about Marlo's good work history for the 15

14    years that she worked at Walmart before the schedule change.

11:02  15          In August 1999, Marlo Spaeth, and her mother, Sandra

16    Barnes, went to the Walmart Super Center in Manitowoc,

17    Wisconsin, to apply for a job for Marlo, together.  Marlo's mom

18    stayed with her during the job interview.  Marlo's mom came with

19    her to new employee orientation after she was hired.

11:03  20          Marlo thrived on her noon to 4:00 schedule for 15

21    years.  You'll hear that Marlo and her mom asked Walmart when

22    she was hired to make sure that Walmart -- that Marlo's schedule

23    was arranged so that she could take the bus to and from work,

24    because Marlo can't drive because of her Down syndrome.

11:03  25          And the evidence shows that Marlo was good at her job.

1  As a sales associate in Walmart's housewares and domestics

2  department, Marlo was responsible for folding the towels,

3  cleaning up the aisles, helping customers find items that

4  they're looking for.  These were essential duties of Marlo's

11:03  5  job.  And Marlo Spaeth received 15 annual performance reviews

6  that ranked her as a solid performer and meets expectations

7  before the schedule change.  She also received pay raises due to

8  her performance.  And for the first 15 years Marlo was scheduled

9  to work noon to 4:00.  You may hear from Walmart that Marlo left

11:04  10  early from her shift on many occasions over the years.  You may

11  hear from Walmart that over 80 unauthorized early departures, or

12  absences, were there before the schedule change in November

13  2014.  But you'll see that as of Marlo's June 2014 performance

14  evaluation, Walmart says she has zero absences.  Marlo's

11:04  15  performance reviews will show that with her noon to 4:00

16  schedule she did not have attendance problems.

17  Marlo did her part at Walmart, helping customers and

18  taking care of the merchandise.  And the evidence in this case

19  will show that adults with Down syndrome thrive on routines,

11:05  20  thrive on repetitive tasks.  The evidence will show that Marlo

21  experienced distress from disruptions to her routines.  The

22  evidence in this case will show that Walmart was aware of

23  Marlo's disability from the very beginning.  And the managers

24  who worked with Marlo were aware that Marlo needed extra support

11:05  25  whenever changes to her routine were forced, but with the right

62

1   amount of patience and time, Marlo was eventually able to adapt

2   to new tasks.

3           You'll hear that Marlo -- that Marlo's schedule

4   changed in 2014, November, and Marlo was unable to adjust to

11:05   5   that change without an accommodation.  After Marlo's June 2014

6   performance review, she was assigned to a new manager, Julia

7   Stern.  Stern was an assistant manager in the Manitowoc store at

8   Walmart, and she began to directly supervise Marlo at some point

9   after the June 2014 evaluation.

11:06   10          You'll hear that Marlo's scheduling availability form

11  had the same end time on it since 2006.  Marlo scheduling

12  availability form said she could not work past 4 p.m.  However,

13  in November of 2014, Walmart began scheduling Marlo to work past

14  4 p.m., past the stop time given on her availability form.

11:06   15          Marlo's new shift ran until 5:30 p.m., and the first

16  shift with her new hours was on November 24th, 2014.  Over the

17  course of the next few weeks Marlo left her shift before 5:30

18  several times, the shifts that went past her 4 p.m.

19  availability.  And Marlo struggled to adapt to the ripples of

11:07   20  change to her life that the new 5:30 end time caused.

21          The 5:30 end time required Marlo to take a different

22  bus, a new bus, not the one she was used to taking as part of

23  her routine.

24          The 5:30 end time also changed Marlo's evening routine

11:07   25  in various ways, including pushing back the dinner time that she

63

1    had for 15 years -- she ate dinner at the same time -- but the

2    new 5:30 pushed that routine out as well.

3         Marlo told her managers, Julia Stern and Robin Castro,

4    that she was worried that she would get sick if she missed her

11:07  5    dinner.  Marlo also told her managers that she was afraid to

6    miss her bus, her normal bus.

7         You'll hear that, before Marlo was fired, Marlo asked

8    Walmart to let her go back to her noon to 4:00 schedule.  You'll

9    hear that Walmart had no trouble staffing Marlo's department for

11:08  10   the first 15 years of her employment when Marlo worked noon to

11   4:00.  And the evidence will show that Marlo's managers, Julie

12   Stern and Robin Castro, both knew that Marlo had Down syndrome

13   and they knew that she was struggling with the new schedule.

14   You'll see emails from Marlo's manager reporting to the other

11:08  15   managers in the store that Marlo asked why she couldn't have her

16   old schedule back; why she couldn't work noon to 4:00 like she

17   used to.  Her manager, Julia Stern, even forwarded the emails to

18   all of the other managers in the store, store manager,

19   co-managers, human resources manager, the personnel coordinator.

11:09  20        And you'll see that Stern also emailed these

21   individuals saying if Marlo would get sick for missing dinner

22   she needs to have something in her medical file.  But nobody at

23   Walmart started the process for getting medical information from

24   Marlo to put in her file.  No one asked for medical information

11:09  25   from Marlo or her family.

1          You'll also hear that, before Marlo got fired, Marlo's

2     younger sister, Amy Jo Stevenson, called Walmart and asked them

3     to give Marlo her noon to 4:00 schedule back.  She asked them to

4     give Marlo back the schedule that had worked for Marlo and for

11:09      5     Walmart for 15 years.

6          You'll hear that Marlo expressed concern over the new

7     schedule to her sister.  She told her sister, Amy Jo, that her

8     managers, Julia and Robin, were picking on her at Walmart.

9          Amy Jo will tell you that, before Marlo got fired, she

11:10    10    called the personnel coordinator at Walmart, she handles human

11    resources within the store, and she told the human resources

12    coordinator that Marlo couldn't handle the new schedule because

13    of her Down syndrome.

14          The evidence will show that Walmart had disability

11:10    15    accommodation policies that were not followed when it came to

16    Marlo Spaeth.  And you'll see that Walmart's reasonable

17    accommodation policies say that family members can request

18    accommodations for Walmart associates, but the evidence will

19    show that the request Marlo's sister made on her behalf was

11:11    20    denied.

21          Walmart will tell you that there was no medical

22    documentation in Marlo's file to let them know that Marlo needed

23    any kind of accommodation, but the evidence will show that

24    Walmart's own disability accommodation policy says that when an

11:11    25    employee has a known or obvious disability, medical information

1    is not required.

2           The evidence will show that, given the nature of

3    Marlo's disability, instead of documenting her attendance lapses

4    Walmart could have used that time to find a schedule that worked

11:11    5    for Marlo to see if they could change it back to her noon to

6    4:00 schedule.

7           You'll hear that Walmart's human resources coordinator

8    now regrets that she did not contact Marlo's mother and talk to

9    her about the schedule change.

11:12    10           The evidence will show that Walmart has an entire

11    department dedicated to providing disability accommodations.

12    It's called the Accommodations Service Center.  But the evidence

13    will show that, despite Marlo's request for a schedule

14    accommodation, no one put her in contact with the Accommodations

11:12    15    Service Center.  No one at Walmart looked into giving Marlo a

16    schedule accommodation.  And no one put her family in contact

17    with the Accommodation Services Center.  The evidence will show

18    that Walmart denied Marlo's request for an accommodation without

19    even considering it.

11:12    20           Yet you'll hear that Marlo worked at a 24-hour

21    seven-day-a-week Walmart.  The evidence will show that every

22    Walmart associate that worked at that store did not have to work

23    4:00 to 5:30 p.m.  The evidence will show that there were other

24    associates who were available to work 4:00 to 5:30 p.m.  The

11:13    25    evidence will show that it didn't have to be Marlo's schedule.

1     The evidence in this case will also show that adults

2   with Down syndrome thrive on set routines and repetitive tasks.

3   You'll hear testimony from the EEOC's Down syndrome expert,

4   Dr. David Smith.  Dr. Smith was the program director at the Down

11:13     5   Syndrome Clinic of Wisconsin which he founded in 1996.

6   Dr. Smith will tell you about the importance of routine for

7   people with Down syndrome and how routines help people with Down

8   syndrome manage their days.

9     Marlo's routine was to take the bus that came shortly

11:13    10   after 4 p.m. that left Walmart at that time.

11     You'll hear that Marlo started clocking out even

12   earlier once her managers confronted her.  And Dr. Smith will

13   explain that people with Down syndrome are people pleasers and

14   they avoid conflict.  They shy away from it.  Dr. Smith will

11:14    15   explain that because individuals with Down syndrome lack the

16   cognitive ability to adjust well to change, routine protects

17   them from the stress, the fear, the anxiety of trying to figure

18   out something new.

19     And Dr. Smith will explain that Marlo experienced that

11:14    20   stress from Walmart's disruption to her schedule, to her

21   routine.  He'll explain that, when routine is taken away,

22   functioning declines.

23     Dr. Smith will also explain that the difficulties that

24   Marlo experienced after the schedule change adversely affected

11:15    25   her ability to perform even at the level that she was performing

1    before the change at her job.

2           And Dr. Smith will tell you that, in his expert

3    opinion, that's what happened to Marlo when Walmart took her

4    routine away, when Walmart changed her schedule, the one that

11:15    5    she had had for 15 years with excellent attendance.

6           Dr. Smith will also tell you that, in light of Marlo's

7    successful work performance before the schedule change, the

8    attendance issues that occurred after the change, and the early

9    departures after the schedule change, were the result of having

11:15    10    Down syndrome and not just a desire to get home earlier.

11          Dr. Smith will explain that Marlo's behavior was not

12    insubordination; it was evidence of a need for accommodation.

13    No one at Walmart considered giving Marlo a schedule

14    accommodation.  Instead, on July 10th, 2015, Walmart fired Marlo

11:16    15    Spaeth.

16          You'll hear that, after Walmart fired Marlo, her

17    sister, Amy Jo, asked for Walmart to give Marlo her job back.

18    Marlo's termination paperwork said she was eligible for rehire.

19    So Amy Jo asked for a meeting with Walmart.  And the evidence

11:16    20    will show that Amy Jo met with Walmart's managers just a few

21    days after Marlo was fired.  And the evidence will show that Amy

22    Jo Stevenson, Marlo's sister, told Walmart that, under the

23    Americans With Disabilities Act, what they did to Marlo wasn't

24    even legal.  She told Walmart that under the Americans With

11:17    25    Disabilities Act they should have given Marlo her schedule back,

1       the noon to 4:00 schedule, when she asked for it.  So Amy asked

2       Walmart to give Marlo her schedule back.  And she asked for the

3       noon to 4:00 schedule that had worked so long for Marlo and for

4       Walmart.

11:17   5       The evidence will show that, when a Walmart employee

6       is fired for attendance issues, they can get their job back;

7       they can be rehired.  The evidence will show that, even if an

8       associate doesn't reapply for the job, they can get their job

9       back through reinstatement.  Reinstatement just requires

11:17  10       approval from Walmart's management.

11       Walmart told Amy Jo that it would consider her

12       requests.  And yet here we are, so you now how that turned out.

13       Walmart never got back to Marlo's sister, Amy Jo

14       Stevenson.  The evidence will show that co-manager Robin Castro

11:18  15       told Walmart's market human resources manager, Lee Spude, about

16       the meeting with Amy Jo.  And you'll hear that instead of

17       reinstating Marlo or considering whether Marlo could be given a

18       schedule accommodation, Walmart's market human resources manager

19       told Robin Castro not to communicate any further with Marlo's

11:18  20       family.  He also told Robin Castro to report the threat of

21       litigation to Walmart's legal hotline.

22       And you'll hear that Walmart launched an internal

23       review after Robin Castro reported what Amy Jo Stevenson said to

24       them at the meeting.  But Marlo Spaeth and Amy Jo Stevenson were

11:18  25       not interviewed as part of Walmart's internal investigation.

1    The evidence will show that Walmart refused to give Marlo her

2    job back with or without an accommodation.  And in September

3    2015, Walmart manager Robin Castro called Marlo and told her

4    that Walmart would not be able to rehire her.

11:19    5    The evidence will show that Walmart never called

6    Marlo's sister, Amy Jo Stevenson, to tell her what their

7    determination was.  They didn't discuss with her their refusal

8    to re-employ Marlo, nor did Walmart explain why it rejected, why

9    it denied both Amy Jo's request for a schedule accommodation and

11:19    10    Marlo's request to return to her noon to 4:00 schedule.

11    We hope you'll be able to hear from Marlo herself

12    during this trial.  She will be here.  And if she's not feeling

13    too nervous, she'll tell you that she really liked working at

14    Walmart.  Her favorite part of the job was helping people; that

11:20    15    she cried when Walmart fired her.  She may even tell you that

16    she wishes that she could still work at Walmart.  But whether

17    Marlo tells us anything at all will depend on how comfortable

18    she's feeling in this courtroom.  It will be a challenge, but

19    we'll do our best.

11:20    20    Amy Jo Stevenson and Marlo thank you for your time

21    this week.  And from all of us at the EEOC, it is our honor and

22    privilege to enforce the Americans With Disabilities Act.  We

23    deeply appreciate your attention.  You're the factfinders here.

24    And at the end of this case we will ask you to enter a

11:21    25    verdict in EEOC and Marlo Spaeth's favor.

70

1          We will ask you to find that Walmart broke the

2    promises of the ADA by refusing to give Marlo a reasonable

3    accommodation.

4          We will ask you to find that Walmart broke the

11:21   5    promises of the ADA by refusing to rehire Marlo because of her

6    Down syndrome or because of her need for accommodation.

7          And we will ask you to compensate Marlo for the harm

8    caused by Walmart's conduct.  We will ask you to do your part to

9    keep the promises under the ADA, because a promise made should

11:21   10   be a promise kept.

11         Thank you.

12         THE COURT:  Thank you, Ms. Carter.

13         Mr. Burnett?

14                DEFENDANT OPENING STATEMENT

11:22   15   MR. BURNETT:  Good morning, ladies and gentlemen.  We

16   met a little earlier today, my name is George Burnett.  With my

17   colleague, Emery Harlan, and my colleague, Warren Buliox, I

18   thank you, as well, for your time and attention today.

19         This is Teri McClone from Walmart.  Teri works at

11:22   20   Walmart's Waupaca store and she'll be with us for much of the

21   week.

22         In listening to the EEOC's opening statement, it

23   occurs to me that the issue in this case, the question in this

24   case for you really is -- it involves two questions.

11:23   25   The first question is, according to the EEOC, Walmart

1    didn't do enough with regard to Marlo Spaeth and her employment.

2        The second question that you're asked to answer, is

3    whether Walmart rid themselves of a disabled employee, who they

4    had employed for 15 years, for no apparent reason at all.

11:23    5        Those are the two questions that I think, when you

6    hear all the evidence, you're ultimately going to need to

7    answer.

8        You've heard the word "reasonable accommodation" in

9    opening statement.  Those are legal words.  Those are lawyers'

11:23    10    words.  Those are words that people in Green Bay, Appleton,

11    Manitowoc, Fond du Lac, Two Rivers don't use regularly.  But the

12    essence of the claim, the essence of the contention is that the

13    people at the Manitowoc store discriminated on purpose against

14    Marlo Spaeth.  It's really that simple.

11:24    15        I would be remiss if I didn't tell you not what

16    Walmart supposedly didn't do, they didn't do enough, but rather

17    what they did do.  And in order to tell you what Walmart did do

18    I need to take you back to 1999, when these people in Manitowoc,

19    Wisconsin hired a disabled young lady who presented with Down

11:25    20    syndrome and for the next 15 years they gave her not only a job,

21    but they gave her a place, a place to work, a place to come to,

22    and they made her feel comfortable, and when she needed help

23    they helped her.

24        She worked in the domestic and household goods

11:25    25    department.  And there she would sort towels, fold them, keep

1    the aisles clean.  And as time passed she developed new skills,

2    did new tasks.  They were simple things like dusting displays,

3    taking returns back that customers had dropped off and putting

4    them on the shelves, helping customers find their way around the

11:25  5    department.  And she did fine at that.  She was well liked by

6    her coworkers.

7         And problems started in around November of 2014 in a

8    special way, because that was the time that Walmart, on a

9    nationwide basis -- not just an edict or a whim issued out of

11:26  10   the Manitowoc store, but on a nationwide basis changed the way

11   they scheduled employees for work.  It was basically a

12   customer-first philosophy.  Instead of scheduling employees

13   based on their availability, Walmart scheduled employees as

14   customers needed them.

11:26  15        And what that involved for Marlo was a change in her

16   hours, from 12:00 to 4:00, which was a routine for her, to

17   starting an hour later, 1:00, and finishing an hour and a half

18   later, 5:30.

19        Marlo's paperwork that showed her a availability for

11:27  20   scheduling said for those first couple of months she can only

21   work 12:00 to 4:00.  And that would create a big problem for

22   Marlo, because with customer first scheduling, this new

23   computerized scheduling that Walmart introduced nationwide, that

24   meant that Marlo would get no hours, no work at all.  It would

11:27  25   have effectively eliminated her job.

73

1        So the people the EEOC says contrived to get rid of

2   her changed that.  They started scheduling her for 1:00 to 5:30.

3   They saved her job.  And the paperwork eventually caught up and

4   Marlo signed off on it and didn't attend regularly.  She missed

11:28   5   some days from work where she didn't call in.  We'll talk about

6   that in a couple of minutes.  And she started punching out

7   late -- or early.  Not just 10 minutes early, but 20 minutes, 30

8   minutes, sometimes as early as 3:00.  Nobody really knows why.

9        Now, Dr. Smith is going to come to court and he will

11:29  10   tell you that it is because Down syndrome people resist change,

11   they don't adapt to change well.  That may be true.  He calls it

12   the "groove theory" and we'll talk about that in a little while.

13   But circumstances suggest here perhaps that's otherwise and that

14   Marlo didn't want to change her schedule.

11:29  15        The first aspect is what she said.  She told people at

16   Walmart that if she didn't -- if she worked till 5:30 she would

17   miss her bus, or she would be unable to take her dinner on time,

18   that she was tired, that she felt hot, she might get sick.

19   Those are all puzzling explanations.  Because the buses in

11:30  20   Manitowoc ran to 8:00.  Marlo would pick up the same bus at the

21   same place only a little bit later.  And, as a matter of fact,

22   on those days when she did work her full shift she caught a bus

23   and got home, and there's going to be no evidence that she was

24   ever stranded.

11:30  25        The EEOC says they didn't need it, but there's no

74

1   medical evidence at all that delaying dinner for Marlo or for

2   someone with Down syndrome is a serious issue.  She said she was

3   hot and tired.  Neither one has a medical explanation.

4          And many days she worked her full shift which tends to

11:30   5   suggest that she understood what was needed and expected of her.

6   Other days she left early and she left even before 4:00.

7   Sometimes, as I mentioned, as early as 3:00, which suggests that

8   she wasn't necessarily reverting to the old schedule.

9          But, in any event, what I was telling you is the ways

11:31   10   that these folks in Manitowoc at Walmart tried to help Marlo.

11   Walmart, like every other employer, has an attendance policy.

12   Attending work on time and staying until the shift ends is an

13   essential function of the job, another legal word that you'll

14   hear in the course of this case.  It's important to be present,

11:31   15   especially at a store like Walmart, for customers.

16          Walmart's policy called for seven occurrences within a

17   six-month period before an employee would be let go.  Now, I'm

18   not going to go through how Walmart calculates occurrences in

19   that policy because that would be unnecessarily complicated for

11:32   20   our purposes today.  But from January through July, Marlo

21   accumulated 17 occurrences.

22          If these folks at the Manitowoc store had followed

23   Walmart's attendance policy to the T, Marlo would have been let

24   go in April of 2015 and again in June of 2015.  But that didn't

11:32   25   happen.  Instead what they did is they tried to do what most of

1    us would do, they tried talking to her.  Regularly she was

2    counseled.  They even wrote out or printed out her schedule for

3    her so she would remember it.  When they saw her in the store

4    they would remind her about her hours.  And when they

11:33    5    encountered her at the time clock ready to punch out early, they

6    would take her back and help her find more work to do.

7         She was given several written coachings, Walmart calls

8    them, and she was asked in those coaching sessions to repeat

9    what it was that was expected of her.

11:33    10        I think the evidence is going to show you that Marlo

11    understood what was expected of her.  You know, when Debbie

12    Moss, who was close to her, was called to walk her out of the

13    store, leave the store with her when Marlo was let go, Debbie

14    asked Marlo, "Marlo, do you understand?"  And the word she heard

11:34    15    was, "Yes, I should have worked more."

16        Over the course of that six months in 2015 Marlo left

17    work, by my count, 33 times.  She didn't come to work and didn't

18    call four times.  So the evidence will show that it was not for

19    lack of trying on Walmart's part that this didn't work.  They

11:34    20    tried for eight months.  They ignored their termination policy

21    twice.

22        And when they let her go, they ended the employment

23    relationship with her, they told Marlo, and then they repeated

24    to her sister, you're rehirable.  Walmart's policy, and you'll

11:35    25    hear about it, is that after a lapse of some time people can

1  reapply if they have been let go for attendance problems, but

2  Marlo never reapplied.  Even now, many years later.

3  Nobody wanted this to happen.  Robin Castro, who

4  you've heard a little bit about on opening and has been

11:35  5  subjected to some criticism this morning, has a disabled child.

6  Debbie Moss, the lady that escorted Marlo from the store, has a

7  disabled grandchild.  And Marlo wasn't the only person crying as

8  she left, Debbie Moss wept with her because she felt so bad for

9  her.

11:36  10  It's important that you know a little bit about Marlo.

11  She lives independently, or semi-independently, with her good

12  friend and stepsister, Barbara Barnes.  She bowls, she

13  participates in the Special Olympics, she shops for groceries,

14  she maintains a checking account.  She's an avid sports fan.

11:36  15  She reads the newspaper every day.

16  And Dr. Smith tells us in his testimony it sounds like

17  she's adapted pretty well to life after Walmart.  She helps at

18  her church, she goes to the wellness center two times a week.

19  And Marlo can adapt to change.

11:37  20  While you may have been under the impression that her

21  schedule was fixed and constant before November of 2014, that's

22  not quite accurate.  The schedule changed on a weekly basis.

23  Some weeks she worked one day a week, other weeks she worked two

24  days a week, some weeks four days a week, some three days a

11:37  25  week.  So it changed and Marlo was able to accommodate that.

1    It's also important not just to understand what Marlo

2    understood, but what Walmart knew.  There was no medical reason

3    given ever, ever to Walmart, or the people in Manitowoc, saying

4    any of these problems were related to Marlo's disability.

11:38    5    By the time this came to pass, Marlo's mom, who was

6    her legal guardian, was in a nursing home.  And her sister, Amy

7    Jo Stevenson, who came to that posttermination meeting and told

8    Walmart folks that she was the legal guardian, actually wasn't.

9    She helped.  But she never alerted to anybody at Walmart you

11:38    10    need to me now if you have a problem with Marlo's job

11    performance.

12    Amy Jo Stevenson and her mother, Sandra Barnes, came

13    to that meeting shortly after Marlo was let go, again, without

14    providing any medical information, or any medical support for

11:38    15    what they were saying, and instead they basically issued an

16    ultimatum:  You hire Marlo back or there will be consequences.

17    You heard a little bit about how important it is to talk.

18    Ultimatums are the antithesis of talking.

19    The irony is that by the end of this case you will

11:39    20    hear more about Down syndrome and Marlo's disability than

21    Walmart was ever informed.  The threat had one effect and it

22    inspired an investigation.  Walmart management took this

23    seriously and they investigated again to find out if there was

24    any basis to the claim that there was discrimination.  And after

11:39    25    that investigation they said, no, based on the 17 occurrences

78

1    and our policy, termination is appropriate, she is rehirable.

2        You were told that Marlo's request "can I have my

3    schedule back" is a request for a reasonable accommodation.  The

4    evidence will show that's not what these people at Manitowoc

11:40    5    understood it to be.  It was an indication of a preference to

6    return back to a schedule that Marlo wanted to experience.

7        The testimony will be from Amy Jo Stevenson that she

8    told the personnel coordinator, Karen Becker at Walmart "you

9    need to give Walmart (sic) her old hours back because this is

11:41    10    all caused by her disability."

11        Jurors are made, as the judge has already told you, to

12    know whose testimony is accurate and whose is not.  I would be

13    remiss if I left this stand without telling you that Karen

14    Becker will say that that conversation never occurred.  And

11:41    15    there is a significant suggestion that she is right.  There's no

16    written communication.  And even though Amy Jo Stevenson should

17    come to court and tell you she considered this a very serious

18    matter, she never followed up with Karen Becker.  There was one

19    call, she says, and just one call.

11:41    20        As a matter of fact, Karen Becker says, "It was beyond

21    my authority to do this," and Amy Jo Stevenson says that was

22    what she heard in the conversation as well.

23        But there's no record.  Nobody says somebody in

24    authority ever took up the question.  No one considered the

11:42    25    request that Amy Jo Stevenson supposedly made before the

1    termination.

2            This is going to be a difficult case for you.  It's

3    going to be a difficult case for everybody.  It is human nature.

4    It is natural for you and for all of us to like and empathize

11:42  5    Marlo Spaeth.  And I tell you that just to warn you in advance.

6            The judge has already mentioned that this is a case

7    involving the EEOC and Walmart, two very, very large entities.

8    The EEOC is an agency of the most powerful nation on earth, and

9    Walmart is one of this nation's biggest companies.  But I

11:43  10    suggest to you that this is a case more about decisions, more

11    about decisions made by local people at a local store, common,

12    ordinary people, who are really no different than you or I.

