UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

-----------------------------------------------------------------
EQUAL EMPLOYMENT OPPORTUNITY   )
COMMISSION,                      )
                                    )
                Plaintiff,     )  Case No. CV 17-70
                              )  Green Bay, Wisconsin
    vs.                     )
                              )  July 13 2021
WAL-MART STORES EAST LP,      )  8:28 a.m.
                              )
                Defendant.     )  **DAY 2**

-----------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:                **Justin Mulaire**
                                United States Equal Employment
                                Opportunity Commission
                                230 S Dearborn St - Ste 2920
                                Chicago, IL 60604
                                312-872-9666
                                Email: justin.mulaire@eeoc.gov

                                **Carrie Noelle Vance**
                                **Leslie N Carter**
                                  United States Equal Employment
                                Opportunity Commission
                                Milwaukee District Office
                                  310 W Wisconsin Ave - Ste 500
                                Milwaukee, WI 53203-2292
                                  414-297-4188
                                Fax: 414-297-3146
                                Email: carrie.vance@eeoc.gov
                                Email: leslie.carter@eeoc.gov

U.S. Official Transcriber:    JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:          WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



238

```
 1   APPEARANCES CONT'D:

 2   For the Defendant:              Emery K Harlan
                                     Warren E Buliox
 3                                   MWH Law Group LLP
                                     735 N Water St - Ste 610
 4                                   Milwaukee, WI 53202
                                     414-436-0353
 5                                   Fax: 414-436-0354
                                     emery.harlan@mwhlawgroup.com
 6                                   warren.buliox@mwhlawgroup.com

 7                                   George Burnett
                                     Law Firm of Conway Olejniczak &
 8                                   Jerry SC
                                     231 S Adams St
 9                                   PO Box 23200
                                     Green Bay, WI 54305
10                                   920-437-0476
                                     Fax: 920-437-2868
11                                   rgb@lcojlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

**(Call to Order of the Court at 8:28 a.m.)**

1

2

3          THE COURT:  Go ahead, be seated.

4          THE CLERK:  The Court calls the case 17-CV-70, *Equal*

08:29    5    *Employment Opportunity Commission vs. Wal-Mart Stores East, LP*

6    for Day 2 of jury trial.  Appearances remain the same.

7          THE COURT:  Okay.

8          MS. VANCE:  Attorney Carrie Vance for EEOC.

9          THE COURT:  The clerk noted appearances are the same

08:29    10    so we're fine.

11          MS. VANCE:  I apologize.

12          THE COURT:  The clerk advised me that you had an issue

13    you wanted to address before the jury?

14          MR. MULAIRE:  Yes, Your Honor.  So the first thing

08:29    15    we're going to do this morning is read from a deposition of

16    Bonnie Popp who was one of the comanagers of the store.  We

17    informed the defendant there were 14 lines that we had left out

18    of our designations, and I take it that they have an issue with

19    our adding them now so we wanted to give them a chance to raise

08:29    20    that with the Court.

21          THE COURT:  Okay.

22          MR. HARLAN:  Good morning, Your Honor.

23          The only issue really is we just got this a few

24    seconds ago, so I haven't even had a chance to review and see

08:30    25    what counter-designations.

1          And moreover, Ms. Popp is actually going to be a

2    witness here.  So if there's a need for her testimony on those

3    issues, she's going to be here as a live witness.

4          MR. MULAIRE:  I guess two things.  One, I thought the

08:30    5    issue of whether -- whether there's a deposition designation or

6    not wasn't the issue, but rather there's 14 lines in which she

7    basically recounts with one of the scheduling forms having asked

8    Marlo to sign it.

9          So it's not earth shattering testimony, but it's

08:30   10    relevant to other things that we had designated.  There's a

11    discussion of the same form on the previous page of the

12    designations.  And I guess what I would say is, defendant is

13    right if there's something that they feel they need to elicit

14    from her in light of that, it sounds like they're calling her in

08:30   15    their case and so I don't see any prejudice to this.  It's only

16    14 lines, there's no objections in the text, and so if they need

17    another minute to look at it.  But it doesn't seem all that

18    prejudicial to me.

19          THE COURT:  And it's testimony you want to introduce

08:31   20    in your case-in-chief and she's not available to you at this

21    point.  She may be coming for the defense, but you haven't --

22          MR. MULAIRE:  And she's one of the comanagers of the

23    store.  So, I mean, there's a couple of different bases in which

24    we can read in the deposition designations.  She's a managing

08:31   25    agent of the defendant and so --

241

1    But, yes, we're just reading in a few of her

2    deposition designations.  It's up to the defendant if they want

3    to call her live in their case.

4    THE COURT:  I take it -- I mean, this isn't a hearsay

08:31   5    problem or anything like that because there's an agreement to

6    read some of her deposition, it's just the part that you're

7    asking for 14 more lines.

8    MR. MULAIRE:  14 lines.

9    THE COURT:  Mr. Harlan, take a look at the 14 lines,

08:31  10    if you want another designation let us know.  Otherwise, if

11    she's going to be here, it seems to me if there's anything extra

12    you want to get out of her, that would be a time to do it as

13    well.  But it's up to you.  Let the clerk know when you're ready

14    and I'll be out.

08:32  15    Is this your first witness?

16    MS. VANCE:  Our first order of presentation will be

17    the dep designations of Ms. Popp.

18    THE COURT:  And how long is that deposition portion

19    you intend to read?

08:32  20    MS. VANCE:  I believe it takes five minutes.

21    THE COURT:  That'll be nice and short.

22    MS. VANCE:  Yes, Your Honor.

23    THE COURT:  Okay.  The whole deposition excerpt is

24    five to 10 minutes, or five minutes or so?

08:32  25    MS. VANCE:  We actually did time it.

242

1          MR. MULAIRE:  That one was either five minutes or

2     seven minutes and maybe it will be another 15 seconds longer.

3          THE COURT:  How about your live witness, what's the

4     next live witness?

08:32  5          MS. VANCE: Adversely, Your Honor, we would call Robin

6     Castro, the other comanager of the store.

7          THE COURT:  And he's outside, or she?

8          MS. VANCE:  Ms. Castro -- defense is aware that she's

9     the first witness we're calling.

08:33  10          MR. HARLAN:  Your Honor, in my quick read, just to

11     move this along and not to delay things, we would like lines 18

12     through 25 read in on page 59.

13          MR. MULAIRE:  Could I have the line numbers one more

14     time?

08:33  15          MR. HARLAN:  Sure.  Page 59, 18 through 25.

16          MR. MULAIRE:  That's fine, Your Honor.

17          THE COURT:  Okay.  Are we ready to go?  Should we

18     bring the jury in?

19          (Discussion off the record.)

08:34  20          (Jury in at 8:34 a.m.)

21          THE COURT:  Now, good morning, ladies and gentlemen.

22     Please be seated.

23          Now, this next witness is a woman, employee of Walmart

24     who the plaintiff intends to introduce testimony taken during

08:35  25     her deposition.  The parties have agreed to some reading of

1    deposition excerpts.

2           You heard yesterday a deposition was used in some of

3    the testimony.  And a deposition is testimony given by a witness

4    out of court but under oath, and you should treat the testimony

5    just as you would any other testimony that was here in court.

6           This particular witness, as I understand it, will be

7    testifying live later as part of the defendant's case, but the

8    plaintiff has elected to read some of the brief testimony to you

9    and that's what will occur now; is that right?

10           MS. VANCE:  Yes, Your Honor.

11           THE COURT:  And do I have a copy of this deposition?

12    Is that among the materials you've given me here?

13           MS. VANCE:  Yes.  The designations aren't in there,

14    Your Honor.  That would have been filed before Thursday as an

15    attachment.

16           THE COURT:  And the designation has been expanded a

17    little bit.  Okay.  Go ahead.  You can proceed.  And we're going

18    to have somebody -- the person playing the role of the witness

19    take the witness stand and testify, that's Ms. Carter will be

20    the witness.

21           MS. VANCE:  The plaintiff will read excerpts from the

22    deposition of Bonnie Popp taken Tuesday, May 8th, 2018.

23           BONNIE POPP, PLAINTIFF WITNESS, VIA DEPOSITION

24               DESIGNATIONS READ AS FOLLOWS:

25    Q.  Would you please state your full name.

244

1   A.   Bonnie Sue Popp.

2   Q.   Ms. Popp, when did you first have a reason to work with

3   Marlo Spaeth?

4   A.   That would have been in 2010, when I was an assistant

5   manager.

6   Q.   And explain what role you would have had as an assistant

7   manager in Marlo Spaeth's employment.

8   A.   As an assistant it would have been CBWA, coaching by walking

9   around interaction to make sure she was on task, and that would

10  be it.

11  Q.   What training as an assistant manager did you have?

12  A.   We did classes out of our store.  I don't know the -- I

13  don't know the timeframe, it's changed since then.

14  Q.   And when you say "out of our store," were you trained for

15  the assistant manager position in the Chilton store or the

16  Manitowoc store?

17  A.   I was trained for the assistant manager position in Green

18  Bay.

19  Q.   And it sounds like the training was in a Walmart store in

20  Green Bay; is that correct?

21  A.   Yes.

22  Q.   In your 2010 assistant manager training in Green Bay, what,

23  if anything, did you learn from Walmart regarding how to respond

24  to discrimination in the workplace?

25  A.   I do not recall.

245

1    Q.  Do you recall whether you had any training at the 2010 Green

2    Bay class specifically regarding disability discrimination?

3    A.  I do not recall.

4    Q.  In Green Bay, at your assistant manager training, did you

08:39    5    learn about the process for requests for reasonable

6    accommodations?

7    A.  No.

8    Q.  Do you have any training, today, as of now, on the process

9    for requesting a reasonable accommodation at Walmart?

08:39    10    A.  No.

11          (Exhibit 1002, Customer Service Scheduling

12    Availability - 02/16/2015 [D000021], admitted previously by

13    stipulation.)

14    Q.  I'd like to direct your attention to the document that's

08:39    15    been admitted into evidence as Exhibit 1002.  Do you recognize

16    this document?

17    A.  Yes.

18    Q.  And do I see your signature at the bottom that says

19    "facility manager's signature"?

08:39    20    A.  Yes.

21    Q.  Do you recall completing this document?

22    A.  Yes.

23    Q.  Where were you when you completed this document?

24    A.  The personnel office.

08:40    25    Q.  And was anybody else with you?

1    A.  Specifically for this, no.  I'm sure Karen was at her desk.

2    Q.  And I'm sorry, did you call it the personnel office?

3    A.  Yes.

4    Q.  And that's a room where Karen Becker has her desk; is that

08:40   5    correct?

6    A.  Yes.

7    Q.  Okay.  To your memory, was Karen Becker in the room when you

8    completed this form, Exhibit 1002?

9    A.  Yes.

08:40   10   Q.  Was anybody else in the room when you completed this

11   exhibit?

12   A.  Not that I remember, no.

13   Q.  Is it true that you wrote out the times in the part of the

14   form that has a row for start time?

08:40   15   A.  Yes.

16   Q.  And is it true that you wrote out the time in the part of

17   the row that has the information for stop time?

18   A.  Yes.

19   Q.  And I'd like to know what formed the basis of the times that

08:40   20   you wrote?  Why did you write those times?

21   A.  That would fall into help Marlo get hours of what this

22   computer based system was dropping.

23   Q.  Before you filled out this form -- or as you filled out this

24   form, did you look up the current availability of Marlo Spaeth?

08:41   25   A.  No.

247

1    Q.   Now, once you completed this form what did you do with it?

2    A.   Handed it to Karen.

3    Q.   At which point in the process did Marlo Spaeth's signature

4    appear?

08:41    5    A.   In the conversation that I had sitting at the personnel

6    table with Marlo explaining the scheduling and what was

7    happening, and I was explaining to her that for her to get hours

8    in the system this is what was happening and this is what we

9    needed to change her work schedule to, if she could do that.

08:41    10    She stated yes.  And then I said, okay, so we're going to change

11    your schedules, and she said, yes.  And she signed it.

12    Q.   I had the impression she was not in the room when you were

13    filling this out; was Marlo Spaeth in the room when you filled

14    out the information in the start time row?

08:42    15    A.   Yes.

16    Q.   Was Marlo Spaeth in the room when you signed your name?

17    A.   Yes.

18    Q.   Did you have situations where the scheduling system

19    generated a schedule but you had to go in and manually enter

08:42    20    different times into an associate's schedule in this

21    January-February 2015 timeframe?

22    A.   That is when they changed it, that we were not supposed to

23    be doing that anymore.

24    Q.   How did you learn that you were not supposed to be doing

08:42    25    that anymore?  Was there a memo that went out to all managers?

248

1  A.  I'm sure there were emails that went out or communication
2  through The Wire.
3  Q.  Am I right that you think the directive to stop the practice
4  of manually changing associates' schedules came from outside
08:43  5  your Manitowoc store?
6  A.  Yes.  That came from the home office.
7  Q.  The home office in Bentonville, Arkansas?
8  A.  Yes.
9  Q.  Okay.  To your knowledge, did managers, when they logged
08:43  10  into the Smart System, still have the capacity, like the
11  capability of manually changing the time that the system
12  generated for an associate?
13  A.  Yes.
14  Q.  Ms. Popp, do you recall when you first met Marlo Spaeth?
08:43  15  A.  It would have been in 2010, when I was an assistant, first
16  moved to Manitowoc as an assistant.
17  Q.  Do you recall whether you recognized, when you first met
18  her, that she has a disability?
19  A.  Yes.
08:44  20  Q.  And could you recognize what disability she had just from
21  the first time you saw her?
22  A.  Yes.
23  Q.  And, Ms. Popp, what disability did you think Marlo Spaeth
24  had?
08:44  25  A.  My thought of what she had is Down syndrome.

249

1                              *    *    *

2                MS. VANCE:  That completes the deposition of Bonnie

3     Popp.

4                THE COURT:  Okay.  Then this witness can be excused.

08:44   5                MS. VANCE:  Thank you, Your Honor.

6                (Deposition read-in concluded at 8:44 a.m.)

7                THE COURT:  Okay.  Did you have something further,

8     Mr. Harlan, at this point?

9                MR. HARLAN:  No, sir.

08:44  10                THE COURT:  Then the plaintiff may call their next

11     witness.

12                MS. CARTER:  The plaintiff calls Robin Castro

13     adversely.

14                (Brief pause.)

08:47  15                THE COURT:  I think we should have the witnesses more

16     readily available.

17                MR. MULAIRE:  It's their employee, Your Honor.

18                THE COURT:  I understand.

19              ROBIN CASTRO, PLAINTIFF WITNESS, DULY SWORN

08:48  20                THE CLERK:  Please state then spell your first and

21     last name, please.

22                THE WITNESS:  Robin Castro, R-o-b-i-n, C-a-s-t-r-o.

23                THE CLERK:  Please be seated.

24                THE COURT:  And you may proceed then, Ms. Carter.

08:48  25                MS. CARTER:  Thank you, Your Honor.

250

1                          DIRECT EXAMINATION

2    BY MS. CARTER:

3    Q.  Good morning, Ms. Castro.

4    A.  Good morning.

08:48   5    Q.  Can you hear me okay?

6    A.  Yes.

7    Q.  We met once before at your deposition, but, just to

8    reintroduce myself, I'm Leslie Carter, one of the attorneys for

9    the EEOC.  Okay?

08:48   10          And, Ms. Castro, in 2015, you were a comanager at the

11   Manitowoc Walmart store; right?

12   A.  Correct.

13   Q.  And that's the same store where Marlo Spaeth worked.

14   A.  Correct.

08:49   15   Q.  You first began working for Walmart in 2006; right?

16   A.  That's correct.

17   Q.  And you've continuously been employed with Walmart from 2006

18   to the present; right?  Correct?

19   A.  Yes.

08:49   20          THE COURT:  Ms. Castro, would you pull the microphone

21   a little closer to you or pull yourself closer to the

22   microphone?  Thank you.

23          MS. CARTER:  Let us know if the problem continues.

24   Okay, thank you.

08:49   25   BY MS. CARTER:

1   Q.  So you've continuously been employed with Walmart from 2006

2   to the present; right?

3   A.  Yes.

4   Q.  Okay.  And so you've worked for Walmart for about 15 years.

08:49  5   A.  Yes.

6   Q.  And over the past 15 years you've held a number of different

7   positions at Walmart.

8   A.  That's correct.

9   Q.  In 2010 you were a zone merchandise supervisor; right?

08:49  10  A.  Yes.

11  Q.  In the home lines department?

12  A.  Yes.

13  Q.  And shortly after you became the zone merchandise supervisor

14  Walmart promoted you again; right?

08:50  15  A.  That's correct.

16  Q.  You were promoted to assistant manager of the store.

17  A.  That's correct.

18  Q.  And by 2014 you were a comanager of the Walmart Super Store

19  in Manitowoc; right?

08:50  20  A.  Yes.

21  Q.  The store where Marlo Spaeth worked.

22  A.  Yes.

23  Q.  Okay, Ms. Castro.  I'd like to ask you a few questions about

24  when you worked with Marlo Spaeth.

08:50  25  A.  Okay.

1  Q.  So you told us a few minutes ago that in 2010 you were a

2  zone merchandise supervisor in the home lines department.

3  A.  Yes.

4  Q.  And Marlo Spaeth worked in home lines; right?

08:50  5  A.  Yes.

6  Q.  So you worked directly with Marlo when you were the zone

7  merchandise supervisor in the home lines department.

8  A.  Yes.

9  Q.  And that was the first time you worked directly with Marlo;

08:51  10  right?

11  A.  That's correct.

12  Q.  You knew Marlo had a mental impairment; right?

13  A.  Yes.

14  Q.  In fact, you knew she had Down syndrome.

08:51  15  A.  Yes.

16  Q.  And you knew Marlo had Down syndrome because you asked Karen

17  Becker.

18  A.  Yes.

19  Q.  The personnel coordinator for the Walmart store.

08:51  20  A.  Yes.

21  Q.  And in 2015, when you were comanager of the Manitowoc

22  Walmart store, you were still aware that Marlo had Down

23  syndrome; right?

24  A.  Yes.

08:51  25  Q.  Now, let's talk about Marlo's performance at work.

253

1    A.  Okay.

2    Q.  Isn't it true that, in all your time as a manager, Marlo

3    didn't have performance issues that you were aware of?

4    A.  That's correct.

08:52   5    Q.  Okay, Ms. Castro.  I'd like to ask you some questions about

6    Walmart's scheduling system.

7    A.  Okay.

8    Q.  At some point in 2014, the Manitowoc Walmart store switched

9    to a new computer based scheduling system; right?

08:52   10   A.  That's correct.

11   Q.  The schedules were done weekly; correct?

12   A.  Yes.

13   Q.  And a Walmart associate could use time off if they asked to

14   leave a shift early before the weekly schedule was set; right?

08:52   15   A.  Yes.

16   Q.  And before the weekly schedule was set an associate could

17   choose whether they wanted to use paid time off or unpaid time

18   off; right?

19   A.  Yes.

08:53   20   Q.  So if an associate was out of paid time off they could still

21   use unpaid time off, couldn't they?

22   A.  Yes.

23   Q.  And isn't it true that there was no limit on unpaid time

24   off?

08:53   25   A.  That's correct.

254

1  Q.  An employee just wouldn't get paid for the hours they didn't

2  work; right?

3  A.  That's correct.

4  Q.  So, if an associate requested unpaid time off every Monday

08:53  5  after 4 p.m., they'd still get scheduled for a partial shift;

6  correct?

7  A.  Can you explain that again, please?

8  Q.  If an associate requested unpaid time off every Monday after

9  4 p.m., they could still get scheduled for a partial shift;

08:53  10  right?

11  A.  They could, depending on their availability.

12  Q.  And if the unpaid time off was requested before the weekly

13  schedule was done, it would not count as an absence; correct?

14  A.  Correct.

08:54  15  Q.  Now, would you agree that blocking off unpaid time in a

16  person's schedule like this was a simple step that Walmart could

17  do in the matter of minutes, wasn't it?

18  A.  Can you re-explain that again, please?

19  Q.  Blocking off unpaid time off in a person's schedule like

08:54  20  this was a simple step that Walmart could do in a matter of

21  minutes; right?

22  A.  Yes.

23  Q.  Okay, Ms. Castro.  I'd like to ask you some questions about

24  Walmart's guidelines and policies.

08:55  25  A.  Okay.

255

1    Q.  When you became a member of management at Walmart you had

2    online training regarding discrimination in the workplace;

3    right?

4    A.  That's correct.

08:55    5    Q.  Ms. Castro, please turn to Plaintiff's Exhibit 30 in your

6    exhibit binder.  It's to your right.

7            (Exhibit 30, Accommodation Management Guidelines -

8    D000984-989, admitted previously by stipulation.)

9            MS. CARTER:  And, Lectrice, I'll let you know when I

08:55    10    need you to publish it.

11    BY MS. CARTER:

12    Q.  Lectrice is our paralegal.  So if you hear me talking to

13    her, she's handling the exhibits.

14            Exhibit 30, Ms. Castro, you're familiar with this

08:56    15    document; right?

16    A.  Yes, I've seen it before.

17    Q.  These are the Walmart accommodation in employment medical

18    related management guidelines; right?

19    A.  Correct.

08:56    20    Q.  Okay.  And these accommodation guidelines were available to

21    members of management at the store where Marlo worked; right?

22    A.  Yes.

23    Q.  Yes?

24    A.  Yes.

08:56    25    Q.  Please, I know that sometimes you may know where I'm going,

256

1    but please allow me to finish the question before you answer,

2    okay?  Okay.

3              In fact, these management guidelines were available to

4    all managers at Walmart; right?

08:56  5    A.  Yes.

6    Q.  Okay.  I'd like to direct your attention to the dates in the

7    upper left corner of Exhibit 30.  Do you see the dates?

8    A.  Yes.

9    Q.  And these were the management -- the Walmart accommodation

08:57  10   and employment medical related management guidelines that were

11   in place at Walmart until August 13, 2015; right?

12   A.  Yes.

13   Q.  Okay.  And Marlo Spaeth's July 2015 termination fell within

14   those dates, didn't it?

08:57  15   A.  Yes.

16   Q.  Okay.

17             MS. CARTER:  Lectrice, can you please publish

18   Exhibit 30 to the jury?  Thank you.

19   BY MS. CARTER:

08:57  20   Q.  So, Ms. Castro, you can look to your right, there's a

21   screen?  If it's easier for you to read.  But you can work with

22   the paper if you prefer.  Yeah, okay.

23             So, Ms. Castro, these guidelines were available to you

24   as the comanager of the Manitowoc Walmart store.

08:57  25   A.  Yes.

257

1    Q.  And these management guidelines applied to all managers and

2    supervisors who worked at Walmart.

3    A.  Yes.

4    Q.  And as a manager you were supposed to follow any company

08:58  5    policy or guideline; right?

6    A.  Yes.

7    Q.  Right?

8    A.  Yes.

9    Q.  Now, if you look at the middle of the first page, do you see

08:58  10   the heading that says "Identifying a Request For Job

11   Assistance"?

12   A.  Yes.

13          MS. CARTER:  Lectrice, can you please call out the

14   section of the document that has the heading "Identifying

08:58  15   Request For Job Assistance"?

16   BY MS. CARTER:

17   Q.  Ms. Castro, right below the heading it says, "An associate

18   may request job assistance in a variety of ways."  Right?

19   A.  Yes.

08:59  20          MS. CARTER:  Lectrice, can you highlight that if you

21   can see it?  It's in the first line.  If not, it's okay.  All

22   right.

23   BY MS. CARTER:

24   Q.  You can see it, Ms. Castro, right?

08:59  25   A.  Yes.

258

1    Q.  And she can make a request directly, right?  An associate

2    could?

3    A.  Yes.

4         MS. CARTER:  Lectrice, could you zoom in on that if

08:59    5    possible?  And we'll just scroll down.

6    BY MS. CARTER:

7    Q.  Now, Ms. Castro, so the guidelines say that an associate

8    could make a request directly; right?

9    A.  Yes.

09:00    10    Q.  And they also say that a family member could make the

11    request; right?

12    A.  Yes.

13    Q.  And the guidelines there don't say anything about a request

14    needing to come from a legal guardian, do they?

09:00    15    A.  They do not.

16    Q.  And they don't say anything about needing guardianship

17    paperwork.

18    A.  That's correct.

19    Q.  Okay.

09:00    20         MS. CARTER:  So, Lectrice, if you can put that callout

21    away and pull out on the full paragraph so we can see it more

22    clearly.  We're still under the Identifying a Request For Job

23    Assistance.

24         We'll give her a few minutes.  Technology.

09:01    25         (Brief pause.)

259

1       MS. CARTER:  Lectrice, if you could go to the first

2  page of Exhibit 30.  The first callout that you had under

3  Exhibit 30.  No, the one before that, please.  Just zoom in on

4  the Identifying Request For Job Assistance.  The second

09:01   5  paragraph in the guidelines, please.  Okay.

6  BY MS. CARTER:

7  Q.  So, Ms. Castro, we've covered the "an associate may request

8  job assistance herself directly;" is that right?

9  A.  Yes.

09:02   10  Q.  And a family member could request job assistance or an

11  accommodation; right?

12  A.  Yes.

13  Q.  And the policy also says that any other person, like a

14  friend, anyone, could make a request on an associate's behalf;

09:02   15  right?

16  A.  Yes.

17  Q.  And the request could be made verbally; right?  Orally.

18  A.  Correct.

19  Q.  It didn't have to be in writing.

09:02   20  A.  Correct.

21  Q.  And the request didn't need to include the word

22  "reasonable;" right?

23  A.  Correct.

24  Q.  And it didn't need to include the word "accommodation;"

09:02   25  correct?

260

1    A.   Correct.

2    Q.   And then the management guidelines tell you -- actually, can

3    you read the sentence that starts with "if an associate tells

4    you that she is having"?

09:03    5    A.   "If an associate tells you that she or he is having trouble

6    doing his or her job because she or he is unable to refine

7    print, consider that a request for job assistance.  Likewise, if

8    the associate calls you to say that the associate will be

9    returning to work but may need help due to a broken foot,

09:03    10   consider that a request for job assistance."

11   Q.   Okay, thank you, Ms. Castro.  Now, Ms. Castro, as the

12   comanager of the Walmart store, you knew it was illegal to

13   discriminate against employees with disabilities; right?

14   A.   That's correct.

09:04    15   Q.   And as the comanager, you also knew that the law requires

16   making reasonable accommodations for employees with

17   disabilities; right?

18   A.   Yes.

19   Q.   Ms. Castro, Walmart's management guidelines say that medical

09:04    20   information is not necessary if the associate has a known or

21   easily observable disability, don't they?

22   A.   Correct.

23   Q.   Okay.  And an associate could ask any member of management

24   at Walmart for a disability accommodation, couldn't they?

09:04    25   A.   Yes.

261

1   Q.  And all members of management were able to provide an

2   associate with an accommodation packet; correct?

3   A.  Yes, we could.

4   Q.  And if you look at the right column on these guidelines, do

09:05   5   you see where it says "printed materials, reasonable

6   accommodation packet"?

7   A.  Yes.

8          MS. CARTER:  Lectrice, could you go to the first page

9   of the document itself and just zoom in on the right column, if

09:05   10   that's possible.

11          (Brief pause.)

12   BY MS. CARTER:

13   Q.  So on that right column there are a couple of links.  The

14   print is very small, but we might be able to zoom in.

09:06   15          MS. CARTER:  Okay.  Thank you, Lectrice.

16   BY MS. CARTER:

17   Q.  And right below "coaching for improvement" you see "printed

18   materials," and then it says "reasonable accommodation packet"

19   and "reasonable accommodation form."  Right?

09:06   20   A.  Yes.

21   Q.  And so this link is a link that any member of management

22   could use to print a reasonable accommodation packet.

23   A.  Yes.

24   Q.  Okay.  And the link to print a reasonable accommodation

09:06   25   packet is right below the link a manager needed to click to

262

1    access the coaching for improvement plan form, isn't it?

2    A.  Yes.

3    Q.  Ms. Castro, the management guidelines say that requests for

4    schedule accommodations could be approved at the store level;

09:07    5    right?

6    A.  Not as far as I knew at the time.

7    Q.  If you go to the next page of this document, page 2.  They

8    list requests that can be approved in store as JAs, which JAs

9    are job assistance; right?

09:07    10    A.  Correct.

11    Q.  And do you see the paragraph that says, "Scheduling.  Minor

12    changes to availability and scheduling preferences can be

13    approved in store."

14    A.  Correct.

09:08    15    Q.  Does that refresh your recollection that the management

16    guidelines say that requests for scheduling accommodations could

17    be approved at the store level?

18    A.  Yes, but it doesn't guarantee hours.

19    Q.  That wasn't my question.  Just requests for schedule

09:08    20    accommodations.

21    A.  Yes.

22    Q.  And in the next section on page 2, the part that says,

23    "Requests that cannot be approved as facility JAs," do you see

24    that, job assistance?  The guidelines state that "If an

09:08    25    associate requests job assistance that cannot or has not been

1    approved at the store level, the request must be forwarded to

2    the Accommodations Services Center," the ASC; is that correct?

3    A.  Yes.

4    Q.  And, in fact, the manager guidelines instruct the

09:09  5    accommodation packet was to be provided as soon as possible,

6    wasn't it?

7    A.  Yes.

8    Q.  And in no event more than two days after the request;

9    correct?

09:09  10   A.  Correct.

11          MS. CARTER:  Lectrice, you can take Exhibit 30 down.

12   Thank you.

13   BY MS. CARTER:

14   Q.  Marlo Spaeth, she asked for a set schedule, didn't she?

09:09  15   A.  Yes.

16   Q.  Her noon to 4:00 schedule.

17   A.  Correct.

18   Q.  And her request to go back to a noon to 4:00 schedule was

19   not approved at the store level.

09:09  20   A.  That is correct.

21   Q.  So according to the management guidelines her request for a

22   set noon to 4:00 schedule had to be forwarded to the

23   Accommodations Service Center, didn't it?

24   A.  That's correct.

09:10  25   Q.  But you didn't provide Marlo Spaeth or any member of her

264

1  family with a request for accommodation packet, did you?

2  A.  I did not.

3  Q.  And you're not aware of anyone else at Walmart ever

4  providing Marlo Spaeth or any member of her family with an

09:10  5  accommodation packet either.

6  A.  That's correct.

7  Q.  And you didn't forward Marlo's request for a set noon to

8  4:00 schedule to the Accommodation Services Center.

9  A.  I did not.

09:10  10  Q.  And you're not aware of anyone else at Walmart forwarding

11  Marlo Spaeth's request --

12  A.  I am not.

13  Q.  Can I finish?  Let me finish my question.  You're not aware

14  of anyone else at Walmart forwarding Marlo Spaeth's request for

09:10  15  a set noon to 4:00 schedule to the Accommodation Services

16  Center?

17  A.  No.

18  Q.  And isn't it true that even for accommodation requests that

19  can't be approved as job assistance at the store level, if the

09:11  20  associate's disability or medical condition is known or

21  otherwise obvious, the Accommodation Service Center may not even

22  need to request medical information?

23  A.  That I'm not aware of.

24  Q.  If you take a look at page 2 of Exhibit 30, you can read

09:11  25  through to refresh your recollection.  It's under the section

265

1    that says "ASC will obtain additional medical information if

2    necessary."  And it's the first line.

3    A.   Then, yes.

4    Q.   So just to be clear I'll ask the question again.

09:11    5            So, Ms. Castro, isn't it true that even for

6    accommodation requests that can't be approved as job assistance

7    at the store level, if the associate's disability or medical

8    condition is known or otherwise obvious the Accommodation

9    Services Center may not even need to request medical

09:12   10    information?

11    A.   That is correct.

12    Q.   Okay, Ms. Castro.  Now I would like to ask you some

13    questions about Marlo's schedule.  Okay?

14    A.   Okay.

09:12   15    Q.   So sometime in 2014 the store switched to this computer

16    generated scheduling; right?

17    A.   Correct.

18    Q.   And the switch to computer generated scheduling resulted in

19    a change to Marlo Spaeth's schedule.

09:12   20    A.   Correct.

21    Q.   You told us a few minutes ago that her schedule was noon to

22    4:00 p.m., before the change.

23    A.   Correct.

24    Q.   And it was changed to 1 p.m. to 5:30 p.m.?

09:13   25    A.   Yes.

266

1  Q.  And after Marlo's schedule changed you noticed that she

2  wasn't doing well with the new schedule, didn't you?

3  A.  Correct.

4  Q.  She was still clocking in early, wasn't she?

09:13  5  A.  Yes.

6  Q.  And she was still leaving around the same time she used to

7  leave before the schedule change; right?

8  A.  I don't recall offhand.

9  Q.  But she was still leaving before 5:30.

09:13  10  A.  Correct.

11  Q.  Closer to 4 p.m.

12  A.  That I don't recall.

13  Q.  But before 5:30.

14  A.  Correct.

09:13  15  Q.  So at some point you asked her why she was leaving early;

16  right?

17  A.  Correct.

18  Q.  And Marlo told you that she was afraid to miss the bus,

19  didn't she?

09:13  20  A.  Yes.

21  Q.  She was afraid to miss the bus she normally took; right?

22  A.  She just said "miss the bus."

23  Q.  And in January 2015, you and assistant manager Julia Stern

24  had a meeting with Marlo; right?

09:14  25  A.  Correct.

267

1   Q.  And in that meeting Marlo asked you and Julia Stern if she

2   could go back to her noon to 4:00 schedule, didn't she?

3   A.  Yes.

4   Q.  That was a request for a schedule accommodation, wasn't it?

09:14  5   A.  According to the policy, yes.

6   Q.  But you didn't give Marlo her old schedule back, did you?

7   A.  I did not.

8   Q.  Now, you told us a few minutes ago that it would have taken

9   just a few minutes to block off unpaid time for an associate

09:15  10  after 4 p.m. in their weekly schedule; right?

11  A.  When it's requested, yes.

12  Q.  Okay.  And that if you made that change to the schedule

13  before the schedule is set, then the early departures would not

14  result in attendance violations; is that correct?

09:15  15  A.  Correct.

16  Q.  But you didn't take five minutes to enter unpaid off after

17  5 p.m. into Marlo's schedule, did you?

18  A.  I did not.

19  Q.  Okay.  Let's fast-forward about six months to July 2015.

09:15  20  Okay?

21  A.  Yup.

22  Q.  You were at the meeting where Marlo Spaeth was fired; right?

23  A.  Yes.

24  Q.  And Julia Stern was there?

09:15  25  A.  Yes.

268

1    Q.  And Debbie Moss was at the termination meeting too; right?

2    A.  At the end.

3    Q.  At the end.

4    A.  Yes.

09:16    5    Q.  And what was Debbie Moss's title?

6    A.  At the time, training coordinator.

7    Q.  And Julie Stern was an assistant manager at the store.

8    A.  Yes.

9    Q.  Marlo Spaeth's supervisor.

09:16   10    A.  Yes.

11    Q.  And in the meeting where she got fired, Marlo didn't talk at

12    all during that meeting, did she?

13    A.  She did not.

14    Q.  She just looked down at the table.

09:16   15    A.  Right.

16    Q.  And she hid her face in her hand, didn't she?

17    A.  I don't recall that.

18    Q.  But she was looking down.

19    A.  Correct.

09:16   20    Q.  And she didn't speak.

21    A.  That's correct.

22    Q.  Okay.

23        THE COURT:  Do you want some water?

24        THE WITNESS:  Yes, please.

09:17   25        (Brief pause.)

269

1  BY MS. CARTER:

2  Q.  Do you remember that Marlo didn't want to take her Walmart

3  vest off?

4  A.  I do not recall that.

09:17  5  Q.  You said that Debbie came in at the end.  Do you remember

6  what prompted Debbie to come into the meeting?

7  A.  I do not.

8  Q.  Do you remember that Marlo was crying?

9  A.  I do not recall that.

09:18  10  Q.  Do you remember if Debbie was crying?

11  A.  I do not recall that either.

12  Q.  And then after Debbie came into the meeting she took Marlo

13  to her Walmart locker; right?

14  A.  That's correct.

09:18  15  Q.  And she had Marlo empty out her locker; right?

16  A.  Correct.

17  Q.  And then sent her home.

18  A.  Correct.

19  Q.  Let's talk about exit interview forms at Walmart, okay?

09:18  20  A.  Excuse me.  Can I take a cough drop?  I have a cold.

21  Q.  Yes.

22          (Brief pause.)

23          MS. CARTER:  Lectrice, if you can prepare Exhibit 20,

24  but don't publish it yet.

09:19  25  BY MS. CARTER:

1   Q.  So, Ms. Castro, when an associate is fired from Walmart, as

2   part of the regular practice the associate is given an exit

3   interview form; right?

4   A.  Correct.

5           (Exhibit 20, Exit Interview - EEOC00745, admitted

6   previously by stipulation.)

7   BY MS. CARTER:

8   Q.  And, Ms. Castro, can you turn to Exhibit 20 in your exhibit

9   folder.  This is Marlo Spaeth's exit interview form; correct?

10  A.  Correct.

11          MS. CARTER:  Lectrice, please publish what's been

12  previously admitted as Exhibit 20 to the jury.  Thank you.

13  BY MS. CARTER:

14  Q.  Now, Ms. Castro, towards the bottom half of the page we can

15  see a part that says "witness name" and next to it it says

16  "Robin Castro;" right?

17  A.  Correct.

18  Q.  And that's your electronic signature there.

19  A.  Yes.

20  Q.  Okay.  And above your name there is a section that says,

21  "Summary of Termination Information;" right?

22  A.  Yes.

23  Q.  And in the summary of termination information on Marlo

24  Spaeth's exit interview form it says that Marlo was

25  involuntarily terminated.

271

1    A.  That's correct.

2    Q.  And it also says that Marlo was eligible for rehire.

3    A.  Correct.

4    Q.  And eligibility for rehire, that's determined based on the

09:21    5    reason for termination; right?

6    A.  Correct.

7    Q.  And Walmart has an actual policy, a rehire and reinstatement

8    policy for former associates; correct?

9    A.  Correct.

09:21    10           MS. CARTER:  Lectrice, can you pull up Exhibit 26,

11    please.

12           (Exhibit 26, Rehire Policy from Deposition Exhibit

13    131, admitted previously by stipulation.)

14    BY MS. CARTER:

09:21    15    Q.  And, Ms. Castro, please turn to Exhibit 26 in your binder.

16           Exhibit 26 was previously admitted by stipulation by

17    the parties.

18           Ms. Castro, this is Walmart's rehire/reinstatement of

19    former associates policy; right?

09:22    20    A.  Right.

21    Q.  I want to draw your attention to the section of the policy

22    that's entitled, "Eligibility For Rehire."  Do you see that?

23    A.  Yes.

24    Q.  And in that section Walmart lists several reasons for

09:22    25    termination that would make an associate ineligible for rehire;

272

1    right?

2    A.  Yes.

3    Q.  Please review the categories of terminations that would make

