UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

------------------------------------------------------------

EQUAL EMPLOYMENT OPPORTUNITY          )
COMMISSION,                           )
                                      )
                    Plaintiff,        )   Case No. CV 17-70
                                      )   Green Bay, Wisconsin
      vs.                             )
                                      )   July 14, 2021
WAL-MART STORES EAST LP,              )   8:31 a.m.
                                      )
                    Defendant.        )   **DAY 3**

------------------------------------------------------------

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              **Justin Mulaire**
                                United States Equal Employment
                                Opportunity Commission
                                230 S Dearborn St - Ste 2920
                                Chicago, IL 60604
                                312-872-9666
                                Email: justin.mulaire@eeoc.gov

                                **Carrie Noelle Vance**
                                **Leslie N Carter**
                                United States Equal Employment
                                Opportunity Commission
                                Milwaukee District Office
                                310 W Wisconsin Ave - Ste 500
                                Milwaukee, WI 53203-2292
                                414-297-4188
                                Fax: 414-297-3146
                                Email: carrie.vance@eeoc.gov
                                Email: leslie.carter@eeoc.gov

U.S. Official Transcriber:      JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:              WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



502

```
1    APPEARANCES CONT'D:

2    For the Defendant:              Emery K Harlan
                                      Warren E Buliox
3                                     MWH Law Group LLP
                                      735 N Water St - Ste 610
4                                     Milwaukee, WI 53202
                                      414-436-0353
5                                     Fax: 414-436-0354
                                      emery.harlan@mwhlawgroup.com
6                                     warren.buliox@mwhlawgroup.com

7                                     George Burnett
                                      Law Firm of Conway Olejniczak &
8                                     Jerry SC
                                      231 S Adams St
9                                     PO Box 23200
                                      Green Bay, WI 54305
10                                    920-437-0476
                                      Fax: 920-437-2868
11                                    rgb@lcojlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

503

P R O C E E D I N G S

**(Call to Order of the Court at 8:31 a.m.)**

THE COURT:  Okay, good morning, everyone.  We are outside the presence of the jury.

COUNSEL IN UNISON:  Good morning.

THE COURT:  And I note that I've received or the defendants have filed a Rule 50 motion for a directed verdict.  My inclination is at least to take that under advisement for now and continue with the case.  I take it EEOC wants to respond.

MR. MULAIRE:  Yes, Your Honor.  When you say "take it under advisement," do you mean you would still like oral argument from us sometime prior to sending the case to the jury, or the Court will consider it post-verdict as needed?

THE COURT:  I wouldn't mind argument ahead of time, but my inclination is we've gone this far, let's let the jury take it and then we can address whether or not -- that way we won't do things twice, hopefully.  I don't think anyone wants to do things twice.

MR. HARLAN:  Your Honor, we do want to be heard after we close our case.

THE COURT:  Sure.

MR. HARLAN:  Okay.

MR. MULAIRE:  So, yes, Your Honor, I'm prepared at whatever point the Court finds it useful to address the motion on the record, but I can also be brief.

504

1       THE COURT:  I think that'll be helpful.  And, you

2   know, there are certain -- I think the punitive damage claim is

3   an interesting argument I haven't really thought of that much.

4   I've given it some thought and I think you can see from the jury

08:33   5   instructions we've kind of been reviewing those cases that the

6   Seventh Circuit has issued concerning some of these matters.

7       So -- okay, let's bring the jury in then.  And we'll

8   continue.  Is Ms. Stern here?

9       MR. HARLAN:  Yes, she is.

08:33   10      THE COURT:  She can come in and we'll get going right

11  away then.

12      Mr. Harlan, does it look like you'll take the whole

13  day or do you think you'll be able to finish?

14      MR. HARLAN:  I think we should be able to finish.

08:34   15      THE COURT:  And then -- toward the afternoon so that

16  closing tomorrow?

17      MR. HARLAN:  Yes, that's our thought.

18      THE COURT:  Yeah.  I don't like to have the case

19  presented to the jury late in the day where they're here at

08:34   20  night.  I think it's much better in the morning.  So if we can

21  finish early, do a jury instruction conference, and then be

22  ready to go.

23      MR. BULIOX:  Judge, it's our intention to get through

24  today so --

08:34   25      THE COURT:  Good.

505

1                    (Jury in at 8:34 a.m.)

2              THE COURT:  Okay.  Good morning, ladies and gentlemen

3      of the jury.  Be seated.  And Ms. Stern has retaken the stand.

4      She is still under oath and we are going forward with the direct

08:35   5      examination of Ms. Stern.

6              So, go ahead, Mr. Harlan.

7              MR. HARLAN:  Thank you, Your Honor.

8          JULIA STERN, DEFENSE WITNESS, PREVIOUSLY SWORN

9                    CONTINUED DIRECT EXAMINATION

08:35  10      BY MR. HARLAN:

11      Q.  Good morning, Ms. Stern.  How are you?

12      A.  Good.

13      Q.  We ended yesterday with you indicating that Ms. Spaeth had

14      approached you after you gave her a coaching and apologized and

08:35  15      committed that she would get on track in terms of attendance.

16              Yesterday we also -- I was trying to show you some

17      attendance records, and I'm wondering if we can go back in terms

18      of the attendance records.  So if you could turn to

19      Exhibit 1006.  And in particular page 2548.  And I apologize for

08:36  20      the heft of our book.

21      A.  Okay.

22      Q.  Okay.  So looking at those records, are you able to see if

23      Ms. Spaeth was scheduled on November 28th, 2014?

24      A.  Yes, she was scheduled, from 1:00 to 5:30.

08:36  25      Q.  I'm sorry, what was the schedule?

506

1    A.   1:00 to 5:30.

2    Q.   And what day was that?

3    A.   November 28th would have been Black Friday.

4    Q.   And based on your recollection and knowledge of the

08:36    5    operations, is that a busy day for the store?

6    A.   That is the busiest day of the year for the store.

7    Q.   Okay.  So you testified that Ms. Spaeth was scheduled on

8    Black Friday in 2014.  Did she complete her shift on that day?

9    A.   She did not work at all on that day.  She was absent.

08:37   10    Q.   And what do the records reflect in terms of whether you got

11    a call or not in terms of whether she was coming to work?

12    A.   It doesn't.  It just says absent.

13    Q.   Okay.  So the records don't indicate a call in terms of

14    whether there was a no call/no show, she just didn't come to

08:37   15    work.

16    A.   No.

17    Q.   Okay.  And based on an associate who is scheduled and not

18    coming to work on Black Friday, what kind of difficulty or

19    hardship does that provide for the business?

08:37   20    A.   That's a huge impact on the customer service for the

21    business.

22    Q.   Can you move the microphone a little bit closer to you and

23    try and speak into it?  I know you're trying to juggle a number

24    of things so I apologize.

08:37   25    A.   Is that better?

507

1    Q.   I think so.

2    A.   Okay.

3    Q.   So you were telling us about what impact that would create

4    for the business.

08:38  5    A.   So that would have a big impact on the customer service,

6    helping customers with shopping for that time and getting the

7    store back in order.

8    Q.   Thank you.  So after you gave Ms. Spaeth her first coaching,

9    I think your testimony yesterday was you noticed some initial

08:38  10   improvement working more of her shift?

11   A.   Yes.

12   Q.   Did that last?

13   A.   No.   In February she kind of went back to leaving work

14   earlier again.

08:38  15   Q.   Okay.

16          MR. HARLAN:   Can we put up Exhibit 1013.

17   BY MR. HARLAN:

18   Q.   Okay.  So you said that after you gave her the first written

19   coaching her adherence to the attendance policy slightly

08:39  20   improved, but it was temporary, and then she had some additional

21   violations; correct?

22   A.   Yes.

23   Q.   And is 1013 a coaching that you delivered to her?

24   A.   Yes, that's the second coaching that I gave her.

08:39  25   Q.   Okay.  And according to this --

508

1          MR. HARLAN:  If you could call out the observation

2    section, Tracy.

3    BY MR. HARLAN:

4    Q.  -- it says that she was scheduled to work on the 24th of

08:39    5    February and March 13th, and that she didn't come to work or

6    call in.  So it's a no call/no show.

7    A.  Yes.

8    Q.  Can you explain what associates are supposed to do if they

9    can't come to work?

08:40   10    A.  If they can't come to work they are supposed to call the

11   store, notify a member of management that they will not be in to

12   work, and the reason why.

13   Q.  Did you get any notification at all that she wasn't going to

14   be at work on those days?

08:40   15   A.  No.

16   Q.  This section also indicates that she left early on eight

17   days between January 5th, 2015 and February 13th, 2015?

18   A.  Yes.

19   Q.  And that sort of violation of the attendance policy, does it

08:40   20   have an effect on the business?

21   A.  Yes, it does.

22   Q.  Okay.  Speak up.

23   A.  Is that better?

24   Q.  So does that have a impact on the business when someone is

08:41   25   leaving early for eight days?

509

1    A.   Yes.

2    Q.   And could you explain what that impact is?

3    A.   That impact is that the tasks she's assigned are not getting

4    completed, so another associate has to pick up her share of the

08:41    5    work as well as their own.  And if we don't have an associate to

6    do that, then it's not ready -- it's not presentable for the

7    customer.

8              MR. HARLAN:  If we could call up the section of that

9    coaching, the action plan section.

08:41   10   BY MR. HARLAN:

11   Q.   So there are some words typed in that action plan section,

12   it says, "I will check my schedule every day."  Who put those

13   words there?

14   A.   Marlo did.

08:42   15   Q.   So she was able to type that on a computer?

16   A.   Yes, she was sitting in front of the computer when she did

17   that.

18   Q.   You personally observed her typing that into the computer.

19   A.   Yes.

08:42   20   Q.   Now, with respect to any of the attendance issues that you

21   were aware of that Ms. Spaeth was displaying, did you have any

22   idea that it might have something to do with her Down syndrome?

23   A.   No.

24   Q.   Did anybody ever tell you that?

08:42   25   A.   No.

1  Q.  There's been some testimony about individuals with Down

2  syndrome having a need for routine; is that something that you

3  had ever heard of at this time?

4  A.  No.

08:42  5  Q.  And with respect to these violations that are noted on this

6  coaching, if the attendance policy was applied as written could

7  she have been subject to termination at that point?

8  A.  Yes.

9  Q.  But that didn't happen at that point, did it?

08:43  10  A.  No.  I gave her the coaching instead.

11  Q.  So after this coaching, or at the time of this coaching,

12  Ms. Spaeth indicated that she was going to read her schedule and

13  do better; correct?

14  A.  Yes.

08:43  15  Q.  Did that happen?

16  A.  She started to work -- she would come in at 1:00 and she was

17  scheduled till 5:30.  She would stay until after 5:00.  She was

18  still leaving early, though.

19  Q.  Okay.

08:43  20  A.  So in order to not count as an occurrence, she would have

21  had to have been there till at least 10 minutes before the end

22  of her shift and she would be leaving like 15, 20, 25 minutes

23  before.

24  Q.  So after the second coaching she incurred some additional

08:44  25  violations of the attendance policy, and we know that she

1    ultimately was terminated; correct?

2    A.  Yes.

3    Q.  Now, was there a third written coaching given to Ms. Spaeth?

4    A.  No, there was not.

08:44    5    Q.  Okay.  Why was there no third written coaching -- first of

6    all, is a third written coaching something that is supposed to

7    happen under the policy?

8    A.  It can, but it can also, depending on the severity of the

9    infraction, it can move up a level.

08:44    10    Q.  And is that what happened in her situation?

11    A.  Yes.

12    Q.  Okay.  So under the attendance policy as it existed then,

13    how many occurrences would a person need to have in order to be

14    subject to termination?

08:44    15    A.  Seven.

16    Q.  Okay.  And at the time she was let go, did she have seven?

17    A.  She had 16.

18    Q.  So she had 16 occurrences?

19    A.  16.

08:45    20    Q.  Now, the decision to let Ms. Spaeth go, to terminate her

21    employment, was that a decision you made?

22    A.  No.

23    Q.  What was your role in that process?

24    A.  Because I was her supervisor, her -- the closest one that

08:45    25    was salaried, it was my job to do the termination.

512

1   Q.  To communicate the termination to her.

2   A.  Yes.

3   Q.  Tell us about that day, what you recall about it, how it was

4   communicated.

08:45   5   A.  Went out to the floor and got Marlo, brought her back to the

6   management office.  The shift manager Robin Castro was with me.

7   We went over all the reasons why, showed her her attendance, and

8   told her that we were ending her employment with us.

9   Q.  So where were you all at when you had this conversation with

08:46   10   her?

11   A.  We were in the management office.

12   Q.  Okay.  So is it fair to say on the day that Ms. Spaeth was

13   let go she didn't really know that she was going to be

14   terminated, did she?

08:46   15   A.  No.

16   Q.  And since you've been at Walmart do associates ever get

17   advanced notice that their employment's going to come to an end

18   because of some infraction that they've committed?

19   A.  No.

08:46   20   Q.  So you all have this meeting with her where you're

21   communicating this to her, I take it she didn't receive it well.

22   A.  No, she broke down crying.

23   Q.  Did anyone else join you and Ms. Castro in that meeting?

24   A.  Debbie from personnel came in and joined us.

08:46   25   Q.  Is that Debbie Moss?

1    A.   Debbie Moss, yes.

2    Q.   How did she come into the meeting, was she summoned into the

3    meeting?

4    A.   We asked her to come in to help soothe Marlo because she was

08:46    5    crying.

6    Q.   And why Debbie in particular?

7    A.   Debbie is very personable that way.  So she can have that

8    effect of calming someone down and making them, you know, come

9    back to a normal level.

08:47    10    Q.   So after Ms. Moss came in, how did the meeting conclude?

11    A.   Marlo cried for a little bit, Debbie got her to stop crying,

12    and then we -- she walked her out the door.

13    Q.   And were you and Ms. Castro present for the entirety of the

14    meeting?

08:47    15    A.   Yes, we were.

16    Q.   And then in terms of leaving, was she escorted by anybody?

17    A.   Debbie walked out with her.

18    Q.   Okay.  Was -- do you recall if Ms. Spaeth was given any

19    paperwork at that meeting?

08:47    20    A.   Yes, she was given -- they get a slip of paper that has

21    different phone numbers on for profit sharing and insurance and

22    401 that they can call and take care of that.

23    Q.   Okay.  And did that paperwork say anything about whether she

24    was eligible for rehire?

08:48    25    A.   That piece, no.

514

1  Q.  Okay.  And what other information do you recall that was on

2  the form?

3  A.  On her termination form?

4  Q.  Yes.

08:48  5  A.  That she was eligible for rehire, and I don't remember what

6  we all wrote on there.

7  Q.  Okay.  So at the point when Ms. Spaeth was let go, did you

8  have any knowledge or understanding that there was somebody

9  other than Ms. Spaeth who had responsibility for her personal

08:48  10  legal affairs?

11  A.  No.

12  Q.  Did you know she had a guardian?

13  A.  No.

14  Q.  Did you know Amy Jo Stevenson?

08:48  15  A.  No.

16  Q.  Did Ms. Spaeth ever -- did she come back the next day

17  confused about whether she had been let go?

18  A.  Not that I was aware of, no.

19  Q.  So you talked to us about Ms. Spaeth, her employment ending

08:49  20  with Walmart.  Are you familiar with a person, Shakira Mills?

21  A.  Yes.

22  Q.  Who was Shakira Mills?

23  A.  Shakira Mills worked in the jewelry department.

24  Q.  And did she report to you?

08:49  25  A.  Yes.

515

1    Q.  And is she still with the jewelry department?

2    A.  No she's not.

3    Q.  What happened to Shakira Mills?

4    A.  She got terminated for absenteeism.

08:49    5    Q.  Violating the attendance policy.

6    A.  Yes.

7    Q.  And when did that termination occur?

8    A.  That would have been in June of 2015.

9    Q.  And then when did Ms. Spaeth's termination occur?

08:49    10    A.  In July of 2015.

11    Q.  So basically a month before Ms. Spaeth was let go Ms. Mills

12    was let go.

13    A.  Yes.

14    Q.  And did Ms. Mills have any sort of disability, to your

08:50    15    knowledge?

16    A.  Not to my knowledge.

17    Q.  Are you familiar with a person named Jennifer Gomez?

18    A.  Yes.

19    Q.  And who was that?

08:50    20    A.  She worked in the jewelry department as well.

21    Q.  And is she still in the jewelry department?

22    A.  No, she's not.

23    Q.  And how is it that she's no longer in the jewelry

24    department?

08:50    25    A.  She was terminated for violating the attendance policy.

516

1    Q.  And who was the person that terminated her?

2    A.  That would have been me.

3    Q.  And was that -- in what timeframe?

4    A.  September of 2015.

08:50    5    Q.  Okay.  And did Ms. Gomez have any disability or physical and

6    mental limitations, to your knowledge?

7    A.  Not to my knowledge.

8    Q.  How about an employee named Meissner Clark, are you familiar

9    with that name?

08:51    10    A.  Shannon?

11    Q.  Yes.

12    A.  Yes.

13    Q.  And did Ms. Clark work for Walmart?

14    A.  Yes, she did.

08:51    15    Q.  What area of the store was she employed at?

16    A.  She was in the apparel department.

17    Q.  You say was, is she still there?

18    A.  No, she is not.

19    Q.  And did she lose her position?

08:51    20    A.  Yes, she did.

21    Q.  For attendance violations?

22    A.  For attendance, yes.

23    Q.  And roughly when was that?

24    A.  About August of 2015.

08:51    25    Q.  So that's approximately one month after Ms. Spaeth was let

517

1    go.

2    A.  Yes.

3    Q.  Did Ms. Meissner Clark have any sort of mental or physical

4    limitations, to your knowledge?

08:51    5    A.  No, not that I know of.

6    Q.  Not disabled.

7    A.  No.

8         THE COURT:  Ms. Stern, would you keep your voice up?

9    I know the microphone picks you up some, but just if you could

08:52    10    talk a little louder I think that would help.

11         THE WITNESS:  Okay.

12         THE COURT:  Thank you.

13    BY MR. HARLAN:

14    Q.  So if I understand what you just testified to, there are

08:52    15    three people, in the same timeframe as Ms. Spaeth, that were let

16    go who were not disabled for violating the same policy.

17    A.  Yes.  That's correct.

18    Q.  Now, at some point did you hear from Amy Jo Stevenson?

19    A.  She called the night that Marlo was terminated.

08:52    20    Q.  And that was the very first time you had heard from

21    Ms. Stevenson.

22    A.  Yes.

23    Q.  Never heard from her checking in terms of how Ms. Spaeth was

24    doing --

08:52    25         MS. VANCE:  Objection, leading.

518

1    THE COURT:  The objection is leading?

2    BY MR. HARLAN:

3    Q.  Had you heard from Ms. Stevenson prior to the day she called

4    when Ms. Spaeth was terminated?

08:52    5    A.  No, I didn't even know she existed before then.

6    Q.  Had she ever called you to check on how Ms. Spaeth was doing

7    in terms of performance --

8    MS. VANCE:  Objection, leading.

9    THE COURT:  Overruled.  Go ahead.

08:53    10    THE WITNESS:  No.

11    BY MR. HARLAN:

12    Q.  Had she ever called to check in terms of how she was

13    adjusting to the new schedule that she had?

14    A.  No.

08:53    15    Q.  So how many times did she call you on that day?

16    A.  She called twice that night.

17    Q.  Okay.  And so what do you recall about the first

18    conversation with Ms. Stevenson?

19    A.  The first time she called she just wanted to know who she

08:53    20    could talk to about getting Marlo her job back.

21    Q.  Okay.

22    A.  So I told her I would give Kent her phone number and he

23    would get back to her when he was in next.

24    Q.  Okay.  Did she make any inquiries in that first call in

08:53    25    terms of, hey, why did my sister lose her position?

519

1    A.   No.

2    Q.   Okay.  And then approximately how soon after that first call

3    did you get the second call?

4    A.   Maybe about an hour or so after she called again.

08:54   5    Q.   Okay.  And what do you recall about that second call?

6    A.   When she called the second time she said that her mother was

7    in the hospital and she was supposed to have picked up the care

8    for Marlo, and that she should have been present when we did the

9    termination.  And she didn't think that it was legal that we

08:54   10   didn't call her.

11   Q.   Okay.  Did you notice a change in her demeanor from the

12   first call to the second one?

13   A.   Yes.  She was more irate on the second one.

14   Q.   And how did you respond to what she said to you in that

08:54   15   call?

16   A.   Again, I told her that I would give Kent her phone number

17   and he would contact her.

18   Q.   And Kent is the store manager.

19   A.   Yes.

08:54   20   Q.   Did she mention anything about Ms. Spaeth's attendance

21   record?

22   A.   No.

23   Q.   Did she mention anything about Ms. Spaeth needing to adjust

24   to a change in a routine?

08:55   25   A.   No.

1    Q.  Did she offer any sort of medical explanation to explain

2    Ms. Spaeth's violation of the attendance policy?

3    A.  No.

4    Q.  Had anybody, prior to your conversation with Ms. Stevenson,

08:55    5    told you or intimated that you were supposed to check with

6    Ms. Stevenson or her mother prior to communicating with

7    Ms. Spaeth?

8    A.  No.

9    Q.  Had you at that point ever contacted an associate's family

08:56   10   member prior to having some discussion about a work related

11   issue?

12   A.  No.

13   Q.  During this -- these two calls did Ms. Stevenson say to you

14   that she had spoken to Karen Becker about this situation?

08:56   15   A.  No.

16            MR. HARLAN:  All right, if we can pull up Exhibit 18.

17            (Exhibit 18, Spaeth Evaluation 2015 - EEOC00590-593,

18   admitted previously by stipulation.)

19   BY MR. HARLAN:

08:56   20   Q.  So now I'm going to show you a few evaluations of Ms. Spaeth

21   and ask you to look at them.

22   A.  Okay.

23   Q.  Trial Exhibit 18.  It's in the --

24   A.  In this book.

08:57   25   Q.  Yeah.  Okay.  Can you tell us what Exhibit 18 is?

1    A.   This is performance evaluation.

2    Q.   For Ms. Spaeth?

3    A.   Yes.

4    Q.   If we could go to page 593.  And if you could just tell us

08:58    5    whose names are on that evaluation.

6    A.   Marlo's name is on there, mine, and Kent.

7    Q.   Can you tell us how this evaluation was put together?

8    A.   Jean Volz and Marissa Nadel (phonetic) were her hourly

9    supervisors, so the three of us would have sat down and

08:58    10   collaborated on her evaluation and rated her and then wrote the

11   comments.

12   Q.   So did the information in the evaluation reflect not only

13   your perspective but also two other managers?

14   A.   Yes.

08:59    15   Q.   Was there consensus among the three managers?

16   A.   Yes.

17   Q.   And how was she performing from your perspective at the time

18   of this evaluation in terms of adherence to the company's

19   attendance policy?

08:59    20   A.   She was not.

21   Q.   So if we could go back to the section --

22        MR. HARLAN:  Actually, highlight the manager's

23   comments section.

24   BY MR. HARLAN:

08:59    25   Q.   So these comments, did you have a role in putting these

522

1    comments in her evaluation?

2    A.  Yes.

3    Q.  So one of the things you're communicating to her, based on

4    what's written here, is that she needs to zone an additional

09:00    5    department?

6    A.  Yes.

7    Q.  Can you explain that?  Why was that something that you were

8    pointing out to her?

9    A.  We had taught her or showed her how to zone in the

09:00    10    housewares department as well.  When I first came to days all

11    she did was fold towels.  So we had her zoning in the housewares

12    department, the appliances and everything.  And then we also

13    taught her how to get the returns from the service desk and put

14    those away.

09:00    15            So part of this she did a good job at doing that when

16    she was there to do it, but when she would leave early then she

17    wouldn't be finishing her tasks.

18    Q.  Okay.  And with respect to doing zoning activity in multiple

19    areas, was that something that was a requirement unique to her,

09:00    20    or were other sales associates also having to do that?

21    A.  No, that was for all associates.

22    Q.  And how was the evaluation presented to Ms. Spaeth?

23    A.  We sit down in the office and we go through the evaluation

24    with her.

09:01    25    Q.  Did she have a response to receiving this evaluation?

1  A.  I don't think she had a response.  I don't recall what her

2  response was.

3  Q.  Okay.

4         MR. HARLAN:  If we could go to the -- Strike that.

09:01  5  We'll just move on to the next one.

6         If we could turn to Exhibit 9.

7         (Exhibit 9, Spaeth Evaluation 2006 - EEOC00617-618,

8  admitted previously by stipulation.)

9  BY MR. HARLAN:

09:01  10  Q.  Are you on that page?

11  A.  Yes.

12  Q.  What's Exhibit 9?

13  A.  That's another performance evaluation.

14  Q.  And what year is that for?

09:02  15  A.  This one was for 2006.

16  Q.  So for the evaluation in 2006, did you have any role

17  whatsoever in that evaluation?

18  A.  No.

19  Q.  You had no management responsibilities for Ms. Spaeth at all

09:02  20  at that point in time; right?

21  A.  Right.

22  Q.  If you could turn to --

23         MS. VANCE:  Objection, foundation.

24         THE COURT:  Is there a question here?

09:02  25         MS. VANCE:  How could Ms. Stern testify to an

524

1    evaluation she just said she had no part in?

2         THE COURT:  There's not a question before the court,

3    though.  I mean, that was the last question, wasn't it?

4         MS. VANCE:  She's being asked to turn to a certain

5    page in an exhibit that she just testified she had no role in

6    making.

7         MR. HARLAN:  Okay.  And I'm just going to ask her one

8    other question related to that.

9         THE COURT:  Well, let's hear the question and then I

10   can decide whether there's a foundation for it.

11   BY MR. HARLAN:

12   Q.  So if you could go to page 618.  I think it's the second

13   page of Number 9.

14        MR. HARLAN:  And if you can highlight under the areas

15   of improvement, the first bullet point.  No, I'm sorry, under

16   the next category, areas of improvement.  Yes.  Thank you.

17   BY MR. HARLAN:

18   Q.  So the feedback in the area for improvement that's in this

19   evaluation from 2006 that you testified you had nothing to do

20   with, how does that recommendation for how she should improve

21   compare to the feedback you gave her in the 2015 evaluation?

22   A.  It's the same.

23   Q.  Can you turn to Exhibit 10.

24        (Exhibit 10, Spaeth Evaluation 2007 - EEOC00615-616,

25   admitted previously by stipulation.)

09:02

09:02

09:03

09:03

525

1  BY MR. HARLAN:

2  Q.  While we're waiting to pull that up, do you recognize the

3  signatures, the names on the second page of that evaluation?

4  A.  Yes, I do.

09:04  5  Q.  Who were those folks?

6  A.  Well, Marlo's signature is on there, there's Joy Nino and

7  Janita Furgens (phonetic).  They were her department managers at

8  the time.

9  Q.  Like the 2006 evaluation, your name is not on there and I

09:04  10  take it you didn't have anything to do with it; right?

11  A.  Right.

12  Q.  You didn't have any management responsibilities for

13  Ms. Spaeth at that time.

14  A.  Right.

09:05  15        MR. HARLAN:  If you could highlight on the second page

16  the areas of improvement section.

17  BY MR. HARLAN:

18  Q.  Says, "Marlo needs to keep working until it's time for her

19  to leave."

09:05  20  A.  Yes.

21  Q.  How does that compare to the feedback you gave her?

22  A.  It's the same.

23  Q.  So based on what you just testified to, it sounds like the

24  feedback you were giving her was identical to the feedback other

09:05  25  managers were giving her in years prior.

526

1  A.  Yes.

2  Q.  Since Ms. Spaeth has been gone from Walmart, have you ever

3  heard anybody at Walmart indicate that they would not rehire her

4  should she apply and there be a position available?

09:06   5  A.  No.

6  Q.  Are you aware of instances where there have been associates

7  who have been let go for slighting the attendance policy who

8  have been able to get their jobs back?

9  A.  Yes.

09:06  10  Q.  And in each of those situations, to your knowledge, have

11  they filed an application to get their job back?

12  A.  Yes, they would have to.

13  Q.  We've heard testimony about an investigation that happened

14  after a posttermination meeting between management staff and

09:06  15  Ms. Spaeth's family.  First of all, with respect to that

16  meeting, you weren't at the meeting; correct?

17  A.  No, I was not.

18  Q.  Okay.  But were you interviewed and did you give a statement

19  as part of that investigation?

09:06  20  A.  Yes, I did.

21  Q.  Okay.  And I take it at the time that you gave that

22  statement you understood that if you were untruthful in that

23  statement you could be subject to discipline by the company;

24  correct?

09:07  25  A.  Yes.

527

1    Q.  And was the information you provided during that

2    investigation true and accurate?

3    A.  Yes.

4            MR. HARLAN:  That's all I have, Your Honor.

09:07    5            THE COURT:  Okay.  Cross?

6            MS. VANCE:  Thank you.

7                    CROSS-EXAMINATION

8    BY MS. VANCE:

9    Q.  Good morning, Ms. Stern.  I want to focus your attention to

09:07   10   the months after Marlo's schedule changed to that 5:30 end time,

11   December 2014, January 2015 timeframe.  Whenever you would talk

12   to Marlo about attendance she would say to you she wished she

13   could work noon to 4:00 like she used to; right?

14   A.  Yes.

09:08   15   Q.  She asked you that question when you had the conversation

16   that you documented in the email on December 17th, 2014; right?

17   A.  Yes.

18   Q.  She asked for her noon to 4:00 schedule during her

19   coachings; right?

09:08   20   A.  Yes.

21   Q.  In fact, every time you talked to Marlo about her schedule

22   that winter, she would say she wished she could work noon to

23   4:00 like she used to; right?

24   A.  Yes.

09:08   25   Q.  Let's look at Exhibit 30, please.  And are you in the binder

528

1    in Exhibit 30, Ms. Stern?

2    A.  Yes, ma'am.

3    Q.  Okay, then I'll get started.  This is the accommodation and

4    employment medical related management guidelines for Walmart;

09:09  5    right?

6    A.  Yes.

7    Q.  And you recognize this document; right?

8    A.  Yes.

9    Q.  I'll read the first two lines.

09:09  10          "These guidelines are a supplement to Walmart's

11    accommodation in employment medical related policy.  They apply

12    to all supervisors and managers who work for Walmart."

13          Do you see that?

14    A.  Yes.

09:09  15    Q.  These guidelines apply to you; right?

16    A.  Yes.

17    Q.  These are your management guidelines.  These are the

18    instructions from Walmart to managers and that includes you;

19    right?

09:09  20    A.  Yes.

21    Q.  I'll direct your attention to the section in the middle

22    called "Identifying a Request For Reasonable Accommodation."  Do

23    you see that in the middle section?

24    A.  The "Identifying a Request For Job Assistance"?

09:10  25    Q.  Thank you.  "Identifying a Request For Job Assistance."

529

1    Thank you.  So I'll read.

2            "An associate may request job assistance in a variety

3    of ways.  She may make the request directly, or a family member,

4    friend, job coach, health professional or other person may make

5    a request on an associate's behalf.  The request may be made

6    verbally or in writing.  The request does not have to include

7    the words 'reasonable' or 'accommodation.'"

8            Did you see that?

9    A.  Yes.

10   Q.  And you knew this policy; right?

11   A.  Yes.

12   Q.  You had to take computer based trainings on accommodation

13   policies; right?

14   A.  Yes.

15   Q.  Let's turn to the second page.  Do you see the section

16   around the middle, "Requests That Cannot Be Approved As Facility

17   JAs."

18   A.  Yes.

19   Q.  And I'll read:  "If the associate requests job assistance

20   that cannot or has not been granted as a facility JA, the

21   request must be forwarded to ASC for review, analysis, and

22   decision."

23           So help us out.  Facility JA, that means an in-store,

24   local Manitowoc job adjustment; right?

25   A.  Yes.

1   Q.   And then ASC is Accommodation Service Center; is that right?

2   A.   Yes.

3   Q.   And that's nationwide for Walmart; correct?

4   A.   Yes.

09:12   5   Q.   And it's in headquarters in Arkansas; correct?

6   A.   I believe so.

7   Q.   Okay.  So if somebody with a disability has a request that

8   can't be handled inside Manitowoc, it has to go to headquarters;

9   right?

09:12   10          MR. HARLAN:  Objection.  Vague in terms of request.

11          THE COURT:  Yeah.  Sustained.  The request like --

12          MS. VANCE:  Okay, let me rephrase.  Thank you.

13   BY MS. VANCE:

14   Q.   So if a personal -- excuse me -- a person with a disability

09:12   15   had a request for a job adjustment or an accommodation that

16   can't be handled in Manitowoc, it has to go to Walmart

17   headquarters; right?  That's what we just read?

18   A.   To the ASC, yes.

19   Q.   Thank you.  To the Accommodation Service Center.  And the

09:13   20   next sentence is:  "At this point the facility manager or his or

21   her designee must provide the associate with a request for

22   accommodation packet.  The packet must be provided as soon as

23   possible and in no event more than two days after the request."

24          Do you see that?

09:13   25   A.   Yes.

531

1    Q.   And at no point during your supervision of Marlo did you

2    provide her with a request for accommodation packet; right?

3    A.   No.

4    Q.   And then I'll direct your attention to that next section

09:13    5    down on page 2.  "The ASC will obtain additional medical

6    information if necessary."  Do you see that?

7    A.   Yes.

8    Q.   And I'll read from there.

9         "If the associate's disability or medical condition is

09:14    10    known or otherwise obvious, ASC may not need to request medical

11    information."

12        Do you see that?

13    A.   Yes.

14    Q.   And you knew that Marlo Spaeth has Down syndrome; correct?

09:14    15    A.   Yes.

16    Q.   Was that obvious to you?

17    A.   Yes.

18    Q.   Okay.  Directing your attention to some of the disciplinary

19    actions we have seen during your testimony.  Am I right that at

09:14    20    Walmart when a manager takes disciplinary action against an

21    employee it's called a coaching?

22    A.   Correct.

23    Q.   So that's when you're writing up somebody and the write-up

24    goes into their record, that disciplinary action, you call it a

09:15    25    coaching.

1   A.   Yes.

2   Q.   And you gave Marlo Spaeth two coachings.

3   A.   Yes, I did.

4   Q.   And do I have this right, when you brought Marlo in for

09:15   5   those coachings, she just sat and stared at the counter in front

6   of her; right?

7   A.   Yes.

8   Q.   And she had her head down; right?

9   A.   Yes.

09:15   10   Q.   And it looked like she may have been crying; right?

11   A.   Yes.

12   Q.   Let's turn your attention to Exhibit 37.

13          (Exhibit 37, Stern Reports to Investigator -

14   D001085-1087; D001100-1104, admitted previously by stipulation.)

09:15   15          MS. VANCE:   And, Lectrice, can you please put up 37.

16   First page first.

17   BY MS. VANCE:

18   Q.   And, Ms. Stern, do you have it in your binder?

19   A.   Yes, I do.

09:15   20   Q.   Thank you.   I'll start while we wait.   Exhibit 37 has the

21   title, "Individual Statement of Fact;" right?

22   A.   Yes.

23   Q.   And you recognize this as a document from Walmart's internal

24   investigation; correct?

09:16   25   A.   Yes.

533

1    Q.  And that was the investigation that was prompted after

2    Marlo's termination; right?

3    A.  Yes.

4    Q.  And you were one of the subjects of the investigation;

09:16    5    correct?

6    A.  Yes.

7    Q.  And so you had to sit down with your store manager; right?

8    A.  Yes.

9    Q.  And give an individual statement of fact.

09:16   10    A.  Yes.

11    Q.  And that's exactly what Exhibit 37 is; correct?

12    A.  Yes.

13    Q.  Okay.  Let's go to page 5.  The fifth page of the exhibit.

14    And on the actual piece of paper it says page 2 of 5, but in the

09:17   15    exhibit it's the fifth page.

16    A.  On 2 of 5?

17    Q.  Yes.  It is on your screen?

18    A.  Okay.

19           MS. VANCE:  And can I have a callout for the middle

09:17   20    where we have "K: Did job performance in any way."

21    BY MS. VANCE:

22    Q.   So part of the investigation --

23           MS. VANCE:  Thank you, Lectrice.

24    BY MS. VANCE:

09:17   25    Q.  Part of the investigation included Kent Abitz, right?  The

1  store manager, sitting down with you?  Right?

2  A.  Yes.

3  Q.  And he interviewed you; correct?

4  A.  Yes.

09:17  5  Q.  And these are the interview notes from his interview of you?

6  A.  Yes.

7  Q.  And so then when we see a column that starts K, that's Kent

8  asking you a question; correct?

9  A.  Yes.

09:17  10  Q.  Or a row, sorry.  A row that starts J, that's Julie

11  answering the question.

12  A.  Yes.

13  Q.  Okay.  So, and I'll ask you to see what we've pulled out

14  here.

09:18  15       "Did job performance in any way contribute to these

16  coachings?

17       "ANSWER:  No.  Coachings are strictly for attendance."

18       Do you see that?

19  A.  Yes.

09:18  20  Q.  And so that was your answer at the time of that

21  investigation; correct?

22  A.  Yes.

23  Q.  Marlo's job performance had nothing to do with the

24  coachings; that's your words; right?

09:18  25  A.  Right.

535

1    MS. VANCE:  Thank you, Lectrice.

2    BY MS. VANCE:

3    Q.  We heard you testify this morning about Black Friday 2014;

4    right?

09:19    5    A.  Yes.

6    Q.  That's Thanksgiving weekend; right?

7    A.  Right, it's the Friday after Thanksgiving.

8    Q.  Marlo can't work when the buses stop for the holidays; did

9    you know that?

09:19   10    A.  No.

11    Q.  Okay.  You testified yesterday afternoon that you considered

12    Marlo's schedule change as only a minor change; right?

13    A.  Yes.

14    Q.  Other employees had to go through much bigger changes to

09:19   15    their schedules; right?

16    A.  Yes.

17    Q.  But if Marlo's schedule change was only a minor change, it

18    would only have been a minor change for Walmart to make; right?

19    MR. HARLAN:  I'm going to object.  Confusing.

09:20   20    THE COURT:  Overruled.

21    THE WITNESS:  What do you mean by "for Walmart to

22    make"?

23    BY MS. VANCE:

24    Q.  Your testimony is that changing an hour and a half of your

09:20   25    schedule would have been a minor change for Marlo.

536

1   A.  Yes.

2   Q.  That was your testimony yesterday; right?

3   A.  Yes.

4   Q.  And you said it's only an hour, that's minor.

09:20   5   A.  Yes.

6   Q.  Isn't it also true that for Walmart it's only one associate

7   for one hour; right?  Isn't that also a minor change?

8   A.  It is a minor change, yes.

9   Q.  Thank you.  You had testimony yesterday about how the

09:21   10   schedule change had to apply to everybody the same.  Do you

11   recall what I'm talking about?

12   A.  Yes.

13   Q.  You can't let people have different hours, every everyone

14   will dictate their own schedule; right?

09:21   15   A.  Yes.

16   Q.  And you said no one would come work at Walmart then; right?

17   A.  I did not say that no one would come work at Walmart.

18   Q.  I'm sorry, what was your testimony, if everyone dictated

19   their own schedule?

09:21   20   A.  They would work when they wanted and we wouldn't have

21   coverage when we needed it.

22   Q.  You wouldn't have coverage when you needed it.  So, but you

23   also testified just now that you're familiar with Walmart's

24   accommodation policy that was Exhibit 30 we just went through;

09:21   25   right?

537

1    A.   Yes.

2    Q.   So under that policy if you have a disability Walmart will

3    give you a reasonable accommodation; correct?

4    A.   Yes.

09:21    5    Q.   Are you opposed to that policy by Walmart?

6    A.   No.

7              MS. VANCE:   I have no further questions.

8              THE COURT:   Any redirect?

9                        REDIRECT EXAMINATION

09:22    10   BY MR. HARLAN:

11   Q.   Counsel asked you about what Ms. Spaeth would say about

12   wanting to work noon to 4:00.  Did you, when she would make

13   those statements, deem that to be some sort of request for an

14   accommodation related to her disability?

09:22    15   A.   No.  I took it more as a wish that she could go back to that

16   schedule.  Just like I wish I could go back to not working

17   weekends.

18   Q.   And counsel asked you about bus service on Black Friday.  Do

19   you have any idea whether there was bus service in Manitowoc or

09:23    20   not?

21   A.   I do not know.  I would think there would be bus service on

22   that shopping day to get people around to the stores, but I

23   don't know for sure if there was service or not.

24   Q.   In any event, you certainly didn't get any communication

09:23    25   from Amy Jo Stevenson that Ms. Spaeth wouldn't be at work

538

1    because there was a bus service issue; right?

2    A.  No.

3              MR. HARLAN:  That's all.

4              Thank you, Your Honor.

09:23    5              THE COURT:  Okay.  Ms. Stern, you can step down.

6    Thank you.

7              (Witness excused at 9:23 a.m.)

8              THE COURT:  Next witness?

9              MR. BULIOX:  Yes, at this time defense calls Bonnie

09:23   10    Popp.

11              THE COURT:  Anyone want to stretch?  Feel free.

12              BONNIE OHLSEN, DEFENSE WITNESS, DULY SWORN

13              THE CLERK:  Please state and spell your first and last

14    name for the record, please.

09:24   15              THE WITNESS:  Bonnie Ohlsen, B-o-n-n-i-e, O-h-l-s-e-n.

16              THE CLERK:  Please be seated.

17                        DIRECT EXAMINATION

18    BY MR. BULIOX:

19    Q.  Good morning, Ms. Ohlsen.

09:25   20    A.  Good morning.

21    Q.  One of the first things I notice is that you identified your

22    name as Bonnie Ohlsen.  Have you been known by any other name?

23    A.  Bonnie Popp.

24    Q.  And how do you spell Popp?

09:25   25    A.  P-o-p-p.

539

1    Q.  And Bonnie, are you from Wisconsin?

2    A.  Yes.

3    Q.  Where in Wisconsin?

4    A.  Brillion.

09:25    5    Q.  Where is Brillion?

6    A.  About 35 miles south of Green Bay.

7    Q.  And how far from Manitowoc?

8    A.  About 25 miles.

9    Q.  Are you a little nervous?

09:25    10   A.  Yup.

11   Q.  Are you currently employed, Bonnie?

12   A.  Yes.

13   Q.  By whom and in what capacity?

14   A.  Walmart.  And I am a coach.

09:25    15   Q.  And what is a coach?

16   A.  A coach is a member of management that is over an area of

17   the store.

18   Q.  And what is your responsibility as a coach?

19   A.  I help staff my area, make sure the freight is to the floor,

09:26    20   work with the associates to make sure they know the priorities,

21   that they're doing their job.

22   Q.  And is that a salaried position?

23   A.  Yes.

24   Q.  And I guess overall how long have you worked at Walmart?

09:26    25   A.  24 years.  It will be 25 in September.

540

1    Q.   Wow.  And do you know when you started, roughly?

2    A.   September 14th of 1996.

3    Q.   And in 2014 what was your job title?

4    A.   I was a comanager.

09:26    5    Q.   And what is a comanager?

6    A.   A comanager is similar to a coach except we were over the

7    whole store.  So we did the same functions, we just oversaw the

8    whole building.  So one step below a store manager, yet involved

9    with all the associates of the store and the runnings and the

09:27    10    financials.

11    Q.   In 2015 what were you?

12    A.   A coach.

13    Q.   Coach.  Okay.  At any point --

14    A.   Comanager.  Sorry.  Comanager.

09:27    15    Q.   And in 2014 were you a comanager as well?

16    A.   Yes.

17    Q.   At any point in time were you an assistant manager?

18    A.   2010.

19    Q.   And what's the difference between an assistant manager and a

09:27    20    comanager?

21    A.   So an assistant manager is over specific areas.  So it's

22    broken down smaller so you're more in depth over the area.  So

23    it's a smaller area of the store versus a comanager is over a

24    larger area.

09:28    25    Q.   And do you recall approximately the period of time that you

