```
                    UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF WISCONSIN
                          GREEN BAY DIVISION
-----------------------------------------------------------------
 EQUAL EMPLOYMENT OPPORTUNITY        )
 COMMISSION,                         )
                                     )
                      Plaintiff,     )   Case No. CV 17-70
                                     )   Green Bay, Wisconsin
       vs.                           )
                                     )   July 15, 2021
 WAL-MART STORES EAST LP,            )   8:39 a.m.
                                     )
                      Defendant.     )   DAY 4

-----------------------------------------------------------------
```

**TRANSCRIPT OF JURY TRIAL**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff:              **Justin Mulaire**
                                 United States Equal Employment
                                 Opportunity Commission
                                 230 S Dearborn St - Ste 2920
                                 Chicago, IL 60604
                                 312-872-9666
                                 Email: justin.mulaire@eeoc.gov

                                 **Carrie Noelle Vance**
                                 **Leslie N Carter**
                                 United States Equal Employment
                                 Opportunity Commission
                                 Milwaukee District Office
                                 310 W Wisconsin Ave - Ste 500
                                 Milwaukee, WI 53203-2292
                                 414-297-4188
                                 Fax: 414-297-3186
                                 Email: carrie.vance@eeoc.gov
                                 Email: leslie.carter@eeoc.gov

 U.S. Official Transcriber:      JOHN T. SCHINDHELM, RMR, CRR,
 Transcript Orders:              WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



765

```
 1   APPEARANCES CONT'D:

 2   For the Defendant:              Emery K Harlan
                                     Warren E Buliox
 3                                   MWH Law Group LLP
                                     735 N Water St - Ste 610
 4                                   Milwaukee, WI 53202
                                     414-436-0353
 5                                   Fax: 414-436-0354
                                     emery.harlan@mwhlawgroup.com
 6                                   warren.buliox@mwhlawgroup.com

 7                                   George Burnett
                                     Law Firm of Conway Olejniczak &
 8                                   Jerry SC
                                     231 S Adams St
 9                                   PO Box 23200
                                     Green Bay, WI 54305
10                                   920-437-0476
                                     Fax: 920-437-2868
11                                   rgb@lcojlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    P R O C E E D I N G S

2    **(Call to Order of the Court at 8:39 a.m.)**

3    THE COURT:  Okay, go ahead, be seated.

4    THE CLERK:  The Court calls Case No. 17-CV-70, *EEOC*

08:40  5    *vs. Wal-Mart Stores East, LP* for continuation of the jury trial.

6    THE COURT:  Okay.  And the record should reflect we

7    are outside the presence of the jury, and counsel are here as

8    they have been throughout the trial, same counsel.

9    JURY INSTRUCTION CONFERENCE

08:40  10   THE COURT:  We sent out -- the record should reflect,

11   of course, we had a lengthy informal jury instruction conference

12   and verdict conference last night.  Counsel indicated their

13   objections to the proposed instructions and verdict form and

14   made recommendations.  Those were taken under advisement.  And

08:40  15   then late last -- well, not that late last night -- I sent out a

16   draft of each.  And then we made some -- I made some further

17   revisions later, or earlier in the morning.

18   And those were -- we sent out a compared -- so you

19   could just see the changes we made.  And then the verdict form.

08:41  20   And I think there was -- in the verdict there might have been

21   one question that was mislabeled or the directions, and other

22   than that you have the final form there.  So that's what I would

23   like to make a record on.

24   First with respect to EEOC, any objections to the

08:41  25   instructions that I propose to give?

767

1          MR. MULAIRE:  Just for the record, Your Honor, the

2    EEOC respectfully objects to the instruction on the interactive

3    process; whether or not an employee's need for an accommodation

4    of her disability can be described as obvious.

08:41  5          We believe if the employer knows of the need it has an

6    obligation to engage in the interactive process with the

7    employee to explore accommodations, and that this is especially

8    so for an employee whose communication skills and abilities her

9    employer knows to be limited.

08:42  10          And then, with deep apologies, one thing that I didn't

11   mention yesterday, it is minor, but the business judgment rule

12   instruction that I know I, trying to be flexible, said, well, if

13   the one from the pattern instruction is included that's fine.

14   It does have "reasonableness" in the title and it says, you

08:42  15   know, the reasonableness of defendant's actions aren't at issue.

16          But the pattern instruction is explicitly intended for

17   Title VII in ADEA claims and disparate treatment claims, and we

18   do have a reasonable accommodation claim in this case so I do

19   worry about telling the jury that the defendant's reasonableness

08:42  20   is not at issue.

21          So we would suggest to simply omit the word

22   "reasonable" from the text.  So it would say "You should not

23   concern yourselves with whether Walmart's actions were wise or

24   fair," rather than "wise, reasonable or fair."

08:43  25          And then for the heading -- I don't even know if the

768

1    jury gets the headings or those are just for our use, but I

2    think it could just be called a cautionary instruction.

3          So my apologies for not noticing that last night. But

4    that's the only other issue we had with the instructions, and we

08:43  5    have no objection to the final version of the verdict form that

6    was distributed.

7          THE COURT: I think that your comment on the

8    cautionary instruction makes sense. This instruction is

9    intended for Title VII cases.

08:43  10         MR. MULAIRE: Correct.

11         THE COURT: And where you add the reasonable

12    accommodation feature of ADA it does not fit.

13         MR. MULAIRE: Correct.

14         THE COURT: So I think that's a reasonable and

08:43  15    probably -- I mean, a lawful -- it would be improper for me to

16    use reasonable to say you don't have to be reasonable here.

17         Any objection, Mr. Harlan?

18         MR. HARLAN: No objection.

19         THE COURT: In terms of the instruction on the

08:44  20    interactive process. And we discussed this quite a bit

21    yesterday. And I went over the cases again, and I think this is

22    consistent with *Bultemeyer* at 100 F.3d 1281, and definitely with

23    *Ekstrand* at 583 F.3d 972.

24         I think to begin the interactive process there has to

08:44  25    be something more than just a disability. I know somebody asked

769

1    the question if the person asks -- with a wheelchair says I need

2    a window, I want a window, does that mean you have to start an

3    interactive process?  Well, what's a wheelchair got to do with a

4    window?  I don't think that's the case.  It sounds like he

08:44   5    wanted a window.  I think the answer to that wasn't what the

6    attorney expected, but nevertheless it caught me.

7        But, and I think that's true here.  There has to be

8    some hint or some indication, or it has to be obvious.  And I

9    think there's an argument here that there's enough there.  And

08:45   10    you've made the argument to me, frankly, that after 15 years,

11    knowing her limitations, this should have been apparent to

12    anyone.  And I think that's what the jury will decide.

13        But I think there has to be something more than just a

14    request by a person with a disability.  I think there has to be

08:45   15    some indication that this request for a change is actually

16    something I need because of my disability.

17        Or, you know, and here the sad thing is Marlo Spaeth

18    did not have somebody acting more closely with her in the family

19    and talking about that or making clear.  Or, you know, the

08:45   20    employer maybe should have known, but that's for the jury to

21    decide.  But the record's made on that.

22        MR. MULAIRE:  Thank you.

23        THE COURT:  Are there any additional instructions

24    you're requesting then?

08:46   25        MR. MULAIRE:  No, Your Honor.

770

1       THE COURT:  How about the form of the verdict?

2       MR. MULAIRE:  We have no objection to the final

3   version that was distributed a little after 7:00 this morning.

4       THE COURT:  Okay.  And Mr. Harlan?  I know you sent an

08:46  5   email just recently -- or maybe it wasn't recent, I just got

6   it -- saying that the verdict -- we don't ask a separate

7   question on the discharge and we didn't include reasonable

8   accommodation in the question about the termination and the

9   reinstatement, but that's because it's in the jury instruction.

08:46  10      The jury instruction defines discrimination or defines

11  a violation of the ADA to include the terminating because of

12  disability or because of the reasonable -- the accommodation,

13  the refusal to provide the accommodation.  And I think because

14  the jury instruction provides the explanation for what a

08:46  15  violation is, there's no need to include it in the verdict form.

16      MR. BULIOX:  So we would obviously object to that.  We

17  think that it should be included.

18      One of the things that we noticed in the form, the

19  verdict form, is that the Court deleted the reference to

08:47  20  "because of" or "on account of" --

21      (Defense counsel confer.)

22      MR. BULIOX:  Yeah.  So our concern is that it's

23  obviously still in the instruction.  You know, I think we argued

24  extensively yesterday off the record about why this is an issue

08:47  25  that needs to be out of the instruction.

771

1          Again, this is a failure to accommodate claim, but we

2     also have a termination claim as well as a refusal to rehire or

3     reinstate claim.  And the failure to accommodate claim is

4     separate from those two other claims.

08:48   5          The EEOC has not cited -- at least I haven't seen any

6     cases from EEOC which suggests that in failure to accommodate

7     claims the element -- I'm sorry, strike that.  In failure to

8     accommodate claims the element of a need to accommodate is also

9     an element in termination and refusal to rehire claims.

08:48  10          Next, in our view and as we indicated on the record,

11     this is essentially a backdoor effort to a retaliation claim

12     which is not part of the EEOC's case.  They had the opportunity

13     to pursue a retaliation claim, they chose not to, and this is a

14     way to get at that.

08:49  15          On top of that, at no point in the litigation did the

16     EEOC place Walmart on notice that its termination and failure to

17     hire claims were going to be based on some alternative theory;

18     that these claims were because of or based on a need for an

19     accommodation.  In other words, what the EEOC has done has

08:49  20     morphed the "because of disability" element into the termination

21     and rehire claims and we don't think that's proper.  And we're

22     not aware of any caselaw to support that.

23          Additionally, if Walmart had notice of this potential

24     I guess nuance theory, then it would have prepared for that.  It

08:50  25     would have presented witnesses and evidence about how the

772

1       company has accommodated other disabled individuals and how the

2       Manitowoc store in particular has dealt with individuals with

3       disabilities as well as Lee Spude and the other Walmart parties.

4       So the lack of notice basically is in our view prejudicial and

08:50   5       we just state that for the record.

6               In addition, the weighting instruction assumes that

7       there was a need to accommodate -- the weighting instruction as

8       written, it assumes there was a need to accommodate Ms. Spaeth

9       in the first place.  And there's only a need if it's known.  And

08:51   10      we would seek clarification on that for the jury's purpose so as

11      to not confuse any issue.

12              And, again, this is basically a second and third shot

13      at the EEOC's failure to accommodate case should they lose on

14      the failure to accommodate because it's an element in each of

08:51   15      the three claims.  So they essentially have three failure to

16      accommodate claims two of which are like hybrid claims.  And we

17      would object to that.

18              So on that particular issue, Judge, for the record,

19      that is our objection.

08:51   20              THE COURT:  Okay.  Mr. Mulaire, did you want to

21      comment at all?  I was going to mention in terms of the basis,

22      Mr. Mulaire cited the statute yesterday and that's what I looked

23      at.

24              42 U.S.C. Section 12112 or 12112(b) talks about the --

08:52   25      the general rule is that no entity shall discriminate against a

773

1    qualified individual on the basis of disability in regard to job

2    application procedures, hiring, advancement, discharge,

3    et cetera.

4              And then the construction says that "the term

08:52   5    'discrimination against a qualified individual on the basis of

6    disability' includes --" and one of the things it includes is

7    "not making reasonable accommodations to the known physical or

8    mental limitations of an otherwise qualified person."

9              And so they've alleged in their claim that there was a

08:52   10   discriminatory discharge and a discriminatory refusal to rehire

11   which is a reinstatement claim.  And I think the statute clearly

12   explains that discrimination in that context would include

13   failing to provide a reasonable accommodation.

14             Now, in terms of -- I don't think the elements -- you

08:53   15   know, if you read all the instructions, and I'm sure whoever is

16   going to make your argument has focused in on the requirements

17   for reasonable accommodation, I think are clear.  In fact, EEOC

18   disagrees with my instruction as to what gives rise to that

19   reasonable accommodation, what their duty is, what the

08:53   20   employer's duty is based upon the evidence that they have.  But

21   I certainly think it's clear from the instructions that the

22   employer has to be aware of a need for an accommodation before

23   there can be a failure to provide a reasonable accommodation.

24             It may not be in each and every element, I don't

08:53   25   repeat it over and over, but it certainly is defined clearly in

774

1    these instructions.

2          So I think your concern is -- I understand your

3    concern, but I think it's addressed in the instructions and I

4    think argument will focus on those issues.

08:54  5          Anything else from Walmart as to either the form of

6    the instructions, are there additional instructions you're

7    asking that I make?  I note I did remove the good faith

8    exception.  I looked at *Carter*, I have an argument here by EEOC.

9    I know it's disputed that they would be -- that they were

08:54  10   prejudiced by the failure to add the good faith defense as an

11   affirmative defense.  And I think that they've made a pretty

12   good argument that they would have been prejudiced, they would

13   have done discovery somewhat differently, asked additional

14   questions.  It's so late in the game that I think it's very

08:54  15   difficult to say they would not be prejudiced.  It seems to me

16   that's a real problem here.

17          Certainly after the prior case it's surprising if

18   Walmart was going to rely on a good faith they didn't move

19   earlier to add that, but I think based on this procedural

08:55  20   history I think the good faith is not here.

21          I also, as I said yesterday, think this is probably

22   more of a technical argument.  I think a jury if they are

23   convinced that Walmart has done everything they can to try and

24   avoid incurring liability, trying to comply with the ADA, I

08:55  25   don't know if a jury is really going to find this as a case that

775

1   warrants punitive damages, but that will be up to the jury.

2           MR. BULIOX:  Yeah, and for the record we respectfully

3   disagree.  We think that the EEOC had ample notice and

4   opportunity to do discovery on and did, in fact, do discovery on

08:55   5   the good faith defense.  We do not believe that they have been

6   prejudiced in any way.  This issue has been litigated

7   vigorously.  And, you know, for the record we would, you know,

8   again disagree with the Court's conclusion and go from there.

9           THE COURT:  Mr. Mulaire, what you told me yesterday

08:56  10   isn't on the record so if you want to make your argument about

11   prejudice and why you think it would be unfair so that there's a

12   basis there.

13           MR. MULAIRE:  Sure.

14           We believe that there's prejudice because the caselaw

08:56  15   typically looks at whether the parties have actually litigated

16   the issue to try to detect an absence of prejudice.  And in this

17   case the good faith affirmative defense was not actually

18   litigated at any stage of the litigation; not in summary

19   judgment; it wasn't addressed at the trial that's now about to

08:56  20   be concluded.

21           During discovery we could have done further discovery

22   or would have undertaken discovery into not just the existence

23   of policies, which we do know something about, but also

24   Walmart's -- whether or not Walmart has actively enforced its

08:57  25   policies against employment discrimination which the Seventh

776

1    Circuit has also said is an element of that defense.

2            THE COURT:  So you would have looked at other

3    instances in other stores and Walmart's history of utilizing

4    this.

08:57   5            MR. MULAIRE:  Correct.

6            And if I could just on an earlier topic just mention

7    the statutory provision that I referenced yesterday.  I won't

8    retread the ground.  But with respect to the definition of what

9    it means to discriminate on a basis of disability, in

08:57  10    Section 12112(b)(5)(B), the ADA defines discrimination on the

11    basis of disability as including denying employment

12    opportunities based on the need to make reasonable accommodation

13    to the physical or mental limitations of the employee or

14    applicant.

08:58  15            THE COURT:  Okay.  Anything else?

16            MR. BULIOX:  Yeah, we have a few items just to state

17    for the record.  We understand the Court's position on them all.

18            But for Instruction 4.03, which is around the elements

19    of a reasonable accommodation, we requested that the Court

08:58  20    modify the model instruction to eliminate the verbiage around

21    knowledge of a disability and to expand on that to include

22    knowledge of a known limitation relating to a disability.

23            And the statute we cited for that was 42 U.S.C. 12112

24    (b)(5)(A).

08:59  25            We also cited *Taylor-Navotny vs. Health Alliance*

1    *Medical Plans, Incorporated*, pin cite 772 F.3d 478, 497, Seventh

2    Circuit 2014, for the proposition that Walmart's duty to

3    accommodate does not trigger unless it knows about a specific

4    limitation about a disability and not just the disability

08:59    5    itself.

6    And because of all of this, you know, we requested

7    that the Court edit I believe at the time what was numbers 2, 6,

8    and 8 to reference no limitations related to Ms. Spaeth's

9    disability as opposed to just her disability.

09:00    10    And if you want, Judge, I can go into our other items

11    or we can do it one at a time.

12    THE COURT:  I'm not sure I follow this one.  I'm

13    looking at 4.03, Elements of Plaintiff's Claim — Reasonable

14    Accommodation.  And Element 2 is "Walmart was aware that

09:00    15    Ms. Spaeth needed an accommodation due to her disability, either

16    because Ms. Spaeth requested one or otherwise."

17    MR. BULIOX:  So our concern is "due to her disability"

18    as opposed to "due to a specific limitation regarding her

19    disability."

09:00    20    THE COURT:  Okay.  Well, I think if you say she needs

21    an accommodation due to her disability, I think that's saying

22    because the disability imposes a limitation that requires an

23    accommodation.  And I think, again, looking at the instructions

24    as a whole, that's covered.  So I understand your objection's

09:01    25    noted.  Let's move on to your next one then.

778

1          MR. BULIOX:  All right.  The next one is on 4.08,

2    which is on the interactive process.  You know, as we stated

3    yesterday, we're not aware of any obligation under the ADA for

4    an employer to engage in a back-and-forth interactive process

09:01   5    with anyone relating to an employee.

6          So, you know, even if Walmart's policies may suggest

7    otherwise, their policies go above and beyond what's required in

8    the law and they're not the law.

9          Now, certainly, you know, anybody can reach out and

09:02  10    request an accommodation, but in terms of engaging in an

11    interactive process, you know, there's nothing that we're aware

12    of that suggests that Walmart has an obligation to do that, with

13    the doctor, or with a family member, or anybody else.

14          And, again, you know, the same argument about

09:02  15    limitations to known disabilities would apply here.  So, you

16    know, we argue that it should not just be because of a

17    disability, but because of known limitations related to a

18    disability.

19          We cited a few cases for the proposition that when the

09:02  20    medical need for an accommodation is not obvious, which is

21    covered, you know, to a degree in the Court's most recent

22    version of the instructions, but that when the need for medical

23    accommodation or reasonable accommodation is not obvious the

24    employer must be provided with corroborating evidence such as a

09:03  25    doctor's note, or at least a statement from a doctor.

779

1    And we cited the *Ekstrand* case *vs. School District of*
2    *Somerset*, 583 F.3d 792 [sic 972], as well as the cases that were
3    cited in our trial brief, at I believe pages 3 and 4 of that
4    brief.  I won't go through all of those case cites unless the
09:03    5    Court wants me to.
6    THE COURT:  No, no.  I think your trial brief is a
7    matter of record, too.  But I think that this instruction
8    accurately -- along with the others -- accurately conveys the
9    law.  So any other objections?
09:03    10    MR. BULIOX:  Yes.  So we requested an instruction
11    regarding attendance violations that are caused by disability,
12    and we argued that an employee's violation of a workplace rule
13    is not excused by the ADA even if it's caused by the employee's
14    disability.
09:04    15    So in that case we cited *Guzman vs. Brown County*,
16    884 F.3d 633, Seventh Circuit, 2018.  So, again, that will be --
17    THE COURT:  Yeah, the idea that there's never a need
18    for a change of schedule as an accommodation flies in the face
19    of the regulations that specifically mention -- in fact,
09:05    20    Walmart's documents as well mention potentially changing the
21    schedule as a reasonable accommodation.  So, yes, you have to
22    show up, but the question of what the schedule should be could
23    be an accommodation.  So I think I've accurately stated the law
24    on that issue as well.  Next?
