# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | **Civil No. 17-cv-0070** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| WAL-MART STORES EAST, L.P., | ) ) | **PLAINTIFF EEOC'S** |
| Defendant. | ) ) ) ) ) | **MEMORANDUM IN SUPPORT OF ITS MOTION FOR EQUITABLE RELIEF** |

**Table of Contents**

I.   INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 2

III. ARGUMENT ................................................................................................................. 2

a.   This Court is authorized under the ADA to enter an Injunction because there has

been a finding that Defendant engaged in intentional discrimination. .................................. 2

b.   Equitable relief is justified to ensure that future violations do not occur. ................... 6

c.   The EEOC seeks injunctive measures narrowly tailored to the ADA violations found

by the jury. ........................................................................................................................ 7

1.   Injunction Prohibiting Denial of Permanent Reasonable Accommodations ............... 7

2.   Revision of Anti-Discrimination Policies ................................................................. 9

3.   Injunction Prohibiting Denial of Reasonable Accommodations ............................... 10

4.   Posting of Notice .................................................................................................... 12

5.   Record-Keeping and Reporting ............................................................................... 12

6.   Anti-Discrimination Training .................................................................................. 13

7.   Accountability for EEO Noncompliance .................................................................. 14

8.   Injunction Prohibiting Retaliation .......................................................................... 14

9.   Reinstate Marlo Spaeth ........................................................................................... 15

10.  Injunction Prohibiting Retaliation Against Marlo Spaeth ........................................ 16

11.  Spaeth's Guardian Must Be Informed ..................................................................... 16

**d. The EEOC also seeks make-whole monetary relief for Marlo Spaeth, including back pay, interest, and a tax component award.** ..................................................................... 16

**1) Backpay should be awarded in the amount of $77,307.** ..................................... 17

**2) Prejudgment interest should be awarded at the Prime Rate, compounded quarterly**. 17

**3) A tax component award is warranted for lost wages and compensatory damages.** ....... 19

**4) Ms. Spaeth's back pay award should not be reduced, as Walmart cannot meet its burden to prove the affirmative defense of failure to mitigate.** .............................................. 24

# I.    INTRODUCTION

Plaintiff Equal Employment Opportunity Commission ("EEOC"), pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(g)), respectfully asks this Court to grant equitable relief to ensure that Walmart employees will not be denied reasonable accommodations in violation of the ADA in the future, as well as relief to make Marlo Spaeth whole. The EEOC asks the Court to grant injunctive measures for a period of five years, including: enjoining Walmart from denying reasonable accommodations to Walmart employees with disabilities; requiring Walmart to report to the EEOC regarding requests for accommodations; requiring Walmart to modify its policies to clarify that long-term or permanent disability accommodations may be granted if they do not impose undue hardship; requiring Walmart to provide additional training to its managers regarding the same; including adherence to Walmart's EEO policies as a factor in management performance reviews; requiring Walmart to provide notice of the verdict in this case to all employees and remind employees of their right to contact the EEOC without fear of retaliation; and enjoining Walmart from retaliating against any employees who request schedule modifications as an accommodation of a disability. Plaintiff EEOC's specific requests for injunctive relief are set forth in full detail in the cover motion and in Section III. c. 1-11 of this brief.

Plaintiff Equal Employment Opportunity Commission ("EEOC") also asks this Court to grant make-whole equitable relief to Marlo Spaeth, including rightful place reinstatement and monetary relief in the form of back pay, prejudgment interest, and a tax component award. Specifically, the EEOC seeks $77,307 in back pay, $9,886 in prejudgment interest, $33,885 in a tax component award to off-set taxation for lost wages, and $65,747 in a tax component award to off-set taxation on compensatory damages, for a total of $186,825 in equitable monetary relief.

1

## II. BACKGROUND

The EEOC brought this case against Walmart alleging Walmart violated the ADA by denying Marlo Spaeth the reasonable accommodation of a schedule change, by wrongfully discharging her because of her disability or her need for accommodation and failing to reinstate her because of her disability or her need for accommodation. After a four-day trial, the jury found for the EEOC on each of these allegations and awarded Ms. Spaeth $150,000 in compensatory damages and $125,000,000 in punitive damages. (Special Verdict, ECF No. 236) In awarding punitive damages, the jury found that "Defendant's managerial employees and officers acted within the scope of their employment in reckless disregard of Ms. Spaeth's right not to be discriminated against." (*See* Jury Instructions, 3.13 Punitive Damages, ECF No. 234). "After the verdict was returned, Walmart orally moved to reduce the award of compensatory and punitive damages to the statutory maximum of $300,000. *See* 42 U.S.C. § 1981(a). The Court granted Walmart's motion," (Order, 1, ECF No. 244), reducing the jury's punitive damages award from $125,000,000 to $150,000. The EEOC now seeks equitable relief against Walmart.

## III. ARGUMENT

### a. This Court is authorized under the ADA to enter an Injunction because there has been a finding that Defendant engaged in intentional discrimination.

Injunctive relief is warranted here. A prevailing plaintiff need not make a special showing to obtain injunctive relief. "In fact, a plaintiff need not produce any evidence beyond that going to [her] particular case before becoming eligible for injunctive relief." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001). Unlike a private plaintiff, the EEOC may seek relief in the interest of employees generally, not just the charging party. *EEOC v. United Parcel Serv.*, 94 F.3d 314, 318 (7th Cir. 1996). "[T]he EEOC does not stand in the employee's shoes." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002). "When the EEOC acts, albeit at the behest of and

for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *General Telephone of the Northwest v. EEOC*, 446 U.S. 318, 326 (1980). When the EEOC is the prevailing plaintiff, "injunctive relief is authorized once the court has found that the defendant intentionally engaged in an unlawful employment practice." *See EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997), citing 42 U.S.C. § 2000e-5(g), made applicable to the ADA by 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(g)(1) ("If the court finds that the Respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate. . .").

"[U]pon a finding of any intentional employment discrimination, a district court possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law." *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 467 (6th Cir. 1999); *see also EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1543 (9th Cir. 1987) ("[i]njunctive relief would deter Goodyear from future unlawful discrimination"). Courts are given wide latitude "to fashion a complete remedy." *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990). "[T]he district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past *as well as bar like discrimination in the future*." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (emphasis added).

The Seventh Circuit has held repeatedly that no showing of widespread or pattern-or-practice discrimination is needed to justify injunctive relief. "The section of Title VII authorizing injunctive relief does not itself require that a pattern or practice of unlawful conduct be shown; instead, injunctive relief is authorized once the court has found that the defendant

intentionally engaged in an unlawful employment practice." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997). The Seventh Circuit further noted that "injunctive relief is appropriate even where the Commission has produced no evidence of discrimination going beyond the particular claimant's case." *Ilona of Hungary*, 108 F.3d at 1578; *see also Bruso v. United Airlines, Inc.,* 239 F.3d 848, 864 (7th Cir. 2001) ("We previously have stated that a successful discrimination plaintiff need not demonstrate that his employer engages in a pattern or practice of discrimination in order to receive injunctive relief"). "The relevant inquiry, then, is whether the employer's *discriminatory conduct could possibly persist* in the future." *Bruso*, 239 F.3d at 864 (7th Cir. 2001) (emphasis added).

