# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

Equal Employment Opportunity Commission,

   *Plaintiff*,

  *v.*
                Case No. 1:17-cv-00070-WCG

Wal-Mart Stores East, LP,

   *Defendant*.

---

## RESPONSE OF WAL-MART STORES EAST, LP, IN OPPOSITION TO THE EEOC'S MOTION FOR EQUITABLE RELIEF

---

GEORGE BURNETT
CONWAY, OLEJNICZAK & JERRY, S.C.
231 South Adams Street
Green Bay, WI 54301
(920) 437-0476
(920) 437-2868 (fax)
gb@lcojlaw.com

MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

*Counsel for Wal-Mart Stores East, LP*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................1

ARGUMENT .......................................................................................................................3

    I.   The EEOC Is Not Entitled To Injunctive Relief ................................................3

        A.  No Injunctive Relief Is Warranted Because The Conduct That The Jury Found Actionable Is Unlikely To Recur ................................................5

        B.  The EEOC's Injunctive Requests Are Unnecessary, Overbroad, And Vague ...........11

    II.  This Court Should Not Award Back Pay, Interest, Or A Tax-Component.......................19

        A.  Ms. Spaeth Did Not Mitigate Her Damages By Searching With Reasonable Diligence For Alternative Employment, Thus The EEOC Cannot Recover Any Back Pay, Interest, Or Tax-Component Monetary Relief............................................21

        B.  Mitigation Aside, The EEOC Has Significantly Inflated Ms. Spaeth's Projected Wage Rate And Average Hours Worked, Which Undermines Its Claims For Back Pay, Interest, And Tax-Component Awards......................................................24

    CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Booker v. Taylor Milk Co.*,
    64 F.3d 860 (3d Cir. 1995) ............................................................................. 23

*Bruso v. United Airlines, Inc.*,
    239 F.3d 848 (7th Cir. 2001) ......................................................................... 18

*Cloutier v. GoJet Airlines, LLC*,
    996 F.3d 426 (7th Cir. 2021) ......................................................................... 18

*EEOC v. AutoZone, Inc.*,
    707 F.3d 824 (7th Cir. 2013) ................................................................... *passim*

*EEOC v. DCP Medstream, L.P.*,
    608 F. Supp. 2d 107 (D. Me. 2009) .......................................................... 17, 19

*EEOC v. Dolgencorp, LLC*,
    277 F. Supp. 3d 932 (E.D. Tenn. 2017) ......................................................... 16

*EEOC v. Gurnee Inn Corp.*,
    914 F.2d 815, 817 (7th Cir. 1990) .......................................................... *passim*

*EEOC v. Ilona of Hungary, Inc.*,
    108 F.3d 1569 (7th Cir. 1997) ................................................................. *passim*

*EEOC v. Ilona of Hungary, Inc.*,
    885 F. Supp. 1111 (N.D. Ill. 1995) ............................................................... 15

*EEOC v. Johnson & Higgins, Inc.*,
    91 F.3d 1529 (2d Cir. 1996) .......................................................................... 12

*EEOC v. KarenKim, Inc.*,
    No. 508CV1019NAMDEP, 2013 WL 12424087 (N.D.N.Y. Sept. 24, 2013) ................ 15

*EEOC v. N. Star Hosp., Inc.*,
    777 F.3d 898 (7th Cir. 2015) ..................................................................... 21, 27

*EEOC v. Siouxland Oral Maxillofacial Surgery Assocs.*,
    578 F.3d 921 (8th Cir. 2009) .............................................................. 3, 5, 8, 17

*EEOC v. United Health Programs of Am., Inc.*,
    350 F. Supp. 3d 199 (E.D.N.Y. 2018) ................................................. 14, 15, 16

*EEOC v. Wal-Mart Stores, Inc.*,
    11 F. Supp. 2d 1313 (D.N.M. 1998) .............................................................. 15

*Franzoni v. Hartmarx Corp.*,
    300 F.3d 767 (7th Cir. 2002) ......................................................................... 18

*Frey v. Coleman*,
    903 F.3d 671 (7th Cir. 2018) ......................................................................... 20

*Gracia v. Sigmatron Int'l, Inc.*,
130 F. Supp. 3d 1249 (N.D. Ill. 2015) ...................................................... 25, 26

*Graefenhain v. Pabst Brewing Co.*,
870 F.2d 1198 (7th Cir. 1989) ...................................................... 20

*Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*,
755 F.2d 599 (7th Cir. 1985) ...................................................... 19, 20

*Hunter v. Allis-Chalmers Corp., Engine Div.*,
797 F.2d 1417 (7th Cir. 1986) ...................................................... 22

*Malhotra v. Cotter & Co.*,
885 F.2d 1305 (7th Cir. 1989) ...................................................... 22

*McKennon v. Nashville Banner Pub. Co.*,
513 U.S. 352 (1995) ...................................................... 18

*Miles v. Indiana*,
387 F.3d 591 (7th Cir. 2004) ...................................................... *passim*

*Morris v. BNSF Ry. Co.*,
969 F.3d 753 (7th Cir. 2020) ...................................................... 23

*Muhich v. Comm'r*,
238 F.3d 860 (7th Cir. 2001) ...................................................... 17

*Sears v. Atchison, Topeka & Santa Fe Ry. Co.*,
749 F.2d 1451 (10th Cir.1984) ...................................................... 21, 27

*Stragapede v. City of Evanston*,
865 F.3d 861 (7th Cir. 2017) ...................................................... 26

*Vega v. Chicago Park Dist.*,
954 F.3d 996 (7th Cir. 2020) ...................................................... 20, 22, 23, 24

*Vega v. Chicago Park Dist.*, ___ F.4th___,
2021 WL 3907883 (7th Cir. Sept. 1, 2021) ...................................................... 21

*Walgreen Co. v. Sara Creek Prop. Co., B.V.*,
966 F.2d 273 (7th Cir. 1992) ...................................................... 4, 12, 13, 17

*Williams v. Gen. Food Corp.*,
492 F.2d 399 (7th Cir. 1974) ...................................................... *passim*

## Statutes And Rules

42 U.S.C. § 1981a ...................................................... 3

42 U.S.C. § 2000e-5 ...................................................... 3, 19, 20

42 U.S.C. § 12117 ...................................................... 3

## INTRODUCTION

Defendant Wal-Mart Stores East, LP ("Walmart") discharged Ms. Marlo Spaeth, an individual with Down syndrome, after she repeatedly failed to work her scheduled shifts. The Equal Employment Opportunity Commission ("EEOC") then sued Walmart on Ms. Spaeth's behalf, claiming that Walmart had violated the Americans with Disabilities Act ("ADA") by not offering her a permanent, modified fixed schedule. While the jury found for the EEOC—a verdict that Walmart intends to challenge under Federal Rules of Civil Procedure 50 and 59—for purposes of the EEOC's equitable relief motion, it is notable that the undisputed evidence at trial showed that Walmart's associates never understood Ms. Spaeth to have requested a permanent schedule change accommodation under the ADA. Indeed, Walmart's associates had no reason to know that such an accommodation would benefit Ms. Spaeth as an individual with Down syndrome.

The EEOC now moves for injunctive relief, back pay plus interest, and tax-component awards—beyond the substantial compensatory and punitive damages that the jury awarded—with many of these requests requiring this Court to put Walmart under broad, continuous federal court supervision, for this single claimed violation of the ADA. The EEOC asks for this relief even though there is no evidence that Walmart has ever previously engaged in the conduct that the jury found to violate the ADA, much less that Walmart would do so again in the future. As Walmart explains below, this Court should deny all of the EEOC's requests in full.

## BACKGROUND[1]

The EEOC argued that Walmart violated the ADA by refusing to provide Ms. Spaeth with a permanent, modified fixed schedule of 12:00 p.m. to 4:00 p.m., after Walmart adopted a new

---

[1] Given the Court's familiarity with this case, Walmart provides only a brief factual and procedural background as it relates specifically to the EEOC's Motion For Equitable Relief.

customer-demand centric, automatic scheduling system that scheduled Ms. Spaeth to work from 1:00 p.m. to 5:30 p.m. Dkt.234 at 9–10, 16–17 (jury instructions).

