# EXHIBIT 9

2021 WL 4190222
Only the Westlaw citation is currently available.
United States Court of Appeals, First Circuit.

Margaret BENSON, Appellant-Plaintiff,

v.

WAL-MART STORES EAST,
L.P., Appellee-Defendant.

No. 20-1495
|
September 15, 2021

**Synopsis**

**Background:** Former employee filed suit in state court against employer, claiming disability discrimination in violation of Maine Human Rights Act (MHRA) and retaliation by firing her for engaging in activities protected under Maine Whistleblower Protection Act (MWPA) and related provisions of MHRA. Following removal based on diversity, the United States District Court for the District of Maine, Lance E. Walker, J., 2020 WL 1669851, granted employer summary judgment. Employee appealed.

**Holdings:** The Court of Appeals, Gelpi, District Judge, sitting by designation, held that:

regular attendance was essential function of employee's job;

employee was qualified individual with disability under MHRA;

employer proffered legitimate non-disability based reason for termination;

fact disputes as to pretext precluded summary judgment on disability discrimination claim;

employee established prima facie case of retaliation under MWPA and MHRA; and

fact disputes as to pretext precluded summary judgment on retaliation claims.

Reversed and remanded.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE, [Hon. Lance E. Walker, U.S. District Judge]

**Attorneys and Law Firms**

Guy D. Loranger for appellant.

Katherine I. Rand, with whom Daniel R. Strader and Pierce Atwood LLP were on brief, for appellee.

Before Howard, Chief Judge, Thompson, Circuit Judge, and Gelpí,[*] District Judge.

**Opinion**

GELPÍ, District Judge.

**\*1** This case, in federal court on the basis of diversity of citizenship, 28 U.S.C. § 1332(a)(1)(c), involves ambiguous job requirements, unclear expectations, and continuous miscommunications between appellant Margaret Benson ("Benson") and appellee Wal-Mart Stores East, L.P. ("Wal-Mart"). Based on our review of the district court record, we conclude the disputed factual evidence as adduced and the fair inferences therefrom reasonably support a case for disability discrimination under the Maine Human Rights Act and for retaliation under the Maine Whistleblower Protection Act and the Maine Human Rights Act. Therefore, for the reasons explained below, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

**I. Standard of Review**

We review the district court's grant of summary judgment in favor of Wal-Mart *de novo*. United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 83 (1st Cir. 2012). Summary judgment is proper if Wal-Mart can demonstrate that "there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage of the proceedings, we construe the record and all reasonable inferences from it in favor of the party opposing the summary judgment motion, Benson. Martínez v. Novo Nordisk Inc., 992 F.3d 12, 16 (1st Cir. 2021) (citing Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 46 (1st Cir. 2019)). Notwithstanding, "[e]ven in employment discrimination cases where elusive concepts such as motive

Case 1:17-cv-00070-WCG Filed 10/15/21 Page 2 of 47 Document 261-9

or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020) (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015)).

We present below all undisputed facts, relying both on the district court's opinion and order as well as the parties' proposed statements of uncontested facts that are properly supported by evidence on the record. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that under Rule 56, "the court should review the record as a whole"). Any genuinely disputed material fact shall also be detailed therein, where it is relevant to either party's argument.

## II. Background

Benson's story is complicated, involving multiple lawsuits, countless medical appointments, and a series of Wal-Mart administrators. In order to provide the reader all relevant information in a comprehensible manner, we begin with an overview of the events that led to this case and then turn to a more detailed description of the testimony, as needed.

### A. Overview

In February 2013, Benson began her employment at the Wal-Mart store in Windham, Maine, as a cashier. In October 2014, Benson—at the time a grocery reclamation associate—suffered a piriformis injury while at work.[1] The injury prevented her from working and she took a leave of absence. Initially, Wal-Mart refused to acknowledge her injury was "work-related," but eventually agreed that it was and offered Benson a Temporary Alternative Duty (TAD) position that she accepted. Benson worked, apparently without incident from June 2015 when she returned, until April 2016 when she took another leave of absence to cope with the side effects of treatment for her injury.

**\*2** Around the same time, in March 2016, Benson, through counsel, filed an action against Wal-Mart in the United States District Court claiming discrimination for failure to accommodate related to this workplace injury. Benson v. Wal-Mart Stores E., L.P., No. 16-cv-114 (DBH), 2017 WL 2729491 (D. Me. June 23, 2017) ("Benson I"). Ultimately, the district court in that case entered summary judgment for

Wal-Mart. The legal analysis in that case has no bearing upon the case before us, but, as we will discuss later, Benson cites Benson I as motivation for Wal-Mart's alleged retaliation.

On October 14, 2016, with her first lawsuit still pending, Benson returned to work in another TAD position, as a People Greeter. Generally, People Greeters would welcome customers when they arrived at the store, provide front-end security, ensure customer safety in the greeting area, respond to electronic surveillances alarms, and provide customers with directions. On the days when Benson was scheduled to work, her assigned shift time was from 6:00 a.m. to 2:00 p.m. It was the practice of the store to have at least one People Greeter scheduled each day for each entrance while the store was open. If a People Greeter was absent, Wal-Mart tended to not replace them, so those functions went unfilled.

Upon Benson's return to work, two things happened that are important to her current claims. First, Benson informed management at the Windham store that she would continue to have regularly scheduled medical appointments for her work-related injury. In response, Nancy Little, a Wal-Mart store supervisor, assured her that "as long as [she] gave her notice [to the store's Personnel Coordinator] of when the time frame was, that they would take care of it and make [her] schedule fit accordingly." Second, Benson also learned of Wal-Mart's Attendance/Punctuality Policy-Maine ("Attendance Policy"), which had changed since Benson took a leave of absence earlier in the year.[2] With those facts in mind, we turn to the details of Wal-Mart's Policy and Benson's efforts to comply with them while attending to her health needs.

### B. Wal-Mart's Attendance Policy

The Attendance Policy, effective October 2016 and applicable to Benson's claims, provides that it is understandable that employees "may have to miss work on occasion. However, regular and punctual attendance is a required and essential function of each associate's job." The Attendance Policy expressly states that "excessive absences or incomplete shifts" may result in termination. It further points out that "[w]hen possible, [an employee] should schedule time off in advance to avoid negatively affecting other associates, customers, and the company."

The Policy additionally states that "[a]n unauthorized absence may result from arriving late or leaving early, as well as missing entire scheduled shifts."[3] The Attendance Policy

Case 1:17-cv-00070-WCG   Filed 10/15/21   Page 3 of 47   Document 261-9

specifically defines "unauthorized absences" as "any time [an employee is] away from a scheduled shift for a reason that is not [a]uthorized or approved by [a] supervisor or manager, unless [the employee] use[s] an income replacement benefit (such as PTO [or Paid Time Off], Sick Time or Personal Time)." Too many unauthorized absences could result in an employee being fired.

**\*3** On the other hand, the Attendance Policy also provides a list of absences that are considered "authorized," and, therefore, per the Policy, need not be "approved by [a] supervisor or manager."[4] Among those were "[w]orkers' compensation" absences. The "Responsibility to Notify Management" section of the Attendance Policy specifies that an employee "must make every effort to report absences or late arrivals (tardies) at least one hour prior to [the] scheduled start time, unless it would be unreasonable to expect [the employee] to report the absences due to circumstances outside of [the employee's] control." To notify management of an absence or late arrival, an employee must report by either calling a designated 1-800 number or using the "Wal-Mart One" website.[5] Benson understood, as she had discussed with Wal-Mart's management, that she could *either* provide verbal notice or make store management aware—via a written note —of her workers' compensation related absences. The term "workers' compensation," which is central to Benson's case, is not defined in the Attendance Policy.[6]

The Windham store manager, Susan Bradstreet ("Bradstreet" or "Manager Bradstreet"), interpreted "workers' compensation" to refer to "leaves of absence" authorized by Wal-Mart's third-party leave administrator for incapacity due to a workers' compensation related injury *and/or* time an associate was required to miss work in order to attend a medical appointment *or* receive treatment for a work-related injury. Manager Bradstreet did not consider time missed beyond that required to attend a medical appointment in connection with a workers' compensation injury to be authorized under the Attendance Policy. Manager Bradstreet expected associates who missed work due to a workers' compensation medical appointment to be able to produce documentation of such appointment upon request.[7] Also, Bradstreet expected associates to schedule workers' compensation appointments during times when they were not scheduled to work; and, when this was not possible, to only miss so much of their shifts as necessary to travel, attend, and return from the appointment. On the other hand, Benson stated that Wal-Mart did not inform her that she should

either schedule her appointments at times when she was not scheduled to work or only miss time necessary for traveling to and from a workers' compensation medical appointment.

Kathy Burns-Egan, the store's Personnel Coordinator, ("Coordinator Burns-Egan") was specifically asked, during a deposition for this litigation, whether an absence, due to complications in connection with medication for a work-related injury, would be excused under the Attendance Policy as a "workers' compensation" absence. Coordinator Burns-Egan responded that she "would not be able to answer that [because she] really [did not] know." Coordinator Burns-Egan acknowledged during her deposition "not remember[ing]" or "recall[ing]" whether the Windham store had any specific policy that employees must follow when notifying management about absences relating to a workers' compensation injury, but noted that it "[s]eems like there should have been [one]." When asked if she was aware of any written policy requiring any additional written verification with regard to workers' compensation absences or tardies, Coordinator Burns-Egan responded that "I don't recall it written. However, it was expected, so I'm not sure if it was written somewhere besides on [the Attendance Policy]."

### C. Benson's Absences

**\*4** Once Benson returned to work as a People Greeter, attendance issues allegedly persisted. According to Wal-Mart's records, between October 14, 2016, and December 12, 2016, Benson was absent, left early, or arrived late to work on twelve occasions.[8] Benson missed a full—day shift on October 18, October 20, October 21, October 28, November 5, November 7, November 12, and November 28. She left more than 120 minutes early from her scheduled shifts on November 3, November 17, November 26, and December 8, 2016. In its internal recording system, Wal-Mart coded these absences, at least initially, as "unauthorized" under the Attendance Policy.

According to Benson, she partially or entirely missed a shift due to medical appointments to treat her work-related injury on October 18 and 20 as well as November 3 and December 8. On October 21 and 28 and November 5, 7, 12, 26, and 28, she missed her entire shift or left early due to illness or "bad reactions" (mostly upset stomach) caused by medications prescribed for her work-related injury. As to the November 17th absence, the parties stipulated that Benson used "vacation time."

Regarding the October 18 and 20 absences, Wal-Mart agrees that Benson informed store management of her appointments ahead of time. Regarding the November 3 and December 8 absences, Benson contends she gave notice to management prior to her appointment, but Wal-Mart disputes this fact. The record reflects that Benson gave advance notice for the November 3 absence, but did not provide notice for the December 8 absence. On December 8, Benson had arrived to work on time but left early and missed four hours of work time for a one-hour medical appointment. At the time, Benson had not offered Wal-Mart an explanation for this departure and, at her deposition in this case, could not explain why she missed four hours of work.

As to the October 21 and 28 and November 5, 7, 12, 26, and 28 absences, Benson stated during her deposition that she gave notice to management prior to each one. Wal-Mart contests that she followed the proper procedure for notifying these absences and whether she, in fact, gave advance notice for missing her shift or leaving early. Wal-Mart also states that Benson informed management that the absences were related to having the flu. Benson clarified in her deposition testimony that the November 5 absence was not because she had the flu but rather because of a "bad reaction" to medication prescribed for her workers' compensation injury.

Overall, Wal-Mart does not dispute, for the purposes of summary judgment, that the reasons Benson eventually provided for these absences were true (i.e., Wal-Mart does not contest that Benson did indeed attend a chiropractor appointment when she claimed she did). However, Wal-Mart argues that, at the time of Benson's termination, management considered the absences to be "unauthorized," because Benson had not properly notified store management of the reason for an absence, because Benson never submitted proper documentation of treatment for her work-related injury, or because the proffered reason for an absence had not met the Attendance Policy criteria for an excused absence.

**D. Communication with Benson about Absences**

On December 12, 2016, Manager Bradstreet first noticed, while reviewing all associates' absences, that Benson had an "excessive number of occurrences" since returning to work in October 2016. Bradstreet arranged to meet with Benson to discuss these absences. According to Bradstreet, the purpose of the meeting was to give Benson the opportunity to provide

a satisfactory explanation for her absences. If Benson did not provide a satisfactory explanation, Manager Bradstreet would have proceeded to terminate her for violating the Attendance Policy. Benson was absent from most of her shifts that week and, hence, the two were unable to meet.

**\*5** The next week, on December 17, 2016, Benson and Manager Bradstreet finally met. Benson explained that nearly all absences upon returning in October 2016 were due to her workers' compensation injury. She attributed the absences from December 12 and 16 to her car breaking down as result of a snowstorm. The record reflects that Benson requested and was approved to use PTO time on these dates. As to the December 15 absence, Benson explained that she had a medical appointment related to her workers' compensation injury. Wal-Mart contests whether she gave prior notice about the appointment.

Manager Bradstreet prepared a memorandum on December 17, 2016, following her meeting with Benson. In it, she noted they had discussed Wal-Mart's Attendance Policy because Benson seemed to be confused about how to properly notify workers' compensation absences. The memorandum also details that Benson expressed concern about receiving "mixed messages" from her workers' compensation attorney and Wal-Mart's management about required expectations when informing supervisors about an absence due to a workers' compensation medical appointment. When Bradstreet asked Benson to provide medical documentation to support these absences, she indicated she could not do so during the meeting because her documentation was at home. At the meeting, Benson further complained about several aspects of how Wal-Mart was generally handling issues concerning her workers' compensation injury. Specifically, Manager Bradstreet detailed in the memorandum that:

> She complained about not being [able] to go [to] physical therapy because [Wal-Mart] would not approve it even though their independent doctor recommended she go. She has been waiting since June for therapy. She complained about her medication and not being able to get it filled however, when she takes it[,] it causes her to "lose control of her bowels and crap her pants" so she [cannot] be at work.

The memo continues that after Benson expressed this frustration, Bradstreet informed her that "going forward she needs to communicate to a member of management when she has appointments for [workers' compensation] ahead of time as soon as she is aware of the appointment." She also stressed that, when calling in, Benson "needs to speak to a

member of management about why she is not at work that day." Bradstreet stated, in a sworn statement prepared for this litigation, that in light of Benson's explanation, Bradstreet held off terminating her.

During her deposition, Benson was asked to review and comment on Manager Bradstreet's memorandum. Benson recalled feeling "very uneasy" during the meeting because she got "constant smirks" and "reactions" for not "saying what [Bradstreet] wanted." Benson acknowledged not being able to provide precise answers as to each absence since she did not have her absence sheet in front of her. She further explained that to avoid giving Bradstreet "false information," she instead gave Bradstreet permission to contact her workers' compensation attorney who had documentation for each medical appointment. As to complaining about the handling of her workers' compensation injury, Benson did not remember her exact words, but recalled generally expressing that the company "kept delaying me with everything." Benson explained that she "couldn't get a straight answer" about workers' compensation questions out of anyone from management; specifically, how to time clock "the way [they] wanted." Finally, Benson indicated that, following this meeting, she still did not understand what information store management required from her or if they were going to request information through her attorney. Benson expressed that after the meeting, she felt that "pretty much ... the harassment started."

### E. More Communication and Harassment Allegations

 **\*6**  On December 20, 2016, Benson sent an e-mail to Manager Bradstreet asking her to provide the dates on which Wal-Mart marked Benson as absent or tardy, so that Benson could further investigate the matter. This e-mail was in response to Bradstreet's inquiry regarding Benson's medical records during the December 17 meeting. After receiving the list of absences and tardies, Benson prepared a list identifying the reason for each absence and sent it to her workers' compensation attorney. Benson expected that her workers' compensation attorney would forward this list to Wal-Mart's legal counsel and believed this did happen. The record lacks clear evidence about what action Benson's attorney took or what happened to this particular list.

Benson's meeting with Bradstreet and subsequent communication did not change the attendance issues. By early January 2017, Benson had missed a full shift on January

3 and arrived late on January 5. According to the record, Benson informed Wal-Mart—via e-mail and after the fact— that the January 3 absence was because of "bad reactions" to medication prescribed for the workers' compensation injury and that on January 5 she was absent because of a workers' compensation medical appointment.

On January 9, Coordinator Burns-Egan spoke to Benson about her January 5 absence. Benson explained that her doctor had ordered additional testing after her January 5 appointment, which caused her to be late. She also informed management about an upcoming medical appointment on January 13 and that, due to the appointment, she expected to arrive late to work. On January 13, 2017, upon arriving to the store after the appointment, Benson sent an e-mail to Bradstreet and Coordinator Burns-Egan stating that: "Today I gave Kathie a copy of my M[-]1 form from Dr. Parris and asked for assistance in my time as there was an error. I punched in at 9:23, went to lunch at 9:25 and returned from lunch at 10:24. This is in all relation to workers' comp injury."[9] The "error" of which Benson speaks appears to be the coding of absences as "unauthorized" where Benson thought the absences ought to be authorized. In response to the message, Coordinator Burns-Egan and Manager Bradstreet met with Benson in-person and discussed her late arrivals. The record contains divergent versions as to what precisely occurred in the meeting.

According to Benson, she was following "Wal-Mart's protocol" and not going to work until after her medical appointment (at 8:30 a.m.) although her shift was scheduled two hours before the same (at 6:00 a.m.). Benson testified that Bradstreet was "very nasty," "rude," and even "screamed" at her. At all times, Benson insisted that she always followed the store's notice protocol.

According to Bradstreet, she asked Benson whether Benson was paid to sit on a couch from 6:00 a.m. to 7:30 a.m., even though she was scheduled to work. Benson responded that it "cost too much in gas" to go to work first, then to her medical appointment, and return to work, so she stayed home and "got ready" for work, per her attorney's instructions. When the meeting concluded, Bradstreet expressed to Benson "significant concern" regarding her absences and how she was missing more days than necessary. As a result, the January 5 and 13 absences were coded as "conditional status" pending Benson's production of medical documentation, presumably meaning these absences were conditionally authorized.

Case 1:17-cv-00070-WCG  Filed 10/15/21  Page 6 of 47  Document 261-9

On January 19, Benson and Bradstreet met again to further discuss Benson's absences and medical documentation. The next day, Benson sent an e-mail to Market Human Resources Manager Wayne Gottwald ("HR Manager Gottwald") and Coordinator Burns-Egan indicating that:

> **\*7**  Because of the work injury and because of the actions that were taken by Susan Bradstreet numerous times yesterday, January 19th, I am feeling more and more that I am feeling harassed. If you need a further explanation, I or my attorney can respond. The harassment needs to stop. It is illegal and unfair.

In their depositions, HR Manager Gottwald and Coordinator Burns-Egan each admitted that an e-mail of this nature, according to Wal-Mart's policy, would have required immediate action and would have initiated an investigation into any possible acts of discrimination or retaliation. HR Manager Gottwald explained that if he had been made aware of this e-mail, he would have had the responsibility to gather facts, provide these to Wal-Mart's ethics team, and render a determination if further investigation was needed. However, the record contains no evidence that anyone at Wal-Mart actually took action concerning Benson's discrimination complaint. At their depositions, neither HR Manager Gottwald nor Coordinator Burns-Egan recalled receiving this e-mail. Similarly, Manager Bradstreet said she was unaware of the e-mail until the day her deposition was taken as part of discovery in this case.

### F. More Absences and Benson's Firing

On January 26, 2017, Benson arrived late to work because of a medical appointment related to her workers' compensation injury. On or about this date, she submitted a medical form indicating that she could only work every other day because of her workers' compensation injury. On January 31, 2017, Wal-Mart adjusted Benson's schedule so that she would work only every other day, consistent with her doctor's restriction.

On February 8, 2017, Benson was absent from her shift. Using the web-based platform, she informed the store that she would miss work due to a snowstorm. Benson requested her absence be covered by her PTO, which appears to be permitted by the Attendance Policy's terms. In her deposition, Benson stated that because she had to shovel snow that day, her workers' compensation injury was aggravated.

On February 10, 2017, Benson arrived late for work due to a workers' compensation medical appointment. On this occasion, she did not provide advance notice, but rather gave Coordinator Burns-Egan the medical record of her appointment upon her arrival. On February 16, 2017, Benson was absent from her shift. She says that, using the web-based call-in procedure, she reported that said absence was due to snow.

