## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

Equal Employment Opportunity Commission,

       *Plaintiff*,

       *v.*

Case No. 1:17-cv-00070-WCG

Wal-Mart Stores East, LP,

       *Defendant*.

---

## MEMORANDUM OF DEFENDANT WAL-MART STORES EAST, LP, IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50, AND MOTION FOR A NEW TRIAL UNDER RULE 59 AND TO REMIT DAMAGES

---

GEORGE BURNETT
CONWAY, OLEJNICZAK & JERRY, S.C.
231 South Adams Street
Green Bay, WI 54301
(920) 437-0476
(920) 437-2868 (fax)
gb@lcojlaw.com

MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

*Counsel for Wal-Mart Stores East, LP*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

    I.   Walmart Is Entitled To Judgment As A Matter Of Law Under Rule 50 ............................ 8

        A.  The EEOC Offered No Evidence Showing That Walmart Was Aware That Ms. Spaeth's Difficulty Adjusting To Her New Schedule Was Linked To Her Down Syndrome ............................................................................................................... 8

        B.  At Minimum, Walmart Is Entitled To Judgment As A Matter Of Law On Punitive Damages Because There Is No Evidence That Walmart Acted With Malice Or Reckless Indifference ............................................................................ 20

    II.  Alternatively, This Court Should Order A New Trial Under Rule 59 Because The Verdict Was Against The Manifest Weight Of The Evidence ........................................... 23

    III.  At Minimum, This Court Should Remit The Compensatory Damages Award ................ 24

CONCLUSION .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Adams v. City of Chicago*,
798 F.3d 539 (7th Cir. 2015) ....................................................................... 24, 25

*Alexander v. City of Milwaukee*,
474 F.3d 437 (7th Cir. 2007) ............................................................................. 24

*Avitia v. Metro. Club of Chi., Inc.*,
49 F.3d 1219 (7th Cir. 1995 ......................................................................... 25, 26

*Bruso v. United Airlines, Inc.*,
239 F.3d 848 (7th Cir. 2001) ....................................................................... 20, 21

*Bultemeyer v. Fort Wayne Cmty. Sch.*,
100 F.3d 1281 (7th Cir. 1996) ........................................................................... 11

*EEOC v. AIC Sec. Investigations, Ltd.*,
55 F.3d 1276 (7th Cir. 1995) ............................................................................. 24

*EEOC v. AutoZone, Inc.*,
707 F.3d 824 (7th Cir. 2013) ................................................................. 21, 22, 24

*EEOC v. Flambeau, Inc.*,
846 F.3d 941 (7th Cir. 2017) ....................................................................... 21, 22

*EEOC v. Sears, Roebuck & Co.*,
417 F.3d 789 (7th Cir. 2005) ............................................................................. 11

*Ekstrand v. School Dist. of Somerset*,
583 F.3d 972 (7th Cir. 2009) ...................................................................... passim

*Fox v. Hayes*,
600 F.3d 819 (7th Cir. 2010) ............................................................................... 8

*Gentry v. Exp. Packaging Co.*,
238 F.3d 842 (7th Cir. 2001) ....................................................................... 20, 21

*Gile v. United Airlines, Inc.*,
213 F.3d 365 (7th Cir. 2000) ......................................................... 11, 20, 21, 22

*Gracia v. SigmaTron Int'l, Inc.*,
842 F.3d 1010 (7th Cir. 2016) ..................................................................... 20, 21

*Hall v. Forest River, Inc.*,
536 F.3d 615 (7th Cir. 2008) ............................................................................... 7

*Hedberg v. Indiana Bell Telephone Co.*,
47 F.3d 928 (7th Cir. 1995) ........................................................................ passim

*Hertzberg v. SRAM Corp.*,
261 F.3d 651 (7th Cir. 2001) ............................................................................. 20

*Knapp v. Nw. Univ.*,
    101 F.3d 473 (7th Cir. 1996) ................................................................. 13, 19

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999) ............................................................... 20, 21, 23

*Lust v. Sealy, Inc.*,
    383 F.3d 580 (7th Cir. 2004) ................................................................. 25, 26

*Marion County Coroner's Office v. EEOC*,
    612 F.3d 924 (7th Cir. 2010) ................................................................. 25, 26

*Massey v. Blue Cross-Blue Shield of Ill.*,
    226 F.3d 922 (7th Cir. 2000) ................................................................. 7, 20

*Matter of Prince*,
    85 F.3d 314 (7th Cir. 1996) ................................................................. 8

*Meija v. Cook Cty.*,
    650 F.3d 631 (7th Cir. 2011) ................................................................. 7

*Sch. Bd. of Nassau Cty. v. Arline*,
    480 U.S. 273 (1987) ................................................................. 13, 19

*Schandelmeier-Bartels v. Chi. Park Dist.*,
    634 F.3d 372 (7th Cir. 2011) ................................................................. 25, 26

*Vega v. Chi. Park Dist.*,
    954 F.3d 996 (7th Cir. 2020) ................................................................. 25, 26

*Wells v. Winnebago Cty.*,
    820 F.3d 864 (7th Cir. 2016) ................................................................. *passim*

*Whitehead v. Bond*,
    680 F.3d 919 (7th Cir. 2012) ................................................................. 7

*Willis v. Lepine*,
    687 F.3d 826 (7th Cir. 2012) ................................................................. 7, 23, 24

*Zimmerman v. Chi. Bd. of Trade*,
    360 F.3d 612 (7th Cir. 2004) ................................................................. 7, 20

**Statutes And Rules**

42 U.S.C. § 1981a ................................................................. 2, 5, 20, 22

42 U.S.C § 12101 ................................................................. 12, 13

42 U.S.C. § 12112 ................................................................. 8, 9

Fed. R. Civ. P. 50 ................................................................. 7

Fed. R. Civ. P. 59 ................................................................. 7

- iii -

## INTRODUCTION

After Defendant Wal-Mart Stores East, LP ("Walmart") discharged Marlo Spaeth—an individual with Down syndrome—due to significant attendance issues, the Equal Employment Opportunity Commission ("EEOC") brought claims against Walmart under the Americans with Disabilities Act ("ADA"). The EEOC argued that the ADA required Walmart to provide Ms. Spaeth with a fixed schedule as a "reasonable accommodation" for her attendance issues.

But as this Court properly instructed the jury, the EEOC could only prevail on its three ADA claims if—among other essential elements—it showed that Walmart discriminated against Ms. Spaeth "on the basis of a disability," which means that Walmart was "aware" that Ms. Spaeth's "limitations" were linked to her Down syndrome. Dkt.234 at 9 (jury instructions). As Walmart explained in its initial Rule 50(a) motion, the EEOC presented no evidence at trial suggesting that Walmart was aware of the link between Ms. Spaeth's Down syndrome and her attendance difficulties. Nor was such a link "obvious." *Ekstrand v. School Dist. of Somerset*, 583 F.3d 972, 977 (7th Cir. 2009). The EEOC's medical expert testified at trial that most people, including "most" members of "the medical profession," "*have no idea*" that individuals with Down syndrome have difficulty adjusting to new schedules. Trial Tr. Day 2 at 413 (Dkt.246) (emphasis added). Despite the failure of proof on this essential element, the jury found for the EEOC on all three claims, awarding Ms. Spaeth $150,000 in compensatory damages and $125 million in punitive damages—later reduced to the combined statutory cap of $300,000.

