# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT )<br>OPPORTUNITY COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>)<br>WAL-MART STORES EAST, L.P., )<br>)<br>Defendant. ) | Civil No. 17-cv-0070 |

**PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S
MEMORANDUM IN OPPOSITION TO WALMART'S RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW UNDER RULE 50, AND FOR A NEW TRIAL
UNDER RULE 59, AND TO REMIT DAMAGES (ECF NOS. 277 AND 278)**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.  Walmart Fails to Meet the Standard for Rule 50 Judgment ..................................... 1

   A.  Walmart asks the Court to conduct an improperly heightened review of the verdict. ........... 2

   B.  The jury determined that Walmart *was* aware of Marlo Spaeth's limitations and her need
   for accommodation. ........................................................................................................... 4

   C.  Walmart witnesses testified that they knew Spaeth had a disability, and they knew the ADA
   requires accommodations for people with disabilities, but still denied Spaeth's request for a
   schedule change. ............................................................................................................... 7

   D.  The jury awarded punitive damages after receiving proper instructions regarding the
   standard for awarding such damages. ............................................................................. 10

      i.   Various types of evidence can justify an award of punitive damages. ................. 11

      ii.  Ample evidence supports the jury's conclusion that Walmart knew Marlo's schedule
      problems were disability-related and that she was requesting a reasonable accommodation... 12

      iii.  Walmart's witnesses testified to their knowledge that denying Marlo Spaeth an
      accommodation might violate the law. ............................................................................. 14

      iv.  Walmart also offered false explanations which justify punitive damages. ................... 18

II.  Walmart's Rule 59 Motion is Equally Unavailing ................................................... 19

   A.  Walmart has not met the standard for altering a verdict under Rule 59. ............................. 19

   B.  Evidence at trial proved Walmart was aware Spaeth needed an accommodation because of
   her disability. .................................................................................................................. 20

III.  The Jury's Compensatory Damage Award Was Proper and Should Not Be Remitted ........ 24

   A.  Evidence supports the jury's award of $150,000 in compensatory damages. ........................ 24

   B.  The jury's award is roughly comparable to similar cases. ................................................... 26

   C.  If this Court remits compensatory damages, the EEOC requests a concurrent increase in
   punitive damages. ............................................................................................................ 27

CONCLUSION ................................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Chicago*,
  798 F.3d 539 (7th Cir. 2015) ............................................................................24, 25

*Beck v. Univ. of Wis. Bd. of Regents*,
  75 F.3d 1130 (7th Cir. 1996) ...................................................................................4

*Blue v. Int'l Bd. of Elec. Workers Loc. Union 159*, No. 09-CV-395-WMC, 2011
  WL 13359246 (W.D. Wis. Feb. 3, 2011), aff'd sub nom, *Blue v. Int'l Bd. of
  Elec. Workers Loc. Union 159*,
  676 F.3d 579 (7th Cir. 2012) .................................................................................23

*Bowers v. Dart*,
  1 F.4th 513 (U.S. 7th Cir. 2021) ..........................................................................2, 8

*Bultemeyer v. Fort Wayne Cmty. Sch.*,
  100 F.3d 1281 (7th Cir. 1996) .......................................................................3, 4, 18

*Davis v. Wis. Dep't of Corr.*,
  445 F.3d 971 (7th Cir. 2006) .................................................................................20

*Deloughery v. City of Chi.*,
  422 F.3d 611 (7th Cir. 2005) .................................................................................27

*EEOC v. AutoZone, Inc.*,
  707 F.3d 824 (7th Cir. 2013) ........................................................................ *passim*

*EEOC v. Sears, Roebuck & Co.*,
  417 F.3d 789 (7th Cir. 2005) ...........................................................................16, 18

*EEOC v. Wal-Mart Stores E., LP*,
  436 F. Supp. 3d 1190 (E.D. Wis. 2020)............................................................14, 16

*Ekstrand v. Sch. Dist. of Somerset*,
  683 F.3d 826 (7th Cir. 2012) .............................................................................9, 10

*Ekstrand v. School Dist. of Somerset*,
  583 F.3d 972 (7th Cir. 2009) .............................................................................8, 9

*Farfaras v. Citizens Bank & Trust of Chi.*,
  433 F.3d 558 (7th Cir. 2006) .................................................................................27

*Giacoletto v. Amax Zinc Co.*,
  954 F.2d 424 (7th Cir. 1992) .................................................................................19

ii

*Kolstad v. Am. Dental Ass'n*,
527 U.S. 526 (1999)...............................................................................11, 14, 16

*Lange v. City of Oconto*,
28 F.4th 825 (7th Cir. 2022) ...............................................................................1, 2

*Lawson v. Sun Microsystems, Inc.*,
791 F.3d 754 (7th Cir. 2015) ....................................................................................1

*Lewis v. McLean*,
941 F.3d 886 (7th Cir. 2019) .................................................................................20

*Lust v. Sealy, Inc.*,
383 F.3d 580 (7th Cir. 2004) .................................................................................28

*Martyne v. Parkside Med. Servs.*,
No. 97-C-8295, 2000 WL 748096 (N.D. Ill. June 8, 2000)...................................27

*May v. Chrysler Grp., LLC*,
692 F.3d 734 (7th Cir. 2012) .....................................................................12, 16, 19

*May v. Chrysler Grp., LLC*,
716 F.3d 963 (7th Cir. 2013) ...................................................................................8

*Moore v. Tuleja*,
546 F.3d 423 (7th Cir. 2008) .................................................................................20

*Olian v. Bd. of Educ.*,
631 F. Supp. 2d 953 (N.D. Ill. 2009) .....................................................................27

*Pickett v. Sheridan Health Care Ctr.*,
610 F.3d 434 (7th Cir. 2010) .................................................................................20

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)...........................................................................................12, 18

*Rudin v. Lincoln Land Cmty. Coll.*,
420 F.3d 712 (7th Cir. 2005) ...........................................................................11, 16

*Ruiz-Cortez v. City of Chicago*,
931 F.3d 592 (7th Cir. 2019) ...................................................................................2

*Tart v. Illinois Power Co.*,
366 F.3d 461 (7th Cir. 2004) .................................................................................14

*Tomao v. Abbott Labs. Inc.*,
No. 04-C-3470, 2007 WL 2225905 (N.D. Ill. July 31, 2007) ...............................26

iii

*Tullis v. Townley Engineering & Mfg. Co.*,
    243 F.3d 1058 (7th Cir. 2001) ........................................................24

*US v. Hassebrock*,
    663 F.3d 906 (7th Cir. 2011) ....................................................23, 24

*Vega v. Chicago Park Dist.*,
    954 F.3d 996 (7th Cir. 2020) ........................................................27

*Whitehead v. Bond*,
    680 F.3d 919 (7th Cir. 2012) ....................................................20, 23

*Willis v. Lepine*,
    687 F.3d 826 (7th Cir. 2012) ........................................................20

**Statutes**

42 U.S.C § 1981a(b)(1)................................................................14

42 U.S.C § 1981a ......................................................................27

ADA .......................................................................... *passim*

Americans with Disabilities Act ...........................................7, 13, 14

**Other Authorities**

No. 156, Ord. Den. Sum. J., 22-23....................................................14, 16

No. 244, Order, p. 1 ..................................................................27

Rule 50 ....................................................................1, 10, 20, 28

Rule 50(b) .............................................................................9