13    They come from Manitowoc and Two Rivers and Fond du Lac and

14    Sheboygan.

11:43  15            Your job is not to second-guess personnel decisions,

16    the way a company operates or not.  Your ultimate role is to

17    decide if what the EEOC has accused these people of is actually

18    true.

19            So I thank you for your very kind attention and wish

11:44  20    you the best.  Thank you.

21            THE COURT:  Thank you, Mr. Burnett.

22            We're going to take our noon recess rather than just

23    start a witness.  And I'm going to give you -- normally we'll

24    just take an hour, but because you have to go find a place for

11:44  25    lunch, the restaurants aren't really at their top speed these

80

1    days, or the sandwich shops, and the court security officer can

2    tell you where some of them are available.  But we'll start up

3    at 1:00.  So please be back in the jury room at 1:00 and we'll

4    start promptly at that time.

11:44    5        We're in recess.  Keep in mind you're not to discuss

6    the case.  The normal caution.

7            (Jury out at 11:44 a.m.)

8        THE COURT:  Okay.  We're outside the presence of the

9    jury.  Anything to put on the record?

11:45    10       MR. BURNETT:  I don't think so, Your Honor.

11       THE COURT:  Okay.  We'll see you all at 1:00 then.

12   We'll start promptly at 1:00.

13       MR. MULAIRE:  Thank you.

14           (Recess taken at 11:45 a.m., until 1:02 p.m.)

01:02    15       THE COURT:  Okay.  The jury should be coming in.

16       I threw a case on your -- on testifying witnesses, on

17   Hanson.  So that's just to take a look at.  We can discuss it

18   later when we get closer to that issue.

19       MS. VANCE:  Thank you, Your Honor.

01:03    20       MR. MULAIRE:  That's the one I gave you, Emery.

21           (Jury in at 1:03 p.m.)

22       THE COURT:  Okay.  Go ahead and be seated, ladies and

23   gentlemen.  We stand when you come in.  It's a tradition when

24   you leave and enter.  And that's a sign of the respect that we

01:03    25   hold for the position that you hold because you're really the

1    judges of the facts.  And that's kind of a tradition in all

2    courts.  It seems strange.  I thought you'd like an explanation.

3              Okay.  Go ahead, be seated.  And we're back on the

4    record.  Jury's here.  Plaintiffs may call their first witness.

01:04  5          MS. VANCE:  Thank you, Your Honor.  The plaintiff

6    calls Amy Jo Stevenson.

7              THE COURT: Ms. Stevenson -- is she out in the hallway?

8              MS. VANCE:  She's out in the hallway.

9              (Brief pause.)

01:04  10        AMY JO STEVENSON, PLAINTIFF WITNESS, DULY SWORN

11             THE CLERK:  Please state and spell your first and last

12   name for the record.

13             THE WITNESS:  Amy Jo Stevenson.  Spell the last name?

14             THE CLERK:  Please.

01:05  15        THE WITNESS:  S-t-e-v-e-n-s-o-n.

16             THE COURT:  Thank you, Ms. Stevenson.  You may be

17   seated.

18             Ms. Vance, you can proceed with your direct exam.

19             MS. VANCE:  Yes, Your Honor.

01:05  20                    DIRECT EXAMINATION

21   BY MS. VANCE:

22   Q.  Good morning, Ms. Stevenson.

23   A.  Good morning, Ms. Vance.

24   Q.  What is your relationship to Marlo Spaeth?

01:05  25   A.  Marlo is my older sister and I am her legal guardian.

1    Q.  Did you and Marlo grow up together?

2    A.  We did.  We grew up in Two Rivers.

3    Q.  Would you please describe for us your current relationship

4    as adults.

01:05    5    A.  We do not live together.  She lives with our stepsister

6    Barb, and I am her legal guardian so I watch over her legal and

7    physical affairs.

8    Q.  Ms. Stevenson, why does Marlo need a legal guardian?

9    A.  Marlo has Down syndrome.  She does not have the mental

01:06    10   capacity to -- she doesn't have the legal competency, so she

11   needs a guardian to care for her money and her well-being.

12   Q.  Aside from her money and her well-being, are there other

13   areas that as a legal guardian you control forever?

14   A.  I take her for her doctor visits.  I schedule them, I take

01:06    15   her to them.  I make sure whatever the doctor says to do we do,

16   be it mammograms or annual physicals or --

17          THE COURT:  Ms. Stevenson, let me just give you a very

18   common warning because it's very difficult sometimes for someone

19   who is not used to these proceedings to realize you have to wait

01:06    20   till she finishes her question before you give the answer.  I

21   think you anticipate probably correctly what it's going to be,

22   but the court reporter has a terrible time taking down two

23   people at once.

24          THE WITNESS:  Very good.

01:06    25          THE COURT:  Uh-huh.

1    BY MS. VANCE:

2    Q.  And then, Ms. Stevenson, for finances what kind of accounts

3    do you manage on Marlo's behalf?

4    A.  Marlo has a checking account, a funeral trust account, and a

01:07   5    special needs trust.

6    Q.  Who is the trustee for the special needs trust?

7    A.  For the special needs trust is myself.

8    Q.  As Marlo's sister are you familiar with her employment

9    history?

01:07   10   A.  I am.

11   Q.  So then turning your attention to Marlo's working career,

12   when did Marlo first enter the workforce?

13   A.  Marlo graduated school, which was a special school in

14   Manitowoc County to serve those with developmental disabilities,

01:07   15   in 1985.  And she started from there in a sheltered workshop

16   called Holiday House, also in Manitowoc, serving Manitowoc

17   County, for adults with various disabilities.

18   Q.  Do you know what type of work tasks Marlo performed?

19   A.  They could vary, but any time I went to visit her she was

01:08   20   working in the ceramics department, mainly decorating pieces.

21   People could custom order and she was decorating the pieces.

22   Q.  And approximately how long did Marlo work at Holiday House?

23   A.  Marlo worked at Holiday House for 14 years, till 1999 when

24   she then started working at Walmart.

01:08   25   Q.  Okay.  And, Ms. Stevenson, I'll ask you to try to get that

1    mic a little closer.  You can move the mic to you.

2    A.  Well, it's on a table, but, okay.

3    Q.  And then, okay, I heard you say 1999 was when she started

4    working at Walmart.  To your knowledge how did Marlo get her job

01:09    5    at Walmart?

6    A.  Marlo went with our mother and with a job coach from Holiday

7    House to seek out employment.

8    Q.  And did Marlo secure employment?

9    A.  She did.

01:09    10    Q.  What was Marlo hired -- what position was she hired into?

11    A.  She was hired in and worked in the domestics department.

12    Q.  Now, what did you observe about having her job at Walmart

13    impacted Marlo?

14    A.  I saw a marked improvement in her social skills, her

01:09    15    outgoingness, her willingness to come to the phone.  Just a very

16    happy lady.  Very proud of her work.  Very proud that she worked

17    at Walmart.  She was very proud.

18    Q.  How would she talk about her work at Walmart?

19    A.  If we passed a truck she would talk about the new load of

01:10    20    towels that were coming in, or on television, "yeah, that's my

21    Walmart."  She was a dedicated employee.

22    Q.  Would Marlo talk about her coworkers from Walmart?

23    A.  She talked fondly of them, yes.  They included her in

24    parties, cards -- she would get balloons and such on her

01:10    25    birthday and they would celebrate her birthday.

1    Q.  Did Marlo ever talk about accomplishments at Walmart?

2    A.  She talked about her bonus checks.  Kind of bragged about

3    her bonus checks.  So we held her -- told her we were going to

4    hold her accountable to take us out to dinner then with her

01:10  5    bonus checks.

6            But she was very proud of, she knew when the new

7    towels shipment was coming in, she knew what she had to do, and

8    she would keep us informed so we knew when the new towels were

9    in.

01:10  10   Q.  And do you know if Marlo ever got raises?

11   A.  She did.  Yes.

12   Q.  Now, turning your attention to the issue of schedule, did

13   you know Marlo's schedule at Walmart?

14   A.  Marlo worked noon to 4:00 every weekday except for Thursday.

01:11  15   Q.  And, Ms. Stevenson, did the fact that Marlo had Down

16   syndrome have any connection to that schedule?

17   A.  I believe it had all the connection, yes.  Because of her

18   Down syndrome she doesn't have the stamina or the endurance to

19   stand for -- stand or walk or perform physical duties for longer

01:11  20   than that.

21   Q.  And did the schedule timing have anything to do with travel

22   or transportation to work?

23   A.  Marlo has always taken a bus to work -- to school and then

24   to work, her entire adulthood.  And when she was at Holiday

01:12  25   House it was a school bus that came around and picked up Marlo

1    and then another boy in the neighborhood.

2              So she was always on a schedule to and from work.  And

3    then when she went to Walmart it became a city bus.  So she was

4    restricted -- she couldn't work a midnight shift, for example,

01:12    5    because the bus doesn't run at that hour.

6    Q.  Could she work weekends?

7    A.  The bus ran on Saturday morning and that was it.  It didn't

8    run at all on Sunday.

9    Q.  Okay.  So did that have anything to do with the hours and

01:12    10   the schedule that Marlo picked -- that Marlo used when she

11   applied to Walmart?

12   A.  Oh, absolutely, yes.  She was limited to when the bus ran so

13   she could get to and from work.

14   Q.  Could Marlo work on holidays?

01:12    15   A.  No, because the bus doesn't run.

16   Q.  And can Marlo drive?

17   A.  No.

18   Q.  Why not?

19   A.  She doesn't have the mental capacity to drive a vehicle.

01:13    20   It's far too complex.

21   Q.  And are you familiar with how Walmart's work schedule fit

22   into Marlo's broader routine, living routine?

23   A.  Perfectly.  She woke up at the same time every morning, ate

24   breakfast at the same time every morning, watched the same

01:13    25   shows, caught the bus at the same time.  Worked her shift.

1  Caught the bus at the same time to come home, ate dinner,

2  watched the same shows at night every day.

3  Q.  You testified there's a lot of things going the same every

4  day in Marlo's routine, but in your experience what happens if

01:14  5  something throws off the routine?

6  A.  Resistance.  If she cannot -- if it's too complex -- and any

7  change really you can see that when it's too complex then she'll

8  commonly ignore the request hoping it will go away.

9       It just, she cannot -- the reason she has her habits

01:14  10  and her routines is what has allowed her to flourish as an

11  adult.  And changing that becomes a problem.  She can't process

12  second to second things like we can.  She can't make snap

13  decisions, she can't change a left turn to a right turn like we

14  can.  She doesn't have the mental faculties to process change.

01:14  15  So it's extremely difficult to change the habits and routines.

16  Q.  Are there signs that show you it's extremely difficult for

17  her?

18  A.  She will shut down and try to ignore that we're trying to

19  change something.  That's I believe her way of saying this "is

01:15  20  the way I do it."

21  Q.  What are the kinds of things she'll say if she's having

22  difficulty with a disruption in routine?

23  A.  Well, she will appease me.  If I say, "Are you riding your

24  bike in the morning?  You're supposed to be riding that bike in

01:15  25  the morning."  She'll say "yes" and then I'll check with Barb or

88

1    check on her and she's not riding the bike.  But she will tell

2    me what she thinks I want to hear to appease me.

3    Q.  Does she have any common complaints if she's having trouble

4    with a forced change in her routine?

01:16  5    A.  She gets frustrated, stressed, too hot is her -- she's often

6    too hot when something -- she takes her little pudgy hand and

7    fans herself and she gets too hot.

8    Q.  And what does that mean?

9    A.  I believe that's -- in my 50-some years of experience that's

01:16  10    her trying to process this change that she's unable to process.

11    Q.  So then, naturally, you would have times when there's a

12    change from the routine that just has to happen.  If

13    something -- if you do have to change the routine for Marlo, how

14    do you handle that?

01:16  15    A.  Handholding.  And give her and explanation.  It has to be a

16    benefit to her as well.  We need to change the grocery shopping

17    time then I say, "We need to go earlier.  You're going to miss

18    Young and the Restless, but you should be back for General

19    Hospital."  So make it a win for her as well that we're changing

01:17  20    something.

21    Q.  And I think I heard you say handholding, are there other

22    examples of ways you would kind of handhold Marlo through --

23    A.  Prep her, tell her every day.  I talk to her every day.  So

24    I would, as much as I can in advance.  The more I said it, the

01:17  25    more I would say it, the more easy it would be when it actually

1    happened.  Or less hard.

2    Q.  Now, I'll direct your attention to your interactions with

3    Walmart about Marlo's employment.

4    A.  Okay.

01:17    5    Q.  When Marlo worked her schedule that was approximately noon

6    to 4:00, did you ever have interactions with Walmart or Walmart

7    HR to talk about Marlo's schedule?

8    A.  There was one instance years ago, I believe 2012, where

9    Marlo's hours -- her days worked were reduced.  She wasn't

01:18    10   working the four days a week.  So my mother had asked me to go

11   in with her and we met with the store manager.  And I stated at

12   that time that we needed to know why Marlo's hours were being

13   reduced; if they weren't reducing everybody's hours that we

14   needed to get Marlo more hours.  And they did get her more

01:18    15   hours.  He opened up the computer right in front of us and

16   listed her availability and made the necessary changes.

17   Q.  Then did Marlo have more days on the schedule after that?

18   A.  Yes.

19   Q.  So asking you to focus on this timeframe of 2014, did you

01:19    20   become aware at any point in 2014 of changes to Marlo's

21   schedule?

22   A.  Yes.

23   Q.  What did you become aware of?

24   A.  She was reporting that she was -- her hours on her time slip

01:19    25   weren't noon to 4:00 so they were wrong.  And she would pull her

1    time slip every time I saw her, out of her purse.  She kept her

2    time -- her work schedule --

3    Q.  Okay.

4    A.  -- out of her purse.  And I would see 1:00 to 5:00, 5:30 or

01:19   5    6:00 shifts at that time.  And she would complain then.  And

6    just like in 2012 when she would complain because she didn't

7    have all her days, "I just have one day this week."

8    Q.  And was specifically the time any problem there?

9    A.  Specific to the time she couldn't get home -- she was going

01:20   10   to miss her bus.  She would miss her bus.  As I stated before,

11   she took the bus at the same time every day to and from.  So she

12   had that down to habit and routine.  So she was going to miss

13   her bus if she stayed at work that late.  Or what she understood

14   to be her bus.

01:20   15   Q.  So once you knew that did you take any action?

16   A.  I did.  I called Karen.

17   Q.  And who is Karen?

18   A.  Karen is the HR manager.  And she's always been our contact,

19   my mom and myself's point of contact with anything regarding

01:20   20   Marlo.  There was always phone calls going both -- not always,

21   but there would be phone calls going both ways.

22   Q.  And what did you tell Karen when you called her?

23   A.  I told her that it was a problem for Marlo to be working

24   past 4:00; that she couldn't do that.  She was getting too hot,

01:21   25   she wasn't able to eat, and she was missing her bus to get home.

1   And that we needed to switch it back to noon to 4:00 like it had

2   been.

3   Q.  Did you explain any other reasons why you were making that

4   request?

01:21  5   A.  Because Marlo has Down syndrome she just couldn't handle

6   working -- she couldn't physically handle working that late and

7   couldn't -- she was complaining she was too hot.

8   Q.  Did you ask Karen to do any -- anything in particular?

9   A.  I asked her to change --

01:21  10  Q.  I'm sorry, to address it?

11  A.  I asked her to have the hours changed back to noon to 4:00

12  to restore the order.

13  Q.  Well, then after this call to Karen did Marlo's schedule get

14  restored to a 4 p.m. end time?

01:22  15  A.  At that time I thought it did.

16  Q.  So did you believe Karen had addressed your concern?

17  A.  Yes.

18  Q.  Okay.  So you call Karen and then you didn't hear about any

19  other problems from Marlo?

01:22  20  A.  No.

21  Q.  And at any point did you come to find out anything

22  different?

23  A.  On Friday, July 10th, in the early afternoon, I got a call

24  from Barb and Marlo's apartment telling me that Marlo had been

01:22  25  let go from Walmart.

1    Q.  Can you describe how Marlo sounded on the phone?

2    A.  I could hear her crying.  She couldn't really talk on the

3    phone, but Barb was relaying what had happened.  And that she

4    came home early and she had a piece of paper, a termination

01:22   5    letter of sorts, but I was on the phone, I couldn't see that at

6    the time.

7    Q.  So what did you do?

8    A.  I hung up with them and I called -- well, I confirmed with

9    Marlo the name of her manager.  It was Julia.  And so I hung up

01:23  10    with them and I called Walmart and asked to speak to Julia, and

11    Julia did come to the phone.  And I asked her -- or I told her

12    that I just talked with Marlo, and I asked her what Marlo

13    possibly could have done to get fired.

14    Q.  I'm sorry, can --

01:23  15    A.  I asked Julia what Marlo possibly could have done to get

16    fired.

17    Q.  What did you learn?

18    A.  I learned that Marlo had been leaving earlier than what her

19    shift ends and that she missed a couple of days of work.  She

01:23  20    didn't show up a couple of days of work.

21    Q.  And what did you do next?

22    A.  I tried reasoning with Julia.  I tried to explain that we've

23    been asking -- Marlo had been asking, my mother had been asking

24    for the shifts to be switched back to noon to 4:00 and it was

01:24  25    obviously a problem.  And she told me that the computer

1    generates the schedules and there's nothing they can do about

2    it.  And I said, "It's 2015, surely you can manually adjust a

3    schedule in the computer."  And she said, "Nope, I have to treat

4    everybody the same."  And I said, "In fact, that's not the

01:24  5    truth."  And that was the end of that conversation.

6    Q.  Did you take any further action?

7    A.  I did.  Then I called Karen, who I had previously talked to,

8    and the two of us set up a meeting for the following Thursday.

9    I wanted to meet with her and the managers without Julia in the

01:24  10    room because I felt that Marlo had been targeted and I didn't

11    think Julie should be present for that conversation.

12    Q.  Then, Ms. Stevenson, did you do anything to prepare for this

13    meeting?

14    A.  Yes, I did.  That Sunday, after she was fired, I went over

01:25  15    to their house and spent the afternoon with them, trying to make

16    sense of the piece of paper which she was given which said she's

17    rehirable.  So that was a positive note.  Tried to understand

18    what had happened by talking to Marlo face to face.  And --

19    Q.  Well, can you tell us if you're at her house, did you

01:25  20    observe her demeanor?

21    A.  Her head was in her hands, crying, *why me?  Why me?  Why did*

22    *they do this to me?  Why me?*

23    Q.  Okay.  And did Marlo talk about her schedule at that point?

24    A.  She talked about two days that were on her schedule that

01:26  25    Karen said not to come into work.  Those were the two days in

1    question.

2    Q.  And did you do anything else to prepare for a meeting with

3    Walmart management?

4    A.  Yes, after I talked with them and had her exit letter that

01:26    5    said she was rehirable, I went and researched.  I needed to

6    educate myself beyond I know this is wrong to why is this wrong,

7    why is this legally wrong and put it into legal terms.

8         Because at that point I was educating myself with the

9    intent to educate them that you can't do that.  So I was

01:26    10    educating myself and learning of the Americans With Disabilities

11    Act and reasonable accommodations, and reading what a reasonable

12    accommodation requirement is and what it's not; if it's an undue

13    hardship then you're not required as a businessowner to do it.

14    But I believe then and now that switching her hours back by that

01:27    15    hour, hour and a half would not have been an undue hardship.

16    Q.  And so if these -- you've been telling us the ways you were

17    preparing for the meeting.  When the time for the meeting came

18    did you bring anything with you?

19    A.  I did.  I brought a fact sheet that I printed off talking

01:27    20    about the Americans With Disabilities Act, who is protected, how

21    they're protected, and reasonable accommodations.  And I also

22    brought the exit letter that she had that said that she's

23    rehirable.

24    Q.  So tell us a little bit about that.  Why did you bring those

01:28    25    two pieces of paperwork with you?

1    A.   As I mentioned, I -- I educated myself and I wanted to go in

2    there and explain what I educated myself on and say this is the

3    law, this is what you're required to do, this says she's

4    rehirable, so let's just make this easy and give her her job

01:28    5    back and restore her hours to noon to 4:00.

6    Q.   So help us picture this meeting a little bit.

7    A.   Okay.

8    Q.   Where was the meeting?

9    A.   It was in a back room in Walmart.  Perhaps the store

01:28    10    manager's office.

11    Q.   And who all came to the meeting?

12    A.   Karen was seated at about 2:00.  Robin was seated over here.

13    Marlo -- mom was next to me, Marlo was across from me.  Some

14    lady I don't know was there.  And then there was a manager -- I

01:29    15    forget her name, was seated right to my right.

16    Q.   Did you say anything at the beginning of the meeting?

17    A.   I did.  What I had just said was that I opened up with -- I

18    just held the two pieces of paper up and said this is the law,

19    this is the Americans With Disabilities Act, Marlo has rights

01:29    20    under this act, and she has been asking for a reasonable

21    accommodation.  And because you've listed on this sheet that

22    she's rehirable, let's just make this easy and rehire her and

23    return her hours to the noon to 4:00.

24    Q.   At any point during the meeting did you talk about any of

01:29    25    the history leading up to that termination?

1    A.  I would have talked about the 2012 meeting where we just

2    walked in and they opened up the computer.  And that was years

3    earlier, they could open up the computer and adjust the

4    schedule.  And so they told me again there that the computer

01:30  5    generated it and the couldn't change it, and I rebutted that

6    with "it has to be possible."

7    Q.  And I heard you testify that Marlo had basically asked for a

8    reasonable accommodation when she was asking for her schedule

9    back; did you recount any other history?

01:30  10   A.  That I had called.  I was -- my mother had called, I had

11   called, and we knew Marlo had asked.  And I looked at Karen when

12   I said this, I said --

13          MR. BURNETT:  Your Honor, I think we're going into

14   hearsay here.

01:31  15          THE COURT:  Approach.

16          (Off-the-record discussion at side bar with

17   Mr. Harlan, Mr. Burnett, Ms. Vance, and the Court.)

18          THE COURT:  So we've cleared that objection up without

19   clearing the courtroom.

01:32  20          So, go ahead, you can proceed.

21   BY MS. VANCE:

22   Q.  So, Ms. Stevenson, I'll ask you -- I'm not asking you about

23   any conversation your mother may have had.  I'd like you to

24   focus on a conversation you had.  And so I'll ask you, at that

01:32  25   meeting had you talked about any history of conversations you

1    had had?

2    A.  Yes.  At that meeting I did -- I looked at Karen when I said

3    -- and I called Karen and asked her to switch the hours back to

4    noon to 4:00 and talked about Marlo's hardship due to Down

01:33    5    syndrome, and Karen nodded her head in the affirmative that I

6    had called and spoke with her.

7    Q.  Did Karen say anything at the meeting?

8    A.  She didn't say a word the whole meeting.  I noted that.

9    Q.  And I heard you testify a moment ago that before the meeting

01:33    10    when you talked to Marlo she had talked about Julie picking on

11    her?  Did I hear that right?

12    A.  Julia and Robin picked on her, is what she broke down and

13    said.

14    Q.  And at the meeting did any topic about -- was there any

01:33    15    discussion about that topic?

16    A.  Picking on -- Marlo stating that she picked on her, no.  But

17    at the meeting I suggested that Julia had targeted Marlo.  I

18    questioned how long Julia had been there, and she had been there

19    a year.  And they also reported that that's when the problems

01:34    20    started happening with her manager, and I suggested at that

21    meeting that she had been targeted by Julia and ultimately

22    removed from her employment.

23    Q.  What was the response from Walmart?

24    A.  Well, we talked for a minute.  The manager was here saying

01:34    25    they just taught Marlo how to do returns.  So Marlo was still

98

1  successful at her job.  And the end -- and I asked if any of the

2  managers had any training working with Down syndrome, and nobody

3  did but a lady -- Robin told me that she had two handicapped

4  sons which, from her explanation, they were severely

01:35  5  handicapped -- but she felt qualified in talking with Marlo.

6          And the end result was me just summing up what I had

7  opened up with, was these are the facts that I've brought.

8  Let's just restore order, give her her job back and her hours of

9  noon to 4:00, four days a week.

01:35  10  BY MS. VANCE:

11  Q.  And then so what was your understanding of where things

12  stood at the end of the meeting, based on Walmart's response?

13  A.  They had to figure it out, was my understanding.  I left

14  there thinking that we would get a call.

01:35  15  Q.  What did you expect?

16  A.  A call that she would be rehired.

17  Q.  And what was your intention going into the meeting in the

18  first place?

19  A.  To restore order.  To educate -- I just educated myself.  I

01:36  20  was trying to educate them that according to the law you must

21  make the reasonable accommodation.  It's not -- it wouldn't be

22  an undue hardship.

23  Q.  So then what happened?

24  A.  I repeatedly called Walmart and asked to speak with Robin.

01:36  25  Somebody told me I had to call and talk to Robin.  And I

99

1    repeatedly, day after day, called to speak with Robin.

2    Sometimes I got her, sometimes I didn't, but every time I did

3    she says she's waiting for regional.  That would be the response

4    I got, "I'm waiting on a response from regional."

01:36    5    Q.  Did Robin ever give you a response from regional?

6    A.  No.  The final time that I talked to Robin she said, "I got

7    a response, but I can't tell you.  I'll have to call Marlo."