4    an associate ineligible for rehire, Ms. Castro.  Can you read

09:22    5    them for me?

6    A.  "Intentional violation of the corporate HIPAA privacy

7    policy;" "gross misconduct - integrity issue;" "gross misconduct

8    - other;" "violation of the workplace standards policy;"

9    "relatives and romantic relationship partner" section; and

09:23    10    "falsification of employment documents."

11    Q.  Thank you, Ms. Castro.  And absenteeism is not one of the

12    termination reasons that would make an associate ineligible for

13    rehire; correct?

14    A.  Correct.

09:23    15    Q.  And, to your knowledge, Walmart has rehired other employees

16    who were terminated for attendance; right?

17    A.  Yes.

18    Q.  And this policy also includes a section on reinstatement;

19    correct?

09:23    20    A.  Yes.

21    Q.  And under Walmart's policy, reinstatement would restore an

22    associate's employment as if termination had not occurred;

23    correct?

24    A.  Correct.

09:23    25    Q.  And for the Manitowoc store, Marlo could have been

273

1    reinstated as if the termination had not occurred with the

2    approval of the market human resources manager; right?

3    A.  Yes.

4    Q.  And in this instance the market human resources manager was

09:24  5    Lee Spude; is that correct?

6    A.  Yes.

7    Q.  And if approval is given by the market human resources

8    manager, an employee can be reinstated by clicking the rehire

9    and reinstatement link; correct?

09:24  10   A.  From what I understand, yes.

11   Q.  Let's talk about the meeting with Marlo's sister, Amy Jo

12   Stevenson, in July 2015, after Marlo was terminated.

13          So, a few days after Walmart fired Marlo you met

14   Marlo's sister, Amy Jo Stevenson, in person; right?

09:24  15   A.  Yes.

16   Q.  She came to Walmart with Marlo's mom.

17   A.  Yes.

18   Q.  And Marlo was with her, too.

19   A.  Yes.

09:25  20   Q.  And Marlo's mom's name, that was Sandy Barnes?  Sandra

21   Barnes?

22   A.  Yes.

23   Q.  Okay.  And Karen Becker was at the meeting as well; correct?

24   A.  Yes.

09:25  25   Q.  Yes?

274

1    A.   Yes.

2    Q.   And at the time of the July 2015 meeting you were aware that

3    Marlo's mother, Sandra Barnes, used to be involved with Marlo's

4    employment; right?

09:25    5    A.   Yes.

6    Q.   And you were aware that Marlo's mother used to be involved

7    with Marlo's employment before the July 2015 meeting.

8    A.   Yes.

9    Q.   You heard Karen Becker talking to another manager about it,

09:25    10    about Sandra Barnes, didn't you?

11    A.   Yes.

12    Q.   And this conversation was occurring around the time of

13    Marlo's attendance issues; correct?

14    A.   Yes.

09:26    15    Q.   And Sandy Barnes came up because Marlo's attendance issues

16    were the sort of thing that would have been raised with Marlo's

17    mother in the past; right?

18    A.   That I can't say.  I don't know.

19    Q.   But Sandra Barnes came up in the context of Marlo's

09:26    20    attendance issues and the fact that she used to be involved in

21    Marlo's employment.

22    A.   Yes.

23    Q.   Yes?

24    A.   Yes.

09:26    25    Q.   Okay.  This was sometime in 2014 that you knew that Marlo's

275

1    mom, Sandra Barnes, used to be involved in Marlo's employment.

2    Sometime in late 2014.

3    A.  Yes.

4    Q.  Okay.  And you also knew that Karen Becker had lost contact

09:27  5    with Marlo's mother because Sandra Barnes was in a nursing home.

6    A.  Yes.

7    Q.  And at the July 2015 meeting, after Marlo was fired, it was

8    your understanding that Marlo's sister, Amy Jo Stevenson, took

9    on the role of someone who was acting on Marlo's behalf, in

09:27  10   Marlo's interests; correct?

11   A.  At that time, yes.

12   Q.  So at the July 15 meeting it was your understanding that Amy

13   Jo Stevenson was someone who was acting in Marlo's interests.

14   A.  Yes.

09:28  15   Q.  Okay.  And Amy Jo Stevenson asked why no one at Walmart had

16   contacted Marlo's mom; right?

17   A.  Yes.

18   Q.  Now, at that July 2015 meeting -- it was July 16th; right?

19   Does that sound --

09:28  20   A.  Yes.

21   Q.  Okay.  At that July 16th, 2015 meeting, Amy Jo Stevenson

22   referred to the Americans With Disabilities Act, didn't she?

23   A.  Yes.

24   Q.  And in that same meeting where Amy Jo referred to the ADA,

09:28  25   the Americans With Disabilities Act, Amy Jo asked for Marlo to

276

1    be rehired; right?

2    A.   Correct.

3    Q.   And in the same meeting where Amy Jo referred to the

4    Americans With Disabilities Act, Amy Jo asked for Marlo to be

09:29   5    given her old schedule back, didn't she?

6    A.   I don't recall that offhand.

7    Q.   But she did refer to the ADA.

8    A.   Yes.

9    Q.   With regard to Marlo's schedule.

09:29   10   A.   Yes.

11   Q.   Okay.  Let's talk about what happened after that meeting

12   with Amy Jo Stevenson.

13        After the July 16th, 2015 meeting with Amy Jo

14   Stevenson, you emailed the market human resources manager, Lee

09:29   15   Spude, to tell him what happened; right?

16   A.   I can't recall if it was a email or phone call.

17   Q.   Did you do both?

18   A.   I don't recall which it was.

19   Q.   Okay.

09:29   20        MS. CARTER:  Lectrice, can you pull up Exhibit 34?

21   Okay.

22        (Exhibit 34, Email exchange Spude and Castro -

23   D001961, admitted previously by stipulation.)

24   BY MS. CARTER:

09:30   25   Q.   And, Ms. Castro, you can take a look at Exhibit 34 to

277

1       refresh your recollection as well.

2       A.   (Witness peruses document.)

3       Q.   So I'll ask again.  After the July 16th meeting with Amy Jo

4       Stevenson, you emailed the market human resources manager, Lee

09:30   5       Spude, to tell him what happened; right?

6       A.   Yes.

7       Q.   And Lee Spude knew that Marlo's rights under the ADA were

8       discussed at that meeting; right?

9       A.   Yes.

09:30   10      Q.   He knew that because you told him; right?

11      A.   Correct.

12      Q.   Now, Ms. Castro, in your email you told Lee Spude that

13      Marlo's sister and mom had asked you to give Marlo her job back;

14      right?

09:31   15      A.   Yes.

16              MS. CARTER:  Lectrice, if you could call out the

17      bottom of Exhibit 34, the email at the bottom part of the page.

18      Thank you.

19      BY MS. CARTER:

09:31   20      Q.   And you also told Lee Spude that Marlo's sister said,

21      "According to the ADA act, Walmart should have changed Marlo's

22      schedule when Marlo asked."  Right?

23      A.   Yes.

24      Q.   So it's fair to say that Lee Spude knew that Marlo's legal

09:31   25      rights under the ADA were at issue; correct?

278

1   A.  Yes.

2   Q.  And, in fact, Mr. Spude told you to contact Walmart's legal

3   department, didn't he?

4   A.  Yes.

09:32  5   Q.  I'd like to draw your attention to the center of the page.

6           MS. CARTER:  Thank you, Lectrice.  You can put that

7   away.  And if you can reopen Exhibit 34 and then zoom in on the

8   email in the middle of the page, Lectrice.

9           In the meantime we can discuss it.  Yeah, right in the

09:32  10  middle.  Thank you.  With a callout.

11  BY MS. CARTER:

12  Q.  So, Ms. Castro, I'd like to draw your attention to the email

13  from Friday, July 17, 2015 from 4:30 p.m.  Do you see that?

14  A.  Yes.

09:32  15  Q.  And this is where, in response to your email, the market

16  human resources manager, Lee Spude, told you to call legal

17  hotline; right?

18  A.  Correct.

19  Q.  And he specifically told you also not to have any further

09:33  20  discussions with Marlo's relatives, didn't he?

21  A.  Yes.

22  Q.  But you told us a few moments ago that Walmart's management

23  guidelines say that you can talk to family members about

24  disability accommodations, don't they?

09:33  25  A.  Yes.

279

1   Q.  But you followed the orders that you were given from the

2   market human resources manager, didn't you?

3   A.  Yes.

4   Q.  And you stopped communicating with Marlo's relatives.

09:33   5   A.  Correct.

6   Q.  And you also followed his instruction to call the legal

7   hotline; right?

8   A.  Yes.

9   Q.  You called Walmart's legal hotline and reported that there

09:33   10   had been an allegation of disability discrimination; right?

11   A.  I did not.

12   Q.  You did not?

13   A.  I did not.  I reported a threat.

14   Q.  You reported a threat?

09:34   15   A.  Correct.

16   Q.  A threat of what?

17   A.  That she was going to take further action if we did not

18   abide by the ADA act.

19   Q.  And the ADA act that deals with disability discrimination;

09:34   20   right?

21   A.  Yes.

22   Q.  Okay.  And so you called the legal hotline and reported that

23   there had been an allegation of disability discrimination under

24   the ADA; right?

09:34   25   A.  With a threat to have legal action, yes.

280

1    Q.  Because of a violation of the ADA; correct?

2    A.  Yes.

3    Q.  Okay.

4          MS. CARTER:  Lectrice, can you please pull up Exhibit

09:34  5    32 for us.

6          (Exhibit 32, Case Details - D001014-1019 - Morgan Dep.

7    100, admitted previously by stipulation.)

8    BY MS. CARTER:

9    Q.  And, Ms. Castro, if you can turn to Exhibit 32.  So, in

09:34  10   Exhibit 32, in the middle of the page, this is -- these are case

11   details, a summary of an investigation that was opened after

12   your call; correct?

13   A.  Yes.

14   Q.  And in the middle of the page it says "parties involved."

09:35  15   Do you see that?

16   A.  Yes, I do.

17   Q.  And right below "parties involved" it's lists your name,

18   Robin Castro.

19   A.  Yes.

09:35  20   Q.  And under "party type" it says you were the caller.

21   A.  Correct.

22   Q.  And Exhibit 32 is the record of your call to the legal

23   hotline after the meeting with Amy Jo Stevenson.

24   A.  Yes.

09:35  25   Q.  And so Walmart opened an investigation about Amy's

1    allegations regarding Marlo's termination after your call to

2    legal hotline; right?

3    A.  Yes.

4    Q.  But Marlo's request for a schedule accommodation was still

09:35    5    denied.

6    A.  Correct.

7    Q.  Okay.  Let's talk about Exhibit 35.  You can turn to

8    Exhibit 35 in your binder.

9            (Exhibit 35, Castro Reports to Investigator -

09:36    10    D001081-1084, D1195-1099, admitted previously by stipulation.)

11            MS. CARTER:  Lectrice, if you can pull up page 5 of

12    Exhibit 35 which has been previously marked and previously

13    admitted by stipulation of the parties.

14    BY MS. CARTER:

09:36    15    Q.  And, Ms. Castro, let me know when you're at page 5.  Are you

16    ready?

17    A.  I think so, yeah.

18    Q.  Yes?

19    A.  Yes.

09:36    20    Q.  Ms. Castro, on the fifth page of Exhibit 35, these are notes

21    of an interview that you had with the store manager, Kent Abitz,

22    aren't they?

23    A.  Yes.

24            MS. CARTER:  Lectrice, do you have Exhibit 35?

09:37    25    Page 5, please.

282

1        (Brief pause.)

2        MS. CARTER:  If you can go directly to page 5?

3   Thank you.  We'll wait a minute.

4        (Brief pause.)

09:37   5   BY MS. CARTER:

6   Q.  Okay.  So these are notes from an interview --

7        MS. CARTER:  It's right.  Yeah.

8   BY MS. CARTER:

9   Q.  So these are notes from an interview that you gave to Kent

09:37   10  Abitz, the then store manager; right?

11  A.  Yes.

12  Q.  And it was in connection with the investigation that

13  occurred after your call to the legal hotline.

14  A.  Yes.

09:38   15  Q.  Okay.  And in these notes you can see an "R" on the left

16  column and a "K" on the left column; right?

17  A.  Yes.

18  Q.  And the "K" in the left column stands for a question being

19  asked by manager Kent Abitz; right?

09:38   20  A.  Yes.

21  Q.  And the "R" on the left side of the page indicates answers

22  that were provided by you.

23  A.  Yes.

24  Q.  Robin Castro.

09:38   25  A.  Yes.

283

1    Q.   Okay.  So if you look at your responses to Mr. Abitz's

2    questions, it confirms that you were involved in the decision to

3    terminate Marlo Spaeth; correct?

4    A.   I had knowledge of it, yes.

09:39   5    Q.   If you turn to page 5 of your -- of the interview with Kent

6    Abitz, there is a question that says, from Kent, "Kay, were you

7    involved in the decision to term Marlo?"  Do you see that?

8    A.   Yes.

9    Q.   And what was your answer?

09:39   10   A.   Yes.

11   Q.   Okay.

12          MS. CARTER:  Lectrice, if you could --

13          Thank you.  Yes.  At the bottom of this page.  "Were

14   you involved in the decision to term Marlo?"  Thank you.

09:39   15   BY MS. CARTER:

16   Q.   And then he asked, "Was your opinion asked?"  Right, Robin?

17   He asked you, "Was your opinion asked?"

18   A.   Yes.

19   Q.   And what was your response?

09:39   20   A.   No.  Only the absences.

21   Q.   No, the -- was your opinion asked?

22   A.   Yes.

23   Q.   And what was your response?

24   A.   I responded yes.

09:40   25   Q.   Okay.  And you were asked your opinion of whether Marlo

1    Spaeth should be fired; right?  That's what your opinion was

2    about, whether Marlo Spaeth should be fired; right?

3    A.  Yes.

4    Q.  And you did say yes, but you made sure to say that the

09:40    5    termination decision was not based on Marlo's job performance;

6    right?

7    A.  Correct.

8    Q.  Because Marlo's job performance was fine.

9    A.  Correct.

09:40    10    Q.  But you didn't make the decision to fire Marlo Spaeth on

11    your own, did you?

12    A.  I did not.

13    Q.  Walmart's market human resources manager, Lee Spude, signed

14    off on the decision to fire Marlo.

09:40    15    A.  Yes.

16    Q.  And in your interview with Kent Abitz, you told him the MHRM

17    Lee advised termination; is that correct?

18    A.  Yes.

19    Q.  To be clear, your opinion was that Marlo should be fired;

09:41    20    right?

21    A.  Correct.

22    Q.  But you told Kent Abitz that Amy Jo said you should have

23    accommodated Marlo with her schedule due to ADA rules, didn't

24    you?

09:41    25    A.  Those were not my exact words, but, yes.

285

1          MS. CARTER:  Lectrice, if you can go to -- --

2     BY MS. CARTER:

3     Q.  Or, Robin, you can turn to the next page of the interview

4     and refresh your recollection, and then I'll ask you the

09:42    5     question again.  Okay?

6          You told Kent Abitz that Amy Jo said you should have

7     accommodated Marlo with her schedule due to ADA rules; right?

8     A.  Yes.

9     Q.  And, Ms. Castro, isn't it true that you knew full well that

09:42   10    Walmart had an obligation under the ADA to provide scheduling

11    accommodations?  Right?

12         MR. BURNETT:  Your Honor, I object.  This is a

13    question that calls for a legal conclusion that belongs to the

14    court what the obligation was.

09:42   15         THE COURT:  I'm going to sustain the objection.

16         MS. CARTER:  I'll restate it.

17         THE COURT:  Okay.

18    BY MS. CARTER:

19    Q.  Ms. Castro, was it's your belief that Walmart had an

09:43   20    obligation under the ADA to accommodate Ms. Spaeth's scheduling

21    needs?

22         MR. BURNETT:  Same objection.  That's irrelevant.

23         THE COURT:  Come forward.  Actually, let's take our

24    morning break.

09:43   25         Ladies and gentlemen, we're going to take our morning

286

1    break and resolve this issue and then bring you back.

2             (Jury out at 9:43 a.m.)

3             THE COURT:  Okay.  You can be seated.

4             So, Mr. Burnett, explain your objection.

09:43    5        MR. BURNETT:  My objection, Your Honor, is this

6    question asks whether this witness's opinion of what the ADA

7    required of Walmart, whether her opinion is correct or incorrect

8    doesn't matter; it is what the Court tells the jury.  So it's a

9    relevancy objection and it's a 403 objection.

09:44   10        THE COURT:  Okay.

11            MS. CARTER:  Your Honor, would you like our response?

12            THE COURT:  Yes, Ms. Carter.

13            MS. CARTER:  Okay.  Ms. Castro was one of the

14   decisionmakers.  She testified that she was familiar with the

09:44   15   ADA and that she knew the ADA required accommodations.  Schedule

16   accommodations were one of them.  It goes to reckless disregard,

17   Your Honor.

18            THE COURT:  I think it's relevant for the purpose

19   Ms. Carter says.  The EEOC is arguing that Walmart intentionally

09:44   20   and recklessly disregarded or violated rules that it knew it was

21   obligated to meet.

22            Now, Mr. Burnett is correct that Ms. Castro, as

23   knowledgeable as she is, is not the expert on this.  So I think

24   a curative instruction or a limiting instruction would be

09:45   25   appropriate to advise the jury that ultimately, you know, the

287

1    legal question of whether or not -- or even the factual question

2    whether under the circumstances of this case Walmart had an

3    obligation to provide an accommodation is an issue that will be

4    decided in this case.  But if her testimony is that she believed

09:45  5    it at the time, that's relevant to, it seems to me, what EEOC is

6    claiming Walmart's understanding was.  So I think in that

7    respect it would be admissible.  Mr. Burnett?

8         MR. BURNETT:  Yes, Your Honor.  On cross then I think

9    I'm entitled to ask the question "Did you believe Walmart was in

09:45  10   violation of the ADA for the way it treated Marlo Spaeth?"

11        THE COURT:  Certainly.  I mean, that's the adverse --

12   the converse of the question.

13        And I think, you know, from what I hear this witness

14   saying, she says, yes, of course, you have to accommodate a

09:46  15   person with a disability.  Now, I don't know if she recognized

16   Marlo Spaeth had a disability.  I mean, these are things that

17   the jury ultimately will be deciding.

18        MS. CARTER:  Your Honor, can we have the witness

19   excused?

09:46  20        THE COURT:  Sure.  Ms. Castro, do you want to wait

21   outside just for a moment?

22        MS. CARTER:  Thank you, Your Honor.  Sorry for

23   interrupting you.

24        THE COURT:  That's all right.  I understand now that

09:46  25   I'm getting attuned to it all.  You guys are immersed in it.

1          It seems to me that an issue that is being vigorously

2     disputed and one that the jury will ultimately decide is whether

3     there was enough information for Walmart to realize that this is

4     an ADA case; that what was being asked for in a schedule change

09:47   5     was actually a reasonable accommodation for a person with a

6     disability.

7          I understand Walmart's claim is, no, we didn't know

8     it.  We knew she had a disability, we knew she didn't like her

9     new schedule, but we didn't know there was a claim that she

09:47   10    couldn't meet that schedule or comply with that schedule because

11    of her disability.

12         And I think that's ultimately what a jury is --

13    somehow the questions we present to the jury will, you know, get

14    to that.  The jury will be asked, it seems to me, did Walmart

09:47   15    know that there was a need for a reasonable accommodation, or

16    were they aware that Ms. Spaeth needed an accommodation.

17         And I think this -- you know, to the extent this

18    question is tied to Ms. Spaeth, you know, whatever her answer

19    is, that's her answer.

09:47   20         But I think I can give a limiting instruction that

21    will protect against what Mr. Burnett legitimately fears which

22    is that the jury will accept that as a statement of the law or a

23    legal conclusion and, therefore, their job's done, Ms. Castro

24    has decided that they violated the law.  And that's not proper

09:48   25    either.

289

1        Do you want to put together during the break,

2    Mr. Burnett, a limiting instruction?

3            MR. BURNETT:  Sure.

4            THE COURT:  If you have something in mind I'll give it

5    right away.  And I think it's probably the kind of issue that we

6    probably should do a limiting instruction immediately.

7            Mr. Harlan?

8            MR. HARLAN:  Your Honor, we've sat through a morning

9    of extensive questioning about guidelines, and we have submitted

10   a limiting instruction about helping the jury understand that

11   their task is to decide whether the ADA was violated, not

12   whether Walmart's internal policies, training manuals or

13   whatever was violated.  Those are two different issues.

14           And obviously in this situation Walmart has set the

15   bar so that the employees don't get anywhere near violating the

16   ADA.  So there's no -- the ADA and the guidelines are not

17   co-extensive.  So I believe that we have to make the jury aware

18   of that given the line of questioning that we heard this

19   morning.

20           THE COURT:  Well, why don't you and Mr. Burnett put

21   together a proposed instruction, run it by counsel for the EEOC,

22   and, you know, either give what you can agree on, or, if you

23   can't, I'll make a determination when I get back.

24           But let's take our break and maybe a little longer, I

25   hate to go too long, but 15 minutes if that will work.  Okay?

290

1    MS. CARTER:  Thank you, Your Honor.

2    THE COURT:  We're in recess.

3    (Recess taken at 9:49 a.m., until 10:12 a.m.)

4    THE COURT:  Go ahead, be seated.

10:12  5    First on the limiting instruction, I submitted

6  something.  I realize you don't have printers at your disposal.

7    MR. MULAIRE:  The instruction that your clerk provided

8  to us looks fine to us, Your Honor.

9    THE COURT:  Any objection?

10:12  10    MR. HARLAN:  Likewise from Walmart.

11    THE COURT:  Okay.  I'll go ahead and give that when we

12  bring the jury in.  I understand the next witness is Marlo

13  Spaeth?

14    MS. VANCE:  Yes, Your Honor.

10:13  15    MS. CARTER:  The next live witness.  We may do dep

16  designations right after this.

17    THE COURT:  Would it make sense to resolve any issues

18  as to Marlo Spaeth before we bring the jury back?

19    MS. CARTER:  Yes, Your Honor.  I think that makes

10:13  20  sense.  So we would ask your permission to have a little bit of

21  leeway on asking questions where the relevance may not be clear,

22  but it's just to get her comfortable.

23    THE COURT:  Yeah.  I think that makes sense.  Yeah.

24    MS. CARTER:  Thank you, Your Honor.

10:13  25    THE COURT:  I think we all understand that the value

1    of this testimony isn't so much -- I'm not sure it's so much as

2    a -- that you're going to elicit factual information from her,

3    but I think it's nevertheless important because it will convey

4    to the jury, you know, her capacity, her understanding, and I

10:13    5    think help them understand in case in general.  So I think it's

6    valuable regardless of the effectiveness of an oath or things

7    like that.

8            But I think the *Hanson* case is a pretty good

9    interpretation of the current state of the law.  And I recognize

10:14    10    it's state court, but the Wisconsin Rules of Evidence, Rule 601,

11    or in Wisconsin nomenclature 90601, is identical.  It seems to

12    me it just requires -- every witness -- every person is

13    competent to be a witness and then you administer the oath for

14    whatever value it might have.

10:14    15            MR. MULAIRE:  Your Honor, if I could just mention

16    briefly, I think that conclusion is right.  We did a little bit

17    of research and under federal law, I mean, I don't know that

18    it's right to rely on state law per se because 601 is limited --

19    limits state law to claims where state law provides the rule of

10:14    20    decision.  But I also found, and can just mention for the record

21    in case it's helpful, two Seventh Circuit cases that get you to

22    the same place I think.  One is *U.S. vs. Banks*, 520 F.2d 627 at

23    page 630; the other is *U.S. v. Snyder*, 189 F.3d 640 at page 645.

24            And they basically say that "competency of a witness

10:15    25    to testify as distinguished from the issue of credibility is a

292

1    limited threshold decision for the trial judge as to whether a

2    proffered witness is capable of testifying in any meaningful

3    fashion whatsoever."  That's a quote from *Banks*.

4          So I think it's -- what we discussed yesterday in

10:15    5    chambers is an accurate statement from the law from our point of

6    view, is that competency is an extremely low threshold and it

7    is, beyond that, largely up to the jury to evaluate what

8    significance to place on that testimony.

9          THE COURT:  Okay.  Well, let's bring the jury in then

10:15   10   and I'll give that instruction and then you'll continue with

11   your direct exam.

12          MS. CARTER:  Thank you, Your Honor.

13          MS. VANCE:  Your Honor, I'm going to take this moment

14   to make sure that Ms. Spaeth is outside and available?

10:16   15          THE COURT:  Sure.

16          (Brief pause.)

17          (Jury in at 10:16 a.m.)

18          THE COURT:  Okay.  Go ahead and be seated, ladies and

19   gentlemen.

10:17   20          Before we continue the testimony, I'm going to give

21   what would be called a limiting or a cautionary instruction on

22   some of the testimony you are hearing and will hear.  And this

23   is how it goes.

24          LIMITING/CAUTIONARY JURY INSTRUCTION

10:17   25

293

1          THE COURT:  You have heard testimony by some

2     witnesses, including Walmart employees, concerning what they

3     believe the ADA required under the circumstances of this case.

4     Such testimony is relevant to determine why they took certain

10:17   5     actions and what their state of mind might be.  But the question

6     of what the ADA requires is a legal question that the Court will

7     address in its instructions at the end of the case, and whether

8     Walmart violated the ADA is ultimately a question for you to

9     decide based on all the evidence in the case.

10:17  10          You have also heard testimony as to what Walmart's

11     action -- whether Walmart's actions complied with its own

12     internal policies and training.  You should keep in mind that

13     Walmart's policies are not necessarily what the law requires.

14     The issue is ultimately whether Walmart violated the ADA, not

10:18  15     whether it violated its own internal policies and procedures.

16          So, with that understanding then we'll continue with

17     the direct examination of Ms. Castro.

18          MS. CARTER:  Thank you, Your Honor.

19          THE COURT:  Uh-huh.

10:18  20     BY MS. CARTER:

21     Q.  Ms. Castro, before our break I asked you, isn't it true that

22     you believed that Walmart had an obligation under the ADA to

23     accommodate Ms. Spaeth's scheduling needs?

24     A.  Could you clarify that?

10:18  25          THE COURT:  You want the question read back?

294

1          THE WITNESS:  Yeah.

2          THE COURT:  I think it's pretty clear.  Listen

3   carefully and we'll have the reporter read the question back.

4          (Record read.)

5          MR. BURNETT:  Your Honor, I'm going to object to that

6   question in regards it's indefinite as to time.

7          THE COURT:  Okay.  Perhaps add when she believed, you

8   know, at what point.

9          MS. CARTER:  Okay.

10  BY MS. CARTER:

11  Q.  Ms. Castro, isn't it true that at the time Marlo Spaeth was

12  fired you believed that Walmart had an obligation under the ADA

13  to accommodate Ms. Spaeth's scheduling needs?

14  A.  I did not.

15  Q.  Isn't it true that at some point after Marlo Spaeth was

16  fired you came to believe that Walmart had an obligation under

17  the ADA to accommodate Ms. Spaeth's scheduling needs?

18  A.  Correct.

19  Q.  And isn't it true that Mr. Spude knew, because you told him,

20  that Walmart had an obligation to accommodate Ms. Spaeth's

21  scheduling needs?

22  A.  I did not tell him that.

23  Q.  But he knew, based on your email, that there had been a

24  request to accommodate Ms. Spaeth's scheduling needs.

25  A.  Correct.

295

1  Q.  Ms. Castro, when did you know -- when did you come to

2  know or to believe that Walmart had an obligation under the ADA

3  to accommodate Ms. Spaeth's scheduling needs?

4  A.  Not until way after.

10:21  5  Q.  Could you estimate a time period?

6  A.  Not offhand, no.

7  Q.  Was it before you called Marlo Spaeth to tell her that

8  Walmart would not rehire her?

9  A.  No.

10:21  10  Q.  To your knowledge, Kent Abitz never looked into

11  accommodating Marlo with her schedule; right?

12  A.  I would have no idea.

13  Q.  To your knowledge, I'm asking.

14  A.  Correct.

10:21  15  Q.  And, to your knowledge, Lee Spude never looked into

16  accommodating Marlo Spaeth schedule.

17  A.  Correct.

18  Q.  And, to your knowledge, Julia Stern never looked into

19  accommodating Marlo Spaeth with her schedule.

10:22  20  A.  Correct.

21  Q.  After the meeting you told Amy Jo Stevenson that you would

22  escalate her request --

23  A.  Correct.

24  Q.  -- to see if anything could be done.

10:22  25  A.  Correct.

296

1   Q.   But you never looked into whether it would be possible to

2   accommodate Marlo's schedule either, did you?

3   A.   Can you repeat that, please?

4            (Record read.)

10:22   5            THE WITNESS:  Correct.

6   BY MS. CARTER:

7   Q.   And you never asked anyone to rehire Marlo, did you?

8   A.   Not to rehire, no.

9   Q.   Did you ever ask anyone -- you clarified your question "not

10:23   10   to rehire no," did you ever ask anyone to reinstate Marlo?

11   A.   No.

12   Q.   You were just verifying the decision to terminate her?

13   A.   Correct.

14   Q.   But isn't it true that Marlo's availability form indicated

10:23   15   that she could not work past 4 p.m. at the time of the

16   coachings?

17   A.   That I did not see at the time.

18   Q.   Are you aware of that now?

19   A.   Yes.

10:23   20   Q.   Let's take a closer look at this issue.  Can you please turn

21   to the fifth page of Exhibit 35.

22            MS. CARTER:  And, Lectrice, can you pull that up for

23   the jury and call out the dates in the middle of that page?

24   Thank you, Lectrice.

10:24   25   BY MS. CARTER:

297

1    Q.   So, Ms. Castro, in your interview with Kent Abitz, you

2    stated that Marlo had been coached about her attendance on

3    December 22nd, 2014; right?

4    A.   Yes.

10:24    5    Q.   And December 17th, 2014.

6    A.   Yes.

7    Q.   And January 13th, 2015; right?

8    A.   Correct.

9    Q.   Okay.  So the latest date that you provided in your

10:24   10   interview for an attendance related coaching was on January

11   13th, 2015.

12   A.   That was not a coaching.

13   Q.   What was --

14   A.   That was just a conversation.

10:25   15   Q.   So the latest date that you provided for an attendance

16   related coaching or communication was January 13th, 2015.

17   A.   Correct.

18   Q.   Okay.  I'd like to show you what's been marked as Exhibit 1.

19            MS. CARTER:  Lectrice, can you pull that up for us,

10:25   20   please.

21   BY MS. CARTER:

22   Q.   This -- and if you can turn to Exhibit 1, Ms. Castro.  Just

23   let me know when you are ready.

24            (Brief pause.)

10:25   25   BY MS. CARTER:

298

1    Q.   Ready?

2    A.   Yup.

3    Q.   Okay.   These are Marlo Spaeth's availability forms; right?

4    A.   Yes.

10:25    5    Q.   And on page 1 of Exhibit 1, we can see that your comanager

6    of the Manitowoc store, Bonnie Popp, filled out a new form, a

7    new availability form with Marlo on February 16th, 2015, didn't

8    she?

9    A.   Yes.

10:26   10    Q.   And on that February 16th, 2015 form Marlo's availability

11    was changed from noon to 4:00 p.m. to noon to 6 p.m., wasn't it?

12    A.   Yes.

13    Q.   So the new availability form was completed on February 16th,

14    2015, but that was over a month after the last attendance

10:26   15    discussion in January 13th, 2015, wasn't it?

16    A.   Yes.

17    Q.   And before Bonnie Popp filled out the new availability form

18    with Marlo in February 2015, the last availability form in

19    Marlo's file had been completed in January 2006; right?

10:27   20    A.   Yes.

21         MS. CARTER:   Lectrice, can you go to the second page

22    of Exhibit 1.   Thank you.

23    BY MS. CARTER:

24    Q.   Ms. Castro, is this Marlo Spaeth's 2006 availability form;

10:27   25    right?

299

A.   Yes.

Q.   Okay.   And based on Marlo's 2006 availability form, Marlo's availability was actually that she could not work past 4 p.m., until February 2015; is that correct?

A.   Correct.

Q.   So at the time of the first attendance coaching on December 17th, 2014, Marlo's availability form said that she could not work past 4 p.m.; correct?

A.   Correct.

Q.   And isn't it true that at the time of the second coaching, on December 22nd, 2014, Marlo's availability form said that she could not work past 4 p.m.?

A.   Correct.

Q.   And at the time of the attendance discussion on January 13th, 2015, Marlo's availability form still said she could not work past 4 p.m.; correct?

A.   Correct.

Q.   So even though her availability form said that she couldn't work past 4 p.m., Marlo had been scheduled to work until 5:30 p.m.?

A.   Correct.

Q.   So Marlo -- so Walmart had scheduled Marlo outside of her availability on all three dates that she was coached or sat down and talked to about her attendance; isn't that right?

A.   According to this, yes.

1  Q.  According to your statements during the investigation.

2  A.  Yes.

3  Q.  It wasn't Marlo's decision to change the end time on her

4  availability form, was it?

10:29  5  A.  I would not have a clue.

6  Q.  You weren't present?

7  A.  I was not present for that.

8  Q.  Okay.  But during the January 13th, discussion that you were

9  a part of, January 13th, 2015, Marlo asked for her noon to 4:00

10:29  10  schedule back, didn't she?

11  A.  Yes.

12  Q.  Okay, Ms. Castro.  Let's talk about Walmart's decision not

13  to give Marlo her job back.  Okay?

14  A.  Yes.

10:29  15  Q.  You told us earlier that Marlo was eligible for rehire;

16  right?

17  A.  Yes.

18  Q.  But despite the fact that Marlo was eligible for rehire,

19  Walmart decided not to rehire Marlo Spaeth; isn't that right?

10:30  20  A.  They decided not to reinstate her.

21  Q.  And they decided not to rehire her; correct?

22       MR. BURNETT:  Your Honor, I don't think there's been a

23  foundation laid that the witness appreciates the distinction or

24  the difference.

10:30  25       THE COURT:  Your objection is foundation?

301

1          MR. BURNETT:  Foundation.

2          THE COURT:  Overruled.  Can you answer it?  Or if you

3     need more clarification you can ask for it.

4          THE WITNESS:  Can you please clarify it?

10:30   5     BY MS. CARTER:

6     Q.  Despite the fact that Marlo was eligible for rehire and that

7     Marlo's sister, Amy Jo, asked for her to be rehired, Walmart

8     decided not to rehire Marlo Spaeth; isn't that right?

9     A.  They can't be rehired if they don't apply.

10:31   10    Q.  Amy Jo Stevenson asked for Marlo to be given her job back;

11    correct?

12    A.  Correct.

13    Q.  And when you called Marlo Spaeth what did you say to her?

14    A.  I don't recall the exact words.

10:31   15    Q.  Okay.

16          MS. CARTER:  May I approach the witness, Your Honor,

17    to refresh her recollection?

18          THE COURT:  Sure.

19          MR. BURNETT:  Could we have a page and line, please.

10:31   20          MS. CARTER:  Yes.  If you go to Ms. Castro's dep

21    testimony on page 141, line 24 and 25.

22          THE COURT:  And, Mr. Burnett, keep in mind you're

23    behind plexiglass and for us to get a record you need to have

24    the microphone a little closer.

10:32   25          MR. BURNETT:  Okay, thanks.

302

BY MS. CARTER:

Q.  Does that refresh your recollection?

A.  Yes, that's what it says.

Q.  Okay.  So I will ask the question again.

        Despite the fact that Marlo was eligible, Walmart decided not to rehire Marlo Spaeth; isn't that right?

A.  Yes.

Q.  And that decision by Walmart involved people above the store level; right?

A.  Repeat that again?

Q.  The decision not to rehire Marlo Spaeth, that involved people above the Manitowoc store level.

A.  Yes.

Q.  Yes?

A.  Yes.

Q.  Lee Spude told you that Walmart would not be rehiring Marlo Spaeth; right?

A.  I don't recall the exact words he said then either.

        MS. CARTER:  Your Honor, may I approach the witness to refresh her recollection?

        THE COURT:  Yes, you may.

        (Witness peruses document.)

BY MS. CARTER:

Q.  Does that refresh your recollection?

A.  Yes.

303

1          MS. CARTER:  And what I showed her was page 139 of her

2    deposition, lines 15 through -- lines 15 and 16.

3          MR. BURNETT:  Thank you.

4          MS. CARTER:  Lines 13 through 16.

10:34  5    BY MS. CARTER:

6    Q.   Okay.  So, Ms. Castro, Lee Spude told you that Walmart would

7    not be rehiring Marlo Spaeth; right?

8    A.   Yes.

9    Q.   And you don't recall him giving you any reasons why Marlo

10:34  10   couldn't have her job back, do you?

11   A.   Not offhand, no.

12   Q.   And so around September 2015, you called Marlo and you told

13   her that she couldn't have her job back at Walmart, didn't you?

14   A.   Correct.

10:34  15   Q.   In fact, you told Marlo that Walmart "would not be able to

16   rehire her," didn't you?

17   A.   Yes.

18         MS. VANCE:  Lectrice, can you please pull up

19   Exhibit 32, page 3.

10:35  20   BY MS. CARTER:

21   Q.   And, Ms. Castro, if you can turn to that in your binder.

22   Thank you.  Ms. Castro, do you see at the very bottom of

23   page 3 --

24         MS. CARTER:  And, Lectrice, if you could zoom in on

10:35  25   the last the paragraph at the bottom of page 3.  Or call out.

1    BY MS. CARTER:

2    Q.  Ms. Castro, do you see at the very bottom of page 3, where

3    it says September 21st, 2015, note from Denise Morgan.  And then

4    it says, "Follow-up email to SM Kent."  That's store manager;

10:36    5    right?  Kent Abitz?

6    A.  Yes.

7    Q.  "Follow-up email to SM Kent.  Thank you for forwarding the

8    completed investigation recap.  Was a closure conversation

9    conducted with Marlo, her mother and sister at the time they

10:36   10    came to the store to discuss Marlo's termination, or was someone

11    to follow up with them?"

12         Do you see that?

13    A.  Yes.

14    Q.  You told us a few minutes ago that you called Marlo and you

10:36   15    told her that Walmart would not be able to rehire her; right?

16    A.  Yes.

17    Q.  But, Ms. Castro, you never had a closure conversation with

18    Marlo's mother, did you?

19    A.  No.

10:36   20    Q.  And you didn't have a closure conversation with Marlo's

21    sister, Amy Jo, did you?

22    A.  No.

23    Q.  Ms. Castro, knowing everything you know today, if Marlo

24    Spaeth didn't need a schedule accommodation, don't you agree

10:37   25    that Marlo would not have been fired in 2015?

1      MR. BURNETT:  Your Honor, I object to the question.  I

2  think it calls for speculation.  And it's irrelevant in the

3  sense it's retrospective.

4      THE COURT:  Sustained.

10:37   5      MS. CARTER:  No further questions for this witness,

6  Your Honor.  Thank you.

7      THE COURT:  Cross?

8      MR. BURNETT:  Thank you.

9                  CROSS-EXAMINATION

10:37  10  BY MR. BURNETT:

11  Q.  Ms. Castro, I want to start at the very beginning.  Tell us

12  where you were born and raised?

13  A.  Two Rivers, Wisconsin.

14  Q.  And you grew up there, go to high school?

10:37  15  A.  Yes.

16  Q.  Graduate from high school at Two Rivers?

17  A.  Mishicot.

18  Q.  Mishicot.  Did you go beyond that for schooling?

19  A.  I did not.

10:37  20  Q.  You started work.

21  A.  Yes.

22  Q.  In a sentence or two, tell us the various jobs you held

23  before you went to Walmart.

24  A.  I was a sales associate at a retail -- another retail store.

10:38  25  I did a little built of bartending, waitressing.  Worked at a

1    factory for a while.

2    Q.  How did it come to pass that you came to work at Walmart?

3    A.  I needed a job.

4    Q.  And when did you start there?

10:38  5    A.  In 2006.

6    Q.  What position did you take?

7    A.  I was an unloader, unloading trucks.

8    Q.  How long did you do that?

9    A.  One month.

10:38  10    Q.  And then what happened next there?

11    A.  I went out on maternity leave.

12    Q.  And how long were you out, until you were unloading trucks

13    at eight months?

14    A.  Four weeks.

10:38  15    Q.  Four weeks.  How long were you out on maternity leave?

16    A.  I was out for four weeks.

17    Q.  Oh, okay.  And then you came back to Walmart at a different

18    job?

19         MS. CARTER:  Objection, leading.

10:38  20         MR. BURNETT:  I'll restate it.

21         THE COURT:  Go ahead.

22    BY MR. BURNETT:

23    Q.  Did you return to Walmart to take another position?

24    A.  Yes.

10:39  25    Q.  What position did you take?

307