541

1    were assistant manager?

2    A.  2010 to 2013.

3    Q.  Outside of being a coach and an assistant manager and a

4    comanager, have you held any other management positions at

09:28    5    Walmart?

6    A.  I was a temporary store manager at one point.

7    Q.  The store manager I guess in terms of levels, is that the

8    highest level in the store?

9    A.  In the store, yes.

09:28    10    Q.  And what store were you a temporary store manager at?

11    A.  West Bend.

12    Q.  And overall how long have you worked in management positions

13    at Walmart?

14    A.  Since October of 2010.

09:28    15    Q.  So about 11 years?

16    A.  Yes.

17    Q.  And have you worked at any particular location during your

18    time as a manager?

19    A.  Manitowoc was the longest store I worked at, and then West

09:29    20    Bend, and now I'm in De Pere.

21    Q.  And you said that Manitowoc was the longest store that you

22    have worked at, would you consider that to have been your

23    primary store?

24    A.  Yes.

09:29    25    Q.  And do you recall the years that you worked at Manitowoc?

542

1    A.  2010 until 2020.

2    Q.  So about 10 years.  During the time that you worked at

3    Walmart have you worked on the sales floor as opposed to some

4    back area, or a combination of both, or something else?

09:29    5    A.  A combination of both.

6    Q.  And how much time -- actually, let me back up.  Do you know

7    what I mean by sales floor?

8    A.  The area where a customer shops.

9    Q.  And how much time would you say you would spend on the sales

09:30    10   floor versus in a back office area?

11   A.  I was on the sales floor I would say 75 percent of the time.

12   Q.  So is it fair to say that you kind of pretty much knew what

13   was going on on the sales floor?

14            MS. CARTER:  Objection, leading.

09:30    15            THE COURT:  Overruled.

16            THE WITNESS:  Can you say that again?

17   BY MR. BULIOX:

18   Q.  Yeah.  Is it fair to say or assume that you knew what was

19   happening on the sales floor on a daily basis when you were a

09:30    20   manager?

21   A.  Yes.

22   Q.  Okay.  What hours have you worked over the years at Walmart?

23   A.  Our hours are fluctuating.  When I first was a member of

24   management we worked a three-on-three-off shift.  Then we

09:30    25   switched to a 7:00 to 5:00 or a 1:00 to 10:00.  Being a member

543

1    of management we have a rotating schedule.

2    Q.   And as an associate at Walmart are you required to be

3    flexible in your schedule?

4    A.   Yes.

09:31    5    Q.   And has that been the case throughout the entirety of your

6    employment at Walmart?

7    A.   Yes.

8    Q.   And have you always been a manager at Walmart?

9    A.   No.

09:31    10    Q.   And before you were a manager what were you?

11    A.   I was hired on as a temporary sales floor associate in 1996.

12    And then I was a sales floor associate for I think about a year

13    to two years.  And then I was a department manager.  I worked my

14    way up to an assistant -- then a zone merchandise supervisor,

09:31    15    and then an assistant.

16    Q.   And during all those times that you were a sales associate

17    were you required to be flexible in your schedule?

18    A.   Yes.

19    Q.   And is it unusual to have fluctuating hours at Walmart?

09:31    20         MS. CARTER:  Objection, leading.

21         THE COURT:  Overruled.

22         THE WITNESS:  No.

23    BY MR. BULIOX:

24    Q.   Why not?

09:31    25    A.   Our business is a fluctuating business.  We have busy times

1    and non-busy times.  We schedule on a customer demand so we want

2    our people to be there when the customers are there which is

3    different at all times.

4    Q.    And has this been the case throughout your employment at

09:32    5    Walmart?

6    A.    Yes.

7    Q.    As a manager at the Manitowoc store, what were your key

8    responsibilities?

9    A.    Key responsibilities were making sure that the store was

09:32    10    staffed, my area was staffed.  Making sure that my merchandise

11    was to the floor.  Making sure we had great features, we were

12    inviting to the customers, and we had great customer service.

13    Q.    And did your role involve any type of supervision over

14    associates?

09:32    15    A.    Yes.

16    Q.    And did you directly supervise associates as well?

17    A.    Yes.

18    Q.    And did you have any involvement in disciplinary matters?

19    A.    Yes.

09:33    20    Q.    And what, if any, involvement would you typically have?

21    A.    Depending upon what the situation was we would do -- it's

22    called CBWA, so coaching by walking around, which is not so much

23    a disciplinary action; it's trying to correct a behavior on the

24    sales floor or with an associate in an appropriate area before

09:33    25    you would end up in an office having a one-on-one conversation

1    with someone to try to correct a behavior.

2    Q.  And why would you do that?

3    A.  The interaction you have with a associate is what makes the

4    difference in you being a good store versus -- not saying a good

09:33    5    store versus a bad store, but a good -- you're more productive,

6    your morale is good.

7    Q.  And have you had success over the course of your time in

8    management with following that type of approach?

9    A.  I feel I have, yes.

09:34    10    Q.  And as an assistant manager or comanager, did you play any

11    role in setting or reviewing work schedules for associates?

12    A.  Yes.

13    Q.  And did you ever work directly with associates on

14    scheduling?

09:34    15    A.  Yes.

16    Q.  What would your role typically be in working with associates

17    on scheduling or work schedules?

18    A.  Depending upon the situation, sometimes we would have to

19    change availabilities with associates if they weren't getting

09:34    20    any hours based on what our scheduling system would drop.  If

21    someone, you know, had doctors' appointments, things like that,

22    we would work through schedules with things like that.

23    Q.  Okay.  I take it you're familiar with Marlo Spaeth?

24    A.  Yes.

09:35    25    Q.  And when is the first time you came into contact with Marlo?

1    A.    Marlo would have been one of my associates when I became an

2    assistant in 2010.

3    Q.    So she would have worked directly under you or was she a few

4    levels removed from you?

09:35    5    A.    She would have been one level underneath me.

6    Q.    Okay.  And do you know what area she worked in at the store?

7    A.    Apparel and home lines.

8    Q.    And when did you first come in the store again?

9    A.    2010.

09:35    10    Q.    So in 2010 Marlo was in apparel and home lines?

11    A.    Yes.

12    Q.    And you were a supervisor, assistant manager of that area?

13    A.    Yes.

14    Q.    And do you know what Marlo's position was at that time?

09:35    15    A.    Marlo was a home line sales floor associate.

16    Q.    Okay.  Okay.  At this time I wants to pull up what's been

17    admitted into evidence as Walmart Exhibit 1017.

18           (Exhibit 1017, Job Description – Apparel/Homes Sales

19    Associate – 2012 [D000027-0000029], admitted previously by

20    stipulation.)

21    BY MR. BULIOX:

22    Q.    So before we get into this exhibit, Bonnie, do you know how

23    long you supervised directly Marlo?

24    A.    Directly, three years.

09:36    25    Q.    So showing you what's been entered into evidence as

547

1   Exhibit 1017, do you recognize this document?

2   A.  Yes.

3   Q.  What is this?

4   A.  It's a job description of apparel and home lines associate,

5   or home associate.

6   Q.  And is this the position that Marlo held?

7   A.  Yes.

8   Q.  And do you see where it says "essential functions"?

9   A.  Yes.

10  Q.  What is this about?

11  A.  It gives a general description of what an associate in the

12  area would be able to do.

13  Q.  And over the course of the time that you supervised Marlo,

14  were you able to observe her perform the duties of her job?

15  A.  Yes.

16  Q.  I want to walk through a few of these.  Was Marlo, at least

17  looking at the first one here, able to maintain merchandise

18  presentation by stocking and rotating merchandise?

19  A.  Yes.

20  Q.  And was she able to maintain her areas of responsibility in

21  accordance with company policies?

22  A.  Yes.

23  Q.  And what about maintaining the fitting room in accordance

24  with the company policies?

25  A.  Marlo didn't work directly in the fitting room, but if asked

09:36

09:37

09:37

09:37

09:37

09:37

548

1    she was able to hang clothes or towels in the specific areas she

2    was working in.

3    Q.   She did that on occasion?

4    A.   Yes.

09:38    5    Q.   Did she organize and maintain the apparel department by

6    following the rules and creating appealing presentations?

7    A.   If she was asked to zone over there, yes, she would.

8    Q.   And just so that I'm clear and we're all clear, what is

9    zone?

09:38   10    A.   Zone is to make the store look presentable.  So pull

11    everything forward on an apparel rack.  We call it

12    finger-spacing.  To make sure your clothes on your racks are

13    there, to make sure your towels are folded, your rugs are

14    folded, your boxes are straight on the side counter.

09:38   15    Q.   Going down a little bit further on this list, was Marlo able

16    to provide customer service by acknowledging the customer?

17    A.   Yes.

18    Q.   And did she receive and stock merchandise?

19    A.   Yes.

09:39   20    Q.   What about complying with company policies and procedures,

21    was she able to do that for most of the time she was at Walmart?

22    A.   Yes.

23    Q.   And she was able to complete work assignments and

24    priorities?

09:39   25    A.   Yes.

549

1    Q.   So pretty much just about everything she was able to do.

2    A.   Yes.

3    Q.   All right.  So at this time I want to direct your attention

4    to Exhibit 1018.  We have a big binder up there.  If you want

09:39    5    you can also look on the screen behind you.

6               So turning over to Exhibit 1019.

7               (Exhibit 1019, Performance Appraisals [D119-D122;

8    D136-D140;D142-D151;D153-D154;D158-D159;D162-D163], admitted

9    previously by stipulation.)

10   BY MR. BULIOX:

11   Q.   All right.  Do you recognize this document?

12   A.   Yes.

13   Q.   And going back to Exhibit 1018.

14              MR. BULIOX: Sorry, Tracy.

15   BY MR. BULIOX:

16   Q.   So Exhibit 1018, what is that document?

17   A.   That is a fabrics, crafts and home lines job description.

18   Q.   And is this a job description that would have applied to

19   Marlo as well?

09:40   20   A.   Yes.

21   Q.   So she had two job descriptions that applied to her?

22   A.   Yes.

23   Q.   And I guess similar to the last job description we went

24   through, do you see where it says "essential functions"?

09:40   25   A.   Yes.

1  Q.  And was Marlo able to do all of the essential functions

2  listed here?

3  A.  Yes.

4  Q.  And, to your knowledge, was she not able to do any of these

09:41   5  functions?

6  A.  The only one Marlo didn't do was cut fabric.

7  Q.  All right.

8  A.  If someone asked her she would find another associate to cut

9  fabric.

09:41   10  Q.  So I think you testified earlier that Marlo worked in the

11  apparel department?

12  A.  She would help in there if we needed, yes.

13  Q.  And she also worked in home lines?

14  A.  Yes.

09:41   15  Q.  And in 2015 do you know what Marlo's schedule was?

16  A.  Marlo's schedule in 2015 was noon to 6:00.  Or her

17  availability was noon to 6:00.

18  Q.  And do you know whether or not her schedule was 1:00 to 5:30

19  in 2015?

09:41   20  A.  Yes.

21  Q.  So yes, it was?

22  A.  Yes.

23  Q.  And was it important -- was it important to have associates

24  in her areas between the hours of 1:00 to 5:30 p.m.?

09:41   25  A.  Yes.

551

1    Q.   What about between 4 p.m. and 5:30 p.m.?

2    A.   Yes.

3    Q.   Why?

4    A.   4:00 to 5:00 is your busier times in your business.  So we

5    have an influx of customers at that time.  So the more

6    associates we have in their particular areas the better customer

7    service we give.

8              Also, if someone is not in an area it puts more stress

9    on someone else in another area that they have to come over and

10   help, which can hurt the morale of a store.

11   Q.   Thank you.  Is it okay to half staff an area; in other

12   words, not have an area fully staffed during the hours of 4:00

13   to 5:30 p.m.?

14   A.   No.

15   Q.   And why not?

16   A.   Again, it would be poor customer service and then add stress

17   onto someone else that has to cover more than one area of a

18   building.

19   Q.   And could different areas go unattended or not fully

20   attended during that time if an area is half staffed?

21   A.   Yes.

22   Q.   Was attendance an important part of Marlo's job?

23   A.   Yes.

24   Q.   Why?

25   A.   Attendance is important because we count on someone to be

552

1    there when they're scheduled.  Again, it goes back to the great

2    customer service that we need and, you know, helping out the

3    other associates in the building.

4    Q.  And was it important or critical in your view for sales

09:43    5    associates like Marlo to be flexible in the schedules that they

6    were able to work?

7    A.  Yes.

8    Q.  During the time that you worked around or with Marlo, do you

9    recall ever asking her any questions?

09:43    10    A.  Yes.

11    Q.  And was she able to answer your questions?

12    A.  Yes.

13    Q.  Did she ever give you a nonresponsive or nonsensical answer

14    to a question?

09:43    15    A.  No.

16    Q.  How often did you have the opportunity to work directly with

17    Marlo?

18    A.  It would depend upon when our schedules crossed paths.  So

19    one to two times a week.

09:44    20    Q.  And what would be the nature of your interactions with

21    Marlo?

22    A.  Just like all the associates I have, I would approach her,

23    talk to her about different things.  So I always start out with

24    a personal conversation, how were your days off, what were you

09:44    25    doing.  And then, you know, after we have that conversation

1    depending upon how often I would talk to them, if I talked to

2    them yesterday about their day off there wasn't much of a

3    conversation, of course, so then we would go into the priorities

4    of the day.  So where I needed her to be.

09:44   5    Q.   Okay.  And what are priorities of the day?

6    A.   What's important to the building, what the customers need.

7    Q.   And can priorities change?

8    A.   Daily.

9    Q.   And was Marlo able to adapt to daily changing priorities?

09:45   10   A.   Yes.

11   Q.   And typically for those daily changing priorities, how long

12   did it take for Marlo to adapt?

13   A.   Daily priorities she would change right away.

14   Q.   So same day.

09:45   15   A.   Yeah.

16   Q.   And would there ever be an occasion in which you believed

17   that Marlo did not understand something that you said to her?

18   A.   No.

19   Q.   Was there ever an occasion you believe at which Marlo did

09:45   20   not understand a direction that you gave to her?

21   A.   No.

22   Q.   Was Marlo's mother or guardian ever present when you gave

23   Marlo work assignments?

24   A.   No.

09:46   25   Q.   Did you ever give Marlo any feedback?

554

1    A.   Yes.

2    Q.   And was her mother or guardian present during any of those

3    interactions?

4    A.   No.

09:46    5    Q.   Was Marlo able to take that feedback and make adjustments

6    typically?

7    A.   Yes.

8    Q.   And did you ever give Marlo new tasks to do?

9    A.   I did.   Yes.

09:46    10   Q.   And was her mother or guardian present during those

11   occasions?

12   A.   No.

13   Q.   Was Marlo able to do new tasks?

14   A.   Yes.

09:46    15   Q.   And during the 10-plus years or so that you were at the

16   Manitowoc store, did you ever witness Marlo's mother or guardian

17   being present during any of Marlo's job evaluations?

18   A.   No.

19   Q.   Any of her trainings?

09:47    20   A.   No.

21   Q.   Issuance or payments of checks?

22   A.   No.

23   Q.   Any discussions about benefits?

24   A.   No.

09:47    25   Q.   Any instructions on new policies or anything like that?

1    A.   No.

2    Q.   And did you hear about from others Marlo's mother or

3    guardian being present during any of those things that we just

4    discussed?

09:47    5    A.   No.

6    Q.   During Marlo's employment with Walmart are you aware of any

7    occasions in which she was required to make adjustments in her

8    routine in order to learn or do new tasks?

9    A.   Yes.

09:48    10   Q.   Can you elaborate on that for us?

11   A.   When I first started with Marlo in 2010, she just folded

12   towels in the domestics area.  So she would spend her shift

13   folding towels.  And as I got to know her a little bit more and

14   spent time with her on the sales floor I'm like you can do more

09:48    15   than this.

16        So one day I started and I'm like hey, let's do

17   returns.  And she looked at me kind of funny and didn't want to

18   do it at first, and I'm like come on, let's do this.

19        So I taught her how to do returns.  We started with

09:48    20   the first day, I would teach her how to go and grab a shopping

21   cart and we would go to the service desk and dump all the

22   service desk returns in there, which are -- returns are what

23   customers bring back or something they find laying throughout a

24   store that we would pick up and put back on the shelf.

09:48    25        So we would take back the cart to the home lines/

1    housewares area and put the returns away.

2    Q.  Okay.  Did I hear you right that she resisted a little bit?

3    A.  She did.

4    Q.  And when she resisted did she still do it regardless?

09:49    5    A.  Yes.

6    Q.  And did it, at least from your perspective, affect her

7    performance in other areas of her job in any way?

8    A.  No.

9    Q.  And how long did it take for her to adapt to doing this new

09:49    10   task, this new routine of returns?

11   A.  It was about two to four weeks.

12   Q.  All right.  Was there any other situation you can think of

13   where she had adapted to a new routine in her work?

14   A.  There were numerous things.  We would add small little

09:49    15   things throughout time.  She went from folding towels to doing

16   returns.  We would bring her into small appliances, furniture.

17   She would dust, straighten out.  So we expanded what she was

18   doing over time.

19   Q.  Okay.  And typically when up made those expansions how long

09:50    20   would it take for her to adapt to that new routine?

21   A.  It was about two to four weeks.

22   Q.  To your knowledge, are products and product displays ever

23   rearranged in the store?

24   A.  Yes.

09:50    25   Q.  And during Marlo's employment did this happen in the areas

557

1   in which Marlo worked?

2   A.  Yes.

3   Q.  And again, to your knowledge, did she display any problems

4   with being able to adjust to those changes in the store?

09:50  5   A.  No.

6   Q.  And did Marlo report to new managers or supervisors over the

7   course of her time at Walmart?

8   A.  Yes.

9   Q.  And again, to your knowledge, did she display any problems

09:50  10   whatsoever in adapting to new managers and new supervisors?

11   A.  No.

12   Q.  How, if at all, did Marlo develop over time as an associate

13   from a work performance and responsibilities standpoint?

14   A.  She developed well.  She took to new tasks.  We added them

09:51  15   on.  She would do the roles that we asked her to do.

16          Sometimes she would tell us she didn't want to do

17   that, but doesn't everybody tell you they don't want to do what

18   you ask them to do?  I mean, that's what happens.

19          So I think she developed fine.  I mean, we kept adding

09:51  20   things and she would do them with us.

21   Q.  Did she ever get mad at you?

22   A.  She did, yeah.

23   Q.  Can you tell me about that?

24   A.  Sure.  One day, for example, we -- Marlo loved the Packers.

09:51  25   Packer jacket, she was all about the Packers.  And they played

558

1    pretty crappy on a Sunday, so the next scheduled day she was in

2    we had our, hey, how is it going, and I said the Packers really

3    sucked.  And she's like, no, they didn't, they played really

4    well.  Because she really likes the Packers and she's dedicated

09:52    5    to them.

6            So, little to my knowledge, because this was early on

7    when I started working with her, she got mad at me and wouldn't

8    talk to me for a couple of days.  You know?  Like there was no

9    more personal casual conversation between Marlo and I, it was

09:52    10    all work.  Until I broke her down again and started talking to

11    her and -- you know, I mean, it went away after a time.

12            But she definitely had her likes of what she was

13    passionate about.

14    Q.  Okay.  So she wouldn't talk to you at all during that time.

09:52    15    A.  Oh, no.  No.  If she would see me coming she would

16    definitely go down another aisle to try to avoid having a

17    conversation with me.

18    Q.  Okay.  And how long did that last?

19    A.  Oh, that was probably about two weeks.

09:52    20    Q.  And during that time did she still do her job?

21    A.  She did.

22    Q.  Did she still come to work?

23    A.  She did.

24    Q.  All right.  And she eventually talked to you again I take

09:53    25    it; right?

559

A.   Yeah.   I mean, even when she was not talking to me we still

had interactions because I still had to make sure she was, you

know, doing her job and knew what she was supposed to be doing.

It was just not lengthy like normal.

09:53    Q.   So during the time that you worked as a manager at Walmart,

did you play a role in actually adjusting work schedules?

A.   Yes.

Q.   And how are work schedules generated?

A.   We have a customer based scheduling system, so through the

09:53    computer.

Q.   And when you say customer based scheduling system, what does

that mean?

A.   It bases it off of the sales in the store.   So the amount of

time that the customers are in the building is when it generates

09:54    more hours.

Q.   And was employee availability a factor in scheduling?

A.   Yes.

Q.   And how so, typically?

A.   If your availability didn't meet the hours that were dropped

09:54    into the system -- so the hours that the customer service

schedule like showed us -- I say dropped -- but when you signed

into it it would generate, if your availability didn't fit that

you wouldn't get any hours.

Q.   And were managers allowed to go in and make adjustments to

09:54    schedules to get associates hours if that happened?

560

1    A.  No.

2    Q.  Who was responsible for entering associate availability into

3    the computer system?

4    A.  Our personnel manager would, but management had the ability

09:55    5    to do it also.

6    Q.  Would they on occasion?

7    A.  On occasion, yes.

8    Q.  And during your time as a manager at Walmart has the

9    company's scheduling practices for associates ever changed?

09:55    10    A.  Yes.

11    Q.  And can you tell me a time when those scheduling practices

12    changed?

13    A.  In 2014 was one change when we were given the direction that

14    we needed to just fill in the shifts that were dropped in the

09:55    15    system.

16    Q.  Okay.  And, I'm sorry, can you give me a little bit more

17    explanation on what that change was about?

18    A.  So what they wanted us to do was not adjust anyone's

19    schedules anymore to what we would put in the system.  So

09:55    20    whatever dropped into the computer was the schedules that we

21    needed to fill.

22    Q.  Okay.  So before this change managers were able to go in and

23    schedule associates outside of what was generated in the

24    computer system?

09:56    25    A.  Yes.

1  Q.  And afterwards the instruction was no, you can't do that.

2  A.  Yes.

3  Q.  All right.  And did any associate need their availability

4  changed because of this?

09:56  5  A.  Yes.

6  Q.  Why?

7  A.  Because they were getting no hours when the computer system

8  dropped and it wasn't matching their availability.

9  Q.  And do you know how many people this affected?

09:56  10  A.  I would say 50-plus in the building.

11  Q.  And do you know whether or not new availability forms were

12  completed for those 50 --

13  A.  Yes.

14  Q.  Were you personally involved in that at all?

09:56  15  A.  Yes.

16  Q.  And did that change go over smoothly?

17  A.  No.

18  Q.  Can you explain?

19  A.  Well, change never goes over smoothly.  People don't like

09:56  20  change.  So having those conversations with associates and

21  making them understand why it was changing and what the need for

22  it was, and then how important they are to the role.

23       It's all about how you explain it to someone and

24  making sure that they know that, you know, they're important to

09:57  25  what we're doing and how the change will affect them negatively

1    and positively.

2    Q.  Did anybody complain about it?

3    A.  Yes.

4    Q.  Generally if an associate wants to change his or her

09:57    5    availability what would they need to do?

6    A.  They would fill out a new availability form and hand it into

7    personnel or their manager.

8    Q.  Were you ever involved in setting or filling out an

9    availability form with Marlo Spaeth?

09:57    10    A.  Yes.

11    Q.  And can you tell me about that occasion or occasions in

12    which you were involved in doing that for her?

13    A.  Yes.  When this availability came down Marlo was not getting

14    any hours with the availability that she had before of 12:00 to

09:58    15    4:00.  And a shift fell into the system of 1:00 to 5:30.  And we

16    sat Marlo down in the personnel office and explained to her that

17    she wasn't going to get any hours if we didn't adjust her

18    availability.

19         And went through it all with her.  Told her what the

09:58    20    shift would be, would it be something that she would be able to

21    do.  She said yes.  I filled out the form, like I did for

22    numerous associates because nobody understands those forms and

23    when you do it for so long.

24         So we sat down, filled out the form, I signed the

09:58    25    form, she signed the form, and then we handed it in to Karen.

563

1    Q.  And at this point in time I want to show you EEOC Exhibit

2    Number 1.  So looking at this exhibit, do you recognize this?

3    A.  Sorry, wrong book.

4         (Brief pause.)

09:59  5    A.  Yes.

6    BY MR. BULIOX:

7    Q.  Okay.  And what is this?

8    A.  That's the customer's -- customer service availability form.

9    Q.  And is this the form you were just talking about?

09:59 10    A.  Yes.

11    Q.  And is that your signature at the bottom?

12    A.  Yes, it is.

13    Q.  And is that Marlo's signature?

14    A.  Yes, it is.

09:59 15    Q.  It looks like it's dated for February 16th, 2015; is that

16    right?

17    A.  Yes.

18    Q.  And do you know what if anything changed in Marlo's

19    availability on this document?

09:59 20    A.  Marlo was available noon to 4:00 before.

21    Q.  And with this one she was available from noon to 6:00 on

22    certain days?

23    A.  Yes.

24    Q.  And kind of directing your attention to the bottom of the

09:59 25    page, the first sentence after your signature, can you read what

1  that says?

2  A.  "This form is no guarantee of a shift or minimum number of

3  hours.  This form supersedes the availability section contained

4  on the application.  Maintain this form in the personnel file."

5  Q.  And is the piece about this form being no guarantee of a

6  shift or minimal number of hours consistent with your experience

7  at Walmart?

8  A.  Yes.

9  Q.  And I take it, Bonnie, that you're aware that Marlo's

10  employment with Walmart was terminated involuntary; is that

11  correct?

12  A.  Yes.

13  Q.  And are you aware why her employment was terminated?

14  A.  Marlo had over the policy amount of absences.

15  Q.  So she was let go for attendance violations?

16  A.  Yes.

17  Q.  And do you know when her employment ended?

18  A.  2015.

19  Q.  And do you know whether or not it was in July of 2015?

20  A.  Yes.

21  Q.  And are you aware of any of the attendance issues leading up

22  to her termination?

23  A.  I do know that Marlo left early.

24  Q.  And how do you know that?

25  A.  I would walk in through the hallways, see Marlo at the time

565

1  clock and she was leaving early, and then through conversation

2  with different members of management.

3  Q.  And how often did you see her leaving early?

4  A.  Once or twice a week.

10:01   5  Q.  Was this in 2015?

6  A.  Yes.

7  Q.  And did it happen enough to be noticeable to you?

8  A.  Yes.

9  Q.  And when you would see her leaving work early, what, if

10:02  10  anything, would you do?

11  A.  If she was standing at the time clock to leave early I would

12  say, "Hey, Marlo, your shift's not done till 5:30."  And then

13  she would say, "I know, I just want to go home."  And I'd be

14  like you can't go home yet, Marlo, we gotta go still do stuff.

10:02  15  So most days she would come with me and some days she would say,

16  "No, I want to go home," so I would let her go home.

17  Q.  You couldn't hold her hostage.

18  A.  No.

19  Q.  Do you believe that Marlo misunderstood at any point her

10:02  20  schedule?

21  A.  No.

22  Q.  And based on what you know, what you saw in your experience

23  as a manager, do you believe that the appropriate action was

24  taken with respect to ending Marlo's employment?

10:03  25  A.  I do.

566

1    Q.  Why so?

2    A.  I feel that we put a lot of time and effort into having

3    Marlo work her schedule.  I think we, for lack of a better word,

4    bent over backwards to work with her to try to get her to work

5    her scheduled shifts and be there when she was supposed to be

6    there.

7    Q.  Can you tell me a little bit more about that time and effort

8    that you put into helping Marlo?

9    A.  Not only, you know, like for me working with her out on the

10   sales floor, talking to her when like for me when I talked to

11   her about standing at the time clock and she knew she was

12   supposed to be out on the sales floor, you know, and going out

13   there, that's putting in a lot of extra effort into someone, you

14   know, when we have 200 and some people in the building that --

15   you know, I tried to make sure as much as I could that she was

16   there.  And I knew that she understood what we were talking

17   about, you know, because she would say, you know, I don't want

18   to be here today; or, you know, I just want to go home.

19   Q.  Okay.  At this point I want to show you what's been admitted

20   into evidence as Exhibit 1015.  So showing you this exhibit.

21   And let me know when you got it up.

22   A.  Okay.

23   Q.  Do you recognize this document?

24   A.  Yes.

25   Q.  Okay.  And what's this document?

567

1   A.   This is an email from Julie telling us that she had a

2   coaching conversation with Marlo about her attendance.

3   Q.   Okay.  It looks like this document was sent to you; is that

4   correct?

5   A.   Yes.

6   Q.   On January 13th, 2015?

7   A.   Yes.

8   Q.   And it's also sent to Robin Castro?

9   A.   Yes.

10  Q.   And Jason Radue?

11  A.   Yes.

12  Q.   Who is Jason Radue?

13  A.   Jason was our store manager at the time.

14  Q.   So he would have been the boss of Julia?

15  A.   Yes.

16  Q.   What was your relationship to Julia at this time?

17  A.   At this point I was Julia's direct supervisor.

18  Q.   So this was an email to her bosses.

19          MS. CARTER:  Objection, leading.

20          THE COURT:  Overruled.

21          THE WITNESS:  Yes.

22  BY MR. BULIOX:

23  Q.   All right.  And looking at this document, about five lines

24  down, do you see where it reads:  "She does understand what

25  shift she is scheduled and that she is expected to work the full

1    shifts.  We explained to her that these are the shifts that are

2    generated due to customer traffic and that is when we need her

3    here."

4         Do you see that?

5    A.  Yes.

6    Q.  And from your personal experiences with Marlo, do you agree

7    with Julia's comment here?

8    A.  Yes.

9    Q.  You agree that she understood her schedule?

10   A.  Yes.

11   Q.  And you agree that she understood that she was required to

12   work her full shifts?

13   A.  Yes.

14   Q.  And what do you base those beliefs on?

15   A.  The time I spent with Marlo and working with her.

16   Q.  And did you also explain to Marlo that she needs to work her

17   entire shift at any point?

18   A.  Yes, when I would meet her at the time clock and she was

19   trying to leave early.

20   Q.  And prior to the time -- prior to the attendance issues that

21   led to her discharge, were you ever involved in a counseling or

22   a need to counsel Marlo on attendance related issues?

23   A.  Yes.

24   Q.  At this point I want to show you Exhibit 1010.

25        Showing you what's been admitted as Exhibit 1010, do

569

1    you recognize this document?

2    A.  Yes.

3    Q.  And what is this?

4    A.  It's an associate attendance personal discussion.

10:07    5    Q.  And at the top it says "Personnel Discussion Log," what is a

6    personnel discussion log?

7    A.  So it was -- when we would have a discussion with an

8    associate on where they were in their attendance.  So once they

9    would hit three absences we would pull them aside in the office

10:08    10    and have a conversation with them saying this is where you are

11    in your attendance.  We would go over what the policy was and

12    help them be successful in what they needed to not get any more

13    attendance occurrences.

14    Q.  And is your name anywhere on this document?

10:08    15    A.  Yes.

16    Q.  Where at?

17    A.  On the first line, February 3rd of 2012.

18    Q.  And does this represent that you had a personnel discussion

19    with Marlo on this day?

10:08    20    A.  Yes.

21    Q.  About attendance?

22    A.  Yes.

23    Q.  And I would like to show you Exhibit 1006.  Let me know when

24    you got it.

10:09    25    A.  I got it.

570

1    Q.   Okay.  So showing you what has been admitted as

2    Exhibit 1006, do you recognize this document?

3    A.   Yes.

4    Q.   And what is this document?

10:09  5    A.   This would be a recording of absences.  Or attendance

6    issues.

7    Q.   For Marlo?

8    A.   Yes.

9    Q.   All right.  And if you look at the first three absences on

10:09  10   this, what does it show?

11   A.   It shows that she was absent on January 9th, 17th, and 18th.

12   Q.   Of 2012?

13   A.   Of 2012, yes.

14   Q.   And would that be the reason why you had the personnel

10:10  15   discussion with Marlo about attendance that we just talked

16   about?

17   A.   Yes.

18   Q.   At any point in time -- at any point in time did you believe

19   that Marlo's attendance issues were related to her Down

10:10  20   syndrome?

21   A.   No.

22   Q.   Have you ever heard that people with Down syndrome cannot

23   adapt to change?

24   A.   No.

10:10  25   Q.   Have you ever heard that people with Down syndrome need a

1    routine?

2    A.  No.

3    Q.  Are you a trained health care professional?

4    A.  No.

5    Q.  Did Marlo's mother ever indicate to you that Marlo's

6    availability to work was connected to her Down syndrome in any

7    way?

8    A.  No.

9    Q.  Did you ever come to believe that?

10   A.  No.

11   Q.  And did you ever receive any doctor's note or any medical

12   record indicating that Marlo's availability to work was

13   connected in any way to her Down syndrome?

14   A.  No.

15   Q.  Did you ever receive a doctor's note that Marlo could not

16   work a particular schedule because of her Down syndrome?

17   A.  No.

18   Q.  Did you ever receive a doctor's note that Marlo's schedule

19   could not change because of her Down syndrome?

20   A.  No.

21   Q.  And did you ever receive a doctor's note that Marlo needed a

22   routine because of her Down syndrome?

23   A.  No.

24   Q.  Prior to her last day of work at Walmart, was there anything

25   at all to suggest to you that Marlo may have been in need of an

1    accommodation to overcome attendance issues?

2    A.  No.

3    Q.  Did you receive training on disabilities in the workplace

4    and accommodations while you were at Walmart?

10:12   5    A.  Yes.

6    Q.  And what would that training be?

7    A.  It would be -- it's called a CBL, a computer based learning.

8    Q.  And what would that computer based learning involve?

9    A.  So it's reading material, videos, knowledge checks, and

10:12  10   scenarios of different examples.

11   Q.  And it covered disabilities in the workplace?

12   A.  Yes.

13   Q.  As well as accommodating reasonably disabilities?

14   A.  Yes.

10:12  15   Q.  And are you aware of Walmart's policies on disabilities and

16   accommodating disabilities?

17   A.  Yes.

18   Q.  And from your perspective were those policies ever invoked

19   in connection with Marlo Spaeth?

10:13  20   A.  No.

21   Q.  Prior to her discharge did you ever talk to anybody in

22   Marlo's family?

23   A.  No.

24   Q.  After her discharge did you talk to anybody in her family?

10:13  25   A.  Yes.

573

1    Q.   And prior to her discharge, to the best of your knowledge,

2    did anybody in Marlo's family attempt to reach out to you?

3    A.   No.

4    Q.   And if somebody wanted to reach out to you to talk about

10:13    5    concerns Marlo may have been having at work, what would they

6    have needed to do?

7    A.   Call the store and just ask for me.

8    Q.   And would they have been able to reach you?

9    A.   Yeah.  Seems like I'm there all the time.

10:14    10    Q.   And at the time, prior to Marlo's discharge, do you know

11    whether or not there was anything in Marlo's file indicating

12    that somebody in her family needed to be contacted regarding

13    matters relating to Marlo's employment?

14    A.   No.

10:14    15    Q.   And you indicated that you met with Marlo and her family

16    after her discharge; is that right?

17    A.   Yes.

18    Q.   Do you recall how soon after discharge that was?

19    A.   A few days.

10:14    20    Q.   And was that in person or was it over the phone?

21    A.   It was in person.

22    Q.   And do you recall --

23         THE COURT:  Let's -- I thought we were going to end,

24    but let's take our break if we're going to get into another

10:14    25    area.  We'll take our morning break.

574

1          (Jury out at 10:14 a.m.)

2          THE COURT:  Okay.  Anything to put on the record?

3          (No response.)

4          THE COURT:  Okay.  About 10 minutes.

10:15    5          MS. VANCE:  Thank you.

6          (Recess taken at 10:15 a.m., until 10:30 a.m.)

7          (Jury in at 10:31 a.m.)

8          THE COURT:  Okay, please be seated, ladies and

9    gentlemen.

10:32   10          Mr. Buliox, you may proceed.

11   BY MR. BULIOX:

12   Q.  Okay, Bonnie, I think before the recess we were getting into

13   the meeting that you had with the family after Marlo's

14   termination.  I'm going to call it the posttermination meeting,

10:32   15   okay?

16   A.  Okay.

17   Q.  All right.  And do you recall who was all there?

18   A.  It was Robin, myself, Julie, Karen, Marlo, Amy Jo, and

19   Marlo's mom.

10:32   20   Q.  And do you know Marlo's mom's name?

21   A.  I don't.

22   Q.  Sandra Barnes sound familiar?

23   A.  Yes.

24   Q.  And Amy Jo, was that her sister, to your knowledge?

10:32   25   A.  Yes.

575

1    Q.  And did you ever meet or speak with either Sandra Barnes or

2    Amy Jo prior to this posttermination meeting?

3    A.  No.

4    Q.  And what do you recall happening at the meeting?

10:33    5    A.  Amy Jo asked us to reinstate Marlo.

6    Q.  And did she make any other request that you recall?

7    A.  Not that I recall, no.

8    Q.  And do you recall anybody saying anything at the meeting

9    that stood out to you as wrong?

10:33    10    A.  Yeah, Amy Jo called Marlo -- I can't remember the word she

11    used right now.  I'm sorry, I'm drawing a blank.

12    Q.  No, that's okay.  Do you remember doing a interview at all

13    in connection with the posttermination meeting?

14    A.  Yes.

10:34    15    Q.  And was that part of an investigation that was done?

16    A.  Yes.

17    Q.  At this point I want to show you Exhibit 1029.

18            (Exhibit 1029, Individual Statement of Fact - Bonnie

19    Popp [D001088 - D001090], admitted previously by stipulation.)

20    BY MR. BULIOX:

21    Q.  So showing you what's been marked as Exhibit 1029, it's a

22    few pages, can you scroll through it?  And when you're done look

23    up and let me know.

24            (Witness peruses document.)

10:34    25    BY MR. BULIOX:

576

1    Q.  Okay?

2    A.  Yes.

3    Q.  So what are we looking at here?

4    A.  That's the -- my statement from the investigation.

10:34    5    Q.  Okay.  And does this accurately summarize -- Strike that.

6           Does this cover the meeting that we were just talking

7    about?

8    A.  Yes.

9    Q.  And does this summarize what you observed during that

10:35    10    meeting?

11    A.  Yes.

12    Q.  And is it accurate?

13    A.  Yes.

14    Q.  And I want to direct your attention to the second page of

10:35    15    this document.  Do you see where it reads in the second

16    paragraph:  "At the middle of the conversation Amy Jo did refer

17    to Marlo as different and I disagree with her there."

18    A.  Yes.

19    Q.  And what was that about?

10:35    20    A.  When they were having that conversation she was saying how

21    Marlo's different than others.  And -- in my opinion of working

22    with Marlo, she's not different; she just needs someone to spend

23    more time with her.  And there's numerous associates I have like

24    that.  So in my opinion she's not different.  And when her own

10:36    25    sister categorized her like that, to me that's -- it's not right

577

1    because she's not different.  Sorry.

2    Q.  That's okay.  It's okay.  There's some tissue right behind

3    you, Bonnie, if you need it.

4         (Brief pause.)

10:36  5  BY MR. BULIOX:

6    Q.  So at this point I want to leave this document and go to

7    Exhibit 1032.

8         (Exhibit 1032, Witnessing Manager Interview Notes -

9    Bonnie Popp [D001105 - D001109], admitted previously by

10   stipulation.)

11   BY MR. BULIOX:

12   Q.  And do you recognize this document?

13   A.  Yes.

14   Q.  And what is this document?

10:37  15  A.  This is the interview notes from the red book investigation.

16   Q.  And what is a red book investigation?

17   A.  A red book investigation is when someone contacts Walmart

18   Ethics of something they feel happened in the building that was

19   not right, so we investigate it.

10:37  20  Q.  And is this the interview that was conducted by Kent Abitz?

21   A.  Yes.

22   Q.  Of you?

23   A.  Yes.

24   Q.  And I take it that the "K" to your knowledge represents

10:37  25  Kent?

1    A.  Yes.

2    Q.  On the left-hand side?  And the "B" represents Bonnie?

3    A.  Yes.

4    Q.  And I want to direct your attention to the third page of

10:38   5    this document.  And I want you to take a look at the exchange

6    kind of in the middle of the page.  It's a question from Kent

7    that says, "When did Amy Jo mention she felt Marlo was termed

8    for discrimination?"

9         Do you see that?

10:38   10   A.  Yes.

11   Q.  And then it looks like he wrote your answer down as

12   "probably her second" -- I can't make out that word -- "Amy Jo

13   started (sic) someone should have contacted before she was

14   terminated."

10:38   15        Can you read the next sentence after that?

16   A.  "Nothing was on file as far as someone needing to be

17   contacted."

18   Q.  And then can you read the very next line?

19   A.  "It was not necessary to contact anyone."

10:39   20   Q.  Okay.  Looks like these comments right here were attributed

21   to you; is that correct?

22   A.  Yes.

23   Q.  And did you say that or something similar to that?

24   A.  Yes.

10:39   25   Q.  And what did you mean by this?

579

1  A.  That we have nothing on file stating that if we have

2  anything with Marlo that there's anyone we need to contact.

3  Q.  Does Walmart employ high school students?

4  A.  Yes.

10:39  5  Q.  Teenagers?

6  A.  Yes.

7  Q.  And as a matter of practice do you call the parents or

8  guardians of high school students or teenagers about employment

9  related matters relating to those associates?

10:39  10  A.  No.

11  Q.  What was your role during the posttermination meeting?

12  A.  I was a witness.

13  Q.  And at any point during the meeting were you provided with

14  any information that indicated that Marlo's attendance issues

10:40  15  were connected to her Down syndrome?

16  A.  No.

17  Q.  And were you provided with any information that Marlo could

18  not adapt to change because of her Down syndrome?

19  A.  No.

10:40  20  Q.  And were you provided with any information that Marlo needed

21  a routine because of her Down syndrome?

22          MS. CARTER:  Objection, vague.

23          THE COURT:  Overruled.

24          THE WITNESS:  No.

10:40  25  BY MR. BULIOX:

580

1  Q.  And did anybody at this posttermination meeting indicate

2  that Marlo could not work from 1 p.m. to 5:30 p.m. because of

3  her Down syndrome?

4  A.  No.

10:41  5  Q.  Have you ever known an associate to have a set permanent

6  work schedule?

7  A.  No.

8  Q.  And, Bonnie, have you been involved in any other decisions

9  to terminate associates for attendance?

10:41  10  A.  Yes.

11  Q.  How often would you say?

12  A.  A lot.

13  Q.  In your experience what is the most common reason associates

14  at Walmart are terminated?

10:41  15  A.  Attendance.

16  Q.  And do you recall whether or not you were involved in any

17  terminations for attendance in 2015, other than Marlo?

18  A.  Yes.

19  Q.  And who would that have been?

10:41  20  A.  Monica Vincent.

21  Q.  And were you a decisionmaker in Monica's situation?

22  A.  Yes.

23  Q.  And to your knowledge does Monica have a disability?

24  A.  No.

10:42  25  Q.  Other than Marlo, are you aware of any other associates who

581

1    have been terminated at the Manitowoc store who have Down

2    syndrome?

3    A.   No.

4         MR. BULIOX:   That's all I have.