09:05    25    MR. BULIOX:  On the punitive damage issue on the

780

1      special verdict form, we've requested that there be a fact

2      question on willful reckless disregard of the law.

3              THE COURT:  I think the need for that element is in

4      the instructions and I think you argued that punitives are not

09:05    5      appropriate here even if you find liability because, as the

6      instruction says, you need to find this recklessness or

7      reprehensibility, the other elements aren't there.  So I think

8      it's simpler to have the jury instructed properly and let them

9      answer the question with that instruction in mind.

09:06   10              MR. BURNETT:  Your Honor, I think to complete our

11      record on that subject we should propose a question, so if I can

12      articulate that for the record.  We would propose:

13              "If you have answered Questions 5 or 6 'Yes' then

14      answer this question:  Did Walmart act with malice or in

09:06   15      reckless disregard of the rights of Marlo Spaeth under the

16      Americans With Disabilities Act?"

17              And we to do that based on Rule 49 which indicates

18      that the court can require a special verdict, but in doing so

19      there should be a special written finding on each issue of fact.

09:06   20              I think the law is that there needs to be a factual

21      basis on liability before a jury can award damages.  I think the

22      law is that the verdict should contain all the findings on

23      essential but contested facts necessary to support a judgment.

24              And I think this particular format has the potential

09:07   25      to mislead the jury into concluding that, if Walmart violated

781

1    the ADA, they may award punitive damages.  All other questions

2    in this verdict are preceded by liability questions, but this

3    one would not be.

4           So that's the full basis of our objection.

09:07   5           THE COURT:  What's the EEOC's position on that?

6           MR. MULAIRE:  I mean, I think, as Your Honor said, the

7    general format that's followed here is that the instructions

8    provide the law and the guideline for jurors to follow and the

9    verdict form just asks them for their conclusions.  So we don't

09:07  10    see the need for that question.

11           Rule 49 also doesn't require -- I mean, Rule 49

12    doesn't require using a special verdict form at all; it just

13    says that the court may require a jury to return only a special

14    verdict in the form of a special written finding on each issue

09:08  15    of fact.  It doesn't require that every issue of fact be

16    spelled --

17           I mean, there are hundreds of issues of fact in this

18    case if you take that literally.  I don't think that Rule 49 is

19    saying that every factual question needs to be spelled out on

09:08  20    the verdict form.

21           I mean, we would also oppose the particular question

22    that they've asked to the extent that for some reason it's only

23    tied to the disparate impact claims.  Punitive damages is a way

24    for any violation of Title I of the ADA, including the failure

09:08  25    to accommodate.  So even if there were such a question, it

782

1    shouldn't just be tied to questions about the termination and

2    failure to reinstate.  So we think the verdict form is fine as

3    is.

4         THE COURT:  Okay.

5         MR. BURNETT:  Your Honor, in listening to

6    Mr. Mulaire's point on the form of the verdict, I think he's

7    right in the sense that the question should read -- and I was

8    going to propose a different preamble:

9         "If you've answered Question 3, 5, or 6 'Yes,'" that

10   covers all three claims.

11        THE COURT:  And then what would the question be?

12        MR. BURNETT:  Then the balance of the question that I

13   read:  "Then answer this question:  Did Walmart act with malice

14   or in reckless disregard of the rights of Marlo Spaeth under the

15   Americans With Disabilities Act?"

16        MR. MULAIRE:  May I comment, Your Honor?

17        THE COURT:  Yes.

18        MR. MULAIRE:  First of all, the Court does have

19   instructions in front of Questions 7 and 8 that do say if you

20   answered -- well, the second sentence says, "If you answered

21   'No' to Questions 3, 5, and 6, then do not answer any more

22   questions."  So I think that makes it clear that they would not

23   go on to 8.

24        And, I mean, as the existing instruction makes clear,

25   just to be precise about it, I mean, it's that the jury has to

783

1    answer "Yes" to Question 3 and "No" to Question 4, or "Yes" to

2    either Question 5 or 6.  Then they go on to the damages

3    questions.

4          But I think that's clear from the existing form.  To

09:11    5    the extent the defendant is asking for additional verbiage in

6    front of Question 8 I think it's redundant.

7          Question 8 is also phrased as "What amount, if any, do

8    you award as punitive damages?"  The instructions make it clear

9    that the jury is not required to award punitive damages, even if

09:11    10    they find there's reckless disregard, and makes it clear what

11    the standard for reckless disregard is.

12          So I don't think -- I just don't think anything

13    further is needed on the verdict form.

14          THE COURT:  Yeah, I agree.  I'm going to leave it as

09:11    15    it is.  I think that the -- a question could be added, but I

16    think we're even disputing what the question should be.  I think

17    the instruction is there to tell them what the circumstances are

18    under which punitive damages may be awarded and the

19    considerations in granting them.  I mean, you could have

09:12    20    separate questions as to each of the considerations, too.  I

21    just think it's -- this is an issue for argument and the jury

22    will return a response.

23          Okay, anything further then?

24          MR. BULIOX:  Yeah, I believe one more, Your Honor.

09:12    25    So yesterday in our conference we requested that our

1    proposed instruction regarding the mother and contacting the

2    mother be included in the Court's jury instructions.  And that

3    proposed instruction was from our amended proposed instruction

4    document we filed with the Court earlier, and it was Instruction

09:12  5    No. 35, which basically provided that Walmart had no obligation

6    under the law to contact Marlo Spaeth's mother or sister

7    regarding any aspect of her employment including, but not

8    limited to, her attendance, coachings, or terminations.  And

9    then we said, "However, you may consider this evidence for other

09:13  10    purposes."

11    We're not aware of, again, any legal authority

12    suggesting that Walmart had an obligation to affirmatively reach

13    out to the mother or sister regarding aspects of Ms. Spaeth's

14    employment.  And I think the way the evidence came out and what

09:13  15    EEOC will likely argue in closing is that they did have an

16    obligation to reach out to the mom or to the sister, and we

17    don't think that's an accurate -- we don't think that's

18    consistent with the law.

19    MR. MULAIRE:  We object to that proposed instruction.

09:14  20    There's no legal authority provided for it in the defendant's

21    submission.

22    The law that governs is the ADA and the reasonable

23    accommodation obligation and the interactive process.  Every

24    aspect of it sounds in reasonableness.  And so the legal

09:14  25    obligation is that if under the circumstances of Ms. Spaeth's

785

1    employment and the way that the company has interacted with her

2    the jury concludes that it would have been reasonable for the

3    company to speak with her mother or her sister later on, then if

4    it's reasonable and the company failed to do it then that is a

5    problem under the ADA.

6         So we think that the instruction proposed is wrong

7    under the law because, depending on the individualized factual

8    circumstances of a particular case, it may be reasonable for a

9    company to interact with some representative of the employee as

10   is the case in this lawsuit.

11        THE COURT:  I agree.  Whether someone should interact

12   with other members of the family is fact dependent upon the

13   case.  It might be reasonable, it's arguable.  But certainly

14   there's not a hard and fast rule that you must, there's not a

15   hard and fast rule that you must not, or that you need not.  It

16   depends on the facts and so counsel can argue that to the jury.

17   Okay.  Is that it?

18        MR. BULIOX:  I think so.

19        THE COURT:  I think the record is made.  We will make

20   the change to the business judgment instruction, and other than

21   that then we'll come right out and bring the jury.

22        MR. MULAIRE:  Your Honor, I believe we were in the

23   process of printing something that Ms. Vance is going to refer

24   to in her -- just her own notes.  I just want to make sure we

25   had enough of a chance to print it.

786

1           Okay, thank you.  We're set.

2           THE COURT:  Okay.

3           (Recess taken at 9:15 a.m., until 9:19 a.m.)

4           THE COURT:  Okay.  We'll bring the jury in then.

09:19   5  Everybody ready?

6           MS. VANCE:  Yes.

7           (Jury in at 9:20 a.m.)

8           THE COURT:  Go ahead be seated everyone.

9           Okay, good morning, ladies and gentlemen.

09:21   10          JURORS IN UNISON:  Good morning.

11          THE COURT:  We're at that stage where what will happen

12  now is first I will instruct you on the law.  And I'll read

13  these instructions to you, but you're going to get copies of the

14  instructions so you can refer to them during your deliberations

09:21   15  after you hear arguments.  But this will give you the law so

16  you'll understand the arguments of the attorneys.

17          I have also handed out copies of the verdict.  And the

18  verdict contains the questions that you'll be asked to answer in

19  the course of your deliberations.  And the attorneys will

09:21   20  probably argue about what those answers should be, and I thought

21  it might be helpful to have the questions in front of you so you

22  can understand their arguments.  Okay.

23                      FINAL JURY INSTRUCTIONS

24          THE COURT:  So.  Members of the jury, you have seen

09:22   25  and heard all the evidence and are about to hear the arguments

787

1    of the attorneys.  Now I will instruct you on the law.

2         You have two duties as a jury.  Your first duty is to

3    decide the facts from the evidence in the case.  This is your

4    job, and yours alone.  Your second duty is to apply the law that

09:22   5    I give you to the facts.  You must follow these instructions,

6    even if you disagree with them.  Each of the instructions is

7    important, and you must follow all of them.  Perform these

8    duties fairly and impartially.  Do not allow sympathy or

9    prejudice to influence you.  You should not be influenced by any

09:22   10   person's race, color, religion, national ancestry, or sex.

11        Nothing I say now, and nothing I said or did during

12   the trial, is meant to indicate any opinion on my part about

13   what the facts are or about what your verdict should be.

14        In this case, the defendant is a corporation.  All

09:23   15   parties are equal before the law.  A corporation is entitled to

16   the same fair consideration that you would give any individual

17   person.

18        The Equal Employment Opportunity Commission, or EEOC,

19   is the plaintiff in this case.  The EEOC is an agency of the

09:23   20   United States Government that is responsible for enforcing the

21   federal laws prohibiting employment discrimination, including

22   the Americans With Disabilities Act, or what we call the ADA.

23   When a person feels that his or her employer has discriminated

24   against them, that person may file a charge of discrimination

09:23   25   with the EEOC.  The EEOC has the authority to file a lawsuit and

788

1  seek remedies against an employer on behalf of such person or

2  the person may sue on his own behalf. The EEOC brings this

3  lawsuit on behalf of Marlo Spaeth. The fact that the EEOC has

4  brought this lawsuit is no cause for you to give more or less

09:24  5  weight to the claims.

6      The evidence consists of the testimony of the

7  witnesses, the exhibits admitted in evidence, and stipulations

8  or agreements by the attorneys as to what facts may be.

9      A stipulation is an agreement between both sides that

09:24  10  certain facts are true.

11     During this trial, certain testimony was presented to

12  you by the reading of depositions. You should give this

13  testimony same consideration you would give it had the witnesses

14  appeared and testified here in court.

09:24  15     Certain things are not to be considered as evidence.

16  I will list them for you:

17     First, if I told you to disregard any testimony or

18  exhibits or struck any testimony or exhibits from the record,

19  such testimony or exhibits are not evidence and must not be

09:24  20  considered.

21     Second, anything you may have seen or heard outside

22  the courtroom is not evidence and must be entirely disregarded.

23     Third, questions and objections or comments by the

24  lawyers are not evidence. Lawyers have a duty to object when

09:25  25  they believe a question is improper. You should not be

789

1    influenced by any objection, and you should not infer from my

2    rulings that I have any view as to how you should decide the

3    case.

4           Fourth, the lawyers' opening statements and closing

09:25  5    arguments to you are not evidence.  Their purpose is to discuss

6    the issues and the evidence.  If the evidence as you remember it

7    differs from what the lawyers said, your memory is what counts.

8           Any notes you have taken during this trial are only

9    aids to your memory.  The notes are not evidence.  If you have

09:25  10   not taken notes, you should rely on your independent

11   recollection of the evidence and not be unduly influenced by the

12   notes of other jurors.  Notes are not entitled to any greater

13   weight than the recollections or impressions of each juror about

14   the testimony.

09:26  15          In determining whether any fact has been proved, you

16   should consider all the evidence bearing on the question

17   regardless of who introduced it.

18          You will recall that during the course of this trial I

19   instructed you that I admitted certain evidence for a limited

09:26  20   purpose.  You must consider this evidence only for the limited

21   purpose for which it was admitted.

22          You have heard testimony by some witnesses, including

23   Walmart employees, concerning what they believe the ADA required

24   under the circumstances of this case.  Such testimony is

09:26  25   relevant to determine why they took certain actions and what

790

their state of mind might be.  But the question of what the ADA

requires is a legal question that the court will address in its

instructions at the end of the case.  In these instructions.

And whether Walmart violated the ADA is ultimately a question

for you to decide based on all the evidence in the case.

    You have also heard testimony as to whether Walmart's

actions complied with its own internal policies and training.

You may consider this evidence in your deliberations.  You

should keep in mind, however, that Walmart's policies are not

necessarily what the law requires.  The issue ultimately is

whether Walmart violated the ADA, not whether it violated its

own internal policies or procedures.

    You should use common sense in weighing the evidence

and consider the evidence in light of your own observations in

life.  In our lives, we often look at one fact and conclude from

it that another fact exists.  In law we call this "inference."

A jury is allowed to make reasonable inferences.  Any inference

you make must be reasonable and must be based on the evidence in

the case.

    You may have heard the phrases "direct evidence" and

"circumstantial evidence."  Direct evidence is proof that does

not require an inference, such as the testimony of someone who

claims to have personal knowledge of a fact.  Circumstantial

evidence is proof of a fact, or a series of facts, that tend to

show that some other fact is true.

791

1       As an example, direct evidence that it is raining is

2  testimony from a witness who says, "I was outside a minute ago

3  and I saw it raining."  Circumstantial evidence that it is

4  raining is the observation of someone entering a room carrying a

09:28   5  wet umbrella.

6       The law makes no distinction between the weight to be

7  give to either direct or circumstantial evidence.  You should

8  decide how much weight to give to any evidence.  In reaching

9  your verdict, you should consider all the evidence in this case,

09:28   10  including the circumstantial evidence.

11       You must decide whether the testimony of each of the

12  witnesses is truthful and accurate, in part, in whole, or not at

13  all.  You also must decide what weight, if any, you give to the

14  testimony of each witness.  In evaluating the testimony of any

09:29   15  witness, including any party to the case, you may consider,

16  among other things:

17       The ability and opportunity the witness had to see,

18  hear, or know the things that the witness testified about;

19       The witness's memory;

09:29   20       Any interest, bias, or prejudice the witness may have;

21       The witness's intelligence;

22       The manner of the witness while testifying;

23       And the reasonableness of the witness's testimony in

24  light of all the evidence in the case.

09:29   25       You may consider statements given by the parties or

792

1    witnesses under oath before trial as evidence of the truth of

2    what he said or they said in the earlier statements, as well as

3    in deciding what weight to give his testimony.

4         With respect to other witnesses, the law is different.

09:29    5    If you decide that, before the trial, one of these witnesses

6    made a statement not under oath or acted in a manner that is

7    inconsistent with his testimony here in court, you may consider

8    the earlier statement or conduct only in deciding whether this

9    testimony here in court was true and what weight to give his

09:30    10   testimony here in court.

11        In considering a prior inconsistent statement or

12   conduct, you should consider whether it was simply an innocent

13   error or an intentional falsehood and whether it concerns an

14   important fact or an unimportant detail.

09:30    15        It is proper for a lawyer to meet with any witness in

16   preparation for trial.

17        You may find the testimony of one witness or a few

18   witnesses more persuasive than the testimony of a larger number.

19   You need not accept the testimony of the larger number of

09:30    20   witnesses.

21        The law does not require any party to call as a

22   witness every person who might have knowledge of the facts

23   related to this trial.  Similarly, the law does not require any

24   party to present as exhibits all papers and things mentioned

09:30    25   during the trial.

1        You have heard witnesses give opinions about matters

2   requiring special knowledge or skill.  You should judge this

3   testimony in the same way that you judge the testimony of any

4   other witness.  The fact that such person has given an opinion

09:31   5   does not mean that you are required to accept it.  Give the

6   testimony whatever weight you think it deserves, considering the

7   reasons given for the opinion, the witness's qualifications, and

8   all the other evidence in the case.

9        Certain demonstrative exhibits have been shown to you.

09:31   10   Those demonstrative exhibits are used for convenience and to

11   help explain the facts of the case.  They are not themselves

12   evidence or proof of any facts.

13        When I say a particular party must prove something by

14   "a preponderance of the evidence," or when I use the expression

09:31   15   "if you find," or "if you decide," this is what I mean:  When

16   you have considered all the evidence in the case, you must be

17   persuaded that it is more probably true than not true.

18        Plaintiff has brought this lawsuit under a federal law

19   called the Americans With Disabilities Act, which is often

09:32   20   referred to by its initials, the "ADA."  Under the ADA, it is

21   illegal for an employer to discriminate against a person on the

22   basis of a disability if that person is qualified to do the

23   essential functions of her job and the employer is aware of her

24   limitations.

09:32   25        In this case, Plaintiff claims that Defendant

794

1  discriminated against Marlo Spaeth by not providing her with a

2  reasonable accommodation, namely, a change of her work schedule;

3  by terminating her employment; and by not reinstating her.

4  Reinstating Ms. Spaeth.  Defendant denies that it discriminated

09:32  5  against Ms. Spaeth and says that Ms. Spaeth's employment was

6  terminated because of her failure to reliably attend work and to

7  adhere to the schedule Defendant set, specifically her

8  repeatedly leaving early before her shift was over.  Defendant

9  contends that reliable attendance and working the complete shift

09:33  10  were essential to performing the job she was hired for.

11  As you listen to these instructions, please keep in

12  mind that many of the terms I will use have a special meaning

13  under the law.  So please remember to consider the specific

14  definitions I give you, rather than using your own opinion as to

09:33  15  what these terms mean.

16  In deciding the EEOC's claims, you should not concern

17  yourselves with whether Walmart's actions were wise or fair.

18  Rather, your concern is only whether the EEOC has proved that

19  Walmart discriminated against Marlo Spaeth because of her

09:33  20  disability.

21  The EEOC's first claim is that Walmart unlawfully

22  refused to give Ms. Spaeth a "reasonable accommodation."  To

23  succeed, the EEOC must prove five things by a preponderance of

24  the evidence.  Actually three things here is what I have:

09:34  25  1.  Marlo Spaeth was a qualified individual with a

795

1  disability.

2        2.  Walmart was aware that Ms. Spaeth needed an

3  accommodation due to her disability, either because Ms. Spaeth

4  requested one or otherwise.  And,

09:34  5        3.  Defendant failed to provide Ms. Spaeth with a

6  reasonable accommodation.

7        If you find that Plaintiff proved each of these things

8  by a preponderance of the evidence, you should turn to the issue

9  of plaintiff's damages.  If you find the Plaintiff has failed to

09:34  10  prove any of these things by a preponderance of the evidence,

11  your verdict should be for the Defendant on this claim.

12        Under the ADA, the term "disability" means a physical

13  or mental impairment that "substantially limits" a "major life

14  activity."  I will now define some of these terms in more

09:35  15  detail.  Again, I remind you to consider the specific

16  definitions I give you, and not use your own opinion as to what

17  these terms mean.

18        Under the ADA, an impairment "substantially limits" a

19  major life activity if it impairs the individual's ability to

09:35  20  perform the activity as compared to the average person in the

21  general population.  Major life activities are those that an

22  average person can do without much difficulty.  Thinking,

23  speaking, and brain function are all major life activities.  The

24  term "substantially limits" is not meant to be a demanding

09:35  25  standard, and a condition does not have to prevent, or

796

1   significantly or severely restrict, a person from performing the

2   major life activity to be considered a disability.