Here, injunctive relief is authorized because the jury found that Walmart intentionally engaged in unlawful discrimination under the ADA. Moreover, there is ample reason to conclude not just that Walmart's discriminatory conduct could possibly persist in the future, but that it is very likely to do so. Walmart's Human Resources staff and managers testified that they were familiar with the ADA. Karen Becker testified that she knew denying a person with a disability a reasonable accommodation was against the ADA. Transcript of Day 1 Jury Trial, ECF No. 245, p. 181:18-24. Robin Castro testified that she knew that the law requires making reasonable accommodations for employees with disabilities. Transcript of Day 2 Jury Trial, ECF No. 246, p. 261:11-18. Bonnie Ohlsen, whose last name was Popp at the time she managed Spaeth, testified that she knew that reasonable accommodations were related to the ADA. Transcript of Day 3 Jury Trial, ECF No. 247, p. 584:16-24.  They knew about the duty to provide reasonable accommodations to employees with disabilities and yet still failed to comply with the ADA.

Even more troubling, the managers also testified that set, long-term or permanent schedules are *not ever* provided as accommodations at Walmart. Transcript of Day 3 Jury Trial,

ECF No. 247, p. 581:5-7; p. 711:20-22. Walmart witness Lee Spude is a regional people director for Walmart's Region 53 who oversees more than a hundred stores in a dozen territories. *Id*. at 649:7-651:13. At trial, Spude testified, "I can tell you that just in my region alone I have about 30,000 people." *Id*. at 698:15-16. Spude testified that he has "never seen a long-term permanent scheduling accommodation." *Id*. at 725:6-7. Indeed, Spude confirmed this fact more than once:

> Q. …So, Mr. Spude, you've told us that you've never seen Walmart give a long-term modified schedule.
> A. Correct.
> Q. A modified work schedule. You've never seen it.
> A. I specifically stated I don't see a long-term permanent schedule. I did testify that it's very common to make one-off scheduling modifications in situations all the time; doctors' appointments, childcare situations, yes.
> Q. But I'm talking about an actual modified schedule.
> A. … I haven't seen long-term permanent modified schedules, no, as a form of accommodation.

*Id*. at 728:25 -729:13.

And this was not merely a local aberration from company policy. Indeed, Walmart managers testified that there was an order from the home office to stop providing schedule adjustments. Transcript of Day 2 Jury Trial, ECF No. 246, p. 249:3-8. Julia Stern testified, "the directive was that we were to allow the schedules to be generated and run them as they were generated and not make adjustments to them unless it was a specific business need." *Id.*, p. 474:16-19.

And, indeed, it was understood that the order not to provide schedule accommodations applied to all employees, with no distinction made for employees with disabilities. Bonnie Ohlsen testified that she understood the directive from the home office not to adjust anyone's schedules "applied to all associates":

> Q. So it was your understanding that you were to deny requests from associates who asked for schedules that were different than the schedules generated by the system.

5

A. Yes.
Q. You were directed by headquarters not to adjust anyone's schedules anymore; right?
A. Yes.
…
Q. It was your understanding that the instruction not to adjust Anyone's schedule applied to all associates.
A. Yes.
…
A. We didn't adjust shifts for any associates.

Transcript of Day 3 Jury Trial, ECF NO 247, pp. 602:17-19, 603:1-3, 22.

Thus, despite having knowledge of the law and the right to accommodation under the ADA, Walmart directed managers to stop adjusting employee schedules and the managers followed the directive without any exception, even when confronted with Marlo Spaeth's obvious need for an accommodation based on disability.

### b. __Equitable relief is justified to ensure that future violations do not occur.__

That managers who were involved in the discrimination remain in management is a proper basis for believing the discrimination may continue absent an adequate remedy. *See Ilona of Hungary*, 108 F.3d at 1579 ("We also agree that injunctive relief is justified in a case like this where the individuals who were found to have discriminated remain the defendant's primary decision-makers."); *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990) (citing that manager who "was aware of [the harasser's] conduct but did nothing to rectify it, still was employed by [defendant] when the court entered the injunction" as factor in support of injunction); *North Star Hospitality*, No. 12-CV-214-BBC, 2014 WL 282026, at *5 (W.D. Wis. Jan. 27, 2014), aff'd sub nom. *EEOC v. N. Star Hosp., Inc.*, 777 F.3d 898 (7th Cir. 2015) (citing retention of one manager involved in discrimination as factor in support of injunction). As Walmart witnesses made clear through their testimony, Walmart has made no substantive changes to the practices and approaches that failed Marlo Spaeth in this case. Walmart has not

established that violations are unlikely to happen again. Instead, this is similar to the defense rejected by the district court and upheld by the Seventh Circuit in *Ilona of Hungry*, where the defendant's owners "offered no evidence to suggest that they no longer will discriminate" and "insisted throughout this litigation that they in fact never discriminated." *Id*.

The jury found Walmart liable for violating its duty under the ADA to provide a reasonable accommodation to Marlo Spaeth. The jury also found that Walmart fired Marlo Spaeth because of her disability or her need for accommodation and also refused to reinstate Marlo Spaeth for those unlawful reasons. While personnel coordinator Karen Becker retired after Ms. Spaeth was terminated, the management responsible for failing to comply with the ADA – Lee Spude, Kent Abitz, Bonnie Popp, Robin Castro, Julia Stern, and Denise Morgan all remain employed by Walmart. Arguably the most egregious ADA violator, Lee Spude, has since been promoted to oversee even more stores and thousands of Walmart employees. An injunction for a period of years is the best way to ensure similar future violations do not occur.

An injunction is also appropriate because Walmart has not accepted responsibility for its ADA violations. Defendant's position at trial was that it believed that there was no violation of the ADA and that no changes in its practices or behaviors were necessary. This is directly at odds with the jury's findings in this case. An injunction is necessary to protect Walmart employees from future violations.

      c.   **The EEOC seeks injunctive measures narrowly tailored to the ADA violations found by the jury.**

Injunctive Relief Generally Applicable to Walmart

**1.    Injunction Prohibiting Denial of Permanent Reasonable Accommodations**

First, for a period five years, Defendant Walmart should be enjoined from denying permanent or long-term reasonable accommodations to Walmart employees with disabilities

7

within the United States, in the absence of undue hardship. *See EEOC v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 1313, 1331 (D.N.M. 1998), *aff'd*, 202 F.3d 281 (10th Cir. 1999) (permanently enjoining defendant from discriminating against individuals with disabilities). Failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" constitutes discrimination under the ADA, unless the employer can demonstrate that accommodation would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018). Here, the jury found that although Marlo Spaeth was a qualified person with a disability, and although Walmart was aware of the need for accommodation due to her disability, Walmart failed to provide a reasonable accommodation to Marlo Spaeth even though the accommodation would not have posed an undue hardship to Walmart's business. (*See* Special Verdict, Jury Answers to Questions Nos. 1-4, ECF No. 236).