At trial, Walmart explained that, as relevant here, it did not violate the ADA because none of its associates "were aware" that "any of the attendance issues . . . that Ms. Spaeth was displaying"—that is, her failures to work her scheduled shifts—"might have something to do with her Down syndrome," or that Ms. Spaeth needed a permanent, modified fixed schedule of 12:00 p.m. to 4:00 p.m. because of her disability. *See, e.g.*, Trial Tr. Day 3 at 510–11, 571–72 (Dkt.247) (Stern); Trial Tr. Day 1 at 78–79 (Dkt.245); Trial Tr. Day 1 at 208, 222, 225, 227 (Becker); Trial Tr. Day 2 at 486–87 (Dkt.246) (Stern); 646–48 (Abitz). Rather, Walmart's associates believed that Ms. Spaeth's desire to return to her previous 12:00 p.m. to 4:00 p.m. shift was "just [ ] comment[s] like anyone else would make that they wanted to go back to their original shift that they had." Trial Tr. Day 2 at 486 (Stern); *accord* Trial Tr. Day 2 at 483 (Stern); Trial Tr. Day 3 at 538 (Stern); Trial Ex. 23. Further, Walmart's associates did not know that "people with Down syndrome cannot adapt to change," such that these individuals need the "routine" of fixed work schedules to complete their scheduled shifts. *E.g.*, Trial Tr. Day 1 at 222 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 510–11, 571–72 (Stern). The EEOC's own medical expert testified that most people—including "most" members of "the medical profession"—"have no idea" that individuals with Down syndrome may need such an accommodation. *See* Trial Tr. Day 2 at 413; *accord* Trial Tr. Day 3 at 572, 580 (Stern); Trial Tr. Day 3 at 756.

The jury found against Walmart on the EEOC's ADA claims. Dkts.245–48; Dkts.236. The jury awarded $150,000 in compensatory damages, and—although this Court had concluded that whether punitive damages were even allowable was a "close" question, Trial Tr. Day 3 at 758—the jury awarded $125 million in punitive damages, Dkt.236 at 2. After trial, this Court

granted Walmart's oral motion to reduce the award of compensatory and punitive damages to the statutory maximum of $300,000 and then advised the parties that it would withhold entry of judgment until it determined issues of equitable relief.  Dkt.244 at 2; 42 U.S.C. § 1981a(b)(3)(D).

## ARGUMENT

### I.     The EEOC Is Not Entitled To Injunctive Relief

Under the ADA, if an employer has "intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint," a court "*may* enjoin [the defendant] from engaging in such unlawful employment practice," exercising its discretion.  42 U.S.C. § 2000e-5(g)(1) (emphasis added); *see* 42 U.S.C. § 12117(a) (enforcement provision of the ADA, expressly incorporating Section 2000e-5).  Thus, "the conclusion that the [employer] was intentionally engaging in an unlawful employment practice does not necessarily warrant the awarding of injunctive relief."  *Williams v. Gen. Food Corp.*, 492 F.2d 399, 407 (7th Cir. 1974).

When deciding whether to grant injunctive relief under the ADA, a court "must consider whether the employer's discriminatory conduct could possibly persist in the future," after evaluating all relevant factors.  *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013) (citation omitted); *see EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997).  In conducting this inquiry, a court may consider whether there have been similar complaints of discrimination against the defendant in the recent past, since the absence of an employer's pattern or practice of discrimination can reasonably suggest that the employer is unlikely to "persist" in discriminatory conduct "in the future."  *AutoZone*, 707 F.3d at 840 (citation omitted); *see Williams*, 492 F.2d at 407 (no injunctive relief where the discriminatory conduct terminated three years earlier); *accord EEOC v. Siouxland Oral Maxillofacial Surgery Assocs.*, 578 F.3d 921, 928 (8th Cir. 2009) (no injunctive relief where plaintiff could only point to "two isolated instances of discrimination,

occurring more than five years before the request for injunctive relief"). A court may also consider whether the employer has robust antidiscrimination policies or grievance procedures. *See Miles v. Indiana*, 387 F.3d 591, 601–02 (7th Cir. 2004); *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir. 1990). And a court may look to "the purposes" of the ADA, "fundamental concepts of fairness," *Williams*, 492 F.2d at 407 (citations omitted), whether the employer acted out of "animus," *Miles*, 387 F.3d at 601, and whether an injunction would require "costly" "continuing supervision by the court," *Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 276 (7th Cir. 1992).

Finally, in crafting any injunction, a court must "prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation." *AutoZone*, 707 F.3d at 841. A plaintiff's request for an "obey the law" injunction, in particular, "raises several concerns" in this regard, including "overbreadth and vagueness," so such requests must be "tailored to the particulars of the case." *Id.* at 841–43. Since a court may enforce "obey the law" injunctions "via contempt motion," such injunctions also "bypass[ ] the normal administrative and adjudicative processes for ADA accommodation claims." *Id.* at 841. Thus, "obey the law" injunctions "must be evaluated with great care" and are appropriate "only where the evidence suggests that the proven illegal conduct may be resumed," such that the court is "convince[d] . . . that voluntary compliance with the law will not be forthcoming." *Id.* at 842–43.

Below, Walmart explains that the EEOC is not entitled to any injunctive relief because Walmart has shown that the ADA violation that the jury found is unlikely to recur. *Infra* Part I.A. Walmart then explains why each of the EEOC's eleven injunctive requests fails. *Infra* Part I.B.

**A.** **No Injunctive Relief Is Warranted Because The Conduct That The Jury Found Actionable Is Unlikely To Recur**

1. This Court should deny the EEOC's request for injunctive relief because the conduct that the jury found violated the ADA "could [not] possibly persist in the future." *AutoZone*, 707 F.3d at 840 (citation omitted).

*First*, there is no evidence of other ADA complaints against Walmart similar to the EEOC's allegations here. *Williams*, 492 F.2d at 407; *Siouxland*, 578 F.3d at 928. There is no record evidence of Walmart denying a schedule change reasonable accommodation to a disabled individual before or after this case. Further, the record here does not show any *other instances* of an associate with disabilities in the Walmart Manitowoc Store raising discrimination complaints even remotely similar to Ms. Spaeth's complaint, Trial Tr. Day 3 at 626, 631, and the EEOC did not identify any other associate in *any* Walmart store who did not receive an ADA-required schedule change accommodation, *see generally* Dkt.255-1 at 6–7 (failing to cite such evidence). Moreover, the Manitowoc Store Manager, Kent Abitz, testified that he has *never* terminated any other associate with disabilities for any reason, let alone because of a need for a permanent, modified fixed schedule. Trial Tr. Day 3 at 625–27.

*Second*, Walmart has adopted robust antidiscrimination and accommodations policies— including as to schedule change accommodations—which protect associates with disabilities above and beyond what the law requires, further undermining the justification for injunctive relief here. *Miles*, 387 F.3d at 601–02; *Gurnee Inn*, 914 F.2d at 817. Consistent with these robust policies, Walmart, through its Accommodations Service Center, Trial Tr. Day 3 at 659–60, grants many reasonable accommodations each year, both in Wisconsin and all over the country.

Walmart has an "Accommodation in Employment" policy that provides "reasonable accommodations" to associates with disabilities to perform their jobs' essential functions, as well

as "job adjustment[s]" to associates with "medical condition[s]" not qualifying as a disability. Trial Ex.1061 at 1 (emphases omitted); *see Miles*, 387 F.3d at 601–02. Accommodations under this policy include "[p]roviding . . . modified work schedules." Trial Ex.1061 at 2. Walmart also has a "Discrimination & Harassment Prevention Policy" that, among other things, prohibits discrimination or harassment based on disability, including by taking any retaliatory action against an individual for enforcing the policy. Trial Tr. Ex.1055 at 1–2; *Gurnee Inn*, 914 F.2d at 817 ("anti-discrimination policy," "grievance procedure"). Walmart has an "Open Door Communications Policy" where associates may "bring . . . [any] concerns to the attention of any supervisor or manager without fear of retaliation." Trial Tr. 1056 at 1. Finally, Walmart has created a department—the Accommodation Service Center, as noted—which is "specifically assigned and designed to help guide managers and stores through the process of handling accommodation requests." Trial Tr. Day 3 at 659–60 (Spude); *accord* Trial Tr. Day 2 at 339–40 (Morgan) (describing Walmart's "ethics hotline"); Trial Ex.1062 (written "guidelines" to help implement the antidiscrimination and harassment policies).