Manager Bradstreet consulted with HR Manager Gottwald regarding Benson's termination. He declined to support the termination and instead referred the decision to Wal-Mart's legal counsel because of her previous lawsuit, Benson I. Specifically, HR Manager Gottwald testified that: "I was asked if I would be willing to support terminating her because she had exceeded the absence number that was allowed by the company. And as I also recall, I did not approve the termination at that time." When asked why he did not approve the termination, he stated that "[b]ecause it was in the hands of the legal team and it was not my decision to make." Furthermore, when questioned who made the decision to terminate Benson, HR Manager Gottwald explained that "I believe it was made at the legal level either -- I don't know if it was made by the [Wal-Mart] attorney or the home office corporate attorney."

 **\*8**  On February 18, 2017, Wal-Mart terminated Benson. In the "Separation Notice" Manager Bradstreet documented the alleged basis for the termination as follows:

> Margaret has been repeatedly asked to communicate absences and tardies to store management. She has chosen not to do this. She is being terminated for 21 attendance exceptions; policy allows for 9.

### G. District Court Proceedings

Following her termination, in November 2018, Benson sued Wal-Mart in state court alleging disability discrimination and retaliation under Maine state law. Benson argued that, pursuant to the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4572, Wal-Mart discriminated against her based on medical disability and terminated her because of a workers' compensation injury. She further asserted that her firing occurred in retaliation for engaging in activities protected under the Maine Whistleblower Protection Act ("MWPA"), Me. Rev. Stat. Ann. tit. 26, § 833(1)(B), and related provisions of the MHRA.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Following removal of the case to federal district court, discovery, and motions practice, the district court issued an order granting summary judgment in Wal-Mart's favor concluding that Benson "failed to generate a genuine issue of material fact concerning the first element of her disability discrimination claim." Benson v. Wal-Mart Stores East, L.P. ("Benson II"), No. 19-cv-41 (LEW), 2020 WL 1669851, at *6 (D. Me. Apr. 3, 2020). Specifically, regarding the disability discrimination claim, the district court ruled that Benson's argument suffered from a "fatal flaw" because she failed to show she is a "qualified individual" under MHRA. Id. at *5. To arrive at this conclusion, it analyzed whether she could "perform the essential functions of her job" and if not, whether "she identified any reasonable accommodation that would enable her to perform those functions[.]" Id. The district court held that the "need for attendance [was] self-evident" and, thus, an essential function of the People Greeter job, and that there was no evidence to support any reasonable accommodation that would have allowed Benson to attend work. Id. at *6. As to the retaliation claim, the district court concluded Benson failed to adduce sufficient proof to show causation between the proffered protected activities and her termination and whether Wal-Mart's explanation for Benson's termination was pretextual. Id. at *8.

This appeal followed.

## III. Discussion

On appeal, Benson posits that the district court erred in finding, as a matter of law, that she was not a "qualified individual" under MHRA and failed to establish the elements of her retaliation claim, pursuant to MHRA and MWPA. We begin with addressing whether summary judgment was appropriate on Benson's disability discrimination claim and then turn to her retaliation claims.

## A. Disability Discrimination

The MHRA provides that "[t]he opportunity for an individual to secure employment without discrimination because of ... physical or mental disability ... is recognized as and declared to be a civil right." Me. Rev. Stat. Ann. tit. 5, § 4571. The Maine Law Court recognizes that "[f]ederal law guides [its] construction of the MHRA." Cookson v. Brewer Sch. Dep't, 974 A.2d 276, 281 (Me. 2009); see also Kelley v. Corr.

Med. Servs., Inc., 707 F.3d 108, 115 n.12 (1st Cir. 2013) ("[D]isability-related claims under the MHRA are construed and applied along the same contours as the [Americans with Disabilities Act (ADA)]") (internal quotation marks and citations omitted).

*9 In cases such as the present, the plaintiff must establish a prima facie case of discrimination, and, if satisfied, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. Ultimately, the plaintiff must come forward with evidence of pretext. See Collazo-Rosado v. U.P.R., 765 F.3d 86, 92 (1st Cir. 2014).

## 1. Prima Facie Case of Discrimination

Mirroring the ADA, to establish a prima facie case of disability discrimination under MHRA, Benson must show that: "(1) [she] has a disability; (2) [she] is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of [her] job; and (3) [her] employer adversely treated [her] based in whole or in part on [her] disability." Daniels v. Narraguagus Bay Health Care Facility, 45 A.3d 722, 726 (Me. 2012). This stage of the case is not supposed to be burdensome. Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010) (noting that prima facie discrimination inference requires only a "modest" showing); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 44 (1st Cir. 1999) (noting that initial prima facie requirements are not especially "onerous" (quoting Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1st Cir. 1998))).

There is no dispute that Benson has a disability (required by the first element) and that she was eventually fired (the adverse treatment from the third element). The central question, the parties and the district court agree, is about the second element—is Benson qualified for the job? Pursuant to the MHRA, a "qualified individual with a disability" is defined as "an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." Me. Rev. Stat. Ann. tit. 5, § 4553(8-D). We thus focus our analysis on whether attendance is an "essential function[ ]" of the People Greeter job and then turn to whether Benson can perform that function with a "reasonable accommodation."

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

*Is Attendance an Essential Function of the Job?*

An essential function is "fundamental" to the position in question. Sepúlveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 553 (1st Cir. 2018) (quoting Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001)). "The term does not include 'marginal' tasks, but may encompass 'individual or idiosyncratic characteristics' of the job." Id. (quoting Ward v. Mass. Health Res. Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000)). When determining whether a function is "essential," we consider factors such as the written requirements or description of the job and the consequences of not requiring the function. 29 C.F.R. § 1630.2(n)(3); accord Ward, 209 F.3d at 34. We are not tasked with second-guessing an employer's legitimate business judgment about what is required of its employees, but we will consider whether the employer actually enforces this requirement of its employees or merely pays it lip service during litigation. See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002); see also Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012) (noting that courts give a "significant degree of deference to an employer's own business judgment" about the necessities of a given job). Of particular relevance here, we have noted that regular attendance "is an essential function of any job." Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 33 (1st Cir. 2011) (internal quotation marks omitted); accord EEOC v. Ford Motor Co., 782 F.3d 753, 761 (6th Cir. 2015) ("That general rule—that regularly attending work on-site is essential to most jobs, especially the interactive ones—aligns with the text of the ADA.").

 **\*10** Benson argues the record permits the conclusion that regular attendance is not an essential function of the People Greeter job, which is all Benson would need at this stage of the litigation to survive summary judgment. In support of this argument, Benson notes that, in its briefing before the district court, Wal-Mart only cited two facts in support of the idea that attendance is an essential function of this job: (1) Wal-Mart only scheduled one People Greeter to work at each entrance at a time and (2) therefore, if that People Greeter was absent, the People Greeter's tasks went unfulfilled. Benson contends that these related facts are disputed and are insufficient as matter of law to support a holding that regular attendance is not an essential function of this job. Further, as Benson sees it, Wal-Mart submitted no evidence of "written job descriptions, consequences of not requiring the function, work experience of past incumbents, and work experience of current incumbents," Ward, 209 F.3d at 34 (citing 29 C.F.R.

§ 1630.2(n)(3)), without which the district court could not properly analyze the essential-function question using those factors we have found to be important.

As to Benson's first argument, there is a difference between an "essential job" and an "essential function" of a given job. Wal-Mart may not consider the People Greeter position as an "essential job," as some parts of the record reflect that the position often went unfilled, but this does not imply that "attendance" fails to be an "essential function" of this job. Even if Wal-Mart scheduled more than one People Greeter to work at each entrance, as Benson says it did, that, on its own, appears to show that Wal-Mart valued having People Greeters present in the store, necessitating attendance. Benson's second argument, that there was no evidence that Wal-Mart considered attendance to be an essential function of the People Greeter role, is similarly unsupported by the record. This claim ignores the text of the Attendance Policy which says that "regular and punctual attendance is a required and essential function of each associate's job." See Jones, 679 F.3d at 14; see also 29 C.F.R. § 1630.2(n)(3).

Above all, Benson cannot perform any of the functions of a People Greeter outside of the hours or location assigned by Wal-Mart and so, showing up is an essential function of that job. See Ward, 209 F.3d at 35-36; see also Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213-14 (4th Cir. 1994) (holding that attendance during assigned class times is an essential function of job as a teacher).

*Can Benson Perform the "Essential Function" of Attendance with a Reasonable Accommodation?*

Having determined that attendance is an essential function of the People Greeter position, we consider whether Benson could perform that function (that is, attend work) with a reasonable accommodation. The ADA requires an employer "to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business.' " Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail in her claim, Benson bears the burden of showing that (1) she has made a sufficient request of accommodation, (2) the accommodation would enable her to perform the essential functions of her job, and

Case 1:17-cv-00070-WCG Filed 10/15/21 Page 9 of 47 Document 261-9

(3) the accommodation is facially reasonable. Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 127 (1st Cir. 2017).

There is no credible debate that Benson requested an accommodation. Upon her return from leave in October of 2016, Benson informed management that she would have regularly scheduled medical appointments for her work-related injury and Supervisor Little told Benson that "as long as [she] gave her notice [to the store's Personnel Coordinator] of when the time frame was, that they would take care of it and make [her] schedule fit accordingly."

Nor is there any reasonable argument that authorizing some absences or tardiness would not enable Benson to show up the rest of the time. Wal-Mart argues that Benson fails to show "that [accommodating] her poor attendance would make it possible for her to heal, to adjust her medication in order to better control her pain, or to accomplish anything else that would enable her to come to work as scheduled." This, however, misses the point of Benson's sought accommodation, which is akin to a modified work schedule where she is excused from working when her disability necessitates treatment. Indeed, a modified work schedule is a classic reasonable accommodation, considered by the ADA. 42 U.S.C. § 12111(9)(B).

**\*11** The decisive factor ultimately is whether Benson's requested accommodation is "facially reasonable." See Echevarría, 856 F.3d at 127. Wal-Mart makes an understandable point that it needs People Greeters to show up in order to do their jobs and that Benson cannot always do that. However, more persuasive than Wal-Mart's arguments on appeal is Wal-Mart's own Attendance Policy, which says that any tardiness or absence related to workers' compensation is permitted. Further, the Attendance Policy also explicitly considers any missed time due to a "reasonable accommodation" to be permitted as well.

Mindful that the prima facie case is not difficult to make out, we conclude that Benson has done enough and so the burden shifts to Wal-Mart to articulate a legitimate non-discriminatory reason for Benson's termination.

## 2. Legitimate Non-Discriminatory Reason and Pretext

Benson appears to agree that Wal-Mart's proffered reason for her termination—excessive unexcused absences—is, on its face, a legitimate non-discriminatory reason for her firing.

She argues that this reason is pretextual, positing that if her absences were authorized by the terms of the Attendance Policy, and, thus, she indeed complied with the written and unwritten Attendance Policy, then her termination for excessive unexcused absences was pretextual.

"[T]here is no mechanical formula for finding pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (quotation marks and citations omitted). However, we have noted that "[o]ne way to show pretext is through 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and with or without the additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons.' " Billings v. Town of Grafton, 515 F.3d 39, 55–56 (1st Cir. 2008) (citations and alteration omitted). The record contains enough facts (however disputed) that make summary judgment inappropriate on these claims.

Benson puts forward evidence that most of her absences should have been coded as "authorized" because they were related to her workers' compensation injury and further followed what she understood to be Wal-Mart's policy for notifying management of such absences. Two grey areas in the record support Benson's pretext argument and preclude summary judgment for Wal-Mart.

First, it is at best unclear as to whether an illness and side-effects from medications prescribed for *treating* a workers' compensation injury could be excused under the Attendance Policy. As per Coordinator Burns-Egan's deposition testimony, this material fact can neither be confirmed nor denied. When questioned about the matter, Coordinator Burns-Egan responded that she "would not be able to answer that [because she] really [did not] know" if an illness related to side-effects from a workers' compensation injury medications would be excused under the Attendance Policy. Whether store management even understood the contours of the policy upon which it based its termination of Benson is hence disputed.

Second, the record is, at best, murky as to whether Benson was indeed aware of Wal-Mart's unwritten job expectations, if they existed at all, regarding documentation of worker's compensation treatment or obtaining permission from management before missing a shift. Similarly, as per

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Coordinator Burns-Egan's deposition testimony, she did "not remember" nor "recall" whether the Maine Windham store had a particular policy as to this material fact, even though she acknowledged that "there should have been [one]."

 **\*12**  The record as a whole inures to Benson's benefit, helping her point out the "implausibilities, inconsistencies, incoherencies, or contradictions," Billings, 515 F.3d at 55, in Wal-Mart's proffered reason for her termination. It is impossible to unequivocally conclude that Wal-Mart internally established that Benson in fact exceeded the store's allowed number of authorized absences, which casts enough doubt in Benson's favor.

Viewing all of these facts in the light most favorable to Benson, the record contains enough to generate genuine issues of material fact insofar as the reason proffered for Benson's termination being pretextual. This is all Benson needs at this point.

### 3. Inapplicability of Maine Caselaw Precedent: <ins>Carnicella</ins>

As a final matter, we differ from the district court's reliance on Carnicella v. Mercy Hosp., 168 A.3d 768 (Me. 2017). In Carnicella, the plaintiff had explicitly requested leave and further extensions to said leave as a means to recover from an injury before returning to work. The Maine Law Court held that the only accommodation requested in Carnicella, leave of absence, was unreasonable as a matter of law because, at the time, the MHRA contemplated a defense that an employer could discharge an employee with disabilities who could not perform the duties of the employment. Carnicella, 168 A.3d at 774.[10] As a result, this rendered any additional leave as an unreasonable accommodation under Maine law.

In this case, there are genuine issues of material facts as to whether Benson, who had a disability and requested a reasonable accommodation for it, could indeed perform the duties of her job. Thus, the statutory defense invoked in Carnicella, at this stage of the proceedings, is inapplicable. Moreover, if these factual disputes were to be resolved in Benson's favor, then the record shows that she understood what an authorized leave of absence implied because she had requested the same before returning to work on October 2016. On this occasion, she knowingly did not request leave, as defined under the Attendance Policy, in relation to her workers' compensation injury. Her reasonable accommodation, as explained above, was not for a request of

"intermittent leave" as Wal-Mart advanced. The record does not contain evidence that Benson ever made such a request as Wal-Mart so characterized.[11]

### B. Retaliation

 **\*13**  Under both MHRA and MWPA, Benson has to establish that: (1) she engaged in protected activity; (2) she suffered a materially adverse action or was adversely affected, and (3) there was a causal connection between the protected activity and the adverse action. See Brady v. Cumberland Cty., 126 A.3d 1145, 1150-51 (Me. 2015); Ramsdell v. Huhtamaki, Inc., 992 F. Supp. 2d 1, 20 (D. Me. 2014). When reviewing Maine MWPA claims, we "collapse the more intricate McDonnell Douglas framework and, in a seamless inquiry, 'recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that the proffered reason is merely a pretext.' " Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018) (quoting Brady, 126 A.3d at 1157-58).

The case law and the parties agree that the causation element is the center of the dispute. Under the Maine-specific causation paradigm, "[t]o demonstrate a causal link sufficient to defeat a summary judgment motion" on a retaliation claim, Benson must make a sufficient evidentiary showing that her protected activity "was a substantial, even though perhaps not the only, factor motivating her dismissal." Id. at 349; see also Caruso v. Jackson Lab., 98 A.3d 221, 226 (Me. 2014).

As previously discussed, in this case, the district court concluded that none of the actions Benson raised, if considered as protected activity, were causally connected to her termination. Benson II, 2020 WL 1669851, at \*7-8. We disagree and hold that the facts viewed in the light most favorable to Benson could lead a reasonable factfinder to conclude that Benson's first employment discrimination lawsuit, the January 20 e-mail complaining of harassment, and her late January request for a reasonable accommodation of a modified schedule could have been "substantial" factors motivating her dismissal.

When we view the facts and inferences in the light most favorable to Benson's legal theory, several facts line up in her favor. First, the timing of the January e-mail and request for a modified schedule does not fare well for Wal-Mart. As Benson tells it, Bradstreet screams at her for missing work in mid-January, Benson complains of this harassment and

Case 1:17-cv-00070-WCG   Filed 10/15/21   Page 11 of 47   Document 261-9

requests a modified schedule in the weeks after that, and then, by mid-February, she is fired. On its own, the temporal proximity between the January e-mail and accommodation request and Benson's February 18 termination is sufficient to make out a prima facie case, but the inference is even stronger alongside HR Manager Gottwald's complete inaction in response to Benson's harassment claim. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (explaining that "temporal proximity must be 'very close' " to satisfy evidence of causality in prima facie case of retaliation); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997) (noting the "larger sequence of events" for the causation element). Rather than initiate some sort of investigation as required by Wal-Mart protocols, Gottwald elected not to act, even in the face of Bradstreet, the alleged harasser, attempting to fire Benson, her alleged victim.

Benson's first lawsuit, filed nearly one year prior to her termination, may be too remote to demonstrate any causation, but the inference from the January events is too strong to ignore, especially when dealing with as low a bar as a prima facie case. These pieces together are enough for Benson to make out a prima facie case. See Soileau, 105 F.3d at 16; accord Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988) (considering the entire sequence of events for causation questions).

**\*14** The January 20 e-mail is also critical. The district court relied on Pomales v. Celulares Telefónica, Inc., 447 F.3d 79 (1st Cir. 2006), to support its reasoning that because

the decisionmaker, Manager Bradstreet, was unaware of the e-mail, it could not be considered as the "but-for" cause of Benson's firing. The record, however, contains evidence indicating Bradstreet was not the only decisionmaker in Benson's termination process. Manager Bradstreet consulted HR Manager Gottwald, one of the recipients of the January 20 e-mail that complained about harassment.[12] HR Manager Gottwald recommended the matter be referred to Wal-Mart's legal team, who, according to HR Manager Gottwald, ultimately made the final decision to terminate Benson. In short, whether or not Bradstreet knew the contents of the e-mail is not fatal to Benson at this stage.

With the prima facie case in Benson's favor, we move on to the legitimate non-discriminatory reason and pretext aspects of the claim. Because we have already concluded that Benson can sustain an argument that Wal-Mart's proffered reason for her termination was pretextual, we need not go any further.

## IV. Conclusion

For the foregoing reasons, we reverse the district court's judgment entered on April 3, 2020, and remand for further proceedings consistent with this opinion. Costs awarded to Benson.

**All Citations**

--- F.4th ----, 2021 WL 4190222

## Footnotes

\*      Of the District of Puerto Rico, sitting by designation.

1      The piriformis is a "muscle that arises from the front of the sacrum, passes out of the pelvis through the greater sciatic foramen, is inserted into the upper border of the greater trochanter of the femur, and rotates the thigh laterally." Merriam-Webster's Medical Desk Dictionary 640 (2005).

2      The record is murky on how Wal-Mart informed employees of the Attendance Policy, but, at her deposition, Benson discussed her impressions and understanding of the policy and appears to have acknowledged that she understood it was in place when she returned to work. Also, Benson does not dispute that she knew the Attendance Policy was in effect in October 2016.
       Separately, all agree that the Attendance Policy was amended from the policy under which Benson had previously worked. The record does not contain great detail about the previous policy and the parties do not argue that the fact of a change is relevant to Benson's case here.

3      The Attendance Policy assigns: 1 "occurrence" for a full-day absence; .5 of an "occurrence" for a late arrival and early departures of between 10 and 120 minutes, and 1 occurrence for a late arrival or early departure of more than 120 minutes. Each "unauthorized" absence or instance of tardiness therefore results in a partial "occurrence" or one or more "occurrences." If an associate accumulates nine or more "occurrences" in a rolling six-month period, through any combination, the employee "will be subject to termination."

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

4    It is unclear from the text of the Attendance Policy whether those absences needed to be approved prior to their occurrence. As we will discuss, Benson and some Wal-Mart employees have different opinions as to whether the Policy requires *pre*-approval or mere eventual approval.

5    Benson considered the "Wal-Mart One" website to be confusing and noted that it did not offer a category for workers' compensation absences or tardies.

6    As discussed later, Benson proposed to the district court as an additional fact (though it reads more like an argument) that "workers' compensation" extended to missing work due to an illness caused by medication prescribed as *treatment* of a workers' compensation injury.

7    It is unclear from the record how this was communicated, if at all, and this information was not written in the Attendance Policy.

8    For purposes of clarity, we shall refer to all absences (full or partial) including late or early arrivals as "absences" rather than "occurrences" as they are described in the Attendance Policy.

9    An "M-1" form is a "Diagnostic Medical Report" completed by medical providers treating those with injuries sustained at work, whose treatment is covered by workers' compensation. The "M-1" form is required by the Maine Workers' Compensation Board. See 39-A M.R.S.A. § 208.