Walmart now renews its Rule 50 motion for judgment as a matter of law under Rule 50(b) and, alternatively, moves for a new trial under Rule 59(a), as well as for remittitur of damages.

The Court should grant judgment to Walmart because the EEOC presented no evidence establishing that Walmart was aware that Ms. Spaeth's attendance difficulties were linked to her

Down syndrome. In fact, no one provided Walmart with a doctor's note explaining this claimed link or offered an oral statement relaying such medical information. So while Walmart knew that Ms. Spaeth had requested a return to her prior fixed schedule, nothing in Walmart's knowledge suggested that this request was linked to her Down syndrome. Walmart going out of its way to help Ms. Spaeth succeed over her long history of employment, including giving her far more latitude for attendance violations than its policies require, highlights its lack of required notice here. And, again, any link between Ms. Spaeth's Down syndrome and her attendance difficulties was not "obvious," *Ekstrand*, 583 F.3d at 977—even for "most" members of "the medical profession," Trial Tr. Day 2 at 413—as the EEOC's medical expert explained.

Even if this Court does not grant judgment in full to Walmart, it should grant Walmart judgment on the EEOC's request for punitive damages. Punitive damages are only available under the ADA when an employer discriminates against an employee "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). None of Walmart's employees acted with those culpable mental states; it was their desire to help Ms. Spaeth *succeed* during her years of employment. For these reasons, this Court correctly recognized in its recent order on the EEOC's motion for equitable relief that "[t]his is *not* a case where Walmart employees exhibited animus or ill will against Spaeth individually or individuals with cognitive disabilities more generally." Dkt.266 at 6 (emphasis added).

Alternatively, this Court should grant Walmart a new trial or remit the $150,000 compensatory damages award. As the above evidence shows, the jury's verdict was at least against the manifest weight of the evidence, given that the EEOC failed to carry its evidentiary burden to show that Walmart was aware of the link between Ms. Spaeth's attendance issues and her Down

syndrome. This means that Walmart is entitled to a new trial. And the jury's $150,000 compensatory damages award is grossly excessive.

## BACKGROUND

Ms. Spaeth is an individual with Down syndrome who had worked for over 15 years as an associate at Walmart's Manitowoc Store, beginning in 1999. *See, e.g.*, Trial Tr. Day 1 at 140–41, 145–46 (Dkt.245) (Becker); Trial Tr. Day 3 at 516 (Dkt.247) (Stern). Until 2014, Walmart had generally scheduled Ms. Spaeth to work from 12:00 p.m. to 4:00 p.m., *e.g.*, Trial Tr. Day 2 at 474–75 (Dkt.246) (Stern), although she often had difficulty fully completing these shifts, *see, e.g.*, Trial Ex.1069. After 2014, Walmart implemented a new, automated scheduling system to schedule associates based on projected customer traffic. Trial Tr. Day 3 at 560–61 (Ohlsen). That system generally scheduled Ms. Spaeth to work from 1:00 p.m. to 5:30 p.m. Trial Tr. Day 1 at 168 (Becker); Trial Tr. Day 2 at 475 (Stern); Trial Tr. Day 3 at 563 (Ohlsen). Ms. Spaeth experienced significant attendance issues with this new schedule as well. *E.g.*, Trial Ex.1068. And although Walmart gave Ms. Spaeth far more leeway for her attendance violations than its policies require, affording her more "chance[s] to rectify her attendance," the attendance issues with her new schedule did not improve. *E.g.*, Trial Ex.37 at 4; Trial Tr. Day 2 at 328 (Castro); *see* Trial Tr. Day 3 at 632 (Abitz); Trial Tr. Day 3 at 667 (Spude). Walmart thus terminated Ms. Spaeth in July 2015. Trial Tr. Day 3 at 516 (Stern).

The EEOC filed this ADA lawsuit against Walmart on behalf of Ms. Spaeth and ultimately tried three ADA claims against Walmart, over a four-day trial. Dkts.236, 245–48. First, under its failure-to-accommodate claim, the EEOC claimed that Walmart unlawfully refused to provide Ms. Spaeth the "reasonable accommodation" of a permanent, modified fixed schedule after Walmart had adopted a new system of automatically scheduling employees based on consumer

demand. Dkt.234 at 9–10 (jury instructions). Second, under its discriminatory-termination claim, the EEOC claimed that Walmart discriminated against Ms. Spaeth by discharging her from her employment either because of her disability or because of the need to accommodate it. Dkt.234 at 16. Finally, under its failure-to-rehire claim, the EEOC claimed that Walmart discriminated against Ms. Spaeth by failing to rehire her. Dkt.234 at 16–17.

As relevant to Walmart's Motion here, to defend against these ADA claims at trial, Walmart argued that none of its associates were "aware" that Ms. Spaeth's difficulty adjusting to her new schedule, and resulting request for a scheduling accommodation, was linked to her Down syndrome. *See, e.g.*, Trial Tr. Day 3 at 510–11 (Stern), 571–72 (Ohlsen); Trial Tr. Day 1 at 78–79; Trial Tr. Day 1 at 208, 222, 225, 227 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 646–48 (Abitz). Walmart presented evidence that its associates believed that Ms. Spaeth's wish to return to her prior shift of 12:00 p.m. to 4:00 p.m. shift was "just [ ] comment[s] like anyone else would make that they wanted to go back to their original shift that they had." Trial Tr. Day 2 at 486 (Stern); *accord* Trial Tr. Day 2 at 483 (Stern); Trial Tr. Day 3 at 538 (Stern); Trial Ex.23.

The EEOC's medical expert explained at trial that most people, and "most" members of "the medical profession," "have no idea" that individuals with Down syndrome have difficulty adjusting to new schedules and thus may require fixed schedules to accommodate this limitation. *See* Trial Tr. Day 2 at 413 (Dr. Smith); *accord* Trial Tr. Day 3 at 572, 580 (Ohlsen); Trial Tr. Day 3 at 756. Consistent with this medical evidence, Walmart's associates did not know that "people with Down syndrome cannot adapt to change," meaning that individuals with this disability need the "routine" of fixed work schedules to complete their scheduled shifts. *E.g.*, Trial

Tr. Day 1 at 222 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 510–11, 571–72 (Stern).

As to the EEOC's request for punitive damages, Walmart did not act with malice or reckless indifference towards Ms. Spaeth's rights, as is necessary to justify a punitive damages award, but at most, it merely misunderstood Ms. Spaeth's request for a scheduling accommodation as not coming within the ADA. *See* Trial Tr. Day 1 at 76; *e.g.*, Trial Tr. Day 2 at 284 (Popp), 327 (Castro).