Rule 59 ...........................................................................*passim*

Rule 59(a).............................................................................20

U.S. EEOC, EEOC-CVG-2003-1, ENFORCEMENT GUIDANCE: REASONABLE
    ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH
    DISABILITIES ACT (2002) ........................................................17

## INTRODUCTION

Walmart points to nothing that would justify judgment as a matter of law in its favor under Rule 50 or a new trial under Rule 59. The jury had substantial evidence upon which to find that Marlo Spaeth was a qualified individual with a disability, that Walmart was aware of her limitations, and that Spaeth's requested accommodation of returning to her old schedule did not impose an undue hardship upon Walmart. There was also ample evidence to support the jury's finding that Walmart fired and refused to reinstate Spaeth because of her disability or her need for accommodation. And the jury had a sound basis for assessing punitive damages, as they heard and saw abundant proof that Walmart took actions against Marlo Spaeth with knowledge that her rights under the ADA were at issue. Moreover, the compensatory damages award in this case was rational in light of the evidence of the harm Spaeth suffered due to Walmart's conduct. Thus, Walmart's requests to overturn the jury's well-reasoned verdict and for a new trial should both be denied.

## ARGUMENT

### I. Walmart Fails to Meet the Standard for Rule 50 Judgment

Walmart is not entitled to judgment as a matter of law under Rule 50. The standard for a Rule 50 motion is essentially the same as for a motion for summary judgment: whether a reasonable jury would have a legally sufficient evidentiary basis to find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). In applying this standard, the Court "do[es] not reweigh the evidence, make credibility determinations, or consider evidence favorable to [Walmart] that the jury was not required to believe." *Lange v. City of Oconto*, 28 F.4th 825, 841 (7th Cir. 2022). The Court will "view all evidence at trial in the light most

1

favorable to the verdict," *Lange,* 28 F.4th at 841, "disregard all evidence favorable to [Walmart]," and give EEOC "the benefit of every inference." *Bowers v. Dart*, 1 F.4th 513, 519 (U.S. 7th Cir. 2021) (quoting *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018) and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). "Only if no rational jury could have found for the nonmovant may [a court] disturb the jury's verdict." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). Walmart has not met this burden, so the verdict must not be disturbed.

### A. Walmart asks the Court to conduct an improperly heightened review of the verdict.

Walmart's motion substantially focuses on the failure to accommodate claim. Walmart asserts that EEOC was required to prove not only that Walmart was aware of Spaeth's Down syndrome, but also that Walmart knew how this specific impairment was "linked" to Spaeth's need for a schedule accommodation. Yet, the jury reasonably found that Walmart possessed the requisite awareness of Spaeth's limitations to trigger Walmart's obligation to accommodate Spaeth, and that Walmart failed to do so. Walmart admits that "this Court properly instructed the jury" at the trial in this matter. (ECF No. 278, Def.'s Br. at 1). Contrary to Walmart's arguments, the proper jury instructions did *not* require the EEOC to prove "that Walmart was aware of the link between Ms. Spaeth's Down syndrome and her attendance difficulties." (ECF 278, Def's Br. 1). The word "link" does not appear in the jury instructions at all. Rather, the jury was properly instructed to return a verdict for the EEOC on the failure to accommodate claim if the preponderance of the evidence showed that:

1. Marlo Spaeth was a qualified individual with a disability.

2. Walmart was aware that Ms. Spaeth needed an accommodation due to her disability, either because Ms. Spaeth requested one or otherwise;

3. Defendant failed to provide Ms. Spaeth with a reasonable accommodation.

(ECF No. 234, Jury Ins. No. 4.03, p. 10).

As will be shown below, the jury found for plaintiff on all three. The Court properly instructed the jury that "[u]nder the ADA, it is illegal for an employer to discriminate against a person on the basis of a disability if that person is qualified to do the essential functions of her job and *the employer is aware of her limitations*." (ECF No. 234, Jury Ins. No. 4.01, p. 9) (emphasis added). "Where the need for an accommodation is obvious, the employer must initiate an informal interactive process with the employee or those acting on the employee's behalf, to determine whether a reasonable accommodation should be provided." (ECF No. 234, Jury Ins. No. 4.08, p. 13). After hearing the evidence at trial, and based on these proper instructions, the jury returned a reasonable verdict for the EEOC.

Walmart cites *Bultemeyer* for the general proposition that an employee must make her employer aware of the need for "nonobvious, medically necessary accommodations with corroborating evidence," (ECF No. 278, Def.'s Br. 11, citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281 (7th Cir. 1996)), while conveniently ignoring the clear exception set forth in *Bultemeyer* for employees with mental impairments. *Id*. at 1285.

> [P]roperly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say "I want a reasonable accommodation," particularly when the employee has a mental [impairment]. The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help. "The employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable

3

accommodation is best determined through a flexible, interactive process that involves
both the employer and the [employee] with a disability."

*Bultemeyer*, 100 F.3d at 1285-86 (citing 29 C.F.R. § 1630); *Beck v. Univ. of Wis. Bd. of Regents*,

75 F.3d 1130, 1135 (7th Cir. 1996).

"[I]f the disability makes it difficult for the applicant or employee to communicate his

needs, an employer must make a reasonable effort to understand those needs, even if they are not

clearly communicated. For example, an employer cannot always expect a mentally disabled

employee to know that she should ask for an accommodation. Instead, the employer should start

communicating with an employee if it knows that she might be mentally disabled." Fed. Civ.

Jury Instr. of the 7th Cir., Instr. 4.03, Elements of Plaintiff's Claim – Reasonable

Accommodation Cases (2017 rev.), Committee Comment (b).

## B. The jury determined that Walmart *was* aware of Marlo Spaeth's limitations and her need for accommodation.

> **Question 2.** Was Walmart aware that Marlo Spaeth needed an accommodation due to her
> disability?
>
> ANSWER: Yes   ⨉       No  _____

(ECF 236, Special Verdict, Question 2).

Resurrecting arguments that it made in support of its motion for summary judgment,

Walmart denies awareness of any specific "link" between Down syndrome and Spaeth's need for

a schedule accommodation. But the evidence at trial showed that Walmart *was* aware of Spaeth's

*limitations*, as they were obvious to those who worked with her. Walmart was also aware that

Spaeth needed an accommodation because she was struggling and requested return to her old

schedule multiple times. And the evidence showed that Spaeth's sister specifically invoked the

ADA when she requested a schedule accommodation for Spaeth due to her disability.

While Walmart disagrees, the jury was well-situated to answer the factual question

4

regarding Walmart's awareness of Spaeth's need for accommodation based on the evidence at trial. Walmart witnesses testified that they knew Marlo Spaeth had a disability, specifically Down syndrome, from the first time they met her. (Jury Trial Tr., Day 1, pp. 145:21-147:24 (Becker); Day 3, p. 586:6-15 (Ohlsen/Popp)). Marlo's mother helped her fill out her employment forms and attended Marlo's interview, as well as new hire orientation with Marlo. (Jury Trial Tr., Day 1, p. 146:1-148:22 (Becker)). Walmart's managers did not train Marlo to use the cash register because they were aware of Marlo's disability and her limitations. (Jury Trial Tr., Day 1, p. 163:5-17 (Becker)). Indeed, Walmart's awareness of Spaeth's obvious limitations is evidenced by Walmart's "going out of its way to help Ms. Spaeth succeed over her long history of employment," (ECF No. 278, Def.'s Br. 2), except for the denial of accommodation that led to Spaeth's termination.