8    Q.  So what happened then?

9    A.  Barb and Marlo called me again and told me that she wasn't

01:37   10    getting her job back.

11    Q.  Did you find out if Robin had called Marlo?

12    A.  Yes.  Yes.  Robin did.

13    Q.  So after you learned that Robin said Marlo can't get her job

14    back, what did you do then?

01:37   15    A.  I did some more research and put together a complaint and

16    filed it at ada.gov.

17    Q.  And at this time I'd like to direct your attention to what's

18    been previously admitted into evidence as Plaintiff's

19    Exhibit 21.

20           (Exhibit 21, Intake to DOJ-EEOC00099, admitted

21    previously by stipulation.)

22           MS. VANCE:  Permission to approach, Your Honor?

23           THE COURT:  Sure.

24    BY MS. VANCE:

01:38   25    Q.  There's a binder there, Ms. Stevenson.

100

1   A.  Does this one have to stay up here?  Let me rearrange my

2   desk here.

3   Q.  You should be able to find Exhibit 21.

4           MS. VANCE:  And can we pull it up for the jury?

01:38  5           THE COURT:  I take it this is one of the exhibits that

6   the parties have stipulated to.

7           MS. VANCE:  Yes, Your Honor.  This is in evidence.

8           THE COURT:  And just so the record's clear, the

9   parties had stipulated to the admission of a number of exhibits,

01:39  10  the clerk has that list.  And there's no need to move on the

11  record for the admission of those; the minutes reflect that

12  they're received.

13  BY MS. VANCE:

14  Q.  Ms. Stevenson, what is Exhibit 21?

01:39  15  A.  That is my complaint that I filed online.  This is a

16  printout of it.

17  Q.  Okay.  And is Exhibit 21, does that represent a summary of

18  all of the facts you had gathered at that point?

19  A.  Yes.

01:40  20  Q.  So let's look at this a bit.  You did report a little bit

21  about Marlo's absences in here.  I see a sentence in the middle

22  that starts, "I learned that Marlo received her weekly

23  schedule."  Do you see that?

24  A.  Yes.

01:40  25  Q.  Can you read those two sentences for us?

1    A.   "I learned that Marlo received her weekly schedule from

2    Karen who printed it out for her.  She was told by Karen not to

3    come in on the two days in question."

4    Q.   And was that about no call/no show absences?

01:41   5    A.   Correct.  Correct.

6    Q.   And at the time you talk about how that's not Marlo's style.

7    Can you explain -- if we look a line above, you say, "That's not

8    Marlo's style."  Can you explain what you mean by that?

9    A.   Marlo was far too proud of her job.  She knew she needed to

01:41   10   be at Walmart for Walmart to succeed, so she wouldn't just not

11   show up.

12   Q.   And then I'll direct your attention to the part in your

13   complaint where you would say you advised Walmart.  If we look

14   four lines up from the bottom, can you read the sentence that

01:42   15   says, "I advised them"?

16   A.   Yes.  Do you want me to read that?

17   Q.   Yes, please.

18   A.   "I advised them of the Americans With Disabilities Act and

19   asked that they simply restore Marlo to employment and return

01:42   20   her to her noon to 4:00 shift.  Marlo's dismissal paperwork

21   noted than she was rehirable."

22   Q.   And finish it, please.

23   A.   I'm sorry.  "After more than a dozen telephone calls to

24   Robin to check the status, Marlo was telephoned on September

01:42   25   21st, 2015, to advise her that she will not be hired back."

102

1    Q.  Thank you.

2         MS. VANCE:  Thank you, Lectrice.

3    BY MS. VANCE:

4    Q.  So then I'll direct your attention to the topic of how Marlo

01:43  5    dealt with the termination.  When Marlo was fired by Walmart,

6    were you around enough to observe her demeanor in that

7    timeframe?

8    A.  Yes, I was.  In fact, we vacationed together.  She -- any

9    time the word "Walmart" came up, be it commercials, or trucks,

01:43  10   her head would go in her hands.  Her biggest concern that Sunday

11   after she was terminated was "I left work too early on Friday, I

12   didn't get my schedule from Karen."

13        So she was -- on that Sunday she was distressed,

14   talking about not having her job but still wondering where her

01:43  15   schedule was for that next week.  And she was like that for

16   years.  A television commercial would come on and she'd put her

17   head in her hands and ask if the television commercial was over

18   so she could open her eyes back up.

19   Q.  Did you observe any specific symptoms of kind of a change in

01:44  20   Marlo at that time?

21   A.  Increased dependence on her stepsister that she lived with.

22   Resistance to make her own decisions.  In my terms she was in a

23   shell.  She wasn't outgoing.  She wasn't proud of her job.  Her

24   job had been taken from her which prompted her to repeatedly

01:44  25   say, *why me?  Why did they do this to me?  Why me?*

1   Q.  Did you notice any change in her cognitively or -- yeah,

2   cognitively.

3   A.  I thought she had been suffering from some memory loss.

4   Q.  Can you give us an example of what made you think she was

01:45   5   having memory loss?

6   A.  She didn't know -- she would tell me the Brewers won if the

7   Brewers lost.

8   Q.  Okay.  What did you do?

9   A.  I called her primary care physician, Annette Kaminski, and

01:45   10   expressed to her that I had some concerns.  I didn't know what.

11   And we talked about dementia.  And Annette over the phone

12   prescribed I think it was called Aricept, a drug for dementia.

13   And had us follow up 14 days or 30 days later.

14   Q.  And once Marlo got on that dementia prescription for

01:46   15   Aricept, was there a change?

16   A.  Not a positive change.  Her blood pressure reacted poorly to

17   the med, but there was no other change in her demeanor or --

18   Q.  Is Marlo currently on dementia medication?

19   A.  No, she was taken off.  When we went to visit it was decided

01:46   20   it was not beneficial.

21   Q.  And what -- what happened to change her treatment?

22   A.  We went to see Dr. Smith at Children's Hospital, a Down

23   syndrome specialist.  To the best of my knowledge that was the

24   first time she had seen a Down syndrome specialist.  And I

01:46   25   brought up the term "dementia" and he said, no, we'll talk about

104

1    that later.

2            So we went through the physical and he came back and

3    said, "She doesn't have dementia, she has depression."  And

4    she's been on depression/anxiety meds ever since.

01:46  5            And we went on vacation right after she started

6    talking the depression meds, the Talopram.  And they say wait

7    six weeks, but within 10 days you could see Marlo was back to

8    who I've seen before.

9    Q.  So there was a change.

01:47  10   A.  Yes.  With the citalopram with the dementia.

11   Q.  With the depression treatment.

12   A.  Yeah.

13   Q.  Okay.  And at that point there was no dementia medication

14   anymore?

01:47  15   A.  No dementia medication or diagnosis, no.

16   Q.  And to this day is Marlo under treatment, under medication?

17   A.  She still takes the citalopram.

18   Q.  For depression.

19   A.  For depression.

01:47  20   Q.  Overall how would you say this termination impacted Marlo?

21   A.  It was detrimental to her.  It was her life.  She

22   identified, "I'm Marlo, I work at Walmart."  And in her eyes

23   Walmart needed her.  She was very proud of her employment.  She

24   was proud of her blue vest.  Hung her vest when she got home.

01:48  25   Packed her lunch before she got on the bus in the morning.  And

1    extremely proud of her -- what she was contributing to Walmart.

2    And just absolutely enjoyed the people she worked with; not just

3    the people she worked with, but the customers at the store,

4    which from time to time would be friends that would go there and

01:48    5    seek her out.

6    Q.   And so then after the termination did that change?

7    A.   It changed dramatically.  When she first got her job at

8    Walmart I remember noticing that she would come on the phone,

9    she would call me, she'd say, "Hey, what's up, how are you

01:48    10    doing?"  And after termination to this day she won't come on the

11    phone when I'm on the phone.

12              MS. VANCE:   I have no further questions for this

13    witness at this time.  Thank you.

14              THE COURT:   Okay, thank you.  Cross?

01:49    15              MR. BURNETT:   Thank you, Your Honor.

16                        CROSS-EXAMINATION

17    BY MR. BURNETT:

18    Q.   Good afternoon, Ms. Stevenson.  Can you hear me?

19    A.   I can.

01:49    20    Q.   Okay, thank you.  If we could start off at the very

21    beginning.

22              (Brief pause.)

23    BY MR. BURNETT:

24    Q.   Are you okay?

01:49    25    A.   I'm fine, thank you.

1    Q.  Great.  Please start at the beginning.  You talked about

2    your discussions after this conference with Walmart managers

3    after Marlo was terminated, and you said at some point in time

4    Robin Castro couldn't discuss things with you anymore; is that

01:50    5    right?

6    A.  Yes.

7    Q.  In 2015, that's when this conference happened; right?

8    A.  Correct.

9    Q.  You were not Marlo's legal guardian at that time, your

01:50    10    mother was; true?

11    A.  I was her legal standby guardian and my mother asked me to

12    the meeting.  She asked me to be an active participant in

13    Marlo's guardianship.

14    Q.  I'm not suggesting that somehow or another you shouldn't be

01:50    15    involved, but what I am wondering is if you were her legal

16    guardian at the time.

17    A.  I was her legal standby guardian.

18    Q.  Not her legal guardian; true?

19    A.  True.

01:50    20    Q.  As a matter of fact, you didn't become her legal guardian

21    until sometime after your mother passed away; right?

22    A.  Correct.

23    Q.  Your mother passed away in about 2016; true?

24    A.  Yes.

01:50    25    Q.  At no point in time did you call up Walmart and say that you

107

1    were the substitute they should talk to for your mother; true?

2    A.  Correct.

3    Q.  Marlo was close to her mother?

4    A.  Yeah.

01:51    5    Q.  She loved her mom?

6    A.  Yes.

7    Q.  She talked to her frequently?

8    A.  Yes.

9    Q.  Even after her mother went into nursing home care.

01:51    10    A.  Yes.

11    Q.  Your mother passed after Marlo's job at Walmart ended;

12    right?

13    A.  Yes.

14    Q.  And has Marlo told you in the past that she missed her mom?

01:51    15    A.  Yes.

16    Q.  And she had a stepdad she was close to as well; right?

17    A.  Yes.

18    Q.  And she's told you she missed her stepdad.

19    A.  Correct.

01:51    20    Q.  And she does that with some frequency, even recently; true?

21    A.  Yes.

22    Q.  This depression that you indicate you saw in Marlo, when do

23    you think that first started?

24    A.  Before she was terminated.  I think she was having some

01:52    25    difficulty.

108

1   Q.  Before she was terminated.  The serious depression problems,

2   did you have a conversation about those with Dr. Smith?

3   A.  I don't understand the question.

4   Q.  Did you tell Dr. Smith that her depression didn't start

01:52   5   until six to eight months after her job ended at Walmart?

6   A.  No.  He's the doctor that I said "dementia" to and he

7   corrected me.

8   Q.  But that wasn't my question.  Did you tell Dr. Smith --

9   A.  No.

01:53   10   Q.  -- let me finish, please.  Did you tell Dr. Smith that

11   depression, the symptomology that you saw, started six to eight

12   months after Marlo's job at Walmart ended?

13   A.  I don't think so.

14   Q.  And you talked to Dr. Smith, though, about some symptoms

01:53   15   that you observed in Marlo that you hadn't seen before her job

16   ended; right?

17   A.  I believe so, yes.

18   Q.  And one of the things you told him is she's more irritable

19   now than she was then; correct?

01:53   20   A.  I don't recall.

21   Q.  Did you tell him that she had a tendency to correct people

22   which she didn't have before?

23   A.  I don't recall.

24   Q.  Did you tell him that she had some engagement in self-talk?

01:54   25   A.  In what?

1    Q.  Self-talk.  Talking to herself.

2    A.  She's always had that, yeah.

3    Q.  Did you tell Dr. Smith that was --

4    A.  I don't recall.  I don't know that I did.

01:54  5    Q.  Did you tell Dr. Smith that you noticed the onset of a

6    memory loss some six to eight months after her job at Walmart

7    ended?

8    A.  I think you asked that already, and I don't think --

9    Q.  I don't think I asked about the memory loss.

01:54  10   A.  Okay.

11   Q.  So let me say it again.  Did you tell Dr. Smith that the

12   memory loss first started six to eight months after --

13   A.  No.

14   Q.  -- Marlo's job ends at Walmart?  And that's a no?

01:54  15   A.  No.

16   Q.  You deny that.

17   A.  Correct.

18   Q.  Under oath.

19   A.  Correct.

01:54  20   Q.  You talked a little bit about Marlo telling -- I think you

21   used the word "peacekeeper;" is that right?

22   A.  No, I didn't.

23   Q.  She likes to avoid conflict.

24   A.  I didn't say that either, but --

01:55  25   Q.  She prefers to avoid conflict?

1    A.  Yes.

2    Q.  And sometimes she'll tell you things that aren't accurate in

3    order to accomplish that.

4    A.  Is that a question?

01:55   5    Q.  Yes, it is.

6    A.  Okay, could you rephrase it?

7    Q.  Sure.  Does Marlo sometimes tell you things that are not

8    accurate in order to avoid conflict?

9    A.  That's my belief, yes.

01:55   10   Q.  And she's done that all her life.

11   A.  Yes.

12   Q.  That's not a new development since she left her job at

13   Walmart.

14   A.  I believe it's part of the Down syndrome, what I mentioned

01:56   15   before.

16   Q.  When you talked to Marlo about missing two days of work when

17   she was scheduled and Walmart said she didn't attend, Marlo said

18   "I was told not to come in"?

19   A.  Correct.

01:56   20   Q.  And you saw a written schedule for that work schedule;

21   right?

22   A.  I did not see that last one, no.

23   Q.  So you didn't -- did you ask to see it?

24   A.  I did.  Nowhere to be found.

01:56   25   Q.  Marlo didn't show it to you.

1    A.  Right.

2    Q.  Okay.  Did you tell -- Strike that.

3            When you went to Walmart in 2012 to talk about

4    readjusting the schedule, seeing that Marlo got more hours, you

01:56    5    said you talked to a manager; is that right?

6    A.  Correct.

7    Q.  Easy man to talk to?

8    A.  In my memory, yes.

9    Q.  Easy to schedule an appointment with?

01:57   10    A.  I think so.

11    Q.  Receptive to the message you were communicating?

12    A.  I believe so.

13    Q.  Seemed to like Marlo?

14    A.  I believe --

01:57   15            MS. VANCE:  Objection, calls for speculation.

16            THE COURT:  Just a minute.  There was an objection.

17            MS. VANCE:  Your Honor, it calls for speculation.

18    "Seemed to like Marlo."

19            MR. BURNETT:  I'll restate the question, Your Honor.

01:57   20    BY MR. BURNETT:

21    Q.  Did you get the sense that he disliked Marlo?

22    A.  No.

23    Q.  As a matter of fact, he did what you asked; gave her more

24    hours?

01:57   25    A.  Correct.

1    Q.  No indication at that time that anybody wanted to see Marlo

2    gone, was there?

3    A.  Not that I saw.

4    Q.  Okay.  You said Marlo would complain frequently about this

01:57  5    change in hours in 2014 when it first happened; is that right?

6    A.  Yes.

7    Q.  I know there was some questioning in deposition about how

8    frequently she would complain about it and I think your answer

9    was somewhere between a dozen times and a hundred times; is that

01:58  10    right?

11    A.  I don't recall, but, yes.

12    Q.  All right.  If we left it at Marlo would speak up frequently

13    and tell you about her dissatisfaction with her schedule, would

14    that be accurate?

01:58  15    A.  Yes.

16    Q.  She wasn't reluctant to talk to you, was she?

17    A.  Absolutely not.

18    Q.  You had this conversation you say with Karen Becker over the

19    phone?

01:58  20    A.  Correct.

21    Q.  It was a short perfunctory five-minute conversation?

22    A.  That would be accurate.

23    Q.  And basically you say you said what you've already recited.

24    A.  Correct.

01:58  25    Q.  And where she left it is, is I have to talk to a manager;

113

1    right?

2    A.  Yes.

3    Q.  So you were expecting some further action; true?

4    A.  Not that I was a party to, but, yes.

01:59  5    Q.  You were expecting somebody would do something and take care

6    of the issue.  Is that accurate?

7    A.  Correct.

8    Q.  When do you say this conversation with Karen Becker

9    happened?

01:59  10   A.  The winter of '14 and '15.

11   Q.  The winter of 2014-15, so that would be November or

12   December, January?

13   A.  Yeah.

14   Q.  Possibly as late as February?

01:59  15   A.  Yeah.

16   Q.  But long before July; correct?

17   A.  I believe so, yes.

18   Q.  Okay.  So if it happened at the latest in February, we got

19   March, April, May, June, July before Marlo's let go; true?  Five

01:59  20   months?

21   A.  Yes.

22   Q.  And in those five months is it your testimony that Marlo

23   never said a word about dissatisfaction with her schedule?

24   A.  "Never" is a strong word, but, yes.

02:00  25   Q.  You have no memory of that ever occurring.

1    A.  No.

2    Q.  And, therefore, you had no further conversation with Karen

3    Becker, for example.

4    A.  Correct.

02:00    5    Q.  And no conversation with any manager who you would expect to

6    have the authority to make the changes that you wanted.

7    A.  Further conversation, no.

8    Q.  Just Karen Becker, five minutes in the winter of 2014 to

9    2015; correct?

02:00    10    A.  Yes.

11    Q.  And you did nothing after that; right?

12    A.  Before her termination?

13    Q.  Before her termination.

14    A.  No.

02:00    15    Q.  And Marlo said nothing after that.

16    A.  To me, no.

17    Q.  You didn't take responsibility for transporting Marlo to

18    work, did you?  She took the bus.

19    A.  Correct.

02:01    20    Q.  Did you ever look to see when she was arriving at work --

21    A.  No.

22    Q.  -- after November of 2014 when the schedule changed?

23    A.  No.

24    Q.  And were you -- you were never aware that she was leaving

02:01    25    work early; is that true?

1    A.  Correct.

2    Q.  You say Karen Becker never told you that in this

3    conversation you said you had.

4    A.  Correct.

02:01  5    Q.  So you have a conversation with Karen Becker in late

6    February of 2015 or thereabouts, and she never mentioned a word

7    to you about Marlo having attendance problems?  Is that true?

8    A.  Correct.

9    Q.  Okay.  You said Marlo has a special needs trust; right?

02:02  10   A.  Correct.

11   Q.  You are the trustee?

12   A.  Correct.

13   Q.  You would control any funds that she puts into that trust;

14   correct?

02:02  15   A.  Correct.

16   Q.  And you're responsible for all her visits to the doctor for

17   her health care; is that right?

18   A.  Yes.

19   Q.  When you saw Dr. Smith, the Down syndrome specialist that

02:02  20   you said you saw, was that at the EEOC's suggestion?

21   A.  Yes.

22   Q.  So the lawyers for the EEOC told you to go see this doctor.

23   A.  Right.  I was excited to go see with that doctor, a Down

24   syndrome specialist.

02:02  25   Q.  But it was at their suggestion?

1    A.   Yes.

2    Q.   Did you have a conversation with Dr. Smith to the point

3    where he said I'm not treating Marlo, I'm going to serve as an

4    expert witness?

02:03    5    A.   No.

6    Q.   You haven't seen him since that initial visit; right?

7    A.   No, he was retiring.

8    Q.   Okay.  As a matter of fact, wasn't he retired at the time

9    you saw him?

02:03    10    A.   Not that I recall.  I remember he was on his way out the

11    door because his brother had just passed.  He was literally just

12    getting on a plane.

13    Q.   So you don't think he was retired.

14    A.   I don't think so.

02:03    15    Q.   You saw him in 2018?

16    A.   (No response.)

17    Q.   Don't remember?

18    A.   No, I don't remember.

19    Q.   Okay.  Did Marlo, based on your communications with her,

02:04    20    understand that she was supposed to work from 1:00 to 5:30?

21    A.   No, she worked noon to 4:00.  She worked noon to 4:00.

22    Q.   She never understood she was supposed to work 1:00 to 5:30.

23    A.   Right.  That's my understanding, yes.

24    Q.   Okay.  Did you review your deposition testimony before

02:04    25    coming to court today?

117

1    A.  I did.

2    Q.  Okay.  I'm going to show you a passage out of that

3    deposition.  If you could look at page 268, starting at line 4.

4    Now, when you gave this deposition it was a long day on

02:05    5    September 21, 2018; correct?

6    A.  Correct.

7    Q.  And at the beginning of the deposition you were sworn to

8    tell the truth, just like today; is that right?

9    A.  Correct.

02:05    10    Q.  Were you asked this question?

11         MR. BURNETT:  Could we see the deposition transcript,

12    please?  It would be -- my copy is not marked.

13         It would be page 68 [sic].  I'm sorry.  If we could

14    start on line 4.  Just highlight it for the jury, please.

02:06    15         TECHNICIAN:  On which page?

16         MR. BURNETT:  Page 268, line 4, please.

17    BY MR. BURNETT:

18    Q.  "QUESTION:  1:00 to 5:30.  And did she understand based on

19    your communications that that was -- those were the hours she

02:06    20    was supposed to work?"

21         Your answer to that question was:  "Yes," was it not?

22    A.  The answer to that question was "yes," correct.

23    Q.  Okay, thank you.

24         MR. BURNETT:  We can take it down.

02:07    25    BY MR. BURNETT:

1    Q.  You talked a little bit about Marlo's acquiring her job at

2    Walmart and the bus schedule being important and that type of

3    thing.  You weren't present for that original encounter, were

4    you, when she interviewed?

02:07    5    A.  No.

6    Q.  And you were not present for any of Marlo's communications

7    with managers at Walmart about wanting to get her old hours

8    back, her old schedule back; true?

9    A.  Correct.

02:07    10    Q.  The reasons Marlo gave you for that, I just want to list

11    them that I think I heard, is that she might miss dinner as

12    scheduled; right?

13    A.  She would, yes.

14    Q.  She could miss the bus; right?

02:08    15    A.  She would miss the bus, yes.

16    Q.  She was hot; right?

17    A.  Yes.

18    Q.  And it was too late to work.

19    A.  Yes.

02:08    20    Q.  Any other reasons?

21    A.  Not that I can think of at this time.

22    Q.  Now, the bus schedule ran after 5:30, didn't it?

23    A.  Her bus came at the same time every day.

24    Q.  And the bus schedule, she could catch another bus after

02:08    25    5:30; right?

119

1    A.  She couldn't comprehend that.

2    Q.  Did she take the bus on occasion after 5:30 to get home?

3    A.  I don't know.

4    Q.  Did you ever get a call that she was stranded and she needed

02:08    5    a ride?

6    A.  No.

7    Q.  Okay.  She cooked for herself; correct?

8    A.  No.

9    Q.  She doesn't know how to cook?

02:09    10    A.  Well, with supervision she can cook, yes.

11    Q.  Doesn't she and Barb cook themselves?

12    A.  They warm up meals.

13    Q.  Were you aware whether or not Barb would get upset or

14    disturbed if Marlo didn't come home for dinner at an appointed

02:09    15    time?

16    A.  I never heard of that.

17             MS. VANCE:  Objection, foundation.

18    BY MR. BURNETT:

19    Q.  Did Marlo ever communicate that to you?

02:09    20    A.  No.

21    Q.  Did Barb ever communicate that to you?

22    A.  No.

23    Q.  You don't know if that was a problem or not.

24             MS. VANCE:  Withdraw.

02:09    25             THE WITNESS:  If it was I would have heard of it from

120

1    one of them, but I hadn't.

2    BY MR. BURNETT:

3    Q.  Okay.  The accommodation that you say you requested from

4    Walmart, did you ever do that in writing?

02:09   5    A.  No.

6    Q.  And the tendency of Marlo getting hot or needing to eat at a

7    specific time or the like, did you ever see a medical doctor

8    about any of those issues?

9    A.  No.  Those were common symptoms of -- common traits of Down

02:10  10    syndrome individuals.

11    Q.  There was not a medical reason in terms of a physiological

12    reason.

13    A.  Yeah, that's traits of Down syndrome, yes.  No.  You go.

14    Q.  You're saying they're characteristics of Down syndrome

02:10  15    adults, but not medically necessary in the sense that they're

16    not physiologically necessary.

17    A.  They are because of the Down syndrome.

18    Q.  Okay.  Marlo participates in the Special Olympics?

19    A.  Yes.

02:10  20    Q.  And she's in bocce ball and bowling?

21    A.  Yes.

22    Q.  And she has been for a long, long time.

23    A.  Yes.

24    Q.  She's been able to navigate the bus schedule adequately;

02:10  25    correct?

1   A.  No.

2   Q.  She took the bus back and forth to work at Walmart for 15

3   years, didn't she?

4   A.  She took her bus at a set time in the morning and took her

02:11  5   bus at a set time in the evening.  She didn't navigate the bus

6   system.

7   Q.  Got it.  She would arrive at Walmart and return from

8   Walmart.

9   A.  Correct, at designated times.

02:11  10  Q.  Doesn't she and her roommate occasionally take the bus

11   elsewhere?

12   A.  Right, yes.

13   Q.  She's an avid sports fan?

14   A.  Yes.

02:11  15  Q.  Reads the newspaper daily?

16   A.  She used to.  I think she does.

17   Q.  She has a checking account?

18   A.  She writes checks under supervision, but I maintain the

19   checking.

02:11  20  Q.  You watch it, but she handles it.

21   A.  Define "handle."

22   Q.  She writes checks under circumstances where there's enough

23   money in the account to cover.