```
 1    A.   It was called an inventory control specialist.

 2    Q.   And how long did you do that work?

 3    A.   Approximately a couple months.

 4    Q.   And then what happened?

 5    A.   I was promoted to department manager.

 6    Q.   And what department was that of?

 7    A.   Frozen.

 8    Q.   And what job did you then take on?

 9    A.   After that I was zone merchandise supervisor.

10    Q.   And what job after that?

11    A.   Assistant manager.

12    Q.   And then?

13    A.   Comanager.

14    Q.   Okay.  And now what?

15    A.   Asset protection system manager.

16    Q.   So it sounds like you worked your way up the ladder at

17    Walmart.

18    A.   Yes.

19    Q.   And you've worked at the company for how long was it?

20    A.   15 years.

21    Q.   Okay.  At some point in time did you come to have direct

22    interaction with Marlo Spaeth?

23    A.   Yes.

24    Q.   When was that?

25    A.   2010.
```

10:39

10:39

10:39

10:39

10:40

308

1    Q.  How did that come to pass?

2    A.  I was the zone merchandise supervisor over home lines.

3    Q.  And did you directly supervise Marlo?

4    A.  Yes, I did.

10:40    5    Q.  For how long would you have supervised her?

6    A.  Approximately a month.

7    Q.  How frequently did you see her during that time?

8    A.  Every scheduled shift of hers.

9    Q.  And how did you and Marlo get along?

10:40    10    A.  Well.

11    Q.  When you would encounter Marlo what would the circumstances

12    involve?

13    A.  Just following up with Marlo to see what she was doing for

14    the day.

10:40    15    Q.  So how closely did you and she work together?

16    A.  Not hand over hand or anything or closely; just

17    interactions.  Following up.

18    Q.  Did you encounter any problems with Marlo's work?

19    A.  I did not.

10:41    20    Q.  How did she do generally?

21    A.  Good.

22    Q.  As the comanager how much interaction did you have with

23    Marlo?

24    A.  Almost none.

10:41    25    Q.  So with what frequency would you see her?

309

1    A.   Just passing through the area.

2    Q.   Passing through the store?

3    A.   Yeah.

4    Q.   Do you recall any episodes involving Marlo and specifically

5    her ability to take direction and attempts to change?

6    A.   Yes.

7    Q.   What do you recall?

8    A.   When I was a zone merchandise supervisor she was folding

9    towels and rugs a lot so I asked her if she could dust the

10   displays of coffee pots off.  And I had a Swiffer with me.  And

11   she told me that day that she refused.  "Robin, I refuse."  And

12   I handed her the Swiffer and walked off.

13          So then the next day she was scheduled I walked up to

14   her again to see how it was going, and she was -- she didn't

15   really say too much.  And then by I believe it was like the

16   third time I had seen her she came up to me, she high-fived,

17   "Robin they're all done."  So we went and looked at them.  She

18   was able to do that task also then.

19   Q.   Did she continue dusting displays --

20   A.   Yes.

21   Q.   -- after that?  Did you have any involvement in teaching her

22   to do returns?

23   A.   I did not.

24   Q.   Did others?

25   A.   Yes.

1   Q.  Did you see that happen?

2   A.  Yes, I did.

3   Q.  Would you describe what you saw?

4   A.  Can you clarify of --

10:43   5   Q.  Sure.  Tell us how you saw people -- Strike that.

6           Tell us how -- what you observed with regard to Marlo

7   doing returns.  Please explain it.

8   A.  So you would see when they started showing Marlo how to do

9   returns they would take her up to the service desk, grab the

10:43   10   cart, show her where to get them, do it with her, to put the

11   returns away.

12          And the returns could be stuff from laying from the

13   store that would be all in a centralized area.  And she would --

14   they would show her how to go get them, how to put them away.

10:43   15          It wasn't perfect every time, but she learned to do

16   that task.

17   Q.  Okay.  And did she continue to do returns well throughout

18   your exposure to her?

19   A.  Yes.

10:43   20   Q.  There was testimony yesterday that somebody came to court

21   and said that they had heard you were picking on Marlo; is that

22   true?

23   A.  No.

24   Q.  Have you ever said anything negative or disparaging to

10:44   25   Marlo?

311

1    A.  I never have, no.

2    Q.  Do you have any experience with people with disabilities?

3    A.  Yes.

4    Q.  Would you tell us about that?

10:44    5    A.  I have a son with disabilities.  He's 14 years old.

6    Q.  What kind of disability does he have?

7    A.  He has epilepsy seizures, and he has extreme developmental

8    delays, and has social outbursts also.

9    Q.  And you said he was 14?

10:44    10    A.  Yes.

11    Q.  So are you sensitive to people with disabilities?

12    A.  Yes, I am.

13    Q.  Before November 2014, did Marlo's work schedule change

14    occasionally?

10:45    15    A.  That I don't recall.

16    Q.  Before November 2014, did you ever have a conversation with

17    Amy Jo Stevenson?

18    A.  I did not.

19    Q.  With Sandy Barnes?

10:45    20    A.  No.

21    Q.  When something came up at work with Marlo, did you deal

22    directly with Marlo about it?

23        MS. CARTER:  Objection, leading.

24        THE COURT:  Overruled.

10:45    25    BY MR. BURNETT:

312

1  Q.  Let me restate the question.  Do you recall any problems

2  with Marlo over the years that you were required to call upon

3  others besides Marlo to deal with?

4  A.  No.

10:46  5  Q.  After November 2014, did scheduling changes occur at

6  Walmart?

7  A.  Yes.

8  Q.  Would you describe the circumstances surrounding those?

9  A.  It was called customer first scheduling.  So it was

10:46  10  generated scheduling that was based around customer traffic in

11  the store.

12  Q.  And did you observe any change in Marlo's schedule?

13  A.  I did not.

14  Q.  Did you hear about any issues involving Marlo and

10:46  15  attendance?

16  A.  Yes.

17  Q.  Who did you speak with and what did you hear?

18  A.  I overheard it in the management office.

19  Q.  And what did you hear?

10:46  20  A.  Just about Marlo's attendance.

21  Q.  Who were you overhearing?

22  A.  It was Karen and Bonnie.

23  Q.  Karen Becker, Bonnie Popp?

24  A.  Yes.

10:47  25  Q.  What were their roles?

313

1    A.   Bonnie Popp was the comanager over that area, and Karen

2    Becker was the personnel.

3    Q.   Okay.  When you say Bonnie Popp was the comanager over that

4    area, would you explain what that means?

10:47  5    A.   So there's comanagers throughout the whole store.  We each

6    had areas and there was -- I was over the food/consumable side,

7    Bonnie was over the -- it was called the hard line side.  We had

8    a backroom comanager and an overnight manager.

9    Q.   Okay.  Who was the supervisor responsible for Marlo's

10:47  10   attendance after November of 2014?

11   A.   As far as salaried manager?

12   Q.   Yes.

13   A.   Bonnie Popp.

14   Q.   Do you recall a meeting in January of 2015 where Marlo was

10:48  15   counseled?

16   A.   Yes.

17   Q.   Where did that meeting happen?

18   A.   In the management office.

19   Q.   And who attended it?

10:48  20   A.   Julie, myself, and Marlo.

21   Q.   And why were you there?

22   A.   Just to be a witness.

23   Q.   What was the purpose of the meeting?

24   A.   Just to have a verbal discussion with Marlo about her

10:48  25   attendance again.

1    Q.  Did you say anything at that meeting?

2    A.  Yes.

3    Q.  What would you have said?

4    A.  I recall asking her why she was not working her scheduled

5    shifts.

6    Q.  Did Marlo respond?

7    A.  Not until I asked her to repeat what we were saying, and she

8    did respond by saying, yes, that she needed to work her

9    scheduled shifts.

10   Q.  Okay.  So why did you ask her to repeat?

11   A.  Just to make sure that she understood.

12   Q.  Was that something that you would ordinarily do with an

13   employee?

14   A.  Yes.

15   Q.  Did you encounter anything in that meeting with Marlo that

16   led you to believe she didn't understand why she was there?

17   A.  No.

18   Q.  Or what she was being asked to do?

19   A.  No.

20   Q.  Or what she was -- or what was expected of her?

21          MS. CARTER:  Objection, foundation.  Speculation.

22          THE COURT:  Overruled.

23   BY MR. BURNETT:

24   Q.  Do you have the question in mind?  Or do you want me to

25   repeat it?

1    A.  Could you repeat that?

2    Q.  Sure.  Did you encounter anything at that meeting that led

3    you to believe that Marlo didn't understand what was expected of

4    her?

10:49    5    A.  No.

6    Q.  Did she provide any explanation that you can recall at that

7    meeting as to why she wasn't working her schedule?

8    A.  Yes, that she was afraid that she was going to miss the bus.

9    Q.  Did somebody explain to Marlo at that meeting as to whether

10:50    10    or not she was likely to miss the bus?

11              MS. CARTER:  Objection, leading.

12              THE COURT:  Overruled.  Can you answer it?

13              THE WITNESS:  Can you repeat it again?  I'm sorry.

14    BY MR. BURNETT:

10:50    15    Q.  Did anybody respond to Marlo's concerns at that meeting as

16    to whether -- about missing the bus?

17    A.  I don't recall.

18    Q.  You also talked about being present at a meeting after Marlo

19    was let go; do you remember that?

10:51    20    A.  Yes.

21    Q.  Again, where did that meeting happen?

22    A.  Also in the management office.

23    Q.  And, again, who was present?

24    A.  Marlo, Amy Jo, Susan Barnes, Bonnie Popp, Karen Becker, and

10:51    25    myself.

316

1    Q.  And how long would that meeting have lasted; do you know?

2    A.  Offhand I can't remember.

3    Q.  How did the meeting start out, can you tell us?

4    A.  Like the atmosphere or the like --

10:51  5    Q.  Well start with the atmosphere.  What was the atmosphere

6    like?

7    A.  It was laid back.  Everybody was calm, talking.

8    Q.  Okay.  And who spoke first, if you know?

9    A.  I don't recall.

10:52  10    Q.  How did the meeting evolve?

11    A.  We just started talking about Marlo.  I remember Susan

12    Barnes talking about Marlo growing up, potty training her.  I

13    talked a little bit about my son back and forth with Susan.

14    Then Amy Jo started asking about the scheduling and why she

10:52  15    couldn't be rehired.

16    Q.  Sounds like your memory's a little vague.

17    A.  Yeah.

18    Q.  Got it.  Do you recall the message Amy Jo Stevenson

19    communicated at that meeting about rehiring Marlo?

10:52  20    A.  Yes, that if we did not rehire or reinstate her that,

21    according to the ADA act, she would take further action.

22    Q.  What did you interpret that to mean?

23    A.  That she was going to seek legal action.  Basically I took

24    it as a threat; that if we didn't rehire her, or reinstate her,

10:53  25    whichever, that she was going to seek legal action.

317

1    Q.   What did Walmart policy require you to do under those

2    circumstances?

3    A.   At that time then we just end the conversation and we report

4    it to the ethics hotline.

10:53   5    Q.   Is that what happened?

6    A.   Yes.

7    Q.   So you made that report and we went through that.  Was there

8    an investigation that was done into the decision to terminate

9    Marlo?

10:53   10   A.   Yes.

11   Q.   And who conducted that investigation?

12   A.   That would have been all done through the red book

13   investigation.

14   Q.   You were not involved in that?

10:53   15   A.   Just interviewed for it.

16   Q.   Got it.  And we saw some of that and we'll go through that

17   in a little bit.  At the end of the day, did you hear the

18   results of that investigation?

19   A.   Yes.

10:54   20   Q.   What was concluded?

21   A.   That we were still to terminate Marlo; that we weren't going

22   to reinstate her or rehire her.

23   Q.   You were told to call and tell Marlo that.

24   A.   Correct.

10:54   25   Q.   So did you call her?

318

1   A.  Yes.

2   Q.  How long did the call last?

3   A.  Less than five minutes.

4   Q.  What did you say to Marlo?

10:54   5           MS. CARTER:  Objection.  This has already been gone

6   over, Your Honor.

7           THE COURT:  Overruled.

8   BY MR. BURNETT:

9   Q.  What did you say to Marlo as best as you can recall?

10:54   10  A.  Well, it was brought clear to me in the last part that I

11  told her that she would not be rehired.

12  Q.  Are you sure you used the word "rehire" or not?

13  A.  According to my deposition, yes.

14  Q.  Okay.  And did Marlo have anything to say in response?

10:55   15  A.  Not that I recall, no.

16  Q.  Did you have any other involvement with decisions to rehire

17  or reinstate Marlo?

18  A.  I did not.

19  Q.  Okay.  What I'd like to do next, if we can, is I'd like to

10:55   20  go through some of the policies that you were shown and talk to

21  you about some parts that were not addressed.

22          So if we can go to Exhibit No. 26, that's EEOC Exhibit

23  Number 26.  That's the reinstatement.

24          MR. BURNETT:  Can we have that up, please?

10:56   25  BY MR. BURNETT:

1   Q.  That's the reinstatement and rehire policy; correct?

2   A.  Yes.

3   Q.  Are those two different terms?

4   A.  Yes.

10:56   5   Q.  Do they have two different meanings in Walmart?

6   A.  Yes.

7   Q.  The very first paragraph, do you see that under the word

8   "rehire"?

9   A.  Yes.

10:56   10   Q.  What does "rehire" mean under Walmart's policy?

11   A.  Do you want me to read it?

12   Q.  I want you to tell us.

13   A.  So rehire, you have to apply into the Walmart's online

14   hiring center.

10:57   15   Q.  So if we highlight that particular paragraph, if we could,

16   please, it says "former associates, who apply for employment and

17   are eligible for rehire, must go through the same competitive

18   selection process as all other external applicants."

19        Is that right?

10:57   20   A.  Yes.

21   Q.  So that means you just start at square 1 as if you were a

22   new person who wanted a job at Walmart.

23   A.  Correct.

24        MR. BURNETT:  Thank you.  Could you take that down?

10:57   25   BY MR. BURNETT:

1    Q.   Does the rehire process require a written application?

2    A.   It's all online.

3    Q.   Okay.  It's not oral, you don't call somebody up and say I'd

4    like a job and that's not considered an application, is it?

10:57    5              MS. CARTER:  Objection, leading.

6              MR. BURNETT:  I'll restate it.

7    BY MR. BURNETT:

8    Q.   Do people apply verbally for jobs at Walmart?

9    A.   No.

10:58    10   Q.   Then it's talks about eligibility for rehire and Marlo was

11   eligible for rehire when she was let go; correct?

12   A.   Yes.

13             MS. CARTER:  Objection, leading.  But she's already

14   answered.

10:58    15             THE COURT:  We could be here all day.

16             Go ahead, Mr. Burnett.

17             MR. BURNETT:  Thank you.

18   BY MR. BURNETT:

19   Q.   Was that explained at the termination meeting you went to?

10:58    20   The posttermination meeting with Amy Jo Stevenson, was the

21   subject of rehireability discussed?

22   A.   I do not recall.

23   Q.   Okay.  Then there's a passage under "rehire within 30 days;"

24   do you see that?

10:58    25   A.   Yes.

321

1   Q.   The first sentence says, "The rehiring center will not allow

2   a former associate to reapply for approximately 30 days, two

3   payroll periods of their termination."  What does that mean?

4   A.   The system will not let them go online and apply before

10:59   5   that.

6   Q.   Okay.  Then if we can go to the next page of that exhibit.

7   This page talks about reinstatement; is that right?

8   A.   Yes.

9   Q.   Are rehiring and reinstatement different?

10:59   10   A.   Yes.

11   Q.   How do they differ?

12   A.   A reinstatement you do not have to reapply online.

13   Q.   So this particular passage of the policy says,

14   "Reinstatement restores an associate's employment as if the

11:00   15   termination had not occurred, including an original hire date,"

16   et cetera.  Do you see that?

17   A.   Yes.

18   Q.   And that requires the approval of a human resources manager;

19   correct?

11:00   20   A.   That is correct.

21          MR. BURNETT:   If we can go to Exhibit 30.  Can we put

22   that up, please.

23   BY MR. BURNETT:

24   Q.   This is the accommodation policy that you were questioned

11:01   25   about extensively; correct?

322

1  A.  Yes.

2  Q.  If we can go to the second paragraph, the one that begins

3  "this document provides."  That says, "This document provides

4  guidelines and directives for responding to associate's requests

11:01  5  for job assistance.  Job assistance includes job aids and

6  reasonable accommodations."  Do you see that?

7  A.  Yes.

8  Q.  So what are job aids and what are reasonable accommodations?

9  A.  Job aids would be more like if somebody needed to have a

11:01  10  stool at certain points during their shift.

11        And then a reasonable accommodation is anything else

12  other than --

13  Q.  I don't mean to interrupt you, but are job aids something

14  that can be decided upon in the store?

11:02  15  A.  Yes.

16  Q.  And are reasonable accommodations something that have to be

17  referred to another part of Walmart outside the store?

18  A.  Yes.

19  Q.  What's that other part of Walmart called?

11:02  20  A.  Associate Accommodation Center.

21  Q.  Thank you.  If we can go to page 2.

22        Before we leave that.  There's a paragraph heading

23  called "Requests That Can be Approved as JAs/Job Assistance."

24  Do you see that?

11:02  25  A.  Yes.

323

1    Q.   Then if we can go to page 2, which is part of that

2    paragraph.  And if we can highlight the passage that says --

3    that addresses scheduling.

4         That says, "Minor changes to availability and

11:03  5    scheduling preferences."  That would be part of a job

6    assistance; correct?

7    A.   Yes.

8    Q.   But you weren't read this:  "Does not" -- and "not" is

9    underlined -- "include approvals of set schedules, guaranteed

11:03  10   hours, or creating special schedules."

11   A.   Correct.

12   Q.   Would returning Marlo to her original 12:00 to 4:00 schedule

13   be considered a set schedule, a guaranteed hours, or a special

14   schedule?

11:03  15   A.   I believe it would be all three.

16   Q.   Okay.  In order to get a reasonable accommodation does the

17   employee need to do something?

18   A.   She would have to have -- they'd have to give her the

19   accommodation packet, or the person could call the Accommodation

11:04  20   Center themselves.

21   Q.   Is the first thing -- let's go back to the first page if we

22   could.  Under the paragraph -- the first sentence under the

23   paragraph identifying a request for a job assistance.  See that?

24   A.   Yes.

11:04  25   Q.   Let's go highlight the first sentence if we could, please.

324

1     It says, "An associate may request job assistance in a

2     variety of ways.  He or she may make the request directly, or

3     through a family member," et cetera.  "The request may be made

4     verbally or in writing."

5     You were asked all about that on direct examination.

6     Do you remember that?

7     A.  Yes.

8     Q.  But according to this policy the associate has to request

9     it.

10    A.  Correct.

11    Q.  When you heard for the first time that Marlo wanted to

12    return to her original schedule, did you conceive that that

13    could possibly be a request for an accommodation?

14    A.  I did not, no.

15    Q.  Tell us why.

16    A.  She was asking just to be put back to her old schedule.

17    Q.  Did she say anything about needing it because of her

18    disability?

19    A.  No, she did not.

20    Q.  Marlo's got some limitations in communications; correct?

21    A.  Yes.

22    Q.  But you dealt with Marlo for many years, true?

23    A.  Mostly during the month that I worked with her.

24    Q.  Okay.  And the explanation she gave was about missing the

25    bus.

325

1    A.  Correct.

2    Q.  Anything that she said that would have alerted you in that

3    meeting that she wanted a reasonable accommodation for her

4    disability?

11:06    5    A.  No.

6    Q.  If we can go to Exhibit 32.  Page 2 if we could.

7         MR. BURNETT:  Could you highlight that paragraph that

8    starts on July 16th?

9    BY MR.  BURNETT:

11:07    10    Q.  You were talked to about the very first sentence:

11         "On July 16th, 2015, Amy Jo threatened to sue the

12    company under the Americans With Disabilities Act unless Marlo

13    was rehired."

14         But you weren't asked about this next sentence:

11:07    15         "Robin said Marlo's termination was based on

16    attendance and scheduling issues and had nothing to do with her

17    disability."

18         Is that what you told this investigator?

19    A.  Yes.

11:07    20    Q.  Is that what you believed then?

21    A.  Yes.

22    Q.  Is that what you believe now?

23    A.  Yes.

24    Q.  Why?

11:07    25    A.  I don't feel that she was actually asking for any type of

326

1    accommodation.  We gave her a schedule.

2    Q.  At any point in time -- you were asked about being asked

3    your opinion and before Marlo was discharged and that type of

4    thing.  At any point in time did anybody say we want to rid

11:08    5    ourselves of an employee who has Down syndrome?

6    A.  Never.

7    Q.  Was that ever a thought in your mind?

8    A.  No.

9    Q.  Could you discern whether anybody else believed that?

11:08   10    A.  No.

11    Q.  Did you try to help Marlo with her attendance issue?

12    A.  Besides the conversation we did have between all management

13    personnel, we would actually -- made sure she was watched by the

14    time clock to make sure she wasn't punching out early.  Her

11:09   15    supervisors during that time also would just keep an eye on her

16    to make sure she was working her scheduled shift.

17    Q.  Did you count up Marlo's occurrences before she was let go?

18    A.  Yes.

19    Q.  And did you count up how many days she had actually missed

11:09   20    work before she was let go without calling you?

21    A.  I don't recall how many offhand.

22    Q.  How many occurrences did Marlo have?

23    A.  17.

24    Q.  And when an employee has 17 occurrences, what's Walmart's

11:09   25    termination policy?

327

1    A.  That you would terminate the associate.

2    Q.  And is there -- do you recall the policy as to when an

3    employee might be terminated in terms of the number of

4    occurrences accumulated?

5    A.  At that time it was seven.

6    Q.  Any explanation as to why people waited, didn't terminate

7    Marlo at seven, didn't terminate her at 14, but did it at 17?

8    A.  They were trying to give her several chances.

9    Q.  You were asked some questions on Exhibit 32 again -- I'm

10   sorry, this is Exhibit 1013.

11           (Exhibit 1013, Coaching - March 18, 2015 [Dkt.

12   102-24], admitted previously by stipulation.)

13   BY MR. BURNETT:

14   Q.  You were asked some questions that may have suggested that

15   all the coachings Marlo got predated the change in her

16   availability form.  Do you remember that line of questioning?

17   A.  Yes.

18   Q.  And that was based on a submission that you made to the

19   investigator listing three specific dates.  Do you recall all

20   that?

21   A.  Yes.

22   Q.  Look at 1032.  I'm sorry, 1013.

23   A.  Can you tell me which exhibit number that is?

24   Q.  Do you recognize that?

25   A.  Which exhibit number is that?

328

1   Q.   That's --

2               THE COURT:   The big book.

3               THE WITNESS:   Oh.

4   BY MR. BURNETT:

11:11   5   Q.   And it might be on the screen right behind you.

6   A.   I can't see very well on that screen.

7   Q.   1013.

8   A.   Okay.

9   Q.   Do you have that in front of you?

11:11   10   A.   Yes.

11   Q.   Was that something that you were involved in?

12   A.   I was not.

13   Q.   Do you recognize the form?

14   A.   Yes.

11:11   15   Q.   And if you would read the form to yourself real quickly,

16   what does it involve?

17   A.   It's a second level of written coaching, online coaching for

18   attendance and punctuality.

19   Q.   What's the date on that?

11:12   20   A.   3/18/2015.

21   Q.   That would be after Marlo's availability form was changed;

22   correct?

23   A.   Correct.

24               MR. BURNETT:   May I have a second to talk to counsel,

11:12   25   Your Honor?

1      THE COURT:  Yeah.

2      MR. BURNETT:  Thank you.

3         (Defense counsel confer.)

4      MR. BURNETT:  That's all the questions I have.

11:12   5      THE COURT:  Okay.  Any redirect?

6      MS. CARTER:  Yes, Your Honor.  I'll try to be brief.

7                    REDIRECT EXAMINATION

8    BY MS. CARTER:

9    Q.  Ms. Castro, you told us a few minutes ago that you didn't

11:12  10   think Marlo's request had anything to do with her limitations?

11   A.  No, I did not.

12   Q.  Ms. Castro, we heard you testify about teaching Marlo new

13   tasks like dusting; right?

14   A.  Yes.

11:13  15   Q.  And others teaching Marlo to do returns; right?

16   A.  Yes.

17   Q.  And you testified that to teach Marlo to do returns her

18   supervisors did the task with her; right?

19   A.  Yes.

11:13  20   Q.  And is it fair to say that Marlo can adjust to change with

21   the right amount of support?

22   A.  Yes.

23   Q.  When Marlo learned how to do -- how to dust the coffee

24   makers, right?  You testified about that, that you taught her or

11:13  25   you told her to learn how to dust coffee makers; right?

1   A.  Yes.

2   Q.  Was Marlo working her noon to 4:00 schedule when you told

3   her to learn how to dust coffee makers?

4   A.  No.

11:13   5   Q.  When was --

6   A.  Yes, she was.  Sorry.

7   Q.  So Marlo was working her noon to 4:00 schedule when she

8   learned how to dust coffee makers.

9   A.  Yes.

11:14   10   Q.  And Marlo was working her noon to 4:00 schedule when she

11   learned how to do returns.

12   A.  That I don't recall the timeline.

13   Q.  Would you say that Marlo learned to do returns more than a

14   year before she was terminated?

11:14   15   A.  It's possible.  But, like I said, I don't recall the

16   timeline of that.

17   Q.  Now, you were asked a few moments ago about Walmart's rehire

18   and reinstatement policy.  That was Exhibit 26.

19   A.  Yes.

11:14   20   Q.  You said -- you mentioned that Marlo had not reapplied.

21   A.  Correct.

22   Q.  But you told Marlo Spaeth that Walmart would not be able to

23   rehire her, didn't you?

24   A.  Yes.

11:15   25   Q.  And you called her more than 30 days after Marlo was fired;

1    right?

2    A.  Yes.

3    Q.  And you didn't mention anything about submitting an

4    application, did you?

11:15    5    A.  I did not.

6    Q.  And Marlo's family met with Walmart less than 30 days after

7    Marlo was fired; correct?

8    A.  Yes.

9    Q.  And that was when Amy Jo Stevenson verbally requested that

11:15    10    Marlo be given her job back; correct?

11    A.  Yes.

12    Q.  And you testified a few moments ago that an associate cannot

13    reapply within 30 days of their termination; is that correct?

14    A.  Yes.

11:15    15    Q.  Because the system won't even allow them to submit the

16    application; correct?

17    A.  Correct.

18    Q.  So at the time that Amy Jo Stevenson asked for Marlo to be

19    given her job back, she couldn't submit an application; correct?

11:15    20    A.  That is correct.

21    Q.  And then the next thing that Marlo heard from you is that

22    Walmart would not be able to rehire her.

23    A.  Yes.

24    Q.  Okay.  Let's talk about Exhibit 30.

11:16    25              A few moments ago Mr. Burnett asked you about job

332

1    aids; right?

2    A.  Yes.

3    Q.  The kinds of job aids that can be approved in store;

4    correct?

11:16  5    A.  Yes.

6    Q.  Versus the kind that cannot be approved in store; correct?

7    A.  Yes.

8    Q.  And he directed you to look at the second page of Exhibit 30

9    where it mentions scheduling job aids, scheduling

11:16  10   accommodations; correct?

11   A.  Yes.

12   Q.  And it says, "Scheduling.  Minor changes to availability and

13   scheduling preferences can be approved in store."  Correct?

14   A.  Yes.

11:17  15   Q.  And that requests for set schedules, guaranteed hours, or

16   special schedules cannot be approved in store; correct?

17   A.  Correct.

18   Q.  And you testified that Marlo Spaeth asked for a set

19   schedule; correct?

11:17  20   A.  Yes.

21   Q.  In fact, you said she asked for all three of the things that

22   could not be approved in store; correct?

23   A.  Correct.

24   Q.  And what were you supposed to do under this policy if you

11:17  25   received a request that could not be approved in store?

333

1    A.   (No response.)

2    Q.   You were supposed to forward it to the Accommodations

3    Services Center, weren't you?

4    A.   Yes.

11:17    5    Q.   But you didn't.

6    A.   Nope.

7    Q.   And no one else did.

8    A.   No.

9         MS. CARTER:  No further questions for this witness,

11:18    10   Your Honor.  Thank you, Ms. Castro.

11        THE COURT:  You can step down then.

12        (Witness excused at 11:18 a.m.)

13        THE COURT:  Plaintiff may call their next witness.

14        Thank you, Ms. Castro.

11:18    15        MS. VANCE:  Your Honor, at this time the EEOC would

16   like to read in deposition designations from Lee Spude.

17        THE COURT:  Okay.

18        MR. HARLAN:  Your Honor, if I can just make a request.

19   Is it possible to get the page number and line numbers as

11:19    20   they're being read?  Because the last time they were just read

21   consistently and I couldn't tell what lines were being read.  So

22   we can keep track.

23        MS. VANCE:  To announce the page?

24        MR. HARLAN:  Yeah, just the page would be fine.  I can

11:19    25   obviously track --

334

1          MR. MULAIRE:  I believe these were all provided to

2      counsel prior to the trial.

3          THE COURT:  They're highlighted, yeah.  This is

4      document no. 223.  But if you don't have that with you,

11:19  5      Mr. Harlan, maybe you can just read it as you move to a

6      different spot?

7          MR. HARLAN:  Thank you.

8          THE COURT:  Like if you're going to begin on page, I

9      guess it's 56, and then when you move to a new spot say the new

11:19  10     page number.

11         MR. MULAIRE:  We don't have to announce each page

12     turn?

13         THE COURT:  Right.

14         MR. MULAIRE:  Okay.

11:20  15     MS. VANCE:  The EEOC will now read excerpts from the

16     deposition of Lee Spude.  This deposition was taken November

17     14th, 2018.

18         LEE SPUDE, PLAINTIFF WITNESS, VIA DEPOSITION

19              DESIGNATIONS READ AS FOLLOWS:

11:20  20   Q.  Good afternoon, Mr. Spude, would you please state your full

21     name for the record.

22   A.  Lee David Spude.

23   Q.  What is your title professionally at your job?

24   A.  Market human resource manager, commonly referred to as MHRM.

11:20  25   Q.  Am I right that the Manitowoc Walmart store was within your

335

1    scope of management in 2014 and 2015?

2    A.  Yes.  I was enrolled at the very end of 2014.  So when you

3    asked me if I was in scope in 2014 and '15, it would have been

4    as long as I held the position, which was very late in 2014 and

11:21  5    then through 2015.

6    Q.  And is that the same position you're currently in?

7    A.  Yes.

8                          *    *    *

9          (Deposition read-in interrupted.)

11:21  10         THE COURT:  What page are you on?

11         MS. VANCE:  Now we're on page 27.

12         THE COURT:  This is now 27 of the deposition?

13         MS. VANCE:  Yes.  The transcript, Your Honor.

14         We're in Lee Spude, not in the corporate deposition.

11:21  15         THE COURT:  Oh, okay.

16         MS. VANCE:  Should we pause, Your Honor?

17         THE COURT:  Just a minute.  Go ahead.

18          (Deposition read-in resumed.)

19    Q.  Mr. Spude, if an employee at the Manitowoc store in 2015 was

11:21  20    terminated and eligible for rehire, is it correct that any

21    manager from the Manitowoc store could go into the Smart System

22    to reactivate their employment if fewer than 30 days had passed

23    from the termination?

24    A.  You are accurate that systematically any manager would be

11:22  25    able to go into the Smart System and activate an associate, and

1   that would systematically put them back into our system so long

2   as they completed it within 30 days.

3   Q.  If an employee at the Manitowoc store in 2015 was terminated

4   and eligible for rehire but more than 30 days had passed, is it

11:22  5   true that you personally, as market human resources manager, you

6   are the person who could reactivate the employment of that

7   employee in the Smart System?

8   A.  That is correct.  Me, or anyone at my level or higher could

9   initiate the reinstatement process.

11:22  10   Q.  And that's in the Smart System; correct?

11   A.  In -- I'm sorry, I misunderstood your question.  So the

12   answer is no.  As a market human resource manager I don't have

13   the ability to initiate anything in the Smart System.  However,

14   we have a separate reinstatement process that I would be able to

11:23  15   initiate at market level after 30 days have passed.

16           (Deposition read-in concluded at 11:23 a.m.)

17                   *    *    *

18           MR. MULAIRE:  That concludes the deposition.

19           MS. VANCE:  Thank you.  That concludes the deposition

11:23  20   reading from Lee Spude, November 14th, 2018.

21           And, Your Honor, next at this time the EEOC will read

22   excerpts from the deposition of Denise Morgan taken March 1st,

23   2019.

24       LINDA DENISE MORGAN, PLAINTIFF WITNESS, VIA DEPOSITION

11:24  25               DESIGNATIONS READ AS FOLLOWS:

337

1    Q.  Would you please state your full name for the record.

2    A.  Linda Denise Morgan.

3    Q.  Are you currently working in headquarters?

4    A.  Yes.

11:24   5    Q.  Am I right that you've never worked in a Walmart store?

6    A.  I have not.

7    Q.  What is your job title in July of 2015?

8    A.  Ethics manager.

9    Q.  What was the name of the department that you worked in as

11:24  10   ethics manager?

11   A.  Ethics.

12   Q.  In your words, can you tell me, in general, what is the

13   Global Ethics hotline?

14                              *     *     *

11:25  15             (Deposition read-in interrupted.)

16             MR. HARLAN:  What page is that?

17             MS. VANCE:  26.

18             MR. HARLAN:  25?

19             MS. VANCE:  Starts at 25, yes.

11:25  20             MR. HARLAN:  Thank you.

21             (Deposition read-in resumed.)

22   A.  It's a number where associates and customers can report

23   concerns about Walmart.

24   Q.  The types of Global Ethics hotline reports that you would

11:25  25   investigate include disability discrimination; correct?

338

1   A.  Yes.

2   Q.  Ms. Morgan, I'll direct your attention to what's been

3   admitted as Exhibit 32.  Do you recognize this document?

4                        *     *     *

11:25   5            (Deposition read-in interrupted.)

6                MS. VANCE:  And, Lectrice, can we have 32 come up?

7            (Deposition read-in resumed.)

8   Q.  Do you recognize this document?

9   A.  I do.

11:26   10  Q.  What is it?

11  A.  It's the case details that came in through the ethics

12  hotline.

13  Q.  Who is the subject of these case details?

14  A.  Julia Stern and Bonnie Popp.

11:26   15  Q.  In Exhibit 32 who is the person who made the report?

16  A.  Robin Castro.

17  Q.  I believe you testified that you investigated several types

18  of reports to the Global Ethics hotline.  Among them are

19  business misconduct reports as one category, and discrimination

11:26   20  or harassment reports as another kind of category; is that

21  correct?

22  A.  That's correct.

23  Q.  How would you characterize, knowing those categories,

24  Exhibit 32?

11:27   25  A.  This was classified as a disability discrimination.

1    Q.  If Julia Stern is listed as one of the subjects of the

2    investigation, is it a fair statement that the investigation

3    then is a question of is Julia Stern somebody who may have

4    discriminated on the basis of disability?

11:27    5    A.  When it was reported she was listed as a subject regarding

6    the disability discrimination.

7    Q.  What does it mean that she's a subject?

8    A.  That she was involved in the allegations that were reported.

9    Q.  Does it mean that she was involved as one of the people who

11:27    10    should be investigated for whether or not there was disability

11    discrimination against a Walmart associate?

12    A.  Correct.

13    Q.  And that same line of questioning, Bonnie Popp is also

14    listed as a subject; correct?

11:28    15    A.  Correct.

16    Q.  Ms. Morgan, did you review the performance evaluations of

17    Marlo Spaeth?

18    A.  No.

19    Q.  Is there a way from reading Exhibit 32 that you can tell who

11:28    20    you assigned or who you determined would be the investigator?

21    A.  Yes.

22    Q.  Show me, please.

23    A.  If you go back to page D1014, the first page.  It has --

24    under "parties involved" it has Kent Abitz as the authorized

11:28    25    assignment.  And then his job title shows SM for store manager.

340

1    Whoever in the parties involved is the authorized assignment,

2    that's who's assigned as the investigating manager.

3    Q.   Who makes the determination about which people -- in this

4    situation, who made the determination about which people would

11:29    5    be listed in the recap report for Kent Abitz to interview?

6    A.   I would have made that designation on the report that was

7    sent to him based on the information that was received from the

8    caller.

9    Q.   Okay.  I'm handing you what's been marked as Exhibit 33.

11:29    10    I'd ask you to look through that document and let me know if you

11    recognize this document.  What is Exhibit 33?

12    A.   Yes, I recognize it.  There are emails and also a copy of

13    the investigation recap.

14    Q.   So then I'll direct your attention to the page marked D1045,

11:30    15    page 2.  We see the reporter's name is Amy Jo, last name

16    unknown; correct?

17    A.   Correct.

18    Q.   Did you fill out that information in the investigation

19    recap?

11:30    20    A.   Yes.

21    Q.   The recorder's position, this refers to Amy Jo's position,

22    and am I right that you filled out Marlo's sister and legal

23    guardian?

24    A.   Yes.

11:30    25    Q.   And the store does not have paperwork regarding legal

1    guardian; is that correct?

2    A.   That's correct.

3    Q.   Then for our next section, other parties involved, I see a

4    list of four names:  Marlo Spaeth, former associate; Julia

11:31  5    Stern, assistant store manager; Bonnie Popp, spelled P-o-p-p,

6    SHM; and Robin Castro, SHM.

7         Do you follow where I'm at?

8    A.   Yes, I do.

9    Q.   I see an X in the row with Marlo Spaeth's name by "other

11:31  10   party involved."  Can you tell me, what does that mean?

11   A.   Other involved party, that's just someone that's not the

12   subject but they are an involved party.

13   Q.   So to Kent Abitz, what does it mean to have Marlo Spaeth

14   listed as an other involved party for the purposes of his work

11:31  15   to complete this recap report?

16   A.   Well, she was an other involved party because she was a

17   former associate, and the investigation was regarding her

18   termination.

19   Q.   How does Kent Abitz know what you want -- know who you want

11:32  20   him to interview -- or how did Kent Abitz know who you wanted

21   him to interview?

22   A.   On page D1044, where it says "Interviews," "interview all

23   parties involved and obtain statements."

24                    *    *    *

11:32  25        (Deposition read-in interrupted.)

342

1        MS. VANCE:  And, Lectrice, can we get page 1 of the

2   exhibit, please?  There it is.  Thank you.

3        (Deposition read-in resumed.)

4   Q.  So interview all parties involved and obtain statements

11:32  5   would be -- would include Marlo Spaeth who is designated as

6   other party involved; correct?

7   A.  Yes.

8   Q.  And it would include Julia Stern; correct?

9   A.  Yes.

11:32 10   Q.  And it would include Bonnie Popp; correct?

11   A.  Yes.

12   Q.  And it would include Robin Castro; right?

13   A.  Yes.

14   Q.  Is the reporter who here we have Amy Jo, last name unknown,

11:32 15   included in that instruction, "interview all parties involved

16   and obtain statements"?

17   A.  Yes.

18   Q.  The documentation we have shows that you didn't review any

19   emails about Marlo that were internal Walmart emails; correct?

11:33 20   A.  That's correct.  I don't recall seeing that email.

21   Q.  I want to make sure I understand your answer.  Am I right

22   that on July 30th, you gave Kent Abitz an investigation recap

23   form that should have caused him to interview Amy Jo, last name

24   unknown, as the reporter, and Marlo Spaeth as other party

11:33 25   involved; is that correct?

343

1    A.   The investigation recap listed Amy Jo as the reporter, and

2    Marlo as a former associate, as other involved party that I sent

3    to Kent Abitz.

4    Q.   An investigation that never included an interview of Amy Jo;

11:33  5    right?

6    A.   Correct.  She was not interviewed.

7    Q.   The investigation also did not include any questioning of

8    Marlo Spaeth; correct?

9    A.   It did not.  So she was a former associate.

10           (Deposition read-in concluded at 11:34 a.m.)

11                   *    *    *

12           MS. VANCE:  That ends the reading from the deposition

13   of Denise Morgan.  And, Your Honor, at this time plaintiff will

14   call Marlo Spaeth.

11:36  15           THE CLERK:  Ms. Spaeth, please raise your right hand.

16           MARLO SPAETH, PLAINTIFF WITNESS, DULY SWORN

17           THE CLERK:  Thank you.

18           MS. CARTER:  Can you hear her okay?

19           THE COURT:  Yup.  Go ahead.

11:36  20                   DIRECT EXAMINATION

21   BY MS. CARTER:

22   Q.   Hey, Marlo, can you look over at me?  Can you hear me,

23   Marlo?

24   A.   (No response.)

11:36  25           MS. CARTER:  Can I approach?

344

1      THE COURT:  Sure.  Uh-huh.

2      MS. CARTER:  Is it okay if I ask her questions while

3  standing?

4      THE COURT:  Yes.

11:37  5  BY MS. CARTER:

6  Q.  So take a minute and get comfortable and let me know when

7  you're ready, okay?

8  A.  I am ready.

9  Q.  You're ready?  Good.  Can you tell us your name?

11:37  10  A.  Marlo Spaeth.

11  Q.  And how are you feeling today, Marlo?

12  A.  Good.  Nervous.

13  Q.  Nervous?  Yeah?  Will you tell us the truth today?

14  A.  Like what?

11:37  15  Q.  Like if I ask you a question, will you tell us the truth?

16  You're nodding.  Is that a yes?

17  A.  Yes.

18  Q.  Okay, Marlo, let's get to know you a little better.  All

19  right?  Who is Amy?

11:38  20  A.  My sister, Amy.

21  Q.  Your sister, Amy?  Does Amy make good cookies?

22  A.  Yes.

23  Q.  They're good cookies; right?  What kind of cookies does Amy

24  make?

11:38  25  A.  Peanut butter, chocolate chip, and sugar cookies.

345

1  Q.  Peanut butter, chocolate chip, and sugar cookies?

2  A.  Yes.

3  Q.  And what kind is your favorite?

4  A.  Both.

11:38  5  Q.  Both.  And where do you live, Marlo?

6  A.  Manitowoc.

7  Q.  Manitowoc?  Is there a grocery store near your house?

8  A.  Piggly Wiggly.

9  Q.  That's near your house?  Yes?

11:38  10  A.  Yes.

11  Q.  Do you live with anyone?

12  A.  My sister, Barb.  My stepsister.

13  Q.  Your stepsister, Barb?

14  A.  Yes.

11:39  15  Q.  Do you like living with Barb?

16  A.  Yes.

17  Q.  Yes?  What time do you wake up in the morning, Marlo?

18  A.  About 7:00.

19  Q.  About 7:00?

11:39  20  A.  Yup.

21  Q.  And when do you eat breakfast?

22  A.  8:00.

23  Q.  8:00?

24  A.  (Nods head.)

11:39  25  Q.  And what do you do after breakfast?

346