5         THE COURT:   Okay.   Cross?

6                   CROSS-EXAMINATION

7    BY MS. CARTER:

8    Q.   Hi, Ms. Popp.

9    A.   Hi.

10   Q.   Can you hear me okay?

11   A.   Yes.

12   Q.   Ms. Popp, you've worked at Walmart since 1996; right?

13   A.   Yes.

14   Q.   So almost 25 years.

15   A.   Yes.

16   Q.   That's more than half your life, isn't it?

17   A.   Yes.

18   Q.   Quick math?

19   A.   I'm not a math expert, but, yes.

20   Q.   In fact, Walmart was your first job out of college, wasn't

21   it?

22   A.   Yes.

23   Q.   And you worked your way up the ranks, didn't you?

24   A.   I did.

25   Q.   You start out as a temporary sales associate?

582

1   A.  Yes.

2   Q.  And you told us earlier that in 2015 you were comanager of

3   the Manitowoc store.

4   A.  Yes.

10:43   5   Q.  And that you've been a manager at Walmart for 11 years.

6   A.  Yes.

7   Q.  You value your career at Walmart; right?

8   A.  Yes.

9   Q.  And you plan to continue working for Walmart, don't you?

10:43   10   A.  Yes.

11   Q.  In fact, you're working for Walmart today.

12   A.  Yes.

13   Q.  Let's talk about the training you've received at Walmart.

14   You told us a few moments ago that you're currently a coach;

10:43   15   right?

16   A.  Yes.

17   Q.  But you started working as an assistant manager at the

18   Manitowoc store in 2010; right?

19   A.  Yes.

10:44   20   Q.  And you received management training when you became

21   assistant manager, yes?

22   A.  Yes.

23   Q.  And that training was here in Green Bay, wasn't it?

24   A.  Yes.

10:44   25   Q.  And it was about four to six weeks long?

583

1    A.   Yes.

2    Q.   Okay.  And when you were a comanager at the Manitowoc store,

3    you still have that training from your training course here in

4    Green Bay; right?

10:44  5    A.   Yes.

6    Q.   And at that training you learned about antidiscrimination

7    laws; right?

8    A.   I don't remember exactly.  I'm sure they covered some of

9    that, yes.

10:44  10   Q.   So they covered -- you're sure that they covered

11   antidiscrimination laws at your training.  Yes?

12   A.   I'm not 100 percent positive what the training was 11 years

13   ago, so I can't say yes to that.

14   Q.   But you're aware that there are laws against discrimination.

10:45  15   A.   Yes.

16   Q.   And as a comanager of Walmart Super Store in 2015, you were

17   aware that an employee with a disability can request a

18   reasonable accommodation; right?

19   A.   Yes.

10:45  20   Q.   And as a comanager of Walmart Super Store you knew that

21   reasonable accommodations are related to a law; right?

22   A.   Yes.

23   Q.   The Americans With Disabilities Act.

24   A.   Yes.

10:45  25   Q.   And Walmart employees can ask any member of management for a

584

1    disability accommodation; right?

2    A.  Yes.

3    Q.  And you're one of the employees, one of the managers that

4    employees can come to to ask for an accommodation.

10:46    5    A.  Yes.

6    Q.  Ms. Popp, I'd like to talk to you about when you first met

7    Marlo Spaeth, okay?  You first met Marlo in 2010; right?

8    A.  Yes.

9    Q.  When you were an assistant manager.

10:46    10    A.  Yes.

11    Q.  And you supervised Marlo's department.  You supervised

12    Marlo's department manager in 2010.

13    A.  Yes.

14    Q.  And you recognized that Marlo has a disability when you

10:46    15    first met her, didn't you?

16    A.  No.

17    Q.  You're saying today that when you first met Marlo you did

18    not recognize that she had a disability?

19    A.  I'm not a medical professional.  I can assume.

10:47    20    Q.  Would it refresh your recollection to look at your

21    deposition testimony?

22    A.  Okay.

23    Q.  Is the deposition binder up there?

24            MS. CARTER:  May I approach, Your Honor?

10:48    25            THE COURT:  You may.

585

1          (Witness peruses document.)

2          THE WITNESS:  Yes.

3     BY MS. CARTER:

4     Q.  Does that refresh your recollection?

10:48   5     A.  Yes.

6     Q.  Ms. Popp, do you recall when you first met Marlo Spaeth

7     whether you recognized that she had a disability?

8     A.  Yes.

9     Q.  And, in fact, you recognized that that disability was Down

10:48  10    syndrome, didn't you, from the first time you met her?

11    A.  Yes.

12    Q.  You knew that just from seeing and interacting with Marlo;

13    right?

14    A.  Her facial features are the same as a Down syndrome person,

10:49  15    yes.

16    Q.  Ms. Popp, let's take a look at Exhibit 14 in the exhibit

17    binder.

18          (Exhibit 14, Spaeth Evaluation 2011 - EEOC00607-608,

19    admitted previously by stipulation.)

10:49  20          MS. CARTER:  And, Lectrice, could you please pull up

21    Exhibit 14 for us, please.  And please go to the second page of

22    Exhibit 14, Lectrice.

23    BY MS. CARTER:

24    Q.  That's your name at the bottom; right?

10:49  25    A.  Yes.

1    Q.   Bonnie Popp.  And that's your signature.

2    A.   Yes.

3    Q.   And this is one of Marlo Spaeth's performance evaluations;

4    right?

5    A.   Yes.

6    Q.   And you were still an assistant manager at the time.

7    A.   Yes.

8    Q.   In 2011; correct?

9    A.   Yes.

10    Q.   Okay.  And that year Marlo received an overall rating of

11    solid performer, didn't she?

12    A.   Yes.

13    Q.   And she also received a 40 cent per hour raise after this

14    performance evaluation; right?

15    A.   Yes.

16    Q.   And you're one of the people who approved that raise.

17    A.   Yes.

18    Q.   Now, maybe you can clarify something for me.  Earlier we

19    looked at an Exhibit 1006, and you said it was a chart of

20    Marlo's attendance.  Do you remember that exhibit?  You can just

21    take a look at it.  We don't need to pull it up.

22    A.   Yes.

23    Q.   Now, Walmart allowed associates to clock in and out within

24    10 minutes of their start and end time; right?

25    A.   Yes.

587

1    Q.  And Marlo had a routine of clocking in and out about 10

2    minutes early, didn't she?

3    A.  I do not --

4            MR. BULIOX:  Objection, foundation.

10:51   5            THE COURT:  Overruled.

6    BY MS. CARTER:

7    Q.  When you worked with Marlo she used to clock in early.

8    A.  I do not remember that, no.

9    Q.  If you take a look at Exhibit 1006, does that refresh your

10:51  10   recollection?

11   A.  On occasions it was a punch in early, yes.

12   Q.  On many occasions it was a punch in early.

13   A.  I don't know if this is her everyday schedule.

14   Q.  But the schedule that you're looking at right now she

10:52  15   punched in early.

16   A.  There are punch in earlies, yes.

17   Q.  Regularly.

18   A.  Yes.

19   Q.  And so those entries that reflect as punching out early, it

10:52  20   was really just four hours after she punched in; right?  She

21   punched in at 11:48 and punched out at 3:48; punched in at

22   11:49, punched out at 3:49?

23           MR. BULIOX:  Objection, compound.

24           MS. CARTER:  I can rephrase.

10:52  25           THE COURT:  Rephrase.

588

1    BY MS. CARTER:

2    Q.  There are entries when she punched in at 11:48 and punched

3    out at 3:48; right?

4    A.  A few, yes.

10:52    5    Q.  And there are entries that she punched in at 11:49 and

6    punched out at 3:49; right?

7    A.  A few, yes.

8    Q.  So she worked a full four hours; correct?

9    A.  Yes.

10:53    10    Q.  There wasn't an incomplete shift; correct?

11        THE COURT:  What's the timing of this?  When are we

12    talking about?

13        MS. CARTER:  These are the entries on Exhibit 1006.

14        THE COURT:  But that covers a long period; what time

10:53    15    are you talking about?

16        MS. CARTER:  So, for example --

17        THE COURT:  Can you indicate just for clarity what

18    dates you're talking about or what time period?

19        MS. CARTER:  The first page of 1006.  Because they

10:53    20    were talking about her having attendance problems in 2012.

21        THE COURT:  What is the date?

22        MS. CARTER:  It's 2012.

23        THE COURT:  2012.

24        MS. CARTER:  Yes.  So these are entries from January

10:53    25    2012 to April 2013, and that's on the first page of

589

1   Exhibit 1006.

2   BY MS. CARTER:

3   Q.  And so my question is just, that if a person works from

4   11:48 to 3:48 they have worked a four-hour shift; right?

10:54   5   A.  On here there are left earlies.

6   Q.  The Walmart system says she left early, but she worked a

7   four-hour shift.  Yes?

8   A.  Well, I go with the Walmart system.

9   Q.  But I'm asking you if she worked a four-hour shift.

10:54   10   A.  Yes.

11   Q.  Ms. Popp, let's talk about -- do you need help?

12   A.  Sorry.

13   Q.  Ms. Popp, let's talk about Marlo Spaeth's June 2014 review.

14   Okay?

10:55   15   MS. CARTER:  Lectrice, could you please pull up

16   Exhibit 17.

17   BY MS. CARTER:

18   Q.  Ms. Popp, that's your signature at the bottom of page 2;

19   right?  The bottom of the last page.

10:55   20   A.  Yes.

21   Q.  And this is one of Marlo Spaeth's performance reviews.

22   A.  Yes.

23   Q.  And she received an overall rating, another overall rating

24   of solid performer, didn't she?

10:55   25   A.  Yes.

590

1   Q.   And Marlo also said how much she liked working at Walmart;

2   right?

3   A.   Yes.

4   Q.   And in this performance review Marlo was praised for having

5   zero absences; right?

6   A.   Yes.

7   Q.   And this is from June 2014; correct?

8   A.   Yes.

9   Q.   Just a few months before the schedule change in November

10  2014; right?

11  A.   Yes.

12  Q.   And there are four manager comments on this performance

13  review; correct?

14  A.   Yes.

15  Q.   And the first one is that Marlo is very good with zoning

16  domestics and houseware areas; correct?

17  A.   Yes.

18  Q.   And the next one is that Marlo is very good at putting away

19  returns for her areas as well; right?

20  A.   Yes.

21  Q.   And then Marlo helps customers find items they are searching

22  for and promotes the 10-foot rule; right?

23  A.   Yes.

24  Q.   And can you explain the 10-foot rule for us, I think, just

25  to clarify?

591

1    A.   It's you greet and help any customer within 10 feet of you.

2    Q.   And then the last comment is that Marlo has zero active

3    absences; correct?

4    A.   Yes.

10:57    5    Q.   Okay.  And that year Marlo also received another raise;

6    right?  40 cents an hour?

7    A.   Yes.

8    Q.   And you approved that raise; right?

9    A.   Yes.

10:57    10    Q.   Now, you told us a few minutes ago about teaching Marlo how

11    to do returns; right?  Do you remember that?

12    A.   Yes.

13    Q.   And you showed Marlo how to do the returns; right?

14    A.   Yes.

10:57    15    Q.   And you worked with her side by side.

16    A.   Yes.

17    Q.   For a couple of weeks.

18    A.   Not consistently for a couple of weeks, but, yes, when our

19    schedules crossed.

10:57    20    Q.   And at the time that you taught Marlo how to do returns

21    Marlo's schedule was noon to 4:00, wasn't it?

22    A.   Yes.

23    Q.   Let's talk about the scheduling change, the change to the

24    way schedules were done at Walmart in 2014.  Okay?

10:58    25    A.   Uh-huh.

592

1    Q.  So around November 2014, Walmart implemented a computer

2    based shift scheduling system; right?

3    A.  Yes.

4    Q.  And before November 2014 --

5                I'm sorry.  Did you say something?  Okay.

6                Before November 2014, Ms. Spaeth was scheduled to work

7    shifts that ended around 4 p.m.; correct?

8    A.  Yes.

9    Q.  And even with the new scheduling system you, as a manager,

10   could still manually change an employee's schedule, change their

11   scheduled hours that were generated by the system; right?

12   Manually.

13   A.  Yes.

14   Q.  Now, in November 2014 you were the comanager while

15   Ms. Spaeth was working in the domestics departments; correct?

16   A.  Yes.

17   Q.  And when you were comanager of the domestics department,

18   there were -- there was Ms. Spaeth and there were four other

19   associates that worked in that department; correct?

20   A.  I do not recall.

21   Q.  If I told you that you previously testified that there were

22   roughly four other associates that worked in the domestics

23   departments, you would agree; correct?

24   A.  Yes.

25   Q.  Let's talk about January 2015.  Okay?

593

1    A.   Uh-huh.

2    Q.   In January 2015 you received an email from Ms. Stern, from

3    Julie Stern, assistant manager and Marlo's supervisor; correct?

4    A.   Yes.

11:00   5    Q.   And you talked about it a few minutes ago.  But in that

6    email you were made aware that Marlo Spaeth reported that she

7    may get sick if she did not eat at a certain time; right?

8    A.   Yes.

9    Q.   And you were also made aware in January 2015 that Marlo

11:00   10   asked to return to her noon to 4:00 schedule; right?

11   A.   Yes.

12   Q.   But Marlo's request to return to her noon to 4:00 schedule

13   was denied, wasn't it?

14   A.   It was not acted upon.  We have numerous associates that ask

11:00   15   for schedule changes, and when a policy changes we try to work

16   with the associate in the new schedule.  So I wouldn't say it

17   was denied.

18   Q.   Well, you're talking about numerous associates, I want to

19   focus your attention on Marlo Spaeth, okay?

11:01   20   A.   Uh-huh.

21   Q.   And when Marlo Spaeth asked to return to her noon to 4:00

22   schedule, she was not returned to that schedule; correct?

23   A.   Correct.

24   Q.   So it's fair to say that Marlo's request was denied;

11:01   25   correct?

594

1    A.  Yes.

2    Q.  You said no.  So Marlo's request was denied; correct?

3    A.  Yes.

4    Q.  So let's talk about Marlo's availability forms.  You told us

5    earlier that you filled out a customer service availability form

6    for Marlo Spaeth in 2015; right?

7    A.  Yes.

8    Q.  And we looked at Exhibit 1.

9         MS. CARTER:  Lectrice, could you please pull up

10   Exhibit 1 for me, please.

11   BY MS. CARTER:

12   Q.  And you explained that you filled out this whole form;

13   right?

14   A.  I did not sign Marlo's name.

15   Q.  But other than that you filled out the form.

16   A.  Yes.

17   Q.  So you chose the start time.

18   A.  With Marlo, yes.

19   Q.  But you wrote it down.  You chose the start time.

20   A.  With talking with Marlo, yes.

21   Q.  Okay.

22   A.  It is my handwriting, but the conversation was with her

23   there.

24   Q.  Okay.

25   A.  When we talked about it.

595

1    Q.  But you chose the end time.

2    A.  Through the discussion with Marlo of the changes that were

3    happening in the building, yes.

4    Q.  Marlo didn't ask to have her end time moved to 6 p.m., did

11:02    5    she?

6    A.  When the changes happened in the building we had associate

7    availability conversations with numerous associates in the

8    building that needed to change availability, and Marlo was one

9    of them, and she agreed when we had the conversation that that

11:03    10    would be a time she would be able to work.

11    Q.  But it wasn't Marlo's idea to change her availability to

12    6 p.m.

13    A.  It was not any associate's request to change with the

14    availability of the way Walmart changed their schedules.

11:03    15    Q.  I want to focus your attention to Marlo Spaeth though.  It

16    wasn't Marlo's idea to change her availability to 6 p.m.; right?

17    A.  No.

18    Q.  And before February 16th, 2015, Marlo's availability was

19    noon to 4:00; correct?

11:03    20    A.  Yes.

21    Q.  By February 2015 Marlo had already been having problems with

22    the new schedule for months, though, hadn't she?

23    A.  I was not in the building for a lot of that time.

24    Q.  But you were aware that Marlo had been having difficulty

11:04    25    with the new schedule for months.  Based on the emails that you

596

1    received from Julia Stern.

2    A.  Based on the email, yes.

3    Q.  And you were aware that Marlo had already asked to return to

4    a noon to 4:00 schedule; right?

11:04  5    A.  From that email, yes.

6    Q.  So Marlo had been scheduled outside of her availability for

7    months by February 2015; correct?

8    A.  I would have to look back to see what she was scheduled.  I

9    do not know.

11:05  10   Q.  You said that Marlo was scheduled to work 1:00 to 5:30 at

11   some point, didn't you?

12   A.  After we filled out the availability form, yes, I did.

13   Q.  So it's your testimony today that Marlo was not scheduled to

14   work 1:00 to 5:30 before you filled out the availability form?

11:05  15   A.  I do not know what she was scheduled before that

16   availability form.

17   Q.  But you received that email from Julia Stern in January

18   2015; right?  The one that said Marlo was scheduled to work 1:00

19   to 5:30.

11:05  20   A.  Yes.

21   Q.  And that was before February 2015; right?

22   A.  Yes.

23   Q.  So before February 2015 you were aware that Marlo had been

24   scheduled outside of her availability for months.

11:05  25   A.  Yes.

597

1    Q.  And you were also aware that Marlo had already been

2    disciplined for clocking out before 5:30 p.m. in February 2015;

3    right?

4    A.  I would have to look at the dates of the coaching.  Yes.

11:06    5    Q.  But you knew that the dates of the coaching were before you

6    completed the form; correct?

7    A.  I can look at them now and say yes.  I mean, from the emails

8    that are in here.

9    Q.  Okay.  You can use the emails to refresh your recollection.

11:06    10   A.  Do you know what number they are?  16?  15?

11   Q.  23.

12           THE COURT:  Is this a question in dispute?  I mean,

13   can we stipulate maybe?

14           MS. CARTER:  The question is whether she was aware at

11:06    15   the time that she filled out the form that Marlo had already

16   been disciplined for being scheduled outside of her

17   availability.

18           THE COURT:  So you're asking was she aware, not

19   whether the forms were in effect.

11:07    20           MS. CARTER:  Right, I'm asking her --

21           THE COURT:  Her awareness.

22           MS. CARTER:  Yes.

23           THE COURT:  Can you answer your awareness without

24   looking at the emails?

11:07    25           THE WITNESS:  I don't remember back to those dates.

598

1    I'm sorry.

2         THE COURT:  So you don't remember what you were aware

3    of at that time.

4         THE WITNESS:  I don't.  Without a memory -- refreshing

5    my memory of the dates of the emails.

6    BY MS. CARTER:

7    Q.  Okay.

8    A.  I know I got the emails, but I would have to look at the

9    dates now to say yes.

10   Q.  Okay.  But you knew that you got the emails before you

11   filled out the form with Marlo; correct?

12   A.  If the dates coincide, yes.

13   Q.  Okay.  And the email -- can we agree that the email was sent

14   in January 2015?

15   A.  Yes.

16   Q.  And you filled out the form in February; correct?

17   A.  Yes.

18   Q.  Isn't it true that you told Marlo that she needed to sign

19   the form saying that she could work until 6 p.m.?

20   A.  No.

21   Q.  You didn't tell Marlo that she needed to sign the form

22   saying that she could work until 6 p.m.?

23   A.  I'm sure I asked her to sign the form because it was her

24   availability form that we were filling out at the time.

25   Q.  Is it your testimony today that you did not tell Marlo

599

1    Spaeth that she needed to sign that form that said she could

2    work until 6 p.m.?

3    A.  I would have told Marlo she needed to -- had to sign the

4    form to get hours, yes.

11:08    5    Q.  Okay.  So you told Marlo Spaeth that she needed to sign the

6    form.  Yes?

7    A.  Yes.

8    Q.  And you did that to make it look like Marlo was okay with

9    working later than you knew she wanted to work.

11:09    10    A.  Through the conversation had with Marlo when we filled the

11    form out, Marlo understood the change of availability and the

12    change of her hours that were going to happen.

13    Q.  But you knew that Marlo didn't -- she had a preference to

14    work noon to 4:00, you knew she didn't want to work until 6:00,

11:09    15    but you told her she needed to sign the form.

16    A.  I didn't know that Marlo couldn't work that shift, no.

17    Q.  That wasn't my question.  My question was whether you told

18    Marlo that she needed to sign that form.  And whether you did it

19    to make it appear in the system that Marlo had consented to work

11:10    20    until 6:00.

21    A.  After the conversation of the scheduling issues and what was

22    changing and we had the conversation and discussed it, Marlo

23    signed the form.

24    Q.  That you told her she needed to sign, yes?

11:10    25    A.  (No response.)

1    Q.  It's a yes-or-no question.  She signed the form that you

2    told her --

3    A.  She signed the form, yes.

4    Q.  -- that you told her she needed to sign.  Yes?

11:10    5    A.  If that's what you feel, yes.

6    Q.  It's not what I feel.  It's your testimony.  I can refresh

7    your recollection with it, but --

8    A.  I don't -- we don't force them to sign them.  After we

9    explain to them the hours and the situation --

11:10    10    Q.  Ms. Popp --

11    A.  -- and then I signed the form or she signed the form and I

12    signe the form or one way or the other.  But we both did sign

13    the form, yes.

14    Q.  The question was, did Marlo Spaeth sign the form that you

11:11    15    told her she needed to sign?

16    A.  Marlo did sign the form, yes.

17    Q.  Okay.  Ms. Popp, you told us a few minutes ago that there

18    was an instruction to give associates computer generated

19    schedules; right?

11:11    20    A.  Yes.

21    Q.  And that came from Walmart's home office; correct?

22    A.  Yes.

23    Q.  And it was your understanding that due to the computer

24    generated scheduling associate requests for schedule changes

11:11    25    should be denied; right?  It was your understanding that you

601

1    were supposed to say no.

2    A.  No.

3    Q.  It was your understanding that you could say yes to

4    associates who asked for schedule changes?

11:11    5    A.  An associate can -- at any time can ask for a schedule

6    change.  If they will generate hours from the system is

7    different than an associate asking for a schedule change.

8    Q.  My question, though, is that based on this directive that

9    came from the home office, it was your understanding that when

11:12    10    associates asked to change the schedules that were generated by

11    the system that you were to say no.

12    A.  We would not edit the schedules, yes.

13    Q.  So it was your understanding that you were to deny requests

14    from associates who asked for schedules that were different than

11:12    15    the schedules generated by the system.

16    A.  Yes.

17    Q.  You were directed by headquarters not to adjust anyone's

18    schedules anymore; right?

19    A.  Yes.

11:13    20    Q.  And it was your understanding that this directive not to

21    adjust anyone's schedules anymore also applied to associates

22    with disabilities; is that correct?

23            MR. BULIOX:  Objection, calls for speculation.

24            THE COURT:  Overruled.

11:13    25    BY MS. CARTER:

1   Q.   It was your understanding that the instruction not to adjust

2   anyone's schedule applied to all associates.

3   A.   Yes.

4   Q.   Including associates with disabilities.

11:13   5   A.   If an associate who has a disability would like an

6   accommodation for something like that we can fill out an

7   accommodation packet.

8   Q.   I'm just asking what your understanding was of the

9   instruction, but we can move on.

11:13   10          MR. BULIOX:  Objection.  Asked and answered.

11          THE COURT:  Is there a question?

12          MS. CARTER:  I said we can move on.  I'm moving on.

13          THE COURT:  There's no question.

14          MS. CARTER:  Yeah.

11:14   15   BY MS. CARTER:

16   Q.   You felt that it wouldn't be fair to adjust shift times for

17   Marlo and not for other associates, didn't you?

18   A.   No.

19   Q.   You agreed with Julia Stern, though, that it would not be

11:14   20   fair to adjust shift times for Marlo and not for other

21   associates.

22   A.   We didn't adjust shifts for any associates.

23   Q.   Yes.  And you agreed that it would not be fair to adjust

24   shift times for Marlo and not for other associates; correct?

11:14   25   That was your feeling about it.

1    A.   We followed the direction from the home office, yes.

2    Q.   I'm asking whether you agreed that Marlo should not have a

3    shift adjustment if other associates couldn't.

4    A.   My opinion or feeling doesn't -- we follow the direction

11:15   5    that's given to us.

6    Q.   I'm asking for your understanding of the situation.  What

7    your --

8    A.   My understanding is that we didn't adjust shifts or edit

9    shifts for any associates.

11:15   10   Q.   Okay.  But you testified a few moments ago that the other

11   associates in the store did not have Down syndrome; right?

12   A.   We do have other intellectually delayed associates in the

13   building.

14   Q.   Do you have other associates with Down syndrome?  No,

11:16   15   correct?

16   A.   I do not know.

17   Q.   So, to your knowledge, there are no other associates with

18   Down syndrome; correct?

19   A.   I do not know.

11:16   20        THE COURT:  Can you get closer to the microphone?

21   Thank you.

22        THE WITNESS:  Oh, sorry.

23   BY MS. CARTER:

24   Q.   So, to your knowledge you're saying you don't know.  So, to

11:16   25   your knowledge, there are no other associates with Down

604

1    syndrome.

2    A.   Yes.

3    Q.   And you told us a few minutes ago that Marlo never gave you

4    a doctor's note.

11:16   5    A.   Yes.

6    Q.   That her family never gave you a doctor's note.

7    A.   Yes.

8    Q.   And you mentioned a few minutes ago that associates can be

9    referred to the Accommodation Services Center; correct?

11:16   10   A.   Yes.

11   Q.   But you never asked Marlo for a doctor's note.

12   A.   I don't ask any associate for a doctor's note.

13   Q.   So you didn't ask Marlo for one either.

14   A.   No.

11:16   15   Q.   And you never asked Marlo's family for a doctor's note.

16   A.   I did not have contact with any of Marlo's family.

17   Q.   So you never asked them for a doctor's note.

18   A.   No.

19   Q.   And you never contacted the Accommodation Services Center on

11:17   20   Marlo's behalf.

21   A.   No.

22   Q.   And you never referred Marlo to the Accommodation Services

23   Center.

24   A.   No.

11:17   25   Q.   You told us a few minutes ago that you're familiar with

605

1    Walmart's guidelines regarding disability accommodations; right?

2    A.  Yes.

3    Q.  So then you must have known that schedule accommodations are

4    common.

11:17    5              MR. BULIOX:  Objection, foundation.

6              THE COURT:  Overruled.

7    BY MS. CARTER:

8    Q.  So you must have known that schedule accommodations are

9    common.

11:17   10    A.  No.

11    Q.  You're familiar with Walmart's guidelines; right?

12    A.  Yes.

13    Q.  And you know that schedule accommodations are listed as an

14    example on Walmart's guidelines; right?

11:17   15    A.  Yes.

16    Q.  And since you're familiar with Walmart's guidelines, you

17    also knew that if a schedule accommodation request was not

18    approved at the store level that it should be forwarded to the

19    Accommodation Services Center; right?

11:18   20    A.  Yes.

21    Q.  You told us earlier that when you first met Marlo you knew

22    that she had Down syndrome.

23    A.  Yes.

24    Q.  It was obvious to you.

11:18   25    A.  Yes.

606

1   Q.  And since you're familiar with Walmart's policies, you also

2   know that when an associate has an obvious disability a doctor's

3   note is not required for an accommodation request; right?

4   A.  Yes.

11:18   5       MS. CARTER:  I have no further questions for this

6   witness at this time.

7           THE COURT:  Okay.  Any redirect?

8           MR. BULIOX:  Yeah.  Just a few questions, Judge.

9                   REDIRECT EXAMINATION

11:18   10  BY MR. BULIOX:

11  Q.  Can you hear me?

12  A.  Yes.

13  Q.  So you testified earlier about Marlo's I guess request for a

14  noon to 4:00 schedule.  Was that a request for a reasonable

11:18   15  accommodation?

16          MS. CARTER:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  No.

19  BY MR. BULIOX:

11:19   20  Q.  Okay.  Did that request for a noon to 4:00 schedule have

21  anything to do with Marlo's Down syndrome as far as you can

22  tell?

23  A.  No.

24  Q.  Okay.  And did Marlo ever request a reasonable accommodation

11:19   25  during your employment at Walmart?

607

1          MS. CARTER:  Objection, foundation.

2          MR. BULIOX:  I'll rephrase.

3          THE COURT:  Rephrase.  Because you're asking her

4 whether she recognized it as a request.

11:19   5          MR. BULIOX:  Yeah, okay.

6 BY MR. BULIOX:

7 Q.  Bonnie, are you aware of any situations in which Marlo

8 Spaeth requested a reasonable accommodation during your time at

9 Walmart?

11:19  10          MS. CARTER:  Objection, foundation.

11          THE COURT:  Overruled.

12          THE WITNESS:  No.

13 BY MR. BULIOX:

14 Q.  Are you aware of any occasion in which a family member of

11:19  15 Marlo requested an accommodation?

16 A.  No.

17 Q.  You testified earlier about Exhibit 1006 and the leave

18 earlies?

19 A.  Yes.

11:20  20 Q.  Do you recall that testimony?

21 A.  Yes.

22 Q.  And you were asked about, you know, whether or not if Marlo

23 worked four hours would that be a complete shift; do you recall

24 that?

11:20  25 A.  Yes.

608

1    Q.  Okay.  Are leave earlies based on the number of hours

2    somebody works or is it based on their scheduled end time?

3    A.  It's their scheduled end time.

4    Q.  Were employees allowed to make up their own schedules as

11:20    5    they saw fit?

6    A.  No.

7    Q.  So if, hypothetically, an employee was scheduled from noon

8    though 4:00, could that employee come in from 10:00 to 2:00?

9    A.  No.

11:21    10    Q.  I want to show you Exhibit Number 17.  All right.  Do you

11    recognize this document?

12    A.  Yes.

13    Q.  This is a document we went over earlier today?

14    A.  Yes.

11:21    15    Q.  And I want to direct your attention to the last page of this

16    document.

17            MR. BULIOX:  Tracy, can we call out the last page of

18    the document, the section that says "manager comments"?  All

19    right.

20    BY MR. BULIOX:

21    Q.  So you were asked about this last sentence right here that

22    says Marlo has zero active absences; correct?

23    A.  Yes.

24    Q.  All right.  Does this say anything about her leave earlies?

11:22    25    A.  No.

609

1          MR. BULIOX:  You can take the exhibit down, Tracy.

2     Thank you.

3     BY MR. BULIOX:

4     Q.  You were asked during cross-examination about a comment

11:22    5     about Marlo getting sick at a certain time.  Do you recall that?

6     A.  In the email, yes.

7     Q.  And did this have any connection in your mind to Marlo's

8     Down syndrome?

9     A.  No.

11:23   10     Q.  In your experience do associates get sick?

11     A.  Yes.

12     Q.  And when they get sick is it always connected to some

13     disability, in your experience?

14     A.  No.

11:23   15     Q.  Okay.  I want to go to EEOC Exhibit Number 1.

16          And I'm almost done.

17          So this is the availability form that you talked about

18     both during my questioning and EEOC's questioning of you?

19     A.  Yes.

11:23   20     Q.  And on this form Marlo's schedule was changed to 6 p.m.;

21     correct?

22     A.  Her availability, yes.

23     Q.  I'm sorry, her availability.  What would have happened if

24     her availability was not changed to 6 p.m.?

11:24   25     A.  Marlo would have received no hours.

610

1    Q.  Would she still have a job?

2    A.  Yes.

3    Q.  But she wouldn't work.

4    A.  Correct.

11:24  5           MR. BULIOX:  Okay, you can take that down.

6    BY MR. BULIOX:

7    Q.  You testified earlier about not receiving a doctor's note;

8    is that correct?

9    A.  Yes.

11:24 10    Q.  And not requesting one; is that correct?

11    A.  Yes.

12    Q.  Was there any reason in your mind to request a doctor's note

13    from Marlo?

14    A.  No.

11:24 15    Q.  Was there any issue that you saw with Marlo with respect to

16    her employment that was attributed to her Down syndrome?

17           MS. CARTER:  Objection, foundation.

18           THE COURT:  As far as she knows.

19    BY MR. BULIOX:

11:25 20    Q.  As far as you know.

21           THE COURT:  With that qualification.

22           MS. CARTER:  That would qualify.  Thank you, Your

23    Honor.

24           THE WITNESS:  No.

11:25 25           MR. BULIOX:  Okay.  I have no further questions.

611

1          THE COURT:  Okay.  Thank you, Ms. Ohlsen.  You may

2   step down.

3          THE WITNESS:  Thank you.

4          (Witness excused at 11:25 a.m.)

11:25    5          THE COURT:  Do you have another witness ready?

6          MR. BULIOX:  Yes.  We were going to call Debbie Moss.

7          THE COURT:  Counsel, could you approach?

8          (Off-the-record discussion at side bar with all

9   counsel and the Court.)

11:26   10          THE COURT:  Okay.  Let's swear the witness.

11          THE CLERK:  Would you please raise your right hand.

12          DEBBIE MOSS, DEFENSE WITNESS, DULY SWORN

13          THE CLERK:  Please state and spell your first and last

14   name for the record.

11:27   15          THE WITNESS:  My first name is Debbie, D-e-b-b-i-e, my

16   last name is Moss, M-o-s-s.

17          THE COURT:  Thank you, Ms. Moss.

18                    DIRECT EXAMINATION

19   BY MR. BURNETT:

11:27   20   Q.  Good morning, Ms. Moss.

21   A.  Good morning.

22   Q.  I'm over here.  The jury's heard a lot of information

23   already in this case so I'm going to try to get to the main

24   points.  Do you work at Walmart?

11:27   25   A.  Yes.

612

1    Q.   How long have you been working there?

2    A.   31 years.

3    Q.   Can you tell us in a couple of sentences the course of your

4    career.

11:27   5    A.   I started off up front working with the cashiers, helping

6    them do their jobs.   I went to layaway.   I went to the cash

7    office briefly, and then I became a training coordinator in

8    2003.

9    Q.   So training coordinator does what?

11:28   10   A.   I set up -- at that time I set up orientations for the job,

11   for their job they're coming into, they've applied for.   I hold

12   the orientations, which is around 4 1/2 hours for the

13   orientation.   I set them up with who will be training them to

14   get them going into their position.

11:28   15   Q.   Fair enough.   Did you hold that position in 2014 and 2015,

16   the years we're primarily concerned about?

17   A.   Yes.

18   Q.   Would that take you onto the floor, the store floor?

19   A.   Yes, it would.   Part of my job would be to go out onto the

11:29   20   sales floor, meet with my associates, work alongside them, ask

21   them if I can help with anything.   And just kind of touch base

22   because we all like to talk to each other and kind of make sure

23   everybody's okay.

24   Q.   Before we get into your particular experiences with Marlo

11:29   25   Spaeth here, were you involved in any decision to terminate

613

1  Marlo's job at Walmart?

2  A.  No, I was not.

3  Q.  Were you involved in any supervision of Marlo on the job in

4  a formal sense?

11:29  5  A.  In a formal sense, no.

6  Q.  Okay.  Nobody consulted you about any personnel decisions

7  about Marlo.

8  A.  No.  No.

9  Q.  Do you have a good memory of your years working around

11:30  10  Marlo?

11  A.  I have memories of working there.  I don't remember

12  everything, but I do remember working with Marlo.

13  Q.  Would you tell us how it came to pass that you and Marlo

14  would work together.

11:30  15  A.  I would -- there was this one occasion that I remember.  I

16  was working later for my shift, and I took my meal around 4:00

17  in the afternoon and I was coming back at 5:00.  I saw Marlo

18  standing at the time clock back by personnel, where I would been

19  clocking in, and I asked her if something was up.  I said,

11:30  20  "What's going on?"  She said she was tired, she wanted to go

21  home.  I said, "Is it time?"  She said, "No."  And I said I'll

22  clock in, we'll go to the service desk, we'll get returns, we'll

23  do returns, and then we'll be done with them and it will be

24  time.

11:30  25  Q.  Is that what you did?

614

1    A.   Yes.

2    Q.   And Marlo was fine with that.

3    A.   Yes.  Yes.

4    Q.   Before that had you had interactions with Marlo?

11:31   5    A.   Briefly.  She would -- my memories are she would bring in

6    birthday treats, we would sit in the break room on break

7    together, we would have conversations, talk about the Packers.

8    Q.   How did Marlo get along with other employees?

9    A.   She got along with most of them, yes.

11:31   10    Q.   And did you ever work alongside Marlo?

11    A.   Yes.

12    Q.   Would you tell us a little bit about that?

13    A.   One time I was walking the floor, which was part of my job

14    to meet up with associates again, and Marlo was folding towels

11:31   15    and washcloths in the domestics and housewares area where she

16    worked.  She was folding them.  I asked her how she was doing;

17    she said good.  She always said she was good.  And a customer

18    came up, asked Marlo where an item was located in the

19    department.  Marlo took them to the item in the department a

11:32   20    couple rows down and came back and continued with what she was

21    doing.

22    Q.   Did you teach Marlo anything about bath rugs, folding those

23    or that type of thing?

24    A.   No.  Her department manager would have at the time.  Or if

11:32   25    I'm working alongside her and I saw that it wasn't folded the

1    way that Walmart wanted them, I would show her how to do it and

2    she would do it.

3    Q.    How well did you get to know Marlo over the years?

4    A.    I thought pretty well.

11:32    5    Q.    And what makes you believe that you knew her pretty well?

6    A.    I felt we were pretty comfortable with each other because

7    she would come in, she would talk to me, I would help her at

8    work if she needed anything, writing a schedule down, getting

9    onto the training computers, that type of thing.

11:33    10         She was comfortable enough with me and I was

11    comfortable enough with her that she would ask me for a ride

12    home occasionally when I was leaving and she was leaving so she

13    wouldn't have to take a bus.  And I did that.  Other people did

14    that also.

11:33    15    Q.    So you would give Marlo rides home every once in a while.

16    A.    Every once in a while.  Not very often.  Usually the bus,

17    but sometimes.

18    Q.    Okay.  Let's go to the meeting where Marlo's last day of

19    work occurred; do you remember that day?

11:33    20    A.    Yes, I do.

21    Q.    Would you tell the jury what happened.

22    A.    I was sitting in the personnel office, the phone rang.  It

23    was comanager Robin.  She was a comanager at the time.  She

24    asked me to come over and help because they had terminated Marlo

11:34    25    and they wanted me to help Marlo with taking her vest off,

616

1    walking her out, that type of thing.

2    Q.  How far away would the personnel office have been from where

3    you were going to?

4    A.  20 seconds, 25 seconds, yes.

11:34   5    Q.  And after you took the phone call did you get up and go in

6    the room?

7    A.  Yes, I did.

8    Q.  And tell us what you saw.

9    A.  I went in the room and Marlo was standing there and she was

11:34  10   looking down at the floor.  And I went up to her.  And I had to

11   crouch down because she's shorter than me, so I crouched down to

12   look her in the eye.  And I said, "Marlo, it's time to go.  We

13   need your vest and I'll walk you out."

14          She took her vest off.  I laid it on management's

11:35  15   counter, one of the counters in the room, and I started walking

16   out with her.  And I put my arm around her, and we both teared

17   up and cried because I cared about her.  I still do.

18   Q.  Did you have any communications with her as you were

19   departing?

11:35  20   A.  Yes.  As we were walking we got to the front of the store

21   and she said she didn't understand.  And I said, "I know."  I

22   said, "It was because of your attendance."  And she said, "I

23   know, I should have worked."  And she said, "Amy isn't going to

24   like it."  I said, "Have Amy call us."

11:35  25          I wrote our Walmart phone number down on a piece of

617

1  paper I had in my pocket, I gave it to Marlo, I gave her a hug,

2  and I said I needed to go back to work now.

3  Q.  And is that where you left her that day?

4  A.  Yes, at the front of the store with the bus stop was to the

5  side of the store, very close.

6          MR. BURNETT:  Okay.  That's all I've got.  Thank you.

7          THE COURT:  Okay.  Cross?

8          MS. VANCE:  Thank you.  Cross-examination

9                      CROSS-EXAMINATION

10 BY MS. VANCE:

11 Q.  Ms. Moss, you testified you're a training coordinator;

12 right?

13 A.  Yes, I was.

14 Q.  And part of your job was to work with employees who were

15 having struggles on the job; right?

16 A.  Part of my job was to work with all the associates, not just

17 the ones that have struggles.

18 Q.  But it included, if an employee was having a struggle, that

19 includes you as the training coordinator working with them;

20 right?

21 A.  My job would have been to get them with the person that

22 would best be able to teach them what they were having struggles

23 with.  Not me myself, I would coordinate it.

24 Q.  And so what prompts your duty as training coordinator is

25 there's an employee having a struggle; right?

11:36
11:36
11:36
11:36
11:37

618

1    A.   Yes.

2    Q.   And that would prompt you to get involved.

3    A.   To get involved at that point, yes.  Or if I have noticed a

4    problem.

11:37   5    Q.   Got it.  And we heard your testimony that during the years

6    with Marlo Spaeth you had opportunities to see her learn new job

7    tasks; right?

8    A.   Yes.

9    Q.   And there was an occasion when you kind of tracked it as

11:37   10   Marlo branched out from folding towels and washcloths to moving

11   into bathroom rugs; right?

12   A.   Bath rugs.  We moved several aisles into the department more

13   and we started folding them, yeah.

14   Q.   And your testimony was her department managers did that with

11:38   15   her; is that right?

16   A.   They would.  That would be part of their responsibility.  I

17   have no knowledge of watching them do that.

18   Q.   So is it fair to say that what you were aware of is that

19   when Marlo learns new tasks she needs a little extra support;

11:38   20   right?

21   A.   I wouldn't say that, no.

22   Q.   But it helps if the managers do it with her; right?

23   A.   It helps any associate if the department manager would show

24   them how to do their job.

11:38   25   Q.   And then we heard you testify about a time you saw Marlo at

619

1    the team clock; right?

2    A.  Yes.  Yes.

3    Q.  And you asked her you're not supposed to go home yet, are

4    you?  Something to that effect?

11:38   5    A.  No, I didn't say that.  I said, "What are you doing at the

6    time clock?"  Because the only reason an associate would be at

7    the time clock would be either to clock in, go home, go to meal,

8    back from meal.

9    Q.  And you remember that you said to her, "Marlo, it's too

11:39   10   early to clock out."  Right?

11   A.  She said she was tired and she wanted to go home.  And I

12   said, "Are you supposed to go home?"  And she said, "Not yet."

13   I said, "It's too early."

14   Q.  Right.  So my question was that you said "Marlo, it's too

11:39   15   early to clock out."  It's a yes-or-no question.

16   A.  Yes.

17   Q.  And then Marlo's response to you was that she was tired.

18   A.  Yes.

19   Q.  Right?  Okay.  And so what you did was you went with her.

11:39   20   You did returns with her; correct?

21   A.  Yes.

22   Q.  And together you and Marlo did the returns; right?

23   A.  Yes.  We worked alongside each other.

24   Q.  You are familiar with, Ms. Moss, with the blank forms for

11:40   25   accommodation requests?

1  A.  At that time I was, yes.

2  Q.  And it's true, isn't it, that they were printed in the

3  personnel office and then kept in a locked cabinet; correct?

4  A.  That is correct.

11:40  5  Q.  And then let's focus again on what we heard about the day

6  Marlo was terminated.  When you arrived into that room where

7  they called you in Marlo was upset, wasn't she?

8  A.  When I walked in the room she was standing there and looking

9  at the floor, is what I saw.

11:41  10  Q.  She was upset; right?

11  A.  I wouldn't be able to say for sure without her saying

12  anything to me.

13  Q.  And then you did see her break down and cry.

14  A.  We both did, yes.

11:41  15  Q.  You both broke down and cried.

16  A.  Yes.

17  Q.  And then the problem was she was resisting surrendering that

18  Walmart vest; right?

19  A.  That was part of it, I believe, yes.

11:41  20  Q.  That's why they called you?

21  A.  Yes.

22  Q.  They couldn't get her to take her vest off; right?

23  A.  I don't know.  I wasn't in there during that part.

24  Q.  Fair enough.  But you eventually got Marlo to take off that

11:41  25  Walmart vest.

621

1    A.   I just asked for it, yes.

2    Q.   And she did it eventually.

3    A.   Yes.

4    Q.   So I think your testimony is that you put your arm around

5    Marlo, right?

6    A.   Yes.

7    Q.   And you're both crying at this point; right?

8    A.   We're both teared up and, yes.

9    Q.   And you're walking her out; right?

10   A.   Yes.

11   Q.   And the first thing she says is, "I don't understand."

12   Right?

13   A.   When we were getting close to the front of the store she

14   said she didn't understand.

15   Q.   And you gave Marlo -- you wrote out the store number;

16   correct?

17   A.   The store's phone number, yes.

18   Q.   And that was so that Marlo had something in her hand that

19   she could give to Amy Jo; correct?

20   A.   It was if Amy needed to call or Marlo needed something, the

21   number was there for them.  It was a resource.

22   Q.   And you said, "Have Amy call," correct?