3        It is not required that there be any medical analysis

4   to make the determination of whether someone is substantially

5   limited in a major life activity.  For example, deafness

6   substantially limits hearing; blindness substantially limits

7   seeing; an intellectual disability -- formerly termed mental

8   retardation -- substantially limits brain function; and autism

9   substantially limits brain function.  Down syndrome is a genetic

10  disorder which varies in severity but causes lifelong

11  intellectual disability and developmental delays.

12       If you find that Ms. Spaeth's impairments

13  substantially limit one major life activity, you must find that

14  her impairments are a disability even if they do not limit any

15  other major life activity.

16       Under the ADA, Marlo Spaeth was "qualified" if she had

17  the skill, experience, education, and other requirements for the

18  job and could do the job's essential functions, either with or

19  without a reasonable accommodation.  You should only consider

20  Ms. Spaeth's abilities at the time of Ms. Spaeth's termination.

21       Not all job functions are "essential."  Essential

22  functions are a job's fundamental duties.  In deciding whether a

23  function is essential, you may consider the reasons the job

24  exists, the number of employees Walmart has to do that kind of

25  work, the degree of specialization the job requires, Walmart's

797

1    judgment about what is required, the consequences of not

2    requiring an employee to satisfy that function, and the work

3    experience of others who held the position.

4        In addition to specific job requirements, an employer

09:37   5    may have general requirements for all employees.  For example,

6    the employer may generally require regular and timely

7    attendance.

8        Under the ADA, to "accommodate" a disability is to

9    make some change that will let a person with a disability

09:38  10    perform the job.  An accommodation is "reasonable" if it is

11    effective and its costs are not clearly disproportionate to the

12    benefits that it will produce.

13        A reasonable accommodation may include a change in

14    such things as ordinary work rules, facilities, conditions, or

09:38  15    schedules, but does not include elimination or change of

16    essential job functions, assignment of essential job functions

17    to other employees, or lower productivity or performance

18    standards.

19        EEOC has the burden of proving that Walmart was aware

09:38  20    of Marlo Spaeth's need for an accommodation for her disability.

21    Where the need for an accommodation is obvious, the employer

22    must initiate an informal interactive process with the employee

23    or those acting on the employee's behalf, to determine whether a

24    reasonable accommodation should be provided.  Where the need for

09:39  25    an accommodation is not obvious, however, the disabled employee,

798

1    or those acting on the employee's behalf, must make their

2    employers aware of any medically necessary accommodation.

3         Once an employer is aware of the employee's disability

4    and knows or should have known that there is a need for a

09:39   5    reasonable accommodation, the employer must discuss with the

6    employee or, if necessary, with her doctor, whether there is a

7    reasonable accommodation that will permit the employee to

8    perform the job.  Both the employer and the employee must

9    cooperate in this interactive process in good faith.  If an

09:39   10   employer has a question regarding a request for a reasonable

11   accommodation, the employer must undertake to find out the

12   answer to the question.

13        Neither party can win this case simply because the

14   other did not cooperate in this process, but you may consider

09:40   15   whether a party cooperated in this process when deciding whether

16   a reasonable accomodation existed and when considering whether

17   to award punitive damages.

18        You have heard evidence that Marlo Spaeth's sister,

19   Amy Jo Stevenson, claims to have made a request for a reasonable

09:40   20   accommodation for Marlo Spaeth's disability subsequent to the

21   termination of Marlo Spaeth's employment.

22        You should not consider evidence of a request for a

23   reasonable accommodation, if any, made after Marlo Spaeth's

24   termination in determining whether the EEOC has met its burden

09:40   25   of proving Walmart violated the Americans With Disabilities Act

799

1    by terminating Marlo Spaeth's employment.  You may consider such

2    evidence, if my, made before Walmart's decision denying her

3    request for reinstatement.

4         Under the ADA, Walmart does not need to accommodate

09:41  5    Marlo Spaeth if it would cause an "undue hardship" to its

6    business.  An "undue hardship" is something too costly or

7    something that is so disruptive that it would fundamentally

8    change the nature of Walmart's business or how Walmart runs its

9    business.

09:41  10    Walmart must prove to you by a preponderance of the

11    evidence that Marlo Spaeth's proposed accommodation would be an

12    "undue hardship."  In deciding this issue, you should consider

13    the following factors:

14         The nature and cost of the accommodation;

09:41  15    Walmart's overall financial resources.  This might

16    include the size of its business, the number of people it

17    employs, and the types of facilities it runs;

18         The financial resources of the facility where the

19    accommodation would be made.  This might include the number of

09:42  20    people who work there and the impact that the accommodation

21    would have on its operations and costs; and

22         The way that Walmart conducts its operations.  This

23    might include its workforce structure; the location of its

24    facility where the accommodation would be made compared to

09:42  25    Walmart's other facilities; and the relationship between these

800

1    facilities.

2         If Walmart provided an accommodation to Marlo Spaeth

3    that was not required by the ADA in the first place, the law

4    does not require Walmart to continue to provide that

09:42  5    accommodation.  Rather, Walmart may lawfully discontinue the

6    accommodation at any time and not provide it again.

7         Elements of an ADA discriminatory termination claim.

8         The EEOC's second claim is that Walmart discriminated

9    against Ms. Spaeth by discharging her from her employment

09:42  10    because of her disability or because of the need to accommodate

11    her disability.  To succeed on this claim, the EEOC must prove

12    four things by a preponderance of the evidence:

13         1.  Ms. Spaeth had a disability.  I have defined

14    "disability" earlier.

09:43  15         2.  Ms. Spaeth was qualified to perform the job with

16    reasonable accommodation.

17         3.  Walmart discharged Ms. Spaeth.  And,

18         4.  Walmart would not have discharged Ms. Spaeth if

19    she did not have a disability or if she did not need an

09:43  20    accommodation, but everything else had remained the same.

21         If you find that the EEOC has proved each of these

22    things by a preponderance of the evidence, you should turn to

23    the issue of Marlo Spaeth's damages.  If you find that the EEOC

24    has failed to prove any of these things by a preponderance of

09:43  25    the evidence, your verdict should be for Walmart.

801

1          To succeed in this case, Plaintiff must prove four

2     things by a preponderance of the evidence:

3          These are the elements for the ADA -- under the ADA

4     for a failure to reinstate claim.

5          To succeed on this claim, Plaintiff must prove four

6     things by a preponderance of the evidence:

7          1.  Marlo Spaeth, or someone on her behalf, requested

8     reinstatement of her position at Walmart after July 10th, 2015.

9          2.  Marlo Spaeth, with or without reasonable

10    accommodation, was "qualified" for the position she requested

11    reinstatement for after July 10th, 2015;

12         3.  Walmart did not reinstate Marlo Spaeth for her

13    position at the company despite her request after July 10th,

14    2015; and

15         4.  Walmart did not reinstate Marlo Spaeth because she

16    has Down syndrome or because of the need to reasonably

17    accommodate her disability.

18         If you find that the EEOC has proved each of these

19    things by a preponderance of the evidence, you should turn to

20    the issue of Marlo Spaeth's damages.  If you find that the EEOC

21    has failed to prove any of these things by a preponderance of

22    the evidence, your verdict should be for Walmart.

23         If you find that the EEOC has proved any of its claims

24    against Walmart, then you must decide what amount of damages, if

25    any, she is entitled to recover for those claims.  The EEOC must

802

1    prove Ms. Spaeth's damages by a preponderance of the evidence.

2         If you find that the EEOC has failed to prove any of

3    its claims, then you will not consider the question of damages.

4         You may award compensatory damages to Marlo Spaeth

09:45    5    only for injuries that have been proved by a preponderance of

6    the evidence -- that have been proved by a preponderance of the

7    evidence were caused by Defendant's wrongful conduct.

8         Your award must be based on evidence and not

9    speculation or guesswork. This does not mean, however, that

09:45    10   compensatory damages are restricted to the actual loss of money;

11   they include both the physical and mental aspects of injury,

12   even if they are not easy to measure.

13        In calculating damages, you should not consider the

14   issue of lost wages or benefits. The court will calculate and

09:46    15   determine any damages for past or future lost wages and

16   benefits, if needed. You should consider the following types of

17   compensatory damages, and no others:

18        The mental and emotional pain and suffering that Marlo

19   Spaeth experienced and is reasonably certain to experience in

09:46    20   the future.

21        No evidence of the dollar value of mental and

22   emotional pain and suffering has been or needs to be introduced.

23   There is no exact standard for setting the damages to be awarded

24   on account of pain and suffering. You are to determine an

09:46    25   amount that will fairly compensate for the injury she sustained.

803

1    If you find for the EEOC, you may, but are not

2    required to, assess punitive damages against the Defendant.  For

3    purposes of punitive damages -- the purposes of punitive damages

4    are to punish a defendant for its conduct and to serve as an

09:47    5    example or warning to Walmart and others not to engage in

6    similar conduct in the future.

7    The EEOC must prove by a preponderance of the evidence

8    that punitive damages should be assessed against Walmart.  You

9    may assess punitive damages only if you find that the conduct of

09:47    10    Walmart was in reckless disregard of Marlo Spaeth's rights.  An

11    action is in reckless disregard of Marlo Spaeth's rights if

12    taken with knowledge that it may violate the law.

13    The EEOC must prove by a preponderance of the evidence

14    that Defendant's managerial employees and officers acted within

09:47    15    the scope of their employment and in reckless disregard of

16    Ms. Spaeth's right not to be discriminated against.  In

17    determining whether a Walmart employee was a managerial

18    employee, you should consider the kind of authority Walmart gave

19    them, the amount of discretion they had in carrying out their

09:47    20    job duties and the manner in which they carried them out.

21    If you find that punitive damages are appropriate,

22    then you must use sound reason in setting the amount of those

23    damages.  Punitive damages, if any, should be in an amount

24    sufficient to fulfill the purpose that I have described to you,

09:48    25    but should not reflect bias, prejudice, or sympathy toward

804

1    either or any party.  In determining the amount of punitive

2    damages, you should consider the following factors:

3              The reprehensibility of Walmart's conduct;

4              The impact of Walmart's conduct on Marlo Spaeth;

09:48    5              The relationship between Marlo Spaeth and Walmart;

6              The likelihood that Walmart would repeat the conduct

7    if an award of punitive damages is not made;

8              The relationship of any award of punitive damages to

9    the actual harm Marlo Spaeth suffered; and

09:48    10             Walmart's financial condition.

11             So that concludes my introductory or the instructions

12   that really govern the substance.  I have some brief closing

13   instructions, but first you'll hear the arguments of counsel.

14             Walmart is the plaintiff, Walmart has the burden of

09:49    15   proof.  Or, I'm sorry, EEOC is the plaintiff, EEOC has the

16   burden of proof.  So the EEOC will argue first and then the EEOC

17   will have an opportunity for brief rebuttal after Walmart makes

18   its argument.

19             Okay.  Hope that's the only mistake I made.  Okay,

09:49    20   Ms. Vance, you may close.

21             MS. VANCE:  Thank you, Your Honor.

22                   PLAINTIFF CLOSING ARGUMENT

23             MS. VANCE:  Good morning, members of the jury.

24             Marlo Spaeth did her part.  She thrived in her job at

09:50    25   Walmart for over 15 years.  The annual reviews, year after year,

805

1    show Marlo meets expectations and is a solid performer.

2         Marlo's annual reviews shows she had zero absences and

3    zero tardies for nine years.  In six of those nine evaluations,

4    Marlo exceeds Walmart's expectations in the area of attendance.

09:51    5         Marlo's annual reviews show her strengths include

6    dependability and reliability -- let's see Exhibit 13 -- with

7    her manager in 2010 praising her for being here when scheduled

8    and willing to do what we ask.  Thank you.

9         Her manager in 2012 praising Marlo because she is here

09:51    10    when scheduled, and her manager in 2014 commending her for zero

11    active absences in a six-month rolling period.

12         Walmart could count on Marlo.  She showed up, she did

13    her work.  She met or exceeded expectations and she did her

14    part.

09:51    15         Walmart, on the other hand, did not do its part.

16    Walmart violated the Americans With Disabilities Act.  The ADA

17    promises equal employment opportunity for people with

18    disabilities.  The ADA promises that you can get a reasonable

19    accommodation at work if you need it because of your disability,

09:52    20    as long as it's not an undue hardship.  Under that law, Marlo

21    Spaeth has the right to an accommodated schedule.  And what

22    we've learned this week is that she needs that accommodation,

23    that routine in order to thrive in her job.

24         Accommodating Marlo's need for routine that was based

09:52    25    on Down syndrome means that Marlo gets to come into work, clock

806

1    in, get her aisle straightened, get all the shelves of her

2    department stocked and organized, process all the returns they

3    give her at the front desk, help all the customers that come

4    through, clock out, and catch her bus.

5           With that routine Marlo performs the essential

6    functions of her job.  She meets or exceeds her -- Walmart's

7    expectations.  She has excellent attendance.  She contributes to

8    Walmart's business model.  She promotes Walmart's 10-foot rule

9    to provide excellent customer service to any customer that comes

10   within 10 feet of her.  She wears her Walmart vest with pride.

11   Walmart rewards Marlo with raises every year.  Walmart thanks

12   Marlo with bonus checks.

13          And do you remember what happens when Marlo gets her

14   bonus checks?  Everyone at home says good work, Marlo, that

15   means you're taking us all out to dinner.

16          And that's what she gets to do.  She gets to be a

17   career woman.  She gets that pride, that sense of success at her

18   career.  She gets to say to her mom, hey, look, I got my bonus

19   check, tonight I'm taking us all out for dinner.

20          We heard Attorney Burnett in his opening say Walmart

21   is not in the business of getting rid of good employees.  That's

22   probably true for the most part.  But here in this case, for

23   Marlo Spaeth, what we learned is that Walmart is not in the

24   business of getting rid of good employees until they need a

25   reasonable accommodation.

1          In November of 2014, the Manitowoc managers got the

2 directive from headquarters, from the home office:  stop

3 manually scheduling employees.  Everybody must conform to the

4 new computerized system, no exceptions.

09:55   5          For the first time in 15 years this meant Walmart

6 scheduled Marlo outside of her availability.  Instead of noon to

7 4:00, Marlo had to work longer and later shifts, 1:00 to 5:30.

8 And Walmart has meticulously documented what happened next.

9 Marlo couldn't make it to 5:30.  She clocked out early.

09:55   10          When confronted before -- excuse me.  When confronted

11 for leaving before 5:30, Marlo asked to have her schedule of

12 noon to 4:00.  Julie Stern, Walmart's supervising manager,

13 testified that every time she talked to Marlo about leaving

14 early Marlo asked to work noon to 4:00.  Walmart started

09:55   15 disciplining her.

16          The conflict and the stress from that conflict only

17 made it worse.  The confrontations and the disciplinary meetings

18 only made it worse.  Marlo started clocking out earlier.  And

19 Marlo even had some no call/no show days, which was very out of

09:56   20 the ordinary for her.  The employee with years and years of zero

21 absences had attendance problems now.

22          Julie Stern admitted that at every coaching Marlo

23 asked to work noon to 4:00.  It was obvious.

24          Marlo couldn't handle the longer and later shifts.

09:56   25 She couldn't handle the disruption to the routine that had

808

1    helped her thrive for so long.  Marlo couldn't conform herself

2    to the computer generated schedule, she needed a reasonable

3    accommodation.

4          Instead of following its own store policies to get

09:56  5    Marlo an accommodation packet and send it to the ADA office in

6    Bentonville, Arkansas, Walmart managers focused their energy on

7    documenting Marlo's attendance infractions and counting up her

8    points.  They continued to write her up.  Instead of following

9    the law and recognizing Marlo's rights to a reasonable

09:57  10    accommodation under the ADA, they counted up all her attendance

11    points and they fired her.  Slowly.

12          At that point, Walmart managers had documented 17

13    points.  Right before their very eyes they had all the proof in

14    the world that Marlo couldn't adapt to such a big change in her

09:57  15    routine because she has a disability.  Marlo needed an

16    accommodated schedule in order to function at her job.  It was

17    obvious.

18          Now, in case there is ever any doubt, Amy Jo

19    Stevenson, her sister, got involved.  When Amy Jo learned that

09:58  20    Marlo was getting scheduled to work to 5:30, she called Karen

21    Becker, the contact for the family for many years.  Amy told

22    Karen, "You have to change Marlo's schedule back.  She can't

23    handle working that late.  She can't do it."

24          So at this point Marlo had repeatedly told Walmart she

09:58  25    needed an accommodation, and now Amy Jo Stevenson told Walmart

809

1    Marlo needed an accommodation because of her disability.

2              Walmart refused to bend on the insistence that

3    everybody must conform to the computerized schedule.  Instead of

4    even considering a schedule accommodation for Marlo, Walmart

09:59    5    fired her.

6              Amy Jo gets involved again, she gets a meeting with

7    Walmart management.  She's going to get Marlo her job back.  She

8    does her homework.  You heard Amy Jo testify she wanted to

9    educate herself about Marlo's rights.  She goes online, she

09:59    10    finds a fact sheet about reasonable accommodations under the

11    ADA, she prints it out.  She collects the termination paperwork

12    from Marlo showing eligibility for rehire.

13             Amy Jo Stevenson sits down with those two documents

14    and says:  "Marlo has a right to a reasonable accommodation

09:59    15    under the ADA.  You should have accommodated her schedule when

16    she asked.  You should have accommodated her schedule when I

17    called in and spoke to Karen.  Let's make this easy, Marlo's

18    eligible for rehire, give Marlo her job back and accommodate her

19    schedule to the noon to 4:00 shift she's had for all these

10:00    20    years."

21             It was obvious.  Marlo needed an accommodation because

22    of her disability, and Amy Jo requested that accommodation plain

23    as day.  You heard the testimony.

24             Walmart managers could have reinstated Marlo with a

10:00    25    simple reactivation process in the system.  It only takes a

810

1    matter of minutes.  But did Walmart reinstate Marlo?  No, they

2    investigated.  They cut off all communications to the family.

3    They reviewed all the attendance points.  They reviewed all the

4    coaching documents that Marlo had to sign.  They wanted to make

10:00   5    sure that all the documentation they had of these attendance

6    violations had the I's crossed and the T's dotted.  The ethics

7    investigator was satisfied that Marlo's record had all that

8    documentation in place to justify the termination based on

9    attendance points and they stuck to the termination decision.

10:01  10    Robin Castro called Marlo and told her that Walmart

11    would not be able to rehire her.  Marlo would not get her job

12    back.

13    Now it's time for you to do your part.  EEOC asks you

14    to return a verdict for the Plaintiff.  We have met our burden

10:01  15    of proof.  In your jury instructions you'll see that you must

16    return a verdict for EEOC, for Plaintiff, if you find that we

17    have met our burden of proof by a preponderance of the evidence.

18    That means it's probably more true than not.

19    You'll have all the admitted evidence in the record

10:02  20    with you in deliberations.  You'll have the binders that the

21    witnesses have been using.  So now I want to walk you through

22    the verdict sheet and give you all the evidence you need to

23    render your verdict.

24    "Question 1.  During the time of her employment with

10:02  25    Walmart was Marlo Spaeth a person with a disability?"

811

1      You heard manager after manager testify that they knew

2 Walmart -- excuse me, that they knew, when they first saw Marlo

3 Spaeth, that she had Down syndrome.  So we know she is a person

4 with a disability, and the question is qualified person with a

5 disability.

6      So in the Plaintiff's exhibit binder I want to direct

7 you to some of the evidence that proves Question 1.

8      You'll find all of Marlo's annual reviews, starting at

9 Exhibit 2, going through Exhibit 18.  You've seen the highlights

10 during the trial and you'll be able to read them all if you care

11 to.