The accommodation at issue was Spaeth's request for a set schedule. Under the ADA, a "reasonable accommodation" may include "modified work schedules" for individuals with disabilities. 42 U.S.C. § 12111(9)(B); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 288 (7th Cir. 2015). Notably, the ADA does not include a time limit on schedule modifications. *Id*. § 12111(9)(B). Indeed, as "modified work schedules" are expressly included in the ADA's definition of "reasonable accommodation," 42 U.S.C.A. § 12111(9), a schedule change is the type of accommodation that would be "reasonable on its face, *i.e.* ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002)). Yet, at trial, Walmart's managers testified that set, permanent or long-term schedule accommodations are *never* provided at Walmart. Transcript Day 2 Jury Trial, ECF No. 246, p. 466:12-14; Transcript Day 3 Jury Trial, ECF No. 247, p. 630:11-14. This is simply not consistent with the flexibility and individualized

consideration required by law under the ADA. Without an injunction, further violations of the ADA are plainly likely to recur at Walmart.

Moreover, an injunction on this point is properly addressed to the company as a whole, rather than some geographic subset of its stores. Walmart's inflexibility on this point is plainly not a local aberration unique to the Manitowoc store. Walmart's own witnesses attributed their failure to accommodate Ms. Spaeth's scheduling needs as "follow[ing] the direction from the home office." Transcript Day 3 Jury Trial, ECF No. 247, p. 603:23-604:1. Moreover, accommodation requests are handled on a centralized basis by the company's Accommodation Services Center in Arkansas, not at the store level. Transcript Day 3 Jury Trial, ECF No. 247, p. 659:23-660:8. Accordingly, this aspect of injunctive relief should apply to Walmart's domestic operations generally. Walmart must be enjoined from denying requests for permanent or long-term schedule accommodations for employees with disabilities, or the discriminatory conduct is likely to continue.[1]

### 2. Revision of Anti-Discrimination Policies

Second, and relatedly, for a period of five years, Walmart should be required to modify its accommodation policies to clarify that fixed, long-term, or permanent disability accommodations *are* available to Walmart employees in the absence of undue hardship. *See Johnson & Higgins, Inc.*, 91 F.3d 1529, 1542 (2d Cir. 1996) (upholding the district court's ruling that defendant must provide the EEOC with a modified policy that complies with the ADEA); *EEOC v. KarenKim, Inc., d/b/a Paul's Big M*, No. 508-cv-1019, 2013 WL 12424087, at *2, 4

---

[1] If the Court denies the Commission's request for "Injunctive Relief Generally Applicable to Walmart," EEOC asks the Court to apply the proposed generally applicable provisions from #1 and #2 specifically to Walmart's Region 53. Walmart's Region 53 is comprised of 11 markets with Walmart witness Lee Spude as its Regional People Director. ECF No. 248, p. 649.

(N.D.N.Y. Sept. 24, 2013) (ordering that defendant adopt a revised version of its anti-discrimination policy for a period of five years). While Defendant's policies mention schedule modifications as a possibility, a clarification of Walmart's disability accommodation policy is necessary. As noted above, at trial, Walmart's witnesses testified that Walmart does not, in actuality, ever provide permanent schedule accommodations to anyone. Transcript Day 2 Jury Trial, ECF No. 246, p. 466:12-14; Transcript of Day 3 Jury Trial, ECF No. 247, p. 581:5-7, 630:11-14, 711:20-22. Managers also testified that the order from Walmart's home office not to provide schedule changes applied to all employees, including those with disabilities. Transcript of Day 3 Jury Trial, ECF No. 247, pp. 601:17-602:19. This blanket denial of schedule accommodations to employees with disabilities, whether permanent or temporary, violates the ADA, as Walmart must provide reasonable accommodations which do not pose an undue hardship on Walmart. Confirmation needs to be provided to all employees and managers that both temporary *and* permanent schedule accommodations are, in fact, available to Walmart employees with disabilities. Walmart's policies need to be modified to make clear that fixed, long-term, or permanent disability accommodations *are* available to Walmart employees. *See United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 225 (E.D.N.Y. 2018) (ordering that Defendant remove a section of its handbook that stated the Company may take corrective action, including termination, if an employee is found to have intentionally provided false information regarding a complaint of discrimination).

Injunctive Relief Applicable to Walmart's Region 53

**3.     Injunction Prohibiting Denial of Reasonable Accommodations**

Third, for a period of five years, within the company's Region 53, Walmart should be enjoined more generally from failing to provide reasonable accommodations to employees with

disabilities in violation of the ADA. In light of the jury's verdict, it is important to place Walmart under an injunction not to violate the ADA's requirement to provide reasonable accommodations to employees with disabilities. This injunction is not limited to permanent or long-term requests for accommodation; it would apply to all requests for reasonable accommodation of disabilities in Region 53. As noted in request number 1, failing to make reasonable accommodations violates the ADA unless the employer can demonstrate that accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A); *Rodrigo,* 879 F.3d 236, 241 (7th Cir. 2018). As noted above, Walmart's witness Lee Spude is the director for Walmart's Region 53 and oversees roughly 30,000 Walmart employees. Trial Transcript Day 3, 649:7-651:13, 698:15-16. Spude testified that he has "never seen a long-term permanent scheduling accommodation," *Id*. 725:6-7, and made no reference to Walmart doing a case-by-case analysis to determine whether each request for accommodation would impose an undue hardship on Walmart.

The jury found that there would have been no hardship for Walmart in providing an accommodation for Marlo Spaeth's known disability. Verdict, ECF No. 236. Yet, Mr. Spude approved Marlo Spaeth's termination, instructed managers to cease communication with Spaeth's family with knowledge that ADA rights were at issue, and denied reinstatement to Marlo Spaeth. Trial Tr. Day 2, 273: 21-274:10, 278:3-281:2, 22-282:6, 285:10-18, 303:4-304:11. Despite Marlo's own request to return to her noon to 4 schedule, and despite Walmart's awareness that Marlo has Down syndrome, no one looked into accommodating her disability, and no one gave her an accommodation packet or directed her to the Accommodations Service Center even though any member of management could have provided Spaeth with an accommodation packet. *Id*. at 262:17-266:11, 296:15-297:13; Trial Tr. Day 3, 530:19-532:17, 605:19-607:4. Region 53 certainly needs to be monitored for future ADA violations.