Walmart ensures that its associates are trained on its antidiscrimination and harassment policies, including the schedule change accommodation component, and that these policies are "widely available." *Miles*, 387 F.3d at 602. At "the time of orientation," Walmart communicates these policies to all associates and then makes these policies continuously available by posting them in its breakrooms and on its intranet. Trial Tr. Day 3 at 653–57, 660–61 (Spude) (discussing Trial Exs. 1055 & 1061); *accord* Trial Exs. 1017 at 1, 1018 at 1 (Walmart's written job descriptions, which associates also sign, confirming that associates may receive "a reasonable accommodation" to perform "essential functions"). Management associates receive additional training on the ADA and must take part in yearly refresher training. Trial Tr. Day 3 at 660–61;

Trial Ex.1064 ("ADA Manager Training") (Walmart's ADA computer-module-based training); Trial Tr. Day 2 at 468–69. Thus, training on "[d]iscrimination and prevention and accommodations is something that [Walmart management associates] consistently redo at least once a year at all levels." Trial Tr. Day 3 at 661.

*Third and finally*, granting the EEOC's request for burdensome injunctive relief, *see infra* Part I.B, would not forward "the purposes" of the ADA or "the fundamental concepts of fairness," given the nature of the conduct found by the jury to violate the ADA here, *Williams*, 492 F.2d at 407, and Walmart's lack of "animus," *Miles*, 387 F.3d at 601.

The conduct that the jury found violated the ADA in this case did not evidence any form of animus for the disabled. *Id.* The undisputed evidence at trial showed that Walmart's associates did not understand Ms. Spaeth to be requesting an accommodation under the ADA or that she would benefit from any such accommodation because of her disability. *See, e.g.*, Trial Tr. Day 1 at 208, 222, 225, 227 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 510–11, 571–72 (Stern), 646–49 (Abitz). There was no indication that Ms. Spaeth's "attendance was related in any way whatsoever to her Down syndrome," Trial Tr. Day 1 at 222 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 647 (Abitz)—nor was there any indication at trial that any associate knew that "people with Down syndrome cannot adapt to change," such that they need a fixed work schedule, Trial Tr. Day 1 at 222 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 510–11, 571–72 (Stern). This is consistent even with the EEOC's own medical expert, who explained that most people—*including "most" members of "the medical profession"*—"have no idea" that individuals with Down syndrome may need modified, permanent fixed schedules as an accommodation. *See* Trial Tr. Day 2 at 413; *accord* Trial Tr. Day 3 at 580; Trial Tr. Day 3 at

756 (this Court observing that "we have a person with an obvious disability[,] [b]ut it's not obvious what the consequences, what the limitations caused by that disability are").

Further, Ms. Spaeth's coworkers took numerous, proactive steps to help her succeed over her 16-year tenure as an associate.  Multiple associates, many of whom the EEOC claims discriminated against Ms. Spaeth, tried to help Ms. Spaeth with her attendance issues by encouraging her to finish her shifts and reminding her of her schedule.  *E.g.*, Trial Tr. Day 1 at 186, 217, 221 (Becker); Trial Tr. Day 2 at 484, 491, 494 (Stern); Trial Tr. Day 3 at 508–10, 567 (Stern), 614–15 (Moss); *compare* Dkt.255-1 at 4, 7 (arguing that Becker and Stern were among those responsible for violating the ADA).  The Personnel Coordinator, Karen Becker, would personally handwrite Ms. Spaeth's schedules for her every week and review them with her, something that she did not do with other associates.  Trial Tr. Day 1 at 164–65; *compare* Dkt.255-1 at 4, 7.  Multiple associates also helped Ms. Spaeth learn new job skills, devoting extra time to her training.  *E.g.*, Trial Tr. Day 2 at 310–11 (Castro); Trial Tr. Day 2 at 479 (Stern); *compare* Dkt.255-1 at 4, 7 (also arguing that Castro was among those responsible for violating the ADA).  And Walmart afforded Ms. Spaeth much more leeway for her attendance violations than its policies require, to give her extra "chance[s] to rectify her attendance."  *E.g.*, Trial Ex.37 at 4; Trial Tr. Day 2 at 328 (Castro); *see* Trial Tr. Day 3 at 632 (Abitz); Trial Tr. Day 3 at 667 (Spude).

2. The EEOC's counterarguments in support of injunctive relief are unpersuasive.

While the EEOC points out that it need not present evidence of a pattern or practice of similar discrimination, Dkt.255-1 at 3–4, it fails to acknowledge that the absence of such evidence can be a powerful reason to deny such relief, *see Williams*, 492 F.2d at 407; *Siouxland*, 578 F.3d at 928.  After all, an employer's lack of a pattern or practice of discrimination can strongly suggest

that the employer is unlikely to "persist" in discriminatory conduct "in the future." *AutoZone*, 707 F.3d at 840 (citation omitted); *see supra* p. 3.

The EEOC next claims that Walmart is "very likely" to discriminate in the future, since the Walmart associates who testified at trial stated that they "were familiar with the ADA." Dkt.255-1 at 4. That familiarity works *against* granting the EEOC's requested injunctive relief, as it shows that Walmart's associates both understood and strove to abide by their ADA obligations. *See, e.g.*, Trial Tr. Day 3 at 661 ("[d]iscrimination and prevention and accommodations [training] is something that [Walmart management associates] consistently redo[es] at least once a year at all levels"). And in this case, as the trial testimony shows, Walmart's associates did not willfully flout their ADA obligations. *See supra* pp. 5–8. Rather, they did not understand Ms. Spaeth to be requesting an accommodation, as nothing indicated that Ms. Spaeth's "attendance was related in any way whatsoever to her Down syndrome"; they were unaware that individuals with Down syndrome needed fixed schedules because such individuals "cannot adapt to change"; and the testimony of the EEOC's own medical expert demonstrated that this need is not obvious. *Supra* p. 7. So while the jury did not conclude that this evidence defeated ADA liability in this case, it nevertheless undermines the claim that Walmart's "conduct could possibly persist in the future," such that injunctive relief is necessary. *AutoZone*, 707 F.3d at 840 (citation omitted).

The EEOC then argues that injunctive relief is warranted because Walmart has a policy of not providing permanent, modified fixed schedules to any associate. Dkt.255-1 at 4–6. The EEOC does not fairly characterize the evidence at trial on this issue. Walmart's accommodation policies *specifically* provide that "[m]odified work schedules" may be a "reasonable accommodation" if they do not impose an "undue hardship" on its operations. Tr. Ex.1061 at 2; Trial Tr. Day 1 at 181 (Becker) (discussing this aspect of the policy). Mr. Lee Spude acknowledged that "there is nothing

[in Walmart's policies that] says they are not provided," irrespective of whether Mr. Spude was personally aware of such accommodations being given in his personal experience, Trial Tr. Day 3 at 729, and the EEOC presented no evidence that any other associate failed to receive a required accommodation, *see* Dkt.255-1 at 6–7. Thus, Mr. Spude's testimony can most fairly be read to explain only that he had not personally seen such accommodations, not that they do not exist or would not be made available in the appropriate circumstances. Trial Tr. Day 3 at 728–29.

Further, the "order from the home office to stop providing scheduling adjustments" that the EEOC mentions refers *only* to Walmart's adoption of a new, *automated*, customer-demand centric scheduling system, which replaced Walmart's previous practice of manually scheduling each associate's shifts. Dkt.255-1 at 5; *see, e.g.*, Trial Tr. Day 3 at 670–71 (Spude) (explaining that Walmart had "updated" its automated scheduling system). This order was not a directive to cease providing reasonable scheduling accommodations for associates after the new system has automatically generated a schedule, which reasonable accommodations can include permanent schedule changes under Walmart's accommodation policies. Dkt.255-1 at 5; *see, e.g.*, Trial Tr. Day 3 at 670–71 (Spude). And again, the EEOC has not identified a single other associate to whom the EEOC believes that Walmart failed to give an ADA-required modified schedule accommodation after the implementation of this system.