10   The MHRA was amended in 2019 to add "leaves of absence" to the list of accommodations in the statutory definition of "reasonable accommodation." 2019 Me. Legis. Serv. Ch. 464 (H.P. 1216) (L.D. 1701) (WEST). Although this amendment became law after the present case was filed, it bears no weight in our analysis. Following the fundamental rule of statutory construction, the Maine Law Court has held that "all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used." Morrill v. Me. Tpk. Auth., 983 A.2d 1065, 1067 (Me. 2009) (citing Terry v. St. Regis Paper Co., 459 A.2d 1106, 1109 (Me. 1983)). Similarly, the Supreme Court has held that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly" and thus " 'the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.' " Landgraf v. USI Film Products, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (citing Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). Neither of the exceptions detailed by the Maine Law Court are present here.

11   We note that it seems contradictory that Wal-Mart on the one hand argues that Benson was required to make a "direct and specific" request for leave of absence to comply with the Attendance Policy, yet also averred before the courts that leave of absence was not a "reasonable accommodation" under Maine law. We disavow Wal-Mart's "attempt[ ] to eat [its] cake and have it, too." State St. Bank & Tr. Co. v. United States, 313 F.2d 29, 31 (1st Cir. 1963).

12   Benson testified that she included HR Manager Gottwald on the e-mail complaining about Manager Bradstreet. Though Gottwald could not recall whether he had received the e-mail, Benson testified that she had sent it to him. Whether HR Manager Gottwald read the e-mail or not is a matter of credibility best suited for a jury. See Ahmed v. Johnson, 752 F.3d 490, 502 (1st Cir. 2014) ("Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly the task of a jury."); United States v. Sepúlveda-Hernández, 752 F.3d 22, 30 (1st Cir. 2014) ("[I]t is the jury's role—not the role of an appellate court—to determine the weight to be given to a witness's testimony and to assess the witness's credibility.").

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part U.S. E.E.O.C. v. Custom Companies, Inc., N.D.Ill., June 21, 2007

2007 WL 734395

United States District Court,

N.D. Illinois,

Eastern Division.

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, Plaintiff,

and

Catherine Copello and Allison
Kennedy, Plaintiffs-Intervenors,

v.

CUSTOM COMPANIES, INC.,
Custom Executive Group, Inc.
and CDN Logistics, Defendants.

Nos. 02 C 3768, 03 C 2293.

|

March 8, 2007.

**Attorneys and Law Firms**

Noelle Christine Brennan, Brennan & Monte, Ltd., Beth A. Miller, Pontikes & Garcia, Deborah Lois Hamilton, John C. Hendrickson, Richard John Mrizek, United States Equal Employment Opportunity Commission, Chicago, IL, for Plaintiff.

Martin K. Denis, Bethany A. Hilbert, Daniel R. Madock, Jessica E. Huebsch-Lynott, Maureen Kay Feldman, Barlow Kobata & Denis, Michael David Robbins, Michael D. Robbins & Associates, Chicago, IL, for Plaintiffs-Intervenors.

Diane E. Gianos, Bennett L. Epstein, Eric M. Phillips, James Daniel Dasso, Jason Robert Bent, Karen Ann Kawashima, Foley & Lardner, David A. Epstein, Attorney at Law, Chicago, IL, Daniel P. Colling, Walter B. Connolly, Jr., Foley & Lardner, Detroit, MI, for Defendants.

*MEMORANDUM OPINION AND ORDER*

HARRY D. LEINENWEBER, United States District Court Judge.

**\*1** The Equal Employment Opportunity Commission (hereinafter, "EEOC") and Plaintiff-Interveners Catherine Copello (hereinafter "Copello") and Allison Kennedy (hereinafter "Kennedy") (collectively, the "Plaintiffs") filed suit against Defendants Custom Companies Inc. (hereinafter, "Custom") and Custom Executive Group (hereinafter, "CEG") (collectively, the "Defendants") alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000 *et seq.* A jury found for the Plaintiffs on all but one count (Kimberly Fritkin's sexual harassment claim). Both Plaintiffs and Defendants filed post-trial motions. Due to the sheer number of motions (and issues) to be decided, the facts pertinent to each issue will be recited within the Court's analysis of that issue, rather than presented here.

**I. *JUDGMENT AS A MATTER OF LAW***

**A. Custom Executive Group As a Proper Party**

Defendants move for summary judgment and/or judgment as a matter of law as to CEG, arguing that Plaintiffs failed to fulfill a statutory prerequisite for suing CEG by failing to include CEG in the only EEOC charge. (Defendants move for summary judgment because this Court has reserved for itself the decision as to the status of CEG and Custom.) Copello's EEOC charge, the only EEOC charge filed by a plaintiff remaining in the case at trial, did not mention CEG.

A plaintiff may add an unnamed defendant if that party had adequate notice of the charge and had been given the opportunity to participate in conciliation proceedings. *See Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 905 (7th Cir.1981). Plaintiffs meet the *Eggleston* requirements. First, CEG was aware of the EEOC charge. CEG and Custom share an owner, a President, Vice-Presidents of Operations and Sales, and human resources officers. *See Eggleston,* 657 F.2d at 906 (overlap of board members between named and unnamed parties indicate that unnamed party was aware of EEOC charge). CEG employees Terry Klonowski (hereinafter, "Klonowski") and Tom Boyle (hereinafter, "Boyle") testified that they were aware of the charge. The charge alleges that Copello complained about "degrading sexist comments" to Perry Mandera (hereinafter,

"Mandera"), CEG's President and owner. Second, CEG had sufficient opportunity to participate in conciliation. "If a party has a close relationship with a named respondent ... and has actual notice of the EEOC charge ... to the extent that [the unnamed party] could have participated in conciliation efforts, the [unnamed party] should not be heard to cry 'foul' when later made a defendant in a suit." *Eggleston,* 657 F.2d at 907 (quoting *Stevenson v. International Paper Co.,* 432 F.Supp. 390, 397-98 (W.D.La.1977)). As in *Eggleston,* CEG's and Custom's close relationship necessarily suggests that CEG had sufficient opportunity to conciliate. Thus, Defendants' motion is denied.

**\*2** Defendants have also argued that CEG is not a single employer with Custom. This argument will be addressed in a later section.

## B. Kimberly Fritkin's Retaliation Claim

Defendants have moved for a directed verdict and/or judgment as a matter of law as to Kimberly Fritkin's (hereinafter, "Fritkin") retaliation claim because that claim was brought only as a piggyback (to Corinne Miller's claim) in the 2003 case. Fritkin filed no timely EEOC charge of her own. The EEOC counters that it brought the claim upon meeting Title VII's prerequisites to filing suit based on an administrative determination that a class of individuals was subjected to retaliation by Defendants.

The EEOC may seek relief on behalf of individuals who have not filed charges if it finds "reasonable cause to believe a valid charge was filed in a timely manner." *E.E.O.C. v. Harvey L. Walner & Associates,* 91 F.3d 963 (7th Cir.1996). No Seventh Circuit authority requires that the EEOC win on the merits of the timely filed charge. Indeed, "any violations that the EEOC ascertains in the course of a reasonable investigation ... are actionable." *E.E.O.C. v. Caterpillar, Inc.,* 409 F.3d 831, 833

(7th Cir.2005). Defendants' only case, *Bost v. Federal Express Corp.,* 372 F.3d 1233, 1241 (11th Cir.2004) is inapposite as it involves a suit filed by a plaintiff (on behalf of himself and a class) before filing the requisite EEOC charge rather than a suit filed by the EEOC on behalf of a class of individuals. *See, generally, Caterpillar,* 409 F.3d at 832 (distinguishing cases brought by the EEOC and those brought by private individuals). Thus, Fritkin's claim is not barred.

Next, Defendants move for judgment as a matter of law on Fritkin's retaliation claim, arguing that a legitimate lawsuit cannot be the basis for a retaliation claim. This Court has previously held that Fritkin met the second requirement of the *McDonnell Douglas* test because she suffered an adverse action by being sued and being forced to incur the expenses of hiring attorneys. *U.S. E.E.O.C. v. Custom Companies, Inc.,* 2006 WL 3087104 (N.D.Ill. Oct.26, 2006); *E.E.O.C. v. Custom Companies, Inc.,* 2004 WL 1638224 (N.D.Ill. July 21, 2004). Based on the evidence at trial, a reasonable jury could have determined that Defendants' lawsuit was retaliatory; Defendants ignored Fritkin's purported debt until after the EEOC filed suit and filed the suit only after Defendants failed to have Fritkin removed from the class. Custom has never filed a similar suit against any of its previous sales representatives. *See, Equal Employment Opportunity Commission v. Levi Strauss & Co.,* 515 F.Supp. 640, 644 (N.D.Ill.1981) ("those suits initiated in state court in good faith ... are not necessarily violations of the Act ... the Commission must demonstrate that the action was filed for improper, *i.e.,* retaliatory, purposes").

## II. *DAMAGES*

## A. Damages Awarded by the Jury

**\*3** The following damages were awarded by the jury:

|  |  | Compensatory | Punitive |
|---|---|---|---|
| Catherine Copello | (harassment) | $ 100,000 | $ 1,000,000 |
|  | (retaliation) | $ 60,000 | $ 300,000 |
| Allison Kennedy | (harassment) | $ 50,000 | $ 500,000 |
|  | (retaliation) | $ 35,000 | $ 150,000 |
| Kimberly Fritkin | (harassment) | ____ | ____ |

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

| (retaliation) | ___ | $ 100,000 |
|---|---|---|
| (attorney fees) | $ 60,000 | |

principles. As such, this Court will apply a per suit, per plaintiff cap.

**B. Compensatory and Punitive Damages**

*1. § 1981a Statutory Caps*

The parties agree that the compensatory and punitive damages are limited by the statutory caps set forth in § 1981a.

*a. Caps Apply Per Plaintiff, Per Suit*

The parties dispute whether the caps apply per plaintiff or per claim. In *Smith v. Chicago School Reform Bd. of Trustees,* 165 F.3d 1142 (7th Cir.1999), the Seventh Circuit considered whether a Plaintiff could apply the caps on a per-claim basis, thus recovering up to the cap maximum on each of three racial discrimination counts. The Seventh Circuit held that the caps applied on a per-lawsuit, per-plaintiff basis: "the unit of accounting is the litigant, not the legal theory." In response to the Plaintiff's argument that this result would lead creative lawyers to file multiple suits, the Court responded:

> "The same-transaction rule developed in the law of preclusion holds out more prospect of giving a practical answer to that question than does any other approach we can envisage. It permits persons who have been victimized multiple times (and separately injured by each discriminatory episode) to recover more than persons who have suffered only once, which is as it should be; but it also recognizes that a single discriminatory 'transaction' may include many nasty events."

Plaintiffs argue that because the EEOC brought two separate class lawsuits, one for harassment (Case No. 02 C 3768) and one for retaliation (Case No. 03 C 2293), the caps should apply per plaintiff and per lawsuit. The cases were combined only for purposes of judicial efficiency. The Seventh Circuit specifically acknowledged that plaintiffs might split their claims into separate suits to take advantage of more than one cap in *Smith;* it responded that so long as the second suit did not run afoul of claim preclusion considerations, a single plaintiff could take advantage of two statutory caps in this manner. The two suits here arose out of different transactions, and thus, Plaintiffs have not run afoul of claim preclusion

*b. Relevant Time Periods*

The relevant time periods in a Title VII action are the time periods in which discriminatory conduct occurred. *See* 42 U.S.C. § 1981(b); *Komorowski v. Townline Mini-Mart and Restaurant,* 162 F.3d 962, 965 (7th Cir.1998). Plaintiffs suggest that the relevant years are 1994-1999 (Copello was harassed between 1994 and 1999), 1998-1999 (Copello was retaliatorily denied quotes in 1998 and terminated in 1999), 1998 (Kennedy was harassed and retaliatorily terminated in 1998), and 2004 until the present (Fritkin was retaliatorily sued in 2004 until the present). Defendants contend that the relevant time period for Fritkin is only 2004 because the suit was initiated in 2004, and that no retaliatory actions were taken thereafter. Although Defendants did not undertake any new retaliatory actions after 2004, their initial retaliatory action was ongoing. As such, this Court will consider 1994-1999, 1998-1999, 1998, and 2004 until the present as the relevant periods.

*c. Number of Employees*

**\*4** To determine the number of employees employed by a company for the purposes of the § 1981a caps, a court must determine the number of employees employed in each of twenty or more calendar weeks in the relevant period. 42 U.S.C. § 1981a(b)(3). Plaintiffs assert that Defendants employed more than 200, but fewer than 501 employees, in each of the relevant time periods, which places the applicable statutory caps at $200,000. 42 U.S.C. § 1981(b). Defendants assert that they employed fewer than 101 employees in 1999 (a $50,000 cap), slightly more than 101 employees in 1998 (a $100,000 cap), and less than 100 employees in 2004 (a $50,000 cap). *Id.* Plaintiffs' and Defendants' differing numbers are due to a dispute over which employees count: Plaintiffs assert that this Court should count (1) Custom employees, (2) CEG employees, and (3) Custom and CEG's leased employees, whereas Defendants argue that this Court should consider only Custom employees.

i. Custom Companies Employees

The parties agree that this Court should count the employees employed by Custom Companies. Custom Companies employed 109 employees for a twenty-week period in 1998, 72 employees for a twenty-week period in 1999, and 91 employees for a twenty-week period between 2004 and 2006.

ii. CEG Employees

Defendants assert that this Court cannot consider employees of CEG when determining the caps because CEG is not a single employer with Custom under the test set forth in *Papa v. Katy Industries, Inc.,* 166 F.3d 937 (7th Cir.1999). *Papa* considered whether a parent corporation's employees could be counted so that the aggregate number of employees for the plaintiff's employer and the parent corporation exceeded the minimum of fourteen required for recovery under Title VII. *Id.* The Seventh Circuit set out three specific situations in which a company may be considered a single employer with another: (1) where traditional "piercing the veil" conditions exist; (2) where an enterprise has split itself up for the express purpose of avoiding liability under the discrimination laws; or (3) where the second corporation has directed the complained of act, practice, or policy. Defendants assert that Plaintiffs cannot meet these tests, primarily because CEG is not Custom's parent corporation. Plaintiffs assert that the companies need not be in a parent-subsidiary relationship for *Papa* to apply, and that Custom and CEG meet the first and third *Papa* prongs.

While *Papa* clearly involved a parent-subsidiary relationship, the Seventh Circuit has applied its test to situations involving affiliated corporations. *Worth v. Tyer,* 276 F.3d 249, 259-260 (7th Cir.2001); *see also, Shannon v. Hotel Employees and Restaurant Employees Intern' Union,* 2003 WL 1338457 (N.D.Ill. Mar.18, 2003). In *Worth,* the plaintiff was employed by one corporation that was closely affiliated with four other corporations. Plaintiffs sought to aggregate the various corporations' employees, and the Seventh Circuit applied the *Papa* test to find that the corporations did not meet any of the prongs. *Id.* 276 F.3d at 259-260 (finding one affiliated corporation liable as a successor in interest). Clearly, the *Papa* test applies to this case, despite the fact that CEG is not Custom's parent corporation.

**\*5** Plaintiffs argue that it can meet the first and third situations identified in *Papa.* Because this Court finds that Plaintiff meets the third of the *Papa* requirements, it will not consider the first. *See Shannon,* 2003 WL 1338457 at \*5. Under this test, Plaintiffs must demonstrate that CEG directed the complained of act, policy, and procedure. *Id.* CEG employed all executives and management-level personnel and at Custom, including harassers Tom Kolzow (hereinafter, "Kolzow") and Mike Maher (hereinafter, "Maher"). Klonowski, who is responsible for Custom's compliance with Title VII, is a CEG employee. Mandera, who was involved in the decisions to retaliatorily terminate Copello and Kennedy and to sue Fritkin, is an employee of CEG. Thus, this Court finds that CEG is properly a single employer with Custom.

As such, this Court must determine the number of employees employed by CEG during 1994-1999, 1998-1999, 1998, and 2004 to the present. The EEOC's and Plaintiff-Intervenors' proposed numbers do not agree; the EEOC claims that CEG employed 19 in 1998, 18 in 1999, and 22 from 2004 to 2006 whereas Plaintiff-Intervenors claim that CEG employed 23 at all relevant times. The disagreement appears to stem from reliance on different sources-the EEOC cites to CEG's payroll records whereas Plaintiff-Intervenors cite to Steve Laue's Rule 30(b)(6) testimony. This Court recognizes that the discrepancies will not affect the outcome and thus employs the lower of the figures. (See table below).

iii. Leased Employees

Lastly, Defendants assert that this Court should not consider leased employees when determining the cap amounts. Between 1995 and 2006, Defendants leased employees from a series of companies, including LeaseCo, Innovative Benefits Concepts (hereinafter, "IBC"), and Transportation Personnel Services, Inc. (hereinafter, "TPS"). These employees were not paid by Custom or CEG, but Plaintiffs assert that they should be counted because Defendants exercised sufficient control over them.

As an initial matter, Defendants argue that employees of LeaseCo, IBC, and TPS should not be counted because these entities were not mentioned in Copello's EEOC charge, the complaints, or the joint pre-trial order, and because Plaintiffs seek to raise a new theory of liability against these entities. Plaintiffs are not seeking to assert liability against these companies. Instead, Plaintiffs merely argue that these entities'

Case: 1:17-cv-00070-WCG   Filed: 10/15/21   Page 17 of 47   Document 261-9

employees were sufficiently controlled by Defendants that they should count for the statutory caps. As such, these entities need not have been mentioned in the EEOC charge, complaints, or pre-trial order. Defendants' reliance on *Parrish v. Solecito,* 280 F.Supp.2d 145 (S.D.N.Y.2003), for the proposition that Plaintiffs attempt to aggregate the leased employees too late, is inappropriate. *Parrish* involved a Plaintiff who belatedly attempted to aggregate employees of several separate entities merely because these entities were owned by the same individual, there was some overlap between employees of the various entities, and the entities shared certain support services. Here, rather, Plaintiffs seek to aggregate employees who, for all intents and purposes, worked for Custom.

**\*6** Next, Defendants argue that LeaseCo, IBC, and TPS are not joint employers with Custom, the Seventh Circuit no longer espouses the joint employer theory, and, even if Plaintiffs successfully asserted a joint employer theory, the employees of the companies cannot be aggregated. Defendants correctly point out that the Seventh Circuit cases cited by Plaintiffs concern joint employer theories where the plaintiff, usually a temporary employee, is officially employed by one employer, the temporary agency, and seeks to sue the employer where she was placed by the agency (the placement employer, not the temporary agency, engaged in discrimination). *See, e.g., Piano v. Ameritech/SBC,* 2003 WL 260337 (N.D.Ill. Feb.5, 2003); *Kerr v. WGN Continental Broadcasting Co.,* 229 F.Supp.2d 880, 885-86 (N.D.Ill.2002). Plaintiffs here seek a joint employer theory not in order to sue the discriminator, but in order to arrive at a more accurate count of the employees who worked for the discriminator. Although the validity of a joint employer theory is in doubt, the Seventh Circuit has not held that aggregation is improper. *See Piano,* 2003 WL 260337; *U.S. E.E.O.C. v. Foster Wheeler Const., Inc.,* 1999 WL 515524 (N.D.Ill. July 14, 1999).

Several other jurisdictions have allowed aggregation of the kind sought here (or suggested that it would be allowed in the proper circumstances). *Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976 (10th Cir.2002) (considering whether temporary workers were sufficiently controlled as to be aggregated); *Virgo v. Riviera Beach Associates, Ltd.,* 30 F.3d 1350, 1361 (11th Cir.1994) (hotel and contractor were properly considered joint employers and that aggregation of employees was appropriate); *Burdett v. Abrasive Engineering & Technology, Inc.,* 989 F.Supp. 1107 (D.Kan.1997) (plaintiff could aggregate employees of staffing agency, as long as those employees were staffed with the employer and

employer exercised sufficient control over the employees); *Stone v. Indiana Postal & Federal Employees Credit Union,* 2005 WL 2347226 at \*2-4 (N.D.Ind. Sept.25, 2005) (plaintiff attempts to aggregate committee members based on argument that they are like temporary employees, but fails because committee members are not employees at all); *Arculeo v. On-Site Sales & Marketing, LLC,* 425 F.3d 193 (N.Y.2005) (suggesting that a plaintiff may aggregate employees of a joint employer, but only if the "loaned" employees are jointly employed; plaintiff did not make this showing); *EEOC Compliance Manual § 2-III(B)(1)(a)(iii)(b)* (giving example where plaintiff sues corporation with thirteen regular employees and five temporary employees; corporation is covered by Title VII because it has eighteen employees).