At the close of trial, Walmart moved for judgment as a matter of law under Rule 50(a). Dkt.229; Trial Tr. Day 3 at 739–58 (hearing on Walmart's Rule 50 Motion). Walmart argued that the EEOC's claims failed because the EEOC had presented no evidence showing that Walmart was aware that Ms. Spaeth's attendance issues were tied to her Down syndrome. Dkt.229 at 6–8; Trial Tr. Day 3 at 740–43. Walmart also argued that the EEOC failed to present sufficient evidence that Walmart had acted with malice or recklessness indifference toward Ms. Spaeth's ADA rights, as required to support any punitive damages award. Dkt.229 at 10–11; Trial Tr. Day 3 at 744. After hearing Walmart's Rule 50(a) Motion, this Court took it "under advisement" to see how the jury would decide the case. Trial Tr. Day 3 at 754–55. That said, this Court did explain during its Rule 50 colloquy that whether punitive damages were available as a matter of law "is a close question." Trial Tr. Day 3 at 758.

The jury found for the EEOC. Dkt.236. The jury then awarded $150,000 in compensatory damages for Ms. Spaeth, and awarded $125 million in punitive damages, Dkt.236 at 2. This Court then reduced the combined award of compensatory and punitive damages to the statutory maximum of $300,000, pursuant to Walmart's oral motion at the end of trial. Dkt.244 at 2; 42 U.S.C. § 1981a(b)(3)(D).

This Court then granted-in-part and denied-in-part the EEOC's Motion For Equitable Relief against Walmart, following the jury's finding of liability. Dkt.266. As relevant here, this Court found that most of the EEOC's injunctive-relief requests were unjustified, since "[t]his is not a case where Walmart employees exhibited animus or ill will against Spaeth individually or individuals with cognitive disability more generally." Dkt.266 at 6. Rather, "[t]he record reflects that, for over 15 years, Walmart's management staff and associates took steps to help Spaeth succeed as an associate," including by: "remind[ing] Spaeth of her schedule"; "personally handwrit[ing] Spaeth's schedule every week and ha[ving] Spaeth read the schedule back to [a Walmart associate] to ensure Spaeth knew the hours and days she was supposed to work"; "encourag[ing] Spaeth to finish her scheduled shifts"; and "help[ing] Spaeth by teaching her new job skills and devoting extra time to Spaeth's training." Dkt.266 at 6 (extensively citing trial transcripts). Indeed, "[n]o one" at Walmart "wanted to see Spaeth lose her job," and training coordinator Debbie Moss even "cried as she walked Spaeth to the front of the store and gave Spaeth a hug as she left." Dkt.266 at 6. So rather than award the broad injunctive relief sought by the EEOC, this Court only ordered the reinstatement of Ms. Spaeth; limited injunctive relief requiring Walmart to communicate with Ms. Spaeth's guardian in certain respects; and the payment of backpay, interest, and a tax-component award to Ms. Spaeth. Dkt.266 at 12.[*]

This Court entered its final judgment on March 22, 2022, Dkt.274, and Walmart now files this Renewed Motion For Judgment As A Matter Of Law Under Rule 50, And Motion For A New Trial Under Rule 59 And To Remit Damages.

---

[*] Walmart is complying with this reinstatement order in good faith and immediately contacted the EEOC after the Court issued that order so as to expeditiously reinstate Ms. Spaeth.

## LEGAL STANDARD

Under Federal Rule Of Civil Procedure 50(a), a trial court may enter judgment as a matter of law to the defendant when there is "not [ ] a legally sufficient evidentiary basis" for "a reasonable jury" to find for the plaintiff on any claim. Fed. R. Civ. P. 50(a). If a court does not grant a defendant's Rule 50(a) motion, and the jury returns a verdict against the defendant, then the defendant may file a "renewed" Rule 50 motion for judgment under Rule 50(b). Fed. R. Civ. P. 50(b); *see Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). Both Rule 50(a) and (b) require the court to ask "whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008); *see Massey*, 226 F.3d at 924. A party opposing a Rule 50 motion must present "more than a mere scintilla of evidence" for support. *Massey*, 226 F.3d at 924 (citation omitted). Thus, where the evidence produced at trial overwhelmingly supports a defendant's defense as to any claim, one piece of evidence arguably to the contrary amounts to no more than a mere scintilla that cannot salvage the jury verdict. *See Zimmerman v. Chi. Bd. of Trade*, 360 F.3d 612, 629 (7th Cir. 2004).

Rule 59(a), in turn, authorizes a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1), no matter whether a court has denied a Rule 50 motion, *Meija v. Cook Cty.*, 650 F.3d 631, 634 (7th Cir. 2011). A new trial under Rule 59(a) may be justified if "the jury's verdict is against the manifest weight of the evidence." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citations omitted). Therefore, a court considering whether to order a new trial under Rule 59(a) must weigh the evidence presented by the parties. *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012).

Finally, a court may alter or amend a judgment under either Rule 59(e) or its inherent authority where, as relevant here, there is evidence of manifest error of fact or law, *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996), which includes the power to remit a damages award that lacks support in the record, *see Fox v. Hayes*, 600 F.3d 819, 845–46 (7th Cir. 2010).

## ARGUMENT

### I.      Walmart Is Entitled To Judgment As A Matter Of Law Under Rule 50

#### A.      The EEOC Offered No Evidence Showing That Walmart Was Aware That Ms. Spaeth's Difficulty Adjusting To Her New Schedule Was Linked To Her Down Syndrome

The EEOC's ADA claims here required it to show that Walmart was "aware" that Ms. Spaeth's difficulty adjusting to her new schedule was linked to her Down syndrome. *Infra* Part I.A.1. The EEOC presented no evidence establishing this essential link, thus Walmart is entitled to judgment on all three ADA claims. *Infra* Part I.A.2. The EEOC's counterarguments presented at the Court's hearing on Walmart's Rule 50(a) motion are unpersuasive. *Infra* Part I.A.3.

1. The ADA provides that employers may not "discriminate against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, . . . discharge . . . , and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Prohibited discrimination under the ADA includes, as relevant here, "not making reasonable accommodations to the *known physical or mental limitations* of an otherwise qualified individual with a disability," *Id.* § 12112(b)(5)(A) (emphasis added) (a failure-to-accommodate claim); terminating an employee "*on the basis of*" the employee's "disability," *id.* § 12112(a) (emphasis added) (discriminatory-termination claim); and failing to rehire a terminated employee "*on the basis of*" the employee's "disability," *id.* (a failure-to-rehire claim) (emphasis added).

As this Court properly instructed the jury, each of the EEOC's three ADA claims against Walmart—a failure-to-accommodate claim under Section 12112(b)(5)(A), a discriminatory-termination claim under Section 12112(a), and a failure-to-rehire claim under Section 12112(a)—may succeed only if Walmart has "discriminate[d] against a person *on the basis of a disability*," which means that Walmart was "aware" that Ms. Spaeth's "limitations" were linked to her Down syndrome. Dkt.234 at 9 (emphasis added). Thus, the jury instructions correctly required the EEOC to present sufficient proof that Walmart was *aware* of the "link," *Wells v. Winnebago Cty.*, 820 F.3d 864, 867 (7th Cir. 2016), between Ms. Spaeth's difficulty adjusting to her new schedule and her Down syndrome to find Walmart liable on any of the three claims, *see* Dkt.234 at 9; *see generally* Dkt.234 at 9–10 (this Court's jury instructions, listing all elements for all three claims).