Managers who worked with Marlo were aware that she needed extra support whenever they made changes to her routine. (Jury Trial Tr., Day 2, p. 330:12-331:9 (Castro)). Managers worked alongside Marlo when she was asked to learn new tasks**.** (Jury Trial Tr., Day 3, p. 618:24-619:16, 620:19-23 (Moss)). Managers shadowed Marlo, working side-by-side with her to teach her how to do returns. (Jury Trial Tr., Day 2, p. 311:1-16 (Castro); Day 3, p. 620:19-23 (Moss); Day 3, p. 592:10-16 (Ohlsen/Popp)). Karen Becker printed Marlo's schedule for her each week. (Jury Trial Tr., Day 1, p. 221:6-21 (Becker)). And, before the November 2014 schedule change, Becker kept in contact with Marlo's mother when Marlo had trouble at work. (Jury Trial Tr., Day 1, pp. 182:21-185:15 (Becker); Day 2, p. 275:2-11 (Castro)). These actions show awareness of Spaeth's limitations and her need for accommodation.

Marlo Spaeth succeeded in her job when she was given proper support. Spaeth received 15 annual performance reviews that ranked her as a "solid performer" and "meets expectations"

before the November 2014 schedule change. (Tr. Exs. 2-17; Jury Trial Tr., Day 1, pp. 154:3-162:18 (Becker)). Many of Spaeth's performance reviews praised her excellent attendance. (Jury Trial Tr., Day 1, pp. 154:3-162:18 (Becker)). As of Spaeth's June 2014 performance evaluation, she was praised for having zero absences. (Tr. Ex. 17; Jury Trial Tr., Day 1, p. 162:14-18 (Becker); Day 3, p. 591:4-11 (Ohlsen/Popp)).

After Walmart changed Spaeth's schedule in November 2014, Marlo's managers were aware that Marlo was struggling with the new schedule. (Jury Trial Tr., Day 2, pp. 267:1-268:7 (Castro)). When complaining about Marlo's new attendance issues, Marlo's manager Julie Stern told the store manager, co-managers, human resources manager and personnel coordinator that Marlo asked why she could not have her old schedule back; why she could not work noon to 4:00, like she used to. (Trial Ex. 23; Jury Trial Tr., Day 3, p. 528:9-24 (Stern)). Indeed, every time Stern talked to Marlo Spaeth about her schedule after the change, Marlo asked to return to her noon to 4 hours. (Jury Trial Tr., Day 3, p. 528:9-24 (Stern)). The jury was free to find that Walmart was aware Marlo Spaeth needed a schedule accommodation "because Ms. Spaeth requested one," and because Stern told every member of management in the Manitowoc store that Spaeth requested one. (*Id.; see* ECF No. 234, Jury Ins. No. 4.03, p. 10 ("Walmart was aware that Ms. Spaeth needed an accommodation due to her disability, *either because Ms. Spaeth requested one* or otherwise") (emphasis added)). Yet, no one at Walmart started the accommodation process with Marlo or her family. (Jury Trial Tr., Day 2, pp. 264:14-266:11, 332:24-334:8 (Castro); 423:18-425:7 (30(b)(6)).

At trial, Marlo's sister and guardian Amy Jo Stevenson testified that, before Marlo got fired, Stevenson called Karen Becker, the Human Resources Coordinator at Walmart, and told her that Marlo could not handle the new schedule because of her Down syndrome. (Jury Trial

Tr., Day 1, pp. 91:15-92:25, 97:7-98:6 (Stevenson)). After Walmart fired Marlo in July 2015, Ms. Stevenson met with Walmart to ask for reinstatement, and again asked for a schedule accommodation due to Marlo's Down syndrome, specifically telling Walmart that Marlo has the right to accommodation under the Americans with Disabilities Act. (Jury Trial Tr., Day 1, p. 96:16-23); Day 2, pp. 276:7-277:10 (Castro); Trial Ex. 35, pp. 6-7). Instead of reinstating Marlo with an accommodation, and with knowledge that Marlo Spaeth's rights under the ADA were at issue, Walmart cut off all communication with the family and reaffirmed Spaeth's termination. (Tr. Ex. 34; Jury Trial Tr., Day 2, pp. 277:11-285:25, 318:16-319:13 (Castro)). The evidence presented at trial supports the jury's rational verdict.

### C. Walmart witnesses testified that they knew Spaeth had a disability, and they knew the ADA requires accommodations for people with disabilities, but still denied Spaeth's request for a schedule change.

Walmart was aware of Marlo Spaeth's limitations and Spaeth's managers knew about the duty to provide reasonable accommodations to employees with disabilities, yet Walmart still failed to comply with the ADA.

Walmart's human resources staff and managers testified that they were familiar with the ADA. Walmart's Human Resources Coordinator, Karen Becker, testified that she knew denying a person with a disability a reasonable accommodation was against the ADA. (Jury Trial Tr., Day 1, p. 181:18-24 (Becker)). Co-Manager Robin Castro testified that she also knew the law requires reasonable accommodations for employees with disabilities. (Jury Trial Tr., Day 2, p. 261:11-18 (Castro)). Co-Manager Bonnie Ohlsen/Popp testified that she knew that reasonable accommodations were related to the Americans with Disabilities Act. (Jury Trial Tr., Day 3, p. 584:16-24 (Ohlsen/Popp)).

Notwithstanding awareness of the federal civil rights governed by the ADA, Walmart

managers also testified that Walmart's home office ordered them not to provide schedule adjustments. (Jury Trial Tr., Day 2, p. 249:3-8 (Ohlsen/Popp)). Julia Stern testified, "the directive was that we were to allow the schedules to be generated and run them as they were generated and not make adjustments to them unless it was a specific business need." (*Id.*, p. 474:16-19 (Stern)). Bonnie Ohlsen/Popp testified that she understood the directive from the home office not to adjust anyone's schedules "applied to all associates." (Jury Trial Tr., Day 3, pp. 602:17-19, 603:1-3, 22 (Ohlsen/Popp)). Lee Spude, a Regional People Director who oversees more than a hundred stores and "about 30,000 people," has "never seen a long-term permanent scheduling accommodation." (Jury Trial Tr., Day 3, pp. 649:7-651:13, 698:15-16, 725:6-7 (Spude)).

Despite Walmart having knowledge of Spaeth's limitations, knowledge of her legal right to disability accommodation under the ADA, and knowledge that Spaeth herself requested a return to her old schedule multiple times, Walmart refused to adjust Spaeth's schedule and terminated her, ignoring her obvious need for an accommodation which would not have caused undue hardship to Walmart. And when given the opportunity to right the wrong, Walmart doubled down on the termination by again failing to consider the requested accommodation and refusing to reinstate Spaeth. The Court's role in deciding Walmart's motion is "to decide whether a *highly charitable* assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *May v. Chrysler Grp.*, LLC, 716 F.3d 963, 971 (7th Cir. 2013) (emphasis added); *Bowers v. Dart*, 1 F.4th 513, 521 (U.S. 7th Cir. 2021). Here, denial of Walmart's motion would be justified by even an *un*charitable assessment of the evidence in this case.