24   A.  She writes checks because she's told to.

02:11  25  Q.  She grocery shops?

122

1  A.  With me or with somebody.

2  Q.  She selects what she wants and pays for it.

3  A.  Do you want to expound on that?  That was far too general.

4  Q.  She selects the groceries she wants to buy; right?

02:12  5  A.  Some of them, yes.

6  Q.  And then she pays for them at the checkout?

7  A.  I manage the paying.

8        MR. BURNETT:  Could we see Exhibit 1050, please.  And

9  specifically, page 2939.

02:13  10  BY MR. BURNETT:

11  Q.  Ma'am, I'm going to show you what's been marked as a medical

12  record from Holy Family Memorial Medical Center.  Do you see

13  that?

14  A.  I do.

02:13  15  Q.  And do you see your mother's signature Sandra Barnes on the

16  bottom?

17  A.  I do.

18  Q.  And do you see the date is May 4, 2010?

19  A.  I do.

02:13  20  Q.  And then I want you to go to the very first question.  It

21  says, "Is it okay to leave a voicemail message stating normal

22  negative mammogram results?"  Do you see that?

23  A.  I do.

24  Q.  And then it's got a phone number next to it; is that right?

02:14  25  A.  That's blocked out.  Something's blocked out.

123

1    Q.  All righty.  And then we have --

2              Oh, I'm sorry.  We have a passage that reads:

3    "Patient has Down syndrome, but very capable of understanding

4    results, per mother."  Do you see that?

02:14    5    A.  I do.

6    Q.  Your mother wasn't wrong about that, was she?

7    A.  I believe she was.

8    Q.  The termination form that you saw from Walmart said that

9    Marlo was rehirable; is that right?

02:15    10   A.  Yes.

11   Q.  And it said that in order to rehire Marlo there needed to be

12   an application; is that true?

13   A.  I did see that later, yes.

14   Q.  In the six years or so since Marlo has been gone from

02:15    15   Walmart, she's never filled out an application to return to work

16   there, has she?

17   A.  She wouldn't be capable of filling one out.

18   Q.  You've never filled one out for her; is that true?

19   A.  No, I called that meeting.

02:15    20   Q.  Pardon?

21   A.  I called that meeting to restore her job.

22   Q.  You never filled out a form since then; right?

23   A.  No.

24   Q.  Dr. Smith suggested a return to work might be of some

02:15    25   benefit to her?

124

 1   A.  Not that I recall.

 2   Q.  Did Marlo apply for work anywhere?

 3   A.  She did volunteer work at the church.

 4   Q.  Did she apply for paid employment anywhere?

02:16   5   A.  We applied at Goodwill I think was the only place that we

 6   applied.

 7   Q.  That's it, one place in six years?

 8   A.  I believe so.

 9   Q.  You didn't apply for anything after Dr. Smith would have

02:16   10   seen her in 2018?

 11   A.  I don't think so.

 12   Q.  Didn't apply for anything after you talked -- you talked to

 13   Dr. Smith again in 2019, didn't you?

 14   A.  Sometime, yes.

02:16   15   Q.  And that's the last time you have spoken with Dr. Smith?

 16   A.  Yes.

 17   Q.  She didn't apply anymore after --

 18         MS. VANCE:  Objection.  May I approach, Your Honor?

 19         THE COURT:  Yes.

02:16   20         (Off-the-record discussion at side bar with all

 21   counsel and the Court.)

 22         THE COURT:  Okay.  All right.  Go ahead, Mr. Burnett,

 23   you may proceed.

 24         MR. BURNETT:  Your Honor, in my old age I don't

02:20   25   remember if there's a question pending.  If there was an

1    objection or not.

2              (Record read.)

3    BY MR. BURNETT:

4    Q.  There was no further applications done after 2019; is that

02:20  5    right?

6    A.  Correct.

7    Q.  Is it a fact that your sister is eligible for and received

8    Social Security benefits?

9    A.  Yes.

02:20  10   Q.  You have nothing that -- no letter that followed up your

11   conversation with Karen Becker about this request for

12   accommodation that you testified about; right?

13             MS. VANCE:  Objection, relevance.

14             THE COURT:  Overruled.

02:21  15   BY MR. BURNETT:

16   Q.  Go ahead.

17   A.  Repeat, please.

18   Q.  Sure.  Is there any letter that you wrote that memorializes

19   your call with Karen Becker about this request for

02:21  20   accommodation?

21   A.  No.

22   Q.  No email either.

23   A.  No.

24   Q.  No memo, no note, no nothing.

02:21  25   A.  Not that I sent to anybody, no.

126

1   Q.  Okay.  You said that your sister complained that she was

2   picked on.  That's nothing you saw yourself; correct?

3   A.  Correct.

4   Q.  And she never said that anybody disparaged her intellect;

02:21   5   true?

6   A.  When she talked about Robin and Julia picking on her they

7   would stand behind her and tell her that she was folding the

8   towels wrong or doing a bad job.

9   Q.  No one disparaged her intellect; right?

02:22   10   A.  Not that I'm aware of.

11   Q.  And nobody disparaged her appearance?

12   A.  Not that I'm aware of.

13   Q.  Nobody made jokes about her Down syndrome condition?

14   A.  At Walmart?

02:22   15   Q.  Yes.

16   A.  Not that I'm aware of.

17   Q.  Nobody made any offensive comments that your sister told you

18   about; true?

19   A.  Not that I'm aware of at Walmart.

02:22   20   Q.  I'm almost done, ma'am.

21           If we could go to Exhibit 1041.

22           (Exhibit 1041, Certified Circuit Court File In the

23   Matter of Marlo Lee Spaeth, admitted previously by stipulation.)

24   BY MR. BURNETT:

02:22   25   Q.  Starting at page 2950, please.

127

1        Every year since you were appointed her official legal
2   guardian you had to fill out a report for the Manitowoc County
3   Probate Court as to how your sister's doing; is that right?
4   A.  Yes.
02:23   5   Q.  If we go to page the 2950.
6        No, page 2950.  Bear with me, please.
7        Could we go to page 2001?  Have you got 2950?
8   Perfect.
9   A.  How do I get to 2001?
02:24   10  Q.  I apologize.  Apparently my exhibits have a different page
11  numbering.  So I'm just going to use what you have.  Do you got
12  2950?
13  A.  I do.
14  Q.  Okay.  This is an annual report of the condition of the ward
02:24   15  that your mother prepared for Marlo; correct?
16  A.  Yes.
17  Q.  And it's dated June 1, 2015.  Do you see that?
18  A.  Yes.
19  Q.  Some month or so -- Strike that.  Some 11 months or so after
02:24   20  she left Walmart.  Do you see that?
21      MS. VANCE:  Objection.
22  BY MR. BURNETT:
23  Q.  June of 2015 would be -- she left Walmart in -- oh, I'm
24  sorry, I'm confused.  It's a month before she left Walmart.
02:25   25  A.  Yes, it is.

128

1   Q.  And your mother certifies her condition as "no change."

2          "Has your ward's health changed in the last year?"

3          Box is marked -- checked "no change;" correct?

4   A.  Under 2C yes, it is.

02:25   5   Q.  And then if we go to 2953, this is a report your mother

6   filled out in February of 2016; correct?

7   A.  Yes, that's the date on it.

8   Q.  That is after your sister left Walmart by some six or seven

9   months; true?

02:26   10   A.  Yes.

11   Q.  And the box next to "has your ward's health changed in the

12   last year" is again marked "no change;" right?

13   A.  Correct, that's when we began seeing physicians.

14   Q.  I'm sorry?

02:26   15   A.  That's the month that we started seeing the physician, after

16   that.

17   Q.  Let's go to 2356.

18          THE COURT:  You mean 2956?

19          MR. BURNETT:  2956, I'm sorry.

02:26   20   BY MR. BURNETT:

21   Q.  I'm just going to go ahead.  On 2956, do you have that page

22   in front of you?

23   A.  I do.

24   Q.  That's 2017?

02:27   25   A.  It is.

129

1    Q.  And is that the first report that you would have filled out?

2    A.  Yes.

3    Q.  And you provided similar information on Marlo's health;

4    correct?

02:27    5    A.  Yes.

6    Q.  And what do you say her health was at that point in time?

7    A.  That her health had worsened.

8    Q.  And do you give a reason?

9    A.  At that time I thought it was dementia.

02:27    10    Q.  Your words are "dementia has set in and is progressing;" is

11    that right?

12    A.  Right.

13    Q.  And if we can go to 2019, page 3008.  Do you have that?

14    A.  Yes, I do.

02:27    15    Q.  And do you also report on Marlo's health at that point in

16    time?

17    A.  Yes.

18    Q.  And how do you describe it?

19    A.  Again I listed "worsened and signs of dementia."

02:28    20    Q.  Okay.  So the information is that between 2017 and 2019 it's

21    worsened; correct?

22    A.  That's what I listed, yes.

23    Q.  And when did the depression medication start?

24    A.  I don't recall.

02:28    25    Q.  Was it 2018 when you saw Dr. Smith?

1    A.   It was linked to Dr. Smith, yes.  He prescribed it.

2    Q.   So it would have been before this.

3    A.   Right.

4    Q.   In 2020 do you report on your sister's health?  Page 3009?

02:28    5    A.   Yes.

6    Q.   And how do you report there?

7    A.   "No change."

8    Q.   From the dementia that you reported in the year earlier.

9    A.   (No response.)

02:29    10    Q.   Is there a box on that form that could be marked if the

11    condition had improved?

12    A.   Yes.

13    Q.   In 2019 you didn't say the condition was improved; right?

14    A.   Not on this form, no.

02:29    15    Q.   And in 2020 you didn't say the condition was improved?

16    A.   Not on the form, no.

17    Q.   And then the form -- go to page 3010, if you would, please.

18    Is that a similar form for this year?

19    A.   Yeah.

02:29    20    Q.   And when did you sign that one?

21    A.   Says February 1st, 2021.

22    Q.   And how did you report your sister's health at that point in

23    time?

24    A.   That there's been no change.

02:29    25    Q.   On any of these formats that we've been looking at I didn't

131

1    see the word "depression."  Do you remember seeing it?

2    A.  No.

3              MR. BURNETT:  Thank you, ma'am.  That's all I've got.

4              THE COURT:  I just realized that I think the court

02:30  5    security officer was trying to tell me earlier, we didn't hand

6    out pads for notes.  Can you do that?

7              And I realize it's been a while, but if you want to

8    take whatever notes real quick.  I don't want to do this all

9    over.  And keep in mind you'll hear arguments and have exhibits

02:30  10   later.

11             Sorry about that.  I must have missed his hint and

12   sleeping at the switch.  Sorry.  If you put your name on the

13   first page and then, you know, take your notes after that.

14             (Brief pause.)

02:30  15             MR. BURNETT:  I'm done.  Thank you.

16             THE COURT:  Okay.  Why don't we just wait a little

17   bit.

18             (Brief pause.)

19             THE COURT:  Everybody ready?  Do you have any

02:31  20   redirect?

21             MS. VANCE:  Yes, Your Honor.  Brief.

22             THE COURT:  Okay.  Go ahead.

23                      REDIRECT EXAMINATION

24   BY MS. VANCE:

02:31  25   Q.  Ms. Stevenson, did Marlo receive Social Security disability

1    benefits before being fired?

2    A.  Yes.

3    Q.  So that's something that has not changed in her life; is

4    that correct?

02:31    5    A.  Correct.

6    Q.  And the guardianship forms we were looking at, did they have

7    any questions about mental health?

8    A.  They do not.

9    Q.  And then I'll direct your attention back to that 2017

02:31    10    report, which was page D002956, where you wrote "dementia has

11    set in and is progressing."

12    A.  Yes.

13    Q.  What, if anything, have you learned about what you believed

14    was dementia back when you signed this in 2017?

02:32    15    A.  Well, Dr. Google was --

16    Q.  Dr. Google?

17    A.  -- was the result of me thinking it was dementia.  But I

18    have since learned that if it had been dementia she would be

19    long passed by now; that it acts very quickly in Down syndrome.

02:32    20    Q.  And then when you say Dr. Google, are you saying that you

21    had done your own searching online?

22    A.  Right.

23    Q.  And so then to catch what you just said, what you've learned

24    about dementia for people with Down syndrome, is what?  If Marlo

02:32    25    had had dementia set in in 2017 --

1   A.  She would be passed away by now.

2   Q.  And she's not passed away.

3   A.  She's not.

4           MS. VANCE:  I have no further questions, Your Honor.

02:33   5           THE COURT:  Okay, very well.

6           Did you have something, Mr. Burnett?

7           MR. BURNETT:  Just two points.

8                       RECROSS-EXAMINATION

9   BY MR. BURNETT:

02:33   10  Q.  Would you consider dementia an aspect of mental health?

11  A.  I view dementia as your brain getting eaten away.

12  Q.  You weren't reluctant to report dementia on this form;

13  correct?

14  A.  Right.

02:33   15  Q.  Are you saying that you thought your sister had depression,

16  but you didn't want to report it to the court?

17  A.  I didn't think of the mental aspect.  It was physical.

18  She's healthy as a horse.

19  Q.  And in 2017 was your sister taking Aricept, the depression,

02:34   20  the memory drug?

21  A.  It was a very short time, so I would say no.

22  Q.  So you reported dementia to the court, but not to her

23  doctor?

24          MS. VANCE:  Objection, mischaracterizes --

02:34   25          THE WITNESS:  Is that a question?

134

1    BY MR. BURNETT:

2    Q.  Yeah.

3            MS. VANCE:  -- prior testimony.

4            THE WITNESS:  I don't know how to answer the question.

02:34  5         THE COURT:  Overruled.  I think there's a question out

6    there.  Do you want to rephrase the question?

7            MR. BURNETT:  Sure.

8    BY MR. BURNETT:

9    Q.  I'm just confused by your testimony.  Is your testimony that

02:34  10   in February of 2017 you concluded your sister had dementia but

11   had not consulted a doctor?

12   A.  I believe that's when I did consult the doctor.

13   Q.  So in 2017 --

14   A.  And then learned that it wasn't.

02:34  15   Q.  In 2017 your sister was prescribed a medication for

16   dementia, wasn't she?

17   A.  Over the phone, yes.

18   Q.  Okay.  By?

19   A.  Annette Kaminski.

02:35  20   Q.  Pardon?

21   A.  Annette Kaminski.

22   Q.  Her primary care provider?

23   A.  Yes.

24   Q.  Okay.  So between you and her primary care provider, the

02:35  25   conclusion was this is dementia based on the symptomology you

1    described.

2    A.  There wasn't a conclusion made over the phone.  She wanted

3    to try the Aricept and see if she had any improvement.  We were

4    to go see her after she took it for some time.

02:35    5    Q.  And she was removed from the Aricept because it dropped her

6    blood pressure, she was having fainting spells?

7    A.  And there was no improvement in her demeanor.

8    Q.  Aricept is not supposed to improve memory, it's supposed to

9    stop a memory loss; right?

02:35    10    A.  I don't know.

11    Q.  Okay.

12            Thank you.  That's all I've got.

13            THE COURT:  Did you have anything else?

14            MS. VANCE:  Nothing further, Your Honor.

02:36    15            THE COURT:  All right.  This witness is excused then.

16            (Witness excused at 2:36 p.m.)

17            THE COURT:  Your next witness?

18            MS. VANCE:  Plaintiff calls Karen Becker.

19            THE COURT:  Feel free to stand and stretch.  Afternoon

02:36    20    is a good time to stretch between witnesses.

21            (Brief pause.)

22            THE COURT:  Let's take our afternoon break.  It will

23    be about 10, 15 minutes.  You can take your notes with you.

24            (Jury out at 2:38 p.m.)

02:38    25            THE COURT:  Okay.  Anything anyone wants to put on the

136

1    record?

2         We had a couple of side bars and I know one was on the

3    issue of whether the Social Security receipt would be

4    admissible.  I concluded that it was relevant on the issue -- as

02:38  5    well as her lack of application for other jobs -- on the issue

6    of what role a job played in her life and how the loss of the

7    job, the motivation she would have had for getting a new job, so

8    I allowed that in.

9         Does anyone want to make any further record on any of

02:39  10   those things?

11        MS. VANCE:  No, Your Honor, but we want to make sure

12   the record does reflect this morning's motion -- granted motion

13   for the admission of all stipulated exhibits.

14        THE COURT:  Yes.  I mentioned that earlier.  And the

02:39  15   record should reflect that the parties have stipulated to

16   numerous exhibits and they've given the list of those exhibits

17   that they've stipulated to to the clerk, and I've indicated

18   there's no need to move for their admission before showing them

19   to a witness or publishing them and they are received.

02:39  20        The other point I'd make is that the clerk pointed out

21   when Mr. Burnett referred to an Exhibit 1050, a page in that,

22   she indicated that had not been on the exhibit list, but that's

23   one we covered in chambers.  That's the small notation from the

24   mother that we discussed in chambers.  And that was also the

02:40  25   subject of the ruling last week.

137

1          MR. MULAIRE:  I wonder, Your Honor, if we should just

2    note for the record that the set of exhibits stipulated to be

3    admissible be moved in as the ones that were listed in -- there

4    was an ECF filing that we did a short time ago, just so that the

02:40  5    record is clear as to what list.  It was about two weeks ago.

6          THE COURT:  Sure.

7          THE CLERK:  I have document 212.

8          THE COURT:  Docket 212 is the one.

9          MS. VANCE:  The stipulation with the list; is that

02:40  10   correct?

11         THE CLERK:  Right.

12         THE COURT:  Yup.

13         MR. HARLAN:  So the document regarding the mammogram

14   result is one page of 1050; correct?

02:41  15         THE COURT:  Yes.

16         MR. BULIOX:  I see the jury is out.

17         THE COURT:  Stick around.  She doesn't have to leave,

18   but no reason to go chase her down.

19         MR. BULIOX:  Do you want me to bring her in here?

02:41  20         THE COURT:  She's fine in here if there's room, or out

21   there.  It wouldn't violate sequestration because we're not

22   taking testimony.

23         MS. CARTER:  And, Your Honor, when are we coming back

24   from break?

02:41  25         THE COURT:  5 minutes before 3:00.  Unless you need

138

1   more.  We're in recess.

2              (Recess taken at 2:41 p.m., until 2:59 p.m.)

3              THE COURT:  Next witness?

4              MS. VANCE:  Karen Becker, Your Honor.

02:59   5              THE COURT:  You can stand right next to the witness

6   stand, Ms. Becker, and the jury will come in and we'll

7   administer the oath and have you take a seat.

8              MR. MULAIRE:  Your Honor, there was one additional

9   exhibit that the parties stipulated to be admissible, it's

02:59   10   Exhibit 1065, Lawent's notes.

11              THE COURT:  Okay, they've received.

12              (Exhibit 1065, Melissa Lawent's Notes, received in

13   evidence.)

14              (Jury in at 3:00 p.m.)

03:00   15              THE COURT:  Plaintiffs may call their next witness.

16              MS. VANCE:  Thank you, Your Honor.  At this time

17   plaintiffs call Ms. Karen Becker.

18              THE CLERK:  Please raise your right hand.

19              KAREN BECKER, PLAINTIFF WITNESS, DULY SWORN

03:00   20              THE CLERK:  Please state and spell your first and last

21   name for the record.

22              THE WITNESS:  My name is Karen Becker.  It's

23   K-a-r-e-n, B-e-c-k-e-r.

24              THE COURT:  Thank you, Ms. Becker.

03:00   25              You may proceed then, Ms. Vance.

139

1          MS. VANCE:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MS. VANCE:

4    Q.  Good afternoon, Ms. Becker.  What is your current

03:01    5    occupation?

6    A.  I'm retired.

7    Q.  Congratulations.  You worked at Walmart prior to your

8    retirement; right?

9    A.  Correct.

03:01    10    Q.  And that's the Super Walmart in Manitowoc, Wisconsin; right?

11    A.  Correct.

12    Q.  What was the last job title you held at Walmart?

13    A.  Personnel coordinator.

14    Q.  And your Super Walmart was open 24 hours a day; correct?

03:01    15    A.  Correct.

16    Q.  Seven days per week; right?

17    A.  Correct.

18    Q.  I'm going to ask you to help us understand a little bit

19    about the management structure at your Super Walmart.  In July

03:01    20    2015, who was the manager that you reported to?

21    A.  That would have been Jason Radue.

22    Q.  And what was the title of Mr. Radue?

23    A.  He would be the store manager.

24    Q.  Is that the top manager at the Manitowoc store?

03:02    25    A.  Yes.

1    Q.   And was Jason -- did Jason Radue have a successor after him

2    during your employment?

3    A.   Yes.

4    Q.   And who was that?

03:02   5    A.   Kent Abitz.

6    Q.   Kent Abitz --

7    A.   Yes.

8    Q.   -- was the store manager after Jason Radue; correct?

9    A.   Correct.

03:02   10   Q.   Then in 2015, what was the next level of managers under the

11   store manager?

12   A.   It was a co-manager.

13   Q.   And in 2015 who were they?

14   A.   It was Bonnie Popp and also Robin Castro.

03:02   15   Q.   Then what is the job title of the people under Bonnie Popp

16   and Robin Castro?

17   A.   Those would be assistant managers.

18   Q.   And so for 2015 and for Marlo Spaeth, who was her assistant

19   manager?

03:03   20   A.   It would have been Julia Stern.

21   Q.   And then -- so that's our Manitowoc store.  Now, when we go

22   above the store level, who is HR above the store level?

23   A.   That would have been Lee Spude.

24   Q.   And what is Lee Spude's title, please?

03:03   25   A.   At that time he was human resources market manager.

1    Q.   And tell us, what's a market manager?

2    A.   He would be over like four or five different stores, over

3    the personnel department.

4    Q.   So he wasn't in Manitowoc; correct?

03:03    5    A.   No, I think he was in one of the Green Bay stores.

6    Q.   Now, and then back to you, Ms. Becker, you held the position

7    of personnel coordinator for over 20 years; right?

8    A.   Correct.

9    Q.   And as personnel coordinator for the Manitowoc store, you

03:04    10    were in that position actually when Marlo Spaeth and her mother

11    applied for a job at Walmart; right?

12    A.   Correct.

13    Q.   Now, your duties as personnel coordinator included

14    maintaining the personnel file; right?

03:04    15    A.   Correct.

16    Q.   And you coordinated benefits for employees?

17    A.   Yes.

18    Q.   And you ran reports called exception reports to make sure

19    employees were getting the correct schedules; right?

03:04    20    A.   That exception report was to make sure that part-time people

21    were only scheduled part-time hours and full-time people would

22    be scheduled full-time hours.

23    Q.   And that was part of your regular duties?

24    A.   That we would have to run like once a month.

03:04    25    Q.   You were part of the human resources department; correct?

142

1   A.  Correct.

2   Q.  Is it true employees could come to you if they wanted to

3   report any unfair treatment in the workplace?

4   A.  Yes, they could.

03:05   5   Q.  If an employee wanted to report employment discrimination,

6   they could come to you; correct?

7   A.  Correct.

8   Q.  If an employee with a disability needed an accommodation,

9   you were one of the people who could help with that; right?

03:05   10   A.  I was one of them, yes.

11   Q.  And isn't it also true that employees with disabilities

12   could ask a manager at Walmart about accommodations?

13   A.  Yes.

14   Q.  And specifically what are the titles of managers who could

03:05   15   discuss reasonable accommodations with employees?

16   A.  It would be the store manager, a co-manager, and an

17   assistant manager.

18   Q.  And so for Marlo Spaeth, that would be store manager, Jason

19   Radue.  Am I saying that right?

03:06   20   A.  Right.

21   Q.  Thanks.  And Kent Abitz once Jason Radue left; right?

22   A.  Right.  Kent was only there like maybe a month after this

23   all happened.

24   Q.  Is that a yes, that Marlo's store manager it sounds like for

03:06   25   most of the time she was there in 2015 was Jason Radue?

143

1  A.  Correct.

2  Q.  And then the co-managers were -- for Marlo, would have been

3  Bonnie Popp and Robin Castro; is that right?

4  A.  That's correct.

03:06  5  Q.  And then the assistant manager for Marlo would be Julie

6  Stern.

7  A.  Correct.

8  Q.  And so you, in addition to those people we just named, are

9  the people who could have discussed reasonable accommodations

03:06  10  with Marlo Spaeth; correct?

11  A.  Correct.

12  Q.  As the person in the HR office you maintained all the

13  paperwork for reasonable accommodations in your office; correct?

14  A.  Correct.

03:07  15  Q.  And your duties included printing out the paperwork for

16  employees to fill out when they wanted to request a reasonable

17  accommodation; right?

18  A.  Correct.

19  Q.  And then you -- part of your duties were faxing the

03:07  20  paperwork when it was filled out to -- well, actually you tell

21  me, where would you fax reasonable accommodation paperwork?

22  A.  There was a department up in Walmart that was the ADA

23  department.

24  Q.  The ADA department?

03:07  25  A.  Yes.  And we would have a number that we would fax that

1    information to.

2    Q.  And to the best of your knowledge was that a nationwide

3    department for all Walmart stores?

4    A.  I'm not sure on that.

03:07   5    Q.  Okay.  You know it wasn't a local Wisconsin number; correct?

6    A.  No, it wasn't.

7    Q.  And when an employee with a disability asked a member of

8    management about a reasonable accommodation, isn't it right that

9    the manager would then come to you for getting all that

03:08   10   paperwork submitted?