```
     1   A.  Help Barb with the dishes.

     2   Q.  You help Barb with the dishes?

     3   A.  Yeah.  Sometimes I make beds, too.

     4   Q.  Sometimes you make the beds?

11:39 5   A.  Yeah.

     6   Q.  And what do you do after that?

     7   A.  Do some laundry.

     8   Q.  Do some laundry?

     9   A.  Watch TV, too.

11:39 10  Q.  And watch TV too?  What do you watch on TV?

    11   A.  Price is Right.

    12   Q.  Price is Right?

    13   A.  Golden Girls first.

    14   Q.  So you watch Golden Girls first and then Price is Right?

11:40 15  A.  Game Show.

    16   Q.  And the Game Show?

    17   A.  Yeah.

    18   Q.  And then Price is Right.

    19   A.  Right.

11:40 20  Q.  What time does Price is Right come on?

    21   A.  10:00.

    22   Q.  Does it come on more than once a day?

    23   A.  (Nods head.)

    24   Q.  What's the second time it comes on?

11:40 25  A.  At night.
```

347

1   Q.  At night?  What time at night?

2   A.  7:00.

3   Q.  7:00?  Okay.  Who is your favorite person on the Price is

4   Right?

5   A.  Bob Barker.

6   Q.  You like Bob Barker?  All right.

7   A.  There's a different guy, too.

8   Q.  What's that?

9   A.  There's a different guy in there, too.  Drew Carey.

10  Q.  A different guy in there too, Drew Carey?

11  A.  Yeah.

12  Q.  Okay.  What do you do after Price is Right?

13  A.  Watch my soap operas.

14  Q.  You watch your soap operas?

15  A.  Uh-huh.

16  Q.  What soap operas do you watch?

17  A.  Young and the Restless, Days of our Lives, and General

18  Hospital.

19  Q.  Young and the Restless, Days of our Lives, and General

20  Hospital?

21  A.  Yeah.

22  Q.  Do you have a favorite?

23  A.  Can't remember.

24  Q.  You can't choose?  Okay.  When do you eat lunch?  What time

25  do you eat lunch?

11:40

11:40

11:40

11:41

11:41

348

1    A.  11:30 or noon.

2    Q.  11:30 or noon?  What do you do after lunch?

3    A.  Watch my soap operas.

4    Q.  So, it's like some before lunch and some after?  Yes?

11:41    5    A.  Yes.

6    Q.  Do you like to watch baseball games?

7    A.  The Packers.

8    Q.  So you like football games.

9    A.  And the Brewers.

11:41    10   Q.  And the Brewers.  Do you have a favorite player on the

11   Packers?

12   A.  Rodgers.

13   Q.  Rodgers?

14   A.  Yeah.

11:42    15   Q.  What do you like about Rodgers?

16   A.  He's good.

17   Q.  He's good?  He's good.

18            Okay, Marlo.  Are you ready to talk about when you

19   worked at Walmart?

11:42    20   A.  I can't remember that.

21   Q.  What's that?  You said I don't want to -- okay, I'll ask you

22   a question.  When you had a job at Walmart; right?

23   A.  Right.

24   Q.  Right.  Okay.  And at Walmart what department did you work

11:42    25   in?

1    A.  Domestic.  Domestics?

2    Q.  And what was your job in domestics?

3    A.  Helping people out.

4    Q.  Helping people out.

11:42    5    A.  Yup.

6    Q.  Did you fold towels?

7    A.  Yes.  Sometimes I do returns too.

8    Q.  Sometimes you do returns too?

9    A.  Yeah.

11:43    10    Q.  Yeah.  Did you zone your area?

11    A.  (Nods head.)

12    Q.  Is that a nod yes?  Zoning?

13    A.  No.

14    Q.  But you folded the towels?

11:43    15    A.  Right.

16    Q.  And you kept the aisles neat.  Yes?

17    A.  Yes.

18    Q.  Did you like working at Walmart?

19    A.  Yes.

11:43    20    Q.  What did you like about working at Walmart?

21    A.  I liked it.

22    Q.  You liked it?  What did you like about it?

23    A.  That's a long time ago.  I can't remember.

24    Q.  A long time ago?

11:43    25    A.  Yeah.  Mom and dad were still alive yet.

1    Q.  Mom and dad were still alive.

2    A.  Yeah.  Now I got my sister, Amy.

3    Q.  Now you got your sister, Amy.

4    A.  Yeah.

11:44    5    Q.  But you remember that your mom and dad were still alive

6    then.

7    A.  (Nods head.)

8    Q.  Is that a yes?  You remember your mom and dad were still

9    alive then.

11:44    10    A.  Yeah.

11    Q.  Okay.  How did you get to work at Walmart?

12    A.  Took the bus.

13    Q.  You take the bus?  Did you eat lunch at Walmart?

14    A.  Yeah.

11:44    15    Q.  Where did you eat lunch at the Walmart?

16    A.  Subway.

17    Q.  Subway?

18    A.  Yeah.

19    Q.  Do you remember what you used to order?

11:44    20    A.  Can't remember.

21    Q.  What do you like from Subway?

22    A.  Chicken.

23    Q.  Chicken?

24    A.  Like a wrap.

11:44    25    Q.  A chicken wrap?

351

1    A.  Yeah.

2    Q.  What time did you punch in at Walmart?  Did you punch in

3    after lunch?  Is that a yes?

4    A.  First I leave.

11:45   5    Q.  First you leave?

6    A.  Yeah.

7    Q.  When?

8    A.  Can't remember.

9    Q.  When you say first you leave, are you talking about when you

11:45   10   left at 4:00?

11   A.  Yeah.

12   Q.  Are you getting sad thinking about Walmart?

13   A.  I leave about 4:00.

14   Q.  You leave at 4:00?

11:45   15   A.  Yeah, I take the bus home.

16   Q.  You take the bus home.

17   A.  Uh-huh.

18   Q.  Did you have a noon to 4:00 schedule when you worked at

19   Walmart?

11:46   20   A.  Noon to 4:00.

21   Q.  Noon to 4:00.  What time did the bus that you took home

22   leave Walmart?  What time was the bus you took home?

23   A.  I got home about 4:00.

24   Q.  You got home about 4:00?  What time did that bus get to

11:46   25   Walmart?

352

1    A.  (No response.)

2    Q.  Did the bus you took home get to Walmart after 4:00?

3    A.  (Nods head.)

4    Q.  Is that a yes?

11:46   5    A.  Yes.

6    Q.  I'm sorry.  Can you put your hand down because we can't hear

7    you.  Thank you, sweetheart.

8    A.  Sorry.

9    Q.  So the bus that you took home left about 4:00 from Walmart?

11:46   10   A.  Yeah.

11   Q.  Okay.

12   A.  I remember now.

13   Q.  You remember now?

14   A.  Yeah.

11:46   15   Q.  About 4:00?

16   A.  I get home about 5:00.

17   Q.  And you'd be home about 5:00.

18   A.  I remember now.

19   Q.  You remember now?  Okay.

11:47   20   A.  Yeah.

21   Q.  And when you got home around 5:00, is that when you would

22   have dinner?

23   A.  (Nods head.)

24   Q.  Is that a yes?

11:47   25   A.  Yes.

353

1   Q.  Can you move up to the microphone for me, honey?  Scooch up

2   a little bit.

3   A.  Yes.

4   Q.  Did you eat dinner with Barb, your sister Barb?  Yes?

11:47   5   A.  Yes.

6   Q.  When you worked at Walmart did anyone tell you you had to

7   work past 4:00?

8   A.  I can't remember.

9   Q.  Do you remember if you asked anyone if you could leave at

11:47   10   4:00?

11   A.  Yes.

12   Q.  Yes?  Who did you ask if you could leave at 4:00?

13   A.  Karen.

14   Q.  Karen?  Is that Karen Becker?

11:48   15   A.  Uh-huh.

16   Q.  The HR lady?

17   A.  Yup.

18   Q.  Why did you ask to leave work at 4:00?

19   A.  I can't remember though.  Noon to 4:00.

11:48   20   Q.  Noon to 4:00 is when you worked?

21   A.  Yeah.

22   Q.  But so that's why you asked to leave.

23   A.  Right.

24   Q.  Oh, okay.  Because you work noon to 4:00.  Do you still work

11:48   25   at Walmart?

1    A.  No, I got fired.

2    Q.  Who fired you?

3    A.  Julia and Robin.

4    Q.  Why?

11:48    5    A.  I don't know what happened.

6    Q.  You don't know what happened?

7    A.  I told Amy about it.

8    Q.  You told Amy about it?

9    A.  Yup.

11:49    10    Q.  What did you tell Amy?

11    A.  She knows about it already.

12    Q.  Can you tell us what you told Amy?  She knows about it

13    already I know, but can you tell us what you told Amy?

14    A.  Yeah, she knows.  I can't remember.

11:49    15    Q.  You can't remember exactly what you told her?

16    A.  No.

17    Q.  That's okay.  So you said Julie and Robin fired you.

18    A.  And Debbie too.

19    Q.  And Debbie too.

11:49    20    A.  Yeah.

21    Q.  What did they say when they fired you?

22    A.  I walked back to take the bus.

23    Q.  That you walked back to take the bus, that's what they said?

24    A.  Yes.

11:49    25    Q.  Did they say anything else?

355

1    A.   Nothing.  I walked out.

2    Q.   You walked out to take the bus?

3    A.   Yeah.

4    Q.   The bus that you took home every day.

11:50  5    A.   About 4:00 something.

6    Q.   About 4:00 something?

7    A.   Yeah, at 4:00.

8    Q.   That was your bus?  Yeah?

9    A.   Yes.

11:50  10   Q.   After you got fired that day did you take that bus home?

11   A.   Yes, I did.

12   Q.   Yes, you did?  Yes, you did you said?  What time was that

13   bus, the bus that you took home the day you got fired?

14   A.   About 2:00 something.

11:50  15   Q.   It was -- oh, you think?

16   A.   About 2:00.

17   Q.   Did you get fired before the end of your shift?

18   A.   Yeah.

19   Q.   Oh.  When you got fired how did it make you feel?

11:50  20   A.   Upset.

21   Q.   Upset?

22   A.   Yup.

23   Q.   Why were you upset?

24   A.   I told mom and dad about that.

11:51  25   Q.   You told your mom and dad about that?

356

1   A.   They were still alive yet.

2   Q.   When they were still alive.

3   A.   Yeah.

4   Q.   What did you say to mom and dad about it?

5   A.   Upset.

6   Q.   Is that you were upset.

7   A.   Yup.

8   Q.   Why were you upset?

9   A.   I missed my job.

10  Q.   You miss your job?  I'm sorry.

11          Did you cry when Walmart fired you?

12  A.   Yes, I did.

13  Q.   Yes, you did?

14  A.   Barb saw me crying.

15  Q.   Barb saw you crying.  I'm sorry.  Are you still sad when you

16  think about getting fired by Walmart?

17  A.   Yes, I do.

18  Q.   Yes?  You do?

19  A.   Yeah.  Yeah.

20  Q.   Does it make you sad when you see a Walmart truck?  Yeah?

21  A.   Yeah.

22  Q.   What do you feel when you see a Walmart truck?

23  A.   I can't remember.

24  Q.   It just makes you sad?

25  A.   Right.

357

1   Q.  Does it make you sad when you see Walmart on TV?

2   A.  My sister gets sad too.

3   Q.  Your sister gets sad too when she sees Walmart on TV?

4   A.  Yeah.

11:52  5   Q.  You said you missed your job, what do you miss about working

6   at Walmart?

7   A.  Can't remember.  It's a long time.

8   Q.  You can't remember anything in particular?  Do you remember

9   what you liked about your job?

11:52  10  A.  I liked it.

11  Q.  That you liked it.

12  A.  Yeah.

13  Q.  That's what you remember.  Did you like meeting people?

14  A.  Yeah.

11:52  15  Q.  Did you like helping the customers?

16  A.  Yes.

17  Q.  Did you like doing returns?

18  A.  Yes.

19  Q.  What else did you like?

11:53  20  A.  Sometimes I put stuff away on the shelves.

21  Q.  Sometimes you put the stuff away on the shelves?

22  A.  Yeah.

23  Q.  You liked that.

24  A.  Yeah.

11:53  25  Q.  Marlo, do you want your job back?

358

1   A.  Yes.

2   Q.  Yes?  Why do you want your job back?

3   A.  I miss it, miss all the people.

4   Q.  You miss all the people?  Yeah.  Is there anything else you

5   want to say to us about Walmart?

6   A.  That I miss everybody.

7   Q.  You miss everybody?  Okay.

8           I don't have any more questions for you right now.

9   Walmart's lawyers might have some questions for you, okay?  So

10  stay put and I'll come back and get you when we're done, okay?

11  All right.

12          THE COURT:  Go ahead, Mr. Harlan.

13                      CROSS-EXAMINATION

14  BY MR. HARLAN:

15  Q.  Good morning, Ms. Spaeth, you remember me from our

16  deposition a couple years ago?  Would you like me to come near

17  you?

18  A.  If you want to.

19  Q.  How have you been doing?  Do you recognize me from our

20  deposition a couple years ago?  We had a nice conversation,

21  didn't we?

22  A.  Yes.

23  Q.  I promise you, I'm just going to ask you a few questions,

24  okay?

25  A.  All right.

1   Q.   So in terms of the teams that you like, I didn't hear

2   anything about the Bucks, you don't like the Bucks?

3   A.   The Bucks I like.

4   Q.   Okay.  They're doing well this year.

5   A.   The Packers does.

6   Q.   Okay.  And the Brew Crew.

7   A.   And the Brewers I like a lot.

8   Q.   So one of the things that counsel for the EEOC didn't ask

9   you about that we talked about at your deposition was all the

10  activities that you liked to do.  Like I remember you telling me

11  about bocce ball.  I can barely pronounce it.  But that's

12  something that you told me at the deposition that you really

13  liked to do; right?

14  A.   Yup.

15  Q.   And are you still doing that today?

16  A.   No.

17  Q.   And you also told me about the Special Olympics; right?

18  A.   Yes.

19  Q.   And are you still involved in Special Olympics?

20  A.   Yup.

21  Q.   Tell the jury and Judge Griesbach what you like to do with

22  the Special Olympics.

23  A.   I do bocce ball.  Bowling.  Swimming.

24  Q.   Does Barb do bowling as well?

25  A.   Yeah.

360

1   Q.  Who is better, you or Barb?

2   A.  Both.

3           (General laughter.)

4   BY MR. HARLAN:

11:56  5   Q.  We may be seeing Barb later so I'll keep that between you

6   and us.

7   A.  Okay.

8   Q.  So I just had really a couple more questions and then I'm

9   going to let you get on with your day.  Thank you very much for

11:56  10  spending time with us and helping us understand your perspective

11  in this case.

12  A.  Okay.

13  Q.  Counsel asked you about your time at Walmart and I

14  understand you miss the people there.  She also asked you about

11:56  15  your schedule and you said it was noon to 4:00, but you remember

16  at some point your schedule changed to 1:00 to 5:30; correct?

17  A.  Yes.

18  Q.  And you mentioned Robin and Julie, those were people who

19  were managers.

11:56  20  A.  Julie too.

21  Q.  Do you remember at some point they told you that you were

22  going to get in trouble if you left early?

23  A.  Robin.  And Debbie.

24  Q.  Okay.  And we're going to hear from your roommate.  You have

11:57  25  a good relationship with Barbara, don't you?

361

1   A.  Yes.

2   Q.  Would you say she's probably somebody who knows you better

3   than anybody in the world at this point?

4   A.  Can't remember.

11:57  5   Q.  You like her, don't you?

6   A.  Yeah.

7   Q.  And when you had to work later was there a point in time

8   where she told you she wasn't happy with you working later

9   because of supper having to be later?

11:57  10   A.  I can't remember that one either.

11   Q.  Why don't we just play a little clip from your deposition.

12   Do you remember when we were at your deposition we had someone

13   there recording it like on TV?  Do you remember that?

14        So I'm just going to play a little bit of your

11:58  15   deposition and then I'm going to sit down and let you go about

16   your day.

17        So deposition pages 97 through 98, lines 25 through

18   16.

19        THE COURT:  And can she see it on the screen there if

11:58  20   she wants?

21        MR. HARLAN:  Yes.  Thank you very much, Judge.  You

22   can turn and look there if you want to look.

23        MS. CARTER:  Can you give us a moment to review the

24   lines really quick?

11:58  25        MR. HARLAN:  Yeah.  So it's 97 through 98.  Lines 25

362

1    through 16.

2    BY MR. HARLAN:

3    Q.  So we're going to play a little bit from that deposition

4    where we had a conversation about Barbara and you having to come

5    home later and just have you look at it.  So I'm on 97 through

6    98, lines 25 through 16.

7                   MR. HARLAN:  Go ahead, Tracy.

8                   TECHNICIAN:  We are currently having some audio

9    problems.  The audio is not working.

10                  MR. HARLAN:  Okay.

11                  TECHNICIAN:  Hold on one second, please, Emery.

12                  THE COURT:  Perhaps you could read the transcript?

13   Maybe that would be faster.

14                  MR. HARLAN:  Yes, sir.

15                  So these were questions that I asked you and answers

16   that you gave me at your deposition:

17                  "Did your stepsister Barbara ever tell you that she

18   was not happy with you -- not happy that you were coming home

19   late for supper?

20                  "ANSWER:  Yeah.

21                  "And do you recall when she told you that, was it

22   while you were still working at Walmart?

23                  "ANSWER:  Yeah.

24                  "QUESTION:  And did she say why she wasn't happy when

25   you were coming home late?

1    "ANSWER:   (Witness nods head.)

2    "QUESTION:  Did she tell you why she was upset about

3  that?

4    "ANSWER:  Right.

12:02  5    "And what did she say, if you remember?

6    "Barb's not too happy with me like that.

7    "QUESTION:  Okay.

8    "I get home and she started eating already.  Except

9  the bus is late sometimes, too."

12:02  10    Ms. Spaeth, thank you very much for taking time to be

11  with us today.  I have no further questions for you.

12    THE COURT:  Do you have follow-up?

13    MS. CARTER:  No further questions from the plaintiff,

14  Your Honor.

12:03  15    THE COURT:  Okay.  Well, thank you, Marlo.  You can

16  step down.

17    (Witness excused at 12:03 p.m.)

18    THE COURT:  We'll take our noon recess.  Let's aim for

19  1:15.  Okay?  1:15 we'll start up.

12:03  20    (Jury out at 12:03 p.m.)

21    THE COURT:  Okay.  Okay.  Anything to put on the

22  record before we break?

23    MR. HARLAN:  No, sir.

24    MS. VANCE:  We do actually real quick need to move

12:04  25  into evidence the stipulated -- the stipulation regarding

                                                              364

1    financials which is Exhibit 41.  There was a ruling and we just

2    hadn't made the motion prior.

3              THE COURT:  You object to the relevance of it but you

4    don't object to the stipulation that given my ruling they can

12:04    5    use the financial information, it's authentic.  Is that a fair

6    statement?

7              MR. HARLAN:  Yes, Your Honor.

8              THE COURT:  So the exhibit then -- and this is exhibit

9    what again?

12:04    10              MS. VANCE:  41.

11              THE COURT:  41 is received.

12              (Exhibit 41, Stipulation regarding Financials,

13    received in evidence.)

14              MS. VANCE:  Thank you.

12:04    15              THE COURT:  Okay.

16              MS. VANCE:  And then, Your Honor, we anticipate having

17    offers of proof at the end of our case-in-chief.  We are about

18    to call our last witness when we return from lunch.

19              THE COURT:  Who is that?

12:05    20              MS. VANCE:  Dr. Smith, the expert witness, Your Honor.

21              THE COURT:  Okay.  And then you wish to do an offer of

22    proof on --

23              MR. HARLAN:  On what?

24              MS. VANCE:  On Exhibits 42 and -- 42 is the Stern

12:05    25    evaluations and then the two attendance records, Your Honor.

365

1          THE COURT:  Okay.

2          MR. MULAIRE:  So these are just to formalize what we

3     think they would show if we were allowed to use them.

4          THE COURT:  Okay.

12:05   5          MR. MULAIRE:  Perhaps we could do that before the jury

6     comes back in, after lunch.

7          THE COURT:  That's possible.  Okay.  1:15 I told the

8     jury to be back, maybe 1:00 for us?

9          MS. VANCE:  Thank you, Your Honor.

12:05  10          THE COURT:  Okay.  We're in recess then.

11          (Recess taken at 12:05 p.m., until 1:12 p.m.)

12          THE COURT:  Okay.  Be seated.  The record should

13     reflect that counsel are here but we are outside the presence of

14     the jury.

01:13  15          Mr. Mulaire?

16          MR. MULAIRE:  Thank you, Your Honor.  I realized that

17     we would not take 15 minutes.  We have two quick offers of proof

18     and a short procedural question about what pageantry is needed

19     for expert witnesses.

20                    DEFENSE OFFERS OF PROOF

21          MR. MULAIRE:  So, first the offers of proof.  And this

22     is -- we recognize that we discussed a lot of this off the

23     record in chambers, we just wanted to make sure that we have a

24     couple of things on the record.

01:13  25          First, if permitted to use Plaintiff's Exhibit 42,

366

which is the performance appraisals of Ms. Stern, we would offer

those because they indicate that Ms. Stern "needs to be more

compassionate when dealing/addressing associate concerns or

issues and be more understanding of situation" and "needs to be

more understanding and compassionate when dealing with

associates' feelings."

That's Exhibit 42.

Separately, if permitted to use Exhibits 25 and 27,

which are the attendance records of Ms. Moss and Ms. Becker, in

addition to using those exhibits we would have also examined

Ms. Becker about her attendance and we anticipate that she would

have testified that she departed early on many occasions over

the years such as when work was slow or completed early; that

this was with management's approval, but that it occurred

without incident and that it did not render her unqualified to

work at Walmart.

So those are our offers of proof.

THE COURT:  Okay.  Does Walmart counsel have any?

MR. HARLAN:  Judge, when we were in chambers we --

THE COURT:  Keep in mind, chambers wasn't on the

record.

MR. HARLAN:  Okay.  So we have I think submitted on

Sunday -- yeah, I think it was Sunday -- well, maybe it was

Saturday, the days are blending together.  We submitted the

arguments in support of excluding those documents.

1          With respect to Ms. Stern, that is classic character

2     evidence that has no place in this case.  And, in addition, it

3     should be excluded under 403 which I think is what the Court

4     concluded.

01:15    5          And likewise, with respect to the attendance records

6     of the individuals, Ms. -- I can't remember both the

7     individuals' names right now, but the individuals who counsel

8     cited are not similarly situated.  And getting into the nuances

9     of why they would have departed is really not relevant to the

01:15   10    claims here, especially since a number of the departures at

11    issue were approved in the sense that they went to their manager

12    and said that they needed to leave or the manager asked them to

13    leave.  And so what we're dealing with in this case as it

14    relates to Ms. Spaeth is unauthorized early departures and

01:16   15    absences.

16         THE COURT:  Okay.  Yeah, the record should reflect we

17    have had discussions in chambers.  And I think we've discussed

18    this to some extent on the record at pretrial and since.

19         42 I've concluded is not specific.  It's general

01:16   20    performance reviews, it's not specific as to any conduct by

21    Ms. -- Stern, is it? -- in relation to Ms. Spaeth.  It's a

22    general comment that she needs to be more compassionate and

23    consider the feelings of associates.  And I think to use a

24    general performance review in this fashion would be unduly

01:16   25    prejudicial.  I think the potential probative value is far

                                                                  368

1    outweighed by the danger of unfair prejudice.  I think it would

2    encourage employers not to be candid in assessments and fear

3    that they would be used against them, even general comments of

4    any specific claim and I think that's one of the dangers.

01:17  5         But more importantly, then we're going to be back here

6    talking about, you know, what the basis of these comments were,

7    assuming they're not specific to Ms. Spaeth, and it just seems

8    to me that the potential for unfair prejudice and going off into

9    tangents would outweigh any potential probative value.

01:17  10        With respect to the attendance records, these are

11   employees -- first of all, it's a period that's between six and

12   eight years before the termination here, as I understand it, or

13   a lengthy period earlier, and there are employees who are in the

14   back office who were not doing customer service.  Ms. Spaeth was

01:17  15   a sales associate.

16        When the store was working -- in fact, the change in

17   schedule was based on the computer showing of customer traffic.

18   And even one of the notes that you went over earlier today

19   indicates that when she wasn't there, you know, when she leaves

01:18  20   the aisles get messy.  Customers take things, they put them

21   elsewhere, and that was her job to help customers when they're

22   there and to straighten out after customers move things around.

23   The two employees were back-office employees doing things like

24   scheduling or payroll or something or other.

01:18  25        And most important of all, those were absences or

1    leaving early -- I shouldn't say they were absences, they were

2    leaving early with the authorization of the company.  And here

3    these were unauthorized leaving early.  So I think it's really

4    apples and oranges completely.  And it would again -- not only

01:18   5    is it irrelevant, but it would violate Rule 403 to have that

6    evidence in.  It would -- it's prejudicial.  It would require

7    lengthening the trial to explain the differences and end up

8    possibly confusing the jury.

9         So your record's made on those offers of proof, but my

01:19   10    ruling remains.

11         And we're working on instructions.  Hopefully before

12    the end of the day we'll give you our version, which is a

13    compilation of what you sent, and we'll have those later.

14         You have one more witness; is that right?

01:19   15         MS. VANCE:  Yes, Your Honor.  The last witness would

16    be our expert witness.  Does this court require a motion after a

17    voir dire?

18         THE COURT:  No, unless -- we've dealt with the *Daubert*

19    issue, so that's preserved.  And I think they can preserve that.

01:19   20    But if you want to make another objection I don't care.

21         But I'm not going to -- I don't pronounce your witness

22    an expert.  I rely on you to lay a foundation for him to

23    introduce or offer evidence that is admissible under Rule 701 or

24    2, whatever the expert --

01:20   25         So as long as you lay the foundation and there's no

370

1    objection, with the understanding that I think the *Daubert*

2    issue, you want that preserved and certainly the defendants have

3    challenged the admissibility of this evidence.  So that's a

4    matter of record as well.

01:20    5    MR. MULAIRE:  And actually, since Your Honor raised

6    it, can I just ask, is the Court's intention then to have a

7    charging conference at the end of the day today, or are we just

8    getting a draft and we'll plan on talking tomorrow?

9    THE COURT:  I would rather give you a draft, let you

01:20    10   look it over, formulate your ideas.

11   MR. MULAIRE:  We would rather that, too.

12   MS. CARTER:  Thank you, Your Honor.

13   THE COURT:  Are you ready to go, Walmart, at the end

14   of this?  We can recess.  I take it Dr. Smith will be some

01:20    15   length?

16   MS. VANCE:  Yes, Your Honor.

17   THE COURT:  And then we'll take a break.

18   MR. HARLAN:  We've notified the agency that we plan on

19   calling Barbara Barnes and they've accepted responsibility for

01:20    20   getting her here.  So Barbara Barnes will be our first witness.

21   And then we also have our second witness I think here as well.

22   THE COURT:  Do you think you're going to be able to

23   get through your evidence by tomorrow?

24   MR. HARLAN:  It's going to be tight, but we're going

01:21    25   to give it our best.

371

1          THE COURT:  Good.  Let's bring in the jury.  We always

2    like to finish early if we can around here, but we don't want to

3    cut anyone off.

4          (Jury in at 1:21 p.m.)

01:22   5          THE COURT:  Okay.  Go ahead, be seated.  You saw

6    Ms. Spaeth just trip as she went out, I just want you to know

7    she's fine, she's okay.  It was just I think the step caught her

8    off guard.

9          Okay.  You may call your next witness then.

01:23  10          MS. VANCE:  Thank you, Your Honor.  Plaintiff calls

11   Dr. David Smith.

12          THE COURT:  If you would raise your right hand the

13   clerk will administer the oath.

14        DAVID SMITH, M.D., PLAINTIFF WITNESS, DULY SWORN

01:24  15          THE CLERK:  Please state and spell your first and last

16   name for the record.

17          THE WITNESS:  David, D-a-v-i-d, S-m-i-t-h, middle

18   initial is S as in Sam.

19          THE COURT:  Thank you, Dr. Smith.

01:24  20          Okay.  Are you ready to go?

21          THE WITNESS:  Yes, I am.  I'm sorry, I forgot to turn

22   my phone off.

23          THE COURT:  That's good you did it now.

24          Go ahead, Ms. Vance, you may proceed.

25

372

1          DIRECT EXAMINATION

2     BY MS. VANCE:

3     Q.  What is your occupation?

4     A.  I'm a medical doctor.

01:25  5     Q.  What professional degree do you hold, Dr. Smith?

6     A.  I have an M.D. which stands for medical doctor, and my field

7     is family medicine.

8     Q.  What certifications do you hold?

9     A.  I have -- besides the M.D., I'm a member of the American

01:25  10    Board of Family Medicine.  I am board certified.

11    Q.  How long have you been board certified in family medicine?

12    A.  Close to 40 years.  38 years I think.

13    Q.  Dr. Smith, what is your area of expertise?

14    A.  Well, many years ago I decided I wanted to work more with

01:25  15    people with Down syndrome, so that's been my area.

16    Q.  And have you focused your medical practice on treating

17    patients with Down syndrome?

18    A.  Yes.  Yes.  I like to think that it's very similar that I

19    accept that people with Down syndrome have some special needs,

01:26  20    but they still are people and they need to be taken care of.

21    Q.  And, Dr. Smith, what is the clinic that -- what's the name

22    of the clinic that you treat patients with Down syndrome in?

23    A.  Down Syndrome Clinic of Wisconsin, founded in 1996.  Right

24    now it's at Children's Hospital.

01:26  25    Q.  And you were the founder; is that correct?

373

1    A.  Correct.

2    Q.  And the program director for many years; is that right?

3    A.  Correct.

4    Q.  And I'll ask to have what's been admitted into evidence as

5    Exhibit 38 published.

6         (Exhibit 38, Dr. David Smith CV - 2018, admitted

7    previously by stipulation.)

8    BY MS. VANCE:

9    Q.  And, Dr. Smith, can you either look at Exhibit 38 in the

10   binder in front of you or we could see it on the screen.

11        MS. VANCE:  And can we first get the first page,

12   please?

13        THE WITNESS:  Almost there.  Okay.  The curriculum

14   vitae?

15   BY MS. VANCE:

16   Q.  Yes.  So what is Exhibit 38, Dr. Smith?

17   A.  It's my curriculum vitae or resume.  And it's in medical

18   school format so it's kind of long.

19   Q.  And this is a record of your scholarly research; is that

20   right?

21   A.  Yes, and my practice.

22   Q.  Okay.  And I'll ask to turn to page 10.  And I see you have

23   peer-reviewed publications in the area of Down syndrome.

24   A.  Correct.

25   Q.  Is that correct?  And I see you have a peer-reviewed journal

1  article in the American Journal of Medical Genetics?

2  A.  Correct.

3        MS. VANCE:  And if I could have Lectrice turn to

4  page 10, please.

5  BY MS. VANCE:

6  Q.  Okay.  Dr. Smith, do you also attend national conferences?

7  A.  Yes, I do.

8  Q.  Okay.  And I'll direct your attention to the tenth page

9  of -- there we go.  I see it now.  The tenth page of your

10  curriculum vitae or your resume, I see that you had a

11  presentation at the Down Syndrome Medical Interest Group USA.

12  Can you tell us what that group is, please?

13  A.  Yes, also known as DSMIG for short.  It's national, but

14  there are also international branches of it, and it's somewhere

15  between two and 300 professionals in the medical field.  Most of

16  them are physicians, but also other therapists, PT, OT.  Speech,

17  nutrition.  The focus is improving the health care for people

18  and families with Down syndrome.

19  Q.  And then I see your presentation was called "Dementia and

20  Down Syndrome Clinic Survey;" and I'm just going to ask is that

21  a research focus that you've had, the subject of dementia and

22  Down syndrome?

23  A.  Yes.  I'm on the -- they have some committees and one of

24  them has to do with dementia.  And I did the survey.

25  Q.  Dr. Smith, can you pull yourself a little closer to your

375

1    microphone?

2    A.   Yes.

3    Q.   Thank you.  Well, I'll ask you then to educate us,

4    Dr. Smith.  What is Down syndrome?

01:30    5    A.   Well, Down syndrome is a medical condition that -- a genetic

6    condition.  And most of us have pairs of chromosomes, so 46 in

7    pairs, 23 pairs.  And on the 21st chromosome for people with

8    Down syndrome they have an extra chromosome.  It happens on some

9    others, but they are what we call lethal, they don't survive.

01:30    10    Q.   Dr. Smith, how does that extra chromosome affect a person

11    with Down syndrome?

12    A.   Well, it gives them certain physical characteristics so that

13    you can often recognize them on the street.  Certain facial

14    characteristics, the bridge of the nose, smaller eye shape.

01:31    15    Their tongue is usually larger so sometimes it protrudes a

16    little bit.

17          There are some other findings that are not as easily

18    seen in the hands and the feet.  And then there are a number of

19    medical conditions that they get much more commonly than other

01:31    20    people do.  There are actually a few that they don't tend to get

21    also, but generally we're most concerned about the ones that

22    they do get.

23          And then they also have certain personality

24    characteristics, for the most part.  Nothing's 100 percent for

01:32    25    anything.  But most people with Down syndrome are not very good

376

1    auditory learners.  In other words, they don't -- talking to

2    them doesn't work as well as visual or demonstrating something.

3         They tend to -- the term "people pleaser" is often

4    used.  They like -- they don't like conflict in particular, so

01:32  5    they do try to please others.  Now, there are some days when I'm

6    sure their parents don't feel that way, but in general that's

7    the case.

8    Q.  Dr. Smith, I heard you describe a lot of physical

9    characteristics of people with Down syndrome, could you also

01:32  10   describe mental characteristics?

11   A.  Sure.  And that's probably one of the most prominent ones

12   once things get rolling.  They have cognitive delays.  Generally

13   we think of them as mild to moderate, but still that puts them

14   in the -- if you met them on the street or something or you

01:33  15   interacted with them, you'd probably think they behaved like a

16   four-year-old or maybe a 10- or 11-year-old, in that range.  And

17   that's pretty typical.

18        Now, there are some that are severely affected and

19   will have severe cognitive disabilities.  Speech tends to be

01:33  20   difficult for them also.

21   Q.  And I heard you talk about an age range of four years to

22   about 10 or 11 years.  In the medical literature do you call

23   that developmental delays?

24   A.  Developmental delays, yes.

01:33  25   Q.  So is it fair to say developmentally a person with Down

377

1    syndrome is probably in the developmental age range of four

2    years to a 10- or 11-year-old?

3    A.   Yes, generally.   There are exceptions, but generally.

4    Q.   And in your practice at the Down Syndrome Clinic of

01:34    5    Wisconsin, what types of issues do you address for your

6    patients?

7    A.   Well, when I first started the clinic I saw kids and adults,

8    but as time went on it was all adults and I had a pediatrician

9    for the kids.

01:34    10         But besides looking at general health care, the most

11    common problem that they came in with was for loss of ability.

12    They were having trouble with something, either how to function

13    at work or at home, or if they're volunteering, some kind of

14    interaction with people that they were having trouble with.

01:35    15    Q.   And in your experience did you find a common link to these

16    problems that your patients would have of having -- experiencing

17    a loss of function?

18    A.   Well, a common link in the sense that it was one of their

19    medical problems, but they oftentimes would come in with a

01:35    20    diagnosis.   Sometimes they would say they had anxiety or

21    depression, sometimes -- and quite frequently actually they'd

22    come in with a diagnosis of dementia.

23         And unfortunately, a couple decades ago some doctors,

24    pathologists on Long Island examined the brains of deceased

01:35    25    adults with Down syndrome, and all of them over the age of 35

378

1    had signs of dementia on the biopsy.  And that got widespread in

2    the medical community.  Everybody said if they're 35 and there's

3    a problem they have dementia.

4         The next year they came out with another article and

01:36  5    said but they don't all have dementia just because they have

6    those plaques.  And we are now learning that there are some

7    other things involved besides just the plaques and tangles.  And

8    so not all of them get dementia.  And that was a problem because

9    the person has a problem we're going to say they have dementia,

01:36  10   it's just too easy to do.

11   Q.  I wanted to ask you, Dr. Smith, if you could talk about

12   routine for people with Down syndrome.

13   A.  Yes.  We all to a certain extent need some routine to order

14   our day.  You know, we get up, we usually eat breakfast, we go

01:37  15   to work, that sort of thing.  It simplifies things.

16        For people with Down syndrome it's especially

17   important to have some routine.  It makes their day much more

18   manageable.  And if you take away that routine, that often

19   causes a great deal of stress for them.

01:37  20   Q.  Then I'll focus your attention on the issue of employment.

21   Are you -- in your practice have you treated a lot of patients

22   with Down syndrome who are in the workforce?

23   A.  A fair number.  I don't know the exact numbers, but either

24   work or volunteer.  And, yeah, they're generally considered good

01:37  25   employees because they like routine.  So if the task is not

379

1    developmentally or technically difficult and they can learn it,

2    they follow the book.  They do it just a certain way.  And

3    they're usually very good and timely in terms of their work

4    schedule.

01:38    5    Q.  And as far as the issue of attendance, how would you say an

6    employee with Down syndrome, how that condition would typically

7    impact attendance?

8    A.  As I was saying, generally very good attendance.  And the

9    things that are written support my statement too that they are

01:38    10    generally good at attendance.  Or with attendance.

11    Q.  And is that connected to routine?

12    A.  I think so.  Yeah.

13    Q.  Okay.  And then I'll direct your attention specifically to

14    Marlo Spaeth.

01:38    15    A.  Sure.

16    Q.  How did you first learn of Marlo Spaeth?

17    A.  Well, Terry, my clinic coordinator and I were sitting in the

18    office, and I don't know if she read the article or told me

19    about it or I saw it, probably she brought it to my attention,

01:39    20    and I said, well, that's interesting, that sounds like it might

21    be something that we would see in our clinic.

22         So, I don't know why, normally I try to keep my nose

23    out of the news, but I was fired up for some reason so I gave

24    you guys a call and said that I would be willing to look into it

01:39    25    to see what I could find.

1    Q.  And, Dr. Smith, once you did become involved in the case

2    what did you do?

3    A.  Well, I wanted to see exactly what was going on.  So we got

4    old records, medical records and we had Marlo make an

01:40  5  appointment.  Was that 2017 I think?  At any rate, she came in

6    for an appointment and then I did an evaluation.

7    Q.  And aside from reviewing old medical records did you also

8    review some history from her employment at Walmart?

9    A.  Yes.  I can't tell you the exact timeframe in which I did

01:40  10  that, those different reviews, but, yes, they were reviewed.

11   Q.  Okay.  And I'll ask you to turn to Exhibit 39.

12              (Exhibit 39, Dr. David Smith Office Visit - 12/8/201,

13   admitted previously by stipulation.)

14              MS. VANCE:  And I'll ask Lectrice to publish

01:40  15  Exhibit 39, please.

16   BY MS. VANCE:

17   Q.  Are you ready?

18   A.  Yes.

19   Q.  Dr. Smith, what is Exhibit 39?

01:40  20  A.  That's my visit note from December 8th, 2017.

21   Q.  Okay.

22   A.  From my office visit with Marlo.

23   Q.  Okay.  I'm sorry, did I stop you from water?  Did you need a

24   drink?

01:41  25  A.  I'll get it.  Thank you, though.

381

1    Q.   Okay.   So when Marlo came to your office as your patient,

2    who was with her?

3    A.   Her sister, Amy Jo.

4    Q.   And when you gathered information to examine Marlo and to

01:41    5    form your opinion, can you describe for us maybe like the order

6    of people you addressed in your office visit and how you did

7    that?

8    A.   I, of course, say hello to everybody.   And often the person

9    without Down syndrome starts to talk and wants to do everything,

01:42   10    and I just tell them sit tight, I'm here to see in this case

11    Marlo.

12           And there's a couple reasons for that.   One is I want

13    to know what they have to say.   And the other is that I want to

14    know how they -- what their speech is like, how they behave, how

01:42   15    they interact with me.   And so then I take a history from her

16    first and then we go from there.

17    Q.   And so when we look at Exhibit 39 and we see a history of

18    present condition that's largely information you gathered

19    directly from Marlo?

01:42   20    A.   For the most part, yes.   But, you know, a lot of the

21    details, of course, came from Amy Jo and then looking at the

22    records.

23    Q.   And can you go through Exhibit 39 and explain to us some of

24    the reports Marlo Spaeth made to you?

01:42   25    A.   Yes.   Well, I would usually ask if she knows why she's here

1      and she said something about Walmart.

2            And then shortly thereafter there was something about,

3      and I put it in quotes because they were her words, "every day

4      is a bad day."  And she was referring to since her termination.

01:43   5            There was also reference from -- I'm assuming it was

6      Amy Jo about self-talk.  Self-talk is where people who are just

7      sitting around and they're talking to themselves, they're

8      talking to the air or whatever it is.  And it's often used, we

9      think, to help people think things through, but also to relieve

01:43   10     some stress.  And everybody does it to some extent.  As we get

11     older we learn not to do it otherwise you get locked up for

12     doing it, but self-talk is a common thing.

13     Q.  Okay.

14     A.  And then "coming more" means that something was stressing

01:44   15     her.

16     Q.  Okay.  And I'll ask that we go to the third page of

17     Exhibit 39 with the assessment.  To a reasonable degree of

18     medical certainty what is your expert opinion of the diagnosis

19     of Marlo Spaeth?

01:44   20     A.  Well, at the time I thought that anxiety and depression were

21     the most likely issues and not dementia.  Earlier she was

22     diagnosed with dementia, by telephone.  And so they called up

23     and the nurse practitioner -- and physicians do this too, no

24     disparagement to nurse practitioners at all -- and said she must

01:45   25     have dementia because of the diagnostic overshadowing that I

383

1    talked about.  And they started her on Aricept which is a

2    treatment for dementia.

3    Q.  And that was at the time based on symptoms of memory loss;

4    right?

01:45    5    A.  Correct, by telephone.

6    Q.  Can symptoms of memory loss in people with Down syndrome

7    actually be a depressive symptom?

8    A.  Yes.  And in the general population, too.  People who are

9    depressed may have more trouble recalling things.

01:45    10    Q.  And when I look in your paragraph 2 I see pseudodementia, is

11    that related?

12    A.  Yes.  There are certain conditions that can look like

13    dementia, and so pseudodementia, they look like dementia.  In

14    the general population in elderly people if they become

01:46    15    depressed sometimes they look like they have dementia and that's

16    called pseudodementia.

17         In people with Down syndrome there are a number of

18    things that can do that:  Depression and anxiety.  Unrecognized

19    thyroid problems.  Pain.  Pain can come from arthritis which is

01:46    20    more common in people with Down syndrome.  It can come from

21    migraine headaches so family history often points us in that

22    direction.  They might have TMJ problems so, you know, jaw,