23   A.   She said, "Amy is not going to like this," and I said, "Then

24   have Amy call us."

25   Q.   And that's because you thought Marlo's sister needed to know

11:42

11:42

11:42

11:42

11:43

1  what was going on; right?

2  A.  No.  My job was to give a resource for Marlo, not for

3  Marlo's sister.  Marlo could give her sister that number if

4  Marlo's sister had questions.  That was my intent.

11:43   5  Q.  And you thought I better make sure Marlo at least has the

6  right phone number to give her sister; right?

7  A.  I didn't think anything, I just did it.

8  Q.  You just did it to make sure that Amy Jo could call;

9  correct?

11:43   10  A.  If she wanted to.

11  Q.  And you told Marlo that you felt sorry for her.

12  A.  Yes.

13          MS. VANCE:  No further questions, Your Honor.

14          THE COURT:  Any redirect?

11:43   15          MR. BURNETT:  No.

16          THE COURT:  Okay.  Thank you, Ms. Moss.  You may step

17  down.

18          (Witness excused at 11:44 a.m.)

19          THE COURT:  Is this a good place to break?

11:44   20          MR. HARLAN:  Yes, I believe so.

21          THE COURT:  We'll break for lunch.

22          Please be back in the jury room at 1:00.  We'll start

23  promptly at 1:00.

24          (Jury out at 11:44 a.m.)

11:44   25          THE COURT:  Okay.  And two more witnesses; is that

623

1    right?  And those are Mr. Spude and --

2              MR. BURNETT:  Mr. Abitz, the store manager.

3              THE COURT:  Okay.  And what do you think?

4              MR. BURNETT:  How long do you think those two guys

11:44  5    will be?

6              MR. HARLAN:  Maybe 40 minutes for Mr. Abitz and then

7    Warren has --

8              MR. BULIOX:  Yeah, maybe like an hour and a half.

9              THE COURT:  Sounds like we'll be able to let the jury

11:45  10   good home early, look at jury instructions and go there, and

11   then we'll close tomorrow.

12             MR. BULIOX:  Judge, it's an hour and a half for me, I

13   don't know what the EEOC will do.

14             THE COURT:  Well, you know, as any judge tells you and

11:45  15   you know yourself, you know, you pay a price when you bore the

16   jury or you make them sit around too long.  So I trust you're

17   all aware of that so I'll stay out of all of that.

18             All right.  Have a good lunch.  We'll see you at 1:00.

19             (Recess taken at 11:45 a.m., until 1:04 p.m.)

01:05  20             (Jury in at 1:05 p.m.)

21             THE COURT:  Okay.  Please be seated.

22             THE CLERK:  Please raise your right hand.

23              KENT ABITZ, DEFENSE WITNESS, DULY SWORN

24             THE CLERK:  Please state and spell your first and last

01:05  25   name for the record.

624

1          THE WITNESS:  Kent, K-e-n-t, Abitz, A-b-i-t-z.

2          THE CLERK:  Please be seated.

3          THE COURT:  Okay, go ahead.  You may proceed,

4    Mr. Harlan.

01:05   5          MR. HARLAN:  Okay.

6                        DIRECT EXAMINATION

7    BY MR. HARLAN:

8    Q.  Good afternoon, Mr. Abitz, how are you, sir?

9    A.  I'm fine, thank you.

01:05  10    Q.  You're the store manager at the Manitowoc location where

11    Marlo Spaeth used to work; correct?

12    A.  That is correct.

13    Q.  So as impressive as it is, your career and all the things

14    you've done, for purposes of moving through this why don't you

01:06  15    just summarize what your career as consisted of in terms of

16    positions at Walmart.

17    A.  I started in high school, 30 years ago.  I worked at the

18    Fond du Lac Walmart store.  And then I was promoted to the

19    department manager in the Fond du Lac Walmart store.  I did that

01:06  20    for a few years and then moved to Rhinelander as a promotion as

21    assistant manager.  Stayed there for about five years and then

22    moved to Oshkosh as assistant manager.  I was closer to home.

23    So I was originally from Fond du Lac.  And stayed there for

24    right around five years.

01:06  25                And then I got promoted to comanager in the

625

1    Fond du Lac store, which was right at home, and I did that for

2    maybe four years.  And then I was a store manager at Sheboygan

3    North.  Promotion to my first store manager role.  And I did

4    that for four years.  And then moved to the Manitowoc store, and

5    I've been there for around six years.

6    Q.  Okay.  And did you go to high school in Fond du Lac?

7    A.  I did, yes.

8    Q.  What high school did you go to?

9    A.  Goodrich High School.

10   Q.  Are you married?

11   A.  I am married.

12   Q.  Okay.  All right.  So, as you know, this case involves an

13   issue around attendance.  I assume you are obviously aware the

14   company has an attendance policy?

15   A.  That is correct.

16   Q.  And based on your time at Walmart, is attendance one of the

17   most frequent or the most frequent bases for employee

18   discipline?

19   A.  Yes.

20   Q.  On average in a month how often -- or week or biweekly --

21   how often are associates let go because of attendance

22   infractions?

23   A.  I would say weekly to biweekly.

24   Q.  And since you've been at the Manitowoc store, other than

25   Ms. Spaeth, have any of the associates who have been let go for

01:07
01:07
01:07
01:07
01:08

626

1    there had any known disabilities?

2    A.  No.

3    Q.  Can you turn to 1067 in your book.

4    A.  I'm there.

01:08    5    Q.  Okay.  What does 1067 represent?

6    A.  1067 is a portion of the attendance policy on how you get

7    occurrences through the attendance policy and then the

8    attendance and punctuality and management guidelines, how you

9    hold people accountable for those occurrences.

01:09    10    Q.  Are you familiar with the attendance policy that 1067 is

11    based upon?

12    A.  Yes.

13    Q.  Okay.

14        MR. HARLAN:  Judge, we'd like to move 1067 into

01:09    15    evidence.

16        (Exhibit 1067, Demonstrative Regarding Attendance

17    Policy, offered in evidence.)

18        THE COURT:  Any objection?

19        MS. VANCE:  Yes.  May I be heard at side bar?

01:09    20        THE COURT:  Sure.

21        (Off the record discussion at side bar between all

22    counsel and the Court.)

23    BY MR. HARLAN:

24    Q.  So, Mr. Abitz, 1067 that you've been looking at is not

01:11    25    actually the policy for Walmart, but it's a document to help

627

1    explain portions of the policy; correct?

2    A.  That is correct.

3              MR. HARLAN:  Your Honor, with your permission I'd like

4    to let the jury see it.

01:11    5              THE COURT:  Sure.  And I'll just instruct the jury,

6    this isn't a Walmart-created document, it's a document created

7    to help you understand the testimony of the witness and

8    understand the policy that Walmart has.

9              Okay.  So it won't be received into evidence, but it's

01:11    10   for demonstrative purposes to help explain what the policy is.

11   BY MR. HARLAN:

12   Q.  Okay.  Using 1067, can you just help explain the attendance

13   policy that existed when Ms. Spaeth was there.

14   A.  Sure.  Our attendance policy worked on a six-month rolling

01:11    15   period.  And the top section is how we gain occurrences or how

16   an associate would occur occurrences.

17             So the reason why it says one to three consecutive

18   unexcused absences is because if you were to miss work for the

19   exact same reason for three days consecutively it would only

01:12    20   count as one occurrence.

21             The second line down has three incomplete shifts.  If

22   you were tardy or you left early in a rolling six-month period,

23   every three you would get one occurrence.  So essentially a

24   tardy, a left-early is one-third of an attendance occurrence.

01:12    25             Three occurrences you can see gets you a personal

628

1    discussion, and that's where a member of management is going to

2    talk to you to try to change your behaviors before they have to

3    hold you accountable for an attendance occurrence.

4        And then in your fourth occurrence you move to

01:12    5    coaching for improvement.  And at that time it's like a first

6    written coaching, and it's basically saying you violated

7    Walmart's attendance policy and we're holding you accountable

8    for that; in the future you need to change your behaviors.

9        So you can see below that, the attendance punctuality

01:12    10    and management guidelines.  When you get to a fifth occurrence

11    you get a second written coaching, and then when you get to a

12    sixth you get a third written coaching, and then when you get to

13    seven you get terminated.

14    Q.   Terrific.  Now, I note on 1067 there is nothing about no

01:13    15    call/no shows, is that part of the attendance policy?

16    A.   Yes, it is.

17    Q.   And how is that handled under the attendance policy?

18    A.   Attendance policy for no call/no shows, if you have a no

19    call/no show you instantly go to a second written coaching.  And

01:13    20    within those -- six-month rolling period if you have three

21    consecutive or nonconsecutive you are terminated.

22    Q.   So there was some testimony earlier about what happens in a

23    situation where an associate say clocks in early and then clocks

24    out early but has worked four hours.  And how does it work when

01:13    25    you clock out early?  Is there a point where you are subject to

629

1    discipline based on the clocking out early?

2    A.  Yes.  If you clock out before nine minutes you're held

3    accountable for leaving early, and if you clock in earlier than

4    50 minutes you're held accountable for clocking in early.  Or

01:14   5    excuse me.  If you clock in earlier than 15 minutes you're

6    considered an attendance exception.  If you leave more than 10

7    minutes early you're considered an attendance exception.

8    Q.  And it wouldn't matter that you had worked four hours if you

9    violated that policy; correct?

01:14   10   A.  That's correct.

11   Q.  So are you -- since you've been at the Manitowoc store have

12   you ever been aware of a part-time associate like Ms. Spaeth who

13   had a fixed permanent schedule?

14   A.  No.

01:14   15   Q.  Is it a key requirement for anybody in a sales associate

16   role at the Manitowoc store to be able to work fluctuating

17   schedules?

18   A.  That's critical.

19   Q.  And why?

01:15   20   A.  Because the business fluctuates.  You'll have seasonal

21   events, Fourth of July, Memorial Day, Black Friday, all those

22   things where your hours are going to fluctuate.  Like our hours

23   in December are 9200 and maybe in January they're 8200.  So you

24   need to have associates in place when the customers are present.

01:15   25   Q.  So as a store manager of Manitowoc, what do you really own

630

1    in that store in terms of responsibility?

2    A.   That's total box responsibility I own, the infrastructure,

3    the associates, the assets.   Performance.

4    Q.   So as a store manager, part of what you're responsible for

01:15    5    is administering policies that the company has in place;

6    correct?

7    A.   Yes.

8    Q.   So am I right that Walmart has a lot of different policies

9    and procedures?

01:15   10   A.   Many, yes.

11   Q.   So how -- and do those policies and procedures change often?

12   A.   Very often.

13   Q.   So how does somebody who has total responsibility for the

14   store -- how many folks are typically working as associates in

01:16   15   the Manitowoc store?

16   A.   Anywhere from 250 to 300.

17   Q.   So how does somebody that's a store manager with that level

18   of responsibility supposed to be able to keep up with all these

19   different policies that are changing all the time?

01:16   20   A.   I don't necessarily need to know them in detail.   I can

21   reference The Wire.   I can reference partners like other store

22   managers, market manager, human resource manager, the home

23   office.

24   Q.   Are there specialists for certain policies that you can

01:16   25   consult with questions?

631

1    A.   Yes.

2    Q.   So when did you first learn who Marlo Spaeth was?

3    A.   I first learned who Marlo Spaeth was when I was at the

4    Manitowoc store and I was helping them through the inventory

01:17   5    process and I remember Bonnie or Robin coming to me and saying

6    that they had an associate with 16 or 17 occurrences.

7    Q.   Okay.  And at that time -- first of all, when did you start

8    in the Manitowoc store approximately?

9    A.   It was in July and I'm not sure of the exact date.

01:17   10   Q.   So you get to the store, some of the management there

11   mentioned that there's an associate that has 16 or 17

12   occurrences, what did you think when you heard that?

13   A.   I thought you need to contact the market human resource

14   manager.  I've never heard of anybody having that many.

01:17   15   Q.   Okay.  So it struck you as a significant amount of

16   occurrences for someone who is still employed.

17   A.   Yes.

18   Q.   Had you ever heard of anybody at that point in time with

19   that many of occurrences who still had a position at Walmart?

01:17   20   A.   No.

21   Q.   And how about since then?

22   A.   No.

23   Q.   There's been some reference to -- I think one of the

24   witnesses mentioned that there may be another associate

01:18   25   currently employed at the Manitowoc store who has an

632

1    intellectual disability; is that the case?

2    A.  Yes, Mike.

3    Q.  Okay.  And he was employed there when there was a schedule

4    change in terms of the new scheduling system?

01:18    5    A.  Yes.

6    Q.  Were there any issues with him in terms of his schedule in

7    terms of how he navigated that?

8    A.  Not that I'm aware of.

9    Q.  So we've heard a lot of testimony about that schedule change

01:18    10    and the 1:00 to 5:30 shift that Ms. Spaeth was working.  As of

11    right now is that shift something that the computer is

12    generating for the Manitowoc store?

13    A.  No.

14    Q.  Am I correct that the schedules that the computer generate

01:19    15    have changed over time?

16    A.  Many times.

17    Q.  Okay.  And why do the shifts that the computer puts out for

18    coverage within a store, why does it continue to evolve and

19    change?

01:19    20    A.  Well, there's technology.  They give us tools that make our

21    job easier or -- like scrubbers that will scrub the floor where

22    you wouldn't need a maintenance associate.  You've all seen

23    self-checkouts.  So technology is a big piece, as well as

24    customer shopping habits like the online presence that Amazon

01:19    25    has.  So you have to adapt to those types of things.

633

1    Q.  So with respect to the attendance issues that you became

2    aware of involving Ms. Spaeth, did you ever -- were you ever

3    aware that there was any connection between her attendance

4    issues and her Down syndrome?

01:20    5    A.  No.

6    Q.  Now, we've also heard about an investigation that was

7    conducted after Ms. Spaeth lost her position.  Tell us about

8    that and what your role was.

9    A.  To start from the beginning, Amy Jo had said that she was

01:20    10    going to sue Walmart.  So that prompted an investigation through

11    I believe Robin Castro.  And from that part I get an

12    investigation -- "red book" investigation, that's what they call

13    it, sent to me.  And then my job is to try to gather facts and

14    then turn them into lead investigator Denise Morgan at the home

01:20    15    office.

16    Q.  And were there interviews conducted?

17    A.  Yes.

18    Q.  And did you conduct those interviews?

19    A.  I did.

01:21    20    Q.  Now, I think we've learned through that investigation

21    Ms. Stevenson wasn't interviewed, Ms. Barnes wasn't interviewed,

22    and Ms. Spaeth wasn't interviewed, is there a reason for that

23    from your perspective?

24    A.  Well, firstly I've never seen a red book investigation that

01:21    25    was like brought on from a third party, someone who didn't work

1    for Walmart.

2            Secondly, I thought I understood what Amy Jo was

3    asking.  You either do this or we're going to sue you.  So you

4    reinstate Marlo or we're going to sue you through ADA.

01:21  5            And then, thirdly, if Denise Morgan wanted me to

6    interview them I think she would have caught that as well.

7            MR. HARLAN:  Can we pull up 1023, Tracy.

8            (Exhibit 1023, Email from Kent Abitz and Investigation

9    Recap [D001037 - D001041], admitted previously by stipulation.)

10   BY MR. HARLAN:

11   Q.  Do you have it in your book?

12   A.  What number?

13   Q.  1023.

14   A.  1023?

01:22  15  Q.  Can you tell us what 1023 is?

16   A.  1023 is the investigation recap.

17   Q.  Okay.  And what was the purpose of that document?

18   A.  It's to go over who the parties that were involved, the

19   allegations that were to be investigated, the investigation, the

01:22  20  findings that I had, and then the actions that I had taken.

21   Q.  Okay.

22           MR. HARLAN:  Tracy, could you put us on page 1040.

23   Just one more question about this document.

24   BY MR. HARLAN:

01:23  25  Q.  So under the "Action Taken" section --

635

1     MR. HARLAN:  Maybe you can call that out, Tracy.

2  Thank you.

3  BY MR. HARLAN:

4  Q.  There's a reference to a verbal discussion with the three

01:23  5  individuals there, do you know what that's about?

6  A.  Yes.  When I was investigating they clearly were not

7  following Walmart policy.

8  Q.  In what way?

9  A.  They weren't holding people accountable correctly.

01:23  10  Q.  Okay.

11  A.  So that's our first step of the coaching process is a verbal

12  coaching saying you need to change your behaviors and you need

13  to do -- follow the company policy.

14  Q.  So with respect to Ms. Spaeth, based on your investigation

01:23  15  you found that she was given far more leniency than she should

16  have based on what the policy called for.

17  A.  Yes.

18  Q.  Now, in connection with your investigation did you do any

19  sort of review or analysis of Ms. Spaeth's attendance records?

01:24  20  A.  Yes.

21  Q.  And why did you do that and what did you find?

22  A.  Well, I need to verify first that she was properly

23  terminated for the attendance policy.  That was very clear.

24  When I checked it was 17.  And then I wanted to just see the

01:24  25  history, if this was something that was -- been going on for a

636

1    while, and it was.

2    Q.   When you say it was going on for a while, so did you find

3    out if prior to her new schedule of 1:00 to 5:30, when she was

4    working noon to 4:00, did you find out that she had --

5              MS. VANCE:   Objection, leading.

6              THE COURT:   Rephrase.

7              MR. HARLAN:   Okay.  All right.

8    BY MR. HARLAN:

9    Q.   So, Mr. Abitz, when you looked into -- I think you testified

10   you looked at her attendance records; right?

11   A.   Yes.

12   Q.   What did you discover -- what, if anything, did you discover

13   relative to what her attendance was like when she was working

14   noon to 4:00?

15   A.   She was consistently leaving early.

16   Q.   You talked about how frequent it is that associates end up

17   losing their position as a result of attendance infractions.

18   Have you been involved personally in any terminations of

19   individuals for attendance violations at the Manitowoc store?

20   A.   Yes.

21   Q.   Approximately how many have you been involved in?

22   A.   In six years, 200 or more.

23   Q.   And, to your knowledge, do any of those 200 or so

24   individuals that you have been involved in letting go have any

25   known disabilities?

637

1    A.   No.

2    Q.   Any of those individuals, to your knowledge, seeking any

3    sort of reasonable accommodation, to your knowledge?

4    A.   No.

01:26    5    Q.   I want to shift gears and just cover a couple more topics

6    with you.

7           We all have kind of been through this COVID episode.

8    Did the COVID crisis affect scheduling in the Manitowoc store in

9    any way?

01:26   10           MS. VANCE:   Objection, relevance.

11           THE COURT:   Overruled.

12           THE WITNESS:   Yes.

13    BY MR. HARLAN:

14    Q.   How so?

01:26   15    A.   Well, you had some associates who were concerned for their

16    safety and health, plus their family, so they wouldn't want to

17    come to work.  And then you had other associates who would work

18    outside their availability all day long.  It was quite heroic to

19    see to be honest with you.  I mean, they were working whenever

01:27   20    just to take care of the community.  It was my most proud

21    moment.

22    Q.   And were any of the associates who were working for Walmart

23    at that particular time required to have some flexibility

24    relative to their schedule?

01:27   25           MS. VANCE:   Objection, relevance to this case.

638

1          THE COURT:  Approach.

2               (Off-the-record discussion at side bar with

3     Ms. Carter, Ms. Vance, Mr. Buliox, Mr. Burnett, Mr. Harlan and

4     the Court.)

01:28   5          THE COURT:  Objection is overruled.  Can you answer

6     that or do you need to have the question repeated?

7               THE WITNESS:  Please repeat the question.

8     BY MR. HARLAN:

9     Q.  So during this period where you were dealing with the COVID

01:28  10     pandemic, was flexibility in terms of scheduling on the part of

11     associates important?

12     A.  Critical.

13               MR. HARLAN:  Can we pull up 1038.  Thank you.

14               (Exhibit 1038, Certified Copy of Maritime Metro

15     Transit Bus Schedule - Dated June 14, 2021 [D002936 - D002938],

16     admitted previously by stipulation.)

17     BY MR. HARLAN:

18     Q.  Okay, Mr. Abitz, can you tell us what this is?

19     A.  It's the Manitowoc Transit bus routes.

01:29  20     Q.  Okay.  And in connection with this case did you review this

21     bus information and look into what the bus route that would have

22     been available to Ms. Spaeth during the time she worked at

23     Manitowoc -- at the Manitowoc store to get her from work to her

24     apartment?

01:29  25     A.  Yes.  Southwest loop.

639

1    Q.  I'm sorry?

2    A.  The southwest loop.

3    Q.  And as part of that work that you did, did you find out what

4    time that southwest bus loop ran in the afternoon/evening?

01:30    5    A.  4:15, 4:45, 5:15, 5:45, 6:45, 7:45.

6    Q.  Okay.  And so if Ms. Spaeth, based on your knowledge of the

7    store -- well, first of all, where was the bus stop at the

8    Walmart?

9    A.  It's right outside the grocery entrance.  50 yards away.

01:30    10    Q.  Okay.  So based on your understanding of how long it takes

11    to get from the clock to the exit or the entrance by the grocery

12    area, if her shift ended at 5:30 would she have enough time to

13    get the 5:45 bus?

14    A.  Yes.

01:31    15    Q.  In this case there's been a lot of discussion about schedule

16    preferences.  Are there challenges for you as a store manager

17    around granting employee preferences in terms of schedules?

18    A.  Yes.

19    Q.  Can you explain that?

01:31    20    A.  Well, you can't just grant people schedules that they want.

21    Like you have to have people there when the customer flow is

22    there.

23    Q.  And why is that important?

24    A.  You have to have customer service, could be safety, shrink.

01:31    25    Those types of things.

1    Q.  And as the guy running the Manitowoc store would you have

2    any concerns with the folks on your management team taking on an

3    obligation to contact an associate's parent/guardian about

4    things that were going on in their employment?

01:32    5    A.  Yes.

6    Q.  Okay.  What concern would you have about that as the guy

7    running that store?

8    A.  First of all, privacy for the employee.  As well as -- I

9    mean, there's 250 people there, there's -- I don't think the

01:32    10   management team would be able to handle that kind of

11   responsibility.

12   Q.  And beyond that do you have any concerns about the

13   qualifications of the management to figure out in what situation

14   they're supposed to be reporting to somebody's parent or

01:32    15   guardian versus others?

16   A.  Yes, they couldn't handle that, in my opinion.

17   Q.  So as the store manager at the Manitowoc store do you have

18   any responsibilities for hiring?

19   A.  Yes.

01:33    20   Q.  And in connection with those responsibilities do you have an

21   understanding of what position -- sales associate positions

22   would be available, you know, at a particular point in time

23   since you've been the manager?

24   A.  Yes.

01:33    25   Q.  So in 2015, were there open sales associate positions?

641

1    A.  Yes.

2    Q.  How about 2016?

3    A.  Yes.

4    Q.  How is it that you're able to answer that so rapidly?

01:33   5    A.  Because the hiring circle never stops.

6    Q.  Okay.  So is it fair to say from 2015 to the present there

7    have been available positions at the Walmart store for sales

8    associates?

9    A.  Yes.

01:33   10   Q.  And in your capacity as someone with responsibility for

11   hiring, do you also have a sense for whether there are positions

12   at other retailers that use positions like sales associates?

13   A.  Yes.  Competition is great.

14   Q.  Okay.  When you say competition is great, what's that mean?

01:33   15   A.  Well, if you were to go to Lowe's you'll see they have a

16   hiring booth or hiring table up.  And then it's common for me to

17   go around and check those areas to see what they're hiring and

18   the positions they have.

19        Also like to inform the home office.  Like let's say

01:34   20   Menard's will offer an additional $3 an hour on the weekend so

21   you need to go that and report back so maybe Walmart can adjust

22   their wages.

23        Also the starting wage of other employees, you want to

24   gather as much information as you can.

01:34   25   Q.  Okay.  And in terms of the pay, is the pay comparable with

642

1  those other places that you mentioned in the Manitowoc area that

2  have positions like sales associate?

3  A.  Yes.

4  Q.  So based on your knowledge of the marketplace and who is

01:34  5  hiring in the Manitowoc area, if an individual like Ms. Spaeth

6  wanted to find a position as a sales associate would there be

7  open available positions that she could fill?

8  A.  Yes.

9  Q.  Okay.  With that, thank you, Your Honor.

01:35  10  THE COURT:  All right.  Cross?

11  MS. VANCE:  Thank you.

12  CROSS-EXAMINATION

13  BY MS. VANCE:

14  Q.  Good afternoon, Mr. Abitz.

01:35  15  A.  Good afternoon.

16  Q.  Let's go back to that red book investigation, the internal

17  investigation you testified about.

18  A.  Yes.

19  Q.  Your role in the investigation was to determine whether

01:35  20  Marlo was terminated based on attendance or she was terminated

21  for her disability; correct?

22  A.  Yes.

23  Q.  And you never did interview Marlo; right?

24  A.  Yes.

01:35  25  Q.  You never did interview Amy Jo Stevenson.

643

1    A.   Correct.

2    Q.   The final decision after that investigation was to stick to

3    the termination of Marlo Spaeth; right?

4    A.   Yes.

01:36  5    Q.   And that decision to stick to the termination of Marlo was

6    made by Dan Clark, Lee Spude, and you.

7    A.   Yes.

8    Q.   Right?  You're the store manager for Manitowoc; right?

9    A.   Yes.

01:36  10   Q.   Lee Spude is higher up for the market; correct?

11   A.   Yes.

12   Q.   Lee Spude is human resources manager for multiple Walmart

13   stores; correct?

14   A.   Yes.

01:36  15   Q.   Dan Clark is the market manager; right?

16   A.   Yes.

17   Q.   And so he's higher up; right?

18   A.   Yes.

19   Q.   He's -- Dan Clark is manager over multiple Walmart stores in

01:36  20   the area.

21   A.   Yes.

22   Q.   Right?  And then I want to -- let's see.  Let's go back to

23   your interview.  In this investigation you did interview Robin

24   Castro; correct?

01:37  25   A.   Yes.

644

1    MS. VANCE:  I'm going to ask you to pull that up and I

2  need a second of your patience.

3    (Brief pause.)

4  BY MS. VANCE:

01:37  5  Q.  So I'll ask you to turn to Exhibit 35 in the plaintiff's

6  binder.

7  A.  Okay.

8  Q.  And I'll ask you to go to what's page 2 of 6.  The Bates

9  stamp on it is D001082.  Let me know when you're at that page.

01:38  10  A.  I am there.

11  Q.  And if we look about three-fourths down I see a sentence

12  that says, "Amy Jo said that she should not have been let go."

13  Do you see that?

14  A.  Yes.

01:38  15  Q.  Okay.  Amy Jo said -- I'll read from there.

16    "Amy Jo said that she should not have been let go

17  without her sister knowing.  She also said that with the ADA act

18  we should have switched her schedule to what she wanted.  She

19  then went on to say that rectifying the situation by taking her

01:38  20  back to work or she would take further action?"

21    Do you see that?

22  A.  Yes.

23  Q.  And when you conducted your investigation is it fair to say

24  you focused on the attendance policy; correct?

01:39  25  A.  Yes.

645

1    Q.   You didn't have your focus on what Robin reported about

2    under the ADA act Marlo should have had a schedule

3    accommodation, did you?

4    A.   It doesn't say she should have a schedule accommodation.

01:39    5    Q.   I'll ask you to turn to four more pages, to your interview

6    with Robin Castro.

7    A.   What's the document number?

8    Q.   It's 2 of 5 is the page number.  The document number looks

9    like 1096 to me but it's hard.  And it's the interview where we

01:40    10    see a row of questions, "K" for Kent.

11    A.   Yeah, but which document?

12              MS. VANCE:   May I approach, Your Honor?

13              THE COURT:   It's 35, same exhibit except --

14              MS. VANCE:   Four pages in.

01:40    15              THE COURT:   It's your interview with Ms. Castro.

16              THE WITNESS:   I see it now.  Thank you.

17    BY MS. VANCE:

18    Q.   Okay.  And?

19    A.   Which page?

01:40    20    Q.   Page 2 of 5.

21    A.   Okay.

22    Q.   Do you see the last question and answer, "K.  Can you tell

23    me"?  Do you see that?

24    A.   Yup.

01:40    25    Q.   Why don't you read your question and Robin's answer?

646

1    A.   (Reading)

2             "Can you tell me what it was about?

3             "Amy Jo wanted Marlo rehired.  Amy Jo felt she was

4    wrongfully terminated.  She said we could rectify the situation

01:40    5    by rehiring her or she would take further action.  Amy Jo felt

6    she should have been contacted because she is her legal

7    guardian.  Amy Jo felt we should have accommodated her with her

8    schedule due to ADA rules."

9    Q.   So in your -- during your investigation you did find out

01:41   10    that this meeting actually was about how Marlo should have

11    been -- needed an accommodation with her schedule under the --

12    due to ADA rules; correct?

13    A.   No.

14    Q.   Oh, that note -- that interview with Robin didn't make you

01:41   15    aware that the issue at stake was accommodating Marlo with her

16    schedule due to ADA rules?

17    A.   No.

18    Q.   Okay.  This is the question you asked for the interview;

19    correct?  That's what this document is, the question you asked

01:41   20    and the answer Robin gave you; correct?

21    A.   Yes.

22    Q.   Okay.  And at the time you conducted this investigation you

23    never had any discussion with your managers about accommodating

24    Marlo by switching her schedule to the noon to 4:00 p.m.

01:42   25    schedule, did you?

1    A.  No.

2              MS. VANCE:  No further questions.

3              THE COURT:  Redirect?

4              MR. HARLAN:  No, Your Honor.

01:42    5              THE COURT:  Okay.  Thank you, Mr. Abitz, you can step

6    down.

7              (Witness excused at 1:42 p.m.)

8              THE COURT:  And next witness?

9              MR. BURNETT:  I believe Mr. Spude is.

01:43    10              THE CLERK:  Please raise your right hand.

11               LEE SPUDE, DEFENSE WITNESS, DULY SWORN

12              THE CLERK:  Please state and spell your first and last

13    name for the record.

14              THE WITNESS:  Lee Spude, spelled L-e-e, S-p-u-d-e.

01:43    15              THE CLERK:  Thank you.

16              THE COURT:  Thank you, have a seat.

17                         DIRECT EXAMINATION

18    BY MR. BULIOX:

19    Q.  Good afternoon, Mr. Spude.  How are you?

01:43    20    A.  I'm good, how are you?

21    Q.  Good.  Is it okay if I call you Lee?

22    A.  Absolutely.

23    Q.  Lee, are you from Wisconsin?

24    A.  I am.

01:44    25    Q.  Born and raised?

648

1   A.   Yup.

2   Q.   Okay.  And where in Wisconsin?

3   A.   Door County, Wisconsin.

4   Q.   All right.  And are you currently employed?

01:44   5   A.   I am.

6   Q.   And by whom and in what capacity?

7   A.   I work for Walmart as a regional people director for

8   Region 53.

9   Q.   And how long have you worked in that capacity as a regional

01:44   10   peoples director?

11   A.   I was promoted to that position in November of 2019.

12   Q.   And as the regional peoples director what are your main

13   responsibilities?

14   A.   So I oversee a team of 11 market people operation lead

01:44   15   positions, previously known as a market human resource manager.

16   Those 12 individuals have territories of their own, but they

17   directly report to me.

18   Q.   Okay.  And the territory you covered as the regional peoples

19   director cover the Manitowoc store?

01:45   20   A.   It does.

21   Q.   And prior to becoming the peoples -- the regional peoples

22   director in 2019, what was your job at Walmart, if anything?

23   A.   I was a market human resource manager.

24   Q.   And what is a market human resource manager?

01:45   25   A.   It is a market-level position that oversees multiple

649

1    facilities.  It ranges anywhere from seven to 24 facilities

2    depending on the territory and setup.  And they're really a

3    direct resource and consult for all the operators to ensure that

4    we're effectively following our processes and establishing that

01:45    5    we have the right group of people in the right spot at the right

6    time to get the job done that we need done.

7    Q.  And in that role did your responsibility include the

8    Manitowoc store?

9    A.  It did.  Amongst others Manitowoc was one of the locations.

01:45    10    Q.  And what was your position, if any, at Walmart in 2014 and

11    2015?

12    A.  So in 2014 is when I would have first taken role as the

13    market human resource manager and I maintained that role,

14    including the Manitowoc store, through 2015.

01:46    15    Q.  Lee, how long have you been employed by Walmart?

16    A.  Since 2010.

17    Q.  Okay.  And when you first joined Walmart what was your

18    position?

19    A.  I was an assistant store manager in Wausau, Wisconsin,

01:46    20    overseeing the front end.

21    Q.  And did you hold any other positions between that time and

22    the time that you became manager?

23    A.  Yeah, I did -- through 2010 to 2014 I oversaw multiple

24    assistant manager positions in various stores.  I was a

01:46    25    comanager and then a store manager in Waukesha, Wisconsin.  So

650

1    all in the management operational functions of the position.

2    Q.   Okay.   And I want to focus on what your responsibilities

3    were as a market HR manager.   What were your main

4    responsibilities?

01:46    5    A.   So as stated earlier, my main responsibilities were to help

6    consult and give guidance to the store managers and operators in

7    my territory, which ranged -- it changed, my territories often

8    were adjusted, but ranged anywhere from nine to 24 stores.   Help

9    make sure we're staying on policy, help make sure we're

01:47    10    following the right evaluation guidelines, hiring guidelines,

11    disciplinary action guidelines when and if necessary, and just

12    being a consult and a liaison between the stores and any home

13    office resources that they might need.

14    Q.   And do you know whether or not Walmart has any policies or

01:47    15    practices regarding rehire or reinstatement?

16    A.   We do.   We have policies that regard each.   They're two

17    separate, but, yeah, we have policies that refer to each.

18    Q.   And are you ever involved in the process of rehiring an

19    associate or reinstating an associate?

01:47    20    A.   So rehiring an hourly associate, not a lot.   Rehiring -- I

21    don't specifically get involved with the hiring practices of an

22    hourly associate.   Again, I'm available if there's questions,

23    concerns, issues, guidelines, whatever, but I don't specifically

24    hiring hourly associates.

01:47    25            Now, reinstatement, that's different.   That's

651

1    referring to a situation where we're basically voiding a

2    termination altogether as if it never existed.  That, at the

3    time specifically of '14 and '15, needed my direct involvement

4    to initiate.  It would need approval from my supervisor at the

01:48    5    time.

6    Q.  And during your six years in HR if my math is right --

7    A.  About that, yeah.

8    Q.  -- did you have access to personal records?

9    A.  I did, yes.

01:48    10    Q.  And personal records of associates; right?

11    A.  Uh-huh.

12    Q.  Right.  And did your job require you to access and review

13    those records?

14    A.  As necessary.  I mean, I'm talking that my territory would

01:48    15    typically range anywhere from 4 to 7,000 associates.  So for me

16    to spend all my time digging personnel records for no reason was

17    obviously unrealistic.  But as certain situations arose and

18    there were concerns that would need to be audited, yeah, I would

19    access personnel records as needed.

01:48    20    Q.  And do these records include attendance records?

21    A.  The attendance records, evaluations, disciplinary actions,

22    signed essential functions often, and then, you know, depending

23    on the associate it would vary slightly, but that's the gist of

24    it, yeah.

01:49    25                (Court reporter interruption.)

652

1    A.   Yes, they do.   Attendance records as well as evaluation

2    records, accountability and disciplinary actions, essential job

3    function signatures for job descriptions amongst other things.

4    My apologies.

01:49    5    Q.   And again, given your role in HR, are you required to be

6    familiar with Walmart's policies as it relates to associates?

7    A.   Yes.

8    Q.   And managers as well?

9    A.   Yes.

01:49    10   Q.   At this point in time I want to show you what's been

11   admitted into evidence as Exhibit 1055.

12            (Exhibit 1055, Discrimination & Harassment Prevention

13   Policy - September 19, 2011 [D000973 - D000975], admitted

14   previously by stipulation.)

15   BY MR. BULIOX:

16   Q.   So you have a big binder up there.   There's two binders, one

17   is really big.   That's the defense binder.   You can look at that

18   or you can look on the screen.

19   A.   Okay.

01:50    20   Q.   Okay.   So showing you what's been marked or what's been

21   admitted as Exhibit 1055, do you recognize this document?

22   A.   I do.

23   Q.   What is this document?

24   A.   This is the discrimination or harassment policy that was

01:50    25   effective as of 2011.

653

1    Q.   Okay.  And was it effective in 2014 and 2015?

2    A.   It was, yes.

3    Q.   And in summary what does this policy provide?

4    A.   This provides Walmart's stance on -- our stance against

01:50  5   discrimination/harassment in the workplace.  It's something that

6    we cover with all of our managers and we provide with all of our

7    associates at the time of hire and at the time of their

8    orientation to make sure they're well aware that it's not

9    something that in any way we condone and support.

01:50  10  Q.   Outside of orientation is this policy available to

11   associates?

12   A.   Yeah.  So this is something that again is available in

13   orientation.  And then we have what we call A Wire.  It's an

14   intranet system where associates have access to policies.  This

01:50  15  particular policy in 2011 through at least 2015, I think beyond

16   that even, was also available in break rooms.  It was posted in

17   break rooms for associates to see as well.

18   Q.   Next I want to show you Exhibit 1056.

19            (Exhibit 1056, Open Door Communications Policy -

20   Updated 08/10/2012 [D000976 - D000977], admitted previously by

21   stipulation.)

22   BY MR. BULIOX:

23   Q.   So if you can turn to that.  Do you recognize this policy?

24   A.   I do.

01:51  25  Q.   And what is this?

654

1    A.   This is the open-door policy that was updated as of August

2    of 2012.  And again, similar to the last policy, was available

3    through 2015.

4    Q.   Okay.  And in summary fashion what does this policy provide?

5    A.   This policy is pretty unique to Walmart specifically.  We

6    have what's called an open-door policy, which this outlines, as

7    an availability for associates to reach out to a member of

8    management, member of leadership, fellow associate, whatever it

9    might be, to express concerns, ideas, thoughts without any fear

10   of retaliation at all.  Something that's fairly unique to

11   Walmart.

12   Q.   Next I want to turn your attention to Walmart Exhibit 1057.

13            (Exhibit 1057, Harassment, Inappropriate Conduct,

14   Non-Retaliation, Non-Discrimination Policy [D000978 - D000979],

15   admitted previously by stipulation.)

16   BY MR. BULIOX:

17   Q.   All right.  Do you recognize this document?

18   A.   I do.

19   Q.   And what is this document?

20   A.   So this is a portion of our policies and guidelines that are

21   put in just a slightly different format that again talks about

22   harassment.

23            And one of the previous documents you showed me was

24   discrimination/harassment policy.  This is more so like a format

25   of informational style to help associates and managers better

1    understand and be more fluid with our expectations around

2    discrimination/harassment.

3    Q.  And was this one too available in 2014 and 2015?

4    A.  It was, yes.

01:52    5    Q.  Next I want to talk about some different types of policies.

6             Can we turn to Exhibit 1061.  I'm showing you what's

7    been admitted into evidence as Exhibit 1061.  Do you recognize

8    this document?

9    A.  I do.

01:53    10    Q.  And what is this?

11    A.  This is our accommodations policy specifically for the state

12    of Wisconsin.

13    Q.  Okay.

14    A.  Each state had slightly different variations based on state

01:53    15    laws, but this is specific for Wisconsin.

16    Q.  And in summary what does this provide?

17    A.  It provides Walmart associates and managers guidelines on

18    what Walmart's stance is around accommodations in the workplace.

19    And, again, specifically to the state of Wisconsin in this case.

01:53    20    Q.  Okay.  And was this policy in effect in 2014 and 2015?

21    A.  Yes.  This, as stated, was updated March 5th of 2014 and

22    stood through 2015.

23    Q.  And do you know whether or not this specific policy was

24    communicated to associates?

01:54    25    A.  Yes.  Similar to the discrimination and harassment policy,

1    this was communicated to all associates at the time of

2    orientation.  It was available The Wire, and similar to the

3    previous policy it was also available in the break room on like

4    a poster form for associates to see.

01:54    5    Q.  And I want to turn your attention to the second page of this

6    policy.  Under this policy do you see where it says on the

7    second page "reasonable accommodations can include"?

8    A.  Yes, I do.  Thank you.  That helps.

9    Q.  And do you see where it says "Reasonable accommodations can

01:54    10    include:  Providing part-time or modified work schedules"?

11    A.  Yes, I do.

12    Q.  And have you seen this occur in real life before?

13    A.  Not that I can recall, no.

14    Q.  And would you have any concerns from a policy standpoint of

01:55    15    granting permanent schedule change requests for associates that

16    have no clear connection to a disability?

17    A.  Yeah.  I mean -- sorry?

18         MS. CARTER:  I was going to say, objection, leading.

19    Relevance.

01:55    20         THE COURT:  Overruled.  But restate the question.

21    BY MR. BULIOX:

22    Q.  Sure.  From a policy standpoint, based on your experience in

23    HR, would you have any concerns of granting a permanent schedule

24    change request for associates that have no clear connection to a

01:55    25    disability?

657

1    A.   Yeah, not a permanent one.  I mean, to clarify my previous

2    statement, I'm reading this, providing part-time modified work

3    schedules, it does happen from time to time that someone needs

4    to adjust their schedule for a dentist appointment or some kind

01:55    5    of short-term situation.  That's very, very common.  We do that

6    all the time.  But providing accommodations or anything that

7    would be on a permanent basis against our normal processes is

8    not common.  I can't think of a specific example at all.

9    Q.   Okay.  And similar on the second page, do you see where it

01:56    10    says "reasonable accommodations do not include" and it goes on,

11    "providing an accommodation that is excessively costly,

12    disruptive, or would alter the nature or operation of the

13    business which would be deemed an undue hardship"?

14    A.   Uh-huh.  I do see it.

01:56    15    Q.   Okay.  And have you seen this play out in real life before?

16    A.   I mean, I'm aware of it.  And that's a reason why we often

17    have to deny certain accommodations, so, yes.  I haven't seen

18    this get played out in the sense where it's approved despite

19    this.

01:56    20    Q.   I guess hypothetically if an associate is in a wheelchair

21    and requests an office with windows, would that be something

22    that would trigger this policy?

23             MS. CARTER:  Objection, calls for speculation.

24             THE COURT:  Overruled.

01:57    25             THE WITNESS:  State the question again?

**658**

1    BY MR. BULIOX:

2    Q.   Sure.  So hypothetically if an associate is in a wheelchair

3    and that associate requests a room with windows, would that in

4    your mind invoke this accommodation policy?