12      Marlo met or exceeded expectations and Marlo got a

13 raise every year until she was scheduled outside of her

14 availability.

15      At Exhibit 19 you'll find a commendation certificate

16 for Marlo Spaeth.

17      This evidence proves Marlo Spaeth was qualified to

18 perform the essential functions of her job with a reasonable

19 accommodation for her schedule.

20      Then you need to go to Exhibits 35, 36, and 37.

21      Lectrice, can we please see -- or highlight from 37.

22      After Walmart fired Marlo they did an investigation,

23 and during that investigation all three managers were asked if

24 Marlo had any performance problems when she was terminated.

25      This is Exhibit 37.  This was J., Julie Stern's

10:02
10:03
10:03
10:03
10:04

812

1    answer.  You'll find the same answer in Exhibit 35 and

2    Exhibit 36 as well.

3            Robin Castro, Bonnie Popp, and Julie Stern reported

4    that there were no problems with job performance at the time of

5    termination for Marlo.  The termination was based on attendance

6    only.

7            Thank you.

8            With that evidence you should answer Question 1 "Yes."

9            So, "Question 2.  Was Walmart aware that Marlo Spaeth

10   needed an accommodation due to her disability?"

11           We can't dispute it.  It's true that Marlo Spaeth

12   never walked in to Karen Becker's office and said:

13           *Excuse me, Karen, I've been reading up under my rights*

14   *under the Americans With Disabilities Act, and there's a section*

15   *in the statute about my right to a reasonable accommodation*

16   *which would help me perform the essential functions of my job*

17   *provided it's not an undue hardship for my employer.  I would*

18   *like to engage in the interactive process with you to determine*

19   *the most appropriate accommodation for my circumstances.  Would*

20   *you please print out the accommodation request paperwork that I*

21   *would need in order to submit a request to work noon to 4:00*

22   *schedule.*

23           It's true, Marlo didn't do that.  She can't.  What

24   Marlo said was:  "I'm tired."  "I can't work too late."  "I'm

25   afraid I'll miss my bus."  "It's too hot to work that late."

813

1    "I'll get sick if I miss supper."  "Why can't I just work noon

2    to 4:00 like I used to?"

3              Marlo told them she needed an accommodation because of

4    her disability in her own words.  It was obvious.  Nobody's too

5    hot to work until 5:30 in January in Manitowoc.  Marlo's own

6    words were enough to make Walmart aware that something was going

7    on with Marlo.  She wasn't coping well with this new schedule

8    because of her disability.

9              We've heard manager after manager come in here and

10   testify that they never imagined that Marlo needed a schedule

11   accommodation because she has Down syndrome.  They had no idea

12   Marlo couldn't adapt to a change in routine because she has a

13   disability.  Maybe they thought it was really just an attitude

14   problem.

15             But do you remember how Walmart's managers also knew,

16   and testified, that when you try to teach Marlo a new task she

17   needed extra support?  When Marlo had to branch out beyond

18   towels and start folding bath rugs, she was so stressed out by

19   the new routine that she went home and told her mother, "They

20   said I have to clean the bathrooms."  Adjusting to that new

21   routine of folding towels, then also folding bath rugs, required

22   extra support.  Karen Becker in HR had to get involved and

23   straighten everything out.  Marlo needed that extra reassurance

24   and that extra support to adapt to the new routine.

25             And remember all the testimony from managers about the

1    process of adding returns to Marlo's job routine?  Marlo's

2    supervisors had to do the returns with her to teach her the

3    task.  They had to walk her through the process in order to add

4    folding towels, and then folding bath rugs, and then processing

10:08   5    returns, to her routine.

6        The testimony was that it took a couple weeks of doing

7    returns with Marlo before it became part of her routine.

8        So when they want you to think they know Marlo well

9    and that they were good managers to Marlo they testify about how

10:08   10    changes to her routine require extra support and guidance.  They

11    testify about how they knew that and everybody knew that about

12    working with Marlo.  But when it comes to honoring her right to

13    a schedule accommodation, well, then Walmart managers had no

14    idea that part of Marlo's life as a person with Down syndrome is

10:09   15    that she can't easily adjust to changes in routine.

16        The other facts that prove Walmart was aware that

17    Marlo needed a schedule accommodation due to disability are:

18        Marlo went from attendance that exceeds expectations

19    to an employee struggling with attendance problems.  That should

10:09   20    have raised questions.

21        You also need to look at Walmart's Exhibits 1006 and

22    1007.  What you'll see is that Marlo kept coming into work, she

23    kept showing up and clocking in -- oftentimes early because they

24    had moved her start time to 1:00 -- and doing her job tasks.

10:09   25    She just couldn't handle staying till 5:30 p.m.

815

1      They've meticulously documented the struggle that

2  Marlo faced because she has Down syndrome, in those exhibits.

3          When Marlo went from excellent attendance to racking

4  up all those early departure points, she proved to them that

5  because of her disability she couldn't handle the new schedule.

6          Marlo kept asking to work noon to 4:00.  That's

7  another fact.

8          Then the other evidence to consider for Question 2 is

9  Marlo showed them that she didn't understand, she wasn't getting

10  it.  They knew she needed help because of the cognitive

11  limitations, the developmental delays that are caused by Down

12  syndrome.  Here you need to go to Exhibit 23.  This exhibit

13  shows you what a conversation with Marlo about her schedule was

14  like.  Julie Stern is her manager, Julie Stern writes the email

15  in Exhibit 23.

16          "I did tell her that the next two days she is

17  scheduled 1:00 to 5:30, and I expect her to work that schedule.

18          "She said she only works noon to 4:00."

19          Okay.  Picture that.  You're in a conversation with a

20  person with Down syndrome and you say "you're scheduled 1:00 to

21  5:30, I expect you to work that schedule," and the reply you get

22  is "I only work noon to 4:00."

23          Thank you.

24          Now, Julie Stern testified that there was never any

25  point in time where she thought Marlo didn't understand her.

816

1    But, members of the jury, you get to use your common sense.

2    That was not a conversation where two people understood each

3    other.  You can decide if Marlo's answer shows she didn't

4    understand.  She has Down syndrome, in order to make a big

10:12  5    change in her routine like that she needed extra support.  She

6    needed a medically necessary accommodation, it was obvious.

7    Your answer to Question 2 should be "Yes."

8    "Question 3.  Did Walmart fail to provide Marlo Spaeth

9    with a reasonable accommodation?"

10:12  10    And for some of these you're going to need to go back

11    to your jury instructions to get your definitions.  Make sure

12    you are using the legal terms according to the judge's

13    instructions.

14    You'll see from Jury Instruction 4.06 the definition:

10:12  15    "A reasonable accommodation may include a change in

16    such things as ordinary work rules, facilities, conditions, or

17    schedules."

18    So right there in the jury instructions you see

19    reasonable accommodations include schedule changes.

10:13  20    Now, you should also review Walmart's own policies.

21    Exhibit 29.  Walmart lists part-time or modified work schedules

22    as one of the examples of a reasonable accommodation.

23    And let's remember --

24    Thank you.

10:13  25    -- we're talking about 90 minutes here, the difference

817

1    between 4 p.m. and 5:30.  Remember, Julie Stern testified that

2    this was such a minor change.  The accommodation was reasonable,

3    the accommodation was never at any point even considered by

4    Walmart.  Your answer to Question 3 should be "Yes."

5            "Question 4.  Would providing Marlo Spaeth an

6    accommodation have posed an undue hardship to Walmart's

7    business?"

8            The evidence that will help you answer Question 4

9    starts at Exhibit 23.  That's that Julie Stern email, where she

10   starts documenting Marlo's difficulties adapting to the new

11   schedule.  It's from December 17th, 2014.  And, in general, take

12   a good look at that email and you'll find -- one of the things

13   you'll find is this sentence:

14           "If she is not going to work the entire shifts, then

15   there are other associates in the store that would be more than

16   happy to have those hours."

17           That's the solution right there.  Think about it.

18   Marlo -- if they did this -- Marlo could clock out at 4 p.m. and

19   catch her bus, other associates can have those hours and would

20   be more than happy.  Customers who came in at 4:45 would be

21   served by these more-than-happy associates.  The domestic

22   departments would get continuously zoned after 4:0 to 5:30 p.m.

23   They had the answer right in front of them:  Marlo's happy,

24   customers are happy, Walmart's happy.  If they would have just

25   done that everyone would benefit.  That's not undue hardship.

10:14

10:14

10:14

10:15

10:15

818

1        Thank you.

2        The other evidence to remember as you look at

3   Question 4 is from Karen Becker.  Remember that she testified

4   that when Marlo worked noon to 4:00 for 15 years there was never

10:15   5   a problem staffing the domestics department.  Walmart always had

6   multiple employees who were assigned to domestics.  Even though

7   for 15 years Marlo's schedule ended at 4:00, they always had

8   coverage in the domestics department.  That's not undue

9   hardship.

10:16   10       And notice, Walmart hasn't presented any evidence

11  showing that during those 15 years when Marlo left at 4:00 the

12  Manitowoc store sales were affected in any way.  Your answer to

13  Question 4 should be "No."

14       "Question 5.  Did Walmart violate the Americans With

10:16   15  Disabilities Act by terminating Marlo Spaeth because of her

16  disability?"

17       For Question 5 you should think through Exhibit 1,

18  that's the history of Marlo's personnel file of her

19  availability.  It's in chronological order.  And you'll see that

10:17   20  the oldest available forms show that through the years Marlo is

21  available to be scheduled approximately noon to approximately

22  4:00, but in February 2015 you see the new availability that

23  Bonnie Popp had Marlo sign.

24       And think about the timing there.  Marlo's schedule

10:17   25  changed in November 2014.  By December, it's already a problem.

819

1    Julie Stern writes out the email to managers to make sure

2    everybody knows what's going on.

3           The email shows Marlo asked to work noon to 4:00; that

4    Marlo says, "Why can't I just work noon to 4:00 like I used to?"

10:17   5    That when Julie says, "I expect you to work to 5:30," Marlo

6    answers, "I work noon to 4:00."  Exhibit 23 shows that Marlo

7    told them "I'll get sick if I miss supper."  "I'm afraid I'll

8    miss my bus."

9           So that's December.  Then Marlo racks up eight more

10:18   10   early departures.  When you go to deliberations you can look at

11   Exhibit 1013.  Marlo has eight early departures leading up to

12   February 13th, 2015.

13          So at this point isn't it obvious that Marlo can't

14   make the adjustment?  But what does Bonnie Popp do?  Instead of

10:18   15   going into the personnel office and grabbing the accommodation

16   packet and sitting down with Marlo to start a request for

17   reasonable accommodation, Bonnie goes to the personnel office to

18   get a blank availability form.

19          Marlo had been scheduled outside of her availability

10:18   20   for four months at this point, but the paperwork hadn't caught

21   up to it yet.  Marlo hasn't been coping with the later and

22   longer shifts, but Bonnie decides we're not going to sit down

23   with an accommodation packet and fill out your request

24   paperwork, we're going to sit down with a blank availability

10:19   25   form.  Bonnie's going to fill out all the times.  Bonnie tells

820

1    Marlo she needs to change her availability, she needs to sign

2    off.  She needs to sign the new availability form.  Marlo does

3    as she's told and signs it, and now the table is set.

4         By February 2015, Marlo has already had one coaching,

10:19    5    she racked up an additional eight early departures, she's only a

6    few points away from getting fired for those early departures,

7    and Walmart doesn't budge.  Walmart won't even consider a

8    schedule accommodation.  The new system demands that the

9    associates expand their availability to work or they won't get

10:20   10   any hours.

11        With this continued insistence on working the new

12   schedule to 5:30 p.m., Marlo just racks up more points.  She

13   eventually gets fired.  It all could have been prevented if

14   Walmart would have been willing to give Marlo an accommodated

10:20   15   schedule.

16        The answer to Question 5 should be "Yes."

17        "Question 6.  Did Walmart violate the Americans With

18   Disabilities Act by failing to reinstate Marlo Spaeth because of

19   her disability?"

10:20   20        Here you need to review Exhibits 20 and 26.  Marlo was

21   eligible for rehire, that's in her termination paperwork, and

22   Walmart has a policy.  That's Exhibit 26, for reinstatement and

23   rehire.

24        Karen Becker testified she could have reactivated an

10:21   25   employee in the system in a matter of minutes.

821

1    Lee Spude, the market human resources manager above

2    the Manitowoc store, he testified that he has the authority at

3    his level of management to approve a reinstatement.  It's not a

4    complicated process.

10:21  5    Amy Jo asked for rehire -- well, Amy Jo asked that

6    Marlo get her job back.  She explained why Marlo has a right to

7    get her job back with an accommodated schedule under the ADA,

8    and Walmart refused.  Your answer to Question 6 should be "Yes."

9    "Question 7.  What sum of money will fairly and

10:21  10   reasonably compensate Marlo Spaeth for her emotional pain and

11   mental anguish?"

12   There's no formula for this.  You've heard the

13   evidence.  You met Marlo Spaeth.  You heard that she still looks

14   down when there's a Walmart commercial on TV.  Even here, six

10:22  15   years later.

16   Now, there are some cases where there's a small

17   injury, like a sprained knee from a car, a fender-bender, and

18   the prevailing plaintiff is awarded a thousand dollars to

19   compensate that injury.  Then there are more serious cases where

10:22  20   there's loss of life due to illegal actions, and the jury gives

21   a verdict in the millions.

22   We think this case is somewhere in-between.  Walmart

23   took Marlo's job away from her, but that was also her sense of

24   purpose, her grounding, organizing part of her routine, her day,

10:23  25   how she structured her life.  It was what she was proud of.  It

822

1    gave her a sense of accomplishment.  It gave her a vocation,

2    it's what she did with her adult years.  The evidence you

3    consider is:

4         The testimony from Amy:  "This was a devastating loss

10:23   5    for Marlo."

6         The testimony from Dr. Smith:  "A job loss here led to

7    depression and anxiety.  It even led to memory loss, decline in

8    memory and brain function."  He called it pseudodementia.  Marlo

9    required antidepressant medications before she could stabilize

10:24   10   from those symptoms.  She remains on the antidepressants to this

11    day.

12         Barb testified she saw Marlo crying when she came home

13    fired.

14         And you heard Marlo:  "I miss Walmart."  "I miss

10:24   15   everybody."

16         She still carries emotional pain and mental anguish.

17    And it's stable now, it's medicated now, but you also want to

18    consider the entire timeframe and especially at the time of

19    termination what that loss meant for Marlo.

10:24   20   What you need to write for the answer for Question 7

21    is the amount of money that you think will make up for it, the

22    amount of money that will make up for the emotional pain and the

23    mental anguish for what Walmart did to Marlo.

24         You know, Marlo gave Walmart 15 years of good work.

10:25   25   She promoted that 10-foot rule for customer service.  She did

823

1    her job, she did her part.  Marlo deserves better than what she

2    got.

3         "Question 8.  What amount, if any, do you award as

4    punitive damages?"

10:25   5         And here let's go to -- I'll tell you you're going to

6    need to go to your jury instructions, get your definitions.

7    Jury Instruction 3.13 is your punitive damages instruction.  And

8    I'm going to need a second to get to it.

9         The purpose of punitive damages is to punish Walmart

10:26   10    and to serve as an example or a warning to Walmart or others.

11        And remember, Walmart has a million employees.  There

12    are other people that could be -- there are other people that

13    Walmart employs with disabilities.  You're here for Marlo

14    Spaeth, but let's remember we're talking about Walmart.

10:26   15        The other instruction I want you to look at for

16    punitive damages as you consider Question 8 on the verdict is

17    4.08.  That's the interactive process.  When you look up the

18    interactive process, Jury Instruction 4.08, you'll see "Where

19    the need for an accommodation is obvious, the employer must" --

10:27   20    they must initiate an informal interactive process with the

21    employee or those acting on behalf -- or acting on the

22    employee's behalf to determine whether a reasonable

23    accommodation should provide.

24        It's a duty under the law.  The interactive process is

10:27   25    a must when the accommodation is obvious like it is here.

824

1    "Where the need for an accommodation is not obvious,

2    however, the disabled employee, or those acting on the

3    employee's behalf, must make their employers aware of any

4    medically necessary accomodation."

10:27 5    Well, that happened, too.  We had Marlo explaining

6    "I'll get sick if I stay this late if I miss supper."

7    We had Amy Jo calling Karen, "She can't handle this."

8    And then later we had Amy Jo in a meeting saying,

9    "Marlo has a disability.  She has a right to an accommodation

10:28 10   for her disability, plain as day."

11   So Walmart knew they were in this territory where they

12   must initiate the interactive process.

13   And if you look to the end of that instruction you'll

14   see "you may consider whether a party cooperated in the

10:28 15   interactive process when deciding whether a reasonable

16   accommodation existed and when considering whether to award

17   punitive damages."

18   So for this you refer to Exhibit 34.

19   Lectrice, can we have Exhibit 34, please?

10:29 20   Walmart must engage in the interactive process?

21   Lee Spude, market research -- market human resource

22   manager, hears about the termination, hears about the meeting

23   with Marlo's family, and he instructs Robin Castro:  "Do not

24   have any further discussion with Marlo's relatives."

10:29 25   He knows better.  That's the opposite of the

825

1    interactive process.

2           So the other instruction for punitive damages is 3.13

3    if Walmart shows reckless disregard in their actions.

4           "An action is in reckless disregard of Marlo Spaeth's

10:30   5    rights if it's taken with knowledge that it may violate the

6    law."

7           What we have heard here this week is manager after

8    manager testifying they know that with the ADA -- because of the

9    ADA it's illegal to deny a person with a disability a reasonable

10:30  10   accommodation.

11          And then, further down, in the punitive damages

12   instructions you see the six factors you're supposed to apply

13   for punitive damages.  It will be on page 19.

14          The reprehensibility of Walmart's conduct;

10:31  15          The impact of Walmart's conduct on Marlo Spaeth;

16          The relationship between Marlo Spaeth and Walmart;

17          The likelihood that Walmart would repeat the conduct

18   if an award of punitive damages is not made;

19          The relationship of any punitive damages award to the

10:31  20   actual harm suffered by Marlo Spaeth;

21          And the last factor is Walmart's financial condition.

22          So can we pull up Exhibit 41?

23          If you look when you get to deliberations, you'll see

24   in Exhibit 41 there's some financial -- there's a financial

10:31  25   document showing Walmart's total revenues.  And I'll tell you,

826

1    this is reported in the millions.  And it's that 485 number?

2    That's for 2015, the year Walmart took Marlo's job away from her

3    is a year where Walmart's revenues were 485 billion -- over

4    $485 billion.

10:32    5        Thank you.

6        So you need to think about what amount of punitive

7    damages would serve as a warning to Walmart not to do this

8    again, not to do this to other employees.  Walmart needs to get

9    the message to follow the law.  The amount of money you write

10:32    10   into Verdict Question No. 8 should be designed to send that

11   message to Walmart.

12        And at its heart this case is about keeping promises

13   and doing your part.  The right to a reasonable accommodation is

14   the promise under the Americans With Disabilities Act.

10:33    15       And now it's time for you to do your part.  Marlo

16   Spaeth was fired July 10th, 2015.  Here we are, to the week, six

17   years later.  Marlo Spaeth has waited six years.  Render the

18   verdict that brings justice, the verdict that makes up for what

19   happened to Marlo Spaeth, the verdict that upholds the law.

10:33    20       Thank you.

21        THE COURT:  Thank you, Ms. Vance.

22        We're going to take our morning recess and we'll bring

23   you back out here after 10, 15 minutes to hear further argument.

24            (Jury out at 10:34 a.m.)