#### 4. Posting of Notice

Fourth, for a period of five years, within the company's Region 53, require Walmart to post a notice to all of its employees informing them of the verdict and injunction in this suit and explicitly informing employees that they may report discrimination directly to the EEOC without fear of retaliation. A requirement that Walmart provide notice of the judgment in this case to its employees is important, as it will deter further discrimination by communicating that noncompliance with federal anti-discrimination laws carries serious consequences. Any changes to Walmart's policies and new training employees receive will be far more meaningful and effective if they have some understanding as to *why* these changes are occurring. *See, e.g. United Health Programs of Am., Inc.*, 350 F. Supp. 3d at 221, 228 (finding that "the Posted Notice [is] appropriate, even though defendants' employees will receive anti-discrimination training, because defendants continue to employ individuals who contributed to defendants' Title VII violations" and ordering that the notice remain posted for five years); *KarenKim*, 2013 WL 12424087, at *2, 4 (ordering defendant to post a notice for a period of five years); *see also Wal-Mart Stores, Inc.*, 11 F. Supp. 2d at 1331. Moreover, if any employee is going to be comfortable in reporting discrimination to the EEOC in the future, there must be some notice of the jury's findings and of any injunction protecting employees from retaliation. The notice the EEOC proposes is attached to the Declaration of Leslie N. Carter, as Exhibit 3. Carter Decl., ¶ 32.

#### 5. Record-Keeping and Reporting

Fifth, for a period of five years, within the company's Region 53, require Walmart to notify the EEOC within ninety days of any request for accommodation of an employee's disability, and provide the EEOC with a description of the request, the name, title, phone number, and address of the requestor, the steps taken by Walmart to accommodate the request, and the outcome of the request. Reporting to the EEOC will help ensure compliance with the

Court's injunction. Requiring Defendant to provide, for example, the names of and contact information for individuals who make requests for disability accommodations will enable the EEOC to take prompt action should additional incidents of discrimination occur. Other courts have ordered relief of precisely this nature. *See, e.g. United Health Programs of Am., Inc.*, 350 F. Supp. 3d at 221, 228 (requiring defendants to retain records and provide semi-annual reports to the EEOC for a period of five years); *KarenKim*, 2013 WL 12424087, at *3-4 (requiring defendants to retain records and provide semi-annual reports to the EEOC for a period of five years); *Wal-Mart Stores, Inc.*, 11 F. Supp. 2d at 1331; *EEOC v. Ilona of Hungary, Inc.*, 885 F. Supp. 1111, 1126 (N.D. Ill. 1995), *aff'd in part, rev'd in part on other grounds*, 97 F.3d 204 (7th Cir. 1996), *opinion modified and superseded on reh'g*, 108 F.3d 1569 (7th Cir. 1997), and *aff'd in part, rev'd in part on other grounds*, 108 F.3d 1569 (7th Cir. 1997). Without reporting requests for schedule changes and other disability accommodations, there can be no way to verify compliance and no way to ensure that additional problems are not occurring at Walmart.

### 6.     Anti-Discrimination Training

Sixth, for a period of five years, within the company's Region 53, require Walmart to provide training to its managers and supervisors regarding the obligation to grant schedule accommodations under the ADA in the absence of undue hardship and to remind them that a request for a schedule accommodation from a person with a disability cannot be denied at the store level. Further, management should be re-trained on how to follow-up after an employee requests a schedule change. Courts often order injunctive relief requiring that employees be trained about federal anti-discrimination laws. *See, e.g. United Health Programs of Am.*, *Inc.*, 350 F. Supp. 3d at 221, 225-26 (ordering that the defendants provide "all supervisory, management, and human resources personnel with at least two (2) hours of live-training and all non-management and non-supervisory employees … at least one (1) hour of live-training" on an

annual basis for a period of five years); *KarenKim*, 2013 WL 12424087, at *3-4 (ordering that defendant provide training regarding anti-discrimination laws to both managerial and non-managerial employees); *see also New Mexico State Univ.*, No. 16-CV-911-JAP-LF, 2018 WL 737451 at *1, 3 (D.N.M. Feb. 6, 2018); *EEOC v. Dolgencorp*, LLC, 277 F. Supp. 3d 932, 963 (E.D. Tenn. 2017), *aff'd*, 899 F.3d 428 (6th Cir. 2018); *Wal-Mart Stores, Inc.*, 11 F. Supp. 2d at 1331.

### 7. Accountability for EEO Noncompliance

Seventh, for a period of five years, within the company's Region 53, require Walmart to document and evaluate adherence to Walmart's Equal Employment Opportunity policies as part of the annual review process for its supervisors, managers, market people operation leads, and regional people directors. Considering compliance with EEO policies as an aspect of performance will help make compliance with non-discrimination laws more of a priority for employees in leadership positions. Measures designed to ensure compliance with policies are appropriate when managers knew of the discriminatory conduct but did nothing to correct it. *Gurnee Inn*, 914 F.2d at 816-817 (7th Cir. 1990) (affirming injunction requiring employer to adopt a procedure to enforce anti-discrimination policy when defendant knew of discriminatory conduct but did nothing to correct it).

### 8. Injunction Prohibiting Retaliation

Eighth, for a period of five years, within the company's Region 53, enjoin Walmart from engaging in any retaliation against any Walmart employees with disabilities who request schedule modifications as an accommodation of a disability. *See EEOC v. DCP Medstream*, L.P., 608 F. Supp. 2d 107, 111 (D. Me. 2009) (enjoining defendant from engaging in retaliation in violation of Title VII). Such a provision vitally aids all of the other portions of the injunction

by helping to ensure that employees may freely enjoy the rights these injunctive provisions are designed to protect.

<u>Injunctive Relief Regarding Marlo Spaeth</u>

### 9. Reinstate Marlo Spaeth

Ninth, the EEOC asks the Court to reinstate Marlo Spaeth as a Walmart employee, with a rate of pay of at least $16.77/hr[2]. Once a district court has found that an employer has intentionally engaged in an unlawful employment practice, the court can order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). Reinstatement is appropriate in this instance, where Spaeth testified that that she wants her job back. Transcript Day 2 Jury Trial, ECF No. 246, pp. 358:25-359:1. When asked why she wanted her job back, Spaeth testified, "I miss it, miss all the people." *Id*., p. 359:2-3. Spaeth also testified about everything she liked about her job, including meeting people, helping the customers, doing returns, and putting the stuff away on the shelves. *Id*., p. 358:8-24.