Finally, the EEOC argues that injunctive relief is warranted because many of the Walmart associates involved here remain employed at Walmart. Dkt.255-1 at 6–7. That factor, standing alone, cannot support the broad injunctive relief that the EEOC seeks, *infra* Part I.B, particularly given the complete lack of similar complaints of discrimination or evidence that these individuals ever discriminated against anyone else in the past, *supra* p. 5; Walmart's strong antidiscrimination

and accommodation policies, *supra* pp. 5–6; and the nature of the conduct of Walmart's associates and lack of animus towards Ms. Spaeth, *supra* pp. 6–7.

**B.    The EEOC's Injunctive Requests Are Unnecessary, Overbroad, And Vague**

To the extent that this Court finds its necessary to go beyond the "could [not] possibly persist in the future" inquiry in denying the EEOC's injunctive requests in whole, *AutoZone*, 707 F.3d at 840 (citation omitted), it should *also* deny each of the EEOC's eleven injunctive relief requests as overbroad and/or impermissibly vague, *id.* at 841–43.

*Prohibiting Denial Of Permanent Reasonable Accommodations.* First, the EEOC asks this Court to enjoin Walmart "as a whole" for five years from "denying permanent or long-term reasonable accommodations to Walmart employees with disabilities within the United States, in the absence of an undue hardship." Dkt.255-1 at 7–9. This Court should deny that request because it is an unjustified "obey the law" injunction, of vast "overbreadth." *AutoZone*, 707 F.3d at 841–43. This proposed relief asks this Court to enjoin Walmart to obey all aspects of the ADA's reasonable accommodations provisions in its thousands of stores nationwide, which employ over a million associates. *See* Trial Tr. Day 3 at 671. There is no basis in this record to conclude that Walmart's "voluntary compliance" with the whole of the ADA's reasonable-accommodations provisions across the country "will not be forthcoming." *AutoZone*, 707 F.3d at 841–43. Nor does the EEOC even purport to "tailor[ ]" this broad ask to the "particulars of th[is] case," which involved only a single associate with a disability (Ms. Spaeth), a single type of reasonable accommodation under the ADA (permanent modified schedule), and a single store (Manitowoc)— where the understanding for the need for the accommodation because of the disability was disputed. *Id.* Finally, an injunction of such scope would be prohibitively "costly" on this Court,

requiring "continuing supervision" of Walmart's nationwide compliance with all aspects of the ADA's reasonable accommodation provisions. *Walgreen*, 966 F.2d at 276.

The EEOC's only argument in support of this overly broad request is to claim that Walmart never provides permanent, fixed schedules as a reasonable accommodation. Dkt.255-1 at 8–9. But that is a misreading of the evidence, as explained above. *Supra* pp. 9–10. In any event, even if EEOC's view of the evidence were correct, that would still not come close to supporting its request for the exceedingly vast "obey the law" injunction, as this proposed injunction extends far beyond any possible "proven conduct" in this case. *AutoZone*, 707 F.3d at 842.

*Revising Antidiscrimination Policies.* Next, the EEOC asks that this Court enjoin Walmart "as a whole" for five years to "modify its accommodation policies to clarify that fixed, long-term, or permanent disability accommodations are available to Walmart employees in the absence of undue hardship." Dkt.255-1 at 9–10 (emphasis omitted). This request is unnecessary, given that Walmart's policies *already* contemplate "[m]odified work schedules" as a "reasonable accommodation," making no distinction between short-term or long-term schedule modifications. Trial Ex.1061 at 2; *see* Trial Tr. Day 3 at 729. That follows the ADA's requirements, *see* 42 U.S.C. § 12111(9), and distinguishes the only appellate case law that the EEOC cites for support, when the court affirmed an injunction requiring a company to modify an "*unlawful [ ] policy*" to "bring the policy into conformity with the ADEA," *EEOC v. Johnson & Higgins, Inc.,* 91 F.3d 1529, 1542 (2d Cir. 1996) (emphasis added); Dkt.255-1 at 9–10. And while the EEOC again claims that Walmart's accommodations policy is a "blanket denial of schedule accommodations," Dkt.255-1 at 10, that is factually wrong, as noted above, *supra* pp. 9–10.

*Prohibiting Denial Of Reasonable Accommodations.* The EEOC also asks that this Court enjoin Walmart in its Region 53 for five years from "failing to provide reasonable accommodations

to employees with disabilities in violation of the ADA." Dkt.255-1 at 10–11. This requested relief also fails, as it is an impermissibly overbroad "obey the law" injunction, *AutoZone*, 707 F.3d at 841–43; *Walgreen*, 966 F.2d at 276, which applies "to *all* requests for reasonable accommodation of disabilities in Region 53," a region comprising 114 stores and 30,000 associates, Dkt.255-1 at 11 (emphasis added); Trial Tr. Day 3 at 698, 721 (Spude). Further, as with the proposed injunctions above, this requested injunction is not "tailored to the particulars of th[is] case," *AutoZone*, 707 F.3d at 841–43, which involved only one associate, one store, and one kind of reasonable accommodation, *supra* pp. 11–12. Nor is there any evidence that Region 53's "voluntary compliance" with any reasonable accommodation request in the future "will not be forthcoming," *AutoZone*, 707 F.3d at 841–43, the EEOC's continued misreading of the trial evidence regarding Walmart's accommodations policies notwithstanding, *see* Dkt.255-1 at 11.

The EEOC's recitation of other testimony at trial, Dkt.255-1 at 11, does not support this broad "obey the law" injunction proposal. Mr. Spude "instructed managers to cease communication with [Ms.] Spaeth's family," *id.*, because "it wasn't verified that there was any official documented legal guardian for [Ms. Spaeth]" at that time, not to subvert the ADA, Trial Tr. Day 3 at 700–01. Further, Walmart's associates did not "look[ ] into accommodating [Ms. Spaeth's] disability," "g[i]ve her an accommodation packet," or "direct[ ] her to the Accommodations Service Center" because they did not understand Ms. Spaeth to be asking for an accommodation, and her need for such an accommodation because of her Down syndrome was not clear. Dkt.255-1 at 11; *supra* p. 7. Instead, Walmart's associates understood Ms. Spaeth's desire to return to her previous 12:00 p.m. to 4:00 p.m. shift as "just [ ] comment[s] like anyone else would make that they wanted to go back to their original shift that they had." Trial Tr. Day 2 at 483 (Stern); *supra* p. 2. While the jury still found that Walmart's conduct violated the ADA,

this evidence nevertheless undermines the EEOC's claim that this ADA violation "could possibly persist in the future," as needed for injunctive relief. *AutoZone*, 707 F.3d at 840 (citation omitted).

*Posting Of Notice.* The EEOC next claims that this Court should enjoin Region 53 to "post a notice to all of its employees informing them of the verdict and injunction in this suit and explicitly informing employees that they may report discrimination directly to the EEOC without fear of retaliation," for a five-year period. Dkt.255-1 at 12. Such a posting is unnecessary, as Walmart *already* posts its antidiscrimination and accommodations policies—which include anti-retaliation provisions—in its breakrooms for its associates' ease of access, and it shares these policies with all associates on its intranet. Trial Tr. Day 3 at 653–57. The EEOC has identified nothing "inadequate" with these procedures. *Miles*, 387 F.3d at 602; *supra* pp. 5–6.

In any event, the actual notice of this lawsuit that the EEOC would have Walmart display is deficient under the EEOC's own cited authority. That proposed notice states in its body that the jury awarded "$125,000,000 in punitive damages against Walmart," only disclosing in a footnote that the jury's award was "reduced to $300,000 to comply with the ADA's limitations on damages." *See* Dkt.254-3 at 1 & n.1. Including "the amount of the jury award in the notice" at all "is unnecessary, especially given that the jury awarded damages that are subject to statutory caps." *EEOC v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 228 (E.D.N.Y. 2018); Dkt.255-1 at 12 (citing *United Health*, 350 F. Supp. 3d 199).