This Court believes that aggregation of sufficiently controlled temporary or leased employees is the correct conclusion. Not permitting a plaintiff to aggregate sufficiently controlled temporary or leased workers would work an injustice. It would artificially deflate an employer's number of employees, thereby artificially limiting a Title VII plaintiff's recovery under the statutory caps, and in some cases, entirely precluding recovery under Title VII. If the caps exist to protect small employers from excessive liability, they necessarily equate number of employees with an employer's size and ability to pay. Whether an employer employs workers via its own payroll, or hires these employees through an employment agency or other joint employer, it seems that these workers should count in an assessment of the employer's size and ability to pay (assuming, of course, sufficient control has been exercised by the employer over these workers). After all, courts will look to "the conventional master-servant relationship as understood by common law agency doctrine" to determine who is an employee under Title VII because the definition of "employee" is unhelpful and circular. *See Brown v. City of North Chicago,* 2006 WL 1840802 at \*5 (N.D.Ill. June 28, 2006) (considering whether plaintiff is employee or independent contractor). Allowing an employer to avoid increased liability simply by employing workers through a third party would distort the application of the caps.

**\*7** That is not to say, however, that any or all temporary or leased employees should be aggregated. Instead, only those workers over whom the employer has a certain amount of control should be counted. *See Piano,* 2003 WL 260337; *Burdett,* 989 F.Supp. 1107. In *Piano,* where a temporary employee sought to sue his placement employer, the court used a five-part test to determine if the placement employer was a joint employer with the temporary agency. *Piano,* 2003

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   5

WL 260337 at *5 (importing the test from the independent contractor/employee context). Thus, this Court will consider the following five factors: "(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) method and form of payment and benefits; and (5) length of job commitment and/or expectations." *Id.* The first factor is the most important. *Id.*

LeaseCo and IBC employees were sufficiently controlled by Custom to have their employees aggregated. LeaseCo and IBC provided dispatch, dock operations, drivers, and mechanics to Custom (but primarily drivers and dock operations workers). Custom maintained control of these workers; they interviewed employees before they were placed with Custom and provided all equipment with which they worked. Custom, furthermore, supervised the employees' supervisor and provided personnel files, performance reviews, discipline, and made these employees eligible for employee of the month rewards. These employees received a Custom handbook and Custom ran their training. Although the employees were paid by LeaseCo and IBC, the employees were eligible for Custom health benefits and Custom approved salary changes. The employees worked in Custom facilities and drove trucks provided by Custom. Additionally, Terry Klonowski arranged for some LeaseCo employees to remain with Custom through IBC.

Defendants argue that LeaseCo and IBC are separate companies and provide the same services now provided to Custom by CDN Logistics. This Court has held that CDN Logistics is not a single employer with Custom and therefore granted summary judgment in its favor. LeaseCo and IBC do not "play the same role" as Defendants claim; CDN Logistics now employs TPS to fill the role previously played by LeaseCo and IBC. LeaseCo and IBC are separate companies; they have their own phone and fax numbers, have separate business facilities from Custom, maintain their own financial and business records, and share no bank loans or credit lines with Custom. Essentially, Defendant argues that LeaseCo and IBC should be characterized as vendors, rather than joint employers (or temporary agencies), and that their employees therefore should not be aggregated. These arguments do not change the facts laid out above or that Custom asserted sufficient control over LeaseCo and IBC employees such

that these employees should be aggregated. Instead, these arguments go to what Plaintiffs freely admit: that LeaseCo and IBC are separate and distinct companies from Custom.

**\*8** The number of employees employed by LeaseCo and IBC and controlled by Custom appears to be in dispute between the parties. Plaintiffs suggest that the number was 100 at all relevant times, drawn from a statement made during Klonowski's deposition. Defendants contest this number in their sur reply (but not in their response) but offer no suggestion as to the proper number. Prior to very recently, Defendants had steadfastly refused to turn over records from which the proper number could be extrapolated, arguing that the leased employees could not be aggregated and that the records were irrelevant. This Court believes that Defendants had an obligation to do more than merely assert that Plaintiffs got it wrong. As such, this Court will deem the number to be 100.

This Court, however, does not believe that Custom had sufficient control over TPS employees such that they may be aggregated. The facts regarding TPS' relationship with CDN Logistics and Custom are somewhat sketchier than those regarding IBC's and LeaseCo's, and many of the facts important for the control test are not clear. Additionally, TPS is on a different footing with Custom because TPS employees work directly for CDN Logistics and/or Custom Global Logistics, not Custom. TPS employees received Custom employee handbooks. After IBC stopped providing employees, many of these same employees remained under TPS because either CDN Logistics or Klonowski arranged for their transition. Before TPS placed employees with CGN Logistics and/or Custom Global Logistics, they were interviewed, but it is unclear which entity interviewed them. There has been no information regarding TPS employees' eligibility for health benefits or employee of the month awards put before this Court. Furthermore, there is no information regarding approval of salary changes, discipline, or the maintaining of personnel files for these workers. The leased TPS employees are relevant only to the cap in Fritkin's retaliation claim; even if they are not aggregated, the jury's punitive award does not exceed the statutory cap. As such, the status of the TPS employees is irrelevant.

iv. Number of Employees and Applicable Statutory Caps

Based on the foregoing, the number of employees in the relevant years of 1998, 1999, and 2004 to the present are:

|  | Custom | CEG | Leased | Total | Cap |
|---|---|---|---|---|---|
| Copello Retaliation (1998-99) | 109 | 19 | 100 | 228 | $ 200,000 |
| Copello Sex Harassment (1994-1999) | 109 | 19 | 100 | 228 | $ 200,000 |
| Kennedy Retaliation (1998) | 109 | 19 | 100 | 228 | $ 200,000 |
| Kennedy Sex Harassment (1998) | 109 | 19 | 100 | 228 | $ 200,000 |
| Fritkin Retaliation (2004-2006) | 91 | 22 | None | 113 | $ 100,000 |

See § 1981a.

## 2. Compensatory Damages

Compensatory and punitive damages together must comply with the § 1981a caps. The Seventh Circuit suggests that the preferred method for reducing awards is to leave compensatory damages intact and lower punitive damages as necessary to bring the total under the cap (rather than reducing the compensatory damages or reducing both *pro rata). See Lust v. Sealy, Inc.,* 383 F.3d 580, 589 (7th Cir.2004). This Court need not reduce the compensatory damages awarded by the jury, as each award is less than the applicable § 1981a statutory caps.

**\*9** Defendants assert that compensatory damages should be reduced to nominal compensatory damages. Specifically, Defendants argue that compensatory damages of only $1.00 are appropriate because the Plaintiffs offered only their own self-serving testimony that they had been emotionally troubled by events at Custom, and this testimony did not reach the requisite level of detail.

A court must give substantial deference to a jury's calculation of compensatory damages, but must also "ensure that the award is supported by competent evidence." *Farfaras v. Citizens Bank & Trust Co. of Chicago,* 2005 WL 670523 at *4 (N.D.Ill. Mar.21, 2005). When reviewing a compensatory award, a court makes three inquiries: "whether the award is 'monstrously excessive;' whether there is no rational connection between the award and the evidence ...; and whether the award is roughly comparable to awards made in similar cases." *Id.*

After reviewing the record, this Court concludes that the compensatory awards are not "monstrously excessive" and

are rationally related to the evidence presented. There was evidence that Copello and Kennedy were subjected to repeated sexually explicit comments and jokes as well as (in Kennedy's case) inappropriate touching by Custom and CEG employees. This behavior did not stop, despite complaints. There was also evidence that Copello and Kennedy were fired shortly after either making complaints or having a complaint made for them, and that Mandera threatened Copello that she would not work again in the industry. Additionally, both Copello and Kennedy testified to the emotional harm she suffered as a result of Defendants' actions.

Furthermore, this Court notes that the jury's awards appear internally consistent: more was understandably awarded to Copello than to Kennedy, as Copello was subjected to the Custom environment longer. While courts do not normally consider internal consistency in determining if a compensatory award is monstrously excessive, this Court believes that the internal consistency is further proof that the award was not the "product of the jury's fevered imaginings or personal vendetta." *See, U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1285 (7th Cir.1995).

Title VII plaintiffs are not required to present medical evidence of emotional injury. *Farfaras v. Citizens Bank and Trust of Chicago,* 433 F.3d 558 (7th Cir.2006) at 566. If, however, the plaintiff provides the sole evidence of mental distress, he must reasonably and sufficiently explain the circumstances of his injury, and not merely make conclusory statements. *Biggs v. Village of Dupo,* 892 F.2d 1298, 1304 (7th Cir.1990). The Seventh Circuit does not require that claims of emotional injury be supported by corroborating testimony. *Niebur v. Town of Cicero,* 212 F.Supp.2d 790, 822 (N.D.Ill.2002). Additionally, because "emotional damages are difficult to describe, it will often suffice to describe their causes, and appeal to the jury's understanding of what it would be like to have to endure such abuse." *Id.* Defendants argue that Copello's and Kennedy's

Case: 1:17-cv-00070-WCG  Filed: 10/15/21  Page 20 of 47  Document 261-9

testimony was insufficiently detailed to support the jury's award. In *Biggs*, and in *Nekolny v. Painter,* 653 F.2d 1164, 1172-73 (7th Cir.1981), the Seventh Circuit reversed a jury's compensatory damages award because the plaintiff merely made "a single statement" that he was "depressed" or "a little despondent." *Biggs,* 892 F.2d at 1305. Despite the fact that Plaintiffs did not present testimony from a medical expert or corroborating testimony, their testimony was sufficient to support the jury awards. Both Copello and Kennedy testified to emotional harm in greater detail than was the case in *Biggs* or *Nekolny* and to sufficient abuse and retaliation from which the jury could infer what it would be like to suffer such abuse (as *Neibur* suggests). Copello testified that she did not enjoy hearing sexually explicit conversations in sales meetings and felt ashamed when hearing them; that she was humiliated, afraid, embarrassed, and felt like "two cents" by the ongoing betting that she would sleep with George Wiszowaty (hereinafter, "Wiszowaty"); that she felt ashamed and embarrassed when forced to go to the Crazy House (a place of adult entertainment); that she felt "pretty worthless" and was shocked and embarrassed at golf outings that included strippers; that she felt horrified when looking at pictures from these golf outings; that she felt terrified after Kennedy was fired; that she felt nervous and uncomfortable having to listen to Wiszowaty while sitting in her cubicle; etc. Kennedy testified that she felt that she didn't know what she was getting herself into when Kolzow referred to women as "bitches and cunts"; she was absolutely ill when going to work knowing she would have to see Maher; that she was upset and could not concentrate after Maher grabbed her on the Rockford sales call; that she did not want to go into work, but did not quit because she needed the job; that she was terrified and very scared, that she was thoroughly embarrassed when she observed Wiszowaty fondling his girlfriend's breasts at the United Center; that she felt shattered when fired and told to leave within 15 minutes; etc. The jury was able to observe both women while they testified and apparently found their testimony to be sincere and sufficient to convince them that they merited the amounts awarded. *See Tullis v. Townley Engineering and Mfg. Co., Inc.,* 243 F.3d 1058, 1068 (7th Cir.2001).

**\*10** The awards in this case are roughly comparable to awards in other Title VII cases. *See, Lampley v. Onyx Acceptance Corp.,* 340 F.3d 478, 484 (7th Cir.2003) (upholding $75,000 award for retaliatory discharge); *Tullis,*

243 F.3d at 1068 (upholding $80,000 award for retaliatory discharge); *Neal v. Honeywell, Inc.,* 191 F.3d 827 (7th Cir.1999) ($200,000 for emotional damages); *Farfaras,* 2005 WL 670523 (upholding $200,000 award for sexual harassment). As this Court stated in *Farfaras,* "[t]his is not a case of an isolated comment or action. Plaintiff testified that Defendants, who each held positions of power ... harassed her on repeated occasions." 2005 WL 670523 at \*4. Thus, this Court will not reduce the compensatory damages awards.

### 3. Punitive Damages

#### a. Appropriateness

As an initial matter, Defendants argue (but only in their reply brief) that Plaintiffs have not made the requisite showing for punitive damages to have been awarded. Punitive damages may be awarded in Title VII cases where the plaintiff demonstrates that his employer engaged in a discriminatory practice "with malice or reckless indifference to the [plaintiff's] federally protected rights." *Kolstad v. American Dental Ass'n.,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). *Kolstad* established a three-part framework for determining whether punitive awards were appropriate: the plaintiff must establish that (1) the employer acted with knowledge that its actions may have violated federal law and (2) the employees who discriminated against him are managerial agents acting within the scope of their employment; and the employer can avoid liability for punitive damages if it can show (3) that it engaged in good faith efforts to implement an anti-discrimination policy. *Bruso v. United Airlines, Inc.,* 239 F.3d 848 (7th Cir.2001). This Court believes that the evidence was sufficient to enable a reasonable jury to determine that Custom was recklessly indifferent to the Plaintiffs' federally protected rights.

#### b. Copello and Kennedy

This Court must reduce the punitive damages awarded by the jury to fit within the § 1981a caps. As the Court has upheld the compensatory damages, the following reductions in the punitive damages must be made to comply with the caps:

| | | Jury Award | Cap Compliant Award |
|---|---|---|---|
| Copello | (harassment) | $ 1,000,000 | $ 100,000 |

| | | | |
|---|---|---|---|
| | (retaliation) | $ 300,000 | $ 140,000 |
| Kennedy | (harassment) | $ 500,000 | $ 150,000 |
| | (retaliation) | $ 150,000 | $ 150,000 |

Now, the court must determine whether the remaining punitive damage awards are excessive. *See Lust,* 383 F.3d at 589-590 (7th Cir.2004) (first reducing punitive damages to comply with cap and then considering whether they are excessive).

One of the purposes of punitive damages in the employment discrimination context is to "dissuade defendants who are unaffected by compensatory damages from the misapprehension that they are beyond the reach of civil penalties." *Farfaras,* 433 F.3d at 567. To determine whether a punitive damage award is excessive, a court considers the following three guideposts: "(1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Kapelanski v. Johnson,* 390 F.3d 525, 534 (7th Cir.2004) (citing *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). A punitive damages award must not "exceed what is necessary to serve the objectives of deterrence and punishment." *AIC Security,* 55 F.3d at 1287.

**\*11** Defendants' actions were reprehensible. There was evidence of repeated touching (in Kennedy's case), sexually explicit comments and jokes, sexual advances, and a sexually-charged atmosphere. There was also evidence that Kennedy was fired immediately after Copello complained to Klonowski about her treatment and that Defendants extensively monitored, took accounts away from, and eventually fired Copello after she complained. The harassment came from employees in positions of power over Copello and Kennedy. *See Farfaras,* 2005 WL 670523 at \*5; *BMW,* 517 U.S. at 576-77.

There is, however, some disparity between the harm suffered by the plaintiff and the punitive awards. After applying the caps, the awards are not internally consistent: Kennedy receives greater punitive awards than Copello (while the reverse is true of the jury's original awards), even though Copello endured the Custom environment for four years and received greater compensatory damages. However, this Court believes that such distortion will necessarily occur

where the caps are applied to awards that exceed the cap amounts. As the Seventh Circuit has stated, "[r]eflecting our general deference to jury verdicts, we have never required the district court to adjust a jury's punitive verdict so that it is proportional, in the court's view, to the defendant's wickedness." *Lampley,* 340 F.3d at486 (citing *Caudle v. Bristow Optical Co. Inc.,* 224 F.3d 1014, 1028 (9th Cir.2000)).

A court will "not normally" disturb an award of damages at or under the statutory cap, "as this decision is largely within the province of the jury." *Fine v. Ryan Intern. Airlines,* 305 F.3d 746 (7th Cir.2002). As such, the statutory maximum permitted by the caps is not reserved for only the most egregious cases. *Lampley,* 340 F.3d at 486. The evidence in this case supported a finding that Defendants engaged in prolonged sexual harassment (both verbal and physical) and then retaliated against Copello and Kennedy when they dared to complain. It is also possible that the jury found large punitive damages awards necessary to ensure that Defendants "sat up and took notice." *Id.* at 486.

Additionally, these awards are comparable to awards made in other cases. *See id.* at 486 (upholding $270,000 punitive damage award); and *AIC Sec. Investigations,* 55 F.3d 1276 ($150,000 punitive award upheld). The punitive damages (once reduced by the caps) range from $100,000 to $165,000. Thus, this Court will not disturb the jury's punitive awards.

### c. Fritkin

Defendants also argue that Fritkin's punitive damage award was excessive. Fritkin's award need not be reduced in order to comply with the statutory cap, as it was initially only $100,000. As noted above, a court will "not normally" disturb an award of damages at or under the statutory cap, "as this decision is largely within the province of the jury." *Fine,* 305 F.3d 746. Defendants' conduct was reprehensible; evidence was presented at trial that Defendants ignored Fritkin's alleged obligation until after Fritkin filed suit. A $100,000 award is in proportion to the harm the jury believed Fritkin suffered (the attorney's fees). A $100,000 award also is comparable to other sexual harassment cases. *See Lampley,*

340 F.3d at 486 (upholding $270,000 punitive damage award); *AIC Sec. Investigations,* 55 F.3d 1276 ($150,000 punitive award upheld). Thus, this Court upholds the jury's punitive award.

## C. Fritkin's Attorney Fees Award

**\*12** Defendants also seek a reduction of the jury award of $60,000 for Fritkin's attorney's fees incurred in the state action. A court may disturb a jury's damage award where there is no rational connection between the award and the evidence. *See Trytko v. Hubbell, Inc.,* 28 F.3d 715, 727 (7th Cir.1994). At trial, Fritkin's attorney testified that he had accumulated $32,000 of fees in defending the state court suit. The jury, however, awarded Fritkin $60,000 for attorney's fees. There appears to this Court no rational connection between the award and the evidence, and thus, the award is hereby reduced to $32,000.

## D. Back Pay and Front Pay

### *1. Back Pay*

Under Section 706(g) of Title VII, back pay relief is an important part of Title VII's objective to deter unlawful employment practices. *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Under *Albermarle,* back pay should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making the person whole for injuries suffered through past discrimination." *Id.* at 418.

Back pay is calculated by "measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by the defendant." *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 606 (7th Cir.1985). Back pay awards include all fringe benefits. *Hathaway v. New Dimension Center for Cosmetic Surgery,* 2006 U.S. Dist. LEXIS 6789 (N.D.Ill.2002). This process is speculative, and therefore, the calculation need not be precise; exactness is not expected. *Horn,* 755 F.2d at 606-08. "Ambiguities in what an employee ... would have earned but for the discrimination should be resolved against the discriminating employer." *Steward v. General Motors Corp.,* 542 F.2d 445, 452 (7th Cir.1976).

Liability for back pay begins at the time that the harassment causes economic injury, but may not accrue from a date more than two years prior to the filing of a charge with the Commission. When the plaintiff obtains comparable or higher paying employment, back pay terminates. *Smith v. America Service Co. of Atlanta, Inc.,* 796 F.2d 1430 (11th Cir.1986).

In addition to their arguments regarding Copello and Kennedy's specific situations, Defendants argue that Copello and Kennedy failed to provide information regarding unemployment benefits and that their back pay awards, if any, should be reduced by any unemployment they received. It is within this Court's discretion to offset unemployment awards. *See E.E.O.C. v. O'Grady,* 857 F.2d 383, 390 (7th Cir.1988); *Doherty v. Crow,* 2001 WL 722090 (S.D.Ind. Apr.20, 2001). Deducting the unemployment benefits Plaintiff-Intervenors received from the amount of back pay owed to them by Defendants "provide[s] [Defendants] with a windfall in exchange for its discriminatory actions." *Hathaway v. New Dimension Center for Cosmetic Surgery,* 2006 WL 1594060 (N.D.Ill., 2006) at *3. Not deducting the benefits, conversely, confers a windfall on plaintiffs. *See Doherty,* 2001 WL 722090. As the Doherty court reasoned, "because the employee is the victim of unlawful discrimination, he or she is 'the logical choice' " to receive the windfall. *Id.* at *16; *see also Hathaway,* 2006 WL 1594060 at *3. Thus, neither award will be offset by unemployment benefits.