Numerous cases from the Seventh Circuit turn on an employee's success or failure to make her employer aware of the link between her qualifying disability and the precise limitation that allegedly needs accommodating, as this Court's instructions properly required here. Dkt.234 at 9.

For example, in *Wells*, 820 F.3d 864, the Seventh Circuit affirmed the grant of summary judgment to the employer because the employee failed to offer evidence proving that her employer was aware of the "link" between her limitation and her disability. *Id.* at 867. The employee had suffered from "chronic fatigue syndrome," which caused her "anxiety," *id.*, and had repeatedly asked "to be placed behind a counter or partition" while working with the public to reduce this anxiety, but "she did not link that anxiety to [her] qualifying disability" by "furnish[ing] any medical evidence" to her employer. *Id.* The ADA demands such medical evidence because the law does not "require[ ]" the employer simply "to treat [a disabled employee's] references to anxiety as notices of a link between her disability and her working conditions." *Id.* Indeed, "[m]any people suffer anxiety without being disabled by it," so "a reasonable employer" would

*not* "understand every mention of an employee's anxiety as a disability or understand, without medical knowledge, how anxiety and chronic fatigue syndrome are related." *Id.* Importantly, *Wells* explained that the ADA requires an employee to make the employer aware of the "link" between her given limitation and her disability even if the employer is already aware that the employee is disabled. *See id.* This is why the Seventh Circuit ruled for the employer, despite the employer previously accommodating the employee's disability by granting her a request for "time off"—a request supported with "medical evidence." *Id.*

The Seventh Circuit's decision in *Ekstrand*, 583 F.3d 972, in which the court reversed the dismissal of an employee's reasonable-accommodation claim at the summary-judgment stage, is in accord. There, the employee-school-teacher suffered from "seasonal affective disorder," which made it difficult for her to "function[ ] in a room with artificial light rather than natural light." *Id.* at 973. While the employee "repeatedly requested" to teach in "an alternate room with natural light" because of her condition, *id.*, she initially "never provided" her school-district employer "with evidence other than her own conclusory remarks that natural light was necessary to accommodate her," *id.* at 976–77. That is, "she never explained that her doctor had advised of the necessity of natural light"—"[n]or is natural light therapy so widely known as a necessary treatment for seasonal affective disorder that it should have been obvious to the school district." *Id.* at 977. This changed on November 28, 2005, when the employee's doctor "notified" the school district "of the importance of natural light for individuals with a history of this disorder." *Id.* at 976 (citations omitted). The school district still refused to provide the employer with a room with natural light, even after November 28, 2005, despite being made aware at that time of the link between the employee's disability and her need for a room with natural light. *Id.* at 973–74, 976–77.

The Seventh Circuit held that the employee's reasonable-accommodation claim could proceed to trial, but only as to the school district's failure to provide her with a room with natural light *after* November 28—the point at which the employer was "informed" by the employee's doctor "that natural light was necessary" to treating the employee's disability. *Id.* at 977. As the court explained, the ADA requires "a great deal of communication between the employee and employer"—especially "in a case involving an employee with a mental disability"—"because any necessary accommodation is often nonobvious to the employer." *Id.* at 976. Thus, as the Seventh Circuit has "consistently held," "disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement *from a doctor*, before an employer may be required . . . to provide" a reasonable accommodation. *Id.* (emphasis added) (citing as examples *Gile v. United Airlines, Inc.*, 213 F.3d 365 (7th Cir. 2000); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005); and *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281 (7th Cir. 1996)). This is because "the language of the ADA demonstrates that a reasonable accommodation is connected to what the employer knows about the employee's *precise* limitations," and "[w]hat an employer knows is limited by the evidence the employer receives." *Id.* (emphasis added). So, in *Ekstrand* itself, while "the school district was aware of [the teacher's] disability" long before November 28, "it was *unaware* of any evidence that natural light is a necessary treatment for seasonal affective disorder until November 28." *Id.* at 975 (emphasis added). This means that the employee could only proceed on her reasonable accommodation claim for her employer's failure to provide a room with natural light after November 28. *Id.* at 976–77.

The Seventh Circuit's decision in *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928 (7th Cir. 1995), illustrates the same principle. There, an employee brought an ADA discriminatory

discharge claim against his employer, claiming that the employer fired him for (among other reasons) "tardiness and lack of work ethic"—both of which were "symptoms" of his primary amyloidosis "disability." 47 F.3d at 930, 933–34. The employee never claimed that he informed his employer that his "symptoms [*i.e.*, limitations]" of tardiness and lack of work ethic were "manifestations of [his] disability," nor were the "symptoms [ ] so obviously manifestations of an underlying disability." *See id.* at 933–34. Instead, the employee argued "that his employer's actual knowledge" was "irrelevant in his case," since "firing [a disabled employee] because of symptoms of his disability is exactly the same as firing him because of his disability"—regardless of the employer's knowledge of a link between the disability and the symptoms. *Id.* at 933. The Seventh Circuit rejected this argument, explaining that "[a]llowing liability when an employer . . . knew of [a] disability's effects"—like tardiness—but "had no knowledge" that those effects were linked to the disability itself "would create an enormous sphere of potential liability" not contemplated by the ADA. *Id.* at 934. Indeed, "[t]ardiness and laziness have many causes, few of them based in illness"—and the "ADA hardly requires" that "an employer who has not been informed" of the link between a particular employee's tardiness/laziness and his disability "is bound to retain [the] apparently tardy and lazy employee[ ] on the chance that [he] may have a disability that causes [his] behavior." *Id.*

    *Wells*, *Ekstrand*, and *Hedberg* flow from the ADA's respect for the dignity and capability of people with disabilities. *See generally* 42 U.S.C § 12101 (ADA findings and purpose). These cases authoritatively interpreted the ADA as giving the disabled employee, rather than the employer, the responsibility to link the employee's request for an accommodation to a limitation of the employee's disability—at least when the link is nonobvious. This employee-centric approach prohibits employers from assuming, "based on prejudice, stereotypes, or unfounded

fears," *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284 (1987), that *any* limitations experienced by a disabled employee must be caused by her disability and thus are insurmountable, *accord Wells*, 820 F.3d at 867. Indeed, such unfounded assumptions may ultimately cause employers—perhaps acting out of misplaced "paternalistic concerns," *Knapp v. Nw. Univ.*, 101 F.3d 473, 485–86 (7th Cir. 1996)—to conclude that disabled employees cannot grow and overcome any of their limitations and so must be "relegat[ed] to lesser . . . activities, . . . jobs, or other opportunities," 42 U.S.C § 12101(a)(5).

2. Thus, each of the EEOC's ADA claims require proof that Walmart was aware of the link between Ms. Spaeth's Down syndrome and her difficulty adjusting to her new schedule, meaning that she needed a scheduling accommodation because of her Down syndrome. *See supra* Part I.A.1; Dkt.234 at 9 (jury instructions, correctly informing the jury of this element). Yet EEOC presented no evidence establishing that Walmart had such awareness.