Walmart heavily relies on the Seventh Circuit's 2009 *Ekstrand* decision, *Ekstrand v.*

*School Dist. of Somerset*, 583 F.3d 972 (7th Cir. 2009) (holding that there was a triable issue of fact as to whether Ekstrand was a qualified individual with a disability within the meaning of the ADA and as to whether the school district was aware of that disability), citing it over twenty times in their brief. (ECF NO. 278, Def.'s Br., *passim*). Tellingly, Walmart fails to cite the Seventh Circuit's more applicable 2012 *Ekstrand* decision, in which the appellate court affirmed denial of the employer's Rule 50(b) motion challenging the sufficiency of the evidence after a jury returned a verdict in favor of the employee at trial. *Ekstrand v. Sch. Dist. of Somerset*, 683 F.3d 826, 827 (7th Cir. 2012). The Seventh Circuit noted: "This challenge to the sufficiency of the evidence is particularly weak because we essentially decided these very same issues in Ekstrand's favor the last time this case was before us." *Ekstrand*, 683 F.3d at 829 (7th Cir. 2012) (citing *Ekstrand*, 583 F.3d 972 (7th Cir. 2009). Likewise, Walmart's challenge to the sufficiency of the evidence in this case is particularly weak because this Court decided these very same issues in EEOC's and Marlo Spaeth's favor at the summary judgment stage.

The jurors had ample evidence to support their verdict against Walmart. They may have credited Amy Jo Stevenson's, Marlo Spaeth's, and Dr. Smith's testimony over Lee Spude's. They may have credited the testimony from Walmart's witnesses as showing that they were aware of Spaeth's limitations and her need for routine due to those limitations. The jury may have also decided *not* to credit Walmart's assertions that it was unaware Spaeth's need for a schedule accommodation was due to her Down syndrome. The jury was entitled to make these credibility determinations. *See Ekstrand*, 683 F.3d at 828 (7th Cir. 2012):

> There are several conclusions that reasonable jurors may have drawn given the evidence in this case. Here are just a few: they may have credited Ekstrand's own testimony over the superintendent's on key issues; they may have found Dr. Erickson convincing when he testified that Ekstrand could have returned to her teaching duties between October and December provided she had a classroom with natural light; and they may have decided not to credit the superintendent's testimony that he was late in reading Dr. Erickson's letter

9

regarding the importance of natural light to Ekstrand's recovery.

*Id.* Courts "are generally forbidden from reexamining the facts found by the jury at trial." *Ekstrand*, 683 F.3d at 828 (citing U.S. Const. Amend. VII).

The standard under Rule 50 presents the Court with the same question it answers at summary judgment, and Walmart has not raised any new legal theory that was not present at summary judgment. Instead, Walmart repeats the same argument it made before the Court denied Walmart's motion for summary judgment, that Walmart had no way of knowing Spaeth needed accommodation. (*See* ECF 93, Def.'s SJ Br. at 20 (Walmart arguing, "Nothing in the record supports a medical necessity for the accommodation proposed and nothing in the record supports a tangible, contemporaneous link between Ms. Spaeth's Down Syndrome and her ability to work the shift she was assigned.")). "But…unless evidence favoring [the plaintiff] in the pretrial stage has since *vanished* (and there is no allegation that it has), we are presented with the same situation as before. Just as there was sufficient evidence for a possible verdict in [the plaintiff's] favor on these very issues [at the pre-trial stage], so is there ample evidence at the post-trial stage for a reasonable jury to have found in [the plaintiff's] favor." *Ekstrand*, 683 F.3d at 829 (7th Cir. 2012) (emphasis in original) (affirming denial of Rule 50 motion). The jury's rational verdict in this case should not be disturbed.

**D. The jury awarded punitive damages after receiving proper instructions regarding the standard for awarding such damages.**

Walmart also argues that there was insufficient evidence to allow a reasonable jury to impose punitive damages. Walmart is wrong. Punitive damages are available to the EEOC if Walmart acted with "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (quoting 42 U.S.C. § 1981a(b)(1)). The jury was instructed that an action is in reckless disregard to Marlo

10

Spaeth's rights if taken with knowledge that it may violate the law. (ECF No. 234, Jury Ins. No. 3.13, pp. 18-20). This Court's punitive damages instruction was correct, and the jury's decision was amply supported by the evidence.

      **i.**      **Various types of evidence can justify an award of punitive damages.**

In considering the propriety of punitive damages, the Court again views the evidence and all reasonable inferences in the light most favorable to the EEOC. The Court may "reverse the verdict only if *no* rational jury could have found for the prevailing party." *AutoZone, Inc.*, 707 F.3d at 835 (7th Cir. 2013) (emphasis added) (quoting *Bogan v. City of Chi.*, 644 F.3d 563, 572 (7th Cir. 2011)). In this case, the jury's punitive damages verdict against Walmart was appropriate because Walmart's discriminatory actions against Spaeth were carried out (1) by managerial agents, (2) acting within the scope of their employment, and (3) "in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 543 (1999); *Bruso*, 239 F.3d at 857-58. Walmart does not argue that the relevant decisions were not made by Walmart employees while "employed in a managerial capacity and…acting in the scope of employment." *Kolstad*, 527 U.S. at 542-43. Therefore, the only issue regarding punitive damages is whether Walmart acted "in the face of a perceived risk that its actions will violate federal law." *Id.*

The law provides multiple ways for the EEOC to demonstrate that Walmart acted with a mental state justifying punitive damages. For instance, punitive damages are justified if the Commission showed "that the relevant individuals knew of or were familiar with the anti-discrimination laws but nonetheless ignored them." *AutoZone, Inc.*, 707 F.3d at 835 (quoting *Bruso* at 857-58). Likewise, evidence that a defendant employer failed or refused to follow its own accommodation procedures also demonstrates a "reckless" state of mind. *Rudin v. Lincoln*

11

*Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005). The EEOC presented ample evidence at trial of Walmart's familiarly with anti-discrimination laws, as well as Walmart's failure to follow its own policies. (*See* Section I(B)-(C), above; and Section I(D)(ii)-(iv), below).

Additionally, as the Court correctly instructed the jury, the factfinder may consider "whether a party cooperated in [the ADA's interactive] process . . . when considering whether to award punitive damages." (ECF No. 234, Jury Ins. No. 4.08, p. 14). "[A]n employer's response sinks from negligence to reckless indifference when it repeatedly fails to accommodate an employee's disability." *AutoZone, Inc.*, 707 F.3d at 835. Here, the evidence at trial showed that Walmart, not only, failed to engage in the interactive process, but also deliberately cut off communications with Spaeth's family. (Jury Trial Tr., Day 2, p. 279:15-25 (Castro); Day 2, p. 423:6-15 (Spude); Day 4, p. 720:18-20; Tr. Ex. 34). Moreover, the requisite mental state may also be shown by evidence that the defendant made false or fabricated claims: "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000).