11   A.  If I was there, yes.

12        MR. BULIOX:  Objection, calls for speculation.

13        THE COURT:  I'll let the answer stand.

14        MS. VANCE:  Okay.

03:08   15   BY MS. VANCE:

16   Q.  Your answer was when you were there; correct?

17   A.  Correct.

18   Q.  As personnel coordinator you also had some involvement in

19   the hiring process; right?

03:08   20   A.  Correct.

21   Q.  And, in fact, you personally were involved when Marlo Spaeth

22   first applied for her job; right?

23   A.  Correct, I did the prescreening.

24   Q.  And that was in 1999, does that sound right to you?

03:08   25   A.  Yes, she was hired in '99.

1    Q.  Marlo and her mother came in for an open interview night;

2    right?

3    A.  Correct.

4    Q.  And that open interview night, that's a night where people

03:09  5    can walk in to apply for a job; correct?

6    A.  Yes.  They would do -- I would do a prescreen for them, and

7    ask them questions about their availability, anything that was

8    on their application, like their former jobs.  And if everything

9    worked out then I would get with the assistant managers and we

03:09  10   would set up interviews.

11   Q.  And so when Marlo and her mother came in and you spoke with

12   them, you did that, right, you spoke next to the management

13   team; right?

14   A.  The next day I did.

03:09  15   Q.  And isn't it true that you thought domestics department

16   might be a good fit for Marlo; right?

17   A.  Yes.

18   Q.  And that would involve folding towels, putting away the

19   bathroom rugs; right, in domestics department?

03:10  20   A.  Correct.

21   Q.  And so you called Marlo in for an interview; right?

22   A.  Right.

23   Q.  And Marlo's mother came with her to the interview as well,

24   didn't she?

03:10  25   A.  Yes.

1    Q.   And you're not aware of any other time when an adult job

2    applicant came to an interview with their mother; right?

3    A.   Not that I can think of right now.

4    Q.   And it's true, right, that the first time that you met Marlo

03:10    5    you could tell immediately she had a disability; right?

6    A.   Yes.

7    Q.   And could you recognize specifically that it was Down

8    syndrome?

9    A.   Yes.

03:10    10    Q.   Now, am I remembering it right, at that time the domestics

11    department had -- the department managers were named Joy Nianow

12    (phonetic) and Juanita Ferguson; is that right?

13    A.   Furgins (phonetic).

14    Q.   Furgins.  Okay.  Thank you.  And you thought these two

03:11    15    managers are going to be a good fit for Marlo, didn't you?

16    A.   Yes, I did.

17    Q.   And that is because you thought of them as patient?

18    A.   Yes.  They would take the time and teach Marlo.

19    Q.   And at the time you thought this might work if Marlo had

03:11    20    department managers who would take the time and teach Marlo the

21    job; is that right?

22    A.   Yes.

23    Q.   And that was because she has Down syndrome?

24    A.   Yes.

03:11    25    Q.   So going back to Marlo's hiring process, the first

147

1   conversation Marlo or her mother ever had about availability was

2   with you; right?

3   A.  On her application there was a place where they could put

4   what she was available to work.

03:12   5   Q.  And that was part of the process that they went through with

6   you personally; right?

7   A.  Yes.

8   Q.  Okay.  And then Marlo's mother also came with her to the

9   first day of orientation, didn't she?

03:12   10   A.  Yes.

11   Q.  And Marlo's mother helped her fill out all the paperwork;

12   correct?

13   A.  Yes.

14   Q.  You know, and the paperwork needed Social Security numbers

03:12   15   and phone numbers and addresses; right?

16   A.  Correct.

17   Q.  And that's -- so Marlo's mother was filling out most of that

18   paperwork; right?

19   A.  Correct.

03:12   20   Q.  It's unusual for an adult to have her mother come to the

21   first day of orientation; right?

22   A.  It's very rare.

23   Q.  And Marlo needed her mother with her for all that paperwork

24   because of her disability; right?

03:13   25   A.  I don't know how to answer that.  I'm not sure.

148

1    Q.  So then, turning your attention back to availability.  Do

2    you recall, was it your understanding that that -- that the

3    availability form in Marlo's application had already been filled

4    out before they came in?  Do you remember that?

03:13    5    A.  The application that I saw with Marlo and her mother, it was

6    already filled out.

7    Q.  And you thought Marlo's mother had done it; right?

8    A.  That's what I thought, but I wasn't sure.

9    Q.  Okay.  And you were aware at the time that Marlo's

03:13    10   availability was set in part because of the bus schedule; right?

11   A.  Correct.

12   Q.  Marlo only worked weekdays.  She couldn't work weekends;

13   right?

14   A.  Right.

03:13    15   Q.  Because the buses don't run on Sundays; right?

16   A.  Right.

17   Q.  And on Saturdays they only run in the mornings; right?

18   A.  I know it was a limited schedule, I'm not sure what it was.

19   Q.  Okay, limited on Saturday.

03:14    20   A.  Right.  And not on Sunday.

21   Q.  And that was so much that it meant Marlo had to only work

22   weekdays; right?

23   A.  Yes.

24   Q.  And at the time of hire you knew that that bus schedule was

03:14    25   important because Marlo was unable to drive; correct?

1    A.  Correct.

2    Q.  And you knew that's because she has Down syndrome; right?

3    A.  I would think so.  I'm not sure.  I know she didn't drive.

4    Q.  And you recall Marlo's availability at the outset was set

03:14    5    for approximately noon to 4:00; right?

6    A.  Correct.

7    Q.  And initially that was for -- well, actually and that was

8    for Monday, Tuesday, Wednesday, and Friday; right?

9    A.  Correct.

03:15    10    Q.  With Thursdays off?

11    A.  Correct.

12    Q.  One day off a week?

13        And you keep those availability forms in your office;

14    right?

03:15    15    A.  In her personnel file.

16    Q.  Is that a locked file cabinet in your office?

17    A.  Yes, it's locked.

18    Q.  And can we look at Exhibit 1, the page EEOC 493.  And I'm

19    hoping this comes up on your screen, Ms. Becker, but if not we

03:15    20    have a paper binder.

21        (Exhibit 1, Spaeth Availability-EEOC00492-495,

22    admitted previously by stipulation.)

23        (Brief pause.)

24    BY MS. VANCE:

03:17    25    Q.  Ms. Becker, are you seeing a document signed in 2006 on your

1    screen?

2    A.  Yes.

3    Q.  Okay.  Thank you.  So, Ms. Becker, tell us what is the kind

4    of form we're looking at here when we look at Exhibit 1?

03:17    5    A.  That is what associates would fill out to let us know what

6    hours they were available to work.

7    Q.  And in this particular form we see Marlo Spaeth signed it

8    and it's dated 2006; is that right?

9    A.  Correct.

03:17    10    Q.  And then when we look at your availability start time and

11    stop time, we see this schedule we had talked about, 12:30 to

12    4 p.m., four days of the week; right?

13    A.  Correct.

14    Q.  Okay.  And so this is the form that the employees fill out,

03:18    15    you maintain them in their personnel files; correct?

16    A.  Correct.

17    Q.  And the blank forms, they come from headquarters, Walmart

18    headquarters; is that right?

19    A.  I can print them off of the computer for forms that are

03:18    20    consistent with the Walmart's.

21    Q.  And it's from the Walmart intranet site; is that right, that

22    you print them off from?

23    A.  Yes.

24    Q.  Okay.  Then employees -- they fill these out at the point of

03:18    25    interview; correct?

151

1   A.  Correct.

2   Q.  And then if they ever want to change the times that they

3   will be available for scheduling, do employees come to you for a

4   new form?

03:18   5   A.  Yes, they usually come to me for a new form.

6   Q.  And an availability form requires a manager's signature;

7   right?

8   A.  Correct.

9   Q.  Before you file it; is that right?

03:19   10   A.  Before I can even enter it into the system.

11   Q.  And then when we look at Exhibit 1, at the bottom I see

12   Brett Wiley, do you agree that I'm reading that right?

13   A.  Correct.

14   Q.  And in 2006 who was Brett Wiley?

03:19   15   A.  He was our store manager.

16   Q.  So that's before Kent Abitz, before Jason Radue.

17   A.  Yes.

18   Q.  Brett Wiley.

19   A.  Right.

03:19   20   Q.  Okay.  And then an employee fills this out, they sign it;

21   right?  They get their store manager's -- or a manager's

22   signature; right?

23   A.  Correct.

24   Q.  And then they give the availability form to you; correct?

03:19   25   A.  They would or the manager who signed it would.

1    Q.  Okay.  And then part of your job is entering the

2    availability that the employee gives you or fills out into the

3    scheduling computer system; correct?

4    A.  Correct.

03:20  5    Q.  And availability forms, they've always been in paper like

6    this; right?

7    A.  Yes.  At that time, yes.

8    Q.  As far as the period of time of Marlo Spaeth's employment

9    they were always in paper; correct?

03:20  10   A.  Yes.

11   Q.  Okay, thank you.  So directing your attention and your

12   memory to Marlo Spaeth's personnel file that you maintained in

13   your office; right?  In 2014 all of Marlo Spaeth's availability

14   forms were in her personnel file; right?

03:21  15   A.  That I did have, yes.

16   Q.  That you had, the history of them.  Okay.  And so in 2004,

17   if you go into your office and pull Marlo Spaeth's personnel

18   file, will you find her latest availability form in the file?

19   A.  Yes.

03:21  20   Q.  And then how are they filed after that if there were any

21   others?

22   A.  I usually put the most recent one on top.

23   Q.  Okay.  And then behind them are older forms?

24   A.  Correct.

03:21  25   Q.  Okay.

1         MS. VANCE:  Thank you, Lectrice.

2    BY MS. VANCE:

3    Q.  And now I wanted to ask you a little bit about personnel

4    evaluations -- or, I'm sorry, performance evaluations.

03:22   5    Performance evaluations were also in the personnel files that

6    you maintained; right?

7    A.  Correct.

8    Q.  And you know that Marlo had a performance evaluation every

9    year; right?

03:22   10   A.  Correct.

11   Q.  Are you aware that before the schedule change for Marlo in

12   2014 she had 15 years of annual evaluations; right?

13   A.  Correct.

14   Q.  And were you aware that in every one of those 15 before the

03:22   15   schedule change Marlo's managers rated her as solid performer

16   and as meets expectations?

17   A.  As far as I can remember, yes.

18   Q.  And now I'd like to direct your attention to Exhibit 5

19   that's been previously admitted into evidence.

20         (Exhibit 5, Spaeth Evaluation 2002-EEOC00627-628,

21   admitted previously by stipulation.)

22   BY MS. VANCE:

23   Q.  It's the -- let's see.  Okay.  And I'm directing your

24   attention to the second page.  Do you recognize this as a

03:23   25   performance evaluation, Ms. Becker?

1    A.   Yes.

2    Q.   And this, in fact, is one that you signed; correct?

3    A.   Correct.

4    Q.   And is this for Marlo Spaeth; right?

03:23   5    A.   Correct.

6    Q.   And it's 2002?

7    A.   Yes.

8    Q.   And Marlo is rated as meets expectations; right?

9    A.   Yes.

03:23   10   Q.   And when we look up at the top we see that she got a pay

11   raise; right?

12   A.   Correct.

13   Q.   And can you read out for us the strengths.

14   A.   I've gotta get my glasses on.

03:24   15        "Excellent zoning.  Starts on one end of the

16   department, works to the other end.  Helps customers.  If she

17   doesn't know something she finds someone who does."

18   Q.   Can you help us to understand the word "zoning" a little

19   bit?  What's zoning mean?

03:24   20   A.   Zoning is when you would go through and straighten out all

21   the towels so they look nice.  In the grocery area you make sure

22   everything would be facing forward, that it would be kind of in

23   line.

24   Q.   Okay.  So that was somewhere where Marlo showed excellence

03:24   25   according to this.

1    A.  Yes, she did an excellent job with zoning.

2           MS. VANCE:  And can we see the first page of

3    Exhibit 5.  Can we do it without the callout, please?  There you

4    go.

5    BY MS. VANCE:

6    Q.  I see at the top the first four categories have checkmarks

7    in exceeds.  Do you see that?

8    A.  Yes.

9    Q.  Does that mean Marlo is exceeding -- or, I'm sorry, Marlo

03:25    10    exceeds expectations?

11    A.  Yes.

12    Q.  Okay.  And those were in the area of customer service;

13    right?

14    A.  Correct.

03:25    15    Q.  And then when we look down we see some NAs.  Do you know

16    what that means?

17    A.  Okay.  We did not have her mixing paint or cutting chains or

18    anything like that.  So there was NAs on some of the things that

19    she did not do.

03:25    20    Q.  Okay.  And then for productivity I see again it looks like

21    Marlo exceeds expectations for zones the department.

22    A.  Correct.

23    Q.  And did you do that evaluation for Marlo?

24    A.  No, I did not write it, Brett did.  But he asked me to sit

03:26    25    in on it so that I did sign it after we gave it to Marlo.

1   Q.  And Brett Wiley, at that time he was the store manager;

2   correct?

3   A.  Yes.

4   Q.  I'll direct your attention to Exhibit 2.  We're going to

03:26   5   spend some time looking at a few more performance evaluations

6   here.

7           (Exhibit 2, Spaeth Evaluation 1999-EEOC00633-634,

8   admitted previously by stipulation.)

9           MS. VANCE:  Is it up now?

10   BY MS. VANCE:

11   Q.  Exhibit 2, can you tell me -- in the performance evaluation

12   that's Exhibit 2, how many days absent were there marked for

13   Marlo?

14   A.  The way it looks is zero.

03:26   15   Q.  And for days tardy what was her rating at her performance

16   evaluation?

17   A.  Zero.

18   Q.  And if we go to the second page of Exhibit 2 -- take a

19   second here.  Can I ask you to read out the strengths.

03:27   20   A.  "Marlo does a very good job straightening everything."

21   Q.  Is that "we ask her to do"?

22   A.  Yeah, "that we ask her to do.  She is also very friendly.

23   She always keeps busy and works on her own."

24   Q.  And this is for 1999; right?

03:27   25   A.  Yes.

157

1   Q.   So this is -- this was her first performance evaluation;

2   right?

3   A.   Yes.

4   Q.   And let's go to Exhibit 3.

5        (Exhibit 3, Spaeth Evaluation 2000-EEOC00631-632,

6   admitted previously by stipulation.)

7   BY MS. VANCE:

8   Q.   Okay.  And for Exhibit 3 what were the days absent noted for

9   Marlo in her annual review here?

03:28   10   A.   Zero.

11   Q.   And days tardy?

12   A.   Zero.

13   Q.   Okay.  And it looks like, if you look at that initiative

14   section, she got an "exceeds expectation" for "works well on her

03:28   15   own and requires very little supervision and follow-up;" right?

16   A.   Correct.

17   Q.   And when we turn to the next page, I'll ask you to read out

18   the strengths again.

19   A.   "Marlo is friendly to both our customers and her fellow

03:29   20   associates.  Marlo is very outgoing."

21   Q.   Okay.  And let's see, that was the year 2000.  So we won't

22   go year by year.

23        Can we go to Exhibit 6.

24        (Exhibit 6, Spaeth Evaluation 2003-EEOC00624-625,

25   admitted previously by stipulation.)

1    BY MS. VANCE:

2    Q.  And that dependability section, can you read out the days

3    absent?

4    A.  Zero.

03:29    5    Q.  And the days tardy?

6    A.  Zero.

7    Q.  And for the checkmark it says "exceeds expectations" in that

8    attendance and punctuality; correct?

9    A.  Yes.

03:29    10    Q.  The checkmark is in exceeds?

11    A.  Yes.

12    Q.  And if we go to our next page of Exhibit 6, that was 2003.

13    Marlo got a pay raise again; right?

14    A.  Correct.

03:30    15    Q.  And can you read out her strengths, please?

16    A.  "Great with customers.  Have to zone her department.  Very

17    hard worker."

18    Q.  Is that "love to zone her department" or "have to"?

19    A.  It could be "love."

03:30    20    Q.  Let's go to Exhibit 12.

21            (Exhibit 12, Spaeth Evaluation 2009-EEOC00611,

22    admitted previously by stipulation.)

23    BY MS. VANCE:

24    Q.  All right.  So we're here looking at 2009.  Marlo got a

03:30    25    raise; right?

1   A.  Correct.

2   Q.  Her overall rating was "meets expectations;" right?

3   A.  Correct.

4   Q.  And let's read out the strengths, please.

03:30   5   A.  "Marlo is very good with customers.  She is always on time.

6   And when she comes out to the floor she goes right to work."

7   Q.  Okay.  Let's go to Exhibit 15.

8           (Exhibit 15, Spaeth Evaluation 2012-EEOC00604-605,

9   admitted previously by stipulation.)

10  BY MS. VANCE:

11  Q.  All right.  Now we have a new form.  We don't get that

12  information about days absent anymore, do we?

13  A.  No, they changed the evaluation forms.

14  Q.  Okay.  So in Exhibit 15 can you read at the very last

03:31  15  comment, "Marlo is a pleasure to see every day?"

16  A.  No -- yes.  "Marlo is a pleasure to see every day."

17  Q.  And we go to page 2.  Okay.  Yeah, it takes up a -- it takes

18  us a second to get through the pages here with the technology.

19          So then, Ms. Becker, could I have you read out the

03:32  20  strengths, please?

21  A.  I really can't see that.  Can they enlarge it a little?

22          MS. VANCE:  I'm sorry, could we have a callout for the

23  strengths, please?

24          THE WITNESS:  "Marlo does a great job of zoning the

03:32  25  towels and rug areas.  She is here when scheduled."

1    BY MS. VANCE:

2    Q.  So that's her manager, even though the form has changed;

3    right?  And you don't report -- you don't look up absences

4    anymore; right?  But this manager decided to write "she is here

03:32    5    when scheduled this year;" is that correct?

6    A.  That's correct.

7    Q.  And that was 2012.  And this associate's comments, that's

8    Marlo; correct?

9    A.  Correct.

03:33    10          MS. VANCE:  I'm sorry, can we take the callout down?

11          And can we get the second page of Exhibit 15?  There

12    we go.

13    BY MS. VANCE:

14    Q.  So in that associate comments where we see that handwriting,

03:33    15    that's Marlo's?

16    A.  Yes.

17    Q.  And Marlo writes "I like my job.  I like to help people."

18    Right?

19    A.  Correct.

03:33    20    Q.  And she got a raise.

21    A.  Correct.

22    Q.  And overall the rating is solid performer; correct?

23    A.  Correct.

24    Q.  And let's go to the last -- we'll stop at 17.  Exhibit 17.

25          (Exhibit 17, Spaeth Evaluation 2014-EEOC00555-560,

161

1   admitted previously by stipulation.)

2   BY MS. VANCE:

3   Q.  And let's go to the last page of Exhibit 17.  All right.

4   I'm sorry.  So here we are.  I see.  Do you recognize Marlo's

03:34   5   handwriting in this document again?

6   A.  Yes, I do.

7   Q.  And Marlo wrote "I like working here."

8   A.  Correct.

9   Q.  And she got a raise.

03:34   10  A.  Correct.

11  Q.  And this is 2014; right?

12  A.  Right.

13  Q.  And could I have you read out manager comments?

14  A.  "Marlo's very good with zoning the domestics and housewares

03:34   15  area.  Marlo is very good at putting away the returns for her

16  areas as well.  Marlo helps customers find the items they are

17  searching for and promotes the 10-foot rule.  Marlo has zero

18  absences in a six-month rolling period."

19  Q.  And so Marlo had zero active absences in a six-month rolling

03:35   20  period.  I think that's self-explanatory, but can you help us

21  understand the 10-foot rule?

22  A.  What the 10-foot rule was, if you came within a customer

23  within 10 feet, you were supposed to great them and ask them if

24  they needed help.

03:35   25  Q.  So this means Marlo's manager thought she was good at it.

162

1    A.  Yes.

2    Q.  Okay.

3            MS. VANCE:  Thank you, Lectrice.

4    BY MS. VANCE:

03:35  5    Q.  Now, Ms. Becker, from what you saw and heard you would agree

6    that Marlo was able to perform the duties of her job in 2015;

7    right?

8    A.  Correct.

9    Q.  In fact, she did all the tasks her colleagues did in

03:36  10   domestics department except that she wasn't cross-trained on

11   cash registers; is that right?

12   A.  That's correct.

13   Q.  And am I remembering it right that the managers at the time

14   didn't even try to train her on cash registers; right?

03:36  15   A.  No, we didn't.

16   Q.  And that was because of her disability; right?

17   A.  Yes.

18   Q.  And the -- when domestics associates go to cash registers

19   it's on an unpredictable schedule; correct?

03:36  20   A.  Correct.

21   Q.  All right.  And I'll ask now for Exhibit 1018.

22           (Exhibit 1018, Job Description Fabrics, Crafts & Home

23   Furnishings Sales Associate-2009 [D000030-000031], admitted

24   previously by stipulation.)

03:37  25           MS. VANCE:  1018.  And I think I need it in paper.  I

1    want the first page, please.  All right.

2    BY MS. VANCE:

3    Q.  And, Ms. Becker, what is Exhibit 1018?

4    A.  It is a job description of the fabrics, crafts, and home

03:37   5    furnishings sales associate.

6    Q.  And when I look at these essential functions, and I'll give

7    you a second to read it, but cash registers is not on those;

8    correct?

9    A.  Correct.

03:37  10    Q.  Okay.  And that's because cash registers isn't considered an

11    essential function for domestics; right?  It's only a

12    cross-train function; is that right?

13    A.  Right.  When they're needed they go up to the registers.

14    Q.  They're cross-trained for that.

03:38  15    A.  Yes.

16         MS. VANCE:  Thank you, Lectrice.

17    BY MS. VANCE:

18    Q.  Now, let's talk a little bit about the issue of setting the

19    schedule, the topic of setting the schedule.

03:38  20         Walmart's scheduling system has been based on customer

21    traffic during all the years you've been a personnel

22    coordinator; right?

23    A.  Yes, it was.  But then the assistant managers would write

24    out the schedule, it wasn't computer generated.

03:38  25    Q.  And so the assistant managers could write out the schedule

1 every week; right?

2 A.  Yes, we do them every week.

3 Q.  And for Marlo you personally actually handwrote her schedule

4 out every week; correct?

03:39 5 A.  Correct.  That was after the assistant manager would put it

6 into the scheduling system.

7 Q.  Okay.

8 A.  Then I would go and I would write out the schedule for Marlo

9 and go over it with her.

03:39 10 Q.  And you did that just for Marlo; right?  Not for other

11 associates?

12 A.  Right.

13 Q.  And you did that for Marlo because of her disability; right?

14 A.  She asked me if I would help her with that.

03:39 15 Q.  Okay.  And you did.

16 A.  Yes.

17 Q.  And that was really you going above and beyond; correct?

18 A.  I didn't mind doing it.

19 Q.  Okay.  Now, I will ask to pull up what's been put into

03:39 20 evidence as Exhibit 23.

21       Actually let me back up and get a little bit of

22 history here.  You said that managers used to write out the

23 schedule every week.  It was based on customer traffic; right?

24 A.  Right.

03:40 25 Q.  And then it changed to the computer generated the schedule

1    every week; is that right?

2    A.  That's correct.

3    Q.  And that was around November 2014?

4    A.  Around that time, yes.

03:40    5    Q.  Okay.

6          MS. VANCE:  Actually, Lectrice, can we take down 23?

7    I want to ask a few questions about this change first.

8    BY MS. VANCE:

9    Q.  So, during that November 2014 switch from the managers

03:41    10    making the schedule to the computer generating the schedule, you

11    became aware of a change in Marlo's schedule because of that

12    when you heard Julie Stern remark that Marlo wasn't getting any

13    hours; right?

14    A.  Correct.

03:41    15    Q.  And you remember that?

16    A.  Yes.

17    Q.  And that was around November of 2014?

18    A.  Around that time or close to that time.

19    Q.  Okay.  And as far as you can remember it was at the same

03:41    20    time that this system changed.

21    A.  Yes.

22    Q.  Okay.  And at the time Julie Stern was the assistant manager

23    for Marlo; right?

24    A.  Correct.

03:41    25    Q.  And so Ms. Stern was in charge of the schedules for

1    employees in domestics; correct?

2    A.  Correct.

3    Q.  And am I right that Ms. Stern had been Marlo's assistant

4    manager for about just three months at that point; right?

03:42    5    A.  They had just switched managers, so, yes, she wasn't there

6    very long.

7    Q.  Ms. Becker, how does Ms. Stern -- how did you refer to

8    Ms. Stern at Walmart?

9    A.  It was Julie.

03:42    10    Q.  Julie.  And am I right that her like employment records

11    would have --

12    A.  Would be Julia.  Yes.

13    Q.  Julia.  Thank you.  Now, so prior to this switch where the

14    computer generated the schedule, how did Marlo's 4:00 end times

03:43    15    get scheduled?

16    A.  It went off of her availability.

17    Q.  And so the assistant managers used Marlo's 4:00 availability

18    to generate her schedules for her; is that fair?

19    A.  That's fair.

03:43    20    Q.  And so if Ms. Stern had already been supervising Marlo for

21    three months before the change, Ms. Stern had been writing out

22    4:00 shifts for Marlo; right?

23    A.  I believe so.

24    Q.  And it's a matter of Ms. Stern manually entering 4:00 end

03:44    25    times for Marlo; correct?

1    A.  Correct.

2    Q.  And that had been done for years by managers for Marlo;

3    correct?