23    joint, arthritis.

24         I've had one -- I shouldn't laugh, but she was 28, and

01:46    25    she was diagnosed with probable dementia because she was no

384

1    longer able to work in the family store.  She no longer

2    volunteered at the church, lost a lot of weight, no longer

3    cleaned in the house and that sort of thing.  And they thought

4    it was dementia.  But on careful examination it turned out that

01:47    5    she had gallbladder disease.  And gallbladder, if any of you

6    have had it, causes pain.  And sometimes it's, you know, it just

7    hits you and you know something bad is going on.  But other

8    times it will be a little bit pain here, little pain there, a

9    little pain there.  And that's what was happening to her and she

01:47    10    didn't know what was going on, she just knew that something was

11    hurting her so she shut down.

12    Q.  So it sounds like this pseudodementia is a misdiagnosis that

13    happens to people with Down syndrome because their symptoms look

14    like they're starting to lose their memory, they're starting to

01:47    15    lose their mental faculties.

16    A.  Right, and there's some physical or mental stress that is

17    causing them to --

18    Q.  And so I heard you say diagnostic overshadowing?

19    A.  Correct.

01:48    20    Q.  And is that related to this pseudodementia issue?

21    A.  Yes.

22    Q.  And explain diagnostic overshadowing?

23    A.  Again, it's because they were -- this information came out

24    that everybody with Down syndrome had dementia; everybody over

01:48    25    the age of 35 that if there was a problem that looked a little

1  bit like dementia then they called it dementia.  It was quick,

2  but not accurate.

3  Q.  To a reasonable degree of medical certainty, is the fact

4  that Marlo Spaeth has Down syndrome connected to her need for a

01:48  5  predictable routine?

6  A.  Yes.

7  Q.  And then -- and could you explain a little bit more about

8  how that played out in your opinion in Walmart.

9  A.  Well, like I said, she -- people with Down syndrome tend to

01:49  10  like routine.  It makes their life predictable.  And she had

11  been doing that job for 15 years.  She was reliable with it.

12  She got raises.  She was just -- you know, really a lot of pats

13  on the back.  So she was doing a really good job.  And she was

14  following a routine.  She was able to tell me the routine she

01:49  15  had that day that I saw her, and this was a few years later, a

16  couple years later after she left there.  So she had that

17  routine down and that was taken away from her.  Now, I did want

18  more information and over time I got that information that

19  confirmed that.

01:50  20  Q.  In your opinion is it likely that the fact that Marlo has

21  Down syndrome impacted her response to disciplinary actions by

22  Walmart?

23  A.  Yeah.  Yes.  She -- you know, she went into these

24  conferences about her actions and they told her what she was

01:50  25  doing wrong.

386

1     And then she -- again, part of the -- I think I

2     mentioned earlier about pleasing people, people pleasing, she --

3     her response would be to say yes to almost anything.  She wanted

4     to be positive, she wanted to get a good feeling from them.  And

01:51   5     so, yes, I think so.

6     Q.  And then I'll ask you in your practice, in your experience

7     but also in your medical opinion, can people with Down syndrome

8     adapt to big changes in routine?

9     A.  Well, it depends on what you mean by big, but, yes, to some

01:51  10     extent they can.  The easiest thing would be to try to adapt the

11     routine that they already have to whatever that new thing is.

12     But with help and someone to kind of show them the way using not

13     so much verbal but visual things, we use picture books, for

14     example, a lot of times to help.  I don't but the people that I

01:52  15     work with.  I'm in the luxury position of being able to say

16     here's the problem now fix it.  But so they often will do

17     picture books and lay out the steps that are involved.

18     And if I may, I understood from one of the records

19     that for one day they used a job coach and she did -- she seemed

01:52  20     to do pretty well that day.  And then they took that away and

21     she went back to her old schedule.  She could still do the job,

22     it was just the schedule was wrong.

23     Q.  Dr. Smith, have you reviewed any other examinations of Marlo

24     Spaeth for this case?

01:52  25     A.  Examinations -- well, the -- Walmart had a psychologist.  I

1   also looked at the medical records from Ms. Kaminski, the nurse

2   practitioner.

3   Q.  I'll direct your attention to Walmart's expert, the

4   psychologist.

01:53   5   A.  Okay.

6   Q.  And who was that expert?

7   A.  Dr. Thompson I think is the name.

8   Q.  And what is Dr. Thompson's field?

9   A.  He's a I think a child psychologist.  He's a psychologist.

01:53   10   Q.  And did you have the opportunity to review the data and the

11   opinions from Walmart's expert, Dr. Thompson?

12   A.  Yes, I did.

13   Q.  What diagnosis did Walmart's expert give Marlo?

14   A.  Well, his initial thoughts were dementia.

01:53   15   Q.  Okay.  Well, do you agree with that diagnosis?

16   A.  No.

17   Q.  In your opinion were there any flaws in Dr. Thompson's

18   methodology?

19   A.  Yes.

01:54   20   Q.  And can you describe that, please?

21   A.  Well, he's -- he was looking at a point in time.  He used

22   some standard questionnaires to look for dementia.  And he did

23   not -- - at least it's not recorded that he used any of the Down

24   syndrome-specific questionnaires to look at dementia.

01:54   25           But all of those groups say that if you're going to

388

1    use these forms, these written tests, you need to first do a

2    medical examination and rule out a medical or a psychiatric

3    cause.

4    Q.  And did Dr. Thompson do any medical examination?

01:54    5    A.  No, he did not.

6    Q.  And did he -- so he did not rule out any medical cause;

7    correct?

8    A.  Right.  Those would be the things that we were talking about

9    earlier called pseudodementias.  They look like it but they're

01:55    10    not.

11    Q.  And in your professional opinion are there any other

12    indications in the case that rule out Dr. Thompson's dementia

13    diagnosis as the proper diagnosis for Marlo Spaeth?

14    A.  The timing in terms of when her symptoms started and after

01:55    15    her being fired.

16        I put her on Citalopram which is the antidepressant.

17    And in a follow-up phone call to the family her symptoms were

18    resolved or certainly much better, and with dementia that would

19    not be the case.  So it really looked more like depression and

01:56    20    anxiety.

21        She also -- people with Down syndrome who have

22    dementia, it progresses very rapidly, almost twice as fast as

23    people without Down syndrome.  And so at this point she would be

24    severely demented at this point, and she's not as far as I know.

01:56    25    Q.  When you say severely demented, what does that --

389

1    A.  She would need total care.  Total care --

2    Q.  Bathroom care and --

3    A.  Assuming she's still alive.  But, yes, total care.  It's

4    really heart wrenching.

01:56    5    Q.  And so if we saw Marlo Spaeth walking around today, that

6    would be a sign to you that there's no way she's in advanced --

7    A.  That would strongly point against it.  Very strong.

8    Q.  So I just wanted to make sure we caught this.  Your

9    treatment recommendation after your examination was a

01:57    10    medication; correct?

11    A.  Correct.

12    Q.  And that was an antidepressant medication?

13    A.  Yes, it was.

14    Q.  Okay.  And then what was your determination about the cause

01:57    15    of the depression and anxiety?

16    A.  I think it was what occurred at Walmart.  So the

17    disciplinary action and then being fired.

18         This was her life.  She had done it for 15 years.  And

19    that was taken away.  And she kept talking about it.  Even a few

01:58    20    years later she was still talking about it.

21    Q.  In your professional experience is it common for people with

22    Down syndrome to become depressed from job loss?

23    A.  Common.  I don't know the percentages, but it certainly does

24    happen and we see it often enough.

01:58    25    Q.  Okay.

390

1          MS. VANCE:  I have no further questions for this

2    witness at this time.

3          THE COURT:  All right, cross?

4          MR. BURNETT:  Thank you, Your Honor.

01:58    5                    CROSS-EXAMINATION

6    BY MR. BURNETT:

7    Q.  Good afternoon, Doctor.

8    A.  Hello.

9    Q.  I want to go back to your visit with Marlo and her sister,

01:58   10   Amy.  That occurred December 8 of 2017 according to your note?

11   That would be Exhibit 39?

12   A.  Correct.

13   Q.  And did I hear you correctly that in that visit the way you

14   purposely started it out was to talk to Marlo as opposed to Amy;

01:59   15   right?

16   A.  Correct.

17   Q.  And did I hear you correctly to say that much of this

18   history that's related in your note you obtained from Marlo?

19   A.  I didn't quite say it that way.  What I said was the initial

01:59   20   part of the history came from Marlo.  The rest I got from Amy Jo

21   and the old records.

22   Q.  The initial part of the history, does that mean the first

23   paragraph?

24   A.  Well, it blends a little bit.  What I got from there is

01:59   25   her -- an idea of her speech.  But, more importantly, one of the

391

1    first things she said was about Walmart and every day is a bad

2    day.  So that's what I'm seeing as her response.

3    Q.  What I'm more concerned about, more interested in is who did

4    most of the talking.

02:00    5    A.  Throughout the whole thing?  It would be Amy Jo.

6            THE COURT:  Hang on a moment.  One talks at a time.

7            THE WITNESS:  I'm sorry.

8            THE COURT:  That's all right.  You're anticipating.

9    It's a normal function of speaking with someone, but we can't do

02:00    10    it in the courtroom because he's gotta take everybody down.

11    BY MR. BURNETT:

12    Q.  And I'm as bad as you are at it.

13            For example, we see Marlo Spaeth is a 51-year-old

14    woman.  Would you have asked her her age?

02:00    15    A.  I probably did.

16    Q.  She told you?

17    A.  She probably did.  I didn't put quotes around it, but that

18    doesn't mean she didn't tell me.

19    Q.  The only thing I see quoted in this entire visit note is

02:00    20    your comment that every day is a bad day; right?

21    A.  Yes.

22    Q.  So if we don't see quotes around anything else does that

23    mean --

24    A.  No, I'm sorry.

02:00    25    Q.  You're doing it again.  Does that mean you got the

392

1   information from someone or somewhere besides Marlo?

2   A.  No.

3   Q.  So some of this information came from Marlo, are you able to

4   tell us four years later what information it was?

02:01   5   A.  Four years later, probably not.  I got more -- my purpose in

6   talking to her first is generally to get a feel for how she is

7   interacting with people.

8   Q.  I know that was your purpose, but what I'm interested in is

9   how well Marlo was able to communicate and give you information.

02:01   10  A.  Yeah.

11  Q.  Okay?  So if you go down to the fourth paragraph, we see the

12  series of sentences about Marlo's regular schedule.  Would that

13  have been information Marlo furnished to you?

14  A.  Marlo gave me the schedule information.

02:01   15  Q.  And then above that in the paragraph we see something about

16  her work history first at a place called Holiday House, a

17  shelter workshop; is that something Marlo told you?

18  A.  She might have.  Sometimes I do get a little impatient

19  because people with Down syndrome tend to speak more slowly so I

02:02   20  probably got that from Amy Jo.

21  Q.  Okay.  And then she went to work for Walmart in 1999, did

22  Marlo tell you that?

23  A.  I don't recall.

24  Q.  And it says she had a good work record and received regular

02:02   25  raises with praise for her work.  Is that something Marlo told

1    you?

2    A.  No, I believe I got that from the old records.

3    Q.  I didn't see anything in this note that you had any

4    difficulty that you commented on in communicating with Marlo.

02:02  5    Is that fair?

6    A.  I'm sorry, say that again?

7    Q.  Did you record any difficulty in communicating with Marlo in

8    this note?

9    A.  Let me take a look.

02:02  10          (Witness peruses document.)

11   A.  She was quiet but appropriate and cooperative.  I probably

12   did not write a lot about that.

13   BY MR. BURNETT:

14   Q.  Okay.  Which would indicate that it didn't impress you.

02:03  15   A.  In what way?

16   Q.  In the sense that if you were unable to communicate with

17   Marlo, in other words, if she was -- if you asked her questions

18   that you would expect her to know the answers to and she was

19   unable to answer, we would find that information in your

02:03  20   four-page medical note.  Is that a correct statement?

21   A.  Yes.

22   Q.  Okay.  The history that came from Amy, did you rely on that?

23   A.  Well, at first you learn to be suspicious.  So I took it in,

24   but I also looked at other records --

02:04  25   Q.  I'm not saying you didn't.  But my question was really to

1    the point that, did you rely on information Amy gave you?

2    A.   For the initial -- initially.

3    Q.   Okay.  Have you seen any records of communications between

4    Amy and the probate court about her sister's medical condition?

02:04    5    A.   Say that again?

6    Q.   Have you seen any records between Amy Jo Stevenson and the

7    Manitowoc County Probate Court recounting information about her

8    sister's medical condition?

9    A.   Right offhand I can't think, other than having Down

02:04    10    syndrome.

11    Q.   So you haven't seen any records, any reports that Amy Jo

12    Stevenson signed and furnished to the probate court Manitowoc

13    County --

14    A.   There was something.  I don't know -- there was something

02:05    15    she had signed.  It was an official document, but I don't know

16    what it was.

17    Q.   And you don't know of any annual report that she signed and

18    gave to the judge in Manitowoc County.

19    A.   About how Marlo's doing?

02:05    20    Q.   Yeah.

21    A.   Yes, I did.

22    Q.   Okay.

23    A.   And there was one I think from her mother.  And I think

24    that's required for guardians.

02:05    25    Q.   Did you see what Amy Jo Stevenson reported about her

1  sister's medical condition in 2019?

2  A.  I don't remember right offhand.

3  Q.  Do you know if her sister told the Manitowoc County Court

4  her sister's medical condition in 2019 was worsening due to

5  dementia?

6  A.  There was something about dementia, I remember that.

7  Q.  Do you know if she told the court it was worsening due to

8  dementia?

9  A.  I don't recall that.

10  Q.  In 2020 do you know if Amy Jo Stevenson told the Manitowoc

11  County Probate Court that her sister's condition was the same

12  and had not improved?

13  A.  The only information I can recall is when I spoke with Amy

14  Jo that her condition had improved from when --

15  Q.  I'm asking you about a record --

16  A.  I can't.  I don't know.

17  Q.  I'm asking you about a record given to the Manitowoc County

18  Probate Court, and so is a direct answer to that question you

19  haven't seen it?

20  A.  I probably saw it, but I don't know.  I can't tell you for

21  sure.

22  Q.  No memory of what she would have told the judge.

23  A.  No.  I just know that there were some reports of -- they're

24  like -- I think they're a page long.

25  Q.  Did you see a report to the court in the year 2021?

02:06
02:06
02:06
02:06
02:06
02:07

396

1    A.   No.   I don't think so.

2    Q.   As you sit here today, can you tell the jury what Amy Jo

3    Stevenson told the probate judge in Manitowoc County her

4    sister's medical condition was?

02:07    5              MS. VANCE:   Objection, relevance.

6              MR. BURNETT:   Well, that record's been in, Your Honor.

7              THE COURT:   Yeah, overruled.

8    BY MR. BURNETT:

9    Q.   Are you able to tell us that?

02:07   10    A.   No, I don't know.

11    Q.   You've indicated that your diagnosis was depression, not

12    dementia; is that right?

13    A.   Correct.

14    Q.   Did somebody tell you when these symptoms started that you

02:07   15    saw in December of 2018?

16    A.   Yes.

17    Q.   And --

18    A.   2017 I saw her.

19    Q.   You're right.   Who told you when the symptoms started?

02:08   20    A.   I believe that was -- I believe that was Amy Jo.

21    Q.   Okay.   And the information you got was the symptoms started

22    in early 2016; right?

23    A.   Early 2016, yes.

24    Q.   That was the beginning of those symptoms.

02:08   25    A.   Yes.   Or at least recognized symptoms.

397

1    Q.  The first time they showed up and were recognized by the

2    people closest to her.

3    A.  Yes.

4    Q.  How much time elapsed between her termination at Walmart and

02:08  5    the onset of those symptoms?

6    A.  It was at least a few months.  Several months.

7    Q.  Can you tell us what year and month she was fired at

8    Walmart?

9    A.  I think it was November 2015.

02:08  10   Q.  How about July, does that sound --

11   A.  Was it July?  Okay.

12   Q.  So it was six to eight months --

13   A.  Yeah.

14   Q.  -- between the onset of these symptoms and her termination

02:09  15   at Walmart; right?

16   A.  Correct.

17   Q.  Did you consider any other explanations for this depression

18   that you identified?

19   A.  Well, I usually look for losses that might have occurred

02:09  20   around the time and to see if they seem to be significant.  And

21   I did not find anything.  I know her mother died at some point

22   later, but --

23   Q.  Mother died at some point later, meaning -- do you know when

24   her mother happened to pass?

02:09  25   A.  I'd have to look it up.  I don't have the exact date of

1   that.

2   Q.  Was Marlo close to her mother?

3   A.  I think so.

4   Q.  Was her mother sick before she passed?

02:10   5   A.  Yes, she was.

6   Q.  Did you do anything to rule out that the onset of these

7   symptoms in early 2016 coincided with her mother's illness and

8   subsequent passing?

9   A.  As best I could I tried to get some idea of that

02:10   10   relationship.

11   Q.  Did Amy Jo tell you that Marlo asks even to this day about

12   her mother and stepfather frequently?

13   A.  I don't recall.

14   Q.  And you probably wouldn't have reason to know this, but

02:10   15   would it surprise you to hear that Marlo referred to her

16   parents' passing a couple of times in testimony today?

17   A.  It could be.  I would not be surprised.

18   Q.  Would that indicate that that's something on her mind?

19   A.  It would indicate that, yes, that that would be there.

02:11   20   Q.  It might signify she's mournful and it's a loss.

21   A.  Yes.  There are other things that occurred that would point

22   otherwise.

23   Q.  But that might be one thing that would explain the

24   depression you say you saw; true?

02:11   25   A.  I did not think so.

1    Q.   Okay.

2    A.   I questioned that and I looked into it, but it did not seem

3    to be --

4    Q.   What information did you learn that allowed you to rule it

02:11    5    out?

6    A.   Well, information in terms of how she responded to the death

7    of her mother.

8    Q.   And Amy Jo told you --

9    A.   Yeah, I got that from her.  Also in terms of Marlo, her

02:12    10   conversation focused on Walmart.

11   Q.   Well, that's why you were there; right?

12   A.   No, I was there to find out why she was having a problem.  I

13   wasn't -- I was evaluating her as a doctor.  I was trying to

14   find out why she was having trouble.

02:12    15   Q.   And do you have any idea what Marlo was told about why she

16   was visiting you?

17   A.   She probably thought it was --

18   Q.   I don't want you to speculate.  I want to know if anybody

19   told you what they informed Marlo about.

02:12    20   A.   I would not have been there so I wouldn't know that.

21   Q.   And nobody told you afterward what they informed Marlo

22   about.

23   A.   No.

24   Q.   That the very first words or close to them that you heard

02:12    25   from Marlo was "every day is a bad day;" right?

1  A.  Right.  And something about Walmart.

2  Q.  With the every day is a bad day?  So they came together?

3  A.  Well, within probably -- I don't know what period of time,

4  but --

02:13  5  Q.  Did that occur to you that she might have been prepared to

6  meet you?

7  A.  Well, I suspect she was to some extent.

8  Q.  If we go to dementia and Down syndrome, if we looked at the

9  medical literature would we see literature that reports by age

02:13  10  60, 50 percent of those having Down syndrome will suffer some

11  sort of dementia?

12  A.  Yes.

13  Q.  And if we looked at the medical literature would we see that

14  by age 70, 75 percent of those with Down syndrome have dementia?

02:13  15  A.  There's a lot of variation in those numbers, but that would

16  be one number that would be out there.

17  Q.  Okay.  And in your report, although I don't think you talked

18  about it today, is it a scientific fact that those having Down

19  syndrome age faster than people who do not?

02:14  20  A.  We generally assume that they are 20 to 30 years older

21  physiologically and such, yes.

22  Q.  So in her early to mid 50s Marlo would be 70 to 75 --

23  A.  Something like that.

24  Q.  You talked a little bit about Dr. Thompson.  You don't --

02:14  25  Dr. Thompson's a psychologist as opposed to a psychiatrist or

401

1    medical doctor; right?

2    A.  Correct.

3    Q.  He specializes in testing, doesn't he?

4    A.  Yes.

02:14   5    Q.  You don't specialize in testing, do you?

6    A.  No.  Well, not that kind of testing.

7    Q.  When you have a patient who needs that kind of testing, you

8    send them to a specialist like Dr. Thompson, true?

9    A.  After I've already ruled out all the other possibilities.

02:14   10   Q.  Okay.  But you don't administer those tests; right?

11   A.  No, I don't.

12   Q.  You don't select the tests that are to be given; true?

13   A.  No, I don't.

14   Q.  You don't interpret the results.

02:15   15   A.  No.

16   Q.  As a matter of fact, you rely on the specialist to tell you

17   what the tests mean.

18   A.  Except he's not a specialist for people with Down syndrome.

19   Q.  Very few are.

02:15   20   A.  Very few.

21   Q.  Okay.  But when you send a patient to a specialist like

22   Dr. Thompson, you don't second-guess or interpret the results;

23   right?  You rely on what the specialist tells you most of the

24   time?

02:15   25   A.  I would not have sent them to him because he doesn't work

402

1   with people with Down syndrome.  He doesn't know --

2   Q.  I know that's your point.  But when you do send people to

3   specialists like Dr. Thompson, it is their interpretation that

4   you rely on; fair?

02:15   5   A.  If it makes sense, yes.

6   Q.  Okay.  You told us about the information that you got about

7   Marlo's current functioning.  The last time you saw Marlo was

8   this December 2017 visit; is that true?

9   A.  Correct.

02:16   10   Q.  You told us in deposition that you assessed her at that time

11   in the high-moderate range; is that right?

12   A.  Yeah.

13   Q.  As of February 2019 when you had your conversation, your

14   second conversation that you alluded to with Amy and her sister,

02:16   15   you learned that Marlo had undertaken some new activities;

16   right?

17   A.  Correct.

18   Q.  She was going to the Wellness Center twice a week?

19   A.  Correct.

02:16   20   Q.  Volunteering at the church on Friday afternoons?

21   A.  I think that's correct.

22   Q.  She was going grocery shopping on Mondays?

23   A.  I think that's correct.

24   Q.  Did you know she was an avid sports fan?

02:17   25   A.  I believe I did, yes.  Packers.

403

1  Q.  We heard that today.  She plays bocce ball?

2  A.  Yes.

3  Q.  And bowls?

4  A.  She learned bocce ball.  She was a bowler.

02:17  5  Q.  And bowling.  And you probably weren't exposed to this, but

6  we learned her favorite soap operas today as well.

7  A.  I can imagine.

8  Q.  Your assessment was that after you prescribed the

9  antidepressant she had adjusted very well.

02:17  10  A.  Yes.

11  Q.  She had replaced her work at Walmart with other activities.

12  A.  Correct.  Can I just interject that she still -- my

13  understanding is she still talked about Walmart.

14  Q.  That's what Amy Jo told you.

02:18  15  A.  Well, yeah, I guess so.

16  Q.  And then Amy Jo told you that she was essentially back to

17  normal; right?

18  A.  Yes.

19  Q.  I think you told us in deposition that you would expect it

02:18  20  to have taken about a month for Marlo to adjust to this new

21  schedule that Walmart exposed her to.

22  A.  I don't think I gave a specific timeframe.  But it would

23  take -- if she were to adjust, it would depend on the

24  individual.

02:18  25  Q.  Is your memory vague on that?

404

1   A.   I guess so if you're bringing out paper.   Did I say a month

2   or at least a month?

3   Q.   I think you said a month.   But go to page 251 if you would,

4   please, Doctor.

02:19   5           Let me see if I can focus you on a specific line.

6           (Brief pause.)

7           MS. VANCE:   We got the wrong transcript.

8           THE WITNESS:   I have it here if you would like.

9   BY MR. BURNETT:

02:19   10  Q.   Do you got it?   I think I gave my copy to the judge.

11          Looking at page 251, does that refresh your

12  recollection as to whether you indicated it would take about a

13  month for Marlo --

14  A.   That's not what I said in this.

02:19   15  Q.   Can I --

16  A.   Can I read it, what I said?

17  Q.   Let me catch a copy first and then --

18  A.   Okay.

19          (Brief pause.)

02:20   20  BY MR. BURNETT:

21  Q.   Let's read the first two questions together on that.

22          So, Mr. Harlan asked you:

23          "So, Doctor, as you sit here today, you can't give an

24  opinion -- even after having reviewed all of Ms. Spaeth's

02:20   25  medical records, examined her in person, talked to her guardian,

405

1    reviewed the deposition testimony of the person who knows her

2    best, you can't give a medical opinion in terms of how long it

3    would take for Ms. Spaeth to adjust to the new schedule that she

4    was given."

02:20  5    Your answer was: "I can't give you an exact time

6    because they didn't even try.

7    "QUESTION: Can you give a rough time? How much?

8    "ANSWER: They should have been able to do it -- they

9    should be able to do it within a month, but it depends."

02:21  10    Did I read those two questions and the answers

11    accurately?

12    A. Yes. You're misinterpreting them though. As I said, it

13    depends.

14    Q. And we'll get to that.

02:21  15    A. And she might not have been able to do it at all.

16    Q. We'll get to that in a second, Doctor.

17    A. Yeah.

18    Q. One of the things that you testified to was that you

19    identify problems but you don't solve them; is that right?

02:21  20    A. Well, there are some that I don't solve them. I refer them

21    to somebody who is a specialist in a certain area.

22    Q. And you alluded to a job coach that Marlo had for a day?

23    A. Yes. Yeah.

24    Q. Can you tell us what that job coach supposedly did for her

02:22  25    to make her come to work on a regular schedule?

406

1  A.  Well, what a job coach's job is to help that person adapt to

2  or learn a skill, and sometimes it works and sometimes it

3  doesn't.

4  Q.  So it's an open question.

02:22  5  A.  Right.

6  Q.  Is being a job coach for this kind of a circumstance

7  something beyond your expertise?

8  A.  I've never done it.  I know the process, but I've not done

9  it.

02:22  10  Q.  So the -- you talked about avoiding conflict.  And that's a

11  feature of people -- a trait of people who have Down syndrome;

12  true?

13  A.  Generally.  Not always, but generally.

14  Q.  Do you know whether -- Strike that.

02:23  15       Do you know whether Marlo was exposed to conflict when

16  her schedule changed with her roommate?

17  A.  If there was it was minor.  I think Mr. Harlan tried to

18  indicate to me earlier that it was significant, but from what I

19  understood from Barbara it was not the case.

02:23  20  Q.  When you say "what I understood from Barbara," the fact is

21  you never talked to Barbara.

22  A.  It was in her testimony.

23  Q.  Did you ever talk to Barbara?

24  A.  No.

02:23  25  Q.  Did you know Barbara was Marlo's roommate?

407

1    A.  Yes.

2    Q.  Did you know that they had lived together for some 20 years?

3    A.  I knew it was for a while, yes.

4    Q.  Did you know that Marlo's best friend in this world is her

02:24    5    half sister Barbara?

6    A.  I wouldn't be surprised.

7    Q.  Okay.  Did you know that Barbara was in the very next room

8    when you interviewed Marlo?

9    A.  No, I did not.

02:24    10    Q.  Did you know that Barbara was available by telephone should

11    you want to ask her any questions?

12    A.  I did not know that, but I would assume that that would be

13    the case.

14    Q.  Did you make any effort to talk to Barbara about Marlo and

02:24    15    her reaction to her work schedule?

16    A.  I did not.

17    Q.  You said that you read her transcript.  What you read from

18    Barbara Barnes was portions of a transcript the EEOC sent to

19    you; right?

02:25    20    A.  Right.

21    Q.  You didn't get the whole document, true?

22    A.  Correct.

23    Q.  The symptoms according to your report that Amy Jo Stevenson

24    told you involved a memory loss.  That's something that you

02:25    25    sometimes see with dementia; right?

408

1    A.  Well, it's -- that's part of what dementia is, memory.

2    Q.  Sure.  And that her sister zoned out.  That also can be

3    associated with dementia; right?

4    A.  Yes.

02:25   5    Q.  And that she self-talks, that's associated with Down

6    syndrome; right?

7    A.  Yeah, but not -- all people do it to some extent, and -- but

8    people with Down syndrome, it's something that they're generally

9    known for.

02:25  10    Q.  So it's associated with Down syndrome and with aging.

11    A.  Yeah, but it's also in little kids.  You'll see a kid

12    playing and they're just jabbering away.

13    Q.  Associated with dementia too?

14    A.  No, it's just part of developmental process.

02:26  15    Q.  Irritation with others, is that something that's associated

16    with dementia?

17    A.  I'm sorry?

18    Q.  Irritation with others, is that something associated with

19    dementia?

02:26  20    A.  That depends.

21    Q.  Given those symptoms can you see why Nurse Practitioner

22    Kaminski might have thought this was dementia?

23    A.  She was going on the story that everybody who was having

24    trouble would have dementia.  This was a phone call.

02:26  25    Q.  Given those symptoms can you see why the differential

409

1    diagnosis would include dementia?

2    A.  Yes.  I'm not blaming her, I'm just saying that she didn't

3    know.  And that's part of my job is to teach people.

4    Q.  Was Amy not only present on the phone call on the visit in

02:26    5    2017, but also on the phone call in 2019?

6    A.  If it was 2019, yes.

7    Q.  Did you tell -- Strike that.

8         In your interview with Marlo Spaeth, when you met her

9    in person, did you ask her about any prior schedule changes that

02:27    10   she had been exposed to before November of 2014?

11   A.  I did not.

12   Q.  You didn't know how her schedule might have varied or

13   changed.

14   A.  As far from what I could gather, there was very little

02:27    15   change.  From when I talked to her, it was a schedule that she

16   had had for most of those 15 years.

17   Q.  Can you tell me the days of the week she usually worked?

18   A.  I think she was off Thursday.  She worked four days a week

19   for four hours each of those four days.

02:28    20   Q.  So you were under the impression that she worked every week

21   four days a week from 12:00 to 4:00.

22   A.  From 12:00 to 4:00.

23   Q.  Were you under the impression that she worked four days a

24   week?

02:28    25   A.  Four days a week.

1    Q.  And that didn't change or vary.

2    A.  It probably did a little bit.

3    Q.  A little bit.

4    A.  Yeah.

02:28    5    Q.  You didn't know how frequently.

6    A.  But I don't know.  Like I said, I was told it was a fairly

7    standard schedule for her for 15 years.

8    Q.  You didn't see any records, did you?

9    A.  No.

02:28    10   Q.  Did you ask how she adjusted to other changes in routines?

11   A.  No.

12   Q.  Did you ask Marlo what schedule she preferred?

13   A.  No.

14   Q.  Did you ask Marlo why she left early?

02:28    15   A.  Why she left early?

16   Q.  Yeah, why she would clock out before her shift ended?

17   A.  She was following her schedule.

18   Q.  Did you ask her?

19   A.  Yes.

02:29    20   Q.  Did you test Marlo's ability to understand?

21   A.  To some extent, like I said, I talked to her and I tried to

22   get an idea of how she would respond to things.

23   Q.  You mentioned that you criticized Dr. Thompson for not

24   asking questionnaires that are geared to Down syndrome patients,

02:29    25   did you administer any of those questionnaires?

411

1   A.  No.

2   Q.  Did you tell the EEOC that would be a good idea?

3   A.  No, because it's not generally a good idea.

4   Q.  Did you administer any objective test to measure or assess

02:29   5   what Marlo's level of understanding was?

6   A.  From a written, no.  I used my experience talking to her and

7   watching her.

8   Q.  Did you test her ability to read and comprehend?

9   A.  No.

02:30   10   Q.  Does she read the newspaper?

11   A.  She might.

12   Q.  Do you know?

13   A.  She might.  I saw her working on a puzzle, so she must be

14   reading something.

02:30   15   Q.  This tendency of those with Down syndrome to rely routine

16   and repetition, it's got a name in the field called the groove

17   theory; is that right?

18   A.  Well, that's a term that we sometimes use, yes.

19   Q.  And it means what you explained --

02:30   20   A.  Routine.

21   Q.  Routine.  There's no real test to determine whether someone

22   has it or not; is that right?

23   A.  It's -- no, in terms of a written test.  It's watching what

24   they do, how they behave.

02:31   25   Q.  And it's never been something that's been peer-reviewed in

412

1    the sense --

2    A.   I don't know if it's been peer-reviewed.  But I can tell you

3    that hundreds of providers of health care for people with Down

4    syndrome will either use the term or something similar to that.

02:31  5    Q.   The doctors and professionals who deal with people with Down

6    syndrome know about it and are familiar with the concept of the

7    groove theory.

8    A.   A lot of parents who have children with Down syndrome also

9    know that that happens.

02:31  10   Q.   But it's not commonly understood, it's not well understood

11   in the medical profession, is it?

12   A.   You know, there is not much taught about Down syndrome.  So

13   I'm not surprised they don't really know a lot.  They know about

14   the 21st chromosome.  They'll know that they have congenital

02:32  15   heart disease.  They might know that they have -- tend to have

16   Hirschsprung's disease and things like that.  But in terms of

17   all the many medical problems that they might have and their

18   strengths and their weaknesses, most of them have no idea.

19   Q.   Poorly understood in the medical profession that this groove

02:32  20   tendency group trait exists; right?

21   A.   It's not discussed.

22   Q.   Even among doctors.

23   A.   Even among doctors.

24   Q.   Is it true that some with Down syndrome possess the trait

02:32  25   and some do not?

1   A.  Yes.

2   Q.  And is it true that the trait can present in varying

3   degrees?

4   A.  I should say I would doubt that anyone has none of it; it's

5   varying degrees is probably a better way to put it.

6   Q.  Fair enough.

7   A.  Like I said, they look for constancy in their life.

8   Q.  It's also present in the general population to some extent,

9   isn't it?

10  A.  Yes and I said that.

11  Q.  I heard that.  You charge for your work; correct?

12  A.  Yes.

13  Q.  And in this case it was $300 an hour.

14  A.  Yes.

15  Q.  When I last saw your bills you had accumulated 26 hours on

16  this case and they ended in 2018.  Have you charged more since

17  then?

18  A.  I don't know.

19  Q.  Can you tell us how much you charge for your testimony so

20  far?

21  A.  I don't know.

22  Q.  You're charging for being here today; right?

23  A.  I will, yeah.  Well, it's interesting that I was asked how

24  much I charge and somebody told me, boy, that's not very much so

25  you better charge this.

02:32
02:33
02:33
02:33
02:33
02:34

414

1    Q.  It's probably Walmart.

2    A.  Probably Walmart.

3    Q.  You're currently retired; right?

4    A.  Correct.

02:34    5    Q.  And before you retired you saw patients in a family

6    practice; is that true?

7    A.  Yes.  Although the last few years of my practice it was just

8    people with Down syndrome.

9    Q.  Right.  And when you were in private practice in family

02:34    10   medicine, most of the people you treated and attended to didn't

11   have Down syndrome; right?

12   A.  Correct.

13   Q.  When you were in family practice you would spend I think one

14   day a month at the Down syndrome clinic that you founded?

02:34    15   A.  That was in the beginning, yes.

16   Q.  And after you closed your family practice you spent two days

17   a month at the Down syndrome clinic; is that right?

18   A.  I think it was a little bit more than that at first and then

19   it cut back.  I have some health problems and so I found that I

02:35    20   could not reliably get to the clinic.  And people would, you

21   know, spend a day trying to get to the clinic and then I

22   wouldn't be there, that just wasn't fair.

23   Q.  Sure.  You don't consider yourself Marlo Spaeth's treating

24   physician, do you?

02:35    25   A.  No.

                                                                      415

1    Q.   I think you -- is it fair to say you saw her for purposes of

2    legal consultation?

3    A.   Kind of.  It was a consultation.  If it was just legal I

4    would not have treated her, I think.  But I saw her and charged

02:35    5    her as if it was a medical consultation.

6    Q.   Didn't the EEOC pay your bill for seeing her?

7    A.   No.

8    Q.   Sure?

9    A.   I don't think so.

02:36    10    Q.   I'm going to show you the --

11    A.   Maybe they did.  I don't know.

12    Q.   I'm going to show you the bills to help you remember.

13           MR. BURNETT:  Your Honor, I don't see a need to mark

14    these unless the Court wants that done if I'm just going to

02:36    15    refresh recollection.

16           THE COURT:  If all you're going to do is refresh the

17    recollection, that's fine.

18    BY MR. BURNETT:

19    Q.   Doctor, I'm going to show you a document that I'll just ask

02:36    20    you to read to yourself and tell us whether or not that helps

21    you remember.

22    A.   It does say that I did charge for that.

23    Q.   To the EEOC?

24    A.   Yeah.

02:36    25    Q.   Okay.  Thank you.  I think you told us already, but you

1  volunteered for this litigation, true?

2  A.  Correct.

3  Q.  You said, I think to use your words, that you got fired up;

4  right?

02:37  5  A.  Yeah.

6  Q.  After reading a newspaper article?

7  A.  Well, somebody reported it to me or I read it, one or the

8  other.

9  Q.  And then you called the EEOC and suggested you might get

02:37  10  involved and work for them.

11  A.  I asked them if they could use my help.

12  Q.  And they said yes?

13  A.  Yeah.  Yes.

14  Q.  Your son has Down syndrome?

02:37  15  A.  Yes, he does.

16  Q.  Is it true that what you brought to this case, that you

17  undertook the case to review it, prepare a report, reach

18  conclusions all after a career of advocating for people with

19  Down syndrome?

02:37  20  A.  It was after that, yes.

21  Q.  And when we look on your curriculum vitae on page 11, did

22  you give a presentation --

23       That would be Exhibit 38 for your reference.  Page 11.

24  Are you there, Doctor?

02:38  25  A.  What page?

1    Q.  Page 11.  So it would be the last page.

2    A.  Okay.

3    Q.  Did you give a publication called "The Family Practitioner

4    as Advocate and Advocate Stimulator"?

02:38    5    A.  Correct.

6    Q.  And that was given at the Ross Roundtable on Health Care for

7    Individuals with Down Syndrome in Washington, D.C.?

8    A.  Correct.

9         MR. BURNETT:  Okay.  Thank you, Doctor, that's all

02:38    10    I've got.

11         THE COURT:  Any redirect?

12         MS. VANCE:  Thank you.

13         THE WITNESS:  Do you want to know what that's all

14    about?

02:39    15                    REDIRECT EXAMINATION

16    BY MS. VANCE:

17    Q.  Dr. Smith, you mentioned that -- I heard you mention that

18    it's common for parents of children with Down syndrome to know

19    the importance of routine.

02:39    20    A.  Correct.

21    Q.  Now, is that tendency, that need for routine something you

22    would notice about a person with Down syndrome if you were their

23    work colleague for 15 years?

24         MR. BURNETT:  Your Honor, I think we don't have any

02:39    25    foundation for this.

418

1        THE COURT:  Sustained.

2    BY MS. VANCE:

3    Q.  Is the desire for routine in Down syndrome something a

4    person could notice by spending a lot of time with somebody who

02:40    5    has Down syndrome?

6    A.  Yes.

7    Q.  And on the issue of a routine including days of the week and

8    hours, if a person's hours of work are the same every time they

9    go to work, is that still a routine even if the days of the week

02:40   10    may differ from week to week?

11    A.  Yes.  Very much so.

12    Q.  Can you explain why?

13    A.  Well, it's -- once you're there -- I mean, it's like when

14    one of us goes on vacation, we come back to work.  We haven't

02:41   15    forgotten how to do it just because we weren't there for one or

16    two weeks or whatever.

17        So they still have the routine that when they are in

18    that setting -- who knows what stimulates that.  The sights, the

19    smells, the sounds, all those things have an impact on them, and

02:41   20    then here I am, these are the hours that I work when I'm here.

21    Q.  These are the hours that I work when I'm here?

22    A.  They probably don't think of it that way, but they know what

23    their schedule is.

24        MS. VANCE:  Thank you.  I have no further questions

02:41   25    for the witness.

419

1          THE COURT:  Okay.  Thank you, Dr. Smith, you can step

2   down.

3          (Witness excused at 2:41 p.m.)

4          THE COURT:  Okay.  We'll take a recess at this point.

02:41  5          MS. VANCE:  Sure.

6          THE COURT:  Okay.  We'll take our afternoon recess.

7          (Jury out at 2:42 p.m.)

8          (Discussion off the record.)

9          MR. HARLAN:  Can we wait until they close their case?

02:44  10          THE COURT:  Sure.

11          MR. HARLAN:  Thank you, Your Honor.

12          THE COURT:  We may have you proceed with your case and

13   then reserve your right to make your motion till the end of the

14   day so we don't move back and forth with the jury.

15          MR. HARLAN:  Absolutely.  Not a problem.

16          THE COURT:  But you can formulate it in-between then.

17          Okay, we're in recess then until about five to maybe,

18   3:00, in that area.

19          (Recess taken at 2:45 p.m., until 3:01 p.m.)

03:02  20          (Jury in at 3:02 p.m.)

21          THE COURT:  Okay, please be seated.  And you may

22   proceed.

23          MS. VANCE:  Thank you, Your Honor.

24          The plaintiff now will read from excerpts from the

03:02  25   deposition of Walmart's corporate deponent.

420

1    THE COURT:  Okay.

2    LEE SPUDE, PLAINTIFF WITNESS, VIA DEPOSITION

3    DESIGNATIONS READ AS FOLLOWS:

4    Q.  Good morning, Mr. Spude.

03:03    5    A.  Good morning.

6    Q.  Mr. Spude, you're the market human resources manager for the

7    Wisconsin region; is that correct?

8    A.  For a portion of the Wisconsin region, yes.  I oversee two

9    of the seven territories now.  It's either seven or eight.  So I

03:03    10    oversee 23 stores in what we currently call Market 440 and

11    Market 436.

12    Q.  And do you understand that you've been designated as