01:57    5    A.   Absolutely, yes.  We would consult this policy and any other

6    resources that we have at our disposal to consider the request.

7    Q.   Next I want to show you Exhibit Number 1062.

8              (Exhibit 1062, Accommodation in Employment

9    (Medical-Related) Management Guidelines – June 17, 2013 [D000984

10    -D00988], admitted previously by stipulation.)

11    BY MR. BULIOX:

12    Q.   So showing you Exhibit 1062, do you recognize this document?

13    A.   Yes, I do.

14    Q.   And what is this document?

01:57    15    A.   Similar to the previous one, it gives guidance on how to

16    handle accommodations.  But what's different is this isn't our

17    actual policy, this is the guidelines.  So with Walmart what we

18    do is we have policies and then to help make sure our managers

19    are equipped and capable of enforcing those policies we have

01:58    20    guidelines that walk them through it.  So this specifically

21    would be the guidelines for our managers for Walmart in

22    Wisconsin.

23    Q.   And this document makes reference to an Accommodation

24    Services Center.  What is that?

01:58    25    A.   So we have a group based out of Arkansas with our home

659

1    office that's specifically assigned and designed to help guide

2    managers and stores through the process of handling

3    accommodation requests.

4    Q.  So it's a separate department committed just to

01:58  5    accommodation requests?

6    A.  Yeah.  It's not something that would be located in any

7    particular store or region, it's based in our home office

8    location in Arkansas.

9    Q.  And are you aware of whether or not there's any law that

01:58  10   requires Walmart to have an entire department dedicated to

11   accommodating associates?

12   A.  Not that I'm aware of, no.

13   Q.  And was this policy communicated to associates?

14   A.  This would not have been communicated to associates

01:59  15   specifically.  Again, this is a guideline so we would cover this

16   with all of our managers at the time of their training.  You

17   know, associates are aware of the policy, but again this is

18   specifically for our management team.

19   Q.  And outside of receiving copies of this document and the

01:59  20   other policies that we talked about, is there any other training

21   that managers or associates go through regarding accommodations

22   in the workplace with respect to disabilities?

23   A.  Yeah.  So we consistently have what at that time I believe

24   was referenced as CBLs, computer-based learning models.  At one

01:59  25   point it was changed at GLMS, global learning management.  But

1    either way, it was E modules that people would sit down and take

2    and they would be refreshed on each year.

3         Discrimination prevention and accommodations is

4    something that we consistently redo at least once a year at all

02:00    5    levels.  Some managers, quite frankly, we have them take it more

6    than once depending on what their position is and how likely

7    they are to experience that at any given time.

8    Q.  At this time I want to show you EEOC Exhibit 28.

9         MR. BULIOX: Can you pull that one up?

10         (Exhibit 28, Training D001561-1568; D001588-1603 -

11    30(b)(6) Dep. 64, admitted previously by stipulation.)

12    BY MR. BULIOX:

13    Q.  All right.  So do you recognize this document?

14    A.  I do.

02:00    15    Q.  What is this?

16    A.  This is what I was just referencing.  I was right about CBL.

17    So this would be an example of one such CBL which stands for

18    computer-based learning.

19    Q.  Okay.

02:00    20    A.  One of the training that we offered.  This would have been

21    for sure effective in 2014, '15.  It likely would have started

22    earlier than that, I'm guessing right around 2010.

23    Q.  And is this I guess a print version of that CBL?

24    A.  Yes.

02:01    25    Q.  Do you know whether or not the CBLs changed substantially

661

1    over the years?

2    A.  Yeah, technology is updated.  So we have adjusted how we do

3    it, the format.  And obviously we're constantly reviewing and

4    adjusting verbiage.  But the general content of what was covered

02:01  5    back when he was hired in 2010, which would have been this

6    version, is very, very similar if not identical to what we

7    covered at that point.  So the content is the same, but the

8    specific verbiage may have been adjusted.

9    Q.  I want to turn your attention back to Exhibit 1061 which we

02:01  10   talked about a little earlier.

11          On that document I want to go to the second page.  And

12   under "Eligibility For a Reasonable Accommodation Due to a

13   Disability," can you read that paragraph?

14   A.  Yup.  It says, "You may be eligible for a reasonable

02:02  15   accommodation if you have the skills, ability, knowledge,

16   certification and experience necessary and can perform the

17   essential functions either with or without reasonable

18   accommodation for the job you hold."

19   Q.  Okay.  Thanks.

02:02  20   A.  Yup.

21   Q.  And I want to focus on that word "essential" function.

22   Under this policy does Walmart consider attendance to be an

23   essential function of a job?

24   A.  Yes.  If you take a look at -- I believe it's outlined in

02:02  25   our attendance policy.  It states attendance and timely

662

1   attendance is an essential function for all hourly associates.

2   Q.  And why is that?

3   A.  Walmart, we pride ourselves on serving the customers and

4   having product available for the customers, and quite frankly

02:03  5   our labor force is the key thing to it.  It's one of the things

6   I do what I do, I love taking care of the people here, but we

7   can't do the job without the people.  And so that time and

8   attendance is really, really important for execution and

9   planning.

02:03  10  Q.  And is it especially important at all or particularly

11  important for people that have customer-facing positions in the

12  store?

13  A.  Yeah.  I think -- I like to think that all of our people

14  play a really critical role.  But in terms of the customer

02:03  15  experience itself there are certain positions that are customer

16  facing and specifically there to serve the customers.  So for

17  them, if they're not there it impacts the customers at a higher

18  degree than non-customer-facing positions.

19  Q.  Okay.  And on the second page of this document still, do you

02:03  20  see where it says that "reasonable accommodations do not

21  include"?

22  A.  Yes, I do.

23  Q.  And then it says, "Eliminating essential functions of a job

24  are transferring an essential function to another associate"?

02:04  25  A.  Yes, I see that.  Third bullet point down.

663

1  Q.  All right.  And is this consistent with your understanding

2  of how the policy is interpreted and applied?

3  A.  Yes.  Hundred percent.

4  Q.  Okay.  And I think you indicated earlier that Walmart has

02:04  5  policies on attendance?

6  A.  Yes, they do.

7  Q.  All right.  At this time I want to show you Exhibit 1054.

8          (Exhibit 1054, Attendance and Punctuality Management

9  Guidelines - 04/29/2013 [D000034 - D000037], admitted previously

10  by stipulation.)

11  BY MR. BULIOX:

12  Q.  All right.  So looking at 1054, do you recognize this

13  document?

14  A.  I do.

02:04  15  Q.  And what is this?

16  A.  This would be one of the versions of the attendance and

17  punctuality guidelines that we talked about.  This was effective

18  in 2013.  And we've changed it many times since then, but this

19  would have been in effect until 2016.

02:05  20  Q.  And in summary what does this provide?

21  A.  It gives guidelines on exactly how our attendance system

22  works.  It talks about expectations and how our overall

23  attendance system is controlled and managed.  And it talks about

24  potential accountability efforts that might be necessary if

02:05  25  associates are unable to follow attendance guidelines.

664

1    Q.   And were managers in 2014 and 2015 instructed to follow

2    this?

3    A.   Yeah.  They use this often.  Unfortunately attendance is one

4    of the most common termination reasons at Walmart, so this is a

02:05  5    guideline that they consistently followed.

6    Q.   Okay.  So in this document I see the word "occurrence" a few

7    times.  What is an occurrence?

8    A.   The best way I can describe it is think of it like a point

9    system.  So an occurrence is essentially equal to one point.

02:05  10           In the time that this policy was in play -- it kind of

11    walks you through I think in the next page too -- it walks you

12    through exactly what would equal an occurrence.

13           So in this example for -- there are -- three

14    incomplete shifts would equal one occurrence or equivalent to

02:06  15    one point.  Or one absence would be one occurrence equivalent to

16    one point.  And depending how many points you acquire over a

17    six-month period it would lead to certain conversations --

18           (Court reporter interruption.)

19           THE COURT:  Slow down.

20           THE WITNESS:  I'm sorry.

21           -- points or occurrences the person had, it would lead

22    to certain disciplinary actions or just conversations that would

23    be necessary.

24    BY MR. BULIOX:

02:06  25    Q.   All right.  I want to turn to the second page of this

665

1  document.  So turning to the second page of this document, do

2  you see where it's says "coaching for improvement"?

3  A.  Yup.  Right in the bottom there.

4  Q.  What's that about?

02:07  5  A.  So as I talked earlier, you know, certain occurrences might

6  lead to disciplinary action.  At the time of 2014 and 2015 our

7  disciplinary action system consisted of what we called

8  coachings.  Coaching for improvement I think specifically is

9  what it's referred to.  So each associate would be allotted up

02:07  10  to no more than three coachings before a termination would

11  occur.

12  Q.  Okay.  And at what point would a termination occur?

13  A.  Well, specifically in the bottom here it's referring to

14  attendance.  I mean, coachings are used to other disciplinary

02:07  15  actions, but for attendance purposes at seven occurrences it

16  would lead to termination.  And that's assuming there were no

17  other disciplinary actions for anything else for that associate.

18  Q.  Okay.  In your experience in 2015 were managers ordinarily

19  instructed to terminate employment after seven occurrences?

02:08  20  A.  Yes.

21  Q.  And at 2015 and afterwards are you aware of any associates

22  who -- are you aware of any associates who accumulated more than

23  seven absences or absent occurrences and were not let go?

24  A.  More than seven absences and were not let go?  No.  I mean,

02:08  25  unfortunately it is common for me to walk into a store or audit

666

1    a store and find someone with more than seven absences.  And in

2    digging in it's usually a result of they're researching

3    absences to make sure they weren't problems --

4            Sorry, I'm trying to be cognizant of going slower

5    here.

6            -- to research to make sure it wasn't a problem at

7    all, or to verify that there wasn't any kind of reasonable

8    explanation that would be approved.

9            So I've seen it get up to 10ish, nine maybe, but

02:08  10   regardless I've never heard of someone accumulate more than

11   seven confirmed and not ultimately be terminated.

12   Q.  Now, what about Marlo Spaeth, did she accumulate more than

13   that?

14   A.  She did, but she again was ultimately terminated, yes.

02:09  15   Q.  Are you aware of any other associate who got up to 16 or 17

16   occurrences and have not been terminated?

17   A.  No.  No one that has not been terminated, no.

18   Q.  Next I'm going to show you Exhibit 1059.

19           (Exhibit 1059, Walmart Field Attendance and

20   Punctuality Policy - April 29, 2013 [D000982 - D000983],

21   admitted previously by stipulation.)

22   BY MR. BULIOX:

23   Q.  Do you recognize this document?

24   A.  I do.

02:09  25   Q.  What is this one?

667

1    A.  So this would specifically be the policy itself.  Similar to

2    one of the previous policies we looked at.  We have guidelines

3    and I think that's what we first looked at, this explicitly is a

4    policy.  So this would be what the associates see at

02:09    5    orientation.  This is what associates can access on The Wire.

6    And this is what their trainings or E modules would be based on.

7    Q.  And would this have been in effect in '14 and '15?

8    A.  Yup.  Similar to the guidelines this was updated in 2013 and

9    would have been in effect until 2016.

02:10    10    Q.  Okay.

11         MR. BULIOX:  You can take that one down, Tracy.

12    BY MR. BULIOX:

13    Q.  During your time at Walmart since 2010, right?

14    A.  Uh-huh.

02:10    15    Q.  What, if anything, is your experience with scheduling

16    associates?

17    A.  So it's what I started off with.  It was like literally one

18    of the first things that I learned in my training.  I had the

19    front end.  So at the time I had by far the largest group of

02:10    20    associates.  And that was my first experience in retail and

21    first experience with team reporting to me.  So scheduling is by

22    far the most critical thing.

23         I remember going to training, being shown how the

24    system works and how it's expected.  But then ironically, you

02:11    25    know, I get back to my store and I remember my mentor at the

1    time, who was like a 15-year manager, the first thing he told me

2    is scrap everything you learned in training and here's how you

3    do it.  And he showed me the system and said take all those

4    things and delete them and here's a piece of paper that we used

02:11  5    for our front end schedules and this is the best way to manage

6    your front end, trust me.

7           So that was my first exposure to scheduling.  And then

8    as I went from store to store, you know, it slowly changed and

9    altered based on what store I was in and what they felt the best

02:11  10   way to do it was.

11   Q.  And this is when you were a manager?

12   A.  Yeah, I was an assistant manager in three stores, a

13   comanager in a store, and then a store manager in a store where

14   again I ran my own way of doing it.  But that was essentially

02:11  15   the process for those years I was in operations was do what's

16   best for your store based on what you know you need.

17   Q.  And are you aware of the customer-first scheduling system?

18   A.  The customer-first -- customer scheduling system?

19   Q.  Yes.

02:12  20   A.  Yes.  So that was -- what we ref -- that's the tool that

21   referred to as a technology.  It was like a black and white

22   green DOS system.  If you can remember some of those.  They had

23   all kinds of systems back then.  And it was the tool that we

24   used.  We called it "Customer Scheduling System" because the

02:12  25   tool did its best to identify traffic patterns and inventory

669

1    flow and different ways to help us identify exactly where and

2    when someone should be placed in different parts of the store.

3    So you're talking about the tool itself I think.

4    Q.  Yeah.  And when you first started as a manager were managers

02:12    5    allowed to disregard whatever schedules were generated by the

6    system?

7    A.  Yeah.  Like I said, that's when I first started, they told

8    me, hey, here's what it generated, but we don't think it's right

9    so go in and delete everything.  And then we refer to it as F6

02:13    10   it.  F6 it was like when you could create your own shift.  So I

11   had a piece of paper and I F6'd and created all these shifts

12   based on what the previous manager before me said worked best

13   for that store.

14   Q.  And did that change at any time?

02:13    15   A.  That changed -- the system?  Or what specifically are you

16   referring to?

17   Q.  So the practice of being able to kind of pick your own

18   schedules irrespective of what the system generated.

19   A.  Yeah.  No.  So, yes, that absolutely changed.  So roughly in

02:13    20   2014 the company said listen, we're just not effectively

21   spending our wages.  And we've got people who are being

22   unproductive in different areas of store.  And so they said

23   we've gotta start trusting the system.  And they explained to us

24   how the system works and what it all takes into consideration so

02:13    25   we could trust it.  They said, listen, we've updated it, it

670

1    should be more accurate, we need you to trust the system and

2    follow it effectively.

3    Q.  Okay.

4    A.  And so the -- again, the tech itself -- the tool itself

02:13    5    didn't change, but our expectations on how to use the tool

6    changed dramatically in 2014.

7    Q.  Okay.  And why are wages important?  You mentioned wages.

8    A.  Yeah.  So, I mean, like Walmart, save money, live better.

9    That's what we live by.  The number one reason people come to

02:14    10    Walmart is for prices.  We'd love for it to be for personal

11    interaction, customer service, but the truth is the number one

12    reason they come --

13              (Court reporter interruption.)

14              THE WITNESS:  -- availability of products and prices.

02:14    15              And so unfortunately what we're seeing is in order to

16    keep the prices low we've gotta keep our expenses low.  The

17    number one expense that we have in our stores by a mile is

18    wages.

19              And so a lot of stores across the country, especially

02:14    20    as you add it up the through 4, 5,000 stores, as they

21    consistently overspent in wages it added up to a significant sum

22    of money that was impacting our P&L.  And so again the company

23    said we've gotta start controlling this and making due diligence

24    on where we're spending the dollars and being effective and

02:15    25    productive with it.

671

1    BY MR. BULIOX:

2    Q.   Okay.  And after this point were managers still allowed to

3    go in and set schedules as they saw fit?

4    A.   Allowed?  We did recognize that the system was not perfect.

02:15  5    So there was an approval process where they could say, hey, I

6    think this needs to be adjusted and for this reason

7    systematically they could, but it needed approval.  And the

8    reason we left it open for approval is because there's often

9    situations like local festivals or different circumstances that

02:15  10   the system can't account for and so we need the flexibility to

11   adjust, but it needed a strict approval process to be adjusted.

12   Q.   Okay.  And, of course, you know who Marlo Spaeth is; right?

13   A.   I DO.

14   Q.   When did you first learn the name Marlo Spaeth?

02:15  15   A.   As my memory recalls the name specifically was brought up in

16   like the summer of 2015.  I believe it was July.

17   Q.   And under what circumstances did her name come up?

18   A.   So the Manitowoc store was getting -- was going through the

19   process of handling some attendance accountability with

02:16  20   associates.  It's not something I usually get involved with to

21   be totally honest.  Again I have roughly 6,000 associates, so by

22   no means do I get phone calls about attendance.

23            But in this particular case the associate -- and

24   again, to be fair, I don't know if I even knew her name at this

02:16  25   point, it was just an associate that they called me about -- had

672

1    accumulated a significant amount of absences and they wanted to

2    make sure that they were okay to proceed with termination.

3         Being confused as to why they would call me on such a

4    situation, I mean, I walked them through it, do we have any kind

02:16  5    of leave of absence, were there system errors that caused these

6    things, was there an accommodation of some kind that excuses

7    them.  The answer was no, no, no.  I'm like, okay, then you can

8    proceed with termination, there's no problem at all.

9         Again at that point I don't know even know if I knew

02:16  10   her name, to be honest with you, it's just an associate that

11   they called and were kind of walking me through with.

12   Q.  And do you recall how many occurrences she had?

13   A.  Well, I mean obviously being reminded through this process,

14   I mean at the time it was 16 or 17.  But again at that moment of

02:17  15   the conversation that's one of thousands of associates that may

16   have been called.  So at that moment I don't know that it would

17   stuck out my mind as anything particular.

18   Q.  And have you reviewed personnel records for Marlo at all?

19   A.  I have.

02:17  20   Q.  What about attendance records?

21   A.  Yes.  In Marlo's case because multiple coachings, which are

22   disciplinary actions like we talked about, and because her

23   termination was all tied to attendance, attendance was something

24   that was captured in her personnel records.

02:17  25   Q.  And outside of I guess this involvement with Marlo in

673

1  connection with her termination, did you have any other

2  involvement with Marlo or Marlo's situation?

3  A.  Yeah.  So after her termination there was a conversation I

4  know occurred with the store and with Marlo and some of her

02:18  5  family.  And as a result of that conversation there was a red

6  book investigation opened up.  And a red book is -- I don't even

7  know if it was an official term, but it was kind of the

8  reference for an ethics investigation.

9       You know, it got brought to my attention some concerns

02:18  10  that the family brought forth.  And as a result of that I

11  recommended that they open up an ethics investigation to ensure

12  that we're doing everything that we can to make sure this is

13  accurate.  That's why we have the team in place, quite frankly,

14  and I'm a part of that process.

02:18  15  Q.  And for a little bit I want to talk about the time prior to

16  the red book investigation.  In reviewing Marlo's personnel

17  records did you come across any of her performance evaluations?

18  A.  I did.

19  Q.  And do you know whether or not Walmart ever had concerns

02:18  20  with Marlo's work or her attendance over the years prior to her

21  termination?

22  A.  Yeah.  Marlo's worked for us for a long time and over the

23  course of several evals, one per year, there were multiple

24  reference of instances of performance issues and attendance

02:19  25  issues.

674

1    Q.   But overall was she able to do her job?

2    A.   Yeah.  I mean, she was given for the most part solid

3    ratings.  There was -- but it was pretty clear that in each year

4    there were certain things she had to improve on.  Attendance was

02:19    5    certainly one thing that was called out, but never did it get to

6    the appointment of termination at least until 2015.

7    Q.   And do you know whether or not one supervisor or multiple

8    supervisors counseled Marlo on attendance or performance

9    matters?

02:19   10    A.   No.  When I reviewed it, as a matter of fact, I think there

11    was -- I mean, don't hold me to this number, I don't remember,

12    but it was like multiple years, five or six years of different

13    supervisors.  Which was really common, especially at that point.

14    We rotated supervisors typically to give them more experience in

02:19   15    the stores, that was very common, and each of them at some point

16    had called out either attendance or some other performance

17    concerns that she had.

18    Q.   And do you know who Marlo's last supervisor was?

19    A.   Her last salaried supervisor was Julie Sterns.

02:20   20    Q.   And do you know whether or not Julia Stern counseled Marlo

21    on performance and attendance issues?

22    A.   She did.

23    Q.   And from what you can tell just from looking at the record,

24    do you believe that Julia picked on Marlo in any way?

02:20   25    A.   No.  If anything, at the time I commended Julie for doing

675

1    such a good job of trying to really take a step above and beyond

2    to try and help her understand what was going on for attendance.

3            Again, we don't -- as a lot of people recognize at

4    Walmart we always could use the help. We always need good

02:20    5    associates. She's been there for 10 years. I mean, we don't

6    like or take pride in seeing people go, but she did a good job

7    of taking steps to try and help counsel her in meeting those

8    attendance expectations.

9    Q. And did others express concerns about Marlo's attendance in

02:20   10    particular outside of Julia?

11    A. Yes.

12    Q. At this point I want to show you Exhibit Number 10.

13    EEOC 10. Showing you what's been marked as Exhibit 10 and

14    admitted into evidence. Do you recognize this document?

02:21   15    A. I do.

16    Q. Okay. What is this document?

17    A. So it's titled, "Performance Appraisal." This would have

18    been one of -- I don't know the year, but I'm assuming one of

19    her first performance evaluations given the format that's on

02:21   20    here.

21    Q. So let's go to the second page of this document. It looks

22    like this was in June of 2007, am I reading that correctly?

23    A. That's correct.

24    Q. All right. And I want to direct your attention to the

02:22   25    section that reads "Areas For Improvement"?

676

1    A.   Okay.

2    Q.   What is this section here for?

3    A.   It's an opportunity for the manager to specifically call out

4    something that the associate needs to, as stated, improve on, or

02:22   5    an opportunity that needs to be developed.

6    Q.   Okay.  And do you see where it reads "Marlo needs to keep

7    working until it is time for her to leave"?

8    A.   I do.

9    Q.   And what, if anything, does this tell you about Marlo's

02:22   10   attendance habits and --

11   A.   It tells me specifically in the fiscal year of 2007 that her

12   not staying to the completion of her shift was enough of a

13   concern that it was the only thing that they called out here.

14   Q.   And I want to take you to one more evaluation.  Let's look

02:22   15   at Exhibit Number 11.

16          (Exhibit 11, Spaeth Evaluation 2008 - EEOC00613-614,

17   admitted previously by stipulation.)

18   BY MR. BULIOX:

19   Q.   Okay.  So you see the first page here.  Let's go to the

02:23   20   second page.  What are we looking at here?

21   A.   It's a similar formatted evaluation.  This one's from 2008.

22   Q.   Okay.  And directing your attention again to the areas of

23   improvement.  Do you see that?

24   A.   I do.

02:23   25   Q.   Okay.  And it says, "Watch how long break is."  See that?

677

1    A.  I do.

2    Q.  What, if anything, does that tell you about Marlo's

3    attendance habits back in 2008?

4    A.  It's just referencing her struggle with ensuring that she's

02:23   5    working the shifts that she's scheduled for.

6    Q.  Okay.  So you indicated earlier that Marlo was terminated

7    for attendance issues.  Have you reviewed attendance records

8    specifically for Marlo?

9    A.  Yes, I have.  Multiple times.

02:24  10   Q.  And do you know how many occurrences she accumulated before

11   she was let go?

12   A.  Yes, 17.  And, again, those, just to clarify, you asked

13   about occurrences; right?

14   Q.  Yes.

02:24  15   A.  Yeah, 17 occurrences.

16   Q.  At this point in time I want to introduce Walmart

17   Exhibit 1007.

18           (Exhibit 1007, Spaeth Attendance History – 11/2014 –

19   07/08/2015 [D002547 - D002550; D002564 – D002569], admitted

20   previously by stipulation.)

21   BY MR. BULIOX:

22   Q.  And actually, Lee, if you can pull this up in the binder as

23   well real quick?

24   A.  Where would I find this in the binder?

02:24  25   Q.  That's in the big binder.

678

1   A.   Okay.

2   Q.   Okay.  So showing you what's been entered into evidence as

3   Exhibit 1007, do you recognize this document?

4   A.   I do.

02:25   5   Q.   Okay.  And what is this?

6   A.   This would be a copy of Marlo's attendance violations

7   starting from September 30th of 2014 and extending through July

8   8th, 2015, which would have been just prior to her termination.

9   Q.   Okay.  And just so that the jury is clear later on when it

02:25   10   looks at this document, can you look at -- do you see the Bates

11   stamp numbers in the lower right-hand corner starting with the

12   letter D?

13   A.   Yes.  Yes.

14   Q.   Okay.  And if you were to look at Bates stamps D2547 through

02:25   15   D2550, what would you be looking at?

16   A.   You're asking me if I look at those two pages what would I

17   be reviewing?

18   Q.   Yeah.

19   A.   So when you're taking a look -- well, again, these are all

02:26   20   attendance violations.  And so I'd be reviewing, number one, how

21   many total occurrences do we have and then how does that equate

22   with our occurrence system or point system into occurrences.

23          So, again, if you're looking at this, just to give you

24   some examples, if I can start at -- you said 50, right?  So, for

02:26   25   example, if I look at 50, and I see that the last three-year on

679

1    July 8th, July 7th, and July 3rd she had unauthorized incomplete

2    shifts, those three incomplete shifts would equal one

3    occurrence.

4    Q.  Okay.

02:26    5    A.  So I'd be going through that exercise for a rolling six

6    months to see how many occurrences she truly had.

7    Q.  Okay.  And then if you were to turn to, within the same

8    document, D002564.

9    A.  Okay.

02:26   10    Q.  What would that be?

11    A.  So it looks similar but this is different.  This is actually

12    her punch log.  So punches from September of 2014 until July of

13    2015.  These would be her punch-ins and outs for that duration.

14         MR. BULIOX:  And if it so pleases the Court I would

02:27   15    like to show Demonstrative Exhibit 1068.

16         (Exhibit 1068, Demonstrative Regarding Occurrences

17    Resulting in Termination, not received in evidence.)

18         MS. CARTER:  May I have a moment to take a look at it?

19         (Brief pause.)

02:28   20    MS. CARTER:  Okay.

21         THE COURT:  Just a minute.  You got it?  Okay.  So you

22    want to show that to the jury as again a demonstrative exhibit?

23         MR. BULIOX:  Yeah.

24         MS. CARTER:  Just as a demonstrative.

02:28   25    THE COURT:  So this is another of those documents that

680

1    was created to help display the evidence.  It's not a document

2    produced at the time, but it's produced to help explain the

3    testimony.  Okay.  Go ahead.

4         MR. BULIOX:  All right, you can go ahead and publish

02:29  5    it.

6    BY MR. BULIOX:

7    Q.  Okay.  So showing you this document which has been prepared

8    as a visual aid.  Do you know what this concerns?

9    A.  Yes.  This is essentially outlining the process I just

02:29  10   described.

11   Q.  And does this summarize the attendance records that we just

12   record at?

13   A.  Yes, it does.  It summarizes the attendance records and

14   indicates essentially how they add up to occurrences.

02:29  15   Q.  Okay.  And can you walk us through briefly how Ms. Spaeth's

16   attendance violations accumulated?

17   A.  Sure.  Stop me or ask me questions if I'm not being clear.

18        But if you look at the very bottom actually, it shows

19   the three incomplete occurrences.  And those three, based on our

02:29  20   policy, three incomplete shifts equals one occurrence.  It's for

21   a six-month rolling period.  So if you look at the dates, we

22   just looked back for an equal six months.  And so we take

23   everything in consideration back that far.  So if you work your

24   way backwards and see all that, you'll notice that through the

02:30  25   roughly 47 instances of incomplete shifts it created

681

1    occurrences, as well as one occurrence for any specific absence

2    which is anytime she misses more than 50 percent of her shift.

3              So if you take that all into consideration in the

4    rolling six-month period, she had 17 occurrences.

02:30    5    Q.   Okay.   And the days that are listed here as days that she

6    left early are accurately reflected based on your review of

7    attendance records?

8    A.   Yes.

9    Q.   So for leave earlies she needed to accumulate three in order

02:31    10    to get an occurrence?

11    A.   So yes.   To equal one occurrence she would need to

12    accumulate three incomplete shifts.

13    Q.   And a no call/no show would equal how many occurrences?

14    A.   A no call/no show in the year of 2014-2015 would be one

02:31    15    occurrence.

16    Q.   Okay.   And then I want to direct your attention to the third

17    column in this document.   And do you see where it says -- kind

18    of in the middle of the page where it says for her absences on

19    -- or her leave earlies on April 13, 14, and 15, it says should

02:31    20    have been terminated per the attendance policy?   See that?

21    A.   Yes.

22    Q.   Is that accurate?

23    A.   Yes.   Again, our policy is once you accumulate seven

24    occurrences it would lead to termination.   If not earlier than

02:31    25    that based on other accountability.   In this case that would

682

1    have been accurately the day that she should have been

2    terminated had we been on top of the policy correctly.

3    Q.  Going down a little bit further on the page where it says

4    14th occurrence; do you see that?

5    A.  I do.

6    Q.  It also says that she should have been terminated per the

7    attendance policy?

8    A.  Uh-huh.

9    Q.  And do you agree with that?

10   A.  I do.  I mean, to be totally honest, it would also be

11   accurate if it said that after eight, nine, 10, 11, 12.  I mean,

12   she really should have been -- if we would have done our

13   research and been on top of it she could have been terminated

14   after any of those occurrences.

15   Q.  At this point I want to show you Exhibit 1006.  And we won't

16   spend much time at all with this one.

17   A.  I'm assuming that's in here, 1006, too; correct?

18   Q.  It is.

19   A.  Okay.

20   Q.  So showing you 1006, do you recognize what this is?

21   A.  Yes.  It's similar to the previous one we looked at.  This

22   would be her attendance violations.  But this is reflecting from

23   January of 2012 until October of -- oh, I'm sorry, there's more.

24   Looks like the end of 2014.

25   Q.  Okay.  Would this be broken up to between attendance

683

1  violations and her punch-ins and punch-outs?

2  A.  Yes, I apologize.  Looks like the back half is also

3  punch-ins and punch-outs for the same timeframe.  Yes, it is.

4  Q.  And from this exhibit it looks like Marlo had many occasions

02:33  5  in which she left work early.

6  A.  That's correct.

7  Q.  Okay.  In this 2012-2015 period; correct?

8  A.  Correct.

9  Q.  And it looks like most of these absences, at least in 2012

02:34  10  and '13, were manager approved; is that correct?

11  A.  Yes, that's correct.  Different variations of it, but, yes,

12  they were approved.

13  Q.  And what, if anything, does this tell you about Marlo's

14  attendance between 2012 and at least November of 2014?

02:34  15  A.  It tells me that it was very inconsistent in her ability to

16  follow the schedule.  The specific reasons I couldn't speak to,

17  but clearly inconsistent.

18  Q.  And what does it tell you about management's approach to

19  Marlo and her attendance at that period of time?

02:34  20  A.  Just based on this alone it tells us that we were very

21  forgiving with the occurrences that she had.  Again, I don't

22  know that I could speak to the reasons behind the approvals, but

23  clearly they were very understanding and forgiving of it.

24  Q.  And given that this was prior to that schedule practice

02:35  25  change that you were talking about, does this surprise you in

684

1   any way?

2   A.  No.  I mean, to be fair, I can think of multiple instances

3   where even myself in management roles, I would be very

4   frequently adjusting schedules, approving schedules, again being

02:35   5   very fluid and patient with it given various circumstances.  I

6   wouldn't say it was a set practice, but we were way more

7   forgiving and understanding of it before 2014.

8   Q.  Okay.  We heard testimony in this case that Karen Becker

9   told Marlo that she could leave work early on occasion.  Do you

02:35   10   know who Karen Becker is?

11   A.  She was the personnel coordinator at the Manitowoc store for

12   a few of the years at least that we're talking about.

13   Q.  And as the personnel coordinator would Karen have authority

14   to allow associates to leave work early?

02:35   15   A.  No.  She would be a point of contact, but she -- she likes

16   to have conversations with the associates, but she wouldn't have

17   any authority to make schedule adjustments in any way.

18           MR. BULIOX:  Judge, may we approach?

19           THE COURT:  Sure.

02:36   20           (Off-the-record discussion at side bar with all

21   counsel and the Court.)

22           THE COURT:  We'll take our afternoon recess.  Looks

23   like someone's happy about that.

24           (Jury out at 2:37 p.m.)

02:37   25           THE COURT:  Okay.  Anything to put on the record?

685

1        (No response.)

2        THE COURT:  Okay.  We're in recess then.

3        MS. VANCE:  I'm sorry, one second.  I just wanted to

4   circle back and make sure the position statement was admitted

02:37   5   into evidence.  24 on everybody's list?

6        MR. HARLAN:  Your Honor, if --

7        Lee, why don't you step out.

8        THE WITNESS:  Sure.

9        MR. HARLAN:  I didn't think -- I thought the decision

02:38   10  was that it was admissible depending on how it was offered.  I

11  didn't understand that the Court's ruling was it was admitted.

12       THE COURT:  I'm sorry, I'm not sure.

13       MR. HARLAN:  Yeah, I mean, I thought you said if they

14  were going to use it with a witness or something they were going

02:38   15  to be able to potentially get it admitted depending on how they

16  were going to use it.  That's my recollection of your ruling.

17       MS. CARTER:  Your Honor, it's fine.  We don't want to

18  admit the document, but we may question the witness.

19       MR. MULAIRE:  At this time we're not going to move it

02:38   20  into admission.

21       THE COURT:  Okay.  We're in recess.

22       (Recess taken at 2:38 p.m., until 2:57 p.m.)

23       (Jury in at 2:58 p.m.)

24       THE COURT:  Be seated.

02:58   25       You may proceed been and continue, Mr. Buliox.

686

1    BY MR. BULIOX:

2    Q.  Welcome back, Lee.  I want to show you now Exhibit Number 1,

3    EEOC Exhibit Number 1.

4         MR. BULIOX:  And, Tracy, can you scroll down on each

02:59  5    page of this exhibit?

6    BY MR. BULIOX:

7    Q.  And I want you to focus as she's scrolling down on

8    Thursdays, Lee.

9         All right.  So, number one, what are these documents?

02:59  10   A.  So these are our associate availability forms.

11        MR. BULIOX:  And, Tracy, can you go back up to the

12   first document?  All right.

13   BY MR. BULIOX:

14   Q.  And from your review of this was Marlo available to work on

02:59  15   Thursdays for most of her employment?

16   A.  According to her availability she was not available.

17   Q.  And before we get into Thursdays, are availability forms

18   used as a form of a reasonable accommodation arrangement or

19   request or anything like that?

03:00  20   A.  Well, as part of our accommodation policy like we consider

21   adjustments of availability forms as possible.  But like if

22   you're asking if it can be changed in the schedule, that

23   wouldn't be a form of accommodation if I'm understanding your

24   question correctly.

03:00  25   Q.  Yeah.  No.  Is the form itself part of the accommodation

687

1    process?

2    A.  No, the form itself is not.

3    Q.  Again, you testified that for most of her employment she did

4    not work Thursdays, would it surprise you if I were to tell you

5    that she did, in fact, work Thursdays?

6    A.  It wouldn't.  You know, again the availability form -- I'm

7    not sure what's been testified up to this point for the jury --

8    but the availability form is a guide to help align their ability

9    to work with the shifts that generate in the system.

10           It doesn't necessarily mean that associates from time

11   to time don't pick up shifts to get more hours or based on a

12   local event or an inventory of some kind.  So it wouldn't shock

13   me if she did work outside of this from time to time.

14   Q.  Okay.  And I want to reintroduce to you Exhibit 1006.

15   A.  Okay.

16   Q.  And this document again is Marlo's attendance records from

17   2012 through sometime in 2015; correct?

18   A.  Correct, yes.

19   Q.  Okay.  And does this indicate what days Marlo was scheduled

20   to work on?

21   A.  Again, the first part of it is the violations and the second

22   part is the days that she worked, correct.

23   Q.  Okay.  And according to this document did she work on

24   Thursdays, to your knowledge?

25   A.  Yes, she did.

688

1       MR. BULIOX:  And at this point, Judge, I would like to

2  publish to the jury demonstrative evidence or Exhibit 1070.

3       (Exhibit 1070, Demonstrative Relating to Schedule, not

4  received in evidence.)

03:02  5       MS. CARTER:  Your Honor, just so that it's clear that

6  it's not evidence, it's just a demonstrative.

7       THE COURT:  Okay.  This again is a document created to

8  help you understand the testimony, it's the witness's analysis

9  of the actual attendance records as I understand it.

03:02  10       With that understanding you can display it.

11  BY MR. BULIOX:

12  Q.  Okay.  Showing you this document as a visual aid that we

13  prepared to assist in your testimony, do you know what this

14  concerns?

03:02  15  A.  Yes, this would be a summary of the second half of that last

16  section we just referred to showing the days of the week that

17  Marlo worked from January of 2012 until December of 2012.

18  Q.  Okay.  And let's look at 2012 first.  Did Marlo work on

19  Thursdays?

03:03  20  A.  Yes, she did.

21  Q.  Okay.  And it says weekly schedule, does this represent the

22  weekly schedule as reflected in the attendance record that we

23  just talked about?

24  A.  Yes.

03:03  25  Q.  And was her schedule consistent at all?

689

1   A.   No.  As you take a look at this, I mean, she consistently

2   did not work weekends.  But outside of that, there's not a whole

3   lot of pattern to it.

4   Q.   So it was pretty unpredictable.

03:03   5   A.   Yes, that's correct.

6   Q.   All right.  And let's go to the second page.  And this is

7   for 2013.  Was her schedule predictable or consistent during

8   2013?

9   A.   No, it was not.

03:03   10   Q.   Before we go to the next page, does she work on Thursdays

11   here as well?

12   A.   Yes, she did.

13   Q.   So she worked outside of her availability?

14   A.   Yes.

03:04   15   Q.   And then let's go to 2014.  And does this indicate that in

16   2014 Marlo had a consistent schedule routine?

17   A.   Again, outside of the fact that she did not work weekends,

18   there wasn't a whole lot of predictability in her schedule.

19   Q.   It looks like some days she worked one day a week --

03:04   20           MS. CARTER:  I'm going to object to leading.

21           THE COURT:  Overruled.

22   BY MR. BULIOX:

23   Q.   And some days she worked two or three?

24   A.   Correct.

03:04   25   Q.   Okay.

690

1      MR. BULIOX:  You can pull down that exhibit, Tracy.

2  Thank you.

3  BY MR. BULIOX:

4  Q.  So you indicated earlier that associate availability is

03:04  5  entered into a computer system, or did you?

6  A.  Correct, yes.

7  Q.  And it seems like I remember some reference to a DOS system;

8  is that right?

9  A.  Yes.  So our -- you referred to it as CSS or Customer

03:05  10  Service Scheduling System.  That same black and green screen DOS

11  system had a part of it that we entered associate availability

12  into.  It was important to match the system because again it

13  communicated with the scheduling system.

14  Q.  And if you were to print out something from that system how

03:05  15  would it look?

16  A.  It's a little confusing because again this is the old tech

17  black and green system so it didn't -- necessarily compatible

18  with Word documents and stuff like that.  So it's confusing, but

19  it would be on just regular sheets of paper, just kind of split

03:05  20  in different ways.

21  Q.  Okay.  And at this point I want to show you Exhibit 1005.

22  Can you pull that one out?

23      THE COURT:  I don't think we've received this exhibit

24  yet, have we?

03:06  25      MS. CARTER:  Should we approach, Your Honor?

691

1          THE COURT:  Pardon?  Is there any objection?  I mean

2     if it's stipulated it's fine.  Okay, it's received and may be

3     shown.

4          MS. VANCE:  No.  I'm sorry, Your Honor.

03:06   5          MS. CARTER:  We objected to it and we discussed it and

6     we determined that if it came in at trial in testimony --

7          MS. VANCE:  It is not subject to stipulation,

8     Your Honor, that's what I meant by no.

9          THE COURT:  Oh, but in terms of authenticity have I

03:06  10     already -- let me look at it.

11          MS. CARTER:  No, we objected to authenticity of this

12     document.

13          MS. VANCE:  We were concerned there was no foundation,

14     Your Honor.

03:06  15          MR. BULIOX:  And, Judge, we discussed this issue at

16     length.

17          THE COURT:  Approach.

18          (Off-the-record discussion at side bar with all

19     counsel and the Court.)

03:09  20     BY MR. BULIOX:

21     Q.  All right.  So looking at this document, Exhibit 105  [sic]

22     --

23          MR. BULIOX:  And don't pull it up.

24     BY MR. BULIOX:

03:09  25     Q.  -- can you tell me what this represents?

692

1    A.  So it would show whoever printed it off exactly what Marlo's

2    availability was at any give time.  Each time she enters an

3    availability it gets documented as a new line on the report so

4    we can capture all of her changes.

03:09    5    Q.  And would this document reflect what's in the computer

6    system?

7    A.  Yes.

8    Q.  And the data that's in the computer system, would that be

9    something that is kept in the ordinary course of business?

03:09    10   A.  Yes.

11   Q.  Okay.  And as a HR professional within the organization are

12   you one of the custodians for this type of data?

13   A.  Yes.

14        MR. BULIOX:  So with that, Judge, I seek permission to