10:34    25       THE COURT:  We're also going to send menus in to let

827

1    them choose sandwiches from a sandwich shop so when they're done

2    hearing arguments they'll have lunch ready and they won't have

3    to go out in the rain in the middle of deliberations.

4           Anything else to put on the record?

10:34    5           MR. MULAIRE:  We plan to do a rebuttal, but I think

6    Your Honor knows that already; otherwise, no.

7           THE COURT:  Very well.  We're in recess.

8           (Recess taken at 10:35 a.m., until 10:51 a.m.)

9           (Jury in at 10:51 a.m.)

10:51    10          THE COURT:  Okay.  Please be seated, everyone.

11   Mr. Harlan, you may proceed.

12              DEFENDANT CLOSING ARGUMENT

13          MR. HARLAN:  May it please the Court, Your Honor,

14   ladies and gentlemen of the jury, counsel, Mr. Burnett,

10:52    15   Ms. McClone, Warren Buliox who has been part of this case, it's

16   really an honor to be able to talk to you all this morning.

17          This case is about Walmart; but, more particularly,

18   it's about individual managers at Walmart who have been

19   disparaged in this case.  And that's why this is a very

10:52    20   important case for Walmart.  It's important to stand up for

21   people who are unfairly attacked for having supposedly violated

22   the law when they have done nothing of the sort and work to be

23   very fair and honest and diligent in working with one of their

24   people.  And that's what the evidence showed in this case.

10:53    25          So if you all have a problem with PowerPoint you're

828

1 going to have a problem with me, unfortunately, because that's

2 what I plan to do today.  And I'm going to ask for your patience

3 because it's going to -- I want to present a fair amount of the

4 evidence to you so that you can consider it in your

10:53 5 deliberations.  So I apologize in advance if I go a little bit

6 long, but I only have one chance to talk with you.  When I sit

7 down Ms. Vance will get back up and have an additional

8 opportunity to speak with you, but I won't, and that's the rules

9 that we have to follow.

10:53 10    Before we get into the presentation I do want to

11 acknowledge the judge.  Judge Griesbach has had a very

12 distinguished career.  I'm sure you all have had some

13 interaction with him throughout the case.  Very fair person,

14 very reasonable.  It has been a pleasure to be in this court to

10:54 15 try this case in front of him.

16    So let's get to it.  I know this is called closing

17 arguments, but one thing that we can agree on, I'm not going to

18 be arguing with you.  I just want to talk to you about what the

19 evidence has shown in the case and why the evidence does not

10:54 20 support any of the EEOC's claims.

21    So here's a little brief review of what I'm going to

22 be covering with you.  I'm going to talk about some of the

23 testimony that we heard.  Just like Ms. Vance, I'm going to talk

24 about some of the key definitions in Judge Griesbach's

10:54 25 instructions; why the EEOC has failed to prove any of its claims

829

1    in this case; the fact that there are absolutely no damages; and

2    respond to some of the points that you heard from Ms. Vance and

3    you heard throughout the trial.  And then I want to talk about a

4    gentleman named Raymond Donovan.  It's not the guy on TV who has

5    a TV show, it's a different Raymond Donovan.

6              Karen Becker.  She was one of the earliest witnesses

7    in the case.  No longer works at Walmart.  Has no connection

8    whatsoever to Walmart.

9              You heard her personal background, her commitment to

10   working with individuals with disabilities.  Worked to

11   accommodate Ms. Spaeth.

12             You heard that she would print out her schedule, write

13   out her schedule on a weekly basis.  There's no evidence that

14   she did that for anybody else at the Manitowoc store.  Didn't

15   have to do it, but she did it.  She thought it was important to

16   do that to make sure Ms. Spaeth understood her schedule.

17             She said that Ms. Spaeth was very capable during the

18   time that she was at Walmart.  Much higher capabilities than

19   Ms. Vance seemed to suggest, and even Ms. Spaeth's sister, Amy

20   Jo Stevenson, and certainly more than what Dr. Smith claims.

21   We're going to talk about Dr. Smith in a moment.  He said she

22   couldn't even read.

23             And, of course, you heard from the person that knows

24   her best, Barbara Barnes, who said they read the newspaper every

25   day and talk about what they read.

1       There was this idea that Walmart had some obligation

2   to call Ms. Spaeth's mother.  That was never the relationship

3   between Walmart and Ms. Spaeth's mother when she was living.  It

4   was the other way around.  When there were things that

5   Ms. Spaeth's mother wanted to communicate, she would get in

6   contact with Ms. Becker.  That's what Ms. Becker said.

7       There's also I think you heard testimony throughout

8   the trial that there was an occasion where Julia Stern was

9   talking with Ms. Spaeth and about her attendance and working her

10  schedule, and then she looked up and Ms. Spaeth was headed home

11  and Ms. Spaeth said, well, you know, Karen said that I could

12  leave.  Well, she happened to talk to Ms. Becker and Ms. Becker

13  said, well, no, I didn't say that.  Ms. Spaeth was fibbing.

14      The reality is Ms. Becker had no authority to send

15  anybody home.  She was a non-salaried manager.  That wasn't part

16  of her responsibility or authority within the company.

17      No knowledge of Ms. Spaeth being mistreated.  And this

18  is a very important point.  Ms. Vance referenced it.  They are

19  really tied to the hip with Amy Jo Stevenson.  She's the one

20  that initiated all this.

21      Amy Jo Stevenson said she called Karen Becker and said

22  my sister needs an accommodation because of the schedule change.

23  Ms. Becker sat in that box and told you that call never

24  happened.  Not I can't recall, maybe, what timeframe -- no, it

25  never happened.  That's what she said.

831

1    Now, Ms. Becker has really no skin in the game; right?

2    She doesn't work for Walmart.  She's gone.  And this outcome is

3    not going to really impact her one way or the other.  Certainly

4    not going to impact her job because she doesn't work for Walmart

10:58    5    anymore.

6    How about Ms. Stevenson?  Does she have skin in the

7    game?  She absolutely has skin in the game.  You heard during

8    her testimony that she's the trustee for some trust that's been

9    set up for Marlo Spaeth.  She controls her money.  Any money she

10:58    10   gets in connection with litigation Ms. Stevenson is going to

11   have control over.  She's the trustee.  She's the legal guardian

12   at this point.

13   So I think one of the things you're going to have to

14   grapple with is what to make of what Amy Jo Stevenson has told

10:59    15   you and what she has been doing.  That's a key aspect of this

16   case.

17   That's a picture of Amy Jo Stevenson from her

18   deposition in the case.  You obviously heard from her.  Let's

19   talk about some of the things about Ms. Stevenson.

10:59    20   She frankly has not been candid or truthful in her

21   dealings with Walmart or in this case.

22   First, she wasn't candid about being Ms. Spaeth's

23   guardian, at all.  She told Walmart management back in 2015 that

24   she was the guardian when, in fact, she wasn't a guardian.  She

10:59    25   told the EEOC she was a guardian in 2016.  She wasn't -- that's

832

1    a completely different story than she told the people at

2    Walmart.  She wasn't even the first standby guardian.  She was

3    in the second position.

4            She didn't become the legal guardian until 2018.  And

5    how do we know that?  Here's an exhibit that you will have

6    access to, 1040, that shows it was on January 24th, 2018 that

7    there was an order entered making Ms. Stevenson the guardian.

8            Here's a typewritten interview from an interview

9    conducted by the EEOC in this case.  There was a question asked

10   at that interview:

11           "Ms. Stevenson, how long have you been Marlo's

12   guardian?

13           "June 16, 2016."

14           That's when she told the EEOC she was first the

15   guardian.  But she was at a meeting with Walmart management

16   after Ms. Spaeth was terminated saying she was the guardian.

17   That was in 2015.

18           She also misrepresented facts about Ms. Spaeth's

19   employment when she filed a complaint with the Department of

20   Justice.  Before she went to the EEOC, she filed a complaint

21   document with the Department of Justice.  In that document she

22   said Marlo had always worked Monday through Friday, noon to

23   4:00, except Thursday.

24           Now, you obviously have seen the records.  She wasn't

25   supposed to work Thursday, that wasn't on her availability, but

833

1    for several years she worked on Thursdays, consistently.  But

2    yet she's telling the Department of Justice that's not what her

3    schedule was.  So either she didn't have a firm handle on what

4    was going on with the person that she's supposed to be caring

5    for, or she was just misrepresenting the facts, willing to say

6    anything.

7         You heard Dr. Smith in his testimony say that, well,

8    Ms. Spaeth really doesn't have dementia.  He I think prescribed

9    some medication, Amy Jo Stevenson, he relied on what she told

10   him, said that her memory has substantially improved.  So

11   somebody's not telling the truth in that account.

12        Here's some documents that Ms. Stevenson filed with

13   the court.  This is a document, on the left, Trial Exhibit 1041.

14   This was filed in 2017 by Ms. Stevenson.  And what does she say?

15        "Dementia has set in and is progressing."

16        That's what she told the court.  But she's here saying

17   that she doesn't have dementia.

18        Then, on February 22nd, 2019 -- actually I guess she

19   signed it on the 13th of 2019.  Here's another form that she

20   filed with the court.  She says, "Worsened.  Her health

21   condition has worsened.  Signs of dementia."  But she's here

22   saying she doesn't have dementia.

23        She came to the termination meeting and played the

24   disability card.  Threatened to sue these people.  So Ms. Vance

25   is saying Lee Spude directed managers not to call her.  Who

834

1    would want -- what HR person would want their management calling

2    somebody -- they're not lawyers -- when there's been a threat of

3    litigation?  She didn't have any authority really to be talking

4    to them.  This involved Marlo Spaeth.  She hadn't presented

11:03    5    Walmart with any documentation showing that she had the

6    authority to speak on behalf of Ms. Spaeth.

7    She was focused on cashing in, not helping Ms. Spaeth.

8    Otherwise, as interested as Ms. Spaeth has indicated and the

9    evidence that's come in that she wants to go back to work, she

11:04    10    misses Walmart, she would have helped her reapply for a position

11    there.

12    You saw the evidences.  There have been a number of

13    individuals who have been terminated for attendance, they wait

14    the requisite time, they put in the application and they've been

11:04    15    rehired.

16    She claims that she got a call from Ms. Castro and

17    said that she wouldn't be rehired, Ms. Spaeth did.  But the

18    context of that call was in response to whether she's going to

19    be put right back to work then.  And they don't reinstate people

11:04    20    with Walmart unless they find out that there was something wrong

21    in terms of how they calculated the attendance occurrences or

22    that there was something wrong with the process.

23    We talked about her being the trustee for the special

24    needs trust.  She testified here in front of you about the fact

11:05    25    that Ms. Spaeth has the ability to adapt to a new routine if you

835

1    do this hand-holding process with her, but there's no evidence

2    that she helped Ms. Spaeth try to adapt to her new schedule.

3    And certainly there's no evidence that she shared any of that

4    information with the folks at Walmart.

11:05    5    This is her sister. And if she knew that she had this

6    difficulty with adapting to new routines or having her routine

7    interrupted, why wouldn't she have shared that information with

8    the folks at Walmart, if she's trying to really do something

9    beneficial for her sister?

11:05    10    Then you heard the testimony from Barbara Barnes. I

11    had to bring it out because I obviously had taken her

12    deposition.

13    Now, Ms. Stevenson had been told "we won't talk to

14    you, we'll talk to your sister. She's the employee, she's the

11:06    15    associate." They told her when the phone call was going to come

16    to Ms. Spaeth. So what does Ms. Stevenson do? First of all,

17    she doesn't go over there to be with her sister when she

18    receives this phone call. She calls up and says, "Hey, Barbara,

19    I want you to go and pick up the line in the other room and

11:06    20    listen in on that conversation and make sure you don't make

21    Walmart aware that you're on that other line."

22    That is a interesting window into what Amy Jo

23    Stevenson is; the fact that she would do something like that

24    knowing that that's improper, knowing that the phone call is

11:06    25    supposed to be between Walmart and Marlo Spaeth, to have

836

1    somebody else listening in on the phone call and directing them

2    to keep it secret, to basically eavesdrop.

3         Testified that Ms. Spaeth was depressed and

4    inconsolable following the termination.  Do you remember what

11:07 5    Ms. Barnes said?  She said when she came home she was crying.

6    She helped console her.  And after about 30 minutes it was like

7    back to normal.  Watched TV, had supper, went to bed.  Didn't

8    stay up crying.

9         And then she talked about what her life has been after

11:07 10   Walmart.  It's been completely happy, no health problems, not in

11   the throes of some depression.  But that completely contradicts

12   what Amy Jo says.

13        Then, interestingly, we have a chart here to show you

14   something about the evolution of Ms. Stevenson's explanation

11:07 15   about this groove that Dr. Smith talked about.

16        So we know that there was a posttermination meeting on

17   July 16, 2015, and at that meeting nobody recounts Ms. Stevenson

18   saying anything about the groove or some inability to adapt to

19   routine.  That did not come up anywhere.  All she did was go to

11:08 20   that meeting and say my sister needs to be put back on the

21   days -- on the hours that she wants to work and if you don't do

22   it, I'm going to sue you.  That's all she said.

23        Then we see the DOJ complaint, the Department of

24   Justice complaint that she filed.  Didn't mention anything about

11:08 25   the fact that her sister has some sort of need for routine and

837

1    that's why her employment was terminated.  Didn't mention that

2    at all.

3              Then the thing that started this case is a charge of

4    discrimination with the EEOC.  She filed a charge.  Didn't

5    mention anything about this difficulty dealing with routine or

6    groove.  Nothing like that was mentioned.  And, of course,

7    Dr. Smith wasn't on the scene at that point.

8              And then there's again the interview that she had with

9    the EEOC.  That's Exhibit 1065 that you will have.  Nothing in

10   that interview about Ms. Spaeth having some sort of need for a

11   consistent routine, and that when there are interruptions in her

12   routine that she faces difficulty.  Nothing about that.

13             And then Dr. Smith comes along.  He hears about this

14   lawsuit and calls up the EEOC and says I'm your guy.  And he

15   comes up with this theory called the groove; that the reason

16   that Ms. Spaeth hasn't been able to follow her schedule is

17   because people with Down syndrome have this resistance to change

18   and when you change their habits, their routine, it throws them

19   out of whack.

20             That's essentially what he testified to.  And then, of

21   course, we get to trial -- we get to trial and we hear

22   Ms. Stevenson say pretty much the same thing, basically

23   parroting what Dr. Smith said, that she's known that she's had

24   this characteristic her whole life, and it's just frankly not

25   credible.

838

1      Ms. Stevenson pointed the finger at Walmart.  And I'm

2  sure you all have heard the expression be careful about pointing

3  the finger at somebody because there are three that point back

4  at you.  And that's particularly appropriate in this situation.

11:10    5      Let's look at Amy Jo Stevenson.

6      Failed to make sure that Ms. Spaeth was complying with

7  her new schedule.

8      You heard the testimony that Ms. Spaeth had told her

9  sister about the change in schedule.  If Ms. Stevenson, as she

11:11   10  maintains, knows that a change in her schedule is going to

11  create problems for her, why didn't she do anything about it?

12  Why didn't she call the company and say, hey, you need to know

13  about this issue in dealing with my sister?

14      And she says that she called Ms. Becker.  She says she

11:11   15  called her once.  I think the testimony was it was like maybe

16  three or four months before her termination.  No evidence

17  whatsoever that she called and checked on her sister's

18  situation; that she sent an email, sent a letter.

19      And you heard testimony from Barbara Barnes.  The EEOC

11:11   20  didn't bring it out.  We just wanted to give you a sense that

21  Ms. Stevenson is a sophisticated individual.  She's a business

22  woman.  And so if this was something that she knew was going to

23  be devastating for her sister that she had her schedule changed,

24  why wouldn't she at least send an email?  How much effort does

11:12   25  it take to find out her manager's email address and just send a

839

1    little note saying, hey, you need to understand that this

2    schedule change is going to be problematic for my sister and I

3    want you to keep me abreast if there are problems so that I can

4    intervene.

11:12    5    Took no steps to replace her mother as the guardian.

6    Most significantly, didn't help her sister look for work.  You

7    heard I think Ms. Spaeth when she came and testified about how

8    much she liked Walmart, she liked the people there.  You heard

9    Kent Abitz say they have positions all the time, they can't find

11:12    10    enough people.

11    You can apply for a position at Walmart at the kitchen

12    table.  You don't have to go to the store.  And incredibly, does

13    it make sense to you that Barbara Barnes, Ms. Spaeth's

14    stepsister, would be invited over to Ms. Stevenson's house and

11:13    15    Ms. Stevenson would help Barbara Barnes apply for a position at

16    Walmart and wouldn't help her own sister?  And she was over

17    there with Ms. Barnes.

18    So I think perhaps Ms. Stevenson believes that this

19    somehow will increase the money that she can get on behalf of

11:13    20    Ms. Spaeth by keeping her out of the workforce.  You saw

21    Ms. Spaeth.  She was able to get up on that witness stand and

22    talk.  She listened to questions, she had the ability to

23    communicate.  She's employable.  Why hasn't she worked?  Why

24    hasn't she tried to help her get back into the workforce?

11:13    25    She also claimed in her trial testimony that she

840

1    handles all of Ms. Spaeth's medical appointments.  But here we

2    have, at Exhibit 1049, a medical record that says Marlo is here,

3    her sister set up the appointment, but she's not there with her

4    today.  She's left Marlo to be at that appointment navigating

11:14    5    her own health situation.  But she told you that she's at all

6    her medical appointments.

7          Barbara Barnes.  I imagine you all were surprised when

8    the EEOC didn't call the person as a witness who was the closest

9    person to Marlo Spaeth in the world.  That's been her roommate

11:14   10    for 15 years, they love each other, have a tremendous

11    relationship.  So if the EEOC wanted you to understand how Marlo

12    Spaeth is doing, wouldn't you expect them to put the person who

13    is the closest to her that knows her intimately on that witness

14    stand and bring out that testimony?

11:15   15          They didn't do that.  We had to call her as part of

16    our case.  We had to subpoena her to bring her to court.  And

17    once she got on that witness stand I think you had a sense of

18    why the EEOC didn't call her, because she completely undermined

19    what Dr. Smith had to say and what Amy Jo Stevenson said about

11:15   20    how devastated Marlo Spaeth has been.

21          When Marlo Spaeth's schedule was changed, what did

22    Barbara Barnes tell you?  Yeah, she came home a little later,

23    but it was just like it always was.  She wasn't sent into some

24    kind of bewilderment, confused.  She had the same life that she

11:15   25    had before the schedule changed.

841

1       You also heard that Ms. Barnes and Ms. Spaeth had a
2  little run-in about the fact that Ms. Spaeth had to work later.
3  They were accustomed to having supper at a certain time.  And
4  because Ms. Spaeth's hours changed, she let Ms. Spaeth know I'm
5  not really happy that I gotta wait around for you to come home
6  and eat.  Might that account for why Ms. Spaeth wanted to get
7  home?  I suspect it had something to do with it.  It's not Down
8  syndrome, it's the fact that had her roommate was ticked off at
9  her because that she was having to wait around for her to eat
10  dinner.  It has nothing to do with Down syndrome.

11       And incredibly, Barbara Barnes told you that she was
12  at the physical examination, the medical examination.  I call it
13  the drive-by examination because Dr. Smith really did that just
14  because he knew that he had to at least see her.  But he saw her
15  for a half hour.  And in just a half hour he was able to figure
16  out that her schedule caused the difficulties that she had and
17  figured out that she's suffering from depression, all in a half
18  hour.