If reinstatement is inappropriate, a court can award front pay to a victim of employment discrimination. *Williams v. Pharmaci*a, 137 F.3d 944, 952 (7th Cir. 1998) ("As the equivalent of reinstatement, front pay falls squarely within the statutory language [of § 2000e-5(g)(1)] authorizing 'any other equitable relief.'"); *Franzoni v. Hartmarx Corp*., 300 F.3d 767, 773 (7th Cir. 2002) (plaintiff entitled to seek instatement or front pay in lieu thereof). Only if the Court finds that reinstatement is unavailable as a remedy, the EEOC asks for ten years of front pay to Ms. Spaeth in lieu of reinstatement.

---

[2] When Ms. Spaeth's average raises over the period of her employment are considered, Ms. Spaeth's pay would be $16.77/hr today. Carter Decl., ¶¶ 6-7, Ex. 1.

### 10. Injunction Prohibiting Retaliation Against Marlo Spaeth

Tenth, the EEOC asks the Court to enjoin Walmart from engaging in any discrimination or retaliation against Ms. Spaeth due to her disability, or on the basis of her involvement in this lawsuit, or because of her enjoyment of any equitable or other remedies granted in this lawsuit. *See EEOC v. DCP Medstream*, L.P., 608 F. Supp. 2d 107, 111 (D. Me. 2009) (enjoining defendant from engaging in retaliation in violation of Title VII).

### 11. Spaeth's Guardian Must Be Informed

Eleventh, the EEOC asks the Court to require Walmart to contact Ms. Spaeth's guardian regarding any discipline or coaching of Marlo Spaeth and any issues involving accommodations for Ms. Spaeth's disability to prevent a recurrence of discrimination against Marlo Spaeth. As we heard at trial, when left to its own devices and even with knowledge that ADA rights were at issue, Walmart chose to cut off all communications with Spaeth's family instead of work with them to identify a reasonable accommodation. Trial Transcript Day 3, ECF No. 247, pp. 719:6-722:6. Therefore, it is necessary to order Walmart to communicate with Spaeth's guardian regarding any future disciplinary action or coaching.

The forgoing injunctive relief is appropriate here because, although Walmart already has a nominal nondiscrimination policy, it was neither followed nor enforced in this case. Indeed, the jury awarded punitive damages because it found that Defendant willfully engaged in unlawful employment practices and, based on testimony from Walmart's managers at trial, the employer's discriminatory conduct is very likely to persist in the future without intervention by the court.

### d. The EEOC also seeks make-whole monetary relief for Marlo Spaeth, including back pay, interest, and a tax component award.

Once the jury has found that there was employment discrimination, there is a presumption that the employee is entitled to an award of back pay. *See Stragapede v. City of*

*Evanston*, 865 F.3d 861, 868-69 (7th Cir. 2017); *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003); *Gurnee Inn Corp.*, 914 F.2d at 817-18 (7th Cir. 1990). The plaintiff must establish the amount of damages, but she is presumptively entitled to full relief. *Hutchison v. Amateur Elec. Supply, Inc*., 42 F.3d 1037, 1044 (7th Cir. 1994); *Gurnee Inn*, 914 F.2d at 817-18; *see also Pollard v. E.I. du Pont de Nemours & Co*., 532 U.S. 843, 847-48, (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir. 1988) (same). The plaintiff must submit evidence to support her calculation of backpay, and the burden then "shifts to the defendant to show that the [employee] failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d 1037, 1044 (7th Cir. 1994).

**1) Backpay should be awarded in the amount of $77,307.**

The EEOC requests backpay in the amount of $77,307. Carter Decl., ¶¶ 2-10. This amount represents lost wages for the period July 16, 2015 to December 31, 2021,[3] using a schedule of 16 hours per week, a wage of $12.50 per hour during the first year of the backpay period, and wages increasing approximately 5% per year thereafter. A 5% annual raise is consistent with Spaeth's history of raises at Walmart.[4]

**2) Prejudgment interest should be awarded at the Prime Rate, compounded quarterly**.

The judgment should also include prejudgment interest on backpay, computed at the prime rate and compounded quarterly. "[P]rejudgment interest should be presumptively available

---

[3] The EEOC has used December 2021 as a placeholder timeframe for the entry of judgment. Should entry of judgment occur materially sooner or later, the EEOC could submit a revised computation of lost wages through the appropriate date. Lost wages are presently accruing at a rate of $1,162 per month.

[4] Spaeth earned raises annually for fifteen years. Trial Exs. 2-17. To calculate annual raises for the purposes of back pay, the EEOC used the average percentage by which Walmart increased Spaeth's wage for the past fifteen raises and increased the wage by that percentage every year from 2016 to 2021. Carter Decl., ¶¶ 6-7.

to victims of federal law violations." *Gorenstein Enterprises v. Quality Care-U.S.A.*, 874 F.2d 431, 436 (7th Cir. 1989). The Seventh Circuit has stated:

> 'Prejudgment interest is an element of complete compensation.'
> Money today is not a full substitute for the same sum that should
> have been paid years ago. Prejudgment interest therefore is an
> ordinary part of any award under federal law.

*In the Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir. 1992), *quoting West Virginia v. United States*, 479 U.S. 305, 310 (1987). Such interest therefore compensates for the delay in payment of damages that occurred years ago and the resulting lost time value of money.

The Seventh Circuit's "practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate, or the district court engages in 'refined rate-setting' directed at determining a more accurate market rate for interest." *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999). The EEOC does not seek any refined rate-setting to establish a higher interest rate in this case, and so its proposed interest computation utilizes the prime rate, as published by the Federal Reserve.

Interest should be computed using quarterly compounding. "The norm in federal litigation, when prejudgment interest is authorized, is compound interest from the date of the injury." *Premium Plus Partners v. Goldman, Sachs & Co.*, 648 F.3d 533, 538 (7th Cir. 2011) (citing *Amoco Cadiz*, 954 F.2d at 1331) (reversing unexplained computation of simple interest rather than compound interest). Although the Seventh Circuit has not endorsed any presumptive frequency for compounding, district courts have found quarterly compounding to be a reasonable "middle ground between continuous and annual compounding." *Milwaukee Electric Tool v. Snap-On*, 288 F. Supp. 3d 872, 909 (E.D. Wis. 2017). Using the average prime rate for each calendar quarter from July 2015 through December 2021, and compounding quarterly,

prejudgment interest on Spaeth's lost wages is $9,886. Carter Decl., ¶¶ 11-16. The EEOC respectfully requests an award of prejudgment interest in that amount. [5]

**3) A tax component award is warranted for lost wages and compensatory damages.**

The EEOC also seeks an award to Spaeth to offset the additional tax burdens she will bear because (1) she will receive her lost wages in one lump sum rather than spread out over a period of years in the form of regular paychecks, and (2) the compensatory damages found by the jury as sufficient to make her whole for her emotional injuries will be subject to income taxes.