*Record-Keeping And Reporting.* The EEOC asks that this Court require Region 53 to "notify the EEOC within ninety days of *any* request for accommodation of an employee's disability" and provide detailed information about the request like the employee's name, title, phone number, and steps taken to process it, for five years. Dkt.255-1 at 12–13 (emphasis added). This proposed injunction fails for lack of any "tailor[ing] to the particulars of th[is] case," including

because it applies to *all* accommodation requests across the 114 stores and 30,000 associates comprising Region 53. *AutoZone*, 707 F.3d at 841–43; Trial Tr. Day 3 at 698, 721 (Spude). And there is no evidence that Region 53's "voluntary compliance" with its ADA reasonable-accommodation obligations "will not be forthcoming," such that any reporting requirement would be justified. *AutoZone*, 707 F.3d at 841–43. The EEOC claims that "[o]ther courts have ordered relief of precisely this nature," Dkt.255-1 at 13, but each of the cases that it cites deal with employers discriminating against multiple individuals, *see United Health*, 350 F. Supp. 3d at 209 (ten individuals); *EEOC v. KarenKim, Inc.*, No. 508CV1019NAMDEP, 2013 WL 12424087, at *2 n.1 (N.D.N.Y. Sept. 24, 2013) (ten individuals); *EEOC v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 1313, 1328 (D.N.M. 1998), *aff'd*, 202 F.3d 281 (10th Cir. 1999) (discriminatory practice affecting "extraordinarily large number of people"); *EEOC v. Ilona of Hungary, Inc.*, 885 F. Supp. 1111, 1112, 1126 (N.D. Ill. 1995), *ultimately aff'd in part, rev'd in part*, 108 F.3d 1569 (7th Cir. 1997) (two plaintiffs, and noting that employer "withdrew its employment manual which provided a policy of accommodation" "in response to the events at issue here").

*Antidiscrimination Training.* The EEOC asks this Court to order Region 53 for five years to "provide training to its managers and supervisors regarding the obligations to grant schedule accommodations under the ADA in the absence of undue hardship," "to remind them that a request for a schedule accommodation from a person with a disability cannot be denied at the store level," and to retrain them "on how to follow-up after an employee requests a schedule change." Dkt.255-1 at 13–14. This proposed injunction is unnecessary and not "tailored to the particulars of the case." *AutoZone*, 707 F.3d at 841–43. Walmart already provides robust training to its managers and supervisors on the ADA, along with implementing its own antidiscrimination and accommodations policies. Trial Tr. Day 3 at 660–61; Trial Ex.1064; Trial Tr. Day 2 at 468–69.

Indeed, "[d]iscrimination and prevention and accommodations [training] is something that [Walmart management associates] consistently redo *at least once a year at all levels*." Trial Tr. Day 3 at 661 (emphasis added). The EEOC has not even attempted to identify any deficiencies in Walmart's training on this score or to explain how additional training would have helped in Ms. Spaeth's case. *See* Dkt.255-1 at 13–14 (failing to discuss the training materials in the record or to cite any record material at all). And while the EEOC states that courts often require training when granting injunctive relief, Dkt.255-1 at 13–14, the cases that it cites usually supported such an injunction with a finding that the employer's previous training efforts were either absent or inadequate, unlike the case here. *See United Health*, 350 F. Supp. 3d at 226 ("defendants have never provided any anti-discrimination training to their employees"); *EEOC v. Dolgencorp, LLC*, 277 F. Supp. 3d 932, 963 (E.D. Tenn. 2017), *aff'd*, 899 F.3d 428 (6th Cir. 2018) (employer's previous efforts "insufficient"); *Wal-Mart Stores*, 11 F. Supp. 2d at 1331 (D.N.M. 1998) ("apparent lack of ADA-specific training for supervisory and managerial employees").

*Accountability For EEO Policy Noncompliance.* The EEOC also seeks an order that Region 53 "document and evaluate adherence to Walmart's Equal Employment Opportunity policies as part of the annual review process" for its management associates for five years. Dkt.255-1 at 14. This Court should reject this request as unnecessary, as Walmart's management associates' compliance history with its own policies is not "the violation established in the litigation or similar conduct reasonably related to the violation." *AutoZone*, 707 F.3d at 841. Because this proposal is not "tailored to the particulars of the case," it must likewise fail. *Id.* at 843. And the EEOC's citation of *Gurnee Inn*, 914 F.2d 815, for support does not help its case, as the injunction ordered by the district court there mandated the creation of a grievance-submission procedure that was actually tied to the legal violation at issue, *see id.* at 817; Dkt.255-1 at 14.

*Prohibiting Retaliation.* The EEOC seeks an order prohibiting Region 53 for five years "from engaging in any retaliation against any Walmart employees with disabilities who request schedule modifications as an accommodation of a disability." Dkt.255-1 at 14. This is an impermissible "obey the law" injunction that this Court should reject because it lacks any "tailor[ing] to the particulars of the case" here. *AutoZone*, 707 F.3d at 841–43. The EEOC did not bring a retaliation claim against Walmart under the ADA. There is thus no connection between "the proven illegal conduct" found by the jury here and this proposed injunctive relief, and thus there is no reason to conclude that Walmart's "voluntary compliance with the law [of retaliation] will not be forthcoming." *AutoZone*, 707 F.3d at 842–43; *see Siouxland*, 578 F.3d at 928 ("[B]ecause the record contained no evidence of retaliation by [the employer], the court reasonably determined that there was no basis for enjoining retaliatory conduct."). The lack of a retaliation claim in this case is notably unlike the only case that the EEOC cites for support, Dkt.255-1 at 14–15, which did deal directly with such a claim, *EEOC v. DCP Medstream, L.P.*, 608 F. Supp. 2d 107, 108 (D. Me. 2009). Finally, given the size of Region 53 and the fact that this case deals only with one individual at one Walmart store, this proposed "obey the law" injunction also presents the same fatal overbreadth and cost monitoring concerns as with many of the other proposals discussed above. *AutoZone*, 707 F.3d at 841–43; *Walgreen*, 966 F.2d at 276; *supra* pp. 11–16.

*Reinstating Ms. Spaeth Or Paying 10 Years Of Front Pay.* The EEOC makes a brief request for this Court to require Walmart either to reinstate Ms. Spaeth "with a rate of pay of at least $16.77/hr.," or to award "ten years of front pay to Ms. Spaeth in lieu of reinstatement." Dkt.255-1 at 15. This Court should deny both perfunctory requests for lack of development. *See Muhich v. Comm'r*, 238 F.3d 860, 864 n.10 (7th Cir. 2001). In any event, these requests fail on the merits. Reinstatement is not appropriate when "the employee has engaged" in conduct that provides the

employer "lawful grounds" for discharge. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–62 (1995); *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773 (7th Cir. 2002). Here, even when Ms. Spaeth had her preferred schedule of 12:00 p.m. to 4:00 p.m., she had an unsatisfactory attendance record, *see* Trial Tr. Day 2 at 476–77, 487–88, 490 (Stern); Trial Tr. Day 3 at 636–37 (Abitz), 663, 675, 683–84 (Spude); Trial Ex.10, which provided Walmart with sufficient grounds to discharge her, *see McKennon*, 513 U.S. at 361; *Franzoni*, 300 F.3d at 773; *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001). The EEOC's request for front pay fails for the same reason, *McKennon*, 513 U.S. at 362, *and* because the EEOC has not supplied "essential data" to support this claim, *Bruso*, 239 F.3d at 862, including the total amount of front pay that it is seeking, the discount rate, or a substantiated statement of how long Ms. Spaeth expected to work for Walmart, *see* Dkt.255-1 at 15, *and* because Ms. Spaeth failed to mitigate her damages, *Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 450 (7th Cir. 2021), as discussed below, *infra* Part II.A.