**\*13** Defendants also argue that in the time since they left Custom, both Copello and Kennedy have had children, and that to the extent that they were or would have been on maternity leave or other disability they should not be able to recover from Defendants. Defendants suggest that this Court reduce any award made to both Plaintiff-Intervenors by the equivalent of 12 weeks unpaid leave for these children. When determining the proper award of back pay, a court must take care not to put the plaintiff in a better position than she was before termination. *Hathaway,* 2006 WL 1594060 at *2. Plaintiff-Intervenors have not provided any information suggesting that they would not have taken twelve weeks of leave or that they had vacation time accumulated such that some of that time would have been paid. *See id.* However, Copello's submissions regarding unreimbursed medical expenses for a miscarriage on June 19, 2000 preclude the possibility that she would have needed maternity leave during her February 1, 2000 to June 31, 2000 back pay period. As such, this Court will deduct from Kennedy's back pay

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

award the equivalent of twelve weeks of pay: $12,692.31 (based on a salary of $55,000 per year).

*a. Copello*

Copello requests back pay damages in the amount of $39,126.00, broken down as follows: (1) $3,000 in lost car allowance ($500 monthly between February 1, 2000 and July 30, 2000); (2) $1,957 in lost 401(k) contributions(between February 1, 2000 and November 17, 2006); (3) $256 in lost profit-sharing contributions (between February 1, 2000 and November 17, 2006); (4) $7,072 in lost pay due to the $5,000 reduction in her salary (between September 12, 1999 and January 31, 2000); (5) $18,066 in lost pay between February 1, 2000 and July 31, 2000; and (6) $8,775 in unreimbursed medical expenses incurred between February 1, 2000 and July 31, 2000. (This request reflects a revised request submitted by Plaintiff-Intervenors after this Court requested additional information regarding unemployment, 401(k) contributions, and severance pay). This request accounts for Copello's severance package and the fact that Copello earned more money in another job as of August 1, 2000. Defendants apparently do not object to the $3,000 in lost car allowance, the $7,072 in lost pay due to the $5,000 reduction in Copello's salary, or basing Copello's back pay award on her $45,000 salary. The lost car allowance constitutes a fringe benefit properly included in the back pay award. This Court believes that there was ample evidence at trial that the $5,000 salary reduction was retaliatory in motive; therefore, Copello should be repaid this amount for the time she was still employed by Custom and her back pay award should be calculated based on this amount. Additionally, Defendants do not object to the $18,066 figure in lost pay, and this Court believes that this is the proper amount.

Copello also requests a total of $2,213 in lost 401(k) contributions (calculated based on Custom's matching contribution for the period ending January 19, 2000) and lost profit sharing (calculated based on Custom's contribution for the period ending January 19, 2000) between February 1, 2000 and November 17, 2006. (This figures vary dramatically from Copello's initial request for lost 401(k) contributions-approximately $22,000 over the same time period.) Copello's subsequent employment did not provide 401(k) contributions. Thus, this Court grants Copello's request for $1,638 in 401(k) contributions. This Court, however, denies Copello's request for $256 in lost profit sharing, as Copello fails to provide any

indication of whether she received profit-sharing benefits in her subsequent employment.

**\*14** In a supplemental request for back pay, Copello seeks an additional $8,775 in unreimbursed medical expenses incurred between February 1, 2000 and July 31, 2000. Health insurance benefits are fringe benefits properly included in a back pay award. *Hathaway,* 2006 U.S. Dist. LEXIS 6789. In order to recover for lost insurance coverage, a plaintiff must show that she either incurred expenses in securing alternative insurance coverage or incurred medical expenses that would have been covered under the employer's insurance program. *Kossman v. Calumet County,* 800 F.2d 697, 703-04 (7th Cir.1986); *see also Kolovitz v. Brokers Title Ins. Co.,* 2004 WL 1199775 at \*4 (N.D.Ill. June 1, 2004) (test requires that plaintiff demonstrate *both* that she was unable to secure alternative coverage *and* incurred a medical expense). Copello has not even addressed whether she secured, attempted to secure, or attempted and failed to secure medical coverage on her own. Although Copello apparently incurred medical expenses that she paid out of pocket, she merely asserts in her brief that these would have been covered under the Custom insurance plan. Copello has made no attempt to substantiate that they would be covered by the insurance plan (even by asserting thus in her affidavit) and only now belatedly seeks reimbursement for these costs in response to the Court's request for further information regarding her unemployment, 401(k) plan, and severance package. This Court, in its discretion, denies her request for medical expenses.

Thus, this Court awards Copello $30,095.00 in back pay.

*b. Kennedy*

i. Mitigation of Damages

A harmed party has a duty to mitigate damages by using reasonable and diligent efforts to secure other employment. 42 U.S.C. § 2000e-5(g); *Doe v. Oberweis Dairy,* 456 F.3d 704, 714 (7th Cir.2006). Defendants have asserted an affirmative defense that Kennedy failed to mitigate her damages; therefore, Defendants bear the burden of persuasion to establish that Kennedy (1) lacked diligence in mitigating her damages and (2) with reasonable diligence, there was a reasonable chance that Kennedy might have found a comparable job. *U.S. E.E.O.C. v. Gurnee Inn Corp.,* 914 F.2d 815, 818 (7th Cir.1990). Plaintiff-Intervenors admit that

Kennedy was not seeking a job between 2002 and 2004, and request no back pay for this period.

Defendants argue that Kennedy lacked diligence in mitigating her damages. They assert that Kennedy was voluntarily a housewife from 1999 to 2003, that she could not recall any place she interviewed between 1999-2002, that she has no documents or notes reflecting any interviews for that time period, and that her trial testimony does not reference sending out resumes, signing up with a headhunter, or registering for unemployment. Defendants also point out that Kennedy claimed to be working with a headhunter named Mark Fischer at her deposition, but could not provide any details about him. However, Kennedy testified at trial that she looked through newspapers, talked to friends and family, and looked on the Internet in order to find a job. Kennedy's deposition provided more thorough testimony regarding her search, and included testimony that she had posted her resume online, sent out resumes online, and had interviews in 1999 and 2001. Additionally, Defendants offered the transcript of a voice mail message with Kennedy's voice at trial, in which Kennedy asked Mandera for a job.

**\*15** The cases cited by Defendants either do not stand for the propositions asserted or do not necessitate that this Court find that Kennedy failed to undertake a reasonably diligent search for an equivalent job. Unlike the plaintiffs in *Chisholm v. Foothill Capital Corp.,* 3 F.Supp.2d 925 (N.D.Ill.1998), *Meyer v. United Air Lines, Inc.,* 950 F.Supp. 874, 876 (N.D.Ill.1997), and *Williams v. Imperial Eastman Acquisition Corp.,* 994 F.Supp. 926, 931-32 (N.D.Ill.1998), Kennedy did not engage in an activity inconsistent with looking for full-time work. Instead, she looked on the Internet, in newspapers, and talked to family and friends. *See Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228 (7th Cir.1986) ("a diligent Title VII plaintiff ... would at least check the want ads, register with employment agencies, and discuss job opportunities with friends and acquaintances"). Defendants make much of Kennedy's lack of success in finding a job, arguing that her failure to find a job indicates that she was not reasonably diligent in seeking one. Defendants also argue that Mandera's threat to Copello that she would never work in the industry again is not relevant to a consideration of Kennedy's diligence. To this Court, however, it appears to be relevant and to excuse, to at least some extent, Kennedy's lack of success. Mandera's threat shows that he is willing, and perceives himself to be able, to blackball a person opposing him. *See Wheeler,* 794 F.2d 1228. While this Court agrees with

Defendants that Kennedy could have been more diligent in seeking work, she was reasonably so.

Defendants have also failed to meet their burden of persuasion regarding the availability of a comparable job. Defendants assert that this Court should adopt a presumption of availability where the plaintiff did little to no job searching. However, this Court has already determined that Kennedy's job search, excluding the period between 2002 and 2004, was reasonably diligent. Otherwise, Defendants offer no evidence whatsoever that comparable jobs existed, except to point out that Copello obtained one and that Chicago is a large job market. Such evidence is insufficient.

### ii. Kennedy's Later Discovered Bad Acts

Defendants argue that Kennedy should not be awarded back pay because she lied on her employment application. If an employer discovers evidence of a plaintiff's misconduct during litigation, it may limit damages to the period before the discovery, if the employer can show (by a preponderance of the evidence) that the misconduct would have resulted in termination had the employer learned of it during employment. *Sheehan v. Donlen Corp.,* 173 F.3d 1039 (7th Cir.1999). Kennedy admitted at trial that she lied on her job application by claiming to have six, rather than three, years of air freight experience. Defendants, however, do nothing more than assert that Kennedy would have been fired had it discovered this falsehood, as "Custom's application made clear that misrepresentation such as those made by Kennedy would have been cause for termination." In order to carry their burden, Defendants must do more than merely reiterate their policy. *See Sheehan,* 173 F.3d at 1048 ("the inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not"). Defendants have shown merely that a decision to fire Kennedy based on this falsehood would have been justified, but not that they would have made it. *See id.*

### iii. Kennedy's Back Pay Calculation

**\*16** Kennedy seeks a total of $296,143.00 in back pay, as follows:

| 10/20/1998-12/31/2001 | 1/1/2004-11/17/2006 |
| --- | --- |

Case: 1:17-cv-00070-WCG   Filed 10/15/21   Page 25 of 47   Document 261-9

| Lost Salary | $ 174,166.54 | $ 151,239.00 |
| Commission Loss | $ 79,166.54 | $ 68,739.00 |
| Car Allowance | $ 26,000.00 | $ 23,100.00 |
| Phone and Pager | $ 1,518.10 | $ 1,316.00 |
| 401(k) | $ 13,177.00 | $ 10,587.00 |
| Unpaid Salary | $ 2,115.38 (last two weeks of work) | |

Having already found that Kennedy is entitled to back pay and denied Defendants' two defenses, this Court grants Kennedy the lost salary and unpaid car allowance (as a fringe benefit). *See* Section regarding Copello above.

Defendants argue that Kennedy's sought commission loss is unduly speculative and should therefore be denied. Kennedy seeks a $25,000 commission per year. Kennedy's contract shows that she was to be paid at a rate of $55,000 per year, and that she was eligible for a monthly commission, dependent upon her performance. While with Custom, Kennedy made no sales, generated no revenue, and therefore, received no commission. While Kennedy correctly asserts that exactness in back pay awards is neither expected nor required, and that "ambiguities ... should be resolved against the employer," *Steward,* 542 F.2d at 452; *see also, Horn,* 755 F.2d at 606, she appears to have drawn this $25,000 figure out of whole cloth. Based on the commission program outlined in her contract (or rather this Court's best interpretation of that program, as it is not clear), Kennedy was eligible for a maximum of $1,937.50 in commission monthly, or $23,250 per year (assuming she sold $250,000 of LTL and Air Freight combined monthly and $160,000 TL and Local Cartage combined monthly). Although this Court is uncomfortable giving Defendants a windfall, any commission award would be unduly speculative. Kennedy provides no information as to sales figures of other Custom salesmen or even her own sales at her prior employment. *See Ungar v. Consoli Foods Corp.,* 657 F.2d 909, 918-19 (7th Cir.1981) (vacated on other grounds) (plaintiff provided court with her successor's sales record and her own previous record); *see also Felts v. Radio Distributing Co.,* 637 F.Supp. 234, 236 (N.D.Ind.1985) (court must look to plaintiff's prior sales record to determine commission). Although this Court must resolve any ambiguity in Kennedy's favor, any estimate of a commission figure based on the information provided by Kennedy would be unduly speculative, especially given the

"highly speculative and personal nature of sales." *See id.* As such, this Court will award Kennedy no commission.

As with the commission, this Court believes that a 401(k) contribution award would be unduly speculative. Kennedy indicates in her affidavit that she was eligible for 401(k) contributions up to 7% of her salary; this Court assumes that she means that Custom had agreed to match her contributions up to that amount. Kennedy has provided no evidence that she made any contributions to a 401(k) while employed at Custom, or that she had done so in her previous position. *See Inks v. Healthcare Distributors of Indiana, Inc.,* 901 F.Supp. 1403 (N.D.Ind.1995); *see Webber v. International Paper Co.,* 307 F.Supp.2d 119, 128 n. 6 (D.Me.2004) (court refused to award 401(k) contributions as back pay because plaintiff was not contributing to 401(k) account at time of termination). As such, this Court will not order 401(k) contributions as back pay.

**\*17** This Court also will not award Kennedy back pay for the loss of the Nextel phone and pager. The phone and pager were for business use and were not fringe benefits. As such, such amounts are not recoverable as back pay.

Lastly, this Court will not award Kennedy $2,115.38 in unpaid salary. Kennedy provides no evidence that this amount was not paid (except for a letter requesting those amounts), and Custom has provided its payroll records, indicating that it was, in fact, paid.

This Court awards Kennedy $205,073.23 ($217,755.54 in lost pay and car allowance less $12,682.31 in maternity leave).

### 2. Front Pay

Title VII permits a court to "order such affirmative action as may be appropriate, which may include ... reinstatement or

hiring of employees ... or any other equitable relief as the court deems appropriate. 42 U.S.C. § 2000e-5(g)(1). Front pay is "a monetary award equal to the gain [the plaintiff] would have obtained if reinstated" and is designed to monetize the value of the lost opportunity to be reinstated. *Williams v. Pharmacia, Inc.,* 137 F.3d 944 (7th Cir.1998); *Tobey v. Extel/JWP, Inc.,* 985 F.2d 330, 332 (7th Cir.1993). Front pay is measured by the difference between what the plaintiff would have earned in the future had they been reinstated at the time of trial and what they would have earned in the future in their next best employment, and is calculated in a manner similar to back pay. *Avita v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1231 (7th Cir.1995); *Wattleton v. International Brotherhood of Boiler Makers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local No. 1509,* 686 F.2d 586 (7th Cir.1982). Front pay is "not intended to assure a plaintiff's future financial success" and should extend only to the date upon which "the sting" of discriminatory conduct has ended. *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1371-72 (7th Cir.1992). Thus, when calculating front pay, a court should terminate its inquiry at the point at which the plaintiff "can reasonably be expected to have moved on to similar or superior employment." *Williams,* 137 F.3d at 954. A decision to award front pay is within the discretion of the district court. *McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111 (7th Cir.1986) at 118.

*a. Reinstatement*

Because front pay is available only as an alternative remedy to reinstatement, this Court must consider whether reinstatement is appropriate in this case. "The equitable remedy of reinstatement requires the court to strike a delicate balance." *Bruso,* 239 F.3d 848, 861. While reinstatement is the "preferred remedy for victims of discrimination," and should be awarded when feasible, a court need not reinstate a plaintiff where the result would be "a working relationship fraught with hostility and friction." *Id.* Where the working relationship would be fraught with hostility, reinstatement could "potentially cause the court to become embroiled in each and every employment dispute that arose between the plaintiff and the employer." *Id.* at 861-62. A court must not, however, base its decision not to order reinstatement on the employer's anger or hostility toward the plaintiff merely for having filed the suit. *Id.* at 862. Thus, a court must identify the source of the friction-a straightforward task when there was no evidence of friction before the plaintiff filed suit. *Id.* However, reinstatement is "particularly infeasible" if the

plaintiff would no longer enjoy the confidence and respect of his superiors once reinstated. *Id.* Reinstatement is also problematic when the plaintiff would be supervised by the same individuals who discriminated against him in the first place. *Id.* Plaintiff-Intervenors argue that reinstatement would be inappropriate in this case because the relationship between Defendants and Plaintiff-Intervenors is fraught with hostility. Defendants, however, argue that there is no hostility, and that Plaintiff-Intervenors should be reinstated.

**\*18** Reinstatement is infeasible. There is copious evidence in the record that hostility between Custom and Plaintiff-Intervenors began before they had filed suit. Before Copello sued, she was subjected to consistent sexual banter, prying questions of a sexual nature, and events featuring scantily-clad adult entertainers. When Copello complained of sexual harassment on Kennedy's behalf, Kennedy was fired. Defendants took accounts away from Copello because she refused to entertain "in the Custom way" and refused to give her timely quotes for her customers after she complained about Defendants' sexual questions. Before Kennedy sued, she was fired the day after Copello complained of sexual harassment on her behalf. Kennedy was subjected to the same sexually-charged environment as Copello. Many of the employees who harassed Plaintiff-Intervenors or who allowed the harassment to continue are still employed by Defendants; in fact, Wiszowaty has since been promoted to Sales Manager and would therefore have direct authority over the Plaintiff-Intervenors were they to be reinstated. After the Plaintiff-Intervenors brought suit, Mandera threatened that they would never work in the industry again; Defendants refused to rehire Copello when she asked for a job in 2000. Additionally, Defendants testified at trial that neither woman's performance on the job was satisfactory. Although the jury found the Plaintiff-Intervenors' testimony to be more credible, the Defendants' testimony indicates that the Plaintiff-Intervenors would not have the respect and confidence of the Defendants if they were reinstated.

*b. Copello*

Copello seeks $1,740 in front pay, representing six years of lost 401(k) contributions by Custom. (Copello initially sought a front pay award of $18,900, which she claimed accounted for lost 401(k) contributions over six years. When Copello corrected her 401(k) contribution back pay claim in response to this Court's request for more information, she failed to correct her front pay claim. This Court assumes that

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

the resulting inconsistency was an oversight, and assumes that she means to claim front pay in the amount of $1,740 based on Custom's $290 contribution in 2000 for six years.) Copello contends that she receives no 401(k) contributions from her current employer. As an initial matter, lost 401(k) contributions are recoverable as front pay. *See Mattenson v. Baxter Healthcare Corp.,* 2004 WL 1244016 (N.D.Ill. June 4, 2004). Copello's period extends well beyond the point where the "sting" of discrimination had ceased-the point where she was in fact making more money in a different, but comparable job. While this job does not provide 401(k) benefits, her increased salary arguably makes up for this loss. The parties agree that Copello made more money in a new job as early as 2001. Additionally, this Court notes that Copello has already been compensated for the loss of her 401(k) contributions, as she was awarded such losses in her back pay award. As such, this Court, in its discretion, denies Copello front pay.

### c. Kennedy

**\*19** Kennedy seeks a front pay award of $320,000, or the equivalent of four years at a salary of $80,000. Defendants contend that Kennedy should receive no front pay because she failed to search for a job. Although this Court held that Kennedy was reasonably diligent in her job search for purposes of the back pay determination, this Court is reluctant to also award Kennedy front pay for four years where she has conducted only the barest minimum search as required to recover. It concerns this Court greatly that Kennedy *still* has been unable to find a job; Kennedy does not appear to be unemployable and Copello was able to find a job despite Mandera's threats. Kennedy, furthermore, has already been compensated for the loss of her job at Custom. *See, Bennett v. Smith,* 2001 WL 717490 at \*2 (N.D.Ill. June 26, 2001) (denying front pay in court's discretion in part because the back pay award fully compensated plaintiff). As such, this Court denies Kennedy front pay in its discretion.

### III. *INJUNCTIVE RELIEF*

The EEOC and Plaintiff-Intervenors request various forms of injunctive relief. Defendants, predictably, argue that injunctive relief is not warranted.

### A. Injunctive Relief is Warranted

Title VII specifically provides for injunctive relief 42 U.S.C. § 2000e-5 (g)(1). Such relief is authorized "once the court has found that the defendant intentionally engaged in an unlawful employment practice." *E.E.O.C. v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1578 (7th Cir.1996). A prevailing plaintiff need not make a special showing to obtain injunctive relief, and specifically need not demonstrate that the employer engages in a pattern or practice of discrimination. *Bruso,* 239 F.3d 848, 864. Instead, the proper inquiry is whether the defendant's "discriminatory conduct could possibly persist in the future." *Id.* This Court believes that injunctive relief is appropriate here. Copello and Kennedy persuaded the jury that they were the victims of sexual harassment and retaliatory termination. Fritkin persuaded the jury that she was likewise a victim of retaliation. Additionally, circumstances indicate that Defendants might engage in sexual harassment in the future. The sexual harassment was carried out by several individuals still employed by Defendants, including Wiszowaty and Kolzow. Mandera, Klonowski, and Boyle, all still in upper management positions, failed to stop the harassment. The President and owner of the company, Mandera, was even involved in the retaliation. The mere fact that Defendants have, and at all times had, written policies addressing sex harassment and retaliation does not demonstrate that injunctive relief is inappropriate, as these policies have been ignored. *See Bruso,* 239 F.3d at 864 ("if United's upper echelon of management felt free to ignore United's policies in the past, there is no reason to believe that those same members of management will abide by them in the future"). Lastly, Defendants have not accepted responsibility for the violations that occurred, but have bitterly contested every issue in this suit.