The EEOC failed to show that Walmart received any "medical evidence" at any relevant time linking Ms. Spaeth's request to return to her prior schedule to a limitation of her Down syndrome. *Wells*, 820 F.3d at 867; *Ekstrand*, 583 F.3d at 976; *see* Dkt.234 at 9 (jury instructions). Walmart did not receive a "doctor's note" or even an "oral[ ] relay[ ]" of "a statement from a doctor," *Ekstrand*, 583 F.3d at 976, explaining that Ms. Spaeth's attendance difficulties were "manifestations of" her Down syndrome, such that she needed a modified schedule as an accommodation, *Hedberg*, 47 F.3d at 934; *see, e.g.*, Trial Tr. Day 1 at 225 (Becker) (not provided with any "type of medical note"); Trial Tr. Day 3 at 510 (Stern) (not provided with any statement from "anybody"). Nothing in the trial record here suggests that Walmart knew that Ms. Spaeth's difficulty adjusting to her new schedule was a "precise limitation[ ]" of her Down syndrome, as is

necessary for the jury to find for the EEOC on any of its three ADA claims, per this Court's correct jury instructions. *Ekstrand*, 583 F.3d at 976; *see Hedberg*, 47 F.3d at 932; Dkt.234 at 9.

The undisputed trial evidence showed that Walmart received no indication, "[a]t any point in time," that Ms. Spaeth's "attendance was related in any way whatsoever to her Down syndrome." Trial Tr. Day 1 at 222–23 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 647 (Abitz). So although Walmart knew that Ms. Spaeth had requested to return to her prior schedule, *e.g.*, Trial Tr. Day 2 at 486 (Stern), no one at Walmart understood this to be a request for an accommodation under the ADA or that such a request was linked to her disability, *see, e.g.*, Trial Tr. Day 1 at 208, 222, 225, 227 (Becker); Trial Tr. Day 2 at 486 (Stern); Trial Tr. Day 3 at 510–11 (Stern), 571–72 (Ohlsen), 647 (Abitz). Rather, Walmart believed that Ms. Spaeth's wish to return to her previous schedule was "just a comment like anyone else would make that they wanted to go back to their original shift that they had." Trial Tr. Day 2 at 486 (Stern); *accord* Trial Tr. Day 2 at 483 (Stern); Trial Tr. Day 3 at 538 (Stern); Trial Ex.23.

The only medical evidence presented at trial—the expert testimony of the EEOC's expert, Dr. David Smith—underscores the EEOC's failure to show that Walmart was aware of the link between Ms. Spaeth's Down syndrome and her attendance difficulties. *See Wells*, 820 F.3d at 867; *Ekstrand*, 583 F.3d at 976; *Hedberg*, 47 F.3d at 934. Dr. Smith testified that most people, *including "most" members of "the medical profession,"* have "no idea" that individuals with Down syndrome have difficulty adjusting to change, such that they would need a fixed work schedule to accommodate this limitation. Trial Tr. Day 2 at 413–14 (emphasis added). This limitation of Down syndrome is simply "not discussed," "[e]ven among doctors"—including because "there is not much taught about Down syndrome" more broadly. Trial Tr. Day 2 at 413–14 (Dr. Smith). Further, as Dr. Smith explained, this trait presents in "varying degrees" in individuals with Down

syndrome and is also "present in the general population to some extent." Trial Tr. Day 3 at 414 (Dr. Smith). The trial evidence showed that Walmart's understanding of Down syndrome mirrored that of most people and "most" members of the medical profession, Trial Tr. Day 2 at 413–14 (Dr. Smith), as its associates testified that they did not know that "people with Down syndrome cannot adapt to change," such that they need a "routine" of fixed work schedules to successfully finish their shifts, *e.g.*, Trial Tr. Day 1 at 222 (Becker); Trial Tr. Day 3 at 571–72 (Stern). Given Dr. Smith's testimony, Walmart would have had to receive at least some piece of medical evidence directly linking Ms. Spaeth's attendance issues to her Down syndrome to become aware of this link—yet, as already discussed, the EEOC failed to show that Walmart received any such evidence. The jury thus should have found in Walmart's favor on all claims, consistent with this Court's proper jury instructions. Dkt.234 at 9.

Relatedly, Dr. Smith's testimony also establishes that the link between Ms. Spaeth's attendance difficulties and her Down syndrome was "*non*obvious," meaning that Walmart did not have to speculate about the existence of this link without medical evidence. *Ekstrand*, 583 F.3d at 976 (emphasis added); *see also Hedberg*, 47 F.3d at 934; *accord Wells*, 820 F.3d at 867. Again, Dr. Smith's testimony establishes that most people and "most" members of "the medical profession" have "no idea" that individuals with Down syndrome have difficulty adapting to change, Trial Tr. Day 2 at 413–14, which is the very antithesis of an "obvious" proposition, *Ekstrand*, 583 F.3d at 977; *Hedberg*, 47 F.3d at 933. Making the link even *more* nonobvious, some members of the general population also have this trait, Trial Tr. Day 2 at 413–14 (Dr. Smith), which reflects Walmart's observation that "anyone else" who "wanted to go back to their original shift" in the face of a scheduling change would have made the very same "comment[s]" as Ms. Spaeth made, Trial Tr. Day 2 at 486 (Stern); *accord* Trial Tr. Day 2 at 483 (Stern); Trial Tr.

Day 3 at 538 (Stern); Trial Ex. 23.  So, the lack of an "obvious" link between Ms. Spaeth's attendance issues and her Down syndrome (along with the failure of the EEOC to submit any evidence showing Walmart's awareness of this link) means that the ADA entitled Walmart to treat Ms. Spaeth's "tardiness" just as it would with any other "apparently tardy . . . employees."  *See Hedberg*, 47 F.3d at 934; *compare* Trial Ex.37 at 4; Trial Tr. Day 2 at 328 (Castro); Trial Tr. Day 3 at 632 (Abitz); Trial Tr. Day 3 at 667 (Spude) (all explaining that Walmart afforded Ms. Spaeth more leeway for her attendance violations than other associates received).

Further, Walmart's long history of respect for Ms. Spaeth and its desire for her to succeed strongly suggest that, had Walmart actually been aware that Ms. Spaeth's attendance difficulties were "connected" to the "precise limitations" of her Down syndrome, *Ekstrand*, 583 F.3d at 976, it would have accommodated those limitations, *accord* Dkt.266 at 5–6 (explaining that "[t]here is no evidence to suggest that Walmart is a corporation that flouts its obligations or is unconcerned about complying with laws prohibiting discrimination" (citation omitted)).  For "over 15 years, Walmart's management staff and associates took steps to help Spaeth succeed as an associate," including by "remind[ing] Spaeth of her schedule," "personally handwrit[ing] Spaeth's schedule every week and ha[ving] Spaeth read the schedule back . . . to ensure Spaeth knew the hours and days she was supposed to work," "encourag[ing] Spaeth to finish her scheduled shifts," and "help[ing] Spaeth by teaching her new job skills and devoting extra time to Spaeth's training." Dkt.266 at 6 (citing trial-record evidence).