Notably, an award of punitive damages does *not* require "evidence of egregious or outrageous conduct by the employer." *May v. Chrysler Grp., LLC*, 692 F.3d 734, 745 (7th Cir. 2012). Nor are an employer's declarations of goodwill controlling – "[w]hen those declarations are belied by the employer's actions, talking a good game will not immunize an employer from a judgment that it was reckless." *May*, 692 F.3d at 746 (7th Cir. 2012).

ii.     **Ample evidence supports the jury's conclusion that Walmart knew Marlo's schedule problems were disability-related and that she was requesting a reasonable accommodation.**

Walmart's motion must fail. As detailed in Section I(B)-(C) of this brief, plentiful evidence supports the jury's conclusion that Walmart knew Spaeth was disabled, knew her

12

attendance problems were related to her disability and understood that she needed an accommodation due to her disability. The jury heard multiple witnesses testify that Marlo Spaeth's disability was obvious and known to them over many years of working together. (Jury Trial Tr., Day 1, p. 147:4-9 (Becker); Day 2, p. 249:17-25 (Ohlsen/Popp); Day 3, pp. 586:6-15 (Ohlsen/Popp); 532:14-15 (Sterns); 723:3-8 (Spude)). The EEOC's expert, David Smith, M.D., testified that "[f]or people with Down syndrome it's especially important to have some routine," and that "the desire for routine in Down syndrome [is] something a person could notice by spending a lot of time with somebody who has Down syndrome." (Jury Trial Tr., Day 2 pp. 379:16-19, 419:3-6). Walmart presented no expert of its own to contradict Dr. Smith's testimony at trial.

Indeed, the jury heard witness after witness confirm, consistent with Dr. Smith's testimony, that they knew Marlo Spaeth needed extra support with new tasks or other disruptions to her routine. (Jury Trial Tr., Day 1, p. 183:1-18 (Becker); Day 2, pp. 267:1-3, 275:6-24, 330:17-221 (Castro); Day 3, p. 594:5-8 (Ohlsen/Popp)). The jury also heard testimony that Marlo Spaeth's sister, Amy Jo Stevenson, explicitly requested a schedule accommodation "[b]ecause Marlo has Down syndrome." (Jury Trial Tr., Day 1, pp. 91:9-92:12 (Stevenson)). Moreover, Walmart does not address Stevenson's testimony that she, again, explicitly raised Marlo's need for a reasonable accommodation due to her Down syndrome at the July 2015 post-termination meeting with Walmart, at which she specifically highlighted Walmart's obligations under the Americans with Disabilities Act by name. (Jury Trial Tr., Day 1, pp. 225:23-226:1 (Becker); 276:21-278:10, 317:18-21 (Castro); 645:16-226 (Abitz); 719:8-19 (Spude); *see also* Tr. Ex. 35, at 2). Walmart is obviously displeased that the jury credited Stevenson's testimony while rejecting self-serving statements of Walmart's employees, but that was a decision for the fact

finders to make and there is no basis to disturb it. *See Tart v. Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004) ("Once a jury has spoken, [courts] are obliged to construe the facts in favor of the parties who prevailed under the verdict.") (citing *Reeves*, 530 U.S. at 150-51).

Walmart also ignores the jury's finding on Verdict Question 6, "Did Walmart violate the Americans with Disabilities Act by failing to reinstate Marlo Spaeth because of her disability?" (ECF No. 236, at 2). The jury answered this question, "Yes." Walmart's failure to reinstate Marlo Spaeth because of her disability provides a separate and independent justification for punitive damages. Even if punitive damages could not be supported by Walmart's failure to accommodate Marlo Spaeth and by her termination, Walmart's failure to reinstate Spaeth when requested is an alternative basis for awarding punitive damages. As this Court rightly found at the summary judgment stage, "[t]he fact that Walmart supervisors and managers persisted in their decision to terminate Spaeth's employment and failed to consider an accommodation even when confronted by her sister and even after she requested re-employment could support a jury finding that Walmart's conduct met the standard for awarding punitive damages." *EEOC v. Wal-Mart Stores E. LP*, 436 F. Supp. 3d 1190, 1205-06 (E.D. Wis. 2020); (ECF No. 156, Ord. Den. Sum. J., 22-23). Walmart's failure to brief or even acknowledge this issue is a concession that Defendant's punitive damages argument is meritless.

### iii. Walmart's witnesses testified to their knowledge that denying Marlo Spaeth an accommodation might violate the law.

The evidence at trial provided ample bases for the jury's finding that Walmart acted with "malice or with reckless indifference," 42 U.S.C. § 1981a(b)(1)), that is, "in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 535. In awarding punitive damages, the reasonable jury in this case concluded that Walmart's managers and supervisors "knew of or were familiar with the anti-discrimination laws but nonetheless ignored

14

them or lied about their discriminatory activities." *AutoZone*, 707 F.3d at 835 (7th Cir. 2013)

(citing *Bruso*, 239 F.3d at 858). Walmart witnesses testified about employee training and

familiarity with the ADA. Robin Castro testified that she had undergone employment

discrimination training, that "accommodation guidelines were available to members of

management at the store where Marlo worked," and that she "knew that the law requires making

reasonable accommodations for employees with disabilities." (Jury Trial Tr., Day 2, pp. 256:1-4,

17-22, 260:7-262:3 (Castro)). Walmart witnesses Julia Stern and Bonnie Ohlsen (Popp) testified

that they received training on the ADA and the right of disabled workers to receive reasonable

accommodation for their disability. (Jury Trial Tr., Day 2, pp. 468:11-469:5 (Stern); 583:20-

586:5 (Ohlsen/Popp)). Karen Becker also testified about Walmart's ADA compliance policies

and explained to the jury that employees should bring discrimination complaints directly to her.

(Jury Trial Tr., Day 1, pp. 143:2-145:11 (Becker)).

The most senior Walmart employee to appear at trial, Lee Spude, testified at length about

his knowledge and experience with Walmart's ADA and disability accommodation polices. (Jury

Trial Tr., Day 2, pp. 422:4-423:17, 425:12-427:8 (Spude); Day 3, pp. 653:5-662:18; 721:22-25

(Spude)). Indeed, in closing arguments, Walmart's counsel boasted that "Lee Spude … certainly

had a command of the policies and procedures at Walmart." (Jury Trial Tr., Day 4, p. 843:8-9).

Yet, instead of engaging in the interactive process that both the ADA and Walmart's own

policies required, it was Spude who personally directed his subordinates to cut off

communication with Marlo Spaeth's family and deny her request for reinstatement. (Trial Ex.

34; Jury Trial Tr., Day 2, p. 279:15-25 (Castro); Day 2, p. 423:6-15 (Spude) (describing

Walmart's policy requiring interactive process for reasonable accommodations); Day 4, pp.

702:20-21; 720:18-20 (Spude); *compare* ECF No. 234 Jury Ins., No. 4.08, p. 14 ("Both the

15

employer and the employee must cooperate in this interactive process in good faith.")); *see also EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005) ("[E]mployer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available.").

"The fact that Walmart supervisors undergo training on ADA issues, and it has an entire department dedicated to addressing reasonable accommodations," would support a reasonable jury's conclusion that "its failure to comply with the ADA was malicious or in reckless indifference to the plaintiff's federal rights." *EEOC v. Wal-Mart Stores E. LP*, 436 F. Supp. 3d 1190, 1205-06 (E.D. Wis. 2020); (ECF No. 156, Ord. Den. Sum. J., 22). Here, the reasonable jury concluded that when Walmart refused Marlo Spaeth's disability accommodation, fired her, and then refused to reinstate her even after Spaeth's sister explicitly cited the ADA, Walmart acted "in the face of a perceived risk that its actions will violate federal law." *Kolstad*., 527 U.S. at 536; *May*, 692 F.3d at 745.