4    A.  Correct.

03:44   5    Q.  So then let's go back to this time when you remember hearing

6    Julie Stern saying Marlo isn't getting any hours.  Do you recall

7    that?

8    A.  Yes.

9    Q.  And was that because Marlo was only available till 4:00?

03:44   10   A.  Yes.

11   Q.  So what does that mean, Marlo's not getting any hours?

12   A.  The computer would not schedule her any hours.

13   Q.  So the computer didn't even put Marlo on the schedule;

14   correct?

03:44   15   A.  Correct.

16   Q.  But then ultimately Marlo did start getting hours; correct?

17   A.  Correct.

18   Q.  And are you aware of how?

19   A.  No.

03:45   20   Q.  And what were the new hours?

21   A.  I think they went until 5:00 or 5:30.

22   Q.  Does it sound right that the new computer shift -- I'm

23   sorry, computer schedule was 1:00 to 5:30?

24   A.  Yes.

03:45   25   Q.  Okay.  So, in essence, that was Marlo getting scheduled

168

1    outside of her stated availability; right?

2    A.  Correct.

3    Q.  And eventually you became --

4         MS. VANCE:  Well, so now I'll ask to pull up

03:46  5    Exhibit 23.

6         (Exhibit 23, Stern FW Becker emails-EEOC00452-453,

7    admitted previously by stipulation.)

8    BY MS. VANCE:

9    Q.  And eventually you became aware that that 5:30 schedule

03:46  10   change was creating problems for Marlo; right?

11   A.  She didn't work it.

12   Q.  Okay.  And so tell us what Exhibit 23 is.  This is an email;

13   right?

14   A.  Yes.  It's an email that Julie had forwarded to me.

03:46  15   Q.  So you received this.

16   A.  Yes.

17   Q.  And it was written December 17th, 2014; right?

18   A.  Right.

19   Q.  And it's sent to several managers; correct?

03:47  20   A.  Correct.

21   Q.  Written by Julia.

22   A.  Correct.

23   Q.  And I'll read from the beginning:

24        "On December 17th, 2014, I had a discussion with Marlo

03:47  25   about her attendance.  She's been scheduled for the past three

1    weeks from 1:00 to 5:30, however, she's been clocking in around

2    12:45 and clocking out around 3:00."

3          Do you see that?

4    A.  Yes.

03:47  5    Q.  And then if we go three lines ahead, I see your name.  Can

6    you start reading where it says "Karen and I"?

7    A.  Can they enlarge it a little?

8          MS. VANCE:  Can we call out the section that starts --

9    the sentences that starts "Karen and I also checked"?  The

03:48  10   lines?  Let's go six lines, please, Lectrice.

11   BY MS. VANCE:

12   Q.  Ms. Becker, let's see if you can follow along and tell me if

13   you -- there we go.

14          So "Karen and I also checked her file and

03:49  15   availability."  Do you see that?

16   A.  Yes, I do.

17   Q.  I'm going to skip to where it says "I explained that she

18   needs to work what she is scheduled, and at this point it should

19   be a coaching, but that I was giving her a chance to correct it

03:49  20   after our discussion today."

21          Do you see that?

22   A.  Yes.

23   Q.  Can you read the next sentence?

24   A.  "I told her I expected her to work her entire shift today

03:49  25   and going forward and if she continued not to work them I would

1   have to coach her as I needed to be consistent with all other

2   associates on attendance.  I also told her that she had wanted

3   the hours and we were scheduling her with what is available, but

4   if she is not going to work the entire shifts then there are

03:49   5   other associates in the store that would be more than happy to

6   have those hours."

7   Q.  Okay.  So let me ask there, when Julie Stern writes "Karen

8   and I also checked her file and availability," you recall that;

9   right?

03:50   10  A.  Yes.

11  Q.  And the availability at the top of Marlo's personnel file at

12  that point said Marlo is available till 4 p.m.; correct?

13  A.  Correct.

14  Q.  And now I want to go down --

03:50   15      MS. VANCE:  Let's take the callout down, please,

16  Lectrice.

17  BY MS. VANCE:

18  Q.  And I'll start reading where it says "she did not say one

19  word the entire time I talked to her."  Do you see that?

03:50   20  A.  Are you referring to this other email?

21  Q.  No, it's the first page still.

22      Okay.  It's around the middle.  "She did not say one

23  word the entire time I talked to her, not even a nod."  Did you

24  see that?

25  A.  (No response.)

1          MS. VANCE:  Okay.  So there we go.  Right in the

2     middle of there.

3     BY MS. VANCE:

4     Q.  "She did not say one word the entire time I talked to her,

03:51  5     not even a nod."  Can you see that now?

6     A.  Yes.

7     Q.  Okay.  And then:  "After the grocery zone she stopped me on

8     the sales floor and said that she was going home, this was about

9     3:00, as she had talked to Karen and she was concerned that if

03:52 10     she did not eat supper on time she would get sick and that she

11     wanted to talk to her sister about her schedule.  So I let her

12     leave."

13          Can you take over reading from there, "so I let her

14     leave"?

03:52 15     A.  "So I let her leave as I was not sure if she has to make any

16     adjustments, but I did tell her that the next two days she is

17     scheduled 1:00 to 5:30 and I expect her to work that schedule.

18     She said she only works 12:00 to 4:00, even though she's been

19     punching in at 12:45, so she knows she's supposed to start at

03:52 20     1:00."

21          MS. VANCE:  Can we take the callout down?

22     BY MS. VANCE:

23     Q.  Okay.  So I wanted to ask --

24          MS. VANCE:  Oh, and then if we can take the callout

03:53 25     down and call out the last paragraph on that same page.

172

1    BY MS. VANCE:

2    Q.  Okay.  I'm going to read the last two sentences.

3           "If she does need to eat at a certain time, then she

4    should have it in her file and she can take her break at that

03:53  5    time to eat.  And since she's only staying for two hours, if she

6    does not want the shifts that are available then they should be

7    given to someone else who will appreciate the hours and is

8    productive."

9           MS. VANCE:  Thank you, Lectrice.

03:53  10   BY MS. VANCE:

11   Q.  So then, Ms. Becker, I wanted to follow up with you about

12   some of that.  If -- when Ms. Stern says "if it's true she's

13   going to get sick if she doesn't eat her meals at a certain

14   time, that needs to be in her file," that would be her medical

03:54  15   file; correct?

16   A.  Correct.

17   Q.  And that is your job to maintain; correct?

18   A.  Correct.

19   Q.  And you're the person who has the paperwork that includes

03:54  20   like the blank doctor's note that an employee takes; correct?

21   A.  If they would bring a doctor's note in, yes, it would go in

22   there.

23   Q.  And then you also maintained the reasonable accommodation

24   paperwork; correct?

03:54  25   A.  Correct.

173

1  Q.  And that includes a blank form for a doctor's -- for a

2  doctor to fill out; correct?

3  A.  Correct.

4  Q.  And so you have the paperwork in your office for an employee

03:55  5  to take to their doctor; right?

6  A.  Correct.

7  Q.  And then when they have their doctor fill out the form, you

8  maintain it in the medical file.

9  A.  If it was for a reasonable accommodation I would fax it to

03:55  10  the ADA for Walmart, and then I would have to wait until I get a

11  response from them.  And then everything would go in their file,

12  in their medical file.

13  Q.  Okay.  And so all of that paperwork and that whole process

14  is part of your job; right?

03:55  15  A.  Yes.

16  Q.  And when you got this email from Ms. Stern, you didn't give

17  Marlo the accommodation packet at that time, did you?

18        MR. BULIOX:  Objection, relevance.  Judge, may we

19  approach?

03:55  20        THE COURT:  Pardon?  You want to approach?

21        MR. BULIOX:  Yes.  Sure.  Thanks.

22        (Off-the-record discussion at side bar with all

23  counsel and the Court.)

24  BY MS. VANCE:

03:57  25  Q.  So thank you, Ms. Becker, for your patience.

1          Directing your attention to the 15 years leading up to

2    November 2014, Marlo's schedule had always ended around 4 p.m.;

3    right?

4    A.  Correct.

03:58    5    Q.  And so other employees in the domestics department had to be

6    working in the department when Marlo left at 4:00; right?  For

7    those 15 years?

8    A.  Yes.

9    Q.  I'm sorry, that was yes?

03:58   10    A.  Yes.

11    Q.  And for those 15 years there were always multiple employees

12    who worked in Marlo's domestics department; right?

13    A.  At different days.  On different days, yes.

14    Q.  Okay.  Even though Marlo would leave at 4 p.m., for 15 years

03:58   15    you never heard about any problems staffing the domestics

16    department after 4 p.m.; right?

17    A.  Because the people that were sales associates in there, they

18    knew Marlo left at 4:00.

19    Q.  And that wasn't -- and you never heard of a problem because

03:59   20    they all knew that; right?

21    A.  I didn't hear of any problems, no.

22    Q.  And as far as you knew the domestics department was always

23    covered from 4:00 to 5:30, right, for those 15 years?

24    A.  Unless somebody called in.

03:59   25    Q.  I see.  If somebody called in sick unpredictably?

175

1   A.  Right.

2   Q.  Okay.  As far as the schedule and what was predicted, there

3   was always coverage from 4:00 to 5:30 p.m. for domestics for 15

4   years; right?

03:59  5   A.  That's hard to say if it was every day.

6   Q.  Okay.  Do you recall giving a deposition?

7   A.  Yes.

8   Q.  I'm going to bring that up to you.  And give me one second

9   here.

04:00  10          (Brief pause.)

11  BY MS. VANCE:

12  Q.  Let's see if we can make room for this.

13          THE COURT:  Does the deposition have an exhibit

14  number?

04:00  15          MS. VANCE:  No.

16          THE COURT:  Is it in a book of depositions?  Oh.  What

17  page are you referring to then?

18          MS. VANCE:  Your Honor, I'd like to refer you to page

19  159 starting at line 12.

04:01  20  BY MS. VANCE:

21  Q.  Ms. Becker, are you at page 159, starting at line 12?

22  A.  Yes.

23  Q.  And then let's just back up.  You took a deposition in this

24  case; correct?

04:01  25  A.  Correct.

1   Q.  And you were under oath at the time; right?

2   A.  Correct.

3   Q.  And I asked you questions and you answered them; right?

4   A.  Correct.

04:01   5   Q.  Okay.  So I'll start reading at -- or I'll -- well, I'll

6   start reading at line 12.

7           My question was:  "To your knowledge, before November

8   of 2014, was there ever a problem in domestics having the

9   department staffed between 4:00 and 5:30?"

04:01   10          You testified:  "Not that I'm aware of.

11          "The department was always staffed by somebody between

12   4:00 and 5:30 for the 15 years before November 2014?

13          "ANSWER:  There were people in or around that area.

14   If there was nobody in domestics they would have to cover it.

04:02   15          "QUESTION:  And that coverage, they would have to

16   cover it because Marlo was leaving at 4:00, is that what you

17   mean?

18          "They would have to cover it if nobody else was in

19   there and Marlo was leaving at 4:00.  Or even once in a while on

04:02   20   weekends or whatever if some other people asked for vacation or

21   time off, the associates in the surrounding areas would have to

22   help cover.

23          "QUESTION:  And I think I'm hearing you say that for

24   15 years that always happened.  The domestics was always covered

04:02   25   one way or another from 4:00 to 5:p.m.

177

1       "ANSWER:  As far as I know, yes."

2       Does that refresh your recollection?

3   A.  Yes.

4   Q.  And so when we go back to the -- as far as you know, there

04:02   5   was never a problem with covering the domestics department from

6   4:00 to 5:30 p.m.  That's true, correct?

7   A.  Correct.

8   Q.  Let's go back to the scheduling change that was initiated

9   around November 2014.  The computer started generating the

04:04   10  schedules; right?

11  A.  Correct.

12  Q.  Now, the capacity like the capability of manually entering a

13  personal schedule still existed after the change; right?

14  A.  Yes.  Yes.

04:04   15  Q.  And so if a manager needed to change somebody's schedule

16  from what the computer spit out, they could press keys to do

17  that; correct?

18  A.  Correct.

19  Q.  And how would they do it?  What keys?

04:04   20  A.  I think it was the F6 key where they could go in and change

21  the hours.

22  Q.  Okay.  And if you wanted to change Marlo's hours for a week,

23  how long do you think that would take you?

24  A.  Anywhere between maybe two to five minutes.

04:04   25  Q.  Directing your attention back to your role in the

178

1    accommodation process, if an employee came into HR and said "I

2    need an accommodation," you're the person who would print out

3    the form; right?

4    A.  For the most part, yes.

04:05    5    Q.  And employees didn't have access to printing out those

6    forms; correct?

7    A.  Not that I'm aware of.

8    Q.  Okay.  And then you would also be the person to coordinate

9    with the ADA office once the paperwork came in; right?

04:05    10    A.  Correct.

11    Q.  Okay.  Over the decades you've dealt with about 20 to 30

12    requests for reasonable accommodations; correct?

13    A.  Correct.

14    Q.  So you knew the process, you had done it many times;

04:06    15    correct?

16    A.  Correct.

17    Q.  And you read Walmart policies about reasonable

18    accommodations; right?

19    A.  Correct.

04:06    20    Q.  You know that under Walmart policies family members can

21    request accommodations on behalf of employees.

22    A.  Correct.

23    Q.  It does not matter if the family member is a legal guardian;

24    right?

04:06    25    A.  Correct.

1          MS. VANCE:  And I'll ask for Exhibit 29 which has been

2     admitted into evidence.

3          (Exhibit 29, Accommodation Policy-D001004-1008,

4     admitted previously by stipulation.)

04:06   5          MS. VANCE:  And let's -- okay.  And can I have the

6     first page of the policy, please.

7     BY MS. VANCE:

8     Q.  So I see this document admitted into evidence, this Exhibit

9     29, is called "An Accommodation in Employment-Medical Related

04:07  10     Policy-Wisconsin."  Do you recognize that?

11     A.  Yes.

12     Q.  And you know this policy; correct?

13     A.  Yes.

14          MS. VANCE:  Now I'll ask Lectrice for the second page,

04:07  15     please.

16     BY MS. VANCE:

17     Q.  And when we look at the section saying "Eligibility For a

18     Reasonable Accommodation Due to a Disability," I'll read:

19          "You may be eligible for a reasonable accommodation if

04:07  20     you have the skills, ability, knowledge, certification, and

21     experience necessary and can perform the essential functions

22     either with or without reasonable accommodation for the job you

23     hold or a job you seek but because of a disability you need

24     assistance to apply for a new job or to perform the essential

04:08  25     functions of a job?"

1          Do you see that?

2     A.  Yes.

3     Q.  Okay.  And two paragraphs down:

4          "A reasonable accommodation means a change in policy,

04:08  5     practices, or the environment which enable an association with a

6     disability to perform the essential functions of his or her job

7     without creating an undue hardship for the company."

8          That's right?

9     A.  Correct.

04:08  10    Q.  And then when I look at that list of examples that Walmart's

11    policy gives for a reasonable accommodation, I see that the

12    fourth one down is about schedules.  Can you read that out?

13    A.  "Providing part-time or modified work schedules."  That one?

14    Q.  Yes.  So in Walmart's reasonable accommodation "providing

04:09  15    part-time or modified work schedules" is one of the examples

16    they give of a reasonable accommodation, isn't it?

17    A.  Yes.

18    Q.  Now, you knew this policy; right, Ms. Becker?

19    A.  Yes.  I've seen it, yes.

04:09  20    Q.  And as HR, you knew that denying a person with a disability

21    a reasonable accommodation is against the law; right?

22    A.  Yes.

23    Q.  It's against specifically the ADA; right?

24    A.  Yes.

04:09  25          MS. VANCE:  Thank you, Lectrice.

181

1   BY MS. VANCE:

2   Q.  Now, when you -- you testified that you had previously gone

3   through the process with other employees of a reasonable

4   accommodation; right?

04:09   5   A.  But they all asked for it.

6   Q.  Okay.  And you never had decision-making power in those --

7   it wasn't your final decision about the accommodation in those

8   situations; right?

9   A.  Right.

04:10   10   Q.  Okay.  And you never -- so you never denied --

11   A.  No.

12   Q.  -- a request for an accommodation.  And would that have been

13   against policy for you to deny one?

14   A.  I didn't have authority to make the decision.

04:10   15   Q.  Okay.  It was always -- it was supposed to be handled by the

16   ADA office; is that your understanding?

17   A.  Yes.

18   Q.  Now, I want to ask you about your interactions a little bit

19   with Marlo's family.  Okay?

04:10   20   A.  Okay.

21   Q.  So you met Marlo's mom at her hire.

22   A.  Yes.

23   Q.  And you kept contact with Marlo's mom when there were

24   problems for Marlo; right?

04:10   25   A.  Yes.  Marlo's mom would call me, yes.

182

1    Q.   And, in fact, you remember the first time this came up was

2    when her department managers wanted to train her on a new task

3    of folding bath rugs.  Do you remember this?

4    A.   Yes.

5    Q.   What happened?

6    A.   Marlo's mom called me and Marlo had told her that we wanted

7    her to clean the bathrooms.  But she must have misunderstood

8    because they did say they wanted her like to do the bathroom

9    rugs in that area, you know, like where the bath accessories are

10   all in that one area.

11   Q.   Okay.

12   A.   So she kind of misunderstood that.  And when I explained

13   that to her mom that we wanted her to move to the bathroom

14   section of the store, the rugs and everything, her mom was okay

15   with that.

16   Q.   And then with that kind of extra intervention with you, that

17   worked out; right?

18   A.   Yes.

19   Q.   And Marlo learned how to fold the bathroom rugs, right?

20   A.   Yes.

21   Q.   And she added that to the duties that she was being trained

22   on; right?

23   A.   Yes.

24   Q.   That was early in her employment; right?

25   A.   Yes.

183

1    Q.  Okay.  And other interactions you had with Marlo's mom would

2    be around scheduling Marlo's vacations; right?

3    A.  She would call and ask me if Marlo showed -- gave me a piece

4    of paper with dates on it.  And I know a lot of times they went

04:12   5    to Vegas.  And she just wanted to make sure that Marlo had given

6    it to me and that she was going to have off.

7    Q.  And you had Marlo's mom's phone number; right?

8    A.  In her personnel file.

9    Q.  And so you had occasional contact with Marlo's mom; correct?

04:12   10   A.  Correct.

11   Q.  And you called her on occasion; correct?

12   A.  Yes, I did.

13   Q.  And can you remember an occasion when you called -- when you

14   initiated calling Marlo's mom?

04:13   15   A.  Marlo came into the office, told me she was not feeling

16   good, and I didn't know her medical history and I wasn't

17   comfortable telling her to go home on the bus, so I called her

18   mom and explained, you know, that Marlo wasn't feeling good and

19   how she wanted us to handle it.

04:13   20   Q.  And what happened?

21   A.  She had said, "no, keep Marlo there" and her stepdad came to

22   pick her up.

23   Q.  And then do you remember there was also a time when sales

24   were slow and Marlo's days were cut; right?

04:13   25   A.  Correct.

184

1   Q.  And did you have involvement with Marlo's mother at that

2   point?

3   A.  She had asked me about it and I said, well, January and

4   February retail sales are always slow and everybody was getting

04:13   5   their hours cut.  She also went to the store manager and he

6   explained the same thing to her.

7   Q.  And then hours eventually picked up again.

8   A.  Yes.

9   Q.  Everybody's schedule eventually picked up again; right?

04:14   10   A.  Yes.

11   Q.  Including yours.

12   A.  Yes.

13   Q.  And that was a time when Marlo's family reached out to you;

14   correct?

04:14   15   A.  Correct.

16   Q.  Okay.  After Marlo's schedule got changed from 1:00 to 5:30,

17   she did eventually get written up, correct, for absences?

18   A.  Yes.

19   Q.  And those were for clocking out early; right?

04:14   20   A.  Yes.

21   Q.  Marlo didn't make it till 5:30, those shifts; right?

22   A.  Right.

23   Q.  And at Walmart when you get written out it's called a

24   coaching; is that right?

04:14   25   A.  That's correct.

185

1   Q.  And then you knew about it when Marlo -- the same day when

2   Marlo got her first coaching.

3   A.  After it was done.

4   Q.  Her first write-up?

04:15  5   A.  Yes.

6   Q.  Write-up, I'm sorry.  And during that timeframe you had even

7   seen Marlo by the clock before; right?  And asked her "Do you

8   remember your new schedule?"  Is that right?

9   A.  Yes.

04:15  10  Q.  And you would say, "Do you remember how long you're supposed

11  to stay today, Marlo?"  Is that right?

12  A.  Yes.

13  Q.  And that was because you thought maybe she doesn't remember

14  because of her disability; is that right?

04:15  15  A.  I just was there to remind her, you know, that that's what

16  she was scheduled.  And when I asked her she would tell me the

17  time.

18  Q.  And you were worried maybe she's not remembering because she

19  has Down syndrome; is that right?

04:15  20  A.  (No response.)

21  Q.  You didn't ask other employees do they remember when they're

22  going to clock out today; right?

23         MR. BULIOX:  Objection, compound.

24         THE WITNESS:  No, I didn't ask other employees.

04:15  25         MS. VANCE:  Okay.

186

1          THE COURT:  I'm sorry, was there an objection?

2          MR. BULIOX:  She answered the question.    The

3   objection was compound.  It was two questions without an answer.

4          MS. VANCE:  Shall I rephrase?

04:16  5          THE COURT:  Is the record okay or --

6          MS. VANCE:  I mean, I think it's asked and answered

7   myself.

8          THE COURT:  Yeah.  Go ahead, you can proceed.

9   BY MS. VANCE:

04:16  10  Q.  So -- and you testified you knew the day that Marlo had her

11  first write-up.

12  A.  After it was done, yes.

13  Q.  You didn't know about it till after it had already happened.

14  A.  Yes.

04:16  15  Q.  And then you didn't call Marlo's mom after that first

16  coaching, did you?

17  A.  No, because Marlo would always -- if there was something

18  that Marlo didn't like or she misunderstood, she would go home

19  and tell her mom and then her mom would contact me.  And that

04:17  20  was the relationship that we have had.

21  Q.  And except for that time when Marlo was sick; right?  You

22  picked up the phone that time?

23  A.  I thought that was my responsibility to call, yes.

24  Q.  And isn't it true that looking back now, in hindsight, you

04:17  25  wish you had contacted Marlo's mother after that first coaching?

187

1    A.  Yes, if I had known that Marlo did not say anything to her

2    mother.

3    Q.  And then Marlo went on and got a second write-up; is that

4    right?  She got a second coaching?

04:17   5    A.  Yes.

6    Q.  And you still didn't call Marlo's mom after the second

7    coaching, did you?

8    A.  No.

9    Q.  I'll ask to see what's been admitted into evidence as

04:18   10   Exhibit 1.  And this time we'll look at the second page.

11           I'm sorry, Lectrice, that was my fault.  Exhibit 23,

12   the second page.

13   BY MS. VANCE:

14   Q.  And this is an email sent July 13th, 2015; right?

04:19   15   A.  Yes.

16   Q.  And this is again Julia -- oh, what did I say?  I'm sorry.

17   I'm reading it and saying it wrong.  January 13th, 2015.  This

18   is Julia Stern's email; correct?

19   A.  Correct.

04:19   20   Q.  To Robin Castro, Bonnie Popp, and Jason Radue.  Right?

21   Those are the managers.

22   A.  Yes.

23   Q.  And I'm going to start reading three lines down.

24           "When I asked her why she was still leaving early she

04:19   25   said she was afraid she would miss the bus, even though it runs

1    till 8 p.m.  She wanted to know why she can't just work noon to

2    4:00 like she used to."

3            Do you see that?

4    A.  Yes, I do.

04:20    5    Q.  And you received that email; right?

6    A.  Not that day.

7    Q.  Not that day, but -- when did you receive that email?

8    A.  When we were getting everything ready for her file.

9    Q.  And did you know that Marlo wanted to know why she can't

04:20    10   just work noon to 4:00 like she used to during that timeframe?

11   A.  No, I didn't know.

12   Q.  And had you had any conversations with Julia about Marlo

13   wanting to work noon to 4:00?

14   A.  No.

04:20    15           MS. VANCE:  Thank you, Lectrice.

16   BY MS. VANCE:

17   Q.  Directing your attention back to your duties as a personnel

18   coordinator, earlier you told us part of your duties include if

19   employees can come to you in HR to report unfair treatment;

04:21    20   right?

21   A.  Correct.

22   Q.  Or employment discrimination; correct?

23   A.  Correct.

24   Q.  At one point between November 2014 and Marlo's termination,

04:21    25   Marlo came into your office to tell you that Julie Stern was

189

1    picking on her; right?

2    A.  Yes.

3    Q.  Am I right that this happened after Ms. Stern gave Marlo a

4    write-up; right?

04:22    5    A.  I believe so.

6    Q.  And Marlo came into your office to say Julie was picking on

7    her and that Julie didn't like her; right?

8    A.  Right.

9    Q.  And you notice that Marlo is a little upset at the time.

04:22   10    A.  Yes.

11    Q.  You told Marlo that you would look into it; correct?

12    A.  Correct.

13    Q.  And shortly after you brought that to your store manager;

14    correct?

04:22   15    A.  Yes.

16    Q.  And who was that?

17    A.  That would have been Jason at that time.

18    Q.  Jason Radue; right?

19    A.  Yes.

04:22   20    Q.  And you told Mr. Radue that Marlo reported that Julie Stern

21    was picking on her; right?