13    Walmart's corporate witness?

14    A.  I do.  I understand.

03:03    15    Q.  Okay.  And so this means you're required to testify about

16    all the information which is known or reasonably available to

17    Walmart regarding the subjects and documents identified in

18    EEOC's Rule 30(b)(6) corporate deposition notice.

19    A.  I understand.

03:04    20    Q.  I'd like to have Exhibit 1061, which is admitted into

21    evidence.

22    (Exhibit 1061, Accommodation in Employment -

23    (Medical-Related) Policy - Wisconsin - March 5, 2014 [D001004 -

24    D001008], admitted previously by stipulation.)

03:04    25    Q.  And can you take your time and review that.

1    A.   Okay.  I've reviewed document 1061.  I haven't read it word

2    for word in its entirety, but it looks accurate to the documents

3    that I have reviewed to prepare for the testimony.

4    Q.   Okay.  And this policy applies to all associates who work

03:04   5    for Wal-Mart Stores, Inc. or one of its subsidiary companies in

6    Wisconsin; is that correct?

7    A.   That's correct.

8    Q.   So the policy indicates on page 2, let's look at that, that

9    reasonable accommodations can include providing part-time or

03:05   10   modified work schedules; is that correct, if you look at the

11   center of the page?

12   A.   Yes.  On bullet point 4, under "reasonable accommodations

13   can include," it states "providing part-time or modified work

14   schedules."

03:05   15   Q.   Yes.  And the policy provides that "an associate can request

16   a reasonable accommodation at any time by telling a salaried

17   member of management that they need help to do their job because

18   of their condition;" correct?

19   A.   If you can, clarify where you are referring to specifically.

03:05   20   Q.   Sure.  If you look at the bottom of page 2, the last line.

21   "You may request a job adjustment or reasonable accommodation at

22   any time by telling any salaried member of management in your

23   facility, or an HR representative, that because of your

24   condition you need help to do your job or gain access to your

03:06   25   workplace."

422

1    A.   That is correctly read, yes.

2    Q.   And the policy also specifically states that "a family

3    member, friend, job coach or health care professional may also

4    request such assistance on the associate's behalf;" correct?

03:06  5    A.   Correct.

6    Q.   Okay.  And the policy also provides that "as soon as you

7    request an accommodation based on a medical condition, we will

8    begin working with you to determine whether or not you're

9    eligible for a job adjustment due to your medical condition."

03:06  10   Is that accurate?

11   A.   That's accurate, yes.

12   Q.   "And if a job adjustment's not granted, we will continue to

13   work with you to determine whether you are eligible for a

14   reasonable accommodation due to a disability."  Is that correct?

03:06  15   A.   That is accurate.

16   Q.   Is that accurate?

17   A.   That is accurate, correct.

18   Q.   Did Walmart consider returning Marlo Spaeth to her noon to

19   4:00 schedule as a reasonable accommodation in 2014?

03:06  20   A.   Prior to Marlo's termination -- I think that can help

21   quantify the time concern -- prior to Marlo's termination there

22   was no consideration to adjust her schedule to a noon to 4:00

23   schedule.  The reason that there was no -- no consideration for

24   that, is there was never an accommodation request; nor did the

03:07  25   company see any reason nor any suggestion that Marlo would need

423

1    an accommodation to adjust her schedule to the noon to 4:00

2    shift.

3    Q.  But the policy says you may request a reasonable

4    accommodation at any time by telling any salaried member of

03:07    5    management in your facility that because of your condition you

6    need help to do your job; is that correct?

7    A.  Yes, it specifically states that you may request an

8    accommodation.  Yes, you are correct in saying that.

9    Q.  By telling a salaried member of management that you need

03:07    10    help.

11    A.  Yes.  You are accurately reading this, yes.

12    Q.  And you testified that Walmart did not consider returning

13    Marlo Spaeth to her noon to 4:00 schedule as an accommodation

14    prior to her termination; is that correct?

03:08    15    A.  That is correct, yeah.

16    Q.  Did Walmart consider returning Marlo Spaeth to her noon to

17    4:00 schedule as an accommodation after her termination?

18    A.  After her termination there was an investigation into

19    multiple aspects of the case that you are referring to and, as

03:08    20    part of that thought process, yes, that was considered regarding

21    to whether or not a modified schedule is an option of any kind.

22    So the answer to your question is specifically, yes, that was

23    considered at that time.

24    Q.  What was the determination of that consideration?

03:08    25    A.  The ultimate determination was that she should not be

424

1    reinstated.  And so the conversation specifically of what her

2    schedule would or wouldn't be never came to fruition because it

3    was decided that she would not be reinstated.

4             So an associate who is not reinstated has no need for

03:08    5    a schedule of any kind.  So the final determination of what her

6    schedule should be was never -- a final decision never came to

7    fruition.

8    Q.  Okay.  So let's look at what is admitted as Exhibit 30.

9    Take time to review that.

03:09    10   A.  Okay.  And, again, I haven't read it in its entirety word

11   for word, but it looks accurate to my knowledge.

12   Q.  Okay.  So these are the Accommodation in Employment,

13   Medical-Related Management Guidelines of Walmart that were in

14   effect between June 2013 and August 2015; is that correct?

03:09    15   A.  That's correct.

16   Q.  And these guidelines applied to all supervisors and managers

17   who worked for Walmart nationwide from June 2013 to August 2015;

18   is that correct?

19   A.  That's correct.

03:09    20   Q.  And these national Walmart guidelines also indicate that

21   family members of an associate can request an accommodation on

22   their behalf; correct?

23   A.  I can confirm that under the heading "Identifying a Request

24   For Job Assistance," the first section starts to read:  "An

03:10    25   associate may request job assistance in a variety of ways."

425

1    Q.  Yes.

2    A.  "She or he may make the request directly, or a family

3    member, job coach" or, excuse me, "friend, job coach, health

4    professional or other person may make the request on the

03:10    5    associates's behalf."  Is that what you're referring to?

6    Q.  Yes.  So the national management guidelines also indicate

7    that family members of an associate can request an accommodation

8    on their behalf; right?

9    A.  Yes.

03:10    10    Q.  Okay.  And the guidelines also describe something called

11    "request for job assistance;" is that correct?

12    A.  That's correct.

13    Q.  And they're also referring to JAs; right?

14    A.  Yes, JAs, correct.

03:10    15    Q.  And these guidelines state that "job assistant requests can

16    be approved at the store level;" correct?

17    A.  Correct.

18    Q.  And the policy states:  "Medical information is not

19    necessary if the associate has a known or easily observable

03:11    20    disability;" correct?

21    A.  Correct.

22    Q.  And the guideline states, if you go to the next page, under

23    the heading "Scheduling," that "minor changes to availability

24    and scheduling preferences are a category of job assistance that

03:11    25    can be approved in the store by a facility manager;" right?

426

1   A.  Yes.  Under the heading "Requests That Can Be Approved as

2   JAs" it does specify that scheduling is an option.

3   Q.  Okay.  And the guidelines also state that "if an associate

4   makes a request that does not qualify as a request for a job

03:11   5   assistance that can be approved in the store facility manager,

6   the request must be immediately forwarded to the Accommodation

7   Service Center;" correct?

8   A.  That is correct.

9         (Deposition read-in concluded at 3:12 p.m.)

03:12   10              *   *   *

11         MS. VANCE:  That ends the reading from the corporate

12   deposition of Walmart taken April 5th, 2019.

13         THE COURT:  Okay.  Any further evidence then from the

14   plaintiff?

03:12   15         MS. VANCE:  The EEOC rests, Your Honor.

16         THE COURT:  Okay.  The EEOC has rested.

17         Defendant Walmart?

18         MR. HARLAN:  We are calling Barbara Barnes as our

19   first witness, adversely.

03:14   20         THE COURT:  All right.

21         THE CLERK:  If the witness would please raise your

22   right hand.

23         BARBARA BARNES, DEFENSE WITNESS, DULY SWORN

24         THE CLERK:  Please state your name.

03:14   25         THE WITNESS:  Barbara Barnes.

427

1                              DIRECT EXAMINATION

2     BY MR. HARLAN:

3     Q.  Good afternoon, Ms. Barnes.  I'm going to be asking you

4     questions.  Let me ask you, do you have a preference in terms of

03:14  5     where you would like me to be when I'm talking to you?  Do you

6     want me to sit down?  Do you have any preference of whether I

7     stand up, come over by you?  I'll let you run the show.

8     A.  Doesn't matter.

9     Q.  Okay.  So do you recall meeting with me at your deposition

03:15  10    in this case; correct?

11    A.  Yes.

12    Q.  And we had a discussion about a number of facts relating to

13    Marlo Spaeth who is your roommate; correct?

14    A.  Yeah.

03:15  15    Q.  And she is somebody that you share an apartment with;

16    correct?

17    A.  Yes.

18    Q.  And you shared an apartment with her for more than 10 years;

19    correct?

03:15  20    A.  Yes.

21    Q.  And in that apartment it's just been you and her there;

22    correct?

23    A.  Yeah.

24    Q.  Living on your own.

03:15  25    A.  Yeah.

428

1  Q.  And I think at the deposition one of the things that we

2  established early on was in terms of the person who you are the

3  closest to in the whole world is Marlo Spaeth.

4  A.  Yes.

03:15  5  Q.  And that continues to be the case; correct?

6  A.  Yes.

7  Q.  In short, she's your best friend.

8  A.  Yes, she is.

9  Q.  So if somebody wanted to know something about Marlo Spaeth

03:16  10  in terms of her habits, routines, likes, dislikes, is there

11  anybody in the world who would have a better handle on that than

12  you?

13  A.  Uh-uh.

14  Q.  You're the best person in the world to know what Marlo is

03:16  15  about; correct?

16  A.  Yes.

17  Q.  And you certainly wouldn't want to see anything bad happen

18  to Marlo, would you?

19  A.  No, I wouldn't.

03:16  20  Q.  And you would do everything you could to protect her.

21  A.  Yes.

22  Q.  You love her.  She's your best friend; correct?

23  A.  Yes.

24  Q.  Now, your families have been close; right?  My understanding

03:17  25  is Ms. Spaeth's mother married your dad; correct?

429

1  A.  Yes.

2  Q.  And your families have always been pretty close; correct?

3  A.  Yes.

4  Q.  Do you know that Amy Jo Stevenson testified in this case?

03:17  5  A.  Yes.

6  Q.  Did she talk to you about her testimony that she gave in

7  this case?

8      MS. CARTER:  Objection, foundation.

9  BY MR. HARLAN:

03:17  10  Q.  Did you speak to Amy Joe Stevenson about the fact that she

11  testified in this trial?

12      MS. CARTER:  Objection, confusing.

13      THE COURT:  Overruled.  Can you answer that question,

14  Ms. Barnes?  Do you want to read it back

03:17  15      MR. HARLAN:  I'll try to break it down.

16  BY MR. HARLAN:

17  Q.  Did you talk to Amy Jo yesterday?

18  A.  Yeah, I talked to her yesterday.

19  Q.  And what did you talk to her about?

03:18  20  A.  She talked about that she testified here yesterday.

21  Q.  And so when Ms. Stevenson testified we didn't really get a

22  lot about her background in her testimony.  So you know

23  Ms. Stevenson pretty well; correct?

24  A.  Yes.

03:18  25  Q.  And did she go to college?

                                                                      430

1   A.  Yes, she did.

2   Q.  And she got a college degree, didn't she?

3   A.  Yes.

4   Q.  In fact, isn't she a CPA, an accountant?  If you know.

03:18   5   A.  No, I don't know.

6   Q.  Does she run her own business?

7   A.  Yes, she does.

8   Q.  And what kind of business does she run?

9   A.  She does screen printing with T-shirts and sweatshirts and

03:18   10  stuff.

11  Q.  Okay.  So she's a business woman.

12  A.  Yes.

13  Q.  Okay.  A pretty astute sophisticated individual.

14  A.  Yes.

03:19   15  Q.  There's also been some testimony in this case about

16  Ms. Spaeth and her reading.  And I think we covered that at your

17  deposition.  We talked about Marlo and her ability to read.  So

18  one thing we can establish is that Marlo does have the ability

19  to read; correct?

03:19   20  A.  Yes.

21  Q.  And she also has the ability to understand things; correct?

22  A.  Yes.

23  Q.  And when you ask her questions at home she can answer those

24  questions.

03:19   25  A.  Yes.

431

1  Q.  And she reads the newspaper; correct?

2  A.  Yes.

3  Q.  And she reads it every day, at least at the time of the

4  deposition; right?

03:19  5  A.  Yeah.

6  Q.  After she reads the paper and you read the paper, you all

7  discuss what you read; correct?

8  A.  Yeah.

9  Q.  And so based on your discussions with Ms. Spaeth after

03:20  10  reading the paper, you have developed a understanding and belief

11  that she understands the things that she's read in the

12  newspaper; correct?

13  A.  Yes.

14  Q.  And that was the case when she was working at Walmart;

03:20  15  correct?

16  A.  Yeah, she could read.

17  Q.  Thank you.  And including during the period of time when she

18  worked at Walmart; correct?

19  A.  Yeah.

03:20  20  Q.  So when we met in Manitowoc for your deposition in this

21  case, it was during football season; correct?

22  A.  Yes.

23  Q.  And I think we had a lot of discussions about you and

24  Ms. Spaeth's favorite football team; right?

03:21  25  A.  Yeah.

432

1    Q.  That wouldn't be the Chicago Bears, would it?

2    A.  No.

3    Q.  And prior to that deposition you spent some time with the

4    fine lawyers from the EEOC, didn't you?

03:21   5    A.  (No response.)

6    Q.  Before you had your deposition did you meet with lawyers

7    from the EEOC?

8    A.  Yes.

9    Q.  Okay.  What did you all discuss at that meeting?  Were they

03:21   10    helping you to prepare for your deposition?

11    A.  Yes.  Yeah.

12    Q.  Let me know if I'm speaking too fast.  I tend to be

13    rapid-fire so I apologize if that's the case.  So when you met

14    with them they were giving you some idea of what was going to be

03:21   15    discussed at the deposition; correct?

16    A.  Yeah.

17    Q.  Did they repeat the same thing for this case?  Did they meet

18    with you and talk to you about the testimony that you were going

19    to give at this trial?

03:22   20    A.  (No response.)

21    Q.  Do you recall that, ma'am?

22    A.  No.

23    Q.  Have you spoken with the lawyers from the EEOC in the last

24    week?

03:22   25    A.  Yeah.

433

1  Q.  Okay.  And would you tell us what you discussed with the

2  lawyers from the EEOC.

3  A.  They just went over the stuff about what they're going to be

4  talking about.

03:22  5  Q.  Okay.  Did they explain to you why you, as a person who was

6  the closest person to Marlo Spaeth in the world, would not be

7  called by them in this case?

8  A.  (No response.)

9  Q.  Let me try to repeat the question.  Did they tell you or

03:23  10  explain to you why, since they are bringing a case on behalf of

11  Marlo Spaeth, they would not put you up as a witness in this

12  case?

13  A.  (No response.)

14  Q.  Did you have any discussion along those lines?

03:23  15  A.  (Nods.)

16  Q.  So you're here today because Walmart issued a subpoena

17  asking you to come and testify today; correct?

18  A.  (Nods.)

19  Q.  Did you receive a piece of paper from somebody who knocked

03:24  20  on your apartment door?

21  A.  Yes.

22  Q.  And said that you should come and testify in this case;

23  correct?

24  A.  Yes.

03:24  25  Q.  All right.  And when you got that piece of paper did you

434

1    call anybody to let them know that you received the piece of

2    paper asking you to come testify?

3    A.   Yeah, I talked to Marlo's sister, Amy Jo.

4    Q.   Okay.  And then did you talk to any of the folks from the

03:24    5    EEOC?

6    A.   Amy called them up.

7    Q.   Okay.  And what can you tell us about that conversation?

8    A.   I don't know.

9            MS. CARTER:  Objection.  Foundation.

03:24   10            THE COURT:  Sustained.

11   BY MR. HARLAN:

12   Q.   So for your -- and it's perfectly fine that you would have

13   met and talked with the lawyers.  The judge is going to give an

14   instruction to the jury perhaps that that's certainly

03:25   15   permissible, but I think it's just important to understand the

16   relationship.

17            So did you meet with the lawyers from the EEOC or have

18   a phone call with them to prepare for your testimony today?

19   A.   Yes.

03:25   20   Q.   Okay.  When did you first have a phone call to prepare for

21   what's happening today?

22   A.   I don't remember what day that was on.

23   Q.   Was it this week?

24   A.   It was a few weeks ago.

03:26   25   Q.   Okay.  And so you haven't spoken with the lawyers from the

435

1    EEOC about anything for two weeks.

2    A.  Yeah.

3    Q.  Okay.  And when you had that conversation two weeks ago, did

4    they talk about the things that would likely come up today?

03:26  5    A.  They talked to us on the phone about it.

6    Q.  When you say "they talked with us," was --

7    A.  They talked to Marlo and talked to me about it.

8    Q.  Okay, thank you.  So just a little bit with your educational

9    background.  My understanding is you went to Lincoln High School

03:26  10   in Manitowoc?

11   A.  Yes.

12   Q.  And you graduated.

13   A.  Yes.

14   Q.  What's the mascot for your old high school?  Do you

03:26  15   remember?

16   A.  I don't remember.

17   Q.  Okay.  And at your deposition one of the things that I think

18   you told me, and I think you were proud of, is that you have a

19   pretty good memory; correct?

03:27  20   A.  Yes.

21   Q.  And as you are here today, you still have a pretty good

22   memory; correct?

23   A.  Yes.

24   Q.  And obviously I think at our deposition I didn't see you

03:27  25   with a walker, so I assume you've had some health issues since

436

1  the last time we met at your deposition; correct?

2  A.  Yes.

3  Q.  I don't want to get into the specifics, but it doesn't have

4  anything to do with your memory; correct?

03:27  5  A.  No.

6  Q.  So your memory is not affected by whatever condition you

7  have, to your knowledge; correct?

8  A.  Correct.

9  Q.  So I don't want to create any conflict with your roommate,

03:27  10  but one of the things we discussed today was bowling and I asked

11  your roommate who the better bowler was, and who do you think

12  she said was a better bowler?

13  A.  I was.

14       (General laughter.)

03:28  15  BY MR. HARLAN:

16  Q.  Like I said, I won't go there.  So I think when we spoke at

17  your deposition, you know, you talked about some of the

18  activities that you and Ms. Spaeth enjoyed; correct?

19  A.  Yes.

03:28  20  Q.  And I think one of the things that you told me that you and

21  Marlo like to do is to go to Brewers games.

22  A.  Yeah.

23  Q.  Have you continued to go to Brewers games with Marlo?

24  A.  We haven't been to a game yet.

03:28  25  Q.  Do you all watch Brewers baseball on TV?

437

1    A.   Yes, we do.

2    Q.   Do you call yourselves loyal dedicated fans?

3    A.   Yes.

4    Q.   Did they play last night?

03:28    5    A.   No.

6    Q.   They play tonight?

7    A.   (Nods.)

8    Q.   And then you also, in addition to bowling, and I'll probably

9    butcher the name, is it bocce ball?

03:29    10    A.   Bocce ball, yeah.

11    Q.   That's another thing that you and Ms. Spaeth like to do;

12    right?

13    A.   Yes.

14    Q.   And it's something that you were doing when Ms. Spaeth was

03:29    15    at Walmart; correct?

16    A.   Yes.

17    Q.   And it's something that you're doing up until this day;

18    correct?

19    A.   Yeah.

03:29    20    Q.   And you also go to church on a regular basis.

21    A.   Yes.

22    Q.   With Ms. Spaeth; correct?

23    A.   Yes.

24    Q.   And you and Ms. Spaeth also shop at Walmart.

03:29    25    A.   No, well, grocery shopping we go to the Festival Food.

438

1    Q.  Did you used to shop at Walmart?

2    A.  We used to go, yeah.

3    Q.  And that was a favorite activity when Ms. Spaeth was working

4    at Walmart; correct?

03:29    5    A.  Yes.

6    Q.  And shopping, bocce ball, bowling, shopping at Festival

7    Foods, those are things that you and Ms. Spaeth did prior to her

8    leaving Walmart and afterwards; correct?

9    A.  Yes.

03:30    10    Q.  And we heard some testimony about the Wellness Center, so

11    that's another activity that you and Ms. Spaeth engage in;

12    correct?

13    A.  Yes.

14    Q.  And when she was at Walmart she would go with you from time

03:30    15    to time?

16    A.  Yes.

17    Q.  And now that she's no longer at Walmart she goes with you a

18    couple of times a week to exercise; correct?

19    A.  Yeah, we used to do that.  We don't anymore.

03:30    20    Q.  And when did you stop going a couple times a week?

21    A.  We stopped going when they had that -- when the virus

22    started last year.

23    Q.  And so you haven't done that for a while.

24    A.  No.

03:31    25    Q.  But you were doing it prior to the virus after Ms. Spaeth

439

1    left Walmart.

2    A.   Yes.

3    Q.   And is that something that she seemed to enjoy?

4    A.   Yes.

03:31    5    Q.   We also discussed cooking and who has the cooking duties in

6    the household; right?

7    A.   Yeah.

8    Q.   And I think you told me that you cook?

9    A.   Yeah.

03:31   10    Q.   And Ms. Spaeth cooks.

11    A.   Yes.

12    Q.   So she has the ability to prepare meals just like you do;

13    correct?

14    A.   Correct.

03:31   15    Q.   And she still does that; correct?

16    A.   Yes.

17    Q.   And so do you.

18    A.   Yeah.

19    Q.   Now, we talked with Ms. Spaeth briefly about Special

03:31   20    Olympics, that she is going to participate -- participant in

21    Special Olympics for a number of years and I take it so have

22    you.

23    A.   Yeah.

24    Q.   And that goes back to prior to 2014; correct?

03:31   25    A.   Yeah.

1    Q.   And from that point to the present you all have been active

2    in Special Olympics; correct?

3    A.   Yeah.

4    Q.   We also talked about somewhat of a sensitive issue at your

03:32    5    deposition and I'm only going to briefly touch on it because it

6    has something to do with the case.  We talked about Marlo's

7    mother passing.  Do you remember that?

8    A.   Yeah.

9    Q.   And if I'm correct, Ms. Spaeth's mother died after she left

03:32    10    Walmart, some point after that; correct, around 2016?

11    A.   Yeah.

12    Q.   And when that event happened Ms. Spaeth was sad; correct?

13    A.   Yeah.

14    Q.   And you saw her cry on that occasion.

03:33    15    A.   Yes.

16    Q.   And even to this day you hear Ms. Spaeth talk about how she

17    misses her mother; correct?

18    A.   Yes.

19    Q.   Now I want to talk about another issue that we've heard a

03:33    20    lot about in this case and that's the bus.  So the bus is the

21    primary mode of transportation for you and Ms. Spaeth; correct?

22    A.   Yes.

23    Q.   Neither one of you drive.

24    A.   No.

03:33    25    Q.   And so you're pretty good at being able to get where you

441

1    need to go on the bus; correct?

2    A.  Yes.

3    Q.  And that means that I assume that you, for instance, know

4    the bus routes and schedules and what time they come.

03:33    5    A.  Yeah.

6    Q.  And so does Ms. Spaeth, from your understanding.

7    A.  Yeah.

8    Q.  Okay.  And the bus stop is really right across the street

9    from your apartment; correct?

03:34    10    A.  Yes.

11    Q.  And my understanding is for the entirety of Ms. Spaeth's

12    employment she never expressed any concern about taking the bus;

13    correct?

14    A.  No.

03:34    15    Q.  Does she have any concern about taking a bus?

16    A.  No.

17    Q.  And from your experience as someone who uses the bus system

18    in Manitowoc, would you agree with me that it's a pretty

19    reliable system?

03:34    20    A.  Yes.

21    Q.  And would you also agree that the buses run with some

22    frequency?

23          MS. CARTER:  Objection, foundation.

24    BY MR. HARLAN:

03:34    25    Q.  Do you know if the buses run with some regularity based on

442

1    your experience?

2    A.  Yeah.

3    Q.  Thank you.  And based on what you observed with Ms. Spaeth,

4    you've seen her take a variety of different buses within the

5    Manitowoc bus system; correct?

6    A.  Yeah.

7    Q.  She's not wedded to one particular bus; am I correct?

8    A.  No.

9    Q.  Am I correct that she takes a variety of different buses and

10   doesn't rely on any one particular bus?

11         MS. CARTER:  Objection, foundation and compound.

12         THE COURT:  Can you rephrase?

13   BY MR. HARLAN:

14   Q.  Okay.  So you're familiar with Ms. Spaeth in terms of her

15   utilization of the bus system; correct?

16   A.  Yes.

17   Q.  And based on your knowledge from observing her take

18   different buses, does she rely on a particular bus to get around

19   or does she take buses at different times and different parts of

20   the day?

21         MS. CARTER:  Objection, compound.

22         THE COURT:  Overruled.

23         THE WITNESS:  She would take Route 3 to get over to

24   Walmart when she was working there.  And then otherwise if she

25   was just going shopping or out to eat, then she would just stay

1    on the 1 bus.

2    BY MR. HARLAN:

3    Q.   And the Route 3 bus that you mentioned runs at different

4    times; correct?

03:36    5    A.   Yeah.

6    Q.   So besides taking the bus to work, taking it to the Wellness

7    Center, are there some other places that you and Ms. Spaeth

8    would take the bus?

9    A.   Yeah, we take it to go out to eat sometimes on Saturdays.

03:36    10   We take the bus to go out to McDonald's or Culver's.

11   Q.   And with the particular bus that you would catch, would it

12   always be the same bus at the same time or it just depend at the

13   time of the day that you wanted to go?

14   A.   It's the same bus.

03:37    15   Q.   And it was always at the same time?

16   A.   Yes.

17   Q.   And what time was that?

18   A.   We'd always take the bus at 11:15 on Saturday and catch the

19   bus there and then go to get dropped off to where we were going

03:37    20   to go out to eat that day.

21   Q.   Okay.  Now, you also mentioned to me that while Ms. Spaeth

22   was at Walmart working, you would from time to time go and see

23   her while she was working; correct?

24   A.   Yes.

03:37    25   Q.   And I think you told me that on some of the occasions when

1  you would go see her working at Walmart, she would be helping

2  customers.

3  A.  Yes.

4  Q.  And in terms of directing them to where they could go find

03:37  5  things that they were looking for; correct?

6  A.  Yes.

7  Q.  And she didn't have any -- you didn't notice her having any

8  difficulties in that activity; correct?

9  A.  No.

03:38  10  Q.  Now, at some point you're aware that Ms. Spaeth, her work

11  hours changed from the hours that she used to work; correct?

12  A.  Yes.

13  Q.  And one of the things that happened as a result of her hours

14  changing is that you weren't happy about it; correct?

03:38  15  A.  No.

16  Q.  So, I mean, you were not pleased when she got different

17  hours; correct?

18  A.  Yeah, because she wouldn't get home until later.

19  Q.  And as a result of her having to come home later because the

03:38  20  new work schedule that she had, the impact on you was that

21  supper would be later than it would typically have been;

22  correct?

23  A.  Yes.

24  Q.  And you talked to Ms. Spaeth about that; correct?

03:39  25  A.  She told me she didn't like her hours being changed.  When

445

1    she first was -- when she worked with Brett -- Brett was the

2    manager at Walmart, he had her work from noon to 4:00 and she

3    said -- she'd get home at 5:00 for supper then.  When they

4    switched her hours she didn't get home until later at night.

03:39    5    Q.  Right.

6    A.  She complained to her -- she talked to her mom and her

7    sister about it.

8    Q.  And that was -- when she talked to her mom and sister about

9    it, that was pretty soon after she got those new hours; correct?

03:39    10   A.  Yeah.

11              MS. CARTER:  Objection, vague.

12              THE COURT:  Just a minute, "pretty soon."  Is that too

13   vague?  Okay, sustained.

14   BY MR. HARLAN:

03:40    15   Q.  So when you testified that Ms. Spaeth spoke with her mother

16   and sister about the hour change, how soon was it after the hour

17   change that you recall her talking to her mother and her sister

18   about that?

19   A.  Right after her hours got changed she talked to them.

03:40    20   Q.  Thank you.  And you also talked to Ms. Spaeth about the fact

21   that you weren't pleased that you were having to have supper

22   later because her hours had changed; correct?

23   A.  Yeah.

24   Q.  Now, you mentioned that her hours changed, but there was a

03:40    25   point in time when she worked from noon to 4:00 that she would

1  come home earlier than 4:00; correct?

2  A.  When she worked from noon to 4:00 she'd get home about a

3  little after 5:00.

4  Q.  Do you recall any occasions when she came home earlier than

03:41  5  that?

6  A.  No, I don't.

7  Q.  One of the things that you told me in the deposition was

8  Marlo's feeling about her supervisor, Julia; correct?

9  A.  (No response.)

03:41  10  Q.  Let me back up.  Do you recall that one of the folks who

11  supervised Ms. Spaeth was named Julia?

12  A.  Julie.

13  Q.  Julie.  And is her last name Stern?

14  A.  I don't know what her last name is.

03:41  15  Q.  Okay.  And Ms. Spaeth told you that she didn't like Julie;

16  correct?

17  A.  Yes.

18  Q.  And she said that Julie was always trying to tell her what

19  to do on the job; right?

03:42  20  A.  Yeah.

21  Q.  But Marlo never said Julie was mean or nasty or used bad

22  language, did she?

23         MS. CARTER:  Objection, compound.

24         MR. HARLAN:  I'll withdraw.

03:42  25  BY MR. HARLAN:

447

1    Q.  Did Ms. Spaeth ever tell you that Julie was mean to her?

2    A.  She'd always tell me that she never liked her.

3    Q.  Did she ever tell you that Julie was nasty to her?

4    A.  No.

03:42    5    Q.  Okay.  Or that she had used bad language with her?

6    A.  No.

7    Q.  And you saw this person named Julie on occasion when you

8    would visit the Manitowoc store; correct?  The Manitowoc

9    Walmart.

03:43    10    A.  Yeah.

11    Q.  And she was never mean to you, was she?

12    A.  I didn't know her so I wouldn't --

13    Q.  She never did anything bad to you when you would visit

14    there, did she?

03:43    15    A.  No.

16    Q.  So you -- I think you testified that you have a pretty good

17    recollection of when Ms. Spaeth's hours changed from 12 to 4:00

18    and she was working later; correct?

19    A.  Yeah.

03:43    20    Q.  And when that happened she still got up around the same

21    time?

22    A.  Yeah.

23    Q.  Went to bed about the same time?

24    A.  Yeah.

03:43    25    Q.  Seemed to be a happy person; correct?

448

1    A.   Yeah.

2    Q.   And her health appeared to be the same; correct?

3    A.   Yeah.

4    Q.   And one of the things you noticed after her hours changed

03:44   5    was that she was coming home like she was working her previous

6    schedule; correct?   Early.

7    A.   (No response.)

8    Q.   I'll withdraw.   After Ms. Spaeth's schedule changed you

9    noticed that she was still coming home at 5:00 or so; correct?

03:44  10    A.   Yeah.

11    Q.   And so you understood that she was leaving work earlier than

12    she should have been; correct?

13         MS. CARTER:   Objection, foundation.

14         THE COURT:   Overruled.

03:44  15         THE WITNESS:   She said that Karen sent her home

16    because she didn't have nothing -- they were -- they didn't have

17    enough work for her so they sent her home earlier.

18    BY MR. HARLAN:

19    Q.   So every time you remember seeing Ms. Spaeth home early

03:45  20    after her schedule change, you recall her saying that Karen had

21    told her to come home early?

22    A.   Yeah, she didn't have nothing to do so they sent her home.

23    Q.   And whether Karen actually said that or not is not something

24    that you know; correct?

03:45  25    A.   No.

449

1    Q.  Now, at some point did Ms. Spaeth tell you that Julie had

2    met with her and basically indicated she was going to get in

3    trouble if she didn't stay and work her full shift?

4            MS. CARTER:  Objection, foundation.  And hearsay.

03:46   5            THE COURT:  Overruled.

6    BY MR. HARLAN:

7    Q.  Do you need me to repeat the question, ma'am?

8    A.  She never said anything to me about it.

9            MR. HARLAN:  Counsel, we're at deposition page 70,

03:46   10   line 5 through 11.

11   BY MR. HARLAN:

12   Q.  We're going to play something on the screen.

13           (Multimedia file played as follows:

14           "Q.  Do you recall her telling you that Julia had met

03:47   15   with her and told her that she was going to get in trouble if

16   she didn't work the full shift she was assigned?

17           "A.  Yes.

18           "Q.  And that was prior to her leaving the company?

19           "A.  Yes.")

03:47   20   BY MR. HARLAN:

21   Q.  Okay, did you hear that, Ms. Barnes?

22   A.  Yes.

23   Q.  Does that now help you remember whether in fact she told you

24   that Julia wanted her to stay later and she was going to get in

03:47   25   trouble if she didn't?

450

1  A.  Yes.

2  Q.  And based on your discussions with Ms. Spaeth, you came away

3  from those discussions understanding -- or, I'm sorry --

4  believing that she knew that she was supposed to be staying

03:47  5  later than she was; correct?

6  A.  Yeah.

7  Q.  We know that Ms. Spaeth ultimately lost her position at

8  Walmart; right?

9  A.  Yes.

03:48  10  Q.  Were you at home on the day that she lost her position?

11  A.  Yes, I was.

12  Q.  So you were there when she arrived home on that day.

13  A.  Yes.

14  Q.  And when she came home she was crying?

03:48  15  A.  Yes.

16  Q.  And you tried to make her feel better; correct?

17  A.  Yes.

18  Q.  And one of the things you did to make her feel better is you

19  gave her a hug.

03:48  20  A.  Yeah.

21  Q.  And this was sometime in the afternoon on the day that she

22  lost her position; correct?

23  A.  Yes.

24  Q.  And then my understanding is that Ms. Spaeth called her

03:48  25  sister to let her know a little bit later in the day that she

451

1    had lost her position; correct?

2    A.  Yes.

3    Q.  And by the time she had that phone call with her sister on

4    that same day, she had stopped crying, hadn't she?

03:48    5    A.  Yeah.

6    Q.  And that call was about a half hour after Ms. Spaeth came

7    home; correct?

8    A.  Yeah.

9    Q.  So basically it was about a period of a half hour from when

03:49   10    she started crying until she ended crying and spoke to her

11    sister; correct?

12    A.  Yeah.

13    Q.  And on that evening where Ms. Spaeth -- on the day that

14    Ms. Spaeth lost her position at Walmart, she had supper with

03:49   15    you; right?

16    A.  Yeah.

17    Q.  Just like she normally did.

18    A.  Yeah.

19    Q.  And other than the fact that Ms. Spaeth came home and told

03:49   20    you that she had lost her position in terms of how you all

21    interacted, it was just like a normal day; correct?

22    A.  Yeah.

23    Q.  Now, at some point after Ms. Spaeth had stopped working at

24    Walmart, did you receive a call from Amy Jo Stevenson about the

03:50   25    fact that Walmart was going to get in contact with Ms. Spaeth

452

1    and let her know what she was going to get her position back?

2              MS. CARTER:  Objection, compound and confusing.

3              THE COURT:  If she's confused she can let us know.  Do

4    you understand the question, Ms. Barnes?

03:50   5              THE WITNESS:  Yes.

6              THE COURT:  Can you answer it?

7    BY MR. HARLAN:

8    Q.  Do you recall?  I think we talked about at your deposition

9    at some point Ms. Stevenson told you and Marlo that Walmart was

03:50  10    going to be calling whether she was going to get her position

11    back.

12   A.  Yes.

13   Q.  And you have a good memory of that date.

14   A.  Yes.

03:50  15   Q.  And am I correct that one of the things that Ms. Stevenson

16   directed you to do is to go in a different room and pick up the

17   phone when Walmart called Ms. Spaeth?

18   A.  Yes.

19   Q.  So, in other words, she was directing you to eavesdrop on a

03:51  20   conversation between Ms. Spaeth and someone from Walmart;

21   correct?

22              MS. CARTER:  Objection, that's not her testimony.

23              THE COURT:  I think that's what he's asking.  She can

24   answer yes or no.

03:51  25   BY MR. HARLAN:

453

1     Q.  Do you need me to repeat the question, ma'am?

2     A.  Yes.

3     Q.  So essentially she was directing you to eavesdrop on a

4     conversation that was intended to be for Ms. Spaeth and someone

03:51  5     from Walmart; correct?

6     A.  She just had me listen in on it.  She didn't say nothing

7     about eavesdropping on it.

8     Q.  Maybe it's a definitional issue.  But it was clear she

9     didn't want the people at Walmart, from your understanding of

03:52  10    her directive, to know that you were listening into the

11    conversation; correct?

12          MS. CARTER:  Objection, calls for speculation.

13          THE COURT:  Sustained.

14    BY MR. HARLAN:

03:52  15    Q.  Did you do that?  Did you ultimately pick up a separate line

16    in your apartment while Ms. Spaeth was on the phone with

17    individuals from Walmart --

18    A.  Yes.

19    Q.  -- and listen in to the discussion?

03:52  20    A.  Yes.

21    Q.  And at any point during that discussion did either you or

22    Ms. Spaeth let the individual from Walmart who called know that

23    you were listening into the conversation?

24    A.  No, I didn't.

03:52  25    Q.  And just to be clear, you did that at the direction of

1    Ms. Stevenson; correct?

2    A.   Yes.

3    Q.   Another issue we talked about at your deposition is

4    Ms. Stevenson's assistance for you in applying for work at

03:53   5    Walmart.  Do you recall that?

6    A.   Yeah.

7    Q.   At some point in time after Ms. Spaeth had left, she helped

8    you apply for a position at Walmart; correct?

9    A.   Yes.

03:53   10   Q.   You went to her house?

11   A.   Yes.

12   Q.   And she went online, yes?

13   A.   Yes.

14   Q.   And helped you fill out an application that was submitted;

03:53   15   correct?

16   A.   Yes.

17   Q.   And was Ms. Spaeth there that day?

18   A.   Yeah, Marlo was there, yeah.

19   Q.   And so after she completed helping you fill out that

03:53   20   application and submit it, did she help Ms. Spaeth do that?

21   A.   No.

22   Q.   Going back briefly to the conversation that we discussed

23   with the individual at Walmart that Ms. Stevenson had asked you

24   to pick up the other line and listen into, did she give any

03:54   25   explanation for why she couldn't be present at your apartment?

455

1      That's a pretty important call; right?

2              MS. CARTER:  Objection, calls for speculation.

3              THE COURT:  Sustained.

4      BY MR. HARLAN:

03:54   5   Q.  Did you understand that call to be pretty important to

6      Ms. Spaeth?

7              MS. CARTER:  Objection, calls for speculation.

8              THE COURT:  Overruled.

9              THE WITNESS:  She was at her store working.  She

03:54   10  couldn't be at the house at that time.

11     BY MR. HARLAN:

12     Q.  That raises another question I wanted to ask you.  So prior

13     to Ms. Spaeth leaving Walmart, on average how many days in the

14     week would Ms. Stevenson come to your apartment?

03:55   15  A.  I don't know.

16     Q.  Do you recall Dr. Smith?  Do you know that name?

17     A.  (Nods.)

18     Q.  Did Ms. Spaeth have a doctor appointment with this doctor

19     where you attended where he gave her an examination?

03:55   20  A.  I don't recall that.

21     Q.  Okay.  Well why don't we play just a few pieces of your

22     deposition to see if that helps you remember it.

23             MR. HARLAN:  If you could put up 87.  Page 87, line 9

24     to 10.

03:56   25             (Multimedia file played as follows:

456

1    "Q.   So do you recall Dr. Smith?

2    "A.   Yes.")

3    BY MR. HARLAN:

4    Q.   And do you recall being in a waiting room with Dr. Smith

03:56    5    when Ms. Spaeth was having an appointment with Dr. Smith?

6    A.   Yes.

7    Q.   Is that yes?

8    A.   Yes, yeah.

9    Q.   Okay.   And while you were at that appointment with

03:56    10   Dr. Smith, did he ever stick his head out the door and say hey,

11   I'd like to speak with you?

12   A.   I don't remember that.

13   Q.   Okay.   So if Dr. Smith wanted to talk to someone who was the

14   best person to understand how Ms. Spaeth's termination affected

03:57    15   her in terms of her routine or her life, you would be the best

16   person for him to speak with.

17         MS. CARTER:   Objection, foundation.   Calls for

18   speculation.

19         THE COURT:   Sustained.

03:57    20   BY MR. HARLAN:

21   Q.   Is there anyone more familiar with Ms. Spaeth in terms of

22   what she likes and the things that she does than you?

23         MS. CARTER:   Objection, foundation.   Calls for

24   speculation.

03:57    25         THE COURT:   I think we've been over this too.   I think

457

1    this is how we started out.  Let's move on.

2              MR. HARLAN:  Okay.

3    BY MR. HARLAN:

4    Q.  Final question on the appointment.  Am I correct that that

03:57    5    appointment was just a half hour?

6    A.  I don't remember how long that was.

7    Q.  Okay.  I'd like to play you just a little bit of your

8    deposition.  It's on page 88, lines 12 through 17.  And perhaps

9    this will refresh your recollection.

03:58    10              (Multimedia file played as follows:

11              "Q.  Do you recall how long you were in the waiting

12    room waiting for them to exit the appointment?

13              "A.  About a half hour.

14              "Q.  So you think they were in with the doctor for

03:58    15    about a half hour?

16              "A.  Yeah.")

17              MR. HARLAN:  Thank you.

18    BY MR. HARLAN:

19    Q.  Did that help you remember how long you were in the

03:58    20    appointment with Marlo and Dr. Smith?

21    A.  Yeah.

22    Q.  About a half hour.

23    A.  Yeah.

24    Q.  Do you remember taking another trip to the Milwaukee area

03:59    25    for Ms. Spaeth to have an appointment with a Dr. Thompson?

458

1   A.  Yeah.

2   Q.  And what do you recall from -- in terms of the things that

3   Dr. Thompson had Ms. Spaeth doing?

4        MS. CARTER:  Objection, foundation.  Calls for

03:59  5   speculation.

6        THE COURT:  Can you approach?

7        (Off-the-record discussion at side bar with all

8   counsel and the Court.)

9   BY MR. HARLAN:

04:01  10   Q.  Ms. Barnes, just a few more questions.  At the time of your

11   deposition I think you told me that Ms. Spaeth was working out

12   with you at the Wellness Center a couple times a week?

13   A.  Yeah.

14   Q.  And you also would go on walks with her?

04:01  15   A.  Yeah.

16   Q.  And she appeared to be happy from the time she left Walmart

17   at least until the time of your deposition; correct?

18   A.  Yeah.

19   Q.  And would that be through today as well, she seemed to be a

04:01  20   happy person?

21   A.  Yeah, she seemed to be happy.

22   Q.  In light of your relationship with Ms. Spaeth, do you all

23   share information about doctors' appointments, medical

24   information?

04:02  25   A.  I don't think we talk about that at all.

459

1    Q.  Based on living with Ms. Spaeth as long as you have, have

2    you ever been made aware that she had a medical reason to eat at

3    a certain time?

4    A.  No.

04:02   5    Q.  Do you recall discussing with Ms. Spaeth whether she had

6    gotten sick since living with you?

7    A.  No.

8    Q.  She hasn't, has she?

9    A.  No.

04:03   10   Q.  Ms. Barnes, thank you very much for your patience.  I wish