03:10    15   publish this exhibit to the jury.

16        THE COURT:  And I understand -- well, it's received.

17        There is there an objection as noted, document is

18   admitted, it may be published.

19        (Exhibit 1005, Customer Service Scheduling

20   Availability – electronic [D001514-001516], received in

21   evidence.)

22        MR. BULIOX:  Thank you.

23        And, Judge, can we also have this admitted into

24   evidence?

03:10    25        THE COURT:  It's received into evidence, yes.

693

1    BY MR. BULIOX:

2    Q.   Okay.  So looking at this document, can you kind of break

3    down what we see on the first line?

4    A.   Sure.  Obviously multiple columns.  The first column it's an

03:10    5    abbreviation for associate ID.  When an associate is hired at a

6    store they all get a unique ID number that uses them in reports

7    and to log onto registers and stuff like that.

8         Obviously you have Marlo's last name and first name.

9    And then that archive date, that's the date that her

03:10    10    availability would have been entered into the system.

11    Q.   Okay.

12    A.   So in this case we're seeing two lines.  The top white line

13    represents availability entered in January 7th, 2012, and the

14    second white line is entered February 21st, 2015.

03:11    15         Then you've got the start of your week, and obviously

16    that's where it cuts off so we've got to move on to what should

17    be the next couple pages.

18         MR. BULIOX:  Tracy, can you go to the next page?  All

19    right.

03:11    20    BY MR. BULIOX:

21    Q.   So what are we seeing in the two rows here?

22    A.   So again as you look through the rest of this document now,

23    you've got the rest of the days that she was available during

24    those given timeframes.  So it clearly shows that she was not

03:11    25    available to work at all on Saturdays and Sundays for either of

694

1    the entries.  And then initially I think the date was 2012, she

2    was available to work Monday 9:00 to 6:00, Tuesday 9:00 to 9:00,

3    Wednesday 9:00 to 6:00, and Thursday 9:00 to 6:00.

4    Q.  And that was --

03:11    5    A.  That would have been the top line so that would have been

6    for 2012, yeah.

7    Q.  Thank you.

8    A.  And obviously the second line shows the update.

9    Q.  Are you aware, Lee, that Marlo's schedule changed in 2014?

03:12    10    A.  Yes.

11    Q.  Okay.

12        MR. BULIOX:  And you can take this exhibit down,

13    Tracy.

14    BY MR. BULIOX:

03:12    15    Q.  And are you aware that it had changed from 1:00 to 5:30

16    p.m.?

17    A.  Yes.

18    Q.  And what effect, if any, would reverting Marlo's schedule

19    back to her noon to 4:00 schedule have on Walmart business and

03:12    20    operations?

21    A.  Reverting her schedule back to noon to 4:00, is that what

22    you're asking?

23    Q.  Yes.

24    A.  So as I walked through earlier, the system generates based

03:12    25    on customer demand, customer traffic, inventory flow,

695

1    operational needs.  So when these shifts drop in the DOS system,

2    the CSS, it's taking that into consideration.  These

3    availability forms again are just the associate notifying us on

4    when they can work; it's not what their schedule is going to be.

03:13    5    If we were to ignore our system and follow just their

6    availability, we wouldn't be able to consistently follow the

7    process.  We wouldn't be able to consistently serve the

8    customers assuming that it doesn't align with the scheduling

9    system as it drops in.

03:13    10    So it could have impacts on customer service and

11    overall just operational productivity.

12    Q.  And would it affect the shopping experience at all?

13    A.  Yeah.  I mean, greater or less depending on the type of

14    situation we're talking about.  In this situation it would have

03:13    15    a pretty big impact because she would be coming in earlier than

16    what the shift calls for, indicating -- given she's in a

17    customer-facing position, indicating that she's working during

18    times where we don't really need that position, and she would be

19    unavailable at the end of the shift where we need someone.  I

03:13    20    think her availability ended at 4:00, which means between 4:00

21    and 5:30 there would be no one there supporting customers in

22    that given department, which is her primary function.

23    Q.  And would this have any effect on other associates?

24    A.  Yeah.  I mean one way or the other we are bound and

03:14    25    determined to serve the customer and to get the job done.  So

696

1    more likely than not, the store would have to react by pulling

2    other associates from other areas of the store to support

3    customers.  Or, quite frankly, what usually happens is we get

4    additional distractions on the front end because the customers

03:14   5    would run to the front end to get support because they can't

6    find anyone in that given area.

7         So one way or the other additional associates are

8    going to end up having to help support the work that's not being

9    done by the person not being there between 4:00 and 5:30.

03:14   10   Q.  And what about wages?  You talked about wages and how

11   critical and important they are to Walmart.  Would reverting

12   Marlo back to this old schedule on a permanent basis affect

13   wages?

14   A.  Yeah, absolutely.  So, again, we talked about the system

03:15   15   generates these shifts based on when we truly need an associate.

16   And so if we're now paying Marlo between noon and 1:00 when we

17   don't feel like we truly need someone there and we can get by

18   without a person in that spot, we're now paying additional

19   wages.

03:15   20        On top of if we do have to, you know, pay other people

21   overtime or whatever it might be to compensate for the shifts

22   that she's not there to help do that work, now all of the sudden

23   we're adding that up.  You multiply that by roughly 300

24   associates in a given store or a given market, those types of

03:15   25   wage situations add up to being pretty detrimental to the

697

1    company which is why we made the adjustment in 2014 to begin

2    with.

3    Q.  And how many associates does Walmart have in the U.S.?

4    A.  Currently?  We're over a million associates.  But, I mean,

03:15  5    I'm assuming you're referencing 2014 and '15, I don't have the

6    exact number off the top of my head.

7         But I can tell you that we've become more productive

8    as the time goes on and so we've been able to do more through

9    technology with less people.  So even though our business has

03:16  10   grown, I would argue that we still would have roughly the same

11   amount of people in 2014 than we do today.

12   Q.  Okay.  And given the million or so employees that the

13   company has, would it be practical from a policy standpoint for

14   Walmart to accommodate individual schedule preferences?

03:16  15   A.  No, it would not.  I can tell you that just in my region

16   alone I have about 30,000 people.  And just in our region alone

17   if we don't control our schedules it very, very quickly impacts

18   our P&L for our region.  So I would assume the same is true for

19   the entire company.

03:16  20   Q.  All right.  So a little earlier we talked about a red book

21   investigation.  Can you remind us what that is?

22   A.  It's an ethics investigation.  A red book is just a term

23   that we referenced because it came in a little red folder.  So

24   it just gained the slang term "red book" investigation.

03:16  25        So it's an ethics investigation that any time anyone

698

1   in the company -- or, quite frankly, outside the company --

2   feels like there's a concern that would be associated with

3   discrimination or retaliation for any kind of protected

4   status -- and, quite frankly, even non-protected statuses in

03:17   5   some cases -- it would initiate an investigation.  That would be

6   -- it would have to follow specific protocol and follow-up and

7   would be overseen by someone who works specifically in our home

8   office location.

9   Q.  Okay.  And I want to show you at this point Exhibit 1033.

10          (Exhibit 1033, Email Relative to Internal Complaint –

11  07/16/2015 [D001961], admitted previously by stipulation.)

12  BY MR. BULIOX:

13  Q.  All right.  Showing you what's been admitted into evidence

14  as Exhibit 1033, do you recognize this document?

03:18   15  A.  I do.

16  Q.  What is this document?

17  A.  This is an email exchange between myself and Robin Castro

18  who was a comanager at the time at the Manitowoc store.

19  Q.  Okay.  It looks like it was an email exchange between the

03:18   20  two of you in July of 2015?

21  A.  Correct.

22  Q.  All right.  And can you tell me what this was all about?

23  A.  This is Robin reaching out to me making me aware that she

24  had terminated Marlo and that, as a result of that termination,

03:18   25  the family had requested a conversation.  And in the midst of

699

1    that conversation she was concerned about some of the -- well,

2    some of the conversation that went back and forth between her

3    and the family.  She had reached out to me for guidance.

4    Q.  And the guidance that you gave her was in that July 17th,

03:19    5    2015 email?

6    A.  Yeah, the one that sees listed at 4:30 p.m., that was the

7    initial response that I gave to her in the email.

8    Q.  You told her to call the legal hotline, what is the legal

9    hotline?

03:19   10   A.  So we have support functions all across Walmart.  In this

11   case the legal hotline or the ethics hotline, it's again there

12   to give guidance on exactly what action should be taken to make

13   sure we're handling the process accordingly.

14   Q.  And you referenced "threat" in quotation marks.  What was

03:19   15   that about?

16   A.  Specifically -- it should say "threat."  Clearly I have a

17   typo there.  I gotta work on that.

18          So I quotated it because it was given to me verbally

19   as a concern -- or in this I should say the concern -- that

03:19   20   based on Robin's interpretation of the conversation with that

21   family, she felt like the family was threatening legal action.

22   And so obviously the response I gave her was how to handle that

23   concern at that moment.

24   Q.  And why did you tell Robin to have no further discussion

03:20   25   with Marlo's relatives?

700

1    A.   So we have some pretty specific policies or expectations at

2    Walmart where unless you are a minor or a documented legal

3    guardian, there's only so much that we can specifically explain

4    to a non -- outside of that specific associate.

03:20    5         So, you know, whether it's specific details on

6    evaluations, discriminatory actions, whatever it might be, we

7    gotta be really cautious on who we're talking about with or

8    without.  And at this moment it wasn't verified that there was

9    any official documented legal guardian for Marlo that we could

03:20   10   talk to, and given that this was clearly becoming a severe

11   matter we had to be very cautious on who we were disclosing

12   information to.

13   Q.   And was this I guess actions that set up the red book

14   investigation that eventually came?

03:20   15   A.   Correct.  The ultimate goal of the red book investigation or

16   the ethics investigation and why we have a home office party

17   involved is to make sure that we get the truth and the accurate

18   story about what's happening.  So whatever we can do to minimize

19   any non-direct input into what's going on the better we can

03:21   20   account for what actually happened.

21   Q.   And do you know what the result of that red book

22   investigation was?

23   A.   The result of the red book investigation was that we

24   substantiated that Marlo did indeed breach our policy and

03:21   25   attendance, and that there wasn't any motivating factors behind

1    any protected status or quite frankly non-protected status.

2             We also did find that quite frankly the store was not

3    adequately following the attendance process and should have

4    terminated Marlo earlier than what they did.  And so there was

03:21   5    action taken to make sure that store moving forward was going to

6    adhere to the policy more effectually.

7    Q.  And when you say "protected status," what do you mean?

8    A.  Protected status as recognized by federal law and by state

9    law.  So anyone based on gender, age, disability, race,

03:21   10   ethnicity, so on and so forth.

11   Q.  So did you look into whether or not her disability had any

12   role in this?

13   A.  Yes.  It quickly became the primary aspect of the

14   investigation itself is whether or not her disability played any

03:22   15   role in the decision to terminate Marlo.

16   Q.  What role, if any, did you play in this red book

17   investigation?

18   A.  So as the market human resource manager at the time, I was

19   essentially the person who oversaw that the procedures were

03:22   20   going effectively across the whole board, and I was the final

21   consultant at the end before any decisions were made.

22   Q.  So are you aware that Marlo's sister made a request that

23   Marlo be reinstated?

24   A.  I am.

03:22   25   Q.  Okay.

702

1    A.   I don't know if she used that word specifically, but that

2    was her intent, yes.

3    Q.   And did you look into that?

4    A.   We did.  We discussed it, yes.

03:22    5    Q.   And does Walmart have a policy on reinstatement or rehire?

6    A.   Yes.  Again, it's two very different things.  But

7    "reinstatement" is a policy that discusses the associate would

8    be brought back into their role and completely erase the

9    termination that occurred from their record altogether as if it

03:23    10    never happened.

11         A "rehire" would be the process of them reapplying,

12    going through the competitive process and being re-selected for

13    position despite the fact that they've already worked for us in

14    the past.

03:23    15    Q.   At this time I want to show you Exhibit 1063.

16         (Exhibit 1063, Rehire/Reinstatement of Former

17    Associates Policy [Dkt. 102-25], admitted previously by

18    stipulation.)

19    BY MR. BULIOX:

03:23    20    Q.   What are we looking at here?

21    A.   This would be the rehire/reinstatement policy I just

22    referenced.

23    Q.   Okay.  And I want to turn your attention to the second page

24    where it talks about reinstatement.

03:24    25    A.   Okay.

703

1    Q.  Does reinstatement require approval?

2    A.  It does.

3    Q.  And what are the circumstances under which reinstatement can

4    occur?

03:24  5    A.  It's any time it's determined that the termination itself

6    was either done incorrectly or done on false pretenses or we

7    determined that basically the termination was wrong and we have

8    to reinstate that.

9    Q.  So if there was a situation where there was a mistake in

03:24  10   counting up attendance occurrences for a termination for

11   attendance, would that be a situation where reinstatement would

12   be appropriate?

13   A.  Yes.  To put it in context to what we're talking about, it

14   could have been an error in occurrence counting, it could have

03:24  15   been a miscalculation of something that would have been approved

16   that no one was aware of previously.  So, yes, that's correct.

17   Q.  And was any circumstance present that warranted under the

18   policy reinstating Marlo?

19   A.  No.

03:24  20   Q.  Was Marlo rehirable after she was let go?

21   A.  Yes.

22   Q.  And is that because she was let go for attendance reasons?

23              MS. CARTER:  Objection, leading.

24              THE COURT:  Overruled.

03:25  25              THE WITNESS:  So depending on the termination reason

704

1    an associate has, it's automatically characterized as rehirable

2    or not.

3           So, for example, gross misconduct is the most severe

4    version of accountability that's not rehirable.  In this case

03:25   5    attendance is one that automatically allows an associate to be

6    rehired for.  Again as I told you earlier, it's one of the most

7    common termination reasons that we have, and in every case the

8    associate's rehired after a 30-day waiting period.

9    BY MR. BULIOX:

03:25   10   Q.  And why rehire somebody after letting them go for violating

11   the attendance policy?

12   A.  People change, honestly.  I mean, we unfortunately terminate

13   people for attendance a lot.  People realize that maybe their

14   ability to show up to work consistently is important so they

03:25   15   change and they adjust.

16          And we recognize when we go through the hiring process

17   that someone may have worked for us in the past, and if we can

18   through the interview process determine that we believe they can

19   consistently show up to work, which is an essential function as

03:26   20   we talked about, then, yeah, we're more than happy to rehire any

21   associate who we think can do the job.

22          MR. BULIOX:  Tracy, you can pull down the exhibit.

23   BY MR. BULIOX:

24   Q.  Was Marlo eligible for rehire?

03:26   25   A.  Yes, she was.

705

1  Q.  And why was that?

2  A.  Again, because she was terminated for attendance and no

3  additional cause that would be deemed non-rehirable.

4  Q.  And in order to be rehired what would she have to do?

03:26  5  A.  She would have to wait 30 days.  So we can't rehire prior to

6  that.  However, after 30 days she would need to just go through

7  the application process and be deemed a competitive applicant,

8  the most competitive applicant who is able to meet the essential

9  functions.

03:26  10  Q.  So she would in essence need to reapply.

11  A.  She would, yes.

12  Q.  And are you aware if Marlo ever reapplied for a job at

13  Walmart?

14  A.  I am not aware of her ever reapplying at Walmart, no.

03:27  15  Q.  And did you communicate the decision on reinstatement to

16  Marlo or anybody in her family?

17  A.  Yes.  To Marlo and her family, excuse me?

18  Q.  Yes.

19  A.  No.  No.

03:27  20  Q.  And who did you communicate that to decision to?

21  A.  As my memory recalls, that was a conversation between myself

22  and either Robin or Kent, who would have been the store manager

23  and comanager at the time.  I can't specifically recall which

24  one, but it would be one of those two.

03:27  25  Q.  And was the instruction given to that person to then

706

1    communicate with Marlo or somebody about the decision that she

2    was not to be reinstated?

3    A.   Correct.  Yeah.  Again, similar to what we just did.  And we

4    had a very specific conversation about the difference and why

03:27    5    reinstatement wasn't an option; but rehire, absolutely.

6    Q.   And if I were to tell you that there's been testimony in

7    this case that someone told Marlo that she was --

8              MS. CARTER:  Objection.

9              MR. BULIOX:  I'm sorry?

03:28    10              THE COURT:  There's an objection.

11              MS. CARTER:  Objection, it's hypothetical, "if I were

12    to tell you."

13              THE COURT:  Can you rephrase?

14              MR. BULIOX:  Sure.

03:28    15    BY MR. BULIOX:

16    Q.   There's been testimony in this case that someone told Marlo

17    that she was not rehirable.  The idea that Marlo was not

18    rehirable, is that accurate?

19    A.   At the time that I was dealing with this, no, not at all.

03:28    20    She was absolutely rehirable.  Doesn't mean that she was

21    guaranteed a job, but she was absolutely rehirable and was

22    allowed to go through the process.

23    Q.   So if somebody told Marlo that she was rehirable is it

24    possible that that person misspoke?

03:28    25    A.   Can you restate the question one more time?

707

1   Q.   Yeah.   If someone told Marlo that she was not rehirable, is

2   it possible that she misspoke?

3   A.   Yes, absolutely.

4   Q.   And was that the direction that you gave?

03:28   5   A.   No, not at all.   The direction again was that she could not

6   be reinstated.   And unfortunately it's -- you know, I think, as

7   a matter of fact with this family in particular they were

8   misusing the words "reinstate" and "rehire" all the time.

9        So it's possible that they were, I don't know,

03:29   10  misinterpreting it or whatever, but, regardless, the direction

11  was not to reinstate, there was no reason for it, but that she

12  was qualified to reapply and be considered to be rehired.

13  Q.   Are you aware of associates who have been terminated for

14  attendance and have actually been rehired?

03:29   15  A.   Yes, absolutely.

16  Q.   Okay.   And were they all required to reapply?

17  A.   Yes.

18  Q.   At this point I want to show you Exhibit 1035.

19       THE COURT:   Has this been received?   Is there any

03:29   20  objection to it?   I see it's on the -- don't put anything up

21  unless it's received.

22       MR. HARLAN:   It's been received.

23       THE COURT:   Has it's been received?   Very well.   You

24  may publish it then.

25       (Exhibit 1035, Associates Terminated for Attendance

708

1  Who Reapplied [Dkt. 126-2], admitted previously by stipulation.)

2  BY MR. BULIOX:

3  Q.  Showing you what's been received as Exhibit 1035, do you

4  recognize what this is?

03:30  5  A.  Yes.

6  Q.  Okay.  And what is it?

7  A.  This would be a collaboration, an effort that went through

8  when we were going through this process to determine how many

9  people were actually rehired after being terminated for

03:30  10  attendance.  And, again, emphasis on rehired, not reinstated.

11  Q.  Can you walk us through real briefly the folks that have

12  been rehired --

13  A.  Sure.

14  Q.  -- and whether or not they reapplied?

03:31  15  A.  Yeah.  On the very top you have Joshua.  Or Joseph, excuse

16  me, I apologize.  So Joseph who was hired in November 6th, 2007,

17  after -- and then terminated on July 28th of 2016 for excessive

18  absences.

19       If you kind of walk through the different rows it

03:31  20  talks about the fact that, in the note section, he did reapply

21  and interviewed and was rehired for that specific position in

22  remodel setup.

23       If you kind of go through the different names, John

24  and through this page, it kind of goes through the same process.

03:31  25  Q.  Okay.  And then on the next page, same thing?

709

1    A.    Yup.  It outlines the same thing.  I think the only one I

2    would call out that's a little bit unique is on the very bottom

3    there's a Justin Straw.  He wasn't explicitly hired by us, he

4    transferred into this area from Arizona.  So, again, terminated

03:32  5    for excessive absence, rehired by a different store so we can't

6    speak to their specific process that they went through.  I would

7    assume that it was the same as everybody else in terms of

8    reapplying, interviewed, so on and so forth.  But he came to us

9    specifically through a transfer after being rehired by someone

03:32  10   in Arizona.

11   Q.    Okay.  And I think finally I want to show you Exhibit

12   Number 1034.

13         (Exhibit 1034, Applications of Comparators [D002880 –

14   D002900], admitted previously by stipulation.)

15   BY MR. BULIOX:

16   Q.    Do you recognize this document?  And if you want you can

17   look at the binder and scroll through it.

18   A.    Yeah, I see here.  This would be the actual application for

19   the first name that I referenced, Joseph.  This would be the

03:32  20   application he would have submitted to be rehired.

21         MR. BULIOX:  And, Tracy, can you scroll through just a

22   few pages of this document?  Keep going.  Keep going a little

23   bit more.

24   BY MR. BULIOX:

03:33  25   Q.    And is this another application?

710

1    A.  Yes, it is.  This also aligns with the summary that we just

2    reviewed.

3    Q.  So if we were to go through the rest of this document would

4    these be applications that people submitted in order to be

03:33   5    rehired?

6    A.  Correct.

7    Q.  And you indicated earlier that attendance is one of the more

8    common reasons for termination?

9    A.  Correct.

03:33   10   Q.  What is the most common reason for termination?

11   A.  Attendance.  But if I could clarify in a broad term, we

12   really have two or three different reason codes that all align

13   to attendance.  And it depends on what type of attendance issue

14   we have.  So we have attendance occurrences.

03:33   15          If you read the policy three no call/no shows equals a

16   termination.  We call it job abandonment, but that's still again

17   attendance, their inability to come to work.  So when you look

18   at those as a whole, attendance is by far the most common

19   termination reason.

03:34   20   Q.  And are you aware of any associate who's been given a set

21   permanent schedule of their preference?

22   A.  No.

23              MR. BULIOX:  That's all I have.

24              THE COURT:  Okay.  Cross?

03:34   25              MS. CARTER:  Yes.

711

1                    CROSS-EXAMINATION

2    BY MS. CARTER:

3    Q.  Mr. Spude.

4    A.  Hi.

03:34    5    Q.  You were just discussing a chart, Exhibit 1035, and it

6    listed associates who were terminated and then reapplied and

7    were rehired; right?

8    A.  Correct.

9    Q.  But you don't have any reason to believe those associates

03:34    10    received a call from a Walmart manager telling them that they

11    were not rehirable, do you?

12    A.  I'm not privy to any conversations they would or wouldn't

13    have had.  So to answer to your question, no.

14    Q.  We've seen Marlo Spaeth's availability forms many times

03:35    15    during this trial.  So we know that for many years her

16    availability stopped at 4 p.m.; right?

17    A.  Correct, yes.

18    Q.  But you are aware that after Marlo's termination Walmart

19    told the EEOC that Marlo Spaeth's customer service scheduling

03:35    20    availability form "had always indicated that she was available

21    during the hours of 12 p.m. to 6 p.m."

22                MR. BULIOX:  Objection, relevance.

23                MS. CARTER:  End quote.

24                THE COURT:  Overruled.

03:35    25    BY MS. CARTER:

1  Q.  You're aware that Walmart told that to the EEOC?

2  A.  I don't recall that specifically, no.  But I don't have any

3  reason to believe that you're not telling truth, so, no.

4  Q.  You testified as Walmart's corporate witness; correct?

03:35  5  A.  Correct.  A couple years ago, yes.

6  Q.  And at that deposition you told us that if there's a

7  conflict between the position statement and the availability

8  forms, the availability forms govern; correct?

9  A.  Yes.  I think I'm following you.  That's correct.

03:36  10  Q.  And in Walmart's position statement Walmart said that Marlo

11  Spaeth "had always indicated that she was available during the

12  hours of 12 to 6 p.m."

13  A.  Okay.

14  Q.  And would you agree that that statement is not true?

03:36  15  A.  I'd have to relook at her availability forms to be

16  100 percent accurate, but I believe that's accurate based on

17  what we just looked at.

18  Q.  So the statement was not true, was it?

19  A.  Again, I'd have to look at the forms to tell you for sure,

03:36  20  but, yes.

21  Q.  You can open your binder and take Exhibit 1 and then answer

22  my question.

23  A.  Can you remind me what the --

24  Q.  Exhibit 1.

03:36  25  A.  1001?

713

1          THE COURT:  It's the small binder.

2          MS. CARTER:  Plaintiff's Exhibit 1.

3          THE WITNESS:  Oh, this one.

4          MS. CARTER:  Yeah.

03:37  5          THE WITNESS:  Sorry.

6   BY MS. CARTER:

7   Q.  And you can use it to refresh your recollection.

8   A.  Yup.  So I can confirm based on the availability forms that

9   I looked at that Marlo Spaeth was not always available between

03:37  10  noon and -- I'm sorry, noon and 4:00 is what you said?

11  Q.  Between noon and 6 p.m.

12  A.  Between noon and 6 p.m., that is correct, yes.

13  Q.  So it's correct that the statement that Walmart made to the

14  EEOC was false.

03:37  15  A.  Yes.  If that statement you're reading is accurate then,

16  yes, it would be false.

17  Q.  Would it help to refresh your recollection if you reviewed

18  the statement --

19  A.  Certainly.

03:37  20  Q.  Flip to Exhibit 24.

21  A.  Okay.

22          (Exhibit 24, Walmart letter - EEOC00428-434, not

23  received in evidence.)

24  BY MS. CARTER:

03:37  25  Q.  Just use it to refresh your recollection.

714

1   A.   Do you want to guide me specifically to save time?

2   Q.   The page that says at the bottom EEOC00430.  And look at the

3   second paragraph under section B, the last sentence.  No, the

4   last sentence of the second paragraph of section B.

03:38   5   A.   I'm reading to get the context.  So it says, yes, she has

6   always been available or has always indicated that she was

7   available during the hours of noon to 6 p.m.  So I see what

8   you're saying, yes.

9   Q.   Okay.  So you're aware that after Marlo Spaeth's termination

03:38   10   Walmart told the EEOC that Marlo Spaeth's availability -- that

11   Marlo "had always indicated that she was available between the

12   hours of 12 p.m. and 6 p.m."?

13   A.   Yes.

14   Q.   And that statement was false.

03:39   15   A.   Yes.  And using the word "always" as meaning forever, that

16   would be false, yes.

17   Q.   And we took a look at Exhibit 1005 a few minutes ago.  We

18   saw that.  And we don't need to pull it up, but it's the little

19   document that said it was an electronic form that said that

03:39   20   Marlo Spaeth was available from 9:00 to 6:00 since 2012.  Right?

21   A.   I believe so, yes.  It was the first line, yeah.

22   Q.   But you don't know who entered that information into

23   Walmart's system, do you?

24   A.   No.

03:39   25   Q.   And this record -- that record is not consistent with the

715

1    signed availability forms that were in Marlo Spaeth's file.

2    A.  Unfortunately, and this is one of the reasons that we

3    transition to digital tiles to begin with.

4    Q.  It's a yes-or-no question.

03:39    5    THE COURT:  Just answer her question.  And the

6    attorneys can come back and ask you for --

7    THE WITNESS:  Sure.  Just restate your question.  I

8    apologize.

9    BY MS. CARTER:

03:40    10    Q.  So the record, that notation in the electronic system, was

11    not consistent with the availability forms, the signed

12    availability forms that were in Marlo Spaeth's file; correct?

13    A.  Correct.

14    Q.  Now, let's take a look at Exhibit 11.

03:40    15    MS. CARTER:  Lectrice, could you pull up Exhibit 11

16    for us.

17    BY MS. CARTER:

18    Q.  A few moments ago -- and if you look at the second page.  A

19    few minutes ago you told us --

03:40    20    MS. CARTER:  The second page, Lectrice, please, for a

21    second.

22    BY MS. CARTER:

23    Q.  A few minutes ago you zoomed in on the "watch how long break

24    is" note on this page; right?

03:40    25    A.  Uh-huh.

716

1    Q.  And you said that that note indicated that Marlo Spaeth had

2    poor attendance even then.

3    A.  I think my direct testimony was that she had a difficulty

4    following her scheduled shifts.

03:41    5    Q.  Difficulty with attendance.  Difficulty following her

6    scheduled shifts.

7    A.  I'm sorry, I didn't mean to talk over you.

8            In this specific example when he asked me what this

9    interprets, I specifically said she has a hard time following

03:41    10    her scheduled shifts.

11            MS. CARTER:  Lectrice, could you please go to the

12    first page of that form?  This is Marlo Spaeth performance

13    evaluation, Exhibit 11.  And can you zoom in on that

14    second-to-last paragraph at the bottom of the page.

15    BY MS. CARTER:

16    Q.  Mr. Spude, do you see the paragraph that I'm talking about,

17    the dependability section?

18    A.  Yes, I do.

19    Q.  Can you read that for me?

03:41    20    A.  It says, "Attendance and punctuality is within acceptable

21    company guidelines.  Days absent, zero; days tardy, zero."

22    Q.  Days absent, zero; days tardy, zero.  Yes?

23    A.  Correct.

24    Q.  And do you see an X a little bit to the right of the zero?

03:41    25    It's a shaded area.

717

1   A.  It's hard to see, but, yes, I see it.

2   Q.  And if you follow that X to the top of the form --

3           MS. CARTER:  Lectrice, you can get rid of the callout.

4   BY MS. CARTER:

03:42   5   Q.  If you follow the X to the top of the form, you can see that

6   the X for Marlo Spaeth's attendance is in what column?

7   A.  In the meets -- oh, it's in exceeds, sorry.  It's in

8   exceeds.

9   Q.  It's in the exceeds column, yes?

03:42   10  A.  Correct, yes.

11  Q.  Okay.  And let's take a look at Marlo Spaeth's performance

12  evaluation from 2014.

13          MS. CARTER:  Lectrice, could you please pull up

14  Exhibit 17.

03:42   15  BY MS. CARTER:

16  Q.  A few moments ago you told us that Marlo Spaeth had poor

17  attendance between -- for the full-time between 2012 to November

18  2014, before the schedule change.

19  A.  Correct.

03:42   20  Q.  But let's take a look at the last page of her 2014

21  performance review.

22          MS. CARTER:  Lectrice, can you go to the last page of

23  the exhibit?  And can you zoom in on the manager comments

24  section, particularly the part regarding Marlo Spaeth's

03:43   25  attendance.

718

1    BY MS. CARTER:

2    Q.   Okay.  Mr. Spude, can you read the last line of the manager

3    comment section for me?

4    A.   It says, "Marlo has zero active absences in a six-month

5    rolling period."

6    Q.   Thank you.  Okay.  So let's talk about what happened after

7    the meeting with Amy Jo Stevenson in July 2015.

8              So after the July 16th meeting that Amy Jo Stevenson

9    had with Walmart managers, Robin Castro emailed you to tell you

10   what happened; right?

11   A.   Yes.

12   Q.   So, Mr. Spude, you knew that Marlo Spaeth's rights under the

13   ADA were discussed at that meeting; right?

14   A.   They were put into question by her family, yes.

15   Q.   So you knew that Marlo Spaeth's family had raised Marlo

16   Spaeth's rights under the ADA in that meeting.

17   A.   Again, they put them into question, yes.

18   Q.   So you were aware of that.

19   A.   Yes.

20   Q.   And you knew that because Robin Castro told you.

21   A.   Yes, as you established earlier they sent me an email.

22   Q.   And after her -- after you received Robin Castro's email you

23   told her to cut off communications with the family.

24   A.   With the family specifically, yes, at that time.

25   Q.   But you knew this was an ADA issue; right?  Or a disability

1    issue?

2    A.  Again, I knew that the family raised concerns about it, yes.

3    I didn't say it was an issue, I said the family raised concerns

4    about it.

03:45    5    Q.  Okay.  You were aware that the family had raised concerns

6    about Marlo's rights under the ADA.

7    A.  Yes.

8    Q.  And because of that you told Robin Castro to contact the

9    legal hotline?

03:45    10    A.  Yes.  Our legal and ethics hotline.  Again, my reaction to

11    it was we need to do a formal investigation which was the ethics

12    investigation that we referenced earlier.

13    Q.  It's a yes or no.

14    A.  Yes.  I just think the context is important.

03:45    15    Q.  Okay.  If it's a yes-or-no answer -- question, though,

16    please try to keep it to.

17    A.  Yes.

18    Q.  Okay.  But Walmart -- so you told Robin Castro not to

19    communicate with the family any further; right?

03:45    20    A.  At that moment in time, yes.

21    Q.  And you follow Walmart's policies; right?

22    A.  Yes.

23    Q.  But doesn't Walmart's accommodation policy say that

24    communications with the family are okay?

03:46    25    A.  In the event of a requested accommodation, yes.  In this

720

1    case it wasn't an accommodation request, so it wasn't deemed at

2    that point.

3    Q.   Mr. Spude, it was a yes-or-no question.  So, yes,

4    communications with the family are okay?

03:46    5    A.   In the event of an accommodation request, yes.  Again, I

6    need to add context to the question that you're asking.

7    Q.   In the event that a person's, for example, right to a

8    reasonable accommodation under the ADA would be raised?

9    A.   In the event that someone raised an accommodation request a

03:46    10    family can do that, and consequently we can converse with that

11    family, yes.

12    Q.   And you are familiar with the accommodation policy and so

13    you know that it doesn't say anything about the family member

14    having to be a legal guardian, does it?

03:46    15    A.   For an accommodation request again?  No, it does not.

16    Q.   Okay.  So in 2015 you oversaw more than 20 Walmart stores;

17    right?

18    A.   Correct.

19    Q.   And now you're overseeing a couple of regions; is that

03:47    20    correct?

21    A.   One region, 114 stores.

22    Q.   And so as a person who oversees so many stores, you know

23    that it's illegal to discriminate against employees with

24    disabilities; right?

03:47    25    A.   Very much so, yes.

721

1  Q.  And you also know that the law does require making

2  reasonable accommodations for employees with disabilities;

3  right?

4  A.  Very much so, yes.

03:47  5  Q.  Okay.  And you knew that in 2015.

6  A.  Absolutely, yes.

7  Q.  Mr. Spude, can you turn to Exhibit 31 in the plaintiff's

8  binder.

9  A.  In the small binder.

03:47  10  Q.  Yes.

11  A.  31 you said?

12  Q.  Uh-huh.

13        MS. CARTER:  And Lectrice, can you pull that up for

14  us?  Page 2 of Exhibit 31.

15        (Exhibit 31, Accommodation Management Guidelines MHRM

16  30(b)(6) Dep. 71, admitted previously by stipulation.)

17  BY MS. CARTER:

18  Q.  Mr. Spude, you were aware that Marlo Spaeth had Down

19  syndrome; right?

03:48  20  A.  It depends on when you're asking.  I mean, I wasn't

21  initially made aware, no.  But throughout the course of this

22  whole proceeding with the ethics investigation I became aware of

23  it, yes.

24  Q.  So in 2015, as of July 2015, you knew that Marlo Spaeth had

03:48  25  Down syndrome.

722

1    A.   I don't know that I can testify to that, no.  I mean --

2    Q.   Okay.  Before September.

3    A.   Through the ethics investigation, which started I wanna say

4    the end of July, it was after termination date, but end of July

03:48  5    into August I became aware of that, yes, she had Down syndrome.

6    Q.   So before if the decision not to reemploy Marlo Spaeth in

7    September 2015, you knew she had Down syndrome.

8    A.   Yes, correct, that is accurate.

9         MS. CARTER:  And, Lectrice, can you Zoom in on the

03:49  10    first sentence in the step 2 at the bottom of the page?  Step 2

11    section?  Or call it out.  Okay.

12    BY MS. CARTER:

13    Q.   Mr. Spude, can you read that line for me?  The first

14    sentence.

03:49  15    A.   Yup.  It says, "If the associate's disability or medical

16    condition is known or otherwise obvious, the people manager/HR

17    manager/MHRM should not request additional medical information."

18    Excuse me, sorry?

19    Q.   No, I'm sorry, I believe you misread.  You're on page D1997;

03:49  20    right?

21    A.   I'm just reading what you have highlighted on the screen

22    right here.

23    Q.   Yes, but you misread it so can you read it again?

24    A.   "If the associate's disability or medical condition is known

03:50  25    or otherwise obvious, the people manager/HR manager/MHRM should

723

1    not request medical information."

2    Q.  Thank you.

3    A.  Okay.

4    Q.  And you are familiar with that policy?

03:50  5    A.  Yes.

6    Q.  And you were familiar with that policy in 2015.

7    A.  Yes.

8    Q.  And the MHRM, that stands for market human resources

9    manager?

03:50  10   A.  Correct, yes.

11   Q.  And that's you.  Well, that was you.

12   A.  In 2014 and '15 yes, it was me.

13   Q.  Mr. Spude, have you received any criticism about your

14   handling of the events surrounding Marlo Spaeth's termination?

03:50  15   A.  I have not received any, no.

16   Q.  And, in fact, you've been promoted; right?

17   A.  I have been promoted since this event, yes.

18   Q.  You spoke earlier about how you would have enforced

19   Walmart's attendance policy against Marlo Spaeth.

03:51  20   A.  How I would have or how I did?

21   Q.  How you did.  Okay, you spoke earlier about how you did

22   enforce Walmart's attendance policy against Marlo Spaeth.

23   A.  Yes, as a result of the ethics investigation I upheld the

24   decision to terminate.

03:51  25   Q.  But what about Walmart's accommodation policies?

724

1    A.  What's your question?  We have accommodation policy.  Is

2    that your question?

3    Q.  Well, earlier you testified -- I'll withdraw the question.

4            But earlier you testified that you had never seen

03:51   5    Walmart give a scheduling accommodation in real life.

6    A.  I think I can further clarify that I've never seen a

7    long-term permanent scheduling accommodation, yes.

8    Q.  Okay.  But Walmart's accommodation policies do contemplate

9    set schedules; right?

03:51   10   A.  They contemplate offering short-term minor changes or

11   adjustments to availability or preferences, but in no way are we

12   obligated in any way to offer permanent long-term scheduling

13   changes.

14   Q.  Mr. Spude, that wasn't my question.  So if you flip to

03:52   15   Exhibit 30.  You can refresh your recollection.

16   A.  Sure.

17   Q.  By looking at the second page of the exhibit under the

18   scheduling.  Few points down where it says "scheduling."

19   A.  I see it.

03:52   20   Q.  So the Walmart accommodation policies do discuss short-term

21   scheduling and long-term scheduling as possibilities; correct?

22   A.  So first off we're looking at the guidelines, not the

23   policy.  So I know I testified that there's a difference between

24   the guidelines and a policy.  I can expand if you'd like, but

03:52   25   I'm trying to stick to your answers here.

725

1    Q.   Walmart's guidelines --

2    A.   Yes.

3    Q.   -- say that short-term scheduling accommodations are a

4    possibility; correct?

03:53    5    A.   As I've stated earlier, short-term changes are a

6    possibility, yes.

7    Q.   But they also say that long-term scheduling accommodations

8    are a possibility; correct?

9    A.   You'll have to refresh my memory.  I don't recall that at

03:53    10    all.

11    Q.   The guidelines say that any request for a long-term schedule

12    accommodation should be forwarded to the Accommodation Services

13    Center; correct?

14    A.   I'd have to be pointed out to confirm that but --

03:53    15         The ASC will consider all kinds of requests,

16    specifically.  The guidelines give -- that we're looking at

17    right now -- give most common types of requests to help an

18    associate or manager kind of go through the process.  And the

19    specific point that you're referencing, scheduling, it

03:53    20    specifically says minor changes to availability and scheduling

21    preferences does not include approvals of set schedules,

22    guaranteed hours, or creating special schedules.

23    Q.   Yes.  And then the guidelines say that anything that cannot

24    be approved in the store should be referred to the Accommodation

03:54    25    Services Center; correct?

726

1    A.  Sure, in the event that there's a formal accommodation

2    request that we can't meet through a job aid, then, yes, we

3    would handle through the service center.

4    Q.  Mr. Spude, I'm going to stop you there.  That's not what the

5    guidelines say.  The guidelines say -- okay.

6    A.  I'm repeating what you just said.

7    Q.  Can you read for me the section on the first page called

8    "Identifying a Request For Job Assistance."

9    A.  Okay.  I see it.

10   Q.  Can you read it for me?

11   A.  Yes.  "An associate may request job assistance in a variety

12   of ways.  She or he may make a special request directly, or a

13   family member, friend, job coach, health professional, or other

14   person, may make a request on an associate's behalf.  The

15   request may be made verbally or in writing.  The request does

16   not have to include the words 'reasonable' or 'accommodation.'

17   For example, request to return from leave of absence with

18   restrictions should be treated as a request for accommodation.

19   If an associate tells you that he or she is having trouble doing

20   his or her job because he or she is unable to read fine print,

21   consider that a request of job assistance.  Likewise if an

22   associate's spouse calls you to say that the associate will be

23   returning to work but may need to due to a broken foot, consider

24   it a request for job assistance."

25   Q.  Mr. Spude, that's enough.  Thank you.  Now, did you see

727

1   anything in there about a request having to be a formal written

2   request for accommodation?

3   A.  No.

4   Q.  Mr. Spude, I'd like to turn your attention to Exhibit 29.

03:55  5   And you can go to the second page.  These are -- this is

6   Walmart's accommodation employment and medical related policy;

7   correct?

8   A.  Correct.  This is not the guidelines, this is now the formal

9   policy, yes.

03:55  10  Q.  And this is the policy that applied in Wisconsin in 2015.

11  A.  Correct.

12  Q.  And if you turn to the second page of that policy and you

13  look at the fourth bullet point down.

14  A.  Under which heading am I looking at?

03:56  15  Q.  Under the heading of "Eligibility For Reasonable

16  Accommodation Due to Disability."

17  A.  Under the "reasonable accommodations can include" portion?

18  Q.  Yes.  Reasonable accommodations can include.

19  A.  Okay.

03:56  20  Q.  Can you read for me the fourth bullet point?

21  A.  "Providing part-time or modified work schedules."

22  Q.  Or modified work schedules.

23  A.  Correct.

24  Q.  Okay.  Thank you.  Just a few more questions for you.

03:56  25         So, Mr. Spude, you've told us that you've never seen

1    Walmart give a long-term modified schedule.

2    A.   Correct.

3    Q.   A modified work schedule.  You've never seen it.

4    A.   I specifically stated I don't see a long-term permanent

5    schedule.  I did testify that it's very common to make one-off

6    scheduling modifications in situations all the time; doctors

7    appointments, child care situations, yes.

8    Q.   But I'm talking about an actual modified schedule.