19       But, incredibly, even though Barbara Barnes was at
20  that appointment, she's the person that knows Ms. Spaeth the
21  best, he didn't even bother to stick his head out of the room
22  and ask to speak to her for five minutes.  Instead, he chose to
23  get his information about Marlo Spaeth from someone who has an
24  interest in this case, the person who created this litigation,
25  and that's Amy Jo Stevenson.  And she is the one that fed him

842

1    all the information that he relied upon.  I think he asked

2    Ms. Spaeth a couple of questions.  99 percent of everything that

3    he got was from Amy Jo.  Oh, Marlo is depressed and she's having

4    difficulties.  That's what he got from Ms. Stevenson.

5    Lee Spude.  You remember him.  He's the rapid-fire

6    guy.  Unfortunately he was -- I hope I'm not doing it, but he

7    was giving the court reporter a difficult time trying to keep up

8    with him.  But he certainly had a command of the policies and

9    procedures at Walmart.  Never construed anything Amy Jo

10   Stevenson was saying as some sort of request for accommodation

11   that Ms. Spaeth needed.  She was basically threatening to sue

12   the company.  That's what his testimony was.

13   Kent Abitz.  He's the person who was a store manager

14   at the Manitowoc store.  He led the investigation after

15   Ms. Stevenson raised the allegations.

16   As part of that investigation he looked at the

17   attendance history.  I'm sure you've seen it.  Now, the theory

18   EEOC's case is, hey, this schedule change in November of 2014

19   threw Ms. Spaeth off.  She was used to working noon to 4:00.

20   What did Mr. Abitz say?  He looked at her attendance

21   history and found that she was leaving work early many, many

22   months and years prior to her schedule change.  So how does that

23   indicate to Walmart that it must be the schedule change and some

24   linkage or connection to Down syndrome?  This has been a

25   long-running practice.

843

1          Now, Ms. Vance wants you to look at these evaluations

2     that show that she has zero tardies and zero absences.  Well,

3     what was most of the case about?  It was leaving early.  An

4     absence isn't leaving early.  That's a different issue.

5          Most of her attendance violations, the vast majority

6     were about leaving early.  And then even on those evaluations,

7     you know based on what you know about Walmart's attendance

8     policy, after a six-month period those violations start to roll

9     off.

10         Bonnie Popp.  She came here and gave emotional

11    testimony.  She was somebody that really liked Marlo Spaeth.

12    She worked with her to learn new tasks.  And she also told you

13    at that meeting she was offended by Amy Jo Stevenson's

14    characterization of her sister as, quote-unquote, different.

15         You had a chance to size up Bonnie Popp.  She came

16    here and was honest and candid and had no idea that any of the

17    discussions with Marlo Spaeth had anything to do with a need for

18    a reasonable accommodation.

19         Robin Castro.  Wasn't her best day.  Being in federal

20    court is a difficult thing for lots of folks.  Clearly nervous.

21    You saw her on the witness stand.  Had some challenges.  But

22    ultimately confirmed that she didn't believe that there was any

23    kind of a request for a reasonable accommodation.  And even if

24    she did believe that that was the case, she's one person.

25         The folks at Walmart who testified here have been

844

1    consistent about what they understood the situation with

2    Ms. Spaeth to be; that she had a preference for a particular

3    time because that's what she wanted, it wasn't what she needed.

4         At no point was there any sort of documentation,

11:21    5    medical or otherwise, substantiating that she needed to work

6    noon to 4:00 because of some feature of Down syndrome.  That's

7    after the fact, Dr. Smith-driven, litigation-driven expert

8    opinion.  And you'll have to make -- since the EEOC claims that

9    Ms. Spaeth's comments about needing to get home because she

11:22    10    might get sick if she doesn't eat, if you believe that that's an

11    obvious indication that you have a need for an accommodation, I

12    frankly think that's ridiculous.

13         Those statements were vague, don't suggest that it has

14    anything to do with her Down syndrome, the fact that she wanted

11:22    15    to be home because she might be sick.  Lots of people state all

16    the time that if they don't eat at a certain time that they

17    might pass out or get dizzy.  That's not an indication that

18    there is something about Down syndrome that's inhibiting her

19    ability to work the shifts that she's been scheduled.

11:23    20         Marlo Spaeth.  She absolutely demonstrated that she

21    had the ability to understand what was being communicated.  She

22    testified in this case, acknowledged telling Amy Jo Stevenson

23    that her schedule had changed, and certainly no indication that

24    she's suffering from depression or any ill effects from having

11:23    25    lost her position at Walmart.

845

1         If you were to look up the definition of "biased,"

2    Dr. Smith would be -- his picture would be there.  He came to

3    this case with an agenda.  Before he knew anything about Walmart

4    and what their actions had been in connection with Ms. Spaeth,

11:23   5    he had reached his conclusion that this groove thing is why

6    Ms. Spaeth had these attendance issues.  That's what he came to

7    the table with.  He's like a hammer in search of nails.  He has

8    this great theory that's his theory about what features

9    individuals with Down syndrome have, and he wants to apply it in

11:24  10    every situation.

11         He conducted his work through the lens of somebody

12    who's an advocate for people with Down syndrome.  He's a

13    competent medical doctor.  He's an advocate for people with Down

14    syndrome.  Spent just a half hour looking at Ms. Spaeth and

11:24  15    treating her.  Reviewed only a portion of her medical records

16    before reaching almost all the opinions that he testified to in

17    this case.  Didn't bother to speak to Ms. Barnes.

18         He relied almost exclusively on what Amy Jo Stevenson

19    was telling him about Ms. Spaeth's situation, and we know that

11:25  20    that's a problem.  He had one phone call with Ms. Spaeth's

21    regular medical provider.

22         And, most significantly, he had no explanation for how

23    he could eliminate the possibility that Ms. Spaeth just simply

24    wanted to work noon to 4:00 because she preferred that time as

11:25  25    opposed to being unable to work a different shift because of her

846

1    Down syndrome condition.  He didn't even ask Ms. Spaeth what her

2    schedule preference was.  That's what he testified to in this

3    case.

4         He wasn't here to provide objective medical evidence

11:25   5    that you should rely upon.  He had an agenda, which is he wanted

6    to help somebody with this theory that he has and try to help

7    her win a case given her status as a individual with Down

8    syndrome.

9         He also completely ignored the evidence that before

11:26  10    her schedule changed to 1:00 to 5:30 she wasn't completing her

11    shifts when she was working noon to 4:00.  So how is it that the

12    schedule change is a cause of her having the inability to

13    complete shifts?

14         Also, how can you indicate that Ms. Spaeth has a need

11:26  15    for routine and an interruption with her routine has caused her

16    all these problems when did you see her schedule for the last

17    two or three years that she was at Walmart?  Week to week she's

18    working different days.  One day she's working Monday, next week

19    she's working Monday, Tuesday, and Wednesday.  She's working,

11:26  20    you know, Friday on some weeks.  Her schedule was all over the

21    place.  That's not a routine.

22         And this groove theory that Dr. Smith talked to you

23    about that he championed, not something that's been

24    peer-reviewed.  Peer review is the process of experts looking at

11:27  25    other experts' work, ripping it apart, subjecting it to

847

1    scrutiny, and then determining that it has validity.

2         Julia Stern.  She's been a person who has been

3    disparaged throughout this litigation.  But what you heard from

4    Ms. Stern is she didn't have any bias against Ms. Spaeth.  She

11:27    5    went beyond the call of duty to try to get Ms. Spaeth to comply

6    with the company's policies.  Showed her extreme leniency.  Had

7    numerous discussions with her.  Worked with her to expand her

8    duties.

9         Sometimes I think there are people who believe that

11:27    10    the disabled aren't capable of doing things.  That wasn't

11    Ms. Stern.  She believed that Ms. Spaeth had the capacity to do

12    more than she was doing.  She was not, when Ms. Stern took over,

13    doing the full components of her position, and she worked with

14    her to expand it.  And we know she wasn't picking on her because

11:28    15    we showed you evaluations that other managers had done where

16    they made the same observations that it's great that Ms. Spaeth

17    is able to fold towels and rugs, but she needs to work on other

18    areas of her department, and that's what Ms. Stern helped her to

19    do.

11:28    20         Most significantly, she also told you that she's

21    terminated numerous people for attendance violations.  She's not

22    only dealing with Ms. Spaeth.  She told you one month before

23    Ms. Spaeth was let go she terminated somebody in the Manitowoc

24    store for attendance.  One month after Ms. Spaeth was let go she

11:28    25    terminated somebody.  Two months later she terminated another

848

1    person.  This is all in 2015.  That's not bias, that's

2    consistency.  The company has an attendance policy and people

3    get terminated when they don't follow it.

4          She also told you she had no idea, no indication that

5    this schedule preference that Ms. Spaeth was continuing to raise

6    in meetings had anything to do with Down syndrome or some sort

7    of request for accommodation.

8          I'm just going to briefly go over some of the key

9    definitions from Judge Griesbach's instructions.

10         Qualified.  One of the first questions that you're

11   going to have to address is whether Ms. Spaeth is a qualified

12   individual.

13         We're not arguing that she didn't have the ability to

14   do the job in terms of the day-to-day tasks as a sales

15   associate.  She was rated well at the company.  She definitely

16   had the capacity, the ability at the time of her termination to

17   do that.  But what's very clear is she didn't have the ability

18   to follow the company's attendance policy.  She continued to

19   violate the company's attendance policy and that's what led to

20   her discharge.

21         You also need to be flexible.  The idea that Walmart

22   is going to give somebody a permanent fixed schedule is not

23   something that they do.  If she needed that, she wasn't

24   qualified for her position at Walmart.  And so when you look at

25   that first question, think about the fact that Walmart has an

849

1  attendance policy as the instruction says.  In addition to

2  specific job requirements, the company can require regular and

3  timely attendance.

4      Reasonable accommodation.  Reasonable accommodation is

11:30  5  not something that an associate necessarily suggests.  Just

6  because an associate wants a particular accommodation doesn't

7  make it reasonable.  It's what will enable the associate to do

8  the job.  And it doesn't include eliminating essential functions

9  and duties of the position.

11:31  10     The EEOC has failed to prove any of its claims in this

11  case.  For their reasonable accommodation claim they have to

12  show that Ms. Spaeth is a qualified individual with a

13  disability.  Walmart had to be aware that Ms. Spaeth needed an

14  accommodation due to her disability and they have to show that

11:31  15  Walmart didn't give her a reasonable accommodation.

16     The judge has also instructed you that when the need

17  for an accommodation is not obvious, the disabled employee or

18  those acting on the employee's behalf must make their employers

19  aware of any medically necessary accommodation.

11:32  20     And the one thing you didn't hear in this case was any

21  evidence that Ms. Spaeth, or anyone on her behalf, provided

22  Walmart with any indication, through documents or otherwise,

23  that she had a medical need for a fixed schedule of noon to

24  4:00.  Zero evidence of that.  And I would ask you that you take

11:32  25  a look at that instruction and consider that as you think about

850

1    whether Walmart violated its duty to provide her with a

2    reasonable accommodation.

3           Ms. Spaeth wasn't qualified.  So these are the reasons

4    that the EEOC has failed to make the showing necessary to

11:32    5    prevail on their claim.  She wasn't qualified at the time of her

6    termination.

7           No evidence that Walmart was aware that there was a

8    need to provide a accommodation of Ms. Spaeth.  In fact, she

9    didn't need an accommodation.  She had a schedule preference

11:33   10    based on what she wanted.

11           And then they also have failed to indicate or show

12    that we failed to provide her with an accommodation.  The

13    reality is that we worked with Ms. Spaeth for a seven-month

14    period to try to get her to comply with the company's policy.

11:33   15           I mentioned before that the records will show that she

16    had this diverse attendance pattern -- I'm sorry, schedule, and

17    these next three slides show that.

18           In 2012, look at the days of the week that she was

19    scheduled.

11:33   20           2013.  Week to week she's working different days.

21           2014.  Same.

22           The idea that she needed some sort of routine to be

23    able to do her job is completely undermined by what her weekly

24    schedule was week to week at Walmart.

11:34   25           The EEOC's whole case is based on trying to downplay

1    what Ms. Spaeth's capabilities are, but her evaluation shows she

2    was quite capable.  She got good ratings.  Her mother thought

3    she was capable, too.  And you obviously saw Ms. Spaeth testify

4    here.

11:34   5        This is an interesting exhibit I would encourage you

6    to look at.  It's again part of the medical records, 1050.  So

7    Ms. Spaeth went to get a mammogram.  And this is when her mother

8    was still living.  And her mother communicated with the hospital

9    that, hey, my daughter has Down syndrome, but she's very capable

11:34   10   of understanding results so feel free to reach out and contact

11   her directly.

12        Something like a mammogram?  That's a very serious

13   thing.  And Ms. Spaeth's mother, who knows her well, is saying

14   she is fully capable of understanding that information and

11:35   15   processing that information.  That doesn't sound to me like

16   someone who doesn't have the requisite cognitive abilities to

17   understand what she's supposed to be doing in terms of her work

18   schedule.

19        So based upon what the evidence has shown in this case

11:35   20   I think the answer to these questions should be "No."

21        "Question 1.  Was she a qualified person with a

22   disability?"

23        "Was Walmart aware that she needed a accommodation due

24   to her disability?"

11:35   25        "No."

852

1          And did Walmart fail to provide her with a reasonable

2     accommodation?

3          "No."

4          Discriminatory discharge.  The judge has given you

5     instructions in terms of elements there.  Again, she has to

6     be -- in order for the EEOC to prevail in this claim they have

7     to prove -- they have the burden of proof and they have to prove

8     that she was qualified at the time of her termination.

9          No dispute that she was discharged.  The real issue

10    is, in addition to the qualification issue, is whether she was

11    discharged because of her disability, but everything else

12    remained the same.  In other words, they have to show because of

13    her disability that she was discharged.  And there's absolutely

14    no evidence of that.

15         You heard extensive evidence from the folks at Walmart

16    about how they worked with her, how they tried to get her to

17    comply, how Karen Becker wrote out her schedule week to week,

18    how they worked with Ms. Spaeth to teach her different things.

19    If they wanted to get rid of Ms. Spaeth, they could have

20    terminated her employment many, many months before they did.  If

21    they wanted to get rid of Ms. Spaeth and not have anything to do

22    with her, why would they work to change her availability form?

23    The computer was spitting out schedules that they had to follow

24    that her availability didn't allow her to work.  If you didn't

25    want to have anything to do with her why would you work to

1       change her availability so that she could get hours?  If they

2       didn't do anything she would get no work.

3               They had no issue with Ms. Spaeth because of her

4       disability.  You didn't hear any evidence of comments or anybody

11:37   5       poking fun of her or anything else.  Just the opposite.  Her

6       colleagues enjoyed working with her and obviously she enjoyed

7       working with them.

8               So I think the answer to Question 5, whether Walmart

9       violated the ADA by terminating her because of her disability,

11:38   10      is clearly "No."

11              Then the third claim that the EEOC has is a failure to

12      reinstate; that they didn't give Ms. Spaeth her job back because

13      her sister came in and threatened to sue them.

14              So if you look at the elements here, somebody asked

11:38   15      for reinstatement.

16              That she was qualified at that point in time.  Again,

17      we've talked about that.  She wasn't qualified because she

18      couldn't follow the attendance policy.

19              And that they didn't reinstate her because of her Down

11:38   20      syndrome or need for reasonable accommodations.

21              There's no evidence that her failure to get her job

22      back had anything to do with her disability.  None at all.  The

23      reality is, Walmart does have a system where individuals can be

24      reinstated if there is some sort of mistake or problem

11:39   25      associated with the action.  But they investigated and found

854

1    that there was no basis to reinstate her.

2            And, of course, you can reapply for your position, and

3    Ms. Spaeth never reapplied.  Her sister never helped her submit

4    an application.  That's for you to determine, how does that make

11:39  5    sense for somebody who wants to come back and work.

6            So I think the answer to Question 6 is clearly "No."

7            There are also no damages in this case.  And how do we

8    know that?  Barbara Barnes told you.  Within 30 minutes of her

9    getting home and after crying initially, she was back to normal.

11:39  10    What's her life been like after her termination?  She's had an

11    active life.  She's into bowling, she's into bocce ball, Special

12    Olympics.  Unfortunately because of COVID they apparently

13    stopped exercising, but they exercised several times a week.

14    They would go together.

11:40  15            Medical records show no record of depression shortly

16    after her termination.  It was only after Ms. Stevenson decided

17    to bring this lawsuit or go to the EEOC and get them to bring

18    the lawsuit that there became references in the medical records

19    to depression.

11:40  20            Dr. Smith's opinions about depression are absurd.  He

21    spent a half hour with her.  If he really thought she had a

22    depression problem, why didn't he send her to a psychiatrist?

23    He's not a psychiatrist, he's a medical doctor, and he's now a

24    retired medical doctor.  And whatever opinions he has about

11:40  25    whether she has depression is 100 percent based upon talking to

855

1    Amy Jo Stevenson.   100 percent.

2          Just want to show you a couple of medical records.

3    You look at Exhibit 1049.  Earlier this year she had a medical

4    examination and this is how Amy Jo or Ms. Spaeth responded in

11:41    5    terms of whether she has depression.

6          "Not at all.  Zero.  Not at all.  Not difficult at

7    all.  Zero."

8          She had an initial depression screening in 2017, not

9    too long after she was let go.  Exhibit 1049.  "Feeling down,

11:41    10    not at all.  Little interest, pleasure in activities?  Not at

11    all.  Zero initial depression score."

12          Then we see some other interesting notes in the

13    medical records where -- based on what Amy Jo is telling the

14    medical providers that she lost her job due to memory loss and

11:42    15    that she's suing Walmart.  Why is she in a doctor's appointment

16    talking about suing Walmart?

17          No new concerns.  If you look at the record in 2016.

18    She's reporting no new concerns.  But yet Ms. Stevenson is

19    talking about how devastated Ms. Spaeth has been because she's

11:42    20    not working at Walmart.  That doesn't make sense.

21          Ms. Vance also talked to you about punitive damages.

22    There's absolutely no basis for punitive damages of any sort in

23    this case.  Walmart worked very diligently to help Ms. Spaeth.

24    They exercised tremendous discretion and leniency with her.

11:42    25    They hired her, they gave her an opportunity at Walmart.

856

1    When she came to Walmart there was an implicit

2    understanding that, hey, we're going to provide you with an

3    employment opportunity, but you have to do your part and adhere

4    to our policies and rules.  And that worked well.

11:43    5    But you heard ample evidence from Walmart that the

6    attendance policy is something that they take seriously.  You

7    can't do folding towels, folding rugs if you're not at work.

8    And Walmart has a right to run its business in a way that it

9    makes sense that's reasonable, and to expect associates who work

11:43    10    for them to work the schedules that they are assigned.

11    There's no recklessness associated with that.  There's

12    no evidence whatsoever that Walmart knew that Ms. Spaeth needed

13    some accommodation and ignored it.

14    The company also provides extensive training to its

11:43    15    associates to help them understand what their obligations are.

16    They have a whole department that deals with accommodation

17    issues for individuals who need help.  Punishing Walmart, the

18    one company that has given Ms. Spaeth an opportunity to work,

19    would be just the opposite thing that needs to happen.  They

11:44    20    should be rewarded for their work with Ms. Spaeth, not punished.

21    So the EEOC has raised a number of points, and I just

22    want to briefly touch on them, that we should have known as

23    obvious that she needed a disability because of the statements

24    that she was making.

11:44    25    Folks at Walmart, it wasn't obvious to them that they

857

1    knew she had a need for some sort of accommodation.  I'm not

2    going to revisit all the things I said earlier, but keep in mind

3    that prior to her schedule change she was leaving work early,

4    repeatedly.  Repeatedly.  There would be no reason for them to

11:45    5    understand that because she's continuing conduct that she was

6    engaged in when her schedule was noon to 4:00 that it must be

7    something due to Down syndrome, especially when we heard Barbara

8    Barnes testify that she wanted Marlo to be home at their regular

9    dinner time.