In employment discrimination cases, "courts are given wide discretion ... to fashion a complete remedy, which may include injunctive relief, in order to make whole victims of employment discrimination." *See Gurnee Inn Corp.,* 914 F.2d at 817 (7th Cir. 1990) (Title VII case); 42 U.S.C. § 12117(a) (incorporating into the ADA by reference the powers and remedies available under Title VII). "Congress gave the lower courts broad power under § 706(g) [of Title VII] to fashion 'the most complete relief possible' to remedy past discrimination." *Local 28 of Sheet Metal Workers' Int'l Assn v. EEOC*, 478 U.S. 421, 448 (1986). As the Seventh Circuit has explained: "Put simply, without the tax-component award, [the employee] will not be made whole, a result that offends Title VII's remedial scheme." *EEOC v. Northern Star Hospitality*, 777 F.3d at 904 (7th Cir. 2015).

<u>Tax Component for Lost Wages</u>

The Seventh Circuit has expressly recognized that a tax-component award is appropriate to compensate for the increased tax burden an aggrieved individual will experience as a result of

---

[5] As with lost wages, the EEOC has used December 2021 as a placeholder timeframe for the entry of judgment. Should entry of judgment occur materially sooner or later, the EEOC could submit a revised computation of prejudgment interest through the appropriate date.

receiving multiple years of lost wages in one lump sum.  *See Northern Star Hospitality*, 777 F.3d at 904 (7th Cir. 2015).

While employed at Walmart, Spaeth's income was not high enough to trigger any personal income tax obligation. Stevenson Decl., ¶ 3. Thus, had Spaeth been allowed to earn the lost wages she is now owed over a period spanning seven calendar years, she would not have owed any personal income tax on those wages. Instead, due to Walmart's violations of the law, Spaeth will receive all of her lost wages in a single tax year, along with payment of compensatory and punitive damages.  Because federal law provides for a graduated income tax, Spaeth's income during the year the judgment is paid will be high enough to trigger income tax. According to the 2020 Tax Table published by the IRS, payment of monetary relief of $387,193[6] to Ms. Spaeth would result in a federal income tax obligation of $110,313, of which $22,025 would be tax on lost wages. Carter Decl., ¶ 20.  The amount by which the judgment must be increased in order to compensate for the income tax on lost wages — i.e., to increase Ms. Spaeth's after-tax income by $22,025 — is $33,885. Carter Decl., ¶¶ 21-25.  Accordingly, a tax-component award of $33,885 is needed to ensure that, with respect to lost wages, Spaeth is returned to the status quo after taxes are accounted for.

<u>Tax Component for Compensatory Damages</u>

A tax-component award is also appropriate to offset the increased tax burden that aggrieved individuals experience as a result of receiving an award of compensatory damages. Compensatory damages are designed to "compensate" for the mental and emotional pain and suffering "caused by Defendant's wrongful conduct."  *See* Jury Instructions ¶ 3.10, ECF No.

---

[6] This amount is the total of $77,307 in lost wages, $9,886 in prejudgment interest on lost wages, $150,000 in compensatory damages, and $150,000 in punitive damages. Carter Decl., ¶ 17.

234.  Accordingly, the jury was instructed to "determine an amount that will fairly compensate for the injury [Spaeth] has sustained."  *See id*.

The jury found that $150,000 was the amount needed to fairly compensate Spaeth for this injury.  However, while awards for physical injuries are not counted as taxable income, *see* 26 U.S.C. § 104(a)(2), no such exemption exists for damages that compensate for mental or emotional injuries, and so such damages are taxed as income. As a result, without a tax-component award, Spaeth will owe $42,735 in tax on compensatory damages. Carter Decl., ¶ 26. After taxes, Spaeth will therefore receive $107,265 of the $150,000 injury found by the jury.  In short, she "will not be made whole" for the $150,000 of emotional harm caused by Walmart's wrongful conduct, "a result that offends Title VII's remedial scheme." *Northern Star Hospitality*, 777 F.3d at 904.

While few cases address the issue in the context of employment discrimination claims, the principle of make-whole relief supports a tax-component award for the increased tax burden associated with compensatory damages for emotional distress.  "Courts have adopted a pragmatic approach to the question of accounting for income taxes on damage awards." *Oddi v. Ayco Corp.*, 947 F.2d 257, 267 (7th Cir. 1991).  In general, the Seventh Circuit has explained, "courts do not increase damages to compensate for expected tax liability on the damage award." *Id.*  This is so, the court explained, because typically, "[w]hen damages place a plaintiff in the position he would have occupied had the defendant's obligation been fulfilled, the amount recovered would (but for the breach) have been income, and thus taxable." *Id.*  Thus, "[s]ince the plaintiff *would have paid taxes even absent the breach*, he should not be compensated for the taxes he will have to pay on the damage award he receives as a result of the breach." *Id.* (emphasis added).

Where a defendant's wrongful conduct does not deprive a plaintiff of *taxable* income, however, the Seventh Circuit has held that increasing damages to offset taxes is appropriate. In *Oddi*, the plaintiff successfully sued a financial planning firm over mistaken advice it provided him regarding tax-deferred investments, erroneously steering him to an investment plan involving a lump sum payment instead of a plan involving deferred income. *Id.* at 259-61. The district court "increase[d] the damage award by the amount it anticipated Oddi would pay in income tax on the award." *Id.* at 267. Despite the general rule, the Seventh Circuit held that this tax-component award was appropriate, reasoning that "[a]lthough occurring in a contract setting, defendant's error did not deprive plaintiff of *taxable* income." *Id.* at 267 (emphasis in original). The court explained:

> Oddi will now incur a new tax on the damages awarded to reflect the differential [between the lump sum and deferred-income investment plans], one never required had he followed the deferred-income plan from the beginning. This new tax is solely the result of Ayco's mistake, and the company must therefore compensate him for the taxes thus imposed.

*Id.*

The compensatory damages owed to Marlo Spaeth are likewise not a replacement for taxable income. Rather, as a result of Walmart's wrongful conduct, Spaeth was deprived of emotional and mental wellbeing (which is not taxed) and will receive as a substitute a monetary payment (which is). As valued by the finder of fact, the jury, Spaeth was deprived of $150,000 worth of emotional wellbeing. As in *Oddi*, however, Spaeth "will now incur a new tax on the damages awarded" for her injury, "one never required had" Walmart not violated her rights. *Id.* As "[t]his new tax is solely the result of [Walmart's] mistake, ... the company must therefore compensate [Spaeth] for the taxes thus imposed." *Id.*

There is no reason to think the reasoning of *Oddi* is limited to breach of contract cases. Indeed, it is fully compatible with the goal of providing "the most complete relief possible" to victims of employment discrimination. *See Local 28*, 478 U.S. at 448. In the context of an ADA claim, at least one court has concluded, for example, that a tax-component award would be appropriate for compensatory damages the plaintiff sought for the "10% penalty she will incur as a result of withdrawing money from her 401(k) retirement fund" to pay her bills after she was fired. *Gibson v. Indiana State Personnel Dep't*, No. 117CV01212RLYTAB, 2017 WL 6342009, at *4 (S.D. Ind. Dec. 12, 2017). It is also immaterial that Spaeth's injury is an emotional rather than pecuniary one: in both situations, the status quo (prior to the discrimination) involved no tax burden, and the tax owed on compensatory damages was solely a result of the need to remedy (with a taxable award of money) the injury caused by the defendant. Principles of equity make it appropriate to place that burden on the defendant who caused it, rather than on the victim of employment discrimination.