*Prohibiting Discrimination Or Retaliation Against Ms. Spaeth.* The EEOC next asks, in a single sentence only, that this Court enjoin Walmart from discriminating or retaliating against Ms. Spaeth because of her disability, because of her involvement in this lawsuit, or because of her receiving any equitable relief or remedies from this lawsuit. Dkt.255-1 at 16. This is an "obey the law" injunction with no evidence that Walmart's "voluntary compliance" with the ADA as to Ms. Spaeth "w[ould] not be forthcoming." *AutoZone*, 707 F.3d at 841–43. Additionally, this proposed injunction lacks "tailor[ing] to the particulars of the case" to the extent that it seeks to enjoin retaliation, given that the EEOC did not bring a retaliation claim here. *AutoZone*, 707 F.3d at 841–43; *supra* p. 17. That is again unlike the only cited authority that the EEOC puts forward, when the court enjoined the employer from engaging in retaliatory conduct after a jury found for

the EEOC on a retaliation claim. *EEOC v. DCP Medstream, L.P.*, 608 F. Supp. 2d 107, 108, 111 (D. Me. 2009); Dkt.255-1 at 16 (citing *DCP Medstream*).

*Requiring Walmart To Inform Ms. Spaeth's Guardians.* The EEOC asks this Court to require Walmart to contact Ms. Spaeth's guardians "regarding any discipline or coaching of Marlo Spaeth and any issues involving accommodations for Ms. Spaeth's disability," in seeming perpetuity. Dkt.255-1 at 16. To begin, this request has no connection to "the violation established in the litigation or similar conduct reasonably related to the violation." *AutoZone*, 707 F.3d at 841. The EEOC claimed here that Walmart violated the ADA by failing to provide Ms. Spaeth with a permanent, modified fixed schedule, *not* by failing to communicate with her legal guardians about aspects of her employment. Moreover, nothing in the ADA would appear to require Walmart to communicate with Ms. Spaeth's guardian in such a manner, and the EEOC fails to argue otherwise. *See* Dkt.255-1 at 16. Further, the EEOC's proposed injunction is hopelessly overbroad, as it "has no time limit," and so would appear to expose Walmart permanently to the risk of contempt proceedings associated with this case. *AutoZone*, 707 F.3d at 841–43. Finally, this request is impermissibly vague, as it would appear to require Walmart to relay conversations it has with Ms. Spaeth to her guardians even when Ms. Spaeth herself desires confidentiality. *Id.* at 841. Indeed, the concerns with such sweeping injunctive relief perhaps explain why the EEOC cites no case awarding such a remedy. *See* Dkt.255-1 at 16.

## II. This Court Should Not Award Back Pay, Interest, Or A Tax-Component

After a jury finds that a plaintiff has proven an ADA violation, the court may, in its discretion, award the employee "back pay." 42 U.S.C. § 2000e-5(g)(1); *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985). The purpose of back pay is "to afford the [employee] complete relief," *Horn*, 755 F.2d at 606, thus, the court must consider

only "what [the] employee would have earned absent the discrimination" when valuing any back pay award, *Ilona of Hungary*, 108 F.3d at 1579. A back pay award must not put the employee "in a better position than she would have occupied had the discrimination not occurred." *Id.* at 1580. There is no specific formula to calculate back pay; this Court must consider "the circumstances of the particular case" and reach "a just result" where the employee is made whole without receiving a windfall. *Id.* (citation omitted); *see Horn*, 755 F.2d at 607. There is also "a presumption in favor of granting [prejudgment] interest" to a back-pay award to "make a plaintiff whole following violations of a federal statute." *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (also instructing district courts to use "the prime rate" for prejudgment interest by default).

While there is a presumption in favor of back pay and interest, "a discharged employee" may only recover a back pay award if she has "mitigate[d] [her] damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (citation omitted); 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person . . . discriminated against shall operate to reduce the back pay otherwise allowable."). The employer has the burden to establish that the plaintiff failed to mitigate her damages by making two showings: (1) "the [discharged employee] was not reasonably diligent in seeking other employment"; and (2) "with the exercise of reasonable diligence there was a reasonable chance that the [discharged employee] might have found comparable employment." *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1009 (7th Cir. 2020) (citation omitted); *Gurnee*, 914 F.2d at 818.

The Seventh Circuit has recognized that a district court may add "a tax-component" award when awarding back pay to an employee discharged in violation of federal antidiscrimination statutes, to make the discharged employee whole. *EEOC v. N. Star Hosp., Inc.*, 777 F.3d 898,

903–04 (7th Cir. 2015) (citing, among other authorities, *Sears v. Atchison, Topeka & Santa Fe Ry. Co.*, 749 F.2d 1451, 1456 (10th Cir.1984)). A tax-component award may be appropriate where a back pay award of a large lump sum would lead to a "tax increase" for the discharged employee, compared to the employee "receiv[ing] the pay on a regular, scheduled basis." *Id.* at 904. Further, under Seventh Circuit precedent, the court may include the discharged employee's compensatory damages award when calculating a tax-component award, after considering "the circumstances peculiar to the case." *Vega v. Chicago Park Dist.*, ___ F.4th___, 2021 WL 3907883, at *7 (7th Cir. Sept. 1, 2021) (citations omitted).[2] And while the Seventh Circuit has not expressly held that a tax-component award should be reserved for cases that present "special circumstances," the Tenth Circuit has imposed such a requirement, *Sears*, 749 F.2d at 1456, in a case that the Seventh Circuit has favorably cited, *N. Star Hosp., Inc.*, 777 F.3d at 903–04.

Below, Walmart argues that Ms. Spaeth is not entitled to any back pay award because she failed to mitigate her damages by searching for a new job with reasonable diligence. *Infra* Part II.A. At a minimum, however, the EEOC's requested back pay plus interest award and tax-component awards are too high, as they depend on an artificially inflated wage rate and average-hours-worked rate for Ms. Spaeth. *Infra* Part II.B.

### A. Ms. Spaeth Did Not Mitigate Her Damages By Searching With Reasonable Diligence For Alternative Employment, Thus The EEOC Cannot Recover Any Back Pay, Interest, Or Tax-Component Monetary Relief

1. This Court should deny in full the EEOC's request for back pay, interest, and tax-component awards since Ms. Spaeth failed to mitigate her damages after her discharge in July 2015. Walmart has shown both that Ms. Spaeth "was not reasonably diligent in seeking other

---

[2] Walmart reserves its right to ask the Seventh Circuit or the Supreme Court to overrule the Seventh Circuit's recent precedent that a district court may include a compensatory damages award in tax-component award calculations.

employment" after her discharge, *Vega*, 954 F.3d at 1009 (citation omitted), and that, with the exercise of such reasonable diligence, Ms. Spaeth "might have found comparable employment." *Id.* (citation omitted).

First, Ms. Spaeth's job-search efforts do not show an "exercise" of "reasonable diligence" to find "comparable employment." *Id.* (citations omitted). Ms. Spaeth, through Ms. Stevenson, appears to have submitted only three job applications since her discharge from Walmart over six years ago. *See* Dkt.253 at 1–3; Trial Tr. Day 1 at 125. Further, Ms. Stevenson submitted the last of these three applications in 2018 at the latest, with apparently no additional applications over the past three years. *Compare* Trial Tr. Day 1 at 125, *and* Declaration of Misha Tseytlin ("Tseytlin Decl.") Ex.4 (Deposition of Ms. Barbara Barnes at 32–34) (establishing 2018 as last possible date of last application), *with* Dkt.253 at 1–3 (failing to contradict this timeline). And while Ms. Stevenson's August 2021 declaration does state that she undertook other, limited job search efforts on Ms. Spaeth's behalf, such as posting a general inquiry on Facebook, Dkt.253 at 1–3, she did not mention these activities in her trial testimony or provide the dates that she engaged in such efforts, suggesting that she may have taken these actions only very recently, Trial Tr. Day 1 at 125. In any event, those few, additional efforts to find Ms. Spaeth a job over this six-year period would not qualify as reasonable diligence, even if they had occurred earlier in this period. *Compare Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1427–28 (7th Cir. 1986), *abrogated on other grounds by Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989).