### B. Specific Injunctive Relief Ordered

**\*20** Plaintiffs request various injunctive relief measures to prevent future sexual harassment and retaliation. This Court grants the bulk of these measures by enjoining Defendants for a period of four years: (1) from violating Title VII with respect to sexual harassment and retaliation; (2) to post a notice informing its employees of the verdict and injunction in this suit and of the employees' right to contact the EEOC without fear of retaliation; (3) to provide the EEOC notice (including a description of the complaint, the investigation conducted, and the result) of any complaint of sexual harassment or retaliation within thirty days from the date the complaint was made; (4) to provide a report to the EEOC every six months detailing all complaints made and listing all individuals

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

terminated by Defendants; (5) to provide written confirmation to every employee that any complaint of harassment or retaliation received by any manager will be taken seriously and investigated; (6) to require each of Defendants' officers, managers, supervisors, and employees to attend a Title VII training seminar on sex harassment, Title VII principles, and retaliation on a yearly basis (sponsored by a group unrelated to any of the law firms that have represented the Defendants); (7) from threatening and participating directly or indirectly in precluding Plaintiff-Intervenors from obtaining work in the freight industry; (8) to expunge from the Plaintiff=Intervenors' personnel files all references to this lawsuit or the investigations of any complaints or charges of sexual harassment or retaliation; and (9) to provide a notice to all Defendants' customers advising them of the jury verdict, the Court's judgment, and reaffirming the Defendants' commitment to equal employment opportunity in the workplace. The Court believes that by granting these injunctions, the Defendants will be prevented from continuing to violate Title VII.

Additional relief not granted includes enjoining the Defendants to (1) submit periodic monitoring reports to the Plaintiff-Intervenors; and (2) reimburse Plaintiff-Intervenors and their attorneys for their fees and costs associated with monitoring the Defendants' reports and compliance with this Court's injunction. The Court believes that this relief will not measurably contribute to preventing the Defendants from engaging in further Title VII violations, especially considering that the EEOC will already be closely monitoring the situation.

### 1. Adult Entertainment and the Crazy Horse

Plaintiffs request that this Court grant an injunction preventing Defendants from (1) sponsoring any company event at a place of adult entertainment or which includes adult entertainers; (2) providing for or reimbursing customer entertainment at adult entertainment establishments; and requiring (3) that the Defendants distribute to their customers a notice advising that Defendants will no longer provide adult entertainment for clients. Plaintiffs argue that this injunction is necessary to prevent Defendants from retaliating against sales personnel who refuse to entertain clients at such establishments. This Court believes that enjoining Defendants from entertaining clients at places of adult entertainment is too broad. Instead, this Court enjoins Defendants from sponsoring company events at a place of adult entertainment.

Defendants are further enjoined from reimbursing sales personnel for costs incurred while entertaining clients at adult entertainment establishments which are owned or operated by Defendants and Defendants' owners, officers, and directors. This measure is intended to decrease the current financial incentive for entertaining clients at the Crazy Horse. The Court does not grant an injunction requiring Defendants to inform clients that they will no longer provide entertainment at adult entertainment establishments.

### 2. The State Court Lawsuit

 **\*21** Lastly, the EEOC seeks an injunction requiring Custom to withdraw its retaliatory lawsuit against Fritkin. The EEOC argues that such an injunction is necessary to prevent further retaliation against Fritkin, and that the jury found that the suit was retaliatory. This Court has already upheld the jury's verdict and refused to grant judgment as a matter of law as to Fritkin's retaliation claim.

Defendants, however, argue that such an injunction would run afoul of the Anti-Injunction Act, 28 U.S.C. § 2283. The Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court, except as expressly authorized by an Act of Congress or where necessary in and of its jurisdiction or to protect or effectuate its judgments." There is, however, an exemption where the "plaintiff in the federal court is the United States itself, or a federal agency asserting 'superior federal interest.' " *See, Levi Strauss,* 515 F.Supp. at 642 (citing *Mitchum v. Foster,* 407 U.S. 225, 235-236, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1971)). As such, the Act does not bar the injunction sought by the EEOC as "the interests represented by the Commission are, in effect, defeated if a retaliatory state court ... action is allowed to proceed." *See id.* at 642-43. Even if this exception did not apply, this Court agrees with *Levi Strauss* that an exception to the reach of the Act, analogous to that articulated in *Mitchum* would apply. *See id.* at 642-43.

Defendants argue, however, that *Levi Strauss* is inapposite because the state court suit does not allege defamation and is not otherwise related to Fritkin's allegations of sexual harassment. While Defendants are correct that the *Levi Strauss* suit alleged defamation based on the very allegations made by the plaintiff in the Title VII action, this difference is unimportant. Regardless of the nature of the state court suit against Fritkin, the jury determined that it was retaliatory in purpose and thus, an injunction is necessary to prevent

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

further retaliation in the form of finally obtaining a state court judgment against Fritkin. The cases Defendants cite in favor of caution in enjoining the state court action are inapposite. This Court, furthermore, is being cautious; it merely believes that injunctive relief is warranted in this case.

### IV. *DEFENDANT'S MOTION FOR ATTORNEY'S FEES*

Without reaching the merits of the motion, this Court strikes Defendant's Motion for Attorney's Fees as a Prevailing Party. Although a prevailing defendant may be awarded attorneys' fees (upon a finding that the plaintiff's action was "frivolous, unreasonable, or without foundation"), Local Rule 54.3 sets for a procedure for a fee motion seeking "any award of attorneys' fees." That Rule provides that a motion for attorney's fees must be filed within 90 days after entry of judgment or settlement; judgment has not yet been entered in this case. Additionally, before a motion for fees may be filed, the movant must provide the opposing party with information regarding hourly rates and time sheets reflecting the fees to be requested, the parties must confer and attempt to agree on an amount of fees to be awarded, and the parties must file a joint statement outlining any remaining disputes. Local Rule 54.3. Defendants have made no attempt to comply with the procedure set out by Local Rule 54.3, and thus, its motion for attorney's fees as a prevailing party is stricken as premature.

**\*22** Defendants' motion in opposition to attorneys' fees being granted to Plaintiff-Intervenors is likewise premature. Plaintiff-Intervenors have, as of yet, filed no motion for attorneys' fees; if (or when) they do, Defendant may raise its objections to such an award when it confers with Plaintiff-Intervenors and in the subsequent joint statement.

### V. *CONCLUSION*

For the reasons stated herein, the following motions are granted:

1. Plaintiffs' Motion for a Finding that Defendants Employed Two Hundred Employees (in part);

2. Defendants' Motion Concerning the Number of Defendants' Employees (in part);

3. Plaintiff-Intervenors' Motion for Back and Front Pay (in part);

4. EEOC's Motion for Injunctive Relief (in part);

5. Plaintiff-Intervenors' Motion for Injunctive Relief (in part); and

6. Defendants' Motion to Reduce Fritkin's Attorney's Fees Award.

The following motions are denied:

1. Defendants' Motion for Directed Verdict in Favor of CEG;

2. Defendants' Motion to Reduce Compensatory Damages to Nominal Damages;

3. Defendants' Motion to Reduce Punitive Damages as Excessive;

4. Defendants' Motion to Deny Back and Front Pay;

5. Defendants' Motion Against Granting an Injunction;

6. Defendants' Motion for Attorney's Fees; and

7. Defendants' Motion Against Awarding Fees to Plaintiff-Intervenors.

The Court enters Judgment against Defendants Custom Companies Inc. and Custom Executive Group in the amount of $1,135,168.23, broken down as specified above.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 734395, 100 Fair Empl.Prac.Cas. (BNA) 859

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 282026
Only the Westlaw citation is currently available.
United States District Court,
W.D. Wisconsin.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,

v.

NORTHERN STAR HOSPITALITY
d/b/a Sparx Restaurant; Northern
Star Properties, LLC; and North
Broadway Holdings, Inc., Defendants.

No. 12–cv–214–BBC.
|
Jan. 27, 2014.

**Attorneys and Law Firms**

Camille Annette Monahan, Equal Employment Opportunity Commission, Milwaukee, WI, Laurie Ann Vasichek, Jessica Ann Palmer–Denig, U.S. Equal Employment Opportunity Commission, Nicholas J. Pladson, Minneapolis, MN, for Plaintiff.

Michael D. Schwartz, Michael D. Schwartz, P.A. Schwartz Law Firm, Oakdale, MN, for Defendants.

OPINION AND ORDER

BARBARA B. CRABB, District Judge.

**\*1** This civil action is before the court on post trial briefing by the parties on plaintiff Equal Employment Opportunity Commission's requests for back pay, front pay and injunctive relief on behalf of Dion Miller, who was the subject of a retaliatory discharge by defendants Northern Star Hospitality, d/b/a Sparx Restaurant, Northern Star Properties, LLC and North Broadway Holdings, Inc. Defendants oppose the grant of any injunctive relief or front pay. In addition, they have moved under Fed.R.Civ.P. 60(b)(3) and (d)(3) to be relieved of any liability for the jury's award of $15,000 for damages incurred by Miller on the ground that the award was based on perjured testimony by Miller.

Plaintiff's request for injunctive relief will be granted because the request is closely tailored to defendants' illegal act of retaliatory termination and properly limited in scope and duration. Miller is not entitled to front pay because plaintiff has neither shown how long he would have continued to work for defendants had he not been terminated nor produced evidence of a proper discount rate to apply to any calculation of front pay. Finally, defendants' motion for relief from liability for the jury's award of damages will be denied because defendants have not shown that Miller's testimony about his child support payments was false or that it went to the heart of the issue to be decided.

BACKGROUND

Plaintiff brought this action in 2012, alleging that a manager working for defendants had subjected Dion Miller, a former employee, to racial harassment and that defendants failed to take appropriate action in response. Plaintiff also contended that defendants retaliated against Miller by firing him when he complained about the harassment. At summary judgment, I dismissed the harassment claim but allowed the case to go forward on the retaliation claim.

An evidentiary hearing was held before trial to determine (1) whether defendants were engaged in interstate commerce at the time of the alleged harassment and (2) whether the three defendants were properly considered a "single employer" for liability purposes. Both issues were decided in plaintiff's favor.

At the September 2013 jury trial, Dion Miller testified that in September 2010, he held the position of assistant kitchen manager. He was earning $14 an hour and was responsible for ordering products for the restaurant.

When Miller reported to work on October 1, he saw that someone had posted a picture of an African–American actor, Gary Coleman, below a notice to employees about rotating food in the cooler. Over the notice was a defaced dollar bill on which someone had drawn a noose around George Washington's neck and a swastika on his forehead; also on the bill were drawings of a man on horseback and a "hooded klansman" with KKK written on his head. When the front-of-the-house manager arrived, Miller asked her to look at the posting; she said she knew nothing about it. Miller asked his direct supervisor about the posting as soon as the supervisor arrived at work. The supervisor removed the dollar bill and

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

substituted a picture of another television star (a white man) under the reminder to rotate the food. In subsequent days, the kitchen supervisor criticized Miller's work several times, although he had never done so before Miller complained about the posting. Another manager met with Miller and told him that his work was not up to his usual standards and that his attitude was poor. Three weeks after the incident, Miller was fired. Although defendants had a progressive discipline policy in place, they did not follow it when terminating Miller.

 **\*2**  At trial, Miller testified about the emotional effects of his termination. He said he "felt terrible" about having to tell his girlfriend and his daughter about the loss of his job; he and his girlfriend had to put off their plans to have a child; he and the mother of his daughter experienced a strain in their relationship because he was unable to pay child support to her, trial tr., dkt. # 198, at 3–45; and he felt "less than a man" because he was no longer the primary bread winner. *Id.* He found it difficult to look for work day after day without success and he went through "a little bit of a depression," put on weight and did not go out much. *Id.* at 3–46.

In her closing argument, plaintiff's counsel argued that Miller had suffered depression, that his termination had affected his family and his family planning, that it caused him to cry, to feel bad about his life and it "turned his whole world upside down." *Id.* at 3–96–97. She did not say anything about the strain placed on his relationship with the mother of his daughter.

The jury found that when Dion Miller complained about the allegedly racial posting at his workplace, he was acting on a reasonable, good faith belief that the posting was racially offensive. It found also that defendants would not have terminated him from his cook's job had he not complained about the posting. A day later, the jury awarded him $15,000 in compensatory damages, but refused to award any punitive damages, despite its finding that defendants had acted with reckless disregard for Miller's federal protected rights.

OPINION

The jury's verdict makes it necessary to decide (1) the amount of back pay to which Miller is entitled; (2) whether Miller is entitled to any front pay and if so, how much; (3) whether plaintiff's motion for injunctive relief should be granted; and (4) whether defendants are entitled to relief from the damages award.

A. *Relief from Judgment for Damages under* Fed.R.Civ.P. *60(b)(3) and* (d)(3)

Defendants do not take issue with the jury verdict as it relates to liability, but they do object to the $15,000 compensatory damages award. They have filed a motion for relief from judgment under Fed.R.Civ.P. 60(b)(3) and (d)(3), both of which relate to fraud. (Subsection (b)(3) refers to fraud by an opposing party; subsection (d)(3) refers to "fraud on the court.") Although no judgment has been entered in this case, I will take up the matter as it relates to the legitimacy of the damages award.

Since the trial, defendants have found evidence that in their opinion shows that Miller was the subject of seven different orders to show cause relating to his non-payment of support for his daughter. They argue that this is proof he was lying when he testified he had a good relationship with his daughter's mother before his termination. Plaintiff does not agree. First, it points out that the court records on which defendants rely relate to Miller's younger daughter, who is the child of a different woman and not the child about whom he testified at trial. Second, the court records are not reliable evidence because they include little information and what they do provide is devoid of context. Third, Miller's testimony related to his subjective thoughts and feelings about his relationship with the mother of his older daughter. Plaintiff adds that defendants had an opportunity to examine Miller about his claims for emotional distress when they deposed him, but never took advantage of it.

 **\*3**  Defendants' showing falls far short of proof that Miller committed perjury requiring relief from the jury's award. To make such a showing, defendants would have to show not only that Miller's testimony was intentionally false but that his testimony went to the heart of the issue before the court. His relationship with the mother of his daughter was only one of several matters that he testified had caused him distress and plaintiff's counsel never even mentioned it in her closing argument. It was not so critical to the jury's decision as to support a damages award by itself. Certainly, it did not go to the "heart of the matter," which is what is required to merit reopening of a judgment under Rule 60(b)(3). *Metlyn Realty Corp. v. Esmark,* 763 F.2d 826, 832 (7th Cir.1985) ("an adverse party's fraud or subornation of perjury permits relatively free reopening of the judgment when the perjury goes to the heart of the issue" (citing *Peacock Records, Inc. v. Checker Records, Inc.,* 365 F.2d 145, 147 (7th Cir.1966), and *Harre v. A .H. Robins Co.,* 750 F.2d 1501, 1503 (11th

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  2

Cir.1985)). The motion for relief from the jury's award of damages under Rule 60(b)(3) and 60(d)(3) will be denied.

### B. *Back Pay Award*

Defendants have several objections to the back pay award, one of which is that Miller is not entitled to back pay for the period in which the Sparx Restaurant was closed for conversion to a Denny's franchise. According to the trial record, however, defendants kept certain employees on their payroll during the conversion period, using them for help with demolition and clean up. It was defendants' burden to show that Miller would not have been kept on for this purpose and they did not offer any evidence to show that he would not have been, so I must assume he would have been retained.

Defendants criticized the efforts that Miller put into finding a replacement job, noting that he looked for jobs only one to two days a week and that he never submitted a résumé or letter of recommendation from former employers. Miller started looking for work the week he was terminated and applied for two or more jobs every week thereafter. He drove up to 60 miles from home to apply for jobs and he testified that he could not afford to do more job hunting. Although he limited his search to restaurant jobs for a long time, that limitation does not bar him from obtaining back pay. Victims of retaliatory discharges are not required to look for jobs in other positions or in other lines of work. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231 (1982). Defendants have not shown that Miller failed to exercise reasonable diligence in his efforts to find work.

Defendants object to plaintiff's failure to make allowance in its proposed back pay award for holidays or days of sick leave that Miller would have taken. Defendants did not put in any evidence about the number of sick days and holidays Miller had taken in the past or even the average number of days that other kitchen crew members took. In the absence of such evidence, it would be improper to speculate about whether Miller would have taken any days off and, if so, how many he would have taken.

 **\*4** Defendants have shown no reason why Miller should not be awarded the damages plaintiff is requesting: $39,775.59 in back pay through August 31, 2013, plus $19.20 per week (the difference between what he earned at Sparx and what he is able to earn now) through the date of judgment. The interest due on the award will be added to that amount, with the interest calculated in the same manner and at the same rate used by the Internal Revenue Service for calculating interest on unpaid taxes. 26 U.S.C. § 6621. Defendants have not objected to the use of this interest rate.

The award will not be taxed because Miller will be taxed on the award when he receives it. However, I will grant plaintiff's request for a 15% increase in the back pay award, to account for the fact that Miller will have to pay taxes on a lump sum award that he would not have had to pay had he received the money spread out over the more than three years since he was terminated improperly.

### C. *Front Pay Award*

Defendants object to any award of front pay on the ground that plaintiff failed to give the court " 'the essential data necessary to calculate a reasonably certain front pay award,' " dfts' br., dkt. # 200, at 23 (quoting *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1372 (7th Cir.1992)). (Defendants do not argue that Miller should have sought reinstatement.) This " 'includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant and the applicable discount rate.' " *Id.*

Plaintiff has set forth the amount of the proposed award, but has said nothing about how long Miller would have expected to work for defendants or about the applicable discount rate. Without any evidence on these factors, plaintiff has failed to sustain its request for a front pay award to Miller. *Bruso v. United Airlines, Inc.,* 239 F.3d 848, 862 (7th Cir.2001).

### D. *Injunctive Relief*

As injunctive relief, plaintiff asks the court to (1) to bar defendants from discharging employees in retaliation for complaints about racially offensive postings in defendants' workplace; (2) require defendants to adopt policies that explicitly prohibit actions made unlawful under Title VII; (3) require defendants to adopt an investigative process with regard to discrimination claims; and (4) require them to provide annual training to Chris Brekken and other managers regarding Title VII. Defendants object to this request, arguing that the proposed injunctions are nothing more than telling defendants to "obey the law" and that such injunctions are not favored by the law. In addition, defendants say that plaintiff does not come before the court with clean hands: it did not

serve the Notice of Claim on defendants within ten days of Miller's charge of discrimination, it made a determination of reasonable cause without interviewing key witnesses, it failed to make a Determination on Reasonable Cause within 120 days from the filing of the Charge of Discrimination, it did not file this civil action within 180 days of the filing of the Charge of Discrimination, it failed to work to eliminate the alleged wrongful conduct by engaging in good faith conciliation and it based its damage request on Miller's misleading and perjured testimony.

 **5** It is too late for defendants to raise a claim of "unclean hands"; the time for doing so was at the outset of the litigation. At this junction, plaintiff's alleged procedural failings are irrelevant to the question on injunctive relief. The question for defendants is whether injunctive relief is unnecessary. Defendants did not show that it is, so I will consider the nature, scope and length of plaintiff's proposal to determine whether the requested injunctive relief is proper.

Defendants are correct when they say that the courts do not favor injunctions that merely require the subject to obey the law, but plaintiff's claim for relief does not fall into that category. Its first request is directed to barring the three defendants from discharging a person in retaliation for complaints about racially offensive postings in defendants' workplace. It is limited in time to three years. Defendants characterize this proposal as an overly broad injunction not to discharge employees for unlawful reasons, but the characterization is unjust. The injunction is narrowly framed and tied to the particular unlawful conduct in this case. Moreover, it would last for only three years, so it escapes the criticism that rightfully attaches to injunctions of unlimited length. *E.g., EEOC v. AutoZone, Inc.,* 707 F.3d 824, 844 (7th Cir.2013) (reversing lower court's imposition of permanent injunction requiring defendant to make accommodations for persons covered by Americans with Disabilities Act).

Plaintiff's second request is for an injunction requiring the adoption of a workplace policy explicitly barring retaliation for opposing matters made unlawful under Title VII. Such an injunction would cover discharges for many more things than objecting to the posting of a racially discriminatory posting, but it is not so broad as to be objectionable. Again, defendants have not shown that this injunction is unnecessary. Although defendants no longer employ many of the people involved in the racial posting incident, Christopher Brekken remains the dominant person in each of the defendant organizations and his testimony that he did not think the posting of the

dollar bill violated any workplace policy indicates that he has an incomplete understanding of the concept of racial discrimination.

Plaintiff's third request is for an injunction requiring defendants to adopt a complaint and investigative procedure for internal complaints of retaliation. Defendants do not deny the merits of the request, but contend that no injunction is needed because the topic is covered by the materials now in use by Denny's, the franchisee. However, a review of Denny's Employee Handbook, trial exh. # 12, shows gaps in procedures for both complaints and investigations. The section on employee complaints of harassment says only that such complaints should be made to "someone in management" or by contacting "anyone at Denny's company offices." *Id.* at 8 (Sparx 963).