The EEOC's failure to submit evidence relating to Walmart's awareness of the link between Ms. Spaeth's attendance difficulties and her Down syndrome is more problematic than the employee's failure in *Wells*, 820 F.3d 864, and the employee's (initial) failure in *Ekstrand*, 583 F.3d 972.  In *Wells*, the employee at least offered a "contention" to her employer that her request

for an accommodation was medically tied to her disability—although the Seventh Circuit explained that this contention could not establish the link between her requested accommodation and her employee's disability, since the employee did not "furnish[ ] any medical evidence" to support it. 820 F.3d at 867. And in *Ekstrand*, the employee offered at least "conclusory remarks" to her employer that her requested accommodation "was [medically] necessary" for her disability, although these remarks too were insufficient because they "never explained that her doctor had advised her" that the requested accommodation was linked to her disability. 583 F.3d at 976–77. Here, the EEOC presented no evidence that Walmart received even medically unsupported contentions or conclusory remarks asserting a link between Ms. Spaeth's attendance difficulties and her Down syndrome. *See, e.g.*, Trial Tr. Day 1 at 225 (Becker); Trial Tr. Day 3 at 510 (Stern). But even if Walmart had received such unsupported contentions or conclusory remarks, they would not have sufficiently established this essential element, since they do not qualify as the kind of "medical evidence" required here. *See Wells*, 820 F.3d at 867; *Ekstrand*, 583 F.3d at 976–77.

3. During this Court's colloquy on Walmart's Rule 50(a) Motion, the EEOC claimed that Walmart was aware of the link between Ms. Spaeth's attendance difficulties and her Down syndrome for three reasons, Trial Tr. Day 3 at 746–47, all of which are unpersuasive.

*First*, the EEOC correctly conceded that "the law requires [ ] that Ms. Spaeth's limits be known to [Walmart]," but it claimed that Walmart's general familiarity with Ms. Spaeth over her long employment history was enough "for a jury to conclude" that her attendance difficulties were "related to her disability." Trial Tr. Day 3 at 746–47. This attempts to erase the EEOC's duty to show that Walmart was aware of "medical evidence" linking Ms. Spaeth's attendance difficulties and need for a fixed schedule to her Down syndrome. *See Wells*, 820 F.3d at 867; *Ekstrand*, 583 F.3d at 976. And while Dr. Smith agreed that "the desire for routine in Down syndrome [was]

something a person could notice by spending a lot of time with somebody who has Down syndrome," Trial Tr. Day 2 at 418–19 (Dr. Smith); Trial Tr. Day 3 at 747 (EEOC referencing this testimony), that does not excuse the EEOC's duty to show that *Walmart itself* was aware of such "medical evidence" *as to Ms. Spaeth*, *see Wells*, 820 F.3d at 867; *Ekstrand*, 583 F.3d at 976. In any event, the unrefuted trial evidence showed that no one at Walmart had "notice," Trial Tr. Day 2 at 418–19 (Dr. Smith), that Ms. Spaeth had such a limitation because of her Down syndrome, *see, e.g.*, Trial Tr. Day 3 at 510–11 (Stern), 571–72 (Ohlsen);; Trial Tr. Day 1 at 208, 222, 225, 227 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 646–48 (Abitz).

*Second*, the EEOC claimed that Ms. Spaeth's experience of "sudden[ ] . . . attendance problems when [Walmart] changed the schedule" alone establishes that these problems are "related to her disability," Trial Tr. Day 3 at 747, but this does not follow as a matter of basic logic. *Any* employee—with or without a disability—could experience attendance (including transportation-related) problems after receiving a new work schedule. For example, any employee—whether disabled or not—could have problems arranging transportation after receiving a new schedule, just like Ms. Spaeth claimed here. *See, e.g.*, Trial Tr. Day 1 at 91 (Stevenson). Thus, Walmart would not "understand, without medical knowledge," how Ms. Spaeth's attendance issues and her Down syndrome were "related." *Wells*, 820 F.3d at 867; *see also Hedberg*, 47 F.3d at 934. Further, Ms. Spaeth had attendance issues long before her schedule changed, *see, e.g.*, Trial Ex. 1069, with no indication that these were caused by her Down syndrome, thus it would be fallacious for Walmart to assume that new attendance issues were caused by this disability. In any event, as explained above, a fundamental premise of the ADA is that an employee has the duty to make her employer aware of any link between her disability and a given limitation to trigger the ADA's protections—at least when such a link is nonobvious—even where the employer otherwise knows

that the employee has a qualifying disability. *See Wells*, 820 F.3d at 867; *Ekstrand*, 583 F.3d at 977; *supra* pp. 12–13. In this way, the ADA does not force an employer to simply assume— whether "based on prejudice, stereotypes, or unfounded fears," *Sch. Bd. of Nassau Cty.*, 480 U.S. at 284, or on "paternalistic concerns," *Knapp*, 101 F.3d at 485–86—that all limitations experienced by an employee with a disability must be on account of her disability, *supra* pp. 12–13.

*Finally*, the EEOC claims that "Ms. Stevenson . . . called Karen Becker and said that Marlo's difficulties were related to her Down syndrome." Trial Tr. Day 3 at 747. Even if this call ever occurred, *but see* Trial Tr. Day 1 at 191 (Becker), Ms. Stevenson's alleged statement does not establish Walmart's awareness of a link between Ms. Spaeth's attendance difficulties and her Down syndrome. All that Ms. Stevenson claims to have said, as relevant here, is as follows:

> Q. And what did you tell Karen when you called her?
>
> A. I told her that it was a problem for Marlo to be working past 4:00; that she couldn't do that. She was getting too hot, she wasn't able to eat, and she was missing her bus to get home. And that we needed to switch it back to noon to 4:00 like it had been.
>
> Q. Did you explain any other reasons why you were making that request?
>
> A. Because Marlo has Down syndrome she just couldn't handle working—she couldn't physically handle working that late and couldn't—she was complaining she was too hot.

Trial Tr. Day 1 at 91–92. That brief assertion is not "medical evidence," like a doctor's note, as required to establish the employer-awareness-of-link element in dispute here. *See Wells*, 820 F.3d at 867; *see also Ekstrand*, 583 F.3d at 976. Nor is this short statement an "oral[ ] relay[ ]" of a "statement from a doctor," *Ekstrand*, 583 F.3d at 976, or even a statement with any medical information at all. Indeed, this layperson's statement fails even to tie Ms. Spaeth's attendance difficulties to a "precise limitation" of her Down syndrome, *id.*—let alone the precise limitation at issue, the inability to adjust to change—as it just broadly asserts that Ms. Spaeth cannot "physically

handle working that late" and "was too hot" "[b]ecause she has Down syndrome," Trial Tr. Day 1 at 91–92 (Stevenson). It does not explain why Ms. Spaeth could work until 4:00 p.m. (her old schedule), but not 5:30 p.m. (her new schedule), because of a limitation of her Down syndrome, rather than for some other reason—like her preferred transportation schedule. *See, e.g.*, Trial Tr. Day 1 at 91 (Stevenson). That said, at most this single statement amounts to a "mere scintilla" of arguably contrary evidence that cannot outweigh the overwhelming trial evidence in Walmart's favor on this point. *Massey*, 226 F.3d at 924 (citation omitted); *Zimmerman*, 360 F.3d at 629.