Evidence of Walmart's failure to follow its own procedures or engage in an interactive process with Marlo Spaeth also justifies the jury's imposition of punitive damages. *Rudin v. Lincoln Land Cmty. Coll*., 420 F.3d 712, 727 (7th Cir. 2005). The jury heard no shortage of testimony on this point. For example, the jury heard how Walmart policy specifically provides for modified work schedules as an accommodation to disabled employees. (Trial Exs. 29-31; Jury Trial Tr., Day 1, p. 181:10-24 (Becker); Day 2, pp. 263:3-264:10 (Castro); Day 4, p. 728:15-23 (Spude)). Yet, the jury heard testimony that – in reality – Walmart did not grant schedule accommodations to employees, whether disabled or not, because doing so might interfere with Walmart's ability to cut costs. (Jury Trial Tr., Day 2, pp. 466: 12-15; 483:15-484:3; 493:1-16 (Stern); 630:11-18 (Abitz); 657:9-658:8, 670:17-671:18, 698:12-18 (Spude)).

16

The jury also heard Walmart defend its refusal to communicate with Marlo's sister by claiming that company procedure prohibited communication with family, when in fact the opposite was true. (Jury Trial Tr., Day 4, pp. 700:24-701:12 (Spude) (claiming that there are "pretty specific policies or expectations at Walmart" which prohibit communicating with employees' family members); Tr. Ex. 34 (email from Castro to Spude explaining that refusal to communicate with family is "due to hippa [sic]")). Yet, Robin Castro admitted at trial that she violated company policy, at the direction of upper management, by cutting off communication with Marlo's sister. (Jury Trial Tr., Day 2, pp. 279:15-280:5 (Castro)). And Spude admitted on cross examination that company policy actually *does* allow communication with family members, whether or not the family member is legal guardian. (Jury Trial Tr., Day 2, pp. 423:2-5; Day 3, 721:7-15 (Spude)); *see also* U.S. EEOC, EEOC-CVG-2003-1, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT (2002) ("[A] family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability.").

Walmart managers also testified that Marlo Spaeth, despite her known and easily observable disability, was to blame for failing to independently produce medical records documenting her disability and need for an accommodation, even though Walmart never requested such information. (Jury Trial Tr., Day 1, pp. 229:19-230:13 (Becker); Tr. Ex. 23, p. 1). Yet once more, the jury learned that, in fact, Walmart has the *opposite* policy, which provides that "medical information is *not* necessary if the associate has a known or easily observable disability." (Trial Ex. 30, p. 1; Jury Trial Tr., Day 1, p. 261:19-22 (Castro); Day 3, p. 607:1-4 (Ohlsen/Popp); Day 4, pp. 723:13-724:7 (Spude).

17

Walmart witnesses admitted that Marlo told them that "she's going to get sick if she doesn't eat her meals at a certain time," and agreed that, under company policy, this information "needs to be in her [medical] file." (Jury Trial Tr. Day 1, pp. 173:11-16; 229:19-230:13 (Becker); Tr. Ex. 23, p. 1). Yet, Walmart failed to initiate the interactive process. Under Seventh Circuit precedent, where an employee's mental illness or disability limits her ability to communicate, "[i]t is crucial that the employer be aware of the difficulties, and help the other party determine what specific accommodations are necessary." *Bultemeyer*, 100 F.3d at 1285 (7th Cir. 1996); *Sears*, 417 F.3d at 804 ("Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification."). Here, the jury learned that instead of Walmart helping Spaeth find a reasonable accommodation that worked, Walmart subjected her to repeated disciplinary "coachings," marched her out of the store in tears, and cut off communication when she and her family sought reinstatement with a schedule accommodation. (Jury Trial Tr., Day 2, p. 300:6-13 (Castro); Day 3, pp. 532:18-533:11 (Stern); 621:5-622:14 (Moss); 719:22-722:6 (Spude); Tr. Ex. 34).

iv.     **Walmart also offered false explanations which justify punitive damages.**

Walmart's attempts to retroactively discredit Marlo Spaeth's strong work history also allow the jury to "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147. Walmart witness Lee Spude testified that Marlo Spaeth "worked for [Walmart] for a long time and over the course of several evals, one per year, there were multiple reference[s] of instances of performance issues and attendance issues," and claimed that a 2012 review showed that Marlo had "trouble following shifts." (Jury Trial Tr., Day 3, pp. 674:19-25, 717:1-10 (Spude)). But the jury both

18

heard and saw that Marlo's performance reviews actually said, "Attendance and punctuality is within acceptable company guidelines. Days absent, zero; days tardy, zero," and that Marlo's attendance "exceeds expectations." (Jury Trial Tr., Day 3, pp. 717:12-719:5 (Spude)). The reasonable jury likely concluded that Walmart's retroactive attack on Marlo's attendance was "nothing more than [an] attempt to cover up its prior failure to accommodate" Marlo's disability. *AutoZone, Inc.*, 707 F.3d at 836; *see also Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992) (holding that jury was entitled to believe negative evaluation leading to discharge was fabricated in light of plaintiff's previous good evaluations).

Finally, Walmart asserts that all its employees really wanted to do was *help* Marlo, and that "at the very worst," they merely "'misunderstood' in good faith their precise ADA obligations." (ECF No. 278 at 22). But the jury heard Walmart's declarations of good will and rejected them, with ample evidentiary support. As the Seventh Circuit explained in *May v. Chrysler Grp., LLC,*

> A good-faith effort at compliance, however, is not a matter of *declarations* about how much the employer cared about a victim of harassment or about how hard certain HR employees say they worked to rectify the situation. When those declarations are belied by the employer's actions, talking a good game will not immunize an employer from a judgment that it was reckless. The jury reasonably determined that Chrysler's *actions* did not add up to a good faith effort to end May's harassment, and, much less, that its actions were (at least) reckless.

692 F.3d at 746 (7th Cir. 2012) (emphasis in original).

There is no reason to overturn the jury's well-supported verdict awarding punitive damages.

## II.     Walmart's Rule 59 Motion is Equally Unavailing

### A.   Walmart has not met the standard for altering a verdict under Rule 59.

Walmart's motion for a new trial should be denied because the jury's verdict was clearly

supported by the evidence. Under Rule 59(a), the court may grant a motion for a new trial if the verdict is "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Lewis v. McLean*, 941 F.3d 886, 891 (7th Cir. 2019) (quoting *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018)). "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) (internal quotation marks omitted); *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (verdict will be set aside as contrary to manifest weight of evidence only if no rational jury could have rendered verdict). As with a Rule 50 motion, "the court does not make credibility determinations or weigh the evidence." *Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012). Moreover, in cases with simple issues but highly disputed facts, the verdict deserves particular deference. *Moore v. Tuleja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). On review, an appellate court will be "particularly careful in employment discrimination cases to avoid supplanting [its] own view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict)." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (quoting *Hybert v. The Hearst Corp.,* 900 F.2d 1050, 1054 (7th Cir. 1990). Here, the Rule 59 motion should be denied because Walmart cannot show that in this case the jury's verdict was unfair or irrational.

## B. Evidence at trial proved Walmart was aware Spaeth needed an accommodation because of her disability.

Walmart knew Spaeth needed a schedule accommodation because of her disability. The jury's verdict required this specific finding at Question 2: "Was Walmart aware that Marlo Spaeth needed an accommodation due to her disability?" (ECF No. 236, Special Verdict). The

20

jury answered, "Yes." *Id.* Walmart now seeks a new trial, relitigating this question, essentially arguing that the substantial evidence supporting the jury's verdict should be discredited and ignored. (*See* ECF No. 278, Def.'s Br., p. 23-24).