22    A.  Yeah.

23    Q.  And what did he say?

24    A.  That he was going to look into it and take care of it.

04:22   25    Q.  And at that time you never called Marlo's mother, did you?

190

1    A.  No.

2    Q.  And so did you have any follow-up after that with Mr. Radue,

3    with the store manager?

4    A.  No.

04:23    5    Q.  And do you know -- do you have any knowledge of any

6    follow-up on the part of Mr. Radue?

7    A.  Not that I'm aware of.

8    Q.  Okay.  And then I'll direct --

9          So then let's fast-forward.  In July 2015 Marlo is

04:23    10    terminated; correct?

11    A.  Correct.

12    Q.  Because she continued to come to work, do her job but clock

13    out early; right?

14    A.  Correct.

04:23    15    Q.  And you helped arrange the meeting; correct?

16    A.  Which meeting?

17    Q.  Yes, I'm sorry.  So then there was a call from Amy Jo

18    Stevenson to you after Marlo's termination; correct?

19    A.  It was not to me.

04:24    20    Q.  Did Amy Jo call you to ask for a meeting?

21    A.  No, she didn't ask me.  I was told by Julia that there was

22    going to be a meeting.

23    Q.  I see.  And you were at the meeting; correct?

24    A.  Yes.

04:24    25    Q.  And it was within a week of Marlo's termination; correct?

1   A.  I'm pretty sure, yes.

2   Q.  Okay.  And at that meeting Amy Jo mentioned reasonable

3   accommodation through the ADA; correct?

4   A.  I don't remember.

04:24   5   Q.  Okay.  We can look at your deposition.  Would that help you

6   remember?

7   A.  I mean, this has been so long ago.

8   Q.  Okay.  I'll ask you to turn in your deposition to page --

9           MS. VANCE:  May I approach, Your Honor?

04:25   10          THE COURT:  You may.

11  BY MS. VANCE:

12  Q.  -- 169, going over to 170.  I'll start at line 22 on page

13  169.

14  A.  Okay.

04:25   15  Q.  "So what do you remember about the context of the words

16  'reasonable accommodation?'"

17          And then we go down to your answer was:  "She would

18  just mention reasonable accommodation through the ADA.

19          "QUESTION:  Amy Jo Stevenson?

04:25   20          "ANSWER:  Amy, yes."

21          Does that help you remember?

22  A.  Yes.  She never asked me for one for Marlo.  She just

23  referred to that through the ADA.

24  Q.  So Ms. Stevenson said Marlo has a right to a reasonable

04:26   25  accommodation through the ADA; is that right?

1    A.  I'm not sure if that was the exact words that she said.

2    Q.  Just that she mentioned reasonable accommodation through the

3    ADA.

4    A.  Yes.  Yes.

04:26    5    Q.  Okay.  And do you recall that Amy Jo's -- Amy Jo Stevenson's

6    request was to have Marlo rehired; correct?

7    A.  Yes.

8    Q.  With the accommodated schedule noon to 4:00; correct?

9    A.  Not that I'm aware about the schedule.  She wanted her

04:26    10    rehired.

11    Q.  Oh, you don't remember if she had said and hire back at her

12    accommodated schedule noon to 4:00?

13    A.  Correct.

14    Q.  Okay.  Now, to your knowledge as personal coordinator, if a

04:26    15    job applicant with a disability needs a reasonable

16    accommodation, at that job applicant stage can they approach you

17    for an accommodation -- for the accommodation paperwork?

18    A.  You mean before they're hired?

19    Q.  As a job applicant.

04:27    20    A.  They could.

21    Q.  Okay.  And when somebody's in the hiring process they're

22    entitled, at Walmart, to apply for a reasonable accommodation in

23    the hiring process; correct?

24    A.  Yes.  They can ask for one.

04:27    25    Q.  Okay.  And am I right that your understanding of the process

193

1    for being reactivated in the system after termination for

2    reinstatement, that would take about five minutes; is that

3    right?

4    A.  If it was a certain amount of time.  If it was past I think

04:27  5    like 30 days or something, then we couldn't do it that way.

6    Q.  All right.  So within 30 days of termination, the process to

7    reinstate somebody's employment is about a five-minute process.

8    A.  Roughly, yes.

9    Q.  And that is something you could do in the store; is that

04:28  10   correct?

11   A.  I could, if I was asked by management.

12   Q.  So overall I want to make sure that the record's clear.  You

13   never at any point in this process gave Marlo Spaeth a

14   reasonable accommodation packet; right?

04:28  15   A.  Right.

16   Q.  You never at any point in this process gave Amy Jo Stevenson

17   the reasonable accommodation paperwork; correct?

18   A.  Right.  She did not ask for one.

19   Q.  And you never gave Marlo's mother the paperwork for a

04:28  20   reasonable accommodation; right?

21   A.  No, because she never asked for one either.

22   Q.  And they can't print them out; right?  It has to come from

23   you; correct?

24   A.  Do you mean like Marlo's mom?

04:28  25   Q.  The ADA packet I mean.

1   A.  Yes.  Like Marlo's mom and that wouldn't have been able to

2   print it off like if they had a computer or something.

3   Q.  Right.

4   A.  Not that I'm aware of.

04:29   5   Q.  It was paperwork that you have.

6   A.  Yes.

7   Q.  Okay.

8           MS. VANCE:  I have no further questions for this

9   witness at this time.

04:29   10          THE COURT:  Okay.  Cross?

11          MR. BULIOX:  All right, thank you, Judge.

12                      CROSS-EXAMINATION

13  BY MR. BULIOX:

14  Q.  Ms. Becker, good afternoon.

04:29   15  A.  Good afternoon.

16  Q.  We are going to start at the top and get a little bit of

17  background.

18  A.  Okay.

19  Q.  Are you from Wisconsin?

04:29   20  A.  Yes.

21  Q.  And where in Wisconsin are you from?

22  A.  I live in Kiel, Wisconsin.

23  Q.  And how far is Kiel, Wisconsin from Manitowoc?

24  A.  From where I live it was like about 25 miles.

04:29   25  Q.  Okay.  How about Green Bay, how far is it from Green Bay?

195

1  A.  It around 55.  I'm not sure.

2  Q.  And are you born and raised in Wisconsin or are you an

3  implant from somewhere else?

4  A.  No, I was born and raised in Wisconsin.

04:30  5           MS. VANCE:  Objection relevance.

6           THE COURT:  Overruled.  Background is fine.

7  BY MR. BULIOX:

8  Q.  Ms. Becker, are you currently married?

9  A.  Yes.

04:30  10  Q.  And how long have you been married?

11  A.  About 46 years.

12  Q.  Does anyone in your family have a disability?

13  A.  Yes.

14  Q.  Who?

04:30  15  A.  My husband does.

16  Q.  And what's his disability?

17  A.  He was in a work accident and he had a head injury and he

18  does not have short-term memory anymore.

19  Q.  And what, if anything, have you done to address his

04:30  20  short-term memory issues?

21  A.  There's different things that we had to do.  And when it

22  first began we had Post-It notes all over for him.  Now we have

23  a great big calendar, we write everything down.  If any of our

24  kids call and say they're coming over that has to be written

04:30  25  down right away, otherwise like 10, 15 minutes later he won't

196

1    remember it.

2    Q.  You testified earlier that you would write things down for

3    Marlo as well; is that correct?

4    A.  Yes.

04:30   5    Q.  And do you have anybody else in your family who has a

6    disability?

7    A.  Yes.

8    Q.  Who?

9    A.  My granddaughter.

04:31   10   Q.  And what is her condition?

11   A.  She's nonverbal.  She's in a wheelchair.  She has very

12   limited use of like her hands.

13   Q.  And have you worked with her at all?

14   A.  Yes.

04:31   15   Q.  How so?

16   A.  I do take care of her when her parents do go away.

17          I do spend time with her because you have to learn

18   because she's nonverbal, she communicates a lot with blinking

19   her eyes or the emotions on her face.  So you have to be around

04:31   20   them a lot in order to understand and see, you know, what

21   they're trying to tell you.

22   Q.  How did you learn all this?

23   A.  Just by being with them.  I mean, I spend a lot of time with

24   her.  And when my husband got hurt I spent a lot of time with

04:31   25   him and you try different things to see what would work.

197

1    Q.  Outside of your experience with your husband and with your

2    granddaughter, do you have any other experience working with

3    people with disabilities?

4    A.  Yes.

04:32    5    Q.  And what is that?

6    A.  I'm a buddy for the Miracle League in Manitowoc.

7    Q.  All right.  So what is the Miracle League first?

8    A.  The Miracle League, it's we play baseball with disabled

9    children.

04:32    10    Q.  Okay.  And what is a buddy?

11    A.  A buddy?  Okay, I'm a buddy and I have one of the children

12    that have a disability, and I will go and get him ready to bat.

13    I'll make sure he has his helmet on.  We'll go up and if he

14    needs help batting I will help him.  If he doesn't I'll stand a

04:32    15    little ways away from him, get him all situated so he can bat

16    the ball.  After that I make sure that I take the bat from him.

17    And then I will run the bases with him, you know, kind of let

18    him know when he should run the bases because of the other kids

19    playing so there's not so many, you know, all piled up at one.

04:32    20         And usually on the third -- when he's on the third

21    base we let the person that just hit go to first base, and then

22    we let him run home and make it kind of a special thing that

23    they can just quick run home.

24    Q.  And do you know what condition that the child that you're a

04:33    25    buddy for has?

198

1    A.  Yes.

2    Q.  And what is it?

3    A.  He has Down syndrome.

4    Q.  And how long have you been involved with the Miracle League?

04:33  5    A.  Oh, I would say about six years.

6    Q.  So you testified earlier about retiring.  Was your last job

7    at Walmart?

8    A.  Yes.

9    Q.  And did you leave voluntarily?

04:33  10   A.  Yes.

11   Q.  And how long had you worked at Walmart before retiring?

12   A.  It was 29 years.

13   Q.  And did you work at one location or did you bounce around?

14   A.  No, I was always at the Manitowoc store.

04:33  15   Q.  And you testified earlier about being a personnel

16   coordinator for over 20 years, did you hold any other job titles

17   at Walmart?

18   A.  Yes.  When I first was hired by Walmart, I think it was

19   called the setup crew because all there was was the building and

04:34  20   we set up everything.

21          After that was done I was in the fitting room.  And

22   then I moved to sales floor associate.  And then I moved to

23   department manager of infants and girls.  And then I went to

24   personnel.

04:34  25   Q.  Okay.  And we talked about, a little bit earlier, some of

199

1    your job duties as a personnel coordinator.  Were you involved

2    at all with employee or associate applications?

3    A.  Yes.

4    Q.  Okay.  And when I say "associate" do you know what I mean?

04:34    5    A.  People that were going to apply or the ones that were just

6    hired?

7    Q.  Does Walmart have a name for its employees?

8    A.  Yes, they're associates.

9    Q.  And did you play any role as a personnel coordinator in the

04:35    10    scheduling of associates?

11    A.  I did key the schedules in that the assistant managers would

12    write out.

13    Q.  And did you ever work directly with associates on

14    scheduling?

04:35    15    A.  If there was a problem, if they came to me and all of the

16    sudden something came up that they would need to have off, I

17    could work with them and then I would let management know that I

18    helped this associate or that this associate wasn't coming in

19    for whatever reason.

04:35    20    Q.  Okay.  And you testified, Karen, earlier about policies that

21    Walmart has on disabilities.  Do associates have access to those

22    policies?

23    A.  Yes.  We have a system on the computer, it's called The

24    Wire, where they can look up the different policies.

04:35    25    Q.  And would that include policies on disability?

1    A.  Yes.

2    Q.  And policies on reasonable accommodations?

3    A.  Yes.

4    Q.  Okay.  And is this a topic that is covered in orientation?

04:35    5    A.  Yes.

6    Q.  So, Karen, given your family members with disabilities and

7    your work with disabled children through the Miracle League,

8    would you allow concerns expressed about disabled individuals to

9    go unaddressed?

04:36    10    A.  No.

11    Q.  And would you be part of actively discriminating against

12    somebody because they have a disability?

13               MS. VANCE:  Objection, leading.

14               THE COURT:  Sustained.

04:36    15    BY MR. BULIOX:

16    Q.  When you worked as a personnel coordinator did you work on

17    the store floor up front with customers, in merchandise?

18    A.  No.  If I did it was like maybe for like an hour during the

19    week.

04:36    20    Q.  And where did you work most of the time?

21    A.  In the personnel office that's in the back of the store.

22    Q.  Okay.  And did any of your day-to-day main responsibilities

23    involve helping customers?

24    A.  No.

04:36    25    Q.  And how often would you say you interacted with customers?

1   A.  Maybe once a week.

2   Q.  And who would you spend most of your time interacting with

3   as a personnel coordinator?

4   A.  The associates and management.

04:37   5   Q.  When did you first meet Marlo Spaeth?

6   A.  When her and her mom came in for the prescreening.

7   Q.  And can you tell us a little bit more about a prescreening?

8   What is that exactly?

9   A.  They would have an application filled out and we would go

04:37   10   over like their work history, their availability, different

11   things like that.  And then we would tell them about what

12   positions we would have open and we would talk to them about

13   what would interest them.

14   Q.  And was Marlo directly asked any questions during this

04:37   15   prescreening?

16   A.  Yes.

17   Q.  And was she able to understand those questions from what you

18   can tell?

19   A.  From what I can tell, yes.

04:37   20   Q.  Was she able to directly answer your questions?

21   A.  Yes.

22   Q.  All of them?

23   A.  Yes.

24   Q.  And from what you can tell did Marlo have any difficulty at

04:38   25   all during the prescreening process?

1   A.  Not that I could tell.

2        MS. VANCE:  Objection, calls for speculation.

3        THE COURT:  Overruled.

4   BY MR. BULIOX:

04:38   5   Q.  In response to any of your questions did she ever give you

6   any answers that didn't make any sense or that were

7   nonresponsive?

8   A.  No.

9   Q.  And what happened after the prescreen?

04:38   10   A.  Then I would talk to management about the application and I

11   would set up an interview.  And then they would come in and

12   interview.  And then management would conduct the interview and

13   then they would decide whether they were going to hire them or

14   not.  And then we usually -- once it came to the job offer, then

04:38   15   we would usually have to send them out for a drug screen.

16   Q.  And do you know whether or not Marlo Spaeth received an

17   interview?

18   A.  Yes.

19   Q.  Did she?

04:38   20   A.  Yes.

21   Q.  And do you know whether or not she was hired?

22   A.  Yes.

23        MR. BULIOX:  At this point I want to introduce what's

24   been admitted into evidence as defendant Exhibit 1000.

25        (Exhibit 1000, New Hire Acknowledgement Form

203

1    08/02/1999 [D000017], admitted previously by stipulation.)

2         MR BULIOX:  If we can pull that one up on the screen,

3    Tracy.

4    BY MR. BULIOX:

04:39    5    Q.  Showing you what's been admitted as Walmart

6    Trial Exhibit 1000.  Do you recognize this document?

7    A.  Yes.

8    Q.  What is this document, Karen?

9    A.  That is something that we had given new hires as like a kind

04:39   10    of a welcome to Walmart.

11    Q.  And does this document go over certain points and

12    information that is important for associates to know upon hire?

13    A.  Yes.

14    Q.  Okay.  And is this a document that is kept in Marlo Spaeth's

04:39   15    personnel file?

16    A.  Yes.

17    Q.  And to your knowledge is this Marlo's signature at the

18    bottom?

19    A.  To my knowledge.  To my knowledge, yes.

04:39   20         MR. BULIOX:  At this point I want to pull up Walmart

21    Exhibit 1001.

22         (Exhibit 1001, Acknowledgement of Receipt of

23    Handbook-August 2, 1999 [D000019], admitted previously by

24    stipulation.)

25    BY MR. BULIOX:

204

1    Q.  Same set of questions.  Showing you what's been admitted as

2    Exhibit 1001, do you recognize this document?

3    A.  Yes.

4    Q.  And what is this document right here?

04:40    5    A.  That is a handbook that we did give to associates and they

6    would read that and then they would sign it, and then they would

7    give the back cover of that to me.

8    Q.  So is this an acknowledgement that an associate received the

9    handbook?

04:40    10    A.  Yes.

11    Q.  And it looks like it's dated 8/2/1999; correct?

12    A.  Correct.

13    Q.  And, to your knowledge, is this Marlo Spaeth's signature on

14    this document?

04:40    15    A.  To my knowledge, yes.

16    Q.  After her hire do you know whether or not Marlo went through

17    any type of orientation?

18    A.  Yes, she did.

19    Q.  And what role, if any, did you have during her orientation?

04:41    20    A.  I was in the room, but he was doing my stuff.  It was

21    usually handled by the training coordinator.

22    Q.  So were you an observer?

23    A.  Yes, I could observe what was going on.

24    Q.  And was the orientation she underwent different in any way

04:41    25    from the orientation that other associates received during this

1   time?

2   A.  No, except -- well, her mother did come to the orientation.

3   Q.  And was her mother there the entirety of the orientation?

4   A.  No, she was mostly there just to help out with the

04:41   5   paperwork.  And then when we started the computer-based learning

6   with Marlo she left the room, so I don't know where she went.

7   Q.  Okay.  And what is computer-based learning?

8   A.  It is where they would go onto the computer, they would have

9   different modules, and it would go into safety, different things

04:41   10   like that that they could learn.

11   Q.  And was Marlo able to handle much of the orientation

12   about --

13          MS. VANCE:  Objection, calls for speculation.

14          THE COURT:  Sustained.

04:42   15   BY MR. BULIOX:

16   Q.  What happens during computer-based training?

17   A.  They would go sign onto the computer, they would select a

18   module, it would go and tell them different things on the

19   module.  And then after that there could be a quiz after it

04:42   20   where it would ask them questions and they would have to answer

21   them.

22   Q.  And did you assist Marlo in any way during that process?

23   A.  No.

24   Q.  And once in this computer training system was Marlo able to

04:42   25   do things on her own and complete it?

1    A.  Yes.

2    Q.  Okay.  And did it require any reading?

3    A.  Yes.

4    Q.  Did it require that she answer written questions?

04:42   5    A.  Yes.

6    Q.  And, to your knowledge, did she answer those questions

7    correctly?

8    A.  On some of the models they would have to get at least

9    80 percent to move on to the next one.

04:43   10   Q.  And did Marlo pass these assessments?

11   A.  Yes.

12   Q.  At or around the beginning of Marlo's employment with

13   Walmart, did you discuss Marlo's availability with Marlo and her

14   mother?

04:43   15   A.  Just at the prescreening.

16   Q.  And can you tell us about that?

17   A.  The prescreening with her mother?

18   Q.  Yes.

19        MS. VANCE:  Objection, asked and answered.

04:43   20   Cumulative.

21        THE COURT:  Overruled.  Go ahead.

22   BY MR. BULIOX:

23   Q.  So can you tell us about the discussion about Marlo's

24   availability during the prescreening?

04:43   25   A.  She said mostly that Marlo couldn't work on weekends because

207

1    of the bus schedule.  And she had put down those hours she

2    thought those would be good for Marlo.

3    Q.  And was there anything that was said during the prescreening

4    conversation where you're talking about availability that

04:44   5    indicated to you that Marlo's availability was affected in any

6    way by her Down syndrome?

7    A.  Not that I'm aware of.

8    Q.  And was there anything relating to Marlo's availability part

9    of a reasonable accommodation request or arrangement?

04:44   10   A.  They did not ask me for any.

11   Q.  And were you ever asked to contact Marlo's mother regarding

12   Marlo's job?

13   A.  No.

14   Q.  Her scheduling?

04:44   15   A.  No.

16   Q.  Any disciplinary matters?

17   A.  No.

18   Q.  I think you mentioned Amy Jo Stevenson earlier in your

19   testimony; do you know who she is?

04:44   20   A.  She's Marlo's sister.

21   Q.  During the time Marlo was at Walmart, what would Amy Jo have

22   needed to do in order to speak with you?

23   A.  She could have called on the phone, she could have come into

24   the store when I was working.

04:45   25   Q.  Okay.  And do you have any sense of how long that would take

208

1    to actually reach you if she were to have called in or came to

2    the store?

3    A.  It could be anywhere between 5, 10, 15 minutes.

4    Q.  At any point during Marlo's employment did you have any

04:45  5    contact with Amy Jo Stevenson?

6    A.  Not during her employment.  The first time I had contact

7    with her was at that meeting after her termination.

8    Q.  So she never called you at any point during Marlo's

9    employment?

04:45  10   A.  No.

11   Q.  And during Marlo's employment at Walmart you had the

12   opportunity, from your earlier testimony, to interact with

13   Marlo.  Am I understanding that correctly?

14   A.  Yes.

04:45  15   Q.  And, in general, what would be the nature of your

16   interactions with Marlo?

17   A.  It would usually be when she would want to come and get her

18   schedule.  And on Mondays, if the Packers played on Sunday and

19   she worked she would always come and say, "Did you watch the

04:46  20   game?  They won."  Or, you know, she liked talking about the

21   Packers.

22   Q.  And, you know, in your interactions with Marlo was there

23   ever an occasion where you believed that she did not understand

24   what you were --

25         MS. VANCE:  Objection, calls for speculation.

1   BY MR. BULIOX:

2   Q.  Was there ever an indication where you believed that Marlo

3   did not understand something that you said to her?

4        THE COURT:  I'm going to overrule it.

04:46   5        MR. BULIOX:  I'm sorry, Judge.

6   BY MR. BULIOX:

7   Q.  Can you answer?

8   A.  Can you repeat it?

9   Q.  During your interactions with Marlo was there ever an

04:46   10   occasion in which you believe that she did not understand

11   something you said to her?

12   A.  No.

13   Q.  And did you and Marlo ever have any type of misunderstanding

14   over anything?

04:47   15   A.  Not with me.

16   Q.  Are you aware of any other misunderstandings Marlo may have

17   had with somebody else?

18   A.  The time when she thought that she was supposed to clean the

19   bathrooms.

04:47   20   Q.  And that's what you talked about a little earlier?

21   A.  Yes.  Yes.

22   Q.  During her employment with Walmart are you aware of any

23   occasions in which Marlo was required to make adjustments in her

24   routine in order to learn new things or do new things?

04:47   25   A.  It would just take a little longer, but other than that, no.

210

1    Q.  And can you think of any specific instances where she made

2    an adjustment, she went from one thing to a new thing or learned

3    a new task?

4    A.  Well, she would learn -- she learned how to do the bathroom

04:48    5    stuff, and that didn't take very long.  Trying to do the returns

6    took a little longer, where to put the stuff.

7    Q.  Can you tell me about the returns and that switch?

8    A.  Okay.  The returns would be anything that would come back

9    from the service desk.  And the returns could be anything that

04:48    10    was in the whole domestic department.

11    Q.  So at one point in time Marlo was not doing returns?

12    A.  When she first started, no.  We kind of gradually worked her

13    into different areas.

14    Q.  And how long did it take for Marlo to adapt to being able to

04:48    15    do returns?

16    A.  I don't think it took very long.  I'm not sure.

17    Q.  Would you say more than a month?

18    A.  No.

19          MS. VANCE:  Objection, personal knowledge.

04:48    20    Foundation.

21          THE COURT:  Sustained.

22    BY MR. BULIOX:

23    Q.  To your knowledge, are products and displays ever rearranged

24    in the store?

04:48    25    A.  Yes.

211

1    Q.  And, to your knowledge, did Marlo display to you any

2    problems with being able to adjust to changes in the store?

3    A.  Not to me.

4    Q.  And, to your knowledge, did Marlo have different supervisors

04:49    5    over the course of her employment with Walmart?

6    A.  Yes.

7    Q.  And, to your knowledge, did she display any problems with

8    being able to adjust to new supervisors?

9    A.  Not that I'm aware of.

04:49    10    Q.  And what was Marlo's position again at the store?

11    A.  She was a sales associate.

12    Q.  We touched on a little bit some of the duties that she

13    performed, are you aware of any duties that she was unable to

14    perform outside of doing the cash register?

04:49    15    A.  Not that I'm aware of.

16    Q.  During the time that you worked at Walmart, Karen, how did

17    availability for associates in general work?

18    A.  They would fill out the availability when they applied.  But

19    then if they needed to change their availability, like say they

04:50    20    went to school or some other reason, they would come and get a

21    new availability form from me, they would fill it out, they

22    would give it to either me or an assistant manager.  If they

23    gave it to me I would give it to the assistant manager, and they

24    would have to look it over, and they would have to sign it

04:50    25    before it could be put into the system.

212

1    Q.  And who was responsible for entering the information on the

2    availability form into the system?

3    A.  If it was given to me I did, but there was also some

4    assistants that entered them in too.

04:50    5    Q.  Did you say some assistants?

6    A.  Yes.

7    Q.  Assistants?

8    A.  Assistant managers.

9    Q.  And is it possible for associate availability in the

04:50    10    computer system to be different than what's reflected on paper

11    copies of an associate's availability form?

12    A.  Yes.

13    Q.  Have you ever seen that happen before?

14    A.  Yes.  If I wasn't given an availability form and it was

04:51    15    keyed in by an assistant and that, you know, it could be

16    different than what was on that previous one.

17    Q.  Okay.  And have you ever seen a situation where an

18    availability form is missing from the personnel file of an

19    associate?

04:51    20            MS. VANCE:  Objection, leading.