11   you well.

12              THE COURT:  Any cross?

13              MS. CARTER:  Very brief.  Very brief.

14                        CROSS-EXAMINATION

04:03   15   BY MS. CARTER:

16   Q.  Hi, Barb.

17   A.  Hi.

18   Q.  Do you watch TV with Marlo?

19   A.  Yes, I do.

04:03   20   Q.  When you and Marlo are watching TV, do you ever see Walmart

21   commercials?

22   A.  Yeah.

23   Q.  Does Marlo do anything when you see Walmart commercials?

24   A.  She covers her face.

04:03   25   Q.  Does she do that every time she sees a Walmart commercial?

460

1    A.   Yeah.  She doesn't want to look at it because it reminds her

2    of what happened when she lost her job.

3    Q.   And if you're in a car and you see a Walmart truck, does

4    that -- is there anything that Marlo does that leads you to

04:03    5    believe that that causes her to remember getting fired?

6    A.   (No response.)

7    Q.   I'll rephrase.  Actually, I'll just withdraw the question.

8         Okay.  I have one question for you.  You told us

9    earlier that Marlo has taken the bus to a few different places.

04:04    10    Supermarket --

11    A.   Yeah.

12    Q.   How do you know that?  Were you with her when Marlo took the

13    bus to the supermarket?

14    A.   Me and her usually go to the supermarket together.

04:04    15    Q.   So when Marlo was taking the bus rides that you spoke about

16    earlier, you knew about them because you rode the bus with her.

17    A.   Yeah.

18    Q.   Yeah.

19         MS. CARTER:  No further questions.

04:04    20         THE COURT:  Okay.  Thank you.  You can step down,

21    Ms. Barnes.

22         (Witness excused at 4:04 p.m.)

23         THE COURT:  Anything further?

24         MR. HARLAN:  Yeah.  May I approach, Your Honor?

04:05    25         THE COURT:  You may.

461

1          (Off-the-record discussion at side bar with all

2     counsel and the Court.)

3          THE COURT:  Would you please raise your right hand.

4     The clerk will administer the oath.

04:06  5          JULIA STERN, DEFENSE WITNESS, DULY SWORN

6          THE CLERK:  Please state and spell your first and last

7     name for the record.

8          THE WITNESS:  Julia Stern.  J-u-l-i-a, S-t-e-r-n.

9          THE CLERK:  Thank you.  Please be seated.

04:07  10               DIRECT EXAMINATION

11    BY MR. HARLAN:

12    Q.  Good afternoon, Ms. Stern.  How are you doing?

13    A.  Pretty good.

14    Q.  All right.  So is this your first time testifying in court?

04:08  15    A.  Yes.

16    Q.  I take it you're probably a little bit nervous?

17    A.  Very.  Very nervous.

18    Q.  You're in great hands in this courtroom with Judge

19    Griesbach, so that should come as some solace for you.

04:08  20    A.  Thank you.

21    Q.  Where are you from originally?

22    A.  Two Rivers, Wisconsin.

23    Q.  Have you been in Wisconsin your whole life?

24    A.  Yes, I have.

04:08  25    Q.  So you're from Two Rivers; where do you live now?

462

1    A.   In Two Rivers.

2    Q.   Any children?

3    A.   I have one daughter.

4    Q.   Okay.  And how about grandchildren?

04:08    5    A.   I have three grandchildren.

6    Q.   Okay.  Anybody in your family have serious medical health

7    challenges?

8    A.   My father had lung cancer.  He was on oxygen for quite a few

9    years.  He passed away in 2008.  And then my sister struggled

04:08    10    with breast cancer for a number of years and she passed away

11    last January, a year ago, year and a half ago.

12    Q.   Sorry to hear that.  Would you tell the court and the jury a

13    little bit about your educational background?

14    A.   I graduated from Roncalli High School in 1979, and then I

04:09    15    attended UW Whitewater for two years after that.

16    Q.   While you were in high school did you work at all?

17    A.   I did.  I worked as a waitress.

18    Q.   Okay.  And how long did you do that?

19    A.   From the time I turned 16 until I graduated high school.

04:09    20    Q.   Okay.  And what was your first job as an adult?

21    A.   The first job as an adult?  I worked some part-time jobs

22    in-between college.  I worked at Lake to Lake Dairy.  I worked

23    at Acandamor (ph) Kennel.  The first full-time job I had was

24    M and M Restaurant, as a waitress.

04:10    25    Q.   And how long did you do that?

463

1    A.  For seven years.

2    Q.  Then did you have another full-time position after that?

3    A.  Then I went to Walmart.

4    Q.  Okay.  And how long have you been at Walmart?

04:10  5    A.  31 years.

6    Q.  And what was the first position you took at Walmart?

7    A.  The first position I had was as a customer service manager

8    mainly over layaway, but also oversaw the service desk and the

9    cashiers up front.

04:10  10   Q.  And for those who are a little bit younger, what's layaway?

11   A.  Layaway is where you choose to purchase some items and you

12   put a deposit down, we hold the items for you, you make payments

13   on it for a specific amount of time, and then you can pick them

14   up.  Usually around Christmas, but at that time we had layaway

04:10  15   year round.

16   Q.  Okay.  And how long did you stay in that role?

17   A.  Probably about four or five years.

18   Q.  Okay.  Then did you -- what was the next position you had at

19   Walmart?

04:11  20   A.  I was over personnel and I was a department manager of

21   furniture at the same time.

22   Q.  Was that at the Manitowoc location?

23   A.  Yes.

24   Q.  How long did you stay in that location?

04:11  25   A.  About a year or two.

1  Q.  Then what was the position you held at Walmart?

2  A.  I was the lead supervisor over the stocking team that worked

3  from 5 a.m. till 2 p.m.

4  Q.  And did you have any supervisory responsibilities in that

04:11  5  role?

6  A.  Yes, I oversaw the entire team.

7  Q.  Approximately how many folks would that have been?

8  A.  Maybe about 15.

9  Q.  Okay.  And how long did you stay in that role?

04:11  10  A.  Couple of years.

11  Q.  Then what was next?

12  A.  Then I became manager of housewares.

13  Q.  And how long did you serve in that position?

14  A.  I was in that position for about two years.

04:12  15  Q.  Did you have any supervisory responsibility then?

16  A.  I had a couple of part-time people that worked in my

17  department that I would give direction to.

18  Q.  And then what was the next position you had?

19  A.  Then I moved over to health and beauty aids.  I was the

04:12  20  department manager for a year over there.

21  Q.  Okay.  And you supervised folks in that position too; right?

22  A.  Yes.

23  Q.  And then what was next?

24  A.  And then I became an assistant manager.

04:12  25  Q.  Is that the role that you're in now?

465

1    A.  Yes.

2    Q.  Okay.  And are you still in the Manitowoc store?

3    A.  No, I am now at the Sheboygan North store.

4    Q.  How did you end up moving from Manitowoc to Sheboygan North

5    store?

6    A.  Last fall the company restructured all the management team

7    and some of us got transferred to other stores.  So that's how I

8    ended up in Sheboygan.

9    Q.  So you would have left -- you left Manitowoc in 2020

10   sometime.

11   A.  Yes.  In October.

12   Q.  Okay.  During the time that you've been at Walmart have you

13   ever been aware of a nonmanagement associate who's had a fixed

14   permanent work schedule?

15   A.  No.

16   Q.  At some point you became Ms. Spaeth's supervisor; correct?

17   A.  Yes.

18   Q.  And at the time that you began supervising Ms. Spaeth, what

19   hours were you working?

20   A.  I worked various shifts.  Some days I'd come in and work

21   from like 7:00 until 5:00, sometimes it was 12:00 until 10:00,

22   sometimes it was a mid-shift in-between.  It was always

23   different days and different shifts.

24   Q.  So your schedule was fluctuating.

25   A.  Yes.

466

1  Q.  We had testimony about policies at Walmart.  I assume since

2  you've been there Walmart has had a number of different policies

3  and procedures; correct?

4  A.  Yes.

04:14  5  Q.  Can you describe some of the policies that you've been made

6  aware of since you've been employed at Walmart?

7  A.  Well, there's the attendance policy, there's a dress code

8  policy, a policy on selling firearms, one on selling tobacco and

9  alcohol, there's a harassment policy.  Just various many, many

04:14  10  policies.

11  Q.  Okay.  And do the policies and procedures that you're aware

12  of at Walmart, do they change from time to time?

13  A.  They change all the time.

14  Q.  So how do you stay on top of a lot of policies that are

04:14  15  frequently changing?

16  A.  They're listed on The Wire.  The Wire is like an internal

17  internet for Walmart.  And you can just look up policies and you

18  can pull up any policy that's on there and read it.  When they

19  have updates they'll put an update on there for you.  Home

04:15  20  office will put an update on there for you.

21  Q.  And are those policies accessible to associates like

22  Ms. Spaeth?

23  A.  Yes.

24  Q.  And I think you mentioned certain employment policies, but

04:15  25  the company's had various employment policies since you've been

467

1    there; correct?

2    A.  Yes.

3    Q.  Since you've been at Walmart has the company had specialists

4    within the organization to help figure out what to do with

5    certain of those policies?

6    A.  Yes.

7    Q.  Has anyone ever informed you, in management at Walmart, that

8    there was an expectation that you know those policies chapter

9    and verse?

10   A.  No.

11   Q.  And so, for instance, with respect to disability, is there a

12   policy that deals with disability and reasonable accommodation?

13   A.  Yes, there is.

14   Q.  And if you have to make decisions or judgments or -- Strike

15   that.

16           If you're approached by someone who has an issue that

17   deals with -- that falls under those policies, are there folks

18   that you can go to at Walmart to get guidance about how to

19   handle the situation?

20   A.  Yes.

21   Q.  During the time that you would have been a manager, had you

22   received training on discrimination policies and disability

23   policies?

24   A.  Yes, I have.

25   Q.  In what form?

1    A.   Mostly in the CBL form.  It's a computer based learning

2    system.

3    Q.   And how does that work?  Are you shown a video or content

4    and have to answer questions about it?

04:16   5    A.   Yes.

6    Q.   I'm going to show you an exhibit that's been admitted into

7    evidence, 1000.

8              MR. HARLAN:  Can you pull that up?

9    BY MR. HARLAN:

04:17   10   Q.   It would be in the EEOC binders.  Also on the screen to your

11   right.

12   A.   Okay.

13   Q.   And by the way, Ms. Stern, I think I've been calling you

14   Julia, do you go by Julie?

04:17   15   A.   I go by Julie, yes.

16   Q.   All right.  So are you able to see that exhibit?

17   A.   Yes.

18   Q.   Can you tell us what that is?

19   A.   This is a new hire document.

04:17   20   Q.   Okay.

21             MR. HARLAN:  Can we call out the third sentence in

22   Section 2?

23   BY MR. HARLAN:

24   Q.   This language that's been highlighted, it says, "From time

04:18   25   to time it may also be necessary to change an associate's

1    schedules or number of hours worked, depending on the store's

2    business needs at the time."

3            Has that been the practice and understanding since

4    you've been at Walmart?

04:18    5    A.  Yes.

6    Q.  And then if we could look at some language in paragraph 3.

7            MR. HARLAN:  Yes, if you could call that out.

8    Thank you.

9    BY MR. HARLAN:

04:18    10   Q.  And it says, "Due to the nature of our business, associates'

11   working hours must remain flexible.  Full-time associates will

12   work 28 or more hours a week, and peak-time associates will work

13   less than 28 hours a week.  Schedules will be posted well in

14   advance of the scheduled workweek."

04:19    15           And was that the practice and policy since you've been

16   at Walmart?

17   A.  That was the policy back then, yes.

18   Q.  So was that an important aspect of an associate's job, to

19   basically be flexible?

04:19    20   A.  Yes.

21   Q.  And why is that something that's important for Walmart

22   associates?

23   A.  Being that it's retail, you have to run your business and be

24   staffed for your business when your customer is available in the

04:19    25   store.  So different times of the week -- you know, weekends and

470

1  nights it's busier than during the day.  Holidays, the first

2  weekend of the month is usually busier.  So you have to have a

3  flexible schedule in order to cover that customer service.

4  Q.  Throughout the time that you have been at Walmart has the

04:19  5  company had an attendance policy in place?

6  A.  Yes.

7  Q.  And, in general, what does the policy require?

8  A.  It requires you to be at work during your scheduled shift.

9  Q.  And how about completing the shift, is that also part of the

04:20  10  policy?

11  A.  Yes, working your entire shift.

12  Q.  And at any point in time since you've been at Walmart has

13  anyone in management ever suggested that the attendance policy

14  wasn't something the company took seriously?

04:20  15  A.  No.

16  Q.  In fact, had you ever been employed anywhere where

17  attendance wasn't an important aspect of a job?

18  A.  No, it's very important.

19  Q.  During the time that you have been at Walmart did you have

04:20  20  an understanding of certain things that associates can do that

21  can lead to discipline?

22  A.  Yes.

23  Q.  And what kind of things that you observed during your time

24  at Walmart that lead to associates getting in trouble and being

04:21  25  disciplined?

471

1    A.   Mostly it is with the attendance, but if they are harassing

2    someone or if they're not being productive, things like that.

3    Q.   And based on your experience, ma'am, what's the most

4    frequent basis for associate discipline at Walmart?

04:21    5    A.   Attendances.

6    Q.   When did you first get to know Ms. Spaeth?

7    A.   When she started working in the store.

8    Q.   And that's a period before you were her manager?

9    A.   Right.  That was when I was still an hourly associate.

04:21    10    Q.   And what was your relationship like with her?

11    A.   It was casual, like, you know, hello, how are you.

12    Q.   Ever discuss sports with her?

13    A.   A little bit with the Packers.  Not too much.  I'm not a

14    Packer fan or football at all so -- but she was.

04:22    15    Q.   And at some point you became Ms. Spaeth's manager; correct?

16    A.   Right.

17    Q.   Approximately when was that?

18    A.   That would have been in 2014, probably around fall.

19    Q.   And how is it that you became her manager?

04:22    20    A.   Every once in a while they rotated the management team.  So

21    I had been on overnights and they rotated us around to different

22    areas.

23    Q.   So during the time that you had been a manager, did you ever

24    have a policy or practice of letting associates leave just on a

04:22    25    regular basis before the completion of their shift?

472

1  A.  No.

2  Q.  Can you describe what your relationship was like with

3  Ms. Spaeth once you became her manager at the outset?

4  A.  It was pretty much the same.  It was still, you know, hello,

04:22  5  how are you.  I did give her direction which she would follow.

6  Q.  And the direction that you gave Ms. Spaeth, was that typical

7  of how you worked with other associates who reported to you?

8  A.  Yes.

9  Q.  Do you recall any situations where she appeared to be angry

04:23  10  with you over anything?

11  A.  No.

12  Q.  Did you have any difficulties managing her?

13  A.  No.

14  Q.  So we've heard that the scheduling process at the Manitowoc

04:23  15  store changed -- Strike that.

16          Prior to Thanksgiving time 2014, am I correct that the

17  management in the Manitowoc store kind of set schedules;

18  correct?

19  A.  Yes.

04:23  20  Q.  The Smart System would generate schedules, but the

21  management had the ability to set schedules; correct?

22  A.  We could adjust the shifts, yes.

23  Q.  Okay.  Were there any drawbacks to that process from your

24  perspective?

04:24  25  A.  It was more time consuming in order to do schedules.

473

1    Q.   How about in terms of the efficiency of it, did it have --

2    did it put personnel-

3              MS. VANCE:   Objection, leading.

4              THE COURT:   Overruled.

04:24   5    BY MR. HARLAN:

6    Q.   Did it create any efficiency issues from your perspective?

7    A.   It would take us longer to do the schedules that way, yes.

8    Q.   Okay.   Now, at some point around Thanksgiving of 2014, there

9    was a change in terms of how the schedules were done; correct?

04:24   10   A.   Yes.

11   Q.   And was there a directive given to the managers in the

12   Manitowoc store?

13   A.   Yes.

14   Q.   And what was the directive?

04:24   15   A.   The directive was, and it came from the home office, changed

16   all across the company.  So the directive was that we were to

17   allow the schedules to be generated and run them as they were

18   generated and not make adjustments to them unless it was a

19   specific business need.

04:25   20   Q.   Okay.  And how did that policy change affect the associates

21   in the store, if at all?

22   A.   A lot of the part-time associates had to adjust their hours.

23   Whether it was working later at night or working more on the

24   weekends, they had to adjust their schedules.

04:25   25   Q.   Okay.  And was there any relief given to the associates in

1    terms of helping them make the adjustments necessary because of

2    the new schedules?

3    A.   Yes.  We gave them a few weeks to make adjustments.  Like if

4    they needed to find new child care, or if they needed a way to

04:25    5    get to work, or transportation issues, anything like that.  So

6    they would have a chance to get those taken care of.

7    Q.   Did you observe whether this change in the scheduling

8    process had an impact on Ms. Spaeth's schedule?

9    A.   Her schedule changed from 12:00 to 4:00 to 1:00 to 5:30.  So

04:26    10    it shifted approximately an hour later.

11    Q.   Was this a significant change from your perspective?

12    A.   No.

13    Q.   And how did the change that Ms. Spaeth experienced with the

14    new scheduling process compare to some of the other associates

04:26    15    in the store?

16    A.   That was a minor change.  Her schedule basically only

17    shifted one hour later, whereas a lot of the other ones had to

18    pick up different days or have more hours.  Longer hours.

19    Q.   Ms. Stern, it might make sense -- do you prefer looking at

04:26    20    the paper or looking on the screen?

21    A.   Probably the paper.

22    Q.   Pardon?

23    A.   The paper would be easier to see.

24    Q.   Okay.  Let me help you get that.

04:27    25    A.   It's a big binder.  Okay.

475

1    Q.  All right.

2         (Exhibit 1006, Spaeth Attendance History – 01/2012 -

3    07/08/2015 [D002542 - D002551; D002553 – D002571], admitted

4    previously by stipulation.)

5    BY MR. HARLAN:

6    Q.  Can you identify what Exhibit 1006 is?

7    A.  It's an attendance tracking.  It tells what time she was

8    scheduled each day and when she clocked in and out.

9    Q.  So looking at that exhibit are you able to tell -- if you go

04:28   10   to page D2547 -- are you able to tell whether she was assigned a

11   shift on November 21st?

12   A.  Yes.

13   Q.  What was her shift on that day?

14   A.  On November 21st she was assigned a 12:00 to 4:00 shift.

04:28   15   Q.  Okay.  And that was the shift that she normally worked;

16   correct?

17   A.  Yes.

18   Q.  And what time did she leave on that day?

19   A.  She left at 13:41.

04:28   20   Q.  What does that translate to us nonmilitary folks?

21   A.  15:41.  So that's 3:41 in the afternoon.

22   Q.  So am I correct then that on that day, when she was working

23   the shift that she normally worked, she left early?

24   A.  Yes.

04:29   25   Q.  Was she authorized to leave early on that day?

476

1    A.   No.

2    Q.   And then if you could look at November 24th.  I think that's

3    on page D2548.  Can you tell us what shift she was assigned on

4    that day?

04:29  5    A.   She was scheduled to work from 1:00 to 5:30.

6    Q.   And did she work her entire shift on that day?

7    A.   No, she did not.

8    Q.   Was she authorized to leave on that day?

9    A.   No.

04:29  10   Q.   Okay.  How about on the 25th?

11   A.   On the 25th she was scheduled to work 12:00 to 4:00.

12   Q.   And what time did she leave on that day?

13   A.   She left at 3:39.

14   Q.   So she didn't complete the shift scheduled as she was

04:29  15   accustomed to working; correct?

16   A.   Right.

17   Q.   And then how about on the 26th?

18   A.   On the 26th she was scheduled from 1:00 to 5:30.  And she

19   left at 4:30.

04:30  20   Q.   Okay.  How about on December 1st, are you able to tell what

21   her shift was on that day?

22   A.   On December 1st she was scheduled from 1:00 to 5:30, and she

23   left at 4:19.

24   Q.   So did she complete her shift on that day?

04:30  25   A.   No.

477

1    Q.   So you just told us that there were a number of shifts in

2    November-December that Ms. Spaeth left early for.  Were her

3    early departures on those days a violation of attendance policy?

4    A.   Yes.

04:30  5    Q.   Would it call for certain action under the attendance

6    policy?

7    A.   Yes.

8    Q.   And was any taken?

9    A.   No.

04:30  10   Q.   And why was no action taken?

11   A.   That was during the transition period that we were giving

12   them to make adjustments to the new schedule.

13   Q.   Okay.  And who made the decision to, in this instance, give

14   Ms. Spaeth an adjustment period so she could get acclimated to

04:31  15   the new schedule?

16   A.   It was kind of a between all of management that we allowed

17   that for the entire store.

18   Q.   And that would include you; correct?

19   A.   Yes.

04:31  20   Q.   Were you obligated to give this adjustment?

21   A.   No.

22   Q.   So as -- you can set that aside for a few seconds.  So as

23   Ms. Spaeth's manager, I take it you're familiar with her work

24   and how she performed during that period?

04:31  25   A.   Yes.

1    Q.   And what would be your general assessment of her

2    performance?

3    A.   She wasn't completing her tasks as she wasn't working her

4    full shift.

04:31    5    Q.   On the occasions I think you testified that you would give

6    her work direction, on the occasions where you asked her to do

7    something did she seem to understand from your perspective what

8    she was being asked to do?

9    A.   Yes.

04:32   10    Q.   And what leads you to conclude that she understood the

11    direction that you were giving her?

12    A.   Well, at first all she would do is fold towels, and so we

13    got her to start zoning other areas in the housewares

14    department.  Zoning is where you straighten all the merchandise

04:32   15    on the shelf so it looks nice for the customers.  And she would

16    do that on a regular basis after we walked through it with her a

17    couple of times.

18         Same with getting returns from the service desk, she

19    would get those and put them away, which is something that she

04:32   20    hadn't done before either.

21    Q.   During the time that you imagined Ms. Spaeth, did she have

22    any kind of job coach or someone that was helping to communicate

23    work direction you were giving to her?

24    A.   No.

04:33   25    Q.   And what are some of the tasks -- new tasks that you asked

479

1    her to perform?

2    A.   The new tasks would have been zoning and then the housewares

3    as well, and the returns.

4    Q.   And based on this new schedule, in terms of just the

04:33    5    day-to-day tasks, after she got a new schedule, the 1:00 to 5:30

6    schedule, did that impact how she did her job in any way in

7    terms of the specific tasks that you --

8    A.   No, just that she wouldn't get them completed when she left

9    early.

04:33    10    Q.   And so once her schedule changed she didn't seem bewildered

11    in any way?

12    A.   No.

13             MS. VANCE:   Objection, calls for speculation.

14             THE COURT:   Overruled.

04:33    15    BY MR. HARLAN:

16    Q.   She didn't lose -- she didn't forget how to do the tasks

17    that she used to do before her schedule changed; correct?

18    A.   Correct.

19    Q.   So based on your experience at Walmart are there particular

04:34    20    points in a year that are busier than others?

21    A.   Yes.

22    Q.   And would Christmas, Thanksgiving, and Black Friday be some

23    of those times that are extremely busy?

24    A.   Very busy, yes.

04:34    25    Q.   Okay.  And based on the fact that those are particularly

1  busy times at Walmart, has the company made any kind of

2  scheduling adjustments to deal with that?

3  A.  Yes, we have.

4  Q.  Explain.

04:34  5  A.  Well, especially like for Black Friday, it's pretty much

6  like all hands on deck.  So if there's associates that don't

7  normally work on that day or they're not available that day, we

8  would get with them and talk to them and see if we can get them

9  to work that day to help cover the customer traffic because it

04:35  10  is very, very busy.

11  Q.  Okay.  So going back to 1006, can you look at Ms. Spaeth's

12  attendance record and see if there was a Black Friday in 2014

13  that she was assigned to work.

14  A.  Do you know what the date was?

04:35  15  Q.  I think it's on page D2548.

16  A.  It doesn't tell me if it's a Friday in here or not.  So --

17  Q.  Do you recall if she was assigned to work Black Friday on --

18  in 2014?

19      MS. VANCE:  Objection, foundation.

04:35  20      THE COURT:  That's what he's trying to -- I mean, does

21  she recall?  If she doesn't -- you don't know when Black Friday

22  was in 2014, do you?

23      THE WITNESS:  Right.

24      THE COURT:  Yeah, me either.

04:36  25      MR. HARLAN:  Can we put up 1014?

481

BY MR. HARLAN:

Q.  Okay.  This is an email that you wrote on December 17th.  Do you recall this situation, Julie?

A.  Yes.

Q.  Can you give us some background at what prompted you to have this discussion that's reflected in the email?

A.  Because Marlo had consistently been leaving early, I had a discussion with her about her attendance and the importance of working her scheduled shifts.

Q.  And why was that an issue that prompted the discussion?

A.  Because with her leaving early her stuff wasn't getting done and I would have to find someone else to do that so it would get completed.

Q.  Okay.  And based on what her attendance had been, as of this date could you have issued her a coaching?

A.  Yes, I could have.

Q.  But you didn't; correct?

A.  No.

Q.  And this is after the grace period; correct?

A.  Yes.

Q.  Did she offer any explanation for why she was violating the attendance policy?

A.  She was afraid she would miss the bus.

Q.  Okay.  Did she make any reference to her Down syndrome condition at all in your discussion with her on this date?

1    A.   No.

2    Q.   Did she say or do anything when you met with her on the 17th

3    that caused you to believe that she didn't understand what the

4    expectations were?

04:38    5    A.   No.

6    Q.   Or that she didn't understand what you were communicating to

7    her?

8    A.   No.

9    Q.   And why did you send this email?

04:38    10    A.   As documentation that I had this conversation with her.

11    Q.   And one of the things you communicated to her was that on a

12    go-forward basis you expected her to work her entire shift;

13    correct?

14    A.   Yes.

04:38    15    Q.   I think you make reference to being consistent on the

16    attendance policy?

17    A.   Uh-huh, yes.

18    Q.   Why was that something that was important from your

19    perspective?

04:39    20    A.   Well, if you're not consistent with all the associates, for

21    one they can accuse you of showing favoritism towards one person

22    and not towards another.

23         The other one is, you want to make sure that no one is

24    going to come up and -- if you let one person dictate what hours

04:39    25    they want to work, then everybody can come up and start saying,

1    well, I don't want to work this shift, I want to work these

2    hours, and then you can't run your business that way.  They're

3    scheduled for a reason.

4    Q.  Okay.  You also, with respect to the issue she raised about

04:39    5    the bus, pointed out that the bus runs until 8:00.

6    A.  Yes.

7    Q.  How did you know that?

8    A.  We had a bus schedule.

9    Q.  Okay.  And what was her response to what was being

04:39    10    communicated to her in this meeting?

11    A.  She just was worried about getting home on time for supper.

12    And then while I was talking to her then she just kind of shut

13    down and wouldn't talk back.

14    Q.  Had you ever experienced a situation with an associate who

04:40    15    you were addressing some performance issue with where, as you

16    were providing that feedback, they didn't say anything?

17    A.  Yes.

18    Q.  It's not unusual; correct?

19    A.  No, it's not.

04:40    20    Q.  I think there's also a reference to talking, that she was

21    going to talk to her sister?

22    A.  She wanted to talk with her sister to make sure that she

23    knew she was not going to be home on time for supper.

24    Q.  And what was your understanding of who she was referring to?

04:40    25    A.  Her sister that she lived with.

484

1    Q.   Okay.  Did you know anything about Amy Jo Stevenson at that

2    point?

3    A.   No, I had never heard of Amy Jo.

4    Q.   Did she mention that in the meeting at all, Amy Jo by name?

04:41    5    A.   No.

6    Q.   If Ms. Stevenson wanted to contact you at the Manitowoc

7    Walmart, what would she have to do to get hold of you?

8    A.   Just call the store and ask for me.

9    Q.   Okay.  So from your perspective would that be something

04:41    10   relatively easy to do?

11   A.   Very easy to do.

12   Q.   There's also a reference to her leaving early and saying

13   that Karen had told her that she could leave?

14   A.   Yes.  She told me that she had talked with Karen in

04:41    15   personnel and that she was going to leave early so she could go

16   home and talk with her sister.

17   Q.   And that's Karen Becker; correct?

18   A.   Yes.

19   Q.   And it looks like, according to this email, that you found

04:41    20   out that that was not the case; correct?

21   A.   Right.  After she had left I went and I talked to Karen and

22   Karen said she had never come to talk to her.

23   Q.   How did that make you feel?

24   A.   Kind of betrayed.  Like she was trying to be sneaky about

04:42    25   leaving.

485

1  Q.  Does the company -- throughout the time that you've been

2  there does the company have a policy on dishonesty?

3  A.  Yes.

4  Q.  Is that a basis for discipline?

04:42  5  A.  Yes.

6  Q.  So if employees/associates are dishonest in terms of

7  misrepresenting things in terms of their work, is that a basis

8  for them to get disciplined?

9  A.  Yes.

04:42  10  Q.  And did you know that at the time of this email?

11  A.  Did I know about the policy?

12  Q.  Yeah --

13  A.  Yes.

14  Q.  -- that that policy was in place.  And did you discipline

04:42  15  her under that policy?

16  A.  No, I did not.

17  Q.  So at some point she mentioned wanting to work noon to 4:00.

18  And what did you think when you heard that from Ms. Spaeth?

19  A.  That that was just a comment like anyone else would make

04:43  20  that they wanted to go back to their original shift that they

21  had.

22  Q.  Did you understand her to be making any sort of request for

23  reasonable accommodation under the ADA?

24  A.  No.

04:43  25  Q.  Did she saying anything that caused you to think that asking

1    to go from -- go back to the noon to 4:00 schedule had something

2    to do with her Down syndrome or some limitation connected to it?

3    A.  No.

4    Q.  And as a manager, what is the impact of Ms. Spaeth not

04:43    5    filling her work shifts and leaving early?

6    A.  Anytime that she would leave early it would leave her work

7    unfinished.  So I would have to find someone else to do her

8    work, plus their own which is putting excess burden on them.

9    And if it didn't get done, you know, it affects the customer;

04:44    10    the store is not presentable for the customer, the merchandise

11    isn't in the correct place for them to purchase it.

12         MR. HARLAN:  Can we put up 1010, Tracy.

13         (Exhibit 1010, Associate Attendance Personal

14    Discussion Log [D000118], admitted previously by stipulation.)

04:44    15    BY MR. HARLAN:

16    Q.  Showing you what's been admitted as Trial Exhibit 1010, do

17    you know what this is?

18    A.  It's a personal discussion log for attendance.

19    Q.  And what's the purpose of the log?

04:44    20    A.  The log is so when you have a discussion with an associate

21    and it's not a coaching, you document it in here.  That way if

22    say I would switch positions with someone and another assistant

23    would come on and they were going to have a discussion with her

24    as well for the attendance, they can look in here and say, oh,

04:45    25    there's already one in here so I would go to the coaching level

1    next.

2    Q.  Okay.  And there's an entry on 2/3/12, and whose name is

3    that?

4    A.  Bonnie Popp.

04:45   5    Q.  And then there's a witness listed and who is that?

6    A.  Karen Becker.

7    Q.  So what does that mean when you see that entry on this

8    particular exhibit?

9    A.  That they had a discussion with her about her attendance on

04:45   10   that date.

11   Q.  Okay.  And that date being February 3rd, 2012?

12   A.  Correct.

13   Q.  And am I correct that would have been before her schedule

14   change?

04:45   15   A.  Yes.

16   Q.  So she would have been working noon to 4:00 at the time that

17   there was a discussion with her about her attendance.

18   A.  Yes.

19   Q.  And then your name is also on the form?

04:46   20   A.  Yes.

21   Q.  And that basically is just documentation of the discussion

22   that you had with her on the 17th; correct?

23   A.  Right.

24   Q.  All right.  So at some point you gave her a coaching;

04:46   25   correct?

1   A.  Yes, I did.

2   Q.  Did you have any discussions with her about her attendance

3   between that coaching and the personal discussion you had with

4   her on the 17th?

04:46   5   A.  No.

6           MR. HARLAN:  We can pull up 1012.

7           (Exhibit 1012, Coaching - December 17, 2014 [Dkt.

8   102-24], admitted previously by stipulation.)

9   BY MR. HARLAN:

04:46   10   Q.  Is this the coaching, the first coaching you had with

11   Ms. Spaeth about her attendance?

12   A.  Yes.

13   Q.  I'll just call out the impact section.  Could you read that

14   for us?

04:47   15   A.  "When Marlo does not work her scheduled shifts there is a

16   lack of customer service as well as completing her tasks.  This

17   results in fellow associates having to finish her tasks, and

18   possible loss of customer sales."

19   Q.  So she was scheduled to work on 12/18 and 12/29 in 2014, and

04:47   20   her shift was 1:00 to 5:30, and according to this she left at

21   around 3:00; correct?

22   A.  Yes.

23   Q.  That would be early under her prior schedule; correct?  Her

24   prior shift of noon to 4:00; correct?

04:48   25   A.  Yes.

489

1    Q.   What was the activity like in the store on December 18th and

2    December 19th?

3    A.   That would have been --

4         MS. VANCE:   Objection, foundation.

04:48  5    BY MR. HARLAN:

6    Q.   Do you know what the activity was like on November -- I mean

7    on December 18th and December 19th at that particular time of

8    the year?

9    A.   That was during our holiday rushes right before Christmas,

04:48  10   so it would have been very busy in the store.

11   Q.   All hands on deck?

12   A.   Yes.

13   Q.   So were there implications in terms of service as a result

14   of Ms. Spaeth not staying her full shift on those two days?

04:48  15        MS. VANCE:   Objection, leading.

16        THE COURT:   Overruled.

17        THE WITNESS:   Yes.

18   BY MR. HARLAN:

19   Q.   Explain that.

04:48  20   A.   Well, if she wasn't there, if customers had a question about

21   where something was she wouldn't have been able to show them.

22   Putting the things away that needed to get put away so it would

23   be available for the next customer to purchase wasn't happening

24   because she wasn't there to do it.

04:49  25   Q.   What kind of effect on zoning, the zoning activity that

490

1    takes place in the stores, is there when there is a lot of

2    activity?

3    A.  When there's a lot of customers the store gets pretty messy.

4    Things -- you know, people look at stuff and they just kind of

04:49  5    drop it.  So in order to maintain that it looks nice and it's

6    shoppable, we have to go through and zone everything.

7    Q.  So at the time of this first written coaching --

8              (Court reporter interruption.)

9              MR. HARLAN:  I'm sorry.

10    BY MR. HARLAN:

11    Q.  So as of the time of this coaching did you have any concern

12    about whether Ms. Spaeth understood what her expectations were

13    in terms of the schedule?

14    A.  No.

04:49  15    Q.  How did it make you feel to have to give her this coaching?

16    A.  I don't like to coach anyone.  It's not a pleasant

17    experience.  It's like reprimanding someone.  I would rather

18    work with them and try and get them to change their behavior.

19    And I tried that previously with her, but ultimately you have to

04:50  20    follow what the procedures are.

21    Q.  Okay.  So after this first written coaching did you notice

22    any change in terms of her adherence to the schedule that she

23    received?

24    A.  After the first one for a couple of weeks she started

04:50  25    working closer to her 1 to 5:30's.

                                                                          491

1   Q.  Okay.  And did that last?

2   A.  No.

3   Q.  Did you create any documentation as a result of kind of the

4   continued attendance problems after this first written coaching?

04:51   5   A.  No.

6   Q.  Did you do an email kind of describing sitting down talking

7   to her again?

8   A.  Not -- no.

9   Q.  Okay.

04:51   10          MR. HARLAN:  Why don't we put up 1015, please.

11          (Exhibit 1015, Email from Julia Stern - January 13,

12   2015 [D000396], received in evidence.)

13   BY MR. HARLAN:

14   Q.  Can you tell us what 1015 is?

04:51   15   A.  That is an email that I sent about having a discussion with

16   her.

17   Q.  Okay.  So you note in here --

18          MR. HARLAN:  Maybe we can call it out, the section

19   about the bus.

04:52   20   BY MR. HARLAN:

21   Q.  So you mentioned that at the coaching she was continuing to

22   talk about concern about missing the bus?

23   A.  Yes.

24   Q.  And what did you think about that explanation for why she

04:52   25   wasn't staying and fulfilling her shift?

492

1   A.   It was just an excuse that she wanted to leave early.

2   Q.   So based on what you're communicating in this email, from

3   your perspective it was important for Ms. Spaeth to work those

4   shifts; correct?

04:52   5   A.   Yes.

6   Q.   And to complete the shifts.

7   A.   Yes.

8   Q.   Walmart is a major company, it's a big company; right?

9   A.   Yes.

04:52   10   Q.   Employs a lot of people; right?

11   A.   Yes.

12   Q.   So why is it a big deal if Ms. Spaeth leaves early?  Why is

13   that a problem?

14   A.   If she was allowed to leave early all the time then the

04:53   15   other associates would have wanted to do the same thing.  And

16   eventually then you don't have anyone covering the store.

17            THE COURT:  You can start looking for a good time to

18   break, Mr. Harlan.

19            MR. HARLAN:  Okay.  Thank you, Your Honor.

04:53   20   BY MR. HARLAN:

21   Q.   You also make reference to her staying productive in zoning

22   all of housewares.  Why was that a concern that you noted?

23   A.   Because when she was leaving early that wasn't getting done

24   unless we would find someone else to take care of that.

04:53   25   Q.   Okay.  And had you spoken to her previously about that?

493

1    A.  Yes.

2              MR. HARLAN:  If you could just call out the last

3    sentence.

4    BY MR. HARLAN:

04:54    5    Q.  It says a while later on the sales floor she came up and

6    apologized to you?

7    A.  Yes, she did.

8    Q.  And she said that she knew she was wrong for departing early

9    from her shifts; correct?

04:54   10    A.  Yes.

11    Q.  How did that make you feel?

12    A.  It made me feel like -- almost like a mom where you finally

13    get your child to understand something.  It made me feel like

14    she cared about her job and that, you know -- it made me feel

04:54   15    good that she was acknowledging it.

16    Q.  And you felt like you were getting through to her?

17    A.  Yes.

18              MR. HARLAN:  That's all.

19              THE COURT:  Okay.  We'll break for the day.  Please be

04:54   20    back in the jury room at 8:30.  We'll try and start right away

21    tomorrow at 8:30.  We're on schedule.  Things are going well.

22              Have a good evening.  Remember not to discuss the

23    case, keep your mind open until you hear everything.

24              (Jury out at 4:54 p.m.)

04:55   25              THE COURT:  You can step down, Ms. Stern.

494

1          (Witness excused for the day at 4:55 p.m.)

2          THE COURT:  We're outside the presence of the jury.

3          Does anybody have anything you want to place on the

4     record?

04:55   5          MS. VANCE:  Could we have the sequestered witness step

6     out?

7          THE COURT:  Yes.  You may step out, please.

8          MR. MULAIRE:  Nothing from the plaintiff.

9          THE COURT:  Okay.  Did you want to make that motion?

04:55  10    Or do you want to do it in the morning or reserve it for later?

11          MR. HARLAN:  Yes, maybe before we get started tomorrow

12    I'll do it.

13          THE COURT:  Okay.  So --

14          MR. HARLAN:  I don't think you want to hear it right

04:55  15    now.

16          THE COURT:  8:15 if you want to do it tomorrow.  Okay?

17    Because we have the jury at 8:30 and I don't keep them waiting.

18    Or you can do it later.

19          MR. HARLAN:  Yeah, maybe later.  I don't want to screw

04:56  20    up everybody's schedule in the morning.

21          MR. MULAIRE:  You could wait until after the verdict.

22          (General laughter.)

23          MR. HARLAN:  I suspect I'm going to be doing that

24    anyway.

04:56  25          THE COURT:  I have a couple of copies of a draft, a

495

1    jury instruction draft and verdict form.  So why don't I -- I

2    have two per side, I should have done three per side but I'm

3    cheap.

4            Go ahead, take a look at those, and once you have a

5    chance to look at those tomorrow we'll have a discussion on that

6    and see where we go.

7            MR. HARLAN:  Do you prefer to just, you know, have us

8    discuss it with you as opposed to trying to file something?  Is

9    that the most efficient way for you to deal with it?

10           THE COURT:  Well, I don't need briefs.  I like

11   letters.  Just short.  If you have a different proposal and the

12   authority.  Those are based on the cases you kind of sent to us

13   and we've looked at.

14           MR. HARLAN:  Okay.

15           THE COURT:  I think I kind of have tried to,

16   in-between things, read those cases more carefully as I've seen

17   the evidence unfold.

18           But I have no doubt that you're going to have some

19   recommendations and objections.  What I will typically do is,

20   once you've had a chance to look it over and you formulate your

21   positions, we'll do kind of an informal conference.  I hate to

22   put it all on the record because court reporters are valuable

23   resources and so we only use them when we need to, at the end.

24   But once we formulate things we'll have a chance for everyone to

25   make their record, okay?

1            MR. HARLAN:  Thank you.

2            THE COURT:  Have a good evening, everyone.  We'll see

3    you tomorrow.

4            (Proceedings concluded for the day at 4:58 p.m.)

5                              *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

497

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified July 25, 2021.

/s/John T. Schindhelm

John T. Schindhelm

             John T. Schindhelm, RPR, RMR, CRR
             United States Official Reporter
             517 E Wisconsin Ave., Rm 324,
             Milwaukee, WI 53202
             Website: WWW.JOHNSCHINDHELM.COM



498