9    A.   If you can clarify context, what you mean by modified.

10   Again, I've just established the context itself.  I haven't seen

11   long-term permanent modified schedules, no, as a form of

12   accommodation.  But, again, short-term, happens all the time,

13   yeah.

14   Q.   But there's nothing in Walmart's policy that says that

15   long-term modified schedules will not be provided.  That's

16   correct.

17   A.   I believe I just read it to you in the guidelines

18   specifically.

19   Q.   No, what I'm saying is there's nothing that says that they

20   are not provided.

21   A.   Not that I can recall in the policy itself outside of what

22   I've already read to you, no.

23           MS. CARTER:  Okay.  No further questions.

24           THE COURT:  Any redirect?

25           MR. BULIOX:  Yeah, just a few questions.

729

REDIRECT EXAMINATION

BY MR. BULIOX:

Q.  So, Mr. Spude, we talked about availability forms and what was there and what wasn't there.  In your experience in HR have you ever seen the occasion in which documents are missing from a personnel file?

A.  Yeah, it's very common.  You know, one of the reasons that we decide as a company to switch heavily to digital is because papers unfortunately get ripped, torn, misplaced.

In stores we, especially in 2014 and 2015, not only did we have 2 to 300 associates, but we had retained files for everyone who had previously worked there.  It's very common that papers would get put in the wrong file or wouldn't get filed at all for some reason.  And so since we've obviously gone all digital for that very reason.  So it is common, unfortunately, to maybe pieces of paperwork missing in a file.

Q.  What about availability forms specifically, have you ever had the occasion to notice those forms missing?

A.  Yes.  And unfortunately one of the more common examples of it, and the reason is in most stores, and in Manitowoc I confirm this to be the case as well, they left availability forms available for associates to grab and use as they need to see fit.

And so they could change their availability and bring it to a manager.  That manager may or may not be in the office

1    to get them filed and so they would sign off and it would be

2    common they set them on a piece of paper on a desk or whatever.

3    And so it was common that it wouldn't be filed appropriately

4    given the nature of that exchange.

03:59    5    Q.   The EEOC directed your attention to EEOC Exhibit 24.  Let's

6    pull that one out and go over something that they did not point

7    out.

8              MS. VANCE:  And, Your Honor, that's not to be

9    published at this point.

03:59    10              MS. CARTER:  It's not in evidence.

11              MR. BULIOX:  Sorry.

12    BY MR. BULIOX:

13    Q.   So looking at this document, this is the one you were

14    testifying about earlier; correct?

04:00    15    A.   Correct.

16    Q.   Okay.  And this is a letter that was written not by Walmart;

17    correct?

18    A.   Correct.

19    Q.   Okay.  It was written by a law firm?

04:00    20    A.   A law firm representing Walmart, but, yes.

21    Q.   And the name to have that law firm was what?

22    A.   Littler.

23    Q.   And do you see where it says in the footnote that this

24    response is based upon --

04:00    25              MS. CARTER:  Objection, hearsay.

731

1                    THE COURT:  Overruled.

2    BY MR. BULIOX:

3    Q.  Do you see where it reads in the footnote that "this

4    response is based upon our understanding of the facts and the

04:00   5    information received thus far"?

6    A.  Yes.

7    Q.  And going down a little bit further in the same footnote in

8    this document which is on the first page, do you see where it

9    says, "Because additional facts likely would be uncovered

04:01  10    through discovery or following a full investigation, Walmart in

11    no way waives its right to present new or additional information

12    at a later date for substance or for clarification"?

13    A.  Yes.

14    Q.  Okay.  There was -- you can put that document down.

04:01  15              There was some discussion on availability.  Does

16    availability for an associate trump scheduling?

17    A.  No.  Quite frankly, again, the only relationship it has, it

18    tells us when they're available to work, not when they're going

19    to work.

04:01  20              For example, it's very common in a store for someone

21    to have an availability from 8 a.m. to 8 p.m.  It just means

22    they can work anytime between those timeframes.  It doesn't mean

23    they literally work a.m. to 8 p.m. every day.

24    Q.  So availability forms, are they a guarantee of a set

04:02  25    schedule?

732

1   A.   No.   As a matter of fact, if you read it I believe it

2   explicitly calls out the fact this is not a guaranteed schedule

3   at all.

4   Q.   Okay.   And EEOC showed you some evaluations.   Let's pull up

04:02   5   EEOC Exhibit 11.   Do you remember going through this moments

6   ago?

7   A.   Yes.

8   Q.   And EEOC pointed out the section towards the bottom,

9   dependability?

04:02   10   A.   Yes.

11         MR. BULIOX:   Tracy, can you call out that section?

12   BY MR. BULIOX:

13   Q.   And they pointed out to you that Marlo had days absent, zero

14   and days tardy, zero?

04:03   15   A.   Yes.

16   Q.   Okay.   Does this section concern work breaks?

17   A.   It does not.

18         MR. BULIOX:   Let's go to the second page of this

19   document.

04:03   20   BY MR. BULIOX:

21   Q.   Okay.   And under "Areas of Improvement" were work breaks

22   cited as a area of concern?

23   A.   It is.

24   Q.   Were any of the ADA issues you talked about the family

04:03   25   raising that led to the red book investigation a request for a

733

1    reasonable accommodation?

2    A.   No.  I think that's the biggest thing I wish I could get

3    further out here.  But through that entire exchange, whether

4    it's from Robin having the conversations or exchange with me, at

04:04    5    no point was any interpretation of an accommodation request

6    given.  It clearly wasn't formal, nor does it's have to be as

7    they point out, but in no point was it ever interpreted in any

8    way to be an accommodation.

9            As you can see in the email that I responded to, she

04:04    10   interpreted it as sheerly a threat.  There was clearly some

11   query going on about why can't she do this or why can't we do

12   that.  That's very common at Walmart.  We change a lot all the

13   time.  And we clearly talk about the fact that it's important to

14   explain the why.  So we explained to Marlo why she's being

04:04    15   terminated and why she's being held accountable and why we can't

16   switch her schedule.

17           At no point did that query of why be interpreted as an

18   accommodation request to come back or to change her schedule.

19   Would it have been an accommodation request we would have

04:04    20   utilized those guidelines and policies at a much higher degree

21   of -- obviously more than we did to this point.  We would have

22   consulted our ASC.  It was never interpreted that.

23           We clearly did see the threat or hear their

24   interpretation of a threat which is why we got ethics involved

04:05    25   and wet through a thorough investigation on that concern.  But

734

1    ASC, the Accommodation Service Center was never involved and

2    those guidelines for accommodation weren't involved because

3    there was never an interpretation of an accommodation request.

4    Q.   And just to be clear, what was the threat exactly?

5    A.   The threat was perceived to be legal action if we didn't

6    follow their bidding or what they desired to see happen.

7    Q.   Okay.   And earlier -- and this is -- I got one or two more

8    questions -- there was a reference to policies that mentioned

9    unknown and otherwise obvious medical conditions and whether or

10   not, you know, people need to forward those on to accommodation?

11   Do you recall that testimony?

12   A.   Yes.

13   Q.   Was there any obvious connection between Marlo's attendance

14   issues and her Down syndrome?

15   A.   No.   I mean at this point we've looked, she had multiple

16   years of service with the company.   And as I stated earlier

17   there was attendance concerns, but never did it reach the point

18   of having any kind of termination -- terminable offense.

19            So, yeah, we've had a history built up that this

20   wasn't a major problem and that's why it wasn't deemed to be

21   something that was requested or necessary at the moment it was

22   happening.

23   Q.   So there was no connection, from your standpoint, between

24   her attendance and her Down syndrome.

25   A.   No.

735

1    Q.  All right.

2            That's all I have.

3            THE COURT:  Okay.  Thank you, Mr. Spude.  You can step

4    down.

04:06  5            THE WITNESS:  Thank you.

6            (Witness excused at 4:06 p.m.)

7            THE COURT:  Next witness?

8            MR. BULIOX:  We close.

9            THE COURT:  Rest.  Okay.  Any rebuttal?

04:06  10            MS. VANCE:  No, Your Honor.

11            THE COURT:  The evidence is complete.

12            Ladies and gentlemen, we're going to break.  Hope you

13   don't mind, we're going to send you home early today.  We're

14   going to work on the jury instructions.  Please be back at -- I

04:06  15   think 9:00 tomorrow.  And we will -- at that time you'll hear

16   the closing instructions, you'll hear the arguments of counsel,

17   and then you'll receive the case for your deliberations.

18            You don't have to take your notepads back in when you

19   come tomorrow because you're done hearing evidence.  Whatever

04:07  20   notes you have of the evidence, that's the evidence.  And then

21   you'll get copies of the instructions and you'll hear the

22   arguments of the attorneys and then you'll go from there.

23            So have a good evening, continue to follow the

24   cautionary instruction of not discussing the case, and we'll see

04:07  25   you tomorrow.  Safe travels.  Hope the storm is over.

736

1       (Jury out at 4:07 p.m.)

2           THE COURT:  Okay.  In terms of the record, we're

3   outside the presence of the jury.

4           I do want to note that the basis for overruling the

5   objection to the reading of the footnote was Rule 106, remainder

6   of related writings or recorded statements, also known as the

7   rule of completeness.  If a statement is partially read and

8   something else needs to be read to be fair and to put it in

9   context, it's admissible even if it otherwise would be hearsay.

10          And that was my ruling on allowing the rest of the

11  footnote.  I think the footnote that specifically qualifies what

12  was read needed to be read in order for fairness, the reading of

13  the part that the EEOC read, to be fair.

14          Okay.  Anything else anyone wishes to put on the

15  record?

16          MR. BULIOX:  Yes, Judge.  So one of the demonstratives

17  that we offered was the work schedule for the years 2012 through

18  '14.  And we offered it as a visual aid demonstrative for the

19  jury, but our witness was able to lay foundation that it's a

20  summation of a voluminous record and he related that summation

21  to the attendance records that he testified about.  I think it's

22  Rule of Evidence 1006, I believe.

23          THE COURT:  Summary of a voluminous record.  Is there

24  any objection to -- whether it's seen as demonstrative or not,

25  does it matter?

1      It shows she worked on Thursdays as well as other days

2  during the week.

3      MR. BULIOX:  Yeah, miscellaneous days.  So we would

4  under this rule move that that exhibit be admitted.

5      (Exhibit 1070, Demonstrative Relating to Schedule,

6  offered in evidence.)

7      THE COURT:  Okay.  Any objection to the -- say the

8  exhibit number again?

9      MR. BULIOX:  1070, I believe.

04:09  10      THE COURT:  1070.

11      MR. MULAIRE:  Your Honor, first of all, the evidence

12  is closed.

13      Second, I don't think these records are particularly

14  voluminous.  This is just intended as a more persuasive display

04:10  15  of the information they want to point out to the jury so I don't

16  think it's a proper application of that rule.

17      MR. BULIOX:  I can tell you, Judge, those records took

18  us a very long time to read through.  You know, they're several

19  pages long.

04:10  20      THE COURT:  You can use it as a demonstrative exhibit.

21  I don't think anyone's challenging how accurate it is.  I

22  honestly don't think this makes much difference.  I think we're

23  fighting over something pretty fictional.  If it becomes an

24  issue you can point to the exhibit in front of the court of

04:10  25  appeals.

738

1    But it seems to me, you know, we closed evidence,

2    let's just leave it as a demonstrative.  But you can use the

3    demonstratives in your closing argument to the jury.  And I

4    didn't hear anyone challenge its accuracy.  So I don't think it

04:10   5    really much matters whether it's received as an exhibit into

6    evidence or whether it's simply a demonstrative to make the

7    argument to the jury.

8    And I think the information is certainly part of the

9    record for the court of appeals to consider should the case go

04:11   10   further.

11   MR. BULIOX:  All right.

12   THE COURT:  Okay.

13   MR. HARLAN:  Judge, we want to make our Rule 50

14   motion.

04:11   15   THE COURT:  Sure.

16   MR. HARLAN:  Although perhaps the prospects are not

17   great based on your comments to the jury as they were leaving.

18   But, in any event, for the record we --

19   THE COURT:  You didn't want me to tell them not to

04:11   20   come.

21   (General laughter.)

22                    RULE 50 MOTION

23   MR. HARLAN:  So we would move for judgment as a matter

24   of law as to all the claims --

04:11   25   THE COURT:  You can remain standing for your argument,

739

1          the rest of us can be seated.

2                   MR. HARLAN:  Okay.  So as an initial matter, I think

3          all of the EEOC's claims fail because of their failure to show

4          that Ms. Spaeth was a qualified individual at the time of any

04:12   5          employment action.

6                   There's been undisputed evidence in the record of her

7          attendance failings, her inability to work a fluctuating

8          schedule.  And while she may have been able -- I think there was

9          evidence clearly that she could do the tasks associated with her

04:12  10          sales associate position, the record is pretty clear that she

11          did not have the ability to perform and fulfill her shifts.  She

12          left on a regular basis even before her schedule change.

13                   And so, therefore, I think she doesn't meet the

14          definition of a qualified individual which would give her

04:12  15          standing to bring claims for discriminatory discharge,

16          reasonable accommodation, or failure to rehire.

17                   In addition, with respect to the -- and, of course,

18          the appropriate time is when these decisions were made.

19                   With respect to the reasonable accommodation claim,

04:13  20          there's been no evidence.  No reasonable jury could find that

21          there has been a failure to provide a reasonable accommodation.

22          Again, based on the fact that she's not qualified, there's been

23          no medical evidence provided by Ms. Spaeth, or anybody on her

24          behalf, to her need for an accommodation.

04:13  25                   I think the evidence that has come into the record is

740

1    clear that Walmart was not aware that there was any need for

2    accommodation or any linkage between her attendance issues --

3    her attendance issues and her -- any limitation arising from her

4    Down syndrome condition, which is I think the appropriate

5    standard.

6         We have cited to the Court on a number of occasions

7    the *Ekstrand* case, which is prevailing law here in the Seventh

8    Circuit, that in situations like this when there is a limitation

9    that a individual has that supposedly gives rise to some sort of

10   sought accommodation, there needs to be corroboration for that

11   request.  That is at this point blackletter law in the Seventh

12   Circuit.  It's been followed by a number of decisions.  I think

13   there was a case, *Cloe*, C-l-o-e, and I think there was a case

14   *Wells vs. Winnebago County* that basically applied the same rule

15   of law.

16        The evidence is also clear that there's been no

17   evidence that there was an actual need for the particular -- the

18   only I guess accommodation that has been put into the record

19   which is basically allowing her to work from noon to 4:00.  It's

20   undisputed that even prior to her schedule changing she had a

21   extensive number of unauthorized early departures from work,

22   even before her schedule changed.  So that evidence undermines

23   the proposition that her new schedule is what prompted her

24   leaving work early and failing to follow the attendance policy.

25        There's absolutely no evidence in the record that

741

1    Walmart knew that the request to go back to her noon to 4:00

2    schedule was on account of her Down syndrome or some limitation

3    associated with her Down syndrome.  And while it may be obvious

4    that she has Down syndrome, the evidence in the record from all

04:15    5    of the witnesses and all of the documentary evidence that you

6    received, is that nobody at Walmart understood that she had some

7    sort of limitation associated with her Down syndrome that

8    necessitated some sort of reasonable accommodation.

9           With respect to her discriminatory discharge claim,

04:16   10    there's absolutely no evidence of discriminatory intent; no

11    evidence that but for her limitation arising from her Down

12    syndrome that she would still be employed there.  She had

13    egregious violations of the company's attendance policy which

14    serve as a legitimate nondiscriminatory explanation for the

04:16   15    action that was taken, her discharge.

16           There's also no evidence, even if based on the current

17    instruction that the Court has, that, I guess, another basis for

18    discriminatory discharge claim is Walmart's unwillingness or

19    lack of desire to provide her with an accommodation.  There's no

04:16   20    evidence that that was the basis for any determination to

21    terminate her employment.  Again, the record is pretty clear

22    that the decision was made based upon the extensive -- I think

23    she had 17 occurrences at the time of her termination.  Nobody,

24    based on the evidence that's in the record it's undisputed, has

04:17   25    ever had anywhere near that number of occurrences and kept their

742

1    position at Walmart.

2           There has been no evidence of comments, no evidence of

3    inconsistent reasons or explanations for its decision.

4           So on the basis of all the evidence that's in the

04:17    5    record, no reasonable juror could possibly find that she was

6    discriminated against based upon her disability, a limitation

7    connected to that disability, or because of a purported need for

8    an accommodation.

9           We also move for judgment as a matter of law on the

04:17    10   rehire claim.  Again, she's not a qualified person under the

11   meaning of the ADA.

12          There's also no evidence whatsoever that she submitted

13   an application and sought to be rehired.

14          There's absolutely no evidence in the record that she

04:18    15   pursued reemployment other than to, through her sister, demand

16   that she be reinstated.  But that was not an application.  Under

17   prevailing Seventh Circuit law in order to have that claim she

18   has to demonstrate that she sought to be rehired by submitting

19   an application.

04:18    20          And then, finally, of course, there's absolutely no

21   evidence that her Down syndrome condition, or any limitation

22   associated with it, is the reason that she wasn't reemployed or

23   rehired at Walmart.  The simple fact is that the company

24   conducted an investigation, determined that there was a

04:19    25   legitimate basis for its discharge decision, upheld that

1    discharge decision, and decided not to reinstate her.

2            There's no evidence that frankly anybody who's been

3    reinstated under any condition, there's absolutely no

4    comparative data whatsoever or evidence that's been put into the

04:19    5    records of nondisabled individuals who have been reinstated for

6    engaging in comparable conduct to Ms. Spaeth.

7            Finally, we also ask for judgment as a matter of law

8    on the issue of punitive damages.  It's very clear that in order

9    to be entitled to punitive damages the EEOC was obligated to

04:19   10    prove that the company's actions with respect to Ms. Spaeth were

11    done with reckless disregard for her rights under the law.

12    There's no evidence of that.  This is obviously a very nuanced

13    situation.  So even if it goes to the jury, we're talking about

14    a situation where it is not at all clear that Ms. Spaeth's

04:19   15    condition had anything to do with her failure to follow the

16    attendance policy.

17            We still have not heard a specific limitation that she

18    supposedly had that is responsible for her failure to follow the

19    attendance policy.

04:20   20            So in a situation like that, I think the evidence does

21    not support the proposition or a finding by the jury that

22    individuals who are managerial employees at Walmart could have

23    possibly formed the requisite intent that is required in order

24    to have punitive damages assessed against the company.

04:20   25            There was no knowing violation of the ADA.  In fact,

744

1    there was absolutely no request for a reasonable accommodation

2    from Ms. Spaeth.  And then the accommodation request, if at all,

3    that was made by Ms. Spaeth's sister, happened after the

4    termination decision, after her employment had already ended.

5    And it's clear that there was no request for accommodation in

6    connection with an application process.  She was talking about a

7    second chance which, as a matter of law, is not something that

8    the ADA requires employers to do.

9        Even in situations where the employee's disability has

10   some causal link to their discharge in the sense that something

11   about their disability played a role in the conduct that they

12   committed that led to their discharge, under prevailing Seventh

13   Circuit law that is not a basis for a liability finding.

14       So that is the sum total of our arguments.  We also

15   incorporate by reference in terms of our Rule 50 motion the

16   earlier Rule 50 motion that we filed with the Court that's been

17   e-filed on the docket.  Thank you.

18       THE COURT:  Thank you.  Mr. Mulaire?

19       MR. MULAIRE:  Thank you, Your Honor.  So we oppose all

20   of their motions.

21       With respect to the failure to accommodate claim, you

22   know, I appreciate there are arguments that the defense has and

23   I realize they are ones that the jury could permissibly credit,

24   but there are certainly disputes of fact on all of the elements

25   of all of these claims.

745

1    With respect to the element of whether Ms. Spaeth was

2   a qualified individual, obviously the dispute here centers

3   around whether or not her early departures were truly something

4   that rendered her unqualified.

04:22   5    The evidence that it wasn't was that for many years,

6   as we just heard from the last witness -- maybe it wasn't the

7   last witness -- but, you know, she received satisfactory

8   performance appraisals, and the company itself assessed her

9   attendance as being highly dependable notwithstanding these

04:22  10   occasional early departures.  And so that's evidence that

11   whatever Walmart might want to argue right now, it wasn't

12   something that at the time Walmart actually considered to render

13   Ms. Spaeth unqualified for her employment.

14    With respect to the link between her disability and

04:23  15   need for accommodation, there I think the defendant reads too

16   much into the *Ekstrand* case.  And what the law requires is that

17   Ms. Spaeth's limits be known to the defendant.  And the

18   defendant worked with Ms. Spaeth for 15 years.  We heard a great

19   deal of evidence about limitations that they were aware of; that

04:23  20   she needed assistance learning new tasks and adjusting to other

21   things in the workplace.  They didn't assign her to work cash

22   registers which was an unpredictable task.

23    So there is evidence that the defendant may not have

24   been able to state with medical precision the link between Down

04:23  25   syndrome and Ms. Spaeth's need for an accommodation, but there's

746

1    enough evidence for a jury to conclude that they were aware that

2    the employee who's attendance had been just fine for 15 years,

3    who suddenly had attendance problems when they changed the

4    schedule, that that may have been the -- that that was related

04:24    5    to her disability and when she asked to go back to her old

6    schedule, that that too was related to her disability.

7    We also heard from Dr. Smith that by spending a great

8    deal of time with a person individuals can learn about the need

9    of many individuals with Down syndrome for routine, and

04:24    10    Walmart's managers did spend many years with Ms. Spaeth. And

11    that too provides the jury a basis to find that the company knew

12    that she had a need that was related to her disability.

13    Additionally, while the defendant contests it,

14    Ms. Stevenson did testify that prior to Ms. Spaeth's termination

04:24    15    she called Karen Becker and said that Marlo's difficulties were

16    related to her Down syndrome. If the jury credits

17    Ms. Stevenson's testimony on that point, then it can find that

18    the company, prior to termination, was made explicitly aware of

19    that link from Ms. Stevenson's comments.

04:25    20    So I believe that covers the qualified element. I'll

21    check with my colleagues at the end to make sure I haven't

22    missed any essential points.

23    And I think there's no dispute that the company did

24    not provide an accommodation to Ms. Spaeth.

04:25    25    With respect to undue hardship, I mean, there was

747

testimony that the needed modifications in the system would have

taken a couple of minutes to enter.  I think it was Ms. Becker

who testified that there were other employees who would have

been happy to have additional hours, and so there was no reason

to think that the company would have been able to not cover the

remaining 90 minutes of the new shift that they wanted her to

work.

And so the undue hardship defense, there may be a jury

question on it.  I'm not even sure if there is, but, in any

event, there is no basis for judgment as a matter of law based

on that defense.

With respect to -- and I should also note that Marlo

herself by asking for, you know, to go back to her old schedule

and by communicating that she was worried that she was going to

get sick if she missed the bus, or sick if she didn't eat supper

on time, or that she was going to be hot in the middle of winter

in northern Wisconsin, these are reasons to think, one, that

Marlo was clearly making a request for an accommodation, she was

asking for an adjustment to her schedule, and that this was

clearly related to her disability.  Individuals without a

disability would not normally react to a new schedule by saying

that they are hot in January or November in Wisconsin.

With respect to the discharge claim, obviously the

qualified element is largely similar.  You know, here, I mean,

it is defined in the ADA that one of the ways in which an

1    employment action can be because of disability or discrimination

2    because of disability is because of the need to provide

3    reasonable accommodations.

4            And there was -- I mean, it seems fairly clear that

04:27    5    the reason Ms. Spaeth got fired was because she needed to be on

6    the 12:00 to 4:00 schedule and the defendant didn't want to put

7    her on that schedule.  The jury will decide whether or not that

8    was, in fact, a reasonable accommodation, whether, you know,

9    there was an undue hardship, but if the jury credits those

04:27    10    things then the link between her termination and the scheduling

11    issues is pretty apparent.  So the causal link is certainly at

12    least a question for the jury.

13            I'll also note briefly to the extent that there were

14    some references to having to show that Walmart's stated reasons

04:28    15    were a pretext, this occurred a little bit more in the written

16    motion, that's not the law.  That's part of the *McDonell-Douglas*

17    burden-shifting mechanism and that is -- can be used on summary

18    judgment, but the Seventh Circuit has been clear that, A, even

19    prior to trial it's not a required evidentiary framework for a

04:28    20    plaintiff to use and, in any event, at the stage of trial

21    *McDonnell-Douglas* is not used.  So we don't need to establish

22    that their reasons are false, we need to prove to the jury that

23    their reasons were discriminatory.

24            With respect to the failure to rehire, you know, we

04:28    25    filed a little bit of additional authority for the Court to

749

1    consider in connection with the jury instructions earlier today.

2    I appreciate that was only a matter of hours ago.  But, in

3    short, we disagree with the defendant's characterization of

4    Seventh Circuit caselaw.

04:28    5    The Seventh Circuit does not have a hard-and-fast

6    requirement that in order to have a failure to hire claim --

7    here a failure to rehire claim -- there has to have been a job

8    application.  There are cases that state that as a formulation

9    of the prima facie case under *McDonnell-Douglas.*  But as I

04:29    10    mentioned a moment ago, first of all, *McDonnell-Douglas* is an

11    evidentiary framework, it's not even mandatory.  It doesn't

12    state the elements of a claim.  And, in any event, the Seventh

13    Circuit has -- well, first of all, the Supreme Court in

14    *McDonnell-Douglas* itself was explicit that it was not creating a

04:29    15    rigid framework, but rather one that was flexible and should

16    depend on the facts of the case.

17    Second, the Seventh Circuit has commented on a couple

18    of occasions that there are instances when, based on the facts

19    of this situation, an application may not be required.  So, for

04:29    20    example, an employer who -- as there was evidenced was the case

21    for Walmart here, you know -- does reinstate people or rehire

22    people without a formal application, the law doesn't require

23    that the person submit an application if that's not a mandatory

24    part of the employer's process.

04:30    25    I'll also note that Walmart has two different routes

750

1    here.  There was the rehiring route which, you know, after 30

2    days somebody could submit an application for rehiring.  But

3    during the first 30 days we heard evidence that you are not even

4    permitted to submit an application for rehiring.  So it would be

04:30    5    a little bit of a catch-22 for the company to say that they

6    couldn't -- they didn't rehire her because she failed to submit

7    an application during the period when she wasn't allowed to.

8        But, secondly, the company has a reinstatement process

9    that we heard evidence does not require any kind of application

04:30    10   from the former employee in any event.

11       And, there was evidence that Walmart told

12   Ms. Stevenson that they would submit the request to rehire

13   Ms. Spaeth to their superiors.  It seems that as a matter of

14   equity the company can't tell the employee's representative that

04:31    15   they will take the request to the proper authorities and then

16   later on in court turn around and say that they needed to take

17   some more formal step to submit a request for a rehiring.  So we

18   believe that there is a jury question on the rehiring claim.

19       With respect to punitive damages, so there's two main

04:31    20   points here.  First of all, as defense counsel mentioned, the

21   basic standard for eligibility for punitive damages is reckless

22   disregard, which we have.  Reckless disregard simply means that

23   the defendant's officials who were involved in the

24   decision-making were aware of the law.

04:31    25       And we heard testimony from I think all of the

751

1    relevant decisionmakers who appeared here that they were aware

2    of an individual's rights under the ADA not to be discriminated

3    against based on a disability and that the ADA imposed an

4    obligation on employers to provide reasonable accommodations.

04:32    5         You know, the reckless disregard weeds out employers

6    who might be unsophisticated about the law and didn't realize

7    that something was not unlawful.  That's certainly not the case

8    with Walmart.  We heard at the very end that they have a

9    training module that ensures that their managers know about the

04:32   10   ADA.  So there really is no question about reckless disregard at

11   least for purposes of creating a jury question.

12        The main focus of the defendant's written Rule 50

13   motion with respect to punitives was a good faith affirmative

14   defense which they have waived.  It was not pled in their

04:32   15   answer.  The rules are clear that you have to plead affirmative

16   defenses; they haven't done so.  The evidence of the trial is

17   now closed; they can't present an affirmative defense on the

18   fly.

19        So that's the first point is that it's waived and

04:33   20   shouldn't be part of the jury's consideration at all for that

21   reason.

22        Secondly, even if it were, it's an affirmative

23   defense.  They have a burden of production to provide evidence.

24   The evidence that they've presented is essentially that they

04:33   25   have good policies, but that is not sufficient as a matter to

752

1    grant them judgment as a matter of law on that affirmative

2    defense.

3          The Seventh Circuit also requires that the employer

4    both establish and enforce good policies to prevent violations

04:33   5    of the law.  A case on that point is *Cooke vs. Stefani*, 250 F.3d

6    564 at 568, Seventh Circuit 2001.  *Russo vs. American Airlines*,

7    which I think we've cited in various materials, also contains

8    the discussion of that point.

9          And so, A, the defense has been waived.  This occurred

04:34   10   in the last case that we had with Walmart in the Western

11   District, and there too the defense was eliminated because it

12   had been waived as not pled and we would suggest the same result

13   is appropriate here.  But even if the Court were to permit it,

14   it's -- there's certainly a jury question at a minimum.

04:34   15        If I can just check with my colleagues for a moment to

16   make sure that my ramblings haven't left out anything essential.

17        (Counsel confer.)

18        MR. MULAIRE:  Thank you, Your Honor.

19        THE COURT:  Mr. Harlan, did you want to reply?

04:34   20        MR. HARLAN:  Yeah, just -- the only thing I would add

21   is with respect to the waiver issue, we -- first of all, the

22   Seventh Circuit does not -- there's no case in the Seventh

23   Circuit that says the failure to expressly say *Kolstad* in your

24   answer is waiver.  And counsel is right that in a different case

04:35   25   with a different judge, he saw it the other way.

753

1          But when you look at the law and what the purpose of

2     an answer is, which is basically just to put issues into

3     dispute, in this particular case, if you look at our answer, we

4     clearly in our answer put the issue of punitive damages at issue

04:35  5     and, in fact, we briefed that issue on summary judgment.

6          So the notion that we somehow have not preserved the

7     issue of punitive damages -- our punitive damages defense under

8     *Kolstad* has no basis and we would ask that the Court so find.

9          MR. MULAIRE:  May I just add briefly to that?

04:35  10          On that point.  So I would agree the defense does not

11     necessarily need to cite *Kolstad*, but it does need to indicate

12     something about a good faith defense.  And I think if the Court

13     reviews the answer, there is a generic denial in connection with

14     the punitive damages claim, but Rule 8(c) does require

04:36  15     affirmatively pleading affirmative defenses.

16          And the Seventh Circuit does say that waiver applies

17     in such a situation.  A case would be *Bank Leumi,* L-e-u-m-i,

18     *Le-Israel* -- L-e hyphen I-s-r-a-e-l -- *vs. Lee*, 828 -- I'm

19     sorry, that should be 928 F.2d 232 at 235, Seventh Circuit 1991.

04:36  20     Thank you.

21          MR. HARLAN:  And, Your Honor, just for completeness if

22     I may, I would refer the Court --

23          THE COURT:  Any reason why I can't take all of this

24     under advisement and let the jury have the case?  And then if

04:37  25     they give punitive damages, Mr. Harlan, you can -- I mean, is

1    this a jury instruction argument?  Is there a good faith jury

2    instruction that I have to address?

3         I mean, if there are punitive damages it almost seems

4    to me that the whole requirement for punitive damages is you

04:37  5    show really a recklessness, kind of almost a lack of good faith.

6    It seems.  You know, the wanton, reckless violation of rights,

7    that would seem to be if you're denying that you're essentially

8    arguing, no, I was acting in good faith.  I'm not sure where --

9    is this one of those arguments that sounds great on paper but in

04:37  10   reality it doesn't make a hill of beans?

11        MR. MULAIRE:  No, I would respectfully disagree,

12   Your Honor.  I mean, it is true that the sort of everyday

13   English meaning of the word "reckless" might lend itself to the

14   sort of point that Your Honor just made.

04:38  15        But "reckless disregard" has a been specific meaning

16   under the statute that Congress enacted in 1991, and it

17   specifically refers to state of mind and it's knowledge of the

18   law.  It's not wantonness.  It's definitely the case that we do

19   not, in order to get punitive damages, have to prove bad faith.

04:38  20   And so it's not the case that this is simply a defense in the

21   sense that it negates an element of punitive damages.  It truly

22   is an affirmative defense.

23        THE COURT:  Well, look, let me just say, I'm going to

24   take the motion under advisement.  I'm satisfied -- you know, it

04:38  25   seems to me there's certainly evidence from which a jury could

755

1  go either way here, at least as far as my current understanding

2  of the law.  And I know we have some jury instruction issues to

3  work out.  But here we have a person with an obvious disability.

4  But it's not obvious what the consequences, what the limitations

5  caused by that disability are.  And I understand the defense to

6  be, yes, we knew she had a disability, we had no idea that she

7  needed an accommodation in terms of her schedule.

8       Now, the thing about a mental disability, and I think

9  the court makes this clear in *Bultemeyer*, is that where it's a

10  mental disability the actual limitations and the actual need for

11  an accommodation may not be clear.  And so that's -- in one

12  sense that's why it's incumbent upon the employer to ask

13  questions if the employer really realizes there's a need for an

14  the accommodation.

15       On the other hand, I think *Bultemeyer* -- and this was

16  a reversal of a summary judgment -- it emphasizes that when

17  you're talking about -- this was a person with a paranoid

18  schizophrenia and the court notes -- and this is at 100 F.3d

19  1281, I'm looking at page 1286.

20       "The court" and the employer here "are also forgetting

21  that Bultemeyer is mentally ill.  He suffers from paranoid

22  schizophrenia and bipolar disorder, among other things, yet the

23  district court and employer treated him as though he were

24  suffering from a minor physical limitation and being stubborn.

25  Bearing in mind the seriousness of his mental illness, it is

756

1    evident that his actions were a product not of cold, calculating

2    intellect, but of an irrational fear.  He was irrationally

3    afraid of Northrop High School:  He did not report for work

4    because he was afraid to work at Northrop, and he did not take

04:40    5    his physical because he was afraid he would pass and have to

6    work at Northrop.  These were not the deliberate actions of a

7    mentally sound man who just didn't want to go to work, they were

8    the product of mental illness.  We understand that the

9    irrationality of these fears may be frustrating to the employer,

04:41    10    but as Bultemeyer's employer, FWCS had a duty to engage in the

11    interactive process and find a reasonable way for him to work

12    despite his fears.  But FWCS made no inquiry about what

13    Bultemeyer found stressful at Northrop."

14        Now this is a reversal to summary judgment.  But what

04:41    15    they found there, it seems to me, was that where there's a

16    disability that is unclear, it may be for the jury to decide

17    whether the need for accommodation was obvious.  I do think that

18    the defendants are right that if there's not a specific request

19    for an accommodation, and it's phrased as an accommodation not a

04:41    20    preference for a different schedule, if it's not tied to the

21    disability then the question becomes is it obvious.  Should it

22    have been obvious to them.

23        And I expect that's a good argument to make to the

24    jury.  It seems to me that the jury can hear Walmart argue

04:42    25    tomorrow that, yes, we knew that Marlo was Down syndrome, we

757

1    realized that had limitations, but we didn't recognize one of

2    the limitations was the need for a different schedule.  And

3    whether or not that would have been a reasonable accommodation,

4    whether it would have been a hardship, those are all questions

04:42    5    that I think the jury can decide.  At least that's my current

6    understanding of the law.

7            I think punitive damages here is a close question.  I

8    don't know, and is there an instruction issue on -- I didn't see

9    that raised by -- in your letter from the EEOC, but we can --

04:42   10    you know, to the extent I have to decide a jury instruction

11    issue regarding punitives, but my thinking right now is to

12    submit it and see what happens and then I certainly, depending

13    on the verdict, will look at a renewed motion should that be

14    necessary.

04:43   15            MR. MULAIRE:  So, yes, Your Honor, to answer your

16    question, it is in the Court's draft instructions that we

17    received yesterday.  There is a sentence here near the end of

18    the first paragraph on page 19 that is the good faith defense.

19            And just to be clear, the letter that we submitted was

04:43   20    not intended to be a comprehensive commentary.  We have some

21    other little things to discuss.

22            THE COURT:  Let's go off the record in a moment.  I do

23    want the record to reflect, though, that the Court's reserving

24    final judgment on the Rule 50 motion.  We'll just put that aside

04:43   25    for now and wait to see what happens with the jury verdict.

758

1          But let's have an informal discussion about jury

2     instructions.  We'll put a formal discussion on the record

3     later.  Let's take a recess right now, come back in five, ten

4     minutes, and then we'll deal with your concerns about jury

04:43   5     instructions.

6          MR. MULAIRE:  Thank you.

7          (Recess taken at 4:44 p.m., until 5:12 p.m.)

8          (After recess, trial resumed off the record to conduct

9     a preliminary jury instruction conference.)

06:38  10          THE COURT:  All right.  Thank you, all.  We're in

11     recess.

12          (Proceedings concluded for the day at 6:38 p.m.)

13                         *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

759

1                    C E R T I F I C A T E

2

3            I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

4    Reporter for the United States District Court for the Eastern

5    District of Wisconsin, do hereby certify that the foregoing

6    pages are a true and accurate transcription of my original

7    machine shorthand notes taken in the aforementioned matter to

8    the best of my skill and ability.

9

10   Signed and Certified August 3, 2021.

11   /s/John T. Schindhelm

12   John T. Schindhelm

13

14                  John T. Schindhelm, RPR, RMR, CRR
                    United States Official Reporter
15                  517 E Wisconsin Ave., Rm 324,
                    Milwaukee, WI 53202
16                  Website: WWW.JOHNSCHINDHELM.COM

17

18

19

20

21

22

23

24

25

760

1                          I N D E X

2     RULE 50 MOTION

3          BY MR. HARLAN.................................   739

4

5     WITNESS   EXAMINATION                            PAGE

6     JULIA STERN, DEFENSE WITNESS

7          CONTINUED DIRECT EXAMINATION BY MR. HARLAN.......   506

8          CROSS-EXAMINATION BY MS. VANCE...................   528

9          REDIRECT EXAMINATION BY MR. HARLAN..............   538

10    BONNIE OHLSEN, DEFENSE WITNESS

11         DIRECT EXAMINATION BY MR. BULIOX................   539

12         CROSS-EXAMINATION BY MS. CARTER.................   582

13         REDIRECT EXAMINATION BY MR. BULIOX..............   607

14    DEBBIE MOSS, DEFENSE WITNESS

15         DIRECT EXAMINATION BY MR. BURNETT...............   612

16         CROSS-EXAMINATION BY MS. VANCE..................   618

17    KENT ABITZ, DEFENSE WITNESS

18         DIRECT EXAMINATION BY MR. HARLAN................   625

19         CROSS-EXAMINATION BY MS. VANCE..................   643

20    LEE SPUDE, DEFENSE WITNESS

21         DIRECT EXAMINATION BY MR. BULIOX................   648

22         CROSS-EXAMINATION BY MS. CARTER.................   712

23         REDIRECT EXAMINATION BY MR. BULIOX..............   730

24

25                          * * * * *

761