11:45    10           You also heard there would be no basis for her to say

11    that she couldn't catch a bus to get home at her later shift.

12    There's a bus stop right outside of Walmart that she could take.

13           Walmart had absolutely no idea that that was a issue.

14    And if it was so obvious, why didn't the EEOC go out and get an

11:45    15    expert to try to talk to you about the issue?  If it was so

16    obvious that everyday folks would understand that, why did they

17    feel compelled to have to get an expert witness to explain this

18    groove about how people with Down syndrome need routine and when

19    you interrupt that routine it sends them into some sort of

11:46    20    tailspin that they can't cope with?  If that's such an obvious

21    principle, why did they need Dr. Smith?

22           And even Dr. Smith says that this whole idea, even in

23    the medical field, is not widely known.  So you expect some

24    folks who were working at Walmart to understand that?  If

11:46    25    Ms. Stevenson had this information, why didn't she share it with

858

1    the folks at Walmart?

2         Could have provided an accommodation packet based on

3    what Ms. Spaeth was saying?  There's no basis for that.  Nobody

4    thought that her comments meant that she needed some help in

11:46  5    order to do her job.  She often would stay close to the end of

6    her work schedule.

7         Calling Ms. Spaeth's sister's mother would have solved

8    the problem.  Well, unfortunately her mother was in a nursing

9    home, and Ms. Spaeth's sister was fully aware of the schedule

11:47  10    change.  Why would that be an obligation of Walmart that they

11    need to call the mother?  The sister claimed to be the guardian.

12    It's her obligation.  That's a serious responsibility that you

13    take on.  If she thought that the schedule change was going to

14    be problematic for her sister, she had an obligation, a legal

11:47  15    obligation to do something about that.

16         The schedule change wasn't a big deal.  I think

17    Ms. Vance said they had other people who could work that hour

18    and a half.  But that's not how Walmart works.  They don't just

19    bring in somebody for an hour and a half.  That would make no

11:47  20    sense and that's not how they conduct their business.  And they

21    can't just simply give people their schedule preferences when

22    there's no basis for that.

23         They had 300 people in the Manitowoc store.  That

24    would be very difficult for them to do.  This availability form,

11:48  25    you changed the availability form.  But as we discussed, that

859

1    was beneficial for Ms. Spaeth.

2        And you heard Lee Spude say that this availability

3    form issue, there are times where the paper doesn't match what's

4    in the computer.  By doing what they did for Ms. Spaeth, she was

5    able to get hours and work.

6        And then the guidelines.  Those guidelines are things

7    that the Walmart managers follow, but they follow those things

8    when they have a reason to believe that those guidelines are

9    implicated.  And the judge has instructed you that the issue is

10   not guidelines, even assuming that Walmart didn't follow them.

11   The issue is whether Walmart violated the ADA, and there's

12   absolutely no evidence of that.

13       Raymond Donovan, for those who are interested in what

14   that's all about.

15       He was a politician who ended up getting prosecuted

16   for some sort of fraud allegation.  And that's really not all

17   that important.  He ultimately was exonerated based on the

18   allegations that he was facing.  But he left some enduring words

19   based on that experience.  And after he was acquitted at his

20   trial, this is the quote that lives on:

21       "Which office do I go to to get my reputation back?"

22       As I told you at the outset, I do represent Walmart.

23   But more importantly, I'm here on behalf of the managers who

24   have had their name dragged through the mud as if they somehow

25   have some sort of bias or animus against Ms. Spaeth because of

860

1      her Down syndrome condition.  They have been accused of

2      violating the ADA, doing something that's unlawful.

3              Now, none of the questions really relate to those

4      individual managers at Walmart who worked with Ms. Spaeth, and

11:50  5      you can't check a box on the form, that's not part of the case,

6      but your verdict rejecting each one of the EEOC's claims will be

7      vindication for those managers, people like Julie Stern, Debbie

8      Moss.  You heard Debbie Moss.  She appeared to be a sincere

9      individual who was candid.  Even Karen Becker who no longer

11:50  10     works for Walmart, her name has been disparaged.

11             Your rejection of the EEOC each, and every one of

12     their claims, will be vindication for them.  And I ask that you

13     do that; that you give them some measure of justice.

14             Thank you very much.  Appreciate your time and

11:50  15     attention.

16             THE COURT:  Thank you, Mr. Harlan.

17             Ms. Carter?

18                    REBUTTAL CLOSING ARGUMENT

19             MS. CARTER:  Okay.  Ladies and gentlemen, of the jury,

11:51  20     let's take a minute and let the smokescreen clear the room.  We

21     were all at the same trial, right?

22             Mr. Harlan made a lot of claims about what certain

23     witnesses said at this trial.  But remember what the judge told

24     you, trust your own memory.  What the lawyers say is not

11:52  25     evidence.

861

1          And unlike Mr. Harlan, I'm not going to tell you who

2     to believe or who not to believe.  You have the evidence, you

3     heard the testimony, you are the factfinders here.  The EEOC

4     trusts your judgment.

11:52  5          And think about this.  If Amy Jo Stevenson was all

6     about money and just wanted to sue Walmart, remember when Marlo

7     got fired?  Amy Jo could have gone straight to the EEOC, but

8     what did she do?  She went to Walmart.  She gave Walmart a

9     chance to get it right.  This wasn't about Amy Jo wanting to sue

11:53  10    anyone, she was trying to get Marlo's job back.  The only reason

11    Amy Jo had to come to us is because Walmart never got back to

12    her.

13         Remember that they couldn't reapply for 30 days.  At

14    the time that Amy Jo went to talk to Walmart it was within a

11:53  15    week of Marlo getting fired.  And Walmart told Amy Jo that they

16    would take her request to their superiors.

17         Now they say, oh, there was more paperwork that she

18    was supposed to submit.  Oh, we didn't have medical information

19    that we never requested.  Consider the evidence that you've

11:53  20    heard, make your own judgments.

21         Walmart wants you to look everywhere but at the actual

22    issues in this case.  Mr. Harlan just admitted that what he

23    asked you to consider isn't even on the verdict form.  It's not

24    even in the jury instructions.  This case isn't about Walmart's

11:54  25    managers.  We're not disparaging any of them.  They are not

1    named as defendants in this case.  The case is about Walmart.

2         Mr. Harlan also spoke a lot about Amy Jo Stevenson and

3    when she became Marlo's guardian.  None of that matters at all.

4    You won't find it in the jury instructions.  It's a nonissue.

11:54    5    It's not relevant to the ADA and it's not one of the questions

6    you have to consider.

7         This case is not about Amy Jo.  Although I admit the

8    photos that they chose were kind of interesting.  This case is

9    not about Barb.  Poor Barb.  She's scary to Marlo, apparently.

11:55   10   That's what Walmart would like you to believe.  Distractions.

11   Just distractions.

12        Remember defendant's own policy.  We showed it to you

13   in various different forms.  But remember that each policy said

14   what?  "Medical information is not necessary where the associate

11:55   15   has a known or easily identifiable disability."

16        Everyone who came into this courtroom, what did they

17   say?  They knew Marlo had a disability from the first time they

18   met her.  Marlo Spaeth has a disability, a known and easily

19   observable disability.  Her Down syndrome substantially limits

11:56   20   her ability to communicate, to understand, to concentrate, to

21   think, and most importantly, to adapt.

22        And in particular, you have to think about it when you

23   compare it to the average person in the population.  That is in

24   your jury instructions.  We're not here trying to denigrate

11:56   25   Marlo in any way.  Marlo's amazing.  But she needed help and

863

1    Walmart didn't give it to her.

2         Marlo Spaeth is a qualified individual because she

3    could do her job at Walmart with a reasonable accommodation, a

4    noon to 4:00 schedule, the schedule she had worked for 15 years.

11:56    5    Her performance reviews show that she succeeded with that

6    schedule.

7         Walmart's willful blindness does not excuse Walmart

8    from its obligations under the ADA.  Don't fall for their

9    distractions.  And as I mentioned, you'll notice that half of

11:57    10    the topics that were covered in Walmart's closing are not in the

11    jury instructions.

12         The dispute we have in this case is also not about

13    what days of the week Marlo Spaeth could work.  The testimony

14    was about routine.  And Dr. Smith told you that the routine can

11:57    15    be -- can still be consistent even if it's different days of the

16    week, because once Marlo got to Walmart she knew exactly what

17    she was supposed to do and when she was supposed to do it and

18    she was still able to follow her routine.  Different days of the

19    week don't matter.  When she went to Walmart, she did the same

11:58    20    thing at the same time and stuck to her schedule, before the

21    schedule change.

22         Marlo Spaeth's early departures were not poor

23    attendance.  They were evidence that she needed an accommodation

24    for her disability.

11:58    25         Her performance reviews for 15 years praised her

864

1    attendance.  You'll notice that.  You have the binders.  They

2    praised her performance.  Everyone testified that she was good

3    at her job.  It was obvious.  It was obvious she needed an

4    accommodation.  And it was a reasonable one, one that Walmart

11:58   5    could have provided not even getting close to undue hardship,

6    with no hardship, and it would have allowed Marlo Spaeth to

7    comply with Walmart's attendance policy as she had for 15 years

8    before they changed her schedule.

9            And when you look at the jury instructions, look

11:59  10   closely under the section of reasonable accommodations.  You'll

11   see that schedule accommodations are one of the types listed.

12   It's a standard accommodation.  And just because Walmart chooses

13   to disregard that obligation under the ADA, that's why we're

14   here.

11:59  15           Walmart clearly denied Marlo Spaeth's request for

16   accommodation, and she did request an accommodation.  "Why can't

17   I have my noon to 4:00 schedule back?"  "Can I have my noon to

18   4:00 schedule back?"  What's that?

19           You saw Walmart's policies.  No magic words are

12:00  20   required.  Anyone can ask for an accommodation.  No written

21   request is required.  It can be verbal.  A friend can ask for an

22   accommodation.  No medical information is required where it's

23   obvious that you have a disability.  But apparently the policies

24   are just another smokescreen, Walmart has no intent to follow

12:00  25   them.  They obviously didn't follow them in Marlo's case.

865

1        The judge told you that we will have proven our case

2   if you find by a preponderance of the evidence that Walmart

3   fired Marlo Spaeth or did not reinstate Marlo Spaeth because of

4   her disability.  But pay attention when you're looking in the

12:00   5   jury instructions, because it also says "or because of the need

6   to reasonably accommodate her disability."  We have absolutely

7   met our burden in this case.

8        Walmart also told you that this case is about what

9   Marlo wants versus needs.  Did you catch that?  That's true, but

12:01   10  not in the way that Walmart means it.  It is about wants versus

11  needs, but it's not about Marlo's wants versus needs.  When you

12  think about it this case is really about what Walmart wanted

13  versus what Marlo needed.

14       Walmart managed to meet the store's staffing needs for

12:01   15  the 15 years that Marlo worked there, before the schedule

16  change.  Walmart didn't need Marlo Spaeth to work 4 to 5:30,

17  Walmart just wanted her to.  That's not the way Walmart likes to

18  do things.  That's a want, that's not a need.

19       It was a 24-hour store.  Remember that?  24 hours.

12:02   20  Seven days a week.  They had to have people working there around

21  the clock.  Every associate didn't have to work peak times.  It

22  was a want.  Walmart just wanted Marlo to work past 4:00.

23       So, yes, this case is about what Walmart wanted so

24  much that it ignored the promises of the ADA.  What Walmart

12:02   25  wanted so much that it ignored what Marlo Spaeth actually

866

1    needed, reasonable accommodation, what Marlo was promised under

2    the ADA.

3           Remember what I said on the first day of this trial.

4    At its heart this case is about keeping promises and doing your

5    part. Both the employee and the employer need to do their part

6    when it comes to the ADA.

7           Marlo and her sister Amy Jo, they did their part; they

8    asked Walmart to make an adjustment to Marlo's schedule. They

9    did their part by reminding Walmart of Marlo's rights under the

10   ADA after they fired her. They did their part by giving Walmart

11   another chance to get it right. Walmart chose not to take that

12   chance. Walmart had obligations under the ADA that it

13   completely ignored when it came to Marlo Spaeth and it purposely

14   turned a blind eye to.

15          Remember Karen Becker, Walmart's human resources

16   coordinator, said she didn't agree -- I don't know if you caught

17   this, but she said she didn't agree with anything Amy Jo

18   Stevenson said at the post-termination meeting. Did that strike

19   you as odd? Because remember that one of the things that Amy Jo

20   Steve said at the post-termination meeting was that the ADA

21   requires employers to provide reasonable accommodations to

22   employees with disabilities.

23          Everyone agreed that Amy Jo raised the ADA at that

24   meeting. But it doesn't matter whether Walmart agrees with the

25   law, Walmart is required to follow the law.

867

1          Mr. Harlan also asked you, how much effort does it

2     take?  Think about that, the irony, huh?  You heard Walmart has

3     over a million employees.  The Manitowoc store had 300

4     associates that worked there.  How can a 90-minute schedule

12:05   5     change for one woman with a disability be a hardship to Walmart?

6          Marlo worked for Walmart for 15 years.  She met and

7     exceeded their expectations for 15 years.  Look at her

8     performance reviews.  I thought it was very interesting that

9     Walmart wants to disregard its own performance reviews of its

12:05  10     employee.  Just look at the reviews, you'll see, she was

11     qualified.  She folded the towels, she tidied the aisles, she

12     did returns.  She helped customers.  Those were the essential

13     functions of her job.  And she fulfilled them before the

14     schedule change, and after actually, the essential functions, it

12:05  15     was just the attendance that she struggled with because she

16     needed an accommodation.

17          Marlo was a good and dependable employee for Walmart.

18     She could do that job with a noon to 4:00 schedule.  She could

19     comply with their attendance policy with a noon to 4:00

12:06  20     schedule.  This was her career and Walmart took it away.  This

21     was the center of Marlo's routine, Walmart took it away.

22          She was a proud and loyal Walmart employee.  She

23     didn't deserve to be treated that way.  After Walmart fired her,

24     Marlo did have to be placed on depression medication.  She still

12:06  25     takes that medicine every day.  And Marlo herself told us that

868

1    she cried when Walmart fired her.  Walmart would like to say it

2    was 30 minutes.  She cried when Walmart fired her.  She really

3    liked her job at Walmart.  She wishes she could still work

4    there.  She told you.  She misses helping people.  She even

12:07   5    misses doing returns.  Nobody likes returns, but she misses

6    doing returns.  And she still gets sad when she sees Walmart

7    trucks.

8            Barb, who lives with Marlo, she told us -- what did

9    she tell you; do you remember?  Marlo and Barb watch TV

12:07  10    together.  When Walmart commercials come on, Marlo can't look.

11    She looks away.  She covers her face with her hand.

12            Does that sound like someone who is over what happened

13    to her six years ago?  Barb said that the commercials remind her

14    every time what Walmart did when Walmart fired her.

12:07  15            But it could have been so simple.  Marlo obviously

16    just needed an accommodation and Walmart just didn't want to

17    give her one.

18            But the ADA gives Marlo federally protected rights,

19    the federally protected right to a reasonable accommodation.

12:08  20    That's why we're here.  Remember the standard in this case is

21    the preponderance of the evidence, which just means more

22    probably true than not true.  Think about that.  More probably

23    true than not true.

24            The EEOC has certainly proven that its claims in this

12:08  25    case are probably true.  If Marlo's disability or her need for

869

1    accommodation tip the scales even the tiniest bit against

2    Walmart, EEOC has proven its case on Marlo's behalf.

3         Look in the jury instructions.  "More probably true

4    than not true."  Trust your judgment.  Because the truth in this

12:09    5    case is that Marlo's disability really was obvious to Walmart.

6    The truth is that Marlo's need for an accommodation really was

7    obvious to Walmart.  How could it not be?  It was obvious

8    because she had worked with them for 15 years.  They knew her

9    and her limitations well.

12:09    10    You heard Marlo's managers testify that whenever they

11   had to introduce a change she required extra support.  And when

12   she had basically a job coach, someone to be with her, to stay

13   with her through it, to help her through it consistently, she

14   was able to adapt.

12:09    15    But Walmart denied Marlo's request for an

16   accommodation because Walmart wanted its employees to work the

17   hours that the computer spat out.  That's how Walmart does it,

18   but that's not legal.

19         Remember, Marlo Spaeth's final rate of pay -- well,

12:10    20   you'll see it if you take a closer look at her 2014 review, it

21   was 12.50 an hour.  Walmart, a company that's worth $485

22   billion, wants you to believe that changing Marlo Spaeth's

23   schedule by 90 minutes, shifting her work schedule back to noon

24   to 4:00 and paying her $12 an hour to work noon to 4:00 is

12:10    25   somehow an undue hardship to Walmart?

870

1    You're the factfinders.  Think about it, though.

2    Walmart didn't need Marlo to work noon to 4:00, they just wanted

3    her to work noon to 4:00.

4    You heard from manager Bonnie Popp that the order to

12:11    5    deny the schedule change requests, where did it come from?  Do

6    you remember?  It came from headquarters.  And Bonnie Popp

7    testified that she understood that the order to deny schedule

8    accommodations also applied to individuals with disabilities.

9    Do you remember when she said that?  Trust your memory.

12:11    10    A company as sophisticated as Walmart knew exactly

11    what it was doing.  Walmart, a company with over a million

12    employees, does not get to stick its head in the sand when it

13    comes to the Americans With Disabilities Act.  Walmart didn't do

14    its part to fulfill the promises under the ADA, so here we are.

12:11    15    So when you go to fill out that verdict form, we ask

16    you to enter a verdict in favor of the EEOC and Marlo Spaeth on

17    all claims.

18    We ask you to find that Marlo Spaeth is a qualified

19    individual with a disability.

12:12    20    We ask you to find that Walmart was aware of Marlo's

21    disability and her need for a schedule accommodation.

22    We ask you to find that Walmart broke the promises of

23    the ADA by denying Marlo her right to a reasonable

24    accommodation, and that such an accommodation would not have

12:12    25    been an undue hardship for Walmart.

871

1          We ask you to find that Walmart broke the promises of

2    the ADA by firing Marlo either because of her disability or

3    because of the need to accommodate her disability.

4          We ask you to find that Walmart broke the promises of

12:12    5    the ADA by refusing to give Marlo her job back through

6    reinstatement, either because of her disability or because of

7    the need to accommodate her disability.

8          And we ask you to decide on an amount of money that

9    will fairly and reasonably compensate Marlo for her emotional

12:13   10    pain and her mental anguish.  We won't ask you for a specific

11    number, we trust your judgment.  You determine what amount is

12    enough to make things right for Marlo.

13          We also ask you to determine an amount that's enough

14    in punitive damages to send Walmart a message that this conduct

12:13   15    will not be tolerated.

16          And all of us from the EEOC, we deeply appreciate your

17    attention this week.  We appreciate your time, we really do.

18          And as I mentioned at the start of this trial, it is

19    our honor and our privilege to enforce the Americans With

12:14   20    Disabilities Act.  And very few people get the opportunity to

21    make things right for someone.  But ladies and gentlemen of the

22    jury, you have that opportunity today.  You can make things

23    right for Marlo Spaeth.

24          So today we ask you to do your part.  What Walmart did

12:14   25    to Marlo Spaeth was not right and it was not legal.  Now it's up

872

1   to you.  Hold Walmart accountable.  Tell Walmart that what it

2   did to Marlo Spaeth is completely unacceptable.  Keep the ADA's

3   promises to Marlo Spaeth because, as I told you at the start of

4   this case, a promise made truly should be a promise kept.

12:15  5         Thank you for your time.