The few courts that have rejected a tax-component award for nonpecuniary compensatory damages have done so based on cursory reasoning. For example, one district court in another circuit asserted that "compensatory and liquidated damages ... are only a product of this lawsuit" and therefore "allowing the plaintiff to recover the increased tax he will have to pay on these sums does more than make him whole." *See O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443 (E.D. Pa. 2000). That court believed that "[i]t gives the plaintiff a windfall." *Id.* This reasoning might be correct with respect to liquidated or punitive damages, but it is mistaken with respect to compensatory damages. Compensatory damages, no less than lost wages, serve to compensate for a loss caused by the defendant's wrongful conduct. That a loss is noneconomic does not make full compensation for it a "windfall." While it is true that the task of placing a

value on lost emotional wellbeing is a difficult one, the jury has performed that task already. The question that remains is simply: Where the operation of the tax code erodes the value of that amount to less than what the jury found to be fair compensation, who should bear that financial burden: Spaeth or the tortfeasor who harmed her and who is liable to make her whole? Equity calls for placing such burdens on the tortfeasor, not the victim.

A tax-component award for compensatory damages can be computed in the same manner described above for lost wages. Of the $110,313 federal income tax obligation discussed above, $42,735 would be tax on compensatory damages. Carter Decl., ¶ 26. The amount by which the judgment must be increased in order to compensate for the income tax on compensatory damages — i.e., to increase Ms. Spaeth's after-tax income by $42,735 — is $65,747. Carter Decl., ¶¶ 27-31. Accordingly, a tax-component award of $65,747 is needed to ensure that, with respect to compensatory damages, Spaeth is returned to the status quo after taxes are accounted for and is fairly compensated in the amount the jury decided.

4) **Ms. Spaeth's back pay award should not be reduced, as Walmart cannot meet its burden to prove the affirmative defense of failure to mitigate.**

"Once a plaintiff has established the amount of damages [she] claims resulted from [her] employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d at 1044; *accord Taylor v. Philips Indus.*, Inc., 593 F.2d 783, 787 (7th Cir. 1979) (holding that it is "[n]ot until the plaintiff establishes what she contends are her damages [that] the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant"); *Stragapede v. City of Evanston*, 125 F. Supp. 3d 818, 823-24 (N.D. Ill. 2015) (affirmed *Stragapede v. City of Evanston*, 865 F.3d 861, 868-69 (7th Cir. 2017)).

It is the *defendant's* burden to establish that the plaintiff failed to mitigate her damages, *see Hutchison*, 42 F.3d at 1044; *Gurnee Inn*, 914 F.2d at 818 ("We emphasize that the employer bears the burden of proving a failure to mitigate."); *Stragapede*, 865 F.3d 861, 868-69 (7th Cir. 2017). To prove a failure to mitigate in this context, the employer must show that "(1) the [employee] failed to exercise reasonable diligence to mitigate his damages, and [that] (2) there was a reasonable likelihood that the [employee] might have found comparable work by exercising reasonable diligence." *Stragapede*, 865 F.3d 861, 868-69 (7th Cir. 2017); *Fleming v. County of Kane*, 898 F.2d 553, 560 (7th Cir. 1990) (emphases omitted).

The Seventh Circuit has emphasized that the employer must prove *both* elements of the affirmative defense. *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1009 (7th Cir. 2020); *accord Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228, 1234 (7th Cir. 1986) (stating that a defendant must "prove both that the employee was not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance the employee might have found comparable employment"); *Gurnee Inn*, 914 F.2d at 818; *see also United States v. City of Chicago*, 853 F.2d 572, 578 (7th Cir. 1988).

Under the first prong of the two-factor burden, Spaeth and Stevenson's efforts to find comparable work were reasonably diligent and further efforts would have been futile. "**[A]n employee can mitigate [her] damages only if it is within [her] power to reduce the harm [she] suffered**. The plaintiff's backpay award should not be reduced based on failure to mitigate if reasonably diligent effort would not have been likely to produce comparable employment." *Stragapede*, 865 F.3d 861, 868-69 (7th Cir. 2017) (emphasis added). Based on Marlo Spaeth's limitations, it was not within her power to reduce the harm she suffered due to Walmart's conduct. Because Spaeth has Down syndrome it is difficult for her to learn new tasks and

routines. Transcript Day 2 Jury Trial, ECF NO. 246, p. 386:3-19. The EEOC's expert, David

Smith, M.D., testified that in order to make big changes in routine, people with Down syndrome

need help and someone to show them the way to do the new thing. *Id.,* p. 387:6-22. This need

for such support necessarily narrows the range of employment opportunity for Spaeth.

     Spaeth, and her sister and guardian, Amy Jo Stevenson, diligently sought out comparable

work. Ms. Stevenson searched for jobs Spaeth could get to without a car where she might find

support during the training stage. Stevenson Decl., ¶¶ 6-7. Ms. Stevenson posted a request on

Facebook, asking friends and family to let her know of any job openings that might fit Marlo.

*Id.,* ¶ 9. Stevenson also inquired about job openings at the company where their brother worked.

*Id.,* ¶ 10. She asked whether Marlo could have a job folding towels at her Wellness Center. *Id.,*

¶ 11. Spaeth, with her sister's assistance, applied for work at Goodwill and Piggly Wiggly, two

stores with a history of employing people with disabilities which Spaeth could get to by bus or

by foot. *Id.,* ¶¶ 12-15. Stevenson even met with staff at Holiday House, the sheltered workshop

where Marlo had worked after high school. Holiday House instructed Stevenson to go to the

Manitowoc County Aging and Disability Resource Center to apply for benefits that would fund

part time employment for Spaeth at the Holiday House. While Spaeth got the health insurance

portion of the benefit she applied for, Spaeth did not receive funding for employment at the

Holiday House. *Id.,* ¶¶ 16-18. Having exhausted employment options that would provide the

support Spaeth would need and that were accessible by bus or by foot, Stevenson and Spaeth

ultimately realized further efforts would be futile. Spaeth began volunteering at her church on

Friday afternoons in order to have work in her life. Stevenson Decl., ¶ 19. "The law did not

require plaintiff to continue to apply for jobs …once she realized her efforts were futile." *Vega v.*

*Chi. Park Dist.*, 351 F. Supp. 3d 1078, 1092 (N.D. Ill. 2018).