Ms. Spaeth's job search efforts fall significantly below what the Seventh Circuit requires for reasonable diligence. In *Hunter*, 797 F.2d 1417, for example, the Seventh Circuit held that a discharged employee's "appl[ying] to 16 employers . . . during five years" is *not* a reasonably diligent effort to mitigate damages, *id.* at 1427–28, and those 16 applications are appreciably

higher than the number of applications that Ms. Stevenson submitted on Ms. Spaeth's behalf. Ms. Spaeth's apparent failure to submit any applications since 2018, three years ago, further confirms a failure to "appl[y] consistently for other positions," which is also a hallmark of reasonable diligence. *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 767 (7th Cir. 2020); *accord Booker v. Taylor Milk Co.*, 64 F.3d 860, 865 (3d Cir. 1995).

Second, "there was a reasonable chance" that Ms. Spaeth would have found "comparable employment" with reasonable diligence. *Vega*, 954 F.3d at 1009 (citation omitted). As Mr. Abitz testified at trial, in testimony unrebutted by the EEOC, there "are positions at other retailers" near Walmart's Manitowoc Store for "positions like sales associates"; in fact, the "[c]ompetition" for these job applicants "is great." Trial Tr. Day 3 at 642 (specifically identifying Lowe's as a nearby competitor). "[I]f an individual like Ms. Spaeth wanted to find a position as a sales associate" in "the Manitowoc area," "there [would] be open available positions that she could fill." Trial Tr. Day 3 at 643. This testimony is sufficient "evidence concerning the availability of comparable jobs" for purpose of this second mitigation-defense prong, *Gurnee*, 914 F.3d at 818–19, including because it is based on the personal "knowledge of the marketplace" of a manager of a large area retailer who himself conducts a "hiring circle [that] never stops," Trial Tr. Day 3 at 642–43.

2. The EEOC claims that Ms. Spaeth's efforts to find a new job should be evaluated in light of her "unique 'individual characteristics.'" Dkt.255-1 at 27 (quoting *Booker*, 64 F.3d 860). But Ms. Stevenson was spearheading Ms. Spaeth's job search efforts. *See supra* pp. 21–22. And while the EEOC argues that Ms. Spaeth's unique need for a job along her bus line limits her job search prospects, it tellingly does not claim that the three employers to which Ms. Stevenson submitted applications were the only ones on that bus route. *See* Dkt.255-1 at 27.

The EEOC's claim that Walmart's conduct toward Ms. Spaeth "caused emotional harm" that "limited [her] ability to function in the job market" does not rebut Walmart's mitigation defense. Dkt.255-1 at 27. The EEOC has not identified sufficient evidence that the emotional harm from which Ms. Spaeth has suffered interferes with her ability to secure alternative employment. *See* Dkt.255-1 at 27–28 (citing only Trial Tr. Day 2 at 390 as evidentiary support). Indeed, by its request to reinstate Ms. Spaeth with Walmart, the EEOC has conceded that she is capable of performing the work, *see* Dkt.255-1 at 15, which necessarily means that Ms. Spaeth could hold "comparable" positions at other retailers, *Vega*, 954 F.3d at 1009 (citation omitted).

Finally, the EEOC preemptively asserts that Walmart has "disclosed no evidence regarding the availability of comparable work," as needed to satisfy the second prong of the mitigation defense. Dkt.255-1 at 28–29. The EEOC overlooks the unrebutted evidence from Mr. Abitz that clearly establishes that there are "open available positions" at other retailers in "the Manitowoc area," given that Walmart's "[c]ompetition is great." Trial Tr. Day 3 at 642–43.

**B.    Mitigation Aside, The EEOC Has Significantly Inflated Ms. Spaeth's Projected Wage Rate And Average Hours Worked, Which Undermines Its Claims For Back Pay, Interest, And Tax-Component Awards**

Although Walmart believes that Ms. Spaeth is not entitled to any back pay because of her failure to mitigate her damages, *supra* Part II.A, if this Court disagrees, it should at least reject the EEOC's inflated amounts for its back pay, interest, and tax-component amounts.

*Back Pay Calculations.* The EEOC requests a back pay award for Ms. Spaeth of $77,307 for the period between midway through July 2015 (the date of her discharge) through December 31, 2021 (the estimated date of final judgment from this Court). Dkt.255-1 at 17. To arrive at this amount, the EEOC estimates that Ms. Spaeth's hourly wage would have been $12.50 in 2015 and would have increased about 5% annually, ending at a rate of $16.77 in 2021. Dkt.255-1 at 17;

Dkt.254-1 at 2 (table of calculations). Then, the EEOC estimates that Ms. Spaeth would work 16 hours per week during this entire period. Dkt.255-1 at 17. This Court should reject this request, as the EEOC's figures are inflated. *Ilona of Hungary*, 108 F.3d at 1579.

Beginning with Ms. Spaeth's estimated hourly wage during the period between July 2015 and December 2021, this Court should assume that Ms. Spaeth would have received an annual raise from Walmart of $.40/hour, as she did for the past seven years. *See* Trial Exs.11–17 (Ms. Spaeth's annual reviews, listing annual raises); Tseytlin Decl. Ex.2 (table of calculations). Projecting this well-grounded, most-current raise history forward best captures what Ms. Spaeth "would have earned absent" her discharge in July 2015, *Ilona of Hungary*, 108 F.3d at 1579, as it shows a consistent practice from the "mo[st] current wage information available," *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1258 (N.D. Ill. 2015), *aff'd*, 842 F.3d 1010 (7th Cir. 2016). So, using a $.40/hour raise per year, Ms. Spaeth's July 2015 to July 2016 wage rate would be $12.50/hour and her projected wage for July 2021 to December 2021 would be $14.90/hour. Tseytlin Decl. Ex.2 (listing projections for all years).

The EEOC's projected raise increase of approximate 5% a year is not the best estimate of what Ms. Spaeth "would have earned" absent her discharge. *Ilona of Hungary*, 108 F.3d at 1579. To calculate Ms. Spaeth's projected raises, the EEOC relied on Ms. Spaeth's entire employment history with Walmart, beginning in 1999. Dkt.255-1 at 17; Dkt.254-1 at 2. Using this history creates a less accurate picture, since it skews the "more current wage information available" with outdated data. *Gracia*, 130 F. Supp. 3d at 1258. This skew is best evidenced by looking at the $.40/hour raises that Ms. Spaeth actually received for the past seven years, expressed as a percentage of her actual wage rate. In none of those years did that $.40/hour raise come close to 5% of Ms. Spaeth's wage rate; instead, six of her raises were below 4%, with one (the oldest) just

above 4%. *See* Trial Exs. 11–17. Thus, the EEOC's claim that Walmart would end its most-current practice of giving Ms. Spaeth a \$.40/hour raise each year and instead increase that raise to 5% of her wages is impermissibly speculative, meaning that this Court should reject it for purposes of any back pay calculations. *See Ilona of Hungary*, 108 F.3d at 1579.

Moving to the estimated hours worked per week for Ms. Spaeth for the period between July 2015 and December 2021, it would be more realistic to assume that Ms. Spaeth would have worked 9.52 hours per week, which is her average hours worked per week for the last two years of her employment (July 2013 to July 2015). Tseytlin Decl. ¶¶ 2–6 & Ex.1 (table of timecard data for Ms. Spaeth, with calculations); Trial Exs. 1006–07 (Ms. Spaeth's timecard history). This two-year history is the "mo[st] current [ ] information available" for Ms. Spaeth, *Gracia*, 130 F. Supp. 3d at 1258, and so best shows what Ms. Spaeth "would have [worked] absent" her discharge in July 2015, *Ilona of Hungary*, 108 F.3d at 1579.

The EEOC's estimation of 16 hours per week for Ms. Spaeth is inflated. *Id.* Although the EEOC does not explain the basis for its 16 hours/week estimate—contrary to its duty, *Stragapede v. City of Evanston*, 865 F.3d 861, 868 (7th Cir. 2017)—it appears that the EEOC simply assumed that Ms. Spaeth would work four hours a day for four days each week, Dkt. 255-1 at 17; Dkt.254 at 2, generally consistent with the availability form that Ms. Spaeth originally submitted to Walmart, *see* Trial Ex.1; Trial Tr. Day 1 at 59. That availability form, however, was not a guarantee of the hours or number of days that Walmart would actually schedule Ms. Spaeth to work, as the uncontroverted trial evidence shows. *E.g.*, Trial Tr. Day 1 at 215–16 (Becker). Indeed, from 2012 to 2014—a period comprising 156 weeks—Ms. Spaeth only worked four days a week seven times. *See* Trial Ex.1070. So the EEOC's estimation has little grounding in actual

"information" about Ms. Spaeth's employment history, *Gracia*, 130 F. Supp. 3d at 1258, and thus is not a "just" estimation for calculating back pay, *Ilona of Hungary*, 108 F.3d at 1579.