 **6** Finally, plaintiff asks for annual training on rights and responsibilities under Title VII, including the provisions on retaliation, for Christopher Brekken and for all managers, including supervisors, working for defendants. Although defendants say that the injunction is unnecessary because it duplicates training already provided by Denny's, they do not say that Christopher Brekken has received the training.

I conclude that the limited injunctive relief sought by plaintiff is appropriate to the violation of law in this case. It is not simply an "obey the law" injunction, but tailored to the deficiencies identified in defendants' operations and it is limited in duration.

ORDER

IT IS ORDERED that plaintiff Equal Employment Opportunity Commission's request for back pay and injunctive relief is GRANTED and its request for front pay is DENIED; the motion filed by defendants Northern Star Hospitality, d/b/a Sparx Restaurant, Northern Star Properties, LLC and North Broadway Holdings, Inc. under Fed.R.Civ.P. 60(b)(3) and (d)(3) for relief from judgment (construed as a motion to overturn the jury's award of damages to Dion Miller), dkt. # 207, is DENIED.

FURTHER, IT IS ORDERED that

1. defendants are enjoined

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

a. from discharging employees in retaliation for complaints about racially offensive postings in defendants' workplace;

b. from failing to adopt policies that explicitly prohibit actions made unlawful under Title VII;

c. from failing to adopt an investigative process with regard to discrimination claims; and

d. from failing to provide annual training to Chris Brekken and other managers, including supervisors, regarding Title VII; and

2. Dion Miller is awarded $15,000 for emotional damages;

3. Dion Miller is awarded back pay in the amount of $39,775.59 for the period through August 31, 2013 and $422.40 for the period from September 1, 2013–January 31, 2014, plus interest of $2,2565.29 for the period through August 31, 2013 and additional interest for the period from September 1, 2013–January 31, 2014, which plaintiff is to calculate using the Internal Revenue Service interest rate and submit to the court for approval no later than February 3, 2014; defendants may have until February 13, 2014 in which to raise any objections they have to the interest calculation; and

4. Plaintiff is awarded an additional amount of back pay equal to 15% of the back pay award, including interest, to reimburse him for the extra taxes he will owe on the lump sum payment he is to receive, to be determined by the court once the interest calculation has been approved.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 282026

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3585599
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

v.

BOH BROTHERS
CONSTRUCTION COMPANY, LLC.

Civil Action No. 09–6460.
|
Aug. 16, 2011.

**Attorneys and Law Firms**

Gregory T. Juge, Tanya Lea Goldman, Equal Employment
Opportunity Commission, New Orleans, LA, James Philip
Sacher, U.S. Equal Employment Opportunity Commission,
Houston, TX, for Equal Employment Opportunity
Commission.

Walter W. Christy, Erin R. Wedge, Jacob C. Credeur, Coats,
Rose, Yale, Ryman & Lee, New Orleans, LA, for Boh
Brothers Construction Company, LLC.

**OPINION**

IVAN L.R. LEMELLE, District Judge.

 *1 Before the Court is Plaintiff, EEOC's Motion for
Injunctive Relief seeking an order requiring defendant to
effectuate a system to prevent and promptly correct unlawful
sexual harassment at Defendant Boh Brothers Construction
Company, LLC's facilities; to mandate distribution of said
policy to all current employees and all new employees within
thirty days of hire; to require delivery to all employees of
a letter notifying them of the verdict in this case, among
numerous other items. (Rec.Doc. No. 60). For the reasons
pronounced below,

**IT IS ORDERED** that Plaintiff's Motion for Injunctive Relief
(Rec.Doc. No. 60) as subsequently redacted, is **GRANTED,**
judgment will issue hereafter.

At the conclusion of a four day jury trial, the jury returned
a verdict for plaintiff and against defendant awarding
plaintiff two hundred one thousand dollars ($201,000.00) in
compensatory damages consisting on one thousand dollars
($1,000.00) for back pay and benefits and TWO HUNDRED
THOUSAND DOLLARS ($200,000.00) for emotional pain
and suffering, inconvenience, mental anguish, and loss of
enjoyment of life, and two hundred fifty thousand dollars
($250,000.00) in punitive damages. (Rec.Doc. No. 58–2).
Following post-trial hearings, the Court reduced the jury
award to comply with statutory caps and applicable case
law, *see* Rec. Doc. Nos. 93, 94, awards set at $301,000.00.
The proposed Judgment of Injunctive Relief in the record
is found at Rec. Doc. No. 60–3. Following the hearing on
the Motion for Injunctive Relief, the Court directed and the
parties submitted revisions on that issue via facsimile.

Injunctive relief must be reasonably tailored to the specific
facts of this case, as reflected by the trial record. Issuance of
an injunction "rests primarily in the informed discretion of the
district court." *Marshall v. Goodyear Tire & Rubber Co.,* 554
F.2d 730, 733 (5th Cir.1977). Additionally, injunctive relief
is warranted where the EEOC acts in the public interest and
seeks remedies designed to vindicate the underlying policies
of Title VII and the CRA. (Rec. Doc. No. 60–1 at 3). The
United States Supreme Court, in *E.E.O.C. v. Waffle House,
Inc.,* 534 U.S. 279, 295–96 (2002) stated:

> [W]e are persuaded that, pursuant to Title VII and the
> ADA, whenever the EEOC chooses from among the many
> charges filed each year to bring an enforcement action in
> a particular case, the agency may be seeking to vindicate
> a public interest, not simply provide make-whole relief for
> the employee, even when it pursues entirely victim-specific
> relief. To hold otherwise would undermine the detailed
> enforcement scheme created by Congress simply to give
> greater effect to an agreement between private parties that
> does not even contemplate the EEOC's statutory function.

(Rec. Doc. No. 60–1 at 4). Noteworthy for our purposes is
*EEOC v. Mid–American Specialties, Inc.,* where the District
Court ordered relief similar to that proposed here. *EEOC
v. Mid–American Specialties, Inc.,* No. 09–2203, 2011 WL
1206163 (W.D.TN. Mar. 24, 2011).

 *2 Defendant argues that injunctive relief is unwarranted,
and alternatively, if the Court decides such relief is
appropriate, that the relief proposed by Plaintiff is
"unnecessary, unreasonable, burdensome, and duplicative of
the substantial relief granted by the jury in its verdict and

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

should be limited accordingly."[1] (Rec. Doc. No. 66 at 17). More specifically, Defendant submits that:

> [T]he company, since conclusion of trial, has begun the process of implementing a new harassment and retaliation policy. This policy will be provided to employees and managers alike. The company intends to deliver the new policy to individual employees, place it in the "Boh Picture," and post the policy on jobsite bulletin boards. The company is also in the process of developing plans to better and more efficiently instruct supervisors and employees regarding harassment and other forms of discrimination. Finally, Chuck Wolfe Resigned his employment with the company on April 4, 2011 after being demoted to the position of operator; he no long poses a threat of continued harassing behavior.
>
> (Rec. Doc. No. 66 at 3). It should be noted that Plaintiff correctly points out in its reply that Defendant offers no sworn testimony to support its claims relative to alleged post-trial remedial work.

Defendant cites in support of its contentions *Armstrong v. Turner Industries, Inc.,* 141 F.3d 554 (5th Cir.1998). That case involved a private plaintiff who brought suit against a potential employer where the employer required a pre-offer medical exam allegedly in violation of Section 12112(d)(2)(A) of the ADA. The EEOC issued a "right-to-sue" letter and suit was filed thereafter. The EEOC acted as amicus but was not a party to the litigation. Affirming dismissal of Plaintiff's 12112(d)(2)(A) claim, the Fifth Circuit held that "Armstrong has not demonstrated any injury and injunctive relief ...." *Id.* at 558. Armstrong is redressable by damages, and he lacks standing to seek declaratory distinguishable from the case at bar as that case involved a private plaintiff seeking relief only for himself, whereas here, and as noted in jurisprudence, the suit was filed by the EEOC who "may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief." *Waffle House,* 534 U.S. at 295–96. Although the only Fifth Circuit case in the section of Defendant's opposition listing "factors" is distinguishable from the case at bar, at least one such factor merits further attention.[2]

At different points in its opposition, Defendant submits that "the monetary compensation and punitive damages awarded are sufficient to deter future violations by Boh Brothers" (Rec. Doc. No. 66 at 5, 8). However, Defendant has filed a Motion to Remit the Judgment (Rec.Doc. No. 68); a Motion for New Trial (Rec.Doc. No. 67); and a Motion for Judgment as a

Matter of Law (Rec.Doc. No. 77).[3] Those motions, along with statements of Defendant's spokeswoman published in the Times–Picayune article submitted by Defendant that Boh Brothers is "confident of a reversal" render meaningless Defendant's suggestion that jury award will have a deterrent effect.

**\*3** Defendant also cites to *EEOC v. E.I. DuPont de Nemours and Co.,* 03–1605, 2004 WL 3048748 (E.D.La. Jan. 4, 2004), a case which Plaintiff states "did not involve a jury verdict regarding Defendant's policies." (Rec. Doc. Nos. 66 at 9; 71 at 5).

Forty-two United States Code § 2000e–5(g)(1) provides that "the [trial] court may enjoin the respondent from engaging in ... unlawful employment practice[s], and order such affirmative action as may be appropriate, ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1) (emphasis added). The district court has broad discretion in granting post-trial injunctive relief in Title VII cases. *EEOC v. Frank's Nursery & Crafts, Inc.,* 177 F.3d 448, 467 (6th Cir.1999); see also *Spencer v. Gen. Elec. Co.,* 894 F.2d 651, 660 (4th Cir.1990) ("[A] district court must ... exercise its discretion ... to ensure that discrimination does not recur."). Permanent injunctive relief is available even where the EEOC has not alleged a pattern or policy of discrimination. *Frank's Nursery,* 177 F.3d at 468. Once an employer has been held liable under Title VII, it is the employer's burden to offer evidence that the unlawful conduct will not recur. *Spencer,* 894 F.2d at 660 n. 13. The ultimate burden of showing that injunctive relief is appropriate, however, lies with the EEOC. *Id.* Federal Rule of Civil Procedure 65(d) provides that an order granting injunctive relief must "state its terms specifically" and "describe in reasonable detail ... the act or acts restrained or required." Fed.R.Civ.P. 65(d)(1)(B)-(C).

As noted earlier, each party submitted proposals for injunctive relief. The EEOC made several revisions to its original draft which effectively lessened certain administrative burdens for implementing remedial and other measures. Defendant's proposal, while not as detailed as the EEOC's proposal, contained eleven measures for relief, reserving the right to oppose entitlement overall.

Based on the record trial evidence along with hearings held on post-trial motions, including the hearing and post-hearing submissions relative to injunctive relief, we find that the EEOC has convincingly shown the appropriateness for

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 2

that relief. Jurisdiction will be retained to implement and enforce terms for injunctive relief, including but not limited to modifying same, as needed, including shortening applicable time periods upon showing of good cause.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3585599

Footnotes

1   For instance, Defendant opposes section three of the Proposed Judgment of Injunctive Relief that would, if ordered, require Defendant to deliver a letter to all employees advising them of the verdict in this case and stating Defendant's intolerance of sexual harassment or retaliation. (Rec. Doc. No. 66 at 13). Defendant "submits that there is no reason for it to have to send a copy of the verdict to its employees other than to satisfy the EEOC's desire to gain publicity .... [s]ending the verdict will do nothing but raise questions." *Id.*

2   Defendant's opposition states, in pertinent part "[a] review of Fifth Circuit case law and that of other jurisdictions discussed below indicate [sic] that equitable relief, such as training, is generally granted only when certain factors are present including: ... (3) the monetary compensation and punitive damages awarded are not sufficient to deter future violations by the employer." (Rec. Doc. No. 66 at 4).

3   Boh Brothers, in its Motion to Remit the Judgment "seeks remittitur of the jury award ... on grounds that the awards are excessive and that they are not supported by sufficient evidence in the record." (Rec. Doc. No. 68–1 at 1).

**End of Document**                                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3487668
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
v.
ROCKAUTO, LLC, Defendant.

18-cv-797-jdp
|
Signed 08/09/2021

**Attorneys and Law Firms**

Bradley Fiorito, Elizabeth B. Banaszak, Ethan M. M. Cohen, U.S. Equal Employment Opportunity Commission, Chicago, IL, Leslie Nicole Carter, U.S. Equal Employment Opportunity Commission, Milwaukee, WI, for Plaintiff.

Amy O. Bruchs, Kurt Ellison, Michael Best & Friedrich, LLP, Madison, WI, for Defendant.

OPINION and ORDER

JAMES D. PETERSON, District Judge

 **\*1** Plaintiff Equal Employment Opportunity Commission (EEOC) brought this suit on behalf of charging party Glenn McKewen under the Age Discrimination in Employment Act (ADEA). A jury found that defendant RockAuto, LLC violated the ADEA when it refused to hire McKewen. Dkt. 153.

This opinion and order addresses remedies. Front pay and injunctive relief are equitable remedies to be decided by the court, but the parties stipulated that the court would also determine back pay and mitigation after trial. Dkt. 133, at 1. Accordingly, the court must decide four issues: (1) whether McKewen is entitled to back pay and front pay; (2) the amount of any pay; (3) whether McKewen failed to mitigate his damages; and (4) whether the court should issue a permanent injunction against RockAuto. The parties agree that McKewen should receive prejudgment interest for any back pay that the court awards.

For the reasons explained below, the court will award McKewen a total of $123,936.15 in back pay and prejudgment interest, and it will grant EEOC's request for a permanent injunction. The court will deny EEOC's request for front pay.

BACKGROUND

RockAuto is an online retailer of motor-vehicle parts and accessories. Glenn McKewen applied for a position with RockAuto as a supply chain manager on October 24, 2016, when he was 64 years old. When McKewen applied, Catherine Cahoon screened all job applications, and RockAuto general manager James Taylor made the final hiring decisions. Cahoon screened McKewen's application using a standardized score sheet. McKewen's resume stated that he had received a master's degree in marketing and supply chain management and a bachelor's degree in business administration, but it did not say when he received these degrees. Cahoon emailed McKewen to request that information; McKewen replied that he had received his bachelor's degree in 1978 and his master's degree in 2003. Cahoon gave McKewen's application a score of eight points, which was not high enough to automatically advance in the hiring process. RockAuto sometimes allowed applicants with lower scores to proceed in the hiring process on a discretionary basis, a process RockAuto calls a "Jim Pass." But RockAuto did not give McKewen a Jim Pass, rejecting his application based on his score.

McKewen continued to look for work after he was rejected by RockAuto. He obtained work with Milwaukee Electronics from February 2017 to October 2017, earning $44,060.94 in wages. He continued to apply for jobs until late 2018, when he stopped looking for work.

ANALYSIS

**A. Back pay**
The ADEA permits an award of back pay (that is, the wages and benefits that McKewen would have received had he been hired) if the plaintiff has proven age discrimination. Barton v. Zimmer, Inc., 662 F.3d 448, 545 (7th Cir. 2011). As the plaintiff, EEOC has the initial burden of establishing the back pay amount, then the burden "shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts."

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.    1

*Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994). A claim for back pay must be supported by evidence, but it does not have to be calculated with "unrealistic exactitude." *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976).

**\*2** EEOC seeks $167,991 in back pay for McKewen, plus $19,385 in prejudgment interest. Dkt. 168, at 15. RockAuto disputes five issues: (1) whether McKewen failed to mitigate his damages; (2) the time period for which McKewen is entitled to back pay; (3) the hourly wage that should be used to calculate McKewen's lost wages; (4) the value of the benefits McKewen would have received from RockAuto had he been hired; and (5) the amount that McKewen's damages should be offset to reflect the wages and benefits that he received from Milwaukee Electronics. The court addresses these arguments separately.

### 1. Mitigation

To establish the affirmative defense that McKewen failed to mitigate his damages, RockAuto has the burden to establish two elements: (1) McKewen failed to exercise reasonable diligence to mitigate his damages; and (2) there was a reasonable likelihood that McKewen might have found comparable work by exercising reasonable diligence. *Stragapede v. City of Evanston, Ill.*, 865 F.3d 861, 868 (7th Cir. 2017); *Hutchinson*, 42 F.3d at 1044.

At his deposition, McKewen testified that after he was terminated from Milwaukee Electronics, he applied for at least four jobs per week through June 30, 2018, when he stopped regularly applying for work and changed his LinkedIn profile to state that he had retired as of January 2018. He also testified that he attended a job interview with Master Lock on July 17, 2018, but he was not hired. And he testified that about three or four months after the July 17 interview, Master Lock emailed him about another opening and invited him to submit his resume. He did so, but he did not receive an interview for the position.

RockAuto concedes that McKewen mitigated his damages through June 30, 2018, but it contends that he did not mitigate beyond that date. RockAuto addresses most of its arguments toward the first element of the defense, contending that McKewen failed to exercise reasonable diligence past June 30 because he was no longer looking for work beyond that date. EEOC contends that McKewen continued to look for work through November 21, based on his testimony that he

had emailed his resume to Master Lock three or four months after his July 17 interview.

RockAuto must show that McKewen had a reasonable likelihood of finding comparable work if he had continued his efforts. *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818–19 (7th Cir. 1990). RockAuto's chief argument on this point is that McKewen "was able to obtain employment relatively quickly with Milwaukee Electronics" in 2017 after RockAuto rejected his application. Dkt. 167, at 5. But RockAuto doesn't challenge McKewen's testimony that he applied for multiple jobs per week between October 2017 and June 2018 with no success, and it offers no reason to believe that McKewen's continued efforts would have been successful, such as "evidence concerning the availability of comparable jobs," *Gurnee Inn*, 914 F.2d at 818. *See also Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1257 (N.D. Ill. 2015) (no failure to mitigate where employer "offer[ed] *no* evidence on the availability of work comparable to [the] lost position") (emphasis in original). As the *Gracia* court noted, "[I]t is appropriate to place the burden of proof on the employer to tamp-down damages because the only reason [the court is considering mitigation] is that the *employer* has engaged in illegal discrimination." *Id.* (emphasis in original). RockAuto has failed to meet its burden on the second element, so its argument that McKewen failed to mitigate his damages after June 30, 2018, fails.

### 2. Time period

**\*3** The purpose of back pay is to make the victim of discrimination whole, so there is "a strong presumption" that a victim of discrimination is "entitled to a back pay award on the basis of what [he] would have earned absent the discrimination." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997). Back pay is typically calculated for the time period between the adverse employment action and the date of the judgment. *See, e.g., Gracia*, 130 F. Supp. 3d at 1255 (citing 7th Cir. Pattern Civil Jury Instruction 3.11 (2015)). But the calculation is a bit more complicated in this case.

The parties disagree about both the start date and the end date for McKewen's back pay. As for the start date, EEOC contends that McKewen is entitled to back pay beginning on November 7, 2016, "the first full pay period after he was rejected" after submitting his application on October 24. Dkt. 168, at 8. But the question is when McKewen would have started earning wages and benefits from RockAuto had he been hired, not when RockAuto rejected his application.

EEOC presents no evidence regarding how much time typically elapsed between when applicants submitted their applications and when they began work. Nor does EEOC address the fact that if McKewen had received a Jim Pass, he would still have been required to complete a test regarding his knowledge of auto parts and to participate in an in-person interview before receiving a job offer.

The court agrees with RockAuto that November 28 would have been a more realistic start date for McKewen. As RockAuto notes, comparator Emily Mei applied around the same time that McKewen applied, and more than five weeks passed between her application submission and her hire date. EEOC doesn't address this evidence in its response brief. *See id.* So the court will calculate McKewen's back pay beginning on November 28, which is likewise about five weeks after McKewen applied.

As for the end date, EEOC doesn't seek back pay through the date of judgment; rather, it seeks back pay through only November 21, 2018, around the time that McKewen made his last job inquiry by sending his resume to Master Lock. EEOC doesn't explain why it requests back pay through only that date, but the court infers that McKewen was not actively looking for work and not genuinely interested in working beyond that date.

The court concludes that McKewen is entitled to back pay from November 28, 2016, through November 21, 2018.

### 3. Hourly wage

The parties agree that the minimum pay rate for supply chain managers was $31 per hour when McKewen applied and that it was increased to $36 per hour in May 2017. And they agree that the maximum pay rate was $42 per hour until May 2017, when it was increased to $50 per hour. But the parties disagree on the rate McKewen would have been paid had he been hired.