## B. At Minimum, Walmart Is Entitled To Judgment As A Matter Of Law On Punitive Damages Because There Is No Evidence That Walmart Acted With Malice Or Reckless Indifference

Punitive damages are available under the ADA only when an employer has discriminated against an employee "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1); *accord* Dkt.234 at 18–20 (jury instructions on punitive damages). "The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind" and refer "to the employer's knowledge that it may be acting in violation of federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). For a punitive-damages award to be lawful, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law," *id.* at 536—that is, the employer must have "a culpable state of mind" regarding whether its actions "violate[ ] federal law," *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000); *see also Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016); *Gentry v. Exp. Packaging Co.*, 238 F.3d 842, 851 (7th Cir. 2001); *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857–58 (7th Cir. 2001); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 661–62 (7th Cir. 2001). In contrast, if an employer's actions amount only "to negligence because it misunderstood" its obligations to the disabled employee under the ADA, then punitive damages are unavailable as a matter of law.

*EEOC v. AutoZone, Inc.*, 707 F.3d 824, 837 (7th Cir. 2013) (citations omitted); *Gile*, 213 F.3d at 375–76; *see also EEOC v. Flambeau, Inc.*, 846 F.3d 941, 947 (7th Cir. 2017).

Here, none of Walmart's associates acted with "malice," *Kolstad*, 527 U.S. at 535; *see Gracia*, 842 F.3d at 1025; *Gentry*, 238 F.3d at 851; *Bruso*, 239 F.3d 848 at 857, or a "culpable state of mind," *Gile*, 213 F.3d at 375, as to whether their conduct violated Ms. Spaeth's rights under the ADA, thus punitive damages are unavailable. Walmart's associates repeatedly sought to help Ms. Spaeth succeed over her long employment history. For example, many associates repeatedly tried to help Ms. Spaeth with her attendance issues by encouraging her to finish her shifts and reminding her of her schedule. *E.g.*, Trial Tr. Day 1 at 186, 217, 221 (Becker); Trial Tr. Day 2 at 484, 491, 494 (Stern); Trial Tr. Day 3 at 508–10 (Stern); 567 (Ohlsen), 614–15 (Moss). Ms. Becker would personally handwrite Ms. Spaeth's schedules every week and review them with her, which she did not do with other associates. Trial Tr. Day 1 at 164–65; *compare* Dkt.255-1 at 4, 7. Multiple other associates helped teach Ms. Spaeth new job skills and spent extra time with her on this training. *E.g.*, Trial Tr. Day 2 at 310–11 (Castro); Trial Tr. Day 2 at 479 (Stern). And Walmart's associates gave Ms. Spaeth far more latitude for her attendance violations than company policies require, so that she would have more "chance[s] to rectify her attendance." *E.g.*, Trial Ex.37 at 4; Trial Tr. Day 2 at 328 (Castro); see Trial Tr. Day 3 at 632 (Abitz); Trial Tr. Day 3 at 667 (Spude). Yet the EEOC claimed that many of these employees who helped Ms. Spaeth over the years were also the ones that violated her ADA rights. Dkt.255-1 at 4, 7 (claiming that Becker, Stern, and Castro violated Ms. Spaeth's ADA rights).

And as explained extensively above, *supra* Part I.A, no one at Walmart understood Ms. Spaeth to have requested an accommodation under the ADA or to have claimed that a scheduling accommodation was necessary to alleviate any limitation linked to her Down

syndrome, *see, e.g.*, Trial Tr. Day 1 at 208, 222, 225, 227 (Becker); Trial Tr. Day 2 at 486–87 (Stern); Trial Tr. Day 3 at 510–11 (Stern), 571–72 (Ohlsen), 646–49 (Abitz). Nor was Ms. Spaeth's need for a scheduling accommodation "obvious," as "it's not obvious" that "the consequences" or "limitations caused by" Down syndrome include an inability to adjust to a new schedule. Trial Tr. Day 3 at 756 (this Court's observations at trial). Indeed, the *only* medical evidence introduced at trial—the testimony of Dr. Smith, the EEOC's medical expert—supported the understanding of Walmart's associates, as that evidence established that most people, including "most" members of the "medical profession," "have no idea" that people with Down syndrome would need a fixed schedule as an accommodation to complete their shifts. Trial Tr. Day 2 at 413 (Dr. Smith); *accord* Trial Tr. Day 3 at 580 (Ohlsen). All of this shows that no one at Walmart "perceived" that the refusal to give Ms. Spaeth a scheduling accommodation "risk[ed] . . . violat[ing]" the ADA, as is necessary to support a punitive damages award. *Gile*, 213 F.3d at 376; *see Flambeau, Inc.*, 846 F.3d 941 at 947–48. At the very worst, Walmart's associates "misunderstood" in good faith their precise ADA obligations to Ms. Spaeth, and a good-faith misunderstanding cannot establish the "culpable state of mind" needed for punitive damages. *Gile*, 213 F.3d at 375–76; *AutoZone*, 707 F.3d at 837; *see Flambeau, Inc.*, 846 F.3d 941 at 947–48.

The conclusion that Walmart lacked the "malice" or "reckless indifference," 42 U.S.C. § 1981a(b)(1), to sustain a punitive-damages award reflects this Court's findings in its order on the EEOC's motion for equitable relief, Dkt. 266 at 6. As this Court explained, "[t]here is no evidence to suggest that Walmart . . . flouts its obligations [under the ADA] or is unconcerned about complying with laws prohibiting discrimination." Dkt. 266 at 5 (citation omitted). That is the opposite of what is needed to satisfy Section 1981a(b)(1), since a finding that Walmart did not "flout its obligations," Dkt. 266 at 5–6, means that it has not acted with "malice," § 1981a(b)(1),

while a finding that Walmart was not "unconcerned about complying with [the] law," Dkt.266 at 5–6, means that it has not acted with "reckless indifference," § 1981a(b)(1). This Court's equitable relief order also found—consistent with the evidence—that "[t]his is *not* a case where Walmart employees exhibited animus or ill will against Spaeth individually or individuals with cognitive disabilities more generally." Dkt.266 at 6 (emphasis added). Instead, the "record reflects that, for over 15 years, Walmart's management staff and associates took steps to help Spaeth succeed as an associate," including by "remind[ing] Spaeth of her schedule," "personally handwrit[ing] her schedule" and having Ms. Spaeth "read [it] back," "encourag[ing] Spaeth to finish her scheduled shifts," and "teaching her new job skills and devoting extra time to [her] training." Dkt.266 at 6 (citing trial transcripts throughout). In short, "*[n]o one wanted to see Spaeth lose her job*," Dkt.266 at 6 (emphasis added)—a finding that fatally undermines any claim that Walmart acted with "knowledge that it may be . . . violati[ng]" Ms. Spaeth's rights here, *Kolstad*, 527 U.S. at 535.