Yet the EEOC's evidence supports the jury's finding. This Court instructed the jury that in order to succeed on the failure to accommodate claim, the EEOC must prove that "Walmart was aware that Ms. Spaeth needed an accommodation due to her disability, either because Ms. Spaeth requested one or otherwise." (ECF No. 234, Jury Ins., No. 4.03, p. 10). The jury's finding on this element is supported by abundant evidence of Spaeth's repeated requests to have her schedule returned to the usual noon to 4 p.m. timeframe. (Trial Ex. 23, pp. 1, 2; Trial Ex. 21; Jury Trial Tr., Day 3 at 528:9-24 (Stern)). This evidence alone is sufficient to support a rational jury's finding, given the fact that all of the managers who worked with Spaeth knew she has Down syndrome. (Jury Trial Tr., Day 1, pp. 145:21-147:24 (Becker); Day 3, p. 586:6-15 (Ohlsen/Popp)).

If the jury had any doubt that Spaeth's own requests made Walmart aware of her need for a schedule accommodation because of her obvious disability, Amy Jo Stevenson's testimony resolved this issue clearly. Stevenson, Spaeth's sister, testified that she called Walmart's Human Resources Coordinator, Karen Becker, before Marlo was fired, and explicitly asked her to change Spaeth's schedule back to noon to 4 p.m., because of her Down syndrome:

> Q. So asking you to focus on this timeframe of 2014, did you become aware at any point in 2014 of changes to Marlo's schedule?
> A. Yes.
> Q. What did you become aware of?
> A. She was reporting that she was -- her hours on her time slip weren't soon to 4:00 so they were wrong. And she would pull her time slip every time I saw her, out of her purse. She kept her time -- her work schedule –
> Q. Okay.
> A. -- out of her purse. And I would see 1:00 to 5:00, 5:30 or 6:00 shifts at

that time. And she would complain then. And just like in 2012 when she would complain because she didn't have all her days, "I just have one day this week."

Q. And was specifically the time any problem there?

A. Specific to the time she couldn't get home -- she was going to miss her bus. She would miss her bus. As I stated before, she took the bus at the same time every day to and from. So, she had that down to habit and routine. So, she was going to miss her bus if she stayed at work that late. Or what she understood to be her bus.

Q. So once you knew that did you take any action?

A. I did. I called Karen.

Q. And who is Karen?

A. Karen is the HR manager. And she's always been our contact, my mom and myself's point of contact with anything regarding Marlo. There was always phone calls going both -- not always, but there would be phone calls going both ways.

Q. And what did you tell Karen when you called her?

A. I told her that it was a problem for Marlo to be working past 4:00; that she couldn't do that. She was getting too hot, she wasn't able to eat, and she was missing her bus to get home. And that we needed to switch it back to noon to 4:00 like it had been.

Q. Did you explain any other reasons why you were making that request?

A. Because Marlo has Down syndrome, she just couldn't handle working -- she couldn't physically handle working that late and couldn't -- she was complaining she was too hot.

Q. Did you ask Karen to do any -- anything in particular?

A. I asked her to change --

Q. I'm sorry, to address it?

A. I asked her to have the hours changed back to noon to 4:00 to restore the order.

Q. Well, then after this call to Karen did Marlo's schedule get restored to a 4 p.m. end time?

A. At that time I thought it did.

Q. So did you believe Karen had addressed your concern?

A. Yes.

(Jury Trial Tr. Day 1, pp. 90:19-92:17 (Stevenson)).

Later in her testimony, Stevenson again referenced this phone call she made to Becker

asking to have Spaeth's schedule returned to noon to 4 p.m. (Jury Trial Tr., Day 1 pp. 97:22-98:6

22

(Stevenson)). Stevenson testified that, in the post-termination meeting she had with Walmart managers, she recounted Marlo's efforts to have her schedule returned to noon to 4 p.m., as well as her own call to Karen Becker about switching Marlo's hours back because of "Marlo's hardship due to Down syndrome." (Jury Trial Tr., Day 1, p. 98:4-98:6 (Stevenson)). Stevenson testified, "Karen nodded her head in the affirmative that I had called and spoke with her." *Id.*

While Walmart would like to characterize Stevenson's testimony as a "mere scintilla" of evidence, it is actually highly probative evidence based on first-hand experience that directly informs the determination the jury was required to make in order to answer Question 2 on the verdict sheet. *See Blue v. Int'l Bd. of Elec. Workers Loc. Union 159*, No. 09-CV-395-WMC, 2011 WL 13359246, at *3 (W.D. Wis. Feb. 3, 2011), aff'd sub nom; *Blue v. Int'l Bd. of Elec. Workers Loc. Union 159*, 676 F.3d 579 (7th Cir. 2012) (testimony based on first-hand experience provides sufficient evidence for jury's finding). In fact, a jury would need to dismiss and discredit Stevenson's testimony in its entirety in order to find that Walmart had no awareness of the link between Spaeth's attendance issues and her Down syndrome.

By asking this court to completely discredit Amy Jo Stevenson's relevant testimony and credit only the testimony of Walmart's managers who deny knowing that Spaeth's request for a schedule accommodation was linked to her disability, Walmart improperly seeks to usurp the jury's determinations and insert the Court into the role of evaluating witness credibility and weighing evidence, rather than viewing the evidence in the light most favorable to the prevailing party. Because "credibility of witnesses is peculiarly for the jury," it is an invasion of the jury's province to grant a new trial merely because the evidence was in conflict. *Whitehead v. Bond*, 680 F.3d at 928; *US v. Hassebrock*, 663 F.3d 906, 920 (7th Cir. 2011). Walmart's motion for a new trial should be denied.

23

### III. The Jury's Compensatory Damage Award Was Proper and Should Not Be Remitted

The evidence supports the jury's reasonable award of $150,000 in compensatory damages. This Court instructed the jury to consider "the mental and emotional pain and suffering that Marlo Spaeth experienced and is reasonably certain to experience in the future." (ECF No. 234, Jury Ins., No. 3.10, p. 18). Additionally, the instructions state, "You are to determine an amount that will fairly compensate for the injury she has sustained." *Id.*

When reviewing an award of compensatory damages, the court asks whether the award is "monstrously excessive," whether there is a rational connection between the evidence and the award, and whether the award is roughly comparable to awards made in similar cases. *Tullis v. Townley Engineering & Mfg. Co.*, 243 F.3d 1058, 1066 (7th Cir. 2001). The first two elements — whether the award was monstrously excessive or rationally connected to the evidence — both focus on whether the award was irrational. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).

#### A. Evidence supports the jury's award of $150,000 in compensatory damages.

Here, the jury awarded Spaeth $150,000 in compensatory damages after hearing evidence from multiple witnesses of Spaeth's distress and confusion at the time of termination, her diagnosis of depression caused by her job loss, Spaeth's continued need for anti-depressant medication, her own testimony that she still misses her job, and her persistent sadness and distress when the memory of her job loss at Walmart is triggered by events, like seeing Walmart advertisements on television.

Marlo herself testified that she felt upset when she got fired. (Jury Trial Tr. Day 2, p. 356:19-20 (Spaeth)). Marlo testified that she did not know what happened. (Jury Trial Tr. Day 2, p. 355:2-5 (Spaeth)). She testified, six years post-termination, that she is still sad when she thinks

24

about getting fired by Walmart. (Jury Trial Tr. Day 2, p. 357:15-25 (Spaeth)). Marlo testified that she wants her job back because she misses it, and she misses all the people. (Jury Trial Tr., Day 2, p. 359:2-6 (Spaeth)). Spaeth's roommate and stepsister, Barbara Barnes, testified that, every time Marlo sees a Walmart commercial on television, she covers her face and does not want to look at it because it reminds her of what happened when she lost her job at Walmart. (Trial Tr. Day 2, pp. 460:23-461:2 (Barnes)).