21            THE COURT:  Overruled.

22            THE WITNESS:  Yes.  We would do like a file audit each

23    year and we could, you know, check different things.  Also, if

24    an associate would come to me and say, hey, this isn't my

04:51    25    availability, I could check into it and see which one I had.

213

1    BY MR. BULIOX:

2    Q.  Okay.  And how often would you see that?

3    A.  That something was missing?

4    Q.  Yes.

04:51  5    A.  Well, we've had like 250 to 300 associates, it could happen

6    like 10, 12 times maybe.

7    Q.  And is it your experience that associates are sometimes

8    scheduled outside of what's on their availability form?

9    A.  Yes.

04:52  10    Q.  And do you know the circumstances under which that may

11    happen?

12    A.  When inventory is around, a lot of people will pick up extra

13    hours that would be scheduled outside.  Like, when we used to

14    have like Black Friday for the holidays, they could pick up

04:52  15    other hours that were outside their availability.

16    Q.  Outside of prescreening, were you ever involved in setting

17    or changing Marlo Spaeth's availability?

18    A.  No.

19    Q.  At this point in time I want to bring up Plaintiff's Exhibit

04:52  20    No. 1.  So showing you what's been admitted as Exhibit Number 1,

21    do you recognize this document?

22    A.  Yes.

23    Q.  Okay.  What is this document?

24    A.  This is a customer service availability form for Marlo.

04:53  25    Q.  I want to direct your attention to the second page of this

214

1    document.

2         MR. BULIOX:  So if we can scroll down.  There we go.

3    BY MR. BULIOX:

4    Q.  And it looks like this is an availability form for Marlo?

04:53  5    A.  Yes.

6    Q.  For 2006 it looks like.  That's the date that it's signed.

7    A.  Yes.

8    Q.  Do you see that?  All right.  And on here what days does

9    Marlo indicate she's available to work?

04:53  10   A.  She can work Monday, Tuesday, Wednesday, and Friday.

11   Q.  Okay.  So from this availability, is it possible that her

12   schedule could fluctuate?

13   A.  Yes.

14   Q.  So could she work on one week three days?

04:54  15   A.  Yes.

16   Q.  Could she work on another week one day?

17   A.  Yes.

18   Q.  Could she work on another week two days?

19   A.  Yes.

04:54  20   Q.  From this availability that Ms. Spaeth indicated that she

21   had during this time, was there any guarantees that she would

22   have a set schedule?

23   A.  That she would always have the same days?

24   Q.  Yes.

04:54  25   A.  No.

215

1    Q.  So her schedule could fluctuate.

2    A.  Yes.

3    Q.  Do availability forms guarantee a set work schedule?

4    A.  No.

04:54  5    Q.  Okay.  I want to direct your attention to the bottom of this

6    document where it reads, right under the signatures "this form."

7    Can you read that?

8    A.  "This form is no guarantee of a shift or minimum number of

9    hours.  This form supersedes the availability section contained

04:55  10   on the application."

11   Q.  All right, thank you.  So according to this form was Marlo

12   available to work on Thursdays?

13   A.  No.

14   Q.  And if I were to tell you that she did work Thursdays

04:55  15   sometimes would that surprise you at all?

16   A.  No, because she would pick up hours if she wanted to.

17   Q.  You talked about, a little earlier, being aware that Marlo

18   was let go.

19   A.  Yes.

04:55  20   Q.  Why was she let go?

21   A.  To my understanding it was for attendance.

22   Q.  And did you play a role in the decision to end her

23   employment?

24   A.  No.

04:56  25   Q.  Are you aware of any -- are you aware of any of the

216

1    attendance issues leading up to her termination?

2    A.  I knew that she was leaving early.

3    Q.  And how were you aware of that?

4    A.  Julia had told me.  But also in some of our attendance

04:56    5    records she would always -- it would show up that she had left

6    early.  And I would catch her by the time clock 15 minutes ahead

7    of time just standing there waiting to clock out.  And I'd tell

8    her that she would need to go back out on the floor to work,

9    4:00 then; if she wasn't going to do that, then she needed to

04:56    10    clock out.

11    Q.  And how often in 2015 would you estimate you saw her leaving

12    work early?

13    A.  I would say maybe at least two days out of the week,

14    roughly.

04:56    15    Q.  And did you have a conversation with her about leaving

16    early?  Did I hear that correctly?

17    A.  Yes.

18    Q.  And what would her response be?

19    A.  She would say, "Yeah, I know I have to stay."

04:57    20    Q.  And then what would she do?

21    A.  Then she would go back out on the floor and then a little

22    while later she'd be back at the time clock again.

23    Q.  And what, if anything, would happen after that point?

24    A.  Then she would just clock out and leave.

04:57    25    Q.  At this point I want to bring up Walmart Exhibit 1014.

217

1          Actually, before we go here, Karen, if I can ask you

2   during your conversations with Marlo when she was leaving work

3   early, did she ever say anything to you that led you to believe

4   that she did not understand that she was leaving early?

04:58   5          MS. VANCE:  Objection, leading.  And calls for

6   speculation.

7          THE COURT:  Overruled.

8          THE WITNESS:  No.

9          MR. BULIOX:  Okay.

10          (Exhibit 1014, Email from Julia Stern-December 17,

11   2014 [D000395], admitted previously by stipulation.)

12   BY MR. BULIOX:

13   Q.  So looking at Exhibit 1014, do you recognize this document?

14   A.  Yes.

04:58  15   Q.  This is a document we talked about a little bit earlier

16   today; is that correct?

17   A.  That's correct.

18   Q.  All right.  And Julia Stern, did she forward this document

19   to you on January 13th, 2015?

04:58  20   A.  Yes.

21   Q.  And looking at, you know, the meat of the email here.

22          So the email dated December 17th, 2014, around the

23   middle of the paragraph.

24          And this may not be fair, but I'm going to ask you to

04:59  25   go down about 14 lines.  And about 14 lines down -- and I think

218

1   we're going to blow it up here -- do you see where it reads,

2   quote, then, after the grocery store?

3   A.  After the zone stopped?

4   Q.  Yes.  Groceries, yep.

5   A.  Yes.

6   Q.  Could you read that for us?

7   A.  "Then, after the grocery zone, she stopped me on the sales

8   floor and said that she was going home, this was about 3:00, as

9   she had talked to Karen and she was concerned that if she did

10  not eat supper on time she would get sick and that she wanted to

11  talk to her sister about her schedule."

12  Q.  Okay.  Thank you, Karen.

13  A.  Yes.

14  Q.  Did Marlo talk to you on this day about leaving work early?

15  A.  No.

16  Q.  Did Marlo talk to you on this day about not eating supper on

17  time?

18  A.  No.

19  Q.  Do you ever recall a conversation in which Marlo indicated

20  to you that she would get sick if she didn't eat supper on time?

21  A.  No.

22  Q.  And then, looking at the same email a little bit further

23  down, at the end of the first paragraph.  Do you see where it

24  reads:

25          "So after she left and I got a chance to talk to

1    Karen, she told me that Marlo never came to see her today, so

2    she lied about having talked to Karen as well?"

3         Do you see that?

4    A.  Yes.

5    Q.  And did Julie speak to you about this on or about December

6    17, 2014?

7    A.  Yes, she did ask me about it.

8    Q.  And is it true that Marlo did not come and speak to you on

9    this day?

10   A.  That's true.

11   Q.  Now I want to pull up Walmart Exhibit 1016.

12        (Exhibit 1016, Email from Julia Stern-July 12, 2015

13   [D000397], admitted previously by stipulation.)

14   BY MR. BULIOX:

15   Q.  So showing you what has been admitted as Exhibit 1016, do

16   you recognize this document?

17   A.  Yes.

18   Q.  And what is this document?

19   A.  This is an email that Julie had sent to a store manager.

20   Q.  And looking at about the fifth line down on this email, do

21   you see where it reads "Marlo was aware"?  Or starts to read

22   "Marlo was aware"?

23   A.  "Marlo was aware that she was to work her full shifts, which

24   are always 1:00 to 5:30 p.m.  Karen would print out the

25   schedules for her."

1    Q.  Thank you.  Do you know whether or not at the time Marlo's

2    work shifts were, in fact, 1 p.m. to 5:30 p.m.?

3    A.  Yes.

4    Q.  And were they?

05:02   5    A.  Yes.

6    Q.  And I think you testified earlier that you printed out her

7    schedule for her; is that correct?

8    A.  Yes.

9    Q.  And were you printing out her schedule for her during this

05:02   10   time?

11   A.  Yes.

12   Q.  And did you print out her schedule for her at any other

13   time?

14   A.  I've been doing it almost since she's been there.  So --

05:02   15   Q.  And would you hand Marlo these printed schedules directly

16   or would you leave it for her, or something else?

17   A.  No, I would hand them to her directly.

18        And then I would ask her, you know, if -- to read them

19   back to me so that I knew she knew what the hours she was

05:02   20   supposed to be and if it was supposed to be Monday, Tuesday, or

21   Friday, or whatever day.

22   Q.  Okay.  And did she ever say anything to you that led you to

23   believe that she did not understand this schedule of 1:00 to

24   5:30 p.m.?

05:03   25   A.  Not that I'm aware of, no.

221

1    Q.  And do you know why Marlo's schedule changed to 1 p.m. to

2    5:30 p.m.?

3    A.  Because of the new customer service scheduling in the

4    computer.  So that she could get hours.

05:03    5    Q.  And did she resist this new schedule in any way?

6    A.  I don't know.

7    Q.  At any point in time, Karen, do you believe that Marlo's

8    attendance was related in any way whatsoever to her Down

9    syndrome?

05:03    10   A.  Not that I'm aware of.

11   Q.  Have you ever heard that people with Down syndrome cannot

12   adapt to change?

13   A.  No.

14   Q.  Have you ever heard that people with Down syndrome need a

05:04    15   routine?

16   A.  No.

17   Q.  Does the buddy you work with at the Miracle League adapt to

18   change?

19   A.  Yes.

05:04    20   Q.  Can you give us an example or two?

21   A.  Well, even just for the baseball alone, we can either play

22   on Mondays or on Wednesdays, or -- and the times can either be

23   5:30 or 7:00.  And he has -- I mean, with that he has no

24   problem.

05:04    25   Q.  Did Marlo's mother ever indicate to you at any point in time

222

1    that Marlo's availability to work was connected in any way to

2    her Down syndrome?

3    A.  No.

4    Q.  Did you ever come to believe that?

05:04    5    A.  No.

6    Q.  And did you ever receive any doctor's note or medical record

7    indicating that Marlo's availability to work was connected in

8    any way to her Down syndrome?

9    A.  No.

05:04    10    Q.  Did you ever receive a doctor's note that Marlo's work

11    schedule could not change because of her Down syndrome?

12    A.  No.

13    Q.  Did you ever receive a doctor's note or a medical record

14    that Marlo needed a routine because of her Down syndrome?

05:05    15    A.  No.

16    Q.  Did you ever receive a medical note about Marlo's ability to

17    adapt to change as a person with Down syndrome?

18    A.  No.

19    Q.  And prior to Marlo's last day of work at Walmart, was there

05:05    20    anything at all -- anything at all to you to suggest that Marlo

21    may have been in need of an accommodation to overcome her

22    attendance issues?

23              MS. VANCE:  Objection, leading.

24              THE COURT:  Overruled.

05:05    25              THE WITNESS:  Not that I'm aware of, no.

223

1    BY MR. BULIOX:

2    Q.  And other than Marlo's mother, did you speak with anyone

3    else in Marlo's family about Marlo?

4    A.  Only at the posttermination meeting.

05:05   5    Q.  And is that the meeting that you referenced earlier with Amy

6    Jo Stevenson?

7    A.  Yes.

8    Q.  And what do you recall about that meeting?

9    A.  I know she wanted Marlo to get her job back.  I know that

05:06   10   she had said, well, that I could put -- she was talking to me --

11   that I could put -- make an application and put it in the system

12   for her.  And I can't do that.  That to me wouldn't be right.

13          And then she said, well, you can copy it from her

14   first -- you know, her first application.  But some of the

05:06   15   questions would have changed.  I don't know any of that.  But

16   Amy Jo at any time could have put in a new application for

17   Marlo.

18   Q.  And, to your knowledge, at least during the time that you

19   were at Walmart, did Amy Jo put in a new application for Marlo?

05:06   20   A.  I never saw one.

21   Q.  Did anybody else put in a new application for Marlo, to your

22   knowledge?

23   A.  No that I'm aware of.

24   Q.  And when did you leave Walmart?

05:06   25   A.  That was in 2019.

224

1    Q.  Was Marlo let go in 2015, to your knowledge?

2    A.  Yes.

3    Q.  What was your role during this, I'm going to call it,

4    posttermination meeting?

05:07  5    A.  I mostly just sat there and just was listening and if they

6    would have had a question that I could have answered, but mostly

7    management talked through the meeting.

8    Q.  At any point during this meeting or afterwards were you

9    provided with any type of medical note indicating that Marlo's

05:07  10    availability to work was connected to her Down syndrome?

11    A.  No.

12    Q.  Did you receive, any time during or after this meeting, any

13    type of medical note or doctor's note that Marlo's schedule

14    could not change because she has Down syndrome?

05:07  15    A.  No.

16    Q.  Okay.  And did you ever receive, after this meeting or

17    during this meeting, a doctor's note or a medical record that

18    Marlo needed to work -- or could not work, excuse me -- from

19    1:00 to 5:30 p.m. because of her Down syndrome?

05:08  20    A.  No.

21    Q.  Have you been trained as a medical professional in any way?

22    A.  No.

23    Q.  And did anyone at this meeting request a reasonable

24    accommodation for Marlo's Down syndrome?

05:08  25    A.  They did not ask for one.  Amy Jo brought it up with

225

1   accordance to the ADA.

2   Q.  And did you agree with anything that Amy Jo said during this

3   meeting?

4   A.  No.

05:08  5   Q.  You testified earlier about a "picking on me" comment that

6   Marlo had made to you?

7   A.  Yes.

8   Q.  Do you recall that?

9   A.  Yes.

05:08  10  Q.  Do you believe that Julia Stern was picking on Marlo in any

11  way?

12  A.  I never saw any evidence --

13         MS. VANCE:  Objection.  Calls for speculation.

14         THE COURT:  You can ask her what she observed and I

05:09  15  think that's what you did.  To that extent it's fine.  Go ahead.

16  Overruled.

17  BY MR. BULIOX:

18  Q.  And did you observe Julia Stern picking on Marlo in any way?

19  A.  No.

05:09  20  Q.  Did you observe Julia Stern singling out Marlo in any way?

21  A.  No.

22  Q.  Did you observe anyone else singling out Marlo in any way?

23  A.  No.

24  Q.  Do you recall testifying earlier today that you wish you

05:10  25  could have done things differently with respect to Marlo?

1   A.  Yes.

2   Q.  And can you remind us what your thought process was behind

3   making that comment?

4   A.  If I had known that Marlo hadn't talked to her mom --

05:10  5   because that was the relationship that we had.  If something --

6   what Marlo didn't like, and that she would talk to her mom and

7   her mom would call me.

8   Q.  And if you were aware that Marlo told her sister or mother

9   many times about the schedule change, would you still feel any

05:10  10  regret or desire to do things differently?

11  A.  If I had known?

12  Q.  Yes.

13  A.  I don't know.  I honestly don't know.

14  Q.  Okay.  And at any point in time did Marlo's mother or sister

05:11  15  express to you directly that Marlo had difficulty adapting to

16  change?

17  A.  No.

18  Q.  In your experience with Marlo did she have difficulty

19  adapting to change?

05:11  20  A.  No, not with the dealings I had with her.

21  Q.  Why did you not have a request for a reasonable

22  accommodation package completed for Marlo during her employment?

23  A.  I was never asked.

24  Q.  And why did you not call Marlo's mother when Marlo was

05:11  25  having difficultly with her attendance?

1    A.  Because Marlo would tell her mother, just like when she

2    misunderstood about the bathroom situation, and Marlo's mom

3    would always call me.  I don't know why she wouldn't have told

4    her mom when she had attendance issues or that people were

05:12    5    talking to her about it.

6    Q.  So historically, what was the relationship between you and

7    Marlo's mom?

8    A.  If Marlo would go home and -- it wasn't complain, but have a

9    concern, and that her mom would come and call me and we could

05:12    10    normally work it out.

11    Q.  And did anybody -- did Marlo's mom ever call you about any

12    issues relating to the discipline Marlo was receiving?

13    A.  No.

14    Q.  Did anybody call you relating to the issues?

05:12    15    A.  No.  No.

16    Q.  So a little bit early on today you talked about the November

17    2014 switch.  And you talked about that managers are able to

18    physically change schedules; is that correct?

19    A.  That's correct.

05:13    20    Q.  After the November 2014 switch, were managers permitted to

21    manually change schedules?

22    A.  They could.

23    Q.  And did they need approval for that?

24    A.  Not that I'm aware of.

05:13    25    Q.  And was there anything in Marlo's file that indicated that

228

1    you needed to call somebody in her family to discuss employment

2    related matters with her?

3    A.  No.

4              MR. BULIOX:  That is all I have.

05:13    5              THE COURT:  Any redirect?

6              MS. VANCE:  Yes, Your Honor, thank you.

7                    REDIRECT EXAMINATION

8    BY MS. VANCE:

9    Q.  Ms. Becker, I heard you testify that Marlo never gave you a

05:13    10    doctor's note; right?

11    A.  Right.

12    Q.  And Amy Jo never gave you any medical information; correct?

13    A.  I have no paper forms.

14    Q.  And from Marlo's mother you never got her health care

05:14    15    records.

16    A.  No.

17    Q.  No medical information.

18    A.  No.

19    Q.  And did you ever ask Marlo to bring in the doctor's note?

05:14    20    You never did; right?

21    A.  No.

22    Q.  You never asked Amy Jo, "Oh, a reasonable accommodation of a

23    schedule, that would require a doctor's note," at that meeting,

24    did you?

05:14    25    A.  No.

1    Q.  You never asked Marlo's mother, "Is there something we

2    should know medically about Marlo?", at any point; correct?

3    A.  No.

4    Q.  Julie Stern emails, "If Marlo does need to eat at a certain

05:14    5    time then we should have it in her medical file."  Julie Stern

6    knew that but Marlo never did; right?

7    A.  I'm not aware of that.  I don't know if Julie said something

8    to Marlo or not.

9    Q.  But as far as we know, there's no evidence that Marlo ever

05:15    10    knew if something had to be in her medical file if it would make

11    her sick to miss supper and work that late; right?  Marlo never

12    knew that; right?

13    A.  There was nothing in her medical file.

14              MR. BULIOX:  Objection, calls for speculation.

05:15    15              MS. VANCE:  There was nothing in her medical file.

16              Okay, thank you.  No further questions.

17              THE COURT:  Very well.  You may step down, Ms. Becker.

18    Thank you.

19              (Witness excused at 5:15 p.m.)

05:15    20              THE COURT:  We're going to break for the day.  We'll

21    start again, 8:30 okay?  Are we doing well in terms of

22    scheduling?

23              MS. VANCE:  We're fine, yes, Your Honor.

24              THE COURT:  Good.  We'll see you at 8:30 tomorrow.

05:15    25    Keep in mind you're not to discuss the case with anyone.  Wait

1    till it's all over and then tell anyone you want, but until then

2    wait until you hear all the evidence and the instructions.

3              Have a good night, everyone.  We'll see you tomorrow.

4              (Jury out at 5:15 p.m.)

05:16  5              THE COURT:  Is there anything we need to put on the

6    record?  I know that there was an objection to plaintiff's

7    questioning of Ms. Becker about -- it was overruled.

8              MR. BULIOX:  Yeah, it was about the whole discussion

9    about the sick time or the sick reference in the email.

10              THE COURT:  Right.

11              MR. BULIOX:  And I guess where the EEOC was going with

12    was that that should have triggered something but --

13              THE COURT:  Yes.

14              MR. BULIOX:  -- under the accommodations policy, but

05:16  15    this isn't a case about --

16              THE COURT:  In any event, the objection was overruled.

17    Do you wish to put anything on the record, Mr. Buliox?

18              MR. BULIOX:  Just to restate the objection for the

19    record.

05:17  20              MR. HARLAN:  If I could maybe supplement that.

21              THE COURT:  Sure.

22              MR. HARLAN:  Your Honor, we filed a trial brief that

23    kind of sets out what we think are cases that deal with

24    situations where there's a non-obvious limitation like this one

05:17  25    and what the requisite amount of information that the employer

1    has to be given in order to trigger any sort of conversation

2    about a reasonable accommodation.

3           THE COURT:  Yeah.  And I think the law is clear that

4    the employer has to be aware of a need for accommodation.  But

05:17    5    the awareness doesn't necessarily have to come from a specific

6    complaint.  The awareness can be gained in other ways, from a

7    family member, or if the circumstances make the need obvious.

8           And I think what we have here is an argument that I'll

9    hear to the jury about whether or not Walmart knew that there

05:17    10   was a need for an accommodation.  I think that's a issue for the

11   jury to decide.

12          But I concluded, in overruling the objection, my

13   ruling was that the evidence that was being offered bears on the

14   question of whether there was a need for an accommodation that

05:18    15   Walmart would have known about or should have known about.

16          MR. HARLAN:  Okay.

17          THE COURT:  That's all.  But the record's made.

18          Okay, good.  And keep in mind, I'm not trying to

19   prevent anyone from making a record, it's just I don't want to

05:18    20   send the jury out all the time.  So make sure you bring it to my

21   attention so we can make sure that on the record for you.

22          All right.  Anything else to address before we recess

23   for the day?

24          (No response.)

05:18    25          THE COURT:  Okay, have a good evening, everyone.

232

1    We'll see you tomorrow at 8:30.

2              IN UNISON:  Thank you, Your Honor.

3              (Proceedings concluded at 5:18 p.m.)

4                          *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

233

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified July 24, 2021.

/s/John T. Schindhelm

John T. Schindhelm

              John T. Schindhelm, RPR, RMR, CRR
              United States Official Reporter
              517 E Wisconsin Ave., Rm 324,
              Milwaukee, WI 53202
              Website: WWW.JOHNSCHINDHELM.COM

234

```
 1                      I N D E X

 2    JURY VOIR DIRE

 3         CONDUCTED BY THE COURT..........................   8

 4    PRELIMINARY JURY INSTRUCTIONS

 5         BY THE COURT...................................  44

 6    OPENING STATEMENT

 7         BY MS. CARTER..................................  57

 8    OPENING STATEMENT

 9         BY MR. BURNETT.................................  71

10

11    WITNESS   EXAMINATION                           PAGE

12    AMY JO STEVENSON, PLAINTIFF WITNESS

13         DIRECT EXAMINATION BY MS. VANCE................  82

14         CROSS-EXAMINATION BY MR. BURNETT..............  106

15         REDIRECT EXAMINATION BY MS. VANCE.............  132

16         RECROSS-EXAMINATION BY MR. BURNETT............  134

17    KAREN BECKER, PLAINTIFF WITNESS

18         DIRECT EXAMINATION BY MS. VANCE...............  140

19         CROSS-EXAMINATION BY MR. BULIOX...............  195

20         REDIRECT EXAMINATION BY MS. VANCE.............  229

21

22                         *****

23

24

25
                                                              235
```

```
 1                    E X H I B I T S

 2    NUMBER              DESCRIPTION           ADMITTED INTRODUCED

 3   1      Spaeth Availability-EEOC00492-495 ..............150    150
            admitted previously by stipulation
 4
     2      Spaeth Evaluation 1999-EEOC00633-63 admitted ..157    157
 5          previously by stipulation

 6   5      Spaeth Evaluation 2002 - EEOC00627-628 ........154    154
            admitted previously by stipulation
 7
     6      Spaeth Evaluation 2003-EEOC00624-625 ..........158    158
 8          admitted previously by stipulation

 9   12     Spaeth Evaluation 2009-EEOC00611 ..............159    159
            admitted previously by stipulation
10
     15     Spaeth Evaluation 2012-EEOC00604-605 ..........160    160
11          admitted previously by stipulation

12   17     Spaeth Evaluation 2014-EEOC00555-560 ..........161    161
            admitted previously by stipulation.
13
     21     Intake to DOJ-EEOC00099 .......................100    100
14          admitted previously by stipulation

15   23     Stern FW Becker emails-EEOC00452-453 ..........169    169
            admitted previously by stipulation
16
     29     Accommodation Policy-D001004-1008 .............180    180
17          admitted previously by stipulation

18   1000   New Hire Acknowledgement Form 08/02/1999 ......203    203
            [D000017]
19          admitted previously by stipulation

20   1001   Acknowledgement of Receipt of Handbook - ......204    204
            August 2, 1999 [D000019]
21          admitted previously by stipulation

22   1014   Email from Julia Stern-December 17, 2014 ......218    218
            [D000395]
23          admitted previously by stipulation

24   1016   Email from Julia Stern-July 12, 2015 ..........220    220
            [D000397] admitted previously by stipulation
25
```

Case 1:17-cv-00070-WCG   Filed 08/04/21   Page 190 of 191   Document 245

```
 1   1018   Job Description Fabrics, Crafts & Home ........ 163      163
             Furnishings Sales Associate-2009
 2           [D000030-000031]
             admitted previously by stipulation
 3
     1041   Certified Circuit Court File In the Matter .... 127      127
 4           of Marlo Lee Spaeth
             addmited previously by stipulation
 5
     1065   Melissa Lawent's Notes......................... 139      139
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

237