```
 1                        I N D E X

 2     LIMITING/CAUTIONARY JURY INSTRUCTION

 3          BY THE COURT...................................    293

 4     DEFENSE OFFERS OF PROOF

 5          BY MR. MULAIRE.................................    366

 6

 7     WITNESS   EXAMINATION                              PAGE

 8     BONNIE POPP, PLAINTIFF WITNESS, VIA DEPOSITION

 9          DESIGNATIONS READ..............................    244

10     ROBIN CASTRO, PLAINTIFF WITNESS

11          DIRECT EXAMINATION BY MS. CARTER...............    251

12          CROSS-EXAMINATION BY MR. BURNETT...............    306

13          REDIRECT EXAMINATION BY MS. CARTER.............    330

14     LEE SPUDE, PLAINTIFF WITNESS, VIA DEPOSITION

15          DESIGNATIONS READ..............................    335

16     LINDA DENISE MORGAN, PLAINTIFF WITNESS, VIA DEPOSITION

17          DESIGNATIONS READ..............................    337

18     MARLO SPAETH, PLAINTIFF WITNESS

19          DIRECT EXAMINATION BY MS. CARTER...............    344

20          CROSS-EXAMINATION BY MR. HARLAN................    359

21     DAVID SMITH, M.D., PLAINTIFF WITNESS

22          DIRECT EXAMINATION BY MS. VANCE................    373

23          CROSS-EXAMINATION BY MR. BURNETT...............    391

24          REDIRECT EXAMINATION BY MS. VANCE..............    418

25
```

```
1     LEE SPUDE, PLAINTIFF WITNESS, VIA DEPOSITION

2          DESIGNATIONS READ................................    421

3     BARBARA BARNES, DEFENSE WITNESS

4          DIRECT EXAMINATION BY MR. HARLAN.................    428

5          CROSS-EXAMINATION BY MS. CARTER.................    460

6     JULIA STERN, DEFENSE WITNESS

7          DIRECT EXAMINATION BY MR. HARLAN.................    462

8

9                              * * * * *

10                          E X H I B I T S

11    NUMBER            DESCRIPTION            ADMITTED INTRODUCED

12    20    Exit Interview - EEOC00745 ....................271     271
            admitted previously by stipulation
13
      26    Rehire Policy from Deposition Exhibit 131 .....272     272
14          admitted previously by stipulation

15    30    Accommodation Management Guidelines ...........256     256
            D000984-989
16          admitted previously by stipulation

17    32    Case Details - D001014-1019 - Morgan Dep. .....281     281
            100 admitted previously by stipulation
18
      34    Email exchange Spude and Castro - D001961 .....277     277
19          admitted previously by stipulation

20    35    Castro Reports to Investigator D001081-1084 ...282     282
            D1195-1099
21          admitted previously by stipulation

22    38    Dr. David Smith CV - 2018 .....................374     374
            admitted previously by stipulation
23
      39    Dr. David Smith Office Visit - 12/8/201 .......381     381
24          admitted previously by stipulation

25    41    Stipulation regarding Financials...............365     365
```

1   1002    Customer Service Scheduling Availability - ....246    246
            02/16/2015 [D000021]
2           admitted previously by stipulation

3   1006    Spaeth Attendance History - 01/2012 - .........476    476
            07/08/2015 [D002542-D002551; D002553 –
4           D002571] admitted previously by stipulation

5   1010    Associate Attendance Personal Discussion Log ..487    487
            [D000118] admitted previously by stipulation
6

    1012    Coaching - December 17, 2014 [Dkt. 102-24] ....489    489
7           admitted previously by stipulation

8   1013    Coaching - March 18, 2015 [Dkt. 102-24] .......328    328
            admitted previously by stipulation
9

    1015    Email from Julia Stern - January 13, 2015 .....492    492
10          [D000396]
            admitted previously by stipulation
11

    1061    Accommodation in Employment ...................421    421
12          (Medical-Related) Policy-Wisconsin-March 5,
            2014 [D001004 - D001008]
13          admitted previously by stipulation

14

15

16

17

18

19

20

21

22

23

24

25

501