```
 1                        E X H I B I T S

 2     NUMBER            DESCRIPTION            ADMITTED INTRODUCED

 3  9       Spaeth Evaluation 2006 - EEOC00617-618 ........     524
            admitted previously by stipulation
 4
    11      Spaeth Evaluation 2008 - EEOC00613-614 ........     677
 5          admitted previously by stipulation

 6  14      Spaeth Evaluation 2011 - EEOC00607-608 ........     586
            admitted previously by stipulation
 7
    18      Spaeth Evaluation 2015 - EEOC00590-593 ........     521
 8          admitted previously by stipulation

 9  24      Walmart letter - EEOC00428-434 [NOT RECV'D]....     714

10  28      Training D001561-1568; D001588-1603 - .........     661
            30(b)(6) Dep. 64,
11          admitted previously by stipulation

12  31      Accommodation Management Guidelines MHRM ......     722
            30(b)(6) Dep. 71
13          admitted previously by stipulation

14  37      Stern Reports to Investigator - ...............     533
            D001085-1087; D001100-1104
15          admitted previously by stipulation

16  1005    Customer Service Scheduling Availability - ....693  693
            electronic [D001514-001516]
17
    1007    Spaeth Attendance History - 11/2014 - .........     678
18          07/08/2015 [D002547-D002550; D002564 -
            D002569]
19          admitted previously by stipulation

20  1017    Job Description - Apparel/Homes Sales .........     547
            Associate - 2012 [D000027-0000029]
21          admitted previously by stipulation

22  1019    Performance Appraisals [D119-D122; ............550  550
            D136-D140;D142-D151;D153-D154;D158-D159;D162
23          -D163]

24  1023    Email from Kent Abitz and Investigation .......     635
            Recap [D001037 - D001041]
25          admitted previously by stipulation


                                                              762
```

| | | |
|---|---|---|
| 1 | 1029 | Individual Statement of Fact - Bonnie Popp .... | 576 |
| 2 | | [D001088 - D001090]<br>admitted previously by stipulation | |
| 3 | 1032 | Witnessing Manager Interview Notes - Bonnie ... | 578 |
| 4 | | Popp [D001105 - D001109]<br>admitted previously by stipulation | |
| 5 | 1033 | Email Relative to Internal Complaint – ........ | 699 |
| 6 | | 07/16/2015 [D001961]<br>admitted previously by stipulation | |
| 7 | 1034 | Applications of Comparators [D002880 – ........ | 710 |
| 8 | | D002900] admitted previously by stipulation | |
| 9 | 1035 | Associates Terminated for Attendance Who ...... | 708 |
| 10 | | Reapplied [Dkt. 126-2]<br>admitted previously by stipulation | |
| 11 | 1038 | Certified Copy of Maritime Metro Transit Bus .. | 639 |
| 12 | | Schedule – Dated June 14, 2021 [D002936 –<br>D002938], admitted previously by stipulation | |
| 13 | 1054 | Attendance and Punctuality Management ......... | 664 |
| 14 | | Guidelines – 04/29/2013 [D000034 – D000037],<br>admitted previously by stipulation | |
| 15 | 1055 | Discrimination & Harassment Prevention ........ | 653 |
| 16 | | Policy - September 19, 2011 [D000973 –<br>D000975], admitted previously by stipulation | |
| 17 | 1056 | Open Door Communications Policy - Updated ..... | 654 |
| 18 | | 08/10/2012 [D000976 – D000977]<br>admitted previously by stipulation | |
| 19 | 1057 | Harassment, Inappropriate Conduct, ............ | 655 |
| 20 | | Non-Retaliation, Non-Discrimination Policy<br>[D000978 - D000979]<br>admitted previously by stipulation | |
| 21 | 1059 | Walmart Field Attendance and Punctuality ...... | 667 |
| 22 | | Policy - April 29, 2013 [D000982 - D000983]<br>admitted previously by stipulation | |
| 23 | 1062 | Accommodation in Employment ................... | 659 |
| 24 | | (Medical-Related) Management Guidelines –<br>June 17, 2013 [D-000984 - D-00988]<br>admitted previously by stipulation | |
| 25 | | | |

763

1   1063    Rehire/Reinstatement of Former Associates .....    703
        Policy [Dkt. 102-25]
2       admitted previously by stipulation

3   1067    Demonstrative Regarding Attendance Policy .....    627
        [OFFERED NOT RECV'D]
4
    1068    Demonstrative Regarding Occurrences ..........    680
5       Resulting in Termination, [NOT RECV'D]

6   1070    Demonstrative Relating to Schedule ...........    689

7   1070    Demonstrative Relating to Schedule, ..........    738
        [OFFERED NOT RECV'D]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

764