6         THE COURT:  Thank you, Ms. Carter.

7              CONCLUDING JURY INSTRUCTIONS

8         THE COURT:  Now, members of the jury, this case is

9   ready to be submitted to you for your serious deliberation.  It

12:15  10  is an important case.  It is important to the plaintiff, the

11  EEOC, and, of course, Marlo Spaeth, it's also important to

12  Walmart.  Consider the case fairly, honestly, impartially, and

13  in the light of reason and common sense.  Give each question in

14  the verdict your careful and conscientious consideration.  In

12:15  15  answering each question, free your minds of all feelings of

16  sympathy, bias, or prejudice.  Let your verdict speak the truth,

17  whatever the truth may be.

18         The verdict must represent the considered judgment of

19  each juror.  In order to return a verdict, it is necessary that

12:16  20  each juror agree.  In other words, your verdict must be

21  unanimous.

22         It is your duty, as jurors, to consult with one

23  another, and to deliberate with a view to reaching an agreement,

24  if you can do so without violence to your individual judgment.

12:16  25  You must decide the case for yourself, but only after an

873

1    impartial consideration of the evidence in the case with your

2    fellow jurors.

3            In the course of your deliberations, do not hesitate

4    to re-examine your own views and change your opinion if you are

12:16  5    convinced it is erroneous.  But do not surrender your honest

6    conviction as to the weight or effect of evidence solely because

7    of the opinion of your fellow jurors or for the mere purpose of

8    returning a verdict.

9            Remember at all times that you are not partisans.  You

12:16  10   are judges -- judges of the facts.  Your sole interest is to

11   seek the truth from the evidence in the case.

12           I remind you that you may not bring into the jury room

13   any research materials or additional information; this includes

14   dictionaries, computers, electronic communication devices, or

12:17  15   other reference materials.  You may not communicate in any way

16   with anyone other than jurors until you have reached your

17   verdict.

18           There is no written transcript of the trial testimony

19   available immediately for use during your deliberations, so rely

12:17  20   primarily on your memory of the evidence and testimony

21   introduced during the trial and your notes.

22           As we've discussed, a form of verdict has been

23   prepared for your convenience.

24           Certain questions in the verdict are not to be

12:17  25   answered -- or are to be answered only if you have answered a

874

1    preceding question in a certain manner.  Therefore, read the

2    introductory portion of each question very carefully before you

3    answer it.  Do not needlessly answer questions.

4           Upon returning to the jury room, you will select one

12:17  5    of your members to act as your foreperson.  The foreperson will

6    preside over your deliberations and will be your spokesperson

7    here in court.

8           You will take to the jury room the verdict form that

9    has been prepared for you.  And you must reach a unanimous

12:18  10    verdict; that is, all eight of you must agree on the answer to

11    each question.  When you have reached unanimous agreement as to

12    your verdict, your foreperson will write in the verdict the

13    answers you have agreed upon and will date and sign the verdict,

14    and then all of you will return with your verdict to the

12:18  15    courtroom.

16           I do not anticipate that you will need to communicate

17    with me.  If you do, however, the only proper way is in writing,

18    signed by the foreperson, or if he or she is unwilling to do so,

19    by some other juror, and given to the bailiff.

12:18  20           To have a complete record of this trial, it is

21    important that you not communicate with me except by a written

22    note.

23           If you have questions, I will talk to the parties

24    before I answer, so it may take some time.  You should continue

12:18  25    your deliberations while you wait for my answer.  I will answer

875

1    any questions in writing or orally here in open court.

2         You will note then from the oath about to be taken by

3    the bailiff that he, too, as well as all other persons, are

4    forbidden to communicate in any way or manner with any member of

12:19   5    the jury on any subject touching on the merits of the case.

6    Bear in mind also that you should never reveal to any person how

7    the jury stands, numerically or otherwise, until after you have

8    reached a unanimous verdict.

9         So at this time then the clerk will administer the

12:19   10   oath to the bailiff, the court security officer.

11        (Bailiff sworn.)

12        THE COURT:  Okay.  Then you can retire to the jury

13   room.  Hopefully your sandwiches are ready.  We will give you

14   extra copies of the instructions.

12:20   15        (Jury out for deliberations at 12:20 p.m.)

16        THE COURT:  Okay.  We are outside the presence of the

17   jury.  Anything to put on the record at this point?

18        MR. MULAIRE:  Not from plaintiff.

19        MS. CARTER:  No.

12:20   20        THE COURT:  We do need to decide which exhibits should

21   go to the jury.  Have you talked about that?

22        MS. VANCE:  No, Your Honor.

23        THE COURT:  Okay.  Well, do that.  And let the clerk

24   know if there's any dispute.  And then we'll clear those up.

12:20   25   But let's see if we can get those to the jury.  And then make

876

1    sure you let the clerk know a number where you can be reached

2    and where we can get hold of you and perhaps get you back here

3    within 10 minutes or so if need be.

4              My hunch is their lunch has probably arrived, so you

5    should be safe in going to lunch or something like that.

6              And, finally, I want to thank the parties, thank you

7    for your cooperative work in getting this case to a jury

8    promptly and quickly and the assistance you've given the Court

9    in trying to resolve difficult issues.  It's always better to

10   say thank you ahead of time, we don't know the result.  But I

11   think the case was well tried and hopefully the jury will be

12   able to reach a verdict and we can go on.

13             MS. CARTER:  Thank you, Your Honor.

14             MR. BULIOX:  Thank you, Judge.

15             MR. BURNETT:  Thank you.

16             MR. HARLAN:  Thank you.

17             THE COURT:  Okay.  We're in recess then.

18             (Trial adjourned for jury deliberations at 12:21 p.m.,

19   until 12:32 p.m.)

20             THE COURT:  Okay.  We're outside the presence of the

21   jury and I understand there's some questions about exhibits.

22             Go ahead, be seated.

23             MR. MULAIRE:  Yes, Your Honor.

24             So we conferred with defendant and we don't agree

25   which exhibits should go back to the jury.  The EEOC's view is

877

1    that the items that are in evidence, which we referred to in our

2    closing and which we believe the jury should be able to examine

3    freely, should go back to the jury with the exception of

4    Exhibits 43 through 46 which are matters that relate solely to

12:32  5    injunctive relief and so were only moved into evidence with the

6    intention that the Court would have access to them later.  We

7    understand the defendant's position is that nothing should go

8    back to the jury unless the jury specifically asks for it, which

9    we disagree with.

12:33  10              THE COURT:  Okay.  Defense?

11              MR. BURNETT:  Yes, Your Honor, that's our position,

12    for a couple of reasons.

13              Number one, there's a lot of exhibits.  And sending

14    all of the exhibits back to the jury tends to prolong the

12:33  15    deliberation and distracts rather than focuses.  If the jury

16    wants a specific exhibit they can ask for it by item, name, or

17    by number and that has worked well, at least in state court

18    practice here, for a number of years.

19              Otherwise the alternative is to go through these

12:33  20    exhibits number by number between the parties and decide, while

21    the jury is deliberating.  Then what happens is you get a

22    shipment of exhibits in the middle of a deliberation that can

23    change the dynamic.

24              THE COURT:  Well, you know, are there that many

12:34  25    exhibits?  How many were introduced?  I know I have huge

878

1    binders, but what was introduced?

2              MR. HARLAN:  I think it was a significant number.

3              MR. BURNETT:  We haven't counted them but --

4              MR. MULAIRE:  I don't have an exact count.  But I will

12:34  5    point out that the defendant did identify this much larger

6    number of pages that they wanted into evidence.  We entered into

7    a stipulation at their request that they could all be moved into

8    evidence.  So then at the end of the trial for them to say

9    they're too voluminous and, therefore, the jury can't see any of

12:34 10   them does not strike me as reasonable.

11             THE COURT:  I typically, especially where the parties

12   have emphasized exhibits, and the review of exhibits was kind of

13   cursory on the monitor, I let them have the exhibits typically

14   and it avoids questions or they get them, they can look at what

12:35 15   they want, and the case comes back.

16             So my inclination is to give them exhibits.  I mean,

17   it seems to me almost all of them in the EEOC binder were -- you

18   know, both parties used them.  They seemed to be pretty much

19   joint exhibits.  I don know what else.  Certainly I suppose the

12:35 20   time records and the other one.

21             But, I mean, pull out the ones that were key and send

22   them all in at once.  I don't think we want to send them in

23   piecemeal, but just send those in.  And they all don't have to

24   go in, especially if they're voluminous exhibits and just a

12:35 25   little bit was used like medical records, we're not going to

1   send all the medical records all in.  Especially when just one

2   small comment was introduced in during the course of the trial

3   on medical records.

4           But, you know, the job evaluations, the availability

12:36  5   forms, the attendance records, the policies and the

6   investigation emails and counseling emails, those are the types

7   of things that I think would typically go in.  And to the extent

8   they were admitted, those things can go in.  Okay?

9           MR. MULAIRE:  Thank you, Your Honor.

12:36  10          MR. HARLAN:  What about, Your Honor, the financials?

11          THE COURT:  Financials don't have to go in.

12          MR. HARLAN:  Thank you.

13          MS. VANCE:  It's the one page, Your Honor, that was

14   referred to in closing.

12:36  15          THE COURT:  It was referred to in closing, I think

16   that's enough.  I mean, it doesn't even -- you said it was

17   millions which would make it billions, but it's not even clear

18   from the exhibit what we're talking about.

19          MS. VANCE:  Your Honor, that's why that page would

12:36  20   help.

21          THE COURT:  Does the page explain?

22          MS. VANCE:  Yes, that's the first thing it says at the

23   top left, reported in millions.  Yes, it's reported in millions.

24   There wouldn't be enough room on the page if there had to be six

12:37  25   zeros following every number.

1    THE COURT:  Yes.

2    MR. HARLAN:  We would object to that, Your Honor.  I

3    think the spirit was that this was just going to be shown and it

4    wasn't going to be a focus.  Obviously it got into the EEOC's

12:37   5    arguments and they obviously know the size and scope and now

6    they even know the revenues.  I don't think it would be an

7    appropriate --

8    THE COURT:  I think it's fine the way it is so let's

9    leave that exhibit out.  I mean, I don't think that's one the

12:37   10   jury really needs to review and consider and evaluate.  I think

11   they understand Walmart is a very large business, they've heard

12   the numbers, we can go from there.  Okay?

13   MR. MULAIRE:  Okay.

14   THE COURT:  All right.  We're in recess then.

12:38   15   (Recess taken for continued jury deliberations at

16   12:37 p.m., until 3:22 p.m.)

17   THE COURT:  I think we're in the process of bringing

18   the jury in.

19   We had a question.

03:22   20   Go ahead, be seated.  When the jury comes in we'll get

21   up.

22   The question we had was:  "Is there a cap on the

23   amount that we can award for punitive damages?"

24   But they told us -- it was not signed, we sent it back

03:22   25   for a signature, and then we were told they had a verdict.  So

881

1    we'll bring in the verdict.

2              MS. VANCE:  I'm sorry, Your Honor, I'm unclear, was

3    there an answer to the jury's question?

4              THE COURT:  No.  I brought you here before formulating

03:22  5    an answer, and they reached a verdict before they got any

6    answer.  They advised us they had a verdict.

7              MS. CARTER:  Okay.

8              THE COURT:  So we'll make that question part of the

9    record, but they apparently decided without it.

03:23  10             MS. CARTER:  Thank you, Your Honor.

11             THE COURT:  And they're on their way, Scott?

12             (Brief pause.)

13             (Jury in at 3:24 p.m.)

14             THE COURT:  Okay, ladies and gentlemen of the jury.

03:24  15    Have you reached a verdict?

16             THE FOREPERSON:  Yes, Your Honor.

17             THE COURT:  And are you the foreperson?

18             THE FOREPERSON:  Yes, Your Honor.

19             THE COURT:  Would you hand the verdict to the court

03:24  20    security officer, please.  You can be seated.

21             (Verdict tendered to the Court.)

22                              **VERDICT**

23             THE COURT:  Okay.  The verdict reads as follows:

24             "We, the jury, for our Special Verdict, answer the

03:25  25    questions submitted to us as follows:

882

1          "1.   During the time of her employment with Walmart,

2     was Marlo Spaeth a qualified person with a disability?

3          "ANSWER:  Yes.

4          "Question 2.  Was Walmart aware that Marlo Spaeth

03:25   5     needed an accommodation due to her disability?

6          "ANSWER:  Yes.

7          "Question 3.  Did Walmart fail to provide Marlo Spaeth

8     with a reasonable accommodation?

9          "ANSWER:  Yes.

03:25   10         "Question 4.  Would providing Marlo Spaeth an

11    accommodation have posed an undue hardship to Walmart's

12    business?

13         "ANSWER:  No.

14         "Question 5.  Did Walmart violate the Americans With

03:25   15    Disabilities Act by terminating Marlo Spaeth because of her

16    disability?

17         "ANSWER:  Yes.

18         "Question 6.  Did Walmart violate the Americans With

19    Disabilities Act by failing to reinstate Marlo Spaeth because of

03:25   20    her disability?

21         "ANSWER yes.

22         "7.   What sum of money will fairly and reasonably

23    compensate Marlo Spaeth for her emotional pain and mental

24    anguish?

03:26   25         "ANSWER:  $150,000.

883

1          "Question 8.  What amount, if any, do you award as

2   punitive damages?

3          "ANSWER:  $125 million."

4          Ladies and gentlemen of the jury, is this your

03:26   5   verdict?

6          JURY IN UNISON:  Yes.

7          THE COURT:  Either party wish to have the jury polled?

8          MR. HARLAN:  Yes, Your Honor.

9          THE COURT:  What that means is I have to ask you to

03:26  10   tell me out loud and for the record if this is your verdict say

11   yes, this is my verdict, and if it's not tell me no.

12          We'll start with Juror Ms. Roberts.

13          JUROR ROBERTS:  Yes.

14          JUROR SCHULTZ:  Yes.

03:26  15          JUROR MILLER:  Yes.

16          JUROR VANDERBLOOMEN:  Yes.

17          JUROR WENNINGER:  Yes.

18          JUROR STEIMEL:  Yes.

19          JUROR TESCHKE:  Yes.

03:26  20          JUROR ALVARADO:  Yes.

21          THE COURT:  Satisfactory?

22          MR. HARLAN:  Yes.

23          THE COURT:  Okay.  Ladies and gentlemen of the jury,

24   your service in the case is complete.  You don't have to answer

03:26  25   any questions, but you're no longer required to remain silent.

884

1    You can talk about the case all you want, if you want.  But you

2    don't have to.  It's up to you.

3            I want to add my thanks to the thanks extended to you

4    already by the parties for your attention to the case, your

03:27  5    careful deliberation and your verdict, the work you've done on

6    the case.  So thank you very much and you're free to go.

7            (Jury out at 3:27 p.m.)

8            THE COURT:  Okay.  Go ahead and be seated.

9            You're aware of motions dates, follow the rules.  I'll

03:27  10   file the verdict with the clerk.  Any comment or anything

11   further to do today?

12           MR. MULAIRE:  One question that I think we meant to

13   ask before the jury came back in was whether we are free -- to

14   the extent we run into them in the parking lot or otherwise have

03:28  15   a chance to speak with them, does Your Honor have any guidance

16   about whether we can speak with the jurors?  We find it useful

17   just as lawyers who do trials only so often, but we wanted to

18   ask can we speak to the jury about the case.

19           THE COURT:  Defense, same thing or --

03:28  20   MR. HARLAN:  I don't know what your normal practice

21   is, Your Honor.

22           THE COURT:  The general rule is we discourage it, but

23   there's not a hard and fast rule.  You know, the last thing I

24   want to see is any -- you know, I'm sure you would not be at all

03:29  25   critical.  But I would, at least for a couple days, leave the

885

1    jury alone.

2            MR. MULAIRE:  That's why we ask.

3            MS. CARTER:  Yes.

4            MR. MULAIRE:  I guess one other question is, I think

03:29  5    our proposal would be to address equitable relief on the papers.

6    And I don't think we see a need to have a further evidentiary

7    hearing, but we wanted to find out should we do that on the same

8    schedule as other post-trial motions?  I don't think the local

9    rule has a specific briefing schedule for that, but --

03:29  10           THE COURT:  Yeah, I think that makes sense.  If I need

11   to have an evidentiary hearing, if defendants believe there are

12   factual disputes that the court needs to decide and hear, I can,

13   after looking at the paper, the evidentiary materials you submit

14   on paper, make that determination.

03:30  15           MR. MULAIRE:  And then, I'm trying to remember now, to

16   the extent I think the -- is the court's practice to enter

17   judgment on the verdict right away or to wait until post-trial

18   motions are concluded first?

19           THE COURT:  I think the statute pretty much indicates

03:30  20   we enter judgment on the verdict, but we wait for motions after

21   verdict then to -- for remittitur or for things of that nature.

22           MR. BURNETT:  I think we should have an oral motion at

23   the present time to reduce the punitive damage award to the

24   statutory maximum of $300,000.

03:30  25           THE COURT:  Is that a statutory maximum for punitives?

886

1        MR. BURNETT:  I thought so.

2        MR. HARLAN:  Compensatory and punitives.

3        THE COURT:  And compensatory?

4        MR. MULAIRE:  Yeah, the total of compensatory and

03:30  5  punitives can't exceed 300,000.  I mean, it should be reduced to

6   that for purposes of the judgment.  The verdict is what it is.

7        THE COURT:  Right.  Yeah.  Well, then I'll direct

8   entry of the judgment in the amount of $300,000 in favor of EEOC

9   and against Walmart.

03:31  10       MR. MULAIRE:  Thank you.  And I think -- and the

11  reduction -- we would propose that the reduction come entirely

12  out of the punitives, meaning of the 300,000, 150 should be

13  compensatory, 150 should be punitive.

14       THE COURT:  Okay.  Any objection to that?

03:31  15       MR. BURNETT:  No, reserving our rights on motions

16  after to challenge that aspect of the award.

17       THE COURT:  Right.  Okay.  Anything further today?

18       MR. MULAIRE:  Nothing from the plaintiff.

19       THE COURT:  Okay, very well.  This matter is concluded

03:31  20  then.  Thank you.

21       MS. CARTER:  Thank you, Your Honor.

22       (Proceedings concluded at 3:31 p.m.)

23                    *   *   *

24

25

887

1              C E R T I F I C A T E

2

3              I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

4    Reporter for the United States District Court for the Eastern

5    District of Wisconsin, do hereby certify that the foregoing

6    pages are a true and accurate transcription of my original

7    machine shorthand notes taken in the aforementioned matter to

8    the best of my skill and ability.

9

10   Signed and Certified August 4, 2021.

11   /s/John T. Schindhelm

12   John T. Schindhelm

13

14                  John T. Schindhelm, RPR, RMR, CRR
                    United States Official Reporter
15                  517 E Wisconsin Ave., Rm 324,
                    Milwaukee, WI 53202
16                  Website: WWW.JOHNSCHINDHELM.COM

17

18

19

20

21

22

23

24

25

888

1                    I N D E X

2      JURY INSTRUCTION CONFERENCE

3           FORMAL CONFERENCE................................    767

4      FINAL JURY INSTRUCTIONS

5           BY THE COURT...................................    787

6      PLAINTIFF CLOSING ARGUMENT

7           BY MS. VANCE...................................    805

8      DEFENDANT CLOSING ARGUMENT

9           BY MR. HARLAN..................................    828

10     REBUTTAL CLOSING ARGUMENT

11          BY MS. CARTER..................................    861

12     CONCLUDING JURY INSTRUCTIONS

13          BY THE COURT...................................    873

14     VERDICT

15          PUBLISHED BY THE COURT.........................    882

16

17

18

19

20

21

22

23

24

25

889