"The reasonableness of a [ADA] claimant's diligence should be evaluated in light of the *individual characteristics of the claimant* and the job market." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 865 (3d Cir. 1995) (emphasis added). In *Booker*, the Third Circuit analyzed whether the employer met its burden in establishing that substantially similar employment was available notwithstanding that the evidence showed that the plaintiff did "not appear to demonstrate his continuing commitment to be a member of the work force." 64 F.3d at 865-66. Here, because of her unique "individual characteristics" and the negative impact Walmart's wrongful conduct had on her ability to function, it was "not within [Marlo Spaeth's] ability to reduce the harm [she] suffered." *Stragapede*, 865 F.3d at 868-69 (7th Cir. 2017); *Booker*, 64 F.3d at 865 (3d Cir. 1995). Marlo Spaeth's individual characteristics and limitations were further exacerbated by Walmart's unlawful conduct, placing her at an insurmountable disadvantage in the job market. The jury found that Walmart's conduct caused emotional harm to Marlo Spaeth, awarding $150,000 in compensatory damages. The emotional harm caused by Walmart's discriminatory conduct decreased Marlo Spaeth's already limited ability to function in the job market, causing memory loss and withdrawal from interaction with others, which was misdiagnosed at the time as dementia, but was actually depression and anxiety. Transcript Day 2 Jury Trial, ECF NO. 246, p. 390:8-24.

Walmart's discriminatory conduct placed Spaeth at an even greater disadvantage in her ability to secure employment and further narrowed her employment opportunities. When combined with Spaeth's individual characteristics and limitations which already narrowed her job search to work she could walk to or take the bus to get to, and work where Spaeth's need for support during training would be met, any continued search for comparable employment was futile. *See Fogg v. Gonzales*, 492 F.3d 447, 455 (D.C. Cir. 2007) (affirming the lower court's

award of back pay in the absence of mitigation efforts, finding that the court "did not abuse its discretion in preventing the [defendant] from profiting from its own wrongful conduct" where "any efforts to find a comparable [] position would have been futile.").

Marlo Spaeth worked at Walmart for 16 years and loved her job. Transcript Day 2 Jury Trial, ECF NO.246, p. 358:8-24. In the absence of Walmart's discriminatory conduct, it is reasonable to conclude that Marlo Spaeth would have continued working at Walmart for as long as possible, likely well into her sixties. For Marlo Spaeth, there was no other job that was comparable to her lost position at Walmart. An award of back pay is proper in this case since "back pay is designed to restore a victim of discrimination to the economic position he would have enjoyed absent the unlawful discrimination. The Supreme Court has instructed that 'given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of [the ADA].'" *Booker*, 64 F.3d at 867 (3d Cir. 1995) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). "A denial of all back pay under the circumstances would frustrate the make-whole purpose underlying Title VII." *Booker*, 64 F.3d at 867 (3d Cir. 1995).

Under the second prong of Defendant's two-factor burden of proof, the Seventh Circuit has rejected mitigation defenses when the employer failed to demonstrate that the claimant might have found comparable work. *Gurnee Inn*, 914 F.2d at 818-19 ("We agree with the district court that, because Gurnee failed to establish that there was a reasonable chance the claimants could have found comparable employment, the defendant failed to sustain its burden of proof."); *Stragapede*, 25 F. Supp. 3d 818, 825 (N.D. Ill. 2015) (concluding that the plaintiff failed to exercise reasonable diligence to find work over a certain period of time, but nonetheless denying the defendant's failure to mitigate defense because "Evanston was required to prove that there

was a reasonable chance that Stragapede might have found comparable employment, and it failed to carry its burden. Stragapede's backpay award will not be reduced for failure to mitigate."). "The reasoning behind the requirement that the employer demonstrate the existence of available work makes sense: an employee might stop looking for work if none is available, and under that circumstance, the plaintiff's decision to stop looking would itself be reasonable." *Stragapede*, 125 F. Supp. 3d at 825-26.

Here, Walmart has disclosed no evidence regarding the availability of comparable work for someone with Marlo Spaeth's limitations. *See Smith v. Farmstand*, No. 11-CV-9147, 2016 WL 5912886, at 20 (N.D. Ill. Oct. 11, 2016), aff'd sub nom. *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747 (7th Cir. 2018). ("Defendants offer little to satisfy the second prong of their failure to mitigate defense. To be clear, the Court is not saying that there were not comparable positions available to Plaintiff at the relevant times, it *merely concludes that Defendants have failed to meet their burden to establish that fact*. And because Defendants 'must prove *both* that the claimants were not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance that the claimants might have found comparable employment,' Defendants' failure to mitigate defense fails.") (emphasis added); *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1257 (N.D. Ill. 2015) (no failure to mitigate where employer "offer[ed] no evidence on the availability of work comparable to [the] lost position") (emphasis in original). As the *Gracia* court noted, "[I]t is appropriate to place the burden of proof on the employer to tamp-down damages because the only reason [the court is considering mitigation] is that the *employer* has engaged in illegal discrimination." *Gracia*, 130 F. Supp. 3d 1249 at 1257. Walmart should be prevented from profiting from its own wrongful conduct. Walmart's affirmative defense fails, and Marlo Spaeth is entitled to back pay.

THEREFORE, the EEOC respectfully asks this Court to enter an injunction order against Walmart for a period of five years, as described above, and to grant other equitable relief to Marlo Spaeth including reinstatement and back pay through the date of judgment, including interest and a tax gross up award. *Only if* the Court concludes that reinstatement is unavailable as a remedy for Ms. Spaeth, the EEOC respectfully asks for ten years of front pay in lieu of reinstatement.

Respectfully submitted this 27th day of August 2021.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Counsel for Plaintiff

*/s/ Leslie N. Carter*
Leslie N. Carter
Trial Attorney

*/s/ Carrie Vance*
Carrie Vance
Trial Attorney

310 West Wisconsin Avenue, Suite 500
Milwaukee, WI 53203-2292
☎ (414) 662-3711
leslie.carter@eeoc.gov
carrie.vance@eeoc.gov

*/s/ Richard J. Mrizek*
Richard J. Mrizek
Trial Attorney

*/s/ Justin Mulaire*
Justin Mulaire
Supervisory Trial Attorney

230 S. Dearborn Street, Suite 2920
Chicago, IL 60604
☎ (312) 872-9724
richard.mrizek@eeoc.gov
justin.mulaire@eeoc.gov