Using Walmart's estimated wage rate and hours per week worked, the back pay award for Ms. Spaeth should be no more than $43,514.39, Tseytlin Decl. ¶¶ 5–12 & Ex.2, assuming that she is entitled to any back pay award at all, *see supra* Part II.A.

*Prejudgment Interest.* The EEOC requests a prejudgment-interest award of $9,886, based on its calculation of Ms. Spaeth's lost wages from July 2015 to December 2021. Dkt.255-1 at 18–19. But this amount relies on the EEOC's erroneously high calculations for Ms. Spaeth's projected hourly rate and average hours per week worked for this period, *see* Dkt.255-1 at 18–19; Dkt.254-1 at 2; *compare supra* pp. 24–26. Using the proper calculations, the award of prejudgment interest should be no higher than $5,710.35, Tseytlin Decl. Ex.2, making the total back pay plus interest award to be $49,224.74—assuming that Ms. Spaeth is entitled to any such award at all, *see supra* Part II.A.

*Tax-Component Awards.* Finally, the EEOC also requests a tax-component award to offset Ms. Spaeth's increased tax liability as a result of her receiving any back pay plus interest award and compensatory damages award as a lump sum. Dkt.255-1 at 19–24. The EEOC requests a tax-component award of $33,885 to offset the back pay plus interest award, Dkt.255-1 at 20; Dkt.254 at 4–5, and a tax-component award of $65,747 to offset the compensatory damages award, Dkt.255-1 at 24; Dkt.254 at 5–6, for a total tax-component award of $99,632. This Court should deny the EEOC's requested tax-component awards.

As an initial matter, this Court should decline to award any tax-component award to Ms. Spaeth, as this case does not present any "special circumstances" that would justify such an award. *Sears*, 749 F.2d at 1456; *see generally N. Star Hosp., Inc.*, 777 F.3d at 904 (favorably

citing *Sears*). As already explained above, Walmart's associates acted in good faith towards Ms. Spaeth, the EEOC has presented no evidence of similar ADA complaints against Walmart from any time period, and Walmart already has robust antidiscrimination and accommodations policies that it applies across the country. *Supra* Part I.A.

If, however, this Court is inclined to grant Ms. Spaeth a tax-component award as part of any back pay plus interest award, it should still reject the amounts requested by the EEOC.

To begin, the EEOC's tax-component calculations are based on the EEOC's impermissibly high calculations for Ms. Spaeth's estimated hourly rate and average hours per week worked for this period. *See* Dkt.255-1 at 18–19; Dkt.254-1 at 2; *compare supra* pp. 24–27. Using the proper calculation for any back pay plus interest award, Ms. Spaeth would receive a maximum award of $49,224.74. *Supra* pp. 24–27. Adding Ms. Spaeth's $150,000 compensatory damages award to that amount yields a $199,224.74 sum that Ms. Spaeth would receive as income, which would trigger a $44,767.42 tax liability, according to the Internal Revenue Service ("IRS") tables submitted by the EEOC. Tseytlin Decl. ¶ 13. So to offset that tax liability—such that Ms. Spaeth would receive $199,224.74 after taxes—Ms. Spaeth would have to receive a tax-component award of approximately $68,497.70. Tseytlin Decl. ¶¶ 13–14 (explaining calculation).

Should this Court agree with the EEOC's $87,193 calculations for a back pay plus interest award, however, it should still refuse to accept the tax-component award calculated by the EEOC, as the EEOC improperly included the punitive damages award in its calculations. In computing its requested tax-component award, the EEOC first added together the $87,193 back pay plus interest award, the $150,000 compensatory damages award, *and* the $150,000 punitive damages award, for a sum of $387,193. Dkt.255-1 at 20–24 & n.6. Adding the punitive damages award and its associated tax consequences, however, leads to an improperly high tax liability to offset,

given the Tax Code's imposition of *progressively higher* tax rates as more income is received. Indeed, the EEOC's inclusion of the punitive-damages award in these calculations is especially unjustified, given its near-concession that including punitive damages in tax-component calculations always leads to a "windfall." Dkt.255-1 at 23 (citations omitted). With its artificially high $387,193 sum, the EEOC then determined that Ms. Spaeth's tax liability would be $110,313. Dkt.255-1 at 20–24 & n.6; Dkt.254 at 4–5. Next, the EEOC attributed portions of that combined tax liability to the back pay plus interest award (19.97%) and the compensatory damages award (38.74%), and then calculated the amount of money that Ms. Spaeth would have to receive to offset those portions of that combined tax liability. Dkt.255-1 at 20–24 & n.6; Dkt.254 at 4–5. Specifically, the EEOC calculated that Ms. Spaeth would have to receive a tax-component award of $33,885 to offset the taxes attributable to the back pay plus interest award and $65,747 to offset the taxes attributable to the compensatory damages award, for a total tax-component award of $99,632. Dkt.255-1 at 20–24 & n.6; Dkt.254 at 4–5. The proper methodology to compute the tax-component award using the EEOC's preferred back pay plus interest award is the method that Walmart used immediately above for its own preferred values: simply compute the tax liability triggered by $237,193—that is, the EEOC's preferred $87,193 back pay plus interest award plus the $150,000 compensatory damages award, thus *excluding* the punitive damages award—which tax liability is $57,812.55, according to the IRS tables submitted by the EEOC. Tseytlin Decl. ¶¶ 15–16. Then, determine the amount of additional money that Ms. Spaeth would have to receive to offset that $57,812.55 tax liability, which is approximately $88,942, according to the IRS tables submitted by the EEOC. Tseytlin Decl. ¶¶ 15–16.

For the Court's convenience, the following chart summarizes the tax-component awards using the correct amounts and methodology, as compared to the EEOC's improper amounts and methodology, as described above:

| | Tax-Component Awards Using The $49,224.74 Back Pay Plus Interest Award Calculated By Walmart | Tax-Component Awards Using The $87,193 Back Pay Plus Interest Award Calculated By The EEOC |
|---|---|---|
| **Result Under Walmart's Proper Methodology** | **$68,497.70**<br><br>(calculated by determining the amount needed to offset the income-tax liability on $199,224.74 of income, which is the sum of $49,224.74 back pay plus interest award calculated by Walmart and the $150,000 compensatory damages award) | **$88,942**<br><br>(calculated by determining the amount needed to offset the income-tax liability on $237,193 of income, which is the sum of the $87,193 back pay plus interest award calculated by the EEOC and the $150,000 compensatory damages award) |
| **Result Under The EEOC's Improper Methodology** | -- | **$99,632**<br><br>(calculated by determining the amount needed to offset the income-tax liability on $387,193 of income, which is the sum of the $87,193 back pay plus interest award calculated by the EEOC, the $150,000 compensatory damages award, and the $150,000 punitive damages award) |

## CONCLUSION

The Court should deny the EEOC's Motion For Equitable Relief.

Dated, October 1, 2021

Respectfully submitted,

GEORGE BURNETT

CONWAY, OLEJNICZAK & JERRY, S.C.

231 South Adams Street

Green Bay, WI 54301

(920) 437-0476

(920) 437-2868 (fax)

gb@lcojlaw.com

/s/Misha Tseytlin

MISHA TSEYTLIN

TROUTMAN PEPPER

HAMILTON SANDERS LLP

227 W. Monroe Street, Suite 3900

Chicago, IL 60606

(608) 999-1240

(312) 759-1939 (fax)

misha.tseytlin@troutman.com

*Counsel for Wal-Mart Stores East, LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of October 2021, a true and accurate copy of the

foregoing was served via the Court's CM/ECF system upon all counsel of record.

/s/ Misha Tseytlin
_____

MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com