EEOC contends that McKewen's damages should be based on the maximum pay rate because of his extensive experience. But EEOC adduces no evidence that any supply chain managers were hired at more than the minimum rate of pay. EEOC says that RockAuto's offer letter to comparator Alison Widner, who applied while she was still in college, shows that "even inexperienced [supply chain managers] earned up [to] $42 per hour." Dkt. 168, at 2. But the offer letter explicitly stated that Widner's starting pay would be $31 per hour; it said only that supply chain managers "have the ability to grow within the Supply Chain Manager role and pay

range, from $31 to $42/hour." Dkt. 37-29, at 15. EEOC also cites a declaration from EEOC investigator Jacob Sobiesczyk, who says that according to notes he took during EEOC's investigation of McKewen's age-discrimination charge, a RockAuto employee said that the pay range for supply chain managers was $36 to $50 per hour. Dkt. 164, ¶ 12. But again, this is not evidence that RockAuto paid a *starting* wage above the minimum.

**\*4** EEOC says that this disagreement is an ambiguity that should be resolved against RockAuto. *See, e.g., Stewart,* 542 F.2d at 452 ("[A]mbiguities in what an employee ... would have earned but for discrimination should be resolved against the discriminating employer."). But EEOC hasn't identified any ambiguity. EEOC has adduced no evidence that suggests that any supply chain managers were hired at an initial pay rate above the bottom of the pay range. The court concludes that McKewen would have been hired at the minimum pay rate. And EEOC doesn't contend that McKewen would have received a raise after his hire date (other than across-the-board increases to the minimum pay rate). So the court will calculate McKewen's lost wages based on $31 per hour through April 2017 and $36 per hour afterward.

Using these pay rates and the beginning and end dates discussed above, the court calculates McKewen's lost wages as follows:

November 28 to December 31, 2016: five 40-hour weeks at $31 per hour = $6,200

January 1 to April 30, 2017: 17 40-hour weeks at $31 per hour = $21,080

May 1 to December 31, 2017: 35 40-hour weeks at $36 per hour = $50,400

January 1 to November 21, 2018: 46 40-hour weeks at $36 per hour = $66,240

Total lost wages: $143,920.

### 4. Benefits from RockAuto

The parties agree that McKewen is entitled to the value of the benefits that McKewen would have received from RockAuto had he been hired. Both sides agree that EEOC's proposed calculation methods are appropriate in principle, although they disagree slightly about the amount of benefits to which McKewen is entitled. The parties divide the lost benefits to which McKewen is entitled into two categories: (1)

Case 1:17-cv-00070-WCG  Filed 10/15/21  Page 41 of 47  Document 261-9

legally required benefit payments that RockAuto would have paid on McKewen's behalf toward Social Security, Medicare, federal and state unemployment insurance, and workers' compensation; and (2) payments that RockAuto would have made toward McKewen's health-insurance premiums. Although other calculation methods might better approximate the value of McKewen's lost benefits, *see, e.g.*, *Barnes v. State of Wis. Dep't of Corr.*, No. 18-cv-105-jdp, 2020 WL 94799, at *3–4 (W.D. Wis. Jan. 8, 2020) (calculating lost benefits on plaintiff's actual replacement costs or expenses, not on what employer would have paid), both sides propose the same calculation methods, so the court will apply those methods.

As for the legally required benefit payments, both parties rely on the same June 2018 publication from the United States Bureau of Labor Statistics.[1] The publication states that as of March 2018, employers paid an average of 7.3 percent of wages for workers overall toward these benefit programs, and 7.4 percent of wages for sales and office workers. RockAuto relies on the 7.3 percent figure for workers overall, and EEOC relies on the 7.4 percent figure for sales and office workers. In its summary judgment briefing, RockAuto repeatedly stressed that the supply chain manager position had a sales focus. *See, e.g.*, Dkt. 22, at 13 (RockAuto looked for direct customer-service experience, not managerial experience). So the court will apply the 7.4 percent figure to McKewen's $143,920 in lost wages, which yields $10,650.08 in legally required benefits.

As for the health-insurance premium payments that RockAuto would have made on McKewen's behalf, both parties rely on an exhibit from RockAuto's 30(b)(6) deposition stating that RockAuto provided a fixed contribution toward each employee's health insurance premium, regardless of which plan the employee chose or how many family members were covered.[2] According to the document, the monthly premium contributions for 2017 were $118.84, the 2018 contributions were $120.36, and the 2019 contributions were $127.44. The document does not state the monthly premium contribution for 2016. EEOC estimates the 2016 contribution by assuming that RockAuto increased its contribution by the same percentage from 2016 to 2017 as it did from 2017 to 2018. RockAuto doesn't explicitly address the issue, but it appears to assume that the document simply states the wrong years—in other words, RockAuto uses the stated 2017 figure for 2016, the stated 2018 figure for 2017, and the stated 2019 figure for 2018. In any event, RockAuto's proposed damages calculation yields slightly *higher* damages

for McKewen on this point, so the court will resolve the ambiguity in McKewen's favor by using RockAuto's figures.

**\*5** For 2016, McKewen would have received one month of contributions, or $118.84. For 2017, McKewen would have received 12 months of contributions at $120.36 per month, or $1,444.32. And for 2018, McKewen would have received 11 months of contributions at $127.44 per month, or $1,401.84. The total value of these contributions is $2,965.

At this point in the tabulation, McKewen is entitled to $143,920 in lost wages, $10,650.08 in lost legally required benefit payments, and $2,965 in lost premium contributions, a total of $157,535.08 in back pay.

### 5. McKewen's earnings and benefits at Milwaukee Electronics

The parties agree that McKewen's back pay must be offset by the value of the wages and benefits that he received from Milwaukee Electronics. Both sides rely on McKewen's 2017 W-2 form from Milwaukee Electronics, Dkt. 98-8.

The parties agree that McKewen's damages should be offset by the $44,060.94 he received in compensation from Milwaukee Electronics, which includes $42,786.87 in wages and $1,274.07 in 401(k) contributions. And as with McKewen's back pay, they agree that his damages should be offset by: (1) a percentage of the compensation he received from Milwaukee Electronics to reflect the amount of Milwaukee Electronics' legally required benefit payments; and (2) the amount of Milwaukee Electronics' contributions toward McKewen's health-insurance premiums.

As for the legally required benefit payments, both sides propose the same percentages as above. The court will again use the 7.4 percent figure for sales and office workers. This yields an offset of $3,260.51.

As for the health-insurance premium contributions, the parties dispute the amount that Milwaukee Electronics contributed. Box 12b of McKewen's W-2 indicates with code DD that the total cost of his employer-sponsored health coverage was $7,241.02.[3] Internal Revenue Service guidance on code DD states that "the amount reported should include both the portion paid by the employer and the portion paid by the employee."[4] Nevertheless, RockAuto contends that McKewen's damages should be offset by the full cost of McKewen's health coverage for two reasons: (1) EEOC failed

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 4

to provide a computation of McKewen's damages before trial; and (2) this figure likely understates the value of the benefits McKewen received from Milwaukee Electronics because he testified at his deposition that he also received dental and vision insurance. But the court addressed the first reason at the final pretrial conference, declining to sanction EEOC for failing to compute damages and urging the parties to confer and stipulate to the value of McKewen's benefits. As for the second reason, IRS guidance states that the value of dental and vision insurance may be included in box 12b under code DD.[5] RockAuto hasn't adduced any evidence that Milwaukee Electronics did not include the value of McKewen's dental and vision insurance in this figure.

RockAuto hasn't offered a good reason to assume that Milwaukee Electronics paid the full cost of McKewen's health coverage. Based on the available evidence, and bearing in mind the principle that ambiguities should be resolved against RockAuto, the court concludes that EEOC's proposed calculation method is the best way to estimate the value of what Milwaukee Electronics paid toward McKewen's health coverage. EEOC's calculation method treats the health-insurance premium contributions as a percentage of his compensation (not including legally required benefits), assuming that Milwaukee Electronics and RockAuto would have paid the same percentage of compensation toward McKewen's health coverage. For 2017, the year that McKewen was employed by Milwaukee Electronics, McKewen is entitled to $71,480 in compensation from RockAuto. The $1,444.32 in premium contributions to which he is entitled for that year is about 2.02 percent of his compensation. Applying the same 2.02 percentage to McKewen's $44,060.94 in compensation from Milwaukee Electronics yields $890.03, so the court will offset his damages by that amount to reflect Milwaukee Electronics' health-insurance premium contributions.

**\*6** McKewen's $157,535.08 in back pay will be offset by the $44,060.94 he received from Milwaukee Electronics in compensation, the $3,260.51 he received in legally required benefits, and the $890.03 he received in health coverage contributions, a total offset of $48,211.48. This yields an adjusted back-pay award of $109,323.60.

## B. Front pay

The ADEA allows the court to award "such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter." 29 U.S.C. § 626(b). Both sides assume that this provision allows the court to award reinstatement or front pay (that is, future lost wages and benefits), so the court will do the same. *See Barton*, 662 F.3d at 454 (open question whether ADEA allows front pay, but reasoning in Supreme Court Title VII case "suggests that front pay is an available equitable remedy under the ADEA in the right circumstances, in lieu of reinstatement, just as it is under Title VII") (citing *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001)). Although McKewen testified at trial that he would accept a position with RockAuto if it were offered, EEOC contends that reinstatement is not feasible. Instead, EEOC seeks front pay for McKewen for a period of four years from the date of the judgment. In support of this request, EEOC says only that four years "is a reasonably certain period during which McKewen could have been expected to continue to work at RockAuto, given his testimony that he wishes to continue to work but gave up applying for jobs because he stopped receiving any responses." Dkt. 163, at 11.

As with back pay, the purpose of front pay (or reinstatement) is to make McKewen whole for the discrimination he has suffered. *Pollard*, 532 U.S. at 851. Such relief is awarded under the district court's discretion. *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir. 1990). It is difficult to square EEOC's request for front pay with its limited request for back pay, as EEOC seeks no damages whatsoever for the period between November 21, 2018, and the judgment. In other words, EEOC appears to believe that McKewen would be made whole regarding back pay with an award of damages through the end of his job search; EEOC doesn't explain why forward-looking relief would be appropriate under these circumstances.

The court concludes that neither front pay nor reinstatement is required to make McKewen whole, so the court will decline to order either remedy.

## C. Prejudgment interest

The decision to award interest is a matter within the district court's discretion, but it is presumptively available for violations of federal law. *Pickett v. Sheridan Health Care Ctr.*, 813 F.3d 640, 646 (7th Cir. 2016). The parties agree that McKewen should receive simple interest of four percent per year, calculated on an annual basis. So the court will award McKewen $13,883.73 in prejudgment interest through June 1, 2021, with additional interest accruing at $364.41 per month through the date of this order, for a total prejudgment interest award of $14,612.55.

## D. Permanent injunction

EEOC also asks the court to issue a permanent injunction against RockAuto under the ADEA's authorization of equitable relief, 29 U.S.C. § 626(b). Before granting EEOC's request for an injunction, the court must consider whether RockAuto's "discriminatory conduct could possibly persist in the future." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 842 (7th Cir. 2013) (quoting *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001)).

**\*7** As an initial matter, RockAuto contends that EEOC's request for injunctive relief is moot unless McKewen is reinstated. But the cases on which RockAuto relies involve individual plaintiffs, not EEOC. *See, e.g.*, *Tennes v. Mass. Dep't of Revenue*, 944 F.2d 372, 382 (7th Cir. 1991). Unlike an individual plaintiff, EEOC may "seek relief on behalf of individuals beyond the charging parties who are identified during the investigation." *E.E.O.C. v. United Parcel Serv.*, 94 F.3d 314, 318 (7th Cir. 1996). "[I]njunctive relief is appropriate even where the [EEOC] has produced no evidence of discrimination going beyond the particular claimant's case." *Ilona of Hungary*, 108 F.3d at 1578. EEOC proved at trial that RockAuto discriminated against McKewen on the basis of age, so EEOC is entitled to injunctive relief "unless [RockAuto] can show that [McKewen's] case is somehow different from the norm." *AutoZone*, 707 F.3d at 840–41 (internal quotation marks omitted).

EEOC requests injunctive relief in four categories for a period of three years:

1. Prohibition on age discrimination in hiring

RockAuto shall not take the age of an applicant into consideration during its hiring process, or otherwise discriminate against applicants on the basis of their age.

2. Adoption of anti-discrimination policy

    a. RockAuto shall adopt an anti-discrimination policy that prohibits age discrimination in its hiring process and establishes a procedure to receive and investigate complaints of discrimination.

    b. RockAuto shall provide a copy of such policy to EEOC within thirty (30) days of the entry of the Court's order.

    c. RockAuto shall maintain copies of any age discrimination complaints, internal investigations, and related records for the duration of the Court's Order, and longer if required by the governing recordkeeping regulations.

3. Implementation of anti-discrimination training

    a. Within ninety (90) days of the entry of the Court's Order, RockAuto shall provide all employees involved in hiring decisions, including all individuals who review applications, participate in interviews, or hold any decision-making authority with regard to hiring, with at least one (1) hour of training on the ADEA and RockAuto's anti-discrimination policy to be conducted either in-person or by live video conferencing.

    b. RockAuto shall provide this training once per year for the duration of the Court's Order.

    c. RockAuto shall provide EEOC with the name and qualifications of the person administering the training and the proposed training materials at least thirty (30) days before each administration of the training.

    d. RockAuto shall provide EEOC with a certification listing the individuals who attended the training, including names and titles, within seven (7) days after each administration of the training.

4. Assurance of compliance

    a. The Court's injunction shall be for three (3) years.

    b. Each year, on the anniversary of the entry of this Order, RockAuto shall file a certificate of compliance with the injunction. If RockAuto has not fully complied with one or more provisions of the Order, the signatory of the report shall indicate what shortcomings have occurred and shall outline a plan to assure immediate compliance.

    c. EEOC will give RockAuto fourteen (14) days' notice of any alleged noncompliance with the terms of this Order before initiating enforcement actions under it. If RockAuto has not remedied the alleged non-compliance or has not satisfied the EEOC that it has complied with the Decree at the end of that period, the EEOC may apply to the Court for appropriate relief. These dispute resolution proceedings do not apply to

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 6

those cases where there is a need to seek immediate or other extraordinary relief from the Court.

Dkt. 163, at 15–18.

EEOC's first category of relief, as drafted, requires RockAuto to obey the law regarding age discrimination. Such requests are generally disfavored as overly broad and vague. *AutoZone*, 707 F.3d at 841 (collecting cases). These "concerns are rooted in basic principles of due process" because such injunctions subject defendants to contempt proceedings for conduct that is unrelated to the litigation and that is defined in indefinite terms. *Id.* at 842. The court will revise the proposed first category of relief to include only the substantive component.

**\*8** The EEOC's remaining categories of injunctive relief are specific and directly related to the conduct at issue in this lawsuit. RockAuto offers no objections to any of EEOC's specific requests. It makes the general objection that a permanent injunction is unnecessary because RockAuto "already prohibits discrimination, includes a link to the 'Equal Opportunity is the Law' poster ... on its employee Wiki, and is willing to provide more training to its human resource professionals related to anti-discrimination laws." Dkt. 169, at 13–14. RockAuto also says that it has stopped asking applicants for their graduation years.

The court is not persuaded that RockAuto has already adequately remediated its age discrimination problem without an injunction. RockAuto already had a nominal nondiscrimination policy when RockAuto rejected McKewen's application. RockAuto employee Catherine Cahoon testified at trial that RockAuto included a link to generic nondiscrimination information in its employee handbook, and she said that she already knew that it is illegal to discriminate against an applicant on the basis of age. Dkt. 158, at 26:11–22. And even if RockAuto has stopped asking applicants for their graduation years, it's likely that most applicants would voluntarily include that information on their resumes, an assumption that is supported by the numerous applications the court has reviewed in this case. RockAuto says that it is willing to voluntarily provide unspecified antidiscrimination training to its employees. But a vague promise to provide some additional training in the future is not enough to meet RockAuto's burden to show that it will not continue to discriminate without an injunction, *AutoZone*, 707 F.3d at 840–41. The court will grant EEOC's request for injunctive relief, substantially in the form proposed by EEOC.

A proposed form of injunction is attached to this opinion and order. The parties have 14 days to submit any objections to the form of the order for injunction. After considering any objections, the court has will enter the injunction in a separate document as required under Rule 65 of the Federal Rules of Civil Procedure.

ORDER

IT IS ORDERED that

1. Glenn McKewen is awarded $109,323.60 in back pay and $14,612.55 in prejudgment interest.

2. Plaintiff Equal Employment Opportunity Commission's request for injunctive relief, Dkt. 163, is GRANTED.

3. A proposed injunction is attached; the parties have 14 days to submit any objections to the proposed injunction.

PROPOSED PERMANENT INJUNCTION

Plaintiff Equal Employment Opportunity Commission proved at trial that defendant RockAuto, LLC discriminated against charging party Glenn McKewen on the basis of age in violation of the Age Discrimination in Employment Act (ADEA). The discrimination occurred despite RockAuto having adopted a non-discrimination policy.

The court finds that a permanent injunction is necessary to ensure that RockAuto complies with the ADEA, and does not take the age of an applicant into consideration during the hiring process or otherwise discriminate against applicants or employees on the basis of age.

Accordingly, IT IS ORDERED that defendant RockAuto, LLC, is permanently ENJOINED as follows:

1. Prohibition on age discrimination in hiring

   a. RockAuto shall not take the age of an applicant into consideration during its hiring process.

2. Adoption of anti-discrimination policy

   a. RockAuto shall adopt an anti-discrimination policy that prohibits age discrimination in its hiring process and establishes a procedure to receive and investigate complaints of discrimination.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

b. RockAuto shall provide a copy of its policy to EEOC within 30 days of the entry of the court's order. EEOC must inform RockAuto of its objections to the policy, if any, within 14 days. If EEOC and RockAuto are unable to resolve any objections to the policy, the parties must submit their positions to the court within 14 days of EEOC's objection.

**\*9** c. Within 14 days of resolution of any objections, or within 14 days of the expiration of the objection period, RockAuto must provide a written copy of its anti-discrimination policy to each of its members, officers, and employees.

d. RockAuto shall maintain copies of any age discrimination complaints, internal investigations, and related records for the duration of this order (or longer if required by any other recordkeeping regulation).

3. Implementation of anti-discrimination training

a. Within 90 days of the entry of this order, RockAuto shall provide all employees involved in hiring decisions, including all individuals who review applications, participate in interviews, or hold any decision-making authority with regard to hiring, with at least one hour of training on the ADEA and RockAuto's anti-discrimination policy to be conducted either in-person or by live video conferencing.

b. RockAuto shall provide this training once per year for the duration of this order.

c. RockAuto shall provide EEOC with the name and qualifications of the person administering the training and the proposed training materials at least thirty days before each administration of the training.

d. RockAuto shall provide EEOC with a certification listing the individuals who attended the training, including names and titles, within seven days after each administration of the training.

4. Assurance of compliance

a. Within 14 days of entry of this injunction, RockAuto must provide a copy of this injunction to its members, officers, and employees.

b. The term of this injunction shall be for three years from the date of entry.

c. Each year, on the anniversary of the entry of this order, RockAuto shall file with the court a certificate of compliance with the injunction. If RockAuto has not fully complied with one or more provisions of this order, the signatory of the report shall indicate what shortcomings have occurred and shall outline a plan to assure immediate compliance.

d. EEOC will give RockAuto 14 days' notice of any alleged noncompliance with the terms of this order before initiating enforcement actions under it. If RockAuto has not remedied the alleged noncompliance or has not satisfied the EEOC that it has complied with this order at the end of that period, the EEOC may apply to the court for appropriate relief.

e. These dispute resolution proceedings do not prevent the EEOC from seeking immediate relief from the court for egregious violations of the injunction.

**All Citations**

Slip Copy, 2021 WL 3487668

---

Footnotes

1    Bureau of Labor Statistics, *News Release* 4 (June 8, 2018), https://www.bls.gov/news.release/archives/ecec_06082018.pdf.

2    This document was not filed on the docket, but EEOC submitted it as trial exhibit 71. *See* Dkt. 127, at 8.

3    *See* Internal Revenue Service, *General Instructions for Forms W-2 and W-3* 20 (2017), https://www.irs.gov/pub/irs-prior/iw2w3--2017.pdf (defining code DD).

4    Internal Revenue Service, *Form W-2 Reporting of Employer-Sponsored Health Coverage*, https://www.irs.gov/affordable-care-act/form-w-2-reporting-of-employer-sponsored-health-coverage (last accessed August 3, 2021).

5    *See id.*

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   8

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.