## II. Alternatively, This Court Should Order A New Trial Under Rule 59 Because The Verdict Was Against The Manifest Weight Of The Evidence

Even if the Court were to conclude that the trial evidence was not so lacking as to require judgment as a matter of law in Walmart's favor, *contra* Part I, this Court should order a new trial under Rule 59 because the verdict was against the manifest weight of the evidence, *Willis*, 687 F.3d at 836. The EEOC did not meet its evidentiary burden to show that Walmart was aware of the link between Ms. Spaeth's attendance issues and her Down syndrome. *Supra* Part I.A.2. Instead, as Walmart explained above, the manifest weight of the evidence shows that Walmart received no medical evidence linking Ms. Spaeth's attendance difficulties to her Down syndrome, such that she required a modified schedule as an accommodation. *Supra* Part I.A.2. While Walmart knew that Ms. Spaeth had requested to return to her prior schedule, everyone at Walmart

had the good-faith understanding that this was just like any other employee wishing to return to an old work schedule—not a request for an accommodation under the ADA or a claim that this was linked to her Down syndrome. *Supra* Part I.A.2. And Dr. Smith's testimony explaining that most people, including most members of the medical profession, do not know that individuals with Down syndrome have difficulty adjusting to change only highlights the EEOC's failure to show Walmart's awareness of the link between Ms. Spaeth's Down syndrome and her attendance. *Supra* Part I.A.2. At best, the EEOC offered only a mere scintilla of contrary evidence of Walmart's supposed awareness of this link in the form of an alleged phone call between Ms. Stevenson and Ms. Becker—a call that did not supply the requisite medical evidence needed to establish Walmart's awareness. *Supra* Part I.A.3. That scintilla of evidence alone does not outweigh the manifest weight of the evidence in Walmart's favor on this essential element, meaning that Walmart is at least entitled to a new trial under Rule 59. *Willis*, 687 F.3d at 836.

## III.    At Minimum, This Court Should Remit The Compensatory Damages Award

A. The "purpose of compensatory damages is to compensate for what was lost," rather than to punish a defendant for its conduct. *Alexander v. City of Milwaukee*, 474 F.3d 437, 451 (7th Cir. 2007). Thus, a court must vacate a compensatory damages award and either order a new compensatory damages trial or remit the award when that award is: (1) "monstrously excessive"; (2) has "no rational connection between the award and the evidence"; or (3) is not "roughly comparable to awards made in similar cases." *AutoZone*, 707 F.3d at 833. A compensatory damages award is "monstrously excessive" if it is "a product of passion and prejudice," *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (citation omitted), and an award has no rational connection to the evidence if it "is merely a product of the jury's fevered imaginings or personal vendettas," *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995). These two

standards "are really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Adams*, 798 F.3d at 543. Finally, compensatory damages awards in other cases may serve as a "reference point" to help the court determine whether an award is reasonable. *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1008 (7th Cir. 2020) (citation omitted).

The Seventh Circuit's decision in *Marion County Coroner's Office v. EEOC*, 612 F.3d 924 (7th Cir. 2010), serves as a helpful guide for determining the proper amount of a compensatory damages award in a case like this—in which only emotional-distress damages were claimed as compensatory damages. There, the Seventh Circuit concluded that the "several months" of "situational depression" experienced by the terminated employee after he suffered racial discrimination, which required "weekly" therapy sessions, justified nothing "close to" the $200,000 compensatory damages award that the employee had obtained. *Id.* at 931 (citations omitted; alternations omitted). Emphasizing the "extremely brief" damages testimony and the fact that "the underlying facts" were not "so extraordinary as to warrant such an award," the court held that $20,000 was the maximum compensatory damages award that "would keep the award within rational limits." *Id.* Other decisions from the Seventh Circuit are also helpful comparators. *See Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1229–30 (7th Cir. 1995) (remitting a $21,000 award to $10,500, when the plaintiff suffered enough distress "to make a grown man cry" and still felt "deeply distressed" "several years after he had been fired"); *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 389–91 (7th Cir. 2011) (remitting $200,000 award to $30,000 in racial-discrimination case in which plaintiff suffered a racist tirade and was terminated); *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004) (upholding reduction of the jury's compensatory damages award from $100,000 to $27,000, where plaintiff testified to "nontrivial symptoms of anxiety and other forms of emotional distress").

B. Here, this case "does not come close to supporting" the $150,000 compensatory damages award to Ms. Spaeth. *Marion Cty.*, 612 F.3d at 931; Dkt.236 at 2 (jury verdict). Although some brief damages testimony showed that Ms. Spaeth suffered depression after her discharge from Walmart, Trial Tr. Day 1 at 94, 103–105 (Stevenson); Trial Tr. Day 2 at 357–59 (Spaeth); Trial Tr. Day 2 at 390, 398–400 (Dr. Smith), the testimony suggested that Ms. Spaeth's depression was not solely caused by the events of this case, Trial Tr. Day 2 at 397–400 (Dr. Smith). This is because, according to Dr. Smith, Ms. Spaeth's depressive symptoms did not begin until "six to eight months" after her termination from Walmart, "coincid[ing] with her mother's illness and subsequent passing." Trial Tr. Day 2 at 397–99 (cross-examination of Dr. Smith). Further, the facts here—Walmart's discharging of a disabled employee with no "animus or ill will against [the employee] individually or individuals with cognitive disabilities more generally," Dkt.266 at 6— are not nearly "so extraordinary as to warrant" the jury's award, *Marion Cty.*, 612 F.3d at 931.

This Court should thus remit the compensatory damages award from $150,000 to $15,000—the same reduction in terms of percentage as in *Marion County*, 612 F.3d at 931 (remitting $200,000 to $20,000). And while case comparisons are not dispositive on the remittitur question, *see Vega*, 954 F.3d at 1008, the thrust of the Seventh Circuit's case law shows that the unreduced, $150,000 compensatory damages award here grossly exceeds the properly reduced damages awards in comparable cases, *see, e.g.*, *Marion Cty.*, 612 F.3d at 931 ($20,000); *Schandelmeier-Bartels*, 634 F.3d at 391 ($30,000); *Avitia*, 49 F.3d at 1229–30 ($10,500); *Lust*, 383 F.3d at 589 ($27,000).

**CONCLUSION**

The Court should grant Walmart's Renewed Motion For Judgment As A Matter Of Law

Under Rule 50, And Motion For A New Trial Under Rule 59 And To Remit Damages.


Dated, April 19, 2022


                                        Respectfully submitted,


GEORGE BURNETT                          /s/Misha Tseytlin
CONWAY, OLEJNICZAK & JERRY, S.C.        MISHA TSEYTLIN
231 South Adams Street                  TROUTMAN PEPPER
Green Bay, WI 54301                     HAMILTON SANDERS LLP
(920) 437-0476                          227 W. Monroe Street, Suite 3900
(920) 437-2868 (fax)                    Chicago, IL 60606
gb@lcojlaw.com                          (608) 999-1240
                                        (312) 759-1939 (fax)
                                        misha.tseytlin@troutman.com

                                        *Counsel for Wal-Mart Stores East, LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of April 2022, a true and accurate copy of the foregoing

was served via the Court's CM/ECF system upon all counsel of record.

/s/ Misha Tseytlin
_____
MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com