Spaeth's sister, Amy Stevenson, testified that Marlo called her the day she was terminated. Marlo was crying and could not really talk on the phone. (Jury Trial Tr. Day 1 p. 92:21-93:6 (Stevenson)). Stevenson testified that, when she first saw Marlo in person after her termination, Marlo had her head in her hands and she was crying, "Why me? Why me? Why did they do this to me? Why me?" (Jury Trial Tr. Day 1, p. 94:19-22 (Stevenson)).

Stevenson also testified that, for years after Marlo's termination, "[A]ny time the word 'Walmart' came up, be it commercials, or trucks, her head would go in her hands." (Jury Trial Tr. Day 1, p. 103:8-10 (Stevenson)). Stevenson also observed that Marlo demonstrated increased dependence on her stepsister and resistance to making her own decisions after Walmart fired her. (Jury Trial Tr. Day 1, p. 103:19-25 (Stevenson)). Stevenson testified that Marlo was in a shell and was not outgoing anymore. Stevenson testified that Marlo was no longer proud of her job at Walmart and that her job had been taken from her. *Id.* Stevenson also noted that Marlo's mental functioning was affected by Walmart's actions because Marlo showed signs of memory loss after being fired, leading Stevenson to discuss treatment options with Marlo's primary care provider and later with David Smith, M.D. of the Down syndrome Clinic of Wisconsin. (Jury Trial Tr., Day 1, pp. 104:1-105:15 (Stevenson)). Stevenson further testified that Dr. Smith diagnosed depression and prescribed anti-depressant medication that Spaeth continues to take. (Jury Trial

25

Tr. Day 1, p. 105:16-19 (Stevenson)).

EEOC's expert witness, Dr. Smith, examined Marlo Spaeth in December 2017, more than two years after her termination. (Tr. Ex. 39). Dr. Smith testified that Spaeth reported to him that, since her termination, "Every day is a bad day." (*Id.;* Jury Trial Tr. Day 2, pp. 382:23-383:12 (Smith)). Dr. Smith diagnosed depression and anxiety and prescribed anti-depressant medication for Spaeth. (Jury Trial Tr. Day 2, p. 389:11-24 (Smith); Tr. Ex. 39). Dr. Smith opined that Spaeth's depression and anxiety was caused by the disciplinary actions and the termination by Walmart. (Jury Trial Tr. Day 2, p. 390:14-20 (Smith)). Dr. Smith testified, "This was her life. She had done it for 15 years. And that was taken away. And she kept talking about it. Even a few years later she was still talking about it." *Id.*

Stevenson described the termination as "detrimental" to Marlo. *Id.* Stevenson testified that Marlo was extremely proud of what she was contributing to Walmart. *Id.* Stevenson testified, "It was her life." (Jury Trial Tr. Day 1, pp. 105:20-106:5 (Stevenson)). The jury's award of compensatory damages of $150,000 is not monstrously excessive when considered in light of this testimony that Spaeth's career at Walmart "was her life." Rather, the fact that Spaeth experienced prolonged depression and continues to show sadness about the loss of her 15-year career provides the rational connection between the jury's award and the evidence. *See Tomao v. Abbott Labs. Inc.*, No. 04-C-3470, 2007 WL 2225905, at *13-14 (N.D. Ill. July 31, 2007) (upholding compensatory damage award of statutory maximum as not excessive where disability discrimination left plaintiff feeling depressed, dejected, and she withdrew from family, friends, and social activity).

**B. The jury's award is roughly comparable to similar cases.**

The award also is roughly comparable to those made in other cases. It does not have to be

the exact match. *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1008 (7th Cir. 2020). As the Seventh

Circuit has explained, "Due to the highly fact-specific nature of Title VII cases, such

comparisons are rarely dispositive." *Id*. In reviewing cases from this Circuit, the amount awarded

here is similar to those awarded to others. *Id*. at 1008-09 (affirming compensatory award of

$300,000 where plaintiff testified that she suffered emotional, mental and physical distress and

worried about impact of continuing unemployment); *Farfaras v. Citizens Bank & Trust of Chi.*,

433 F.3d 558, 563, 566-67 (7th Cir. 2006) (upholding $200,000 award where plaintiff "lost self-

esteem, gained weight, had problems sleeping, changed demeanor, and became nervous");

*Deloughery v. City of Chi.*, 422 F.3d 611, 619-21 (7th Cir. 2005) (affirming $175,000

compensatory award in a failure to promote case, although plaintiff never sought professional

help for her emotional distress and defendant presented evidence that her stress stemmed from

her divorce); *Martyne v. Parkside Med. Servs.*, No. 97-C-8295, 2000 WL 748096, at *7-8 (N.D.

Ill. June 8, 2000) (upholding $302,000 compensatory damage award, observing that plaintiff's

"work was a very large part of her life; when she became unable to work, she was 'cut off from

one of the major defining aspects of [her] life.'"). Here, the jury's $150,000 award should not be

remitted where it is not an "extreme outlier." *Olian v. Bd. of Educ.*, 631 F. Supp. 2d 953, 965

(N.D. Ill. 2009) (upholding $244,000 compensatory damage award for failure to accommodate

plaintiff where cases with similar facts resulted in similar and greater awards).

C.  **If this Court remits compensatory damages, the EEOC requests a concurrent increase in punitive damages.**

Walmart's request for remittitur should be denied. If there is remittitur of compensatory

damages in any way, the EEOC requests that the Court order a concurrent increase in the amount

of punitive damages awarded, which were reduced by the Court pursuant to the operation of the

damage caps under 42 U.S.C. § 1981a. (ECF No. 244, Order, p. 1). The same procedure the

27

Court previously used to reduce the $125,150,000 award to the damage caps should be applied again to increase the award. Thus, if compensatory damages are remitted, the EEOC requests the Court "determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages." *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004).

## CONCLUSION

Walmart's motion for judgment as a matter of law under Rule 50 and for a new trial under Rule 59 should be denied. The jury's verdict was supported by law and fact. The evidence at trial supports the jury's award of punitive damages. The jury's compensatory damages award was, likewise, rationally related to the evidence and is in line with verdicts from other cases. As there is no manifest injustice in the verdict here, Walmart's motions should be denied in their entirety.

Respectfully submitted this 19th day of May 2022.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Counsel for Plaintiff

*/s/ Leslie N. Carter*
Leslie N. Carter
Senior Trial Attorney

*/s/ Carrie Vance*
Carrie Vance
Senior Trial Attorney

EEOC Milwaukee Area Office
310 West Wisconsin Avenue, Suite 500
Milwaukee, WI 53203-2292
☎ (414) 662-3711
☎ (414) 662-3686
leslie.carter@eeoc.gov
carrie.vance@eeoc.gov

28

/s/ *Greger B. Calhan*
Greger Calhan
Trial Attorney
EEOC Minneapolis Area Office
330 South Second Avenue, Suite 720
Minneapolis, MN 55401-2224
☎ (612) 552-7323
greger.calhan@eeoc.gov